Michael L. Cook (MC 7887)
Lawrence V. Gelber (LVG 9384)
Robert J. Mrofka (RM 1930)
SCHULTE ROTH & ZABEL LLP
Attorneys for the Debtor and Debtor in Possession
919 Third Avenue
New York, New York  10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                        :
In re                                                   :        Chapter 11
                                                        :
QUIGLEY COMPANY, INC.                                   :        Case No. 04-_____ (___)
                                                        :
                                                        :
                            Debtor.                     :
                                                        :
-------------------------------------------------------------------x

AFFIDAVIT OF PAUL STREET
PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

Paul Street, being duly sworn, deposes and says:

1.     I am the President and Chairman of the Board of Quigley Company, Inc.

("Quigley").  I have served in this capacity since June 27, 2003.  As such, I am familiar with

Quigley's day-to-day operations and business and financial affairs.

2.     I am authorized to submit this affidavit in support of Quigley's petition for

relief under chapter 11, title 11, United States Code (the "Bankruptcy Code") filed on the date

hereof (the "Petition Date") and the first-day motions filed by Quigley on the Petition Date.

Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal

knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning Quigley's operations and financial affairs. If I were called upon to testify, I would testify competently to the facts set forth herein.

## BACKGROUND

Quigley's History and Products

      3.      Quigley was a small refractory company founded in 1916 by Wirt Quigley. Quigley developed, produced and marketed a broad range of refractories and related products to customers in the iron, steel, glass and other industries. Quigley's primary business was the sale of a large line of specialty formulated monolithic refractory materials, including Roofchrome, a non-asbestos, monolithic slurry that markedly extended the useful life of the then standard open hearth furnace, thereby both increasing steelmaking capacity and reducing the cost of production. Quigley's products were marketed throughout the United States and Canada as well as Europe and Asia. On or about August 25, 1968, Quigley was acquired by Chas. Pfizer & Co., Inc. (now known as Pfizer Inc., "Pfizer") as part of an effort to grow its minerals business.

      4.      From around the time of World War II until the early 1970's, when the OSHA regulations were enacted, Quigley manufactured two products that contained asbestos, Insulag and Panelag. Both of these products were minor, low-cost, low-volume, narrow application products used for a short period of time in the steelmaking industry. Insulag contained a small amount of asbestos (5.62% in wet form; 9.7% in dry form). Panelag also contained a small amount of asbestos (12% in wet form; 20% in dry form). Both products were applied in a slow, wet stream mainly to coat, protect and seal vertical surfaces, such as the open-hearth's collar-level checker chamber bulkheads after cleaning. Due to their moisture levels, compositions and the manner in which they were applied, only a minimal amount of dust

(and virtually no asbestos dust) was created.  Sales of Insulag and Panelag accounted for less than 1% of Quigley's total sales.

5.      In 1992, Pfizer determined it wanted to concentrate entirely on its core health care business and divest itself of all its minerals, pigments and metals business.  In September 1992, Quigley exited the refractories business, and sold its assets to Minteq International, Inc., which acquired substantially all of Quigley's assets and assumed certain of Quigley's liabilities.  Quigley, however, retained all of its liabilities stemming from products it sold prior to the sale of the business, including its liabilities for present and future personal injury claims.  Quigley's principal business today is managing the defense, processing, settlement and other resolution of personal injury claims brought against it, which allege personal injury or wrongful death based upon purported exposure to asbestos, silica, mixed dust, talc, or vermiculite.  Quigley also operates a Claims Handling Unit.

Personal Injury Claims History and Status

6.      Quigley was first named as a defendant in asbestos-related personal injury claims in 1979 or 1980.  Although Quigley ceased manufacturing any products containing asbestos in the 1970s, and exited the refractories business in 1992, as of August 23, 2004, it has been named as a defendant in approximately 424,100 personal injury claims in approximately 147,000 civil actions brought in federal and state courts throughout the United States.  As of August 23, 2004, there are approximately 162,000 personal injury claims pending against Quigley in approximately 59,000 civil actions.

7.      Although Pfizer never produced, marketed, distributed, or sold any of Quigley's products, like Quigley, Pfizer also has been named as a defendant in numerous past and pending civil actions for personal injury allegedly attributed to asbestos or other dust products.  Based on past experience, it appears that Pfizer is named as a defendant in the

9712673.15

-3-

overwhelming number of these cases because it is Quigley's parent and is viewed as one of a shrinking number of "deep pocket" defendants.  As of August 23, 2004, Pfizer is a named co-defendant with Quigley in approximately 114,800 personal injury claims in approximately 34,000 civil actions.  In virtually all of these cases, plaintiffs have asserted claims of joint and several liability against all named defendants, including Pfizer and Quigley.  As of that same date, Pfizer is a named defendant in approximately 3,720 additional actions by approximately 10,950 personal injury claimants in which Quigley is not a named defendant.

Shared Insurance Policies and Insurance Trust

8.     As did most large companies, Pfizer purchased occurrence-based comprehensive general liability insurance policies for insurance coverage during the period October 1, 1964 through October 1, 1985, for its benefit and for its covered subsidiaries, in varying amounts in each of these years, which, among other things, cover liabilities incurred to third parties as well as associated defense costs.  In subsequent years, because of the explosion of asbestos-related claims, insurers wrote exclusions in their policies for various types of asbestos-related injuries.  Quigley is covered by these policies from and after August 25, 1968, the date Pfizer acquired Quigley's stock.

9.     Over the past twenty-five years, Pfizer and/or Quigley have been engaged in numerous insurance coverage litigations and alternative dispute resolution proceedings to secure coverage and payment from their insurers for a variety of claims.  Pfizer and Quigley have been successful in confirming insurance coverage for claims.  Consistent with their respective rights under the insurance policies and settlements with their insurers, Pfizer, Quigley and other Pfizer subsidiaries covered by these insurance policies historically have accessed the coverage provided under these policies on an as-needed basis to the extent of their covered liabilities and defense costs.  Thus, each of Pfizer and Quigley drew down on the shared

9712673.15

-4-

insurance asset on a first billed, first paid basis.  The policies are accessed and the available

coverage is drawn down by submitting bills to particular insurers with documentation supporting

the bills.

10.   The face amount of remaining insurance and insurance settlement

proceeds in which Quigley shares an interest with Pfizer currently approximate $637 million (the

"Available Insurance").  The actual recoverable amount of this insurance may be less.

11.   Over the past several years, Pfizer and Quigley engaged in negotiations

with certain of their insurers for the purpose of entering into agreements to settle various

coverage disputes or agreements to settle coverage under certain of the insurance policies.  To

date, Pfizer and Quigley have entered into 4 agreements with 14 insurers.  Under the terms of

these agreements, the insurers pay Pfizer and Quigley a cash amount up front or over time in

exchange for a release under the insurance policies being settled or commuted.  As of the

Petition Date, Pfizer and Quigley have received approximately $15 million in cash and

approximately $330 million to be received over time under these settlement agreements.  These

amounts constitute available insurance for Pfizer or Quigley to fund settlements and defense of

personal injury claims (the "Net Insurance Proceeds").

12.   For the purpose of preserving the rights of each of Pfizer and Quigley with

respect to the shared insurance policies and their historical practice of drawing on the policies on

a first billed, first paid basis, on August 27, 2004, Pfizer, Quigley, and JPMorgan Chase Bank, as

trustee, established the Pfizer/Quigley Joint Insurance Fund Trust (the "Insurance Trust").  All

Net Insurance Proceeds are required to be deposited into the Insurance Trust.  Pfizer and Quigley

are the sole beneficiaries under the Insurance Trust.  Under the Insurance Trust, the rights of

each of Pfizer and Quigley to draw on the Net Insurance Proceeds are identical in every respect

to the rights they held to draw on the settled insurance policies.  Under the terms of the Insurance

9712673.15

Trust, subject to receipt of satisfactory documentation, Quigley and Pfizer may draw on the funds in the Insurance Trust on a first billed, first paid basis, to pay settlements, judgments or defense costs relating to the types of claims that were previously covered by the settled policies, which consist primarily of personal injury claims.  To the extent the amount of Net Insurance Proceeds in the Insurance Trust is not sufficient to satisfy the amount of the bills submitted by Pfizer or Quigley, the unpaid portion of the bill is required to be paid as soon as additional Net Insurance Proceeds are deposited into the Insurance Trust before any other bill submitted by Pfizer or Quigley is paid.

13.     Since the 1980s, Quigley and Pfizer have paid approximately $1.1 billion in settlements or judgments to resolve approximately 236,630 personal injury claims and incurred approximately $181 million in defense of these claims.  Based on all historic billings to insurers as of August 23, 2004, the Available Insurance under the shared insurance policies and the Insurance Trust remains available to respond to the defense and resolution of these claims.

14.     Both Pfizer and Quigley continue to draw down on the remaining insurance coverage under the policies and the funds in the Insurance Trust at an accelerating rate, in connection with the defense and resolution of personal injury claims.  Since January 1, 2003, Pfizer and Quigley billed approximately $201 million in liability and defense payments for claims.  Although certain of these amounts allocated to Pfizer are billed to the insurance policies issued to Pfizer before Pfizer acquired Quigley (i.e., the 1964 to 1967 policies), most of these liabilities have been and will be allocated to the shared insurance policies in accordance with the terms of Pfizer and Quigley's agreements with their insurers concerning personal injury claims. Also, a portion of these amounts will be paid from the Insurance Trust.  As a result, coverage remaining under the insurance policies and funds in the Insurance Trust have been diminishing at an accelerating rate.

9712673.15

15.     Quigley has no material assets other than its rights under the insurance policies and the Insurance Trust.  As a result, Quigley relies on its rights to proceeds under the insurance policies and the funds in the Insurance Trust to pay for its substantial liabilities arising from the personal injury claims.  Historically, certain of Pfizer's and Quigley's insurers from time to time have failed to honor their obligations to make payments on a timely basis.  The insurers' failure to timely pay claims has left Quigley from time to time without financial means to pay its liability and defense obligations.  As a result, since approximately March 2003, Pfizer has provided loans and advances for the benefit of Quigley to bridge the period between Quigley's payment of settlements, judgments and defense costs and its receipt of amounts billed under the policies.  Pfizer's loans and advances are secured by the payments Quigley is entitled to receive under the policies.

Quigley's Past Efforts to Resolve Its Personal Injury Claims

16.     In an attempt to process efficiently the growing number of  personal injury claims asserted against Quigley and Pfizer, and to preserve their resources for future claims, Quigley and Pfizer executed the Agreement Concerning Asbestos-Related Claims, dated June 19, 1985 (the "Wellington Agreement").  The Wellington Agreement originally was entered into by twenty companies, which were the subject of mounting personal injury claims alleging exposure to asbestos, and those companies' insurers.  The Wellington Agreement resolved various disputes among the defendant companies and their insurers regarding the manner in which the insurance companies must respond to asbestos bodily injury claims.  The agreement provided the defendant companies, including Quigley and Pfizer, with certainty as to insurance coverage.  The agreement allocated to each signatory a fixed share of the costs of defending and settling the claims, which would get billed to the defendant companies' insurance.  The agreement also provided its signatories with a more cost-effective method of defending against

9712673.15

thousands of cases in jurisdictions located throughout the country since each company only was responsible for its share of the cost of shared legal counsel, which represented the interests of the signatories as a group. Pursuant to the Wellington Agreement, and until October 1988, the personal injury claims against Quigley and Pfizer were handled and administered by the Asbestos Claims Facility ("ACF"), which was a non-judicial forum for resolving claims.

17.     Following the dissolution of the ACF, from October 1988 to February 1, 2001, the Center for Claims Resolution (the "CCR"), a non-profit organization, handled and resolved the personal injury claims asserted against Quigley and Pfizer and other members of the CCR. The CCR differed from the Wellington Agreement because it allowed its members to adjust their allocation of the costs of defense and settlement based on whether or not they were a named defendant in a particular action. As of February 1, 2001, all remaining CCR members, including Quigley and Pfizer, began handling and resolving their own asbestos bodily injury claims. At present, the CCR continues to administer and process those claims that the CCR settled on behalf of all CCR members on or before February 1, 2001. Claims that the CCR did not settle on behalf of all CCR members on or before February 1, 2001, whether filed before or after February 1, 2001, are now resolved by each member individually. As of June 30, 2001, Quigley and Pfizer terminated their membership in the CCR.

Prepetition Settlements With Present
and Future Holders of Personal Injury Claims

18.     It is Quigley's intention to file a chapter 11 plan as soon as practicable, and to seek confirmation at the earliest possible time. Shortly before the commencement of this chapter 11 case, Pfizer entered into settlement agreements with numerous law firms who represent, upon information and belief, more than 80% of all personal injury claims against Quigley. Pfizer and Quigley have also engaged in discussions with an independent third party

9712673.15

who has agreed to serve as a futures representative in this case, subject to appropriate approval. The settlement agreements and other negotiations have resulted in consensus on the principal elements of a chapter 11 plan which would establish a trust under section 524(g) of the Bankruptcy Code.  Pfizer and Quigley would make substantial contributions to the trust, including substantial insurance and insurance proceeds and would seek the benefit of a channeling injunction.

FIRST DAY MOTIONS

19.   On the Petition Date, Quigley filed a number of "first day" motions, which if granted, will assist Quigley in making a smooth transition into chapter 11 and facilitate an orderly bankruptcy case.  Each of these motions is described below.

A.   Procedural Motions

Motion for Extension of Time to File
Schedules and Statement of Financial Affairs

20.   As described above, in excess of 160,000 plaintiffs have asserted personal injury claims against Quigley.  The information for each of these plaintiffs must be compiled and listed in Quigley's schedules and statement of financial affairs (together, the "Schedules").  The preparation of the Schedules in this case will therefore require an enormous expenditure of time and effort on the part of Quigley and its staff.  Quigley will work diligently and expeditiously on the preparation of the Schedules, but its staff is limited and its resources are strained.  In view of the amount of work entailed in completing the Schedules, Quigley is concerned that it will not be able to complete the Schedules within the fifteen day time period imposed under the Bankruptcy Rules.

21.   Pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Quigley has requested that this Court issue an order extending the

9712673.15

fifteen day period within which Quigley must file the Schedules for an additional forty days, without prejudice to Quigley's ability to request additional time should it become necessary.

Motion to Establish Notice Procedures and
Authorize Quigley or Its Agent to Mail Notices

22.    Quigley is aware of approximately 160,000 personal injury claims currently pending in different courts throughout the United States.  The cost of photocopying and postage expenses as well as other expenses associated with having to provide notice of all pleadings and other papers filed in this case to the holders of the 160,000 personal injury claims and other parties in interest would be extremely burdensome and costly to Quigley's estate.

23.    Quigley has requested that this Court authorize Quigley to establish a master service list (the "Master Service List"), which would include:  (i) the Office of the United States Trustee for the Southern District of New York; (ii) Quigley; (iii) the attorneys for Quigley; (iv) the attorneys for the committee of asbestos claimants appointed in this chapter 11 case; (v) the attorneys for any other committee appointed in this chapter 11 case; (vi) counsel for the representative appointed in this case to represent the interests of all holders of future personal injury demands against Quigley; (vii) counsel for Pfizer Inc.; (viii) those persons who have formally appeared and requested service in this case pursuant to Bankruptcy Rule 2002; and (ix) the Securities and Exchange Commission, the Internal Revenue Service and other government agencies to the extent required by the Bankruptcy Rules and the local rules of this Court.

24.    Quigley is requesting that notice of all matters covered by Bankruptcy Rule 2002 be limited to the Master Service List, any parties that have, pursuant to Bankruptcy Rule 2002, formally appeared and requested service since the last Master Service List was filed with the Court, and any party whose interests are directly affected by a specific pleading, with

9712673.15

the express exception of the following:  (i) notice of the commencement of this case, (ii) notice

of the first meeting of creditors pursuant to section 341 of the Bankruptcy Code, (iii) the time

fixed for filing proofs of claim pursuant to Bankruptcy Rule 3003(c), (iv) the time fixed for filing

objections and the hearing to consider approval of a disclosure statement or confirmation of a

plan of reorganization, and (v) notice of and transmittal of ballots for accepting or rejecting a

plan of reorganization, which shall be served on all parties consistent with any order entered by

this Court.  Quigley further proposes that the Master Service List, plus any party whose interests

are directly affected by a specific pleading, also be used for proceedings in addition to Rule 2002

matters that may be required by the Local Rules to be served upon all parties in interest.

Motion to Provide Notice to Personal Injury Claimants'
Counsel in Lieu of Notice to Personal Injury Claimants

25.    As of August 23, 2004, approximately 162,000 personal injury claims are

pending against Quigley in approximately 59,000 civil actions throughout the United States.  As

of that same date, Pfizer was a defendant in approximately 125,800 personal injury claims in

approximately 37,700 civil actions throughout the country.   The number of personal injury

claims filed against Quigley and Pfizer has increased dramatically over the years.  Historically,

Quigley and Pfizer, through various professionals, tracked the personal injury claims by

maintaining a detailed database that, *inter alia*, lists the names of the holders of the personal

injury claims.

26.    The addresses for each of the  personal injury claimants are not readily

available to Quigley or Pfizer.   Both Quigley and Pfizer historically only have maintained

address information for the counsel of record for the personal injury claimants, since all

communications regarding the personal injury claims and the various pending lawsuits have been

through and with such counsel.

9712673.15

27.      Neither Quigley nor Pfizer currently is able to obtain the addresses of many of the personal injury claimants.  In certain instances, the addresses of the personal injury claimants were never supplied to Quigley or Pfizer by their counsel.  In instances where the information was supplied, gathering the individual addresses would require a massive manual review of the actual files maintained by the various past and current counsel representing Quigley and Pfizer across the nation with respect to the personal injury claims.

28.      Throughout the course of this chapter 11 case, various notices, mailings and other communications will need to be sent to the personal injury claimants that have sued Pfizer, including those claimants in actions where Quigley is not a defendant.  For instance, Quigley will need to provide those claimants with notice of the hearing on Quigley's motion for a preliminary injunction to enjoin any and all personal injury claims from being continued or commenced against Pfizer.  By the motion, Quigley is seeking to have the notice procedures described below also apply with respect to any notices, mailings and other communications related to this chapter 11 case that need to be sent by Quigley to personal injury claimants who have asserted personal injury claims against Pfizer.

29.      In light of the limited address information that is available to Quigley and Pfizer and the practical impossibility of Quigley and Pfizer obtaining the address information for the personal injury claimants who have asserted claims against Quigley or Pfizer in any kind of a reasonable or cost-effective manner, Quigley seeks court approval, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 2002(g) and (m), to:  (i) list the addresses of counsel for the personal injury claimants who have asserted claims against Quigley and/or Pfizer on the creditor matrix filed with the Court in lieu of the actual addresses of the personal injury claimants themselves; and (ii) implement a procedure by which Quigley or its designee shall send required notices, mailings and other communications related to this chapter 11 case to the

9712673.15

-12-

address of counsel of record for the personal injury claimants who have asserted claims against either Quigley or Pfizer.

Application for Order Appointing a Legal Representative for
Future Asbestos Personal Injury Claimants

30.     Pursuant to sections 105(a), 524(g) and 1109(b) of the Bankruptcy Code, Quigley seeks the entry of an order appointing a legal representative (the "Legal Representative") in this chapter 11 case to protect the rights of persons who may, subsequent to the date of confirmation of Quigley's plan of reorganization, assert "demands" related to exposure to asbestos, silica, mixed dust, talc or vermiculite ("Asbestos-Related Claims").  The appointment of the Legal Representative is required to afford appropriate protections to persons who may subsequently hold Asbestos-Related Claims and to ensure that the Court  grant the relief requested by Quigley in this chapter 11 case consistent with notions of due process and fairness to all claimants.

31.     One of the key elements necessary to maximize the recovery of creditors in this chapter 11 case will be a channeling injunction, pursuant to which all current and future Asbestos-Related Claims and demands against Quigley and its affiliates, including Pfizer, will be channeled to a trust established under Quigley's plan of reorganization for processing and payment.   Channeling injunctions are authorized under sections 105 and 524(g) of the Bankruptcy Code and may be issued if, among other things, a Legal Representative is appointed for the purpose of protecting the rights of persons that might subsequently assert Asbestos-Related Claims against Quigley.  Pursuant to section 524(g)(4)(B)(i) of the Bankruptcy Code, a future claimants' representative bears the responsibility of acting as a "legal representative for the purposes of protecting the rights of persons that might subsequently assert demands."  The

appointment of the Legal Representative will assure that the interests of holders of future demands will be protected in this process.

32.     Quigley began interviewing candidates to serve as the Legal Representative for future claimants asserting Asbestos-Related Claims starting in June, 2004. Quigley sought an independent candidate with recognized excellence in the fields of business reorganization and bankruptcy and with complete independence.

33.     After considering the qualifications of various candidates, Quigley selected Albert Togut and recommends him to the Court as the most qualified candidate to serve as the Legal Representative in this chapter 11 case.

34.     Mr. Togut is a senior partner at Togut Segal & Segal LLP, a specialty "boutique" whose practice is limited to corporate restructurings (particularly under Chapter 11). He has specialized in bankruptcy law for approximately 30 years.  Mr. Togut has written and lectured on many topics under the former Bankruptcy Act and the Code and has been interviewed for newspaper articles and financial news radio and television programs.  For several years, Mr. Togut chaired the Plan Process Task Force of the Chapter 11 Business Bankruptcy Committee of the American Bar Association Section of Business Law, and he is now serving on the Bankruptcy Committee of the Association of the Bar of the City of New York.  He is a Fellow of the American College of Bankruptcy.

B.     Professional Retention Applications and Related Motions

Application to Retain Schulte,
Roth & Zabel LLP as Counsel

35.     Prior to the Petition Date, Quigley retained Schulte Roth & Zabel LLP ("SRZ") as its attorneys to represent Quigley in the commencement and prosecution of its chapter 11 case.  Quigley is seeking an order authorizing the retention and compensation of SRZ

9712673.15

pursuant to section 328(a) of the Bankruptcy Code.  Quigley proposes to retain SRZ to: (a) advise it with respect to its powers and duties as a debtor in possession; (b) attend meetings and negotiate with representatives of creditors and other parties in interest; (c) take all necessary actions to protect and preserve Quigley's estate, including the prosecution of actions on its behalf, the defense of any actions commenced against it, negotiations concerning all litigation involving Quigley, and objections to claims filed against Quigley's estate; (d) prepare on Quigley's behalf all motions, applications, answers, orders, reports and papers necessary to the administration of the estate; (e) take any necessary action on Quigley's behalf to (i) obtain confirmation of any plan that it may propose, (ii) implement all transactions related thereto, and (iii) prosecute any modifications thereto; (f) appear before this court, any appellate courts, and the United States Trustee, and protect the interest of Quigley's estate before such courts and the United States Trustee; (g) advise Quigley with respect to all corporate matters; and (h) perform all necessary legal services and provide all other necessary legal advice to Quigley in this chapter 11 case.

36.    SRZ will apply to the court for allowance of compensation for professional services rendered and reimbursement of expenses incurred in the case under applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  Subject to Court approval, Quigley proposes to pay SRZ its customary hourly rates for services rendered that are in effect from time to time.

Application to Retain Claims and Noticing Agent

37.    Quigley must provide notice to more than 160,000 creditors, potential creditors, and other parties in interest, including notice of the commencement of this chapter 11 case.  I believe that the office of the Clerk of the Bankruptcy Court for the Southern District of

New York (the "Clerk's Office") is not equipped to efficiently and effectively docket and

maintain the extremely large number of proofs of claim that likely will be filed in this case. The

sheer magnitude of Quigley's creditor body makes it impracticable for the Clerk's Office to

process Proofs of Claim and send notices to the creditors and other parties in interest.

38.     The most effective and efficient manner to accomplish the process of

receiving, docketing, maintaining, photocopying, and transmitting proofs of claim in this case is

for Quigley to engage an independent third party to act as an agent of the Court.

39.     Quigley seeks an order authorizing it to retain and employ a claims and

noticing agent (the "Claims, Noticing and Balloting Agent") to, among other things: (a) serve as

the Court's noticing agent to mail notices to certain of the estate's creditors and other parties in

interest, (b) provide computerized claims, objection, and balloting database services, (c) provide

expertise, consultation and assistance in ballot distribution and tabulation and, if necessary,

claims processing, and (d) with the dissemination of other administrative information related to

the Debtor's chapter 11 case.

40.     The Trumbull Group, LLC ("Trumbull") is a data processing firm that

specializes in noticing, claims processing and other administrative tasks in chapter 11 cases.

Quigley desires to engage Trumbull to send out all notices, maintain claims files and a claims

register and act as balloting agent in this chapter 11 case. I believe that such assistance will

expedite service of Rule 2002 notices, streamline the claims administration process, and permit

the Debtor to focus on its reorganization efforts.

41.     I believe that Trumbull is well qualified to provide such services. In

preparation for the filing of this case, Trumbull started performing many of the services

contemplated by the Application to retain Trumbull's services. Trumbull has assisted and

advised numerous chapter 11 debtors in connection with noticing, claims administration and

9712673.15

reconciliation and administration of plan votes.  Trumbull has provided identical or substantially

similar services in other chapter 11 asbestos bankruptcy cases.

      42.    I anticipate that Trumbull will perform the following services[1] as Claims, Noticing and Balloting Agent, at the request of Quigley or the Clerk's Office:

      (a)      Prepare and serve required notices in theses Reorganization Cases;

      (b)      Within five business days after the service of a particular notice, file with the Clerk's Office a certificate or affidavit of service;

      (c)      Maintain copies of all proofs of claim and proofs of interest filed in these cases;

      (d)      Service of pleadings as required by Quigley;

Motion to Retain Ordinary Course Professionals

      43.    Prior to the Petition Date, Quigley employed various professionals in the

ordinary course of its business (the "Ordinary Course Professionals") to render services relating

to the management, defense and settlement of the personal injury claims.  Given the prominent

role personal injury claims will play in Quigley's chapter 11 case, the services of these Ordinary

Course Professionals will continue to be required (although on a much reduced basis) monitoring

the cases seeking to stay the actions, in potentially removing the hundreds of thousands of

personal injury claims, responding to motions for remand filed by plaintiffs, and in the

management of such claims by Quigley as a debtor in possession under the Bankruptcy Code.

      44.    Quigley is seeking entry of an order authorizing the retention and

compensation of the Ordinary Course Professionals without the necessity of filing formal

retention and fee applications.  All professionals utilized by Quigley in connection with the

administration of this chapter 11 case will be retained by Quigley pursuant to a formal retention

---

[1] The following is only a summary of the services to be provides by Trumbull.  Interested parties are referred to the affidavit of Lorenzo Mendizabal, submitted in support of the application, for a more complete understanding of the terms of Trumbull's retention.

9712673.15

application and compensated pursuant to the formal fee application procedures approved by the Court. It would severely hinder the administration of Quigley's estate if Quigley was required (i) to submit to the Court an application, affidavit and proposed retention order for each Ordinary Course Professional; (ii) to wait until such order is approved before such Ordinary Course Professional continues to render services; and (iii) to withhold payment of the normal fees and expenses of the Ordinary Course Professionals until they comply with the compensation and reimbursement procedures applicable to all chapter 11 professionals. Quigley is requesting that it be authorized to retain the Ordinary Course Professionals on the procedures described in the motion.

Motion to Establish Interim Compensation and
Expense Reimbursement Procedures for Chapter 11 Professionals

45.     Contemporaneously herewith, Quigley is seeking approval to employ Schulte Roth & Zabel LLP as counsel in connection with the commencement and prosecution of its chapter 11 case. Quigley anticipates that it may need to retain other professionals in connection with its chapter 11 case. One or more statutory committees, if appointed, and a representative of the holders of future personal injury demands against Quigley will also be appointed in this case, and will likely retain counsel, and possibly other professionals, to represent them.

46.     Quigley seeks entry of an order pursuant to sections 105(a) and 331 of the Bankruptcy Code establishing an orderly, regular process for allowance and payment of compensation and reimbursement for attorneys and other professionals whose services are authorized by this Court pursuant to section 327, 524(g) or 1103 of the Bankruptcy Code, including any person appointed to represent the interests of the holders of future personal injury demands against Quigley, and its professionals, who will be required to file applications for

9712673.15

allowance of compensation and reimbursement of expenses pursuant to sections 330 and 331 of the Bankruptcy Code.  In addition, Quigley seeks entry of an order establishing a procedure for reimbursement of reasonable out-of-pocket expenses incurred by members of any statutory committees appointed in this case.

47.    In general, the proposed procedure, which is described in detail in the motion, would require the presentation of a statement to certain parties for interim approval and allowance of compensation for professional services rendered and reimbursement of expenses incurred by each professional during the immediately preceding month.  If no party timely objects to such statements, Quigley would be authorized to pay each professional eighty percent (80%) of the amount of fees incurred for the preceding month, and one hundred percent (100%) of disbursements for the preceding month.  These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process, approximately every 120 days.

C.    Motions Pertaining to Business Operations

Motion to Pay Prepetition Wages of Employees
and Reimbursable Expenses and Requiring Banks
to Honor Checks for Such Wages and Expenses

48.    Quigley currently employs a total of approximately nine employees (collectively, the "Employees").  All of the Employees are employees at will that are paid semimonthly.  In the ordinary course of Quigley's business, Quigley incurs payroll obligations to the Employees for the performance of services rendered by such employees.  Employees are paid semimonthly in arrears on the 15th and last day of each month.  The average weekly gross payroll for Employees is approximately $42,500.

49.    In addition to the Employees, Quigley retains the services of approximately twenty-three independent contractors, who provide contract labor, consulting and

9712673.15

full time temporary services to Quigley. These independent contactors are paid on an hourly

basis billed in arrears. Twenty-two of the independent contractors are retained through several

temporary employment agencies. The independent contractors that are hired through a

temporary employment agency are paid through their respective agencies. The average monthly

expense for these independent contractors is approximately $158,000.

50.     I estimate that, as of the Petition Date, approximately $8,823 in prepetition

wages and compensation earned by its Employees prior to the Petition Date was unpaid, together

with approximately $23,154 for the services of the independent contractors (the "Unpaid

Compensation"). Items of Unpaid Compensation were due and owing on the Petition Date

because, *inter alia*:

> (i)     Employees are paid in arrears in the ordinary course of Quigley's
> business;

> (ii)     Quigley's chapter 11 petition was filed in the middle of Quigley's
> regular and customary payroll periods; and

> (iii)     some payroll checks issued to Employees prior to the Petition Date
> may not have been presented for payment or cleared the banking system and,
> accordingly, have not been honored and paid as of the Petition Date.

The request to pay Unpaid Compensation relates solely to Employees and independent

contractors who are employed or retained as of the Petition Date.

51.     Quigley reimburses its Employees for business expenses incurred in the

performance of their duties. Reimbursable business expenses include, among other expenses,

those incurred in connection with business travel, long distance and cellular phone charges,

meals, and supplies (collectively, the "Reimbursable Business Expenses").

9712673.15

52.     I estimate that, as of the Petition Date, an aggregate of approximately $1,000 will be owed on account of Reimbursable Business Expenses, and will be payable upon submission of appropriate documentation and approval.

53.     Any delay in paying the Prepetition Employee Obligations will adversely impact Quigley's relationship with its Employees and will irreparably impair the Employees' morale, dedication, confidence, and cooperation.   The Employees' support for Quigley's reorganization efforts is critical to the success of those efforts.   At this early stage, Quigley simply cannot risk the substantial damage to its operations that would inevitably attend any decline in the Employees' morale attributable to Quigley's failure to pay wages, compensation and other similar items.   Furthermore, if the Prepetition Employee Obligations are not paid promptly, the Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable Employees to meet their own personal financial obligations.

54.     As a result, Quigley is seeking entry of an order:  (i) authorizing Quigley to pay, in its sole discretion, prepetition obligations relating to the Employees, including the Unpaid Compensation and Reimbursable Business Expenses and all costs incident to the foregoing, and to continue to honor its practices, programs, and policies with respect to their Employees, as such practices, programs and policies were in effect as of the Petition Date; and (ii) authorizing and directing applicable banks and other financial institutions to receive, process and pay any and all checks drawn on Quigley's payroll and general disbursement accounts, and automatic payroll transfers to the extent that such checks or transfers relate to any of the foregoing.

9712673.15

Motion to Maintain Cash Management
<u>System and Existing Bank Accounts</u>

55.    Quigley maintains three bank accounts (collectively, the "Bank Accounts") at JPMorgan Chase Bank:  a demand deposit account (the "Demand Deposit Account"), an accounts payable account (the "Positive Pay Account"), and a payroll account (the "Payroll Account").  In accordance with the terms of a prepetition loan agreement with Pfizer, Quigley entered into a valid, enforceable and effective deposit account control agreement in favor of Pfizer with respect to the Demand Deposit Account (the "Blocked Account Control Agreement").

56.    As described in more detail below, prior to the Petition Date, Quigley obtained loans under a prepetition loan agreement with Pfizer to pay settlements and judgments pending reimbursement from its insurers, and to fund Quigley's payroll and operating capital.  In accordance with the terms of that loan agreement, proceeds of loan advances under the agreement were deposited into the Demand Deposit Account.  Thereafter, such funds were transferred, as needed, to:  (i) the Positive Pay Account to pay settlements, judgments, and defense costs of the personal injury claims, and to pay office rent, utilities, and Quigley's other operating expenses; and (ii) to the Payroll Account to fund payroll for Quigley's employees.

57.    In addition, prior to the Petition Date, Quigley received from time to time in the ordinary course of business either wire transfers or checks from the shared insurance policies with respect to the settlements, judgments and defense costs of the personal injury claims.  Once such insurance payments were received, such proceeds were also deposited into the Demand Deposit Account.  Since the relevant settlements, judgments and defense costs had already been paid from the proceeds of loan advances from Pfizer, the insurance payments, once

9712673.15

received, were then paid to Pfizer in repayment of the loan advances. The Demand Deposit Account earns minimal interest.

58.    Quigley is seeking an order authorizing it to continue to maintain and to utilize its cash management system postpetition on substantially the same basis as existed prepetition, as modified by any debtor in possession financing agreement approved by this Court, and provided that no funds are to be paid or applied in reduction of any prepetition indebtedness, except as permitted by any debtor in possession financing approved by this Court, or other order of the Court.

59.    In connection with the continuation of its cash management system, Quigley seeks a court order dispensing with those provisions of the United States Trustee's Guidelines, which would require that (i) the Bank Accounts be closed and that new postpetition bank accounts be opened, and (ii) all existing business forms, including checks, be replaced with documents specifically identifying Quigley as debtor in possession.

60.    Authorizing Quigley to continue to use its existing Bank Accounts and current cash management system is essential to providing Quigley with a smooth and orderly transition into chapter 11 and to avoid disruption of its business. The bank at which the Bank Accounts are maintained has been advised not to honor checks issued prior to the Petition Date except as specifically authorized by order of this Court. Furthermore, Quigley will confirm with Chase whether there are any prepetition checks outstanding as of the Petition Date.

D.    Quigley's Motion for Postpetition Financing

61.    Prior to the Petition Date, Quigley's main expenses were those associated with managing and defending the personal injury claims and paying settlements, judgments and defense costs related to these claims. Most of these costs were covered by the shared insurance policies and the Insurance Trust. However, many insurers have failed to honor their obligations

9712673.15

to make payments on a timely basis.  These delays have had a significant impact on Quigley's ability to timely meet its own financial commitments.

62.    As a result, prior to the Petition Date, Quigley obtained loans and advances from Pfizer pursuant to that certain Credit and Security Agreement, dated as of March 6, 2003 (as amended on May 29, 2003 and October 29, 2003), between Quigley, as borrower, and Pfizer, as lender (the "Prepetition Loan Agreement") and the agreements, documents, and instruments executed and/or delivered in connection therewith.  Quigley used the funds it borrowed under the Prepetition Loan Agreement to bridge the period between Quigley's billing of incurred liability under the shared insurance policies and the time of receipt of these funds.

63.    As of the Petition Date, approximately $46 million in prepetition revolving credit loans were outstanding under the Prepetition Loan Agreement.  To secure its obligations under the Prepetition Loan Agreement, Quigley granted Pfizer a security interest in virtually all of its assets, including, without limitation, Quigley's rights under certain insurance policies that potentially provide coverage or indemnity for Quigley's personal injury claims.  In addition, Quigley assigned and pledged to Pfizer the proceeds of those insurance policies.

64.    Quigley has an immediate need for financing and use of cash collateral. Quigley requires working capital to continue funding its business operations and the payment of administrative expenses incurred in this chapter 11 case.  As a result of the filing of this case, Quigley is no longer entitled to borrow under the Prepetition Loan Agreement.  To continue its day-to-day operations, Quigley needs the use of Pfizer's cash collateral, which is subject to Pfizer's liens under the Prepetition Loan Agreement.  Quigley has insufficient available cash to meet ongoing obligations necessary to accomplish its objectives in this chapter 11 case.  As a result, Quigley urgently needs access to cash collateral, credit and additional capital.  Lack of

immediate availability of cash collateral and new credit will severely imperil Quigley's efforts to successfully conduct its chapter 11 case and maximize a recovery for stakeholders.

65.     Quigley has made a concerted, good-faith effort to obtain credit on an unsecured basis.   However, Quigley lacks hard assets and traditional ongoing business operations, has extensive exposure to the personal injury claims, and a significant portion of its assets secure the Prepetition Obligations.   As a result, although Quigley solicited sources of financing other than Pfizer, obtaining such financing from a third party is, under the circumstances, virtually impossible.   Accordingly, after carefully evaluating alternative sources of credit, Quigley determined that its efforts to arrange postpetition financing should be focused on Pfizer.   Quigley requested postpetition financing from Pfizer on both an unsecured and non-priming basis.   Pfizer was unwilling to extend loans to Quigley in the absence of the protections described in the motion.   Given the current state of its business, the large number of personal injury claims, and the fact that Quigley's prepetition obligations to Pfizer are secured by a significant portion of Quigley's assets, Quigley determined in its reasonable business judgment that it has no other options from which to obtain postpetition financing, other than from Pfizer pursuant to the Amended Credit Agreement (as defined below) negotiated between Quigley and Pfizer.   Nevertheless, Quigley believes that the proposal for the Credit Agreement received from Pfizer is fair, competitive and addresses Quigley's working capital and liquidity needs.

66.     Accordingly, Quigley determined in the exercise of its sound business judgment that it needs access to cash collateral and borrowings to be provided under the Credit Agreement.   Prior to the Petition Date, Quigley engaged in good faith, arm's-length negotiations with Pfizer to discuss the terms of the Credit Agreement in the context of a chapter 11 case. These negotiations culminated in an agreement by Pfizer to provide postpetition financing to Quigley on the terms and subject to the conditions set forth in Credit Agreement and described in

9712673.15

the motion. Pfizer's cash collateral, together with the loan facility provided under the Credit Agreement, are anticipated to provide the necessary cash for Quigley to administer its chapter 11 case. In sum, without immediate access to cash collateral and postpetition financing, Quigley expects to suffer an acute cash shortage that would immediately and irreparably harm its estate and creditors.

67.     Pursuant to the motion, Quigley is seeking entry of an interim and final order authorizing, among other things:

(i)     Quigley to use the funds in a secured cash collateral deposit account maintained at JPMorgan Chase Bank (the "Secured Account") on an interim basis for a period through and including the date of a final hearing on the motion up to a maximum principal amount of $4 million ("Interim Cash Collateral"), and subject to approval at the final hearing use cash collateral up to a maximum principal amount of $20 million ("Final Cash Collateral" and, collectively, "Cash Collateral");

(ii)     Quigley to obtain senior secured superpriority postpetition financing from Pfizer pursuant to sections 364(c) and (d) of the Bankruptcy Code in the form of a revolving credit facility up to a maximum principal amount, on an interim basis, of $4 million in the event the Interim Cash Collateral amounts to less than that amount (the "Interim DIP Facility") and, after a final order is entered by the Court, availability under the credit facility would be increased to $20 million in the event the Final Cash Collateral amounts to less than that amount (the "Total DIP Facility"), plus interest, fees and other amounts accruing thereon from time to time pursuant to the terms of a postpetition amendment to the Prepetition Loan Agreement (as approved, the "Amended Credit Agreement"), provided that borrowing availability thereunder would be reduced by Cash Collateral that Quigley has used or which is available for Quigley to use in the Secured Account;

9712673.15

(iii)     Quigley to (a) ratify and reaffirm the liens and security interests granted to Pfizer in it prepetition collateral, (b) grant priming liens in its prepetition collateral to Pfizer as DIP lender, and also for the diminution in value of Pfizer's prepetition collateral resulting from Quigley's use of Cash Collateral and (c) grant in favor of Pfizer first priority liens and security interests in substantially all of Quigley's postpetition assets and after-acquired property in order to secure Quigley's obligations under the Amended Credit Agreement;

(iv)     Quigley to grant administrative superpriority claims in favor of Pfizer with respect to Quigley's postpetition obligations under the Amended Credit Agreement, and as adequate protection for Quigley's use of Pfizer's cash collateral, which claims are to be paid in full prior to any and all administrative expenses of the kinds specified in sections 503(b) and 507(b) of the Bankruptcy Code (other than as described herein); and

(v)     Quigley to enter into the Amended Credit Amendment, which ratifies, extends, adopts, amends and restates the Prepetition Loan Agreement and the other existing loan, financing and security agreements by and among Quigley and Pfizer.

## ADDITIONAL INFORMATION
## REQUIRED BY LOCAL RULE 1007-2

68.     Unless otherwise indicated, the financial information contained herein is unaudited.

69.     Pursuant to Fed. R. Bankr. P. 1007(d) and Local Bankruptcy Rule 1007-2, this affidavit includes the following information:

(i)     Set forth on Schedule 1 hereto is a list of the names, addresses, and, where available, telephone numbers, of the creditors holding the twenty-two largest unsecured claims against Quigley, excluding insiders.  Such list includes the amount of the claim, the nature of the claim (i.e., trade debt, bank loan, government contract, etc.) and, if appropriate, an indication of

9712673.15

whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to certain reservations of rights stated on Schedule 1 regarding, *inter alia*, the actual validity of any such claims.

(ii)     Schedule 2 consists of the name and address of Quigley's secured creditor.

(iii)     Quigley's consolidated assets and liabilities as of July 31, 2004 are approximately $155,187 and $141,933, respectively.

(iv)     Quigley has no publicly held shares of stock, debentures, or other securities, and no shares are held by Quigley's officers and directors.  Quigley is a wholly-owned subsidiary of Pfizer Inc.

(v)     Set forth on Schedule 4 is a list of the premises owned, leased, or held under other arrangement from which Quigley operates its business.

(vi)     Set forth on Schedule 5 is a list of the locations of Quigley's substantial assets in the United States and abroad, including its books and records.

(vii)     Set forth on Schedule 6 are the names of the individuals who comprise Quigley's existing senior management, and their tenure and positions with Quigley.

(viii)     A description of the nature and present status of each action or proceeding, pending or threatened, against Quigley or its property where a judgment against Quigley or a seizure of property may be imminent, is too voluminous to attach to this document, and has been submitted separately on a CD Rom to this Court.

(ix)     Quigley has nine employees.  Set forth on Schedule 8 are the amounts required to be paid to Quigley's employees during the 30 day period after the Petition Date.

9712673.15

(x)    Set forth on Schedule 9 hereto are the amounts proposed to be paid to

Quigley's officers, directors, stockholders and consultants for services for the thirty-day period

following the Petition Date.

/s/ Paul A. Street
Paul A. Street
President

Sworn to before me this
2nd day of September, 2004

/s/ Kathleen C. Falco
Kathleen C. Falco
Notary Public
Fairfield City, CT
My Commission Expires 2-28-2007

9712673.15

## SCHEDULE 1

### LIST OF CREDITORS HOLDING 20 LARGEST UNSECURED CLAIMS

The following is a list of Quigley Company, Inc.'s ("Quigley") creditors holding the 20 largest unsecured claims.  This list has been prepared in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure.  This list does not include (1) persons who come within the definition of "insider" set forth in 11 U.S.C. § 101, or (2) secured creditors unless the value of the collateral is less than the total amount of such creditor's claim.  The information set forth herein shall not constitute an admission of liability by, nor is it binding on, Quigley.  This list reflects amounts as of September 2, 2004.

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code of Law firm representing creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| Ytuarte, Estele | Baron & Budd, P.C. Suite 1100 3102 Oak Lawn Ave. Dallas, TX 75219 Attn:  Natalie Duncan, Esq. Tel:  214-521-3605 Fax:  214-520-1181 | Judgment currently on appeal | Disputed | $2,795,731.52 |
| Estate of Luis Ytuarte | Baron & Budd, P.C. Suite 1100 3102 Oak Lawn Ave. Dallas, TX 75219 Attn:  Natalie Duncan, Esq. Tel:  214-521-3605 Fax:  214-520-1181 | Judgment currently on appeal | Disputed | $1,310,745.06 |
| Estate of Jerry Freeman | Waters and Kraus, LLP Suite 3000 3219 McKinney Avenue Dallas, TX 75204 Attn:  Andy Waters, Esq. Tel:  214-357-6244 Fax:  214-357-7252 | Judgment currently on appeal | Disputed | $1,304,948.40 |
| Geritz, William F. | Parker, Dumler & Kiely, LLP 36 S. Charles Street Suite 2200 Baltimore, MD 21201 Attn:  Matthew E. Kiely, Esq. Tel:  410-625-9330 Fax:  410-625-9309 | Settlement of litigation | Contingent | $665,000.00 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code of Law firm representing creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| Monk, William Lee | Kaeske Law Firm<br>6301 Gaston Avenue<br>Suite 735<br>Dallas, TX 75214<br>Attn: Mike Kaeske, Esq.<br>Tel: 214-821-1221<br>Fax: 214-821-0977 | Settlement of litigation | Contingent | $476,000.00 |
| Anastasio, Edward | Weitz & Luxenberg, P.C.<br>180 Maiden Lane<br>New York, NY 10038<br>Attn: Charles Ferguson, Esq.<br>Tel: 212-558-5500<br>Fax: 212-344-5461 | Settlement of litigation | Contingent | $420,000.00 |
| Hill, Lester Van | Silber Pearlman LLP<br>5th Floor LB 32<br>2711 N. Haskell Ave., 5th Fl.<br>Dallas, TX 75204<br>Attn: Steven T. Baron, Esq.<br>Tel: 214-874-7000<br>Fax: 214-824-8100 | Settlement of litigation | Contingent | $450,000.00 |
| Molinari, George E. | Weitz & Luxenberg, P.C.<br>180 Maiden Lane<br>New York, NY 10038<br>Attn: Charles Ferguson, Esq.<br>Tel: 212-558-5500<br>Fax: 212-344-5461 | Settlement of litigation | Contingent | $280,000.00 |
| Curreri, Angelo | Weitz & Luxenberg, P.C.<br>180 Maiden Lane<br>New York, NY 10038<br>Attn: Charles Ferguson, Esq.<br>Tel: 212-558-5500<br>Fax: 212-344-5461 | Settlement of litigation | Contingent | $266,000.00 |
| Bostic, Timothy | Baron & Budd, P.C.<br>3102 Oak Lawn Avenue<br>Suite 1100<br>Dallas, TX 75219<br>Tel.: 214-521-3605<br>Fax: 214-520-1181<br>Attn: Natalie Duncan, Esq. | Settlement of litigation | Contingent | $350,000.00 |
| Mazza, Vincent J. | Weitz & Luxenberg, P.C.<br>180 Maiden Lane<br>New York, NY 10038<br>Attn: Charles Ferguson, Esq.<br>Tel: 212-558-5500<br>Fax: 212-344-5461 | Settlement of litigation | Contingent | $238,350.00 |

9712673.15

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code of Law firm representing creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| Iacoviello, Vito S. | Weitz & Luxenberg, P.C.<br>180 Maiden Lane<br>New York, NY  10038<br>Attn:  Charles Ferguson, Esq.<br>Tel:  212-558-5500<br>Fax:  212-344-5461 | Settlement of litigation | Contingent | $238,350.00 |
| Renow, Alex | Weitz & Luxenberg, P.C.<br>180 Maiden Lane<br>New York, NY  10038<br>Attn:  Charles Ferguson, Esq.<br>Tel:  212-558-5500<br>Fax:  212-344-5461 | Settlement of litigation | Contingent | $210,000.00 |
| Altimore, Louise | Heard Robins Cloud<br>Lubel & Greenwood LLP<br>910 Travis St.<br>Suite 2020<br>Houston, TX  77002<br>Attn:  Ian P. Cloud, Esq.<br>Tel.:  713-650-1200<br>Fax:  713-650-1400 | Settlement of litigation | Contingent | $210,000.00 |
| Drummond, James R. | Heard Robins Cloud Lubel & Greenwood LLP<br>910 Travis St.<br>Suite 2020<br>Houston, TX  77002<br>Attn:  Ian P. Cloud, Esq.<br>Tel.:  713-650-1200<br>Fax:  713-650-1400 | Settlement of litigation | Contingent | $210,000.00 |
| Lindelsee, Lee | Kaeske Law Firm<br>6301 Gaston Avenue<br>Suite 735<br>Dallas, TX  75214<br>Attn:  Mike Kaeske, Esq.<br>Tel: 214-821-1221<br>Fax:  214-821-0977 | Settlement of litigation | Contingent | $206,500.00 |
| Mellendorf, Donald | Law Offices of<br>Cooney & Conway<br>120 North Lasalle Street<br>30th Floor<br>Chicago, IL  60602<br>Attn:  John D. Cooney, Esq.<br>Tel.:  312-236-6166<br>Fax:  312-236-3029 | Settlement of litigation | Contingent | $157,500.00 |

| Name of creditor and complete mailing address including zip code | Name, telephone number and complete mailing address, including zip code of Law firm representing creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if secured also state value of security) |
|---|---|---|---|---|
| Kearns, John N. | Weitz & Luxenberg, P.C.<br>180 Maiden Lane<br>New York, NY 10038<br>Attn: Charles Ferguson, Esq.<br>Tel: 212-558-5500<br>Fax: 212-344-5461 | Settlement of litigation | Contingent | $140,000.00 |
| Taylor, Robert | Kaeske Law Firm<br>6301 Gaston Avenue<br>Suite 735<br>Dallas, TX 75214<br>Attn: Mike Kaeske, Esq.<br>Tel: 214-821-1221<br>Fax: 214-821-0977 | Settlement of litigation | Contingent | $140,000.00 |
| Locke, James | The David Law Firm<br>10655 Six Pines Drive #260<br>The Woodlands, TX 77380<br>Attn: Jonathan David, Esq.<br>Tel.: 281-296-9090<br>Fax: 281-296-9494 | Settlement of litigation | Contingent | $122,500.00 |

**SCHEDULE 2**

**CREDITORS HOLDING 5 LARGEST SECURED CLAIMS**

The information set forth herein shall not constitute an admission of liability by, nor is it binding on, Quigley.

| Creditor's name and mailing address including zip code | Amount of claim without deducting value of collateral |
|---|---|
| Pfizer Inc.<br>235 East 42nd Street<br>New York, New York  10017 | $46,014,833 (As of September 2, 2004) |

**SCHEDULE 3**

**NUMBER AND CLASSES
OF SHARES OF STOCK, DEBENTURES, AND OTHER
SECURITIES OF QUIGLEY COMPANY, INC. THAT ARE PUBLICLY
HELD, AND THE NUMBER OF REGISTERED HOLDERS THEREOF,
LISTING SEPARATELY THOSE SECURITIES HELD BY EACH OF QUIGLEY
COMPANY'S OFFICERS AND DIRECTORS AND THE AMOUNTS SO HELD**

| Type of Security | Number of Shares | Number of Registered Holders | As of Date |
|---|---|---|---|
| N/A | N/A | N/A | N/A |

| Name of Officer or Director | Number of Shares Owned of Record | As of Date |
|---|---|---|
| N/A | N/A | N/A |

## SCHEDULE 4

### PREMISES OWNED, LEASED, OR HELD UNDER OTHER ARRANGEMENT FROM WHICH QUIGLEY COMPANY, INC. OPERATES ITS BUSINESS

### Real Property Owned

NONE

### Real Property Leases

| Name and Address of SubLandlord | Location of Premises | Monthly Basic Rental and Other Charges | Lease Expiration Date | Outstanding Security Deposit |
|---|---|---|---|---|
| Aquaries, L.L.C. 521 5th Avenue New York, NY 10017 | 52 Vanderbilt Avenue, New York, NY 10017 | $27,377.24 | January 30, 2008 | None |

**SCHEDULE 5**

**LOCATION OF QUIGLEY COMPANY, INC.'S
SUBSTANTIAL ASSETS IN THE UNITED STATES, AND
THE NATURE, LOCATION, AND VALUE OF ANY ASSETS
HELD BY QUIGLEY COMPANY, INC. OUTSIDE
THE TERRITORIAL LIMITS OF THE UNITED STATES**

Quigley's corporate books and records are maintained at its headquarters, at 52 Vanderbilt Ave., New York, NY 10017.

Quigley's material assets consist of insurance policies which are primarily located at its corporate offices in New York, New York.  Additionally, Quigley is a joint beneficiary with Pfizer under the Pfizer/Quigley Joint Insurance Fund Trust, which is located at JPMorgan Chase Bank in New York, New York.

9712673.15

**SCHEDULE 6**

**MEMBERS OF QUIGLEY COMPANY, INC.'S EXISTING SENIOR
MANAGEMENT AND MEMBERS OF ITS BOARD OF DIRECTORS
AND THEIR TENURE WITH QUIGLEY COMPANY**

| Name | Positions and Responsibilities | Tenure with Quigley |
|---|---|---|
| Paul Street | President, Secretary and Chairman of the Board | May 27, 2003 – present |
| Charles Raeburn | Director | July 30, 2002 – present |
| Kevin Altit | Director | June 2004 – present |
| Kim Jenkins | Senior Vice President, Treasurer and Director of Claims Handling Unit | June 2004 – present |

9712673.15

**SCHEDULE 7**

**PENDING OR THREATENED ACTIONS
AGAINST QUIGLEY COMPANY OR ITS PROPERTY
WHERE A JUDGMENT AGAINST QUIGLEY COMPANY, INC.
OR A SEIZURE OF PROPERTY MAY BE IMMINENT**

Please see CD-Rom which has been filed separately with the Court.

9712673.15

## SCHEDULE 8

**CERTAIN AMOUNTS PROPOSED TO BE PAID BY
QUIGLEY COMPANY, INC. FOR WEEKLY EMPLOYEE PAYROLL
FOR THE 30-DAY PERIOD FOLLOWING THE COMMENCEMENT DATE**

| Payments to Employees |
| --- |
| $ 89,000 |

9712673.15

## SCHEDULE 9

## AMOUNTS PROPOSED TO BE PAID TO QUIGLEY COMPANY, INC.'S OFFICERS, DIRECTORS, STOCKHOLDERS AND CONSULTANTS FOR SERVICES FOR THE 30-DAY PERIOD FOLLOWING THE COMMENCEMENT DATE

| Payments to Officers, Directors, Stockholders and Consultants for Services |
| --- |
| $ 75,000 |

9712673.15