Michael L. Cook (MC 7887)
Robert J. Mrofka (RM 1930)
Leslie W. Chervokas (LC 5023)
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

Proposed Attorneys for Quigley Company, Inc.


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
In re                                            :
                                                 :        Chapter 11
QUIGLEY COMPANY, INC.,                            :
                                                 :        Case No. 04-_____ (___)
                                                 :
                          Debtor.                :
                                                 :
-------------------------------------------------------------------x


QUIGLEY COMPANY, INC.'S MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS: (I) AUTHORIZING POSTPETITION FINANCING;
(II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING THE USE
OF CASH COLLATERAL; (IV) AUTHORIZING QUIGLEY COMPANY,
INC. TO ENTER INTO FINANCING AGREEMENTS; (V) MODIFYING THE
AUTOMATIC STAY; (VI) GRANTING REPLACEMENT LIENS AND RIGHTS
TO ADEQUATE PROTECTION; AND (VII) SCHEDULING A FINAL HEARING


INTRODUCTION

1.      Quigley Company, Inc. ("Quigley"), debtor and debtor in

possession, submits this motion (the "Motion") pursuant to sections 105(a), 361, 362,

363, and 364 of title 11, United States Code (the "Bankruptcy Code") and Rules 4001(b)

and (c) and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for this Court (the "Local Rules"), for entry of an order authorizing Quigley to use cash collateral and obtain postpetition financing from Pfizer Inc. ("Pfizer" or the "Lender") in the form of a revolving credit pursuant to the terms and conditions of Amendment No. 3 to Credit and Security Agreement between Quigley, as borrower, and Pfizer, as lender, substantially in the form attached hereto as Exhibit A (the "Amended Credit Agreement").

        2.      Prior to September 3, 2004 (the "Petition Date"), Pfizer made secured loans and advances to Quigley under the Credit and Security Agreement, dated as of March 6, 2003 (as amended on May 29, 2003 and October 29, 2003), a copy of which is attached hereto as Exhibit B (the "Prepetition Credit Agreement"), which are secured by, among other property and assets, Quigley's right to receive proceeds from insurance policies purchased by Pfizer in which Quigley is covered, and the funds held in Quigley's deposit account maintained by JPMorgan Chase Bank (the "Secured Account") for the benefit of the Lender where the insurance proceeds and other funds of Quigley are deposited.  As of the Petition Date, Quigley had borrowed secured loans and advances on a revolving basis under the Prepetition Credit Agreement in the aggregate principal amount outstanding of $46,014,833, plus accrued and unpaid interest, fees and other amounts thereon pursuant to the terms of the Prepetition Credit Agreement (collectively, the "Prepetition Obligations").

        3.      Under the terms of the Amended Credit Agreement, upon approval of the Court pursuant to an interim order, Quigley would be authorized to use the funds in the Secured Account, and other insurance receivables and amounts held by Quigley as of

the Petition Date, which represents the Lender's cash collateral for the Prepetition Obligations pursuant to section 363(a) of the Bankruptcy Code ("Cash Collateral") on an interim basis up to a maximum principal amount of $4 million ("Interim Cash Collateral"). In the event the amount of Interim Cash Collateral is less than $4 million, Quigley would be permitted to obtain postpetition financing from Pfizer in the form of a revolving credit facility up to a maximum principal amount of $4 million (the "Interim DIP Facility"), provided that availability under the Interim DIP Facility would be reduced by amounts on deposit in the Secured Account and any Cash Collateral that Quigley may have used.

4.       Upon entry of a final order by the Court approving the Amended Credit Agreement on a permanent basis, Quigley would be authorized to use Cash Collateral up to a maximum of $20 million (the "Final Cash Collateral"). In the event the amount of Final Cash Collateral is less than $20 million, Quigley would be permitted to obtain permanent postpetition financing from Pfizer in the form of a revolving credit facility up to a maximum principal amount of $20 million, inclusive of the $4 million extended pursuant to the Interim DIP Facility (the "Total DIP Facility"), provided that availability under the Total DIP Facility would be reduced by amounts on deposit in the Secured Account and any Cash Collateral that Quigley may have used.

5.       As security for the full and timely payment and performance of the obligations of Quigley under the Interim DIP Facility and Total DIP Facility, including all principal, interest and other amounts accruing thereon pursuant to the terms of the Amended Credit Agreement, the Interim Order, as defined below, and the Final Order, as defined below, (collectively, "Postpetition Obligations"), the Lender will receive,

pursuant to sections 364(c)(2) and (d) of the Bankruptcy Code, subject only to the Carve Out Expenses, as defined below, a first priming lien in the Prepetition Collateral and a first lien in the Postpetition Collateral (collectively, the "DIP Liens"). In addition, all of the Postpetition Obligations shall have the status of administrative expenses, in accordance with section 364(c)(1) of the Bankruptcy Code, having priority over any and all expenses and claims of Quigley (the "Superpriority Claims"), subject and subordinate only to the Carve Out Expenses, as defined below.

6. Any holder of a valid, perfected and non-avoidable lien against the Prepetition Collateral, including the Lender, will receive, as adequate protection for the granting of the priming liens, a replacement second priming lien in the Prepetition Collateral and a second lien in the Postpetition Collateral, and the Lender will also receive, for Quigley's postpetition use of the Lender's Cash Collateral, a replacement second priming lien in the Prepetition Collateral and a replacement second lien in the Postpetition Collateral (collectively, the "Adequate Protection Liens"). In addition, to the extent the Adequate Protection Liens described above are not adequate to protect the holders of such liens against any diminution in value of their collateral, the obligations secured by the Adequate Protection Liens will have priority in this chapter 11 case in accordance with the provisions of sections 503(b) and 507(b) of the Bankruptcy Code over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code (the "Adequate Protection Claims"), subject and subordinate only to the Superpriority Claims and the Carve Out Expenses.

7. As explained below, Quigley has an immediate need for postpetition financing and use of the Cash Collateral. Quigley requires working capital to

continue to fund its business operations and to pay administrative expenses incurred in this chapter 11 case.  By this Motion, Quigley seeks the following relief:

(i)      Entry of an interim order (the "Interim Order") substantially in the proposed form attached hereto as Exhibit C[1]:

(a)      Authorizing Quigley, under section 363(e) of the Bankruptcy Code and Bankruptcy Rule 6004, to use Interim Cash Collateral on an interim basis up to a maximum principal amount of $4 million;

(b)      Authorizing Quigley, under sections 364(c)(2) and (d) of the Bankruptcy Code and Bankruptcy Rules 4001 and 6004, to obtain the Interim DIP Facility, pursuant to the terms and conditions of Amended Credit Agreement;

(c)      Authorizing Quigley to grant to the Lender assurances for the full and timely payment by and performance of the respective obligations and indebtedness of Quigley under the Interim DIP Facility by granting to the Lender: (1) Superpriority Claims; and (2) DIP Liens;

(d)      Authorizing Quigley to grant to the Lender as adequate protection for the use of Interim Cash Collateral and the diminution in value thereof arising from the Priming Liens granted to the Lender: (1) Adequate Protection Claims; and (2) Adequate Protection Liens;

(e)      Modification of the automatic stay to the extent hereinafter set forth; and

---

[1] To the extent there are any inconsistencies between this Motion and the Interim Order, the terms of the Interim Order shall control.

(f)     Setting a final hearing on the Motion (the "Final Hearing");
and

(ii)    Entering a final order (the "Final Order"):

(a)     Approving the Amended Credit Agreement on a permanent basis pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code;

(b)     Authorizing, under section 363(e) of the Bankruptcy Code and Bankruptcy Rule 6004, Quigley's postpetition use of Final Cash Collateral up to a maximum principal amount not to exceed $20 million; and

(c)     Authorizing, under sections 364(c)(2) and (d) of the Bankruptcy Code and Bankruptcy Rules 4001 and 6004, Quigley to obtain the Total DIP Facility, pursuant to the terms and conditions of the Amended Credit Agreement.   In support of this Motion, Quigley respectfully represents as follows:

## JURISDICTION AND VENUE

8.     The Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

Quigley

9.     On the Petition Date, Quigley commenced this case under chapter 11 of the Bankruptcy Code.  Quigley continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10.    Prior to 1992, Quigley was engaged in the refractories business, where it developed, produced and marketed primarily monolithic refractories and related products to various industries, including the iron, steel and glass industries.  Affidavit of Paul A. Street, sworn to the 2nd day of September 2004 (the "Street Affidavit"), ¶3.  Quigley was acquired and became a wholly-owned subsidiary of Pfizer on August 25, 1968, and remains so today. Id.

11.    In September 1992, Quigley exited the refractories business, and sold its assets to Minteq International, Inc., which acquired substantially all of Quigley's assets and assumed certain of Quigley's liabilities.  Id. ¶4.  Quigley, however, retained all of its liabilities stemming from products it sold prior to the sale of the business, including its liabilities for present and future personal injury claims.  Id.  Quigley's principal business today is managing the defense, processing, settlement and other resolution of personal injury claims brought against it.  Id.  Quigley also operates a Claims Handling Unit.

12.    Quigley was first named as a defendant in asbestos-related personal injury claims in 1979 or 1980.  Although Quigley ceased manufacturing any products containing asbestos in the 1970s, and exited the refractories business in 1992, as of August 23, 2004, it has been named as a defendant in approximately 424,100 personal injury claims in approximately 147,000 civil actions brought in federal and state courts throughout the United States.  Id. ¶5.  As of August 23, 2004, there are approximately 162,600 personal injury claims pending against Quigley in approximately 59,000 civil actions.  Id.

13.    Quigley has commenced this chapter 11 case to conserve its remaining assets and to afford it time to formulate a chapter 11 reorganization plan that would satisfy the requirements of section 524(g) of the Bankruptcy Code, and treats all present and future plaintiffs fairly and equitably.

Prepetition Financing

14.    Quigley has no material assets other than its rights under insurance policies purchased by Pfizer in which Quigley is a covered subsidiary.  Quigley relies on its rights to proceeds under the shared insurance to pay for its substantial liabilities arising from the asbestos-related personal injury claims.  Historically, certain of Pfizer and Quigley's insurers from time to time have failed to honor their obligations to make payments on a timely basis.  This timely payment issue recently has become more of a problem, which has left Quigley from time to time without financial means to pay its liability and defense obligations.

15.    As a result, since approximately March 2003, Pfizer has provided loans and advances under the Prepetition Credit Agreement for the benefit of Quigley to bridge the period between Quigley's payment of settlements, judgments and defense costs related to the personal injury claims and its receipt of amounts billed under the shared insurance policies.

16.    Quigley was entitled to borrow on a revolving basis up to $110 million under the Prepetition Credit Agreement.  To secure its obligations thereunder, Quigley granted to the Lender a security interest in certain of its assets, including, without limitation, Quigley's rights to receive proceeds under certain insurance policies that potentially provide coverage or indemnity for Quigley's asbestos liabilities.  Quigley

also established the Secured Account, into which proceeds of its receivables from its insurers are deposited.

Quigley's Urgent Need for Postpetition Financing

   17. Quigley has an immediate need for postpetition financing and use of Cash Collateral. Quigley requires working capital to continue funding its business operations and the payment of administrative expenses incurred in this chapter 11 case. As a result of the commencement of this case, Quigley is no longer entitled to borrow under the Prepetition Credit Agreement. To continue its day-to-day operations, Quigley needs the use of the Lender's Cash Collateral, which is subject to the Lender's liens under the Prepetition Credit Agreement and a new line of credit. Quigley has insufficient available cash to meet ongoing obligations necessary to accomplish its objectives in this chapter 11 case. As a result, Quigley urgently needs access to Cash Collateral, credit and additional capital. Lack of immediate availability of Cash Collateral and new credit will severely imperil Quigley's efforts to conduct its chapter 11 case and maximize a recovery for stakeholders.

   18. Accordingly, Quigley determined in the exercise of its sound business judgment that it needs access to Cash Collateral and borrowings to be provided under the Amended Credit Agreement. The Lender's Cash Collateral, together with the Total DIP Facility, are anticipated to provide the necessary cash for Quigley to administer its chapter 11 case. In addition, because Quigley does not have sufficient funds to meet expenses necessary for the continued operation of its business before a final hearing can be held, it is essential that it obtain interim financing.

Debtor's Negotiations to Acquire Postpetition Financing

19.     Quigley lacks the ability to obtain credit on an unsecured basis.  It lacks hard assets and traditional ongoing business operations, has extensive exposure to asbestos-related personal injury claims, and substantially all of its assets secure the Prepetition Obligations.  As a result, obtaining financing from a third party is, under the circumstances, virtually impossible.

20.     Accordingly, after carefully evaluating alternative sources of credit, Quigley determined that its efforts to arrange postpetition financing should be focused on the Lender.  Quigley requested postpetition financing from the Lender on both an unsecured and non-priming basis, but the Lender was unwilling to extend loans to Quigley in the absence of the protections described above.  Given the current state of its business, the large number of asbestos-related personal claims, and the fact that the Prepetition Obligations are secured by substantially all of Quigley's assets, Quigley determined in its reasonable business judgment based on requests to alternative lenders that it has no other options from which to obtain postpetition financing, other than from the Lender pursuant to the Amended Credit Agreement.  Nevertheless, Quigley believes that the proposal for the Amended Credit Agreement received from the Lender is fair, competitive and addresses Quigley's working capital and liquidity needs.

21.     Prior to the Petition Date, Quigley engaged in good faith, arm's length negotiations with the Lender to discuss the terms of the Amended Credit Agreement in the context of a chapter 11 case.  These negotiations culminated in an agreement by the Lender to provide postpetition financing to Quigley on the terms and conditions set forth in the Amended Credit Agreement.

The Proposed Postpetition Financing Facility

22.     The principal terms of the Amended Credit Agreement are summarized below:[2]

(a)     Cash Collateral.    Use of Cash Collateral securing the Prepetition Credit Agreement and/or cash balances on deposit in the Secured Account: (i) on an interim basis up to a maximum principal amount not to exceed $4 million, and (ii) on a final basis up to a maximum principal amount not to exceed $20 million.   Quigley shall have no right to use Cash Collateral after the occurrence and during the continuance of any Event of Default.

(b)     Credit Facility.    A senior secured revolving credit facility, whereby:  (i) on an interim basis, revolving credit advances will be made not to exceed $4 million *less* the sum of (A) the aggregate amount of Cash Collateral used by Quigley as of such date, and (B) all Cash Collateral on balance in the Secured Account on such date; and (ii) on a final basis, revolving credit advances will be made not to exceed $20 million *less* the sum of (A) the aggregate amount of Cash Collateral used by Quigley as of such date, and (B) all Cash Collateral on balance in the Secured Account on such date.

(c)     Use of Proceeds.    Proceeds shall be used by Quigley only for ordinary course business expenses incurred in operating Quigley's business, or expenses for the administration of the Case.

(d)     Interest.    Each revolving credit loan will bear interest at seven percent (7.0%) per annum.   Upon the occurrence and during the continuance of an Event of Default, interest will accrue at a rate per annum equal to nine percent (9.0%).

(e)     Maturity.    All revolving credit loans are to be repaid in full on earlier of (i) September 9, 2005, or (ii) the termination of the Lender's commitment to make revolving credit loans either voluntarily by Quigley or pursuant to the exercise of remedies by the Lender.

(f)     Events of Default.    Including, by way of example and without limitation: (i) failure of Quigley to pay principal of or interest on revolving credit advances or other amounts due under the

---

[2]     This summary is intended only to assist the Court in understanding the key aspects of the arrangement and is qualified in its entirety by reference to the Amended Credit Agreement.

Amended Credit Agreement; (ii) failure of Quigley to perform or observe covenants or other terms and such failure remains unremedied for 30 consecutive days after written notice is given to Quigley; (iii) any provision of the Amended Credit Agreement ceasing to be valid and binding on Quigley or Quigley states the same in writing, or any lien granted under the Amended Credit Agreement shall cease to create a valid first priority, perfected security interest in the Collateral; (iv) dismissal of the Case, conversion of the Case to a case under chapter 7 of the Bankruptcy Code, appointment of a chapter 7 or chapter 11 trustee or examiner with expanded powers, (v) entry of an order granting relief from the automatic stay to holders of security interests to permit foreclosure on assets with a value in excess of $250,000; and (vi) failure of the Bankruptcy Court to enter the Final Order within 30 days following the date of the Interim Order or entry of an order reversing, amending, supplementing, staying for more than 10 days, vacating or otherwise modifying the Interim Order or Final Order.

(g)    <u>Mandatory Prepayments</u>.    After entry of the Interim Order, Quigley shall promptly upon receipt prepay the Postpetition Obligations by all amounts deposited from time to time in the Secured Account, inclusive of all amounts on deposit on the Petition Date.

(h)    <u>Application of Payments</u>.    All mandatory prepayments will be applied to repay all of the Postpetition Obligations outstanding from time to time.

(i)    <u>Priority and Liens</u>.    The Prepetition Collateral will secure the payment and satisfaction of all obligations in the following order of priority: (i) all Postpetition Obligations; (ii) all Adequate Protection Amounts; and (iii) all Prepetition Obligations.    The Postpetition Collateral will secure payment and satisfaction of all obligations in the following order of priority: (x) all Postpetition Obligations; and (y) all Adequate Protection Amounts.    Each of the liens above will be subject to the Carve Out Expenses.

(j)    <u>Carve Out Expenses</u>.    The Lender's claims, liens and security interests in the Collateral shall be subject only to the Permitted Prior Liens and to the right of payment of the following expenses (the "<u>Carve Out Expenses</u>"): (i) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); (ii) fees payable to the Clerk of the Court;  (iii) allowed fees and expenses of a chapter 7 trustee pursuant to sections 326, 726 and 506(c) of the Bankruptcy Code; provided, that the aggregate amount of such fees and

expenses allowed pursuant to section 506(c) of the Bankruptcy Code shall not exceed $15,000; and (iv) subject to the terms and conditions of this Interim Order and Final Order, the unpaid and outstanding reasonable fees and expenses of counsel to the Debtor, counsel to a representative appointed by the Court pursuant to section 524(g) of the Bankruptcy Code for the purpose of representing the interests of persons that might assert future claims against Quigley actually incurred on or after the Petition Date and counsel to the statutory committee, pursuant to Sections 328, 330, or 331 of the Bankruptcy Code; provided, however, to the extent an Event of Default has occurred and is continuing, the post-Event of Default carve-out for Professionals only shall be an aggregate sum not to exceed $500,000, including any holdbacks required by this Court.

(k)     Remedies.  Upon the occurrence and during the continuance of an Event of Default, the Lender may (i) terminate the commitment to make advances; (ii) declare all outstanding advances and interest accrued thereon due and payable; and (iii) following five days' notice, foreclose upon the Collateral as described in the Amended Credit Agreement.  After the occurrence and during the continuance of any Event of Default, Quigley's right to use Cash Collateral shall automatically terminate.

(l)     Expenses.  Payment of the Lender's reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and other out of pocket expenses in connection with the enforcement of or preservation of rights under any of the Financing Agreements.

(m)    Fees.  Quigley will pay no loan or commitment fees, except as set forth in paragraph 22(l) immediately above.

23.    As noted above, the security interests and liens granted pursuant to the Amended Credit Agreement will prime all liens and security interests granted pursuant to the Prepetition Credit Agreement.  Pfizer, in its capacity as lender for the Prepetition Credit Agreement, has consented to such priming, on the terms and subject to the conditions set forth in the Amended Credit Agreement and the Interim and Final Orders.  The Debtor, based on its due diligence, believes that there are no other liens or security interests in the assets proposed to secure the obligations to the Lender as the

lender under the Amended Credit Agreement, other than as set forth in the applicable Schedules to the Prepetition Credit Agreement.

REASONS FOR GRANTING THE MOTION

24.     The Court should grant the Motion because Quigley's postpetition working capital needs can be satisfied only if Quigley is authorized to borrow up to $20 million under the Amended Credit Agreement to fund its operations.  The credit provided under the Amended Credit Agreement will enable Quigley to continue to maintain ongoing operations and pay its administrative expenses in the ordinary course of its business, thereby preserving and enhancing the value of its assets for the benefit of its creditors.

Approval of DIP Liens and Superpriority Claims

25.     To obtain postpetition credit under section 364(c) of the Bankruptcy Code, the Court must find, after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c); see also In re Garland Corp., 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa.), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

26.	In addition, section 364(d) of the Bankruptcy Code, which governs the postpetition incurrence of debt secured by senior or "priming" liens, provides that a bankruptcy court may, after notice and a hearing, authorize such financing only if (i) the debtor in possession is unable to obtain credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which a senior or equal lien is proposed to be granted.  See 11 U.S.C. § 364(d).

27.	To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) and 364(d) of the Bankruptcy Code.  Bray v. Shenandoah Federal Savings & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Id. at 1088.  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988),  aff'd sub nom.,  Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

28.	As set forth in the Street Affidavit, and as the evidence at the interim hearing and the Final Hearing will demonstrate, Quigley could not obtain a postpetition financing facility on an unsecured basis.  Moreover, Quigley's extensive exposure to the asbestos-related personal injury claims has a significant negative impact on its ability to obtain unsecured credit.  Quigley also has virtually no unencumbered assets.  The Prepetition Obligations are secured by substantially all of Quigley's assets.

In order to obtain postpetition financing from a source other than the Lender, Quigley would almost certainly be required to permit that source to "prime" the liens of the Lender. The Lender advised Quigley that it would not consent to be primed by another lender. Accordingly, borrowing from another postpetition lender could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. As a result, obtaining financing from a third party is, under the circumstances, virtually impossible. This conclusion was confirmed when Quigley sought post-petition financing from various sources before the commencement of this case, and none of those potential lenders expressed an interest in providing such financing.

29. Quigley's efforts to seek postpetition financing from the Lender satisfy the statutory requirements of sections 364(c) and 364(d) of the Bankruptcy Code. See, e.g., In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor "must make an effort to obtain credit without priming a senior lien"); In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) (requiring demonstration that less onerous financing was unavailable). See also In re Phoenix Steel Corp., 39 B.R. 218, 222 and n.9 (D. Del. 1984) (same).

30. Additionally, the fact that the Lender is the sole shareholder of Quigley does not prevent the granting of senior secured liens and superpriority status with respect to the loans to be provided by the Lender to Quigley under the Amended Credit Agreement. "The debtor may borrow property from . . . shareholders of the debtor, as a senior priority loan under 11 U.S.C. § 364(d) because the statute does not prohibit such a loan." In re 495 Cent. Park Ave. Corp., 136 B.R. at 632. See also In re

<u>Aerovias Nacionales De Colombia S.A. Avianca</u>, Case No. 03-11678 (ALG) (Bankr. S.D.N.Y. 2003) (approving postpetition secured financing from debtor's affiliates and granting superpriority claims); <u>In re Enron Corp.</u>, Case no. 01-16034 (AJG), jointly administered with <u>In re San Juan Gas Company</u>, Case no. 02-12902 (AJG) (Bankr. S.D.N.Y. 2002) (approving postpetition secured financing from debtor's parent and granting superpriority claims).

31.     Here, Quigley has demonstrated its inability to obtain financing on less onerous terms.  Furthermore, it is unlikely that Quigley could obtain financing from any other source on <u>any</u> terms at all, in light of Quigley's lack of hard assets, exposure to asbestos-related personal injury claims, and obligations under the Prepetition Credit Agreement.  Accordingly, the terms of the financing to be provided by the Lender are actually <u>better</u> than may be obtained from any non-affiliate third party, and evidence that such credit is being extended in good faith.  For example, the Amended Credit Agreement provides for interest to be payable at an annual interest rate of seven percent (7.0%) per annum, a rate that is significantly lower than the average market interest rate for debtor in possession loans.  Additionally, the financing provided by the Lender does not require any commitment, facility, closing, unused line or similar fees to be paid by Quigley to the Lender, also an anomaly in the DIP financing world.  For the foregoing reasons, Quigley submits that credit on an unsecured basis or without incurring senior priming liens is unavailable, the Amended Credit Agreement is necessary to preserve and enhance Quigley's estate, and that the terms of the Amended Credit Agreement are fair, reasonable and appropriate, and proposed in good faith.

Application of the Business Judgment Standard

32.     As described above, after appropriate investigation and analysis, Quigley's management has concluded that the proposed financing pursuant to the Amended Credit Agreement is the best alternative available in the circumstances of this case. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); In re TM Carlton House Partners, LTD, 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of Quigley's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

33.     Quigley has exercised sound business judgment in determining that a postpetition credit facility is appropriate and has satisfied the legal prerequisites to incur debt under the Amended Credit Agreement.   The terms of the Amended Credit Agreement are fair and reasonable and are in the best interests of Quigley's estate. Accordingly, Quigley should be granted authority to enter into the Amended Credit Agreement and obtain funds from the Lender on the secured, administrative "superpriority" basis described above.

Good Faith

34.     The terms and conditions of the Financing Agreements are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  As set forth above, proceeds from loans under the Amended Credit Agreement will be used only for purposes that are permissible under the Bankruptcy Code.   Therefore, the Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the Financing Agreements, or the Interim Order or Final Order or any other order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

Request for Modification of the Automatic Stay

35.     The proposed Amended Credit Agreement contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the Lender, in its sole discretion, to: (a) file necessary or appropriate documents to perfect the security interests and liens granted in respect of the Amended Credit Agreement; and (b) upon the occurrence of an Event of Default under the Amended Credit Agreement, subject in certain instances to certain notice requirements,

(i) terminate the Commitment and cease to extend credit under the Amended Credit Agreement, (ii) declare Obligations under the Amended Credit Agreement immediately due and payable, (iii) effect setoffs, or otherwise enforce rights, against the Collateral, or (iv) take any other action or exercise any other right or remedy permitted to the Lender under the Amended Credit Agreement, the other Financing Agreements or applicable law.

36.     Stay modification provisions of this type are customary features of postpetition debtor in possession financing facilities and, in Quigley's business judgment, are reasonable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Amended Credit Agreement.

Extraordinary Provisions Under Guidelines

37.     Quigley believes that of the significant provisions of the proposed Amended Credit Agreement and in the relief set forth in the attached Interim Order, the following constitute "Extraordinary Provisions" pursuant to the Guidelines for Financing Requests adopted by this Court pursuant to General Order No. M-274 dated September 9, 2002 (the "Guidelines"):

    (a)    Events of Default.  The Interim Order provides that there will be an event of default which will terminate the use of Cash Collateral on the "the filing of a challenge to the lender's prepetition lien or to the lender's prepetition conduct" and "the making of a motion by a party in interest seeking any relief (as distinct from an order granting such relief)" and the entry of an order granting adequate protection to any holder of a Primed Lien without the Lender's consent. See Guidelines, Section II.A.8.

    (b)    Termination of Use of Cash Collateral.  Quigley's right to use Cash Collateral shall automatically terminate upon the occurrence and during the continuance of any Event of Default.  See Guidelines, Section II.A.8.

38.     Given the facts and circumstances of this case, including, without limitation, Quigley's dire need for operating capital, Quigley's inability to obtain other financing, and the fact that the Prepetition Obligations are fully secured, there is justification for these terms.

Interim Approval of the Amended Credit Agreement Should be Granted

39.     A final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  However, under Bankruptcy Rule 4001(c)(2), the bankruptcy court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

40.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., Simasko, 47 B.R. at 449; see also In re Ames Dept. Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., Simasko, 47 B.R. at 449; Ames, 115 B.R. at 36.

41.     Pursuant to Bankruptcy Rule 4001(c), Quigley requests that this Court conduct a preliminary expedited hearing on this Motion to permit it to borrow up to $4 million on an interim basis to the extent necessary to maintain the ongoing operations and activities of Quigley and avoid immediate and irreparable harm and prejudice to Quigley's estate.

42.     The use of new credit provided under the Amended Credit Agreement will enable Quigley to continue to operate in the normal course of its business and pay its administrative expense obligations in this chapter 11 case, thereby enhancing the value of its estate for the benefit of its creditors.  Quigley has an immediate and urgent need for the cash requested, absent which, pending the Final Hearing, irreparable harm will occur.

43.     As discussed above, Quigley is unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations. Moreover, Quigley has been unable to obtain postpetition financing on terms more favorable than those proposed under the Amended Credit Agreement.  Under these circumstances, the granting of the relief requested herein is necessary and appropriate.

44.     Accordingly, for the reasons set forth above, Quigley respectfully requests that this Court grant the Motion.

## ESTABLISHMENT OF A FINAL HEARING DATE

45.     Quigley proposes that a Final Hearing on this Motion, be scheduled pursuant to Bankruptcy Rule 4001.

46.     At the Final Hearing, Quigley intends to seek approval of the Amended Credit Agreement on a final basis and seek entry of the Final Order.

## WAIVER OF LOCAL RULE 9013-1(b) FOR
## THE FILING OF A MEMORANDUM OF LAW

47.     Pursuant to Local Rule 9013-1(b), Quigley respectfully requests that the Court waive the requirement that it file a separate memorandum of law.  The Motion is supported by citations to relevant authorities.

## NOTICE

48.     As noted above, no trustee, examiner or statutory creditors' committee has been appointed in this chapter 11 case.  Notice of this Motion has been provided to:  (i) the Office of the United States Trustee for the Southern District of New York, (ii) counsel for the Lender, (iii) all parties known by Quigley to have a security interest or lien that will be "primed" by the proposed Amended Credit Agreement, and (iv) the holders of the twenty (20) largest unsecured claims against Quigley's estate.  In light of the nature of the relief requested, Quigley submits that no other or further notice is necessary or required.

## NO PRIOR REQUEST

49.     No prior request for the relief sought herein has been made to this or any other court.

<u>CONCLUSION</u>

WHEREFORE, for all of the foregoing reasons, Quigley respectfully requests that this Court grant the Motion, and grant such other relief as is just.

Dated: New York, New York
September 3, 2004

SCHULTE, ROTH & ZABEL LLP
Proposed Attorneys for Quigley Company,
Inc.

By: /s/ Michael L. Cook
Michael L. Cook (MC-7887)
(A Member of the Firm)
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

**<u>Exhibit A</u>**


Amended Credit Agreement

**<u>Exhibit B</u>**


Prepetition Credit Agreement

**Exhibit C**


Proposed Interim Order