UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------x
                                                    :
In re                                               :     Chapter 11
                                                    :
QUIGLEY COMPANY, INC.,                              :     Case No. 04-15739 (PCB)
                                                    :
                                                    :
                                                    :
            Debtor.                                 :
                                                    :
-----------------------------------------------------------------------------x

CORRECTED EXHIBIT B TO
QUIGLEY COMPANY, INC.'S MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS: (I) AUTHORIZING POSTPETITION FINANCING; (II) GRANTING SECURITY
INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS;
(III) AUTHORIZING THE USE OF CASH COLLATERAL; (IV) AUTHORIZING QUIGLEY
COMPANY, INC. TO ENTER INTO FINANCING AGREEMENTS; (V) MODIFYING THE
AUTOMATIC STAY; (VI) GRANTING REPLACEMENT LIENS AND RIGHTS TO
ADEQUATE PROTECTION; AND (VII) SCHEDULING A FINAL HEARING

Dated:   New York, New York
         September 23, 2004

                              SCHULTE ROTH & ZABEL LLP
                               Attorneys for Quigley Company, Inc.
                              By:____Lawrence V. Gelber_____
                              Lawrence V. Gelber (LG-9384)
                              (A Member of the Firm)
                              919 Third Avenue
                              New York, New York 10022
                              Telephone: (212) 756-2000
                              Facsimile: (212) 593-5955

CREDIT AND SECURITY AGREEMENT

CREDIT AGREEMENT dated as of March 6, 2003 between QUIGLEY COMPANY, INC., a New York corporation (the "**Borrower**"), and PFIZER INC., a Delaware corporation (the "**Lender**").

Section 1    The Advances (a) Revolver Advances. The Lender agrees, subject to the terms and conditions hereinafter set forth, to make advances (each, a "**Revolver Advance**") to the Borrower from time to time until the date that is the earlier of (i) March 6, 2008 and (ii) the date of termination in whole of all of the Lender's commitment to lend hereunder pursuant to either Section 1(d) or Section 7 (such earlier date, the "**Termination Date**") in an aggregate principal amount not to exceed U.S. $50,000,000 (the "**Facility**"). Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow under this Section 1(a), prepay pursuant to Section 1(d) and reborrow under this Section 1(a). Each Revolver Advance shall be made, subject to a notice of borrowing in substantially the form of Exhibit A hereto (a "**Notice of Borrowing**") being delivered to the Lender not later than 11:00 a.m. (New York City time) on the day of the requested borrowing by telephone, confirmed immediately in writing, or by telex or telecopier, and duly executed by the Borrower, specifying therein the aggregate amount of the proposed Advance. Upon fulfillment of the applicable conditions set forth in Section 2 and Section 3, the Lender will make the proceeds of such Revolver Advance available to the Borrower by depositing such Advance in the "Secured Account" (as defined below).

(b) Term Advance. The parties hereto agree that on the "Effective Date" (as defined below), an aggregate principal amount of loans equal to fifty-two million U.S. dollars ($52,000,000) plus an aggregate principal amount of open accounts equal to thirty-eight million eight-hundred and eleven thousand U.S. dollars ($38,811,000), in each case made by the Lender to the Borrower prior to the date hereof (the "**Existing Loans**"), plus all accrued and unpaid interest thereon, shall be continued and combined into a single term advance hereunder, in an aggregate principal amount equal to ninety-one million five-hundred and forty-two thousand U.S. dollars ($91,542,000) (the "**Term Advance**"). The Borrower hereby confirms and acknowledges to the Lender that it is validly and justly indebted to the Lender for the payment of the Term Advance without offset, defense, cause of action or counterclaim of any kind or nature whatsoever. Amounts prepaid or repaid on account of the Term Advance may not be reborrowed.

(c) Repayment of Advances. The Borrower shall repay to the Lender the aggregate principal amount of all outstanding Revolver Advances and the Term Advance (collectively, the "**Advances**"), together with all accrued and unpaid interest thereon, on the Termination Date, and the commitment of the Lender to make Revolver Advances shall terminate on such date. The Borrower shall make each payment hereunder, irrespective of any defense or right of counterclaim or setoff, not later than 11:00 a.m. (New York City time) on the day when due in U.S. dollars and in same day funds to the Lender at the account of the Lender most recently specified in writing to the Borrower by the Lender, with any payment received after 11:00 a.m. (New York City time) on any such day being deemed to have been received on the next succeeding business day. Repayment of the Advances pursuant to this Section 1(c), and prepayment of Advances pursuant to Section 1(d), shall be applied in the following order of priority:

(i)    first, to the repayment of all costs and expenses that are due and payable to the Lender on such date under and in respect of this Agreement and the other documents and instruments contemplated hereby;

(ii)    second, to the payment of the outstanding principal amount of all of the Revolver Advances that that are due and payable to the Lender on such date, together with all accrued and unpaid interest thereon; and

(iii)    third, to the payment of the outstanding principal amount of the Term Advance that is due and payable to the Lender on such date, together with all accrued and unpaid interest thereon.

(d) Commitment Reduction; Prepayment.    The Borrower may, upon at least three business days' notice to the Lender, (i) terminate in whole or reduce in part the unused portions of the Facility, or (ii) prepay all or any part of the Advances.

(e) Interest. (i) The Borrower shall pay interest on the unpaid principal amount of each Advance from the date of such Advance until such amount shall be paid in full, at a rate per annum equal at all times to 7.00%.

(ii)    If any principal of or interest on any Advance or any fee or other amount payable by the Borrower under or in respect of this Agreement or any other document or instrument contemplated hereby is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to 9.00%.

(iii)    All accrued interest on each Advance shall be payable in arrears on the Termination Date and, in respect of interest under Section 1(e)(ii), on demand.   All computations of interest and fees payable hereunder shall be made on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest or fees are payable.

Section 2    Conditions to Effectiveness.  Section 1 of this Agreement shall become effective on the first date (the "Effective Date") on which all of the following conditions have been satisfied:

(a) all of the representations and warranties set forth in Section 4 shall be true and correct in all material respects on and as of the Effective Date, as though made on and as of such date;

(b) the Lender shall have received financing statements (Form UCC-1 or a comparable form) or the equivalent thereof under the New York Uniform Commercial Code and the applicable law of all jurisdictions that may be necessary or that the Lender may deem reasonably desirable in order to perfect and protect the liens and security interests created or purported to be created under this Agreement, covering the "Collateral" (as defined below) described therein, in each case completed in a manner reasonably satisfactory to the Lender; and

(c) no event shall have occurred and be continuing, or shall occur as a result of the Effective Date, that would constitute a "Event of Default" (as defined below), including without limitation any event or occurrence that would constitute an Event of Default but for the requirement that notice be given or time have elapsed or both.

Section 3    Conditions to Each Revolver Advance.  The obligation of the Lender to make a Revolver Advance shall be subject to the further conditions precedent that, on the date of such Revolver Advance, the following statements shall be true (and each of the giving of the applicable Notice of Borrowing and the acceptance by the Borrower of the proceeds of such Revolver Advance shall

constitute a representation and warranty by the Borrower that both on the date of such notice and on the date of such Revolver Advance, such statements are true):

(a) the representations and warranties set forth in Section 4 are true and correct in all material respects on and as of such date, before and after giving effect to such Revolver Advance and to the application of any proceeds therefrom, as though made on and as of such date;

(b) no event has occurred and is continuing, or would result from such Revolver Advance or from the application of any proceeds therefrom, that constitutes an Event of Default, including without limitation any event or occurrence that would constitute an Event of Default but for the requirement that notice be given or time have elapsed or both;

(c) the Borrower shall have established a deposit account subject to a valid, enforceable and effective deposit account control agreement, in form and substance satisfactory to the Lender (the "Secured Account"), for deposit of the proceeds of such Revolver Advance; and

(d) the Borrower shall have delivered a notice, in form and substance satisfactory to the Lender, to each insurer on any of the Included Policies (as defined below) informing such insurer of the Lender's lien on and security interest in the insurance proceeds that remain payable in respect of claims submitted to such insurer since the date of the most recent notice delivered by the Borrower to such insurer, if any.

Section 4  Representations and Warranties. The Borrower represents and warrants that:

(a) it is a company duly organized and validly existing and in good standing under the laws of New York and is duly qualified to do business in or from such jurisdiction and in each other jurisdiction in which the conduct of its business or the ownership or lease of its assets requires such qualification;

(b) no governmental authorization, and no material consent, approval or authorization of, or notice to or filing with, or other action by, any other person, is required for the execution, delivery or performance by the Borrower of this Agreement or any other document or instrument contemplated hereby; the grant by the Borrower of a security interest in the Collateral to the Lender hereunder or the perfection or maintenance of such security interest (including the first priority nature thereof), or the exercise by the Lender of its rights under this Agreement or any other document or instrument contemplated hereby;

(c) it has full corporate power and authority to conduct its business as currently conducted and to execute, deliver and perform this Agreement and all other documents and instruments contemplated hereby, to grant a security interest in the Collateral to the Lender hereunder, and perfect and maintain such security interest, and to take all action as may be necessary to complete the transactions contemplated by this Agreement;

(d) it has taken all necessary corporate and legal action to execute, deliver and perform this Agreement and all documents and instruments contemplated hereby, to grant a security interest in the Collateral to the Lender hereunder and perfect and maintain such security interest, and to take all action as may be necessary to complete the transactions contemplated by this Agreement;

(e) each of this Agreement and each other document and instrument contemplated hereby constitutes the legal, valid and binding obligation of the Borrower, enforceable against it in

accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or similar laws affecting the rights of creditors generally, general principles of equity (whether considered in a proceeding in equity or law) and an implied covenant of good faith and fair dealing;

(f) the execution, delivery and performance by the Borrower of this Agreement and each other document and instrument contemplated hereby, the borrowing of the Advances hereunder and the use of the proceeds thereof and the grant by the Borrower of a security interest in the Collateral to the Lender hereunder and the perfection or maintenance of such security interest (including the first priority nature thereof) and consummation of the transactions contemplated hereby (i) will not violate or result in a breach of any applicable law, judgment, decree or order of any court or an order, rule or regulation of any administrative or governmental body, (ii) will not violate or result in a default under any material contractual obligation of the Borrower, (iii) will not violate or result in a breach of any of the corporate organizational documents of the Borrower and (iv) will not result in, or require, the creation or imposition of any lien on or security interest in any of the properties or revenues of any of the Borrower other than the liens and security interests created hereunder; and

(g) all filings, recordings and other actions that are necessary or, in the judgment of the Lender, desirable in order to establish, protect, preserve and perfect the Lender's lien on and perfected security interest in all right, title, estate and interest of the Borrower in and to the Collateral have been duly made or taken as of the Effective Date or shall, to the satisfaction of the Lender, be taken within five days thereof, and the Lender has, or will have upon the taking of such action, a legal, valid, enforceable and perfected first lien on and security interest in all right, title, estate and interest of the Borrower in and to the Collateral, prior and superior to all other liens and security interests.

Section 5    Covenants.  Until all obligations of the Borrower under this Agreement have been satisfied, all Advances and other amounts payable hereunder have been paid in full and the Termination Date has occurred, the Borrower shall promptly after the occurrence of the Effective Date deliver notices in form and substance satisfactory to the Lender to each insurer on any of the Included Policies (as defined below) informing such insurer of the Lender's lien on and security interest in all payments under and the right to receive moneys due and to become due under or in respect of the Included Policies and all settlement agreements with respect thereto.

Section 6    Security Interest; Assignment of Right to Payment under Insurance Policies and Settlement Agreements with Respect Thereto.  (a)  The Borrower hereby assigns and pledges to the Lender, and hereby grants to the Lender a lien on and security interest in, the following, in each case, as to each type of property and assets described below, whether now owned or hereafter acquired by such the Borrower, wherever located, and whether now or hereafter existing or arising (collectively, the "Collateral"):

(i) all of the Borrower's right, title and interest in, to and under all payment intangibles and the right to receive moneys due and to become due under or in respect of each policy of insurance of the Borrower that purports or may potentially provide coverage or indemnity for the Borrower's asbestos liabilities to which the Borrower is now or may hereafter become a party (other than any policy of insurance for directors' and officers' liability), in each case as such policy may be amended, supplemented or otherwise modified from time to time (collectively, the "Included Policies"), and each settlement agreement with respect thereto, including without limitation all rights of the Borrower to receive payments arising under any indemnity, warranty or guarantee with respect to such policies or settlement agreements with respect thereto or any other instrument, agreement or document delivered pursuant thereto;

(ii)     all of the Borrower's right, title and interest in and to all money, accounts, contract rights, securities and securities accounts, deposit accounts, equipment, chattel paper, instruments, payment intangibles and general intangibles, and all other rights and obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services, and whether or not earned by performance (including, without limitation, any right with respect to workers' compensation or other deposits made by the Borrower and any right to receive tax refunds or other refunds, reimbursements or payments from any governmental authority), and all rights in and to all security agreements, leases and other contracts securing or otherwise relating to any such money, accounts, contract rights, securities and securities accounts, deposit accounts, equipment, chattel paper, instruments, payment intangibles and general intangibles; and

(iii)     all proceeds and supporting obligations of any and all of the foregoing;

provided, however, that notwithstanding the foregoing, the Collateral shall not include any rights under any insurance policies or settlement agreements with respect thereto or other agreements that have been validly assigned by the Borrower prior to the date hereof, or to the extent that the grant of a security interest in any of the Collateral would constitute a valid and enforceable restriction in favor of a third party, or give any party thereto a right to terminate its obligations thereunder, in each case, after giving effect to Section 9-407, 9-408 and 9-409 of the New York Uniform Commercial Code, or equivalent provisions of applicable law (the "Excluded Assets"); provided further, however, that if at any time the security interest granted by this Section 1 could include all or part of the Excluded Assets without violating the rights of such third parties (whether because the applicable restriction, if any, becomes void, ineffective or lapses, or for any other reason), then the Collateral automatically shall be deemed to include such Excluded Assets, as if this proviso had never been in effect.   The Lender and the Borrower acknowledge that this Credit and Security Agreement is not a general assignment of any insurance policy or any settlement agreement with respect thereto or a transfer or assignment of the Borrower's interest in or rights under any of the Included Policies or any settlement agreement with respect thereto (other than the right to receive payments thereunder), including rights to coverage under any of the Included Policies.

(b) Interpretation.  Unless otherwise defined in this Agreement, terms used in Article 8 or 9 of the Uniform Commercial Code in effect in the State of New York are used herein as therein defined.

(c) Security for Obligations.  The pledge and assignment of, and the grant of a lien on and security interest in the Collateral by the Borrower under this Agreement secures the payment and satisfaction of all of the obligations of the Borrower to the Lender hereunder and under each other document and instrument contemplated hereby (including, without limitation, any extensions, modifications, substitutions, amendments or renewals of any or all of the foregoing obligations), whether direct or indirect, absolute or contingent, and whether for principal, interest (including, without limitation, interest accruing at the then applicable rate provided in Section 1(e) after the maturity of the Advances or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or similar proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), premium, fees, indemnifications, costs, expenses (including, without limitation, all fees and disbursements of counsel for the Lender that are required to be paid by the Borrower pursuant to Section 7 or Section 10 (all such obligations being the "Secured Obligations"); provided, however that it is understood and agreed that the Collateral shall secure the payment and satisfaction of all of the Secured Obligations in the following order of priority:

(i)     first, to the payment and satisfaction of all of all costs and expenses owing to the Lender under and in respect of this Agreement and the other documents and instruments contemplated hereby; and

(ii)    second, to the payment and satisfaction of the outstanding principal amount of all of the Revolver Advances, together with all accrued and unpaid interest thereon; and

(iii)   third, to the payment and satisfaction of the payment of the outstanding principal amount of the Term Advance, together with all accrued and unpaid interest thereon.

(d) Authority. The Borrower hereby authorizes the Lender to file one or more financing statements, continuation statements or other similar documents, and amendments thereto, relating to all or any part of its Collateral (including without limitation preparation, execution and filing of financing statements, continuation statements and amendments in all jurisdictions without the signature of the Borrower where permitted by applicable law.

(e) Further Assurances. The Borrower hereby agrees that from time to time, at its sole expense, it shall promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that the Lender may deem reasonably advisable and may request, in order to perfect and protect the security interest granted or intended to be granted by the Borrower hereunder (including, without limitation, the first priority nature thereof) or to enable the Lender to exercise and enforce all of its rights and remedies hereunder with respect to any of the Collateral, including without limitation by providing notice to the Lender of each new insurance policy of the Borrower, material change to any existing policy of the Borrower or change of address or other information in respect of any insurer of the Borrower, and notice of any claims or actions against any of the Collateral hereunder by any person or entity. The Borrower agrees that it will not cause or permit any payment or other transfer of any Collateral to any person other than the Lender without the Lender's prior consent.

Section 7      Events of Default. If any of the following events shall occur and be continuing, whether voluntary or involuntary, by operation of law or pursuant to or in compliance with any judgment, decree or order of any court or an order, rule or regulation of any administrative or governmental body or otherwise (each, an "**Event of Default**"):

(a) the Borrower (i) shall fail to pay any principal of any Advance when due or (ii) shall fail to pay any interest on any Advance or any other amount payable hereunder or under any other document and instrument contemplated hereby within five days after any such amount becomes due in accordance with the terms hereof or thereof; or

(b) the Borrower shall fail to perform or observe any of its terms, covenants or agreements set forth in this Agreement or in or under any other document and instrument contemplated hereby and such failure shall remain unremedied for at least 30 consecutive days after written notice thereof shall have been given to the Borrower by the Lender; or

(c) any representation or warranty made or deemed made by the Borrower (or any of their respective officers) under or in connection with this Agreement or any other document or instrument contemplated hereby shall prove to have been incomplete, false or misleading in any material respect when such representation or warranty was made or deemed made; or

(d) (i) the Borrower shall fail to pay any principal of, premium or interest on, or any other amount payable in respect of, one or more items of indebtedness of the Borrower (excluding

indebtedness outstanding hereunder) that is outstanding (or under which one or more persons have a commitment to extend credit) in an aggregate principal amount of at least $250,000 at the time of such failure, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the applicable grace period, if any, specified in the agreements or instruments relating to all such indebtedness; or (ii) any other event shall occur or condition shall exist under the agreements or instruments relating to one or more items of indebtedness of the Borrower (excluding indebtedness outstanding hereunder) that is outstanding (or under which one or more persons have a commitment to extend credit) in an aggregate principal amount of at least $250,000 at the time of such other event or condition, and shall continue after the applicable grace period, if any, specified in all such agreements or instruments, if the effect of such event or condition is to accelerate, or to permit the acceleration of, the maturity of such indebtedness or otherwise to cause, or to permit the holder thereof to cause, such indebtedness to mature; or (iii) one or more items of indebtedness of the Borrower (excluding indebtedness outstanding hereunder) that is outstanding (or under which one or more persons have a commitment to extend credit) in an aggregate principal amount of at least $250,000 shall be declared to be due and payable or required to be prepaid or redeemed (other than by a regularly scheduled or required prepayment or redemption), purchased or defeased, or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case prior to the stated maturity thereof; or

(e) the Borrower shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against the Borrower to adjudicate it bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, administrator or other similar official for it or for any substantial part of its property and assets and, in the case of any such proceeding instituted against it (but not instituted by it) that is being diligently contested by it in good faith, either such proceeding shall remain unbonded, undismissed or unstayed for a period of at least 60 consecutive days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property and assets) shall occur; or any event or action analogous to or having a substantially similar effect to any of the events or actions set forth above in this Section 7(e) (other than a solvent reorganization) shall occur under the applicable law of any jurisdiction applicable to the Borrower; or the Borrower shall take any corporate, partnership, limited liability company or other similar action to authorize any of the actions set forth above in this Section 7(e); or

(f) one or more judgments or decrees for the payment of money shall be entered (i) against the Borrower involving in the aggregate a liability of $5,000,000 or more, and shall remain unsatisfied and either (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment or decree and remain unstayed or (ii) there shall be any period of at least 30 consecutive days during which a stay of enforcement of any such judgment or decree, by reason of a pending appeal or otherwise, shall not be in effect; or

(g) one or more nonmonetary judgments or orders (including, without limitation, writs or warrants of attachment, garnishment, execution, distraint or similar process) shall be rendered against the Borrower that, either individually or in the aggregate, could reasonably be expected to have a material adverse effect on the Borrower or its assets or operations, and there shall be any period of at least 30 consecutive days during which a stay of enforcement of any such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(h) (i) any provision of this Agreement or any other document or instrument contemplated hereby after delivery hereof or thereof shall for any reason (other than pursuant to the terms hereof or thereof) cease to be valid and binding on or enforceable against the Borrower or the Borrower shall so state in writing or, (ii) any lien or security interest granted hereunder shall for any reason cease to create a valid and perfected first priority lien on and security interest in the Collateral purported to be covered hereby; or

(i) the Borrower shall at any time cease to be the wholly-owned subsidiary of the Lender;

then, and in every such event, and at any time thereafter during the continuance of such event, the Lender may in its discretion by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the commitment to make Advances pursuant to Section 1, and (ii) declare the Advances then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable) and thereupon the principal of the Advances so declared to be due and payable, together with accrued and unpaid interest thereon and all fees and all other obligations of the Borrower accrued hereunder in respect of all or such portion of the Advances, as applicable (including any fees and costs of enforcement hereof), shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; provided, however, that in the event of an actual or deemed entry of an order for relief with respect to the Borrower under the United States Bankruptcy Code or a similar order or action under any other applicable law covering the protection of creditors' rights or the relief of debtors applicable to the Borrower, (1) such commitment to make Advances and (2) the principal of all Advances then outstanding, together with accrued and unpaid interest thereon and all fees and other obligations of the Borrower accrued hereunder (including any fees and costs of enforcement hereof), shall automatically become and be due and payable, without presentment, demand, protest or any notice of any kind, all of which are hereby expressly waived by the Borrower. Upon an Event of Default, the Lender may exercise in respect of the Collateral, in addition to the other rights and remedies provided for herein or in any other instrument or agreement securing, evidencing or otherwise relating the Secured Obligations of the Borrower or otherwise available to it, all the rights and remedies of a secured party upon default under the New York Uniform Commercial Code (whether or not the New York Uniform Commercial Code applies to the affected Collateral) and also may:

(i) require Borrower to, and the Borrower hereby agrees that it will, at its sole expense and upon request of the Lender forthwith, assemble all or part of its Collateral capable of being assembled as directed by the Lender and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties;

(ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable; and

(iii) occupy any premises owned or leased by the Borrower where the Collateral or any part thereof is assembled or located for a reasonable period of time in order to effectuate the rights and remedies afforded to the Lender under this Agreement, without obligation to the Borrower in respect of such occupation.

The Borrower hereby agrees that, to the extent notice of sale shall be required by applicable law, at least ten days' prior notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to

make any sale of Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Any of the Collateral may be sold, leased or otherwise disposed of in the condition in which the same existed when taken by the Lender or after any overhaul or repair which the Lender shall determine to be commercially reasonable.

Section 8    Notices.    All notices, demands, declarations, consents, directions, approvals, instructions, requests and other communications required or permitted by the terms hereof shall be in writing (unless expressly permitted by the terms of this Agreement to be made by telephone and, in such case, shall be promptly confirmed in writing) and shall be given in person or by means of telex, telegraphic, telecopy (promptly followed by delivery in person, by mail or by courier in the case of a notice of any Event of Default) or other wire transmission, or mailed by registered or certified mail, or sent by courier, in each case addressed as follows (or to such other address as may be hereafter notified by the respective parties from time to time parties hereto in accordance with the terms of this Section 8):

(a) if to the Lender, to such person at 235 East 42nd Street, New York, NY 10017, Attention: Kathleen R. O'Connor, Fax: (212) 673-1133; and

(b) if to the Borrower, to such person at 235 East 42nd Street, New York, NY 10017, Attention: Susan Grant, Fax: (212) 573-1853.

Section 9    Amendments, Etc.  No amendment or waiver of any provision of this Agreement or other document or instrument contemplated hereby to which it is or is to be a party, or consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Borrower and the Lender. No failure or delay by the Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Lender are cumulative and are not exclusive of any rights or remedies that it would otherwise have. The making of a Loan shall not be construed as a waiver of any Event of Default, regardless of whether the Lender may have had notice or knowledge of such Event of Default at the time. This Agreement shall be binding on and inure to the benefit of the Borrower and the Lender and their successors and assigns, except that the Borrower shall not have the right or the power to assign its rights hereunder or any interest herein without the prior written consent of the Lender. The Lender may assign to one or more persons all or any portion of its rights and obligations under this Agreement, under the terms and subject to the conditions set forth herein. In connection with any such assignment, the Borrower agrees to execute and deliver any such documentation as the Lender or any such assignee may reasonably request to evidence such assignment and continue the perfection and protection of the liens granted hereunder in and to the Collateral.

Section 10    Expenses.  The Borrower hereby agrees to pay on demand all costs and expenses of the Lender in connection with the enforcement of this Agreement and all documents and instruments contemplated hereby, whether in any action, suit or litigation, or in any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally (including, without limitation, the reasonable fees and expenses of counsel for the Lender with respect thereto).

Section 11    Severability.  Any provision hereof held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the

remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 12    Counterparts, Effectiveness.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page hereof by telecopy shall be as effective as delivery of a manually executed counterpart hereof.

[The rest of this page is intentionally blank.]

Section 13    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

QUIGLEY COMPANY, INC.


By: _____
    Name:  Susan Grant
    Title:  President and Chief Executive Officer


PFIZER INC.


By: _____
    Name:  Richard A. Passov
    Title:  Vice President and Treasurer

### [Form of] Notice of Borrowing

_____ __, 200_

Pfizer Inc.
235 East 42nd Street
New York, NY 10017
Attention: _____

Ladies and Gentlemen:

The undersigned, Quigley Company, Inc., a New York corporation (the "**Borrower**") refers to the Credit and Security Agreement dated as of March 6, 2003 (as amended, supplemented or otherwise modified from time to time, the "**Credit and Security Agreement**"; capitalized terms used and not otherwise defined herein shall have the same meanings as specified therefor in the Credit and Security Agreement) between the Borrower and Pfizer Inc. as the "**Lender**" and hereby gives you notice, irrevocably, pursuant to Section 1(a) of the Credit and Security Agreement, that the undersigned hereby requests a Revolver Advance under the Credit and Security Agreement and, in connection therewith, sets forth below the information relating to such requested Revolver Advance (the "**Proposed Revolver Advance**") as required by Section 1(a) thereof:

1)       The aggregate principal amount of the Proposed Revolver Advance is requested to be $[_____].

2)       The business day of the Proposed Revolver Advance is requested to be [month] [day], 200_.

The undersigned hereby certifies that the following statements are true on and as of the date of this Notice of Borrowing and will be true on and as of the date of the Proposed Revolver Advance:

a)       The representations and warranties contained in Section 4 of the Credit and Security Agreement are correct in all material respects on and as of the date hereof, before and after giving effect to the Proposed Revolver Advance, and to the application of the proceeds therefrom, as though made on and as of such date.

b)       No event has occurred and is continuing, or would result from the Proposed Revolver Advance, or from the application of the proceeds therefrom, that constitutes an Event of Default, including without limitation any event or occurrence that would constitute an Event of Default but for the requirement that notice be given or time have elapsed or both.

c)       The Borrower has established the Secured Account, and it remains subject to a valid, enforceable and effective deposit account control agreement, in form and substance satisfactory to the Lender, for deposit of the proceeds of the Proposed Revolver Advance.

d)       The Borrower has delivered a notice, in form and substance satisfactory to the Lender, to each insurer on any of the Included Policies informing such insurer of the Lender's lien on and security interest in the insurance proceeds that remain payable in respect of claims submitted to such insurer since the date of the most recent notice delivered by the Borrower to such insurer, if any.

Very truly yours,

QUIGLEY COMPANY, INC.

By_____
    Name:
    Title:

# BLOCKED ACCOUNT CONTROL AGREEMENT
## ("Shifting Control")

AGREEMENT dated as of March 4, 2003, by and among QUIGLEY COMPANY, INC. (the "Company"), PFIZER INC., a Delaware corporation (the "Lender") and JPMorgan Chase Bank (the "Depositary").

The parties hereto refer to Account No. _____ in the name of Company maintained at Depositary (the "Account") and hereby agree as follows:

1. Company and Lender notify Depositary that by separate agreement Company has granted Lender a security interest in the Account and all funds on deposit from time to time therein. Depositary acknowledges being so notified.

2. Prior to the Effective Time (as defined below) Depositary shall honor all withdrawal, payment, transfer or other fund disposition or other instructions which the Company is entitled to give under the Account Documentation (as hereinafter defined) (collectively, "instructions") received from the Company (but not those from Lender) concerning the Account. On and after the Effective Time (and without Company's consent), Depositary shall honor all instructions received from Lender (but not those from Company) concerning the Account and Company shall have no right or ability to access or withdraw or transfer funds from the Account.

For the purposes hereof, the "Effective Time" shall be the opening of business on the *second* business day next succeeding the business day on which a notice purporting to be signed by Lender in substantially the same form as Exhibit A, attached hereto, with a copy of this Agreement attached thereto (a "Shifting Control Notice"), is actually received by the individual employee of Depositary to whom the notice is required hereunder to be addressed; provided, however, that if any such notice is so received after 12:00 noon, New York City time, on any business day, the "Effective Time" shall be the opening of business on the *third* business day next succeeding the business day on which such receipt occurs; and, provided further, that a "business day" is any day other than a Saturday, Sunday or other day on which Depositary is or is authorized or required by law to be closed.

Notwithstanding the foregoing: (i) all transactions involving or resulting in a transaction involving the Account duly commenced by Depositary or any affiliate prior to the Effective Time and so consummated or processed thereafter shall be deemed not to constitute a violation of this Agreement; and (ii) Depositary and/or any affiliate may (at its discretion and without any obligation to do so) (x) cease honoring Company's instructions and/or commence honoring solely Lender's instructions concerning the Account at any time or from time to time after it becomes aware that Lender has sent to it a Shifting Control Notice but prior to the Effective Time therefor (including without limitation halting, reversing or redirecting any transaction referred to in clause (i) above), or (y) deem a Shifting Control Notice to be received by it for purposes of the foregoing paragraph prior to the specified individual's actual receipt if otherwise actually received by Depositary (or if such Shifting Control Notice contains minor mistakes or other irregularities but otherwise substantially complies with the form attached hereto as Exhibit A or does not attach an appropriate copy of this Agreement), with no liability whatsoever to Company or any other party for doing so.

3. This Agreement supplements, rather than replaces, Depositary's deposit account agreement, terms and conditions and other standard documentation in effect from time to time with respect to the Account or services provided in connection with the Account (the "Account Documentation"), which Account Documentation will continue to apply to the Account and such services, and the respective

rights, powers, duties, obligations, liabilities and responsibilities of the parties thereto and hereto, to the extent not expressly conflicting with the provisions of this Agreement (however, in the event of any such conflict, the provisions of this Agreement shall control). Prior to issuing any instructions on or after the Effective Time, Lender shall provide Depositary with such Account Documentation as Depositary may reasonably request to establish the identity and authority of the individuals issuing instructions on behalf of Lender. Lender may request the Depositary to provide other services (such as automatic daily transfers) with respect to the Account on or after the Effective Time; however, if such services are not authorized or otherwise covered under the Account Documentation, Depositary's decision to provide any such services shall be made in its sole discretion (including without limitation being subject to Company and/or Lender executing such Account Documentation or other documentation as Depositary may require in connection therewith).

4. Depositary agrees not to exercise or claim any right of offset, banker's lien or other like right against the Account for so long as this Agreement is in effect except with respect to (i) returned or charged-back items, (ii) reversals or cancellations of payment orders and other electronic fund transfers, (iii) Depositary's charges, fees and expenses with respect to the Account or the services provided hereunder or (iv) overdrafts in the Account.

5. Notwithstanding anything to the contrary in this Agreement: (i) Depositary shall have only the duties and responsibilities with respect to the matters set forth herein as is expressly set forth in writing herein and shall not be deemed to be an agent, bailee or fiduciary for any party hereto; (ii) Depositary shall be fully protected in acting or refraining from acting in good faith without investigation on any notice (including without limitation a Shifting Control Notice), instruction or request purportedly furnished to it by Company or Lender in accordance with the terms hereof, in which case the parties hereto agree that Depositary has no duty to make any further inquiry whatsoever; (iii) it is hereby acknowledged and agreed that Depositary has no knowledge of (and is not required to know) the terms and provisions of the separate agreement referred to in paragraph 1 above or any other related documentation or whether any actions by Lender (including without limitation the sending of a Shifting Control Notice), Company or any other person or entity are permitted or a breach thereunder or consistent or inconsistent therewith, (iv) Depositary shall not be liable to any party hereto or any other person for any action or failure to act under or in connection with this Agreement except to the extent such conduct constitutes its own willful misconduct or gross negligence (and to the maximum extent permitted by law, shall under no circumstances be liable for any incidental, indirect, special, consequential or punitive damages); and (v) Depositary shall not be liable for losses or delays caused by force majeure, interruption or malfunction of computer, transmission or communications facilities, labor difficulties, court order or decree, the commencement of bankruptcy or other similar proceedings or other matters beyond Depositary's reasonable control.

6. Company hereby agrees to indemnify, defend and save harmless Depositary against any loss, liability or expense (including reasonable fees and disbursements of counsel who may be an employee of Depositary) (collectively, "Covered Items") incurred in connection with this Agreement or the Account (except to the extent due to Depositary's willful misconduct or gross negligence) or any interpleader proceeding relating thereto or incurred at Company's direction or instruction. Lender hereby agrees to indemnify, defend and save harmless Depositary against any Covered Items incurred (i) on or after the Effective Time in connection with this Agreement or the Account (except to the extent due to Depositary's willful misconduct or gross negligence) or any interpleader proceeding related thereto, (ii) at Lender's direction or instruction (including without limitation Depositary's honoring of a Shifting Control Notice) or (iii) due to any claim by Lender of an interest in the Account or the funds on deposit therein.

7. Depositary may terminate this Agreement (a) in its discretion upon the sending of at least thirty (30) days' advance written notice to the other parties hereto or (b) because of a material breach by Company

or Lender of any of the terms of this Agreement or the Account Documentation, upon the sending of at least five (5) days advance written notice to the other parties hereto. Any other termination or any amendment or waiver of this Agreement shall be effected solely by an instrument in writing executed by all the parties hereto. The provisions of paragraphs 5 and 6 above shall survive any such termination.

8. Company shall compensate Depositary for the opening and administration of the Account and services provided hereunder in accordance with Depositary's fee schedules from time to time in effect. Payment will be effected by a direct debit to the Account.

9. This Agreement: (i) may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument; (ii) shall become effective when counterparts hereof have been signed and delivered by the parties hereto; and (iii) shall be governed by and construed in accordance with the laws of the State of New York. All parties hereby waive all rights to a trial by jury in any action or proceeding relating to the Account or this Agreement. All notices under this Agreement shall be in writing and sent (including via facsimile transmission) to the parties hereto at their respective addresses or fax numbers set forth below (or to such other address or fax number as any such party shall designate in writing to the other parties from time to time).

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

QUIGLEY COMPANY, INC.

By: _____

Name: Susan Grant
Title: President and CEO
Address   Quigley Company, Inc.
for          235 East 42nd Street
Notices:   New York, NY 10017
              Fax: (212) 573-1853

PFIZER INC.

By: _____

Name: Richard A. Passov
Title: Vice President and Treasurer
Pfizer Inc.
235 East 42nd Street
New York, NY 10017
Fax: (212) 338-1558

JPMORGAN CHASE BANK

By: _____

Name: Robert Dyckman
Title: Vice President – Treasury Services

Address
For Notices:     JPMorgan Chase Bank
                      270 Park Avenue
                      New York, NY 10017
                      Attention: Rod O'Connor and Robert Dyckman
                      Fax No.: (212) 552-5367

EXHIBIT A

[to be placed on Lender letterhead]

BLOCKED ACCOUNT AGREEMENT

SHIFTING CONTROL NOTICE

_____, ____

JPMorgan Chase Bank
[Address]
Attention: [Customer Service Officer] or _____

Re:    Blocked Account Control Agreement dated as of _____, 200____
(the "Agreement") by and among _____, _____,
and JPMorgan Chase Bank

Ladies and Gentlemen:

This constitutes a Shifting Control Notice as referred to in paragraph 2 of the Agreement, a copy of which
is attached hereto.

[NAME OF LENDER]

By:_____
    Signature

_____
Name

_____
Title:

## AMENDMENT NO. 1 TO CREDIT AND SECURITY AGREEMENT

AMENDMENT NO. 1 dated as of May 29 2003 to CREDIT AND SECURITY AGREEMENT dated as of March 6, 2003 between QUIGLEY COMPANY, INC., a New York corporation (the "Borrower"), and PFIZER INC., a Delaware corporation (the "Lender"). Capitalized terms used herein and not defined shall have the meanings set forth in the Credit Agreement referred to below.

### PRELIMINARY STATEMENTS

(1)     The Borrower and the Lender have entered into the Credit and Security Agreement dated as of March 6, 2003 (the "Credit Agreement").

(2)     The Borrower has requested that the Lender convert the Term Advance into a capital contribution to the Borrower pursuant to the terms of the Contribution Agreement dated as of the date hereof (the "Contribution Agreement") between the Borrower and the Lender. The Borrower has also requested that the Lender agree to certain other amendments of the Credit Agreement, and the Lender has indicated its willingness to agree to such request upon the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises, the mutual covenants contained herein and for other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Borrower and the Lender hereby agree as follows:

Section 1     <u>Amendments to the Credit Agreement</u>.  The Credit Agreement is amended upon the occurrence of the Effective Date (as hereinafter defined) in the following manner:

(a)     Subsection (a) of Section 1 of the Credit Agreement is hereby amended by deleting the language "$50,000,000" in the sixth line of thereof and replacing it with the new language "$75,000,000".

(b)     Subsection (b) of Section 1 of the Credit Agreement is hereby deleted in its entirety and replaced by the new language "[Intentionally omitted.]".

(c)     Subsection (c) of Section 1 of the Credit Agreement is hereby amended by (i) deleting the language "and the Term Advance" in the second line thereof, (ii) adding the new word "and" at the end of clause (i) thereof, (iii) deleting the language "; and" at the end of clause (ii) thereof and replacing it with the new punctuation mark "." and (iv) deleting clause (iii) thereof in its entirety.

(d)     Subsection (c) of Section 6 of the Credit Agreement is hereby amended by (i) deleting the language "; and" at the end of clause (ii) thereof and replacing it with the new punctuation mark "." and (ii) deleting clause (iii) thereof in its entirety.

(e)     Subsection (a) of Section 8 of the Credit Agreement is hereby amended by deleting the language "Kathleen R. O'Connor, Fax: (212) 673-1133" in the second line thereof and replacing it with the new language "Kathleen R. O'Connell, Fax: (212) 338-1850".

Section 2    Conditions Precedent to Effectiveness of Agreement. This Agreement shall become effective on the first date (the "Effective Date") on which each of the following conditions precedent shall have been satisfied or waived:

(a)    the Lender shall have received counterparts of this Agreement, the Contribution Agreement, and the other documents and instruments contemplated hereby and thereby (collectively, the "Transaction Documents"), in each case duly executed by the Borrower;

(b)    the Lender shall have received a certified copy of the resolutions of the Board of Directors of the Borrower approving the execution and delivery of and performance under each of the Transaction Documents and the consummation of all transactions contemplated hereby or thereby;

(c)    the representations and warranties contained in Section 4 of the Credit Agreement shall be true and correct in all material respects on and as of the Effective Date, before and after giving effect to this Agreement, as though made on and as of such date (except for any such representation and warranty that by its terms refers to a specific date other than the Effective Date, in which case it shall be true and correct as of such other date); and

(d)    no Event of Default, or event or occurrence that would constitute an Event of Default but for the requirement that notice be given or time have elapsed or both, shall have occurred and be continuing.

Section 3    Representations and Warranties. In order to induce the Lender to enter into this Agreement, the Borrower hereby represents and warrants that:

(a)    it has all of the corporate and other power and authority to execute, deliver and perform under the Transaction Documents, and has taken all necessary corporate and other action to authorize the execution and delivery of and performance under the Transaction Documents, and the consummation of the transactions contemplated hereby or thereby;

(b)    its execution, delivery and performance of the Transaction Documents, and the consummation of the transactions contemplated hereby and thereby (i) do not and will not violate or result in a breach of any applicable law, rule or regulation or any judgment, order, writ or decree of any court, arbitrator or other governmental authority to which it is subject, (ii) do not and will not violate any of its organizational documents, (iii) do not and will not violate or result in a default under any agreement, instrument or other document to which it is party or by which any of its property or assets is bound and (iv) will not result in, or require, the creation or imposition of any Lien on any of its properties, assets or revenues;

(c)    no consent or authorization of, filing with, notice to or other act by or in respect of, any court, arbitrator or other governmental authority or any other Person is required in connection with the execution, delivery and performance of the Transaction Documents or the consummation of any of the transactions contemplated hereby or thereby;

(d)    it has duly executed and delivered the Transaction Documents, each of which constitutes the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms;

(e)    the representations and warranties of contained in Section 4 of the Credit Agreement are true and correct in all material respects on and as of the Effective Date, as though

made on and as of such date (except for any such representation and warranty that by its terms refers to a specific date other than the Effective Date, in which case it is true and correct as of such other date); and

(f)     no Event of Default, or event or occurrence that would constitute an Event of Default but for the requirement that notice be given or time have elapsed or both, has occurred and is continuing.

Section 4     Reference to and Effect on Credit Agreement; Ratification of Credit Agreement.  (a) On and after the Effective Date, each reference in the Credit Agreement to "*this Agreement*"; "*hereunder*", "*hereof*" or words of like import referring to the Credit Agreement, and each reference in any document or instrument contemplated thereby to "*the Credit Agreement*", "*thereunder*", "*thereof*" or words of like import referring to the Credit Agreement, shall mean and be a reference to the Credit Agreement, as amended and otherwise modified by this Agreement.

(b) The Credit Agreement, as amended by this Agreement, is and shall continue to be in full force and effect and is hereby ratified and affirmed in all respects.

Section 5     Costs and Expenses.  The Borrower hereby agrees to pay on demand all costs and expenses of the Lender (including, without limitation, the reasonable fees and expenses of counsel for the Lender) in connection with the preparation, execution, delivery, administration, enforcement, amendment and modification of this Agreement or the Credit Agreement and all of the other documents and instruments contemplated hereby or thereby.

Section 6     Counterparts, Effectiveness.   This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page hereof by telecopy shall be as effective as delivery of a manually executed counterpart hereof.

[The rest of this page is intentionally blank.]

Section 7     <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

     IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

QUIGLEY COMPANY, INC.

By: _____

    Name: Paul Street
    Title: President and Chief Executive Officer


PFIZER INC.

By: _____

    Name: Richard A. Passov
    Title: Vice President and Treasurer

Amendment No. 1 to Credit and Security Agreement

NYLIB5 707327.5

235 EAST 42ND STREET  NEW YORK, NY 10017   **Phone**  (212) 733-0891 **Fax** (212) 573-1853

## LETTER AMENDMENT NO. 2
## TO CREDIT AND SECURITY AGREEMENT

October 29, 2003

Pfizer Inc.
235 East 42nd Street
New York, NY 10017
Attention: Richard A. Passov
Vice President and Treasurer
Fax: (212) 338-1850

We refer to the Credit and Security Agreement dated as of March 6, 2003, as amended by Amendment No. 1 dated as of May 29, 2003 (the "**Credit Agreement**") between Quigley Company, Inc., a New York corporation (the "**Borrower**"), and Pfizer Inc., a Delaware corporation (the "**Lender**"). Capitalized terms used herein and not otherwise defined shall have the respective meanings assigned to them in the Credit Agreement.

The Borrower has requested and the Lender has agreed, subject to the terms and conditions set forth below, to increase the amount of the Facility provided for under the Credit Agreement by $35,000,000. Accordingly, Section 1(a) of the Credit Agreement shall be amended on the Effective Date (as hereinafter defined) by replacing the dollar amount "$75,000,000" in the sixth line of thereof with the new dollar amount "$110,000,000."

This Letter Amendment shall become effective as of the date first written above (the "**Effective Date**") so long as each of the following conditions shall be satisfied not later than seven days later than the date written first above: (a) the Lender shall have received (i) the counterpart signature pages of this Letter Amendment, duly executed and delivered by all parties, and (ii) a certified copy of the resolutions of the Board of Directors of the Borrower approving the execution and delivery of and performance under this Letter Amendment; (b) the representations and warranties contained in Section 4 of the Credit Agreement shall be true and correct in all material respects on and as of the Effective Date, before and after giving effect to this Letter Amendment, as though made on and as of such date (except for any such representation and warranty that by its terms refers to a specific date other than the Effective Date, in which case it shall be true and correct as of such other date); and (c) no Event of Default, or event or occurrence that would constitute an Event of Default but for the requirement that notice be given or time have elapsed or both, shall have occurred and be continuing. The effectiveness of this Letter Amendment is further conditioned upon the accuracy of all of the factual matters described herein. This Letter Amendment is subject to the provisions of Section 9 of the Credit Agreement.

On and after the Effective Date, each reference in the Credit Agreement to "*this Agreement*", "*hereunder*", "*hereof*" or words of like import referring to the Credit Agreement, and any words of like import referring to the Credit Agreement contained in the other documents and instruments contemplated by the Credit Agreement, shall mean and be a reference to the Credit Agreement, as amended hereby. The Credit Agreement, as amended hereby, is and shall continue to be in full force and effect and is hereby ratified and confirmed in all respects.

NYLIB5 735735.1

The parties hereto indicate their acceptance of this Letter Amendment by signing below and returning at least one counterpart signature page to Cadwalader, Wickersham & Taft LLP, 100 Maiden Lane, New York, NY 10038, Attention: Michele Cohen, Telecopy (212) 993-2747.

This Letter Amendment may be executed in any number of counterparts, but all such counterparts shall together constitute but one instrument. Delivery of an executed counterpart signature page by telecopy shall be as effective as delivery of a manually executed counterpart signature page.

Very truly yours,

QUIGLEY COMPANY, INC.

By: _____
Name: Paul Street
Title: President and Chief Executive Officer

ACKNOWLEDGED AND AGREED TO BY:

PFIZER INC.

By: _____
Name: Richard A. Passov
Title: Vice President and Treasurer

NYLIB5 735735.1