**EXHIBIT H**

**TO**

**QUIGLEY COMPANY, INC. THIRD AMENDED PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

———————————

**AMENDED BYLAWS OF REORGANIZED QUIGLEY**

**AMENDED AND RESTATED**

**BY-LAWS**

**OF**

**QUIGLEY COMPANY, INC.**

ARTICLE I

<u>Offices</u>

Section 1.   The registered office of the Corporation shall be in the City of New York, County of New York, State of New York.  The Corporation also may have offices at such other places, within or without the State of New York, as the Board of Directors determines from time to time or the business of the Corporation requires.

ARTICLE II

<u>Meetings of Stockholders</u>

Section 1.  <u>Place of Meetings</u>.   Except as otherwise provided in these By-laws, all meetings of the stockholders shall be held on such dates and at such times and places, within or without the State of New York, as shall be determined by the Board of Directors and as shall be stated in the notice of the meeting or in waivers of notice thereof.  If the place of any meeting is not so fixed, it shall be held at the registered office of the Corporation in the State of New York.

Section 2.  <u>Annual Meeting</u>.   The annual meeting of stockholders for the election of directors and the transaction of such other proper business as may be brought before the

meeting shall be held on such date after the close of the Corporation's fiscal year, and at such time, as the Board of Directors may from time to time determine.

Section 3.  <u>Special Meetings</u>.   Special meetings of the stockholders, for any purpose or purposes, may be called by the Board of Directors and shall be called by the President or the Secretary upon the written request of a majority of the directors or holders of not less than 50% of the Corporation's outstanding shares entitled to vote at such meeting.  The request shall state the date, time, place and purpose or purposes of the proposed meeting.

Section 4.  <u>Notice of Meetings</u>.   Except as otherwise required or permitted by law, whenever the stockholders are required or permitted to take any action at a meeting, written notice thereof shall be given, stating the place, date and hour of the meeting and, unless it is the annual meeting, by or at whose direction it is being issued.  The notice also shall designate the place where the stockholders list is available for examination, unless the list is kept at the place where the meeting is to be held.  Notice of a special meeting also shall state the purpose or purposes for which the meeting is called.  A copy of the notice of any meeting shall be delivered personally or shall be mailed, not less than 10 and not more than 60 days before the date of the meeting, to each stockholder entitled to vote at the meeting.  If mailed, the notice shall be deemed given when deposited in the United States mail, postage prepaid, directed to each stockholder at such stockholder's address as it appears on the records of the Corporation, unless such stockholder shall have filed with the Secretary of the Corporation a written request that such notices be mailed to some other address, in which case it shall be directed to such other address.  Notice of any meeting of stockholders need not be given to any stockholder who shall attend the meeting, other than for the express purpose of objecting at the beginning thereof to the transaction of any business because the meeting is not lawfully called or convened, or who shall

submit, either before or after the time stated therein, a signed waiver of notice.  Unless the Board of Directors, after an adjournment is taken, shall fix a new record date for an adjourned meeting or unless the adjournment is for more than 30 days, notice of an adjourned meeting need not be given if the place, date and time to which the meeting shall be adjourned are announced at the meeting at which the adjournment is taken.

     Section 5. <u>Quorum; Adjournments</u>. Except as otherwise provided by law or by the Certificate of Incorporation of the Corporation, at all meetings of stockholders the holders of a majority of the shares of the Corporation entitled to vote, present in person or represented by proxy, shall constitute a quorum for the transaction of business.  If, however, a quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall, by a majority vote of the shares held by such stockholders, have the power to adjourn the meeting from time to time, without notice of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken, until a quorum shall be present or represented.  Even if a quorum shall be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall, by a majority vote of the shares held by such stockholders, have the power to adjourn the meeting from time to time without notice of the adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken (except as otherwise provided herein), until a date which is not more than 30 days after the date of the original meeting.  At any such adjourned meeting, at which a quorum shall be present in person or represented by proxy, any business may be transacted which might have been transacted at the meeting as originally called.  If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned

meeting, notice of the adjourned meeting shall be given to each stockholder of record entitled to vote thereat.

Section 6.  <u>Voting</u>.  Except as otherwise provided by law or by the Certificate of Incorporation of the Corporation, at any meeting of the stockholders every stockholder of record having the right to vote thereat shall be entitled to one vote for every share of stock standing in his name as of the record date and entitling him to so vote.  A stockholder may vote in person or by proxy.  Except as otherwise provided by law or by the Certificate of Incorporation, any corporate action to be taken by a vote of the stockholders, other than the election of directors, shall be authorized by the affirmative vote of a majority of the shares present or represented by proxy at the meeting and entitled to vote on the subject matter.  Directors shall be elected as provided in Section 2 of Article III of these By-laws.  Written ballots shall not be required for voting on any matter unless ordered by the chairman of the meeting.

Section 7.  <u>Proxies</u>.  Every proxy shall be executed in writing by the stockholder or by his authorized representative, or otherwise as provided in the Business Corporation Law of the State of New York (the "BCL").

Section 8.  <u>List of Stockholders</u>.  At least 10 days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing their addresses and the number of shares registered in their names as of the record date shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least 10 days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to

be held.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

Section 9.  <u>Conduct of Meetings</u>.  At each meeting of the stockholders, the President or, in his absence, any one of the Vice Presidents, in order of their seniority, shall act as chairman of the meeting.  The Secretary or, in his absence, any person appointed by the chairman of the meeting shall act as secretary of the meeting and shall keep the minutes thereof.  The order of business at all meetings of the stockholders shall be as determined by the chairman of the meeting.

Section 10.  <u>Consent of Stockholders in Lieu of Meeting</u>.  Unless otherwise provided in the Certificate of Incorporation of the Corporation, any action required to be taken or which may be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed, in person or by proxy, by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted in person or by proxy and shall be delivered to the Corporation as required by law.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

## ARTICLE III

### Board of Directors

Section 1.  <u>Number of Directors</u>.  Upon effectiveness of these By-Laws, the Board of Directors shall consist of three directors.  The number of Directors may be reduced or

increased from time to time by the Board of Directors or the stockholders. Except as otherwise provided in the Certificate of Incorporation of the Corporation (including any Certificates of Designations in respect of any series of Preferred Stock of the Corporation), the number of directors may be reduced or increased from time to time by action of a majority of the whole Board, provided that no decrease may shorten the term of an incumbent director. When used in these By-laws, the term "whole Board" means the total number of directors which the Corporation would have if there were no vacancies.

Section 2.  <u>Election and Term</u>.   Except as otherwise provided by law, by the Certificate of Incorporation of the Corporation or by these By-laws, the directors shall be elected at the annual meeting of the stockholders and the persons receiving a plurality of the votes cast shall be so elected.  Subject to his earlier death, resignation or removal as provided in Section 3 of this Article III, each director shall hold office until his successor shall have been elected and shall have qualified.

Section 3.  <u>Removal</u>.   Unless otherwise provided by the Certificate of Incorporation of the Corporation, these By-Laws or any contract or agreement to which the Corporation is a party, a director may be removed at any time, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.

Section 4.  <u>Resignations</u>.  Any director may resign at any time by giving written notice of his resignation to the Corporation.  A resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt, and, unless otherwise specified therein, the acceptance of a resignation shall not be necessary to make it effective.

Section 5.  <u>Vacancies</u>.  Except as otherwise provided in the Certificate of Incorporation of the Corporation, any vacancy in the Board of Directors arising from an increase in the number of directors or otherwise may be filled by the vote of a majority of the directors then in office, although less than a quorum, or by a sole remaining director.

Section 6.  <u>Place of Meetings</u>.  Except as otherwise provided in these By-laws, all meetings of the Board of Directors shall be held at such places, within or without the State of New York, as the Board determines from time to time.

Section 7.  <u>Annual Meeting</u>.  The annual meeting of the Board of Directors shall be held either without notice immediately after the annual meeting of stockholders and in the same place, or as soon as practicable after the annual meeting of stockholders on such date and at such time and place as the Board determines from time to time.

Section 8.  <u>Regular Meetings</u>.  Regular meetings of the Board of Directors shall be held on such dates and at such times and places as the Board determines from time to time. Notice of regular meetings need not be given, except as otherwise required by law.

Section 9.  <u>Special Meetings</u>.  Special meetings of the Board of Directors, for any purpose or purposes, may be called by the President and shall be called by the President or the Secretary upon the written request of a majority of the directors.  The request shall state the date, time, place and purpose or purposes of the proposed meeting.

Section 10.  <u>Notice of Meetings</u>.  Notice of each special meeting of the Board (and of each annual meeting which is not held immediately after, and in the same place as, the annual meeting of stockholders) shall be given, not later than 24 hours before the meeting is scheduled to commence, by the President or the Secretary and shall state the place, date and time of the meeting.  Notice of each meeting may be delivered to a director by hand or given to a

director orally (either by telephone or in person) or mailed, telegraphed or sent by facsimile transmission to a director at his residence or usual place of business, provided, however, that if notice of less than 72 hours is given it may not be mailed. If mailed, the notice shall be deemed given when deposited in the United States mail, postage prepaid; if telegraphed, the notice shall be deemed given when the contents of the telegram are transmitted to the telegraph service with instructions that the telegram immediately be dispatched; and if sent by facsimile transmission, the notice shall be deemed given when transmitted with transmission confirmed. Notice of any meeting need not be given to any director who shall submit, either before or after the time stated therein, a signed waiver of notice or who shall attend the meeting, other than for the express purpose of objecting at the beginning thereof to the transaction of any business because the meeting is not lawfully called or convened. Notice of an adjourned meeting, including the place, date and time of the new meeting, shall be given to all directors not present at the time of the adjournment, and also to the other directors unless the place, date and time of the new meeting are announced at the meeting at the time at which the adjournment is taken.

Section 11. <u>Quorum</u>. Except as otherwise provided by law or in these By-laws, at all meetings of the Board of Directors a majority of the whole Board shall constitute a quorum for the transaction of business, and the vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board. A majority of the directors present, whether or not a quorum is present, may adjourn any meeting to another place, date and time.

Section 12. <u>Conduct of Meetings</u>. At each meeting of the Board of Directors, the President or, in his absence, a director chosen by a majority of the directors present shall act as chairman of the meeting. The Secretary or, in his absence, any person appointed by the chairman of the meeting shall act as secretary of the meeting and keep the minutes thereof. The

9821818.2

order of business at all meetings of the Board shall be as determined by the chairman of the meeting.

Section 13. <u>Committees of the Board</u>.   The Board of Directors, by resolution adopted by a majority of the whole Board, may designate an executive committee and other committees, each consisting of one or more directors.  Each committee (including the members thereof) shall serve at the pleasure of the Board of Directors and shall keep minutes of its meetings and report the same to the Board.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member or members at any meeting of the committee.   In addition, in the absence or disqualification of a member of a committee, if no alternate member has been designated by the Board of Directors, the member or members present at any meeting and not disqualified from voting, whether or not they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of the absent or disqualified member.  Except as limited by law, each committee, to the extent provided in the resolution of the Board of Directors establishing it, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Corporation.

Section 14. <u>Operation of Committees</u>.   A majority of all the members of a committee shall constitute a quorum for the transaction of business, and the vote of a majority of all the members of a committee present at a meeting at which a quorum is present shall be the act of the committee.  Each committee shall adopt whatever other rules of procedure it determines for the conduct of its activities.

Section 15. <u>Consent to Action</u>.   Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a

meeting if all members of the Board or committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

Section 16. <u>Attendance Other Than in Person</u>. Members of the Board of Directors or any committee thereof may participate in a meeting of the Board or committee, as the case may be, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at the meeting.

ARTICLE IV

<u>Officers</u>

Section 1. <u>Executive and Other Officers</u>. The executive officers of the Corporation shall be a Chairman, a President, and a Secretary, and a Treasurer. The Board of Directors also may elect or appoint one or more Vice Presidents (any of whom may be designated as Executive Vice Presidents or otherwise), and any other officers it deems necessary or desirable for the conduct of the business of the Corporation, each of whom shall have such powers and duties as the Board determines. Any officer may devote less than all of his working time to his activities as such if the Board so approves.

Section 2. <u>Duties</u>.

(a)      <u>The Chairman</u>. The Chairman shall have such powers and shall perform such duties as shall from time to time be designated by the Board.

(b)      <u>The President</u>. The President shall be the chief executive officer and chief operating officer of the Corporation, and shall preside at all meetings of the stockholders and of the Board of Directors. The President shall have general management of the

business and affairs of the Corporation, subject to the control of the Board of Directors, and he shall have such other powers and duties as the Board assigns to him.

(c)     The Vice President.  The Vice President or, if there shall be more than one, the Vice Presidents, if any, in the order of their seniority or in any other order determined by the Board of Directors, shall perform, in the absence or disability of the President, the duties and exercise the powers of the President, and shall have such other powers and duties as the Board or the President assigns to him or them.

(d)     The Secretary.  Except as otherwise provided in these By-laws or as directed by the Board of Directors, the Secretary shall attend all meetings of the stockholders and the Board; he shall record the minutes of all proceedings in books to be kept for that purpose; he shall give notice of all meetings of the stockholders and special meetings of the Board; and he shall keep in safe custody the seal of the Corporation and, when authorized by the Board, he shall affix the same to any corporate instrument.  The Secretary shall have such other powers and duties as the Board or the President assigns to him.

(e)     The Treasurer.  Subject to the control of the Board, the Treasurer shall have the care and custody of the corporate funds and the books relating thereto; and he shall perform all other duties incident to the office of Treasurer.  The Treasurer shall have such other powers and duties as the Board or the President assigns to him.

Section 3.  Term; Removal.   Subject to his earlier death, resignation or removal, each officer shall hold his office until his successor shall have been elected or appointed and shall have qualified, or until his earlier death, resignation or removal.  Any officer may be removed at any time, with or without cause, by the Board of Directors.

Section 4.  <u>Resignations</u>.   Any officer may resign at any time by giving written notice of his resignation to the Corporation.  A resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt, and, unless otherwise specified therein, the acceptance of a resignation shall not be necessary to make it effective.

Section 5.  <u>Vacancies</u>.   If an office becomes vacant for any reason, the Board of Directors or the stockholders may fill the vacancy, and each officer so elected or appointed shall serve for the remainder of his predecessor's term and until his successor shall have been elected or appointed and shall have qualified.

ARTICLE V

Provisions Relating to Stock

<u>Certificates and Stockholders</u>

Section 1.  <u>Form, Signatures</u>.

(a)      To the extent the Corporation issues any certificates representing some or all classes or series of its stock, each such certificate shall be in a form approved by the Board of Directors and shall be signed by or in the name of the Corporation by the Chairman of the Board, if any, or the President or any Vice-President, and [the Treasurer or any Assistant Treasurer or] the Secretary or any Assistant Secretary of the Corporation, exhibiting the number and class (and series, if any) of shares owned by such stockholder.  Such signatures may be facsimiles.  In case any officer who has signed, or whose facsimile signature was placed on, a certificate shall have ceased to be such officer before such certificate is issued, it may

nevertheless be issued by the Corporation with the same effect as if he or she were such officer at the date of its issue.

(b)     All requested stock certificates that represent shares of capital stock that are subject to restrictions on transfer or to other restrictions shall have conspicuously noted thereon such notation to such effect as may be required by law or determined by the Board of Directors.

Section 2.   <u>Registration of Transfer</u>.  Except as provided in the Certificate of Incorporation or any contract or agreement to which the Corporation is a party, upon surrender to the Corporation or any transfer agent of the Corporation of a certificate for shares, if such a certificate was issued, duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the Corporation or its transfer agent to issue, upon request, a new certificate to the person entitled thereto, to cancel the old certificate (if any) and to record the transaction upon its books.

Section 3.   <u>Registered Stockholders</u>.

(a)     Except as otherwise provided by law, the Corporation shall be entitled to recognize the exclusive right of a person that is registered on its books as the owner of shares of its capital stock to receive dividends or other distributions, to vote as such owner, and to hold liable for calls and assessments any person that is registered on its books as the owner of shares of its capital stock.  The Corporation shall not be bound to recognize any equitable or legal claim to or interest in such shares on the part of any other person.

(b)     If a stockholder desires that notices and dividends shall be sent to a name or address other than the name or address appearing on the stock ledger maintained by the

Corporation, such stockholder shall have the duty to notify the Corporation of such desire. Such notice shall specify the alternate name or address to be used.

Section 4.  <u>Record Date</u>.

(a)     In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not (i) precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and (ii) be more than 60 nor less than 10 days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting taken pursuant to Section 5 of Article II; <u>provided</u>, <u>however</u>, that the Board of Directors may fix a new record date for the adjourned meeting.

(b)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not (i) precede the date upon which the resolution fixing the record date is adopted by the Board of Directors and (ii) be more than 10 days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a

signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

(c)     In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion, or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not be more than 60 days prior to such action.  If no record date is fixed, the record date for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 5.  <u>Lost, Stolen or Destroyed Certificates</u>.  The Board of Directors may direct, upon request, a new certificate to be issued in place of any certificate theretofore issued by the Corporation, alleged to have been lost, stolen or destroyed.  When authorizing such issuance of a new certificate, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate, or its legal representative, to give the Corporation a bond in such sum, or other security in such

form, as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate claimed to have been lost, stolen or destroyed.

## ARTICLE VI

### Indemnification

Section 1.  Indemnification.  Unless otherwise determined by the Board of Directors, the Corporation shall, to the fullest extent permitted by the BCL (including, without limitation, Sections 722 and 723 thereof) or other provisions of the laws of New York relating to indemnification of directors, officers, employees and agents, as the same may be amended and supplemented from time to time, indemnify any and all such persons whom it shall have power to indemnify under the BCL or such other provisions of law.

Section 2.  Statutory Indemnification.  Without limiting the generality of Section 1 of this Article VI, to the fullest extent permitted, and subject to the conditions imposed, by law, and pursuant to the BCL unless otherwise determined by the Board of Directors:

(i)  the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that such person is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if such person acted in good faith and in a manner he reasonably believed to be in or

not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful; and

(ii)　　the Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if such person acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation, except as otherwise provided by law.

Section 3. Indemnification by Resolution of Stockholders or Directors or Agreement. Without limiting the generality of Section 1 or Section 2 of this Article VI, to the fullest extent permitted by law, indemnification may be granted, and expenses may be advanced, to the persons described in Section 722 of the BCL or other provisions of the laws of New York relating to indemnification and advancement of expenses, as from time to time may be in effect, by (i) a resolution of stockholders, (ii) a resolution of the Board of Directors, or (iii) an agreement providing for such indemnification and advancement of expenses, provided that no indemnification may be made to or on behalf of any person if a judgment or other final adjudication adverse to the person establishes that such person's acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or that such person personally gained in fact a financial profit or other advantage to which such person was not legally entitled.

Section 4.  <u>General</u>.  It is the intent of this Article VI to require the Corporation, unless otherwise determined by the Board of Directors, to indemnify the persons referred to herein for judgments, fines, penalties, amounts paid in settlement and expenses (including attorneys' fees), and to advance expenses to such persons, in each and every circumstance in which such indemnification and such advancement of expenses could lawfully be permitted by express provision of by-laws, and the indemnification and expense advancement provided by this Article VI shall not be limited by the absence of an express recital of such circumstances.  The indemnification and advancement of expenses provided by, or granted pursuant to, these By-laws shall not be deemed exclusive of any other rights to which a person seeking indemnification or advancement of expenses may be entitled, whether as a matter of law, under any provision of the Certificate of Incorporation of the Corporation, these By-laws, by agreement, by vote of stockholders or disinterested directors of the Corporation or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

Section 5.  <u>Indemnification Benefits</u>.  Indemnification pursuant to these By-laws shall inure to the benefit of the heirs, executors, administrators and personal representatives of those entitled to indemnification.


ARTICLE VII

<u>General Provisions</u>

Section 1.  <u>Dividends</u>.   To the extent permitted by law, the Board of Directors shall have full power and discretion, subject to the provisions of the Certificate of Incorporation of the Corporation and the terms of any other corporate document or instrument binding upon the

Corporation, to determine what, if any, dividends or distributions shall be declared and paid or made.

Section 2. <u>Seal</u>. The Corporation may have a corporate seal which shall be in such form as is required by law and approved by the Board of Directors.

Section 3. <u>Fiscal Year</u>. The fiscal year of the Corporation shall be determined by the Board of Directors.

Section 4. <u>Voting Shares in Other Corporations</u>. Unless otherwise directed by the Board of Directors, shares in other corporations which are held by the Corporation shall be represented and voted only by the President or by a proxy or proxies appointed by him.

ARTICLE VIII

<u>Amendments</u>

Section 1. By-Laws may be adopted, amended or repealed by the Board of Directors, provided the conferral of such power on the Board shall not divest the stockholders of the power, or limit their power, to adopt, amend or repeal By-laws.

**EXHIBIT I**

**TO**

**QUIGLEY COMPANY, INC. THIRD AMENDED PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

———————————

**AMENDED CERTIFICATE OF INCORPORATION
OF REORGANIZED QUIGLEY**

# AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

## OF

## QUIGLEY COMPANY, INC.
### (A NEW YORK CORPORATION)

I, the undersigned, Paul A. Street, being the President of Quigley Company, Inc., a corporation organized and existing under and by virtue of Business Corporation Law of the State of New York (the "BCL"), DO HEREBY CERTIFY:

1.      The name of the corporation is Quigley Company, Inc.  The date of filing of its original Certificate of Incorporation, under the name Quigley Furnace Specialties Company, Inc., with the Secretary of State was May 18, 1916.  A Certificate of Change of Name, changing the corporation's name to Quigley Company, Inc., was filed on July 7, 1930.

2.      This Amended and Restated Certificate of Incorporation has been duly adopted and effected in conformity with Section 402 of the BCL and pursuant to the order entered by the United States Bankruptcy and District Courts for the Southern District of New York on [_____], 2006, in the case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") encaptioned In re Quigley Company, Inc., Case No. 04-15739 (SMB), confirming the Quigley Company, Inc. Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan").

3.      This Amended and Restated Certificate of Incorporation shall be effective upon filing.

4.      This Amended and Restated Certificate of Incorporation restates, integrates and further amends the Certificate of Incorporation of this corporation by restating the text of the original Certificate of Incorporation, as amended and restated, in full to read as follows:

FIRST:          The name of the corporation is Quigley Company, Inc. (the "Corporation").

SECOND: The Secretary of State of the State of New York is hereby designated as the agent of the Corporation upon whom process in any action or proceeding against it may be served, and the address to which the Secretary of State shall mail a copy of process in any action or proceeding against the Corporation which may be served upon the Secretary of State is 111 Eighth Avenue, New York, New York 10011. CT Corporation System is the Corporation's registered agent at that address.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the BCL, provided that the Corporation is not formed to engage in any act or activity requiring the consent or approval of any state official, department, board, agency or other body without such consent or approval first being obtained.

FOURTH: A. The total number of shares of stock which the corporation shall have authority to issue is one thousand shares (1,000), par value one hundred dollars ($100) per share.

B. The corporation shall not issue any class of non-voting equity securities unless, and solely to the extent, permitted by section 1123(a)(6) of the Bankruptcy Code as in effect on the effective date of the Plan and applicable to the Corporation's chapter 11 case; provided, however, that this Section B of Article FOURTH (i) shall have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code, (ii) shall have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the Corporation, and (iii) in all events may be amended or eliminated in accordance with applicable law as from time to time in effect.

FIFTH: Except as otherwise provided by the BCL as the same exists or may hereafter be amended, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; provided, however, that the foregoing shall not apply to liability of a director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 719 of the BCL, or (iv) for any transaction from which the director derived an improper personal benefit. The Corporation shall indemnify directors and officers of the Corporation to

the fullest extent permitted by the BCL. Any repeal or modification of this Article FIFTH by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

SIXTH: The Board of Directors shall have the power to adopt, amend or repeal By-laws of the Corporation, subject to the right of the stockholders of the Corporation to adopt, amend or repeal any By-law.

SEVENTH: The Corporation shall, to the fullest extent permitted by the BCL, as the same may be amended and supplemented from time to time, indemnify any and all persons whom it shall have power to indemnify under the BCL. The Corporation also may indemnify such persons pursuant to agreement or resolution of shareholders or directors, from and against any and all of the expenses, liabilities or other matters referred to in or covered by the BCL. The indemnification provided for herein shall not be deemed exclusive of any other rights to which any person may be entitled under any By-law, resolution of shareholders, resolution of directors, agreement or otherwise, as permitted by the BCL, as to action, or as to the failure to act, in any capacity in which such person served at the request of the Corporation.

EIGHTH: The election of directors of the Corporation need not be by written ballot, unless the By-laws of the Corporation otherwise provide.

NINTH: The county, within this state, in which the office of the Corporation is to be located is New York.

The undersigned, being the President of the Corporation, does make and file this Amended and Restated Certificate of Incorporation, hereby declaring and certifying that the facts herein stated are true, and accordingly has hereunto set his hand this ___ day of _____, 2006.

 

 

                              _____

                              Name: Paul A. Street
                              Title: President

**EXHIBIT J**

**TO**

**QUIGLEY COMPANY, INC. THIRD AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

———————————

**ASBESTOS PI CLAIMS SERVICES AGREEMENT**

# ASBESTOS PERSONAL INJURY
# CLAIMS SERVICES AGREEMENT

This ASBESTOS PERSONAL INJURY CLAIMS SERVICES AGREEMENT (this "Services Agreement"), dated and effective as of _____, 2006, is between Quigley Company, Inc. ("Reorganized Quigley"), a New York corporation and the reorganized debtor in chapter 11 case number 04-15739 (SMB) (the "Chapter 11 Case") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and the Quigley Company, Inc. Asbestos Personal Injury Trust (the "Asbestos PI Trust") established pursuant to the Quigley Company, Inc. Third Amended Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code, as amended, modified or supplemented from time to time (the "Plan").

## RECITALS

**WHEREAS**, at the time of the entry of the order for relief in the Chapter 11 Case, Quigley Company, Inc. (the "Debtor") was named as a defendant in personal injury actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

**WHEREAS**, Reorganized Quigley has reorganized under the provisions of chapter 11 of the Bankruptcy Code in the Chapter 11 Case;

**WHEREAS**, the order confirming the Plan filed by the Debtor and supported by the Creditors' Committee and the Future Demand Holders' Representative, has been issued or affirmed by the District Court (the "Confirmation Order") and has become a Final Order;

**WHEREAS**, the Plan provides for, among other things, the creation of the Asbestos PI Trust;

**WHEREAS,** pursuant to the Plan and the Confirmation Order, all Asbestos PI Claims are channeled to the Asbestos PI Trust;

**WHEREAS,** pursuant to the Plan, the Asbestos PI Trust is to use its assets and income to pay Asbestos PI Claims as and to the extent provided for in the Asbestos Personal Injury Trust Agreement and in the Quigley Company, Inc. Asbestos Personal Injury Trust Distribution Procedures (the "Asbestos PI Trust Distribution Procedures");

**WHEREAS,** the Plan provides that Reorganized Quigley and the Asbestos PI Trust will enter into this Services Agreement, pursuant to which Reorganized Quigley will manage and process the Asbestos PI Claims on behalf of the Asbestos PI Trust;

**NOW, THEREFORE**, in consideration of the mutual covenants and understandings contained herein, and subject to and on the terms and conditions herein set forth, the parties hereby agree as follows:

# ARTICLE 1

## DEFINITIONS

Section 1.1    Definitions. All capitalized terms used herein but not otherwise defined shall have the meanings given to such terms in the Plan or the Asbestos PI Trust Distribution Procedures, and such definitions are incorporated herein by reference.    All capitalized terms not defined herein or in the Plan or the Asbestos PI Trust Distribution Procedures, but defined in the Bankruptcy Code or Bankruptcy Rules, shall have the meanings given to them in such code or rules, and such definitions are incorporated herein by reference.

Section 1.2    References. Unless indicated otherwise, all references in this Services Agreement to a particular Article or Section number are references to Articles or Sections of this Services Agreement.

# ARTICLE 2

## START UP/TRANSITION SERVICES

Section 2.1    Prior to performing any of the Quigley Services (as defined below in Section 3.1), including without limitation, commencing review of Asbestos PI Claims, Reorganized Quigley shall develop reports, claim forms, procedures and related materials in compliance with the terms and provisions of the Asbestos PI Trust Distribution Procedures and as directed by the Asbestos PI Trust for use by the Asbestos PI Trust in connection with processing, liquidating and considering the allowance of Asbestos PI Claims, which shall include, without limitation:

(a) Developing procedures for the transfer of information from Reorganized Quigley to the Asbestos PI Trust.

(b) Preparing claims filing materials consistent with the terms and provisions of the Asbestos PI Trust Distribution Procedures ("Claims Materials").

(c) Developing procedures for notice to the Asbestos PI Trust of requests for Claims Materials by claimants or other counsel.

(d) Developing a database for Asbestos PI Claims.

# ARTICLE 3

## QUIGLEY SERVICES

Section 3.1    The services to be provided by Reorganized Quigley to the Asbestos PI Trust under this Services Agreement shall generally be referred to herein as the "Quigley Services," which shall consist of:

(a) Establishing the FIFO Processing Queues, tracking claimants' positions in such FIFO Processing Queues, and providing claimants with notice of their position in the applicable FIFO Processing Queue as required by the Asbestos PI Trust Distribution Procedures.

(b) Establishing the FIFO Payment Queues, tracking claimants' positions in such FIFO Payment Queues, and providing claimants with notice of their position in the applicable FIFO Payment Queue as required by the Asbestos PI Trust Distribution Procedures.

(c) Working with the Asbestos PI Trust, the Trustees, the Trust Advisory Committee and the Future Demand Holders' Representative to adopt procedures for reviewing and liquidating all unliquidated Asbestos PI Claims, including the establishment of deadlines for processing such claims.

(d) Reviewing and processing all incoming proof of claim forms and medical, exposure or any other evidence required by the Asbestos PI Trust Distribution Procedures to determine eligibility under the Asbestos PI Trust Distribution Procedures for liquidation and payment of an Asbestos PI Claim, taking into account, among other things, (i) Medical/Exposure Criteria, (ii) statute of limitations, and (iii) whether the claim satisfies the requirements to be an Exigent Hardship Claim.

(e) Managing the process of imaging all data received in connection with Section 3.1(d).

(f) Monitoring the accrued amount of each of the Maximum Annual Payment and the Maximum Available Payment.

(g) Tracking: (i) the number of Category A Claims and Category B Claims and amounts paid with respect thereto; (ii) the number of claims paid by the Asbestos PI Trust for each Disease Level and the amounts paid with respect thereto; (iii) the identity and number of claims liquidated by Individual Review, Expedited Review, ADR Procedures, or in the tort system; and (iv) the identity and number of claims liquidated as Extraordinary Claims and Exigent Hardship Claims.

(h) Tracking and processing the payment of filing fees for each Asbestos PI Claim, to the extent payment of any fee is required pursuant to Section 6.4 of the Asbestos PI Trust Distribution Procedures.

(i) Providing the Asbestos PI Trust with information relating to the Quigley Services as requested by the Asbestos PI Trust in connection with any ADR proceeding or litigation in the tort system.

(j) Monitoring the allocation of amounts billed to insurers for payment of Asbestos PI Claims allowed by the Asbestos PI Trust.

(k) Managing and tracking Insurer Receivables owed to Quigley.

(l)  Not less than monthly, or more often if requested by the Asbestos PI Trust in writing, providing the Asbestos PI Trust with a written summary of all information being tracked or monitored.

(m) Working with the Asbestos PI Trust to develop and implement, as necessary, a claims audit program, as described in Section 5.8 of the Asbestos PI Trust Distribution Procedures.

Section 3.2    The parties shall cooperate and endeavor in good faith to modify and supplement Section 3.1 of this Services Agreement to accurately identify the Quigley Services, and to specify the manner and terms under which the Quigley Services shall be performed, in order to refine and further effect the understandings set forth in this Services Agreement.

Section 3.3    In furtherance of the principles set forth in this Article 3, each party shall cooperate with and assist the other party in obtaining any consent, authorization, order or approval of, or any exemption by, any third party required to be obtained or made for the performance by the parties of their obligations under this Services Agreement at no cost to either party.  If the parties are unable to obtain any required consents, the parties shall negotiate in good faith reasonable modifications of the Quigley Services such that such consents are not required.

Section 3.4    Each party shall designate a representative to be the primary liaison between the parties for the provision of the Quigley Services under this Services Agreement (each, a "Services Representative").  The Services Representatives shall meet regularly in person, telephonically, or as they otherwise agree, at least monthly for the first year following the date hereof, to discuss any issues arising under this Services Agreement and the need for any modifications or additions hereto.

## ARTICLE 4

## EMPLOYEES

Section 4.1    Reorganized Quigley shall at all times maintain staff sufficient to provide the Quigley Services.

## ARTICLE 5

## FEES

Section 5.1    Reorganized Quigley shall provide the services as set forth herein for the following fees:

(a)    One-time Start Up/Transition Services Fee          $250,000.00

(b)     Asbestos PI Claims Services – Fixed Cost

(i)     per claim reviewed (if claim is accepted and paid)     $47.50 (which per claim fee shall be paid in installments as follows:  (i) $22.50 when Reorganized Quigley commences review of such claim; (ii) $20.00 upon placement of claim in a FIFO Processing Queue; and (iii) $5.00 upon placement of the claim in a FIFO Payment Queue);

(ii)     per claim reviewed (if claim is rejected)     $47.50 (which per claim fee shall be paid in installments as follows:  (i) $22.50 when Reorganized Quigley commences review of such claim; and (ii) $25.00 upon rejection of the claim).

## ARTICLE 6

## PAYMENT OF FEES

Section 6.1     On the date of execution of this Services Agreement by the parties, the Asbestos PI Trust shall pay to Reorganized Quigley by wire transfer to an account designated by Reorganized Quigley the sum of $250,000.00, which amount shall constitute the Start Up/Transition Services Fee.

Section 6.2     Reorganized Quigley shall provide a monthly invoice to the Asbestos PI Trust setting forth in reasonable detail the Asbestos PI Claims processed by Reorganized Quigley pursuant to this Services Agreement.  The Asbestos PI Trust shall have fifteen (15) days from receipt of the invoice to dispute any amounts contained therein.  If the Asbestos PI Trust does not timely dispute any or all of the invoiced amount, it shall pay the invoiced amount within fifteen (15) days of the completion of the review period.  To the extent that any dispute is not resolved between the parties, such dispute shall be resolved pursuant to Article 14 of this Services Agreement.  Notwithstanding anything to the contrary contained in this Services Agreement, the Asbestos PI Trust shall not have the right to withhold any invoiced amounts in excess of the disputed amount, unless the amount in dispute exceeds one-third (33%) of the aggregate amount invoiced.

## ARTICLE 7

## STANDARD OF PERFORMANCE

Section 7.1     (a)  Reorganized Quigley shall provide the Quigley Services with reasonable skill and care.

(b) The parties acknowledge that the timely completion of the Quigley Services by Reorganized Quigley may depend upon the provision of information and/or services to Reorganized Quigley by the Asbestos PI Trust. Reorganized Quigley shall not be responsible for the failure to provide the Quigley Services to the extent that such failure results from the Asbestos PI Trust's failure to provide such information and/or services to Reorganized Quigley.

# ARTICLE 8

## TERM OF SERVICES

Section 8.1    The parties agree that, except as otherwise designated in this Services Agreement, all Quigley Services shall terminate on the earlier of:  (a) the termination of the Asbestos PI Trust pursuant to section 8.02(a) of the Asbestos PI Trust Agreement; (b) at any time after the fifth anniversary of the Effective Date, six months after either party provides the other party with written notice of termination; and (c) the mutual agreement of the parties.

Section 8.2    To the extent the Services Agreement terminates pursuant to section 8.1(b) or (c) above, or any of the Quigley Services are discontinued prior to a termination of the Services Agreement, each party shall provide the other with reasonable assistance in winding down such services or, if applicable, transferring responsibility for such Quigley Services to the new provider of such services.

# ARTICLE 9

## ACCESS TO RECORDS

Section 9.1    The Asbestos PI Trust shall be entitled to have access during regular business hours and upon reasonable notice to Reorganized Quigley to the books, records and premises of Reorganized Quigley (insofar as it relates to the Quigley Services provided hereunder) and any agent, auditor (internal and external), employee or other representative of the Reorganized Quigley, provided, however, that such access (a) shall not be disruptive to Reorganized Quigley's business and operations; (b) shall be at the sole expense of the Asbestos PI Trust; and (c) shall only be to the extent necessary to verify the proper performance by Reorganized Quigley of the Quigley Services.

# ARTICLE 10

## ASSIGNMENT

Section 10.1   The provisions of this Services Agreement shall be binding upon and inure to the benefit of Reorganized Quigley, the Asbestos PI Trust and the Trustees (solely in their capacity as the Trustees of the Asbestos PI Trust) and their respective successors, except that neither Reorganized Quigley, the Asbestos PI Trust nor the Trustees may assign or otherwise transfer any of its, or his or her, rights or obligations under this Services Agreement.

# ARTICLE 11

## REPRESENTATIONS AND WARRANTIES OF REORGANIZED QUIGLEY

Section 11.1   Reorganized Quigley hereby represents and warrants to the Asbestos PI Trust as follows:

(a) Reorganized Quigley is a corporation duly organized, validly existing and in good standing under the laws of the State of New York.

(b) Reorganized Quigley has the requisite financial resources, assets, personnel, corporate power and authority to execute, deliver and perform satisfactorily this Services Agreement. The execution, delivery and performance of this Services Agreement by Reorganized Quigley have been duly authorized by all necessary corporate action. This Services Agreement has been duly executed and delivered by Reorganized Quigley and constitutes the legal, valid and binding obligation of Reorganized Quigley, enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting enforcement of creditors' rights or by general principles of equity.

## ARTICLE 12

## INDEMNIFICATION AND LIMITATION ON LIABILITY

Section 12.1   The Asbestos PI Trust agrees to indemnify Reorganized Quigley, its employees, officers and directors against any loss, liability, or damage (including reasonable costs of litigation and counsel fees) arising from or in connection with the Asbestos PI Trust's operations or the performance of Reorganized Quigley's duties under this Services Agreement, except for losses, liabilities, or damages resulting from Reorganized Quigley's gross negligence or willful misconduct, in each case, as determined by a Final Order.

Section 12.2   In no event shall Reorganized Quigley have any liability for loss of profit, diminution in value, loss of goodwill or consequential, incidental or punitive or other special damages as a result of provision of or failure to provide the Quigley Services under the terms of this Services Agreement.

Section 12.3   EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS SERVICES AGREEMENT, REORGANIZED QUIGLEY MAKES NO EXPRESS WARRANTIES, AND NO WARRANTY SHALL BE IMPLIED UNDER THIS SERVICES AGREEMENT OR AT LAW, INCLUDING, WITHOUT LIMITATION, WARRANTY OF MERCHANTABILITY OR WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AS TO THE QUIGLEY SERVICES TO BE PERFORMED HEREUNDER.

Section 12.4   The receipt by the Asbestos PI Trust of the Quigley Services shall be an unqualified acceptance of, and a waiver by, the Asbestos PI Trust of its rights to make any claim (other than based on gross negligence or fraud) with respect to such Quigley Services unless the Asbestos PI Trust gives written notice of the claim to Reorganized Quigley within thirty (30) days after receipt of the Quigley Service by the Asbestos PI Trust.

# ARTICLE 13

## CONFIDENTIALITY

Section 13.1   Reorganized Quigley acknowledges that the information, data and documents obtained by Reorganized Quigley during the course of its performance under this Services Agreement concerning the Asbestos PI Claims are the property of the Asbestos PI Trust.   During the term of this Services Agreement and at all times thereafter, Reorganized Quigley shall not, and shall not permit any of Reorganized Quigley's employees or affiliates to, directly or indirectly use, divulge, furnish or make available to anyone, for any purpose whatsoever, any confidential or proprietary information of the Asbestos PI Trust, including but not limited to, information pertaining to the Asbestos PI Claims (the "Confidential Information").   Reorganized Quigley shall only disclose Confidential Information to its internal personnel whose duties justify their need to review and know the Confidential Information, who are informed of the confidential nature of such information and who agree in writing to be bound by terms of this Article 13.   By making Confidential Information available to its internal personnel, Reorganized Quigley agrees that it may be held responsible for any damages suffered by the Asbestos PI Trust as a result of the disclosure of the contents of the Confidential Information by any such internal personnel.

Section 13.2   Reorganized Quigley further agrees that it shall not use or disclose at any time any Confidential Information, except (a) as may be required for Reorganized Quigley to perform its duties hereunder, (b) to the extent such information has been disclosed to Reorganized Quigley by a third party who is not affiliated with the Asbestos PI Trust or such information otherwise becomes publicly known, without a breach of this Services Agreement, (c) as to information which must be disclosed as a result of a subpoena or other legal process, or (d) unless Reorganized Quigley shall first secure the prior written authorization of the Trustees, the Trust Advisory Committee and the Future Demand Holders' Representative.   Reorganized Quigley acknowledges that disclosure of the Confidential Information will give rise to irreparable injury to the Asbestos PI Trust and such injury will be inadequately compensable in damages.   Accordingly, the Asbestos PI Trust may seek and obtain injunctive relief against the breach or threatened breach of the foregoing undertakings, in addition to any other legal remedies that may be available.

Section 13.3   As soon as reasonably practicable following termination of this Services Agreement pursuant to Section 8.1, Reorganized Quigley shall (a) deliver to the Asbestos PI Trust, or to such other person or entity designated by the Asbestos PI Trust, all copies and embodiments, in whatever form, including all partial or complete copies or duplicates, of all Confidential Information (including but not limited to, written records, notes, photographs, manuals, notes and notebooks, magnetic media, disks, diskettes, tapes and all other materials containing any Confidential Information), or (b) destroy or cause to be destroyed all of such copies and embodiments, in whatever form, of all Confidential Information, and such destruction shall be certified in writing to the Asbestos PI Trust by an authorized officer supervising such destruction.

# ARTICLE 14

## DISPUTE RESOLUTION

Section 14.1   Reorganized Quigley and the Asbestos PI Trust shall attempt in good faith to resolve any controversy, dispute or claim arising out of or relating to this Services Agreement or the breach, enforceability or validity thereof (collectively, a "Dispute") promptly by negotiations by an officer of Reorganized Quigley who shall have authority to settle the Dispute and the Trustees.  Either party may give the other a written notice setting forth with reasonable specificity the nature of the Dispute (the "Dispute Notice").  Upon the receipt of a Dispute Notice, the representatives of both parties shall meet as soon as is practicable at a mutually acceptable time and place to negotiate in good faith a settlement of the Dispute, and shall meet thereafter as they reasonably deem necessary.

Section 14.2   If the Dispute has not been resolved within thirty (30) days after receipt of the Dispute Notice (the "Negotiation Period") then the Dispute shall be resolved through binding arbitration.  The following provisions shall cover any such arbitration:

(a) Within ten (10) days after the termination of the Negotiation Period, the parties to the arbitration shall jointly select a single arbitrator. If for any reason, the parties are unable to select an arbitrator, the arbitrator shall be chosen, or caused to be chosen, by the American Arbitration Association ("AAA"), or any successor organization, in accordance with its then current rules.

(b) The arbitrator shall hold his or her first hearing on the Dispute as promptly as possible, but in no event later than ten (10) days after the arbitrator is selected.  All hearings and proceedings of the arbitration shall be conducted in New York, New York, unless both parties agree otherwise.

(c) The arbitrator shall have the right to issue any and all orders, final or otherwise, including interim or injunctive relief, and any and all awards that a court of competent jurisdiction sitting at law or in equity could issue, including the awarding of monetary damages.  Under no circumstances, however, shall punitive or exemplary damages, non-compensatory damages or damages for pain and suffering be awarded.  In the event interim or injunctive relief is sought before an arbitrator is selected, either party may seek such relief by applying to the AAA for such relief under its Rules for Emergency Measure of Protection.  Each party shall be entitled to present to the arbitrator written briefs on all issues in the arbitration, and the arbitrator shall be authorized to rule on motions for summary judgment or other motions.  The parties shall also be entitled to cause a transcript of the arbitration proceedings to be made.  Unless otherwise agreed by the parties, the cost of the transcript shall be borne by the party requesting the transcription, unless the arbitrator requests a transcript, in which case, the arbitrator shall determine who shall bear such cost at the termination of the proceedings.  If the arbitrator does not request transcription, then neither party shall provide any transcribed portions of the proceedings to the arbitrator unless that party furnishes the entire transcript to the other party.

(d) The decision of the arbitrator shall be final and binding on the parties and may be confirmed and entered by any court of competent jurisdiction at the request of any

party hereto.  It may not be appealed to any court of competent jurisdiction except upon a claim of fraud on the part of the arbitrator.

(e) Each party shall bear one-half of the fees and expenses of the arbitrator, and one-half of the costs of conducting the arbitration, as well as the party's own costs and expenses.  Promptly after commencing proceedings, the arbitrator shall estimate the entire cost of the arbitration and shall require each party to deposit its share of such cost with the arbitrator, as soon as practicable following release of the estimate.  If the estimate is later determined to be insufficient, the arbitrator may require further deposits.  The arbitrator shall be compensated and pay the costs of the arbitration from the amounts so deposited by the parties. Each party shall bear its own attorneys' fees.

(f) The arbitrator shall be compensated for his or her services at a reasonable hourly rate agreed to by the parties.  The arbitrator shall be reimbursed for any and all reasonable expenses incurred by him or her in connection with the rendering of such services. The arbitrator shall be entitled to be indemnified, defended and held harmless by each of the parties for any and all loss, cost, expense, claim, action, demand or suit arising, from or relating to the arbitration.

(g) The laws of the United States regarding arbitration procedure shall govern the arbitration and New York substantive law, without regard to conflicts of law, shall govern all Disputes.  Any arbitration hereunder is intended to be administered by the arbitrator selected as provided herein, except to the extent that resort may be made to the AAA, as specified herein.  However, the parties incorporate the rules of the AAA for Large, Complex Disputes and the rules for Emergency Measures of Protection as they may exist on the date an arbitrator is selected, to the extent not inconsistent herewith.  If any such inconsistency exists, these rules shall govern, unless otherwise agreed by the parties in dispute hereunder.  It is recognized by the parties hereto that Disputes, which may arise hereunder, may be complex and may require discovery of documents and depositions, which may be ordered by the arbitrator as deemed reasonable and necessary.

(h) This Services Agreement is intended to provide a mechanism whereby Disputes may be resolved in a confidential manner, without publicity and the attendant distractions.  Accordingly, (i) no person shall be present at any hearing or other proceeding of the arbitrator except the parties, the arbitrator, such witnesses and producers of documents as the arbitrator shall allow, counsel to the parties, court reporters employed to produce a transcript of such hearing or other proceedings and such other persons allowed by the arbitrator consistent with the purpose of confidentiality; (ii) each party shall keep both the fact of the Dispute and all proceedings related thereto confidential, except to the extent necessary in order to preserve and maintain its position; and (iii) all testimony before the arbitrator and any whole or partial transcript of any hearing or other proceeding related to the arbitration shall be kept confidential and shall in no event be released, shown or distributed to any person other than the parties, their counsel and the arbitrator.  If either party shall breach this subsection, the arbitrator is authorized to award compensation to the other party as appropriate.

(i) Notwithstanding anything herein to the contrary, the definition of "Dispute" shall not include a controversy, dispute or claim arising out of or relating to the

termination of this Services Agreement by the Asbestos PI Trust or Reorganized Quigley pursuant to Section 8.1(b) of this Services Agreement.

# ARTICLE 15

## GENERAL PROVISIONS

Section 15.1 <u>Force Majeure</u>. No party hereunder shall be liable to the other for its failure to perform hereunder caused by contingencies beyond its reasonable control, including, but not limited to, acts of god, fire, flood, wars, acts of terrorism, sabotage, strike, government actions and any other similar occurrence beyond the non-performing party's reasonable control. Any party asserting its inability to perform any obligation hereunder for any such contingency shall promptly notify the other party of the existence of any such contingency, and shall use its reasonably diligent efforts to re-commence its performance of such obligation as soon as commercially practicable.

Section 15.2 <u>Amendments</u> Reorganized Quigley and the Asbestos PI Trust may modify or amend this Services Agreement in a writing executed by each of them. Notwithstanding anything contained in this Services Agreement to the contrary, this Services Agreement shall not be modified or amended in any way that could jeopardize, impair, or modify the applicability of section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction and the Non-Settling Asbestos Insurance Entity Injunction set out in the Plan and Confirmation Order, the Asbestos PI Trust's "qualified settlement fund" status under section 468B of the Internal Revenue Code or the rights and protections provided to Quigley, Reorganized Quigley or the Pfizer Protected Parties under the Plan Documents.

Section 15.3 <u>Notices</u>. All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon the party for whom it is intended, if delivered by registered or certified mail, return receipt requested, or by a national courier service, or if sent by facsimile, provided that the facsimile is promptly confirmed by telephone confirmation thereof, to the party at the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such party:

To the Asbestos PI Trust through the Trustees:

_____

_____

_____

Attention: _____

To Debtor or Reorganized Quigley:

Quigley Company, Inc.
52 Vanderbilt Avenue
New York, New York 10017
Attention:  Paul A. Street

With a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York 10022
Attention:  Michael L. Cook, Esq.
              Lawrence V. Gelber, Esq.

Section 15.4    Governing Law.  This Services Agreement shall be governed by the laws of the State of New York, its rules of conflict of laws notwithstanding.

Section 15.5    Counterparts.  This Services Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement.

Section 15.6    Headings.  The headings contained in this Services Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Services Agreement.

Section 15.7    Entire Agreement.  This Services Agreement contains the entire understanding and agreement between the parties hereto as to the services being performed hereunder.

Section 15.8    Waiver.  Any provision of this Services Agreement may be waived if, and only if, such waiver is in writing and signed by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 15.9    Severability.  The provisions of this Services Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any term or other provision of this Services Agreement, or the application thereof to any person or entity or any circumstance, is invalid, illegal or unenforceable: (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision; and (b) the remainder of this Services Agreement and the application of such provision to other persons, entities or circumstances shall not be affected by such invalidity, illegality or unenforceability, nor shall such invalidity, illegality or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

IN WITNESS WHEREOF, the parties have duly executed this Services Agreement as of the day and year first above written.

QUIGLEY COMPANY, INC.

By:_____
Name:
Title:

ASBESTOS PERSONAL INJURY TRUST

_____
By:
Title:  Trustee

_____
By:
Title:  Trustee

_____
By:
Title:  Trustee

**EXHIBIT L**

**TO**

**QUIGLEY COMPANY, INC. THIRD AMENDED PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

_____

**PRODUCT LICENSE AND SERVICES AGREEMENT**

## FORM OF PRODUCT LICENSE AND SERVICES AGREEMENT

This PRODUCT LICENSE AND SERVICES AGREEMENT (the "Agreement") is between Pfizer Inc., a Delaware corporation, as the owner of the medications Vistaril and Navane, Warner-Lambert Company LLC, a Delaware limited liability company, as the owner of the medication Zarontin, and Pharmacia & Upjohn Company LLC, a Delaware limited liability company, as the owner of the medication Glynase (collectively, the "Licensor"), and Quigley Company, Inc. ("Licensee"), a New York corporation and the debtor and debtor in possession in the case In re Quigley Company, Inc., Case No. 04-15739 (SMB), pending in the United States Bankruptcy Court for the Southern District of New York. Licensor and Licensee shall also be hereinafter referred to each as a "Party", or collectively as the "Parties", as the case may be.

## RECITALS

**WHEREAS**, the Licensee has reorganized under the provisions of chapter 11 of the Bankruptcy Code in the case In re Quigley Company, Inc., Case No. 04-15739 (SMB), pending in the United States Bankruptcy Court for the Southern District of New York; and

**WHEREAS**, Licensor owns or controls certain Patents, Trademarks, Copyrights and Know-How (each as defined below) relating to the medications Vistaril, Navane, Zarontin, and Glynase (each, a "Product" and, collectively, the "Products"); and

**WHEREAS**, pursuant to the terms of the Third Amended Plan of Reorganization of Quigley Company, Inc. under Chapter 11 of the Bankruptcy Code dated October 6, 2005 (as further amended, modified or supplemented, the "Plan"), Licensor agreed to execute and deliver this agreement to (i) effectuate Licensor's grant to Licensee of an exclusive, irrevocable, royalty free, perpetual license in the United States under the applicable intellectual properties to make, have made, use, sell, offer for sale and import the Products; and (ii) specify the terms and conditions under which Licensor will continue to provide certain services, at Licensee's expense, with respect to the Products, including without limitation, manufacturing and distribution services; and

**WHEREAS**, the Confirmation Order has been entered or affirmed by the District Court and has become a Final Order.

**NOW, THEREFORE**, in consideration of the mutual agreements and undertakings contained herein, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1

## CERTAIN DEFINITIONS

Section 1.1    Definitions.    Unless otherwise defined elsewhere in this Agreement, capitalized terms used in this Agreement shall have the meanings set forth below;

provided, however, that capitalized terms used but not otherwise defined in this Agreement shall have the meanings given to them in the Plan.

"Affiliate" means, in relation to any Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, that first Person.

"Agreement Effective Date" means the first day of the Licensor's fiscal quarter that is immediately subsequent to the fiscal quarter in which the Effective Date occurs.

"cGMPs" means the current Good Manufacturing Practices applicable to pharmaceutical products for human use in the United States of America and similar regulations applicable to pharmaceutical products for human use in other countries where a material amount of any of the Products is sold.

"Change In Control of Licensee" means (a) a transfer resulting in a Person that owned less than 50% of the direct or indirect equity interests in the Licensee at the time this Agreement was executed owning 50% or more of such equity interests after such transfer, (b) a transfer or transfers after the execution of this Agreement that aggregates 50% or more of the direct or indirect equity interests in the Licensee to a Person that owned less than 50% of such equity interests at the time this Agreement was executed, or (c) a change in the equity owner that Controls the Licensee; provided, however, that the exercise of the Quigley Stock Right shall not be deemed a Change in Control of the Licensee.

"Control" (including, with correlative meanings, "Controls", "Controlled" and "Controlling") means (a) with respect to any intellectual property right, the possession (whether by ownership or license) by a party (or by any Affiliate of a party) of the ability to grant to the other party a license under such right (i) without violating the terms of any agreement with any Third Party, and (ii) which does not require the prior consent of such Third Party, and (b) with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract, or otherwise. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, 50% or more of the ownership interests in such other Person.

"Copyrights" means solely with respect to the Products, copyrights, copyright registrations and copyright applications set forth on Schedule 3 hereto and all other registered and unregistered copyrights in the Territory, and any renewals or extensions thereof.

"Effective Date" means the first Business Day on which all conditions precedent set forth in Section 12.2 of the Plan have been satisfied or waived as provided in Section 12.3 of the Plan.

"FDA" means the United States Food and Drug Administration, and any successor agency thereto.

"Government Authority or Regulatory Authority" means any court, tribunal, arbitrator, agency, commission, official or other instrumentality of any federal, state, county, city or other political subdivision, domestic or foreign, including, but not limited to, the FDA.

"Improvements" means any inventions, improvements, discoveries, methods, applications or other developments relating to the Products which are made and/or developed after the Agreement Effective Date.

"Intellectual Property" means collectively, all Patents, Trademarks, Copyrights and Know-How.

"Know-How" means all ideas, inventions, data, instructions, processes, formulas, formulation information, validations, package specifications, chemical specifications, chemical and finished goods analytical test methods, stability data, testing data, product specifications, information with respect to expert opinion and information (whether or not patented or patentable) and technology owned or controlled by Licensor or under which the Licensor has the right to grant sublicenses, as of the Agreement Effective Date, all of the foregoing only to the extent relating solely to the Products, including all biological, chemical, pharmacological, toxicological, pharmaceutical, physical and analytical, clinical, safety, manufacturing and quality control data and information related thereto and all correspondence with the FDA or other similar Governmental Authority and all other documents pertaining to communications with the FDA or other similar Governmental Authority (including minutes of any FDA communications and applications for any regulatory approval of the Products, if any); provided that in no event shall "Know-How" include information properly in the public domain as of date hereof.

"Labeling" means any and all printed labels, labeling and package inserts for the Products.

"Law" or "Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of any Governmental Authority.

"NDA" means a New Drug Application filed with the FDA relating solely to any of the Products.

"Non-Serious Adverse Drug Experience" for the Products means an untoward medical occurrence at any dose for any of the Products that is not a Serious Adverse Drug Experience.

"Operating Expenses" means all of the following: (a) sales allowances or discounts, (b) standard and other costs of sales, (c) advertising, promotion and marketing expenses, (d) distribution expenses and (e) general and administrative expenses.

"Operating Income" means for any fiscal period, the amount by which gross sales exceeds Operating Expenses.

"Operating Loss" means for any fiscal period, the amount by which Operating Expenses exceeds gross sales.

"Patents" means all patents, patent applications and statutory invention registrations owned or Controlled by Licensor or its Affiliates in the Territory as of the Agreement Effective Date, which relate solely to the Products, including but not limited to, the Patents listed in Schedule 1, including reissues, divisions, continuations, continuations-in-part, supplementary protection certificates, extensions and reexaminations thereof, all inventions disclosed therein, all rights therein provided by international treaties and conventions, including priority patents, and all rights to obtain and file for patents and registrations thereto.

"Person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture or other entity.

"Plan" shall have the meaning set forth in the recitals hereto.

"Plants" means the manufacturing and packaging facilities and equipment utilized by Licensor in connection with the manufacture and supply of the Products.

"PPI" shall have the meaning set forth in Section 5.2.

"Product Quality Complaint" shall have the meaning set forth in Section 4.1.

"Product Registration" means the licenses, permits, certificates, approvals, registrations or other authorizations for each Product under the applicable Laws of any Governmental Authority, including any NDAs.

"Products" shall have the meaning set forth in the recitals hereto.

"Quigley Stock Right" means the right granted by the Licensor to the Trust to acquire 100% of the common stock of the Licensee, which is exercisable by the Trust no earlier than upon the satisfaction of each of the following conditions: (a) the one-year anniversary of the Effective Date has occurred; (b) the Products licensed under this Agreement have in the aggregate generated revenue of at least $6 million; and (c) the Trust has made distributions on account of allowed asbestos personal injury claims channeled to the Trust under the Plan having an aggregate face amount of at least $25 million.

"Recall" shall have the meaning set forth in Section 4.4.

"Serious Adverse Drug Experience" shall have the meaning set forth in 21 C.F.R. § 314.80(a), as amended, or the International Conference on Harmonisation guidelines, as applicable.

"Specifications" means the specifications for the Products set forth on Schedule 5, and as those specifications are amended from time to time.

"Standard Cost" means the forecasted or predetermined operating costs required to manufacture a single unit, or a number of units of product, at specified labor, material, and overhead prices and levels of operations during a period in the immediate future.

"<u>Taxes</u>" means all applicable federal, state, local and sales taxes, or any other tax levied by a Government Authority or Regulatory Authority.

"<u>Territory</u>" means the domestic United States.

"<u>Third Party</u>" means any Person other than the Parties to this Agreement and their Affiliates.

"<u>Third Party Cost</u>" means, in respect of the period commencing on the Agreement Effective Date and ending on _____, 200__, the price Licensor will charge Third Parties to purchase each Product during the calendar year 2006, which price is set forth on <u>Schedule 4</u> hereto, and which amount shall be in excess of the Standard Cost for each Product, and in respect of subsequent calendar years, shall mean the Third Party Cost in effect for the preceding calendar year as adjusted pursuant to Sections 5.2 and 5.3.

"<u>Trademark</u>" means, solely with respect to the Products:  (a) all trademarks, trade names, service marks and logos and the goodwill associated therewith in the Territory, including without limitation, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States or any state thereof, including, without limitation, those listed on <u>Schedule 2</u> hereto, and (b) all extensions or renewals thereof.

"<u>Trust</u>" means the trust established under the Plan pursuant to section 524(g) of the Bankruptcy Code.

# ARTICLE 2

## PRODUCT LICENSE

Section 2.1    <u>License Grant</u>.    Subject to the terms and conditions of this Agreement and during the term hereof, Licensor grants to Licensee, and Licensee accepts, an exclusive, irrevocable, royalty free, perpetual license in the Territory under the Intellectual Property to make, have made, use and sell, offer for sale, have used and have sold, import, have imported, promote, have promoted, distribute, have distributed, develop, have developed, test, have tested, package, or have packaged, the Products.  Such license shall be effective as of the Agreement Effective Date.  Licensee shall not be entitled to sub-license or assign any such rights to any Third Party without the express written consent of the Licensor.

Section 2.2    <u>No Transfer</u>.    Licensee hereby acknowledges and agrees that this Agreement does not, and shall not be deemed to, transfer any proprietary ownership interest whatsoever to Licensee in or to the Intellectual Property, except the rights granted pursuant to this Agreement.  Nothing herein shall give Licensee any right, title or interest in or to any of the Intellectual Property, except the rights granted pursuant to this Agreement.

Section 2.3    No Implicit Rights.  All of the rights granted herein are explicitly stated herein and nothing in this Agreement shall be construed to grant any implied rights whatsoever to Licensee in or to the Intellectual Property.

Section 2.4    Sublicenses.  All permitted sublicenses granted by Licensee shall contain the limitations contained herein and shall not be inconsistent with the terms hereof.  No sublicenses shall relieve Licensee of its obligations hereunder to Licensor and Licensee shall be responsible as between itself and Licensor for the observance by its sublicensees of the limitations contained in this Agreement.

Section 2.5    Improvements.  Each Party shall be free to develop, register and own, at its own costs, any Improvements and without any obligation to the other Party.

## ARTICLE 3

## SERVICES CRITERIA

Section 3.1    General.  Subject to the terms of this Agreement, Licensor or its designee will continue to manufacture and supply the Products to Third Party purchasers following substantially the same practices and procedures in effect as of the Agreement Effective Date; provided, however, Licensor shall have the ability, but not the obligation, to change such practices and procedures when in its good faith judgment, such a change will protect the interests of the Parties and the purpose of this Agreement.

Section 3.2    Changes to Specifications or the Products Manufacturing Process.  Licensor may implement changes to the Specifications or the Products manufacturing process in order to comply with an approval required by a Government Authority or Regulatory Authority in the Territory, cGMPs, or other applicable Law (a "Required Change") on the date specified by a Government Authority or Regulatory Authority in the Territory, cGMPs, or other applicable law, or if no such date if specified, as reasonably agreed to by the Parties, and such date will allow a commercially reasonable period for Licensor to implement such change.  If any Required Change increases or is reasonably likely to increase the Standard Cost of any Product to Licensor, Licensee shall bear the cost of such change.  Alternatively, in the event of any Required Change that would require changes to Licensor's manufacturing facility, Licensor may elect, in its sole discretion, to transfer the manufacturing of such Product to another facility of the Licensor or a third party manufacturer, provided that Licensor will remain primarily liable for the performance or failure to perform of any such third party manufacturer; provided, further, that Licensor shall provide not less than three months' prior written notice to Licensee of its election to transfer the manufacturing of such Product to another facility of the Licensor or a third party manufacturer.

Section 3.3    Practices.  Licensor shall adhere in all material respects to cGMPs as they apply to the manufacturing, handling and control of the Products.

Section 3.4    Compliance with Applicable Laws and Agreement.

(a)    All Products manufactured by Licensor or its designee shall be in finished dosage form, filled, labeled and packaged for commercial sale by Licensor in accordance with the terms and conditions of this Agreement and applicable Laws.  Licensor shall be responsible for the purchase of all raw materials in accordance with the NDAs and other regulatory filings for the Products as necessary to supply finished Products to all purchasers.

(b)    Licensor shall promptly notify Licensee of any necessary changes in manufacture or supply of the Products that are required by changes in applicable Laws.  Any such changes required by changes in applicable Laws shall be subject to the prior approval of Licensor, which approval shall not be unreasonably withheld, and Licensor shall, subject to the foregoing, use commercially reasonable efforts to accommodate such changes.  If a change proposed to be made to the manufacture or supply of the Products under this Section requires prior approval by any applicable Governmental Authority before implementation, such change shall not be implemented in respect of a Product until such change has been so approved.  If any such change would cause an increase or decrease in the Standard Costs of the Products, Licensor shall promptly notify Licensee of the change in the Standard Costs of the Products, and Licensee shall bear the cost of such change.  Licensee shall also bear any costs required to implement any such change.

(c)    Notwithstanding Sections 3.4(a) and (b), Licensor shall not be obligated to make any such changes or conduct any development, testing or other activities (e.g., process development, stability testing, validation of new specifications, or similar activities) with respect to its or its designee's manufacture of the Products if Licensor, in its sole and absolute discretion, determines that such changes or such activities may interfere with or otherwise adversely affect its resource allocation for its other business interests.  In the event Licensor makes such a determination, Licensor may terminate the manufacture of the Product or Products; provided, however, that Licensor shall provide Licensee with not less than three months' prior written notice of Licensor's intention to terminate the manufacture of the Product or Products.

Section 3.5    Capital Investments.  Licensor shall not be required to make any capital investment for the purpose of expanding the capacity or modification of the manufacturing facilities for the Products.  Licensor shall use commercially reasonable efforts to seek to minimize any investment required for compliance with changes in Law during the term of this Agreement, but if any such investments are required, the cost of these capital investments shall be borne by Licensee.

Section 3.6    Quality Control.  Licensor or its Affiliates shall conduct all quality control testing of the Products prior to shipment in accordance with the applicable Product Registrations and Laws.  Licensor or its Affiliates shall retain records and samples of Products relating to such testing as required by applicable Law; provided, however, that Licensee shall be entitled to request annually an audit of such records, samples, and the results of all quality control testing of the Products, which audit shall be conducted by an independent third party

auditor, at Licensee's expense and on not less than thirty (30) days' prior written notice to Licensor.

Section 3.7    Adverse Drug Experiences.  Licensor shall establish and maintain records of, and report to the FDA, all Serious Adverse Drug Experiences and Non-Serious Adverse Drug Experiences relating to the Products in accordance with FDA regulations and other applicable Laws.  Each Party shall promptly notify the other Party of any significant adverse event(s) that are required to be reported in accordance with FDA regulations, including adverse drug experiences and inquiries by Governmental Authorities.  Each Party shall cooperate with the other Party in connection therewith as reasonably requested by the other Party and as follows:

(a)    Serious Adverse Drug Experiences for the Products of which one Party becomes aware shall be submitted to the other Party within the time frames specified in the applicable regulations or guidelines.  Non-Serious Adverse Drug Experiences for the Products that are reported to one Party shall be submitted to the other Party no more than one month from the date received by the first-mentioned Party; provided, however, that medical and scientific judgment should be exercised in deciding whether expedited reporting is appropriate in other situations, such as important medical events that may not be immediately life-threatening or result in death or hospitalization, but may jeopardize the patient or may require intervention to prevent a Serious Adverse Drug Experience outcome.

(b)    All Serious Adverse Drug Experiences and Non-Serious Adverse Drug Experiences shall be submitted by one Party to the other Party pursuant to this Section 3.7 in accordance with the current contact information for the non-reporting Party.  Each Party shall provide the other with current contact information in writing promptly after the date hereof, but in no event later than 15 Business Days after such date, and, in the event of any changes, shall promptly update such information in writing to the other Party.

Section 3.8    Medical Inquiries.  Licensor shall have sole responsibility for handling all medical inquiries concerning the Products.  Licensee shall refer all routine medical information requests in writing to Licensor as set forth in Section 3.7(b).  Urgent medical information requests shall be referred by Licensee to Licensor by telephone.

Section 3.9    Restart Matters.  In the event that any relevant Governmental Authority determines that Licensor must cease manufacturing either of the Products as well as other products in any of the Plants due to Licensor's or its designee's failure to adhere to cGMPs relating to manufacturing, handling or controlling of any product made in such Plants, Licensor shall use reasonable best efforts to obtain approval from the relevant Governmental Authority to begin manufacturing the Products as soon as practicable thereafter.  In the event any Plants undergo a shutdown described herein, should the relevant Governmental Authority allow Licensor or its designee to begin manufacturing products in such Plants on an incremental product-by-product basis, Licensor shall not discriminate against the Products during Licensor's efforts to obtain approval to restart manufacturing.

Section 3.10   Notification, Etc. of Certain Matters.   In the event that representatives of any relevant Governmental Authority inspect or notify Licensor of their intention to inspect the Plants in connection with the manufacturing or supply of the Products, Licensor shall notify Licensee promptly upon learning of such inspection, and shall supply Licensee with copies of all correspondence and other documentation received from the Governmental Authority relating thereto.  Licensor shall provide promptly to Licensee copies of any letter, comments or inquiry from any relevant Governmental Authority in connection with the manufacturing or supply of the Products that requires a response or action by Licensor including, but not limited to, an FDA Form 483 or a Warning Letter.

Section 3.11   Marketing, Advertising, Promotion and Sales.   Licensor will continue to be responsible for and undertake all aspects of marketing, advertising, promotion, distribution and sales with respect to the Products, if any, following substantially the same practices and procedures in effect as of the Agreement Effective Date; provided, however, Licensor shall have the ability, but not the obligation, to change such practices and procedures when in its good faith judgment, such a change will protect the interests of the Parties and the purpose of this Agreement; provided, further, however, Licensor shall promptly notify Licensee of its election to change such practices and procedures.

Section 3.12   Labeling.  Licensor will continue to use Licensor's Labeling on the Products.

Section 3.13   Periodic Reporting.  During the term of this Agreement, within thirty (30) days of the end of the Licensor's fiscal quarter, Licensor will provide Licensee with an income statement for each Product for the prior fiscal quarter.

Section 3.14   Exclusivity.

(a)   Licensee shall not, unless so authorized in writing by Licensor, act as a sales representative for or otherwise handle products that compete in any way with the Products.  Licensee shall avoid all circumstances and actions that would place Licensor in a position of adverse interest or divided loyalty with respect to its obligations under this Agreement.  Licensee shall notify Licensor before entering into any additional agreements for the distribution or licensing of any type of pharmaceutical product.

(b)   Licensor shall have the exclusive right to make, have made, use, sell, offer for sale and import the Products on behalf of the Licensee.

# ARTICLE 4

# PRODUCT QUALITY COMPLAINTS, RECALLS, TESTING AND INSPECTION, AND CLINICAL STUDIES

Section 4.1   Product Quality Complaints.  Subject to Sections 4.2 and 4.3, Licensor shall be responsible for addressing all Product Quality Complaints with respect to the Products.  Both Parties shall cooperate to effect any resolutions with respect to any Product

Quality Complaint. "Product Quality Complaint" shall mean any complaint that questions the purity, identity, potency or quality of any Product, its packaging or Labeling, any complaint that concerns any incident that causes any Product or its Labeling to be mistaken for, or applied to, another article, any bacteriological contamination, any significant chemical, physical or other change or deterioration in any distributed Product or any failure of any Product to meet its applicable specifications.

Section 4.2    Notice of Complaints.   Licensee shall inform Licensor of any Product Quality Complaint received by it within three Business Days but no more than five days from the receipt date by Licensee.  Such information shall be sent to the contact set forth below:

Pfizer Inc.
Product Complaints
_____
_____
Attention:  Director of Product Complaints
Facsimile No.:  (___) _____
Telephone No.:  (___) _____

Licensor shall inform Licensee of any Product Quality Complaint received by it within three Business Days but no more than five days from the receipt date by Licensor.  Such information shall be sent to Licensee as set forth below:

Quigley Company, Inc.
Product Complaints
52 Vanderbilt Avenue
New York, NY, 10017
Attention:  Kim Jenkins
Facsimile No.:  (212) 857-3739
Telephone No.:  (212) 733-6283

Section 4.3    No Effect on Reporting Obligations.   Nothing in this Article 4 is intended to limit, alter or restrict a Party's reporting obligations under applicable Law.

Section 4.4    Product Recalls.   In the event that either Party obtains information that a Product or any portion thereof should be alleged or proven not to meet the Product Registration for such Product or to be otherwise defective, such Party shall notify the other Party immediately and both Parties shall cooperate fully regarding the investigation and disposition of any such matter. Licensor shall maintain such traceability records as are sufficient and as may be necessary to permit a recall, product withdrawal or field correction of any of the Products.  In the event (i) any applicable Governmental Authority should issue a request, directive or order that a Product be recalled or withdrawn or (ii) Licensor determines that any Product already in interstate or international commerce presents a risk of injury or gross deception or is otherwise defective and that a recall of such Product is appropriate (each of (i) and (ii), a "Recall"), Licensor shall give telephonic notice (to be confirmed in writing) to Licensee within 24 hours of the occurrence of such event. Licensor shall have sole responsibility for carrying out any Recalls.

Section 4.5    <u>Product Testing and Inspection</u>.  Licensor shall perform any testing or inspection required by any Government Authority or Regulatory Authority with respect to each of the Products.  The Licensor shall bear all costs associated with any product testing or inspection required under this Section 4.5.

Section 4.6    <u>Additional Clinical Studies</u>.  In the event the FDA requires that additional studies (clinical or non-clinical) or additional pharmacokinetic data be provided, Licensor agrees that it will either (i) undertake such studies at Licensee's expense, or (ii) terminate the manufacture of such Product or Products pursuant to Article 9.  In the event the FDA requires that additional manufacturing data be provided, Licensor agrees that it will undertake to provide such data to FDA at Licensee's expense.

## ARTICLE 5

## PRICES AND PAYMENTS

Section 5.1    <u>Third Party Cost</u>.  Subject to Section 5.2, the Parties agree that the price Licensor will charge Third Parties for each Product during the term of this Agreement will be the Third Party Cost of such Product in effect at the time such Product was produced.

Section 5.2    <u>Third Party Cost Adjustment Based on PPI</u>.  The Third Party Cost of each Product will be adjusted effective as of each January 1st during the term of this Agreement by such percentage increase in the Producer Price Index as published by the United States Department of Labor, Bureau of Labor Statistics (the "<u>PPI</u>") over the immediately preceding 12 month period, except to the extent that Licensor has elected to adjust the Third Party Cost as set forth in Section 5.3 for such year.  The Third Party Cost adjustment under this Section 5.2 shall be notified by the Licensor to the Licensee and all purchasers who order Products after such adjustment is made and shall apply to all orders received on or after said January 1st.  If the PPI is not available for any period, the most similar available index shall be used.

Section 5.3    <u>Third Party Cost Adjustment Based on Increased Costs</u>.  In the event that during any given calendar year during the term of this Agreement, a change of more than 20% (above or below the amount included in the applicable Standard Cost of a Product) in the price to Licensor of any material, service or utility used in the manufacture of a Product results in an increase or decrease in the total Standard Cost of such Product of 5% or more, Licensor may elect in its sole and absolute discretion to adjust the Third Party Cost for such Product for the following calendar year to reflect the increase or decrease in cost above or below that included in the then prevailing Third Party Cost for such Product; <u>provided</u>, <u>however</u>, that Licensor shall promptly notify Licensee of its election to adjust the Third Party Cost for such Product in accordance with this Section 5.3.  Licensor shall act in good faith in connection with the Third Party Cost adjustment set forth in this Section 5.3.  Any Third Party Cost adjustment made pursuant to this Section 5.3 shall be notified by the Licensor to purchasers who order Products after such adjustment is made and shall apply to all orders received on or after said January 1st.

Section 5.4    Payments.

(a)    From Licensor to Licensee.  Within 45 days of the end of each of Licensor's fiscal quarters, Licensor shall pay to Licensee the pre-Tax Operating Income, if any, resulting from sales of each Product in such fiscal quarter.

(b)    From Licensee to Licensor.  Within 45 days of the end of the Licensor's fiscal quarter, Licensee shall pay Licensor an amount equal to the Operating Loss, if any, resulting from the sales of each Product in such fiscal quarter; provided, however, that Licensee shall have no obligation to pay Licensor under this Section 5.4(b) with respect to any Operating Loss that occurs in any fiscal quarter during the five-year period commencing on the Agreement Effective Date.

Section 5.5    Operating Income Make-Whole Provision.  Notwithstanding any other Section in this Agreement, including without limitation, Section 9.2(a), in the event that the pre-Tax Operating Income generated by the Products aggregates less than $21.7 million for the five-year period commencing on the Agreement Effective Date, Licensor shall pay Licensee in cash the difference between $21.7 million and the aggregate amount of pre-Tax Operating Income actually generated by the Products during such five-year period.  Licensor shall make such payment, if any, as a one-time payment within thirty (30) days after the conclusion of such five-year period.

Section 5.6    Taxes.  Licensee will be responsible for payment of all Taxes which result from sales of the Products during the term of this Agreement.

# ARTICLE 6

# REPRESENTATIONS AND WARRANTIES

Section 6.1    Licensor's Representations and Warranties.  Licensor represents and warrants that, as of the date hereof:

(a)    Licensor, or one of its Affiliates, is the owner of the Products and of all the Intellectual Property related thereto.

(b)    Licensor is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Licensor has the full corporate power and authority to execute and deliver this Agreement, grant the license and perform the services and other obligations contemplated hereunder.  Licensor has taken all corporate or other action necessary to authorize the execution, delivery and performance of this Agreement.

(c)    This Agreement has been duly executed and delivered by Licensor and, assuming due and valid authorization, execution and delivery by Licensor, this Agreement constitutes a legal, valid and binding obligation of Licensor, enforceable against the Licensee in accordance with its terms.

Section 6.2    Licensee's Representations and Warranties.  Licensee represents and warrants that, as of the date hereof:

(a)    Licensee is a corporation duly organized, validly existing and in good standing under the laws of the State of New York.  Licensee has the full corporate power and authority to execute and deliver this Agreement, grant the license and perform the services other obligations contemplated hereunder.  Licensee has taken all corporate or other action necessary to authorize the execution, delivery and performance of this Agreement.

(b)    This Agreement has been duly executed and delivered by Licensee and, assuming due and valid authorization, execution and delivery by Licensee, this Agreement constitutes a legal, valid and binding obligation of Licensee, enforceable against the Licensor in accordance with its terms.

## ARTICLE 7

## PATENT, COPYRIGHT AND TRADEMARK RIGHTS

Section 7.1    Maintenance.  Licensor shall at its own cost maintain in full force the Patents, Trademarks and Copyrights in the Territory.  Licensor shall not abandon any Patents, Trademarks or Copyrights without at least 90 days' prior written notice to Licensee.  If Licensor intends to abandon or has abandoned any Patents, Trademarks or Copyrights, Licensee shall have the option to obtain ownership of such Patents, Trademarks or Copyrights and related applications free of charge and to continue the prosecution and maintenance of such Patents, Trademarks or Copyrights and related applications in its own name and at its own expense. Licensor shall execute and deliver all instruments, evidence or authorizations as may be required to effect or to formalize the transfer of said Patents, Trademarks or Copyrights and related applications.

Section 7.2    Notice Requirements.  Licensee shall comply with all notice and marking requirements under applicable intellectual property laws that are necessary for the protection and enforcement of the Patents, Trademarks and Copyrights.

Section 7.3    Nothing in Sections 7.1 and 7.2 shall have any effect on the Parties' obligations under this Agreement.

## ARTICLE 8

## INFRINGEMENT

Section 8.1    Infringement by Third Parties.    (a) Each Party shall promptly inform the other Party of, and provide full particulars upon becoming aware of, any infringement of the Intellectual Property in the Territory.  In the event of any such infringement or unauthorized disclosure, Licensor or its Affiliate shall have the first right but not the obligation to institute an action based on such infringement or threatened infringement and shall be responsible for the conduct and cost of such action.  Licensee shall provide Licensor or its

Affiliate all assistance reasonably required by them to engage and pursue such proceedings to a satisfactory conclusion.

(b)     Licensor shall not, without the express prior written consent of Licensee (which consent shall not be unreasonably withheld), make any admission as to liability or agree to any settlement or compromise relating to such proceedings to the extent that such would affect the rights granted to Licensee under this Agreement.

(c)     Within one (1) month after notification of the infringement or threatened infringement (or such shorter period of time as may be required to maintain all rights of action against such infringer), Licensor shall notify Licensee in writing whether it intends to take action against the infringer.  If Licensor informs Licensee that it does not intend to take any action, or if within two (2) months of notification of the infringement or threatened infringement (or such shorter period of time as may be required to maintain all rights of action against such infringer), Licensor has taken no demonstrable action to enjoin or address such infringement or threatened infringement, Licensee shall have the right, but not the obligation, to institute an infringement action at its cost.  Licensor shall provide, subject to prompt reimbursement by Licensee of Licensor's reasonable out of pocket expenses, Licensee with all assistance reasonably required by them to engage and pursue such proceedings to a satisfactory conclusion.

(d)     The Party responsible for the conduct of the action based on such infringement shall timely inform the other Party of any material event in connection with such action.

(e)     Each Party shall execute all necessary and proper documents and take such action as shall be appropriate to allow the other Party to institute and prosecute any infringement action and Licensor shall, if required, lend its name or be joined as a party, to otherwise enable Licensee to conduct the proceedings.

(f)     The proceeds of any recovery, court award or settlement of such proceedings shall first be applied to reimburse the Parties for the costs and expenses of such prosecution and the balance shall be paid based on a pro rata basis consistent with the relative damages incurred by each Party as a result of such infringement.

Section 8.2     Allegations of Infringement.  In the event of any claim against Licensor and/or any of its Affiliates and/or Licensee based on an alleged infringement of any third party's know-how, patents, trademarks, copyrights or other intellectual property rights in connection with the Products, the sued Party (the "Claim Recipient") shall notify the other Party as promptly as possible.  The Claim Recipient shall have the first right to assume full responsibility for the defense of the infringement and to make any offer or agree to any settlement of such claim.  The Claim Recipient agrees not to take any action which would be detrimental to the other Party's interests.  More specifically, each Party shall not, without the express prior written consent of the other Party, make any admission as to liability or agree to any settlement or compromise relating to such proceedings to the extent that such would affect any rights granted under this Agreement.  The other Party shall provide to the Claim Recipient or its Affiliates, if applicable, subject to prompt reimbursement by the other Party of reasonable out

of pocket expenses, all assistance reasonably required by them to engage and pursue any proceedings conducted by the Claim Recipient to a satisfactory conclusion.

Section 8.3    Invalidity or Nullity.  Licensor shall conduct the defense of any suit brought by a third party based on the alleged invalidity or nullity of any Intellectual Property other than an action instituted by way of counterclaim in an action for infringement of any Intellectual Property, in which case, the Party conducting the infringement action shall have the right to conduct the defense.  Licensee shall assist and cooperate with Licensor to the extent necessary in the defense of such suit.

Section 8.4    Acknowledgment.    Licensee acknowledges and agrees that Licensor shall not assume any liability, costs and expenses (other than reimbursement of the expenses mentioned in Section 8.2).

## ARTICLE 9

## TERM AND TERMINATION

Section 9.1    Perpetual License.  Subject to this Article 9, the license granted in Section 2.1 is perpetual and will continue unless otherwise agreed to by the Parties in writing.

Section 9.2    Term of Services.  Licensor's provision of services pursuant to this Agreement, including without limitation, Articles 3 and 4 of this Agreement, shall commence on the Agreement Effective Date and shall terminate with respect to each Product if one of the following events occurs:

(a)    An Operating Loss is generated with respect to such Product in any two consecutive fiscal quarters after the Agreement Effective Date.  Upon termination of this Agreement with respect to each Product under this Section 9.2(a), Licensee shall pay Licensor an amount equal to the Operating Losses generated by such Product in the two consecutive fiscal quarters giving rise to the termination under this Section 9.2(a), unless such termination occurs during the five year period commencing on the Agreement Effective Date.  Services to be provided by the Licensor under this Agreement shall terminate under this Section 9.2(a) regardless of the reason for the decrease in Operating Income for such Product, which reasons may include, without limitation, one or more of the following with respect to such Product:  (i) low sales, (ii) increase in the Standard Cost, (iii) an increase in any other cost associated with manufacturing and distributing such Product or (iv) a Recall.

(b)    Licensor notifies Licensee in writing that Licensor must cease manufacturing and distributing such Product because Licensor has determined that based on its review of Product Quality Complaints, Serious Adverse Drug Experiences reported, Non-Serious Adverse Drug Experiences reported and/or Product Recall(s) that such Product has or may cause injury to its users and has or may give rise to multiple claims against Licensor based on such injuries.

(c)    Licensor is notified by the FDA or any other Governmental Authority that Licensor is prohibited from continuing to manufacture and/or distribute such Product.

(d)    Licensor notifies Licensee in writing that Licensor is terminating the manufacture of such Product in accordance with Section 3.4(c) of this Agreement.

(e)    Licensor notifies Licensee in writing that Licensor is terminating the manufacture of such Product in accordance with Section 3.5 of this Agreement.

(f)    Licensor notifies Licensee in writing that Licensor is terminating the manufacture of such Product in accordance with Section 4.6 of this Agreement.

At such time as any of the above events occurs with respect to one of the Products, Licensor shall no longer be obligated to provide any services under this Agreement only with respect to such Product.  Licensor's obligation to provide services will remain in effect with respect to the other Products until a termination of services with respect to such other Products is warranted under this Section 9.2.

Section 9.3    Effect of Change in Control of Licensee.  Licensee shall give Licensor at least thirty (30) days' prior notice of any Change in Control of Licensee.  Upon the receipt of such notice, Licensor may terminate this Agreement by giving notice of such termination to Licensee, and such termination shall be effective upon the giving of such notice.  Any Change in Control of Licensee effectuated without the giving of the notice described in this Section 9.3 shall be a default under this Agreement, which shall terminate immediately upon the occurrence of such Change in Control of Licensee.

Section 9.4    Termination upon Default.  Subject to and without modifying Section 9.3, this Agreement may be terminated by either Party upon the failure or neglect of the other Party to perform covenants or provisions of this Agreement, if such default is not cured within ninety (90) days after receiving written notice from the non-defaulting Party with respect to such default.

# ARTICLE 10

# CONFIDENTIALITY

Section 10.1    For the term of this Agreement and for ten (10) years thereafter, Licensee, shall not, and shall cause its employees not to, (i) disclose to any Third Party, other than a person that is a party to a sublicense agreement entered into with Licensee pursuant to the terms of this Agreement and who is subject to an obligation of confidentiality and non-use consistent with those contained herein, any and all proprietary information of Licensor that has been communicated to Licensee pursuant to this Agreement, and/or (ii) use such confidential information other than as permitted by this Agreement.

Licensee shall not have any obligation of confidentiality as herein above set forth, if it can be shown that such confidential information (i) is or becomes generally available to the

public other than as a result of a breach by Licensee of the obligations contained herein, or (ii) becomes available to Licensee from a Third Party who is not in default of any confidentiality obligation owed to Licensor or its Affiliates, or (iii) was in Licensee's possession prior to disclosure by Licensor pursuant to this Agreement, provided that any information disclosed by Licensor to Licensee pursuant to any agreements entered into between Licensor and Licensee shall remain subject to the confidentiality provisions contained in this Agreement, or (iv) was independently developed by Licensee without reference to any of Licensor's confidential information.

## ARTICLE 11

## APPLICABLE LAW – JURISDICTION

Section 11.1    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflicts of law rules of such state.

Section 11.2    Jurisdiction.    Each Party submits to the exclusive jurisdiction of the United States District Court for the Southern District of New York or a local court sitting in New York, New York (collectively, the "Courts") for purposes of any action, suit or proceeding relating to or arising out of this Agreement.  Each Party agrees not to raise any objection at any time to the laying or maintaining of the venue of any such action, suit or proceeding in any of the Courts, irrevocably waives any claim that such action, suit or other proceeding has been brought in an inconvenient forum and further irrevocably waives the right to object, with respect to such action, suit or other proceeding, that such Court does not have any jurisdiction over such Party.

## ARTICLE 12

## INDEMNITY

Section 12.1    Licensee Indemnification.    Licensee shall indemnify, defend, and hold Licensor and its Affiliates, directors, officers, and employees harmless from any and all liability, loss, damages, costs or other expenses of any nature whatsoever incurred or suffered by Licensor as a result of any actions or inactions taken by the Licensee, including any failure to comply with its obligations under this Agreement, which damage or impair the Intellectual Property with respect to the Products.

## ARTICLE 13

## GENERAL PROVISIONS

Section 13.1    Subcontract by Licensor.    Licensor shall be entitled, at any time, to subcontract its obligation to provide the services and satisfy Licensor's obligations described in Articles 3 and 4 to a Third Party; provided, however, that the such Third Party shall provide the services in accordance with the terms and conditions of this Agreement.

Section 13.2    Amendments.    This Agreement may only be amended, supplemented or modified and any provision hereof may only be waived, pursuant to a written instrument making specific reference to this Agreement and executed by duly authorized representatives of the Parties.

Section 13.3    Notices.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) by personal delivery, (ii) upon transmission by facsimile machine if a confirmation sheet is emitted from such machine, (iii) upon delivery by a nationally-recognized overnight courier service, or (iv) if mailed, certified or registered mail (return receipt requested), postage prepaid, each to the other Party at the following address (or at such other address as shall be given in writing by any Party to the other in accordance with these provisions):

If to Licensor, to:

Pfizer Inc.
235 East 42nd Street
New York, NY 10017
Facsimile No.:
Attention:

If to Licensee, to:

Quigley Company, Inc.
52 Vanderbilt Avenue
New York, NY, 10017
Facsimile No.:  (212) 857-3739
Telephone No.:  (212) 733-6283
Attention:  Kim Jenkins

Section 13.4    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, each of which shall remain in full force and effect.  If any provision of this Agreement, or any part thereof is held void or unenforceable or in conflict with the laws of any relevant jurisdiction, the Parties hereto shall negotiate in good faith to modify this Agreement, so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 13.5    Recordal of Agreement.  Licensor shall, at Licensee's cost and upon its request, execute such documents as are reasonably necessary for registration of this Agreement (or an instrument reflecting the license granted under Section 2.1) with the United States Patent and Trademark Office and/or other relevant authorities in the Territory.

Section 13.6    Third Party Beneficiaries.    None of the provisions of this Agreement shall be for the benefit of or enforceable by any Third Party, including, without

limitation, any creditor of either Party. No such Third Party shall obtain any right under any provision of this Agreement or shall by reason of any such provision make any claim in respect of any debt, liability or obligation (or otherwise) against either Party.

Section 13.7 <u>Binding Effect - Assignment.</u> This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. This Agreement is not intended to and shall not be construed to give any person or entity other than the Parties signatory hereto any interest or rights (including, without limitation, any third party beneficiary rights) with respect to or in connection with any agreement or provision contained herein or contemplated hereby. No assignment of this Agreement or of any rights or obligations hereunder, other than Licensor's right to subcontract pursuant to Section 13.1, may be made by either Party without the prior written consent of the other Party; <u>provided</u>, <u>however</u>, that (i) either Party may assign any or all of its rights and obligations under this Agreement to anyone or more of its Affiliates without the consent of the other Party but no such assignment shall relieve such Party of its obligations hereunder and (ii) Licensor may assign any or all of its rights and obligations under this Agreement to a Third Party acquirer of all of Licensor's rights in the Products and the related Intellectual Property without the consent of the Licensee but such Third Party must be bound by the terms of this Agreement; any attempted assignment without such required consent shall be null and void.

Section 13.8 <u>Entire Agreement</u>. This Agreement shall constitute the entire understanding and agreement between the Parties to it in relation to the subject matter of this Agreement and shall supersede all previous agreements between the Parties in relation to the same subject matter. It is further agreed that neither Party has entered into this Agreement in reliance upon any warranty or undertaking of the other Party which is not expressly set out or referred to in this Agreement.

Section 13.9 <u>Headings</u>. The headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

IN WITNESS WHEREOF, the Parties have caused this Product License and Services Agreement to be signed by their respective duly authorized officers as of the date first above written.

PFIZER INC.

By: **DRAFT**_____
    Name:
    Title:

QUIGLEY COMPANY, INC.

By: **DRAFT**_____
    Name:
    Title:

**Schedule 1**

**Patents**

**To be provided by Licensor to Licensee on or before the Agreement Effective Date.**

**Schedule 2**

**Trademarks**

**To be provided by Licensor to Licensee on or before the Agreement Effective Date.**

**Schedule 3**

**Copyrights**

**To be provided by Licensor to Licensee on or before the Agreement Effective Date.**

**Schedule 4**

**Third Party Costs**

**To be provided by Licensor to Licensee on or before the Agreement Effective Date.**

**Schedule 5**

**Specifications**


**To be provided by Licensor to Licensee on or before the Agreement Effective Date.**

# EXHIBIT M

## TO

## QUIGLEY COMPANY, INC. THIRD AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

——————————

## PFIZER NOTE

# FORM OF PFIZER NOTE

$405,000,000                                                                    __/__/200_

      FOR VALUE RECEIVED, the undersigned, PFIZER INC. (**"Pfizer"**), a corporation organized under the laws of Delaware, hereby unconditionally promises to pay the Quigley Asbestos PI Trust (the **"Trust"**) the principal sum of FOUR HUNDRED AND FIVE MILLION U.S. DOLLARS AND NO CENTS ($405,000,000) (the **"Principal"**) pursuant to the terms contained in this note (the **"Note"**).

      Pfizer shall pay the Principal to the Trust in equal annual installments over a period of forty (40) years, with the first installment payment to be paid to the Trust on the date the Quigley Company, Inc. Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the **"Plan"**) becomes effective (the **"Effective Date"**).  Each subsequent installment payment shall be paid to the Trust on the yearly anniversary of the Effective Date until such time as Pfizer has paid the Principal in full to the Trust.  Pfizer will have no obligation to pay the Trust any interest on any Principal.

      The Trustees[1] shall provide detailed wire instructions to Pfizer in writing no later than five (5) Business Days prior to the date each payment is due and payable under this Note, other than with respect to the first installment payment due on the Effective Date, for which the Trustees do not need to provide wire instructions.

      Whenever any payment under this Note is due on any day other than a Business Day, such payment shall be made on the next succeeding Business Day.

      By its execution hereof, Pfizer represents that:  (a) Pfizer's execution and delivery of, and performance under, this Note are within Pfizer's corporate power and authority, have been duly authorized by all necessary actions, and do not and will not violate any law, rule or regulation, conflict with any agreement, instrument or other document or order, judgment, injunction or determination by which Pfizer or any of its assets are bound, or require the consent or approval of any governmental authority or other person or entity; and (b) this Note is a legal, valid and binding obligation of Pfizer, enforceable against Pfizer in accordance with the terms hereof.

      Pfizer shall immediately notify the Trust of the occurrence of any Event of Default (as hereinafter defined) and the actions that Pfizer has taken and proposes to take with respect thereto.

      This Note shall be immediately due and payable if any of the following events occurs (each an **"Event of Default"**):

      (a) Pfizer fails to pay any installment payment under this Note within five

---

[1]   Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Plan.

Business Days of the date such amount is due and payable, and Pfizer fails to pay such installment in full within five Business Days following notice of such failure of payment; or

(b) Pfizer admits in writing its inability to pay its debts generally, or makes a general assignment for the benefit of creditors; or any proceeding shall be instituted against Pfizer seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, protection, relief, or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, administrator or other similar official for it or for any substantial part of its property and assets and, in the case of any such proceeding instituted against it that is being diligently contested by it in good faith, either such proceeding remains undismissed or unstayed for a period of at least 60 consecutive days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, it or any substantial part of its property and assets) occurs; or any event or action analogous to or having a substantially similar effect to any of the events or actions set forth above in this paragraph (b) occurs under the requirements of law of any jurisdiction applicable to Pfizer; or Pfizer shall take any corporate or other similar action to authorize any of the actions set forth above in this paragraph (b).

If any or all amounts due under this Note are not paid when due under the terms hereof, whether by demand or otherwise, the Trust shall have all of the rights and remedies provided by any law or agreement.

No delay or omission of the Trust in exercising any right or rights shall operate as a waiver of such rights or any other rights. All rights of the Trust under this Note are cumulative and may be exercised concurrently and consecutively at the Trust's option.

This Note embodies the entire agreement and understanding between Pfizer and the Trust and supersedes all prior agreements and understandings relating to the subject matter hereof.

Pfizer may not assign or otherwise transfer this Note, in whole or in part, without the express written consent of the Trust. The Trust may not assign this Note, in whole or in part, without the express written consent of the Future Demand Holders' Representative, the Trust Advisory Committee and Pfizer, with Pfizer's consent not to be unreasonably withheld. This Note shall be binding upon and inure to the benefit of Pfizer and the Trust and their successors and permitted assigns.

This Note may only be modified in a written instrument executed by Pfizer and the Trust.

In the event any term or provision hereof is declared by a court of competent

jurisdiction to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

Pfizer hereby irrevocably consents and submits to the nonexclusive jurisdiction and venue of any State or Federal Court sitting in New York County, New York over any action or proceeding arising out of or relating to this Note, and Pfizer hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such State or Federal Court. Pfizer waives any objection to any action or proceeding in any State or Federal Court sitting in New York County, New York on the basis of forum non conveniens.

This Note is made under, and shall be governed by and construed in accordance with, the laws of the State of New York.

PFIZER INC., a corporation

By: __**DRAFT**_____
Name:
Title: