UNITED STATES BANKRUPTCY COURT        **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
In re:                           :
                                :        Chapter 11
QUIGLEY COMPANY, INC.,       :        Case No. 04-15739
                                :
                                :
                 Debtors.     :
-----------------------------------------------------X

## MEMORANDUM DECISION AND ORDER ESTIMATING
## ASBESTOS PI CLAIMS FOR VOTING PURPOSES ONLY

**A P P E A R A N C E S :**

SCHULTE ROTH & ZABEL LLP
Attorneys for the Debtor
919 Third Avenue
New York, NY 10022

        Michael L. Cook, Esq.
        Lawrence V. Gelber, Esq.
           Of Counsel


CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for Pfizer Inc.
One World Financial Center
New York, New York 10281

        Bruce R. Zirinsky, Esq.
        John H. Bae, Esq.
           Of Counsel


BROWN RUDNICK BERLACK ISRAELS LLP
Attorneys for The Ad-Hoc Committee of Tort Victims
120 West 45th Street
New York, New York 10036

        Gregory T. Arnold, Esq.
        Edward S. Weisfelner, Esq.
        John P. Biedermann, Esq.
           Of Counsel

LOWENSTEIN SANDLER PC
Attorneys for Hissey Kientz, L.L.P. and
  Hissey, Kientz & Herron P.L.L.C.
65 Livingston Avenue
Roseland, New Jersey 07068

      Jeffery Prol, Esq.
      Thomas A. Pitta, Esq.
          Of Counsel

BARLOW GARSEK & SIMON, LLP
Attorneys for Wade Freeman
3815 Lisbon Street
Fort Worth, Texas 76107

      Robert A. Simon, Esq.
      Henry W. Simon, Jr., Esq.
          Of Counsel

WALTER & KRAUS, LLP
Attorneys for Wade Freeman
3219 McKinney Avenue
Dallas, Texas 75219

      Loren Jacobson, Esq.
          Of Counsel

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
Attorneys for Reaud, Morgan & Quinn, L.L.P.
1633 Broadway
New York, New York

      Edward A. Friedman, Esq.
      Hal Neier, Esq.
          Of Counsel

SHAPIRO SHER GUINOT & SANDLER
Attorneys for William F. Geritz and the Kilnoise Claimants
36 S. Charles St., 20th Floor
Baltimore, Maryland 21201

      Joel I. Sher, Esq.
      Kimberly M. Stoker, Esq.
          Of Counsel

SCARCELLA ROSEN & SLOME LLP
Attorneys for William F. Geritz and the Kilnoise Claimants
333 Earle Ovington Boulevard, Suite 901
Uniondale, New York 11553

      Louis A. Scarcella, Esq.
          Of Counsel


HALPERIN BATTAGLIA RAICHT, LLP
Attorneys for the David Law Firm
555 Madison Avenue, 9th Floor
New York, New York 10022

      Christopher J. Battaglia, Esq.
          Of Counsel


CAMPBELL & LEVINE, LLC
Attorneys for the David Law Firm
1700 Grant Building
Pittsburgh, Pennsylvania

      Philip E. Milch, Esq.
      Paul J. Cordaro, Esq.
          Of Counsel


**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

      This is an asbestos bankruptcy. The debtor, Quigley Company Inc. ("Quigley") and its non-debtor parent company, Pfizer Inc. ("Pfizer"), are seeking to confirm Quigley's Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated Oct. 6, 2005 (the "Plan")(ECF Doc. # 505), to deal with their asbestos-related liability. Approximately 210,000 people, holding unliquidated asbestos-related personal injury claims, have voted to accept or reject the plan. The question before the Court is how to estimate their claims for <u>voting purposes only</u>.

The present dispute raises two estimation issues.  First, should the Court value the claims at $1.00 per vote, or alternatively, weigh the votes based on the impairment allegedly suffered by the voting claimant?  Second, should the Court discount the value of certain votes by 90% based on a settlement discussed in detail below?  For the reasons explained below, the Court declines to estimate the claims at $1.00, and instead, will weigh the votes in accordance with the values assigned to the particular impairment under the Plan.[1]  In addition, the Court will discount, or dilute, the settled claims for voting purposes by 90%.

## BACKGROUND

### A.    Introduction

At all relevant times prior to 1992, Quigley was engaged in the business of developing, producing and marketing a broad range of refractories and related products.  Some of these products contained asbestos.  (Fourth Amended Disclosure Statement with Respect to Quigley Company, Inc. Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated Oct. 17, 2005 ("DS"), at 20 (see ECF Doc. # 520).) [2]  In 1968, Pfizer & Co., Inc, Pfizer's predecessor, acquired Quigley.  In 1992, Pfizer sold substantially all of Quigley's assets to Minteq International, Inc.  Under the

---

[1]    This conclusion moots, for now, the separate dispute between Quigley and Reaud Morgan & Quinn, L.L.P.  The latter law firm represents approximately 2,600 claimants.  It filed an unsecured, liquidated claim on their behalf in the aggregate sum of $70,517,900, and argued that the claimants are entitled to vote the full amount of their liquidated claims.  The claims are based on a series of pre-petition settlement agreements that Quigley contends were never signed and are not binding.  According to Quigley, they hold unliquidated claims that should be estimated for voting purposes, with all of the other asbestos claimants, at $1.00.

[2]    A copy of the DS is attached as Exhibit B to Order: (I) Approving Quigley's Disclosure Statement; (II) Approving Solicitation Procedures, Forms of Ballots, and Manner of Notice; and (III) Fixing Date, Time and Place for Confirmation Hearing and Deadline for Filing Objections Thereto, dated Jan. 23, 2006 ("DS Order") (ECF Doc. # 593.)

sale terms, Quigley and Pfizer retained all liability stemming from Quigley's distribution and use of asbestos-containing products.  (Id.)  Since the sale, Quigley's only function has been to manage the hundreds of thousands of asbestos personal injury claims asserted against it.  (DS, at 21.)

## B.    The Pre-Petition Settlements

Many of Quigley's asbestos creditors also asserted claims against Pfizer on the theory that Pfizer was derivatively liable for Quigley's liabilities.[3]  (Id.)  Prior to the commencement of Quigley's bankruptcy, and in contemplation of the bankruptcy, Pfizer engaged in extensive efforts to settle its derivative liability with the holders of asbestos-related personal injury claims (the "Asbestos PI Claimants").  (DS, at 29.)  The negotiations culminated in a settlement agreement between Pfizer and more than 80% of the Asbestos PI Claimants (the "Settling PI Claimants").[4]  Pfizer agreed to pay the aggregate approximate amount of $430 million, to be divided among the Settling PI Claimants based on disease category and exposure.  (DS, at 31.)  In exchange, the Settling PI Claimants agreed to release their claims against Pfizer and the Pfizer-protected parties (as defined in the Pfizer Settlement Agreement), but did not agree to release their claims against Quigley.  (Pfizer Settlement Agreement, Ex. B (Form of Plaintiff Release).)

---

[3]    Some claimants have asserted independent asbestos-related claims against Pfizer based on products that Pfizer distributed.  The present controversy does not concern or purport to affect Pfizer's liability for those direct claims.

[4]    The form of the Pfizer Settlement Agreement is attached as exhibit A to the Supplemental Memorandum of Quigley Company, Inc. and Pfizer Inc. in Support of Motion for an Order Approving Procedures to Tabulate the Votes Cast on Quigley's Plan of Reorganization by Holders of Asbestos PI Claims, June 2, 2006 ("Supplemental Vote Tabulation Memorandum") (ECF Doc. # 841.)

The Plan was a central feature of the pre-petition settlement negotiations. The Plan contemplated the creation of a Trust, to be funded with approximately $645 million contributed by Pfizer and Quigley.  The Trust would administer and pay the present and future asbestos claims under the Plan's Trust Distribution Procedures (the "TDP").  (DS, at 7.)  All current and future asbestos personal injury claims asserted against Quigley or Pfizer would be channeled to the Trust.  (DS, at 6.)  The channeling order would prevent the Asbestos PI Claimants from pursuing their claims against reorganized Quigley, Pfizer or certain other companies.  (Id.)

Although the Pfizer settlement did not release Quigley, it did include a provision of critical importance to the present controversy.  The Settling PI Claimants agreed that if the Trust assets proved insufficient to satisfy 100% of the value attributed to the present and estimated future claims under the TDP "each Settling Plaintiff [would] reduce its distribution on its claim against Quigley to ten percent (10%) of the Payment Percentage of the allowed amount of such claim under the Trust Distribution Procedures."  (Pfizer Settlement Agreement, at § 2.4(b).)  In other words, the Settling PI Claimants agreed to reduce their claims against the Trust by 90%.  This provision, we are told, was included at the insistence of Al Togut, the future asbestos claimants representative (the "Future Claims Representative") selected by Quigley to represent the future claimants in the settlement negotiations.  (See Supplemental Vote Tabulation Memorandum, at ¶ 18 (during the negotiations, the Future Claims Representative "insisted that the assets in [Quigley's post-bankruptcy Trust] be maximized for the benefit of future asbestos claimants.")  It appears that the Trust will not be able to pay out 100%, and the 90% dilution provision will, therefore, apply.

Under the settlement, Pfizer agreed to pay, and actually did pay, one-half of the amounts due by December 1, 2005. (Pfizer Settlement Agreement, at § 4.2(b).)  The balance of the settlement amount was payable, inter alia, when and if the Plan was confirmed and the Consensual Plan Effective Date occurred.[5]  (Id.)  Pfizer could unilaterally terminate the settlement at any time prior to the "Consensual Plan Effective Date."[6]  (Pfizer Settlement Agreement, at § 5.1.)  In addition, Pfizer's obligations terminated if less than 75% of the holders of Asbestos PI Claims who actually voted, voted to reject the plan.[7]  (Id. at § 4.3.)  If the Plan was not confirmed, the Settling PI Claimants were free to assert the full amount of their claims against Quigley.  (See Pfizer Settlement Agreement, at § 2.4(b).)

## C.    Quigley's Bankruptcy

Quigley filed its chapter 11 petition on September 3, 2004.  The disclosure statement included a schedule that identified the value attributed to each level of asbestos-related disease or impairment, and hence, the amount the Trust would pay upon proof of that impairment:[8]

---

[5]    The "Consensual Plan Effective Date" is the date on which the District Court's order confirming the Plan becomes a final order, and is no longer subject to further review.  (Pfizer Settlement Agreement, at § 1.1(b), p. 4.)

[6]    In theory, Pfizer could terminate its obligation to pay the remaining 50% after the votes were solicited and even after Plan was confirmed, provided that the Consensual Plan Effective Date had not yet occurred.

[7]    The 75% requirement tracks the voting requirement for acceptance of the Plan by the Asbestos PI Claimants.  See 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

[8]    To receive payment, a claimant must submit evidence of exposure to an asbestos-containing product produced by Quigley, and evidence of an asbestos-related illness.  (DS, at 8.)

| Disease Type [9] | Scheduled Value |
|---|---|
| Mesothelioma | 200,000 |
| Lung Cancer 1 (Level VI) | 35,000 |
| Lung Cancer 2 (Level V) | None[10] |
| Other Cancer | 15,000 |
| Severe Asbestosis | 35,000 |
| Asbestosis/Pleural Disease (Level II) | 5,000 |
| Asbestosis/ Pleural Disease (Level I) | 2,000 |

(DS, at 8, 81-83.)  The values assigned to the claims were based on Quigley's historical settlements, and the Official Unsecured Creditors' Committee and the Future Claims Representative deemed them to be appropriate for current and future claimants.  (Id. at 8.)

The Plan divided Quigley's creditors into several classes, but only Class 4 is the subject of the current dispute.  Class 4, entitled "Asbestos PI Claims," included any claim, demand or remedy, "whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, bonded, secured, or unsecured," resulting from exposure to Quigley's asbestos containing

---

[9]      The "Medical/Exposure Criteria" for each category is listed at pages 81-84 of the DS.

[10]     No specific value was ascribed to "Lung Cancer 2 (Level V)," and each such claim is subject to Individual Review.  (DS, at 81.)  The Individual Review Process applies to a claimant who believes that his claim would be compensable in the tort system even though the claim does not meet the presumptive criteria established under the Plan.  In addition, a claimant may elect to pursue the Individual Review Process if he believes the liquidated value of the claim exceeds the scheduled value.  (DS, at 89.)

products.[11]  (DS, at 50.)  Pursuant to the Order Establishing Deadline for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof, dated July 26, 2005 ("Bar Date Order") (ECF Doc. # 405), the Court ordered the Asbestos PI Claimants holding un-liquidated claims not to file proofs of claim in Quigley's bankruptcy.  Quigley argued and the Court agreed that claims-management should be undertaken by the Trust because the claims will be channeled into the Trust for final liquidation and payment.  Quigley also contended that organizing and reviewing thousands of proofs of claim would take years and would delay confirmation.  (Motion of Quigley Company, Inc. For an Order: (I) Approving Quigley's Disclosure Statement; (II) Approving Solicitation Procedures, Forms of Ballots, and Manner of Notice; (III) Estimating Each Asbestos PI Claim at $1.00 Solely for Voting Purposes and (IV) Fixing Date, Time and Place for Confirming Hearing and Deadline for Filing Objections Thereto, dated Aug. 17, 2005, at 16 (ECF Doc. # 421).)

## D.      The Plan Voting Procedures

On August 17, 2005, Quigley filed the Solicitation Procedures Motion requesting an order approving voting procedures.[12]  Quigley asked the Court to estimate the unliquidated Asbestos PI Claims at $1.00 for voting purposes only.  The Ad-Hoc Committee of Tort Victims (the "Ad-Hoc Committee"), which is comprised of a group of

---

[11]      Class 2 consists of Quigley's secured creditors, and includes certain Asbestos PI Claimants that hold pre-petition judgments secured by supersedeas bonds posted to stay collection.  (See DS 47-49.)  Their claims fall within the broad definition of Asbestos PI Claims, and, therefore, appear to fit into both classes.

[12]      Motion of Quigley Company, Inc. For an Order: (I) Approving Quigley's Disclosure Statement; (II) Approving Solicitation Procedures, Forms of Ballots, and Manner of Notice; (III) Estimating Each Asbestos PI Claim at $1.00 Solely for Voting Purposes and (IV) Fixing Date, Time and Place for Confirming Hearing and Deadline for Filing Objections Thereto, dated Aug. 17, 2005 ("Solicitation Procedures Motion") (ECF Doc. # 421.)

Asbestos PI Claim holders that did not settle with Pfizer, opposed Quigley's motion.[13]  In

substance, the Ad Hoc Committee argued that the Asbestos PI Claimants' votes should be

weighed based on the severity of their impairments, and that the votes of the Settling PI

Claimants should be diluted to reflect the voluntary 90% reduction of their claims against

the Trust.

On January 23, 2006, Judge Beatty signed the <u>DS Order</u> approving the disclosure

statement and the voting procedures.  The Court ordered each holder of an Asbestos PI

Claim to designate on its ballot whether he based his claim on mesothelioma, lung

cancer, or another asbestos related disease.  (<u>DS Order</u>, at ¶ 4.)  It also required the

claimant to indicate whether he was a Settling PI Claimant. (<u>Id.</u>, at ¶ 5.)   Finally, the

order included the following provision:

> Each Asbestos PI Claim (including Indirect Asbestos PI Claims),
> including any Asbestos PI Claims that Quigley has scheduled as
> liquidated, noncontingent or undisputed, shall be estimated at a fixed value
> of $1.00 pursuant to section 502(c) of the Bankruptcy Code, solely for
> purposes of voting to accept or reject the Plan, and not for any other
> purpose.  The Court shall determine the appropriate manner of tabulating
> votes on the Plan after the Voting Deadline, and all objections with respect
> thereto are hereby preserved.

(<u>DS Order</u>, at ¶ 3.)  Although the <u>DS Order</u> appeared to resolve the $1.00 per vote issue,

the parties agree that it was the intent of the last sentence to defer the resolution of the

issue.

---

[13]    In addition to the Ad Hoc Committee's Objection, which is <u>Objection of the Ad-Hoc Committee of Tort Victims to the Debtor's First Amended Disclosure Statement…</u>, dated Sept. 15, 2005 (ECF Doc. # 450), certain other objections were filed by Asbestos PI Claimants and their law firms on the basis of the proposed voting scheme; <u>Objection of the David Law Firm Who Represents Victims of Mesothelioma to the Motion…</u>, dated Sept. 15, 2005 (ECF Doc. # 443); <u>Wade Freeman Objections to Motion of Quigley Company, Inc…</u>, dated Sept. 14, 2005 (ECF Doc. # 442); <u>Reaud, Morgan & Quinn, L.L.P.'s Objection to Motion…</u>, dated Sept. 15, 2005 (ECF Doc. # 445); <u>Objection of William F. Geritz, et. al to First Amended Disclosure Statement…</u>, dated Sept. 15, 2005 (ECF Doc. # 446);  <u>Objection of Hissey Kientz, L.L.P. and Hissey, Kientz & Herron P.L.L.C…</u>, dated Sept. 15, 2005 (ECF Doc. # 455.)

Quigley thereafter solicited the votes of the Asbestos PI Claimants, and the voting is now complete. According to the Second Supplemental Declaration of Daniel P. McSwigan Certifying Tabulation of Ballots Regarding Vote on Debtor's Third Amended Plan of Reorganization, dated July 17, 2006 (ECF Doc. # 880)(the "Certification"), 209,171 holders of Class 4 Asbestos PI Claims voted. Eighty-five percent – 177,530 – accepted the Plan. Fifteen percent, or 31,641, voted to reject it. (Certification, Ex. A.) Thus, Class 4 creditors voted overwhelmingly in number to accept the Plan, and if the Court adopts the $1.00 per vote methodology urged by Quigley, the Plan will satisfy the voting requirements for confirmation. Consequently, the Court turns to the two voting issues discussed at the beginning of this opinion.

## DISCUSSION

**A.    Introduction**

With certain exceptions, an impaired class of creditors is entitled to vote on a plan.[14] The class accepts the plan if it meets two voting requirements under 11 U.S.C. § 1126(c): number and amount. More than 50% of the votes cast must vote to accept. In addition, the accepting votes must account for at least two-thirds, in amount, of the votes cast. When a plan, such as the one in this case, also contains a § 524(g) channeling injunction, the proponent must meet a heightened "number" requirement; the plan must be accepted by at least 75% of those voting if their claims will be addressed by the trust. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

These straightforward rules are difficult to apply in tort cases, and particularly, in asbestos cases. Only "allowed" claims can vote. 11 U.S.C. § 1126(a). Unless the debtor

---

[14]    If a class receives nothing, it is deemed to reject the plan. 11 U.S.C. § 1126(g).

schedules a claim as undisputed, liquidated and non-contingent, a creditor must file a claim in order for it to be deemed "allowed."  See FED. R. BANKR. P. 3002(a); 11 U.S.C. § 502(a).  Many asbestos cases, including this one, excuse asbestos claimants from the requirement to file claims because of the practical difficulties involved.  As this case shows, the asbestos creditors number in the hundreds of thousands.  In addition, the filing of a one page proof of claim, see Official Form no. 10, with minimal information and an exorbitant or unliquidated demand is not helpful.  The alternative, designing a claim form that calls for more detailed medical information about the nature and the severity of the claimant's impairment, is cumbersome and best postponed for submission to the post-confirmation trust.  Accordingly, a bankruptcy court overseeing an asbestos case often enters order that permits the asbestos claimants to vote their unfilled claims, and allows their attorneys to vote the claims of all of the attorneys' clients in a single, master ballot.[15]   See S. ELIZABETH GIBSON, JUDICIAL MANAGEMENT OF MASS TORT BANKRUPTCY CASES 130-31 (Fed. Jud. Ctr. 2005)("GIBSON").

Even if the tort claimant files a claim, voting is still a problem.  Tort claims are usually unliquidated, and hence, the Court must estimate their value for voting purposes. FED. R. BANKR. P. 3018(a)("Notwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting the plan."); accord Kane v. Johns-Manville Corp (In re Johns-Manville Corp.), 843 F.2d 636, 646 (2d Cir. 1988) ("Manville").  The Bankruptcy Code and the Federal Bankruptcy Rules provide little guidance, and the estimation of claims for voting purposes is essentially committed to the

---

[15]        In some cases, like Manville, which is discussed in the succeeding text, the ballot doubles as a proof of claim.

12

court's discretion.  Bittner v. Borne Chem. Co., 691 F.2d 134, 135-136 (3d Cir. 1982);

Pension Benefit Guar. Corp. v. Enron Corp. (In re Enron), No. 04 Civ. 5499 (HB), 2004

WL 2434928, at *5 (S.D.N.Y. Nov. 1, 2004); In re Ralph Lauren Womenswear, Inc., 197

B.R. 771, 775 (Bankr. S.D.N.Y. 1996).  In the end, any estimation should ensure that the

voting power is commensurate with the creditor's economic interests in the case.  Enron,

2004 WL 2434928, at *5.


**B.      Estimating Methodology**

        Two estimation approaches have emerged in asbestos cases.  The first, pressed by

Quigley, values all of the claims at $1.00 for voting purposes.  The second weighs the

votes by ascribing values based on the claimant's impairment.  See GIBSON 132-33.

Judicial support for estimating unliquidated claims at $1.00 comes primarily from

Manville and Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694 (4th Cir.),

cert. denied, 493 U.S. 959 (1989) ("Robins").[16]

        In Manville, the bankruptcy court adopted a procedure that combined the proof of

claim with the ballot, and estimated each asbestos claim at $1.00 for voting purposes.

Manville, 843 F.2d at 641.  In all, 52,440 claimants voted, and 50,275, or 95.8%,

accepted the plan.  Id.  One creditor challenged the voting procedures.  He argued, inter

alia, that the $1.00 estimate was arbitrary, deprived him of the opportunity to vote the

amount indicated in his claim, and essentially disenfranchised or discouraged those with

---

[16]       In addition, Quigley refers to a few unpublished bankruptcy court orders that adopted the $1.00
methodology.  Such citations are not persuasive because the issue may not have actually been litigated or
decided.  For example, this Court presided over Keene Corporation, Case no. 93-46090 (Bankr. S.D.N.Y.),
one of the cases cited by Quigley.  The plan in Keene was consensual, and all parties acquiesced in the
$1.00 estimation.  Frankly, it did not matter in light of the overwhelming acceptance, a critical factor
discussed in the succeeding text.

large claims from opposing the plan. Id. at 646. The Court rejected the challenge, noting that it did not have to decide if the voting procedures violated the Bankruptcy Code; "the alleged irregularities were at most harmless error." Id. at 647. In light of the overwhelming acceptance, none of the alternative procedures advocated by the objecting party would change the outcome of the vote. Id.

The Robins court reached a similar conclusion. Robins involved tort claims arising from the use of the Dalkon Shield rather than asbestos. Approximately 195,000 personal injury claims were asserted, and the district court, which presided over the bankruptcy case, estimated each claim in the same amount for voting purposes. Robins, 880 F.2d at 697. Approximately 140,000 claimants voted, and 94.38% accepted the plan. Id. at 698. Persuaded by the reasoning of the Manville Court, the Fourth Circuit Court of Appeals rejected the challenge to the voting procedure "because, in view of the outcome of the vote, the challenged procedure was at most harmless error." Id.

It appears, then, that the $1.00 per vote method can be used when support is overwhelming and a different voting method will not change the result. Where the harmless error rule cannot be applied, another approach may be necessary. The alternative is to weigh each vote based on the nature and impairment of each claimant's injury. This method more accurately aligns the voting strength with the ultimate claim value, GIBSON 133, and prevents the holders of relatively small claims from disenfranchising the more severely impaired who hold larger claims.

Quigley has proposed an alternative that weighs the votes according to the values scheduled in the Plan. Much of the information can be extracted from the ballots, even

though the three categories of diseases listed in the ballot subsume the seven categories established in the TDP. In addition, this approach fulfills the expectations of the claimants since their votes are presumably cast, in part, based upon the amount the creditors expect to receive from the Trust. Moreover, both sides acknowledge that this result is reasonable. (See Supplemental Vote Tabulation Memorandum, at ¶ 32; Memorandum of the Ad-Hoc Committee of Tort Victims in Support of a Voting Methodology that Takes into Account Both the Differing Interests Held by Settling and Non-Settling Claimants as Well as Disease-Based Variations in Claim Value, dated June 2, 2006 ("Memorandum of the Ad-Hoc Committee"), at 11 n.14 (ECF Doc. # 838) (noting that a methodology that applies some objective criteria, for example, "actual historical settlement values or TDP-based values would seem more appropriate in this case.").)

The use of historical settlement values, preferred by the Ad Hoc Committee, makes less sense. The Ad Hoc Committee contends that the use of values derived from Quigley's historical records will reflect the actual economic and legal viability of the Asbestos PI Claims presently at stake. For the sake of efficiency, it proposes to seek discovery and prepare a matrix that will describe what each claimant should be paid. The matrix will also take into account the settlement history of the law firms that represented each Asbestos PI Claimant. It asserts that such information is pertinent because certain firms settled, on the average, for approximately $475 per claim, while for other firms settled, on the average, for $281,250 per claim. (Memorandum of the Ad-Hoc Committee, at 13.)

The Ad Hoc Committee's proposal is no better and is more time consuming than the use of the TDP values.  Claims are settled based on the individual merit of the underlying claim, and relevant factors include the plaintiff's age, disease, medical proof, pain and suffering, exposure history, and lifestyle.  (<u>Supplemental Vote Tabulation Memorandum</u>, ¶ 37.)  The same bits of information would be necessary under the Ad Hoc Committee's proposal, and the Court would have to review every claim, including the identity of the lawyer representing the claimant, to determine its appropriate voting weight.  Furthermore, the TDP values already reflect Quigley's settlement experience, have been approved by the Official Committee of Unsecured Creditors and the Future Claims Representative, and no one has suggested that the TPD values, or the differences in values assigned to the various disease categories, are arbitrary or unreasonable.

**C.     The Voting in this Case**

As noted, 85% of the Asbestos PI Claimants that voted accepted the Plan.  This number will not change, regardless of the methodology used.  Accordingly, the vote to accept meets the "more than one-half in number" requirement under § 1126(c), and the three-quarters requirement imposed by § 524(g).  The choice between methodologies will only affect the "two-thirds in amount" test under § 1126(c).  Under the $1.00 per vote method, the same 85% vote also satisfies this criterion.

The use of weighted voting, based on the TDP values, also results in the acceptance by at least two-thirds in amount.  Quigley made a rough estimate of the weighted votes based on the three categories of impairments listed on the ballots.  Except

for "Mesothelioma," each ballot category encompasses more than one Plan category. [17]

The scheduled value of the disease categories fluctuates based on the severity of the impairment.   For example, the ballot category "Other" encompasses the last four scheduled categories in the TDP, which range in value between $35,000 and $2,000. Quigley weighed the voting results using the lowest scheduled value, and the result, depicted in the following chart, shows that approximately 73% in amount accepted the Plan (see Certification, Ex. B):

| Disease | TDP Value[18] | Accept | Accept Value | Reject | Reject Value | % Accept |
|---|---|---|---|---|---|---|
| Mesothelioma | 225,000 | 5,085 | 1,144,125,000 | 2,222 | 499,950,000 | 69.59% |
| Lung Cancer | 15,000 | 10,896 | 163,440,000 | 3,599 | 53,985,000 | 75.17% |
| Other | 2,000 | 161,412 | 322,824,000 | 24,883 | 49,766,000 | 86.64% |
| **All Diseases** | | **177,393** | **1,630,389,000** | **30,704** | **603,701,000** | **72.98%** |

Since the results are the same using $1.00 per vote or the TDP values, the use of the former is harmless error at most.   This conclusion also holds true if the Court estimates the Settling PI Claimants votes at 10% of their value, but for the opposite

---

[17]      As noted, the TDP listed seven disease types while the ballot listed only three.  According to Quigley, "Lung Cancer" subsumed "Lung Cancer 1" and "Lung Cancer 2" claims, and "Other" subsumed "Other Cancer," "Severe Asbestosis," "Asbestosis/Pleural Disease (Level II)" and "Asbestosis/Pleural Disease (Level I)" claims.  (Supplemental Vote Tabulation Memorandum, at ¶ 33.)    The TDP schedules Lung Cancer I claims in the TDP is $35,000 and ascribed no value to Lung Cancer II.  In their papers, the parties estimated the value of the votes in class 4 using both the $15,000 value and the $35,000 value for Asbestos PI Claimants who indicated a claim stemming from Lung Cancer, and neither party has argued that this difference is material.  (See Supplemental Vote Tabulation Memorandum, at ¶ 36 n.8; Memorandum of the Ad-Hoc Committee, at 15.)

[18]      The scheduled value of mesothelioma claims in the Disclosure Statement is $200,000, but both parties used $225,000 in their calculations.  (See Supplemental Vote Tabulation Memorandum, at ¶ 35; Memorandum of the Ad-Hoc Committee, at 15.)

reason. Regardless of which methodology is used, the dilution by 90% will prevent the Plan from satisfying the two-thirds in amount requirement under 11 U.S.C. § 1126(c). Accordingly, we turn to this issue.

### D.    The Revised Voting Results

####    1.    The Rationale for Discounting the Votes

Each side argues strongly for or against the dilution of the Settling PI Claimants' votes. The Ad Hoc Committee contends that dilution of the Settling PI Claimants' votes is mandated by In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir. 2004). The Plan proponents maintain that the plain language of the Bankruptcy Code requires the opposite conclusion.

In Combustion Engineering, the debtor entered into pre-petition settlements with its asbestos creditors as part of a pre-packaged bankruptcy plan. Each settling claimant received between 37.5% and 95% of his claim. The debtor funded the settlement by transferring most of its assets to a pre-petition trust. Id. at 204. The settling claimants retained their claims for the balance, the so-called "stub claims," which they could assert in the bankruptcy case. Id. at 205. The plan was overwhelmingly accepted, and the vast majority of the votes cast belonged to the stub claimants. See id. at 208.

Although the lower courts confirmed the plan, the Third Circuit Court of Appeals reversed and remanded, raising substantial issues regarding the pre-petition settlements and the stub claims. The transfer to the pre-petition trust, and the trust payments to the stub claimants, may have been voidable preferences, id. at 240, and violated the principle of equality of distribution among creditors. Id. at 241-42. The plan may have treated

particular groups of claimants unfairly, and the lower courts had not evaluated the overall fairness of the plan from the perspective of settling versus non-settling claimants.  Id. at 242.  The creation of the stub claims may have constituted artificial impairment and manipulated the voting.  Id. at 244-45.  Finally, the creation of stub claims implicated concerns about the debtor's good faith.  Id. at 247.

Combustion Engineering is distinguishable from this case.  In Combustion Engineering, the debtor used its own assets to pay settling claimants, arguably "preferring" the settling claimants but certainly diminishing what remained for those who chose not to settle.  Here, Pfizer used its own funds to settle.  There are no preferential transfers.  In addition, the amount of assets available to all creditors is more rather than less as a result of the settlements.  Accordingly, the settlement will not reduce the distribution that those parties, who chose for their own reasons not to settle, will receive under the Plan.

Moreover, many of the problems in Combustion Engineering turned on the failure to develop a sufficient factual record, or make factual findings, regarding discrimination, good faith, artificial impairment and vote manipulation.  Here, the Court has not yet conducted the confirmation hearing.  It has advised all sides in this case that these factual issues, and their potential impact on the voting, are reserved for the confirmation hearing. The only question, at this point, is whether the Court should discount the Settling PI Claimants votes regardless of the Plan proponents' good or bad faith, or the other concerns identified by the Third Circuit.  Accordingly, Combustion Engineering does not mandate discounting their votes by 90%.

19

Nor does the language of the Bankruptcy Code call for the opposite result. Pfizer and Quigley argue that diluting the Settling PI Claimants' votes would be contrary to several of its provisions. Section 1126(c), they assert, imposes a "mechanical test" under which each creditor is entitled to vote its "allowed" claim. The only exception is "designation" under 11 U.S.C. § 1126(e), and designation requires a finding of bad faith. Moreover, § 1123(a)(4) requires a plan to provide the same treatment for each member of a class, unless the holder of the claim or interest agrees to less favorable treatment. It does not, however, insist that the creditor who voluntarily agrees to accept less favorable treatment accept a corresponding reduction in its vote. By agreeing to take less, the Settling PI Claimants essentially agreed to less favorable treatment under this Plan.

The argument misstates the question. An Asbestos PI Claimant does not hold an allowed claim unless he filed a claim, and with few exceptions, the record does not reflect that any did. In fact, the bar date order told them they should not. Consequently, the current exercise involves an attempt to estimate the value of each Asbestos PI Claim for voting purposes. The question now posed is simply whether the Court should consider the Settling PI Claimants' concession of 90% of their claims under the Pfizer settlement in estimating the value of their claims for voting purposes.

The Court concludes that it should. The factor is relevant because it ensures voting power that is commensurate with the Settling PI Claimants' economic interests and the economic realities of the case. Enron, 2004 WL 2434928, at *5. This does not mean that a creditor must always reduce the amount of its claim as the result of a third party payment. But the Settling PI Claimants contractually agreed to reduce their recoveries in this case, and intentionally conferred a benefit on the Quigley estate. Under

the Pfizer settlement, which is essentially a class settlement, Settling PI Claimants agreed, for good and valuable consideration, to accept 10% of the liquidated value of their claims against the Trust. If the Settling PI Claimants held liquidated claims, and agreed as part of a settlement to take 10%, their allowed claims, and hence, their votes, would be reduced to the settlement amount.

Here, Settling PI Claims are unliquidated, and the settling parties cannot fix that amount today. Instead, the Settling PI Claimants did the next best thing. They agreed that whenever their claims are liquidated by the Trust, they will accept 10% of that amount. There is no reason to treat this settlement differently from the settlement of a liquidated amount.

### 2.      The Results of the Voting After Dilution

After discounting the Settling PI Claimants' votes by 90%, the Class 4 vote is insufficient to meet the requirement for acceptance. The following chart reflects the voting results under the $1.00 per vote method prior to any dilution, and divides the claimants between those who settled and those who did not (see Certification, Ex. C-2):

| Claimants | Accepting | Rejecting | Percentage Accepting | Percentage Rejecting |
|---|---|---|---|---|
| Settling PI Claimants | 140,593 | 4,233 | 97% | 3% |
| Non-Settling PI Claimants | 36,937 | 27,408 | 57% | 43% |
| **Totals** | **177,530** | **31,641** | **85%** | **15%** |

If the dollar amount of the Settling PI Claimants' votes is reduced by 90%, their accepting and rejecting votes are reduced in amount, respectively, to $14,059 and $423.

21

Substituting the diluted vote for the undiluted vote lowers the accepting vote to 65% in amount, just shy of the required two-thirds requirement:

| Claimants | Accepting | Rejecting | Percentage Accepting | Percentage Rejecting |
|---|---|---|---|---|
| Settling PI Claimants | 14,059 | 423 | 97% | 3% |
| Non-Settling PI Claimants | 36,937 | 27,408 | 57% | 43% |
| **Totals** | **50,996** | **27,831** | **65%** | **35%** |

The effect of dilution is even more pronounced if the votes are weighed according to the TDP values. The TDP-weighted value of the votes cast by the Settling PI Claimants, before dilution, is the following (see Certification, Ex. C-2):

| Settling | TDP Values | Accept | Total Value | Reject | Total Value |
|---|---|---|---|---|---|
| Mesothelioma Claimants | 225,000 | 3,522 | 792,450,000 | 321 | 72,225,000 |
| Lung Cancer | 15,000 | 7,873 | 118,095,000 | 325 | 4,875,000 |
| Other | 2,000 | 129,141 | 258,282,000 | 3,517 | 7,034,000 |
| **Total** | | 140,536 | **1,168,827,000** | 4,163 | **84,134,000** |

The corresponding values for the non-settling claimants is the following (see Certification, Ex. C):

| Non-settling | TDP Values | Accept | Total Value | Reject | Total Value |
|---|---|---|---|---|---|
| Mesothelioma Claimants | 225,000 | 1,563 | 351,675,000 | 1,901 | 427,725,000 |
| Lung Cancer | 15,000 | 3,023 | 45,345,000 | 3,274 | 49,110,000 |
| Other | 2,000 | 32,271 | 64,542,000 | 21,366 | 42,732,000 |
| **Total** | | 36,857 | **461,562,000** | 26,541 | **519,567,000** |

As already noted, 73% in amount accepted the Plan under the TDP-weighted voting methodology. The information in the two previous charts discloses that 93% of

22

the Settling PI Claimants accepted the Plan, while more than 50% of the non-settling claimants voted to reject it:

|  | Accept | Reject | Total Vote | % Accepting |
|---|---|---|---|---|
| Settling | 1,168,827,000 | 84,134,000 | 1,252,961,000 | 93% |
| Non-Settling | 461,562,000 | 519,567,000 | 981,129,000 | 47% |
| **Total** | **1,630,389,000** | **603,701,000** | **2,234,090,000** | **73%** |

If the Settling PI Claimants are reduced by 90%, the result is that only 52% in amount accepted the Plan:

|  | Accept | Reject | Total Vote | % Accepting |
|---|---|---|---|---|
| Settling | 116,882,700 | 8,413,400 | 125,296,100 | 93% |
| Non-Settling | 461,562,000 | 519,567,000 | 981,129,000 | 47% |
| **Total** | **578,444,700** | **527,980,400** | **1,106,425,100** | **52%** |

Accordingly, dilution of the Settling PI Claimants' vote by 90% results in rejection of by Class 4, and this holds true regardless of which methodology is used.

**CONCLUSION**

Class 4 has rejected the Plan under the estimation methodology adopted by the Court.  Quigley cannot confirm the Plan on a consensual basis, but this does not decide whether Quigley can cram the Plan down over Class 4's rejection.  The parties are directed to contact chambers to arrange a conference for the purpose of discussing the status of the Plan and the case.

So ordered.

Dated: New York, New York
       August 9, 2006

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge