UNITED STATES BANKRUPTCY COURT　　　　FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:　Chapter 11
QUIGLEY COMPANY, INC.,　　　　　　 :　Case No. 04-15739 (SMB)
　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　:
　　　　　　　Debtors.　　　　　　　　:
------------------------------------------------------X

## MEMORANDUM DECISION CONCERNING CLASSIFICATION AND TREATMENT OF ASBESTOS PERSONAL INJURY CLAIMS

**A P P E A R A N C E S:**

SCHULTE ROTH & ZABEL LLP
Attorneys for the Debtor
919 Third Avenue
New York, NY 10022

　　　Michael L. Cook, Esq.
　　　Lawrence V. Gelber, Esq.
　　　　　Of Counsel

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for Pfizer Inc.
One World Financial Center
New York, New York 10281

　　　Bruce R. Zirinsky, Esq.
　　　John H. Bae, Esq.
　　　　　Of Counsel

BROWN RUDNICK BERLACK ISRAELS LLP
Attorneys for The Ad-Hoc Committee of Tort Victims
120 West 45th Street
New York, New York 10036

　　　Gregory T. Arnold, Esq.
　　　Edward S. Weisfelner, Esq.
　　　　　Of Counsel

CAPLIN & DRYSDALE
Attorneys for the Official Committee of
Unsecured Creditors
One Thomas Circle, NW
Suite 1100
Washington, D.C. 20005

    Ronald E. Reisnsel, Esq.
        Of Counsel

OFFICE OF THE U.S. TRUSTEE
33 Whitehall Street
21st Floor
New York, New York 10004

    Greg M. Zipes, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge:**

The debtor, Quigley Company Inc. ("Quigley"), has filed a plan that includes a single class of claimants holding personal injury claims that arose from exposure to asbestos (the "PI Claimants"). A majority of the PI Claimants entered into prepetition settlements (the "Settling PI Claimants") with Quigley's non-debtor former parent, Pfizer, Inc. ("Pfizer"). Pfizer has already paid 50% of the settlements, and its obligation to pay the remaining 50% is contingent, <u>inter alia</u>, on the confirmation of Quigley's plan.

Quigley has sought approval of its disclosure statement, and its application raises two interrelated and narrow questions: must Quigley separately classify the Settling PI Claimants and the non-settling PI Claimants, and do the two groups receive unequal treatment under the proposed plan? For the reasons that follow, the Court concludes that although the settlements with Pfizer implicate several confirmation issues, the

classification scheme and treatment of the members of the class satisfy the relevant provisions of the Code.

## BACKGROUND

**A.    Introduction**

The facts underlying the instant dispute are detailed in <u>In re Quigley Co., Inc.</u>, 346 B.R. 647 (Bankr. S.D.N.Y. 2006), familiarity with which is assumed. The factual discussion in this opinion is limited to what is necessary to explain the Court's decision.

Quigley had been engaged in the business of developing, producing and marketing a broad range of refractories and related products. Some of these products contained asbestos. (<u>Fifth Amended and Restated Disclosure Statement with Respect to Quigley Company, Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code</u>, dated July 11, 2007 ("<u>DS</u>"), at 21-22 (<u>see</u> ECF Doc. # 1174).) In 1968, Pfizer & Co., Inc., Pfizer's predecessor, acquired Quigley, and in 1992, Pfizer sold substantially all of Quigley's assets to Minteq International, Inc. Under the sale terms, Quigley and Pfizer retained all liability stemming from Quigley's distribution and use of asbestos-containing products. (<u>Id.</u>) Since the sale, Quigley's only function has been to manage the hundreds of thousands of asbestos personal injury claims asserted against it. (<u>DS</u>, at 22-23.) Quigley estimates that as of the petition date, 212,000 asbestos personal injury claims were pending or would be asserted against it. (<u>DS</u>, at 9.)

**B.    The Prepetition Settlements**

Many of Quigley's asbestos creditors had also asserted claims against Pfizer based upon Quigley's asbestos-containing products (the "Pfizer Derivative Claims").

3

(DS, at 36.) In addition, Pfizer had manufactured asbestos-containing products, for which it bore potential asbestos-related liability unrelated to Quigley (the "Pfizer Direct Claims"). (See id.) As of the petition date, approximately 109,200 claimants had asserted claims naming both Quigley and Pfizer, it is impossible to discern the basis of liability from the pleadings. (See DS, at 24.)

Prior to the commencement of Quigley's bankruptcy, and in contemplation of the bankruptcy, Pfizer engaged in extensive efforts to settle its direct and derivative liability to the PI Claimants. (DS, at 36.) The negotiations culminated in settlement agreements (the "Pfizer Settlement Agreement") between Pfizer and more than 80%, or approximately 172,095, of the PI Claimants.[1] (DS, at 36-37.) Pfizer agreed to pay the aggregate approximate amount of $430 million, to be divided among the Settling PI Claimants, based on disease category and exposure. (See DS, at 36-37.) Pfizer paid 50% of the settlement by December 1, 2005. (DS, at 41.) The balance of the Settlement Amount is payable, inter alia, when and if the plan is confirmed and the Consensual Plan Effective Date occurs. (Pfizer Settlement Agreement, at § 4.2(c).)

In exchange, the Settling PI Claimants agreed to deliver a release (the "Release") of their direct and derivative claims against Pfizer and the Pfizer Protected Parties (as defined in the Pfizer Settlement Agreement), while retaining their claims against Quigley. (Pfizer Settlement Agreement, Ex. B (Form of Plaintiff Release).) According to the current disclosure statement, each Settling PI Claimant's Release became effective upon

---

[1] The form of the Pfizer Settlement Agreement is attached as Exhibit A to the Supplemental Memorandum of Quigley Company, Inc. and Pfizer Inc. in Support of Motion for an Order Approving Procedures to Tabulate the Votes Cast on Quigley's Plan of Reorganization by Holders of Asbestos PI Claims, June 2, 2006 ("Supplemental Vote Tabulation Memorandum") (ECF Doc. # 841.) The Form of Plaintiff Release is attached as Exhibit B to the Pfizer Settlement Agreement.

4

the 50% payment. (DS, at 41.) Although Quigley was not released, the Pfizer Settlement Agreement included a provision that was tantamount to a 90% release. The Settling PI Claimants agreed that if the assets in the Trust established under the plan to pay PI Claimants and future demands, proved insufficient to satisfy 100% of the value attributed to the present and estimated future claims, "each Settling Plaintiff [would] reduce its distribution on its claim against Quigley to ten percent (10%) of the Payment Percentage of the allowed amount of such claim under the Trust Distribution Procedures." (Pfizer Settlement Agreement, at § 2.4(b).) It is undisputed that the Trust assets will not be sufficient to pay 100%, and the 90% reduction would kick in.

The plan was a central feature of the prepetition settlement negotiations. The current version of the plan (the "Plan") contemplates that the aforementioned Trust will be funded with approximately $645 million contributed by Pfizer and Quigley. The Trust will administer and pay the present and future asbestos claims under the Plan's Trust Distribution Procedures (the "TDP"). (DS, at 6-7.) The amount of payment will depend on the severity of the claimant's impairment, ranging from a scheduled value of $200,000 for mesothelioma down to a $2,000 for certain asbestosis/pleural disease. (DS, at 8.) All current and future asbestos personal injury claims asserted against Quigley, and all "Pfizer Derivative Claims," will be channeled into the Trust, and the PI Claimants will be barred from pursuing the channeled claims against reorganized Quigley, Pfizer and certain Pfizer affiliates. (Id.)

**C    Quigley's Bankruptcy**

Quigley filed its chapter 11 petition on September 3, 2004, and filed its initial plan and disclosure statement on March 4, 2005. All of Quigley's proposed plans,

5

including the current Plan, placed the PI Claimants in the same class, regardless of whether they had settled with Pfizer. On January 23, 2006, Bankruptcy Judge Beatty signed an order approving Quigley's fourth amended disclosure statement and establishing voting procedures. Each PI Claimant was directed to designate on the ballot whether he based the claim on mesothelioma, lung cancer, or another asbestos related disease. (Order: (I) Approving Quigley's Disclosure Statement; (II) Approving Solicitation Procedures, Forms of Ballots, and Manner of Notice; and (III) Fixing Date, Time and Place for Confirmation Hearing and Deadline for Filing Objections Thereto (the "DS Order"), at ¶ 4.) (ECF Doc. # 593.) Judge Beatty's order also required the claimant to indicate whether he was a Settling PI Claimant. (Id., at ¶ 5.)

The Court's order did not decide how the claims would be valued for voting purposes, a topic of hot dispute. Quigley (and Pfizer) maintained that each claim should be estimated for voting purposes at $1.00. A dissident group, spearheaded by the unofficial Ad Hoc Committee of Tort Victims (the "Ad Hoc Committee"), argued that the claims should be valued for voting purposes in amounts consistent with their historic settlement value. In addition, the Ad Hoc Committee argued that the claims held by the Settling PI Claimants, diluted by 90% by virtue of the Pfizer Settlement Agreement, should also be reduced by 90% for voting purposes. While this issue was still pending, Quigley solicited the votes of the PI Claimants, and 85% of the voting creditors accepted the plan. A breakdown of the votes showed that 93% of the Settling PI Claimants accepted the plan, while over half of the non-settling PI Claimants rejected it. Quigley, 346 B.R. at 658-59.

6

After the vote was completed, the Court addressed the valuation dispute. The Court questioned the $1.00 per vote methodology, but ultimately concluded that it was immaterial to the outcome. Id. at 655-56. Instead, the critical issue was whether the dollar amount of the votes cast by the Settling PI Claimants should be reduced by 90% to reflect the 90% reduction agreed to in the Pfizer Settlement Agreement. See id. at 656. The Court concluded that they should be, id. at 657-58, and after the vote was recalculated to reflect the reduction, the plan failed to garner the requisite majority needed to confirm. Id. at 659.

Following an unsuccessful motion for reargument, Quigley and Pfizer returned to the drawing board. On May 18, 2007, Quigley filed its Fifth Amended Disclosure Statement with Respect to Quigley Company, Inc., Fourth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (ECF Doc. # 1097) and the Quigley Company, Inc., Fourth Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (ECF Doc. # 1098). Quigley simultaneously moved for an order approving, among other things, the adequacy of its disclosure statement and its proposed solicitation procedures.[2] While the object of the new Plan did not change, the 90% dilution provision in the Pfizer Settlement Agreement was waived. Accordingly, the Plan will allow the Settling PI Claimants to collect the full amount of their claims from the

---

[2]  See Motion of Quigley Company, Inc. For an Order: (I) Approving Quigley's Disclosure Statement; (II) Approving First Amended Ballot Solicitation and Tabulation Procedures, Forms of Ballots, and Manner of Notice; (III) Estimating Each Asbestos PI Claim Solely for Voting Purposes Using Amounts Set Forth in the Asbestos PI Trust Distribution Procedures; and (IV) Fixing Date, Time and Place for Confirmation Hearing and Deadline for Filing Objections Thereto (the "Solicitation Procedures Motion") (ECF Doc. # 1095). Quigley subsequently modified the Disclosure Statement and Plan on June 7, 2007, (ECF Doc. # 1124 and 1125, respectively), and July 11, 2007 (ECF Doc. # 1174 and 1175, respectively).

7

Trust, without regard to the Pfizer settlement. As a consequence, Pfizer has agreed to increase its contribution to the Trust.

### D.    The Ad Hoc Committee's Objection

The Ad Hoc Committee objected to the disclosure statement.[3] The United States Trustee also objected.[4] The majority of the objections challenged the adequacy of the disclosure, and were either resolved or overruled at the disclosure statement hearing. The Ad Hoc Committee nevertheless argued that the Plan was unconfirmable as a matter of law because all of the PI Claimants are placed in one class, but the non-settling PI Claimants will receive less favorable treatment. Pfizer will pay the Settling PI Claimants under the Pfizer Settlement Agreement and the Trust will also pay their claims pursuant to the TDP. The non-settling PI Claimants are limited to the Trust. In addition, the non-settling PI Claimants are releasing the Pfizer Derivative Claims under the Plan, but unlike the Settling PI Claimants, will not receive a direct payment from Pfizer. In short, the non-settling PI Claimants are getting less and paying more.

## DISCUSSION

A disclosure statement must contain "adequate information," 11 U.S.C. § 1125(a) & (b), describing a confirmable plan. If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the

---

[3]    See Objection of the Ad-Hoc Committee of Tort Victims to the Debtor's Motion (I) Approving Quigley's Fifth Amended and Restated Disclosure Statement; (II) Approving First Amended Ballot Solicitation and Tabulation Procedures, Forms of Ballots, and Manner of Notice; (III) Estimating Each Asbestos PI Claim Solely for Voting Purposes Using Amounts Set Forth in the Asbestos PI Trust Distribution Procedures; and (V) Fixing Date, Time and Place for Confirmation Hearing and Deadline for Filing Objections Thereto ("Ad Hoc Objection") (ECF Doc. # 1165).

[4]    See Objection of the United States Trustee to the Fifth Amended and Restated Disclosure Statement with Respect to Fourth Amended and Restated Plan of Reorganization of the Debtor Under Chapter 11 of the Bankruptcy Code (ECF Doc. # 1168).

8

vote would be futile. See In re Beyond.com Corp., 289 B.R. 138, 140 (Bankr. N.D. Cal.2003) (collecting cases); In re 266 Washington Assocs., 141 B.R. 275, 288 (Bankr. E.D.N.Y.), aff'd, 147 B.R. 827 (E.D.N.Y. 1992); In re Filex, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990). The Ad Hoc Committee contends that Quigley's disclosure statement describes a plan that classifies and treats the PI Claimants in such a manner that the Plan cannot be confirmed as a matter of law.

### A.    Classification

Section 1122(a) of the Bankruptcy Code states that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." The plan proponent has substantial flexibility, In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992), and "classification is constrained by two straight-forward rules: Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." In re Chateaugay Corp., 89 F.3d 942, 949 (2d Cir. 1996). Claims are similar if they have "substantially similar rights to the debtor's assets." Drexel Burnham Lambert Group, Inc., 138 B.R. at 757 (emphasis added); accord In re AOV Indus., Inc., 792 F.2d 1140, 1150 (D.C. Cir. 1986). The fact that some members of the class may also look to third parties for payment, while others in the class do not have the same right, does not mandate separate classification. See, e.g., AOV Indus., Inc., 792 F.2d at 1151 ("The existence of a third-party guarantor does not change the nature of a claim vis-à-vis the bankrupt estate and, therefore, is irrelevant to a determination of whether claims are 'substantially similar' for classification purposes.")

9

All of the PI Claimants have the same legal rights against Quigley's estate; they are unsecured creditors. The Settling PI Claimants also have rights to additional payments from Pfizer if the Plan is confirmed, and the settlement gives them an added incentive to vote in favor of the Plan. While these rights and incentives raise other issues regarding confirmation that are discussed below, they do not require the separate classification of the two groups of PI Claimants.

**B.    Unequal Treatment**

The flipside of the classification question is equality of treatment. Section 1123(a)(4) of the Bankruptcy Code requires the plan to "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Section 1123(a)(4) does not require precise equality, only approximate equality. In re Dow Corning Corp., 255 B.R. 445, 497 (E.D. Mich. 2000), aff'd in part and remanded in part, 280 F.3d 648 (6th Cir. 2002); In re Resorts Int'l, Inc., 145 B.R. 412, 447 (Bankr. D.N.J. 1990) ("This is not to be interpreted as requiring precise equality of treatment, but rather, some approximate measure since there is no statutory obligation upon plan proponents to quantify exactly what each class member is relinquishing by a release.")

Equality of treatment has two aspects. Absent consent to accept less favorable treatment, all members of the class must receive equal value. In addition, each member of the class must pay the same consideration for its distribution. As noted, this case involves both aspects centering on the Pfizer settlement payments and the Pfizer release under the Plan. The Pfizer payments do not, however, affect the equality of treatment because all similarly situated PI Claimants will receive the same distribution under the

10

Plan. The Pfizer settlement is being funded by a non-debtor and is being paid outside of the Plan.

The "unequal consideration" issue is less clear-cut, as illustrated by the majority and dissenting opinions in AOV Industries. There, the proposed plan established a fund of $4.5 million to pay the unsecured creditor class. Two third parties, Steag and Sleigh, supplied $3 million, most of the money in the fund. AOV Indus., Inc., 792 F.2d at 1143. In fact, the estate had sued Steag on the theory that it was a joint venturer with the debtor, and had settled with Steag in exchange for its contribution. Id. at 1152. The unsecured creditors could not receive a distribution from the $3 million portion unless they agreed to release Steag and Sleigh. Id. at 1150.

One of the creditors, Hawley, held a disputed guarantee given by Steag. Hawley had sued Steag in district court and the jury had rendered a verdict in Hawley's favor in the sum of $1.8 million, id. at 1142, but the district court had granted a judgment n.o.v., Hawley Fuel Coalmart, Inc. v. Steag Handel, GmbH, 614 F. Supp. 361 (S.D.N.Y. 1985).[5] In the bankruptcy case, Hawley objected to its classification and the treatment of its claim. It argued that it held a direct claim against Steag, while the other creditors held, at most, the type of derivative claim that Steag had settled with the estate. Consequently, it was required to give greater consideration than the other unsecured creditors – the release of its direct guarantee claim – to receive the same distribution. AOV Indus., Inc., 792

---

[5] AOV Industries was originally decided on June 6, 1986. Approximately six weeks later, the Second Circuit reversed the judgment n.o.v., and reinstated the verdict in favor of Hawley. Hawley Fuel Coalmart, HIncH. v. Steag Handel GmbH, 796 F.2d 29 (2d Cir. 1986), cert. denied, 479 U.S. 1066 (1987). Although the reported AOV Industries decision indicates that it was modified on August 22, 1986, and includes a citation to the Second Circuit reversal, see 792 F.2d at 1142, the majority and dissenting discussions do not otherwise refer to the Second Circuit's reversal, and treat Hawley's guarantee claim as having been rejected.

11

F.2d at 1150. Furthermore, the plan funders had settled other direct claims for additional consideration. Id. at 1153.

Although the AOV Industries court rejected the challenge to the classification, id. at 1150-51, it agreed that Hawley was receiving unequal treatment. Hawley held a unique claim, and its position "differed substantively" from its fellow class members. Id. at 1151. The plan compelled Hawley to give more consideration – the release of its unique claim – than the other class members, in violation of § 1123(a)(4). 792 F.2d at 1152. Lastly, the strength or weakness of the guarantee claim was immaterial to this conclusion. Id. at 1153.

The dissent found this aspect of the majority opinion to be unsupported by the law and "to require the analysis of the specific circumstances of each creditor properly within a single class to determine whether, like privileged characters on Orwellian farms, he is more equal than others in his class." Id. at 1156 (Starr, J., dissenting). Carried to its extreme, the requirement of equal consideration would eviscerate the principle of equality of distribution:

> [T]he increased fairness to be gained from requiring, as the court does today, equality of consideration is likely to be far outweighed by the unfairness resulting from the loss in equality of distribution. For example, unsecured creditors are typically provided the same distribution regardless of whether their claims might be subject to dispute or the debtor has potentially better defenses against some than against others. Under the logic of the broad equality-of-consideration principle enunciated today, such equality of distribution would be prohibited or at least suspect.

Id.

The dissent's concerns were echoed by the district court in Dow Corning, a mass tort bankruptcy involving numerous, unliquidated tort claims:

>In the In re AOV case, the claims were undisputed and liquidated. Requiring a bankruptcy court to inquire as to the amount of consideration involved in each claim involving a disputed and unliquidated personal injury claim, especially in a mass tort situation, would be an unrealistic, unworkable and an unduly burdensome position for the bankruptcy court to be in. Settlement negotiations would not be effective under such a standard and the bankruptcy court would be placed in a situation where it would become involved in the negotiation process. The In re AOV case also failed to consider the second half of the language found in § 1123(a)(4) which expressly allows for disparate treatment of a claim if the claimant "agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). Agreeing to settle, instead of litigating a claim, would permit a claimant to be treated differently, such as giving up more valuable consideration, in exchange for the settlement offer. This treatment is allowed under § 1123(a)(4).

255 B.R. at 497-98.

Dow Corning's admonition is especially apt in this case. The Ad Hoc Committee views the Pfizer settlement and the Plan as parts of the same transaction. Under that theory, the Settling PI Claimants are receiving a greater distribution, but may also be paying a greater consideration. The Release under the Pfizer Settlement Agreement is broader than the release available under the Plan.[6] The former releases both Pfizer Derivative Claims and Pfizer Direct Claims. The latter only releases Pfizer Derivative Claims, and the non-settling PI Claimants can pursue their direct claims after confirmation.

In addition, the Settling PI Claimants assumed a risk that the non-settling PI Claimants avoided. The Release states that it is being given in exchange for the "[Settlement Amount] in hand paid, the receipt and sufficiency of which is hereby expressly acknowledged." The Release implies that it is immediately effective, even

---

[6] During the disclosure statement hearing, the Ad Hoc Committee intimated that the Plan release exceeded the third party injunction available under 11 U.S.C. 524(g)(4)(A). Regardless of what the Plan provides, the Code sets forth the scope of the third party injunction available upon confirmation. The Plan release and injunction provisions in the Plan must comply with the statutory limits.

though Pfizer prepaid only 50% of the Settlement Amount. (See Pfizer Settlement Agreement, at § 4.2(b).) The disclosure statement, on the other hand, states that the 50% payment constituted the consideration for the Release. Under either interpretation, the Releases are valid and effective, even though Quigley may never confirm a plan and Pfizer may never make another payment. The Settling PI Claimants have already surrendered their rights to pursue any claims against Pfizer or the other released parties, but absent confirmation of the Plan, the non-settling PI Claimants can pursue all of their claims against Pfizer.

As the AOV Industries dissent and the Dow Corning court warned, this Court cannot review the merits of each settled Pfizer Direct Claim to determine the value of what each Settling PI Claimant gave up or, for that matter, the merits of the Pfizer Direct Claims that each non-settling PI Claimant is retaining. It suffices to say that the Court cannot determine as a matter of law that the non-settling PI Claimants are receiving unequal treatment in violation of 11 U.S.C. § 1123(a)(4).

The Pfizer Settlement Agreement nevertheless raises several confirmation issues. The Pfizer Settlement Agreement obviously gave the Settling PI Claimants a strong incentive to vote in favor of the Plan, and receive the remaining 50% of the Settlement Amount on the effective date. The Ad Hoc Committee would argue that Pfizer bought the vote. In addition, the Ad Hoc Committee has contended that Pfizer historically settled Quigley's claims as part of the settlement of its own liabilities with asbestos creditors. The Pfizer payments, they maintain, coupled with the failure to settle 10% of Quigley's liabilities under the Pfizer Settlement Agreement, raise questions of good faith, see 11 U.S.C. § 1129(a)(3), improper voter manipulation, see In re Combustion Eng'g,

14

Inc., 391 F.3d 190, 244-45 (3d Cir. 2005) (remanding for the purpose of determining whether the creation of stub claims, with little incentive to scrutinize the plan, amounted to artificial impairment in violation of 11 U.S.C. § 1129(a)(10)), and vote designation. See also In re Combustion Eng'g, Inc., 391 F.3d at 247; 11 U.S.C. § 1126(e).

This list is not intended to be exhaustive.  Nevertheless, these are confirmation issues that require an evidentiary hearing.  For present purposes, the application to approve the disclosure statement is granted since it contains "adequate information," and does not describe a plan that is unconfirmable as a matter of law.  The parties are directed to schedule a conference to resolve any remaining solicitation, voting or scheduling issues prior to proposing an order approving the disclosure statement.

Dated: New York, New York
       October 23, 2007

                                        /s/  *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        Chief United States Bankruptcy Judge

15