UNITED STATES BANKRUPTCY COURT       **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                          :
                             :       Chapter 11
QUIGLEY COMPANY, INC.,         :       Case No. 04-15739
                             :
                             :
           Debtors.          :
------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER
## CONCERNING VOTING RIGHTS AND
## BALLOTING AND SOLICITATION MATERIALS

**A P P E A R A N C E S :**

SCHULTE ROTH & ZABEL LLP
Attorneys for the Debtor
919 Third Avenue
New York, NY 10022

       Michael L. Cook, Esq.
       Lawrence V. Gelber, Esq.
           Of Counsel

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for Pfizer Inc.
One World Financial Center
New York, New York 10281

       Bruce R. Zirinsky, Esq.
       John H. Bae, Esq.
           Of Counsel

BROWN RUDNICK BERLACK ISRAELS LLP
Attorneys for The Ad-Hoc Committee of Tort Victims
120 West 45th Street
New York, New York 10036

       Gregory T. Arnold, Esq.
       Edward S. Weisfelner, Esq.
           Of Counsel

SEYFARTH SHAW LLP
Attorneys for Continental Insurance Company
1270 Avenue of the Americas, Suite 2500
New York, New York 10020

      Robert M. Dremluk, Esq.
      David C. Christian II, Esq.
          Of Counsel

GOLDBERG, PERSKY & WHITE, P.C.
Attorneys for certain claimants
1030 Fifth Avenue
Pittsburgh, Pennsylvania 15219

      James J. Bedortha, Esq.
          Of Counsel

LAW OFFICES OF DOUGLAS T. TABACHNIK
Counsel for Baron & Budd, P.C., Silber Pearlman, LLP
  and LeBlanc Waddell, LLP
Woodhull House
63 West Main Street, Suite C
Manalapan, New Jersey 07728

      Douglas T. Tabachnick, Esq.
          Of Counsel

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA
Counsel for Baron & Budd, P.C., Silber Pearlman, LLP
  and LeBlanc Waddell, LLP
2323 Bryan Street, Suite 2200
Dallas, Texas 75201

      Sander L. Esserman, Esq.
          Of Counsel

OFFICE OF THE U.S. TRUSTEE
33 Whitehall Street
21st Floor
New York, New York 10004

      Greg M. Zipes, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

  The debtor, Quigley Company, Inc. ("Quigley"), submitted a proposed order approving

its current disclosure statement and the proposed ballot that it plans to use to solicit votes from

the individuals that hold asbestos personal injury claims (the "Asbestos PI Claims").  The Ad

Hoc Committee of Tort Victims (the "Ad Hoc Committee") objected to the proposed ballot, and

requested certain modifications.  The modifications are intended to identify Asbestos PI

Claimants who live in so-called tort reform states, described below, and allege causes of action

that are currently unenforceable under the laws of their home states.  In substance, the Ad Hoc

Committee contends that such creditors do not hold "claims," and are not entitled to vote.  For

the reasons that follow, the objection is overruled.

<strong>BACKGROUND</strong>

**A.**  **Introduction**

  The underlying facts, which are not disputed, are detailed in the Court's prior opinions, <u>In</u>

<u>re Quigley Co., Inc.</u>, 346 B.R. 647 (Bankr. S.D.N.Y. 2006)("<u>Quigley I</u>") and <u>In re Quigley Co.,</u>

<u>Inc.</u>, 377 B.R. 110 (Bankr. S.D.N.Y. 2007)("<u>Quigley II</u>").  I assume familiarity with those

opinions, and highlight the facts necessary to understand the disposition of the current dispute.

Quigley had been engaged in the business of developing, producing and marketing a broad range

of refractories and related products.  Some of these products contained asbestos.  (<u>Fifth Amended</u>

<u>And Restated Disclosure Statement With Respect To Quigley Company, Inc. Fourth Amended</u>

<u>And Restated Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code</u>, dated

November 5, 2007 (" <u>DS</u> "), at 20-21 (<u>see</u> ECF Doc. # 1257).)  In 1968, Pfizer & Co., Inc., Pfizer

3

Inc.'s predecessor (collectively "Pfizer"), acquired Quigley, and in 1992, Pfizer sold substantially

all of Quigley's assets to Minteq International, Inc.  Under the sale terms, Quigley and Pfizer

retained all liability stemming from Quigley's distribution and use of asbestos-containing

products.  (Id.)  Since the sale, Quigley's only function has been to manage the hundreds of

thousands of asbestos personal injury claims (the "Asbestos PI Claims") asserted against it.  (DS,

at 21-22.)  Quigley estimates that as of the petition date, 212,000 Asbestos PI Claims were

pending or would be asserted against it. (DS, at 9.)

**B.      Quigley's Bankruptcy**

Quigley filed its chapter 11 petition on September 3, 2004.  On May 18, 2007, it filed its

Fifth Amended Disclosure Statement With Respect to Quigley Company, Inc., Fourth Amended

Plan Of Reorganization Under Chapter 11 Of the Bankruptcy Code (ECF Doc. # 1097) and the

Quigley Company, Inc., Fourth Amended Plan Of Reorganization Under Chapter 11 of the

Bankruptcy Code (ECF Doc. # 1098).  Quigley simultaneously moved for an order approving,

among other things, the adequacy of its disclosure statement and the proposed solicitation

procedures.[1]

The current Plan, like its predecessors, places all of the Asbestos PI Claims into Class 4.

Class 4 claims will be channeled into a Trust, and paid pursuant to the Trust Distribution

Procedures ("TDP") established under the Plan.  The Plan divides the Asbestos PI Claims into

---

[1]      See Motion Of Quigley Company, Inc. For An Order: (I) Approving Quigley's Disclosure Statement; (II)
Approving First Amended Ballot Solicitation And Tabulation Procedures, Forms Of Ballots, And Manner Of
Notice; (III) Estimating Each Asbestos PI Claim Solely For Voting Purposes Using Amounts Set Forth In The
Asbestos PI Trust Distribution Procedures; And (IV) Fixing Date, Time And Place For Confirmation Hearing And
Deadline For Filing Objections Thereto, dated May 18, 2007 (ECF Doc. # 1095).  Quigley subsequently modified
the Disclosure Statement and Plan on June 7, 2007, (ECF Doc. # 1124 and 1125, respectively), July 11, 2007 (ECF
Doc. # 1174 and 1175, respectively), and November 5, 2007 (ECF Doc. # 1257 and 1258, respectively).

the following seven categories of impairment, and ascribes values, for distribution purposes, to

each category:

| Disease Type [2] | Scheduled Value |
|---|---|
| Mesothelioma (Level VII) | 200,000 |
| Lung Cancer 1 (Level VI) | 35,000 |
| Lung Cancer 2 (Level V) | None[3] |
| Other Cancer (Level IV) | 15,000 |
| Severe Asbestosis (Level III) | 35,000 |
| Asbestosis/Pleural Disease (Level II) | 5,000 |
| Asbestosis/ Pleural Disease (Level I) | 2,000 |

(DS, at 89-91.)

## C.    The Current Dispute

The Ad Hoc Committee and the United States Trustee objected to the disclosure

statement.  The majority of the objections challenged the adequacy of the disclosure, and were

either resolved or overruled at the disclosure statement hearing.  The Ad Hoc Committee also

argued that the Plan was unconfirmable as a matter of law.  The legal objections were overruled

by the Court in Quigley II.

---

[2]    The "Medical/Exposure Criteria" for each category are listed at pages 89-91 of the DS.

[3]    No specific value was ascribed to "Lung Cancer 2 (Level V)," and each such claim is subject to Individual Review.  (DS, at 89.)  The Individual Review Process applies to a claimant who believes that his claim would be compensable in the tort system even though the claim does not meet the presumptive criteria established under the Plan.  In addition, a claimant may elect to pursue the Individual Review Process if he believes the liquidated value of the claim exceeds the scheduled value.  (DS, at 91.)

Quigley thereafter presented a proposed order approving the disclosure statement and proposed individual and master ballots (collectively, the "Ballot").[4] A lawyer that represents more than one Asbestos PI Claimant can use the master ballot, rather than file an individual ballot for each client. The individual ballot is designed for use by a single Asbestos PI Claimant. The Ballot requires the Class 4 Asbestos PI Claimants or their counsel to provide each Asbestos PI Claimant's (1) name; (2) social security number; (3) date of birth; (4) date of death, if applicable; (5) disease type, as defined in the TDP; (6) whether or not the claimant is a party to the Pfizer Settlement Agreement;[5] (7) the claimant's law firm (master ballot only); and (8) whether the claimant votes to accept or reject the plan.

The Ad Hoc Committee objected to the proposed Ballot,[6] and the Continental Casualty Company and the Continental Insurance Company also objected.[7] The Ad Hoc Committee argued that the laws of four states — Texas, Florida, Georgia and Ohio (collectively, the "Tort Reform States") — preclude Asbestos PI Claimants who suffer from non-malignant impairments

---

[4]    Notice Of Presentment By Quigley Company, Inc. Of Order: (I) Approving Quigley's Disclosure Statement; (II) Approving First Amended Ballot Solicitation And Tabulation Procedures, Forms Of Ballots And Manner of Notice; (III) Estimating Each Asbestos PI Claim Solely For Voting Purposes Using Amounts Set Forth In The Asbestos PI Trust Distribution Procedures; And (IV) Fixing Date, Time And Place For Confirmation Hearing And Deadline For Filing Objections Thereto, dated November 7, 2007 ("the Proposed Order") (ECF Doc. #1261). The proposed individual and master ballots are attached to the Proposed Order as Exhibits D and E, respectively.

The Ad Hoc Committee directed its challenge and proposed changes at the master ballot. Memorandum In Response To Notice Of Presentment On Balloting And Solicitation Materials, dated November 19, 2007 (the "Ad Hoc Response") (ECF Doc. # 1278) at Ex. A. The proposed individual ballot requires similar information, and should, therefore, be subject to the same objection. Accordingly, the Court will treat the objection as having been directed at both ballots, but this does not affect the disposition of the Ad Hoc Committee's objection.

[5]    The Pfizer Settlement and the Pfizer Settlement Agreement are discussed at length in Quigley I.

[6]    See the Ad Hoc Response.

[7]    See Reply Of Continental Casualty Company To The Ad Hoc Committee's Memorandum In Response To Notice Of Presentment On Balloting And Solicitation Materials, dated December 4, 2004 (ECF Doc. #1287).

and cannot produce certain medical evidence from prosecuting their causes of action in state court. As a result, the holders of those "claims" should not be allowed to vote on the Plan.

The proposed Ballot did not elicit the information that the Ad Hoc Committee said it needed to identify the allegedly ineligible claims. As a result, the Ad Hoc Committee proposed modifications to the Ballot that called for six additional pieces of information: (a) the claimant's state of residence; (b) the date of the claimant's original medical diagnosis; (c) the state(s) in which the claimant alleges exposure; (d) the state in which the claimant's lawsuit was filed; (e) the date on which the lawsuit was filed; and (f) if the claimant lives in a Tort Reform State, whether the claimant possesses the type of medical report that would allow the claimant to proceed with its state court action. The Official Committee of Unsecured Creditors stated that based on the Ad Hoc Committee's agreement to withdraw item (f), the Official Committee agreed to the inclusion of items (a) through (e) in the Ballot.[8]

Quigley, Pfizer, and two other groups[9] opposed the Ad Hoc Committee's position. They argued that the information demanded by Ad Hoc Committee is irrelevant, and should not be required. First, the non-malignant Asbestos PI Claims are "claims" within the meaning of the Bankruptcy Code, and state tort reform statutes cannot affect their status as "claims." Second, the state tort reform statutes do not affect the Asbestos PI Claimants' substantive rights. They are procedural in nature, and are essentially a form of reverse trial preferences. Third, the Ad

---

[8]    See  Statement Of Official Committee Of Unsecured Creditors In Reply To Ad Hoc Committee's Response To Balloting And Solicitation Materials, dated December 5, 2007 (ECF Doc. # 1290).

[9]    See Certain Ohio Claimants' Memorandum In Opposition To Ad Hoc Committee's Memorandum In Response To Notice Of Presentment On Balloting And Solicitation Materials, undated (ECF Doc. # 1284); Reply On Behalf Of Certain Settling Claimants Represented By Baron & Budd, P.C., Silber Pearlman, LLP, And Leblanc & Waddell, LLP, To The Ad Hoc Committee Of Tort Victims Memorandum In Response To Notice Of Presentment On Balloting And Solicitation Materials, dated Dec. 5, 2007 (ECF Doc. # 1288).

Hoc Committee's request amounted to improper discovery, i.e., the Ad Hoc Committee should bear the cost of ascertaining the information it believes it needs to object to the vote; Quigley should not have to do the work for it.

At bottom, the dispute involves the right to vote to accept or reject the Plan. In the typical chapter 11 case, a creditor may vote if he files a proof of claim, and no one objects. The creditor holds a claim that is "deemed allowed," 11 U.S.C. § 502(a),[10] and allowed claims are entitled to vote to accept or reject a plan. 11 U.S.C. § 1126(a). Conversely, the claim is not "deemed allowed" if a party in interest objects to the proof of claim. In that situation, the creditor must apply to the court to allow the claim for voting purposes. See Fed. R. Bankr. P. 3018(a). In many mass tort cases, and particularly in asbestos cases like this one, the asbestos personal injury creditors are not required to file claims. The court authorizes them to vote without filing claims, and their ballots serve officially or unofficially as their proofs of claim. Quigley I, 346 B.R. at 653.

This procedure does not give parties in interest the chance to object to the proof of claim before the vote is cast. They can only challenge the vote after it is cast. The Ad Hoc Committee's objection should, therefore, be viewed as an objection to the claim.[11] It challenges the status of the holders of non-malignant Asbestos PI Claims who cannot pursue their causes of

---

[10]     If the debtor schedules a claim as liquidated, non-contingent and undisputed, the claim will be "deemed allowed" without the need to file a proof of claim. See Fed. R. Bankr. P. 3003(b)(1). This exception does not apply to unliquidated tort claims.

[11]     The Ad Hoc Committee had filed an objection to these claims, (see The Ad-Hoc Committee Of Tort Victims' Objection To Any Claim Proposed To Be Voted By A Non-Malignant Claimant Identified By Pfizer As Being In a "Tort Reform State", dated September 19, 2007 ("Ad Hoc Claim Committee Objection") (ECF Doc. # 1218)), but then withdrew it. (See Notice of Withdrawal of The Ad-Hoc Committee Of Tort Victims' Objection To Any Claim Proposed To Be Voted By A Non-Malignant Claimant Identified By Pfizer As Being In a "Tort Reform State", dated October 10, 2007 (ECF Doc. # 1239).) Its objection to the Ballot raises the same issue as the withdrawn claim objection.

action commenced in the Tort Reform States because they cannot produce the required medical

report.  In other words, can a person whose right to payment is not enforceable under state law

nevertheless hold a bankruptcy "claim" and be entitled to vote?

## DISCUSSION

### A.    "Claim" Under the Bankruptcy Code

The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right

is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured,

disputed, undisputed, legal, equitable, secured or unsecured . . . ." 11 U.S.C. § 101(5)(A).  The

broad definition was intended to reach all legal obligations, no matter how remote, and deal with

them in the bankruptcy case.  H.R. REP. NO. 95-595, at 309 (1977); S. REP. NO. 95-989, at 21

(1978); see Ohio v. Kovacs, 469 U.S. 274, 279 (1985)("it is apparent that Congress desired a

broad definition of a "claim'"); In re Chateaugay Corp., 944 F.2d 997, 1003 (2d Cir. 1991)

("Congress unquestionably expected this definition [of a claim] to have a wide scope.").

Bankruptcy only discharges "claims," and a narrow definition of "claim" would undercut the

"fresh start" policy so important to bankruptcy law.

The broad definition of "claim" can encompass a right to payment that is not enforceable

under state law.  Grady v. A.H. Robins Co., Inc., 839 F.2d 198 (4th Cir. 1988) is directly on

point.  There, Grady had had a Dalkon Shield manufactured by Robins inserted several years

before the August 21, 1985 petition date, but thought it had fallen out.  On the petition date, she

was admitted to the emergency room with abdominal pains and other problems.  The doctors

discovered a Dalkon Shield, and surgically removed it on August 28, 1985.  Following

discharge, she continued to suffer symptoms, and was readmitted on November 14, 1985.

Diagnosed with a pelvic inflammatory disease, she underwent a hysterectomy.  In the interim, she commenced a civil action against Robins, by then a debtor in possession.  Id. at 199.

The principal question was whether the automatic stay barred Grady's civil action. Under 11 U.S.C. § 362(a)(1), the filing of a bankruptcy petition stays the commencement or continuation of an action to recover a "claim" that arose before the commencement of the case. Grady contended that under the law of California, where she resided and had sued, she could not sue Robins until she knew the nature of her injuries.  Id. at 201.  Since she had no pre-petition right to payment from Robins, the stay did not apply.  Id.

The Court of Appeals rejected her position, and concluded that she held a pre-petition claim subject to the automatic stay.  The Court began by acknowledging the general proposition that "a claim implies the existence of an obligation created by State law."  Id. (quoting Vanston Committee v. Green, 329 U.S. 156, 167, 170 (Frankfurter, J., concurring)).  Nevertheless, Congress has the power to define and classify claims against a bankrupt estate, and the definition of a claim, then contained in § 101(4)(A) and now found § 101(5)(A), included a right to payment that was unliquidated, disputed, unmatured or contingent.  Id. at 202.  Based on this analysis, the Court concluded:

> Mrs. Grady's claim, as well as whatever rights the other Future Tort Claimants have, is undoubtedly "contingent."  It depends upon a future uncertain event, that event being the manifestation of injury from use of the Dalkon Shield. We do not believe that there must be a right to the immediate payment of money in the case of a tort or allied breach of warranty or like claim, as present here, when the acts constituting the tort or breach of warranty have occurred prior to the filing of the petition, to constitute a claim under § 362(a)(1).  It is at once apparent that there can be no right to the immediate payment of money on account of a claim, the existence of which depends upon a future uncertain event.  But it is also apparent that Congress has created a contingent right to payment as it has the power to create a contingent tort or like claim within the protection of § 362(a)(1). We are of opinion that it has done so.

Id. at 202-03 (emphasis added).

In reaching its conclusion, the Robins Court expressly rejected the reasoning and contrary

holding in Avellino & Bienes v. Frenville Co., Inc. (In re M. Frenville Co., Inc.,), 744 F.2d 332

(3d Cir. 1984), cert. denied, 469 U.S. 1160 (1985).  In that case, Avellino & Bienes ("A & B")

provided pre-petition accounting services to the debtor, including the preparation of certified

financial statements.  After the petition was filed, several banks sued A & B in New York state

court, alleging that A & B had negligently and recklessly prepared the debtor's financial

statements.  A & B applied to the bankruptcy court for relief from the automatic stay to implead

the debtor for contribution and indemnity.  The bankruptcy court denied the motion, and the

district court affirmed.  Id. at 333-34.

The Third Circuit Court of Appeals reversed.  Although the Court observed that the

definition of "claim" was broad, and at first glance, A & B's claim could be viewed as a

contingent, disputed, unliquidated unmatured pre-petition right to payment, id. at 336, it

ultimately reached the opposite conclusion.  It reasoned that under New York state law, a non-

contractual right to contribution or indemnity accrues when the underlying judgment is paid.  Id.

at 337.  While New York law permits a defendant to assert its contingent right in its answer and

implead the indemnitor/contribution defendant, A & B's "right to payment" still arose post-

petition when the primary action was filed.  In short, A & B "did not have a claim for

indemnification or contribution until the banks filed their suit.  Thus, by its very terms, the

automatic stay provision of § 362(a) is inapplicable to A & B's suit."  Id.

Although Frenville provides direct support for the Ad Hoc Committee's position, the

decision was not cited by the Ad Hoc Committee, and with good reason; every court outside the

Third Circuit, including courts in this district, have rejected <u>Frenville</u>'s holding that a "claim" does not arise under the Bankruptcy Code until the right to payment is enforceable under state law. <u>See</u>, <u>e.g.</u>, <u>Watson v. Parker (In re Parker)</u>, 313 F.3d 1267, 1269-70 (10th Cir. 2002)("All of the cases coming to our attention which have considered the issue have declined to follow <u>Frenville's</u> limiting definition of claim.")(quoting <u>Grady</u>, 839 F.2d at 201); <u>American Law Center PC v. Stanley (In re Jastrem)</u>, 253 F.3d 438, 442 (9th Cir. 2001)("we have criticized <u>Frenville 's</u> 'right to payment' theory"); <u>Andrews v. Andrews (In re Andrews)</u>, 239 F.3d 708, 710 n. 7 (5th Cir. 2001)("The Third Circuit has taken a narrower view of 'claim,' <u>see</u> [Frenville], but this approach has been universally rejected."); <u>Epstein v. Official Committee of Unsecured Creditors (In re Piper Aircraft Corp.)</u>, 58 F.3d 1573, 1576 n. 2 (11th Cir. 1995)(The <u>Frenville</u> test "has been rejected by a majority of courts as imposing too narrow an interpretation on the term claim.")(citing cases); <u>Emons Indus., Inc. v. Allen (In re Emons Indus., Inc.)</u>, 220 B.R. 182, 193 (Bankr. S.D.N.Y. 1998) ("[T]he Subsequent DES Claimants rely heavily on the now much discredited decision of the Third Circuit in [Frenville]."); <u>In re Chateaugay Corp.</u>, 102 B.R. 335, 352 n. 12 (Bankr. S.D.N.Y.1989)("It should be noted that the <u>Frenville</u> decision has been subject to substantial criticism.")(citing cases); <u>In re Johns-Manville Corp.</u>, 57 B.R. 680, 690 (Bankr. S.D.N.Y. 1986)("Adherence to <u>Frenville</u> would reinstitute the provability concept of claims, which the drafters of the Code specifically intended to abolish."). The Second Circuit has also questioned the ruling in <u>dicta</u>. <u>See Erti v. Paine Webber Jackson & Curtis, Inc. (In re Balwin-United Corp. Litig.)</u>, 765 F.2d 343, 349 n. 4 (2d Cir. 1985) ("We are not as certain as the District Court that, if we reached the issue, we would follow <u>Frenville</u> and hold the stay inapplicable to Paine Webber's third-party complaint.") In fact, even <u>Frenville</u> acknowledged its holding might not apply in the area of asbestos mass tort cases, 744 F.2d at 337 n. 8.

In re Lloyd E. Mitchell, Inc., 373 B.R. 416 (Bankr. D. Md. 2007), the bankruptcy court applied these principles to the substantially identical voting question raised by the Ad Hoc Committee.  There, the court had not required asbestos claimants to file proofs of claim.  The proposed voting procedure allowed anyone who had been exposed to asbestos to vote even if an injury had not yet manifested itself.  Several parties objected.  Many of the asbestos cases filed by plaintiffs without manifested asbestos-related injuries languished on the local court's "inactive docket."  Citing Frenville, the objecting parties argued that these claimants held "demands" rather than "claims."  Id. at 423-24.

The bankruptcy court overruled the objection.  Relying on Grady, it concluded that the "inactive docket" imposed a procedural obstacle but did not affect a substantive right:

> The Objectors make too much of the so-called "inactive docket."  The Objectors attempt to elevate what appears to be simply a procedural device that the state court has implemented for control over its docket into a substantive determination of whether a claim exists.  Such an overreaching interpretation of this procedural designation also transgresses the settled law in this Circuit.  A claim arises upon exposure, not manifestation.  See Grady v. A.H. Robins Co. Inc., 839 F.2d 198 (4th Cir.1988).

Id. at 424 (emphasis added).

Here, too, an Asbestos PI Claimant's pre-petition exposure to asbestos gave rise to a "claim," regardless of whether the law of any particular state renders the cause of action unenforceable until some future contingency occurs.  If the Asbestos PI Claimant was exposed to asbestos before the Quigley petition date, he or she holds a "claim."  Like Mrs. Grady, the claimant's status in bankruptcy does not depend on the manifestation of the injury, or on a state or court-made rule that delays enforcement of the cause of action unless and until the injury becomes manifest.  In essence, all of the exposure-only claims are being estimated for voting purposes at the appropriate level in the TDP.  Like the plaintiffs in the Tort Reform States, every

claimant will still have to prove his claim under the TDP in order to receive a distribution.  For

present purposes, the Asbestos PI Claimant's inability to satisfy a state's proof requirements does

not affect that claimant's status as a creditor entitled to vote.[12]

**B.        The Tort Reform Statutes Do Not Affect Rights Under the Bankruptcy Code**

Although the foregoing is sufficient to dispose of the Ad Hoc Committee's objection, its

arguments also mischaracterize the effect of the laws in the Tort Reform Statutes.  The Ad Hoc

Committee succinctly summarized their effect in its withdrawn claim objection:

> These statutes, enacted in states such as Texas, Florida, Ohio and Georgia
> (the "Tort Reform States") remove the claims of unimpaired asbestos claimants
> from the court system, while extending the statute of limitations.  See, e.g., TEX.
> CIVIL PRACTICE & REMEDIES CODE, § 90.001, et seq. (the "Texas Asbestos
> Reform Statute"); FLA. STAT. ANN., § 774.001, et seq. (the "Florida Asbestos
> Reform Statute"); OHIO REV. CODE ANN., § 2307.91, et seq. (the "Ohio Asbestos
> Reform Statute"); GA. CODE. ANN. §51-14-1, et seq. (the "Georgia Asbestos
> Reform Statute").  As an example, the Ohio Asbestos Reform Statute, which was
> effective prior to the Petition Date, requires any claimant asserting an asbestos-
> related injury to file a written report meeting certain, specified criteria.  See OHIO
> REV. CODE ANN., § 2307.93.  If the claimant has a non-malignant condition, that
> report must contain certain, specified medical information.  Id., § 2307.92(B).
> Failure to produce such a report results in a dismissal of the action.  Id., §
> 2307.93(A)(I)(3)(c).  Similar procedures, and dismissal provisions, exist in other
> state asbestos reform statutes.

(Ad Hoc Committee Claim Objection, at 3)(footnote omitted.)

In other words, the Tort Reform Statutes preserve the cause of action but delay its

enforcement.  These laws were intended to decongest the courts' dockets, and allow the more

severely injured to proceed with their cases.  See 2005 Tex. Sess. Law Serv. Ch. 97, § 1

---

[12]        The Ad Hoc Committee acknowledges that some creditors do not satisfy a Tort Reform State's proof
requirements but nonetheless meet the proof requirements under the TDP.  (See Ad Hoc Committee Claim
Objection at 4 ("[T]he medical criteria required to collect under . . . the proposed Trust Distribution Procedures . . .
allow for recovery by claimants who fail to meet the standards set forth in the Tort Reform Statutes.").)  Its
objection ignores the anomalous result that such an Asbestos PI Claimant would not hold a "claim," but would still
have a present right to a distribution under the Plan.

(Vernon); accord 2005 Fla. Sess. Law Serv. Ch. 2005-274 (H.B. 1019) (West); 2004 Ohio Laws

File 88, § 3 (Am. Sub. H.B. 292); GA. CODE ANN. §51-14-1 (West 2007).  All four Tort Reform

Statutes provide for dismissal without prejudice.  TEX. CIVIL PRACTICE & REMEDIES CODE §

90.007(c); FLA. STAT. ANN., §774.205(2); OHIO REV. CODE ANN., §2307.93; GA. CODE ANN.

§51-14-6(1-2).  They are procedural, and do not purport to affect any substantive rights that

accrued prior to their effective dates.  See DaimlerChrysler Corp. v. Hurst, 949 So.2d 279, (Fla.

Dist. Ct. App. 2007); Norfolk S. Ry. Co. v. Bogle, 875 N.E. 2d 919, at ¶ 16 (Ohio 2007); cf.

DaimlerChrysler Corp. v. Ferrante, 637 S.E.2d 659, 661 (Ga. 2006) (provisions of Georgia's

Tort Reform Statute requiring plaintiffs "to produce evidence establishing that exposure to

asbestos was a substantial contributing factor to their medical conditions affect[s] appellees'

substantive rights and cannot be retroactively applied to their claims.")[13]

        The Tort Reform Statutes, in this regard, serve the same purpose and accomplish the

same goal as the Baltimore county "inactive docket" in Lloyd E. Mitchell, Inc., and more

generally, the various court-adopted deferred docket and similar case management techniques.

See Victor E. Schwartz, Mark A. Behrens & Rochelle M. Tedesco, Addressing the "Elephantine

Mass"of Asbestos Cases: ConsolidationVersus Inactive Dockets (Pleural Registries) and Case

Management Plans That Defer Claims Filed by the Non-Sick, 31 Pepp. L. Rev 271, 286 (2004)

("[C]ourts that have implemented inactive dockets seek to manage their cases by screening out

the claims of the non-sick, while preserving the right of these claimants to sue if they should

develop an asbestos-related disease in the future.")(footnote omitted).  For example, in

December 2002, Justice Helen Freedman of the New York Supreme Court entered a case

---

[13]     The Tort Reform Statutes are of recent vintage.  The earliest – Ohio – became effective on September 2,
2004.  I suspect that all or virtually all of the exposure-only Asbestos PI Claims pre-date their adoption.  Clearly, the
Tort Reform States could not strip the Asbestos PI Claimants of substantive rights that had already accrued.

management order establishing a deferred docket for exposure claimants who lacked any

discernible physical impairment.  She explained her rationale:

> The large number of claims made by or on behalf of the unimpaired or
> minimally impaired impedes the ability of the much smaller group of seriously ill
> plaintiffs and decedents to recover for their injuries. Recoveries by unimpaired or
> minimally impaired plaintiffs deplete the funds needed to compensate present and
> future claimants with serious illnesses, and resources are dwindling as the
> "elephantine mass of asbestos cases" nationwide drives large numbers of
> potentially culpable parties into bankruptcy

In re New York City Asbestos Litig., No. 40000/88, 2002 WL 32151568, at *1 (N.Y. Sup. Ct.

Dec. 19, 2002.

The Tort Reform Statutes, like the analogous case management orders, represent efforts

to control the flood of asbestos litigation, and give preferences to the truly impaired by deferring

the prosecution of claims held by the unimpaired.  They were not intended to affect substantive

rights, and a fortiori, do not affect whether the Asbestos PI Claimant holds a "claim" in a

bankruptcy case.[14]  Accordingly, the inclusion of the information requested, inter alia, by the Ad

Hoc Committee is unnecessary, and its objection to the Ballot is overruled.  Quigley is directed

to resubmit a proposed order that reflects the disposition of the objection to the Ballot, and the

---

[14] In fact, three of the four Tort Reform States provide in their statutes that the provisions do not affect any parties' rights in bankruptcy.  See FLA. STAT. ANN. §774.209(2); OHIO REV. CODE ANN. §2307.95(A)(1); TEX. CIVIL PRACTICE & REMEDIES CODE § 90.011.  Although Georgia's tort reform statute does not contain a similar clause, the purpose and procedural effect of the Georgia law is similar to the laws enacted in Ohio, Florida and Texas.  The bankruptcy clauses are probably superfluous as a legal matter, but nevertheless provide further evidence of the states' intent in enacting the Tort Reform Statutes.

parties are directed to arrange a conference to discuss the scheduling of the confirmation hearing.


        So ordered.

Dated: New York, New York
       February  26, 2008


                          /s/  *Stuart M. Bernstein*
                             STUART M. BERNSTEIN
                Chief United States Bankruptcy Judge