UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

QUIGLEY COMPANY, INC.,

                                Debtor.

Chapter 11

Case No. 04–15739 (SMB)

**FIFTH AMENDED AND RESTATED DISCLOSURE STATEMENT WITH RESPECT TO QUIGLEY COMPANY, INC. FOURTH AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS MODIFIED AS ~~OF NOVEMBER 5, 2007~~MARCH 28, 2008)**

Schulte Roth & Zabel LLP

Michael L. Cook (MC 7887)
Lawrence V. Gelber (LG 9384)
Jessica L. Fainman (JF 9200)
919 Third Avenue
New York, NY 10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955

Attorneys for Quigley Company, Inc.
Debtor and Debtor-in-Possession

*The Fourth Amended and Restated Quigley Company, Inc. Plan of Reorganization, which is attached as Exhibit A to this Fifth Amended and Restated Disclosure Statement, contains the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction and the Dividend Injunction.  For a description of the acts to be enjoined and the identity of the entities that would be subject to the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction and the Dividend Injunction, see "THE PLAN OF REORGANIZATION – Releases, Injunctions and Discharges – The Asbestos PI Channeling Injunction, – The Settling Asbestos Insurance Entity Injunction, -- the Non-Settling Asbestos Insurance Entity Injunction, -- The Confidentiality Injunction and the Dividend Injunction," and Sections 11.6, 11.7, 11.8, 11.11 and 11.12 of the Quigley Company, Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.*

Dated:   New York, New York
         ~~November 5, 2007~~**March 28, 2008**

**DISCLAIMER**

ALL CREDITORS AND EQUITY INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY (INCLUDING ALL SCHEDULES AND EXHIBITS) BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE SCHEDULES AND EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE INDICATED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THEY CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE ABOVE-CAPTIONED CHAPTER 11 CASE, (THE "*CHAPTER 11 CASE*") AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF THE DEBTOR OR ANY OTHER PARTY IN INTEREST HAVE BEEN APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY WARRANTY OR REPRESENTATION REGARDING SUCH DESCRIPTIONS, AND NEITHER WARRANTS NOR REPRESENTS THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY WITH RESPECT TO TREATMENT OF ASBESTOS PERSONAL
INJURY CLAIMS..................................................................................................................5

    A.      Generally.....................................................................................................................5

    B.      Trust Contributions.....................................................................................................5

    C.      Reorganized Quigley's Business.................................................................................6

    D.      How a Claimant Gets Paid from the Trust..................................................................6
        1.      The Trust Distribution Procedures Generally.................................................6
        2.      Disease Categories and Scheduled and Maximum Values..............................7
        3.      Application of the Payment Percentage...........................................................8
        4.      Analysis of Current and Future Claims...........................................................9

II.     INTRODUCTION.................................................................................................................9

III.    OVERVIEW OF THE PLAN..............................................................................................14

    A.      Summary of the Plan.................................................................................................14

    B.      Summary of Classification and Treatment Under the Plan.......................................15

IV.     GENERAL INFORMATION...............................................................................................20

    A.      Description and History of Quigley's Business.........................................................20
        1.      Quigley's Beginnings....................................................................................20
        2.      Quigley's Involvement with Asbestos-Containing Materials....................~~21~~20
        3.      Sale of Quigley's Refractory Business and Related Assets.......................~~21~~20
        4.      Quigley's Business Today.........................................................................~~21~~20
        5.      Asbestos and Silica Personal Injury Claims.............................................~~22~~21
        6.      Insurance Coverage...................................................................................~~23~~22
        7.      Prepetition Financing of Quigley's Operations.............................................34

    B.      Prepetition Settlement Negotiations......................................................................~~35~~34
        1.      Holders of Asbestos PI Claims................................................................~~35~~34
        2.      Future Demand Holders' Representative.......................................................40

    C.      Commencement of the Chapter 11 Case.................................................................~~41~~40

V.      THE CHAPTER 11 CASE...................................................................................................41

    A.      General......................................................................................................................41

    B.      Professionals Retained in the Chapter 11 Case.....................................................~~42~~41
        1.      Quigley's Attorneys and Advisers...........................................................~~42~~41
        2.      Creditors' Committee and Future Demand Holders' Representative..............42

    C.      Significant Events During the Chapter 11 Case........................................................43
        1.      Stay of Asbestos and Silica Personal Injury Claims Against Pfizer..............43
        2.      Employee-Related Matters.............................................................................44
        3.      Use of Cash Collateral and the DIP Credit Facility......................................45
        4.      Real Property Matters....................................................................................46
        5.      Judicial Recusal Motion.................................................................................46
        6.      Disclosure Requirements................................................................................47
        7.      The Bar Date (for Claims other than Asbestos PI Claims)............................47
        8.      The Prior Solicitation Procedures Order........................................................48
        9.      The Solicitation of Acceptances and Rejections of the Third Amended Plan.....49

| | 10. | The Asbestos PI Claims Estimation Order | 49 |
| | 11. | Quigley and Pfizer's Motion to Partially Withdraw the Reference with Respect to Confirmation | 50 |
| | 12. | The Continental Adversary Proceeding | 5150 |
| | 13. | Motion to Appoint a Trustee | 51 |
| | 14. | Motion to Convert Chapter 11 Case to Chapter 7 or to Dismiss Chapter 11 Case | 51 |
| | 15. | Solicitation Procedures Motion for the Current Plan | 51 |

VI. THE PLAN OF REORGANIZATION ..... 5253

A. Classification and Treatment of Claims Against and Equity Interests in Quigley ..... 5253
   1. Administrative Claims ..... 53
   2. Fee Claims ..... 54
   3. Priority Tax Claims ..... 5455
   4. DIP Claim ..... 5455
   5. Class 1: Priority Claims ..... 55
   6. Class 2: Secured Claims ..... 5556
   7. Class 3: Unsecured Claims ..... 57
   8. Class 4: Asbestos PI Claims ..... 58
   9. Class 5: Equity Interests in Quigley ..... 59

B. Conditions to Confirmation ..... 59

C. Conditions Precedent to the Effective Date under the Plan ..... 6263
   1. Confirmation Order ..... 63
   2. No Request for Revocation of Confirmation Order ..... 63
   3. Conditions to the Confirmation Date Remain Satisfied or Have Been Waived ..... 63
   4. Execution of Documents ..... 63
   5. Injunctions ..... 6364
   6. Qualified Settlement Fund Status ..... 6364

D. Description of the Consideration Contributed to the Asbestos PI Trust and Reorganized Quigley and Estimate of Asbestos PI Claims ..... 64
   1. The Insurance Relinquishment Agreement and the Quigley Insurance Transfer ..... 64
   2. The Quigley Contribution to the Asbestos PI Trust ..... 65
   3. The Pfizer Contribution to the Asbestos PI Trust and Reorganized Quigley ..... 6566
   4. Economic Consequences of Converting Quigley's Interest in the AIG Payments Under the AIG Settlement Agreement for Pfizer Annuity ..... 67
   5. Estimation of Asbestos PI Claims ..... 67

E. Executory Contracts and Unexpired Leases ..... 68

F. Indemnification and Reimbursement Obligations ..... 69

G. Corporate Reorganization Actions ..... 69

H. Distributions under the Plan on Account of Claims Other than Asbestos PI Claims ..... 6970
   1. Generally ..... 6970
   2. Pro Rata Share Distributions ..... 70
   3. Delivery of Distributions ..... 70
   4. Fractional Cents ..... 70
   5. Interest on Claims ..... 7071

I. Distributions to the Asbestos PI Trust and Reorganized Quigley ..... 7071

J. Effect of Confirmation ..... 71
   1. Revesting of Reorganized Quigley's Assets ..... 71
   2. Preservation of Certain Causes of Action; Defenses ..... 71
   3. Quigley Insurance Transfer ..... 7172
   4. Insurance Neutrality ..... 7273
   5. Reduction of Insurance Judgments ..... 7273

6. Terms of Injunction and Automatic Stay............................................................73
7. Title to Asbestos PI Trust Assets.....................................................................73
8. Dissolution of Creditors' Committee; Retention of Future Demand Holders' Representative; Creation of the Trust Advisory Committee............................................7374
9. Avoidance and Recovery Actions.....................................................................74
10. Tax Sharing Agreement.................................................................................74

K. Releases, Injunctions and Discharges..................................................................7475
1. Discharge of Quigley....................................................................................7475
2. Injunction..................................................................................................7475
3. Exculpation................................................................................................75
4. Release of Quigley's Officers and Directors.......................................................7576
5. Limited Release of Released Parties by Entities Accepting Distributions Under the Plan or Asbestos PI Trust Distribution Procedures.....................................................7576
6. Asbestos PI Channeling Injunction..................................................................76
7. Settling Asbestos Insurance Entity Injunction....................................................78
8. Non-Settling Asbestos Insurance Entity Injunction..............................................79
9. Limitations of Injunctions.............................................................................80
10. Release and Indemnification of Plan Contributors by Quigley.................................8081
11. Confidentiality Injunction.............................................................................81
12. Dividend Injunction......................................................................................81

L. Miscellaneous Plan Provisions...........................................................................81
1. Modification of the Plan................................................................................81
2. Revocation or Withdrawal of the Plan................................................................81
3. Supplemental Documents...............................................................................8182
4. Governing Law...........................................................................................82
5. Inconsistencies..........................................................................................82

M. Retention of Jurisdiction..................................................................................82

VII. THE ASBESTOS PI TRUST..................................................................................84

A. General Description of the Trust.........................................................................84
1. Creation and Purposes of the Asbestos PI Trust..................................................84
2. The Trustees..............................................................................................84
3. The Trust Advisory Committee........................................................................85
4. The Future Demand Holders' Representative.......................................................86
5. Transfer of Certain Property to the Asbestos PI Trust............................................8687
6. Ability to Amend Asbestos PI Trust Documents..................................................88
7. Asbestos PI Trust Distribution Procedures.........................................................88

VIII. CONFIRMATION AND CONSUMMATION PROCEDURE..................................................104

A. Solicitation of Votes......................................................................................104

B. Voting Deadline...........................................................................................105

C. The Confirmation Hearing................................................................................105106

D. Confirmation..............................................................................................107
1. Acceptance...............................................................................................107
2. Unfair Discrimination and Fair and Equitable Tests..............................................107
3. Feasibility.................................................................................................108
4. Best Interests Test.......................................................................................109

E. Consummation............................................................................................110

IX. MANAGEMENT AND BUSINESS OF REORGANIZED QUIGLEY......................................110

A.     Management of Reorganized Quigley................................................................................110
    1.    Board of Directors..............................................................................................110
    2.    Management Contracts.......................................................................................110
    3.    Amendment and Restatement of Quigley's Certificate of Incorporation and By-Laws...........~~110~~111

B.     Business of Reorganized Quigley.....................................................................................111

X.       RISK FACTORS................................................................................................................112

A.     Overall Risks to Recovery by Holders of Claims..........................................................112
    1.    Certain Bankruptcy Considerations...................................................................112
    2.    Quigley Transferred Insurance Rights Assigned to the Asbestos PI Trust..........~~112~~113
    3.    Projected Financial Information.........................................................................113
    4.    Appointment of Different Trustees and/or Different Members of the Trust Advisory Committee for the Asbestos PI Trust...............................................................113
    5.    Distributions Under the Asbestos PI Trust Distribution Procedures....................113
    6.    Federal Income Tax Consequences of the Plan to Quigley.................................~~113~~114
    7.    Risk of Post-Consummation Default...................................................................~~113~~114
    8.    Dependence on Key Personnel.............................................................................114

B.     The Asbestos PI Channeling Injunction..........................................................................114

XI.     CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.............114

A.     Consequences to Quigley.................................................................................................115
    1.    Cancellation of Debt..........................................................................................115
    2.    Treatment of the Asbestos PI Trust....................................................................~~115~~116

B.     Consequences to Holders of Claims................................................................................116
    1.    Consequences to the Holder of the Pfizer Secured Claim..................................116
    2.    Consequences to Holders of Unsecured Claims..................................................~~116~~117
    3.    Consequences to Holders of Asbestos PI Claims................................................117

C.     Information Reporting and Withholding..........................................................................117

XII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN......118

A.     Liquidation under Chapter 7............................................................................................118

B.     Alternative Plan of Reorganization.................................................................................118

XIII.   CONCLUSION AND RECOMMENDATION...................................................................~~119~~120

## EXECUTIVE SUMMARY WITH RESPECT TO
## TREATMENT OF ASBESTOS PERSONAL INJURY CLAIMS

A.      **Generally**

Under the terms of Quigley's plan of reorganization, all current and future asbestos personal injury claims that have been or could be asserted against Quigley will be "channeled" to a trust fund that will be created for the purpose of evaluating and paying such claims. In addition, all current and future asbestos personal injury claims that have been or could be asserted against certain companies other than Quigley, including Pfizer Inc., Quigley's parent company, also will be "channeled" to the trust, but only to the extent such claims are based on Quigley's conduct or products. The effect of "channeling" claims to the trust is that such claims may be pursued only through, and paid only from, the trust; they may not be asserted against Quigley, Pfizer and certain other companies as described fully elsewhere in the disclosure statement.

As described below, the trust will be funded with assets of Pfizer and Quigley, including cash, insurance, stock, two annuities and dividends from Quigley's post-Effective Date business operations. In order to conserve Quigley's

earnings for the benefit of the trust, Quigley will be prohibited from declaring or paying dividends while Pfizer continues to own Quigley's stock. The assets in the trust will be used to pay current and future asbestos personal injury claimants in accordance with the terms of trust distribution procedures established under Quigley's plan of reorganization. The trust's assets are limited, and will be managed by trustees to ensure that funds are available to pay expected future claimants as well as current claimants. The trust's limited assets are insufficient to pay more than a small percentage of each claimant's claim amount.

Nevertheless, Quigley believes for all the reasons detailed in this disclosure statement that there will be substantially more money available to pay claimants under the plan than would be the case if there were no plan and Quigley were forced to pay claims solely from its own assets. Specifically, Quigley estimates that only approximately $~~261~~**259** million would be available for distribution in a liquidation, while, under Quigley's plan of reorganization, approximately $~~759~~**757** million will be available. That is because, among other reasons, Pfizer is contributing substantial assets to the trust as part of the plan that would not be contributed if the plan were not confirmed and consummated. Moreover, without the settlements and distribution procedures in the plan of reorganization, there likely would be years of costly and time-consuming litigation involving insurance companies, creditors and others that could be avoided through the plan's orderly administrative process. Absent a plan, the distributions of money to creditors would be delayed and, due to the costs of litigation, the amount of cash actually available for creditors would be reduced substantially. For this reason and others explained in detail herein, Quigley believes that each of its creditors who is entitled to vote should vote to accept this plan of reorganization.

As of the date of this Disclosure Statement, there are pending (i) a motion by the U.S. Trustee to convert or dismiss the Chapter 11 Case and (ii) a motion by an ad hoc committee of tort claimants to appoint a trustee in the Chapter 11 Case. Quigley believes the motions are without merit, has filed written oppositions to each and intends to vigorously defend itself against the allegations made by the U.S. Trustee and the ad hoc committee. For further information about the motions, see Sections V.C.13 and V.C.14 below.

## B. Trust Contributions

Quigley and Pfizer will make the following contributions to the trust to fund the processing and payment of asbestos personal injury claims:

> a $50 million cash payment;

> $101.9 million of insurance that contains no restrictions on the payment of asbestos personal injury claims;

> $191 million of insurance that contains restrictions on the payment of certain asbestos personal injury claims;

> receivables owed by insurance companies to Quigley, as of the date that Quigley's plan becomes effective, for amounts that Quigley billed the insurance companies before it filed for chapter 11 relief (as of ~~November~~**March** 1, ~~2007,~~**2008,** these receivables total $23.8 million);

> $~~23.6~~**24** million in cash as of ~~November~~**March** 1, ~~2007,~~**2008,** which is currently in an insurance trust account jointly held by Quigley and Pfizer;

> $~~1.8~~**4.6** million in excess cash (i.e., net of amounts required to, among other things, fund distributions to holders of Allowed Claims against Quigley) that Quigley is expected to have in its accounts when the trust begins operating;

> $405 million, paid in accordance with the terms of an annuity that Pfizer will contribute to the Asbestos PI Trust on the Effective Date of Quigley's Plan, payable in equal installments over a period of 40 years, with the first installment payment payable on the date the trust begins operating;

$45.1 million, paid in accordance with the terms of an annuity that Pfizer will contribute to the Asbestos PI Trust on the Effective Date of Quigley's Plan, payable in equal installments over a period of 41 years, with the first installment payment payable on the fifth anniversary of the Effective Date;

additional payments or distributions from the estates of insolvent insurers; and

Quigley's common stock, upon satisfaction of certain conditions described in Quigley's plan of reorganization.

## C. Reorganized Quigley's Business

Reorganized Quigley will continue to operate Quigley's claims-handling business, which processes personal injury claims and settlements. Because Reorganized Quigley will be owned by the trust, the trust will benefit from any profits generated by Reorganized Quigley's business operations. Quigley currently performs these functions with respect to all personal injury claims brought against Quigley, as well as all asbestos-related claims brought against Pfizer. Reorganized Quigley will continue to provide claims-handling services to Pfizer pursuant to a new five-year claims services agreement. Reorganized Quigley will generate $5 million in revenues per year from providing these services to Pfizer, or an aggregate amount of $25 million during Reorganized Quigley's first five years of operation. In addition, the services of the claims-handling business will be**is being** marketed to others, and Quigley intends that the business will continue to grow and generate more revenues for the benefit of the trust. Quigley previously has received indications of interest in its claims-handling services from third parties. Quigley has reviewed these opportunities, and, while none have yet come to fruition, it intends to actively pursue these and/or other business opportunities in the future. Moreover, once the trust begins operating, it will require the services of a claims handling business to process claims as they are filed against it. Rather than obtaining and paying for the services of an outside vendor, Reorganized Quigley will provide these services to the trust. Quigley anticipates that Reorganized Quigley's claims-handling business will generate approximately $3.5 million in net revenues per year from the trust.

## D. How a Claimant Gets Paid from the Trust

### 1. The Trust Distribution Procedures Generally

Under Quigley's plan of reorganization, the trust will pay claims in accordance with court-approved trust distribution procedures ("*TDP*"). The TDP describes the information claimants will have to submit to the trust to qualify for payment on their claims. Generally, the TDP also contains a chart showing the possible "value" of each claim (based on the type of disease). In most cases, claimants will be paid under an "expedited review process." This process is intended to provide quick payment to claimants. To receive a payment, claimants must submit evidence that they were exposed to a Quigley asbestos-containing product and that they have an asbestos-related disease. The expedited review process is designed to minimize administrative costs and preserve the trust's limited funds for the benefit of all claimants.

Some claimants will have the option to submit their claims through a more detailed individual review process. The individual review process is designed to accommodate claimants who, for example, believe they have special circumstances and deserve a higher payment than would be available under the expedited review process or who cannot meet the general requirements for documenting exposure (but can demonstrate exposure to a Quigley product through other means). Claimants who qualify under the individual review process could receive payments that are higher or lower than the payments allowed in the expedited review process.

Claimants also have the option of going to arbitration and/or litigation against the trust to establish their claims, but only after they have completed the individual review process. The trust is permitted to pay only those claims that qualify for payment under the procedures and standards of the TDP.

Claims will be processed in "First In First Out" ("*FIFO*") order so that of the claims filed with the trust initially, the oldest claims will be processed first. This means that people who filed lawsuits before Quigley filed its chapter 11

case will have their claims processed first. After the initial filing deadline (which is 6 months after the claim forms are provided to claimants by the trust) the claims will be processed in the order they are received by the trust. The TDP creates an exception to this FIFO processing system for claimants who have more serious diseases (like severe asbestosis or cancer) and who require financial assistance. (These are called "Exigent Hardship Claims.") Any Exigent Hardship Claims will be processed first. The TDP also establishes payment guidelines that will assure that more money is allocated to the most serious disease claims. The TDP establishes a claims payment ratio that provides that, in each year, 83% of the amount available to pay claims in that year will be paid to the most serious claims (i.e., the severe asbestosis and malignancy claims), and that 17% of the amount available to pay claims will be paid to the less serious claims (i.e., asbestosis/pleural). If there are insufficient funds in any year, the claims will be carried over to the next year for payment.

2.      **Disease Categories and Scheduled and Maximum Values**

The TDP establishes seven disease categories: (1) mesothelioma, (2) lung cancer 1, (3) lung cancer 2, (4) other cancer, (5) severe asbestosis, (6) asbestosis level II, and (7) asbestosis level I. Claimants must submit specific medical diagnosis information and test results to show that they have one of these diseases. Also, to be eligible for payment the claimants must demonstrate that they were exposed to a Quigley asbestos-containing product and, in most cases, that they had significant work-related exposure to asbestos.

The values for each type of disease are set forth below. These values are based on and derived from Quigley's historical claims experience. Of course, Quigley's claims experience has varied over time, and the amounts paid to resolve claims differed because of a variety of factors. The values contained in the TDP are the same values included in Quigley's third amended plan and were determined by the creditors' committee and the representative of holders of future claims to be the most appropriate values for current and future claimants.

As mentioned above, if a claim qualifies under the expedited review process, the claimant will be entitled to receive the "scheduled value" for that disease. If the claimant elects the individual review process, then the claimant could receive as much as the maximum value for his or her claim. In any case, however, because the trust's assets are limited, the trust will pay each claimant only a percentage of the scheduled or maximum value. Claimants (except for claimants who have agreed or may agree to a lower distribution) will be paid based on the "payment percentage," which is described below.

| Disease Level | Scheduled Value | Maximum Value | Amount of Scheduled Value Paid After Application of Payment Percentage | Amount of Maximum Value Paid After Application of Payment Percentage |
|---|---|---|---|---|
| Mesothelioma (Level VII) | $200,000 | $450,000 | $15,000 | $33,750 |
| Lung Cancer 1 (Level VI) | $35,000 | $90,000 | $2,625 | $6,750 |
| Lung Cancer 2 (Level V) | None | $30,000 | — | $2,250 |
| Other Cancer (Level IV) | $15,000 | $30,000 | $1,125 | $2,250 |
| Severe Asbestosis (Level III) | $35,000 | $90,000 | $2,625 | $6,750 |
| Asbestosis/Pleural Disease (Level II) | $5,000 | $5,000 | $375 | $375 |
| Asbestosis/Pleural Disease (Level I) | $2,000 | $2,000 | $150 | $150 |

3.        **Application of the Payment Percentage**

Because the trust will have a limited amount of money to pay all present and future asbestos personal injury claims, the trust must determine how much it can pay individual claimants presently so that it can retain money for claimants who are diagnosed with diseases in the future.  The trustees are required to make the limited money last long enough to pay all qualified claimants.  This job is complicated by the fact that the number of claims that will be asserted in the future can only be estimated and the fact that the value of certain assets available to the trust, such as insurance and stock, must also be estimated and are not certain.  The TDP requires that the trustees regularly review the trust assets and prepare updated projections of the likely number of future claims to determine how much can be paid to claimants each year.  The trustees have to try to set the payment amounts so that all claimants, including those claimants who assert claims 20 or 30 years from now, are paid in amounts that are as equivalent as possible based on their disease.  For these reasons, the TDP establishes what is referred to as a "payment percentage" and a "maximum annual payment." The payment percentage is determined by dividing the total estimated value of current and projected future claims by the total amount of assets projected to be available to pay all claims.  This percentage is the experts' best estimate as to what portion of each claimant's claim value (as determined under the TDP) can be paid to current claimants, consistent with the trust's obligation to pay all claimants roughly the same portion of their claims.  To the extent that fewer claims are filed, either in the aggregate or in the more serious disease categories, then the trust might be able to increase the percentage (and thereby increase the amount paid) for all claimants.  If more claims are filed than anticipated, either in the aggregate or in the more serious disease categories, then the percentage will be reduced (but not retroactively).  Additionally, if the trust is able to obtain favorable resolutions of disputed insurance issues, then the trust may recover additional assets and in turn may increase the payment percentage. All asbestos personal injury claims paid by the trust are subject to the payment percentage.  The maximum annual payment is determined based on the trust's estimate of the amount of money it will have over its expected life.  The trust is required to determine the amount that it can pay out each year in light of its principal, earnings and claim payment needs (including costs) in the future taking into account the payment percentage.  The amount determined is defined as the "maximum annual payment."  In each year, the trust's distributions cannot exceed the maximum annual payment.

In practice, the payment percentage will be applied as follows:  Assuming that a claimant meets the disease and exposure standards required for a particular disease under the expedited review process, then the claimant will receive a payment equal to the scheduled value for that disease multiplied by the payment percentage then in effect.  For example, a claimant who establishes under the expedited review process that he has mesothelioma would

receive an actual payment of $15,000, which is calculated by applying the payment percentage of 7.5% to the scheduled value for the particular disease ($200,000 for mesothelioma) (7.5% × $200,000 = $15,000). Alternatively, a claimant who elects to establish a mesothelioma claim using the individual review process could establish a claim value as high as $450,000 (maximum value), in which case he would be paid $33,750 (7.5% × $450,000 = $33,750).

A more detailed description of Quigley's plan of reorganization, the contributions being made to the trust and the TDP are set forth below in Sections VI and VII.A.7.

## 4. Analysis of Current and Future Claims

As of the Petition Date, Quigley believes there were approximately 212,000 asbestos personal injury claims that either were pending against Quigley or that Quigley believed would be asserted against it. As described more fully below, on January 31, 2006, Quigley commenced a solicitation of acceptances and rejections of a prior plan of reorganization. As of March 31, 2006, the voting deadline, 209,171 claimants who claim to hold asbestos personal injury claims against Quigley had voted to accept or reject the plan. Among these claimants, 7,307 stated on their ballots that they are suffering from mesothelioma; 14,495 stated that they are suffering from lung cancer; 186,295 stated that they are suffering from another asbestos disease; and 1,074 did not identify any disease.

The general methodology described in Exhibit I yields an estimate of 261,567 future claims asserted against Quigley. Based on the TDP values and Quigley's historical claims experience, the total aggregate value of these claims is estimated at $4.43 billion undiscounted and $2.66 billion discounted.

The methodology for projecting future claims consists of several steps. First, the population of individuals occupationally exposed to asbestos is determined. This population extends from 1929 through the mid- to late 1970s. In general, this information is derived from statistics from the Department of Labor and from other data gathered by experts from other sources, such as union records. This population can be aged and adjusted as appropriate over time, and it can be assigned to specific industry and occupational groups. Second, based on intensity of exposure (which is, in turn, based on the occupation/industry category) and duration of exposure (which is based on the rate of job "turnover" in the work force), various experts have calculated the incidence of asbestos-related malignant disease among those exposed to asbestos through work. These calculations are based on generally accepted epidemiological studies.[1] These calculations result in annual expected incidence of asbestos-related malignant disease in the population. Third, there is an evaluation of the types of claims that have been asserted against Quigley in the past – including the source of claims, the industries and occupations of the claimants and their diseases. This information is compared to the population projected to contract an asbestos-related malignant disease to determine a "rate of claiming" (i.e., the percentage of any given occupational group of individuals that historically have asserted claims against Quigley). Fourth, because there is no epidemiological formula to predict the incidence of non-malignant conditions, these claims are typically predicted based on the historical filing rate in comparison to malignancy claims. Experts may also adjust such ratios to account for developments and/or changes in tort law or the litigation environment. The estimated number of future claims likely to be asserted against Quigley is thus based on historical filing rates and the projected future incidence of disease in the underlying population.

The value of future claims is determined based on Quigley's historical resolution values adjusted for inflation. The value of the current claims is determined by applying these same resolution values to the existing known claims. To determine the aggregate value of the future claims, the estimated number of claims for each disease category is multiplied by the resolution value for that disease type and then adjusted to account for inflation.

## INTRODUCTION

Quigley Company, Inc. ("*Quigley*") hereby transmits this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to the holders of Claims (each a "*Claimant*," and, collectively, "*Claimants*") and Equity Interests in connection with: (i) the solicitation of acceptances or rejections of Quigley's fourth amended and restated chapter

---

[1]  In general, the incidence of mesothelioma can be "checked" periodically against actual data. The incidence of lung cancer is based on a determination of "excess" cancer, i.e., incidence in excess of expected underlying lung cancer rates.

11 plan of reorganization, dated ~~November 5, 2007~~**March 28, 2008** (as it may be amended, supplemented, or modified from time to time, the "***Plan***"), filed with the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***"), and (ii) the hearing on confirmation of the Plan (the "***Confirmation Hearing***") scheduled for [~~_____~~**September 4,** 2008] at 10:00 a.m.  **Unless otherwise defined herein, all capitalized terms contained in this Disclosure Statement shall have the meanings ascribed to them in the Plan**.

Attached as Exhibits to this Disclosure Statement are the following documents:

1.    the Plan (Exhibit A);

2.    the Solicitation Procedures Order (with the Solicitation Procedures attached) (each as defined below) (Exhibit B);

3.    Financial Appendix (Exhibit C);

4.    Schedule of Shared Asbestos Insurance Policies (Exhibit D);

5.    Schedule of Shared Asbestos-Excluded Insurance Policies (Exhibit E)

6.    Schedule of receivables owed by insurance companies (other than the AIG Companies) to Quigley for asbestos personal injury claims billed prior to the Petition Date (Exhibit F);

7.    Schedule of Shared Asbestos-Excluded Claims-Made Insurance Policies (Exhibit G);

8.    Liquidation Analysis (Exhibit H); and

9.    Summary of Analysis of HR&A, Estimation Experts to Future Demand Holder's Representative (Exhibit I).

In addition, a Ballot for accepting or rejecting the Plan is enclosed with this Disclosure Statement if you or your clients, if you are counsel to asbestos personal injury claimants, are entitled to vote to accept or reject the Plan.

Workshare DeltaView comparison of interwovenSite://NYCMS/NEWYORK/10435708/6 and interwovenSite://NYCMS/NEWYORK/10435708/7. Performed on 3/28/2008.

**Certain Exhibits to the Plan are included with this Disclosure Statement. The remaining Exhibits to the Plan will be contained in a separate exhibit volume, the Plan Supplement, which will be filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to [~~March 3,~~August 4, 2008], the deadline established by the Bankruptcy Court for filing and serving objections to confirmation of the Plan.** The Plan Supplement will be available for inspection in the office of the Clerk of the Bankruptcy Court during normal court hours and at Quigley's Internet site (www.quigleyreorg.com). Claimants also may obtain a copy of the Plan Supplement, once filed, from Quigley by written request sent to the following address:

> ~~The~~**Wells Fargo** Trumbull ~~Group, L.L.C.~~
> P.O. Box 721
> Windsor, CT 06095-0721
> (860) 687-7579
> (quigleyreorg@~~trumbullbankruptcy.net~~**wftrumbull.com**)

On [~~_____], 2007, after notice and a hearing,~~_____, 2008, the Bankruptcy Court entered the Solicitation Procedures Order approving, among other things: (a) this Disclosure Statement as containing information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Claimants and Equity Interest holders to make an informed judgment as to whether to accept or reject the Plan; and (b) the voting and solicitation procedures set forth in the Ballot accompanying this Disclosure Statement. Among other things, these procedures (i) designate which Claimants and holders of Equity Interests are entitled to vote on the Plan and (ii) establish certain procedures governing the solicitation and tabulation of Ballots.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR A DETERMINATION AS TO THE FAIRNESS OR THE MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION ("*SEC*"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

Each Claimant and Equity Interest holder entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.

Under the Bankruptcy Code, only classes of Claims or Equity Interests that are "impaired," but are entitled to receive a distribution of, or retain, property under the Plan, are entitled to vote to accept or reject the Plan. The Claims in each of Classes 2.01, 3 and 4 and the Equity Interests in Class 5 of the Plan are Impaired (see "THE PLAN OF REORGANIZATION — Classification of Claims and Equity Interests," for a description of these classes) and holders of these Claims and Equity Interests are entitled to vote on the Plan in accordance with the Solicitation Procedures. Holders of Claims and Equity Interests in Classes 2.01, 3, 4, and 5 may vote by completing and mailing the enclosed Ballot to the address set forth on the Ballot so that it is received by 5:00 p.m., New York City time, on [~~March 3,~~**June 10,** 2008] (the "***Voting Deadline***"). Solely with respect to holders of Class 4 Claims, counsel for holders of such Claims may vote by completing and mailing a Master Ballot in compliance with the Solicitation Procedures. If you have any questions about the type of Ballot you received, please call Quigley's balloting and solicitation agent, ~~The~~**Wells Fargo** Trumbull ~~Group, L.L.C.~~ (the "***Ballot Agent***"), at (860) 687-7579.

If you did not receive a Ballot, it is because Quigley believes that you are not entitled to vote on the Plan or because you are an individual holder of an Asbestos PI Claim. Because Quigley does not have records of the addresses of the overwhelming majority of individual holders of Asbestos PI Claims, in accordance with the Solicitation Procedures Order, this Disclosure Statement and a form of Ballot and Master Ballot is being sent to counsel of record for holders of Asbestos PI Claims listed on Quigley's schedules of assets and liabilities and the statements of financial affairs filed with the Bankruptcy Court (as such schedules and statements may be amended or supplemented from time to time, the "***Schedules***"). The Solicitation Procedures Order also provides that counsel of record for holders of Asbestos PI Claims not listed on the Schedules as well as individual holders of such Claims may request a copy of this Disclosure Statement in writing from Quigley or the Ballot Agent. The Solicitation Procedures also provide special procedures for voting by counsel on behalf of holders of Asbestos PI Claims (if, as, and to the extent such counsel are authorized to do so) or voting by individual holders of Asbestos PI Claims.

Please review the voting procedures accompanying the Ballot for detailed instructions regarding how to vote with respect to Asbestos PI Claims.

> The following Persons and Entities are NOT entitled to vote on the Plan and, therefore, have not received Ballots with this Disclosure Statement:
>
> Holders of Administrative Claims
>
> Holders of Secured Bond Claims
>
> Holders of Priority Tax Claims
>
> Holders of Priority Claims
>
> Claimants whose Claims have been disallowed in their entirety
>
> Claimants whose Claims are the subject of pending objections or are unliquidated, disputed or contingent (other than holders of Asbestos PI Claims) and thus are not allowed for voting purposes

If you believe that you are the holder of a Claim not listed above and you did not receive a Ballot, received a damaged Ballot, or lost your Ballot, please call The**Wells Fargo** Trumbull Group, L.L.C., at (860) 687-7579.

If you are not entitled to vote solely because your Claim is the subject of a pending objection or because your claim is unliquidated, disputed or contingent (and is not an Asbestos PI Claim), you may apply to the Bankruptcy Court for an order under Bankruptcy Rule 3018(a) allowing your Claim for voting purposes only. Under the terms of the Solicitation Procedures Order, any such motions must be filed and served by [February 20,**May 27,** 2008]. If you timely file such a motion, you will be provided a Ballot and be permitted to cast a provisional vote to accept or reject the Plan. If you timely filed and served a motion under Bankruptcy Rule 3018(a) seeking the temporary allowance of your claim for voting purposes only with respect to Quigley's third amended plan of reorganization, and if the Bankruptcy Court did not resolve your motion prior to [February 20,**May 27,** 2008], the date on which such a motion must otherwise be filed with respect to the Plan, you are deemed to have satisfied these requirements and you will be provided a Ballot and permitted to cast a provisional vote to accept or reject the Plan. If and to the extent you wish to raise additional arguments in favor of the temporary allowance of your claim for voting purposes only, you may file and serve a supplement to your previously filed motion prior to [February 20,**May 27,** 2008].

Quigley is seeking acceptance of the Plan by Classes 2.01, 3, 4 and 5. The Bankruptcy Code defines "acceptance" of a plan by a class of Claimants as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of that class that actually vote to accept or reject the plan. The Bankruptcy Code defines "acceptance" of a plan by a class of equity interests as acceptance by at least two-thirds in amount of the interests of that class that have actually voted to accept or reject a plan. In addition, section 524(g) of the Bankruptcy Code provides that in connection with confirmation of a plan seeking a channeling injunction under that section, such as the Asbestos PI Channeling Injunction and the Settling Asbestos Insurance Entity Injunction contained in the Plan, the Bankruptcy Court may issue such an injunction only if: (a) the holders of the claims to be channeled under the injunction are classified separately under the plan; and (b) at least 75% of the holders of the claims in that class who actually vote on the plan vote to accept the plan. For a more complete description of the requirements for acceptance of the Plan. *See* "CONFIRMATION AND CONSUMMATION PROCEDURE."

**ONCE CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN QUIGLEY, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. IN PARTICULAR,**

**HOLDERS OF IMPAIRED CLAIMS AND EQUITY INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS AND SCHEDULES TO THE PLAN AND TO THE DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.**

After carefully reviewing this Disclosure Statement, including the exhibits, each Claimant or Equity Interest holder in an Impaired Class that is entitled to vote (and each attorney voting on behalf of holders of Class 4 Asbestos PI Claims) should vote on the enclosed Ballot and return the Ballot in the envelope provided so that it is *actually received* by the Voting Deadline — 5:00 p.m., New York City time, on [~~March 3,~~**June 10,** 2008]. If you have a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you will receive and must complete separate Ballots for each Claim.

All Claimants and attorneys voting on behalf of Claimants should vote and return their Ballots to the Ballot Agent at one of the following two addresses:

| | |
|---|---|
| **BY HAND DELIVERY, COURIER OR OVERNIGHT MAIL:** | **BY U.S. MAIL:** |
| ~~The~~**Wells Fargo** Trumbull ~~Group, L.L.C.~~ | ~~The~~**Wells Fargo** Trumbull ~~Group, L.L.C.~~ |
| 4 Griffin Road North | P.O. Box 721 |
| Windsor, CT 06095-1511 | Windsor, CT 06095-0721 |
| (Attn:  Quigley Company, Inc.) | (Attn:  Quigley Company, Inc.) |

**If you have any questions about the procedure for voting your Claim or Equity Interest or with respect to the package of materials that you have received, please call the Ballot Agent, ~~The~~Wells Fargo Trumbull ~~Group, L.L.C.~~, at (860) 687-7579.**

**TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AND *ACTUALLY* RECEIVED AT THE APPROPRIATE ADDRESS BY THE VOTING DEADLINE — 5:00 P.M., NEW YORK CITY TIME, ON [~~MARCH 3,~~JUNE 10, 2008].  BALLOTS MUST BE DELIVERED BY MAIL, COURIER, OR DELIVERY SERVICE.  FACSIMILE BALLOTS WILL *NOT* BE ACCEPTED OR COUNTED.  ANY COMPLETED BALLOTS RECEIVED THAT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATE BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.  BALLOTS DELIVERED TO THE BANKRUPTCY COURT, QUIGLEY OR ANY PERSON OR ENTITY OTHER THAN THE BALLOT AGENT, ~~THE~~WELLS FARGO TRUMBULL ~~GROUP, L.L.C.~~, WILL NOT BE COUNTED.**

> QUIGLEY BELIEVES THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERIES TO CURRENT CLAIMANTS AND FUTURE DEMAND HOLDERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF CURRENT CLAIMANTS AND FUTURE DEMAND HOLDERS.  ACCORDINGLY QUIGLEY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will commence on [~~——————~~,**September 4,** 2008], at 10:00 a.m. (New York City time) or as soon thereafter as counsel may be heard, in Room 723 of the Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before [~~March 31,~~**August 4,** 2008] at 5:00 p.m. (New York City time), in the manner described below in "CONFIRMATION AND CONSUMMATION PROCEDURE — The Confirmation Hearing."  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned date of the Confirmation Hearing.

## OVERVIEW OF THE PLAN

On ~~November 5, 2007,~~**March 28, 2008,** Quigley filed the Plan, which sets forth the manner in which Claims and Demands against and Equity Interests in Quigley will be treated following Quigley's emergence from chapter 11. This Disclosure Statement describes certain aspects of the Plan, Quigley's past, present, and future operations, significant events occurring during the Chapter 11 Case, and related matters. This overview is intended solely as a summary of the classification and treatment of Claims and Equity Interests in the Plan and is qualified in its entirety by reference to the Plan, a copy of which is included as Exhibit A. Capitalized terms used in this overview and not otherwise defined herein have the meanings ascribed to them in the Plan, this Disclosure Statement, the Bankruptcy Code, or the Bankruptcy Rules, as the case may be.

**FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE SCHEDULES AND EXHIBITS THERETO IN THEIR ENTIRETY. FOR A COMPLETE DESCRIPTION OF THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN QUIGLEY, PLEASE SEE SECTION V, "THE PLAN OF REORGANIZATION."**

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASE AND CERTAIN FINANCIAL INFORMATION REGARDING QUIGLEY AND REORGANIZED QUIGLEY. ALTHOUGH QUIGLEY BELIEVES THAT THE PLAN, RELATED DOCUMENT AND STATUTORY PROVISION SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY QUIGLEY'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. QUIGLEY IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.**

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING QUIGLEY OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF QUIGLEY'S REORGANIZATION OR THE PLAN. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.**

**CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD-LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. FURTHER, EXCEPT AS OTHERWISE SPECIFICALLY AND EXPRESSLY STATED HEREIN, THIS DISCLOSURE STATEMENT DOES NOT REFLECT ANY EVENTS THAT MAY OCCUR SUBSEQUENT TO THE DATE HEREOF. WHILE SUCH EVENTS COULD HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, QUIGLEY DOES NOT INTEND TO UPDATE THIS DISCLOSURE STATEMENT TO REFLECT SUCH OCCURRENCES. ACCORDINGLY, NEITHER THE FILING NOR DELIVERY OF THIS DISCLOSURE STATEMENT SHALL UNDER ANY CIRCUMSTANCE IMPLY THAT THE INFORMATION HEREIN IS CORRECT OR COMPLETE AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.**

**EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.**

Workshare DeltaView comparison of interwovenSite://NYCMS/NEWYORK/10435708/6 and interwovenSite://NYCMS/NEWYORK/10435708/7. Performed on 3/28/2008.

**A.**     **Summary of the Plan**

The primary purpose of the Plan and the Chapter 11 Case is to accomplish a reorganization of Quigley that provides a fair, equitable and reasonable treatment to all holders of Claims and Equity Interests and, in particular, holders of Asbestos PI Claims, including both present Claimants and holders of future Demands. In addition to certain unclassified Claims, the Plan designates five (5) Classes — four Classes of Claims (including Class 2 which has ~~six~~**five** sub-classes) and one Class of Equity Interests in Quigley (which are held by Pfizer Inc. ("*Pfizer*"), Quigley's sole shareholder). These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The Plan resolves Quigley's liability for all Asbestos PI Claims (Class 4) by channeling them to the Asbestos PI Trust to be established on the Effective Date of the Plan. In exchange for the consideration to be contributed by Pfizer and Quigley to the Asbestos PI Trust pursuant to the terms of the Plan (*see* "THE PLAN OF REORGANIZATION — Description of the Consideration Contributed to the Asbestos PI Trust and Reorganized Quigley and Estimate of Asbestos PI Claims"), the Asbestos PI Trust will assume and be responsible for all liability for Asbestos PI Claims and certain other obligations associated with the Quigley Transferred Insurance Rights and the Insurance Relinquishment Agreement. All Asbestos PI Claims will be determined and paid pursuant to the terms, provisions, and procedures of the Asbestos PI Trust, the Asbestos PI Trust Distribution Procedures, and the Asbestos PI Trust Agreement. In addition, as described below in "THE PLAN OF REORGANIZATION – Releases, Injunctions and Discharges — The Asbestos PI Channeling Injunction," holders of Asbestos PI Claims will be permanently enjoined from pursuing their Asbestos PI Claims against Reorganized Quigley and certain other parties, including Pfizer and the other Pfizer Protected Parties, to the extent that their Asbestos PI Claims against the Pfizer Protected Parties are derivative of Quigley's business. **ASBESTOS PI CLAIMS AGAINST PFIZER AND OTHER PFIZER PROTECTED PARTIES WILL BE CHANNELED TO THE ASBESTOS PI TRUST UNDER THE PLAN ONLY TO THE EXTENT SUCH CLAIMS ARE BASED ON ALLEGATIONS THAT PFIZER OR ANOTHER PFIZER PROTECTED PARTY IS DIRECTLY OR INDIRECTLY LIABLE FOR THE CONDUCT OF, CLAIMS AGAINST, OR DEMANDS ON QUIGLEY.** In other words, only Asbestos PI Claims against Pfizer and other Pfizer Protected Parties that are derivative of Quigley will be channeled to the Asbestos PI Trust. Non-derivative claims against Pfizer and other Pfizer Protected Parties will not be channeled to the Asbestos PI Trust and will survive confirmation and consummation of the Plan. Further, as described in "THE PLAN OF REORGANIZATION – Releases, Injunctions and Discharges — The Settling Asbestos Insurance Entity Injunction and The Non-Settling Asbestos Insurance Entity Injunction," from and after the Effective Date of the Plan, all holders of Asbestos PI Claims will be permanently enjoined from pursuing their Asbestos PI Claims against Settling Asbestos Insurance Entities and Non-Settling Asbestos Insurance Entities. Quigley believes that the consideration that Pfizer and Quigley will contribute to the Asbestos PI Trust for ultimate distribution to holders of Asbestos PI Claims pursuant to the Asbestos PI Trust Distribution Procedures and the other contributions being made to Reorganized Quigley or the Asbestos PI Trust, will result in a greater recovery for holders of such Claims than would otherwise be available absent such contributions, procedures, and channeling injunctions.

**B.**     **Summary of Classification and Treatment Under the Plan**

The Plan classifies Claims against and Equity Interests in Quigley for all purposes, including voting, confirmation, and distribution, as set forth below. The table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the entire Disclosure Statement and the Plan for a complete description of each classification and treatment.

| CLASS | TREATMENT | STATUS | ENTITLED TO VOTE? | ESTIMATED RECOVERY |
|---|---|---|---|---|
| **Class 1:** Priority Claims | Paid in full, in Cash, on the later of the Initial Distribution Date or as soon as practicable after such Priority Claim becomes Allowed. | Unimpaired | No | 100% |
| **Class 2:** Secured Claims | Class 2 consists of separate subclasses for each Secured Claim. Each subclass is deemed to be a separate class for all purposes under the Bankruptcy Code. | | | |
| **Class 2.01**: Pfizer Secured Claim | Pfizer, as the sole holder of the Pfizer Secured Claim, will receive Cash equal to 100% of the amount of the Allowed Pfizer Secured Claim <u>less</u> an amount equal to $30 million, which Pfizer has agreed to forgive as part of its contribution to the Asbestos PI Trust. | Impaired | Yes | 54% |
| ~~**Class 2.02:** Freeman Secured Claim~~ | ~~On the Effective Date, Freeman, as the holder of the Freeman Secured Claim, will be entitled to proceed with the Pending Appeal of the judgment underlying the Freeman Secured Claim to Final Judgment as provided for under the terms of the Freeman Bond and in accordance with applicable law. If the Final Judgment is ultimately entered against Quigley or Reorganized Quigley, as the case may be, Freeman will be entitled to seek payment of the Final Judgment from the Freeman Bond. If, after application of the Freeman Bond to the Final Judgment, Freeman holds an Asbestos PI Deficiency Claim, the sole recourse of Freeman for such Asbestos PI Deficiency Claim will be to proceed against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures. If the Final Judgment ultimately reverses any extant judgment against Quigley, then any remaining Asbestos PI Claim that Freeman may have will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Articles IX and XI of the Plan.~~ | ~~Unimpaired~~ | ~~No~~ | ~~100%~~ |
| **Class ~~2.03~~2.02**: | On the Effective Date, the Reaud | | | |

| CLASS | TREATMENT | STATUS | ENTITLED TO VOTE? | ESTIMATED RECOVERY |
|---|---|---|---|---|
| Reaud Secured Claim | Claimants, as the holders of the Reaud Secured Claim, will be entitled to proceed with the Pending Appeal of the judgment underlying the Reaud Secured Claim to Final Judgment as provided for under the terms of the Reaud Bond and in accordance with applicable law. If the Final Judgment is ultimately entered against Quigley or Reorganized Quigley, as the case may be, the Reaud Claimants will be entitled to seek payment of the Final Judgment from the Reaud Bond. If, after application of the amounts received on account of the Reaud Bond to the Final Judgment, the Reaud Claimants hold an Asbestos PI Deficiency Claim, the sole recourse of the Reaud Claimants for such Asbestos PI Deficiency Claim will be to proceed against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures. If the Final Judgment ultimately reverses any extant judgment against Quigley, then any remaining Asbestos PI Claim that any of the Reaud Claimants may have will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Articles IX and XI of the Plan. | Unimpaired | No | 100% |
| **Class 2.042.03:** Hatchett Secured Claim | On the Effective Date, Hatchett, as the holder of the Hatchett Secured Claim, will be entitled to proceed with the Pending Appeal of the judgment underlying the Hatchett Secured Claim to Final Judgment as provided for under the terms of the Hatchett Bond and in accordance with applicable law. If the Final Judgment is ultimately entered against Quigley or Reorganized Quigley, as the case may be, Hatchett will be entitled to seek payment of the Final Judgment from the Hatchett Bond. If, after application of the amounts received on account of the Hatchett Bond to the Final Judgment, Hatchett holds an Asbestos PI Deficiency Claim, the sole recourse of Hatchett for such Asbestos PI Deficiency Claim will be to proceed | Unimpaired | No | 100% |

Workshare DeltaView comparison of interwovenSite://NYCMS/NEWYORK/10435708/6 and interwovenSite://NYCMS/NEWYORK/10435708/7. Performed on 3/28/2008.

| CLASS | TREATMENT | STATUS | ENTITLED TO VOTE? | ESTIMATED RECOVERY |
|---|---|---|---|---|
| | against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures. If the Final Judgment ultimately reverses any extant judgment against Quigley, then any remaining Asbestos PI Claim that Hatchett may have will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Articles IX and XI of the Plan. | | | |
| **Class 2.052.04:** Sherry Secured Claim | On the Effective Date, Sherry, as the holder of the Sherry Secured Claim, will be entitled to proceed with the Pending Appeal of the judgment underlying the Sherry Secured Claim to Final Judgment as provided for under the terms of the Sherry Bond and in accordance with applicable law. If the Final Judgment is ultimately entered against Quigley or Reorganized Quigley, as the case may be, Sherry will be entitled to seek payment of the Final Judgment from the Sherry Bond. If, after application of the amounts received on account of the Sherry Bond to the Final Judgment, Sherry holds an Asbestos PI Deficiency Claim, the sole recourse of Sherry for such Asbestos PI Deficiency Claim will be to proceed against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures. If the Final Judgment ultimately reverses any extant judgment against Quigley, then any remaining Asbestos PI Claim that Sherry may have will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Articles IX and XI of the Plan. | Unimpaired | No | 100% |
| **Class 2.062.05:** Other Secured Bond Claims | On the Effective Date, any holder of an Other Secured Bond Claim will be entitled to the same treatment as the holders of the Secured Claims in Classes 2.02 through 2.05 2.04. | Unimpaired | No | 100% |
| **Class 3:** Unsecured | Paid on or before the later of (a) the Initial Distribution Date, and (b) the | Impaired | Yes | 7.5% |

| CLASS | TREATMENT | STATUS | ENTITLED TO VOTE? | ESTIMATED RECOVERY |
|---|---|---|---|---|
| Claims | date such Unsecured Claim becomes Allowed, or as soon after such date as practicable, in Cash in an amount equal to the Allowed Amount of such Unsecured Claim multiplied by the Payment Percentage on the Effective Date. | | | |
| **Class 4:** Asbestos PI Claims | All Asbestos PI Claims will be channeled to the Asbestos PI Trust, which will be funded pursuant to section 9.3 of the Plan, and will be paid pursuant to the terms, provisions and procedures of the Plan, the Asbestos PI Trust Agreement, the Asbestos PI Trust and the Asbestos PI Trust Distribution Procedures. | Impaired | Yes | unknown |
| **Class 5:** Pfizer's Equity Interests in Quigley | On the Stock Transfer Date, Pfizer, as the sole holder of the Equity Interests, will transfer the common stock of Reorganized Quigley to the Asbestos PI Trust. | Impaired | Yes | n/a |

Pursuant to Section 12.1(c) of the Plan, it is a condition to confirmation of the Plan that at least 75% of the holders of Asbestos PI Claims who actually vote on the Plan must have voted to accept the Plan. The conditions to confirmation also include **(i)** a condition that the Confirmation Order contain findings consistent with those required by section 524(g) of the Bankruptcy Code, which contains the requirements for issuance of a "channeling injunction" of the type provided for under the Plan (*see* "THE PLAN OF REORGANIZATION — Conditions to Confirmation", "THE PLAN OF REORGANIZATION — Releases, Injunctions and Discharges — The Asbestos PI Channeling Injunction," and "THE PLAN OF REORGANIZATION — Releases, Injunctions and Discharges — The Settling Asbestos Insurance Entity Injunction")**_ and (ii) a condition that any order entered by the Bankruptcy Court or the District Court that modifies, clarifies, or interprets the scope of the Preliminary Injunction Order or the Asbestos PI Channeling Injunction must be in form and substance acceptable to Quigley and Pfizer._**. Only Quigley, with the written consent of Pfizer, and after consulting with the Creditors' Committee and the Future Demand Holders' Representative, may waive any of these conditions to confirmation of the Plan.

If the Plan is confirmed by the Bankruptcy Court and the Confirmation Order is affirmed by the District Court, the Plan will become effective on the first Business Day following the date by which all of the conditions precedent to the effectiveness of the Plan have been satisfied or waived (the "***Effective Date***"). For purposes of this Disclosure Statement, Quigley has assumed that the Effective Date will be on or about ~~June~~**September** 1, 2008. However, because satisfaction of many of the conditions to the occurrence of the Effective Date is not within Quigley's sole control or discretion, there can be no guarantee that the Effective Date will occur by that date.

Under the Plan, Distributions on account of all then-Allowed Claims (other than Asbestos PI Claims) will commence within thirty (30) days of the Effective Date and Distributions will only be made on account of Disputed Claims after, and to the extent that, they become Allowed Claims. Distributions to holders of Asbestos PI Claims will be made in accordance with the Asbestos PI Trust Distribution Procedures. The timing of such distributions will be established by the Trustees pursuant to the Asbestos PI Trust Agreement and the Asbestos PI Trust

Distribution Procedures described below (*see* "THE ASBESTOS PI TRUST—General Description of the Asbestos PI Trust").

## GENERAL INFORMATION

**A.     Description and History of Quigley's Business**

**1.     Quigley's Beginnings**

Quigley was founded by Wirt Quigley in 1916 as a refractory company.  Quigley developed, produced and marketed a broad range of refractories and related products to the iron, steel, power generation, petroleum, chemical and glass industries.  After the early 1950s, taking advantage of the steel consuming needs of a burgeoning U.S. economy and the post-war rebuilding of Europe, Quigley's primary business was the sale of a line of specialty formulated monolithic refractory materials to the steelmaking industry.  A typical Quigley product was Roofchrome, a non-asbestos, monolithic slurry that significantly extended the useful life of the then-standard open-hearth furnace, thereby both increasing steel making capacity and reducing the cost of production.  Quigley's products were marketed in the United States and Canada as well as in Europe and East Asia.  On or about August 25, 1968, Chas. Pfizer & Co., Inc. (now known as Pfizer Inc.) acquired Quigley's stock as part of an effort by Pfizer to expand its minerals business.

**2.     Quigley's Involvement with Asbestos-Containing Materials**

From around the time of World War II until the early 1970's, when OSHA regulations related to asbestos were enacted, Quigley made and/or sold a small number of products containing asbestos, including Damit and various forms of Insulag and Panelag.  Virtually all asbestos personal injury claims against Quigley are based on alleged exposure to Insulag and/or Panelag.  Insulag and Panelag were minor, low-cost, low-volume, narrow application products primarily used for a short period of time in the steelmaking and power generation industries, respectively. Insulag contained a small amount of asbestos (5.62% in wet form; 9.7% in dry form).  Panelag also contained a small amount of asbestos (12% in wet form; 20% in dry form).  Insulag was applied in a slow, wet stream primarily to coat, protect and seal vertical surfaces, such as the open-hearth's cellar-level checker chamber bulkheads after cleaning.  Panelag typically was trowelled on or cast into blocks to enclose steam generators.  The application of these products created only a minimal amount of dust (and virtually none, if any, of it asbestos) because of their moisture levels, compositions and the manner in which they were applied.  Sales of asbestos-containing products, including Damit and various forms of Insulag and Panelag, accounted for less than 1% of Quigley's total sales. Nevertheless, these products allegedly have given rise to numerous personal injury claims, as described below.

**3.     Sale of Quigley's Refractory Business and Related Assets**

In 1992, Pfizer decided to concentrate more closely on its core health care business and to divest itself of its minerals, pigments, and metals businesses.  Toward that end, Quigley exited the refractories business when Minteq International, Inc. ("*Minteq*") acquired substantially all of Quigley's assets and assumed certain of Quigley's liabilities in September 1992.  Quigley, however, retained all of its present and future liabilities stemming from products it sold prior to the sale of its business to Minteq, including liability for present and future asbestos personal injury claims.  The net proceeds from the sale of Quigley's assets were used principally to fund payments with respect to personal injury claims against Quigley.

**4.     Quigley's Business Today**

Quigley operates a Claims Handling Unit, which processes settlements for claims asserted against itself and Pfizer. Pfizer currently pays Quigley $50,000 per month for these claims handling services.  Upon emergence from chapter 11, Reorganized Quigley and Pfizer will execute a new five-year claims services agreement (the "Pfizer Claims Services Agreement"), pursuant to which Reorganized Quigley will continue to service and process asbestos related claims brought against Pfizer that have been resolved under the Pfizer Claimant Settlement Agreements (defined below).  Reorganized Quigley also will process additional asbestos-related claims brought against Pfizer that are not subject to the Asbestos PI Channeling Injunction.  (For a more detailed description of Quigley's future business

operations and prospects, *see* "Management and Business of Reorganized Quigley – Business of Reorganized Quigley.")

**Paul A. Street began serving as** Quigley's President and the Chairman of its Board of Directors ~~is Paul A. Street, who has served in that position since~~**in** May 2003.  Since 1997, Mr. Street has been a partner at Impala Partners, a boutique advisory and principal investment firm specializing in distressed situations.  Prior to joining Impala, Mr. Street started the first work-out group at General Electric Capital Corporation in 1990.  He also was a partner at McKinsey & Company, specializing in telecommunications and financial services, and a Managing Director at Lazard Frères & Co. (now Lazard LLC) before joining General Electric Capital Corporation.  **On March 11, 2008, Mr. Street resigned from both positions, effective March 31, 2008.**

**On March, 19, 2008, Quigley's Board of Directors appointed Kim D. Jenkins to serve as Quigley's President and as a Director.  Ms. Jenkins, who has worked for Quigley since July 15, 2004, manages Quigley's day-to-day operations and has served as Quigley's Vice President and Treasurer.  She is intimately familiar with Quigley's operations, employees, contacts at Pfizer, vendors and professionals.  She has overseen, and will continue to oversee, all facets of the Claims Handling Unit's processing of settlements for asbestos personal injury and wrongful death claims against Quigley and Pfizer.  Prior to joining Quigley, Ms. Jenkins had similar responsibilities at Pfizer, beginning in October 2001 as a consultant and in April 2002 as an employee.**

**Ms. Jenkins and** Mr. Street ~~has~~**each have** been directly and intimately involved in all aspects of Quigley's business and its reorganization efforts, including the development of a post-emergence business plan.  **During his tenure,** Mr. Street, among other things, ~~has~~**had** ultimate responsibility for settlement negotiations with Quigley's insurers to secure additional valuable assets that will be contributed to the Asbestos PI Trust; he oversaw the formulation and negotiation of the Plan; and he has represented Quigley in negotiations with Pfizer to resolve significant issues in Quigley's reorganization efforts.  Mr. Street ~~is~~also **was** involved in positioning Quigley to continue to operate its business successfully upon its emergence from this Chapter 11 Case.~~Quigley's day-to-day operations are managed by Kim D. Jenkins, Quigley's Vice President and Treasurer.  Ms. Jenkins has worked for Quigley since July 15, 2004, and is therefore thoroughly familiar with Quigley's operations, employees, contacts at Pfizer, vendors and professionals.  She oversees the Claims Handling Unit's processing of settlements for asbestos personal injury and wrongful death claims against Quigley and Pfizer.  Prior to joining Quigley, Ms. Jenkins had similar responsibilities at Pfizer beginning in October 2001 as a consultant and in April 2002 as an employee.~~  **Upon her appointment as President, Ms. Jenkins assumed these responsibilities.**

Quigley currently employs eight full-time employees, who, with Ms. Jenkins, are primarily responsible for the operation of the Claims Handling Unit.  These employees have **many** years of extensive experience processing complex mass-tort claims, and through them, Quigley has developed a sophisticated computer architecture uniquely designed to facilitate these tasks.

Quigley also retains the services of approximately 23 individuals through four outsource staffing firms on an as-needed basis.  These individuals provide data processing, custom programming, information technology consulting and other full-time project services to Quigley.  By using these outsource staffing firms, Quigley has been able to expand or contract its staff as necessary to meet efficiently the claims-processing workload that it faced at any particular time.  (For a more detailed description of Quigley's future business operations and prospects, *see* "Management and Business of Reorganized Quigley – Business of Reorganized Quigley.")

**5.       Asbestos and Silica Personal Injury Claims**

      **(a)       Quigley's Asbestos Personal Injury Claims**

As described above, Quigley's principal business today is managing the personal injury claims brought against it in tort litigations alleging personal injury or wrongful death allegedly arising from plaintiffs' purported exposure to asbestos allegedly contained in products formerly made, used or sold by Quigley and managing and processing claims brought against Pfizer.  Quigley was first named as a defendant in asbestos personal injury claims in 1979 or 1980.  Although Quigley ceased manufacturing any products containing asbestos in the 1970s, and exited the

refractories business in 1992, as of the Petition Date, it had been named as a defendant in approximately 411,100 asbestos personal injury claims in approximately 131,500 civil actions brought in federal and state courts throughout the United States. As of the Petition Date, there were approximately 212,000 asbestos personal injury claims that either were pending against Quigley or that Quigley believed would be asserted against it. When Quigley solicited acceptances and rejections of its third amended plan of reorganization, 209,171 claimants who claim to hold Asbestos PI Claims voted on the plan.

### (b) Quigley's Silica Personal Injury Claims

Quigley does not believe that any products that it manufactured, sold, supplied or distributed contained respirable free silica or alpha-quartz. Nevertheless, Quigley has been sued by plaintiffs alleging personal injury based on alleged exposure to respirable free silica or alpha-quartz purportedly contained in Quigley's products. As of the Petition Date, approximately 5,400 personal injury claims had been asserted against Quigley alleging exposure to respirable free silica or alpha-quartz purportedly contained in products manufactured, sold, supplied or distributed by Quigley. As of that same date, approximately 4,600 of those claims were pending. *See* "THE PLAN OF REORGANIZATION – Classification and Treatment of Claims Against and Equity Interests in Quigley – Class 3: Unsecured Claims," for a description of the treatment provided under the Plan to holders of Allowed silica personal injury Claims against Quigley.

### (c) Pfizer's Asbestos Personal Injury Claims

As of the Petition Date, approximately 109,200 claimants had pending claims naming both Quigley and Pfizer as defendants allegedly responsible for the claimants' personal injury or wrongful death allegedly arising from exposure to asbestos allegedly contained in products formerly made, used or sold by Quigley. The complaints in virtually all of the actions are "boilerplate" pleadings often filed on behalf of multiple plaintiffs, almost always against multiple defendants (frequently hundreds) and generally make no specific allegations concerning the basis on which liability is being asserted against any particular defendant. Asbestos PI Claims against Pfizer only will be channeled to the Asbestos PI Trust under the Plan to the extent such Claims are based on allegations that Pfizer is directly or indirectly liable for the conduct of, Claims against, or Demands on Quigley.

## 6. Insurance Coverage

Quigley's most significant remaining assets include its rights under certain third-party liability insurance policies, insurance settlement agreements related to personal injury claims, and funds contained in the Insurance Settlement Proceeds Trust (defined below). Quigley's rights to each of these assets are shared with Pfizer. Except as otherwise described below, these assets are available to provide coverage for Asbestos PI Claims (defined below). In addition, certain insurers have outstanding receivables owed to Quigley for asbestos personal injury claims that were settled or otherwise resolved prior to the Petition Date and previously billed to insurers (other than the AIG Companies) in accordance with certain Insurance Settlement Agreements (as defined below) (the "*Quigley Insurer Receivables*"). The Quigley Insurer Receivables constitute an additional asset of Quigley.

### (a) Insurance Coverage Generally

As did most large companies, Pfizer purchased comprehensive general liability insurance policies to provide coverage for itself and its subsidiaries, which generally, among other things, reimburse the cost of defending and resolving certain personal injury claims asserted by third parties. Pfizer, Quigley and other covered Pfizer subsidiaries historically have accessed the coverage provided under these policies to the extent of their covered liabilities and associated defense costs on a first-billed, first-paid basis. Quigley is covered under these policies as of August 25, 1968, the date Pfizer acquired Quigley's stock.

### (b) Occurrence-Based Insurance Coverage

The comprehensive general liability insurance policies Pfizer purchased prior to October 1, 1985 are "*occurrence-based*" policies, which generally provide coverage, subject to other policy terms, for personal injuries occurring during the policy period. Pfizer purchased approximately $2.85 billion of primary and excess products/completed

operations limits that cover personal injury claims, subject to the other policy terms, between August 25, 1968 and October 1, 1985.[2] Much of this coverage has been exhausted and/or released through settlements in connection with various third-party liabilities of insureds under the policies, including Quigley and Pfizer.

Of the original $2.85 billion of coverage purchased by Pfizer, approximately $660 million in products/completed operations limits were issued by domestic and foreign insurers that are currently in rehabilitation or liquidation proceedings, subject to an insolvent scheme of arrangement and/or have been declared insolvent (the "insolvent insurers"). Of the $660 million issued by insolvent insurers, approximately $210 million either has been resolved through settlements that established an allowed claim for products/completed operations claims under the policies or was issued by insolvent insurers whose estates are now closed and therefore will not be making further payments.[3] These settlements resulted in allowed claims against the insolvent insurers' estates totaling approximately $120 million that will be paid over time at the same proportion paid to similarly-situated policyholder creditors of the insurers' estates. Pfizer has also recovered approximately $26 million from various state guaranty funds on behalf of certain insolvent insurers on account of personal injury claims against Pfizer other than those that are related to asbestos. As of the Petition Date, approximately $200 million in products/completed operations limits issued by insolvent insurers remained unresolved with respect to asbestos personal injury claims and other personal injury claims and approximately $200 million in products/completed operations limits remained unresolved with respect to other personal injury claims (but have been resolved with respect to asbestos personal injury claims). Recovery under policies issued by insolvent insurers is subject to the uncertainties that result from each of the insolvent insurers' respective liquidation or rehabilitation proceedings or foreign scheme of arrangement, and therefore it is not possible to predict any additional amounts that ultimately may be recovered.

As of ~~November~~ **March** 1, ~~2007~~**2008** and based on information currently available to Quigley and Pfizer, there remained approximately $899.1 million in unbilled, solvent products/completed operations limits available under the pre-October 1, 1985 occurrence-based policies and insurance settlement agreements related to personal injury claims as follows:

Approximately $101.9 million in products/completed operations limits issued by insurers other than the AIG Companies that contain no restriction or exclusion for the payment of asbestos personal injury claims. Of this amount, approximately $57.4 million in limits are subject to Insurance Settlement Agreements. The proceeds from these products/completed operations limits and the related Insurance Settlement Agreements form part of the Pfizer Contribution and the Quigley Contribution to the Asbestos PI Trust subject to the terms and conditions of the Insurance Relinquishment Agreement and the Quigley Insurance Transfer. *See* Section VI.D. below.

Approximately $191 million in products/completed operations limits issued by insurers other than the AIG Companies that contain various restrictions on the availability of coverage for claims arising from exposure to asbestos, although the scope and effect of these asbestos restrictions have not been fully resolved. The proceeds from these products/completed operations limits and the related Insurance Settlement Agreements form part of the Pfizer Contribution and the Quigley Contribution to the Asbestos PI Trust subject to the terms and conditions of the Insurance Relinquishment Agreement and the Quigley Insurance Transfer. *See* Section VI.D. below.

Approximately $322.4 million in products/completed operations limits that exclude payment of claims arising from exposure to asbestos, and contain limited restrictions on the payment of other personal injury claims. The proceeds from these products/completed operations limits do not form part of the Pfizer Contribution or the Quigley Contribution.

---

[2]  Quigley purchased its own primary occurrence-based comprehensive general liability policies from Travelers Indemnity Company covering the period from February 12, 1962 through February 12, 1969. The products/completed operations limits of these policies have been exhausted and released as a result of asbestos personal injury claims. Quigley is not aware of any excess insurance policies or other third-party liability policies purchased before it was acquired by Pfizer.

[3]  An additional $220 million of the $660 million issued by insolvent insurers was settled with respect to asbestos personal injury claims in the context of an agreement entered into prior to the insurers' insolvency. The pre-insolvency agreement did not resolve the insurers' liability for other personal injury claims, such as silica.

Approximately $283.8 million in products/completed operations limits issued by the AIG Companies and subject to the AIG Insurance Settlement Agreement (as defined below). The proceeds from these products/completed operations limits issued by the AIG Companies are subject to the AIG Assignment Agreement and do not form part of the Pfizer Contribution or the Quigley Contribution. *See* Section IV.A.6(d)(ii) below.

In addition, as of ~~November~~**March** 1, ~~2007,~~**2008,** there is approximately $~~23.6~~**24** million in Net Insurance Proceeds, including interest thereon, contained in the Insurance Settlement Proceeds Trust (each as defined below). This amount is exclusive of the AIG Payments made to date plus interest thereon that are also held in the Insurance Settlement Proceeds Trust. The Net Insurance Proceeds form part of the Pfizer Contribution and the Quigley Contribution. *See* Sections IV.A.6(e) and VI.D. below.

Schedule 1 of Exhibit D to this Disclosure Statement lists the occurrence-based policies issued by solvent insurers that provide the remaining $292.8 million in products/completed operations limits available to pay all or certain asbestos personal injury claims, as described above, and Schedule 2 of Exhibit D to this Disclosure Statement lists the occurrence-based policies issued by insolvent insurers potentially available to pay all or certain asbestos personal injury claims (collectively, the "***Shared Asbestos Insurance Policies***"), the proceeds of which together form part of the Pfizer Contribution and the Quigley Contribution, subject to the terms and conditions of the Insurance Relinquishment Agreement and Quigley Insurance Transfer. *See* Section VI.D. below.

Schedule 1 of Exhibit E to this Disclosure Statement lists the occurrence-based policies issued by solvent insurers that provide the remaining $322.4 million in products/completed operations limits not available to pay asbestos personal injury products claims but may be available to pay other personal injury or property claims, as described above, and Schedule 2 of Exhibit E to this Disclosure Statement lists the occurrence-based policies issued by insolvent insurers that are not available to pay asbestos personal injury products claims but are potentially available to pay other personal injury or property claims (collectively, the "***Shared Asbestos-Excluded Insurance Policies***"). The proceeds of the policies on Exhibit E do not form part of the Pfizer Contribution or the Quigley Contribution. Pfizer and Quigley will each retain their respective rights in and to the Shared Asbestos-Excluded Insurance Policies on a first-billed, first-paid basis, subject to the terms and conditions of the Insurance Relinquishment Agreement and Quigley Insurance Transfer. *See* Section VI.D. below.

Exhibit F to this Disclosure Statement lists the Quigley Insurer Receivables owed by each relevant insurer (other than the AIG Companies) as of ~~November~~**March** 1, ~~2007.~~**2008.** The Quigley Insurer Receivables that remain unpaid as of the Effective Date form part of the Quigley Contribution. *See* Section VI.D. below. The amounts listed on Exhibit F are in addition to the amounts reflected in Exhibits D and E.

Each of Exhibits D, E and F are based on available information and may be amended from time to time prior to the Confirmation Date. The fact of inclusion or exclusion, and the classification of an insurance policy on Exhibits D and E to the Disclosure Statement (i) does not constitute a determination as to whether a particular insurance policy provides coverage for any matter resolved by the Quigley plan of reorganization or for any other matter, (ii) does not constitute waiver of any position of any entity with respect to any coverage determination, and (iii) is subject to any applicable Asbestos PI Insurance Coverage Defense, as defined in the Quigley plan.

### (c) Claims-Made Insurance Coverage

Beginning October 1, 1985, Pfizer purchased "***claims-made***" excess liability policies. Those policies generally provide coverage, subject to other policy terms, for claims made against the policy during the policy period, provided injury has taken place during the policy period or on or after the "retroactive coverage date" (typically October 1, 1986). All of the claims-made policies exclude coverage for claims arising from exposure to asbestos and/or asbestos-containing products (and in certain instances for asbestiform talc), but contain generally no express restriction for the payment of certain other personal injury claims, including silica claims. Quigley provided its only notice of claims under these claims-made policies in or around 2003, and only with respect to silica-related claims. The only claims-made program therefore arguably applicable to cover such claims is subject to a $500 million self-insured retention, meaning that Quigley must pay the first $500 million on account of such claims before any insurer provides insurance coverage. As described in Section IV.A.5(b) above, Quigley does not believe that it ever

manufactured, sold, supplied or distributed any products that contained any respirable free silica or alpha-quartz. Quigley therefore has concluded that the claims-made coverage is effectively of no value to it, and has agreed to relinquish its rights to coverage under the claims-made policies in exchange for certain consideration provided by Pfizer in the Insurance Relinquishment Agreement (as detailed in Section VI.D. below).

Exhibit G to this Disclosure Statement lists each of the solvent and unresolved claims-made policies that provided products/completed operations coverage to Quigley (the "**Shared Asbestos-Excluded Claims-Made Insurance Policies**"), the proceeds of which do not form part of the Pfizer Contribution or the Quigley Contribution. Pursuant to the Insurance Relinquishment Agreement, Quigley will relinquish to Pfizer its right, title and interest in and to the Shared Asbestos-Excluded Claims-Made Policies. Exhibit G is based on available information and may be amended from time to time prior to the Confirmation Date. The fact of inclusion or exclusion, and the classification of an insurance policy on Exhibit G to the Disclosure Statement (i) does not constitute a determination as to whether a particular insurance policy provides coverage for any matter resolved by the Quigley plan of reorganization or for any other matter, (ii) does not constitute waiver of any position of any entity with respect to any coverage determination, and (iii) is subject to any applicable Asbestos PI Insurance Coverage Defense, as defined in the Quigley plan.

### (d) Insurance Settlement Agreements

Over the past twenty-five years, Pfizer and/or Quigley have been engaged in numerous insurance coverage litigation matters and alternative dispute resolution proceedings to secure coverage and payment from their insurers for a variety of claims. Quigley and Pfizer have been successful in resolving disputes with most insurers.

With respect to asbestos personal injury claims, each of Quigley and Pfizer have billed their shared occurrence-based policies on a first-billed, first-paid basis, in accordance with various insurance settlement agreements. Prior to the Petition Date, Quigley and Pfizer billed the products/completed operations limits under the occurrence-based policies in response to their accelerating costs of defending and resolving asbestos personal injury claims. Since the 1980s and through the Petition Date, Quigley, Pfizer and their insurers have paid approximately $1.04 billion in settlements or judgments to resolve approximately 239,901 asbestos personal injury claims and incurred approximately $179 million to defend these claims. A portion of the amounts paid by Pfizer have been billed to insurance policies issued to Pfizer prior to its August 25, 1968 acquisition of Quigley, but the post-acquisition policies also are responsible to pay a portion of these amounts. Pfizer therefore also has billed policies that provide coverage to Quigley for amounts Pfizer incurred for asbestos personal injury claims, in accordance with various insurance settlement agreements.

As described above, the comprehensive general liability insurance policies purchased by Pfizer provide coverage to Pfizer and its subsidiaries and historically have been accessed to the extent of covered claims on a first-billed, first-paid basis. Such covered claims include heart valve claims against Pfizer arising out of the activities of its formerly wholly-owned subsidiary Shiley, Inc., as well as other pharmaceutical, medical, implantable and household products manufactured and sold by Pfizer and/or its other subsidiaries. Settlements entered into between Pfizer and its insurers to resolve these covered claims resolved in full approximately $200 million in solvent products/completed operations limits under occurrence-based policies issued to Pfizer after its acquisition of Quigley.

In general, the asbestos insurance settlements fall into two categories: coverage-in-place agreements Quigley and Pfizer entered into with insurers prior to the Petition Date, and recent agreements with insurers involving payments over time to resolve various coverage disputes.

### (i) Prepetition Coverage-in-Place Settlement Agreements

Many of the asbestos settlement agreements Quigley and Pfizer entered into with insurers that issued occurrence-based coverage set forth the manner in which each insurance policy must pay its share of Pfizer's and Quigley's losses and defense costs related to asbestos personal injury claims (so-called "*coverage-in-place*" agreements). The Agreement Concerning Asbestos Claims, dated June 19, 1985 (the "**Wellington Agreement**"), is a coverage-in-place agreement between thirty-three companies that were former miners, manufacturers, sellers or installers of asbestos-containing products and co-defendants in personal injury claims alleging exposure to asbestos (including Quigley

and Pfizer), and many, but not all, of their comprehensive general liability insurers (the "*signatory insurers*"). The Wellington Agreement resolved various disputes among the defendant companies and signatory insurers regarding the manner in which the defendant companies would allocate and bill their asbestos losses and defense costs to their insurance policies.[4]

Signatory insurers issued to Pfizer after its acquisition of Quigley occurrence-based policies with approximately $545 million in products/completed operations limits that indisputably apply to asbestos personal injury claims. Signatory insurers also issued to Pfizer after its acquisition of Quigley occurrence-based policies with approximately $365 million in remaining products/completed operations limits, but the extent to which such limits may be available to pay asbestos and other bodily injury claims has not yet been determined. Quigley and Pfizer also entered into various agreements with insurers that are not signatories to the Wellington Agreement (the "*non-signatory insurers*"). The settlement agreements with non-signatory insurers also are coverage-in-place agreements and resolved coverage disputes arising from asbestos personal injury claims concerning approximately $530 million in products/completed operations limits issued to Pfizer after its acquisition of Quigley.

(ii)        AIG Insurance Settlement Agreement

In August 2004, Quigley and Pfizer entered into the AIG Insurance Settlement Agreement with the AIG Companies to resolve disputed issues relating to: (a) remaining unbilled coverage under certain shared occurrence-based policies in the amount of $283,754,705, of which approximately $137,768,070 in limits is subject to a restriction on the payment of claims "arising out of asbestosis or any similar condition caused by asbestos;" (b) an excess liability claims-made policy issued to Pfizer covering the period November 1, 1997 through November 1, 2001 and providing $75 million in limits; (c) a Quigley Insurer Receivable owed by the AIG Companies of $40,620,245; and (d) an insurer receivable owed to Pfizer by the AIG Companies of $6,371,926. The AIG Insurance Settlement Agreement is an addendum to a prior agreement between Quigley, Pfizer and the AIG Companies that resolved the manner in which approximately $10 million in occurrence-based policies issued to Pfizer prior to its acquisition of Quigley and approximately $130 million in shared occurrence-based policies would respond to asbestos personal injury claims against Quigley and Pfizer. Under the AIG Insurance Settlement Agreement, the AIG Companies agreed to pay to Quigley and Pfizer a total sum of $405,746,856 through a stream of payments over a period of 10 years in accordance with a schedule set forth in the AIG Insurance Settlement Agreement. As of May 1, 2007, the AIG Companies have paid $68.75 million under the terms of the AIG Insurance Settlement Agreement. These amounts and the interest thereon (approximately $4 million as of May 1, 2007) are held in the Insurance Settlement Proceeds Trust (defined below).

In consideration for these payments, Quigley and Pfizer will provide the AIG Companies with a release under the specific policies identified in the AIG Insurance Settlement Agreement for products/completed operations claims, Asbestos-Related Claims, Silica-Related Claims, Other Dust Claims, and Pharmaceutical Claims (each as defined in the AIG Insurance Settlement Agreement) upon payment in full of the settlement amount. Quigley and Pfizer also dismissed the AIG Companies from the Shortfall Insurance Coverage Litigation (defined below) with prejudice and committed to use commercially reasonable best efforts to obtain court approval of a Quigley plan of reorganization that includes an injunction in the AIG Companies' favor pursuant to section 524(g) of the Bankruptcy Code permanently enjoining Asbestos PI Claims under the policies identified in the AIG Insurance Settlement Agreement.

Under the terms of the Plan, on the Effective Date, **Reorganized** Quigley will execute the AIG Assignment Agreement (defined below), pursuant to which Quigley will assign all of its right, title and interest in and to the AIG Payments to Pfizer. In exchange for this assignment and other consideration, Pfizer will make the Pfizer

---

[4]   Pursuant to the Wellington Agreement, the Asbestos Claims Facility (the "*ACF*") was established in 1985 to administer and arrange for the evaluation, defense, settlement and payment of all asbestos personal injury claims against the defendant companies and signatory insurers. The ACF did so until 1988, when it ceased operations. Thereafter, the Center for Claims Resolution, Inc. ("*CCR*"), a non-profit organization, was established to perform the same functions for certain Wellington defendant companies, including Quigley and Pfizer. As of February 1, 2001, all remaining CCR members, including Quigley and Pfizer, began handling and resolving their own asbestos personal injury claims. At present, the CCR continues to administer and process those claims that the CCR settled on behalf of all CCR members, including Quigley and Pfizer, prior to February 1, 2001. Each CCR member now individually resolves claims that the CCR did not settle on behalf of all CCR members prior to February 1, 2001, whether filed before or after February 1, 2001. As of June 30, 2001, Quigley and Pfizer terminated their membership in the CCR. The Claims Handling Unit has administered and processed asbestos personal injury claims and certain other personal injury claims on behalf of Quigley and Pfizer since January 2002.

Contribution. *See* "THE PLAN OF REORGANIZATION – Description of Consideration Contributed to the Asbestos PI Trust and Reorganized Quigley and Estimate of Asbestos PI Claims – The Pfizer Contribution to the Asbestos PI Trust."

        (iii)     Everest Insurance Settlement Agreement

In March 2000, Pfizer and Quigley entered into a confidential "coverage-in-place" settlement agreement with Everest Reinsurance Company (formerly known as Prudential Reinsurance Company) ("Everest") concerning insurance coverage for asbestos-related bodily injury claims asserted against Pfizer and Quigley. The agreement (the "1999 Everest Settlement Agreement"), which was effective as of June 1, 1999, set forth certain agreed rules and principles pursuant to which Everest would pay under certain Prudential Reinsurance policies, to or on behalf of Pfizer and/or Quigley, with respect to asbestos-related bodily injury claims, as claims were submitted. For their part, in exchange for the promises set out in the 1999 Everest Settlement Agreement, Pfizer and Quigley agreed to release Everest from certain claims, liabilities, and lawsuits as set forth in the agreement.

In July 2004, Pfizer, Quigley, and Everest executed a confidential "Addendum" to the 1999 Everest Settlement Agreement. The Addendum resolved matters at issue in the Shortfall Insurance Coverage Litigation, as defined below, Everest's obligations under the Prudential Reinsurance policies and the 1999 Everest Settlement Agreement, as well as other issues.

Pursuant to the Addendum, Everest agreed to pay a specified sum to Pfizer in three installments. The first installment was due within 20 days of execution of the Addendum, and was paid pre-petition. The second and third installments, which total $4.5 million and were paid after the Petition Date, include substantial payments under a post-1982 occurrence-based policy that contains or incorporates an endorsement allegedly restricting the availability of coverage for certain claims arising from exposure to asbestos (the "Asbestos Restricted Policy"). Although the scope and the effect of such restrictions had not finally been adjudicated by the courts, the Addendum nonetheless resolved Everest's obligations under the Asbestos Restricted Policy. In exchange for Everest's promise to make the payments pursuant to the Addendum, Pfizer and Quigley, on the one hand, and Everest, on the other hand, agreed, inter alia, to mutually release each other from all claims for insurance coverage for asbestos-related bodily injury claims and all claims relating to the "products/completed operations hazards" of the Prudential Reinsurance insurance policies. In addition, Pfizer and Quigley agreed to dismiss Everest, with prejudice, from the Shortfall Insurance Coverage Litigation.

Although the Addendum required Everest to make the payments to Pfizer, Quigley and Pfizer agreed and instructed Everest to make the payments to Quigley. A substantial portion of the Everest payments constitute Net Insurance Proceeds, as defined below, and were deposited in the Insurance Settlement Proceeds Trust upon payment by Everest.

On March 10, 2006, Everest filed a motion requesting, among other things, that the Bankruptcy Court designate Everest as a Settling Asbestos Insurance Entity, as defined by the Quigley plan of reorganization, based on its payment in full of amounts owed under the 1999 Everest Settlement Agreement and the Addendum. Quigley filed a joinder in support of Everest's motion. On March 30, 2006, the Bankruptcy Court entered an order that, among other things, designated Everest as a Settling Asbestos Insurance Entity under the Quigley plan.

        (iv)     Postpetition Insurance Settlement Agreements

A.     <u>Yosemite Insurance Company</u>

On July 26, 2005, the Bankruptcy Court entered an order approving an addendum to a 1999 settlement entered into between Quigley, Pfizer and Yosemite Insurance Company ("**Yosemite**") regarding an insurance policy issued by Yosemite to Pfizer, which also provided coverage to Quigley. The settled policy provided $1 million of products/completed operations limits for asbestos personal injury claims, all of which had been billed by Quigley and Pfizer prior to the Petition Date. Under the addendum, Yosemite agreed to pay Quigley and Pfizer $1.3 million, $1 million of which represents the amounts previously billed by Quigley and Pfizer to Yosemite, and $300,000 of which is in consideration for a full release by Quigley and Pfizer of all claims against the settled policy. The $1.3

million was distributed to Pfizer and Quigley as follows: (i) approximately $150,000 was paid directly to Pfizer, (ii) approximately $850,000 was paid directly to Quigley, and (iii) $300,000 was paid into the Insurance Settlement Proceeds Trust. As part of the settlement, Pfizer and Quigley also agreed to dismiss, with prejudice, an alternative dispute resolution proceeding Pfizer and Quigley had commenced against Yosemite to collect amounts previously billed to Yosemite for asbestos personal injury claims.

B.    Lumbermens Mutual Casualty Company

On July 26, 2005, the Bankruptcy Court entered an order approving an addendum to a 1999 settlement entered into between Quigley, Pfizer and Lumbermens Mutual Casualty Company ("***Lumbermens***") regarding certain insurance policies issued by Lumbermens to Pfizer, which also provided coverage to Quigley. The addendum resolved the claims at issue in the Shortfall Insurance Coverage Action (defined below) and resulted in a mutual dismissal from that litigation in exchange for a $10,000 payment from Lumbermens, which was paid into the Insurance Settlement Proceeds Trust. Under the addendum, Quigley and Pfizer provided Lumbermens with a release for Asbestos-Related Bodily Injury Claims (as defined by the settlement) and for claims under the products/completed operations limits of the Lumbermens policies. Quigley and Pfizer, however, did not release Lumbermens for any claims for interest due or asserted to be due on any amount billed to or paid by Lumbermens under the Lumbermens policies or the 1999 settlement agreement between Quigley, Pfizer and Lumbermens.

C.    American Re-Insurance Company and North Star Reinsurance Company

On October 20, 2005, the Bankruptcy Court entered orders approving the "Settlement Agreement Concerning Shortfall Claims between Quigley and American Re-Insurance Company" ("American Re") (the "2005 American Re Agreement") and the "Settlement Agreement Concerning Shortfall Claims between Quigley and North Star Reinsurance Company" ("North Star") (the "2005 North Star Agreement"). In July 1999, Quigley and Pfizer had entered into a "coverage-in-place" settlement agreement with North Star concerning insurance coverage for asbestos-related bodily injury claims against Quigley and Pfizer. In January 2000, Quigley and Pfizer had entered into a similar "coverage-in-place" settlement agreement with American Re. Based on bills issued by Quigley and/or Pfizer prior to the Petition Date pursuant to these settlement agreements, the applicable products/completed operations limits under the insurance policies issued by American Re-Insurance and North Star that provide coverage to Quigley were billed in full and ultimately paid in full by each of American Re and North Star.

The 2005 American Re Agreement and the 2005 North Star Agreement resolved claims at issue in the Shortfall Insurance Coverage Action and resulted in mutual dismissals between Quigley, on the one hand, and American Re and North Star, on the other, from that litigation and mutual releases of claims for insurance coverage for Shortfall Claims, as defined in the 2005 American Re Agreement and the 2005 North Star Agreement.

D.    Centennial Insurance Company

On December 22, 2005, the Bankruptcy Court entered an order approving a settlement agreement entered into between Quigley, Pfizer and Centennial Insurance Company ("Centennial") (the "2005 Centennial Agreement"). In March 1999, Quigley and Pfizer had entered into a "coverage-in-place" settlement agreement with Centennial concerning insurance coverage for asbestos-related bodily injury claims against Quigley and Pfizer (the "1999 Centennial Agreement"). The 1999 Centennial Agreement set forth certain agreed rules and principles pursuant to which Centennial would pay under a certain insurance policy, to or on behalf of Quigley and/or Pfizer, with respect to asbestos-related bodily injury claims, as claims were submitted. For their part, Pfizer and Quigley agreed to release Centennial from certain claims, liabilities, and lawsuits as set forth in the 1999 Centennial Agreement.

As of the Petition Date, the full $2 million in products/completed operations limits remained unbilled and available under the sole insurance policy issued by Centennial. Under the 2005 Centennial Agreement, Centennial agreed to pay $2 million to the Asbestos PI Trust, or as the Bankruptcy Court may otherwise instruct, in three installments. The first installment of $600,000.00 was due within ten (10) days of the entry of an order by the Bankruptcy Court approving the 2005 Centennial Agreement and was paid into the Insurance Settlement Proceeds Trust. The second installment of $700,000.00 is due within ten (10) days of the date that an order by the Bankruptcy Court confirming

a Plan becomes a Final Order, as defined in the 2005 Centennial Agreement, and the third installment of $700,000.00 is due within one year of such date.

In exchange for Centennial's promise to make these payments, Quigley and Pfizer, on the one hand, and Centennial, on the other, agreed, inter alia, to mutually release each other from: (1) all claims for insurance coverage for Asbestos-Related Bodily Injury Claims, as defined in the 2005 Centennial Agreement, and Asbestos PI Claims; and (2) all claims relating to the products/completed operations limits under the insurance policy issued by Centennial, both upon Centennial's payment in full of all amounts payable under the 2005 Centennial Agreement. The parties also agreed to dismiss each other, with prejudice, from the Shortfall Insurance Coverage Action. In addition, Quigley and Pfizer committed to use commercially reasonable best efforts to obtain confirmation of a Quigley plan that includes an injunction pursuant to section 524(g) and/or section 105 of the Bankruptcy Code permanently enjoining the assertion and/or prosecution of Asbestos PI Claims against Settling Asbestos Insurance Entities (as defined by the plan), and to cause Centennial to be designated as a Settling Asbestos Insurance Entity. Centennial agreed not to object to or otherwise oppose, or support any person's objection or opposition to, confirmation of the Plan or any Plan Documents, including amendments thereto.

E.    Old Republic Insurance Company and Westport Insurance Company

On March 1, 2006, the Bankruptcy Court entered orders approving agreements entered into by Quigley, Pfizer and Old Republic Insurance Company ("Old Republic") (the "2006 Old Republic Agreement") and by Pfizer, Quigley and Westport Insurance Company ("Westport") (the "2006 Westport Agreement"). In June 1998, Quigley and Pfizer had entered into a "coverage-in-place" settlement agreement with Old Republic concerning insurance coverage for asbestos-related bodily injury claims against Quigley and Pfizer (the "1998 Old Republic Agreement"). In July 1999, Quigley and Pfizer had entered in a similar "coverage-in-place" settlement agreement with Westport (the "1999 Westport Agreement"). These agreements set forth certain agreed rules and principles pursuant to which Old Republic and Westport would pay under certain insurance policies each had issued, to or on behalf of Quigley and/or Pfizer, with respect to asbestos-related bodily injury claims, as claims were submitted. For their part, Quigley and Pfizer agreed to release Old Republic and Westport from certain claims, liabilities, and lawsuits, as set forth in the 1998 Old Republic Agreement and the 1999 Westport Agreement.

As of the Petition Date, $3,961,803.00 in products/completed operations limits remained unbilled and available under insurance policies issued by Old Republic. Under the 2006 Old Republic Agreement, Old Republic agreed to pay this amount to the Asbestos PI Trust, or as the Bankruptcy Court may otherwise instruct, in six installments. The first installment of $1,491,803.00 is due on the date the Bankruptcy Court enters an order confirming a Plan and the second installment of $500,000.00 is due within one hundred eighty (180) days of such date or December 31 of the year in which the Bankruptcy Court enters an order confirming a Plan, whichever is earlier. Subsequent installments of $500,000.00 each are due on February 15, May 15, August 15, and November 15 in the calendar year following the year of the Bankruptcy Court's entry of an order confirming a Plan.

Similarly, as of the Petition Date, $8,029,797.00 in products/completed operations limits remained unbilled and available under insurance policies issued by Westport. Under the 2006 Westport Agreement, Westport agrees to pay this amount to the Asbestos PI Trust, or as the Bankruptcy Court may otherwise instruct, in six installments. The first installment of $3,029,797.00 is due on the date the Bankruptcy Court enters an order confirming a plan and the second installment of $1 million is due within one hundred eighty (180) days of such date or December 31 of the year the Bankruptcy Court enters an order confirming a Plan, whichever is earlier. Subsequent installments of $1 million each are due on February 15, May 15, August 15, and November 15 in the calendar year following the Bankruptcy Court's entry of an order confirming the Plan.

In exchange for Old Republic's and Westport's promises to make these payments, Quigley and Pfizer, on the one hand, and Old Republic and Westport, on the other, agreed, inter alia, to mutually release each other from: (1) all claims for insurance coverage for Asbestos-Related Bodily Injury Claims, as such term is defined in the 1998 Old Republic Agreement and the 1999 Westport Agreement, and Asbestos PI Claims; and (2) all claims relating to the products/completed operations limits under the insurance policies issued by Old Republic and Westport both upon Old Republic's and Westport's payment in full of all amounts payable under their respective agreements. The parties also agreed to dismiss each other, with prejudice, from the Shortfall Insurance Coverage Action. In addition, Quigley and Pfizer committed to use commercially reasonable best efforts to obtain confirmation of a Quigley plan

that includes an injunction pursuant to section 524(g) and/or section 105 of the Bankruptcy Code permanently enjoining the assertion and/or prosecution of Asbestos PI Claims against Settling Asbestos Insurance Entities, and to cause Old Republic and Westport to be designated as Settling Asbestos Insurance Entities. Old Republic and Westport agreed not to object to or otherwise oppose, or support any person's objection or opposition to, confirmation of the Plan or Plan Documents, including amendments thereto.

F.    Stonewall Insurance Company

On April 27, 2006, the Bankruptcy Court entered an order approving an agreement entered into between Quigley, Pfizer and Stonewall Insurance Company ("Stonewall") (the "2006 Stonewall Agreement"). In August 1999, Quigley and Pfizer had entered into a "coverage-in-place" settlement agreement with Stonewall concerning insurance coverage for asbestos-related bodily injury claims against Quigley and Pfizer (the "1999 Stonewall Agreement"). The 1999 Stonewall Agreement sets forth certain agreed rules and principles pursuant to which Stonewall would pay under a certain insurance policy, to or on behalf of Quigley and/or Pfizer, with respect to asbestos-related bodily injury claims, as claims were submitted. For their part, Quigley and Pfizer agreed to release Stonewall from certain claims, liabilities, and lawsuits, as set forth in the 1999 Stonewall Agreement.

The 1999 Stonewall Agreement left unresolved a dispute between Quigley and Pfizer, on the one hand, and Stonewall, regarding the limits available under the policy issued by Stonewall. The parties to the 1999 Stonewall Agreement reserved their rights to determine the amount of products/completed operations limits available under that policy through negotiations, alternative dispute resolution procedures and/or litigation. Quigley and Pfizer issued bills to Stonewall pursuant to the 1999 Stonewall Agreement in the aggregate amount of $3 million prior to the Petition Date. Stonewall paid Pfizer and Quigley the aggregate amount of $2,071,916.16 prior to the Petition Date, leaving an unpaid balance of $928,082.64.

Stonewall asserted that the insurance policy at issue provided only $1 million in products/completed operations limits. On September 12, 2005, Stonewall filed a proof of claim in the Chapter 11 Case alleging its right to reimbursement of $1,073,972.00 of its prior payments and asserting other claims against Quigley arising out of the 1999 Stonewall Agreement. On March 13, 2006, Stonewall filed a motion under Bankruptcy Rule 3018(a) requesting the temporary allowance of its proof of claim in the amount of $848,304.00 to permit Stonewall to vote to accept or reject the Quigley plan.

Under the 2006 Stonewall Agreement, Stonewall has agreed to obtain a financial instrument in a form acceptable to Pfizer and Quigley from National Indemnity Company that will result in a joint payment to Pfizer and Quigley of $928,082.84 on or before May 15, 2010, of which $112,320.90 is owed to Pfizer and $815,761.94 is owed to Quigley. In exchange for Stonewall's promise to pay, Pfizer and Quigley, on the one hand, and Stonewall, on the other, agreed, inter alia, to mutually release each other from: (1) all claims for insurance coverage for Asbestos-Related Bodily Injury Claims, as defined in the 1999 Stonewall Agreement, and Asbestos PI Claims; and (2) all claims of any kind whatsoever arising out of or in connection with the insurance policy issued by Stonewall, both upon payment in full of all amounts payable to Pfizer and Quigley under the 2006 Stonewall Agreement or the occurrence of the Effective Date of the Plan, whichever is earlier. The parties also agreed to dismiss each other, with prejudice, from the Shortfall Insurance Coverage Action.

In addition, Quigley and Pfizer committed to use commercially reasonable best efforts to obtain confirmation of a Quigley plan that includes an injunction pursuant to section 524(g) and/or section 105 of the Bankruptcy Code permanently enjoining the assertion and/or prosecution of Asbestos PI Claims against Settling Asbestos Insurance Entities, and to cause Stonewall to be designated as a Settling Asbestos Insurance Entity. The 2006 Stonewall Agreement also resolved Stonewall's proof of claim by temporarily allowing such claim in the amount of $1.00 for the purpose of voting to accept Quigley's third amended plan, and Stonewall agreed to timely vote to accept the third amended plan and any subsequently amended, supplemented or modified plan. Stonewall also agreed not to object to or otherwise oppose, or support any person's objection or opposition to, confirmation of the third amended plan and plan documents, and any subsequently amended, supplemented or modified plan and plan documents.

G.    Protective National Insurance Company, In Liquidation

On June 13, 2007, the Bankruptcy Court entered an order under section 105(a) of the Bankruptcy Code and Rule 9019, authorizing and approving an April 2007 agreement between Quigley, Pfizer and the Liquidator for Protective National Insurance Company of Omaha ("Protective National").

On February 12, 2004, Protective National became the subject of liquidation proceedings before the District Court of Lancaster County, Pennsylvania (the "Liquidation Court"). Protective National issued $11 million in high-level excess products/completed operations coverage, subject to a separate endorsement providing that the policies do not "cover any of our insured's operations involving . . . Asbetos [sic]." Quigley and Pfizer filed timely proofs of claim in the Protective National liquidation proceeding for a variety of claims, including asbestos personal injury claims. The Liquidator denied all of the proofs of claim on the basis that Quigley and Pfizer did not have sufficient liability to trigger Protective National's excess policy obligations and also because the separate endorsement excluded coverage for all asbestos claims. Quigley and Pfizer objected to the Liquidator's denial of their respective proofs of claim and requested that the Liquidator submit the proofs of claim associated with asbestos personal injury claims to the Liquidator Court for adjudication.

Rather than adjudicate the Liquidator's determination of the asbestos personal injury claims before the Liquidation Court, Quigley, Pfizer and the Liquidator entered into an agreement to resolve their various disputes (the "Protective National Agreement"). Under the Protective National Agreement, the Liquidator will recommend to the Liquidation Court that one of Quigley's proofs of claim should be allowed in the amount of $1 million. All distributions from Protective National, subject to the determination of the Liquidation Court, will be paid to Quigley. Pursuant to the Plan, any distributions made under the policies issued by Protective National will in turn be paid to the Asbestos PI Trust.

In exchange for the Liquidator's recommendation to allow Quigley's claim in the amount of $1 million, Quigley and Pfizer agree to withdraw their remaining proofs of claim, and to release Protective National and the Liquidator from all claims arising out of or related to the issuance of the policies issued by Protective National.

### H. OneBeacon Insurance Company

**On March 6, 2008, the Bankruptcy Court entered an order approving an agreement (the "2008 OneBeacon Agreement") between and among Quigley, Pfizer and OneBeacon Insurance Company, the successor-in-interest to CGU Insurance, which in turn is the successor-in-interest to Commercial Union Insurance Company ("OneBeacon"). In November 1998, Quigley and Pfizer had entered into a "coverage-in-place" settlement agreement with OneBeacon concerning insurance coverage for asbestos-related bodily injury claims against Quigley and Pfizer (the "1998 OneBeacon Agreement"). The 1998 OneBeacon Agreement set forth certain agreed rules and principles pursuant to which OneBeacon would pay under certain insurance policies, to or on behalf of Quigley and/or Pfizer, with respect to asbestos-related bodily injury claims, as claims were submitted. Prior to the Petition Date and pursuant to the 1998 OneBeacon Agreement, OneBeacon had been billed $1,994,369.20 by Quigley and $1,253,768.80 by Pfizer for asbestos-related bodily injury claims which OneBeacon had not yet paid (the "OneBeacon Insurance Receivable"). As of the Petition Date, $6,016,963 in products/completed operations limits remained unbilled and available to Quigley and Pfizer under certain insurance policies issued by OneBeacon and an additional $18,246,748 in products/completed operations limits remained unbilled and available to Pfizer under certain insurance policies issued by OneBeacon to Pfizer prior to Pfizer's acquisition of Quigley (the "Non-Released Insurance Policies").**

**Under the 2008 OneBeacon Agreement, OneBeacon agreed to pay the full amount of the OneBeacon Insurance Receivable to Quigley and Pfizer. In exchange for OneBeacon's payment of the OneBeacon Insurance Receivable, Quigley and Pfizer, on the one hand, and OneBeacon, on the other agreed, inter alia, to mutually release each other from (1) insurance coverage under the Products Limits of the Released Insurance Policies, as defined in the 2008 OneBeacon Agreement; and (2) insurance coverage for Asbestos-Related Bodily Injury Claims, as defined in the 1998 OneBeacon Agreement, under the Released Insurance Policies. The parties also agreed to dismiss each other, with prejudice, from the Shortfall Insurance Coverage Action, where OneBeacon is the sole remaining defendant. The parties further agreed that the Non-Released Insurance Polices will remain subject to the terms of the 1998 OneBeacon Agreement, and each Party reserved all rights, claims, and benefits under the 1998 OneBeacon Agreement and the Non-**

**Released Insurance Policies that were not expressly waived, limited, dismissed or released under the 2008 OneBeacon Agreement.**

(e)     **Insurance Settlement Proceeds Trust**

For the purpose of preserving each of Pfizer's and Quigley's rights to the insurance policies that they share on a first-billed, first-paid basis, on August 27, 2004, Pfizer, Quigley and JPMorgan Chase Bank, as trustee, entered into the Pfizer/Quigley Joint Insurance Settlement Proceeds Trust Agreement (the "*Insurance Settlement Proceeds Trust Agreement*") to establish a trust (the "*Insurance Settlement Proceeds Trust*") to hold Net Insurance Proceeds. Net Insurance Proceeds are amounts paid or to be paid by (i) insurers (other than the AIG Companies) under certain policies identified in the Insurance Settlement Proceeds Trust Agreement that are shared by Quigley and Pfizer, net of any insurer receivables owed by such insurers, and (ii) the AIG Companies pursuant to the AIG Insurance Settlement Agreement (collectively, the "*Net Insurance Proceeds*"). Under the terms of the Insurance Settlement Proceeds Trust, the rights of each of Quigley and Pfizer to draw on the Net Insurance Proceeds are identical in every respect to the rights they held to draw on the relevant shared insurance policies. Quigley and Pfizer may draw upon the Net Insurance Proceeds on a first-billed, first-paid basis to pay documented settlements, judgments and defense costs relating to the types of claims covered under the settled policies, which consist primarily of personal injury claims, subject to Pfizer's or Quigley's submission of satisfactory documentation. If the Insurance Settlement Proceeds Trust does not hold sufficient funds to satisfy in full a request from Pfizer or Quigley to release funds, the unpaid portion of the request must be paid as soon as additional Net Insurance Proceeds are deposited into the Insurance Settlement Proceeds Trust and before any other request by Pfizer or Quigley is paid. As of ~~November~~**March** 1, ~~2007.~~**2008,** there is approximately $~~23.6~~**24** million in Net Insurance Proceeds, including interest thereon, in the Insurance Settlement Proceeds Trust, net of $~~75~~**93.8** million in AIG Payments already made and the $~~5.7~~**7.2** million of interest earned thereon. All Net Insurance Proceeds in the Insurance Settlement Proceeds Trust on the Effective Date, other than AIG Payments already made and to be received prior to the Effective Date and the interest thereon, will be contributed by Quigley and Pfizer to the Asbestos PI Trust.

(f)     **Ongoing Insurance Collection Efforts and Coverage-Related Litigation**

(i)     Contribution Action

Pfizer, but not Quigley, is currently a defendant in a New York state court action where Certain Underwriters at Lloyd's of London and London Market Insurance Companies (collectively, "*London*") are seeking contribution from Allstate Insurance Company ("*Allstate*") with respect to certain excess policies issued by Allstate's predecessor-in-interest that provide coverage to both Quigley and Pfizer. Pursuant to a December 2002 settlement between Pfizer, Quigley and London, Quigley and Pfizer have an interest in any recovery London obtains from Allstate.

Pursuant to the terms of the preliminary injunction order issued by the Bankruptcy Court on December 17, 2004, London's contribution action was enjoined. On February 18, 2005, Quigley filed a motion with the Bankruptcy Court seeking an order approving an agreement between Quigley, Pfizer and London whereby the parties agreed that among other things: (a) Quigley and Pfizer would seek and obtain an order from the Bankruptcy Court modifying the automatic stay and granting relief from the preliminary injunction to permit London to pursue its damages claim for equitable contribution against Allstate; and (b) London would dismiss its claim in the contribution action seeking a declaratory judgment regarding the manner in which Allstate policies would be required to pay future asbestos personal injury claims.

On March 11, 2005, Allstate filed an objection to Quigley's motion and also filed a cross-motion. Allstate alleged that pursuant to an indemnification provision of an April 2000 settlement agreement among Allstate, Pfizer and Quigley, any recovery by London in its contribution action would result in a dollar-for-dollar reduction in the remaining products/completed operations limits under the Allstate excess insurance policies. Accordingly, Allstate argued that granting Quigley's motion to approve the settlement with London would threaten products/completed operations limits remaining under the Allstate policies, which are property of Quigley's bankruptcy estate. Allstate requested that the Bankruptcy Court either deny Quigley's motion or, in the alternative, modify the automatic stay

and preliminary injunction to allow Allstate to pursue an indemnification claim against Pfizer and Quigley in the London contribution action. On March 16, 2005, Quigley filed a reply in opposition to Allstate's objection and cross-motion.

A hearing on Quigley's and Allstate's motions was held on March 17, 2005. To date, the Bankruptcy Court has not ruled on either motion.

Regardless of the outcome of the pending motion, under the Plan's definition of "Indirect Asbestos PI Claims," following the Effective Date the preliminary injunction enjoining London's contribution action will be dissolved and London then may proceed to prosecute Count I of its contribution complaint against Allstate and Pfizer. In the event that Allstate incurs liability to London in the contribution action, Allstate may assert its now contingent, unliquidated, unmatured, and disputed indemnification claim against Reorganized Quigley in accordance with the terms of the April 2000 settlement agreement among Allstate, Pfizer and Quigley.

(iii)(ii)    Shortfall Insurance Coverage Litigation

Claims have been asserted, and litigation commenced, against Quigley, Pfizer and other current and former members of the CCR alleging that Quigley, Pfizer, or both are obligated for amounts for asbestos personal injury claims that were initially allocated to members of the CCR who withdrew or who were terminated from the CCR and/or have filed for protection under chapter 11 of the Bankruptcy Code (the "**Shortfall Claims**"). Quigley's and Pfizer's insurers dispute their obligations to pay amounts under their policies that Quigley and Pfizer incur to defend and/or resolve Shortfall Claims. As a result, Quigley, Pfizer and several other CCR members who are alleged to be liable for Shortfall Claims initiated the following actions to secure coverage: (1) litigation in the Superior Court of the State of Delaware against certain non-signatory insurers; (2) an ADR proceeding against certain non-signatory insurers; and (3) an ADR proceeding against certain signatory insurers. In addition, many of the signatory insurers initiated an ADR proceeding against Quigley, Pfizer and other CCR members regarding a November 2000 invoice issued by the CCR on behalf of its members (collectively, these actions are referred to as the "**Shortfall Insurance Coverage Litigation**"). Since 2001 and through the Petition Date, Quigley has incurred in litigation or settlement $58 million in underlying Shortfall Claims, none of which has been billed to Quigley's insurers pending resolution of the Shortfall Insurance Coverage Litigation.

The action pending in Delaware state court has been resolved with respect to all ~~but one non-signatory insurer~~**insurers that were party to that action**. Both of the ADR proceedings involving the signatory insurers are confidential under the Wellington Agreement and are being appealed pursuant to the agreement's dispute resolution provisions. On January 21, 2005, the Bankruptcy Court issued an order lifting the automatic stay and the preliminary injunction to permit Quigley and Pfizer to proceed with an appeal in the ADR proceeding in which Quigley and Pfizer were defendants. The other ADR proceeding is being appealed by the signatory insurers and has been consolidated for appellate purposes with the ADR proceeding appealed by Quigley and Pfizer.

(iv)(iii)    The Continental Adversary Proceeding

On February 21, 2006, two insurers, Continental Casualty Company and Continental Insurance Company commenced an adversary proceeding against Quigley, Pfizer and more than sixty of their insurers (Adv. Proc. No. 06-01299 (SMB)) (the "**Continental Adversary Proceeding**"). In the complaint, CIC sought a declaration as to the scope of Quigley's and Pfizer's rights to coverage for asbestos-related claims under certain of CIC's excess insurance policies that are listed on the "Schedule of Shared Asbestos Insurance Policies" attached as Exhibit C to the Plan and contain or incorporate alleged restrictions regarding the availability of coverage for certain claims arising from exposure to asbestos. CIC and CCC also sought a declaration that Quigley and Pfizer have anticipatorily breached the "anti-assignment" provision of insurance policies issued by CCC and CIC by virtue of the Quigley Insurance Transfer and the Insurance Relinquishment Agreement (as defined in the Plan). Several of the insurers named as defendants in the Continental Adversary Proceeding filed cross-claims against Quigley and Pfizer seeking similar relief.

On April 21, 2006, Quigley and Pfizer moved to dismiss the Continental Adversary Proceeding in its entirety. With respect to CIC's claim for a declaration of the scope of insurance coverage, Quigley and Pfizer asserted that the

claim should be dismissed because, among other things, the claim is not ripe. With respect to CCC's and CIC's "anticipatory breach" claim, Quigley and Pfizer asserted that the claim should be dismissed for, among other things, failure to state a claim.

Also in response to the Continental Adversary Proceeding, several defendant insurers filed motions seeking to stay the proceeding in favor of arbitration under the Wellington Agreement. Those insurers simultaneously filed a motion in the main bankruptcy case seeking to lift the automatic stay so that such arbitration could proceed. Quigley and Pfizer opposed both motions.

On February 22, 2007, the Bankruptcy Court entered an order in the Continental Adversary Proceeding, among other things, (a) dismissing all claims seeking a declaratory judgment that Quigley and Pfizer have anticipatorily breached the "anti-assignment" provision of certain insurance policies; (b) modifying the automatic stay as to certain Wellington signatory insurers to permit confidential arbitration pursuant to the Wellington Agreement regarding the scope of Pfizer's and Quigley's rights to coverage for asbestos-related claims under certain insurance policies, as more fully described in Section IV.A.6(f)(v) below; and (c) staying all other claims at issue in the Continental Adversary Proceeding.

> (~~v~~**iv**) The Asbestosis Restriction ADR

As described above in Section IV.A.6(b), there are approximately $191 million in products/completed operations limits issued by a number of insurers that contain various restrictions on the availability of coverage for claims arising from exposure to asbestos, although the scope and effect of these asbestos restrictions have not been fully resolved. Pursuant to the Bankruptcy Court's February 22, 2007 order in the Continental Adversary Proceeding granting relief from the automatic stay, certain Wellington signatory insurers that issued policies that contain or incorporate these alleged restrictions initiated a confidential Wellington ADR proceeding against Pfizer and Quigley on March 12, 2007 to address, among other issues, the scope and effect of these asbestos restrictions (the "***Asbestosis Restriction ADR***").

On May 30, 2007, CCC and CIC filed a motion to compel Quigley to either assume or reject the Wellington Agreement to the extent the Bankruptcy Court finds it to be an executory contract. Quigley and Pfizer timely responded to CCC and CIC's motion. On July 12, 2007, the Bankruptcy Court adjourned the hearing on CCC and CIC's motion, pending discussion among the parties. A~~**Following a**~~ further hearing on the motion ~~is scheduled for~~**on** November 6, ~~2007~~**2007, the Bankruptcy Court denied CCC and CIC's motion.**

## 7. Prepetition Financing of Quigley's Operations

Quigley's principal assets include its rights under the Shared Asbestos Insurance Policies, the Insurance Settlement Agreements and the AIG Insurance Settlement Agreement, the Quigley Insurer Receivables and Quigley's interest in the funds contained in the Insurance Settlement Proceeds Trust. Quigley relies on its rights to proceeds under these insurance policies, the funds in the Insurance Settlement Proceeds Trust, and the proceeds of these settlement agreements to pay for its substantial liabilities arising from the asbestos personal injury claims. Historically, certain insurers have failed at times to honor their obligations to make payments on a timely basis, leaving Quigley from time to time without financial means to pay its liability and defense obligations.

To avoid such cash-flow difficulties, Quigley, as borrower, and Pfizer, as lender, entered into a Credit and Security Agreement, dated as of March 6, 2003 (as amended on May 29, 2003 and October 29, 2003, and as further amended in connection with the DIP Credit Facility (defined below) on October 8, 2004, February 18, 2005, July 15, 2005, January 31, 2006, August 31, 2006, January 18, 2007, ~~and~~August 10, ~~2007~~**2007, and February 14, 2008**) (the "***Senior Secured Loan Facility***"). Under the Senior Secured Loan Facility, Pfizer provided loans and advances secured by all of Quigley's assets other than certain insurance policies, to allow Quigley to bridge the period between when Quigley: (a) paid settlements, judgments and defense costs in connection with asbestos claims, and (b) received payment from its insurers for its insurer receivables.

Under the terms of the Senior Secured Loan Facility, Quigley was required to pay amounts recovered from insurers on account of Quigley's insurer receivables directly into a certain secured cash collateral deposit account

maintained at JPMorgan Chase Bank, which was subject to a blocked account control agreement between Quigley and Pfizer. As Quigley's insurer receivables were deposited into this account, those amounts were used to reduce the outstanding principal balance under the Senior Secured Loan Facility. As of the Petition Date, Quigley was entitled to borrow up to $110 million on a revolving basis under the Senior Secured Loan Facility. The aggregate principal amount of Quigley's outstanding obligations under the facility on the Petition Date was approximately $52,724,363, inclusive of $6,709,530 in accrued but unpaid prepetition interest.

## B.     Prepetition Settlement Negotiations

### 1.     Holders of Asbestos PI Claims

#### (a)     Quigley's and Pfizer's Historical Claims and Settlements

Quigley was first named as a defendant in an action alleging an asbestos personal injury claim in 1979 or 1980. As of the Petition Date, Quigley had been named as a defendant in approximately 411,100 asbestos personal injury claims in approximately 131,500 civil actions brought in federal and state courts throughout the United States. Pfizer was also first named as a defendant in an action alleging an asbestos personal injury claim in 1979 or 1980. Of the 411,100 claims that had been asserted against Quigley as of the Petition Date, Pfizer also had been named as a defendant in approximately 280,343 of these claims in approximately 67,434 civil actions brought in federal and state courts throughout the United States.

As of the Petition Date, Quigley and Pfizer had settled approximately 132,075 asbestos personal injury claims where both Quigley and Pfizer were parties to the settlement agreement.[5] The settlement amounts due under those settlement agreements were apportioned between Quigley and Pfizer (and certain other defendants if the settlement was administered by the ACF or CCR when Quigley and Pfizer were members, as described above in Section IV.A.6), and each of Quigley and Pfizer paid its apportioned share. In exchange for the settlement payment, Settling Plaintiffs (as defined below) would provide Quigley and Pfizer with a release of all asbestos personal injury claims alleged by the Settling Plaintiffs. This release included claims against Pfizer based on its own independent liability (i.e., arising from Pfizer's asbestos-containing products) and also any claims against Pfizer that were derivative of, based on, or related to, Quigley's asbestos-containing products.

#### (b)     Pfizer's Prepetition Negotiations with Current Holders of Asbestos PI Claims

Commencing in late 2003, Ronald B. Rubin, then a member of the law firm of Rubin & Rubin, Chartered, and Michael K. Rozen, a partner in the Feinberg Group, LLP, as counsel for Pfizer and its affiliates, other than Quigley, began settlement negotiations with plaintiffs' counsel who represented a substantial majority of the holders of pending asbestos personal injury claims against both Quigley and Pfizer. Pfizer's counsel engaged in negotiations with plaintiffs' counsel who historically had represented claimants with cognizable claims against both Pfizer and Quigley. Ultimately, Pfizer's counsel entered into numerous settlements with plaintiffs' law firms representing claimants that Pfizer's counsel believed would be able to establish an actual asbestos-related disease arising from exposure to a Quigley asbestos-containing product, who also had asserted or would assert cognizable claims against Pfizer, and whose counsel's settlement demands were reasonable.

As a result of the settlement negotiations, claimants who met certain criteria, including submitting qualifying evidence of asbestos-related disease and delivering a signed release to Pfizer, became Settling Plaintiffs (as defined below) who settled all of their claims against Pfizer arising out of exposure to asbestos, silica, talc and mixed dust. The settlements did not resolve or release any claims the Settling Plaintiffs hold against Quigley. Thus, all Settling Plaintiffs retained their claims against Quigley, but released their claims against Pfizer. As a consequence of the settlements, even after Quigley emerges from chapter 11, the Settling Plaintiffs will have no ability to assert any claims against Pfizer based on exposure to an asbestos-containing product manufactured or sold by Pfizer. Upon confirmation and consummation of Quigley's plan of reorganization nonsettling and future claimants, however, will

---

[5]   These settlement agreements are separate and apart from the Pfizer Claimant Settlements Agreements (defined below) that Pfizer, but not Quigley, entered into shortly before Quigley commenced the Chapter 11 Case.

be able to assert claims against Pfizer based on exposure to an asbestos-containing product manufactured or sold by Pfizer.

As of May 14, 2007, law firms representing approximately 172,095 known holders of asbestos personal injury claims that had been asserted against both Pfizer and Quigley entered into settlement agreements with Pfizer (the "Pfizer Claimant Settlement Agreements"). Quigley believes there are approximately 212,200 asbestos personal injury claims that have been or may be asserted against Quigley, including the 172,095 claimants who are parties to the Pfizer Claimant Settlement Agreements and could become Settling Plaintiffs (as defined below). See Section IV.A.5(a). On that basis, Quigley believes that Pfizer entered into Pfizer Claimant Settlement Agreements with more than 80% of the individuals that also hold separate Asbestos PI Claims against Quigley (172,095 ÷ 212,200 = 81.1%).

Pfizer's counsel also engaged in settlement discussions with other plaintiffs' counsel, including counsel for certain plaintiffs who objected to Quigley's prior plan and disclosure statement. Pfizer's counsel ultimately did not reach a settlement with these law firms because it concluded that their settlement demands were unreasonable.

### (c)  Types of Claims Settled Under the Pfizer Claimant Settlement Agreements

Under the Pfizer Claimant Settlement Agreements, Settling Plaintiffs agreed to settle all asbestos personal injury claims that they may have against Pfizer and its affiliates. However, Settling Plaintiffs did not settle their claims against Quigley. As discussed below, Settling Plaintiffs' claims against Quigley are preserved under the Pfizer Claimant Settlement Agreements and are to be addressed under the terms of Quigley's Plan.

The claims subject to the Pfizer Claimant Settlement Agreements, as asserted by the claimants, are believed to break down into the following disease categories: (i) 3,820 mesothelioma claims; (ii) 9,110 lung cancer claims; (iii) 3,880 other cancer claims; and (iv) 155,577 non-malignant claims. In addition, Pfizer is still in the process of reviewing and identifying the asbestos-related disease for an additional 708 claims. Pfizer believes these claims include both malignant and nonmalignant claims.

The proportion of each disease type settled by Pfizer under the Pfizer Claimant Settlement Agreements is similar to the proportion of such disease types as a whole that have been asserted against Pfizer and Quigley in the tort system.

### (d)  Evidence Required Under the Pfizer Claimant Settlement Agreements to Establish a Settling Plaintiff's Claim

#### (i)  Generally

As one of the conditions precedent to receiving payment from Pfizer under the Pfizer Claimant Settlement Agreements, settling plaintiffs' counsel, on behalf of each settling plaintiff, must provide Pfizer with the following information in support of the settling plaintiffs' claims:

settling plaintiff's name and social security number;

settling plaintiff's trade and the alleged years of exposure to asbestos or asbestos-containing products;

a list of the major jobsites (including facility names and locations) and the dates worked at these jobsites by each settling plaintiff;

evidence of exposure to asbestos or asbestos-containing products for which the settling plaintiff alleges Pfizer or one of its affiliate bears legal responsibility; and

competent medical evidence that the settling plaintiff has or had an asbestos-related disease.

**(ii)** Medical Evidence

The Pfizer Claimant Settlement Agreements compensate settling plaintiffs that are able to establish, among other things, that they are suffering from one of the following eight asbestos-related diseases: (a) mesothelioma, (b) lung cancer 1, (c) lung cancer 2, (d) other cancer, (e) severe asbestosis, (f) asbestosis/pleural disease I, (g) asbestosis/pleural disease II, or (h) other asbestos disease. In general, the Pfizer Claimant Settlement Agreements provide that in order to qualify for one of the foregoing asbestos-related diseases categories, the settling plaintiff must submit documentation sufficient to satisfy the detailed medical criteria requirements contained in the Pfizer Claimant Settlement Agreements. These medical requirements are summarized below.

Mesothelioma

In order for a plaintiff to establish that he or she is suffering from mesothelioma, the plaintiff must submit a statement from a board-certified pathologist, a board-certified oncologist, a board-certified internist, a board-certified pulmonary specialist, or a board-certified occupational physician that concludes that there is a greater than 50% likelihood or concludes that it is more likely than not (in either instance, referred to herein as a ***"Reasonable Degree of Medical Probability"***) that the plaintiff has the diagnosis of malignant mesothelioma. In order for a practitioner to be "board certified" under the Pfizer Claimant Settlement Agreements, the practitioner must currently be licensed to practice medicine in the District of Columbia or in one or more U.S. states or territories. In addition, a "board-certified" practitioner also must be currently certified by an American medical board with respect to the field in which the practitioner is board-certified. For example, a board-certified radiologist must be currently certified by the American Board of Internal Medicine in the specialty of radiology.

Lung Cancer 1

In order for a plaintiff to establish that he or she is suffering from lung cancer 1, the plaintiff must submit a statement from a board-certified pathologist, a board-certified internist, a board-certified oncologist, a board-certified pulmonary specialist, a board-certified radiologist or a board-certified occupational physician concluding to a Reasonable Degree of Medical Probability that the plaintiff has a primary carcinoma of the lung and that the plaintiff's asbestos exposure was causally related to the primary carcinoma in question. In addition, the plaintiff must also submit a report prepared by a ***"Certified B-reader."*** A Certified B-reader is defined in the Pfizer Claimant Settlement Agreement as an individual who has successfully completed the x-ray interpretation course sponsored by the National Institute of Occupational Safety and Health (***"NIOSH"***), who has passed the NIOSH examination for certification as a B-reader and whose NIOSH certification is up to date at the time of his or her interpretation of the plaintiff's x-rays. The Certified B-reader's report must show that the plaintiff has one or more of the following: a chest x-ray reading of 1/0 or higher on the ILO Grade, bilateral pleural plaques, bilateral pleural thickening or bilateral pleural calcification[6].

To the extent an ILO reading is not available for the plaintiff, instead of submitting the Certified B-reader's report, the plaintiff must submit a chest x-ray reading or report that finds one or more of the following, bilateral interstitial fibrosis, bilateral interstitial markings, bilateral pleural plaques, bilateral pleural thickening or bilateral pleural calcification, which in each case is consistent with, or compatible with, a diagnosis of an asbestos-related disease.

Lung Cancer 2

In order for a plaintiff to establish that he or she is suffering from lung cancer 2, the plaintiff must submit a statement from a board-certified pathologist, a board-certified internist, a board-certified oncologist, a board-certified pulmonary specialist, a board-certified radiologist or a board-certified occupational physician concluding to a Reasonable Degree of Medical Probability that the plaintiff has a primary carcinoma of the lung and that the plaintiff's asbestos exposure was causally related to the primary carcinoma in question.

---

[6] Under the terms of the Pfizer Claimant Settlement Agreements, the ***"ILO Grade"*** is the radiology rating for the presence of pleural or parenchymal lung changes by chest x-rays as established from time to time by the International Labor Organization (***"ILO"***) and as set forth in "Guidelines for the Use of ILO International Classification of Radiographs of Pneumoconioses (2000)."

Other Cancer

In order for a plaintiff to establish that he or she is suffering from a cancer other than lung cancer 1 or lung cancer 2, the plaintiff must submit a statement by a board-certified pathologist, a board-certified internist, a board-certified oncologist, a board-certified pulmonary specialist, a board-certified radiologist or a board-certified occupational physician concluding to a Reasonable Degree of Medical Probability that the plaintiff has a primary colorectal, esophageal, laryngeal, pharyngeal or stomach carcinoma and that the plaintiff's asbestos exposure was causally related to the carcinoma in question.

Asbestosis/Pleural Disease I

In order for a plaintiff to establish that he or she is suffering from asbestosis/pleural disease I, the plaintiff must submit documentation sufficient to satisfy one of the following three options. Under the first option, a plaintiff may submit a report by a board-certified pathologist, a board-certified pulmonary specialist, a board-certified internist or a board-certified occupational physician concluding to a Reasonable Degree of Medical Probability that the plaintiff has pulmonary asbestosis. Under this option, a plaintiff also must submit a report by a Certified B-reader showing that the plaintiff has a chest x-ray reading of 1/0 or higher on the ILO Grade. Under the second option, a plaintiff may submit a statement by a board-certified pathologist concluding to a Reasonable Degree of Medical Probability that more than one representative section of lung tissue otherwise involved with any other process (i.e., cancer or emphysema) demonstrates a pattern of peribronchiolar or parenchymal scarring in the presence of characteristic asbestos bodies, and that there is no other more probable explanation for the presence of the fibrosis other than asbestos exposure. Finally, under the third option, a plaintiff may submit a report by a Certified B-reader showing that the plaintiff has a chest x-ray reading of bilateral pleural disease of B2 or greater on the ILO Grade.

In addition to satisfying one of the foregoing three options, a plaintiff seeking to establish that he or she is suffering from asbestosis/pleural disease I also must submit a statement from a board-certified pulmonary specialist, a board-certified internist or a board-certified occupational physician concluding to a Reasonable Degree of Medical Probability that the plaintiff's asbestos exposure was causally related to the asbestos-related disease in question.

All plaintiffs seeking to establish asbestosis/pleural disease I must also submit to Pfizer the results of ***"Pulmonary Function Testing."*** Under the terms of the Pfizer Claimant Settlement Agreement, Pulmonary Function Testing is defined as standardized procedures used for testing lung function. These tests can measure how much air can be moved into and out of the lungs, various lung volumes, the capacity of the lungs to transfer gases from the alveoli into the blood, and the amount of gases in the blood. The results of a plaintiff's Pulmonary Function Testing must satisfy one of two standards under the terms of the Pfizer Claimant Settlement Agreement. Under the first set of standards, a plaintiff's Pulmonary Function Testing must show that the plaintiff's "forced vitality capacity" (***"FVC"***) is less than 80% of normal values. The "FVC" measures a person's ability to exhale as completely and quickly as possible after inhalation on a pulmonary function spirometry test. In addition, the results of the plaintiff's Pulmonary Function Testing under the first set of standards also must show that the ratio of the plaintiff's "forced expiratory volume in one second" (***"FEV1"***) when compared to a plaintiff's FVC is greater than or equal to 65%. The FEV1 measures the quantity of air forcefully expired in one second during pulmonary function spirometry test.

Under the second set of standards necessary to satisfy the Pulmonary Function Testing requirement, a plaintiff may submit the results of its Pulmonary Function Testing that shows "total lung capacity" (***"TLC"***) of less than 80% of normal values. The TLC measures the total amount of air that can be taken into the lungs by a person, including the air that cannot be exhaled, as measured by lung volume testing in a Pulmonary Function Testing.

Asbestosis/Pleural Disease II

In order for a plaintiff to establish that he or she is suffering from asbestosis/pleural disease II, the plaintiff must submit a report by a board-certified pathologist, a board-certified pulmonary specialist, a board-certified internist or a board-certified occupational physician concluding to a Reasonable Degree of Medical Probability that the plaintiff has pulmonary asbestosis. A plaintiff must also submit a report by a Certified B-reader showing that plaintiff has

one or more of the following, a chest x-ray reading of 1/0 or higher on the ILO Grade, bilateral pleural plaques, bilateral pleural thickening or bilateral pleural calcification.

To the extent an ILO reading is not available, the plaintiff must submit a chest x-ray reading or report that finds one or more of the following, bilateral interstitial fibrosis, bilateral interstitial markings, bilateral pleural plaques, bilateral pleural thickening or bilateral pleural calcification, which in each case is consistent with, or compatible with, a diagnosis of an asbestos-related disease.

In addition to the foregoing materials, a plaintiff also must submit a statement from a board-certified pathologist, a board-certified pulmonary specialist, a board-certified internist or a board-certified occupational physician concluding to a Reasonable Degree of Medical Probability that the plaintiff's asbestos exposure was causally related to the asbestos-related disease in question.

Other Asbestos Disease

In order for a plaintiff to establish that he or she qualifies for payment under the other asbestos disease category, the plaintiff must submit one of two types of reports.  The first report is a report by a board-certified pathologist, a board-certified pulmonary specialist, a board-certified internist or a board-certified occupational physician concluding to a Reasonable Degree of Medical Probability that the plaintiff has one or more of the following, bilateral interstitial fibrosis, bilateral interstitial markings, bilateral pleural plaques, bilateral pleural thickening, bilateral pleural calcification or an asbestos-related malignancy (except for mesothelioma), which in each case is consistent with, or compatible with, a diagnosis of an asbestos-related disease.

The second report that a plaintiff may submit to qualify for payment under the other asbestos disease category is a report by a Certified B-reader that shows that the plaintiff has one or more of the following, a chest x-ray reading of 1/0 or higher on the ILO Grade, bilateral pleural plaques, bilateral pleural thickening or bilateral pleural calcification.  To the extent an ILO reading is not available, a plaintiff must submit a chest x-ray reading or report that finds one or more of the following, bilateral interstitial fibrosis, bilateral interstitial markings, bilateral pleural plaques, bilateral pleural thickening or bilateral pleural calcification, which in each case, is consistent with, or compatible with, a diagnosis of an asbestos-related disease.

**(iii)**          Exposure Evidence

Under the terms of the Pfizer Claimant Settlement Agreements, plaintiffs also must submit evidence of exposure to an asbestos-containing product. Specifically, plaintiffs must provide Pfizer with evidence of exposure to asbestos or asbestos-containing products for which the plaintiff alleges Pfizer or one of its affiliate bears legal responsibility. Exposure evidence will be limited solely to documentary evidence, including affidavits or other sworn testimony, verified answers to interrogatories or trial or deposition testimony.  All evidence must demonstrate that the plaintiff was exposed to asbestos or an asbestos-containing product and be sufficient to defeat a motion for summary judgment under the law of the jurisdiction where the settling plaintiff's legal action is pending.

**(e)**          **Specific Provisions of the Pfizer Claimant Settlement Agreements**

As a result of additional post-petition settlements, the Pfizer Claimant Settlement Agreements contemplate an aggregate cash payment by Pfizer of approximately $450 million outside of Quigley's Chapter 11 Case.  From this cash payment, each Settling Plaintiff (described below) will be paid an agreed amount (the "***Settlement Amount***").  Under the Pfizer Claimant Settlement Agreements, a ***"Settling Plaintiff"*** is a plaintiff who satisfies the medical and exposure requirements described above and who agrees to be bound by the terms of the Pfizer Claimant Settlement Agreement.  The Settlement Amount for each Settling Plaintiff is principally dependent on which disease category the Settling Plaintiff qualifies for based on the Settling Plaintiff's satisfaction of the medical and exposure evidence requirements described above.  The Settlement Amount will be paid only if certain conditions are satisfied, including the delivery of a signed release to Pfizer, as described more fully below.

Under the Pfizer Claimant Settlement Agreements, each Settling Plaintiff only has settled its claim(s) against Pfizer and the other Pfizer Protected Parties, but not its claim(s) against Quigley.  Settling Plaintiffs' Asbestos PI Claims

against Quigley are fully preserved and are to be paid in accordance with the terms of the Asbestos PI Trust Distribution Procedures.

As executed, the Pfizer Claimant Settlement Agreements provided that if, as Quigley currently projects, the Asbestos PI Trust Assets are insufficient to satisfy 100% of the value attributed under the Asbestos PI Trust Distribution Procedures to the Asbestos PI Claims of all non-settling present Claimants and the estimated number of future Claimants as determined as of the Effective Date of the Plan, each Settling Plaintiff agreed to reduce the amount of its distribution from the Asbestos PI Trust to an amount not to exceed 10% of the payment percentage established in the Asbestos PI Trust Distribution Procedures for similarly-situated non-settling and future Claimants. As described in more detail below in Section V.C.10, the Bankruptcy Court found that this provision required the claim amount of holders of Asbestos PI Claims that entered into Pfizer Claimant Settlement Agreements to be reduced by 90% for purposes of voting on Quigley's prior plan. Based on this ruling, the Court held that holders of Asbestos PI Claims had not accepted that plan. As further described in more detail in Section V.C.10 below, Pfizer has agreed to waive the provision in the Pfizer Claimant Settlement Agreements that requires Settling Plaintiffs to reduce their distributions from the Asbestos PI Trust, provided that such waiver will be null and void and of no further force or effect in the event that the Effective Date of the Plan does not occur. Based on this waiver, claimants that become Settling Plaintiffs under the Pfizer Claimant Settlement Agreements will receive the same distribution from the Asbestos PI Trust as similarly situated non-settling holders of Asbestos PI Claims.

Pfizer's obligation to pay the Settlement Amount is subject to various conditions, including the following:

> Settling Plaintiffs must provide Pfizer with medical and exposure evidentiary support for their claims (as discussed above);

> Settling Plaintiffs must support any action by Pfizer or Quigley to preliminarily enjoin the further prosecution or commencement of personal injury actions against Pfizer and its affiliates during the pendency of Quigley's Chapter 11 Case;

> Each Settling Plaintiff must have delivered a valid release of all asbestos personal injury claims against the Pfizer Protected Parties, other than Quigley; Asbestos PI Claims against Quigley will be treated under the Plan in accordance with the Asbestos PI Trust Distribution Procedures and will be discharged and released under section 1141 of the Bankruptcy Code; and

> Quigley must have obtained a final order of the District Court for the Southern District of New York (the "*District Court*") confirming the Plan (or affirming an order of the Bankruptcy Court confirming the Plan), which is not subject to appeal, review or certiorari proceeding (the "*Settlement Agreement Effective Date*").

As of December 1, 2005, Pfizer became obligated to pay 50% of the Settlement Amount to the Settling Plaintiffs' counsel, for the benefit of the Settling Plaintiffs, to the extent Settling Plaintiffs had satisfied all of the above conditions except for the occurrence of the Settlement Agreement Effective Date. The remaining 50% balance of the Settlement Amount will be paid within five Business Days after the occurrence of the Settlement Agreement Effective Date.

As consideration for Pfizer's payment of the 50% advance, Settling Plaintiffs have agreed to release all asbestos personal injury claims against Pfizer and the other Pfizer Protected Parties (other than Quigley) and Settling Plaintiffs' counsel have agreed to a three-year moratorium on the filing of new asbestos personal injury claims against the Pfizer Protected Parties other than with respect to the filing of Asbestos PI Claims in the Chapter 11 Case. This moratorium will not apply to Settling Plaintiffs who need financial assistance on an immediate basis and who have first pursued and exhausted all sources of recovery from defendants other than the Pfizer Protected Parties.

2.      **Future Demand Holders' Representative**

Prior to the commencement of the Chapter 11 Case, Quigley selected Albert Togut to serve as the representative of the holders of future Demands alleging exposure to asbestos or asbestos-containing products allegedly manufactured by Quigley. Mr. Togut selected the law firm of Togut Segal & Segal LLP as his bankruptcy counsel and Kirkpatrick & Lockhart Nicholson Graham LLP as his special insurance counsel. Mr. Togut also retained Hamilton, Rabinovitz & Alschuler, Inc. to act as Mr. Togut's expert for the purpose of evaluating the Asbestos PI Claims against Quigley. Over a period of three months, Mr. Togut and his professionals conducted due diligence on Pfizer and Quigley and the Asbestos PI Claims, including the product history of Quigley. During that time, Mr. Togut and representatives of Quigley and Pfizer spent considerable time negotiating the general terms of the Quigley Contribution and the Pfizer Contribution (i.e., Quigley's and Pfizer's respective contributions to the Asbestos PI Trust) and the principal terms of the Asbestos PI Trust Distribution Procedures. Shortly before the commencement of the Chapter 11 Case, the parties reached an agreement in principle on the broad parameters of a resolution of these issues. For a detailed description of Pfizer's Contribution, Quigley's Contribution and the terms of the Asbestos PI Trust Distribution Procedures, *see* Sections VI.D and VII.A.7, respectively.

C.      **Commencement of the Chapter 11 Case**

The cost of defending and resolving the personal injury claims against Quigley and Pfizer has been and is substantial. As of the Petition Date, Quigley and Pfizer had incurred approximately $1.04 billion in settlement payments or judgments with respect to asbestos personal injury and wrongful death claims and incurred approximately $179 million to defend these claims. As of the Petition Date, Quigley was defending approximately 160,000 pending asbestos personal injury claims, and when Quigley solicited acceptances and rejections of its prior plan, 209,171 claimants who claim to hold asbestos personal injury claims voted. When coupled with the bankruptcies of nearly 70 asbestos defendants, the pressure on Quigley in the tort system had grown to intolerable levels. Quigley currently estimates that the remaining coverage potentially available to it under the Shared Asbestos Insurance Policies, the Insurance Settlement Agreements and the AIG Insurance Settlement Agreement, together with the amounts contained in the Insurance Settlement Proceeds Trust, will not be sufficient to satisfy in full the pending and future Asbestos PI Claims asserted against Quigley. Accordingly, Quigley commenced its Chapter 11 Case to conserve its remaining assets and to afford it time to formulate a chapter 11 reorganization plan that will satisfy the requirements of section 524(g) of the Bankruptcy Code, and treat all present and future Claimants fairly and equitably.

## V.      THE CHAPTER 11 CASE

A.      **General**

On September 3, 2004, Quigley filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court in order to resolve its liability for the Asbestos PI Claims under a court-supervised reorganization process. The case is being administered as *In re Quigley Company, Inc.*, Case No. 04-15739 (SMB), and was originally administered by the Honorable Prudence Carter Beatty, a United States Bankruptcy Court Judge for the Southern District of New York. As of January 24, 2006, the case was reassigned to the Honorable Stuart M. Bernstein, a United States Bankruptcy Court Judge for the Southern District of New York.

Quigley continues to operate its business and manage its properties as a debtor in possession subject to the provisions of the Bankruptcy Code. Pursuant to the provisions of the Bankruptcy Code, Quigley is not permitted to pay any Claims that arose prior to the Petition Date unless specifically authorized by the Bankruptcy Court. Similarly, Claimants may not enforce any Claims against Quigley that arose prior to the Petition Date unless specifically authorized by the Bankruptcy Court. In addition, as a debtor in possession, Quigley has the right, subject to the Bankruptcy Court's approval, to assume or reject any Executory Contracts and unexpired leases in existence at the Petition Date. Parties having Claims as a result of any such rejection may file proofs of claim with the Bankruptcy Court, which will be addressed as part of the Chapter 11 Case.

Both before and after the Petition Date, Quigley, Pfizer, the Future Demand Holders' Representative and the Creditors' Committee (or certain of its members with respect to prepetition negotiations) have been engaged in

extended substantive negotiations regarding the terms of the Plan and the Asbestos PI Trust Distribution Procedures, as well as the terms of the Pfizer Contribution and the Quigley Contribution to the Asbestos PI Trust to be created under the Plan.

**B.** **Professionals Retained in the Chapter 11 Case**

**1.** **Quigley's Attorneys and Advisers**

The principal professionals that Quigley has retained with respect to chapter 11 matters are as follows:

| **Attorneys** | **Claims, Noticing and Ballot Agent** |
|---|---|
| Schulte Roth & Zabel LLP | ~~The~~**Wells Fargo** Trumbull ~~Group, L.L.C.~~ |
| 919 Third Avenue | Griffin Center |
| New York, NY  10022 | 4 Griffin Road North |
| (212) 756-2000 | Windsor, CT 06095 |
| Attn:  Michael L. Cook | (860) 687-7579 |
| | Attn:  Rhonda Collum |

**Pharmaceutical Products Evaluation Consultant**

The Foresight Group
2300 Computer Avenue
Willow Grove, PA 19090
(215) 628-3695
Attn:  Pieter van Hoeven

**2.** **Creditors' Committee and Future Demand Holders' Representative**

On September 22, 2004, the United States Trustee for the Southern District of New York (the "*U.S. Trustee*"), pursuant to its authority under section 1102 of the Bankruptcy Code, appointed the Creditors' Committee.  By final order dated September 27, 2004, the Bankruptcy Court approved the appointment of Albert Togut as the Future Demand Holders' Representative.  The Creditors' Committee and the Future Demand Holders' Representative have participated actively in all aspects of the Chapter 11 Case.

**(a)** **Creditors' Committee**

The Creditors' Committee currently consists of the following seven members.  The law firm representing each member of the Creditors' Committee is indicated in the parentheses.

Kathleen LoPresti (Kelley & Ferraro LLP)

Thomas Geoffrey Langved (Baron & Budd, P.C.)

Lyle Lewis (Brayton Purcell)

Thomas Bailey (Law Offices of Cooney & Conway)

Ricardo Whitehead (Simmons Cooper, LLC)

James Brennan (Weitz & Luxenberg, P.C.)

T.J. Littlefield (Silber Pearlman LLP)

Workshare DeltaView comparison of interwovenSite://NYCMS/NEWYORK/10435708/6 and interwovenSite://NYCMS/NEWYORK/10435708/7. Performed on 3/28/2008.

The Creditors' Committee has retained the following professionals:

| Attorneys | Accountants and Financial Advisor |
|---|---|
| Caplin & Drysdale, Chartered<br>1 Thomas Circle NW<br>Washington, DC 20005<br>(202) 862-5000<br>Attn: Peter Van N. Lockwood | ~~L. Tersigni Consulting, P.C.~~<br>~~2001 W. Main Street, Suite 220~~<br>~~Stamford, CT 06902~~<br>~~(203) 569-9090~~**Charter Oak Financial Consultants, LLC**<br>**430 Center Ave.**<br>**Mamaroneck, NY 10543**<br>**(914) 372-1874** |
| Caplin & Drysdale, Chartered<br>399 Park Avenue, 27th Floor<br>New York, NY 10022<br>(212) 319-7125<br>Attn: Elihu Inselbuch | Attn: ~~————————~~**Brad M. Rapp**<br><br>**Asbestos Personal Injury Consultants** |
| | Legal Analysis Systems<br>970 Calle Arroyo<br>Thousand Oaks, CA 91360<br>(805) 499-3572<br>Attn: Mark Peterson |

**(b)    Future Demand Holders' Representative**

The Future Demand Holders' Representative has retained the following professionals:

| Attorneys | Asbestos Personal Injury Consultants |
|---|---|
| Togut, Segal & Segal LLP<br>One Penn Plaza<br>New York, NY 10019<br>Bankruptcy Counsel<br>(212) 594-5000<br>Attn: ~~Scott E~~**Richard K**. ~~Ratner~~**Milin** | Hamilton, Rabinovitz & Alschuler, Inc.<br>26384 Carmel Rancho Lane, Suite 202<br>Carmel, CA 93923<br>(831) 626-1350<br>Attn: Francine Rabinovitz |
| Kirkpatrick & Lockhart Preston Gates Ellis LLP<br>Henry W. Oliver Building<br>535 Smithfield Street<br>Pittsburgh, PA 15222-2312<br>(412) 355-6500<br>Special Insurance Counsel<br>Attn: Donald Seymour | |

## C.    Significant Events During the Chapter 11 Case

### 1.    Stay of Asbestos and Silica Personal Injury Claims Against Pfizer

To preserve Quigley's most significant assets, the Shared Asbestos Insurance Policies, the Insurance Settlement Agreements, the AIG Insurance Settlement Agreement, and the funds in the Insurance Settlement Proceeds Trust, Quigley commenced an adversary proceeding in the Bankruptcy Court on the Petition Date, pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Rule 7065 of the Bankruptcy Rules in the Bankruptcy Court, against: (a) all current and future claimants who have asserted or may assert claims against Pfizer, which allege personal injury or wrongful death based on purported exposure to asbestos, silica, mixed dust, talc or vermiculite; and (b) any party who attempts to take action against any property in which both Pfizer and Quigley have a legal, equitable, beneficial, contractual or other interest including, without limitation, the Shared Asbestos Insurance

Policies and the funds in the Insurance Settlement Proceeds Trust (Adv. Proc. No. 04-04262 (SMB)). In the adversary proceeding, Quigley sought a declaratory judgment that the automatic stay of section 362(a) of the Bankruptcy Code stays the commencement or continuation of these claims and an injunction under section 105(a) of the Bankruptcy Code.

In connection with the commencement of the adversary proceeding, Quigley also filed a motion seeking a temporary restraining order and preliminary injunction staying all pending and future asbestos personal injury claims against Pfizer. Quigley sought this relief because, absent a stay of the asbestos personal injury claims against Pfizer, the Shared Asbestos Insurance Policies and the funds in the Insurance Settlement Proceeds Trust would be depleted. In other words, if Pfizer were required to continue to defend the asbestos personal injury claims pending against it, Quigley could be left with significantly fewer assets to fund its Plan.

The Bankruptcy Court issued a temporary restraining order on September 7, 2004, staying all pending and future asbestos personal injury claims against Pfizer, and prohibiting any party from taking any action against property shared by Quigley and Pfizer, including the Shared Asbestos Insurance Policies and the funds in the Insurance Settlement Proceeds Trust. The temporary restraining order also provided for a hearing on Quigley's request for a preliminary injunction on September 27, 2004. By order dated September 27, 2004, the Bankruptcy Court adjourned the hearing on the preliminary injunction and extended the duration of the temporary restraining order until completion of the hearing on the preliminary injunction.

The Bankruptcy Court held the preliminary injunction hearing on November 1 and 17, 2004. At the conclusion of the November 17 hearing, the Bankruptcy Court approved Quigley's request for a preliminary injunction. The Bankruptcy Court held a further hearing on the form of the preliminary injunction order on December 13, 2004 and, on December 17, 2004, issued the preliminary injunction staying the prosecution of (a) all current and future claims or actions against Pfizer that allege personal injury or wrongful death based on purported exposure to asbestos, silica, mixed dust, talc or vermiculite; and (b) any attempts by any party to take action against any property in which both Pfizer and Quigley have a legal, equitable, beneficial, contractual or other interest, including, without limitation, the Shared Asbestos Insurance Policies and the funds in the Insurance Settlement Proceeds Trust, during the pendency of the Chapter 11 Case.

On December 27, 2004, the Ad Hoc Committee of Tort Victims (the "*Ad Hoc Committee*") and Reaud, Morgan & Quinn, L.L.P. ("*Reaud Morgan*"), each of which had previously objected to the issuance of the preliminary injunction, moved for leave to appeal from the Bankruptcy Court's preliminary injunction order. The motion(s) for leave to appeal were assigned to United States District Court Judge Victor Marrero. In a decision and order dated April 8, 2005, Judge Marrero held that the preliminary injunction order was not a final, appealable order and denied the motions for leave to appeal.

On November 16, 2006, certain claimants who allegedly hold asbestos personal injury claims against Pfizer, and not Quigley, filed a motion in the Bankruptcy Court for relief from the preliminary injunction, asserting, among other things, that the claimants were not precluded by the terms of the preliminary injunction from suing Pfizer because they were not claimants at the time the preliminary injunction was issued and they therefore did not receive actual notice of the injunction. On December 7, 2006, Quigley and Pfizer filed an objection to the claimants' motion, asserting, among other things, that the preliminary injunction by its terms enjoins future claimants. On December 14, 2006, the Bankruptcy Court held a hearing on the claimants' motion, but reserved decision. On January 10, 2007, the Bankruptcy Court directed the parties to submit additional briefing on the issue of whether claimants who did not receive actual notice of the injunction could be bound to the preliminary injunction. Following the parties' submission of those briefs, the Bankruptcy Court ruled on January 31, 2007, that the preliminary injunction could bind claimants that had not received actual notice of the adversary proceeding or the preliminary injunction. On March 6, 2007, the claimants' counsel advised the Bankruptcy Court that they had negotiated a satisfactory resolution of their motion with counsel for Pfizer and Quigley, and they withdrew their motion.

**On May 2, 2007, in connection with its Trustee Motion (described below in Section V.C.13), the Ad Hoc Committee requested, among other things, that the Bankruptcy Court modify the Preliminary Injunction to allow claimants to assert asbestos-related claims against Pfizer that are not based on Quigley's products. Quigley, Pfizer and the Ad Hoc Committee negotiated modifications to the Preliminary Injunction, and,**

**following status conferences on October 2, November 6, and December 6, 2007, the Bankruptcy Court approved the amended Preliminary Injunction.**

## 2. Employee-Related Matters

On September 9, 2004, Quigley obtained an order of the Bankruptcy Court authorizing Quigley to pay its employees for prepetition wages, salaries, and other compensation, in an effort to maintain the continued support, cooperation, and morale of its employees and to minimize any salary, wage, and employee benefit disruptions that might have been resulted from the commencement of the Chapter 11 Case.

In addition, on March 17, 2005, the Bankruptcy Court entered an order granting Quigley's request to assume retention allowance agreements with eight employees of its Claims Handling Unit. Under these agreements, each employee ~~is entitled to receive~~**received** a retention bonus from Quigley equal to his or her annual base salary ~~if the employee remains employed by Quigley through the earlier of: (a) July 15, 2006; and (b) the date that Quigley ceases to exist in its present form, whether due to merger, acquisition, spin-off, liquidation, change in control or ownership or sale or transfer of assets. Quigley's aggregate maximum potential liability under the eight agreements is~~**on July 15, 2006. Quigley's aggregate payment on account of the eight retention bonuses was** $580,900.

On May 25, 2005, the Bankruptcy Court entered an order extending the employment agreement of Paul A. Street, Quigley's President, for one year, to May 25, 2006. On June 27, 2006, the Bankruptcy Court entered an order extending the same employment agreement for an additional year, to May 24, 2007. **From May 25, 2007 through March 31, 2008, Mr. Street continued to serve as Quigley's President on an at-will basis.**

The Bankruptcy Court entered an order on July 16, 2007, authorizing Quigley to assume its retention allowance agreement with Kim D. Jenkins, Quigley's Senior Vice President, Treasurer and director of its Claims Handling Unit. **As described above, on March 19, 2008, Quigley's Board of Directors appointed Ms. Jenkins as Quigley's President, effective April 1, 2008. She will serve as Quigley's President on an at-will basis.**

## 3. Use of Cash Collateral and the DIP Credit Facility

The Bankruptcy Court entered an interim order on September 7, 2004, authorizing Quigley to use Pfizer's cash collateral in an amount not to exceed $365,615 in accordance with an agreed upon budget. In consideration for such use, the Bankruptcy Court authorized Quigley to grant Pfizer, as adequate protection for use of such cash collateral and for any decline in value of Pfizer's prepetition collateral:

> (a) a senior and perfected priming security interest and lien on: (i) all of Pfizer's prepetition collateral under the Senior Secured Loan Facility, and (ii) all postpetition collateral (excluding Avoidance Actions); and

> (b) superpriority administrative expense status over any and all other expenses or claims against Quigley, except for certain expenses carved out in such order for certain Fee Claims.

On September 27, 2004, the Bankruptcy Court entered the Final DIP/Cash Collateral Order, authorizing Quigley to further use Pfizer's cash collateral and to amend the Senior Secured Loan Facility to authorize Quigley to borrow from Pfizer postpetition (as amended, the "***DIP Credit Facility***").

Pursuant to the terms of the Final DIP/Cash Collateral Order and the DIP Credit Facility:

> Quigley may use Pfizer's prepetition cash collateral up to a maximum principal amount of $~~20~~**30** million. If such accessible cash collateral is at any time less than $~~20~~**30** million, Quigley will have access to financing under a revolving credit facility up to a maximum of $20 million; provided, however, that availability under the revolving credit facility will be reduced by the sum of: (a) cash collateral available to Quigley in a certain secured account; and (b) cash collateral

used by Quigley between the Petition Date and the date of entry of the Final DIP/Cash Collateral Order.

Quigley may use cash collateral and/or proceeds of the DIP Credit Facility to pay ordinary course business expenses incurred in operating its business or expenses for the administration of the Chapter 11 Case, consistent with an agreed upon budget.

All loans and all other obligations under the DIP Credit Facility are (a) entitled to superpriority claim status pursuant to section 364(c)(1) of the Bankruptcy Code; and (b) secured by a first priority perfected priming lien on and security interest in all of Quigley's current and future assets (other than certain insurance policies) pursuant to sections 364(c)(2) and 364(d) of the Bankruptcy Code, subject in each case to a carve out from such superpriority status and liens for (x) the payment of allowed and unpaid Professional fees and disbursements incurred by Quigley, the Creditors' Committee, or the Future Demand Holders' Representative, but to the extent an event of default occurs under the DIP Credit Facility, the carve out for such Professional fees and disbursements will be an aggregate amount not to exceed $700,000, (y) the payment of U.S. Trustee and Bankruptcy Court clerk fees, and (z) the payment of Chapter 7 trustee fees in an aggregate amount not to exceed $15,000.

As adequate protection for the granting of the priming liens and for use of Pfizer's prepetition cash collateral, Pfizer was granted a replacement second priming lien on its prepetition collateral and second lien on postpetition collateral (in each case, other than certain insurance policies). As additional adequate protection for the use of its cash collateral, Pfizer's claim for use of cash collateral is entitled to superpriority status pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, subject to the carve out expenses described above and the superpriority claims granted to Pfizer with respect to Quigley's obligations under the DIP Credit Facility.

The term of the DIP Credit Facility extends through ~~February 19,~~**August 18,** 2008, or such earlier date as provided in the Senior Secured Loan Facility.

As of the date of this Disclosure Statement, there were no outstanding borrowings or other obligations under the DIP Credit Facility and Quigley anticipates that there will be no borrowings prior to ~~June~~**September** 1, 2008, the assumed Effective Date of the Plan.

## 4.      Real Property Matters

The Bankruptcy Court entered an order on December 7, 2004, authorizing Quigley to assume an office sublease for the premises at which its headquarters and Claims Handling Unit are located. ~~Under the sublease, which has a term of 3~~**The sublease expired in January, 2008.**

**The Bankruptcy Court entered an order on March 3, 2008, authorizing Quigley to enter into a new office lease for the same premises at which its headquarters and Claims Handling Unit are now located. Under the lease, which has a term of 5** years ~~and 5 months~~ from its ~~August 12, 2004~~**February 1, 2008** inception, Quigley ~~pays $27,377.24~~**will pay approximately $46,000.00** per month for basic rent and other charges.

## 5.      Judicial Recusal Motion

On October 4, 2004, the Creditors' Committee filed a motion requesting that Judge Beatty recuse herself from presiding over the Chapter 11 Case (the "*Recusal Motion*"). The Ad Hoc Committee joined the Recusal Motion on October 26, 2004. The Bankruptcy Court entered an order (the "*Recusal Order*") denying the Recusal Motion on November 1, 2004.

The Creditors' Committee and the Ad Hoc Committee filed a petition seeking a Writ of Mandamus directing recusal on November 12, 2004. On November 30, 2004, Quigley and Pfizer filed an opposition brief to the Ad Hoc Committee's Writ of Mandamus petition. In addition, on November 18, 2004, the Creditors' Committee moved for

leave to appeal to the District Court from the Recusal Order. Both the petition and motion for leave to appeal were assigned to United States District Judge Charles Haight. On December 1, 2004, Judge Haight issued a memorandum and order finding that the petition had been subsumed by the motion and advising that he would determine the motion without the need for oral argument. Subsequently, on February 2, 2005, Judge Haight issued an opinion and order denying the motion for leave to appeal.

On February 10, 2005, Judge Haight issued a memorandum and order authorizing the Ad Hoc Committee to file a reply brief by February 17, 2005 to Quigley and Pfizer's opposition to the Ad Hoc Committee's Mandamus petition, following which he would consider the merits of the petition. On February 17, 2005, the Ad Hoc Committee filed its reply brief.

On February 28, 2005, Judge Haight issued a further memorandum and order advising the parties that Judge Haight owns shares of stock in Pfizer. The memorandum advised that 28 U.S.C. § 455(d)(4), a statute governing recusal of judges, provides that a judge will disqualify himself in a case where he has a financial interest in a party to the proceeding. Judge Haight's memorandum directed Quigley and the Ad Hoc Committee to file and serve letter briefs by March 15, 2005, addressing the issue of whether Pfizer is a "party" within the meaning of 28 U.S.C. § 455(d)(4) in the proceeding before him. The memorandum further provided that if it were determined that Pfizer is a "party" within the meaning of the statute, Judge Haight would recuse himself from the matter. On March 15, 2005, Quigley, Pfizer, the Ad Hoc Committee, and the Creditors' Committee submitted letter briefs in response to Judge Haight's memorandum. A decision on the petition for the Writ of Mandamus was stayed pending a determination on this issue.

On February 28, 2005, United States District Court Judge William H. Pauley, III, issued an order concurring with Judge Haight's February 2, 2005 order, which held that the Recusal Order was not a final order and that the Creditors' Committee's motion for leave to appeal was denied.

By letter dated March 23, 2005, Judge Haight advised the Creditors' Committee's counsel, and requested that they advise the other parties, that Judge Haight had recused himself from the matter. On April 7, 2005, the matter was reassigned to United States District Judge Victor Marrero. On July 5, 2005, Judge Marrero issued a decision and order denying the petition for a Writ of Mandamus.

The Creditors' Committee and the Ad Hoc Committee filed a notice of appeal from Judge Marrero's order denying the petition for a Writ of Mandamus on August 3, 2005, Case No. 05-4250-BK. They simultaneously filed a petition in the Court of Appeals for the Second Circuit seeking a Writ of Mandamus directing recusal, Case No. 05-4028-OP. A pre-argument conference was held on October 18, 2005, and the Court of Appeals issued a briefing schedule under which oral argument was to occur no earlier than late-January 2006. On January 9, 2006, Judge Beatty took a medical leave of absence. On January 19, 2006, the Court of Appeals addressed a letter to the parties inquiring whether the appeal had been rendered moot as a result of Judge Beatty's leave of absence. On January 24, 2006, Quigley informed the Court of Appeals that the Chapter 11 Case had been reassigned from Judge Beatty to Judge Bernstein. The Court of Appeals concluded on that date that the appeal had been rendered moot, and on or about February 7, 2006, the Court of Appeals removed the appeal from the oral argument calendar. On May 9, 2007, the Court of Appeals issued a mandate that the notice of appeal filed by the Creditors' Committee and the Ad Hoc Committee was dismissed as moot.

## 6. Disclosure Requirements

Quigley and Pfizer moved (the "*Rule 2019 Motion*") on November 9, 2004 for an order, among other things, striking the objections of the Ad Hoc Committee and Reaud Morgan to Quigley's motion for a preliminary injunction and disqualifying the members of the Ad Hoc Committee, Reaud Morgan, and their counsel from representing personal injury Claimants in the Chapter 11 Case for failure to comply with the disclosure requirements of Rule 2019 of the Bankruptcy Rules. On November 17, 2004, the Bankruptcy Court held a hearing on the Rule 2019 Motion and directed the United States Trustee to oversee compliance with the disclosure requirements of Federal Rule of Bankruptcy Procedure 2019. Consequently, the United States Trustee submitted a proposed Bankruptcy Rule 2019 order on December 15, 2004. After a series of discussions among counsel for Quigley, Pfizer, the Ad Hoc Committee, and Reaud Morgan, and a hearing on January 21, 2005 with respect to the

form of the order, the United States Trustee withdrew the proposed order in response to certain concerns raised by the Bankruptcy Court.

**7.        The Bar Date (for Claims other than Asbestos PI Claims)**

On November 19, 2004, Quigley filed with the Bankruptcy Court its Schedules.  In the Schedules, Quigley listed a total of approximately 162,000 Claims.

On June 22, 2005, Quigley filed a motion seeking an order fixing a bar date for the filing of proofs of claim against Quigley's estate for all Claims except for Asbestos PI Claims and certain other excluded Claims described below.  By order dated July 26, 2005 (the "***Bar Date Order***"), the Bankruptcy Court set a bar date of September 15, 2005 (the "***Bar Date***").  Holders of Claims alleging exposure to silica allegedly contained in a Quigley product were subject to the Bar Date.

Quigley mailed notices of the Bar Date and proof of claim forms to all the entities identified in the Schedules other than holders of Asbestos PI Claims (the "***Bar Date Notice***").  Along with the Bar Date Notice sent to counsel for claimants who have asserted silica claims against Quigley, Quigley attached a list of the plaintiffs Quigley believes such counsel represents.

Notice of the Bar Date was published once in *USA Today*, the national edition of *The Wall Street Journal* and *Mealey's Litigation: Silica*.

Pursuant to the Bar Date Order, each Creditor holding a prepetition Claim (other than an Asbestos PI Claim) was required, subject to certain limited exceptions, to file a proof of claim on or before the Bar Date.  Specifically, as provided in the Bar Date Notice, the following types of creditors were not required to file proofs of claim on or before the Bar Date:

> Creditors holding Claims that already had been properly filed with the clerk of the Bankruptcy Court or ~~the~~**Wells Fargo** Trumbull ~~Group, L.L.C.~~ using a claim form that substantially conforms to Official Form No. 10;

> Creditors holding Claims that (a) are listed on the Schedules, (b) are not described in the Schedules as "disputed," "contingent, " or "unliquidated," and (c) are in the same amount and of the same nature as set forth in the Schedules;

> Creditors asserting an Administrative Claim against Quigley's chapter 11 estate under section 503(b) or 507(a) of the Bankruptcy Code;

> Creditors holding Claims that had been Allowed by an order of the Bankruptcy Court entered on or before the Bar Date;

> Creditors holding Claims for which specific deadlines previously have been fixed by the Bankruptcy Court;

> Creditors holding Claims that had been paid in full by Quigley; and

> Creditors holding Asbestos PI Claims (other than a Claim for contribution, indemnity, reimbursement or subrogation).

Pursuant to the Bar Date Order, if a creditor that was required to file a proof of claim on or prior to the Bar Date fails to do so, then that creditor will be forever barred from asserting a Claim against Quigley or its Estate. Additionally, to the extent a holder of an Asbestos PI Claim or its counsel filed a proof of claim on account of such Asbestos PI Claim, such proof of claim on account of such Asbestos PI Claim will be automatically disallowed

without prejudice to the holder of such Asbestos PI Claim or its counsel to refile such Claim against the Asbestos PI Trust.

As of the date hereof, Quigley has received and processed approximately 4,360 proofs of claim, 4,302 of which assert Silica PI Claims.

Basic information regarding Claims that have been scheduled and filed in the Chapter 11 Case can be accessed using the following website: www.quigleyreorg.com.

**8.      The Prior Solicitation Procedures Order**

On August 17, 2005, Quigley filed with the Bankruptcy Court a motion (the "***Prior Solicitation Procedures Motion***") for an order establishing solicitation and voting procedures with respect to Quigley's third amended plan of reorganization (the ***"Third Amended Plan"***).   The proposed procedures were designed to address the unique circumstances of a mass-tort bankruptcy case.   The Bankruptcy Court approved portions of the Prior Solicitation Procedures Motion and entered an order on January 23, 2006 (the "***Prior Solicitation Procedures Order***").   The Bankruptcy Court, however, deferred resolution of all issues regarding the appropriate procedure to be used for tabulating votes cast by holders of Asbestos PI Claims on the Third Amended Plan.

The Prior Solicitation Procedures Order: (i) approved a prior disclosure statement for use in connection with Quigley's solicitation of votes on the Third Amended Plan; (ii) approved the proposed form of ballots and master ballot; (iii) established March 31, 2006 as the voting deadline with respect to the Third Amended Plan;   (iv) approved procedures for soliciting votes to accept or reject the Third Amended Plan; (v) approved a solicitation package to be mailed to certain interested parties; (vi) scheduled a confirmation hearing and the deadline for filing objections to the Third Amended Plan; and (vii) established certain notice procedures.

In light of the difficulties of estimating each Class 4 Asbestos PI Claim individually, the Prior Solicitation Procedures Motion requested that all Class 4 Asbestos PI Claims be estimated at $1.00 for voting purposes only. Certain parties objected to that portion of the Prior Solicitation Procedures Motion, asserting that claimants suffering from more serious diseases should be permitted to vote a higher claim amount than claimants with less serious illnesses.   The objecting parties also argued that holders of Class 4 Asbestos PI Claims who are parties to Pfizer Claimant Settlement Agreements should have their claim amounts estimated for voting purposes at 10% of the claim amount of similarly-situated non-settling holders of Class 4 Asbestos PI Claims, to reflect the Settling Plaintiffs' agreement to reduce their distributions from the Asbestos PI Trust by up to 90% under certain circumstances.   As noted above, the Bankruptcy Court reserved decision on these issues but ordered Quigley to require holders of Asbestos PI Claims to indicate on their ballots: (1) whether their claims were based on mesothelioma, lung cancer, or another asbestos disease; and (2) whether they were party to a Pfizer Claimant Settlement Agreement.

**9.      The Solicitation of Acceptances and Rejections of the Third Amended Plan**

On January 31, 2006, the Ballot Agent mailed solicitation packages to holders of Claims and Equity Interests pursuant to the Prior Solicitation Procedures Order.   Holders of Claims and Equity Interests, including the holders of 209,171 Class 4 Asbestos PI Claims, individually or through counsel, delivered Ballots or Master Ballots to the Ballot Agent through the voting deadline, March 31, 2006.   On May 2, 2006, the Ballot Agent filed its Declaration of Daniel P. McSwigan Certifying Tabulation of Ballots Regarding Vote on Debtor's Third Plan of Reorganization (as supplemented from time to time, the "***Tabulation Certification***").   According to the Tabulation Certification, all classes of Claims, including Class 4 Asbestos PI Claims, and Equity Interests voted to accept Quigley's Third Amended Plan.

**10.     The Asbestos PI Claims Estimation Order**

As discussed above, in the Prior Solicitation Procedures Order, the Bankruptcy Court had reserved decision on the appropriate method to tabulate the votes of holders of Class 4 Asbestos PI Claims.   Following a discovery conference before the Bankruptcy Court on May 17, 2006, Quigley, Pfizer and the Ad Hoc Committee filed further

memoranda addressing the issues of: (a) which methodology the Bankruptcy Court should use to estimate for voting purposes the claim amount for holders of Asbestos PI Claims who voted on the Third Amended Plan; and (b) whether holders of Asbestos PI Claims that entered into Pfizer Claimant Settlement Agreements who voted on the Third Amended Plan should have their claim amount discounted for voting purposes to reflect their agreement to reduce their distributions from the Asbestos PI Trust. The Bankruptcy Court held a hearing on June 14, 2006, and issued its Memorandum Decision and Order Estimating Asbestos PI Claims for Voting Purposes Only (the "**Asbestos PI Claims Estimation Order**") on August 9, 2006. In the Asbestos PI Claims Estimation Order, the Bankruptcy Court ruled that: (a) Asbestos PI Claims would be estimated for voting purposes according to the amounts assigned in the Asbestos PI Trust Distribution Procedures for the diseases that the Asbestos PI Claim holders identified on their ballots; and (b) the claim amount of holders of Asbestos PI Claims that entered into Pfizer Claimant Settlement Agreements would be reduced for voting purposes to 10% of the amounts assigned in the Asbestos PI Trust Distribution Procedures for the diseases that these claimants identified on their ballots. As a result of the rulings in the Asbestos PI Claims Estimation Order, the Bankruptcy Court concluded that less than two-thirds in amount of the allowed claims voting in Class 4 under the Third Amended Plan had voted to accept the Third Amended Plan, and that the Third Amended Plan therefore could not be confirmed consensually under section 1129(a) of the Bankruptcy Code.

On August 21, 2006, Quigley and Pfizer filed a motion (the "**Reconsideration Motion**") requesting that the Bankruptcy Court reconsider the Asbestos PI Claims Estimation Order. Certain parties filed objections to the Reconsideration Motion, and in a bench ruling on September 28, 2006, the Bankruptcy Court denied the Reconsideration Motion. In connection with the Reconsideration Motion, Quigley advised the Bankruptcy Court of its position that notwithstanding the Asbestos PI Claims Estimation Order, and even if the claim amounts of certain holders of Asbestos PI Claims that entered into Pfizer Claimant Settlement Agreements are discounted by 90% for voting purposes, Class 4 holders of Asbestos PI Claims had in fact voted to accept the Third Amended Plan. During the course of discovery on the issue of whether the Third Amended Plan had been accepted by holders of Asbestos PI Claims, Quigley and Pfizer ultimately determined that it was in the best interests of Quigley's creditors and estate to avoid further litigation on the tabulation issue, and to modify the Third Amended Plan to eliminate the provisions that required Settling Plaintiffs to reduce their distributions from the Asbestos PI Trust.

On May 18, 2007, Quigley filed its fourth amended plan of reorganization, which provides that Pfizer has waived the obligation contained in the Pfizer Claimant Settlement Agreements that holders of Asbestos PI Claims who entered into such agreements and become Settling Plaintiffs must reduce the amount of their Distributions from the Asbestos PI Trust. In addition, following further negotiations with the Future Demand Holders' Representative, Pfizer has agreed to make additional financial contributions to the Asbestos PI Trust on the Effective Date in the aggregate amount of $95.1 million and to enter into the five-year Pfizer Claims Services Agreement, pursuant to which Pfizer will pay Quigley $5 million per year in exchange for Quigley's continued claims handling servces. These amounts, having an aggregate value of approximately $120.1 million, are intended, among other things, to maintain the payment percentage of 7.5% based on current projections of claims and assets available for distribution to claimants and to ensure that there will be sufficient funds to satisfy the administrative costs of the Asbestos PI Trust. The Payment Percentage (defined below) will remain at 7.5%.

11.     **Quigley and Pfizer's Motion to Partially Withdraw the Reference with Respect to Confirmation**

As discussed above, section 524(g) of the Bankruptcy Code requires the District Court to issue or affirm an injunction under that section, such as the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, and the Non-Settling Asbestos Insurance Entity Injunction contained in the Plan. Accordingly, on April 19, 2006, Quigley and Pfizer filed a motion (the "**Motion to Partially Withdraw the Reference**") in the District Court, requesting that the District Court partially withdraw the reference of the Chapter 11 Case from the Bankruptcy Court to the District for the purpose of conducting a hearing to consider confirmation of the Third Amended Plan. In the Motion to Partially Withdraw the Reference, Quigley and Pfizer proposed that the District Court and the Bankruptcy Court preside jointly over a confirmation hearing, arguing that a joint confirmation hearing was the most efficient way to satisfy section 524(g) of the Bankruptcy Code. Pfizer and Quigley also referred the District Court to other section 524(g) bankruptcy cases where a district court and a bankruptcy court presided jointly over the confirmation hearing. The Motion to Partially Withdraw the Reference is docketed in the District Court as *In re Quigley Company, Inc.*, Case No. 06-03077-LAP.

On May 3, 2006, certain insurance companies filed an objection to the Motion to Partially Withdraw the Reference. These objecting insurers include Century Indemnity Company, Insurance Company of North America, Highlands Insurance Company, Westchester Fire Insurance Company, Central National Insurance Company of Omaha through its managing general agent Cravens Dargan & Co., Pacific Coast, and Motor Vehicle Casualty Company through its managing general agent Cravens Dargan & Co., Pacific Coast (collectively the *"ACE Insurers"*). Each of the ACE Insurers issued insurance policies to Pfizer that Quigley and Pfizer believe provide coverage for asbestos personal injury claims. In their objection to the Motion to Partially Withdraw the Reference, the ACE Insurers argued that there is no statutory authority for the joint confirmation hearing that Quigley and Pfizer proposed. On July 18, 2006, Continental Insurance Company and The Continental Casualty Company joined in the ACE Insurers' objection.

On August 10, 2006, the District Court ordered the parties to the Motion to Partially Withdraw the Reference to confer and to advise the District Court on the status of the proceeding. Quigley advised the District Court that the proceedings on the Asbestos PI Claims Estimation Decision, the Estimation Reconsideration Motion, and later the proceedings to determine whether holders of Class 4 Asbestos PI Claims accepted the Third Amended Plan under the Estimation Decision were still pending. Quigley requested that the District Court hold the Motion to Partially Withdraw the Reference in abeyance pending the outcome of those proceedings, and the District Court approved Quigley's request. Quigley and Pfizer later advised the District Court on January 16, 2007, that Quigley intended to submit a modified plan to the Bankruptcy Court, and requested that the District Court continue to hold the motion in abeyance pending that submission. The District Court ordered on January 22, 2007, that the motion would be deemed withdrawn, subject to reinstatement by letter at the appropriate time. ~~Pfizer and Quigley intend to seek reinstatement of the motion promptly upon approval of this Disclosure Statement by the Bankruptcy Court.~~**As a result, the Motion to Partially Withdraw the Reference is no longer pending.**

**On March 11, 2008, the District Court ordered the parties to confer and inform it of the status of the action. By letter, dated March 27, 2008, Quigley requested a chambers conference to determine and appropriate resolution of the Motion and the objections to it.**

**12.      The Continental Adversary Proceeding**

On February 21, 2006, two related insurers, CCC and CIC, commenced the Continental Adversary Proceeding, which is further discussed in Section IV.A.6(f)(iv) above.

**13.      Motion to Appoint a Trustee**

On May 2, 2007, the Ad Hoc Committee filed a motion (the "*Trustee Motion*") requesting that the Bankruptcy Court: (a) appoint a chapter 11 trustee for Quigley in its Chapter 11 Case; and (b) modify the Preliminary Injunction to allow claimants to assert asbestos-related claims against Pfizer that are not based on Quigley's products. The Ad Hoc Committee contends, among other things, that Quigley has not acted independently of Pfizer and has breached its fiduciary duties to its creditors. On May 4, 2007, Reaud Morgan joined in the Trustee Motion. Quigley and Pfizer each objected to the Trustee Motion on June 7, 2007. Pfizer supplemented its objection on June 27, 2007. The Court held a preliminary hearing on the Trustee Motion on June 12, 2007, reserving decision pending the conclusion of an evidentiary hearing**, which Quigley expects will occur as part of the Confirmation Hearing**. Quigley disputes all of the allegations made in the Trustee Motion and intends to vigorously defend itself against such charges.

**14.      Motion to Convert Chapter 11 Case to Chapter 7 or to Dismiss Chapter 11 Case**

On May 11, 2007, the U.S. Trustee filed a motion (the "*Conversion Motion*") requesting that the Bankruptcy Court convert the Chapter 11 Case to chapter 7 or dismiss the Chapter 11 Case. The U.S. Trustee contends, among other things, that Quigley has not acted independently of Pfizer and has breached its fiduciary duties to its creditors. Quigley and Pfizer objected to the Conversion Motion on June 7, 2007. The Court held a preliminary hearing on the Conversion Motion on June 12, 2007, reserving decision pending the conclusion of an evidentiary hearing**,**

**which Quigley expects will occur as part of the Confirmation Hearing**. Quigley disputes all of the allegations made in the Conversion Motion and intends to vigorously defend itself against such charges.

15. **Pfizer's Motion to Enforce the Preliminary Injunction**

**Following the Bankruptcy Court's entry of the amended Preliminary Injunction on December 6, 2007, the Law Offices of Peter G. Angelos, P.C. ("*Angelos*"), a member of the Ad Hoc Committee, commenced numerous personal injury actions (including new actions and previously stayed actions) against Pfizer in Pennsylvania state court based on its clients' alleged "exposure to Insulag" (the "*Insulag Actions*"). On February 5, 2008, Angelos served Pfizer with complaints in 15 of these Insulag Actions and also served Pfizer with complaints in three other asbestos actions. On February 11, 2008, the Pennsylvania court joined Pfizer in 72 existing actions. On February 19, 2008, Angelos moved for summary judgment, seeking to hold Pfizer liable for Quigley's Insulag refractory cement product in 185 Insulag Actions, some of which have been set for trial in 2008.**

**Because Pfizer never produced, marketed, distributed, or sold any of Quigley's products, including Insulag and Panelag, Pfizer moved in the Bankruptcy Court on February 28, 2008, for an order (i) enforcing the Preliminary Injunction and (ii) providing interim relief enjoining and staying the Insulag Actions and enjoining the commencement or resumption of any other actions against Pfizer based on alleged exposure to Insulag pending the Bankruptcy Court's disposition of Pfizer's motion. Following a hearing on March 4, 2008, the Bankruptcy Court reserved decision on the motion and entered a temporary restraining order enjoining and staying the Insulag Actions and enjoining the commencement or resumption of any other actions against Pfizer based on alleged exposure to Insulag pending the Bankruptcy Court's ruling on the motion. The temporary restraining order was subsequently modified on March 5, 2008. At a March 6, 2008 case status conference, the Bankruptcy Court invited briefing from parties in interest regarding the scope of Bankruptcy Code section 524(g) to be considered in connection with the Bankruptcy Court's deliberation on the motion. Pfizer, the Ad Hoc Committee, and certain insurers submitted briefs on March 17, 2008, and, to date, the matter remains *sub judice*.**

16. ~~15.~~ **Solicitation Procedures Motion for the Current Plan**

In connection with the Plan, Quigley filed with the Bankruptcy Court on May 18, 2007 a solicitation procedures motion similar to the Prior Solicitation Procedures Motion (the **"*Solicitation Procedures Motion*"**) . However, the Solicitation Procedures Motion does not seek to estimate each Asbestos PI Claim at $1.00 for voting purposes. Instead, the Solicitation Procedures Motion seeks an order estimating each Asbestos PI Claim solely for voting purposes based on the Average Value assigned to such Asbestos PI Claim in the Asbestos PI Trust Distribution Procedures.

**The Ad Hoc Committee objected to Quigley's proposed form of order approving the Solicitation Procedures Motion on November 19, 2007. The Ad Hoc Committee argued that Quigley's proposed form of ballots for holders of Asbestos PI Claims should be modified to require claimants to provide additional information. The Ad Hoc Committee asserted that this information was necessary to identify holders of Asbestos PI Claims who reside in states that have enacted so-called "tort reform" statutes and allege causes of action that, according to the Ad Hoc Committee, are currently unenforceable under the laws of their home states. The Ad Hoc Committee further argued that these creditors do not hold "claims" under the Bankruptcy Code and thus should not be entitled to vote on the Plan. CCC and CIC joined in the Ad Hoc Committee's objection. Quigley, Pfizer, and certain holders of Asbestos PI Claims opposed the Ad Hoc Committee's request, arguing that the requested information is irrelevant and the "tort reform" statutes should have no impact on Quigley's case. On February 26, 2008, the Bankruptcy Court issued a memorandum decision and order denying the Ad Hoc Committee's request for additional information on the ballots and finding, among other things, that the state tort reform statutes do not affect the rights of holders of Asbestos PI Claims under the Bankruptcy Code.**

The Bankruptcy Court approved the Solicitation Procedures Motion and entered an order (the "*Solicitation Procedures Order*") on _____, 2007 2008. (A copy of the Solicitation Procedures Order and the Solicitation Procedures is attached to this Disclosure Statement as Exhibit B.).

The Solicitation Procedures Order:

approved the Disclosure Statement for use in connection with Quigley's solicitation of votes by Claimants and holders of Equity Interests;

approved Quigley's proposed form of Ballots and master Ballot;

established the Voting Deadline;

established the 3018(a) Motion Deadline;

approved procedures for soliciting votes to accept or reject the Plan (the "*Solicitation Procedures*");

approved a Solicitation Package to be mailed to: (a) all holders of Claims (other than Asbestos PI Claims) and Equity Interests listed on Quigley's Schedules other than holders of Claims that are subject to the Bar Date, (b) holders of Claims (or their counsel) subject to the Bar Date who have filed a proof of claim by the Bar Date, (c) counsel representing holders of Asbestos PI Claims listed on Quigley's Schedules, (d) counsel representing holders of Asbestos PI Claims not listed on Quigley's Schedules, to the extent such counsel requests a Solicitation Package in writing from either Quigley or the Ballot Agent, (e) each entity listed on Quigley's Schedules as a party to an Executory Contract or unexpired lease with Quigley, (f) individual holders of Asbestos PI Claims, but solely to the extent provided for in the Solicitation Procedures, (g) the Office of the United States Trustee for the Southern District of New York, (h) Pfizer and its counsel, (i) counsel for the Creditors' Committee, (j) counsel for the Future Demand Holders' Representative, and (k) each party that filed a notice of appearance with the Bankruptcy Court and has not withdrawn such notice of appearance as of the date the Bankruptcy Court enters the Solicitation Procedures Order;

scheduled the Confirmation Hearing and the deadline for filing objections to the Plan; and

established the manner in which notice of the following events would be provided: (a) the Confirmation Hearing, (b) the Voting Deadline, and (c) the deadline for filing objections to the Plan.

## THE PLAN OF REORGANIZATION

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A, AND TO THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN.**

**ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.**

**THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN AND WILL,**

**UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND ALL OTHER PARTIES IN INTEREST.**

The crux of the Chapter 11 Case is the formulation, confirmation, and consummation of a plan of reorganization that maximizes value for the benefit of all constituents. Quigley believes that the Plan does precisely that. In particular, Quigley believes that (i) through the Plan, Claimants will obtain a substantially greater recovery from its Estate than the recovery that would be available if Quigley's assets were liquidated under chapter 7 of the Bankruptcy Code; (ii) the Plan provides a fair and reasonable treatment for holders of Asbestos PI Claims and Future Demand Holders that is superior to, and will provide greater and more efficient recovery for such Claimants than, litigation in the tort system; and (iii) confirmation of the Plan is in the best interests of all holders of Asbestos PI Claims, Future Demand Holders, and all other Claimants and parties in interest.

**A.      Classification and Treatment of Claims Against and Equity Interests in Quigley**

The Plan classifies Claims against and Pfizer's Equity Interests in Quigley separately and provides different treatment for different Classes of Claims and Pfizer's Equity Interests as set forth below.

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

**1.      Administrative Claims**

"*Administrative Claims*" are Claims constituting a cost or expense of administration of the Chapter 11 Case of a kind specified under section 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without limitation, (i) any actual and necessary costs and expenses of preserving the Estate, (ii) any actual and necessary costs and expenses of operating the businesses of Quigley, (iii) any indebtedness or obligations incurred or assumed by Quigley in the ordinary course of business in connection with the conduct of its businesses, (iv) any Fee Claims, (v) any fees or charges assessed against the Estate under 28 U.S.C. § 1930, including post-Confirmation Date and post-Effective Date fees and charges, and (vi) all costs and expenses, including any recording fees, transfer taxes, or similar fees or taxes, but only to the extent not proscribed by section 1146(a) of the Bankruptcy Code, arising out of or related to the transfer of Quigley's assets pursuant to the Plan.

Quigley currently estimates that the amount of Administrative Claims that may become Allowed is $~~368,000.~~**463,000.**

*Administrative Claim Bar Date*

The Confirmation Order will establish a deadline for the filing of Administrative Claims against Quigley's Estate (the "*Administrative Claims Bar Date*"). If a holder of an alleged Administrative Claim fails to file proof of its Administrative Claim so that it is *actually received* before the Administrative Claims Bar Date, then such Administrative Claim will be barred and discharged, and the holder of such Administrative Claim will have no right to assert such Administrative Claim against Quigley, its Estate, Reorganized Quigley, or the property of any of them.

**(a)      Treatment of Administrative Claims**

The method by which an Administrative Claim becomes Allowed under the Plan differs depending upon the type of Administrative Claim that is being asserted. All Allowed Administrative Claims will be treated similarly, however.

Pursuant to Section 3.1 of the Plan, holders of Allowed Administrative Claims (other than Fee Claims, which are governed by Section 3.2 of the Plan and described below) will be paid the unpaid portion of such Allowed Administrative Claims in full, in Cash, on the Initial Distribution Date, or as soon thereafter as such Administrative Claims becomes an Allowed Claim if the date of allowance is after the Initial Distribution Date of the Plan. Alternatively, the holders of such Administrative Claims and Quigley or Reorganized Quigley may agree to other terms, or the Allowed Administrative Claims may be paid according to ordinary business terms.

Any Administrative Claim that is timely asserted against Quigley but disputed by Quigley or Reorganized Quigley, as the case may be (whether because Quigley disputes that it has liability or because Quigley disputes that such Administrative Claim is entitled to administrative expense priority under sections 503(b) and 507(a)(i) of the Bankruptcy Code), will only become Allowed when the Bankruptcy Court enters an order allowing such Administrative Claim and such order becomes a Final Order. The Allowed Amount of any such Administrative Claim will be paid in full, in Cash, as soon as practicable after such Administrative Claim becomes Allowed.

Other than payables that are recorded on Quigley's books and records and paid in the ordinary course of business, Quigley estimates that, on the Effective Date, it will have Administrative Claims that may become Allowed in the following approximate amounts:

| Nature of Claims | Estimated Amount |
|---|---|
| Miscellaneous administrative expenses | $~~368,000~~**463,0 00** |
| **Total** | $~~368,000~~**463,0 00** |

## 2.      Fee Claims

A "*Fee Claim*" is a Claim by: (a) a Professional for allowance of compensation and reimbursement of costs and expenses; and (b) a member of the Creditors' Committee for reimbursement of costs and expenses, incurred in the Chapter 11 Case prior to and including the Effective Date. Pursuant to Section 3.2 of the Plan, all Entities seeking payment of a Fee Claim (including a request under section 503(b)(4) of the Bankruptcy Code by any Professional or other Entity for making a substantial contribution in the Chapter 11 Case) must file and serve their final applications for allowance of their Fee Claim so that it is received by Reorganized Quigley and its counsel no later than forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court. Objections to any Fee Claim must be filed and served on Reorganized Quigley and the requesting party within thirty (30) days of the date of service of the application for payment of the Fee Claim. Allowed Fee Claims will be paid in Cash on the date such Fee Claim becomes an Allowed Fee Claim, or within ten (10) days thereof.

Quigley currently estimates that the amount of Fee Claims that may become Allowed but remain unpaid as of the Effective Date is approximately $~~800,000.~~**1,000,000.**

Notwithstanding the foregoing, any Professional entitled to receive compensation or reimbursement of expenses pursuant to orders of the Bankruptcy Court may continue to do so for services rendered before the Effective Date, without further review or approval of the Bankruptcy Court, pursuant to such order.

## 3.      Priority Tax Claims

"*Priority Tax Claims*" are those Claims entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code. Quigley currently estimates that the amount of Priority Tax Claims that may become Allowed is $0.

Under the Plan, if and to the extent an Allowed Priority Tax Claim has not been paid prior to the Effective Date of the Plan, each holder of an Allowed Priority Tax Claim, if any, will be paid the Allowed Amount of its Allowed Priority Tax Claim either in (a) Cash in an amount equal to the unpaid portion of the Allowed Amount of such Allowed Priority Tax Claim, on the latest of (i) the Initial Distribution Date; (ii) the date such Priority Tax Claim

becomes Allowed, or as soon thereafter as practicable; and (iii) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law; or (b) deferred Cash payments, over a period not exceeding six years after the date of assessment of the tax that is the basis of such Claim, of a value, as of the Effective Date, equal to the Allowed Amount of such Allowed Priority Tax Claim, together with interest at an annual rate equal to the long-term applicable federal rate, as published by the Internal Revenue Service, in effect during the month in which the Effective Date occurs, or as otherwise agreed to by Reorganized Quigley and such holder.

If deferred Cash payments are made to a holder of an Allowed Priority Tax Claim, payments of principal will be made in equal annual installments, with the first payment to be due on the first anniversary of the Effective Date, and subsequent payments to be due on each successive anniversary of the first payment date or as soon thereafter as is practicable. However, any installments remaining unpaid on the date that is six years after the date of assessment of the tax that is the basis of the Allowed Priority Tax Claim will be paid on the first Business Day following such date, together with any accrued and unpaid interest to the date of payment. Quigley and Reorganized Quigley reserve the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty.

**4.      DIP Claim**

The DIP Claim is a Claim of Pfizer arising under the DIP Credit Facility, the Interim Cash Collateral Order and Final DIP/Cash Collateral Order. *See* "THE CHAPTER 11 CASE — Significant Events During the Chapter 11 Case — Use of Cash Collateral and the DIP Credit Facility," for a description of the DIP Credit Facility. Section 3.4 of the Plan provides that on the Effective Date, Pfizer, as the holder of the DIP Claim, will receive in full satisfaction, settlement, release and discharge of and in exchange for such Claim, Cash equal to the Allowed Amount of the DIP Claim, or such other treatment as Quigley and Pfizer will have agreed to in writing.

Quigley currently estimates that the amount of the DIP Claim that may become Allowed is $0.

**5.      Class 1:  Priority Claims**

"***Priority Claims***" consist of those Claims that are entitled to priority in accordance with section 507(a) of the Bankruptcy Code, other than an Administrative Claim, a Fee Claim, DIP Claim or Priority Tax Claim. Such Claims include, among others, Allowed unsecured Claims for accrued employee compensation earned within ninety (90) days prior to the Petition Date to the extent of $4,925 for each employee. Because Quigley obtained an order from the Bankruptcy Court that allowed Quigley to satisfy its prepetition wage Claims during the pendency of its Chapter 11 Case, Quigley believes that no unpaid Priority Claims exist. Thus, Quigley currently estimates the amount of Priority Claims that may become Allowed is $0.

Pursuant to Section 4.1 of the Plan, the holders, if any, of Allowed Priority Claims will be paid the Allowed Amount of their Priority Claims in Cash, on or before the later of (a) the Initial Distribution Date, and (b) the date the holder's Claim becomes an Allowed Priority Claim, or as soon thereafter as practicable. All Allowed Priority Claims first becoming due and payable after the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

Priority Claims are Unimpaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, each holder of an Allowed Priority Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

**6.      Class 2:  Secured Claims**

Each Class 2 Secured Claim will be treated as a separate class for purposes of voting on, implementing, and consummating the Plan, and each holder of an Allowed Class 2 Secured Claim will receive the treatment set forth below.

**(a)  Class 2.01:  Pfizer Secured Claim**

The Pfizer Secured Claim consists of (a) the principal amount outstanding under the Senior Secured Loan Facility as of the Petition Date, which was $46,014,833, plus (b) prepetition interest and postpetition interest through September 30, 2005, in the amount of $10,931,129, plus (c) accrued interest from September 30, 2005 through the Effective Date, for a total Claim of approximately $~~65,210,630~~ **69,584,107.**  Interest has continued to accrue after the Petition Date on the Pfizer Secured Claim under the terms of the Senior Secured Loan Facility and the Final DIP/Cash Collateral Order.  Pfizer is the sole holder of the Pfizer Secured Claim.  Pursuant to Section 4.2(a) of the Plan, on or before the Initial Distribution Date, Pfizer will receive in full satisfaction, settlement, release and discharge of and in exchange for the Pfizer Secured Claim, Cash equal to (a) 100% of the Allowed Amount of the Allowed Pfizer Secured Claim minus (b) $30 million, which amount Pfizer has agreed to forgive as part of the Pfizer Contribution.  *See* "THE PLAN OF REORGANIZATION – Description of the Consideration Contributed to the Asbestos PI Trust and Reorganized Quigley and Estimate of Asbestos PI Claims – The Pfizer Contribution to the Asbestos PI Trust."

The Pfizer Secured Claim is Impaired under the Plan.  Pfizer, as the sole holder of the Pfizer Secured Claim, will be entitled to vote to accept or reject the Plan.

**(b)  ~~Class 2.02:  Freeman Secured Claim~~**

~~The Freeman Secured Claim consists of the Claim secured by a certain supersedeas bond (the "*Freeman Bond*") in the amount of $1,360,643.40, dated August 20, 2003, securing Freeman's judgment against Quigley in the civil action styled Freeman v. ACandS, Inc., et al., to the extent of the value of the Freeman Bond.  The Freeman Bond is not property of, or secured by property of, Quigley's estate.  On the Effective Date, Freeman, as the holder of the Freeman Secured Claim, will be entitled to proceed with the Pending Appeal of the judgment underlying the Freeman Secured Claim to Final Judgment as provided for under the terms of the Freeman Bond and in accordance with applicable law.  If the Final Judgment is ultimately entered against Quigley or Reorganized Quigley, as the case may be, Freeman will be entitled to seek payment of the Final Judgment from the Freeman Bond.  If, after application of the Freeman Bond to the Final Judgment, Freeman holds an Asbestos PI Deficiency Claim, the sole recourse of Freeman for such Asbestos PI Deficiency Claim will be to proceed against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures.  If the Final Judgment ultimately reverses any extant judgment against Quigley, then any remaining Asbestos PI Claim that Freeman may have will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Articles IX and XI of the Plan.~~

~~Class 2.02 is not Impaired under the Plan.  Freeman, as the holder of the Freeman Secured Claim, is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.~~

**~~(c)~~  Class 2.03:  ~~Reaud~~ Secured Claim**

The Reaud Secured Claim consists of all Claims secured by a certain supersedeas bond (the "*Reaud Bond*") in the amount of $8,773,100 securing the Reaud Claimants' judgment against Pfizer and Quigley in civil action styled Sammy Ray Acker, et al. v. Quigley Co., Inc. et al., to the extent of the value of the Reaud Bond.  The Reaud Bond is not property of, or secured by property of, Quigley's estate.  On the Effective Date, the Reaud Claimants, as the holders of the Reaud Secured Claim, will be entitled to proceed with the Pending Appeal of the judgment underlying the Reaud Secured Claim to Final Judgment as provided for under the terms of the Reaud Bond and in accordance with applicable law.  If the Final Judgment is ultimately entered against Quigley or Reorganized Quigley, as the case may be, the Reaud Claimants will be entitled to seek payment of the Final Judgment from the Reaud Bond.  If, after application of the amounts received on account of the Reaud Bond to the Final Judgment, the Reaud Claimants hold an Asbestos PI Deficiency Claim, the sole recourse of the Reaud Claimants for such Asbestos PI Deficiency Claim will be to proceed against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures.  If the Final Judgment ultimately reverses any extant judgment against Quigley, then any remaining Asbestos PI Claim that any of the Reaud Claimants may have will automatically and without further act,

deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Articles IX and XI of the Plan.

Class 2.03<u>2.02</u> is not Impaired under the Plan. The Reaud Claimants, as the holders of the Reaud Secured Claim, are deemed to have accepted the Plan and are therefore not entitled to vote to accept or reject the Plan.

### <u>(c)</u>        <del>(d)</del> Class 2.04<u>2.03</u>:  Hatchett Secured Claim

The Hatchett Secured Claim consists of the Claim secured by a certain supersedeas bond (the "***Hatchett Bond***") in the amount of $174,624.87, dated March 31, 2004, securing Hatchett's judgment against Quigley in the civil action styled <u>George L. Hatchett, et al. v. Owens Corning, et al</u>, to the extent of the value of the Hatchett Bond.  The Hatchett Bond is not property of, or secured by property of, Quigley's estate.  On the Effective Date, Hatchett, as the holder of the Hatchett Secured Claim, will be entitled to proceed with the Pending Appeal of the judgment underlying the Hatchett Secured Claim to Final Judgment as provided for under the terms of the Hatchett Bond and in accordance with applicable law.  If the Final Judgment is ultimately entered against Quigley or Reorganized Quigley, as the case may be, Hatchett will be entitled to seek payment of the Final Judgment from the Hatchett Bond.  If, after application of the amounts received on account of the Hatchett Bond to the Final Judgment, Hatchett holds an Asbestos PI Deficiency Claim, the sole recourse of Hatchett for such Asbestos PI Deficiency Claim will be to proceed against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures.  If the Final Judgment ultimately reverses any extant judgment against Quigley, then any remaining Asbestos PI Claim that Hatchett may have will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Articles IX and XI of the Plan.

Class 2.04<u>2.03</u> is not Impaired under the Plan.  Hatchett, as the holder of the Hatchett Secured Claim, is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### <u>(d)</u>        <del>(e)</del> Class 2.05<u>2.04</u>:  Sherry Secured Claim

The Sherry Secured Claim consists of the Claim secured by a certain supersedeas bond (the "***Sherry Bond***") in the amount of $258,444.80, dated March 31, 2004, securing Sherry's judgment against Quigley in the civil action styled <u>Edward J. Sherry, et al. v. Owens Corning, et al</u>., to the extent of the value of the Sherry Bond.  The Sherry Bond is not property of, or secured by property of, Quigley's estate.  On the Effective Date, Sherry, as the holder of the Sherry Secured Claim, will be entitled to proceed with the Pending Appeal of the judgment underlying the Sherry Secured Claim to Final Judgment as provided for under the terms of the Sherry Bond and in accordance with applicable law.  If the Final Judgment is ultimately entered against Quigley or Reorganized Quigley, as the case may be, Sherry will be entitled to seek payment of the Final Judgment from the Sherry Bond.  If, after application of the amounts received on account of the Sherry Bond to the Final Judgment, Sherry holds an Asbestos PI Deficiency Claim, the sole recourse of Sherry for such Asbestos PI Deficiency Claim will be to proceed against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures.  If the Final Judgment ultimately reverses any extant judgment against Quigley, then any remaining Asbestos PI Claim that Sherry may have will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with and to the extent set forth in Articles IX and XI of the Plan.

Class 2.05<u>2.04</u> is not Impaired under the Plan.  Sherry, as the holder of the Sherry Secured Claim, is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

### <u>(e)</u>        <del>(f)</del> Claim 2.06<u>2.05</u>:  Other Secured Bond Claims

Other Secured Bond Claims consist of all Secured Bond Claims against Quigley, other than the Secured Bond Claims included in Classes 2.02 through 2.05, that are based on a prepetition judgment obtained by a claimant against Quigley for an asbestos personal injury claim and are secured, in whole or in part, by a supersedeas bond.  On the Effective Date, any holder of an Other Secured Bond Claim will be entitled to the same treatment as the holders of the Secured Claims in Classes 2.02 through 2.05.

Class ~~2.06~~**2.05** is not Impaired under the Plan.  The holders of any Other Secured Bond Claim are deemed to have accepted the Plan and are therefore not entitled to vote to accept or reject the Plan.

**7.      Class 3:  Unsecured Claims**

Class 3 consists of all Allowed Unsecured Claims.  Unsecured Claims are Claims against Quigley that are not secured by valid and enforceable liens against property of Quigley and that are not Administrative Claims, Priority Claims, Priority Tax Claims or Asbestos PI Claims.  Quigley currently estimates that the amount of Unsecured Claims will be approximately $33.4 million.  Of that amount, Pfizer holds Allowed Unsecured Claims of $33,370,920.38 against Quigley arising from: (a) Pfizer's payment on Quigley's behalf of amounts totaling $31,391,640 owed by Quigley under certain pre-bankruptcy settlement agreements (separate and apart from the Pfizer Claimant Settlement Agreements, to which Quigley is not a party) between various holders of asbestos personal injury claims, Quigley and Pfizer, as to which Quigley had not satisfied its obligations prior to the Petition Date; (b) Pfizer's payment on Quigley's behalf of amounts totaling $1,977,545.38 for pre-bankruptcy fees and expenses due to certain legal professionals representing Quigley in the defense of asbestos personal injury claims prior to commencement of the Chapter 11 Case; and (c) Pfizer's payment on Quigley's behalf of $1,735 to DJ Consultants, a third party vendor that provided pre-bankruptcy consulting services to Quigley.  Except to the extent a holder of an Allowed Unsecured Claim agrees to a different treatment or has been paid prior to the Effective Date, pursuant to Section 4.3 of the Plan, on or before the later of: (a) the Initial Distribution Date; and (b) the date such Claim becomes an Allowed Unsecured Claim, or as soon thereafter as practicable, each holder of an Allowed Unsecured Claim will receive in full satisfaction, settlement and discharge of and in exchange for such Claim, Cash in an amount equal to the Allowed Amount of such Unsecured Claim multiplied by the Payment Percentage in effect on the Effective Date.

The "***Payment Percentage***" is the initial percentage of the full liquidated value that holders of Asbestos PI Claims will be entitled to receive as of the Effective Date from the Asbestos PI Trust pursuant to the Asbestos PI Trust Distribution Procedures.  The Payment Percentage in effect on the Effective Date will be 7.5%.

Unsecured Claims are Impaired under the Plan.  Each holder of an Allowed Unsecured Claim will be entitled to vote to accept or reject the Plan to the extent and in the manner provided in the Solicitation Procedures Order.

As of the Bar Date, 4,302 proofs of claim were filed by Claimants alleging personal injury based on alleged exposure to respirable free silica or alpha quartz allegedly contained in a Quigley product.  Quigley will object to all of these Claims and will seek to have them Disallowed on the basis that Quigley is not aware of any product that it manufactured, sold, supplied or distributed that contained respirable free silica or alpha quartz.  To the extent any of these silica-related personal injury Claims are Allowed, the holders of these Claims will receive the treatment afforded to other Class 3 Unsecured Creditors.

**8.      Class 4:  Asbestos PI Claims**

An "***Asbestos PI Claim***" is:  any Claim or Demand seeking recovery for damages for bodily injury allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products (1) against or on Quigley or Reorganized Quigley; and (2) against or on any other Entity that is alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on Quigley to the extent such alleged liability arises by reason of— (a) the other Entity's ownership of a financial interest in Quigley, a past or present Affiliate of Quigley, Reorganized Quigley or a predecessor in interest of Quigley or Reorganized Quigley; (b) the other Entity's involvement in the management of Quigley, Reorganized Quigley or a predecessor in interest of Quigley or Reorganized Quigley, or service as an officer, director or employee of Quigley, Reorganized Quigley or a related party; (c) the other Entity's provision of insurance to Quigley, Reorganized Quigley or a related party; or (d) the other Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of Quigley, Reorganized Quigley or a related party, including but not limited to— (i) involvement in providing financing (debt or equity), or advice to an Entity involved in such a transaction; or (ii) acquiring or selling a financial interest in an Entity as part of such a transaction.  "Asbestos PI Claims" shall include, without limitation, Indirect Asbestos PI Claims, Asbestos PI Deficiency Claims and Trust Expenses.  "Asbestos PI Claims" will not include any Claim against a Quigley Person or any Pfizer Protected Party for benefits under any government-

mandated workers' compensation system. "Asbestos PI Claims" will include, without limitation, Indirect Asbestos PI Claims, Asbestos PI Deficiency Claims and Trust Expenses.

Except as expressly set forth below, as of the Effective Date, liability for all Class 4 Claims will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust in accordance with, and to the extent set forth in, Articles IX and XI of the Plan and the Plan Documents. Each Asbestos PI Claim will be determined and paid in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures. The Asbestos PI Trust will be funded in accordance with the provisions of Section 9.3 of the Plan. Except as set forth in Section 11.6(b)(viii) of the Plan, the sole recourse of the holder of an Asbestos PI Claim on account of such Claim will be to the Asbestos PI Trust and each holder will have no right whatsoever at any time to assert its Asbestos PI Claim against any Asbestos Protected Party, or, subject to the terms of Section 11.7 of the Plan, a Settling Asbestos Insurance Entity, or, subject to the terms of Section 11.8 of the Plan, a Non-Settling Asbestos Insurance Entity. *See* "THE PLAN OF REORGANIZATION – Releases, Injunctions and Discharges – Asbestos PI Channeling Injunction – Settling Asbestos Insurance Entity Injunction and Non-Settling Asbestos Insurance Entity Injunction."

**As described in Section V.C.10 above, Pfizer has waived, and will be deemed to have waived, any and all obligations or requirements of holders of Asbestos PI Claims who become Settling Plaintiffs under the terms of the Pfizer Claimant Settlement Agreements to reduce the amount of distributions they are entitled to receive from the Asbestos PI Trust; provided, however, that such waiver will be null and void and of no further force and effect in the event that the Effective Date of the Plan does not occur.**

For a more complete description of the Asbestos PI Trust and the Asbestos PI Trust Distribution Procedures, *see generally*, Section VII, entitled "The Asbestos PI Trust."

Asbestos PI Claims are Impaired under the Plan. Each holder of an Asbestos PI Claim will be entitled to vote to accept or reject the Plan to the extent and in the manner provided in the Solicitation Procedures Order.

**9.      Class 5: Equity Interests in Quigley**

Class 5 consists of the Equity Interests in Quigley, all of which are held by Pfizer as the parent company of Quigley. Under the Plan, Pfizer initially will retain the Equity Interests. On the Effective Date, Pfizer will grant to the Asbestos PI Trust a right to acquire 100% of the common stock of Reorganized Quigley (the "***Quigley Stock Right***"). The Quigley Stock Right will be exercisable by the Asbestos PI Trust upon satisfaction of each of the following: (a) the one year anniversary of the Effective Date has occurred; and (b) the Asbestos PI Trust has processed Asbestos PI Claims having an aggregate nominal amount of at least $25 million.

Upon exercise by the Asbestos PI Trust of the Quigley Stock Right (the "***Stock Transfer Date***"), Pfizer, as the sole holder of the Equity Interests, will transfer the common stock of Reorganized Quigley to the Asbestos PI Trust. In the event that the Bankruptcy Court confirms the Plan under section 1129(b) of the Bankruptcy Code, Pfizer will transfer the common stock of Reorganized Quigley to the Asbestos PI Trust on the Effective Date of the Plan.

Equity Interests are Impaired under the Plan. Pfizer, as the sole holder of the Equity Interests, will be entitled to vote to accept or reject the plan.

**B.      Conditions to Confirmation**

The Plan will not be confirmed and the Confirmation Order will not be entered until and unless each of the following conditions to confirmation is either satisfied or waived by Quigley with the written consent of Pfizer, after consulting with the Creditors' Committee and the Future Demand Holders' Representative:

1.      The Bankruptcy Court will have entered an order, in form and substance reasonably acceptable to Quigley and Pfizer, after consulting with the Creditors' Committee and the Future Demand Holders' Representative,

approving the Disclosure Statement with respect to the Plan as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

      2.      **Any order entered by the Bankruptcy Court or the District Court that modifies, clarifies, or interprets the scope of the Preliminary Injunction Order or the Asbestos PI Channeling Injunction will be in form and substance acceptable to Quigley and Pfizer.**

      **3.**      The Confirmation Order will be in form and substance acceptable to Quigley and Pfizer, after consulting with the Creditors' Committee and the Future Demand Holders' Representative.

      3̶.̶**4.**      At least 75% of those holders of Class 4 Asbestos PI Claims actually voting on the Plan vote to accept the Plan.

      4̶.̶**5.**      The Confirmation Order will, among other things:

      (i)      order that the assets revesting in Reorganized Quigley will be free and clear of all Claims, Liens, and Encumbrances (other than Liens granted pursuant to the terms of the Plan or the Exit Facility);

      (ii)      provide that the Confirmation Order will supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

      (iii)      order that, except with respect to obligations specifically preserved in the Plan, including, without limitation, Section 7.5 of the Plan, Quigley is discharged effective on the Effective Date (in accordance with the Plan) from any Claims, Demands, and any "debts" (as that term is defined in section 101(12) the Bankruptcy Code), and Quigley's liability in respect thereof, whether reduced to judgment or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, or known or unknown, that arose from any agreement of Quigley entered into or obligation of Quigley incurred before the Effective Date, or from any conduct of Quigley prior to the Effective Date, or whether such interest accrued before or after the Petition Date, is extinguished completely;

      (iv)      provide that, as part of the Pfizer Contribution to the Asbestos PI Trust, Pfizer is obligated to contribute to the Asbestos PI Trust the Pfizer/AIG Annuity, the Pfizer Annuity, and Pfizer's Cash Contribution.

      (v)      provide that, subject to the limitations set forth in Section 10.4 of the Plan, all transfers of assets of Quigley contemplated under the Plan, and the transfer of the common stock of Reorganized Quigley by Pfizer on the Stock Transfer Date, will be free and clear of all Claims, Liens and all Encumbrances on or against such assets and common stock;

      (vi)      authorize the implementation of the Plan in accordance with its terms;

      (vii)      provide that any transfers effected or entered into, or to be effected or entered into, under the Plan will be and are exempt from any state, city or other municipality transfer taxes, mortgage recording taxes and any other stamp or similar tax under section 1146(c) of the Bankruptcy Code;

      (viii)      approve the other settlements, transactions and agreements to be effected pursuant to the Plan in all respects;

      (ix)      provide that all Executory Contracts or unexpired leases assumed by Quigley and assigned during the Chapter 11 Case or under the Plan will remain in full force and effect for the benefit of Reorganized Quigley or the assignee thereof notwithstanding any

provision in such contract or lease (including those provisions described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease;

(x)     provide that the transfers of property by Quigley to Reorganized Quigley (A) are or will be legal, valid, and effective transfers of property; (B) vest or will vest Reorganized Quigley with good title to such property free and clear of all Liens, Claims, Encumbrances, and interests, except as expressly provided in the Plan or Confirmation Order; (C) do not and will not constitute avoidable transfers under the Bankruptcy Code or under applicable bankruptcy or non-bankruptcy law; and (D) do not and will not subject Reorganized Quigley to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, any laws affecting successor or transferee liability;

(xi)    find that the Plan does not provide for the liquidation of all or substantially all of the property of Quigley, that Reorganized Quigley will continue its business as an ongoing reorganized debtor, and that confirmation of the Plan is not likely to be followed by the liquidation of Reorganized Quigley or the need for further financial reorganization;

(xii)   find that the Plan complies with all applicable provisions of the Bankruptcy Code, including, without limitation, that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud;

(xiii)  provide that any attorney-client, work product or other privilege that applies to the Asbestos Records transferred by the Asbestos Record Parties to the Asbestos PI Trust will not be destroyed, waived, or otherwise affected by the transfer of the Asbestos Records to the Asbestos PI Trust; and

(xiv)   find that Pfizer has waived and will be deemed to have waived any and all obligations or requirements of holders of Asbestos PI Claims who become Settling Plaintiffs under the terms of the Pfizer Claimant Settlement Agreements to reduce the amount of distributions they are entitled to receive from the Asbestos PI Trust; provided, however, that such waiver will be null and void and of no further force and effect in the event that the Effective Date of the Plan does not occur.

5.6.     In addition to the foregoing, the Confirmation Order will contain the following findings of fact and conclusions of law, among others:

(i)     The Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction and the Dividend Injunction are approved and to be implemented in accordance with the Plan and the Asbestos PI Trust;

(ii)    As of the Petition Date, Quigley has been named as a defendant in personal injury, wrongful death, or property damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;

(iii)   The Asbestos PI Trust is to be funded in part by securities of Quigley, the Quigley Contribution and the Pfizer Contribution;

(iv)    The Asbestos PI Trust, on the Stock Transfer Date, will own one hundred percent (100%) of the common stock of Reorganized Quigley;

(v)     The Asbestos PI Trust is to use its assets and income to pay Asbestos PI Claims;

(vi)     Quigley is likely to be subject to substantial future Demands for payment arising out of the same or similar conduct or events that gave rise to the Asbestos PI Claims, which are addressed by the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction and the Non- Settling Asbestos Insurance Entity Injunction;

(vii)    The actual amounts, numbers, and timing of Demands cannot be determined;

(viii)   Pursuit of Demands outside the procedures prescribed by the Plan and the Asbestos PI Trust Distribution Procedures is likely to threaten the Plan's purpose to deal equitably with Asbestos PI Claims;

(ix)     The terms of the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction and the Dividend Injunction, including any provisions barring actions against third parties, are described in specific and conspicuous language in the Plan and the Disclosure Statement;

(x)      Pursuant to (A) the Asbestos PI Trust Distribution Procedures, (B) court order, or (C) otherwise, the Asbestos PI Trust will operate through mechanisms such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of the numbers and values of Asbestos PI Claims or other comparable mechanisms, that provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, similar Asbestos PI Claims in substantially the same manner;

(xi)     The Future Demand Holders' Representative was appointed by the Bankruptcy Court as part of the proceedings leading to the issuance of the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction and the Non-Settling Asbestos Insurance Entity Injunction for the purpose of, among other things, protecting the rights of persons that might subsequently assert Demands of the kind that would constitute Asbestos PI Claims and are addressed in the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction and the Non-Settling Asbestos Insurance Entity Injunction and channeled to the Asbestos PI Trust;

(xii)    In light of the benefits provided, or to be provided, to the Asbestos PI Trust on behalf of each Asbestos Protected Party or Settling Asbestos Insurance Entity, as applicable, the Asbestos PI Channeling Injunction and the Settling Asbestos Insurance Entity Injunction are fair and equitable with respect to the persons that might subsequently assert Demands that would constitute Asbestos PI Claims against any Asbestos Protected Party or Settling Asbestos Insurance Entity, as applicable;

(xiii)   The Plan and its acceptance otherwise comply with sections 524(g) and 1126 of the Bankruptcy Code;

(xiv)    The Asbestos PI Trust will have the sole and exclusive authority as of the Effective Date to defend all Asbestos PI Claims;

(xv)     The Quigley Insurance Transfer, the Insurance Relinquishment Agreement and the AIG Assignment Agreement do not violate any consent-to-assignment provisions of any Shared Asbestos Insurance Policy, any Insurance Settlement Agreement, the AIG Insurance Settlement Agreement or any other applicable insurance policy, agreement, or contract;

(xvi)    The Quigley Insurance Transfer pursuant to the Plan is valid, effective and enforceable, and effectuates the transfer to the Asbestos PI Trust of the Quigley Transferred Insurance

Rights; provided, however, that all Asbestos PI Insurer Coverage Defenses are preserved to the extent set forth in Section 10.4 of the Plan;

(xvii)    The duties, obligations and liabilities of any Asbestos Insurance Entity under all insurance policies, all Shared Asbestos Insurance Policies, all Insurance Settlement Agreements, and all other settlement agreements, are not diminished, reduced or eliminated by: (a) the discharge of Quigley and Reorganized Quigley from all Asbestos PI Claims; (b) the injunctive protection provided to Quigley, Reorganized Quigley, the Asbestos Protected Parties, and the Settling Asbestos Insurance Entities with respect to Asbestos PI Claims; or (c) the assumption of responsibility and liability for all Asbestos PI Claims by the Asbestos PI Trust; provided, however, that all Asbestos PI Insurer Coverage Defenses are preserved to the extent set forth in Section 10.4 of the Plan;

(xviii)   The Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction and the Dividend Injunction are essential to the Plan and Quigley's reorganization efforts; and

(xix)     Pfizer's contribution of the Pfizer Contribution and Quigley's contribution of the Quigley Contribution, to the Asbestos PI Trust or Reorganized Quigley, as applicable, constitute substantial assets of the Plan and the reorganization.

## C.    Conditions Precedent to the Effective Date under the Plan

The "effective date of the plan," as used in section 1129 of the Bankruptcy Code, will not occur, and the Plan will be of no force and effect, until the Effective Date. The occurrence of the Effective Date is subject to satisfaction of the following conditions precedent, unless such conditions are waived by Quigley and Pfizer (after consulting with the Creditors' Committee and the Future Demand Holders' Representative) pursuant to Section 12.3 of the Plan.

### 1.    Confirmation Order

The Confirmation Date will have occurred and the Confirmation Order, in form and substance acceptable to the Debtor and Pfizer, will have been entered and will have become a Final Order.

### 2.    No Request for Revocation of Confirmation Order

No request for revocation of the Confirmation Order under section 1144 of the Bankruptcy Code will have been made, or, if made, will remain pending.

### 3.    Conditions to the Confirmation Date Remain Satisfied or Have Been Waived

All conditions precedent to the Confirmation Date will have been satisfied or waived and will continue to be satisfied or waived.

### 4.    Execution of Documents

The following agreements and documents, in form and substance satisfactory to Quigley and Pfizer, will have been executed and delivered, and all conditions precedent thereto will have been satisfied:

(i)       Amended Charter Documents;

(ii)      Asbestos PI Trust Agreement;

(iii)     AIG Assignment Agreement;

<table>
<tr><td>(iv)</td><td>Insurance Relinquishment Agreement;</td></tr>
<tr><td>(v)</td><td>Asbestos PI Claims Services Agreement;</td></tr>
<tr><td>(vi)</td><td>Pfizer Claims Services Agreement;</td></tr>
<tr><td>(vii)</td><td>Pfizer/AIG Annuity; and</td></tr>
<tr><td>(viii)</td><td>Pfizer Annuity.</td></tr>
</table>

Further, all actions, Plan Documents and other documents and agreements necessary to implement the provisions of the Plan to be effectuated on or prior to the Effective Date will be satisfactory to Quigley and Pfizer and such actions, documents and agreements will have been effected or executed and delivered.

**5.        Injunctions**

The Confirmation Order will contain the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction, and the Dividend Injunction.

**6.        Qualified Settlement Fund Status**

Quigley will have obtained an opinion of counsel stating that the Asbestos PI Trust qualifies as a "qualified settlement fund" within the meaning of regulations issued pursuant to section 468B of the Internal Revenue Code.

Notwithstanding the foregoing conditions precedent to Confirmation of the Plan and the Effective Date, Quigley reserves the right in its sole discretion, with the written consent of Pfizer, and after consulting with the Creditors' Committee and the Future Demand Holders' Representative, and to the fullest extent permitted by law, to waive or modify, in whole or in part, the occurrence of any of the foregoing conditions precedent to Confirmation of the Plan and the Effective Date. Any such waiver or modification may be effected at any time, without notice, without leave or order of the Bankruptcy Court or the District Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date will take place and will be deemed to have occurred simultaneously, and no such action will be deemed to have occurred prior to the taking of any other such action.

If Quigley decides that one of the foregoing conditions has not been satisfied or waived, as applicable, within 90 days of entry of the Confirmation Order, then Quigley or Pfizer will notify the Bankruptcy Court of the failure of the Effective Date to occur, at which time the Plan and the Confirmation Order will be deemed null and void, and all parties will be restored to their respective positions as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred.

**D.     Description of the Consideration Contributed to the Asbestos PI Trust and Reorganized Quigley and Estimate of Asbestos PI Claims**

Quigley and Pfizer will each contribute to the Asbestos PI Trust and Reorganized Quigley, as applicable, on account of the Asbestos PI Claims as described below.

**1.        The Insurance Relinquishment Agreement and the Quigley Insurance Transfer**

Upon the Effective Date of the Plan, and as part of the Pfizer Contribution and the Quigley Contribution as defined further below, Pfizer and Quigley will enter into an agreement whereby each party relinquishes certain insurance rights it has, to and for the benefit of the other party. Generally, Pfizer will relinquish its following rights to the ultimate benefit of Quigley and/or the Asbestos PI Trust:

Pfizer's rights, titles, privileges, interests, Claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, state guaranty fund payments, causes of action and choses in action in and to the products/completed operations coverage remaining under the Shared Asbestos Insurance Policies and to the Insurance Settlement Agreements, solely with respect to the products/completed operations coverage remaining under the Shared Asbestos Insurance Policies;

To the extent the products/completed operations coverage under any Shared Asbestos Insurance Policy is subject to any aggregate per occurrence or other policy limit of a Shared Asbestos Insurance Policy that is or could potentially be applicable to Asbestos PI Claims, Pfizer's rights, titles, privileges, interests, Claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, state guaranty fund payments, causes of action and choses in action in and to such other coverage under such Shared Asbestos Insurance Policy; and

Pfizer's right to object to any settlement by Quigley concerning the Shared-Asbestos Excluded Insurance Policies, provided that such settlement is not manifestly unreasonable.

Pfizer will not relinquish, however, and will retain the rights to pursue collection of any unpaid amount Pfizer billed to any insurer prior to the Petition Date pursuant to any Insurance Settlement Agreement and/or the Products/Completed Operations Coverage under any insurance policy to the extent that it gives rise to any such amount (the "Pfizer Insurer Receivables").

For its part, Quigley will relinquish its rights, titles, privileges, interests, Claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, state guaranty fund payments, causes of action and choses in action in and to the Shared Asbestos-Excluded Claims-Made Insurance Policies for the benefit of Pfizer. The Shared Asbestos-Excluded Claims-Made Insurance Policies do not constitute a part of the Pfizer Contribution or Quigley Contribution.

Pursuant to the terms and conditions of the Insurance Relinquishment Agreement, Quigley will have sole and exclusive rights, titles, privileges, interests, Claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, state guaranty fund payments, causes of action and choses in action in and to the products/completed operation coverage remaining under the Shared Asbestos Insurance Policies and related Insurance Settlement Agreements (subject to certain provisions of the Insurance Relinquishment Agreement). Under the Plan, Quigley's rights, titles, privileges, interests, Claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, state guaranty fund payments, Causes of Action and choses in action in and to the Shared Asbestos Insurance Policies and related Insurance Settlement Agreements are part of the Quigley Transferred Insurance Rights, which will be transferred to the Asbestos PI Trust as part of the Quigley Insurance Transfer. In addition to the foregoing, Quigley Transferred Insurance Rights also include the Quigley Insurer Receivables.

The Quigley Transferred Insurance Rights do not include (a) Quigley's rights, titles, privileges, interests, Claims, demands or entitlements to any proceeds, payments, initial or supplemental dividends, scheme payments, supplemental scheme payments, state guaranty fund payments, Causes of Action and choses in action under, for or related to a Shared Asbestos Insurance Policy and/or related Insurance Settlement Agreement in the event there is a final and binding determination (by settlement or adjudication) that such Shared Asbestos Insurance Policy and/or related Insurance Settlement Agreement does not provide products/completed operations coverage for Asbestos PI Claims; (b) the Shared Asbestos Insurance Policies and the Insurance Settlement Agreements themselves; and (c) the Pfizer Insurer Receivables.

## 2. The Quigley Contribution to the Asbestos PI Trust

Pursuant to the Plan, on or after the Effective Date, Quigley **or Reorganized Quigley, as the case may be,** will provide the following contributions and benefits to the Asbestos PI Trust (the "**Quigley Contribution**"):

(a) the Quigley Insurance Transfer will occur, pursuant to which Quigley will transfer, grant and assign to the Asbestos PI Trust the Quigley Transferred Insurance Rights;

(b) Quigley's right, title and interest in and to the Insurance Settlement Proceeds except for Quigley's right, title and interest in and to any AIG Payments and any interest earned thereon, which Quigley will assign to Pfizer in accordance with the AIG Assignment Agreement; and

(c) Excess Cash, calculated on the last day of the month immediately preceding the month in which the Effective Date occurs. "***Excess Cash***" will be an amount equal to the greater of the following: (1) $0; and (2) the sum of (i) all Cash and short term Cash investments held by Quigley and (ii) the Pfizer Tax Sharing Receivable outstanding, as of the last day of the month immediately preceding the Effective Date *less* the sum of the following as of such date: (i) a working capital reserve in the amount of $1 million (or such other amount as Quigley, after consultation with the Future Demand Holders' Representative and the Creditors' Committee, determines it requires for working capital purposes); (ii) the Allowed Amount of Allowed Administrative Claims; (iii) a reasonable estimate by Quigley of additional Administrative Claims (such as Fee Claims) that may become Allowed thereafter; (iv) the Allowed Amount of Allowed Priority Tax Claims; (v) a reasonable estimate by Quigley of additional Priority Tax Claims that may become Allowed Priority Tax Claims thereafter; (vi) the Allowed Amount of all Priority Claims; (vii) a reasonable estimate of all Priority Claims that may become Allowed Priority Claims thereafter; (viii) the DIP Claim; (ix) the amount of the Pfizer Secured Claim minus $30 million; (x) the Allowed Amount of all Unsecured Claims multiplied by the Payment Percentage; and (xi) any other Cash required to be paid or distributed by Quigley or Reorganized Quigley pursuant to the Plan, other than in respect of Cash to be contributed to the Asbestos PI Trust. Based upon the assumption that the Effective Date will occur on ~~June~~**September** 1, 2008, Quigley expects to have approximately $~~1.8~~**4.6** million in Excess Cash on the Effective Date.

## 3. The Pfizer Contribution to the Asbestos PI Trust and Reorganized Quigley

Prior to the commencement of the Chapter 11 Case, Quigley engaged in intensive negotiations with Pfizer regarding scope , nature, and extent of the contribution to be made by Pfizer under the Plan. Those protracted discussions ultimately resulted in Pfizer's agreement to, among other things, relinquish its rights under the shared insurance to the Asbestos PI Trust and to contribute Pfizer's right, title and interest in and to the Insurance Settlement Proceeds Trust (except for its right, title and interest in and to any AIG Payments and interest earned thereon) and an annuity (originally a note) with a total nominal face value of $405 million. Quigley and its advisors determined that this contribution to the Asbestos PI Trust not only was a fair compromise in exchange for Pfizer and the other Pfizer Protected Parties obtaining protection under the Asbestos PI Channeling Injunction, but that it also maximized the value of Quigley's available assets for the benefit of Quigley and all of its current and future creditors and demand holders. At the same time, Quigley also determined that, if other constituencies wanted to negotiate with Pfizer to obtain additional contributions under the Plan, Quigley would facilitate those negotiations.

Following the issuance of the Asbestos PI Claims Estimation Order and Pfizer's subsequent waiver of the obligation contained in the Pfizer Claimant Settlement Agreements that holders of Asbestos PI Claims who entered into such agreements and become Settling Plaintiffs must reduce the amount of their Distributions from the Asbestos PI Trust, Quigley urged Pfizer to agree to make an additional contribution to the Asbestos PI Trust to compensate for the increased Distributions from the Asbestos PI Trust that would be required to be made to the Settlement Plaintiffs and to help defray the Asbestos PI Trust's administrative costs, such that the Asbestos PI Trust would not have to invade the corpus of the trust to finance its operations. Once Pfizer agreed in principle to the additional contribution, Quigley facilitated negotiations between Pfizer and the Future Demand Holders' Representative regarding the amount of the contribution to be made by Pfizer that would, among other things, (i) maintain the payment percentage of 7.5% based on current projections of claims and assets available for distribution

to claimants (ii) ensure that there will be sufficient funds to satisfy the administrative costs of the Asbestos PI Trust for the duration of its existence, and (iii) maximize the value of Quigley's assets. During this process, Quigley reviewed Pfizer's calculation of the amount necessary for its additional contribution and its methodologies. As a result of those negotiations, Pfizer has agreed to make additional financial contributions to the Asbestos PI Trust on the Effective Date in the aggregate amount of $95.1 million and to enter into the five-year Pfizer Claims Services Agreement, pursuant to which Pfizer will pay Quigley $5 million per year in exchange for Quigley's continued claims handling services with respect to additional unrelated asbestos claims against Pfizer.

Pursuant to the terms of the Plan, on or after the Effective Date, Pfizer on behalf of itself and the other Pfizer Protected Parties will provide the following contributions and benefits to the Asbestos PI Trust and Reorganized Quigley, as applicable (the "***Pfizer Contribution***"):

(a)      Pfizer will execute and deliver to Reorganized Quigley the Insurance Relinquishment Agreement;

(b)      A contribution to the Asbestos PI Trust of an annuity with a total nominal face value of $405 million, payable in equal installments over a period of 40 years, with the first installment payment payable on the Effective Date (the "***Pfizer/AIG Annuity***");

(c)      A contribution to the Asbestos PI Trust of an annuity with a total nominal face value of $45.1 million, payable in equal installments over a period of 41 years, with the first installment payment payable on the fifth anniversary of the Effective Date (the "***Pfizer Annuity***");

(d)      Pfizer's agreement to forgive $30 million of the Pfizer Secured Claim as of the Effective Date;

(e)      Pfizer will make a cash contribution to the Asbestos PI Trust on the Effective Date in the amount of $50 million;

(f)      A contribution to the Asbestos PI Trust of Pfizer's right, title and interest in and to the Insurance Settlement Proceeds Trust except for Pfizer's right, title and interest in and to any AIG Payments and interest earned thereon, which Quigley will assign to Pfizer in accordance with the AIG Assignment Agreement; and

(g)      Upon the occurrence of the Stock Transfer Date, the transfer of 100% of the common stock of Reorganized Quigley to the Asbestos PI Trust; provided that, until the occurrence of the Stock Transfer Date, neither Pfizer, Quigley, nor Reorganized Quigley, as the case may be, shall not and Pfizer shall not cause Quigley or Reorganized Quigley, as the case may be, to declare, issue or otherwise pay any dividend; provided further that, following the transfer of 100% of the common stock of Reorganized Quigley to the Asbestos PI Trust, any dividends that are declared on such common stock will be used to fund the Asbestos PI Trust.

## 4.      Economic Consequences of Converting Quigley's Interest in the AIG Payments Under the AIG Settlement Agreement for Pfizer Annuity

As discussed above, the Plan provides that as part of the Pfizer Contribution, Pfizer will contribute to the Asbestos PI Trust the Pfizer Annuity. The form of the Pfizer Annuity will be included in the Plan Supplement. Using a discount factor of 5.39%, the net present value of the Pfizer Annuity is approximately $174 million. The Plan further provides that in exchange for the Pfizer Contribution, Quigley will execute the AIG Assignment Agreement, pursuant to which Quigley will assign all of its rights, title and interest in and to the AIG Payments. Under the terms of the AIG Settlement Agreement, the AIG Companies agreed to pay Pfizer and Quigley a total sum of $405,746,856 through a stream of payments over a period of 10 years. Using a discount rate of 5.39, the net present

value of Quigley's interest in the AIG Payments is approximately $160 million.[7] As a result of the conversion of Quigley's interest in the AIG Payments for Pfizer's contribution of the $405 million, 40 year Pfizer Annuity, Quigley's estate is receiving a net benefit of approximately $14 million.

## 5.    Estimation of Asbestos PI Claims

Experts retained by each of the Creditors' Committee and the Future Demand Holders' Representative have been provided with information relevant to the estimation of claims, including databases of claims filed and resolved before the Petition Date. In general, experts are charged with the task of preparing forecasts that estimate the number, type and year of filing of future asbestos personal injury claims against Quigley along with the estimated cost of resolving those claims (including resolution costs). To create such forecasts, experts apply methodologies that have been employed and tested in other contexts. They also make certain assumptions about historical events and likely future behavior.

As the basis for projections, experts will generally rely on Quigley's historical litigation experience in the tort system (as it exists as of the date of this Disclosure Statement). The first step in the process is to estimate the underlying aggregate population of individuals occupationally exposed to asbestos in the United States. For this estimate, experts have generally relied in substantial part on the population estimate originally developed by Dr. William Nicholson.

The second step consists of a calculation of the number of people who will develop a malignant disease due to asbestos exposure. Experts rely on generally accepted epidemiological studies of mesothelioma and lung cancer to make these calculations. The formulas basically take into account the intensity and duration of exposure to predict the number of exposed individuals who will contract these malignant diseases over time.

The next step is to predict the number of non-malignant claims. There is no epidemiological study that predicts the number of exposed individuals who might develop a non-malignant condition. Accordingly, experts will rely on Quigley's historical claims experience to predict the number of non-malignant claims. Specifically, experts apply the historical relationship of the number of non-malignant claims to certain malignant claims as a predictor of non-malignant claim filings. Experts may also adjust such ratios to account for developments and/or changes in tort law or the litigation environment.

The above steps yield a prediction of potential claimants. However, because not everyone who contracts a disease will actually file a claim, the expert must determine the likely rate of claim filing. To determine filing rate, experts determine the proportion of claims historically filed against Quigley as compared to the estimated total group of individuals with the designated asbestos-related diseases.

Finally, in order to determine the aggregate value of these estimated claims, experts apply historical indemnity values paid by Quigley to resolve claims. The calculation of total indemnity value takes into account not only the dollar value of historical settlements by disease type but also the rate of dismissals and any verdicts against Quigley. The total value is calculated by multiplying the number of claims in each disease type by the average value. In addition, to account for future events, the experts apply an inflation rate to the indemnity values. Estimates also include a prediction of future defense costs.

---

[7]  In computing the net present value of Quigley's interest in the AIG Payments, the following assumptions were used with respect to each of the following categories insurance policies or receivables owed by the AIG Companies, that were settled under the AIG Insurance Settlement Agreement: (a) Quigley has no right to any portion of the $6,371,927.10 Insurer Receivable owed to Pfizer, (b) Quigley has no Claim pending against it that would be covered by the $75 million excess liability claims-made policy issued to Pfizer covering the period November 1, 1997 through November 1, 2001; (c) Quigley has sole right to the $40,620,224.56 Quigley Insurer Receivable; (e) Quigley has a 50% interest (solely for purposes of this analysis) in the $283,754,705.34 of remaining unbilled occurrence-based coverage that is shared between Pfizer and Quigley; and (f) Quigley has a 50% interest in the approximately $9.2~~10~~ **10** million of interest that will have accrued on the AIG Payments as of ~~June~~**September** 1, 2008, the assumed Effective Date of the Plan. *See* "GENERAL INFORMATION – Insurance Coverage – Insurance Settlement Agreements – AIG Insurance Settlement Agreement."

The various experts have conducted an analysis of Quigley's historical claims. Attached to the Disclosure Statement as Exhibit "I" is a more detailed description of the methodology for estimating Quigley's future Asbestos PI Claims.

As described in more detail in Exhibit I, the estimated future claims population (based on one of several analyses) is 261,576 claims. The total value of these future claims, assuming application of the compensation amounts set forth in the TDP applicable to such claims under this plan, is estimated at $ $4.43 billion undiscounted and $2.66 billion discounted. There is typically variation in the estimates prepared by different experts based on such factors as the particular period of time used to determine the claiming rate and applicable value and the length of time it will take to process claims as well as the inflation and discount rates applied.

E.      **Executory Contracts and Unexpired Leases**

The Plan constitutes a motion by Quigley to assume, as of the Effective Date, all Executory Contracts to which Quigley is a party except for:  (a) the Executory Contracts specifically listed in the Plan Supplement, which will either be rejected or assumed and assigned as described therein; and (b) the Executory Contracts dealt with in the Plan or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date.   The Confirmation Order will constitute an order of the Bankruptcy Court approving such (a) rejections; (b) assumptions; or (c) assumptions and assignments, as the case may be, pursuant to section 365 of the Bankruptcy Code as of the Confirmation Date.

Quigley may at any time on or before the Confirmation Date amend the Plan Supplement to delete therefrom or add thereto any Executory Contract, and, as of the Effective Date, such Executory Contract will be deemed to be rejected or assumed and assigned, as the case may be.  Effective as of the Confirmation Date, all other Executory Contracts that are not specifically listed in the Plan Supplement will be deemed to be automatically assumed by Reorganized Quigley.  Quigley will provide notice of any amendments to the list of Executory Contracts contained in the Plan Supplement to the parties to the Executory Contracts affected thereby and to parties on the Master Service List.  The fact that any contract or lease is listed in the Plan Supplement will not constitute or be construed to constitute an admission that such contract or lease is an Executory Contract within the meaning of section 365 of the Bankruptcy Code or that Quigley or any successor in interest to Quigley (including Reorganized Quigley) has any liability thereunder.

Any monetary amounts by which each Executory Contract to be assumed or assumed and assigned under the Plan may be in default will be satisfied in full by the payment of Cure in accordance with section 365(b)(1) of the Bankruptcy Code.  In the event of a dispute regarding (a) the nature or the amount of any Cure; (b) the ability of Quigley, Reorganized Quigley or any proposed assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or assumed and assigned; or (c) any other matter pertaining to assumption, the payment of the Cure will occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute.  No amount will be due for Cure or other compensation to the parties to assumed or assumed and assigned Executory Contracts except as expressly provided in the Plan Supplement or as otherwise ordered by the Bankruptcy Court pursuant to a Final Order.  On the Initial Distribution Date, Reorganized Quigley will pay any undisputed Cure amounts under any of the Executory Contracts being assumed or assumed and assigned pursuant to Section 7.2 of the Plan.  Except for Claims for payment of Cure amounts, the parties to the assumed or assumed and assigned contracts will have no Claim against Quigley or Reorganized Quigley relating to those contracts.

If the rejection of an Executory Contract under the Plan by Quigley results in damages to the other party or parties to such contract, a Claim for such damages will be forever barred and will not be enforceable against any of Quigley, Reorganized Quigley or its properties, whether by way of setoff, recoupment, or otherwise unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for Quigley or Reorganized Quigley by the earlier of (a) thirty (30) days after entry of the Confirmation Order; and (b) thirty (30) days after entry of an order rejecting a contract pursuant to a motion filed by Quigley to reject such contract.

**F.      Indemnification and Reimbursement Obligations**

For purposes of the Plan, Quigley's obligations to indemnify and reimburse Persons who are or were directors, officers, or employees of Quigley on the Petition Date or at any time thereafter against and for any obligations pursuant to articles of incorporation, codes of regulations, by-laws, applicable state law, or specific agreement, or any combination of the foregoing, will survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date.  In furtherance of the foregoing, Reorganized Quigley will use its commercially reasonable efforts to maintain or procure insurance for the benefit of such directors, officers, or employees at levels no less favorable than those existing as of the date of entry of the Confirmation Order for a period of no less than four years following the Effective Date.

**G.      Corporate Reorganization Actions**

On or as soon as practicable after the Effective Date, Reorganized Quigley will take such actions as may be or become necessary to effectuate the following, all of which will be authorized and approved in all respects, in each case without further action being required under applicable law, regulation, order, or rule (including, without limitation, any action by the shareholders or directors of Quigley or Reorganized Quigley or the Asbestos PI Trust or the Trustees):

> Quigley will file the Amended Certificate of Incorporation with the Secretary of State for the State of New York.

> Reorganized Quigley will adopt the Amended Bylaws.

> Pursuant to the Plan, unless otherwise agreed to between Reorganized Quigley and Pfizer, the existing members of Quigley's Board of Directors will continue to serve in their respective capacities until the Stock Transfer Date.  On and after the Stock Transfer Date, the Asbestos PI Trust will have the right, but not the obligation, to replace any or all of the members of Reorganized Quigley's Board of Directors.

> On the Stock Transfer Date, Pfizer will transfer to the Asbestos PI Trust, 100% of the common stock of Reorganized Quigley.

**H.      Distributions under the Plan on Account of Claims Other than Asbestos PI Claims**

**1.      Generally**

Reorganized Quigley will make all Distributions required under the Plan as provided under Article VI of the Plan. Distributions on account of Allowed Claims in Classes 1, 2 and 3 will be made on the related Distribution date or as soon thereafter as practicable (unless otherwise provided in the Plan or ordered by the Bankruptcy Court).  All distributions on account of Asbestos PI Claims will be made in accordance with the terms of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

**2.      Pro Rata Share Distributions**

The Pro Rata Share of any Cash or assets to be distributed to or for the benefit of the holder of an Allowed Claim in any Class of Claims under the Plan will be distributed as provided in the Plan.  An initial distribution will be made on the Initial Distribution Date, with escrowed Distributions established in the aggregate amounts that would be distributable to Disputed Claims.  If and when a Disputed Claim in any Class becomes a Disallowed Claim, then the Pro Rata Share to which each holder of an Allowed Claim in such Class is entitled will increase proportionately. Accordingly, Reorganized Quigley will have the right (but not the obligation) to make or direct the making of subsequent interim Distributions to the holders of Allowed Claims in such Class in order to reflect any increases in the Pro Rata Share.  Similarly, on a periodic basis, Reorganized Quigley will distribute Pro Rata Shares of the escrowed Distributions to the holders of Claims that were Disputed Claims on the Effective Date, as they become

Allowed Claims. In any event, as soon as practicable after all Disputed Claims in any Class receiving Pro Rata Shares have become either Allowed Claims or Disallowed Claims, a final Distribution will be made to the holders of Allowed Claims in such Class.

### 3. Delivery of Distributions

Distributions and deliveries to holders of Allowed Claims will be made at the addresses set forth on the Proofs of Claim filed by such holders (or at the last known addresses of such holders if no Proof of Claim is filed or if Reorganized Quigley has been notified of a change of address). If any holder's Distribution is returned as undeliverable, then no further Distributions to such holder will be made unless and until Reorganized Quigley is notified of such holder's then current address, at which time all missed Distributions will be made to such holder without interest. Cash Distributions that are not claimed by the expiration of six (6) months from the date that such Distributions were made will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will revest in Reorganized Quigley and the Claim of any holder to such Distributions will be discharged and forever barred. Nothing contained in the Plan will require Quigley or Reorganized Quigley to attempt to locate any holder of an Allowed Claim.

### 4. Fractional Cents

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with half pennies or more being rounded up and fractions less than a half of a penny being rounded down.

### 5. Interest on Claims

Except as specifically provided for in the Plan, the Confirmation Order, the Interim Cash Collateral Order or the Final DIP/Cash Collateral Order, interest will not accrue on Claims, and no holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim. Interest will not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim. Except as expressly provided in the Plan, no prepetition Claim will be Allowed to the extent that it is for postpetition interest or other similar charges.

## I. Distributions to the Asbestos PI Trust and Reorganized Quigley

Except as otherwise provided below, on the later of the Effective Date and the date by which all the Trustees have executed the Asbestos PI Trust Agreement, the following assets will be transferred to the Asbestos PI Trust:

> the Quigley Contribution; and

> the Pfizer Contribution, except that:

> the common stock of Reorganized Quigley will be delivered by Pfizer to the Asbestos PI Trust on the Stock Transfer Date.

## J. Effect of Confirmation

### 1. Revesting of Reorganized Quigley's Assets

Under section 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan or the Confirmation Order, the property of Quigley's Estate (except for the Quigley Contribution) will revest in Reorganized Quigley on the Effective Date. From and after the Effective Date, Reorganized Quigley may operate its businesses and may use, acquire, and dispose of its property free of any restrictions imposed under the Bankruptcy Code or the Bankruptcy Rules or by the Bankruptcy Court. As of the Effective Date, all property of Quigley and Reorganized Quigley will be free and clear of all Claims, Liens and interests, except as specifically provided in the Plan or in the Confirmation

Order.  Without limiting the generality of the foregoing, Reorganized Quigley may, without application to or approval by the Bankruptcy Court, pay Professional fees and expenses that Reorganized Quigley may incur after the Effective Date.

**2.      Preservation of Certain Causes of Action; Defenses**

Except as otherwise provided in the Plan or the Confirmation Order, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized Quigley, as successor in interest to Quigley and its Estate, will retain and may enforce such Claims, rights and Causes of Action that are property of Quigley and its Estate, and Reorganized Quigley will retain and enforce all defenses and counterclaims to all Claims asserted against Quigley or its Estate, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code. Reorganized Quigley may pursue such Claims, rights, or Causes of Action, as appropriate, in accordance with its best interests, as determined by the Board of Directors of Reorganized Quigley.

Notwithstanding anything to the contrary contained in Section 10.2(a) of the Plan, on the Effective Date, all defenses and Causes of Action of Quigley and Reorganized Quigley relating to Asbestos PI Claims**, including any Asbestos Insurance Actions,** will be transferred and assigned to the Asbestos PI Trust.  Except as otherwise provided in the Plan or the Confirmation Order, in accordance with section 1123(b) of the Bankruptcy Code, the Asbestos PI Trust will retain and may enforce such defenses and Causes of Action and will retain and enforce all defenses and counterclaims to all Claims asserted against the Asbestos PI Trust with respect to such Claims, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code.  The Asbestos PI Trust may pursue such defenses, rights, or Causes of Action, as appropriate, in accordance with its and its beneficiaries' best interests.  Nothing in Section 10.2(b) of the Plan, however, will be deemed to be a transfer by the Debtor or Reorganized Quigley of any Claims, Causes of Action, or defenses relating to assumed Executory Contracts or otherwise which are required by Reorganized Quigley to conduct its business in the ordinary course subsequent to the Effective Date.

**3.      Quigley Insurance Transfer**

(a)      **Implementation of Quigley Insurance Transfer**

To effectuate the Quigley Contribution, ~~immediately upon~~**on** the Effective Date and without any further action of the Bankruptcy Court or further act or agreement of any Entity, Quigley will irrevocably transfer, grant and assign to the Asbestos PI Trust the Quigley Transferred Insurance Rights pursuant to the Quigley Insurance Transfer.  The Asbestos PI Trust ~~shall~~**will** assume responsibility for all obligations of Quigley **arising from,** under ~~any Insurance Settlement Agreement and any Shared Asbestos Insurance Policy~~**or related to any of the Quigley Transferred Insurance Rights**.  The Quigley Transferred Insurance Rights ~~are~~**will be** subject to any **and all** Asbestos PI Insurer Coverage Defenses.  The Quigley ~~Transferred~~ Insurance ~~Rights~~**Transfer** will be made and will be effective.  The Quigley Insurance Transfer ~~is~~**will** not **be**, and will not be deemed to be, ~~a transfer, grant or~~**an** assignment of the Shared Asbestos Insurance Policies, ~~or~~ the Insurance Settlement Agreements~~,~~ or any other settlement agreements with Asbestos Insurance Entities themselves.

(b)      **Institution and Maintenance of Legal and Other Proceedings**

From and after the Effective Date, the Asbestos PI Trust will be empowered and entitled ~~to~~, in its sole and absolute discretion, **to** pursue, compromise or settle its interests in any and all Quigley Transferred Insurance Rights, including without limitation, its interests in any and all Asbestos Insurance Actions.  The duties, obligations and liabilities of any Asbestos Insurance Entity under all insurance policies, all Shared Asbestos Insurance Policies, all Insurance Settlement Agreements, and all other settlement agreements with Asbestos Insurance Entities, are not diminished, reduced or eliminated by: (i) the discharge of Quigley and Reorganized Quigley from all Asbestos PI Claims; (ii) the injunctive protection provided to Quigley, Reorganized Quigley, the Asbestos Protected Parties, and the Settling Asbestos Insurance Entities with respect to Asbestos PI Claims; or (iii) the assumption of responsibility and liability for all Asbestos PI Claims by the Asbestos PI Trust**, For avoidance of doubt**, ~~subject to~~ any **and all** Asbestos PI Insurer Coverage Defenses **are preserved by and under the Plan**.

**(c)    License Back To Reorganized Quigley**

From and after the Effective Date, Reorganized Quigley will have a license to collect and use the proceeds of the Shared Asbestos Insurance Policies (the "License") only to the extent that (i) Reorganized Quigley's collection and use of the proceeds of the Shared Asbestos Insurance Policies does not reduce the Products/Completed Operations Coverage or any aggregate, per occurrence or other policy limit of any Shared Asbestos Insurance Policy that is or could potentially be applicable to Asbestos PI Claims, and (ii)  Reorganized Quigley's collection and use of the proceeds of the Shared Asbestos Insurance Policies does not in any way interfere with the Asbestos PI Trust's exercise of any Quigley Transferred Insurance Rights.  The Asbestos PI Trust may terminate this License at any time if the Asbestos PI Trust deems the termination of the License necessary for any reason, including, without limitation, to resolve any disputes with insurers concerning any of the Shared Asbestos Insurance Policies.

**(d)    Obligations of Reorganized Quigley**

At the reasonable direction and request of the Asbestos PI Trust, and at the cost of the Asbestos PI Trust, Reorganized Quigley will (i) use reasonable efforts to pursue any of the Quigley Transferred Insurance Rights for the benefit of Asbestos PI Trust; and (ii) immediately transfer any amounts recovered by Reorganized Quigley under or on account of any of the Quigley Transferred Insurance Rights to the Asbestos PI Trust; provided, however, that while any such amounts are held by or under the control of Reorganized Quigley, such amounts will be held for the benefit of the Asbestos PI Trust.  To the extent permitted by applicable law, Reorganized Quigley will cooperate with the Asbestos PI Trust in its pursuit of the Quigley Transferred Insurance Rights as requested by the Asbestos PI Trust, including, but not limited to, by making its books, records, employees, agents, and professionals available to the Asbestos PI Trust solely as they relate to the Quigley Transferred Insurance Rights.

**4.    Insurance Neutrality**

All Asbestos PI Insurer Coverage Defenses are preserved and nothing in the Plan, ~~the exhibits to the Plan,~~ the Confirmation Order, any finding of fact and/or conclusion of law with respect to the Confirmation of the Plan, or any order or opinion entered on appeal from the Confirmation Order, will limit the right of any Asbestos Insurance Entity, in any Asbestos Insurance Action, to assert any Asbestos PI Insurer Coverage Defense.  Notwithstanding anything in Section 10.4 of the Plan to the contrary, nothing in Section 10.4 **of the Plan** will affect or limit, or be construed as affecting or limiting, (i) the binding effect of the Plan and the Confirmation Order on Quigley, Reorganized Quigley, or the Asbestos PI Trust or the beneficiaries of such trust; (ii) the protection afforded to any Settling Asbestos Insurance Entity by the Settling Asbestos Insurance Entity Injunction; or (iii) the Non-Settling Asbestos Insurance Entity Injunction.  ~~Further, nothing~~

**Nothing** in Section 10.4 of the Plan is intended or will be construed to preclude otherwise applicable principles of *res judicata* or collateral estoppel from being applied against any Asbestos Insurance Entity. **with respect to any issue that is actually litigated by such Asbestos Insurance Entity as part of its objections, if any, to confirmation of the Plan or as part of any contested matter or adversary proceeding in this Chapter 11 Case.**

**5.    Reduction of Insurance Judgments**

Any right, Claim or cause of action that an Asbestos Insurance Entity would have been entitled to assert under applicable ~~nonbankruptcy~~**non-bankruptcy** law against any Settling Asbestos Insurance Entity but for the Settling Asbestos Insurance Entity Injunction will be treated solely as a setoff claim against the Asbestos PI Trust.  Any such right, Claim, or cause of action to which an Asbestos Insurance Entity may be entitled will be solely a setoff against any recovery of the Asbestos PI Trust from that Asbestos Insurance Entity.  Under no circumstances will that Asbestos Insurance Entity receive an affirmative recovery of funds from the Asbestos PI Trust or any Settling Asbestos Insurance Entity for such right, Claim, or cause of action.  Any setoff in favor of an Asbestos Insurance Entity will not constitute a classified or unclassified Claim under this Plan and will not be subject to or Impaired by this Plan.  Instead, any setoff will be determined, calculated and applied solely as a matter of applicable ~~nonbankruptcy~~**non-bankruptcy** law without regard to any other provision of this Plan or any bankruptcy law or decision.

## 6. Terms of Injunction and Automatic Stay

All of the injunctions and/or automatic stays provided for in or in connection with the Chapter 11 Case, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, Bankruptcy Rules or other applicable law, in existence immediately prior to the Confirmation Date, including, but not limited to, the Preliminary Injunction Order, will remain in full force and effect until the injunctions set forth in the Plan (and as described below in Section V.K) become effective pursuant to a Final Order, and will continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, Reorganized Quigley may seek such orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in the Plan or the Confirmation Order will become effective on the Effective Date and will continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order. Notwithstanding anything to the contrary contained in the Plan or the Confirmation Order, all actions of the nature of those to be enjoined by such injunctions will be enjoined during the period between the Confirmation Date and the Effective Date.

## 7. Title to Asbestos PI Trust Assets

On the Effective Date, title to all of the Asbestos PI Trust Assets will vest in the Asbestos PI Trust free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity, as provided in Section 10.7 of the Plan; provided, however, that title to the Quigley Stock Right shall vest in the Asbestos PI Trust on the Stock Transfer Date. The Asbestos PI Trust will be empowered and entitled to initiate, prosecute, defend, settle, maintain, administer, preserve, pursue, and resolve all Quigley Transferred Insurance Rights (subject to any Asbestos PI Coverage Defenses), including without limitation, its interests in any and all Asbestos Insurance Actions, in the name of the Asbestos PI Trust, the Trustees of the Asbestos PI Trust, **and/**or Reorganized Quigley.

## 8. Dissolution of Creditors' Committee; Retention of Future Demand Holders' Representative; Creation of the Trust Advisory Committee

On the Effective Date, the members of the Creditors' Committee will be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case, and the Creditors' Committee will be deemed dissolved. If the Effective Date occurs prior to the Confirmation Order becoming a Final Order, the Creditors' Committee, may, at its option, continue to serve and function for the purposes of participating in any: (a) appeal of the Confirmation Order, but only until such time as the Confirmation Order becomes a Final Order; (b) hearing on a Fee Claim; and (c) adversary proceeding pending on the Effective Date in which the Creditors' Committee was a party. The Future Demand Holders' Representative also may, at his option, participate in any: (a) appeal of the Confirmation Order, but only until such time as the Confirmation Order becomes a Final Order; (b) hearing on a Fee Claim; and (c) adversary proceeding pending on the Effective Date in which the Future Demand Holders' Representative was a party.

On the Effective Date, the Trust Advisory Committee will be appointed by the Bankruptcy Court effective as of the Effective Date, as provided in Section 9.3(c) of the Plan. From and after the Effective Date, the Future Demand Holders' Representative will continue to serve as provided in the Plan and in the Asbestos PI Trust Agreement to perform the functions specified and required by that agreement. Upon termination of the Asbestos PI Trust, (a) members of the Trust Advisory Committee and the Future Demand Holders' Representative will thereupon be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case; and (b) the Trust Advisory Committee will be deemed dissolved and the Future Demand Holders' Representative's employment will be deemed terminated. All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Trust Advisory Committee and the Future Demand Holders' Representative will be paid exclusively by the Asbestos PI Trust in accordance with the terms of the Asbestos PI Trust Agreement, and Reorganized Quigley will not be liable for any such fees and expenses. If there will be any dispute regarding the payment of such fees and expenses, the parties

will attempt to resolve such dispute in good faith and if they will fail to resolve such dispute, they will submit the dispute to the Bankruptcy Court for resolution.

**9.      Avoidance and Recovery Actions**

Except to the extent released or otherwise relinquished pursuant to the Plan, any other Plan Document or the Confirmation Order (including, without limitation, Section 10.7(b) of the Plan), any rights, Claims, or Causes of Action accruing to Quigley pursuant to the Bankruptcy Code or pursuant to any statute or legal theory, including any Avoidance Action, any rights to, Claims, or Causes of Action for recovery under any policies of insurance issued to or on behalf of, or which provides indemnity or liability payments to or on behalf of Quigley, and any rights, Claims, and Causes of Action against third parties related to or arising out of Allowed Claims, except Claims that will, pursuant to the Plan, be retained and resolved by Reorganized Quigley, will be transferred to the Asbestos PI Trust on the Effective Date.

The Asbestos PI Trust will be deemed to be the appointed representative to, and may, pursue, litigate, and compromise and settle any rights, Claims, or Causes of Action transferred to it, as appropriate, in accordance the best interests, and for the benefit, of the Asbestos PI Trust and the beneficiaries thereof.

**10.      Tax Sharing Agreement**

The Tax Sharing Agreement will remain in effect until the Stock Transfer Date.

**K.      Releases, Injunctions and Discharges**

**1.      Discharge of Quigley**

Except as specifically provided in the Plan, the Plan Documents or in the Confirmation Order, pursuant to section 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan will discharge the Debtor and Reorganized Quigley from any and all Claims of any nature whatsoever and Demands, including, without limitation, any Claims, Demands and Liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not:  (a) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtor; (b) such Claim is or was Allowed under section 502 of the Bankruptcy Code; or (c) the holder of such Claim has voted on or accepted the Plan.  Except as specifically provided for in the Plan or other Plan Documents, as of the Effective Date, the rights provided for in the Plan will be in exchange for and in complete satisfaction, settlement, discharge of, all Claims (including, without limitation Asbestos PI Claims) or Demands against, Liens on, and interests (other than the Equity Interests) in the Debtor or the Reorganized Debtor or any of their assets or properties.

**2.      Injunction**

**Except as otherwise expressly provided in the Plan or in the Confirmation Order, all entities who have held, hold or may hold Claims or Demands against Quigley, are permanently enjoined, on and after the Confirmation Date, from:**

> **commencing or continuing in any manner any action or other proceeding of any kind against Quigley with respect to any such Claim or Demand,**

> **the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against Quigley on account of any such Claim or Demand,**

creating, perfecting or enforcing any Encumbrance of any kind against Quigley or against the property or interest in property of Quigley on account of any such Claim or Demand, and

asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from Quigley or against the property or interests in property of Quigley on account of any such Claim or Demand.

Such injunction will extend to the successors of Quigley (including, without limitation, Reorganized Quigley) and their respective properties and interests in property.

3.      Exculpation

None of the following Released Parties (but solely in respect of their specific capacities as listed below):

the Creditors' Committee and the present and former members thereof (including ex officio members, if any);

Quigley;

Reorganized Quigley;

the Future Demand Holders' Representative;

the Asbestos Protected Parties; and

all present or former Representatives of the foregoing,

will have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of: (a) the Chapter 11 Case; (b) the pursuit of confirmation of the Plan; (c) the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan or the Asbestos PI Trust Distribution Procedures; (d) the Plan; or (e) the negotiation, formulation and preparation of the Plan and the other Plan Documents and any of the terms and/or settlements and compromises reflected in the Plan and the other Plan Documents, except for gross negligence, willful misconduct, breach of fiduciary duty that resulted in personal profit at expense of the Estate, or, in the case of attorneys, breaches of professional responsibility, and, in all respects, Quigley, Reorganized Quigley, and each of the Released Parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the other Plan Documents.

4.      Release of Quigley's Officers and Directors

The acceptance of (a) any Distribution by any holder of a Claim and (b) the Quigley Contribution by the Asbestos PI Trust will constitute a waiver and release of any and all causes of action that such holder, including any holder of an Asbestos PI Claim, could have commenced against any officer or director of Quigley serving in such capacity from and after the Petition Date, that is based upon, related to or arising from any actions or omissions of such officers or directors occurring prior to the Effective Date in connection with or related to their capacities as officers or directors of Quigley, to the fullest extent permitted under section 524(e) of the Bankruptcy Code and applicable law as now in effect or as subsequently extended; provided, however, that the forgoing will not operate as a waiver or release from (a) any causes of action arising out of willful misconduct, gross negligence of any such person or entity, or breach of fiduciary duty by any such person or entity that resulted in personal profit at expense of the Estate; (b) any claim by any federal, state or local authority under the Internal Revenue Code or any applicable environmental or criminal laws; or (c) any contractual obligations arising from or out of a loan or advance from Quigley to any officer or director of Quigley.

**5.     Limited Release of Released Parties by Entities Accepting Distributions Under the Plan or Asbestos PI Trust Distribution Procedures**

Except as otherwise specifically provided in the Plan or the Confirmation Order, any Entity who has accepted the Plan or who is entitled to receive any distribution pursuant to the Plan or the Asbestos PI Trust Distribution Procedures will be presumed conclusively to have released the Released Parties, from any Claim or cause of action based on, arising from, or in any way connected with the same subject matter as the Claim for which a distribution is received.  The foregoing release will be enforceable as a matter of contract law against any Entity who has accepted the Plan or who is entitled to receive any property or interest in property pursuant to the Plan or any distribution under the Asbestos PI Trust Distribution Procedures.

**6.     Asbestos PI Channeling Injunction**

    **(a)     Parties Covered by the Asbestos PI Channeling Injunction**

Pursuant to the Asbestos PI Channeling Injunction and the Plan, the following entities will be Asbestos Protected Parties protected by the scope of the Asbestos PI Channeling Injunction:

    any Quigley Person;

    Reorganized Quigley;

    any Pfizer Protected Party and any other Entity that is alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on Quigley to the extent such alleged liability arises by reason of—

        the Pfizer Protected Party's or other Entity's ownership of a financial interest in Quigley, a past or present Affiliate of Quigley, Reorganized Quigley or a predecessor in interest of Quigley or Reorganized Quigley;

        the Pfizer Protected Party's or other Entity's involvement in the management of Quigley, Reorganized Quigley or a predecessor in interest of Quigley or Reorganized Quigley, or service as an officer, director or employee of Quigley, Reorganized Quigley or a related party;

        the Pfizer Protected Party's or other Entity's provision of insurance to Quigley, Reorganized Quigley or a related party; or

        the Pfizer Protected Party's or other Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of Quigley, Reorganized Quigley or a related party, including but not limited to—

            involvement in providing financing (debt or equity), or advice to an Entity involved in such a transaction; or

            acquiring or selling a financial interest in an Entity as part of such a transaction.

    **(b)     Terms of the Asbestos PI Channeling Injunction**

Subject to Section 11.6(b) of the Plan, pursuant to section 524(g) of the Bankruptcy Code, the sole recourse of any holder of an Asbestos PI Claim on account of such Asbestos PI Claim will be to the Asbestos PI Trust pursuant to the provisions of the Asbestos PI Channeling Injunction as described in Section 11.6 of the Plan, the Asbestos PI Trust Agreement, and the Asbestos PI Trust Distribution Procedures.  Each such holder will be enjoined from taking legal action directed against Quigley, Reorganized Quigley or any other Asbestos Protected Party or the property of any of them for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery with respect to such Asbestos PI Claim, other than from the Asbestos PI

**Trust in accordance with this Asbestos PI Channeling Injunction and pursuant to the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.**

      **(c)**      **Reservations.**

**Notwithstanding anything to the contrary above, the Asbestos PI Channeling Injunction will not enjoin:**

      **(i)**      **the rights of Entities to the treatment accorded them under Articles III and IV of the Plan, as applicable, including the rights of Entities with Asbestos PI Claims to assert Asbestos PI Claims against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures;**

      **(ii)**      **the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Asbestos PI Trust;**

      **(iii)**      **the rights of the Asbestos PI Trust and/or Reorganized Quigley to take any action with respect to any and all of the Quigley Transferred Insurance Rights, subject to the terms of any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;**

      **(iv)**      **the rights of any Entity to which the Asbestos PI Trust, Reorganized Quigley and/or any Pfizer Protected Party has assigned any of the Quigley Transferred Insurance Rights to take any action with respect any such Quigley Transferred Insurance Right, subject to ~~the terms of~~ any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;**

      **(v)**      **the rights of the Asbestos PI Trust, Reorganized Quigley, any Pfizer Protected Party or any other Entity to assert any Claim, debt, obligation, or liability for payment against any Settling Asbestos Insurance Entity to the extent any insurance policies or insurance coverages were not resolved or released in the Insurance Settlement Agreement or the AIG Insurance Settlement Agreement, as applicable, with that Settling Asbestos Insurance Entity, subject t~~o the terms of~~ any applicable Insurance Settlement Agreement, the AIG Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;**

      **(vi)**      **the rights of Pfizer, as defined in the AIG Insurance Settlement Agreement, to assert or prosecute any Claim, debt, obligation, or liability for payment against any AIG Company in connection with the implementation, enforcement or interpretation of the AIG Insurance Settlement Agreement, subject t~~o the terms~~ the AIG Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;**

      **(vii)**      **the rights of any ~~Pfizer Protected Party~~Entity to assert or prosecute any Claim, debt, obligation, or liability for payment against any Asbestos Insurance Entity, subject to the ~~terms of~~Quigley Insurance Transfer, any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense; and**

      **~~(viii)~~**      **~~the rights, if any, of any Entity to assert or prosecute any Claim, debt, obligation, or liability for payment against a Shared Asbestos Insurance Policy or related Insurance Settlement Agreement in the event there is a final and binding determination (by settlement or adjudication) that such Shared Asbestos Insurance Policy and/or related Insurance Settlement Agreement does not provide~~**

**Products/Completed Operations Coverage for Asbestos PI Claims; and(ix)** the rights of holders of Secured Bond Claims to prosecute such Claims against Quigley or Reorganized Quigley in accordance with Section 4.2(b), (c), (d), ~~(e), (f),~~ or (gc) of the Plan, as applicable.

7.      **Settling Asbestos Insurance Entity Injunction**

      (a)      **Terms.**

Subject to Section 11.7(b) of the Plan, in order to preserve and promote the property of the Estate, as well as the settlements contemplated by and provided for in the Plan, and the agreements approved by the Bankruptcy Court, pursuant to section 524(g) of the Bankruptcy Code, the sole recourse of any holder of an Asbestos PI Claim on account of such Asbestos PI Claim will be to the Asbestos PI Trust pursuant to the provisions of the Settling Asbestos Insurance Entity Injunction as described in Section 11.7 of the Plan, the Asbestos PI Trust Agreement, and the Asbestos PI Trust Distribution Procedures. Each such holder will be enjoined from taking legal action directed against any Settling Asbestos Insurance Entity or its property for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery with respect to such Asbestos PI Claim, other than from the Asbestos PI Trust in accordance with this Asbestos PI Channeling Injunction and pursuant to the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

      (b)      **Reservations.**

Pursuant to Section 11.7(b) of the Plan, this Settling Asbestos Insurance Entity Injunction will not enjoin:

      (i)      the rights of Entities to the treatment accorded them under Articles III and IV of the Plan, as applicable, including the rights of Entities with Asbestos PI Claims to assert Asbestos PI Claims against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures;

      (ii)     the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Asbestos PI Trust;

      (iii)    the rights of the Asbestos PI Trust and/or Reorganized Quigley to take any action with respect to any and all of the Quigley Transferred Insurance Rights, subject to ~~the terms of~~ any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;

      (iv)     the rights of any Entity to which the Asbestos PI Trust, Reorganized Quigley and/or any Pfizer Protected Party has assigned any of the Quigley Transferred Insurance Rights to take any action with respect any such Quigley Transferred Insurance Right, subject to ~~the terms of~~ any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;

      (v)      the rights of the Asbestos PI Trust, Reorganized Quigley, any Pfizer Protected Party or any other Entity to assert any Claim, debt, obligation, or liability for payment against any Settling Asbestos Insurance Entity to the extent any insurance policies or insurance coverages were not resolved or released in the Insurance Settlement Agreement or the AIG Insurance Settlement Agreement, as applicable, with that Settling Asbestos Insurance Entity, subject to ~~the terms of~~ any applicable Insurance Settlement Agreement, the AIG Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;

(vi) the rights of Pfizer, as defined in the AIG Insurance Settlement Agreement, to assert or prosecute any Claim, debt, obligation, or liability for payment against any AIG Company in connection with the implementation, enforcement or interpretation of the AIG Insurance Settlement Agreement, subject to the ~~terms the AIG Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;(vii) the rights of any Pfizer Protected Party to assert or prosecute any Claim, debt, obligation, or liability for payment against any Asbestos Insurance Entity, subject to the terms of any applicable~~AIG Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense; and

(~~viii~~vii) the rights~~, if any,~~ of any Entity to assert or prosecute any Claim, debt, obligation, or liability for payment against ~~a Shared~~any Asbestos Insurance ~~Policy or related~~Entity, subject to the Quigley Insurance Transfer, any applicable Insurance Settlement Agreement ~~in the event there is a final and binding determination (by settlement or adjudication) that such Shared Asbestos Insurance Policy and/or related Insurance Settlement Agreement does not provide Products/Completed Operations Coverage for Asbestos PI Claims~~, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense.

8. **Non-Settling Asbestos Insurance Entity Injunction**

(a) **Terms.**

Subject to Sections 11.8(b) and (c) of the Plan, in order to preserve and promote the property of the Estate, pursuant to section 105(a) of the Bankruptcy Code, holders of Asbestos PI Claims will have no right whatsoever at any time to assert their Asbestos PI Claims against a Non-Settling Asbestos Insurance Entity or any property or interest in property of a Non-Settling Asbestos Insurance Entity. Each such ~~holders~~holder of Asbestos PI Claims will be enjoined from taking legal action directed against Non-Settling Asbestos Insurance Entity or its property for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to such Asbestos PI Claim, other than from the Asbestos PI Trust in accordance with this Non-Settling Asbestos Insurance Entity Injunction and pursuant to the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

(b) **Reservations.**

Notwithstanding anything to the contrary above, this Non-Settling Asbestos Insurance Entity Injunction will not enjoin:

(i) the rights of Entities to the treatment accorded them under Articles III and IV of the Plan, as applicable, including the rights of Entities with Asbestos PI Claims to assert Asbestos PI Claims against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures;

(ii) the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Trust Expenses against the Asbestos PI Trust;

(iii) the rights of the Asbestos PI Trust and/or Reorganized Quigley to take any action with respect to any and all of the Quigley Transferred Insurance Rights, subject to ~~the terms of~~ any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;

(iv) the rights of any Entity to which the Asbestos PI Trust, Reorganized Quigley and/or any Pfizer Protected Party has assigned any of the Quigley Transferred Insurance Rights to take any action with respect any such Quigley Transferred Insurance

**Right, subject to the terms of any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;**

(v) **the rights of the Asbestos PI Trust, Reorganized Quigley, any Pfizer Protected Party or any other Entity to assert any Claim, debt, obligation, or liability for payment against any Settling Asbestos Insurance Entity to the extent any insurance policies or insurance coverages were not resolved or released in the Insurance Settlement Agreement or the AIG Insurance Settlement Agreement, as applicable, with that Settling Asbestos Insurance Entity, subject to the terms of any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense;**

(vi) **the rights of Pfizer, as defined in the AIG Insurance Settlement Agreement, to assert or prosecute any Claim, debt, obligation, or liability for payment against any AIG Company in connection with the implementation, enforcement or interpretation of the AIG Insurance Settlement Agreement, subject to the terms the AIG Insurance Settlement Agreement, the AIG Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense; and**

(vii) **the rights of any ~~Pfizer Protected Party~~Entity to assert or prosecute any Claim, debt, obligation, or liability for payment against any Asbestos Insurance Entity, subject to the ~~terms of~~Quigley Insurance Transfer, any applicable Insurance Settlement Agreement, the Insurance Relinquishment Agreement and any Asbestos PI Insurer Coverage Defense~~; and~~**

(viii) ~~the rights, if any, of any Entity to assert or prosecute any Claim, debt, obligation, or liability for payment against a Shared Asbestos Insurance Policy or related Insurance Settlement Agreement in the event there is a final and binding determination (by settlement or adjudication) that such Shared Asbestos Insurance Policy and/or related Insurance Settlement Agreement does not provide Products/Completed Operations Coverage for Asbestos PI Claims.(ix) the rights of any Entity to take any action against a Shared Asbestos Insurance Policy or related Insurance Settlement Agreement, only to the extent that there is a final and binding determination (by settlement or adjudication) that such Shared Asbestos Insurance Policy (and/or related Insurance Settlement Agreement) does not provide products/completed operations coverage for Asbestos PI Claims.~~

(c) **Notwithstanding anything in Section 11.8 of the Plan to the contrary, (i) the Non-Settling Asbestos Insurance Entity Injunction is issued solely for the benefit of the Asbestos PI Trust and not for the benefit of any other Entity, including, but not limited to, any Non-Settling Asbestos Insurance Entity, and no Non-Settling Asbestos Insurance Entity is intended to be a third-party beneficiary of the Non-Settling Asbestos Insurance Entity Injunction; (ii) the Asbestos PI Trust will have the sole right to enforce the Non-Settling Asbestos Insurance Entity Injunction; and (iii) the Asbestos PI Trust has the sole discretion to waive the Non-Settling Asbestos Insurance Entity Injunction as to any Asbestos PI Claim or any Non-Settling Asbestos Insurance Entity upon express written notice to such Non-Settling Asbestos Insurance Entity.**

## 9. Limitations of Injunctions

Notwithstanding any other provision of the Plan to the contrary, the releases set forth in the Plan and the injunctions set forth in Sections 11.6, 11.7 and 11.8 of the Plan, respectively, will not serve to satisfy, discharge, release, or

enjoin claims by any Entity against (a) the Asbestos PI Trust for payment of Asbestos PI Claims in accordance with the Asbestos PI Trust Distribution Procedures, or (b) the Asbestos PI Trust for the payment of Trust Expenses.

**10.     Release and Indemnification of Plan Contributors by Quigley**

As of the Effective Date, except to the extent otherwise provided for in the Plan, the other Plan Documents or the Confirmation Order, Quigley and Reorganized Quigley will release and will be permanently enjoined from any prosecution or attempted prosecution of any and all Causes of Action that they have, may have or claim to have, which are property of, assertable on behalf of or derivative of Quigley, against the Released Parties (but solely in their capacities as Released Parties); provided, however, that this release will not serve to release or enjoin any Settling Asbestos Insurance Entity from its obligations under the relevant Insurance Settlement Agreement, other settlement agreement, or Shared Asbestos Insurance Policy.  Reorganized Quigley also will indemnify, release and hold harmless each of Pfizer and the other Pfizer Protected Parties pursuant to the provisions of, and to the extent set forth in, the  Plan.

**11.     Confidentiality Injunction**

**To instill the confidence of its clients, neither (i) Reorganized Quigley nor (ii) any other Entity shall cause or purport to permit Reorganized Quigley to make any use of any information entrusted to Reorganized Quigley by any client of Reorganized Quigley, except as expressly permitted by the terms of any agreement between Reorganized Quigley and such client or under applicable law.  Reorganized Quigley and any Person harmed or likely to be harmed by the actual or threatened violation of this Section shall be entitled to enforce the Confidentiality Injunction through any remedy available under any applicable principle of law or equity**.

**12.     Dividend Injunction**

**The Confirmation Order will provide further that, until the occurrence of the Stock Transfer Date, neither Pfizer, Quigley, nor Reorganized Quigley, as the case may be, shall not and Pfizer shall not cause Quigley or Reorganized Quigley, as the case may be, to declare, issue or otherwise pay any dividend.**

**L.     Miscellaneous Plan Provisions**

**1.     Modification of the Plan**

Quigley may, with the consent of Pfizer, alter, amend, or modify the Plan or any Schedules or Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date and may include any such amended Schedules or Exhibits in the Plan or the Plan Supplement, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and Quigley has complied with section 1125 of the Bankruptcy Code, to the extent necessary.  Quigley may, with the consent of Pfizer, alter, amend, or modify the Plan or any Schedules or Exhibits thereto at any time after entry of the Confirmation Order and before the Plan's substantial consummation, provided that:  (a) the Plan, as modified, altered, or amended, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; and (b) the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.  A holder of a Claim that has accepted or rejected the Plan will be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, if any, such holder changes its previous acceptance or rejection.

**2.     Revocation or Withdrawal of the Plan**

Quigley reserves the right to revoke or withdraw the Plan, with the written consent of Pfizer, at any time prior to entry of the Confirmation Order.  If Quigley revokes or withdraws the Plan or if confirmation of the Plan does not occur, then:  (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of Executory Contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan, will be deemed null and void; and (c) nothing contained in the Plan, and

no acts taken in preparation for consummation of the Plan, will: (x) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Equity Interests in, Quigley or any other Entity; (y) prejudice in any manner the rights of Quigley or any Entity in any further proceedings involving Quigley; or (z) constitute an admission of any sort by Quigley or any other Entity.

3.      **Supplemental Documents**

The Exhibits referred to in the Plan can be found either as attachments to the Plan, such as the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, or as part of a separate exhibit volume which will be filed with the Clerk of the Bankruptcy Court at least five (5) Business Days prior to the deadline for the filing and service of objections to the Plan.  Thereafter, any person may examine the exhibit volume in the office of the Clerk of the Bankruptcy Court during normal court hours and may also view the same at Quigley's Internet site (www.quigleyreorg.com).  Claimants may also obtain a copy of the exhibit volume, once filed, from Quigley upon written request to the following address:

| If sent by U.S. Mail: | If sent by Overnight Carrier: |
|---|---|
| Quigley Company, Inc. | Quigley Company, Inc. |
| c/o ~~The~~**Wells Fargo** Trumbull-~~Group~~ | c/o ~~The~~**Wells Fargo** Trumbull-~~Group~~ |
| P.O. Box 721 | 4 Griffin Rd. North |
| Windsor, CT 06095-0721 | Windsor, CT 06095-1511 |
| (860) 687-7579 | (860) 687-7579 |

4.      **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), or a Schedule or Exhibit hereto or instrument, agreement or other document executed under the Plan provides otherwise, the rights, duties and obligations arising under the Plan, and the instruments, agreements and other documents executed in connection with the Plan, will be governed by, and construed and enforced in accordance with, the internal laws of the State of New York without giving effect to the principles of conflicts of law thereof.

5.      **Inconsistencies**

To the extent the Plan is inconsistent with this Disclosure Statement, the provisions of the Plan will be controlling. To the extent the Plan is inconsistent with the Confirmation Order, the Confirmation Order will be controlling.

M.      **Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, the Bankruptcy Court will, to the fullest extent permitted by law, retain and have exclusive jurisdiction over all matters arising out of and related to the Chapter 11 Case and the Plan, including, among other things, jurisdiction to:

(a)      Hear and determine any and all objections to and proceedings involving the allowance, estimation, classification, and subordination of Claims (other than Asbestos PI Claims) or Equity Interests;

(b)      Hear and determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Asbestos PI Trust after the Effective Date, including any proceedings with respect to Avoidance Actions, except to the extent that any such Avoidance Actions have been released under the Plan or the Confirmation Order, or otherwise to recover assets for the benefit of the Estate or the Asbestos PI Trust;

(c)      Hear and determine all objections to the termination of the Asbestos PI Trust;

(d)  Hear and determine such other matters that may be set forth in or arise in connection with the Plan, the Confirmation Order, the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction, the Dividend Injunction or the Asbestos PI Trust Agreement;

(e)  Hear and determine any proceeding that involves the validity, application, construction, enforceability, or modification of the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction or the Dividend Injunction;

(f)  Hear and determine any conflict or other issues that may arise in the Chapter 11 Case and the administration of the Asbestos PI Trust;

(g)  Enter such orders as are necessary to implement and enforce the injunctions described herein, including, if necessary, orders extending the protections afforded by section 524(g) of the Bankruptcy Code to the Settling Asbestos Insurance Entities and the Asbestos Protected Parties;

(h)  Hear and determine any and all applications for allowance of Fee Claims and any other fees and expenses authorized to be paid or reimbursed under the Bankruptcy Code or the Plan;

(i)  Enter such orders authorizing non-material modifications to the Plan as may be necessary to comply with section 468B of the Internal Revenue Code;

(j)  Hear and determine any applications pending on the Effective Date for the assumption, rejection or assumption and assignment, as the case may be, of Executory Contracts to which Quigley is a party or with respect to which Quigley may be liable, and to hear and determine and, if necessary, liquidate any and all Claims arising therefrom;

(k)  Hear and determine any and all applications, Claims, causes of action, adversary proceedings, and contested or litigated matters that may be pending on the Effective Date or commenced by Reorganized Quigley or any other party in interest subsequent to the Effective Date;

(l)  Consider any modifications of the Plan, remedy any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order, to the extent authorized by the Bankruptcy Code;

(m)  Hear and determine all controversies, suits, and disputes that may arise in connection with the interpretation, enforcement, or consummation of the Plan or any Entity's obligations hereunder, including, but not limited to, performance of Quigley's duties under the Plan;

(n)  Hear and determine any proposed compromise and settlement of any Claim against or cause of action by or against Quigley;

(o)  Issue orders in aid of confirmation, consummation and execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

(p)  Hear and determine such other matters as may be set forth in the Confirmation Order or other orders of the Bankruptcy Court, or which may arise in connection with the Plan, the Confirmation Order, or the Effective Date, as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(q)  Hear and determine any timely objections to Administrative Claims or to Proofs of Claim filed, both before and after the Confirmation Date, including any objections to the classification of any Claim, and to Allow or Disallow any Disputed Claim, in whole or in part;

Workshare DeltaView comparison of interwovenSite://NYCMS/NEWYORK/10435708/6 and interwovenSite://NYCMS/NEWYORK/10435708/7. Performed on 3/28/2008.

(r) Hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(s) Compel the conveyance of property and other performance contemplated under the Plan and documents executed in connection herewith;

(t) Enforce remedies upon any default under the Plan;

(u) Hear and determine any other matter not inconsistent with the Bankruptcy Code; and

(v) Enter a final decree closing the Chapter 11 Case.

If and to the extent that the Bankruptcy Court is not permitted under applicable law to exercise jurisdiction over any of the matters specified above, the reference to the "Bankruptcy Court" in the preamble above will be deemed to be a reference to the "District Court." Notwithstanding the terms of Section 13.1 of the Plan, the Bankruptcy Court will retain continuing but not exclusive jurisdiction over Asbestos Insurance Actions; provided, however, that Section 13.1 of the Plan will not confer or grant jurisdiction to the Bankruptcy Court when the Asbestos Insurance Action is governed by an otherwise applicable arbitration provision. Notwithstanding anything in Section 13.1 of the Plan to the contrary, the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures will govern the satisfaction of Asbestos PI Claims and the forum in which such Asbestos PI Claims will be determined.

## THE ASBESTOS PI TRUST

The following summarizes the most salient terms of the governing documents for the Asbestos PI Trust, including the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures. The following is intended only to be a summary and is qualified in its entirety by reference to the full text of such documents. In the event of any inconsistency between the provisions of these documents and the summary contained herein, the terms of such documents will control. Interested parties should therefore review the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, copies of which are attached to the Plan as Exhibits A and B, respectively.

## A. General Description of the Trust

### 1. Creation and Purposes of the Asbestos PI Trust

On the Effective Date, the Trustees for the Asbestos PI Trust will execute the Asbestos PI Trust Agreement, and the Asbestos PI Trust will be created. The purpose of the Asbestos PI Trust is to assume all Asbestos PI Claims (whether now existing or arising at any time hereafter) and to use the Asbestos PI Trust Assets to pay holders of such Asbestos PI Claims in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, in such a way that all holders of Asbestos PI Claims that involve similar claims are treated in a substantially equivalent manner, and to otherwise comply in all respects with the requirements of a trust under section 524(g)(2)(B) of the Bankruptcy Code. All Asbestos PI Claims will be paid in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

### 2. The Trustees

On the Confirmation Date, the Bankruptcy Court will appoint the individuals selected jointly by the Committee and the Future Demand Holders' Representative, in consultation with Quigley, to serve as the initial Trustees for the Asbestos PI Trust, effective as of the Effective Date. As soon as practicable after the Effective Date, one Trustee will be designated the Managing Trustee, by vote of the Trustees, to serve in accordance with the Asbestos PI Trust Bylaws. The initial Trustees will serve staggered terms of three (3), four (4), and five (5) years. Each of the initial Trustees will serve from the Effective Date until the earlier of (a) his or her death; (b) the end of his or her term; (c) his or her resignation; (d) his or her removal; and (e) the termination of the Asbestos PI Trust.

Any Trustee may resign at any time by written notice to each of the remaining Trustees, the Trust Advisory Committee and the Future Demand Holders' Representative. The notice of resignation must specify a date when such resignation will take effect, which must not be less than ninety (90) days after the date such notice is given, where practicable.

A Trustee may be removed by the unanimous vote of the remaining Trustees in the event that such Trustee becomes unable to discharge his or her duties under the Asbestos PI Trust Agreement due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause will be deemed to include, without limitation, any substantial failure to comply with Section 3.02 of the Asbestos PI Trust Agreement governing the general administration of the Asbestos PI Trust, a consistent pattern of neglect and failure to perform or participate in performing the duties of a Trustee under the Asbestos PI Trust Agreement, or repeated non-attendance at scheduled meetings of the Trustees. Such removal will require the approval of the Bankruptcy Court and will take effect at such time as the Bankruptcy Court determines.

In the event there is a vacancy in the position of Trustee, the vacancy will be filled by the unanimous vote of the remaining Trustees, or if such vacancy has not been filled within ninety (90) days, then by the majority vote of the remaining Trustees, the members of the Trust Advisory Committee and the Future Demand Holders' Representative. In the event the remaining Trustees cannot agree on a successor Trustee, or a majority of the members of the Trust Advisory Committee or the Future Demand Holders' Representative vetoes the Trustees' appointment of a successor Trustee, the Bankruptcy Court will fill the vacancy. Nothing will prevent appointment of a Trustee for successive terms.

Each successor Trustee will serve until the earlier of (a) the end of a full term of five (5) years if the predecessor to that Trustee completed his or her term, (b) the end of the remainder of the term of the predecessor Trustee whom he or she is replacing if that predecessor Trustee did not complete his or her term, (c) his or her death, (d) his or her resignation, (e) his or her removal, and (f) the termination of the Asbestos PI Trust.

Each Trustee will be entitled to receive annual compensation for his or her services. The Trustee's annual compensation will be determined and disclosed to the Bankruptcy Court prior to the Confirmation Date. Each Trustee also will receive a *per diem* allowance for meetings attended and out-of-pocket costs and expenses. The Trustees' annual and *per diem* compensation will be reviewed every three years and appropriately adjusted for changes in the cost of living.

**3.        The Trust Advisory Committee**

The Asbestos PI Trust Agreement provides for the establishment of the Trust Advisory Committee to be composed of five members. Pursuant to Section 9.3(c) of the Plan, prior to or at the Confirmation Hearing, the Debtor will inform the Bankruptcy Court of the five individuals selected by the Creditors' Committee, in consultation with Quigley and the Future Demand Holders' Representative, to serve as the initial members of the Trust Advisory Committee. A complete biography for each such initial member will be provided to the Bankruptcy Court prior to the Confirmation Hearing.

The Trust Advisory Committee will be formed pursuant to the Plan as of the Effective Date. The Trust Advisory Committee will have a chairperson who will act as the Trust Advisory Committee's liaison with the Asbestos PI Trust and the Future Demand Holders' Representative, coordinate and schedule meetings of the Trust Advisory Committee, and handle all administrative matters that come before the Trust Advisory Committee. The Trust Advisory Committee will act in all cases by majority vote.

The five (5) initial members of the Trust Advisory Committee will serve staggered terms of three (3), four (4), and five (5) years as set forth on the signature page of the Asbestos PI Trust Agreement. Thereafter, each term of service will be five (5) years. Each initial member of the Trust Advisory Committee will serve until the earlier of (a) the end of his or her term, (b) his or her death, (c) his or her resignation, (d) his or her removal, and (e) the termination of the Asbestos PI Trust. Any member of the Trust Advisory Committee may resign at any time by written notice to each of the remaining Trust Advisory Committee members and the Future Demand Holders' Representative. Any member of the Trust Advisory Committee may be removed in the event he or she becomes

unable to discharge his or her duties under the Asbestos PI Trust Agreement due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause will be deemed to include, without limitation, a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member under the Asbestos PI Trust Agreement and under the Asbestos PI Trust Distribution Procedures, such as repeated non-attendance at scheduled meetings. Such removal will be made at the recommendation of the remaining members of the Trust Advisory Committee and with the approval of the Bankruptcy Court.

In the event of a vacancy caused by the resignation or death of a Trust Advisory Committee member, his or her successor will be pre-selected by the resigning or deceased Trust Advisory Committee member, or by his or her law firm in the event that such member has not pre-selected a successor. If neither the member nor the law firm exercised the right to make such a selection, the successor will be chosen by a majority vote of the remaining Trust Advisory Committee members. If a majority of the remaining members cannot agree, the Bankruptcy Court will appoint the successor. In the event of a vacancy caused by the removal of a Trust Advisory Committee member, the remaining members of the Trust Advisory Committee, by majority, will name the successor. If the majority of the remaining members of the Trust Advisory Committee cannot reach agreement, the Bankruptcy Court will appoint the successor.

Each successor member of the Trust Advisory Committee will serve until the earlier of (a) the end of a full term of five (5) years if his or her predecessor member completed his or her term, (b) the end of the remainder of the term of the member whom he or she is replacing if that predecessor member did not complete his or her term, (c) his or her death, (d) his or her resignation, (e) his or her removal, and (f) the termination of the Asbestos PI Trust.

The members of the Trust Advisory Committee will receive compensation from the Asbestos PI Trust for their attendance at meetings or other conduct of trust business (e.g., reviewing documents to be discussed at meetings and conference calls to discuss trust business) in the form of a reasonable hourly rate set by the Trustees. The Asbestos PI Trust will also promptly reimburse members of the Trust Advisory Committee for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties under the Asbestos PI Trust Agreement.

## 4. The Future Demand Holders' Representative

The Asbestos PI Trust Agreement provides that Albert Togut, the Future Demand Holders' Representative appointed by the Bankruptcy Court to serve in the Chapter 11 Case, will continue to serve in a fiduciary capacity for the purpose of protecting the rights of persons that might subsequently assert Demands.

Mr. Togut or his successor, if any, will serve until the earlier of (a) his or her death, (b) his or her resignation, (c) his or her removal, and (d) the termination of the Asbestos PI Trust. The Future Demand Holders' Representative may resign at any time by written notice to the Trustees. The Future Demand Holders' Representative may be removed in the event he or she becomes unable to discharge his or her duties under the Asbestos PI Trust Agreement due to accident, physical deterioration, mental incompetence, or for other good cause. Good cause will be deemed to include, without limitation, a consistent pattern of neglect and failure to perform or to participate in performing the duties of the Future Demand Holders' Representative under the Asbestos PI Trust Agreement and under the Asbestos PI Trust Distribution Procedures, such as repeated non-attendance at scheduled meetings. Such removal will be made by decision of the Trustees and the Trust Advisory Committee, and will take effect at such time as the Trustees and the Trust Advisory Committee jointly will determine.

A vacancy caused by resignation will be filled with an individual nominated prior to the effective date of the resignation by the resigning Future Demand Holders' Representative. A vacancy for any other reason, or in the absence of a nomination by the resigning Future Demand Holders' Representative, will be filled with an individual selected by the majority vote of the Trustees and the members of the Trust Advisory Committee. The successor Future Demand Holders' Representative will, in either case, be subject to Bankruptcy Court approval.

The Future Demand Holders' Representative will receive monthly compensation from the Asbestos PI Trust for his or her services as the Future Demand Holders' Representative in the form of payment of the greater of: (i) his customary hourly rate for the services provided; and (ii) $5,000 per month, such compensation being subject to an

annual review and adjustment by the Trustees. The Future Demand Holders' Representative will also be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of his or her duties under the Asbestos PI Trust Agreement.

5.    **Transfer of Certain Property to the Asbestos PI Trust**

(a)    **Transfer of Consideration to be Contributed to the Asbestos PI Trust**

Except as otherwise provided below, on the later of the Effective Date and the date by which all the Trustees have executed the Asbestos PI Trust Agreement, the following assets will be transferred to the Asbestos PI Trust:

> the Quigley Contribution; and

> the Pfizer Contribution, except that:

> the common stock of Reorganized Quigley will be delivered by Pfizer to the Asbestos PI Trust on the Stock Transfer Date.

*See* "THE PLAN OF REORGANIZATION — Description of the Consideration Contributed to the Asbestos PI Trust and Reorganized Quigley and Estimate of Asbestos PI Claims," for a description of the Quigley Contribution and the Pfizer Contribution.

(b)    **Asbestos PI Claims Services Agreement**

On the Effective Date, Reorganized Quigley and the Asbestos PI Trust will execute the Asbestos PI Claims Services Agreement, pursuant to which Reorganized Quigley will manage and process the Asbestos PI Claims on behalf of the Asbestos PI Trust. *See* "MANAGEMENT AND BUSINESS OF REORGANIZED QUIGLEY — Business of Reorganized Quigley," for a description of the Asbestos PI Claims Services Agreement.

(c)    **Books and Records**

On the Effective Date, and in accordance with instructions to be provided by the Asbestos PI Trust, Quigley, Reorganized Quigley, Pfizer, and Pfizer's Affiliates (the "***Asbestos Record Parties***") will transfer their books and records to the Asbestos PI Trust to the extent such books and records relate to any Asbestos PI Trust Asset or Asbestos PI Claim, including without limitation: (a) historical claims data relating to claims for personal injury or wrongful death allegedly arising from exposure to asbestos allegedly contained in products formerly made, used or sold by Quigley; (b) sales records of Quigley relating to asbestos or asbestos-containing products formerly made, used or sold by Quigley; and (c) insurance policies, agreements, claim forms, and any other records relating to the Quigley Transferred Insurance Rights (the "***Asbestos Records***"). The Asbestos PI Trust and its representatives will use the Asbestos Records to assist in the processing and determination of, objection to, or otherwise in connection with, Asbestos PI Claims pursuant to the Asbestos PI Trust Distribution Procedures and in connection with any Asbestos Insurance Actions. The Asbestos PI Trust will treat the Asbestos Records as confidential and will not voluntarily waive any attorney-client, work product or other privilege applicable to the transferred books and records without the consent of the transferring Asbestos Record Parties. The Asbestos PI Trust will cooperate with each Asbestos Record Party with respect to the Asbestos Records to the extent necessary for the Asbestos Record Party to comply with any discovery, subpoena, or other process.

(d)    **Asbestos PI Trust Termination Provisions**

The Asbestos PI Trust is irrevocable but will terminate ninety (90) days after the first to occur of any of the following events:

> the Trustees in their discretion decide to terminate the Asbestos PI Trust because (A) they deem it unlikely that new Asbestos PI Claims will be filed against the Asbestos PI Trust; and (B) Asbestos

PI Claims duly filed with the Asbestos PI Trust have been resolved and paid to the extent provided in the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures (and to the extent possible, based upon the funds available through the Plan Documents), or Disallowed by a Final Order, and twelve (12) consecutive months have elapsed during which no new Asbestos PI Claims have been filed with the Asbestos PI Trust;

if the Trustees have procured and have in place irrevocable insurance policies and have established claims handling agreements and other necessary arrangements with suitable third parties adequate to discharge all expected remaining obligations and expenses of the Asbestos PI Trust in a manner consistent with this Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, the date on which the Bankruptcy Court enters an order approving such insurance and other arrangements and such order becomes a Final Order; or

to the extent that any rule against perpetuities will be deemed applicable to the Asbestos PI Trust, twenty-one (21) years nine ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr. of Massachusetts, father of the late President John F. Kennedy, living on the date of the Asbestos PI Trust Agreement.

On the date the Asbestos PI Trust terminates, after payment of all the Asbestos PI Trust's liabilities, including Trust Expenses, after all Demands have been provided for, and after liquidation of all properties and other non-cash Asbestos PI Trust Assets then held by the Asbestos PI Trust, all monies remaining in the Asbestos PI Trust estate, if any, will be given to those organization(s) exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code as are selected by the Trustees using their reasonable discretion. If practicable, the tax-exempt organization(s) will be related to the treatment of, research on, or the relief for individuals suffering from lung disorders related to asbestos exposure. Further, the tax-exempt organization(s) will not bear any relationship to Reorganized Quigley within the meaning of section 468B(d)(3) of the Internal Revenue Code. Quigley believes that the likelihood of any monies remaining in the Asbestos PI Trust after it terminates is extremely remote.

## 6. Ability to Amend Asbestos PI Trust Documents

The Trustees, subject to the consent of both the Future Demand Holders' Representative and the Trust Advisory Committee, may modify or amend the Asbestos PI Trust Agreement or any document annexed to it, including the Trust Bylaws and the Asbestos PI Trust Distribution Procedures. However, the Asbestos PI Trust Agreement may not be modified or amended in any way that could jeopardize, impair, or modify the applicability of section 524(g) of the Bankruptcy Code, the efficacy or enforceability of the Asbestos PI Channeling Injunction, Settling Asbestos Insurance Entity Injunction, the Non-Settling Asbestos Insurance Entity Injunction, the Confidentiality Injunction, the Dividend Injunction or the Asbestos PI Trust's qualified settlement fund status under section 468B of the Internal Revenue Code.

## 7. Asbestos PI Trust Distribution Procedures[8]

### (a) Asbestos PI Trust Goals

The Trustees will implement and administer the Asbestos PI Trust Distribution Procedures, which are attached to the Plan as Exhibit B. These procedures will have been adopted after lengthy negotiations between and among the Future Demand Holders' Representative, the Creditors' Committee, Quigley, Pfizer, and counsel for certain holders of Asbestos PI Claims.

The goal of the Asbestos PI Trust is to treat all claimants equitably. The Asbestos PI Trust Distribution Procedures further that goal by setting forth procedures for processing and paying Quigley's several share of the unpaid portion of the liquidated value of Asbestos PI Claims generally on an impartial, first-in-first-out ("FIFO") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on

---

[8]    All capitalized terms used in this Section VII.A.7 of the Disclosure Statement and not otherwise defined in the remainder of the Disclosure Statement will have the meanings set forth in the Asbestos PI Trust Distribution Procedures or the Plan, as the case may be.

historical values for substantially similar claims in the tort system. To this end, the Asbestos PI Trust Distribution Procedures establish a schedule of seven asbestos-related diseases ("***Disease Levels***") for the resolution of Asbestos PI Claims. All Disease Levels have presumptive medical and exposure requirements ("***Medical/Exposure Criteria***"), six have specific liquidated values ("***Scheduled Values***"), and all seven have anticipated average values ("***Average Values***") and caps on their liquidated values ("***Maximum Values***"). The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values have all been selected and derived with the intention of achieving a fair allocation of the Asbestos PI Trust Assets as among Asbestos PI Claimants suffering from different disease processes in light of the best available information considering the settlement history of Quigley and the rights claimants would have in the tort system absent the Chapter 11 Case.

      **(b)**      **Disease Levels, Scheduled Values and Medical/Exposure Criteria Set Forth in the Asbestos PI Trust Distribution Procedures**

The seven Disease Levels covered by the Asbestos PI Trust Distribution Procedures, together with the Medical/Exposure Criteria for each and the Scheduled Values for the six Disease Levels eligible for Expedited Review (defined below), are set forth below. Evidentiary requirements for both medical diagnoses and exposure are set forth below in Section VII.A.7(s) of this Disclosure Statement, entitled "Evidentiary Requirements."

These Disease Levels, Scheduled Values, and Medical/Exposure Criteria will apply to all Asbestos PI Trust Voting Claims (other than Pre-Petition Liquidated Asbestos PI Claims (defined below)) filed with the Asbestos PI Trust on or before the Initial Claims Filing Date (defined below). Thereafter, with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative, the Trustees may add to, change or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional Asbestos PI Claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then current Disease Levels.

**Disease Levels for Asbestos PI Claims**

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VII) | $200,000 | (1) Diagnosis[9] of mesothelioma, **and** (2) Quigley Exposure.[10] |
| Lung Cancer 1 (Level VI) | $35,000 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Non-malignant Disease,[11] **and** (2) evidence of six months of Quigley Exposure, **and** (3) Significant Occupational Exposure,[12] **and** (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing |

---

[9]   The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of the Asbestos PI Trust Distribution Procedures are set forth in Section VII.A.7(s) below.

[10]   The term "Quigley Exposure" is defined at Section VII.A.7(s)(ii)(C) below.

[11]   Evidence of "Bilateral Asbestos-Related Non-malignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, IV and VI, means either (i) a chest X-ray read by a qualified B-reader of 1/0 or higher on the ILO scale or, (ii) (a) a chest X-ray read by a qualified B-reader, (b) a CT scan read by a qualified physician, or (c) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Solely for claims filed against Quigley or another asbestos defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a qualified physician or (ii) pathology sho wing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with, or compatible with, a diagnosis of asbestos-related disease will be evidence of Bilateral Asbestos-Related Non-malignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels I, II, IV and VI. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982).

[12]   The term "Significant Occupational Exposure" is defined at Section VII.A.7(s)(ii)(B) below.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | the lung cancer in question. |
| Lung Cancer 2 (Level V) | None – subject to Individual Review | (1) Diagnosis of a primary lung cancer, **_and_** (2) evidence of Quigley Exposure, **_and_** (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| | | Lung Cancer 2 (Level V) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VI) claims. All claims in this Disease Level will be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $15,000, with such awards capped at $30,000, unless the claim qualifies for Extraordinary Claim treatment. |
| | | Level V claims that show no evidence of either an underlying Bilateral Asbestos-Related Non-malignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims will be treated as having any significant value, especially if the claimant is also a smoker.[13] In any event, no presumption of validity will be available for any claims in this category. |
| Other Cancer (Level IV) | $15,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Non-malignant Disease, **_and_** (2) evidence of six months of Quigley Exposure, **_and_** (3) Significant Occupational Exposure, **_and_** (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level III) | $35,000 | (1) Diagnosis of asbestosis by a physician along with a report from a Certified B-reader showing that the claimant has a chest X-ray reading of 2/1 or greater on the ILO Grade, _or_ (2) asbestosis determined by a pathologist based on pathological evidence of asbestos, **_plus_**, for both (1) and (2), Pulmonary Function Testing that shows either (a) TLC less than 65% of predicted value, **_or_** (b) FVC less than 65% of predicted value and FEV1/FVC ratio greater than 65% of predicted value, **_and_** (3) evidence of six months of Quigley Exposure, **_and_** (4) Significant Occupational Exposure to asbestos, **_and_** (5) supporting medical |

---

[13]  There is no distinction between Non-Smokers and smokers for either Lung Cancer 1 (Level VI) or Lung Cancer 2 (Level V), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VI) (evidence of an underlying Bilateral Asbestos-Related Non-malignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Asbestos PI Trust.  "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
| --- | --- | --- |
| | | documentation establishing asbestos exposure as a contributing factor in causing the asbestosis. |
| Asbestosis/Pleural Disease (Level II) | $5,000 | (1) Diagnosis of asbestosis along with a report by a Certified B-reader showing that the claimant has a chest X-ray reading of ILO of 1/0 or greater on the ILO Grade **or** (2) asbestosis determined by a board-certified pathologist based on pathological evidence of asbestosis, or (3) Bilateral Asbestos-Related Non-malignant Disease, **plus**, for each of (1), (2), and (3), Pulmonary Function Testing that shows either (a) TLC less than 80% of predicted value or (b) FVC less than 80% of predicted value and FEV1/FVC ratio greater than or equal to 65%, **and** (4) evidence of six months Quigley Exposure, **and** (5) Significant Occupational Exposure to asbestos, **and** (6) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the asbestos-related disease in question. |
| Asbestosis/Pleural Disease (Level I) | $2,000 | (1) Diagnosis of a Bilateral Asbestos-Related Non-malignant Disease, **and** (2) evidence of six months of Quigley Exposure, **and** (3) five years cumulative occupational exposure to asbestos. |

**(c)      Claims Liquidation Procedures**

Asbestos PI Claims will be processed based on their place in a FIFO Processing Queue (defined below).  The Asbestos PI Trust will take all reasonable steps to resolve Asbestos PI Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration.  To this end, the Asbestos PI Trust, in its sole discretion, may conduct settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in the Asbestos PI Trust Distribution Procedures. The Asbestos PI Trust will also make every effort to resolve each year at least that number of Asbestos PI Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment for Category A Claims and Category B Claims (each as defined below).

The Asbestos PI Trust will liquidate all Asbestos PI Claims, except Foreign Claims, that meet the presumptive Medical/Exposure Criteria of Disease Levels I-IV, VI, and VII under the Expedited Review Process (defined below).  Claims involving Disease Levels I–IV, VI, and VII that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Asbestos PI Trust's Individual Review Process (defined below).  In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Asbestos PI Trust can offer the claimant an amount up to the Scheduled Value of that Disease Level if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

Claims in Disease Levels III–VII tend to raise more complex valuation issues than the claims in Disease Levels I-II. Holders of Asbestos PI Claims involving Disease Levels III, IV, VI or VII may in addition or alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the Asbestos PI Trust's Individual Review Process.  However, the liquidated value of an Asbestos PI Claim in Disease Levels III, IV, VI, or VII that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value, and, in any event, will not exceed the Maximum Value for the relevant Disease Level set forth in Section VII.A.7(p) below, unless the claim qualifies as an Extraordinary Claim as defined in Section VII.A.7(q) below, in which case its liquidated value cannot exceed the Maximum Extraordinary Value (defined below)

specified in that provision for such claims. Level V (Lung Cancer 2) claims and all Foreign Claims may be liquidated only pursuant to the Asbestos PI Trust's Individual Review Process.

Based upon Quigley's claims settlement history in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values for Asbestos PI Claims set forth in Section VII.A.7(p) have been established for each of the Disease Levels that are eligible for Individual Review of their liquidated values, with the expectation that the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process will result in the Average Values also set forth in that provision.

All unresolved disputes over a claimant's medical condition and/or the liquidated value of an Asbestos PI Claim will be subject to binding or non-binding arbitration as set forth in Section VII.A.7(v) below, at the election of the claimant, under procedures that are provided in the ADR Procedures (defined below), which are attached to the Asbestos PI Trust Distribution Procedures as Attachment A. Asbestos PI Claims that are the subject of a dispute with the Asbestos PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Section VII.A.7(x) below. However, if and when a claimant obtains a judgment in the tort system, the judgment will be payable (subject to the Payment Percentage, the Maximum Available Payment, and Claims Payment Ratio provisions set forth below) as provided in Section VII.A.7(x) below.

### (d)     Payment Percentage

After the liquidated value of an Asbestos PI Claim, as described in Section VII.A.7(b) above, is determined pursuant to the applicable procedures set forth herein for Expedited Review, Individual Review, arbitration, or litigation in the tort system, the claimant will ultimately receive a pro rata share of that value based on the Payment Percentage, which is described in the Asbestos PI Trust Distribution Procedures as the percentage of full liquidated value that holders of Asbestos PI Claims will be likely to receive. The Payment Percentage will also apply to all Pre-Petition Liquidated Asbestos PI Trust Claims as provided in Section VII.A.7(j) below.

The initial Payment Percentage will be 7.5% percent.

The Payment Percentage may be adjusted upwards or downwards from time to time by the Trustees with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative to reflect then-current estimates of the Asbestos PI Trust's assets and its liabilities, as well as the then-estimated value of pending and future Asbestos PI Claims. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the Asbestos PI Trust Distribution Procedures will not receive additional payments except as provided in the Asbestos PI Trust Distribution Procedures. Because there is uncertainty in the prediction of both the number and severity of future Asbestos PI Claims, and the amount of the Asbestos PI Trust's assets, no guarantee can be made of any Payment Percentage.

### (e)     Maximum Annual Payment

The Asbestos PI Trust will estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds will be available to treat all present and future Asbestos PI Claimants as similarly as possible. In each year, the Asbestos PI Trust will be empowered to pay out all of the interest earned during the year on assets, together with a portion of its principal, calculated so that the application of Asbestos PI Trust funds over its life will correspond with the needs created by the anticipated flow of Asbestos PI Claims (the "**Maximum Annual Payment**"), taking into account the Payment Percentage. The Asbestos PI Trust's distributions to all Asbestos PI Claimants for that year will not exceed the Maximum Annual Payment determined for that year.

In distributing the Maximum Annual Payment, the Asbestos PI Trust will first allocate the amount in question to outstanding Pre-Petition Liquidated Asbestos PI Claims, if any. The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, will then be allocated and used to satisfy all other liquidated Asbestos PI Claims, subject to the Claims Payment Ratio. In the event there are insufficient funds in any year to pay the total number of outstanding Pre-Petition Liquidated Asbestos PI Claims, the available funds allocated to that group of claims will be paid to the maximum extent to claimants based on their place in their respective FIFO

Payment Queue. Claims in either group for which there are insufficient funds will be carried over to the next year and placed at the head of their FIFO Payment Queue.

**(f)** **Claims Payment Ratio**

Based upon Quigley's claims settlement history and analysis of present and future claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 83% for Asbestos PI Claims involving severe asbestosis and malignancies (Disease Levels III-VII) ("***Category A Claims***") that were unliquidated as of the Petition Date, and at 17% for Asbestos PI Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels I and II) ("***Category B Claims***") that were unliquidated as of the Petition Date. The Claims Payment Ratio will not apply to any Pre-Petition Liquidated Asbestos PI Claims. In each year, after the determination of the Maximum Available Payment, 83% of that amount will be available to pay Category A Claims and 17% will be available to pay Category B Claims that have been liquidated since the Petition Date.

In the event there are insufficient funds in any year to pay the liquidated Asbestos PI Claims within either or both of the Categories, the available funds allocated to the particular Category will be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue, which will be based upon the date of claim liquidation. Claims for which there are insufficient funds allocated to the relevant Category will be carried over to the next year where they will be placed at the head of the FIFO Payment Queue. If there are excess funds in either or both Categories, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for either or both Categories will be rolled over and remain dedicated to the respective Category to which they were originally allocated.

The 83%/17% Claims Payment Ratio and its rollover provision will apply to all Asbestos PI Trust voting Claims except Pre-Petition Liquidated Asbestos PI Claims (defined below). The term "***Asbestos PI Trust Voting Claims***" includes  (i) Pre-Petition Liquidated Asbestos PI Claims; and (ii) claims filed against Quigley in the tort system or actually submitted to Quigley pursuant to an administrative settlement agreement prior to the Petition Date of September 3, 2004; provided, however, that the holder of a claim described in subsection (i) or (ii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court, and provided further that the claim was subsequently filed with the Asbestos PI Trust by the Initial Claims Filing Date.

The initial 83%/17% Claims Payment Ratio will not be amended until the fifth anniversary of the Effective Date. Thereafter, both the Claims Payment Ratio and its rollover provision will be continued absent circumstances, such as a significant change in law or medicine, necessitating amendment to avoid a manifest injustice. However, the accumulation, rollover and subsequent delay of claims resulting from the application of the Claims Payment Ratio, will not, in and of itself, constitute such circumstances. Nor may an increase in the numbers of Category B Claims beyond those predicted or expected be considered as a factor in deciding whether to reduce the percentage allocated to Category A Claims.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustees will consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustees should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

In any event, no amendment to the Claims Payment Ratio may be made without the consent of the Trust Advisory Committee and the Future Demand Holders' Representative. However, the Trustees, with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for expedited payment (the "***Reduced Payment Option***").

### (g)     Ordering of Claims

The Asbestos PI Trust will order Asbestos PI Claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "*FIFO Processing Queue*").  For all claims filed on or before the date that is six months after the date that the Asbestos PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos PI Trust (the "*Initial Claims Filing Date*"), a claimant's position in the FIFO Processing Queue will be determined as of the earlier of (i) the date prior to the Petition Date (if any) that the specific claim was either filed against Quigley in the tort system or was actually submitted to Quigley pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that a claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with Quigley; (iii) the date after the Petition Date (if any) but before the Initial Claims Filing Date that the claim was filed against another defendant in the tort system; (iv) the date after the Petition Date (if any) but before the Effective Date that a Proof of Claim was filed against Quigley in Quigley's Chapter 11 Case; and (v) the date a ballot was submitted in Quigley's Chapter 11 Case for purposes of voting on the Plan in accordance with the voting procedures adopted by the Bankruptcy Court.

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue will be determined by the date the claim is filed with the Asbestos PI Trust.  If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue will be determined by the date of the diagnosis of the claimant's asbestos-related disease.  If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue will be determined by the date of the claimant's birth, with older claimants given priority over younger claimants.

### (h)     Effect of Statutes of Limitations and Repose

To be eligible for a place in the FIFO Processing Queue, a claim must meet either (i) for claims first filed in the tort system against Quigley prior to the Petition Date, the applicable federal, state and foreign statutes of limitation and repose that were in effect at the time of the filing of the claim in the tort system, or (ii) for claims that were not filed against Quigley in the tort system prior to the Petition Date, the applicable statute of limitation that was in effect at the time of the filing with the Asbestos PI Trust.  However, the running of the relevant statute of limitations will be tolled as of the earliest of (A) the actual filing of the claim against Quigley prior to the Petition Date, whether in the tort system or by submission of the claim to Quigley pursuant to an administrative settlement agreement; (B) the filing of the claim against another defendant in the tort system prior to the Petition Date if the claim was tolled against Quigley at the time by an agreement or otherwise; (C) the filing of a claim after the Petition Date but prior to the Initial Claims Filing Date against another defendant in the tort system; (D) the date after the Petition Date (if any) but before the Effective Date that a Proof of Claim was filed against Quigley in Quigley's Chapter 11 Case; (E) the date a ballot was submitted in Quigley's Chapter 11 Case for purposes of voting on the Plan in accordance with the voting procedures adopted by the Bankruptcy Court; or (F) the filing of a proof of claim with the requisite supporting documentation with the Asbestos PI Trust after the Effective Date.

If an Asbestos PI Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable statute of limitation at the time of the tolling event, it will be treated as timely filed if it is actually filed with the Asbestos PI Trust within three (3) years after the Initial Claims Filing Date.  In addition, any claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant statute of limitation or repose, may be filed with the Asbestos PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later.  However, the processing of any Asbestos PI Claim by the Asbestos PI Trust may be deferred at the election of the claimant.

### (i)     Payment of Claims

Asbestos PI Claims that have been liquidated by the Expedited Review Process, the Individual Review Process, arbitration, or litigation in the tort system, will be paid in FIFO order based on the date their liquidation became final (the "*FIFO Payment Queue*"), all such payments being subject to the applicable Payment Percentage, the

Maximum Available Payment, and the Claims Payment Ratio, except as otherwise provided in the Asbestos PI Trust Distribution Procedures.

If the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos PI Trust on the claim will remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos PI Trust will pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue will be determined by the date of the diagnosis of the claimant's asbestos-related disease. If any claims are liquidated on the same date and the respective claimants' diseases were diagnosed on the same date, the position of those claimants in the FIFO Payment Queue will be determined by the Asbestos PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

### (j) Resolution of Pre-Petition Liquidated Asbestos PI Claims

As soon as practicable after the Effective Date, the Asbestos PI Trust will pay, upon submission by the claimant of the applicable Asbestos PI Trust proof of claim form (attached to the Asbestos PI Trust Distribution Procedures as Attachment B) together with all documentation required thereunder, all Asbestos PI Claims that were liquidated by (i) a binding settlement agreement for the particular claim entered into prior to the Petition Date that is judicially enforceable against Quigley by the claimant; or (ii) a judgment that became final and non-appealable prior to the Petition Date (collectively "*Pre-Petition Liquidated Asbestos PI Claims*"). In addition, Asbestos PI Claims that, prior to the Petition Date, had been reduced to judgment and which are pending on appeal and are secured by a bond — specifically claims in Classes 2.02, 2.03, 2.04, 2.05, and 2.06 — will also be deemed Pre-Petition Liquidated Asbestos PI Claims for purposes of processing and payment but only if and to the extent the holder of such Asbestos PI Claim holds an Asbestos PI Deficiency Claim. If the Final Judgment for any claim in Classes 2.02 through 2.06 ultimately reverses any currently existing judgment against Quigley, then any remaining Asbestos PI Claim will be channeled to and assumed by the Asbestos PI Trust and liquidated pursuant to the Asbestos PI Trust Distribution Procedures as an unliquidated Asbestos PI Claim.

The liquidated value of a Pre-Petition Liquidated Asbestos PI Claim will be Quigley's share of the unpaid portion of the amount agreed to in the binding settlement agreement or the unpaid portion of the amount of the Final Judgment, as the case may be, plus interest, if any, that has accrued on that amount in accordance with the specific terms of the binding settlement agreement, if any, or under applicable state law for settlements or judgments as of the Petition Date; however, except as otherwise provided in Section VII.A.7(w) below, the liquidated value of a Pre-Petition Liquidated Asbestos PI Claim will not include any punitive or exemplary damages. In the absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the Asbestos PI Trust over this issue will be resolved pursuant to the same procedures in the Asbestos PI Trust Distribution Procedures that are provided for resolving the validity and/or liquidated value of an Asbestos PI Claim (*i.e.*, arbitration and litigation in the tort system). To the extent that any binding settlement agreement was entered between one or more claimants and both Pfizer and Quigley, Pfizer will continue to be liable for its share of the unpaid portion of the amount agreed to in the binding settlement agreement.

Pre-Petition Liquidated Asbestos PI Claims will be processed and paid in accordance with their order in a separate FIFO queue to be established by the Trustees based on the date the Asbestos PI Trust received a completed proof of claim form with all required documentation for the particular claim; provided, however, the amounts payable with respect to such claims will not be subject to or taken into account in consideration of the Claims Payment Ratio, but will be subject to the Maximum Annual Payment and Payment Percentage. If any Pre-Petition Liquidated Asbestos PI Claims were filed on the same date, the claimants' position in the FIFO queue for such claims will be determined by the date on which the claim was liquidated. If any Pre-Petition Liquidated Asbestos PI Claims were both filed

and liquidated on the same dates, the position of those claimants in the FIFO queue will be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

Under the terms of the Plan, asbestos personal injury claims that prior to the Petition Date had been reduced to judgment, and which are pending on appeal and are secured by a bond, are classified separately. Under the Plan, holders of these bonded judgment claims are entitled to proceed with the appeal of such claims to Final Judgment as provided under the terms of the bond, letter of credit or other security and in accordance with the Plan and applicable law. If the judgment in favor of the claimant is affirmed, in whole or in part, by a Final Judgment, the holder(s) of such claims will be entitled to seek payment of the Final Judgment from the bond, letter of credit or other security securing the judgment in accordance with the terms of the Asbestos PI Trust Distribution Procedures applicable to Pre-Petition Liquidated Asbestos PI Claim; provided, however, that the liquidated value of such holder's Pre-Petition Liquidated Asbestos PI Claim will include punitive and/or exemplary damages, if awarded, to the extent such damages were not satisfied from the proceeds of the bond, letter of credit or other security securing such Pre-Petition Liquidated Asbestos PI Claim. To the extent the amount received on account of such bond is insufficient to fully satisfy the Final Judgment, the judgment deficiency will be treated as a Pre-Petition Liquidated Asbestos PI Claim in accordance with the provisions of the Asbestos PI Trust Distribution Procedures. If the Final Judgment ultimately reverses any currently existing judgment against Quigley, then any remaining Asbestos PI Claim will automatically and without further act, deed or court order be channeled to and assumed by the Asbestos PI Trust and liquidated pursuant to the Asbestos PI Trust Distribution Procedures as an unliquidated Asbestos PI Claim.

All holders of Pre-Petition Liquidated Asbestos PI Claims that are secured by letters of credit, appeal bonds, or other security or sureties must first exhaust their rights against any applicable security or surety before making a claim against the Asbestos PI Trust. If, after application of such security or surety is insufficient to pay thesuch a Pre-Petition Liquidated Asbestos PI Claim in full with the deficiency, the holder of such claim holds an Asbestos PI Deficiency Claim, such Asbestos PI Deficiency Claim will be processed and paid as a Pre-Petition Liquidated Asbestos PI Claim.

### (k) Resolution of Unliquidated Asbestos PI Claims

Within six (6) months after the establishment of the Asbestos PI Trust, the Trustees with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative will adopt procedures for reviewing and liquidating all unliquidated Asbestos PI Claims, which will include setting deadlines for processing such claims. Such procedures will also require claimants seeking resolution of unliquidated claims to first file a proof of claim form, together with the required supporting documentation. It is anticipated that the Asbestos PI Trust will provide an initial response to the claimant within six months of receiving the proof of claim form.

The proof of claim form will require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, all claims will be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future will be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing a valid proof of claim form with the required supporting documentation, the claimant will be placed in the FIFO Processing Queue. The Asbestos PI Trust will provide the claimant with six months' notice of the date by which it expects to reach the claim in the FIFO Processing Queue, following which the claimant will (as applicable) promptly (i) advise the Asbestos PI Trust whether the claim should be liquidated under the Asbestos PI Trust's Expedited Review Process or, in certain circumstances, under the Asbestos PI Trust's Individual Review Process; (ii) provide the Asbestos PI Trust with any additional medical or exposure evidence that was not provided with the original claim submission; and (iii) advise the Asbestos PI Trust of any change in the claimant's Disease Level. If a person with an Asbestos PI Claim fails to respond to the Asbestos PI Trust's notice prior to the reaching of the claim in the FIFO Processing Queue, the Asbestos PI Trust will process and liquidate any such Asbestos PI Claim under the Expedited Review Process based upon the medical or exposure evidence previously submitted by the claimant, although the claimant will retain the right to request Individual Review.

(l)    **Expedited Review Process**

The Asbestos PI Trust's Expedited Review Process for Asbestos PI Claims is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos PI Claims (except those involving Lung Cancer 2 (Disease Level V) and all Foreign Claims, which will be liquidated pursuant to the Asbestos PI Trust's Individual Review Process) where the claim can easily be verified by the Asbestos PI Trust as meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level (the "***Expedited Review Process***"). Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Asbestos PI Claims than does the Individual Review Process.  Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, claims that undergo Expedited Review and meet the presumptive Medical/Exposure Criteria for the relevant Disease Level will be paid the Scheduled Value for such Disease Level.  However, all claims liquidated by Expedited Review will be subject to the applicable Payment Percentage, the Maximum Available Payment, and the Claims Payment Ratio.  Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the Asbestos PI Trust's Individual Review Process.

(m)    **Claims Processing Under Expedited Review**

All claimants seeking liquidation of their Asbestos PI Claims pursuant to Expedited Review will file the Asbestos PI Trust's proof of claim form provided in Attachment B to the Asbestos PI Trust Distribution Procedures.  As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos PI Trust will determine whether the claim described therein meets the Medical/Exposure Criteria for one of the six Disease Levels eligible for Expedited Review, and will advise the claimant of its determination.  If a Disease Level is determined, the Asbestos PI Trust will tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with a form of release approved by the Asbestos PI Trust.  If the claimant accepts the Scheduled Value and returns the release properly executed, the claim will be placed in the FIFO Payment Queue, following which the Asbestos PI Trust will disburse payment subject to the limitations of the Maximum Available Payment and Claims Payment Ratio, if any.

(n)    **Individual Review Process**

(i)    In General

Certain claimants may elect to have their Asbestos PI Claims reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section VII.A.7(b) above (the "***Individual Review Process***").  In addition or alternatively, certain claimants may elect to have their claims undergo the Individual Review Process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the relevant Disease Level.  However, until such time as the Asbestos PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the Asbestos PI Trust's Expedited Review Process.  In the event of such a change in the processing election, the claimant will nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under the Asbestos PI Trust Distribution Procedures will be established only under the Asbestos PI Trust's Individual Review Process.  A "***Foreign Claim***" is an Asbestos PI Claim with respect to which the claimant's exposure to an asbestos-containing product for which Quigley has legal responsibility occurred outside of the United States and Canada and their Territories and Possessions.

In reviewing such Foreign Claims, the Asbestos PI Trust will take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction (defined below).  The Asbestos PI Trust will determine the liquidated value of Foreign Claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section VII.A.7(o) below.

For purposes of the Individual Review Process for Foreign Claims, the Trustees, with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which will be applicable to all Foreign Claims channeled to the Asbestos PI Trust; provided, however, that such criteria, standards or requirements will not effectuate substantive changes to the claims eligibility requirements under the Asbestos PI Trust Distribution Procedures, but rather will be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the Asbestos PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Trustees, with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative, may also establish a separate valuation matrix for any such Foreign Claims based on that data.

   **(ii)**   Review of Medical/Exposure Criteria

The Asbestos PI Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of an Asbestos PI Claim that fails to meet the presumptive Medical/Exposure Criteria for Disease Levels I-IV and VI-VII.  In such a case, the Asbestos PI Trust will either deny the claim, or, if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the Asbestos PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level, unless the claim qualifies as an Extraordinary Claim (defined below), in which case its liquidated value cannot exceed the Maximum Extraordinary Value (defined below) for such a claim.

   **(iii)**   Review of Liquidated Value for Asbestos PI Claims in Disease Levels III-VII

Claimants holding Asbestos PI Claims in the more serious Disease Levels III, IV, VI or VII will be eligible to seek, and claimants holding Asbestos PI Claims in Disease Level VI and all Foreign Claims will be required to undergo, Individual Review of the liquidated value of their claims, as well as their medical/exposure evidence. The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Asbestos PI Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review. Moreover, the liquidated value for a claim involving Disease Levels III–VII will not exceed the Maximum Value for the relevant Disease Level unless the claim meets the requirements of an Extraordinary Claim, in which case its liquidated value cannot exceed the Maximum Extraordinary Value for such claims.  Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process will necessarily be paid the liquidated value of their Asbestos PI Claims later than would have been the case had the claimant elected the Expedited Review Process.

   **(o)**   **Valuation Factors to be Considered in Individual Review**

The Asbestos PI Trust will liquidate the value of each Asbestos PI Claim that undergoes Individual Review based on the historical liquidated values of other similarly situated claims in the tort system for the same Disease Level. The Asbestos PI Trust will thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependencies, special damages, and pain and suffering; (iii) evidence that the claimant's damages were (or were not) caused by asbestos exposure, including Quigley Exposure (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; and (v) settlements, verdicts, and the claimant's and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims.

For these purposes, the "***Claimant's Jurisdiction***" is (a) the jurisdiction in which the claim was filed (if at all) against Quigley in the tort system prior to the Petition Date or (b) if the claim was not filed against Quigley in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction

in which the claimant resides at the time of diagnosis or (ii) the jurisdiction in which the claimant resides when the claim is filed with the Asbestos PI Trust; or (iii) a jurisdiction in which the claimant experienced Quigley Exposure.

With respect to the Claimant's Jurisdiction, in the event a personal representative or authorized agent makes a claim under the Asbestos PI Trust Distribution Procedures for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim will be the Commonwealth of Pennsylvania, and such claimant's damages will be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision described in Section VII.A.7(u) below is applicable to any claim with respect to which, but for that choice of law provision, the applicable law of the Claimant's Jurisdiction is determined to be the Alabama Wrongful Death Statute, will only govern the rights between the Asbestos PI Trust and the claimant, and, to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance coverage to Quigley, the Alabama Wrongful Death Statute will govern.

(p)    **Scheduled, Average, and Maximum Values**

The Scheduled, Average and Maximum Values for the Disease Levels compensable under the Asbestos PI Trust Distribution Procedures are the following:

| Disease Level | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VII) | $200,000 | $225,000 | $450,000 |
| Lung Cancer 1 (Level VI) | $35,000 | $45,000 | $90,000 |
| Lung Cancer 2 (Level V) | None | $15,000 | $30,000 |
| Other Cancer (Level IV) | $15,000 | $16,500 | $30,000 |
| Severe Asbestosis (Level III) | $35,000 | $40,000 | $90,000 |
| Asbestosis/Pleural Disease (Level II) | $5,000 | $5,000 | $5,000 |
| Asbestosis/Pleural Disease (Level I) | $2,000 | $2,000 | $2,000 |

These Scheduled Values, Average Values and Maximum Values will apply to all Asbestos PI Trust Voting Claims (except Pre-Petition Liquidated Asbestos PI Claims) filed with the Asbestos PI Trust on or before the Initial Claims Filing Date. Thereafter, the Trustees, with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative, pursuant to the Asbestos PI Trust Agreement, may change these valuation amounts to account for the effect of inflation or for other good cause and consistent with other restrictions on the amendment power.

(q)    **Extraordinary and/or Exigent Hardship Claims**

An "***Extraordinary Claim***" is an Asbestos PI Claim that otherwise satisfies the Medical/Exposure Criteria for Disease Levels III–VII and that is held by a claimant whose exposure to asbestos (i) occurred predominately as the result of working in a manufacturing facility of Quigley during a period in which Quigley was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of Quigley Exposure and there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims will be presented for Individual Review and, if valid, will be entitled to an award of up to of five times the Scheduled Value for claims qualifying for Disease Levels III, IV, VI, and VII, and five times the Average Value for claims in Disease Level V (in each case, the "***Maximum Extraordinary Value***"), multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status will be submitted to a special Extraordinary Claims Panel (the "***Extraordinary Claims Panel***") established by the Trustees with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative. All decisions of the Extraordinary Claims Panel will be final and not subject to any further administrative or judicial review. An Extraordinary Claim, following its liquidation, will be

placed in the Asbestos PI Trust's FIFO Payment Queue ahead of all other Asbestos PI Claims except Pre-Petition Liquidated Asbestos PI Claims and Exigent Hardship Claims, which will be paid first in that order in said Queue, based on its date of liquidation and will be subject to the Maximum Available Payment and Claims Payment Ratio.

At any time the Asbestos PI Trust may liquidate and pay Asbestos PI Claims that qualify as Exigent Hardship Claims as defined below. Such claims may be considered separately no matter what the order of processing otherwise would have been under the Asbestos PI Trust Distribution Procedures. An Exigent Hardship Claim, following its liquidation, will be placed first in the FIFO Payment Queue ahead of all other liquidated Asbestos PI Trust Claims except Pre-Petition Liquidated Asbestos PI Trust Claims, and will be subject to the Maximum Available Payment and Claims Payment Ratio, described above. An Asbestos PI Claim qualifies for payment as an Exigent Hardship Claim (an "***Exigent Hardship Claim***") if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level III) or an asbestos-related malignancy (Disease Levels IV–VII), and the Asbestos PI Trust, in its sole discretion, determines (i) that the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

       (r)       **Secondary Exposure Claims**

If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant may seek Individual Review of his or her claim. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under the Asbestos PI Trust Distribution Procedures that would have been applicable had that person filed a direct claim against the Asbestos PI Trust. In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the seven Disease Levels or an asbestos-related disease otherwise compensable under the Asbestos PI Trust Distribution Procedures, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person experienced Quigley Exposure, and that such secondary exposure was a cause of the claimed disease. The proof of claim form included in Attachment B to the Asbestos PI Trust Distribution Procedures contains an additional section for Secondary Exposure Claims. All other liquidation and payment rights and limitations under the Asbestos PI Trust Distribution Procedures will be applicable to such claims.

       (s)       **Evidentiary Requirements**

          (i)       **Medical Evidence**

             In General

All diagnoses of a Disease Level will be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a ten (10)-year latency period. All diagnoses will also be based upon the standards set forth below. A finding by a physician after the Petition Date that a claimant's disease is "consistent with" or "compatible with" a disease in question will not alone be treated by the Asbestos PI Trust as a diagnosis of that disease.[14]

             Disease Levels I–III

Except for claims filed against Quigley or any other asbestos defendant prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–III) will be based in the case of a claimant who was living at the time the claim was filed (a) upon a physical examination of the claimant by a physician providing the diagnosis of the asbestos-related disease, and (b) an X-ray reading by a Certified B-reader or a CT Scan. All living claimants must also provide (i) for Disease Levels I and II, evidence of Bilateral Asbestos-Related Non-malignant

---

[14]    All diagnoses of Asbestosis/Pleural Disease (Disease Levels I and II) not based on pathology will be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VII) will be presumed to be based on findings that the disease involves a malignancy. However, the Asbestos PI Trust may rebut such presumptions.

Disease (as defined in footnote above); (ii) for Disease Level III, an ILO reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease Levels II and III, Pulmonary Function Testing.

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–III) will be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, if available, or (ii) in the case of Disease Levels I-II, evidence of Bilateral Asbestos-Related Non-malignant Disease and for Disease Level III either an ILO reading of 2/1 or greater or pathological evidence of asbestosis, or (iii) pathological evidence of the non-malignant, asbestos-related disease, and (iv) for either Disease Level II or III, Pulmonary Function Testing.

### Disease Levels IV–VII

Diagnoses of an asbestos-related malignancy (Disease Levels VI–VII) will be based upon (i) diagnosis of such a malignant Disease Level by a board-certified pathologist, or (ii) for a claimant living at the time of the submission of his or her claim to the Asbestos PI Trust or for a deceased claimant for whom such information is available, a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.

### Exception to the Exception for Certain Pre-Petition Claims

If the holder of an Asbestos PI Claim that was filed against Quigley or any other defendant in the tort system prior to the Petition Date has not provided the Asbestos PI Trust with a diagnosis of the asbestos-related disease by a physician who conducted a physical examination of the holder as described in the Asbestos PI Trust Distribution Procedures, or if the holder has such a diagnosis by an examining physician engaged by holder, or if the holder filed such a diagnosis with another asbestos-related personal injury settlement trust that requires such evidence, the holder must provide such diagnosis to the Asbestos PI Trust notwithstanding the exception described above for Disease Levels I-III.

### Credibility of Medical Evidence

Before making any payment to a claimant, the Asbestos PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Asbestos PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, or (ii) that is consistent with evidence submitted to Quigley to settle similar disease cases prior to Quigley's bankruptcy, or (iii) that consists of a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, is presumptively reliable, although the Asbestos PI Trust may seek to rebut the presumption.

In addition, claimants who otherwise meet the requirements of the Asbestos PI Trust Distribution Procedures for payment of an Asbestos PI Claim will be paid irrespective of the results in any litigation at anytime between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system involving another defendant, other than any findings of fact, a verdict, or a judgment, may be introduced by either the claimant or the Asbestos PI Trust in any Individual Review proceeding or any Extraordinary Claim proceeding.

### (ii) Exposure Evidence

### In General

As set forth above in Section VII.A.7(b), to qualify for any Disease Level, the claimant must demonstrate Quigley Exposure which, in the case of Indirect Asbestos PI Claims, will be Quigley Exposure in respect of the Direct Claimant. Claims based on conspiracy or derivative liability theories that involve no Quigley Exposure are not

compensable under the Asbestos PI Trust Distribution Procedures. If the claimant cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review of his or her Quigley Exposure.

Significant Occupational Exposure

"***Significant Occupational Exposure***" means employment for a cumulative period of at least five (5) years with a minimum of two years prior to December 31, 1982 in an industry and/or an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis, (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers, (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers, or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

Quigley Exposure

The claimant must demonstrate meaningful and credible exposure prior to December 31, 1982, to asbestos or asbestos-containing products supplied, specified, manufactured, installed, maintained, or repaired by Quigley and/or any entity for which Quigley has legal responsibility ("***Quigley Exposure***"). That meaningful and credible exposure evidence may be established by an affidavit of the claimant, by an affidavit of a co-worker or the affidavit of a family member in the case of a deceased claimant (providing the Asbestos PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the Asbestos PI Trust to process a claim under either Expedited or Individual Review is or will be set forth on the proof of claim form to be used by the Asbestos PI Trust, which is attached as Attachment B to the Asbestos PI Trust Distribution Procedures. The Asbestos PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

**(t)    Second Disease (Malignancy) Claims**

The holder of an Asbestos PI Claim involving a non-malignant, asbestos-related disease (Disease Levels I through III) may assert a new Asbestos PI Claim against the Asbestos PI Trust for a malignant disease (Disease Levels IV-VII) that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease will not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed by the time the claimant was paid with respect to his or her original claim involving the non-malignant disease.

**(u)    Punitive Damages**

Except as provided below for claims asserted under the Alabama Wrongful Death Statute, or as described above in Section VII.A.7(j), in determining the value of any liquidated or unliquidated Asbestos PI Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, will not be considered or allowed, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages will be payable with respect to any claim litigated against the Asbestos PI Trust in the tort system pursuant to Section VII.A.7(x) below. The only damages that may be awarded pursuant to the Asbestos PI Trust Distribution Procedures to claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute will be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles. The choice of law provision in the Asbestos PI Trust Distribution Procedures applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to VI.A.7(o) is determined to be the Alabama Wrongful Death Statute, will only govern the rights between the Asbestos PI Trust and the claimant including, but not limited to, suits in the tort system, and to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance to Quigley, the Alabama Wrongful Death Statute will govern.

(v)     **Interest**

(i)     **In General**

Subject to the limitations set forth below, interest will be paid on all Asbestos PI Claims with respect to which the claimant has had to wait a year or more for payment. The Trustees will establish the annual interest rate with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative. In setting the interest rate, the Asbestos PI Trust will also consider the application of an inflation factor to the Scheduled Values to account for the diminution in value over time of the Scheduled Values so that the Asbestos PI Trust maintains equality of treatment as specified in the Asbestos PI Trust Distribution Procedures.

(ii)     **Unliquidated Asbestos PI Claims**

Interest will be payable on the Scheduled Value of any unliquidated Asbestos PI Claim that meets the requirements of Disease Levels I-IV, VI, and VII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration. No interest will be paid on any claim liquidated in the tort system as described in Section VII.A.7(x) below. Interest on an unliquidated Asbestos PI Claim that meets the requirements of Disease Level V will be based on the Average Value of such a claim. Interest on all such unliquidated Asbestos PI Claims will be payable only if the delay in payment is attributable to the Asbestos PI Trust (and not that actions of the claimant) and will be measured from the date the Asbestos PI Claims was filed with the Asbestos PI Trust after the Effective Date.

(iii)     **Pre-Petition Liquidated Asbestos PI Claims**

Interest will also be payable on the liquidated value of all Pre-Petition Liquidated Asbestos PI Claims described in VII.A.7(j) above. In the case of Pre-Petition Liquidated Asbestos PI Claims liquidated by verdict or judgment, interest will be measured from the date of payment back to the date that is one year after the date that the verdict or judgment was entered. In the case of Pre-Petition Liquidated Asbestos PI Claims liquidated by a binding, judicially enforceable settlement, interest will be measured from the date of payment back to the date that is one year after the Petition Date.

(w)     **Arbitration**

(i)     **In General**

The Trustees, with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative, will (institute binding and non-binding arbitration procedures as set forth in the Asbestos PI Trust Alternative Distribution Procedures (the "*ADR Procedures*") for resolving disputes over (i) whether the Asbestos PI Trust's outright rejection or denial of a claim was proper, or (ii) whether the claimant's medical condition or exposure evidence meets the requirements of the Asbestos PI Trust Distribution Procedures for purposes of categorizing a claim. Binding and non-binding arbitration will also be available for resolving disputes over the liquidated value of a claim involving Asbestos Disease Levels III-VII as well as disputes over Quigley's share of the unpaid portion of a Pre-Petition Liquidated Asbestos PI Claim and disputes over the validity of an Indirect Asbestos PI Claim.

In all arbitrations where relevant, the arbitrator will consider the same medical and exposure evidentiary requirements that are set forth in Section VII.A.7(s)(i). In the case of an arbitration involving the liquidated value of a claim, the arbitrator will consider the same valuation factors that are set forth in Section VII.A.7(n). With respect to all claims eligible for arbitration, the claimant, but not the Asbestos PI Trust, may elect either non-binding or binding arbitration. The ADR Procedures may be modified by the Trustees with the consent of the Trust Advisory Committee and the Future Demand Holders' Representative. Such amendments may include adoption of mediation procedures as well as establishment of an Extraordinary Claims Panel to review Extraordinary Claims.

(ii)     **Claims Eligible for Arbitration**

In order to be eligible for arbitration, a person with an Asbestos PI Claim must first complete the Individual Review Process as well as either Pro Bono Evaluation or Mediation under the ADR Procedures with respect to the disputed

issue.  Individual Review will be treated as completed for these purposes when the claim has been individually reviewed by the Asbestos PI Trust, the Asbestos PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Asbestos PI Trust of the rejection in writing.  Individual Review will also be treated as completed if the Asbestos PI Trust has rejected the claim.

### (iii)     Limitations on and Payment of Arbitration Awards

In the case of a non-Extraordinary Claim involving Disease Levels III–VII, the arbitrator will not return an award in excess of the Maximum Value for the appropriate Disease Level, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator will not return an award greater than the Maximum Extraordinary Value for such a claim.  For claims involving Disease Levels I and II the arbitrator will not award more than the Scheduled Value for such claims.  A claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who accepts the Asbestos PI Trust's original valuation of the claim.

### (x)     Litigation

Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos PI Trust.  However, a claimant only will be eligible for payment of a judgment for monetary damages obtained in the tort system from the Asbestos PI Trust's available cash.

If the holder of a disputed claim disagrees with the Asbestos PI Trust's determination regarding the Disease Level of the claim or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section VII.A.7(w) above, the holder may file a lawsuit in the Claimant's Jurisdiction as defined in Section VII.A.7(n) above.  Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including, with respect to the Asbestos PI Trust, all defenses which could have been asserted by Quigley) will be available to both sides at trial; however, the Asbestos PI Trust may waive any defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial prepetition complaint was filed or on the date the proof of claim was filed with the Asbestos PI Trust, the case will be treated as a personal injury case with all personal injury damages (other than punitive or exemplary damages) to be considered even if the claimant has died during the pendency of the claim.

## CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

## A.     Solicitation of Votes

Detailed voting instructions approved by the Bankruptcy Court pursuant to the Solicitation Procedures Order are provided with the Ballot accompanying this Disclosure Statement.  In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in Classes 2.01 (Pfizer Secured Claim), 3 (Unsecured Claims) and 4 (Asbestos PI Claims) and the Equity Interests in Class 5 are Impaired.  Any Claimant holding a Claim or Equity Interest in such Impaired Classes is entitled to vote under the Plan in accordance with the terms of the Solicitation Procedures Order.

***Any holder of a contingent, disputed or unliquidated Class 3 Unsecured Claim (including a silica personal injury claim) or holder of a Claim or Equity Interest that is the subject of a pending objection is  not entitled to vote to accept or reject the Plan unless: (i) the Court enters an order allowing such claim for voting purposes prior to the Voting Deadline (defined below); (ii) such Claimant timely files and serves a 3018(a) Motion by the 3018(a) Motion Deadline (each defined below), in which event such Claimant will be permitted to cast a provisional ballot as explained below; or (iii) such Claimant timely filed and served a motion under Bankruptcy Rule 3018(a) seeking the temporary allowance of such Claim or Equity Interest for the purposes of voting to accept or reject***

*Quigley's third amended plan of reorganization, and that motion remains unresolved as of the 3018(a) Motion Deadline, in which event such Claimant will be permitted to cast a provisional ballot as explained below.*

Any holder of an Unsecured Claim that is contingent, disputed or unliquidated, or any holder of a Claim or Equity Interest that is the subject of a pending objection may file a motion under Bankruptcy Rule 3018(a) seeking the temporary allowance of such Claim or Equity Interest for the purposes of voting to accept or reject the Plan (the "*3018(a) Motions*"). Such motions must be filed and served in accordance with the Solicitation Procedures Order on or prior to [February 20,**May 27,** 2008] (the "*3018(a) Motion Deadline*"). Any Claimant that timely files and serves a 3018(a) Motion will be provided a Ballot and be permitted to cast a provisional vote to accept or reject the Plan. To the extent that any 3018(a) Motion is unresolved prior to the Voting Deadline, [March 3,**June 10,** 2008], the Court will determine at the Confirmation Hearing, [————,**September 4,** 2008], whether such party's provisional ballot will be counted as a vote on the Plan. Any Ballot cast by the holder of a Claim or Equity Interest that is required to file a 3018(a) Motion to be entitled to vote on Quigley's Plan will not be provisionally counted in determining whether the Plan has been accepted or rejected if their 3018(a) Motion is not timely filed and served by the 3018(a) Motion Deadline.

Notwithstanding anything to the contrary in the preceding paragraph, if any holder of a Claim or Equity Interest filed and served a timely motion under Bankruptcy Rule 3018(a) seeking the temporary allowance of such Claim or Equity Interest for the purposes of voting to accept or reject Quigley's third amended plan of reorganization, and if that motion remains unresolved as of the 3018(a) Motion Deadline, then without any further act or deed by such holder, the Bankruptcy Court or any other entity, that motion will be and will be deemed to be for all purposes a timely 3018(a) Motion, and such holder will be entitled to cast a provisional vote to accept or reject the Plan. If and to the extent any holder described in the preceding sentence wishes to raise additional arguments in favor of the temporary allowance of its Claim or Equity Interest for voting purposes only, that holder may file and serve a supplement to its prior motion by the 3018(a) Motion Deadline.

If any holder of a Claim or Equity Interest filed and served a timely motion under Bankruptcy Rule 3018(a) seeking the temporary allowance of such Claim or Equity Interest for purposes of voting to accept or reject Quigley's third amended plan of reorganization, and if the Bankruptcy Court resolved such motion prior to the date of the Solicitation Procedures Order, all parties in interest are bound to such resolution in all respects and for all purposes as though such motion were a 3018(a) Motion that is resolved prior to the Voting Deadline.

Claims in Class 1 (Priority Claims) and Classes 2.02 (Freeman**Reaud** Secured Claim), 2.03 (Reaud**Hatchett** Secured Claim), 2.04 (Hatchett Secured Claim), 2.05 (Sherry Secured Claim), and 2.06**2.05** (Other Secured Bond Claims) are Unimpaired. The holders of Allowed Claims in Class 1 and Classes 2.02, 2.03, 2.04, 2.05, and 2.06**2.05** are conclusively presumed to have accepted the Plan, and the solicitation of acceptances with respect to Class 1 and Classes 2.02, 2.03, 2.04, 2.05, and 2.06**2.05** is not required under section 1126(f) of the Bankruptcy Code. Claims in Classes 2.01 (Pfizer Secured Claim), 3 (Unsecured Claims) and 4 (Asbestos PI Claims) and Equity Interests in Class 5 are Impaired under the Plan. The holders of Claims in Classes 2.01, 3 and 4 and Equity Interests in Class 5 are entitled to vote to accept or reject the Plan in accordance with the terms of the Solicitation Procedures Order.

*The Ballot and the Solicitation Procedures set forth detailed instructions concerning the voting of Asbestos PI Claims and impose requirements on attorneys for holders of Asbestos PI Claims to notify the Ballot Agent immediately if they are not authorized to vote on the Plan on behalf of the holders of Asbestos PI Claims whom they represent.*

The Bankruptcy Code defines "acceptance" of a plan by a class of Claimants as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of that class that actually vote to accept or reject the plan. The Bankruptcy Code defines "acceptance" of a plan by a class of equity interests as acceptance by at least two-thirds in amount of the interests of that class that have actually voted to accept or reject a plan. In addition, section 524(g) of the Bankruptcy Code provides that in connection with confirmation of a plan seeking a channeling injunction under section 524(g) of the Bankruptcy Code, such as the Asbestos PI Channeling Injunction and the Settling Asbestos Insurance Entity Injunction contained in the Plan, the Bankruptcy Court may issue such an injunction only if: (a) the holders of the claims to be channeled under the injunction are classified separately

under the plan; and (b) at least 75% of the holders of the claims in that class who actually vote on the plan vote to accept the plan.

**B.**     **Voting Deadline**

The Solicitation Procedures Order provides that the Voting Deadline (i.e., the last date and time by which Ballots and master Ballots must be ACTUALLY RECEIVED by the Ballot Agent in order to be counted) is 5:00 p.m. (New York City Time) on [March 3,**June 10,** 2008].  The Solicitation Procedures Order further provides that Quigley will have the right, in its sole discretion, to extend in writing the date until which Ballots and master Ballots will be accepted.  To be counted, Ballots or master Ballots must be properly completed, signed and returned so that they are received by the Ballot Agent by 5:00 p.m. (New York City Time) on the Voting Deadline, unless the Voting Deadline is extended in writing by Quigley in its sole discretion.  Ballots delivered to the Bankruptcy Court, Quigley or any person or entity other than the Ballot Agent, The**Wells Fargo** Trumbull Group, L.L.C., will not be counted.

**C.**     **The Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice to all creditors and interest holders, to hold a confirmation hearing.  The Confirmation Hearing with respect to the Plan has been scheduled to commence on [_____,**September 4,** 2008] at 10:00 a.m., in Courtroom 723 of the United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be (i) made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount of the Claim held by the objector and (ii) filed with the Bankruptcy Court and served so that they are **RECEIVED** on or before [March 31,**August 4,** 2008], at 5:00 p.m., New York City time by the Bankruptcy Court and:

> Counsel to Quigley:
>
> Schulte Roth & Zabel LLP
> 919 Third Avenue
> New York, New York 10022
> Attention:  Michael L. Cook, Esq. and Lawrence V. Gelber, Esq.
>
> Counsel to the Creditors' Committee:
>
> Caplin & Drysdale, Chartered
> 399 Park Avenue
> 27th Floor
> New York, NY 10022-4614
> Attention:  Elihu Inselbuch, Esq.
>
> Caplin & Drysdale, Chartered
> One Thomas Circle, NW
> Washington, D.C. 20005
> Attention:  Peter V.N. Lockwood, Esq. and Ronald Reinsel, Esq.
>
> Counsel to Pfizer:
>
> Cadwalader, Wickersham & Taft LLP
> One World Financial Center
> New York, New York 10281
> Attention:  Bruce R. Zirinsky, Esq. and John H. Bae, Esq.

Counsel to the Future Demand Holders' Representative:

Togut, Segal & Segal LLP
One Penn Plaza
Suite 3335
New York, New York 10119
Attention:  ~~Scott E~~**Richard K**. ~~Ratner~~**Milin**, Esq.

United States Trustee:

Office of the United States Trustee
Southern District of New York
33 Whitehall Street
21st Floor
New York, New York  10004
Attention:  Tracy Hope Davis, Esq.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

## D.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court can and will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) feasible; and (iii) in the "best interests" of creditors and interest holders that are Impaired under the Plan.

### 1.    Acceptance

Classes 2.01, 3, 4 and 5 of the Plan are Impaired under the Plan and are entitled to vote to accept or reject the Plan in accordance with the Solicitation Procedures.  Classes 1, 2.02, 2.03, 2.04, ~~2.05,~~ and ~~2.06~~**2.05** are Unimpaired and are conclusively deemed to have voted to accept the Plan.  Quigley reserves the right to seek nonconsensual confirmation (*i.e.*, "cram-down") of the Plan with respect to any Class of Claims or Equity Interests that rejects the Plan.

### 2.    Unfair Discrimination and Fair and Equitable Tests

To obtain nonconsensual confirmation of the Plan, Quigley must demonstrate to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, nonaccepting Class.  The Bankruptcy Code provides the following non-exclusive definition of the phrase "fair and equitable," as it applies to secured creditors, unsecured creditors, and equity holders:

#### (a)    Secured Creditors

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides: (1)(a) that the claim holders included in the rejecting class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred Cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

**(b)     Unsecured Creditors**

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides: (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

**(c)     Equity Interest Holders**

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides: (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (2) that the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property at all.

At the Confirmation Hearing, Quigley will request confirmation pursuant to section 1129(b) of the Bankruptcy Code with respect to each Class of Claims or Equity Interests that does not or is deemed not to have accepted the Plan. Quigley believes that the Plan and the treatment of all Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

**3.     Feasibility**

In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code, which requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization of the debtor. For purposes of determining whether the Plan meets this requirement, Quigley has analyzed its ability to meet its obligations under the Plan. As part of this analysis, Quigley has prepared projections of its financial performance for the ~~ten~~**four**-month period ending ~~May~~**August** 31, 2008 and each of the years ending December 31, 2008 through 2011 (the "***Projection Period***"). These projections, and the assumptions on which they are based, are included in the Quigley Company Projected Financial Information included in the Financial Appendix annexed hereto as Exhibit C (the "***Projected Financial Information***"). Based upon the Projected Financial Information, Quigley believes that Reorganized Quigley will be able to make all payments required pursuant to the Plan, and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Projected Financial Information consists of the following:

> Projected Consolidated Balance Sheets of Reorganized Quigley as of ~~June~~**September** 1, 2008 (which reflects the projected accounting effects of consummation of the Plan and the application of "fresh start" accounting principles) and at December 31 for each of the years from 2008 through 2011

> Projected Consolidated Statements of Income of Reorganized Quigley for the one-month period ending ~~May 31,~~**September 30,** 2008 and each of the years ending December 31, 2008 through 2011

> Projected Consolidated Statements of Cash Flow of Reorganized Quigley for the one-month period ending ~~May 31,~~**September 30,** 2008 and each of the years ending December 31, 2008 through 2011

The Projected Financial Information is based upon the assumption that the Plan will be confirmed and, for projection purposes, that the Effective Date and the initial distributions take place as of ~~June~~**September** 1, 2008. Although the Projected Financial Information is based upon a ~~June~~**September** 1, 2008 Effective Date, Quigley

believes that an actual Effective Date as late as ~~July~~**October** 31, 2008 or shortly thereafter would not have any material adverse effect on the projections.

Quigley has prepared the Projected Financial Information based upon certain assumptions that it believes to be reasonable under the circumstances.[15]  As noted therein, however, Quigley cautions that no representations can be made as to the accuracy of the Projected Financial Information or as to Reorganized Quigley's ability to achieve the projected results.  Those assumptions considered to be significant are described in the Projected Financial Information.  The Projected Financial Information has not been examined or compiled by independent accountants.  Many of the assumptions on which the Projected Financial Information is based are subject to significant uncertainties outside the control of Reorganized Quigley.  Inevitably, some assumptions will not materialize, and events and circumstances occurring after the date on which the Projected Financial Information was prepared may be different from those assumed or may be unanticipated, and may affect adversely Reorganized Quigley's financial results.  Therefore, the actual results achieved throughout the Projection Period may vary from the projected results, and the variations may be material.  All holders of Claims and Equity Interests that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Projected Financial Information is based in evaluating the Plan.

THE PROJECTED FINANCIAL INFORMATION WAS NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC REGARDING PROJECTIONS.  FURTHERMORE, THE PROJECTED FINANCIAL INFORMATION HAS NOT BEEN AUDITED BY INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS.  ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTED FINANCIAL INFORMATION IS BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH IN THE PAST HAVE NOT BEEN ACHIEVED AND WHICH MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF QUIGLEY AND/OR REORGANIZED QUIGLEY.  CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY QUIGLEY, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTED FINANCIAL INFORMATION.

**4.      Best Interests Test**

Confirmation of the Plan also requires that each holder of an Impaired Claim or Equity Interest either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if Quigley were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."  To determine what holders of Claims and Equity Interests of each Impaired Class would receive if Quigley were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of Quigley's assets and properties in the context of a chapter 7 liquidation case.  The Cash amount that would be available for satisfaction of Claims (other than the Pfizer Secured Claim) and Equity Interests would consist of the proceeds resulting from the disposition of the unencumbered assets of Quigley, augmented by the unencumbered Cash held by Quigley at the time of the commencement of the liquidation case.  Such Cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative claims and priority claims that may result from the termination of Quigley's businesses and the use of chapter 7 for the purposes of liquidation.

Quigley's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those of attorneys and other professionals that such a trustee may engage.  In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and Executory Contracts assumed or entered into by Quigley during the pendency of the Chapter 11 Case.  The foregoing types of claims and other claims that may arise in a liquidation case or result from the pending Chapter 11 Case, including any unpaid expenses incurred by

---

[15]  The Projected Financial Information contains projections regarding Reorganized Quigley's tax liability.  Quigley is investigating potential strategies to minimize Reorganized Quigley's tax liability.  Quigley or Reorganized Quigley, as the case may be, will work with the Trustees, once appointed, to minimize Reorganized Quigley's tax liability.

Quigley, as debtor-in-possession, during the Chapter 11 Case, such as compensation for professionals, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition claims.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of the liquidation of Quigley's unencumbered assets and properties, after subtracting the amounts attributable to the foregoing Claims, are then compared with the value of the property offered to such Classes of Claims and Equity Interests under the Plan. After considering the effects that chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Case, including (i) the increased costs and expenses of liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisers to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under a chapter 7 case and the "forced sale" atmosphere that would prevail, and (iii) the substantial increases in Claims that would be satisfied on a priority basis or on a parity with creditors in the Chapter 11 Case, Quigley has determined that confirmation of the Plan will provide each holder of an Allowed Claim or Equity Interest with a recovery that is not less than such holder would receive pursuant to a liquidation of Quigley under chapter 7 of the Bankruptcy Code.

Further, because the Pfizer Contribution would not be made in a liquidation under chapter 7, the amount available for distribution to Claimants in Class 4 (Asbestos PI Claims) and all other Classes under a chapter 7 scenario would be substantially less than the amounts available under the Plan. Quigley also believes that the value of any distributions to each Class of Allowed Claims in a chapter 7 case, including the Pfizer Secured Claim, would be less than the value of distributions under the Plan because liquidation of Quigley's assets in a chapter 7 case would not occur for a substantial period of time. Indeed, it is likely that distribution of the proceeds of the liquidation would be delayed a number of years after the completion of the liquidation to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be significantly longer.

Quigley's Liquidation Analysis is attached hereto as Exhibit "H" (the "*Liquidation Analysis*"). The information set forth in Exhibit "H" provides a summary of the liquidation values of Quigley's assets assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of Quigley's estate. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although considered reasonable by Quigley's management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of Quigley's management. The Liquidation Analysis is also based upon assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected may not be realized if Quigley were, in fact, to undergo such liquidation.

E.    **Consummation**

The Plan will be consummated on the Effective Date. For a more detailed discussion of the conditions precedent to consummation of the Plan and the impact of the failure to meet such conditions, *see* "THE PLAN OF REORGANIZATION — Conditions Precedent to the Effective Date under the Plan."

**MANAGEMENT AND BUSINESS OF REORGANIZED QUIGLEY**

A.    **Management of Reorganized Quigley**

1.    **Board of Directors**

Unless otherwise agreed to between Reorganized Quigley and Pfizer, the existing members of Quigley's Board of Directors will continue to serve in their respective capacities until the Stock Transfer Date. On and after the Stock

Transfer Date, the Asbestos PI Trust will have the right, but not the obligation, to replace any or all of the members of Reorganized Quigley's Board of Directors.

The current members of Quigley's board of directors are: (a) Paul A. Street, Chairman, (b) Charles F. Raeburn, and (c) Kevin M. Altit. **Upon Mr. Street's resignation, effective as of March 31, 2008, Kim D. Jenkins will fill Mr. Street's seat on the board of directors.**

### 2. Management Contracts

On the Effective Date, all employment contracts between Quigley and any employee of Quigley who was employed by Quigley as of the date immediately preceding the Effective Date (including, without limitation, any offer letters issued to any such employees to the extent such offer letters are not superseded by formal employment contracts) will be deemed assumed by Reorganized Quigley to the extent not already assumed by Quigley. From and after the Effective Date, the existing officers of Quigley will serve in their respective capacities as officers of Reorganized Quigley, unless otherwise provided in the Plan Supplement or at the Confirmation Hearing.

### 3. Amendment and Restatement of Quigley's Certificate of Incorporation and By-Laws

The Certificate of Incorporation and By-laws of Quigley will be amended and restated as of the Effective Date in substantially the form of the Amended Certificate of Incorporation and Amended By-Laws included in the Plan Supplement. The Amended Bylaws and the Amended Certificate of Incorporation will contain those provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary, to prohibit the issuance of nonvoting equity securities (other than the Quigley Stock Right) as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Bylaws and the Amended Certificate of Incorporation after the Effective Date, as permitted by applicable law. Except as otherwise provided in the Plan, the Amended Bylaws and Amended Certificate of Incorporation will contain such indemnification provisions applicable to the officers, directors and employees of Reorganized Quigley and such other Entities as may, in the discretion of the Board of Directors of Reorganized Quigley, be appropriate.

### B. Business of Reorganized Quigley

Reorganized Quigley will continue to operate the Claims Handling Unit, which will provide claims handling services, including processing settlements of asbestos personal injury and wrongful death claims. (For more information on the Claims Handling Unit and its services, see Section IV.A.4 of this Disclosure Statement, entitled "GENERAL INFORMATION – Description and History of Quigley's Business – Quigley's Business Today"). Quigley and Pfizer have entered into, or will enter into, the five-year Pfizer Claims Services Agreement, pursuant to which Reorganized Quigley will service and process asbestos related claims brought against Pfizer that are not derivative of Quigley or related to Quigley's products, as well as claims connected with the submission of medical and exposure evidence under the terms of the Pfizer Claimant Settlement Agreements. Quigley will generate $5 million in revenues per year from providing these services to Pfizer, or an aggregate amount of $25 million during Reorganized Quigley's first five years of operation. Quigley previously received indications of interest in its claims-handling services from third parties. Quigley has reviewed these opportunities, and, while none have yet come to fruition, Quigley intends to actively pursue additional opportunities for its claims handling services following confirmation of the Plan, as discussed further below.

Reorganized Quigley will also be retained by the Asbestos PI Trust in the ordinary course of Reorganized Quigley's business to provide these services to the Asbestos PI Trust under the terms of the Asbestos PI Claims Services Agreement.

Upon emerging from the Chapter 11 Case, Reorganized Quigley will be able to enter the market for claims handling services, in which a number of companies operate with success. Quigley's employees have developed significant expertise in processing asbestos claims. Specifically, six of Quigley's employees have 36 years of combined experience working at the CCR prior to their employment at Quigley. During their tenure at the CCR, these individuals gained expertise in a range of services relating to defense case management and claims processing, including information technology support, software programming and analysis, technical maintenance, and

qualifying claims for settlement. Given Quigley's unique computer infrastructure, the experience and expertise of its employees, and its ability to scale to its workload, Quigley believes that Reorganized Quigley will be able to compete effectively with other participants in the market.

Under the terms of the Asbestos PI Claims Services Agreement, Reorganized Quigley will, among other things, initially develop procedures for the transfer of information regarding the Asbestos PI Claims from Reorganized Quigley to the Asbestos PI Trust, prepare claims filing materials consistent with the terms of the Asbestos PI Trust Distribution Procedures and develop a database for the Asbestos PI Claims (the "**start up services**").

Once these start up services are complete, Reorganized Quigley will provide the following services, among others, to the Asbestos PI Trust:

> establish the FIFO Processing Queue and FIFO Payment Queue and track claimants' positions in the queues;

> assist the Trustees, the Future Demand Holders' Representative and the Trust Advisory Committee in developing procedures for reviewing and liquidating Asbestos PI Claims;

> review and process incoming proof of claim forms and medical and exposure evidence required by the Asbestos PI Trust Distribution Procedures submitted by claimants to determine whether they are eligible to have their claims paid by the Asbestos PI Trust;

> provide the Asbestos PI Trust with any information relating to the services being performed by Reorganized Quigley under the agreement that the Asbestos PI Trust requests in connection with any ADR proceeding or litigation in the tort system; and

> monitor the allocation of amounts being billed to insurers for payment of Asbestos PI Claims.

Under the terms of the Asbestos PI Claims Services Agreement, Reorganized Quigley will charge the Asbestos PI Trust a one-time fee of $250,000 for the start up services. Additionally, Reorganized Quigley will receive a fee for each Asbestos PI Claim it reviews. For each claim that is accepted and paid by the Asbestos PI Trust, a $47.50 per-claim fee will be paid in installments as follows: (i) $22.50 when Reorganized Quigley commences review of such claim; (ii) $20.00 upon placement of the claim in the FIFO Processing Queue; and (iii) $5.00 upon placement of the claim in a FIFO Payment Queue. For each claim that is rejected by the Asbestos PI Trust, a $47.50 per-claim fee will be paid in installments as follows: (i) $25.00 when Reorganized Quigley commences review of such claim; and (ii) $22.50 upon rejection of the claim.

**RISK FACTORS**

HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN QUIGLEY SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR REFERRED TO HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.**     **Overall Risks to Recovery by Holders of Claims**

The ultimate recoveries under the Plan to holders of Claims (other than holders whose entire Distribution is paid in Cash) depend for the most part upon the value of the Quigley Transferred Insurance Rights, and the number and magnitude of Asbestos PI Claims ultimately asserted against the Asbestos PI Trust, neither of which can be known with certainty. The factors below (other than the factor entitled "Certain Bankruptcy Considerations") assume that the Plan is confirmed and that the Effective Date occurs on or about ~~June~~**September** 1, 2008. Prior to voting on the

Plan, each holder of a Claim should consider carefully the risk factors specified or referred to below, including the exhibits annexed hereto, as well as all of the information contained in the Plan.

**1.      Certain Bankruptcy Considerations**

Although Quigley believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no guaranty that the Bankruptcy Court will reach the same conclusion, or that the Confirmation Order, if challenged on appeal, will be affirmed.  There also can be no assurance that the Plan as proposed will be accepted by the requisite number of holders or amounts of Claims and Equity Interests, that the Plan will not be modified up to and including the Confirmation Date, or that the Bankruptcy Court will enter a Confirmation Order containing the findings of fact and conclusions of law that are conditions precedent to confirmation of the Plan.

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a liquidation or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan.  If a liquidation or protracted reorganization were to occur, there is a substantial risk that the value of Quigley's assets would be substantially eroded to the detriment of all stakeholders.

**2.      Quigley Transferred Insurance Rights Assigned to the Asbestos PI Trust**

A discussion of the insurance coverage available for Asbestos PI Claims is provided above in Sections III.A.5 and V.D.  Estimating the insurance recovery under the Quigley Transferred Insurance Rights is inherently uncertain and depends on a number of factors, including but not limited to, the potential for disputes over coverage issues with Asbestos Insurance Entities or arising under Insurance Settlement Agreements, the principles of law which would likely apply in resolving such disputes, the amount that will be received under Insurance Settlement Agreements, the amount that will be received under Shared Asbestos Insurance Policies that are not subject to an Insurance Settlement Agreement, the timing and amount of Asbestos PI Claims that may be made in the future, the financial stability of the Asbestos Insurance Entities and their ability to meet their obligations, and the amount which may be paid to settle or otherwise dispose of disputes with Asbestos Insurance Entities over coverage issues.  These factors are beyond the control of Quigley and changes in these factors could materially affect the ultimate insurance recovery and the amount of funding for the Asbestos PI Trust.

**3.      Projected Financial Information**

The Projected Financial Information is dependent upon numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized Quigley, conditions in the industries in which Reorganized Quigley will operate, certain assumptions with respect to competitors of Reorganized Quigley, general business and economic conditions, and other matters, many of which are beyond the control of Quigley.  Accordingly, there can be no assurance that such assumptions will prove to be valid.  In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projected Financial Information may affect the actual financial results of Reorganized Quigley.  Although Quigley believes that the projections are reasonable and attainable, some or all of the estimates will vary, and variations between the actual financial results and those projected may be material.

**4.      Appointment of Different Trustees and/or Different Members of the Trust Advisory Committee for the Asbestos PI Trust**

At the Confirmation Hearing, Quigley will request that the Bankruptcy Court appoint certain Entities as the initial Trustees of the Asbestos PI Trust, and certain Entities as the initial members of the Trust Advisory Committee.  The Bankruptcy Court, however, may reject or otherwise decline to appoint one or more of the proposed Trustees or proposed members of the Trust Advisory Committee.  In that case, one or more alternate Entities would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The selection of different Trustees or Trust Advisory Committee members also could materially impact administration of the Asbestos PI Trust.

5.     **Distributions Under the Asbestos PI Trust Distribution Procedures**

Payments that will be made on Asbestos PI Claims will be determined under the Asbestos PI Trust Distribution Procedures and will be based on the one hand, on estimates of the number, types, and amount of present and expected future Asbestos PI Claims and, on the other hand, on the value of the assets of the Asbestos PI Trust, the liquidity of the Asbestos PI Trust, the Asbestos PI Trust's expected future income and expenses, as well as other matters that are likely to effect the sufficiency of funds to pay all holders of Asbestos PI Claims.  There can be no certainty as to the precise amounts that will be distributed by the Asbestos PI Trust in any particular time period or when Asbestos PI Claims will be paid by the Asbestos PI Trust.

6.     **Federal Income Tax Consequences of the Plan to Quigley**

It is a condition to the occurrence of the Effective Date that Quigley receive an opinion that the Asbestos PI Trust will be a "qualified settlement fund" within the meaning of the United States Treasury Regulations promulgated under section 468B of the Internal Revenue Code.  This opinion will be subject to the normal and customary caveats and limitations found in opinions of this type.  If Quigley cannot obtain this opinion, the Effective Date of the Plan might not occur.

7.     **Risk of Post-Consummation Default**

Although Quigley can give no guarantees, it believes that Reorganized Quigley will generate sufficient operating cash flow to meet its business obligations and operating requirements and that such cash flow will be sufficient to make the payments required to be made by Reorganized Quigley under the Plan.  At the Confirmation Hearing, the Bankruptcy Court will be required to make a determination that the Plan is feasible (i.e., not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized Quigley) in order to confirm the Plan.

8.     **Dependence on Key Personnel**

A relatively small number of key executive officers and personnel manage Quigley's business and the loss of one or more of these executive officers or employees could have a material effect on Reorganized Quigley's business going forward.  As of the date of this Disclosure Statement, Quigley had not entered into written employment contracts with all of such key executive officers and personnel.

B.     **The Asbestos PI Channeling Injunction**

The Asbestos PI Channeling Injunction, which, among other things, bars the assertion of "future" Asbestos PI Claims against Quigley and the other Asbestos Protected Parties, is the cornerstone of the Plan.  In 1994, the United States Congress added subsections (g) and (h) to section 524 of the Bankruptcy Code in order to confirm the authority of the Bankruptcy Court, subject to the conditions specified therein, to issue injunctions such as the Asbestos PI Channeling Injunction and Settling Asbestos Insurance Entity Injunction with respect to present and future asbestos personal injury, wrongful death and related claims and demands.  Although the Plan, the Asbestos PI Trust Agreement, and the Asbestos PI Trust Distribution Procedures all have been drafted with the intention of complying with sections 524(g) and (h) of the Bankruptcy Code, and satisfaction of the conditions imposed by sections 524(g) and (h) is a condition precedent to confirmation of the Plan, there is no guarantee that the validity and enforceability of the Asbestos PI Channeling Injunction, the Settling Asbestos Insurance Entity Injunction or sections 524(g) and (h) or the application of the Asbestos PI Channeling Injunction and Settling Asbestos Insurance Entity Injunction to Asbestos PI Claims will not be challenged, either before or after confirmation of the Plan.  Although Quigley believes that adequate bases exist for the courts to uphold sections 524(g) and (h), the Asbestos PI Channeling Injunction and Settling Asbestos Insurance Entity Injunction, there can be no assurance that, in the future, courts might not invalidate all or a portion of sections 524(g) and (h) or the Asbestos PI Channeling Injunction and Settling Asbestos Insurance Entity Injunction.

# CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS NOT WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO QUIGLEY, REORGANIZED QUIGLEY AND CERTAIN HOLDERS OF CLAIMS. THE FOLLOWING SUMMARY DOES NOT DISCUSS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH OR ARE OTHERWISE UNIMPAIRED UNDER THE PLAN OR TO HOLDERS OF EQUITY INTERESTS.**

**THE FOLLOWING SUMMARY IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "*INTERNAL REVENUE CODE*"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE INTERNAL REVENUE SERVICE ("*IRS*") AS IN EFFECT ON THE DATE HEREOF. CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF MAY HAVE RETROACTIVE EFFECT AND COULD SIGNIFICANTLY AFFECT THE FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.**

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES. QUIGLEY DOES NOT CURRENTLY INTEND TO SEEK A RULING FROM THE IRS CONCERNING ANY OF THE TAX ASPECTS OF THE PLAN. IN ADDITION, THIS SUMMARY DOES NOT ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE PLAN, NOR DOES IT PURPORT TO ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH AS FOREIGN TAXPAYERS, BROKER-DEALERS, BANKS, MUTUAL FUNDS, INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, SMALL BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES, TAX-EXEMPT ORGANIZATIONS, AND INVESTORS IN PASS-THROUGH ENTITIES).**

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE TO THEM UNDER THE PLAN.**

## A.     Consequences to Quigley

As of the date of this Disclosure Statement, Quigley does not have any net operating loss ("*NOL*") carryforwards. Because Pfizer will treat Quigley as a member of its consolidated group until the Stock Transfer Date, Quigley expects that any deduction incurred by Quigley as a result of the funding of the Asbestos PI Trust on the Effective Date will be utilized by the consolidated group of which Quigley is a member for U.S. federal income tax purposes (the "*Affiliated Group*") in the Affiliated Group's taxable year that includes the Effective Date.

## 1.    Cancellation of Debt

Cancellation of debt income ("*COD*") is generally includible in a taxpayer's gross income.  COD is the amount by which the indebtedness discharged exceeds any consideration given in exchange therefore, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD.  For example, COD is not included in gross income to the extent the payment of such indebtedness would have given rise to a deduction.  In addition, any COD realized by a debtor in a bankruptcy case is excluded from the debtor's gross income.  In such a case, the Internal Revenue Code provides that the bankrupt debtor must reduce certain of its tax attributes such as NOLs, excess tax credits, and tax basis in its assets by the amount of the excluded COD.

Quigley's satisfaction of the Unsecured Claims and the Asbestos PI Claims generally should not give rise to COD because payment of such Claims generally would have given rise to a deduction for Quigley.  Under applicable Treasury regulations governing debt instruments of consolidated group members, Quigley should recognize ordinary income on the discharge of the Pfizer Secured Claim without the relief normally afforded by Internal Revenue Code Section 108, while the holder of any Secured Claim should recognize a matching ordinary loss at the same time, resulting in offsetting income and loss amounts in the Affiliated Group.

## 2.    Treatment of the Asbestos PI Trust

It is a condition to the effectiveness of the Plan that Quigley receive an opinion of counsel stating that the Asbestos PI Trust qualifies as a "qualified settlement fund" within the meaning of Section 468B.

The Treasury regulations promulgated under Internal Revenue Code section 468B provide that to be treated as a qualified settlement fund, a fund, account, or trust must be (i) established pursuant to an order of, or be approved by, a government authority, including a court, and must be subject to the continuing jurisdiction of that government authority, (ii) established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event or a related series of events that has occurred and that has given rise to at least one claim asserting liability arising out of, among other things, a tort, and (iii) a trust under applicable state law or have its assets physically segregated from the other assets of the transferor and persons related to the transferor.

Assuming the Asbestos PI Trust is treated as a qualified settlement fund, Quigley generally would be entitled to a current federal income tax deduction for all transfers of cash, stock, and other property (other than its own notes) to the Asbestos PI Trust to the same extent it would have been entitled to a deduction if such amounts had been paid directly to the holder of an Asbestos PI Claim.  Quigley expects to obtain a deduction with respect to its transfer to the Asbestos PI Trust of cash and certain interests in its insurance coverage on the Effective Date.  Quigley generally will not be entitled to a deduction, however, to the extent that it funds the Asbestos PI Trust with amounts not included in its income, including insurance proceeds or interests in its insurance coverage previously excluded from its income.

As a qualified settlement fund, the Asbestos PI Trust will be subject to a separate entity level tax at the maximum rate applicable to trusts and estates.  In determining the taxable income of the Asbestos PI Trust, (i) any amounts transferred by Quigley to the Asbestos PI Trust will be excluded from the Asbestos PI Trust's income, (ii) any sale, exchange, or distribution of property by the Asbestos PI Trust generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis of the Asbestos PI Trust in such property, and (iii) administrative costs (including state and local taxes) incurred by the Asbestos PI Trust will be deductible.  In general, the adjusted tax basis of property received by the Asbestos PI Trust pursuant to the Plan will be its fair market value at the time of such receipt.

## B.    Consequences to Holders of Claims

The U.S. federal income tax consequences to a holder of a Claim that is impaired, including the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby, will be determined by reference to the Claim in respect of which the distribution is made and as if the distribution were made directly by Quigley.  Accordingly, a holder's tax consequences will depend upon, among other things: (i) the nature of the Claim, (ii) the manner in which the holder acquired the Claim, (iii) the length of time the Claim

has been held, (iv) whether the Claim was acquired at a discount, (v) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (vi) whether the holder has previously included in income accrued but unpaid interest with respect to the Claim, (vii) the method of tax accounting of the holder, and (viii) whether the Claim constitutes a security for U.S. federal income tax purposes. Accordingly, each holder of a Claim is urged to consult its tax advisor regarding the tax consequences of the Plan to such holder.

## 1. Consequences to the Holder of the Pfizer Secured Claim

Pursuant to the Plan, in full satisfaction, settlement, release and discharge of its Allowed Claim, the holder of the Allowed Pfizer Secured Claim will receive Cash in an amount equal to the amount of its Allowed Pfizer Secured Claims less $30 million. Under applicable Treasury regulations governing debt instruments of consolidated group members, Quigley may recognize ordinary income on the discharge of any portion of the Allowed Pfizer Secured Claim held by members of its consolidated group without the relief normally afforded by Internal Revenue Code Section 108, while the holder of the Pfizer Secured Claim may recognize a matching ordinary loss at the same time, resulting in offsetting income and loss amounts in the Affiliated Group.

## 2. Consequences to Holders of Unsecured Claims

Pursuant to the Plan, in full satisfaction, settlement, release and discharge of their Allowed Claims, holders of Allowed Unsecured Claims will receive Cash in an amount equal to the amount of their Allowed Unsecured Claims multiplied by the Initial Payment Percentage. Each holder of an Allowed Unsecured Claim will recognize gain or loss for U.S. federal income tax purposes on the exchange of such Allowed Unsecured Claim for Cash equal to the difference between the amount of Cash received in respect of such Allowed Unsecured Claims (other than amounts allocable to accrued and unpaid interest) and such holder's adjusted tax basis in such Allowed Unsecured Claim.

Quigley intends to take the position that distributions to holders of the Allowed Unsecured Claims will be allocated first to the original principal portion of such Claims as determined for federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the portion of such Claims representing accrued but unpaid interest. There is no assurance, however, that the IRS would respect such an allocation for federal income tax purposes.

In general, to the extent that an amount received by a holder of debt is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed or amortized original issue discount ("*OID*") was previously included in its gross income and is not paid in full. The IRS, however, has privately ruled that a holder of a security could not claim a current deduction with respect to any unpaid OID, in an otherwise tax-free exchange. Accordingly, it is also unclear whether, by analogy, a holder of a Claim with previously included OID that is not paid in full would be required to recognize a capital loss, rather than an ordinary loss. Holders are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of accrued, but unpaid interest for federal income tax purposes.

## 3. Consequences to Holders of Asbestos PI Claims

Each Asbestos PI Claim will be liquidated and satisfied in cash from the Asbestos PI Trust, in accordance with the Asbestos PI Trust Distribution Procedures. The federal income tax treatment of the receipt of payments from the Asbestos PI Trust by a holder of such a Claim generally will depend upon the nature of the Claim. Because the amounts received by a holder of an Asbestos PI Claim (other than an Indirect Asbestos PI Claim) generally will be attributable to, and compensation for, such holder's personal physical injuries or sickness, within the meaning of section 104 of the Internal Revenue Code, any such amounts received by the holder should be nontaxable. However, to the extent payments from the Asbestos PI Trust to a holder of an Asbestos PI Claim are attributable to medical expense deductions allowed under section 213 of the Internal Revenue Code for a prior taxable year, such payments will be taxable as ordinary income to the recipient.

To the extent that a holder of a Secured Bond Claim or Other Secured Claim becomes entitled to seek payment of its final judgment from the supersedeas bond, letter of credit or other security that secures such Claim and the amount received from the bond, letter of credit or other security is insufficient to satisfy the final judgment, the Claim holder will be entitled to proceed against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures. Thus for federal income tax purposes such a Secured Bond Claim holder or Other Secured Claim holder will be treated in the same manner as a holder of an Asbestos PI Claim to the extent of such deficiency.

Each holder of an Asbestos PI Claim should consult his or her own tax advisor as to the proper tax treatment of any amounts received with respect to such Claim.

## C.    Information Reporting and Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable information reporting and withholding (including employment tax withholding on Distributions relating to Claims for employee compensation). Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("**TIN**"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, Quigley's alternatives include (i) liquidation under chapter 7 of the Bankruptcy Code and (ii) the preparation and presentation of an alternative plan of reorganization.

## A.    Liquidation under Chapter 7

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate Quigley's assets. A discussion of the effect that a chapter 7 liquidation would have on the recovery of holders of Claims is set forth above. *See* "CONFIRMATION AND CONSUMMATION PROCEDURE — Confirmation — Best Interests Test." In performing the Liquidation Analysis, Quigley has assumed that all holders of Asbestos PI Claims (whether presently known or unknown) will be determined to have "claims" that are entitled to share in the proceeds from any such liquidation. Quigley believes that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of: (i) the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee; (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation; (iii) the inability to maximize the value of all of Quigley's assets; and (iv) the absence of the Pfizer Contribution or any similar contribution by Pfizer or its Affiliates. Quigley further believes it is likely that distributions in a chapter 7

liquidation would not occur for a substantial time, primarily due to the time required to liquidate Quigley's insurance-related assets and the likelihood of potentially protracted litigation to resolve Claims against Quigley.

**B.**  **Alternative Plan of Reorganization**

If the Plan is not confirmed, Quigley or any other party in interest could attempt to formulate a different plan of reorganization. Such a plan might involve either a reorganization and continuation of Quigley's businesses or an orderly liquidation of its assets. During the negotiations prior to the filing of the Plan, Quigley explored various alternatives to the Plan.

Quigley believes that the Plan enables Quigley to emerge from chapter 11 more successfully and expeditiously than any alternative plan, preserves its assets, and allows Claimants to realize the highest recoveries under the circumstances. In particular, under an alternative plan under chapter 11 of the Bankruptcy Code, the Pfizer Contribution may not be available to Claimants in Class 4 (Asbestos PI Claims), thereby reducing or eliminating the amounts available for distribution to all classes.

In a liquidation under chapter 11 of the Bankruptcy Code, Quigley's assets would be liquidated in an orderly fashion over a more extended period of time than in liquidation under chapter 7, and a trustee need not be appointed. Accordingly, creditors would receive greater recoveries in a chapter 11 liquidation than in a chapter 7 liquidation. Although a chapter 11 liquidation is preferable to a chapter 7 liquidation, Quigley believes that a liquidation under chapter 11 is a much less attractive alternative to Claimants than the Plan because a greater return is provided for in the Plan to Claimants.

## CONCLUSION AND RECOMMENDATION

Quigley believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims.  In addition, other alternatives would involve significant delay, uncertainty, and substantial additional administrative costs.  **We urge holders of Impaired Claims and Equity Interests entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the address set forth thereon so that they will be received no later than 5:00 p.m., New York City time, on [~~March 3,~~June 10, 2008]**.

Respectfully submitted,

QUIGLEY COMPANY, INC.

By:   /s/ ~~Paul A~~**Kim D** ~~Street~~**Jenkins**
_____
Name:   ~~Paul A~~**Kim D** ~~Street~~**Jenkins**
Title:   **Senior Vice** President ~~and Chief Executive Officer~~

Dated:         New York, New York
               ~~November 5, 2007~~**March 28, 2008**

SCHULTE ROTH & ZABEL LLP
Attorneys for Quigley Company, Inc.,
Debtor and Debtor-in-Possession

By:  /s/ Lawrence V. Gelber

Michael L. Cook (MC 7887)
Lawrence V. Gelber (LG 9384)
Jessica L. Fainman (JF 9200)
919 Third Avenue
New York, New York 10022
Telephone:  (212) 756-2000
Facsimile:  (212) 593-5955

**1998 OneBeacon Agreement** ........................ **31**
**2008 OneBeacon Agreement** ........................ **31**
3018(a) Motion Deadline ............................... 104
3018(a) Motions ............................................. 104
ACF ...................................................... ~~26~~25
Ad Hoc Committee ........................................ 44
Administrative Claims .................................... 53
Administrative Claims Bar Date .............. ~~53~~54
ADR Procedures ........................................... 103
Affiliated Group .......................................... 115
Allstate ......................................................... 32
**Angelos** ...................................................... **51**
Asbestos PI Claim .......................................... 58
Asbestos PI Claims Estimation Order ............ 49
Asbestos PI Trust voting Claims .................... 93
Asbestos Record Parties ................................ 87
Asbestos Records .......................................... 87
Asbestosis Restriction ADR ........................... 34
Average Values ...................................... ~~88~~89
Ballot Agent .................................................. 11
Bankruptcy Court .......................................... 10
Bar Date ........................................................ 47
Bar Date Notice ............................................ 47
Bar Date Order .............................................. 47
Category A Claims ......................................... 93
Category B Claims ......................................... 93
CCR ............................................................... 26
Chapter 11 Case .............................................. i
Claimant ......................................................... 9
Claimant's Jurisdiction .................................. 98
Claimants ........................................................ 9
COD ............................................................. 115
Confirmation Hearing .................................... 10
Continental Adversary Proceeding ................ 33
Conversion Motion ........................................ 51
Coverage-in-place ................................... ~~26~~25
DIP Credit Facility ......................................... 45
Disease Levels ............................................... 88
District Court ................................................. 40
Effective Date ........................................ ~~20~~19
Excess Cash ................................................... 65
Exigent Hardship Claim ......................... ~~99~~100
Expedited Review Process ....................... ~~96~~97
Extraordinary Claim ....................................... 99
Extraordinary Claims Panel ........................... 99
Fee Claim ...................................................... 54
FIFO ........................................................ 7, 88
FIFO Payment Queue ..................................... 94
FIFO Processing Queue ........................... ~~93~~94
First Solicitation Procedures Motion ............. 48
First Solicitation Procedures Order ............... 48
Foreign Claim ................................................ 97
~~Freeman Bond~~ ............................................. ~~55~~
Hatchett Bond ................................................ 56

Individual Review Process..................................97
Initial Claims Filing Date..................................~~93~~**94**
**Insulag Actions**..................................**51**
Insurance Settlement Proceeds Trust..................................~~32~~**31**
Insurance Settlement Proceeds Trust Agreement..................................~~32~~**31**
Internal Revenue Code..................................~~114~~**115**
IRS..................................~~114~~**115**
Liquidation Analysis..................................110
London..................................32
Lumbermens..................................28
Maximum Annual Payment..................................92
Maximum Available Payment..................................92
Maximum Extraordinary Value..................................99
Maximum Values..................................~~88~~**89**
Medical/Exposure Criteria..................................~~88~~**89**
Minteq..................................~~21~~**20**
Motion to Withdraw the Reference..................................50
Net Insurance Proceeds..................................~~32~~**31**
NOL..................................115
Non-**Released Insurance Policies**..................................**31**
**Non**-signatory insurers..................................~~27~~**26**
Occurrence- based..................................~~23~~**22**
OID..................................117
**OneBeacon**..................................**31**
Payment Percentage..................................~~57~~**58**
Pfizer..................................15
Pfizer Annuity..................................~~66~~**67**
Pfizer Contribution..................................66
Pfizer/AIG Annuity..................................66
Plan..................................10
Pre-Petition Liquidated Asbestos PI Claims..................................95
Priority Claims..................................55
Priority Tax Claims..................................~~54~~**55**
Projected Financial Information..................................108
Projection Period..................................108
Quigley..................................9
Quigley Contribution..................................65
Quigley Insurer Receivables..................................~~23~~**22**
Quigley Stock Right..................................59
Reaud Bond..................................56
Reaud Morgan..................................44
Recusal Motion..................................46
Recusal Order..................................46
Reduced Payment Option..................................93
Rule 2019 Motion..................................47
Scheduled Values..................................~~88~~**89**
Schedules..................................11
SEC..................................11
Senior Secured Loan Facility..................................34
Settlement Agreement Effective Date..................................40
Settlement Amount..................................39
Shared Asbestos Insurance Policies..................................24
Shared Asbestos-Excluded Claims-Made Insurance Policies.....25
Shared Asbestos-Excluded Insurance Policies..................................~~25~~**24**
Sherry Bond..................................57

Shortfall Claims......................................................33
Shortfall Insurance Coverage Litigation......................33
Signatory insurers..............................................2625
Significant Occupational Exposure....................101102
Solicitation Procedures........................................5152
Solicitation Procedures Motion.................................51
Solicitation Procedures Order..............................5152
Start up services...................................................111
Stock Transfer Date................................................59
Tabulation Certification...........................................49
TDP.........................................................................6
TIN.....................................................................117118
Trustee Motion.......................................................51
U.S. Trustee...........................................................42
Voting Deadline......................................................11
Wellington Agreement......................................2625
Yosemite.............................................................2827

[This Page Intentionally Left Blank]

Document comparison done by Workshare DeltaView on Friday, March 28, 2008
2:14:51 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://NYCMS/NEWYORK/10435708/6 |
| Document 2 | interwovenSite://NYCMS/NEWYORK/10435708/7 |
| Rendering set | (SRZ) - Standard |

| Legend: |
|---|
| **Insertion** |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 292 |
| Deletions | 298 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 590 |