UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:                                              :
                                                    :        Chapter 11
QUIGLEY COMPANY, INC.,                              :        Case No. 04-15739 (SMB)
                                                    :
                                                    :
                              Debtors.              :
------------------------------------------------------X

## MEMORANDUM DECISION AND
## ORDER REGARDING PRIVILEGES

**A P P E A R A N C E S :**

SCHULTE ROTH & ZABEL LLP
Attorneys for the Debtor
919 Third Avenue
New York, New York 10022

>       Michael L. Cook, Esq.
>       Lawrence V. Gelber, Esq.
>       Victoria A. Lepore, Esq.
>               Of Counsel

CADWALADER, WICKERSHAM & TAFT LLP
Attorneys for Pfizer Inc.
One World Financial Center
New York, New York 10281

>       Dennis J. Block, Esq.
>       Gary D. Ticoll, Esq.
>       Michele L. Angell, Esq.
>               Of Counsel

GREENBERG TRAURIG, LLP
Attorneys for Pfizer Inc.
Met Life Building
200 Park Avenue
New York, New York 10166

>       Bruce R. Zirinsky, Esq.
>       John H. Bae, Esq.
>               Of Counsel

BROWN RUDNICK BERLACK ISRAELS LLP
Attorneys for The Ad Hoc Committee of Tort Victims
120 West 45th Street
New York, New York 10036

      Jeffrey L. Jonas, Esq.
      James W. Stall, Esq.
      Gregory T. Arnold, Esq.
      Edward S. Weisfelner, Esq.
         Of Counsel

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

The unofficial Ad Hoc Committee of Tort Victims (the "Ad Hoc Committee") has

objected to the confirmation of the plan filed by the debtor, Quigley Company, Inc. ("Quigley").

Faced with the assertion of various privileges by Quigley and its parent, Pfizer Inc., that would

bar the production of documents and information to the Ad Hoc Committee, the latter moved to

compel disclosure. For the reasons that follow, the motion to compel is granted in part and

denied in part.

## BACKGROUND

The underlying facts are detailed in the Court's prior opinions, including In re Quigley

Co., Inc., 346 B.R. 647 (Bankr. S.D.N.Y. 2006) ("Quigley I") and In re Quigley Co., Inc., 377

B.R. 110 (Bankr. S.D.N.Y. 2007). I assume familiarity with those opinions, and state the facts

relevant to the disposition of the pending motion.

Quigley had been engaged in the business of developing, producing and marketing a

broad range of refractories and related products, including products containing asbestos. In

1968, Pfizer & Co., Inc., Pfizer Inc.'s predecessor (collectively "Pfizer"), acquired Quigley, and

in 1992, Pfizer sold substantially all of Quigley's assets to Minteq International, Inc. Under the

sale terms, Quigley and Pfizer retained all liability stemming from Quigley's distribution and use of asbestos-containing products.

Quigley and Pfizer became caught up in the asbestos litigation explosion.  On September 3, 2004, when Quigley filed its chapter 11 petition, it estimated that 212,000 asbestos personal injury claims were pending or would be asserted against it.  Although Quigley was no longer an operating company, the continuing litigation threatened the common insurance shared by Pfizer and Quigley.  It also threatened Pfizer and its own assets.  Pfizer was a defendant in many of the asbestos lawsuits, although the pleadings in those cases did not necessarily indicate why.  Furthermore, although Pfizer had allegedly manufactured or distributed its own products containing asbestos, which had nothing to do with Quigley, it seems that many of the claims asserted against Pfizer were derivative of the claims against Quigley rather than based on exposure to Pfizer products.

At some point, Pfizer and Quigley embarked, or so it appears, on a plan to place Quigley in bankruptcy and confirm a plan under 11 U.S.C. § 524(g).  A plan confirmed under § 524(g) could discharge Pfizer from its derivative liability, and channel those claims into the same trust that addressed the claims against Quigley.

Quigley filed its chapter 11 petition on September 3, 2004.  Since then, Quigley and Pfizer have jointly prosecuted the bankruptcy case.  The Court approved the appointment of a legal representative to represent the interests of the future creditors (the "FCR"), and the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee").  In addition, the Ad Hoc Committee weighed in on numerous issues, and opposed Quigley and Pfizer at virtually every turn.  As the case now stands, the Court approved the disclosure

3

statement; Quigley solicited the vote, and has certified that it has sufficient acceptances in number and amount to satisfy the confirmation requirements.

The Ad Hoc Committee filed an extensive objection to confirmation.[1]  (See Objection of the Ad Hoc Committee of Tort Victims to the Quigley Co., Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as of March 28, 2008), dated Sept. 4, 2008)(ECF Doc. # 1542.)  Many of its arguments were raised earlier in connection with other disputes.  For example, questions surrounding the Pfizer settlements described in Quigley I arose several times in connection with allegations of Quigley's bad faith, improper classification, unequal treatment and voter manipulation.  The Ad Hoc Committee also maintains that Quigley cannot satisfy and has not satisfied the "ongoing business" requirement contained in § 524(g)(2)(B)(i)(II)-(III).  In essence, it maintains that Quigley was a non-operating entity that Pfizer sought to resuscitate artificially by setting Quigley up to conduct illusory business operations.  This alleged strategy is part and parcel of the Pfizer strategy to obtain a partial discharge through a Quigley chapter 11 plan without the need to file its own chapter 11.

The parties have engaged in discovery, and their efforts have led to discovery disputes. Pfizer and Quigley have withheld documents on the basis of various privileges, and the Ad Hoc Committee moved to compel the production of some of the withheld documents.  The Court received briefing and oral argument on the issue, and reviewed the documents in camera.  What follows is the Court's determination of the motion to compel.

---

[1]    Other parties in interest also filed objections, but I focus on the Ad Hoc Committee's.

**DISCUSSION**

Before turning to any specific documents, it is helpful to outline the issues, and where possible, make certain preliminary determinations.  Quigley and Pfizer have relied on the attorney-client privilege, the work product privilege and the joint defense/common interest privilege.  The Ad Hoc Committee primarily challenges the assertion of the latter two privileges, and further contends that any privileges have been waived or overcome by countervailing considerations.

**A.    Attorney-Client Privilege**

Federal Rule of Evidence 501 states that the federal common law of privileges applies when federal law determines the substantive rights of the parties.  Accord United States v. Zolin, 491 U.S. 554, 562 (1989); In re Asia Global Crossing, Ltd., 322 B.R. 247, 254-55 (Bankr. S.D.N.Y. 2005).  Here, the privilege question arises in the context of a bankruptcy case, and specifically, a confirmation dispute, which is governed by a federal statute.  Accordingly, the federal common law rules of privilege apply.

The attorney-client privilege "attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived."  Lugosch v. Congel, 219 F.R.D. 220, 234-35 (N.D.N.Y. 2003); accord United States v. Int'l Bhd. of Teamsters, 119 F.3d 210, 214 (2d Cir. 1997); accord Madanes v. Madanes, 199 F.R.D. 135, 143 (S.D.N.Y. 2001).  The purpose behind the privilege "is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of

justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); accord Commodity Futures

Trading Comm'n v. Weintraub, 471 U.S. 343, 348 (1985); von Bulow v. von Bulow (In re von

Bulow), 828 F.2d 94, 100 (2d Cir. 1987). The privilege belongs to the client, and only the client

can waive it. Id. at 100; Republic Gear Co. v. Borg-Warner Corp., 381 F.2d 551, 556 (2d Cir.

1967). It must be narrowly construed, and its application limited to the extent necessary to

encourage full and frank communication between the attorney and the client. Fisher v. United

States, 425 U.S. 391, 403-04 (1976); Misek-Falkoff v. Int'l Bus. Machs. Corp., 144 F.R.D. 48,

49 (S.D.N.Y. 1992). The burden of establishing entitlement to the privilege rests on the person

asserting it. Clark v. Am. Commerce Nat'l Bank, 974 F.2d 127, 129 (9th Cir. 1992).

**B.**      **The Joint Defense/Common Interest Privilege**

As a rule, the attorney-client privilege is waived when a protected communication is

disclosed to a third party. S.R. Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC, No. 01

Civ. 9291 (JSM), 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002). However, the exception to

this general rule is the common interest privilege, which is itself an extension of the attorney-

client privilege. United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989). The common

interest privilege "serves to protect the confidentiality of communications passing from one party

to the attorney for another party where a joint defense effort or strategy has been decided upon

and undertaken by the parties and their respective counsel." Id. The doctrine is limited to

situations where multiple parties are represented by separate counsel but share a common interest

about a legal matter.[2] Id.; Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D.

437, 447 (S.D.N.Y. 1995).

---

[2]      In contrast, the "joint defense" or "joint client" privilege applies when two or more clients are represented
by the same attorney on matters of common interest. See 3 HON. JACK B. WEINSTEIN, ET AL., WEINSTEIN'S

"There are two elements of the common interest rule: (1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought were designed to further that interest." Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 471 (S.D.N.Y. 2003) (citation omitted). Mere cooperation among the parties, absent the intent to participate in a joint strategy, does not create the requisite ongoing common enterprise. See United States v. Weissman, 195 F.3d 96, 99-100 (2d Cir. 1999). Rather, "some form of joint strategy is necessary to establish the existence of a joint defense agreement, which would then operate to protect evidence under the common interest rule." 3 WEINSTEIN § 503.21[3], at 503-72 (citing Weissman, 195 F.3d at 99-100). As in all claims of privilege arising out of the attorney-client relationship, the proponent must establish that the communication was given in confidence, and under circumstances that made it objectively reasonable for the client to believe that the communication was confidential. Schwimmer, 892 F.2d at 244. Once established, the privilege cannot be waived without the consent of all of the parties that share it. John Morrell & Co. v. Local Union 304A, 913 F.2d 544, 555-56 (8th Cir. 1990); In re Grand Jury Subpoenas, 89-3 and 89-4, John Doe 89-129, 902 F.2d 244, 248 (4th Cir. 1990); Bass Pub. Ltd. Co. v. Promus Cos. Inc., 868 F. Supp. 615, 620-21 (S.D.N.Y. 1994).

It is undisputed that Quigley and Pfizer have engaged in a joint strategy to file and prosecute this chapter 11 case. In fact, their concerted efforts have, in great part, led to charges by the Ad Hoc Committee and the United States Trustee that Quigley and its managers lack

---

FEDERAL EVIDENCE § 503.21[1], at 503-67 to 68 (2d ed. 2008)("WEINSTEIN"). Nevertheless, courts sometimes use "joint defense" and "common interest" interchangeably. See Schwimmer, 892 F.2d at 243.

independence and have breached their fiduciary duties.  Instead, the Ad Hoc Committee

contends that Quigley and Pfizer do not share common legal interests, and in fact, are adverse.[3]

In this case, the commonality or lack of commonality of an interest depends on which

interest you consider.  It is true, as the Ad Hoc Committee argues, that Pfizer and Quigley have

certain divergent interests in this case.  For example, Quigley owes a fiduciary duty to its

creditors and its estate.  It has an interest in procuring the largest possible contribution from

Pfizer to the Asbestos PI Trust (the "Trust") formed under the Quigley Co., Inc. Fourth Amended

and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as

of March 28 2008), dated March 28 2008 (the "Plan") (ECF Doc. # 1380).  Pfizer, on the other

hand, owes no ostensible duties to the Quigley estate or its creditors, and obviously wants to

minimize its contribution.  There are doubtless other points of adversity.

---

[3]     The Ad Hoc Committee contends that Quigley and Pfizer must share identical legal interests.  Under
Second Circuit law, however, parties asserting the common interest privilege need not share identical legal interests,
despite the use of the term identical in a number of cases.  Rather, the parties need only share "a common interest
about a legal matter."  Schwimmer, 892 F.2d at 243 (internal quotation marks and citations omitted); Walsh v.
Northrop Grumman Corp., 165 F.R.D. 16, 18 (E.D.N.Y. 1996); Bank Brussels Lambert, 160 F.R.D. at 447; United
States v. United Techs. Corp., 979 F. Supp. 108, 111 (D. Conn. 1997); Asia Global Crossing, Ltd., 322 B.R. at 264;
Kingsway Fin. Servs., Inc. v. Pricewaterhouse-Coopers LLP, No. 03 Civ. 5560 (RMB)(HBP), 2008 WL 4452134, at
*7 (S.D.N.Y. Oct. 2, 2008);Bruker v. City of New York, No. 93 Civ. 3848 (MGC)(HBP), 2002 WL 484843, at *4
(S.D.N.Y. Mar. 29, 2002); see also Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974, 406 F. Supp. 381, 386
(S.D.N.Y. 1975) ("[W]here there is consultation among several clients and their jointly retained counsel, allied in a
common legal cause, it may reasonably be inferred that resultant disclosures are intended to be insulated from
exposure beyond the confines of the group . . . .") (emphasis added).

        In any event, the distinction between identical and common interests is semantic, and depends on how one
defines the interest.  The emphasis of the privilege is properly placed, not on the similarity of the parties' interest but
on whether, in practice, they "have demonstrated cooperation in formulating a common legal strategy."  Bank
Brussels Lambert, 160 F.R.D. at 447; accord N. River Ins. Co. v. Columbia Cas. Co., No. 90 Civ. 2518 (MJL), 1995
WL 5792, at *4 (S.D.N.Y. Jan. 5, 1995) ("The common thread of these cases is that the determination of whether the
common interest doctrine applies cannot be made categorically . . . . What is important is not whether the parties
theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal
goal."); Strougo v. BEA Assocs., 199 F.R.D. 515, 520 (S.D.N.Y. 2001) (same).  Moreover, it has been held that "a
joint defense may be made by somewhat unsteady bedfellows."  Grand Jury Subpoena Duces Tecum Dated Nov. 16,
1974, 406 F. Supp. at 392.  See Kingsway Fin. Servs., Inc., 2008 WL 4452134, at *8 (parties who were currently
adverse in a related action still shared a common interest at the time the communications alleged to be privileged
were made); Megan-Racine Assocs., Inc., 189 B.R. at 572 (privilege can extend even where a lawsuit between the
two parties is foreseeable).

On the other hand, they share a common interest and overall strategy geared toward the confirmation of Quigley's Plan. Initially, they are co-defendants in numerous lawsuits. Many of the claims against Pfizer appear to be derivative of the claims against Quigley. I infer this because the Plan will only channel the Quigley-derivative claims asserted against Pfizer, and will not affect direct claims arising from Pfizer's own products. The level of opposition to the release that Pfizer will receive if the Plan is confirmed implies that the opponents (as well as the proponents) hold Quigley-derivative claims against Pfizer. Thus, they are being sued, often jointly, based upon the same alleged wrong: Quigley's manufacture or sale, or both, of asbestos products. Their co-defendant status bolsters the claim of common interest. See Niagara Mohawk Power Corp. v. Megan-Racine Assocs., Inc. (In re Megan-Racine Assocs., Inc.), 189 B.R. 562, 573 (Bankr. N.D.N.Y. 1995) ("A common legal interest exists where the parties asserting the privilege were co-parties to litigation or reasonably believed that they could be made a party to litigation.") (emphasis in the original).

Furthermore, they share a common interest in resolving their joint liabilities through Quigley's chapter 11 case to the extent permitted by § 524(g). They are covered by shared insurance that they have used to defend against these claims. Both seek the confirmation of Quigley's Plan in order to preserve the shared insurance, protect their other assets and avoid continued litigation by channeling all asbestos-related claims against Quigley and derivative claims against Pfizer to the Trust.

As noted above, and confirmed by the Court's own observations, Quigley and Pfizer have engaged in a joint strategy to prosecute a Quigley bankruptcy to achieve the common benefits of the release and channeling injunction. It should come as no surprise that this organized effort predated the bankruptcy filing in September 2004. While Quigley and Pfizer have operated a

joint defense against asbestos claims since the early 1980's, the parties formally entered into a

Joint Defense Agreement in September 2003.  The Joint Defense Agreement provides, <u>inter alia</u>,

that Quigley and Pfizer authorize their respective attorneys and other representatives to cooperate

in taking whatever actions may be in their mutual interests relating to the investigation, defense,

and resolution of asbestos personal injury claims, including the use of insurance to fund the

resolution of such claims.  The Joint Defense Agreement also provides that if anyone requests or

demands privileged information from either Quigley or Pfizer, the recipient of such request must

notify the other entity, and the parties will take all steps necessary to permit the assertion of all

applicable privileges with respect thereto.  Where "a joint defense agreement exists there is an

implicit understanding that one attorney is permitted not only to confer with another but with the

other attorney's party."  <u>See</u> <u>Lugosch</u>, 219 F.R.D. at 237-38 (citations omitted).

The sharing of documents with the Committee and the FCR present a different question.

The Committee and the FCR do not necessarily share a common interest with Quigley and Pfizer

in this case.  In fact, they are adversaries.  The Committee's members and constituents have been

litigating against Quigley and Pfizer since before the chapter 11 case was filed.  The chapter 11

stayed those litigations.  Quigley and Pfizer seek, through confirmation under § 524(g), to

discharge their present and future liability, and channel the claims into the Trust.

In addition, although Quigley and the Committee have the duty to maximize the estate,

<u>see</u> <u>Value Prop. Trust v. Zim Co. (In re Mortgage & Realty Trust)</u>, 212 B.R. 649, 653 (Bankr.

C.D. Cal. 1997), Quigley does not have an interest in maximizing the recovery of the present

creditors at the expense of the future creditors.[4]  The Committee and the FCR, in this regard,

---

[4]       As already indicated, Pfizer has no ostensible duty or interest in maximizing the size of the Quigley estate
or the recovery by present or future creditors.

have a natural antagonism; the Committee wants to maximize the payments to current creditors, while the FCR wants to ensure that enough is available to future creditors.  See Ortiz v. Fibreboard Corp., 527 U.S. 815, 856 (1999) ("'[F]or the currently injured [asbestos claimants], the critical goal is generous immediate payments,' but, '[t]hat goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.'") (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 626 (1997)).

In order for the common interest privilege to apply, the parties must share a common legal interest at the time that the communications were exchanged.  In re United Mine Workers of Am. Employee Benefit Plans Litig., 159 F.R.D. 307, 314 (D. D.C. 1994).  Advice discussed during negotiations with an adversary in the absence of circumstances supporting a reasonable expectation of confidentiality is not entitled to protection.  SCM Corp. v. Xerox Corp., 70 F.R.D. 508, 525 (D. Conn. 1976).  Thus, notwithstanding the FCR's and the Committee's current support of the Plan, the party asserting the common interest privilege – Quigley or Pfizer, or both – must demonstrate, at a minimum, that they shared communications with the Committee or the FCR in furtherance of a common interest at that time.

## C.    The Work Product Privilege

### 1.    Introduction

The work product rule is a qualified privilege codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure.  Upjohn Co., 449 U.S. at 398; Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465, 471 (S.D.N.Y. 1993).  Rule 26(b)(3) provides, in pertinent part, as follows:

> [A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . . [unless] they are otherwise discoverable under Rule 26(b)(1), and . . . the party

shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means. . . . If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

First recognized by the Supreme Court in the landmark decision of Hickman v. Taylor, 329 U.S. 495 (1947), the doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." United States v. Nobles, 422 U.S. 225, 238 (1975).  The party asserting work product protection bears the burden of proving that the material sought (1) is a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative.  Allied Irish Banks, p.l.c. v. Bank of Am., N.A., 240 F.R.D. 96, 105 (S.D.N.Y. 2007) (internal quotation marks and citations omitted).  It generally does so through a combination of affidavits and privilege logs that address each document at issue.  Bowne of New York City, Inc., 150 F.R.D. at 474.

"[D]ocuments should be deemed prepared 'in anticipation of litigation,' and thus within the scope of the Rule, if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"  U.S. v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) (quoting 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE § 2024, at 343 (1994)) (emphasis in the original).  This involves two questions.  The first is "whether the party actually thought it was threatened with litigation and the objective question of whether that belief was reasonable."  Gulf Islands Leasing, 215 F.R.D. at 475.  The second is "what 'would have' happened had there been no litigation threat-that is, whether [the party] 'would have' generated these documents if it were acting solely for its 'business-related

12

purposes.'" <u>Allied Irish Banks</u>, 240 F.R.D. at 106.  While documents need not be prepared for

the primary or exclusive purpose of assisting in that litigation to acquire protection, the work

product privilege will not be afforded to materials prepared in the ordinary course of business or

that "'would have been prepared in essentially similar form irrespective of litigation.'"  <u>Id.</u>

(quoting <u>Adlman</u>, 134 F.3d at 1204).

The Ad Hoc Committee challenges Quigley's and Pfizer's assertion of work product

privilege, arguing that the requested documents were not prepared "in anticipation of litigation,"

but, instead, in the ordinary course of business.  (<u>Motion of the Ad Hoc Committee of Tort</u>

<u>Victims to Compel Production Documents and Testimony from Pfizer, Inc. and Quigley Co., Inc.</u>

<u>Withheld on Basis of Privilege or Not Produced</u>, dated Jan. 9, 2009 ("<u>Motion to Compel</u>"), at 3,

23)(ECF Doc. # 1675.)  With few exceptions, the documents withheld by the parties were

created because of the anticipated bankruptcy filing by Quigley or in connection with the

pending chapter 11 case.  Furthermore, they relate to issues triggered by the bankruptcy case, and

would not have been created if Quigley never contemplated or filed bankruptcy.  The Ad Hoc

Committee's motion, therefore, raises the question whether this bankruptcy, without more, can

be considered litigation for the purpose of the work product privilege.  (<u>See</u> <u>Response of Pfizer</u>

<u>Inc. to Motion of the Ad Hoc Committee of Tort Victims to Compel Production of Documents</u>

<u>and Testimony from Pfizer, Inc and Quigley Co., Inc. Withheld on Basis of Privilege or Not</u>

<u>Produced</u>, dated Jan. 23, 2009 ("<u>Pfizer Response</u>"), at 20)(ECF Doc. # 1691); <u>Opposition of</u>

<u>Quigley Co., Inc. to Motion of Ad Hoc Committee of Tort Lawyers [sic] for Order Compelling</u>

<u>Disclosure of Documents and Testimony from Pfizer and Quigley</u>, dated Jan. 23, 2009 ("<u>Quigley</u>

<u>Opposition</u>"), at 4-5, 29)(ECF Doc. # 1692.)

I conclude that it can.  Asbestos bankruptcies, by their nature, are designed to stop existing and threatened litigation.  In substance, the asbestos bankruptcy establishes a framework for the settlement of the non-bankruptcy litigation through the creation of an injunction that channels those claims into a trust.  When Quigley commenced this case on September 4, 2004, there were approximately 212,000 asbestos bodily injury claims pending against it.  (Quigley Opposition, at 6; Pfizer Response, at 3.)  Quigley and Pfizer estimate that there will be 261,567 future claims filed against Quigley.  (Fifth Amended and Restated Disclosure Statement with Respect to Quigley Co., Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as [of] March 28, 2008), dated March 28, 2008, ("Fifth Amended Disclosure Statement" at 9)(ECF Doc. # 1379.)  According to Quigley, the Quigley Board considered at length Quigley's legal options during the summer of 2004, which included the benefits of filing for bankruptcy protection, one solution to the looming litigation ahead which would allow Quigley and Pfizer to settle the claims that it faced.  (Quigley Opposition, at 7.)  Quigley considered, and ultimately chose, this option "[a]s a result of" the impending litigation.  (Id.)  In short, although bankruptcies are typically filed to address financial problems, and indeed, the numerous lawsuits had created financial problems for Quigley and Pfizer, this chapter 11 case was filed to resolve mass tort litigation.

## 2.    Substantial Need

As the privilege is qualified, factual work product material may be ordered produced if the party seeking the discovery satisfies a two-part test.  First, it must demonstrate a substantial need for the materials in preparation of the party's case.  "[S]ubstantial need for work product materials exists where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries

great probative value on contested issues.  Nat'l Congress for Puerto Rican Rights v. City of New York, 194 F.R.D. 105, 110 (S.D.N.Y. 2000) (citations and footnotes omitted); see also Hickman, 329 U.S. at 511 ("Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had.  Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts.  Or they might be useful for purposes of impeachment or corroboration.").

The subject matter of the documents requested by the Ad Hoc Committee is, with one exception, relevant to the contested issues.  It is hard to gauge whether the documents are essential or crucial since it is not entirely clear how the Ad Hoc Committee intends to use them.  Nevertheless, they should be entitled to the benefit of the doubt.  The exception concerns the FCR.  A few of the documents relate to the identification of the FCR in other cases, and perhaps imply something about the selection process in this case.  The Ad Hoc Committee has failed to demonstrate that this information is relevant much less crucial to any confirmation issue.

Second, the discovering party must demonstrate that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means.  Madanes, 199 F.R.D. at 150 (citing Fed. R. Civ. P. 26(b)(3)).  Undue hardship may be established when a witness can no longer recall statements reflected in documents, see A.F.L. Falck S.p.A v. E.A. Karay Co., Inc., 131 F.R.D. 46, 49 (S.D.N.Y. 1990), or where it would be unusually expensive to obtain the requested information.  6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 26.70[5][d], at 26-460 (3d ed. 2009)("MOORE").  In addition, "production might be justified

15

where the witnesses are no longer available or can be reached only with difficulty." Hickman, 329 U.S. at 511.[5]

The Ad Hoc Committee argues that it has met its burden of demonstrating a substantial need. The requested documents "are critical to the central issues in its Objection – the bad faith of Pfizer and Quigley in pursuing the Plan, including the lack of a legitimate ongoing business, the vote buying/manufacturing of claims, assessing the value of the Pfizer contribution, the AIG Assignment, the shared insurance assets, and the treatment of Pfizer's secured and unsecured claims." (Motion to Compel, at 14.) Obviously, this must be decided on a document by document basis, and not in the abstract. Nevertheless, the proposition that documents relating to these issues are needed rings true.

The Ad Hoc Committee also maintains that it has shown that it "is unable … to obtain the substantial equivalent of the materials by other means." According to the Ad Hoc Committee, all of the requested information rests solely within Pfizer and Quigley and depositions of their Federal Rule of Civil Procedure 30(b)(6) witnesses, and the Ad Hoc Committee's document requests have been entirely unfruitful. The Ad Hoc Committee has deposed a number of witnesses, including Sandy Berland and Kim Jenkins, Pfizer's and Quigley's Rule 30(b)(6) witnesses,[6] respectively, who have refused to provide critical information based on privilege or a lack of recollection or knowledge. During the depositions of Mr. Berland and Ms. Jenkins, the Ad Hoc Committee alleges that it was generally met with objections and directions not to answer

---

[5]    Opinion work, in contrast to factual work product, enjoys a near absolute immunity. It "'can be discovered only in very rare and extraordinary cases where weighty considerations of public policy and proper administration of justice would militate against nondiscovery.'" Comair Rotron, Inc. v. Minebea Co., Ltd (In re Minebea Co., Ltd.), 143 F.R.D. 494, 499 (S.D.N.Y. 1992) (internal quotation marks and ellipses omitted); accord Upjohn Co., 449 U.S. at 401; Adlman, 134 F.3d at 1204; In re Sealed Case, 676 F.2d 793, 809-10 (D.C. Cir. 1982).

[6]    Quigley repeatedly argues that Ms. Jenkins is not a Rule 30(b)(6) witness. (Quigley Opposition, at 5, 30.)

by the witness' counsel.  Finally, although the Ad Hoc Committee made this motion before

discovery was complete, it has since completed discovery, and has not been able to obtain the

"substantial equivalent" of the withheld materials.

### 3.    Waiver Through Disclosure

The disclosure of work product to a third party does not automatically waive the

privilege.  Rather, "[w]aiver of work-product immunity is found whenever a party has disclosed

the work-product in such a manner that it is likely to be revealed to his adversary."  Gramm v.

Horsehead Indus., Inc., No. 87 Civ. 5122 (MJL), 1990 WL 142404, at *2 (S.D.N.Y. Jan. 25,

1990).  In other words, the deliberate disclosure of work product must create a "substantial

danger" that it will be disclosed thereafter to an adversary.  6 MOORE § 26.70[6][c], at 26-465.

The conclusions relating to the joint defense/common interest privilege apply equally to

the waiver of the work product privilege.  Quigley and Pfizer shared many of the

communications memorialized by the documents placed in issue by the pending motion.  Having

reviewed the documents in camera, I conclude that neither waived the work product privilege by

sharing its documents with the other.

### THE DOCUMENTS

### A.    Pfizer

The Pfizer documents primarily consist of emails and email chains.  In the main, the

documents concern the "on-going" business requirement.  The Court reviewed the Pfizer

documents in camera aided by (1) the Supplemental Privilege Log of Pfizer Inc., as Pertaining to

Pfizer Inc. Documents Sought By Ad Hoc Committee of Tort Victims January 9, 2009 Motion to

Compel, Not Already Produced ("Pfizer Supp. Log"), (2) the Pfizer Response and (3) the

<u>Declaration of Michele L. Angell in Support of Response of Pfizer Inc. to Motion of the Ad Hoc</u>

<u>Committee of Tort Victims to Compel Production of Documents and Testimony From Pfizer,</u>

<u>Inc. and Quigley Co., Inc. Withheld on Basis of Privilege or Not Produced</u>, dated Jan. 23, 2009,

attached as Exhibit A to the <u>Pfizer Response</u>.  The Court concludes that Pfizer has sustained the

claims of privilege, except as noted below.  The documents are identified in the same manner as

they were in the <u>Pfizer Supp. Log</u>.

**Document # 9** consists of two emails, each dated July 21, 2004.  Pfizer asserts the

attorney-client privilege.  The earlier email (4:11 pm) is privileged.  The later email (5:54 pm)

also appears as part of an email chain that comprises Document # 10.  Pfizer did not assert any

privilege in connection with the identical email in Document # 10, and accordingly, waived the

claim of privilege.  The later email should be produced.

**Document # 23** consists of a chain of five emails exchanged between and among Pfizer's

in house counsel and Pfizer's employees.  All of the emails concern the identification of products

that Pfizer planned to transfer to Quigley to satisfy the "on-going" business requirement.  Pfizer

asserted the attorney-client privilege with respect to the top (latest) email (10/28/04, at 11:36 am)

only, and represented in the <u>Pfizer Supp. Log</u> that it would produce the remaining emails.

It is not clear how or why Pfizer made this distinction.  The production of the four

preceding emails waived any assertion of privilege regarding the top (latest) email, and it should

be produced.

**Document # 31** consists of three emails relating to the products to be transferred by

Pfizer to Quigley.  Pfizer asserted the attorney-client privilege and the work product privilege.

The earliest (bottom) email (1/12/05, at 7:23 am) contains claims-related information about the

products.  Pfizer has failed to sustain its claim of attorney-client privilege as to the bottom email, and although the email falls within the protection of the work product privilege, the Ad Hoc Committee has demonstrated a substantial need.  Accordingly, Pfizer is directed to produce this email, except for the last clause in the opening paragraph that begins with the word "but."  That clause is pure opinion work product.

The middle email (1/13/05, at 11:27 am) is privileged.  The top (latest) email (1/13/05, at 11:56 am) consists of two sentences.  The first sentence is factual work product, and should be produced.  The second sentence is not factual, and may be withheld.

**Document # 74** consists of six emails and an attached tax-related agreement.  Pfizer has asserted the attorney-client and work product privileges.  Pfizer has failed to sustain the assertion of the work product privilege since the tax agreement does not appear to be the type of document that was created in anticipation of litigation (it would have been created anyway), and the emails relate to the tax agreement.  Nevertheless, Pfizer has sustained its claim of attorney-client privilege as to the email sent on December 22, 2003 (11:28 am) from Linda Swartz, Esq. to John H. Bae, Esq. of Cadwalader Wickersham & Taft ("Cadwalader").  The balance of the emails and the attachment should be produced.

**Document # 173** concerns the draft <u>Fifth Amended Disclosure Statement</u>.  The document consists of two emails and the draft.  The bottom (earlier) email (5/15/07, at 9:17 pm) sent by Jessica L. Fainman, Esq. of Schulte Roth & Zabel LLP ("Schulte Roth"), attached and sent a version of the draft to, among others, the FCR and his attorneys, the attorneys for the Committee and the attorneys for Pfizer.  Pfizer has asserted the work product privilege.  It has also asserted the joint defense privilege although it did not assert the attorney-client privilege.

With one caveat, the work product privilege was waived by the transmission of the email and draft to the FCR and the Committee. For the reasons already discussed, there was always a substantial risk that they would be adversaries of each other and adversaries of Pfizer and Quigley.

The top (later email) (5/17/07, at 2:32 pm) was sent by Jennifer A. Brennan, Esq., a Pfizer attorney, to other Pfizer and Quigley attorneys. It also transmitted a draft <u>Fifth Amended Disclosure Statement</u>, but this draft contained the handwritten comments of her firm, Gilbert Randolph LLP. If this was not the same version transmitted to the FCR and the Committee, and the handwritten comments were shared only with Pfizer and Quigley lawyers, the handwritten comments can be redacted. The email may also be withheld on the ground of work product.

**Document # 77** consists of a single email sent on May 28, 2004 (11:22 am) by a Pfizer in house attorney to John H. Bae, Esq. of Cadwalader. Pfizer asserted the attorney-client privilege, but the email does not concern legal advice. Accordingly, Pfizer has failed to sustain the privilege.

**Document # 127** is an internal Cadwalader email sent on August 31, 2004 (8:54 am) by John H. Bae, Esq. to Bruce R. Zirinsky, Esq. It transmits the comments made by Baron & Budd, P.C. ("Baron & Budd") to three paragraphs in the proposed Pfizer Settlement Agreement. The paragraphs are numbered 1, 2 and 3 in the email. Pfizer has asserted both the attorney-client and the work product privileges.

Pfizer obviously shared the draft agreement with Baron & Budd, and thereby waived any privilege in the draft, including any draft that reflected Baron & Budd's comments. The bulk of

this email contains verbatim quotations from the three paragraphs of the draft that include Baron

& Budd's comments.  These verbatim quotations cannot be withheld.

Each verbatim quotation is also followed by a sentence or short paragraph that includes

some opinion work product supplied by Mr. Bae.  Pfizer may redact the following from this

trailing matter: (1) the second sentence of the two sentence paragraph following the paragraph

numbered 1, (2) the second clause of the sentence following the paragraph numbered 2, and (3)

the second clause of the first sentence following the paragraph numbered 3, and the entire second

sentence.

**B.    Quigley**

Like the Pfizer documents, the Quigley documents consist primarily of email chains.  The

Court reviewed the Quigley documents in camera aided by (1) the Supplemental Privilege Log of

Quigley Company, Inc. Documents Sought By Ad Hoc Committee of Tort Victims January 9,

2009 Motion to Compel, Not Already Produced ("Quigley Supp. Log"), and (2) the Amended

Affidavit of Michael L. Cook in Support of Objection to Ad Hoc Committee of Tort Lawyers

[sic] Motion for an Order Compelling Disclosure of Documents and Testimony From Pfizer and

Quigley, sworn to Feb 5, 2009 ("Amended Cook Affidavit") (ECF Doc. # 1709).  The Court

concludes that Quigley has sustained the claim of privilege, except as noted below.  The

documents are identified in the same manner as they are in the Quigley Supp. Log.

**1.    September 11, 2008 Privilege Log[7]**

**Document # 37** consists of two emails, each with the subject "Potential Business."

Quigley asserts the attorney-client privilege.  The bottom (earlier) email (5/24/06, at 3:06 pm)

---

[7]    Quigley assembled its documents in the same manner as they are listed on the three Quigley privilege logs.

includes a brief message of what appears to be a verbatim transcription of a voicemail from a third party to Kim Jenkins, Quigley's current president. The voicemail is not protected by the attorney-client privilege,[8] and did not become privileged because Ms. Jenkins sent it to a lawyer at Schulte Roth. The transcription of the voicemail should be produced.

Both emails also include a brief statement from Ms. Jenkins to Schulte Roth lawyers that identifies and transmits the transcription. The assertion of privilege is sustained as to these statements.

### 2.    September 11, 2007 Privilege Log

**Document ## 78, 80, 83 and 84** are related. Document # 83 (# 84 is identical) consists of two emails and an attachment. The attachment is the clean and black-lined versions of a Product License and Services Agreement between Quigley and Pfizer. The bottom (earlier) email (7/12/05, at 10:33 am) was prepared by Philip J. Nichols, a law clerk employed by Cadwalader, and sent to Jason A. Cohen, Esq. and Darryl Pinsker, Esq., Cadwalader attorneys. The email comments on some of the points apparently raised by Laura Chenoweth, Esq. an in house Pfizer lawyer, and explains how those points were addressed in the annexed draft. The top (later) email (9/16/05, at 3:47 pm) does not contain text, but simply forwards the earlier email and attachment to Jessica L. Fainman, Esq. of Schulte Roth. Quigley asserts the work product and joint defense privileges with respect to the two emails and the attachment.

The earlier email was written by a Cadwalader lawyer and sent to Cadwalader lawyers. Viewed in isolation, only Pfizer or Cadwalader could assert a privilege. The Pfizer privilege logs do not list the Nichols' email. Its omission raises several possibilities: (1) the email (and

---

[8]    Quigley has not asserted that the transcription is protected by the work product privilege.

attachment) were not responsive to document requests sent by the Ad Hoc Committee to Pfizer, and hence, Pfizer had no need to identify them in any privilege log, (2) the email (and attachment) were produced by Pfizer, or (3) the email (and attachment), though responsive to a document request, were neither produced nor identified on a privilege log.

The last two possibilities raise the question of waiver, and if Pfizer waived any privileges, it is not clear that Quigley can assert a privilege simply because a copy of the document was in its files.  For these reasons, Quigley has failed to demonstrate that it can assert any privilege with respect to the earlier email and attachment, unless it supplements its submission within ten days of the date of this order, with evidence or legal argument, or both, that justify the assertion of the privilege.  Absent supplementation and further proceedings in connection with this document, Quigley should produce it.

The later email sent by Mr. Cohen forwards Mr. Nichols' email of two months earlier to Ms. Fainman of Schulte Roth.  It does not include any text in the body of the email.  There is no basis to assert a privilege since the email merely provides proof, generated by the email system, that the Nichols' email and attachments were forwarded.

The top (latest) email  (9/16/05, at 3:58 pm) in the three email chain that comprises Document # 80 transmits the two emails and attachment referred to immediately above from Ms. Fainman to Lawrence V. Gelber, Esq., also of Schulte Roth.  It includes a brief message that characterizes what is being transmitted, and is protected by the work product privilege.

Finally, Document # 78 includes the latter three emails and the attachment, and one new email.  The new (top) email (9/16/05, at 4:00 pm) reflects Mr. Gelber's response to Ms. Fainman, regarding how to proceed.  It is covered by the work product privilege.

**Document # 369** consists of ten emails.  Quigley asserts the work product and joint defense privileges over the first nine (5/12/05, at 9:13 am; 5/12/05, at 12:13 pm; 5/12/05, at 1:18 pm; 5/12/05, at 1:23 pm; 5/13/05, at 9:34 am; 5/13/05, at 9:35 am; 5/13/05, at 9:50 am; 5/13/05, at 1:40 pm; 5/16/05, at 10:16 am), and the attorney-client, work product and joint defense privileges with respect to the top (latest) email (5/16/05, at 10:40 am).  The first seven emails were sent by Pfizer employees to Pfizer employees, and the eighth and ninth emails were also sent to a Pfizer in house attorney.[9]  The tenth email, authored by Ms. Jenkins, forwarded the email chain, inter alia, to lawyers at Schulte Roth and Cadwalader.

The email chain relates to the relocation of the claims handling unit to different leased premises.  It appears to be a document that was prepared in the ordinary course of Pfizer's business, and is not protected work product.  Furthermore, Quigley has failed to show that the tenth email, which has no substance other than an innocuous transmittal message, should be protected by any of the cited privileges.  Accordingly, this email chain should be produced.

**Document ## 387 and 390** are identical with one exception.  Document # 387 consists of a chain of eight emails, but Quigley asserts a privilege only with respect to the last three (4/18/05, at 1:16 pm; 4/20/05, at 4:49 pm; 4/20/05, at 4:52 pm).[10]  Document # 390 consists of the first seven of the eight emails that comprise Document # 387.  The Amended Cook Affidavit, at ¶ 61, states that Quigley was asserting the attorney-client privilege only as to the top (latest) email (4/20/05, at 4:49 pm) in Document # 390, but the privilege log states that the entire chain is privileged.

---

[9]        The ninth email was also sent to Kim Jenkins.

[10]        Quigley agreed to produce the five earlier emails subject to review by the Committee.  (Amended Cook Affidavit, at ¶ 60(a).)  The Committee's January 30, 2009 letter to the Court did not list this document as one to which it might assert a privilege.

The assertions of privilege are contradictory, as are the supporting affidavit and privilege log.  The first five emails (4/5/05, at 12:13 pm; 4/5/05, at 5:02 pm; 4/8/05, at 10:24 am; 4/8/05, at 10:35 am; 4/18/05, at 12:28 pm) in both documents should be produced, and the seventh email (4/20/05, at 4:49 pm) reflects a communication protected by the attorney-client privilege.  The sixth email (4/18/05, at 1:16 pm) also reflects a communication that is protected by the attorney-client privilege, as does the eighth email (4/20/05, at 4:52) in Document # 387.

**Document # 402** consists of one email and two attachments, as to which Quigley asserts the attorney-client and work product privileges.  The email (4/20/05, at 9:00 am) from Lawrence V. Gelber, Esq. of Schulte Roth to John H. Bae, Esq. of Cadwalader concerns the selection of a valuation expert for pharmaceutical product lines.  The email is work product, and there is no discernable factual work product.

The attachments were prepared by two valuation firms, LifeTech Research, Inc. and The Foresight Group, which Quigley had consulted.  The attachments are the proposed retention agreements submitted by each, but differ markedly.  The LifeTech Research proposal is almost completely generic.  Except for the "Project Objective" on page two, the proposal does not indicate what the parties discussed, and another section on the same page, "Project Scope," is so general that it looks like "boilerplate" included in every valuation proposal.  Quigley may redact the "Project Objective" since it is intertwined with the disclosure of Quigley's strategy to satisfy the "ongoing business" requirement, was obviously revealed to LifeTech Research so that it could make a retention proposal, and is protected work product.  The balance of the LifeTech Research proposal should be produced.

The Foresight Group, who Quigley ultimately retained, submitted a much more comprehensive proposal. It includes a summary of projected financial information regarding the profitability of the product lines, an identification of the issues that must be analyzed, and a discussion of Foresight's step-by-step approach. Disclosure of this document would provide a roadmap crafted by Foresight with respect to how to tackle the "ongoing business" requirement as proposed by Quigley and Pfizer at that time. These portions of the document reflect strategy and are protected work product.

Some of the content, on the other hand, is generic and should be produced. This includes page eight, starting with the section marked "Indemnification" through page ten, and page twelve through page nineteen.

### 3.    June 20, 2007 Log

**Documents ## 4 and 6** concern email communications between Kevin M. Altit, a Quigley director, on the one hand, and other Quigley directors and lawyers at Schulte Roth, Quigley's counsel, on the other. One of the emails at issue (7/14/04, at 7:13 pm) from Mr. Altit to other directors and Schulte Roth attorneys, appears in both documents. Document # 6 also includes a second and later email (7/15/04, at 7:17 am) in which Michael Cook, Esq. responds to Mr. Altit's email. Quigley asserts the attorney-client privilege with respect to Document # 4 and the conforming email in Document # 6. Quigley asserts the attorney-client and work product privileges with respect to Mr. Cook's response.

Quigley has failed to demonstrate that an attorney-client relationship existed between Mr. Altit and Schulte Roth, or, notwithstanding the description in the privilege log, that Mr. Altit was seeking legal advice. "[A]n attorney's representation of a corporation does not make that

26

attorney counsel to the corporate officers and directors as individuals." <u>Correspondent Servs.</u>
<u>Corp. v. J.V.W. Inv. Ltd.</u>, No. 99 Civ. 8934 (RWS), 2000 WL 1174980, at *13 (S.D.N.Y. Aug.
18, 2000); <u>see</u> 22 N.Y.C.R.R. § 1200.28(a) (requiring the lawyer for an organization when
dealing with a director to explain that the lawyer represents the organization and not the director
in situations where it appears that the interests of the organization and director may differ).  The
subject of the emails between Mr. Altit and the Schulte Roth attorneys was one on which a
reasonable observer could conclude that their interests might differ.  Accordingly, the assertion
of the attorney-client privilege is overruled.

Quigley has also failed to demonstrate that the Cook email in Document # 6 is entitled to
protection as work product.  The email concerns the content of the minutes following a Quigley
board meeting.  On its face, the Cook email does not appear to relate to the impending
bankruptcy or any other pending or contemplated litigation.  Rather, it appears to relate to
ordinary corporate business.  For this reason, the assertion of the work product privilege is also
overruled, and both documents should be produced.

So ordered.

Dated: New York, New York
       April 24, 2009

                              /s/ *Stuart M. Bernstein*
                              STUART M. BERNSTEIN
                         Chief United States Bankruptcy Judge