Douglas T. Tabachnik
LAW OFFICES OF
DOUGLAS T. TABACHNIK, P.C.
Woodhull House
63 W. Main Street, Suite C
Freehold, New Jersey 07728
Telephone: (732) 780-2760
Facsimile: (732) 792-2761

and

Sander L. Esserman (admitted pro hac vice)
STUTZMAN, BROMBERG, ESSERMAN
& PLIFKA, a Professional Corporation
2323 Bryan Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 969-4900
Facsimile: (214) 969-4999

**ATTORNEYS FOR BARON & BUDD, P.C.,
ON BEHALF OF CERTAIN SETTLING CLAIMANTS**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>QUIGLEY COMPANY, INC.,<br><br>           Debtor. | Case No. 04-15739 (SMB)<br>(Chapter 11) |

**STATEMENT OF CERTAIN SETTLING CLAIMANTS
REPRESENTED BY BARON & BUDD, P.C. IN SUPPORT OF
CONFIRMATION OF QUIGLEY COMPANY INC.'S
FOURTH AMENDED AND RESTATED PLAN OF
<u>REORGANIZATION (AS MODIFIED AS OF MARCH 28, 2008)</u>**

TO THE HONORABLE STUART M. BERNSTEIN,
CHIEF UNITED STATES BANKRUPTCY JUDGE:

      Stutzman, Bromberg, Esserman & Plifka, a Professional Corporation

and Douglas T. Tabachnik of the Law Offices of Douglas T. Tabachnik,

counsel for Baron & Budd, P.C. ("<u>Counsel for the Settling Claimants</u>"), file

this Statement on behalf of certain Settling Claimants[1] in Support of Confirmation of Quigley Company Inc.'s Fourth Amended Plan of Reorganization, Dated March 28, 2008 (the "Plan"), and respond to certain objections to confirmation of Quigley Company Inc.'s ("Quigley") Plan asserted by the Ad Hoc Committee of Tort Victims (the "AHC"). In support thereof, Counsel for the Settling Claimants state as follows:

## I.
## INTRODUCTION

Through its Plan, Quigley and its parent, Pfizer, are pursuing resolution of their asbestos-related claims in accordance with the process that Congress set forth when it enacted section 524(g) of the Bankruptcy Code. Section 524(g) requires that the class of claimants with asbestos-related claims to be addressed by a section 524(g) trust must vote, by at least 75% of those voting, in favor of the plan.[2] Quigley has garnered the requisite votes for confirmation of its Plan: 86.62% of the holders of Class 4 Asbestos PI Claims that cast a vote on Quigley's Plan voted to accept it, and the holders of Class 4 Asbestos PI Claims voting to accept Quigley's Plan hold 81.77% in amount of the Asbestos PI Claims in Class 4.[3]

---

[1] Counsel for the Settling Claimants represent thousands of asbestos personal injury claimants who settled their claims against Pfizer Inc. ("Pfizer"), the Debtor's non-debtor parent, prior to the commencement of this Chapter 11 case. These personal injury claimants are referred to herein as the "Settling Claimants" and the related settlement agreements are referred to herein as the "Pfizer Settlement Agreements."

[2] 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

[3] *See* Declaration of Brad Daniel on Behalf of BMC Group, Inc., as Tabulation Agent, Regarding the Tabulation of Votes with Respect to Quigley Company, Inc.'s Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy

2

The AHC's suggestion that opposition to confirmation of Quigley's Plan is representative of all Non-Settling Claimants[4] is not supported by the evidence: 66.27% in number and 66.20% in amount of the holders of Class 4 Asbestos PI Claims that were not parties to any pre-petition settlement agreement with Pfizer voted in favor of the Plan.[5] While the AHC has been the most active, vocal objector at every turn in this bankruptcy case, the evidence shows that the majority of asbestos claimants – Settling Claimants and Non-Settling Claimants alike – support confirmation of Quigley's Plan. For the reasons stated below, Counsel for the Settling Claimants urges this Court to confirm Quigley's Plan so that the thousands of individuals holdings Asbestos PI Claims who are suffering from asbestos-related illnesses may finally be paid for their claims. Quigley's long-awaited emergence from Chapter 11 should not be derailed by the unavailing arguments of a disgruntled minority.

## II.
## QUIGLEY'S PLAN SATISFIES THE REQUIREMENTS FOR CONFIRMATION UNDER THE BANKRUPTCY CODE

A. <u>Quigley's Plan Satisfies Section 1129(a)(10) of the Bankruptcy Code</u>

1. To confirm a plan of reorganization, section 1129(a)(10) of the Bankruptcy Code requires that the court must find "at least one class of claims that is impaired under the plan has accepted the plan, determined

---

Code (As Modified March 28th 2008) (hereinafter, the "<u>Vote Tabulation</u>") [Docket No. 1525] at 5.

[4] "Non-Settling Claimants" refers to holders of Class 4 - Asbestos PI Claims that did not enter into a settlement agreement with non-debtor Pfizer outside of this case.

[5] *See* Exhibit C-2 of Vote Tabulation.

3

without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). The purpose of section 1129(a)(10) is "to provide some indicia of support by affected creditors and prevent confirmation where such support is lacking." *See In re Lettick Typografic, Inc.*, 103 B.R. 32, 38 (Bankr. D. Conn. 1989). As such, section 1129(a)(10) requires that a plan pass muster in the opinion of creditors whose rights to repayment from the debtor are implicated by the reorganization. Quigley's Plan satisfies this requirement: the holders of Class 4 – Asbestos PI Claims, an impaired class, voted overwhelmingly to accept Quigley's Plan.

    *i.*    ***There are no "stub claims," as criticized by the Third Circuit in Combustion Engineering, in the case at issue***

2.    Notwithstanding the fact that holders of Class 4 – Asbestos PI Claims voted overwhelmingly to accept Quigley's Plan, the AHC argues, erroneously, that Quigley's Plan fails to satisfy the requirements of section 1129(a)(10) of the Bankruptcy Code. The AHC claims that "Pfizer and Quigley employed a strategy (one centering on pre-petition settlements and the creation of stub claims)" which artificially impaired Class 4 – Asbestos PI Claims. Objection of the Ad Hoc Committee of Tort Victims to the Quigley Company, Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (As Modified As of March 28, 2008) (hereinafter, the "<u>AHC Objection</u>") [Docket No. 1542] at 116. As support for this proposition, the AHC cites to the Third Circuit's opinion in *In re*

*Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2005). As shown below, the AHC's reliance on *Combustion Engineering* is misplaced.

3. In *Combustion Engineering*, the debtor entered into certain pre-petition settlement agreements to settle its own asbestos liability using estate assets and paid such claimants for part, but not the entire amount, of their claims. *Id.* at 201. The remaining unpaid portion of the claims, known as "stub claims," were to be paid under the debtor's plan thereby enabling such claimants to vote on the debtor's plan. *Id.* at 201, 244. Concerned with the fact that the pre-petition settlements allowed the holders of the stub claims to receive more from the debtor than other members in their class, the Third Circuit in *Combustion Engineering* opined that the use of stub claims may have constituted "artificial impairment" under section 1129(a)(10). *Id.*

4. The facts and circumstances that gave rise to the Third Circuit's concerns in *Combustion Engineering* are not present here. In *Combustion Engineering*, the *debtor* entered into the pre-petition settlement agreements resolving *its own* asbestos-related liabilities. Here, Pfizer – Quigley's non-debtor parent – entered into certain settlement agreements with the Settling Claimants to settle Pfizer's asbestos-related liabilities and used its own funds, not funds belonging to Quigley or its estate. Nothing constrains a highly solvent, non-bankrupt entity from settling its tort liabilities on whatever terms are acceptable to it and the respective settling tort claimants. Moreover, this Court has already found that *Combustion Engineering* is

5

distinguishable from the instant case because in this case the settlement amounts are all paid by Pfizer with Pfizer assets, not with estate assets. *In re Quigley Co., Inc.*, 346 B.R. 647, 657 (Bankr. S.D.N.Y. 2006). Quigley had no involvement and never participated in the Pfizer Settlement Agreements. The Pfizer Settlement Agreements do not resolve, in whole or in part, Quigley's liability to any of the Settling Claimants. Quigley has no payment obligations under the Pfizer Settlement Agreements, and the Settling Claimants have not released any claims against Quigley under those agreements.

5. Since the claims of the Settling Claimants against Quigley remain completely intact, there simply are no stub claims in this case as there were in *Combustion Engineering*. The claims of the Settling Claimants against Quigley are resolved under Quigley's Plan. Quigley's Plan treats those claims the same as it treats all other asbestos personal injury claims. This Court has already held that Pfizer's payments to the Settling Claimants "do not … affect the equality of treatment because all similarly situated PI Claimants will receive the same distribution under the Plan. The Pfizer settlement is being funded by a non-debtor and is being paid outside the Plan." *In re Quigley Co., Inc.*, 377 B.R. 110, 116-17 (Bankr. S.D.N.Y. 2007).

### ii. *Contrary to the allegations of the AHC, Pfizer did not "buy the vote" of the Settling Claimants*

6. The AHC makes the preposterous allegation that Pfizer bought the vote of the Settling Claimants.[6] As a threshold matter, the notion that Pfizer bought the vote is only supportable if the Pfizer Settlement Agreements and Quigley Plan are viewed as part of the same transaction. They are not. The Pfizer Settlement Agreements are separate and independent of Quigley and its Plan. As this Court has previously recognized, they are being funded by a non-debtor and are being paid outside of the Plan. *In re Quigley Co., Inc.*, 377 B.R. 110, 117 (Bankr. S.D.N.Y. 2007). For this reason, the AHC's theory that Pfizer bought the vote is unsupportable.

7. However, even assuming *arguendo* that the Pfizer Settlement Agreements and Quigley's Plan are part of the same transaction, the AHC's allegations that Pfizer bought the vote still fails. As this Court recognized, while the Settling Claimants may be receiving a greater distribution, they may also be paying a greater consideration. *Id.* at 118.

8. The release the Settling Claimants give to Pfizer under the Pfizer Settlement Agreements are broader than the release Pfizer will receive

---

[6] The Settling Claimants previously responded to the AHC's baseless allegations, including that the Settling Claimants' votes were in fact cast by Pfizer and should be treated as if Pfizer purchased the Settling Claimants' votes, in the Settling Claimants' Opposition to the AHC's Motion to Designate Votes Pursuant to 11 U.S.C. § 1126(e) filed in this case on May 29, 2009 [Docket No. 1812], which the Settling Claimants adopt and incorporate herein.

under Quigley's Plan.  *Id.*  Under the Pfizer Settlement Agreements, the Settling Claimants release Pfizer from non-derivative claims for which Pfizer has its own potential asbestos-related liability unrelated to Quigley and derivative claims based on Quigley's asbestos-containing products.  *Id.*  Quigley's Plan, on the other hand, only releases Pfizer from claims based on Quigley's asbestos-containing products.  *Id.*  Thus, asbestos personal injury claimants who did not settle with Pfizer may pursue their direct claims against Pfizer after confirmation.  *Id.*  For these reasons, the AHC's claim that Pfizer bought the votes of the Settling Claimants is wholly lacking in merit.

9. Accordingly, this Court should find that Quigley's Plan satisfies the requirements for confirmation under section 1129(a)(10) of the Bankruptcy Code.

B. **Quigley's Plan Satisfies the Requirements for Confirmation Under Section 524(g) of the Bankruptcy Code**

   i. *In exchange for Pfizer's contributions to Quigley's Plan, Pfizer will obtain the benefits of the section 524(g) injunction*

10. The AHC objects to confirmation of Quigley's Plan claiming that Pfizer's contributions under the Plan are not sufficient to warrant the extension of the protections of a section 524(g) injunction to Pfizer.

11. The Bankruptcy Code provides that an injunction issued in favor of a debtor under section 524(g) may be extended to specified third parties if the court appoints a legal representative to protect the rights of future

asbestos claimants, and the court determines that such injunction is fair and equitable with respect to the persons that might subsequently assert future claims against the debtor or such third party, in light of the benefits to be provided to the 524(g) trust on behalf of such debtor or third party. *See* 11 U.S.C. § 524(g)(4)(B).

12. This Court appointed Albert Togut (the "FCR") to serve as the representative of future asbestos claimants. Fifth Amended and Restated Disclosure Statement with Respect to Quigley Company, Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (As Modified As March 28, 2008) (hereinafter, the "Disclosure Statement" or "DS") at 40. The FCR has retained various professionals to assist him with his duties in this case, including an expert to evaluate the asbestos claims against Quigley. *Id.* The FCR and his professionals conducted several months of due diligence on Pfizer and Quigley with respect to their asbestos liabilities. *Id.* The FCR and representatives of Quigley and Pfizer were involved in the negotiation of the initial terms of Quigley's and Pfizer's respective contributions to the 524(g) trust to be formed under Quigley's Plan. *Id.*

13. Several years after Quigley commenced its bankruptcy case, Pfizer waived the obligation contained in the Pfizer Settlement Agreements that holders of Asbestos PI Claims who entered into such agreements must reduce the amount of their distributions from the 524(g) trust. At that time,

the FCR engaged in further negotiations with Pfizer to require it to make additional financial contributions to the 524(g) trust. *Id.* at 49. As a result of those negotiations, Pfizer agreed to make a contribution to Quigley's Plan with an aggregate value of approximately $120.1 million. *Id.* at 50. In exchange, Pfizer will receive the benefits of the 524(g) injunction which will enjoin holders of Asbestos PI Claims from pursuing Pfizer for derivative claims based on Quigley's asbestos-containing products. *Id.* at 49-50.

14. Non-derivative claims for which Pfizer has its own potential asbestos-related liability unrelated to Quigley will not be released under Quigley's Plan, and the holders of such claims will still have recourse against Pfizer directly. Thus, while the holders of Asbestos PI Claims will look to the 524(g) trust for satisfaction of their claims against Quigley and their derivative claims against Pfizer, claimants represented by the AHC who chose not to enter into the Pfizer Settlement Agreements (and any other Non-Settling Claimants) still will be able to pursue Pfizer for their direct claims.

15. Significantly, neither the FCR nor the Committee has objected to the amount of the contribution to be provided by Pfizer and the benefits to be provided to Pfizer in exchange. From previous statements made by counsel for the AHC in open court, the AHC's objections to confirmation of Quigley's Plan appear to be just a pretext concealing the AHC's real motives to extract a more favorable settlement with Pfizer outside this case:

> As a practical matter, you know it and I know it and everyone in this courthouse knows it. This case, from the perspective of the

> dissenting members [represented by the AHC], is all about the view … that there wasn't enough money offered in settlement by Pfizer for my clients to be willing to accept it. … In terms of a dynamic that's ever going to suggest to Pfizer that Pfizer ought to re-think whether or not it wants to consider resolution with my constituency … Pfizer has to be told for once in the last three year's it's not going to get its way.

Hrg. Transcr. 76:3-76:25 (June 12, 2007). This Court should not permit the AHC to use Quigley's' bankruptcy case as a bargaining chip in the hopes of gaining a more favorable settlement from non-debtor Pfizer. The Settling Claimants urge this Court to confirm Quigley's Plan over the objections of the AHC so that the 524(g) trust may begin paying the thousands of individuals holding Asbestos PI Claims who are suffering from asbestos-related illnesses.

    *ii.*    *Contrary to the AHC's assertions, section 524(g) does not contain an "ongoing business" requirement[7]*

16. The AHC also asserts that Quigley's Plan cannot be confirmed because "there would be no 'ongoing business' of the sort envisioned and required by section 524(g)(2)(B)(i)(II)-(III)." AHC Objection at 66. Contrary to the AHC's assertions, the plain statutory language of section 524(g) – like chapter 11 itself – simply does not require a debtor availing itself of the statute to emerge from bankruptcy as a rehabilitated, for-profit business. To be sure, the plain language of section 524(g)(2)(B)(i) provides that a supplemental injunction may issue to enjoin entities from seeking to recover

---

[7] See Sander L. Esserman and David J. Parsons, *The Case for Broad Access to 11 U.S.C. § 524(g) In Light of the Third Circuit's Ongoing Business Requirement Dicta in Combustion Engineering*, 62 N.Y.U. Annual Survey of Am. L. 187 (2006) for a more thorough discussion of this issue.

on any claim or demand that, under a plan of reorganization, is to be paid by a trust that

> (I) is to assume the liabilities of a debtor which ... has been named as a defendant in [personal injury or property damage asbestos cases];
>
> (II) is to be funded in whole or in part by the securities of 1 or more debtors ... and by the obligation of such debtor ... to make future payments, including dividends;
>
> (III) is to own, or ... be entitled to own ... a majority of the voting shares of [the debtor, its parent, or a subsidiary which is also a debtor]; and
>
> (IV) is to use its assets or income to pay claims and demands . ...

11 U.S.C. § 524(g)(2)(B)(i). Quigley's Plan meets these requirements in all respects. The 524(g) trust will assume Quigley's asbestos liabilities, be funded by all of the outstanding common stock of Quigley, and use its assets and income to pay asbestos claims. *See* Quigley Plan at § 9.3.

17. Ignoring the language of the statute that Congress actually enacted, the AHC focuses on what it suspects a few members of Congress may have "envisioned." The AHC invokes excerpts of the legislative record as a means of contradicting Congress' unambiguous statutory language – an approach the Supreme Court has repeatedly denounced. "[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms." *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S. Ct. 1026 (1989) (quoting *Caminetti v. U.S.*, 242 U.S. 470, 485, 37 S. Ct. 192 (1917)). Dissatisfied with the result mandated by the plain statutory

history, the AHC looks instead to selected excerpts from the statutory history – a sleight of hand the Supreme Court roundly condemns:

> [T]his Court has repeated with some frequency: "Where, as here, the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history *if the statutory language is unclear.*" *Blum v. Stenson*, 465 U.S. 886, 896, 104 S. Ct. 1541, 79 L.Ed. 2d 891 (1984). … [A]lthough a court appropriately may refer to a statute's legislative history to resolve statutory ambiguity, there is no need to do so [where there is no such ambiguity].

*Toibb v. Radloff*, 501 U.S. 157, 162, 111 S. Ct. 2197 (1991) (emphasis added); *accord Barnhill v. Johnson*, 503 U.S. 393, 112 S. Ct. 1386 (1992) ("[A]ppeals to statutory history are well taken only to resolve 'statutory ambiguity,'" quoting *Toibb*).

18. In *Toibb*, the Supreme Court reversed the Eighth Circuit and held that an individual debtor not engaged in business was eligible to reorganize under chapter 11. 501 U.S. at 166. The Court rejected the same argument the AHC is making here, the notion that the legislative history of Chapter 11 somehow justifies an inference of congressional intent contrary to the plain language of the operative statute.[8] Declaring in *Toibb* that "the structure and legislative history of Chapter 11 indicate that this Chapter was intended primarily for the use of business debtors," the Court found the

---

[8] The statute in question was 11 U.S.C. § 109, which defined those "persons" who may be chapter 11 debtors. Noting that section 11 U.S.C. § 101(35) – now § 101(41) – defines "person" to "include [an] individual," the Court swiftly resolved the matter by reference to the plain statutory language. 501 U.S. at 161.

13

absence of a statutory requirement that a Chapter 11 debtor be an "ongoing business" dispositive. *Id.* at 166.

19. While discrete legislative comments cited by the AHC could arguably suggest an *expectation* on the part of some legislators that most debtors availing themselves of § 524(g) would be ongoing, traditional business enterprises, Congress articulated no such statutory requirement though it easily could have done so. Additionally, the legislative history when viewed as a whole – unlike the plain statutory language – is inconclusive. For example, the following comment attributed to Representative Fish is consistent with the view that Congress intended section 524(g) relief to be available for a debtor with no traditional business:

> We clarify judicial authority to issue injunctions in certain circumstances where trusts are created to pay asbestos-related claims – because *we recognize that by removing uncertainty over the validity of such injunctions, the value of trust assets available to fund recoveries by victims can increase.*

140 Cong. R. H 10,771 (daily ed. Oct. 4, 1994), reprinted in E-1 COLLIER ON BANKRUPTCY App. Pt. 9(b) at 104 (15th rev. ed.) (emphasis added). In other words, by providing for a permanent injunction invulnerable to collateral attack against future claimants, section 524(g) causes the resources available to satisfy future claims to increase. In this case, a section 524(g) injunction would have exactly such an effect: increasing the value of trust assets available to pay asbestos tort victims. The prospect of obtaining permanent injunctive relief immune to collateral attack pursuant to section 524(g) has

14

motivated Pfizer to conditionally agree to contribute $120.1 million under Quigley's Plan. The value of the trust assets will obviously increase substantially.

20. Furthermore, a determination that section 524(g) does not impose such a requirement was implicit in the confirmation of a number of plans of reorganization that expressly allowed a reorganized debtor to do nothing more than prosecute insurance coverage actions, liquidate assets, and make transfers to a section 524(g) trust for the processing and payment of claims. *See e.g.*, *In re Swan Transp., Co.*, No. 01-11690 (Bankr. D. Del. May 30, 2003) (order confirming debtor's plan of reorganization where debtor had conducted no ongoing business of any sort except litigation defense and the collection of insurance proceeds prior to bankruptcy and, post-confirmation, would conduct no conventional business but would exist for the purpose of maximizing insurance recoveries for distribution to asbestos claimants through the 524(g) trust); *In re Fuller-Austin Insulation Co.*, No. 98-2038-JJF, 1998 U.S. Dist. LEXIS 18340, at 4, 11 (D. Del. Nov. 10, 1998) (order confirming debtor's plan of reorganization even though debtor had not maintained a traditional business prior to bankruptcy and, post-reorganization, would be engaged in the "business" of paying its asbestos liabilities under a Chapter 11 plan); *In re Asbestos Claims Management Corp.*, No. 02-37124-SAF-11 (Bankr. N.D. Tex. Dec. 12, 2002) (order confirming debtor's plan of reorganization where debtor, post-confirmation,

would have no conventional business and would exist solely to pursue insurance recoveries for use with other assets to fund the 524(g) trust).

21. However, even if Congress had explicitly imposed a requirement that a debtor seeking to reorganize under section 524(g) must show that it has an ongoing business – which it clearly did not – Quigley would satisfy such a condition. Quigley will emerge from bankruptcy and continue to operate its claims-handling business which it anticipates will generate approximately $3.5 million in net revenues per year. DS at 6. Quigley expects that its net profits after taxes will be approximately $1 - $3 million in its first four years after emergence from bankruptcy. *See* Financial Appendix, Exhibit C to Disclosure Statement, at 6.

22. It is hardly surprising then that the AHC fails to cite to any authority where a court has held that a traditional ongoing business is a requirement under section 524(g). This is because no court has so held. The only support that the AHC can muster in support of its "envisioned" 524(g) ongoing business requirement, is dicta from *Combustion Engineering*, 391 F.3d 190.

23. In *Combustion Engineering*, the debtor's plan contemplated that Combustion Engineering's post-confirmation business operations would be relatively minimal and that it would emerge from its bankruptcy "with no employees, no products or services, and in a cash neutral position." *Id.* at 248. Its sole business activity following confirmation would involve the

ownership of an environmentally contaminated piece of real estate in Connecticut and related lease activities. *Id.* In dicta, the Third Circuit remarked that it was "debatable" whether the debtor could satisfy section 524(g)(2)(B)(i)(II) on account of its minimal business activities post-reorganization. *Id.* However, the issue was not properly before the court, as it had been raised by a party that lacked standing, and the court therefore did not render an opinion. *Id.* at 248. Notably, on remand, the bankruptcy court confirmed the debtor's plan and found that the debtor's commercial real estate leasing business[9] entitled it to the benefits of section 524(g). *In re Combustion Engineering, Inc.*, 2005 Bankr. LEXIS 2623, at *52-55 (Bankr. D. Del. Dec. 19, 2005). Again, the facts giving rise to the Third Circuit's dicta in *Combustion Engineering* are not present in this case. Here, Quigley will emerge from bankruptcy and continue its claims-handling business, which is anticipated to be profitable, not "cash neutral" as in *Combustion Engineering*. Further, unlike the debtor in *Combustion Engineering* that would emerge from bankruptcy with no employees, Quigley anticipates that it will maintain the employment of the current eight (8) employees in its business post-confirmation. *See* Financial Appendix, Exhibit C to Disclosure Statement at 3.

---

[9] The debtor's modified plan called for the remediation of the debtor's real estate. *Id.* at 56.

24. As demonstrated, Quigley is eligible for relief under section 524(g) of the Bankruptcy Code. For all of the foregoing reasons, this Court should overrule the AHC's objections to confirmation of Quigley's Plan.

## III.
## RESERVATION OF RIGHTS

Counsel for the Settling Claimants reserves its right to amend and supplement this Statement and/or join in the arguments of the Debtor and any other parties in the case and be heard at the confirmation hearing on the Debtor's Plan with respect to any issues relating thereto.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

# IV.
# CONCLUSION

For the reasons stated, Counsel for the Settling Claimants respectfully requests that this Court confirm Quigley's Plan over the objections of the AHC, and grant such other and further relief to which this Court finds it to be entitled.

Respectfully submitted this 5th day of June, 2009.

>    */s/ Douglas T. Tabachnik*
>    Douglas T. Tabachnik
>    LAW OFFICES OF
>    DOUGLAS T. TABACHNIK, P.C.
>    Woodhull House
>    63 W. Main Street, Suite C
>    Freehold, New Jersey 07728
>    Telephone: (732) 780-2760
>    Facsimile: (732) 792-2761
>
>    and
>
>    Sander L. Esserman
>    (admitted pro hac vice)
>    STUTZMAN, BROMBERG,
>    ESSERMAN & PLIFKA, a
>    Professional Corporation
>    2323 Bryan Street, Suite 2200
>    Dallas, Texas 75201
>    Telephone: (214) 969-4900
>    Facsimile: (214) 969-4999
>
>    **ATTORNEYS FOR BARON & BUDD, P.C., ON BEHALF OF CERTAIN SETTLING CLAIMANTS**