GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Bruce R. Zirinsky
John H. Bae
Gary D. Ticoll
Michele L. Angell

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666
Dennis J. Block

Attorneys for Pfizer Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | | Chapter 11 |
| QUIGLEY COMPANY, INC., | : | |
| | | Case No. 04-15739 (SMB) |
| Debtor. | : | |

------------------------------------------------------x

### MEMORANDUM OF LAW OF PFIZER INC. IN SUPPORT OF CONFIRMATION OF QUIGLEY COMPANY, INC.'S FOURTH AMENDED AND RESTATED PLAN OF REORGANIZATION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... v

I.      PRELIMINARY STATEMENT ................................................................................. 1

II.     FACTUAL BACKGROUND ...................................................................................... 4

        A.     Quigley Company Background........................................................................ 4

        B.     Quigley's Historical Involvement with Asbestos Personal Injury
               Litigation ........................................................................................................ 5

        C.     Pfizer Was Not Involved With Quigley's Business........................................ 6

        D.     Pfizer's Historical Involvement with Asbestos Personal Injury
               Litigation ........................................................................................................ 7

        E.     Shared Asbestos Insurance Policies and Insurance Settlement
               Proceeds Trust................................................................................................. 7

        F.     Past Efforts to Resolve Personal Injury Claims ........................................... 14

               1.    Wellington Agreement........................................................................ 14

               2.    The Center for Claims Resolution ...................................................... 15

        G.     Claims Handling Unit .................................................................................... 16

        H.     State Court Asbestos Litigation .................................................................... 18

        I.     Quigley Structure and Board of Directors .................................................... 21

        J.     Quigley's Bankruptcy -- Commencement of Chapter 11 Case ..................... 22

        K.     Pfizer Claimant Settlement Agreements ....................................................... 23

        L.     The Future Claimants Representative ............................................................ 26

        M.     Initial Negotiations/Pfizer Contribution....................................................... 27

        N.     The Pfizer Waiver and Pfizer's Additional Contribution .................................. 28

III.    ARGUMENT ........................................................................................................... 31

        A.     Quigley's Commencement of This Case Was Not in Bad Faith.................... 31

B.     The Pfizer Claimant Settlement Agreements were Entered Into in Good Faith and Fully Disclosed.................................................... 34

    1.   Incentives Are Not Improper ........................................................ 34

    2.   There is no Basis for Ad Hoc Committee's Allegation that Pfizer Selected Settling Law Firms With Historically Lower Settlement Values ...................................................................... 41

        a.   Pfizer Sought to Settle at Reasonable Values With All Plaintiff Law Firms.................................................... 41

        b.   The Data Does Not Show that Settling Law Firms Had Lower Historical Settlement Values than Non-Participating Law Firms .......................................... 44

        c.   There is No Basis to Contend that Historic Settlement Mean By Law Firm and Disease is Predictive of Other Claims Values.................................................... 48

        d.   The Ad Hoc Committee's Attacks on Pfizer's Settlement with the Jaques Firm Violates Stipulation and Order of this Court .................................................... 49

    3.   Quigley Was Not a Third Party Beneficiary of the Pfizer Claimant Settlement Agreements ................................................. 50

C.     The Plan Satisfies The Requirements For Entry Of The Asbestos PI Channeling Injunction Under Section 524(g) .................................. 51

    1.   The Asbestos PI Trust Satisfies the Structure and Funding Requirements of Section 524(g)(2)(B)(i) ...................................... 52

    2.   Quigley's History, the Nature of Asbestos Related Litigation, and the Facts of the Chapter 11 Case Support the Findings Required Under 524(g)(2)(B)(ii) and 524(g)(1)(A)...................... 54

    3.   The Court May Extend the Asbestos PI Channeling Injunction to the Pfizer Protected Parties ...................................... 56

        a.   Pfizer's Contribution is Fair and Equitable to Future Claimants Under 524(g)(4)(B)(ii) ........................ 58

        b.   The Interpretation of "Fair and Equitable" Proposed by the Ad Hoc Committee Has No Legal or Logical Basis ........................ 61

c.  The Ad Hoc Committee's Valuation of the Pfizer Contribution is Legally, Financially, and Arithmetically Flawed .......................................................... 65

(i)  Calculation of the Pfizer Contribution ................................. 65

(ii)  The Ad Hoc Committee's Calculation of the Pfizer Contribution is Flawed ....................... 71

4.  The Asbestos PI Injunction Tracks the Language of Section 524(g)........................................................................ 79

D.  The Plan Does Not Improperly Benefit an Insider Section 524(g) is Specifically Designed to Offer Protection to Affiliates .................................. 82

E.  The Ad Hoc Committee is Seeking to Relitigate Numerous Issues that Have Previously Been Resolved by the Court ............................................. 84

1.  The Decided Issues ......................................................... 84

a.  It is Law of the Case that TDP Values are Utilized to Weigh Claim Values for Voting.......................... 85

b.  It is Law of the Case that Classification and Treatment Under the Plan are Proper.......................... 86

c.  It is the Law of the Case that Asbestos PI Claimants Residing in Tort Reform States Were Entitled to Vote on the Plan ...................................................... 88

d.  It is Law of the Case that the Future Claimants Representative Can Adequately  Represent the  Interests of All Future Demand Holders ...................... 89

e.  It is Law of the Case That Apparent Manufacturer Claims May Be Channeled, Despite the Ad Hoc Committee's Appeal of the Court's Ruling ................................. 90

F.  Pfizer Has No Liability for Quigley Derivative Claims ...................................... 93

1. Pfizer Did Not Exercise Dominion and Control Over Quigley ...................... 95

a.  Pfizer and Quigley Observed the Requisite Corporate Formalities........................................................ 97

b.  Pfizer Did Not Improperly Influence Quigley's Policies and Decisions.......................................... 98

c.  Limited Director/Officer Overlap Is Not Improper .............................. 100

d.  Sharing of Office Space is Insufficient to Support Veil Piercing.................................................................................... 101

e.  A Parent May Provide Services to its Subsidiaries ............................... 102

2.  Refusal to Pierce Will Not Result in Unfairness or Injustice ..................... 103

a.  Quigley Was Adequately Capitalized ................................................... 104

b.  Pfizer Did Not Strip Assets From Quigley............................................ 105

c.  There are No Other Indicia of Fraud or Unfairness .............................. 106

G.  Court Should Find That Pfizer Did Not Participate In the Manufacture or Distribution of Insulag or Any Other Quigley Product ........................................................................................... 106

CONCLUSION.................................................................................... 112

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                Page(s)

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
    122 F.3d 130 (2d Cir. 1997)................................................................................95

*Amalgamated Lithographers of Am. Local One v. Armen Graphics Ltd.*,
    No. 96 Civ. 5844 (LBS), 1997 WL 458738 (S.D.N.Y. Aug. 12, 1997) ................................101

*Arizona v. California*,
    460 U.S. 605 (1983)................................................................................85

*Bair v. Purcell*,
    500 F. Supp. 2d 468 (M.D. Pa. 2007) ................................................................96

*Bennett v. GAF Corp.*,
    No. Civ. 93-432-M, 1994 WL 279752 (D.N.H. Jun. 2, 1994)...........................................93, 95

*Breeden v. Bennett (In re The Bennett Funding Group, Inc.)*,
    367 B.R. 269  (Bankr. N.D.N.Y. 2007) ...............................................................90

*Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l., Inc.*,
    2 F.3d 24 (2d Cir. 1993)................................................................97, 100, 104

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988)................................................................................85

*Common Law Settlement Counsel v. Bailey*,
    129 S.Ct. 762 (2008)................................................................................109

*Craig v. Lake Asbestos of Que., Ltd.*,
    843 F.2d 145 (3d Cir. 1988)................................................................................97

*DiLaura v. Power Auth.*,
    982 F.2d 73 (2d Cir. 1992)................................................................................85

*Dole Food Co. v. Patrickson*,
    538 U.S. 468 (2003)................................................................................94

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995) ................................................................ passim

*Hillsborough Holdings Corp. v. Celotex Corp. (In re Hillsborough Holdings Corp.)*,
    166 B.R. 461, 468 (Bankr. M.D. Fla. 1994),
    *aff'd*, 176 B.R. 223 (M.D. Fla. 1994)................................................................ passim

*Horizon Plastics, Inc. v. Constance*,
    No. 00 Civ. 6458 n (RCC), 2004 WL 1234049 (S.D.N.Y. Jun. 2, 2004)................................102

*Hukill v. Auto Care, Inc.*,
   192 F.3d 437 (4th Cir. 1999) ...................................................................102

*Hystro Prods., Inc. v. MNP Corp.*,
   18 F.3d 1384 (7th Cir. 1994) .................................................................104

*In re Bush Indus., Inc.*,
   315 B.R. 292 (Bankr. W.D.N.Y. 2004) ....................................................83

*In re Congoleum Corp.*,
   362 B.R. 167 (Bankr. D.N.J. 2007) ................................................. passim

In re Dow Corning Corp.,
   287 B.R. 396 (E.D. Mich. 2002)..............................................................73

*In re Foxmeyer Corp.*,
   290 B.R. 229 (Bankr. D. Del. 2003) ...............................................101, 104

*In re Future Energy Corp.*,
   83 B.R. 470 (Bankr. S.D. Ohio 1988)......................................................83

*In re J T Thorpe Co.*,
   308 B.R. 782, 787 (Bankr. S.D. Tex. 2003),
   *aff'd*, 2004 U.S. Dist. LEXIS 13589 (S.D. Tex. Mar. 3, 2004) .................37, 59, 73

*In re Jartran, Inc.*,
   44 B.R. 331 (Bankr. N.D. Ill. 1984) .........................................................36

*In re Kaiser Aluminum Corp.*,
   No. 02-10429 (JKF), 2006 WL 616243 (Bank. D. Del. Feb. 6, 2006) ....................72

*In re Kellogg Square P'ship*,
   160 B.R. 336 (Bankr. D. Minn. 1993) ......................................................36

*In re Mid-Valley, Inc.*,
   Case No. 03-35592 (JKF), 2004 Bankr. LEXIS 1553 (Bankr. W.D. Pa. July 21, 2004) ....37, 61

*In re N. Telecom Ltd. Secs. Litig.*,
   42 F. Supp. 2d 234 (S.D.N.Y. 1999).........................................................85

*In re Quigley Co., Inc.*,
   346 B.R. 647 (Bankr. S.D.N.Y. 2006).......................................29, 84, 86

*In re Quigley Co., Inc.*,
   377 B.R. 110 (Bankr. S.D.N.Y. 2007)....................................37, 38, 84, 87

*In re Quigley Co., Inc.*,
   383 B.R. 19 (Bankr. S.D.N.Y. 2008).....................................................84, 88

*In re Rhead*,
179 B.R. 169 (Bankr. D. Ariz. 1995) ............................................................36

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
887 F. Supp. 1447 (N.D. Ala. 1995) .......................................................93, 96

*In re U.S. Mineral Prods. Co.*,
No. 01-2471 (JKF), 2005 WL 5898300 (Bankr. D. Del. Nov. 29, 2005) ................60

*In re W. Asbestos Co.*,
313 B.R. 832 (Bankr. N.D. Cal. 2003) .................................................58, 63

*In re W. Real Estate Fund, Inc.*,
75 B.R. 580 (Bankr. W.D. Okla. 1987) ..................................................36

In re Woolley's Parkway Ctr., Inc.,
147 B.R. 996 (Bankr. M.D. Fla. 1992) ..................................................83

*Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.*,
456 F. Supp. 831 (D. Del. 1978) .....................................................99, 102

*Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.)*,
517 F.3d 52 (2d Cir. 2008) ..........................................................108

*Lambert Brussels Assocs. Ltd. v. Drexel Burnham Lambert Group., Inc.*
*(In re Drexel Burnham Lambert Group, Inc.)*,
140 B.R. 347 (S.D.N.Y. 1992) ........................................................36

*Land Ocean Logistics, Inc. v. Aqua Gulf Corp.*,
68 F. Supp. 2d 263 (W.D.N.Y. 1999) ...............................................97, 102

*Lippe v. Bairnco Corp.*,
No. 03-7360, 2004 WL 1109846 (2d Cir. May 17, 2004) ...............................95, 102

*Mabey v. Sw. Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*,
150 F.3d 503 (5th Cir. 1998) .........................................................35

*Mobil Oil Corp. v. Linear Films, Inc.*,
718 F. Supp. 260 (D. Del. 1989) ................................................. passim

*Nelson v. Int'l Paint Co.*,
734 F.2d 1084 (5th Cir. 1984) ....................................................96, 97, 103

*Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.)*,
984 F.2d 1305 (1st Cir. 1993) .........................................................35

*Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.*,
170 F.3d 1373 (Fed. Cir. 1999) .......................................................90

*Pledger v. United States,*
 236 F.3d 315 (6th Cir. 2000) ...................................................................101

*Quarles v. Fuqua Indus.,*
 504 F.2d 1358 (10th Cir. 1974) ...............................................................102

*Quigley Co., Inc. v. Coleman (In re Quigley Co., Inc.),* No. 04-15739 (SMB),
 Adv. Proc. 04-04262 (SMB), 2008 Bankr. LEXIS 1565, (Bankr. S.D.N.Y.
 May 15, 2008) ................................................................................... passim

*Travelers Indem. Co. v. Bailey,*
 129 S.Ct. 761 (2008) .................................................................................108

*Underwood v. Armstrong World Indus., Inc. (In re Birmingham Asbestos Litig.,*
 997 F.2d 827 (11th Cir. 1993) ..................................................................103

*United States v. Bestfoods,*
 524 U.S. 51 (1998) ....................................................................................100

*United Steelworkers v. Connors Steel Co.,*
 855 F.2d 1499 (11th Cir. 1988) ..................................................................96

*W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.,*
 11 F.3d 65 (5th Cir. 1994) ........................................................................104

*Wausau Bus. Ins. Co. v. Turner Constr. Co.,*
 141 F. Supp. 2d 412 (S.D.N.Y. 2001) .........................................................94

*Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc.*
 *(In re Windsor on the River Assocs., Ltd.),*
 7 F.3d 127 (8th Cir. 1993) ..........................................................................36

*Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.,*
 933 F.2d 131 (2d Cir. 1991) ........................................................................95

*Zubik v. Zubik,*
 384 F.2d 267 (3d Cir. 1967) ........................................................................94

## State Cases

*Bart Arconti & Sons v. Ames-Ennis,*
 340 A.2d 225 (Md. 1975) ............................................................................95

*Morris v. N.Y.S. Dep't of Taxation and Fin.,*
 603 N.Y.S.2d 807 (1993) ...........................................................................104

*Outokumpu Eng'g Enters, Inc. v. Kvaerner EnviroPower, Inc.,*
 685 A.2d 724 (Del. Super. Ct. 1996) ........................................................103

*Pritchard Servs. (NY) Inc. v. First Winthrop Props., Inc.*,
    568 N.Y.S.2d 775 (N.Y. App. Div. 1991) .............................................. 99

*Starfish Condo. Ass'n v. Yorkridge Servs. Corp., Inc.*,
    458 A.2d 805 (Md. 1983) ............................................................................95

**Federal Statutes**

11 U.S.C. § 1122(a) ............................................................................................87

11 U.S.C. § 1123(a)(4)....................................................................................87, 88

11 U.S.C. § 1126(e) ..............................................................................................3

11 U.S.C. § 1129(a) ................................................................................... passim

11 U.S.C. § 524(g) .................................................................................... passim

**Misc.**

*A-Best Products Company, Inc.*, No. 02-12734 (JKF) (Bankr. D. Del. Feb. 23,
    2004) (ECF Doc. # 383)................................................................................ 31-32

*Combustion Engineering, No. 03-10495*, No. 03-10495 (JKF) (ECF Doc. # 2589)
    (Bankr. D. Del. Oct. 7, 2005) ..........................................................................81

Delaware General Corporate Law, Section 102(b)(6) ....................................94

*In re ACandS, Inc.,* No. 02-12687 (JKF) (Bankr. D. Del. May 6, 2008) (ECF
    Doc. # 3310) ...................................................................................................73

*In re Babcock and Wilcox Co.,* No. 00-10992 (JAB) (Bankr. E.D. La. Sept. 29,
    2005) (ECF Doc. # 6757) (plan confirmed Jan. 18, 2006, see ECF Doc. #
    7053) ................................................................................................................73

*In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF) (ECF Doc. # 7311) (Bankr.
    D. Del. Sept. 5, 2005) ....................................................................................32

*In re Mid-Valley, Inc.,* No. 03-35592 (JKF) (ECF Doc. # 4) (Bankr. W.D. Pa.
    Dec. 16, 2003) ................................................................................................37

*In re Swan Transportation Corp.* No. 01-11690 (JKF) (ECF Doc. # 46) (Bankr.
    D. Del. Feb. 22, 2002).....................................................................................32

*In re J T Thorpe Co.,* No. 02-41487-H5 11, (ECF Doc. # 17) (Bankr. S.D. Tex.
    Oct. 1, 2002) ...................................................................................................37

*In re Pittsburgh Corning Corp.,* No. 00-22876 (JKF) (ECF Doc. # 3603) (Bankr.
    W.D. Pa. Sept. 24, 2004) ..............................................................................109

*J T Thorpe,* No., 02-41487 (KKB) (ECF Doc. # 15) (Bankr. S.D. Tex. Oct. 1, 2002); ...................................................................................................................37

*Kaiser Aluminum Corporation,* No. 02-10429 (JKF), (ECF Doc. # 7312) (Bankr. D. Del. Sept. 7, 2005) (plan confirmed Feb. 6, 2006, see ECF Doc. # 8225) ........................81

Restatement of Torts Section 400 ...........................................................................................91, 92

*United States Mineral Products,* No. 01-02471 (JKF) (Bankr. D. Del. Nov. 22, 2005) (plan confirmed Nov. 30, 2005, see ECF Doc. # 3282) .................................81

*USG,* No. 01-2094 (JKF) (Bankr. D. Del. Apr. 5, 2006) (plan confirmed Jun. 16, 2006, see ECF Doc. # 11688) .................................................................................81

Pfizer Inc. ("Pfizer") hereby joins in the Memorandum in Support of Confirmation of Debtors' Chapter 11 Plan of Reorganization Under 11 U.S.C. § 1129 (a) (as Modified as of March 28, 2008), filed by Quigley Company, Inc. ("Quigley") on June 5, 2009 in this case (the "Quigley Confirmation Brief"). Pfizer additionally submits this Memorandum of Law: (i) in support of confirmation of Quigley's Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated March 28, 2008 (the "Plan"); and (ii) in response to certain objections to the Plan. For the reasons set forth below and in the Quigley Confirmation Brief (which Pfizer incorporates herein), and on the basis of the evidence Pfizer will submit at the confirmation hearing, Pfizer respectfully requests that the Court overrule all objections to the Plan, and enter an order confirming the Plan.

I    PRELIMINARY STATEMENT

After decades of defending against asbestos claims in the tort system, and recognizing that its ability to fund the defense and settlement of asbestos litigation with its dwindling insurance assets that it shares with Pfizer would soon come to an end, Quigley sought relief under chapter 11 of the Bankruptcy Code to resolve all present and future asbestos liabilities arising from exposure to its asbestos products. In tandem with Quigley's bankruptcy, Pfizer sought to resolve the asbestos claims against it through its own separate settlements with plaintiffs' law firms. Pfizer agreed to fund the settlements and in that regard, subject to confirmation of Quigley's plan of reorganization, not to use any of the insurance coverage it shares with Quigley to fund the settlements but instead to relinquish all rights to the shared insurance for the benefit of Quigley's estate. All present and future asbestos claims against Quigley arising from exposure to Quigley's asbestos products would be resolved through the bankruptcy and funded by the shared insurance and other contributions to be made by Pfizer in

accordance with section 524(g) of the Bankruptcy Code.

As described in detail below, and as the evidence that Pfizer will introduce at the confirmation hearing will further demonstrate, Quigley has presented to the Court a confirmable plan that has the support of an overwhelming number of all creditors, and in particular, the asbestos claimants and the Future Claimants Representative, and which meets all of the requirements of chapter 11 and section 524(g). The few objectors to Quigley's Plan are led by the self-styled Ad Hoc Committee of Tort Victims (the "Ad Hoc Committee"), which is made up of three plaintiffs' law firms -- Weitz & Luxenberg ("Weitz"), Cooney & Conway ("Cooney"), and the Law Offices of Peter G. Angelos ("Angelos") -- that refused to settle their claims against Pfizer.[1] The Ad Hoc Committee has objected to virtually every step Quigley has taken in this case, including its efforts to confirm its Plan. The sole motivation for its decision to object has never been a mystery. As counsel for the Ad Hoc Committee candidly announced in open Court, "This case . . . is all about the view . . . that there wasn't enough money offered in settlement by Pfizer for my clients to be willing to accept it."

In other words, having failed to extract the enormous sums of money they sought from Pfizer in the settlement negotiations, the Ad Hoc Committee members have embarked on a path to disrupt this chapter 11 case at any and all costs in the hope that Pfizer will change its mind and capitulate to their demands for more money. This is what has driven the Ad Hoc Committee's objections throughout this chapter 11 case, and is what is driving the Ad Hoc Committee to object to confirmation of Quigley's Plan. The Ad Hoc Committee's objections throughout this case do not stem from any defect in the Plan or its treatment of present and future asbestos claimants. The objections are and always have been driven by the Ad Hoc Committee's ulterior

---

[1] A handful of other plaintiffs' firms have also objected to the confirmation of the Plan, but have looked to the Ad Hoc Committee to lead by filing joinders.

motive of extracting more money out of a nondebtor third party -- the same type of motive that this Court has found to be condemned by law and the type of bad faith conduct to warrant designating such creditor's vote on a plan under section 1126(e) of the Bankruptcy Code.

While the Ad Hoc Committee's objection to the Plan is riddled with inflammatory accusations of bad faith vote buying, improper bankruptcy schemes, and more, the exhaustive discovery taken by the Ad Hoc Committee over the course of this chapter 11 case has yielded nothing to substantiate any of its accusations of misconduct. The Ad Hoc Committee has no factual or legal support for its contention that a company like Quigley is precluded from seeking chapter 11 relief or implementing a channeling injunction under section 524(g) of the Bankruptcy Code that, among other things, channels to a trust derivative asbestos claims against the debtor's parent company. Indeed, section 524(g) was crafted by Congress precisely to achieve this outcome. The Ad Hoc Committee has presented nothing apart from unsubstantiated accusations to support its contention that Pfizer or Quigley acted in bad faith in seeking to obtain the benefits afforded them under a federal statute.

There is no evidence of bad faith relating to Pfizer's prepetition settlements. The Ad Hoc Committee's contention that Pfizer "bought" the favorable votes on Quigley's Plan by timing the second half of the settlement payment on the confirmation of the Plan has no merit whatsoever. The law permits nondebtor third parties to incentivize a creditor to vote in favor of a plan. Moreover, irrespective of whether the settlement payment may have encouraged the settling claimants to vote in favor of the Plan, the Ad Hoc Committee has presented zero evidence that the settling claimants would have voted against the Plan, but for the Pfizer settlements. Indeed, the deposition testimony of the four settling law firms deposed by the Ad Hoc Committee is directly to the contrary, and demonstrates that these firms advised their clients to support the

Plan based on its treatment of their clients' claims.

The Ad Hoc Committee has failed to substantiate its contention that Pfizer only sought to settle with plaintiffs' law firms that historically had lower value settlements. Discovery has confirmed that (i) Pfizer settled with numerous firms that exclusively handle high-value claims and (ii) Pfizer actively negotiated with the members of the Ad Hoc Committee to settle their claims against Pfizer, and the only reason settlement was not attained was because the Ad Hoc Committee demanded too much, and wanted to be treated better than all other settling law firms.

The Ad Hoc Committee's other assertions of bad faith relating to Quigley's ability to satisfy the provisions of section 524(g) are equally unavailing. The simple fact here is that there was no bad faith on the part of Pfizer or Quigley. Section 524(g) enables an asbestos debtor, like Quigley, to implement a plan that addresses asbestos liabilities against it and its corporate parent. That Pfizer and Quigley have taken steps to avail themselves of the rights afforded under that statute without paying the ransom demanded by the Ad Hoc Committee does not transform this legitimate and proper chapter 11 case into a bad faith case.

The Court should overrule the Ad Hoc Committee's objection and all other objections to Quigley's Plan, and enter an order confirming the Plan.

## II. FACTUAL BACKGROUND

At the Confirmation Hearing, Pfizer will introduce testimony and other evidence to demonstrate the following facts:

### A. Quigley Company Background

Quigley was founded in 1916 as a manufacturer of refractory products. Fifth Amended and Restated Disclosure Statement With Respect to Quigley Company, Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, No. 04-15739

(SMB) (ECF Doc. # 1379) (Mar. 28, 2008), at 20 (the "Disclosure Statement"). From the mid-to-late 1930s until late 1973 or early 1974, around the time when OSHA regulations related to asbestos were enacted, Quigley manufactured and sold a small number of products containing asbestos, including Damit, Insulag and Panelag. *Id.* Virtually all asbestos personal injury claims against Quigley are based on alleged exposure to Insulag or Panelag. Disclosure Statement at 20. Sales of asbestos-containing products, including Damit, Insulag and Panelag, accounted for less than 1% of Quigley's total sales during the period they were manufactured.

In 1968, Pfizer acquired Quigley's stock as part of an effort by Pfizer to expand its mineral business. In 1992, Pfizer decided to concentrate more closely on its core healthcare business and to divest the minerals, pigments, and metals businesses. As part of that effort, in September 1992, Quigley sold substantially all of its operating assets to Minteq International, Inc. ("Minteq"). The net proceeds from the sale of Quigley's assets were used principally to fund payments for personal injury claims against Quigley, which were not divested to the extent they arise from products Quigley sold prior to the transaction.

B.     Quigley's Historical Involvement with Asbestos Personal Injury Litigation

Although Quigley ceased manufacturing any products containing asbestos in the 1970s, and exited the refractory business in 1992, as of the date on which Quigley commenced its chapter 11 case (the "Petition Date"), Quigley had been named as a defendant in approximately 411,100 asbestos personal injury claims in approximately 131,500 civil actions brought in federal and state courts throughout the United States. Disclosure Statement at 34. As of the Petition Date, there were approximately 212,000 asbestos personal injury claims that either were pending against Quigley or that Quigley believed would be asserted against it. *Id.* at 9.

5

C.    Pfizer Was Not Involved With Quigley's Business

Following its acquisition by Pfizer, Quigley continued to operate as a separate corporation, manufacturing Insulag, Panelag and Damit only at its Old Bridge plant and selling and marketing those materials as it had done prior to the stock purchase. Pfizer never participated in the design specifications, quality control, manufacturing, marketing, sale, or distribution of Insulag, Panelag, Damit or any other Quigley product. Quigley always had its own sales force separate and apart from Pfizer, maintained its own manufacturing facilities, and never manufactured any products for Pfizer. Indeed, Pfizer had no direct role in the day-to-day operations of Quigley's business. Furthermore, Pfizer never manufactured or marketed Insulag, Panelag, or Damit. Thus, any claim that might be asserted against Pfizer based on personal injury allegedly arising from exposure to Insulag, Panelag, or Damit can be based only on a theory of veil piercing based on Pfizer's ownership and/or alleged management of Quigley.

At no time did Pfizer participate in the day-to-day operations of Quigley. Pfizer was never responsible for the implementation of any safety requirements at Quigley's Old Bridge facility. From time to time, at the request of Quigley and in Pfizer's capacity as Quigley's parent, Pfizer made recommendations to Quigley regarding plant safety and OSHA regulations.

Although the Ad Hoc Committee continues to contend that the appearance of the Pfizer logo on Quigley promotional materials, reports, and other documents somehow demonstrates Pfizer's participation in the marketing of Insulag, this Court has already found to the contrary. In its decision clarifying the amended preliminary injunction, the Court held that "Quigley simply added the Pfizer logo to its existing documents and written materials after the Pfizer acquisition, but nothing else changed." *Quigley Co., Inc. v. Coleman (In re Quigley Co., Inc.)*, No. 04-15739 (SMB), Adv. Proc. 04-04262 (SMB), 2008 Bankr. LEXIS 1565, at *13 (Bankr. S.D.N.Y. May

15, 2008) (the "Clarifying Order"). The Court also found that the presence of Pfizer logos on Quigley materials is a statement of corporate affiliation, noting that Angelos acknowledged that the Pfizer name and logo would not have appeared but for the Pfizer affiliation. *Id.*

D.    Pfizer's Historical Involvement with Asbestos Personal Injury Litigation

Although Pfizer never produced, marketed, distributed, or sold any of Quigley's products, including Insulag, Panelag, and Damit, Pfizer has also been named as a defendant in numerous past and pending civil actions for personal injury allegedly attributed to asbestos or other dust products. In the overwhelming number of cases, Pfizer has been named as a defendant based on its relationship as Quigley's corporate parent and its perceived status as one of a shrinking number of deep-pocket defendants. Of the 411,100 claims that had been asserted against Quigley as of the Petition Date, Pfizer also had been named as a defendant in approximately 280,343 of these claims in approximately 67,434 civil actions brought in federal and state courts throughout the United States. Disclosure Statement at 35. In virtually all of these cases, plaintiffs have asserted claims of joint and several liability against all named defendants, including Pfizer and Quigley. Pfizer is also a named defendant in approximately 3,720 other civil actions, alleging asbestos claims for personal injury by approximately 10,950 claimants, in which Quigley is not a named defendant.

E.    Shared Asbestos Insurance Policies and Insurance Settlement Proceeds Trust

Quigley's most significant remaining assets consist of its rights under certain insurance policies that Pfizer purchased and under which Quigley is an additional insured (the "Shared Asbestos Insurance Policies"), insurance settlement agreements resolving issues under certain of those policies (the "Insurance Settlement Agreements"), and the proceeds of certain of those policies that have been paid into an insurance settlement proceeds trust (the "Insurance

Settlement Proceeds Trust").

Pfizer purchased comprehensive general liability insurance policies to provide coverage for itself and its subsidiaries. Among other things, these policies generally pay the costs of defending and resolving certain personal injury claims asserted by third parties. Quigley is covered under Pfizer's policies as of August 25, 1968, the date Pfizer acquired Quigley's stock. The general liability insurance policies Pfizer purchased prior to October 1, 1985 are what are known as "occurrence-based" policies, which generally provide coverage, subject to other policy terms, for personal injuries and other losses occurring during the policy period. Pfizer purchased approximately $2.85 billion of primary and excess Products/Completed Operations Coverage[2] in the period from August 25, 1968 to October 1, 1985, which cover, among other things, personal injury claims, subject to the other policy terms.[3] Of this coverage, the policies through October 1, 1982 all provided coverage for asbestos-related bodily injury claims; some of the coverage from October 1, 1982 to October 1, 1985 excluded coverage for asbestos altogether, and others contain various restrictions on the availability of coverage for certain asbestos-disease-related claims (the effect and scope of which have never been adjudicated). Most of this occurrence-based coverage has been exhausted and/or released in connection with asbestos and other third-party tort claims asserted against Pfizer and its subsidiaries, including Quigley.

The occurrence-based insurance policies with remaining applicable limits that are potentially available to provide coverage to both Pfizer and Quigley for asbestos-related bodily

---

[2] All capitalized terms used herein but not otherwise defined shall have the respective meanings given to such terms in the Plan.

[3] Quigley purchased its own primary occurrence-based comprehensive general liability policies from Travelers Indemnity Company covering the period from February 12, 1962 through February 12, 1969. The Products/Completed Operations Coverage of these policies have been exhausted and released as a result of asbestos-related bodily injury claims.

Pfizer also purchased occurrence-based comprehensive general liability policies which cover periods prior to August 25, 1968 (the "Pfizer-Only Policies"). These Pfizer-Only Policies do not provide coverage to Quigley and, because they have no value to Quigley, do not form part of the Pfizer Contribution.

injury claims are referred to in the Plan as the "Shared Asbestos Insurance Policies" and are listed on Exhibit C to the Plan. As it relates to coverage available to Quigley for asbestos-related bodily injury claims, there currently are two categories of remaining solvent Products/Completed Operations Coverage (other than that issued by the AIG Companies), some of which is subject to insurance settlement agreements:

- Approximately $101.9 million in Products/Completed Operations Coverage issued by insurers which contain no restriction or exclusion for the payment of asbestos-related bodily injury claims and much of which is subject to pending or prior settlement agreements. Through the Insurance Relinquishment Agreement (described below), the Products/Completed Operations Coverage available under these Shared Asbestos Insurance Policies will form part of the Pfizer Contribution; and

- Approximately $191 million in Products/Completed Operations Coverage issued by insurers that contains various restrictions on the availability of coverage for asbestos disease-related claims, although the scope and effect of these restrictions have not been fully resolved. Through the Insurance Relinquishment Agreement, the Products/Completed Operations Coverage available under these Shared Asbestos Insurance Policies also will form part of the Pfizer Contribution.

Additional coverage that Pfizer purchased, such as the Shared Asbestos-Excluded Insurance Policies and the Shared Asbestos-Excluded Claims-Made Policies, are not part of the Pfizer Contribution, because the coverage does not apply to asbestos-related claims and, therefore, cannot be accessed by the Asbestos PI Trust.

Included in the Shared Asbestos Insurance Policies is approximately $600 million in Products/Completed Operations Coverage that was issued by insurers that are currently in rehabilitation or liquidation proceedings, are subject to an insolvent scheme of arrangement and/or have been declared insolvent (the "Insolvent Insurers").[4] The Liquidation Analysis (Exhibit H to the Disclosure Statement) does not ascribe a stated value to this coverage, although this coverage is part of the Pfizer Contribution (again, based upon the terms of the Insurance

---

[4] The Shared Asbestos Insurance Policies issued by Insolvent Insurers are listed on Schedule 2 of Exhibit C to the Plan.

Relinquishment Agreement) and likely does have some value. Although a large portion of these limits will not result in any recovery for the Asbestos PI Trust, approximately $120 million in claims have been allowed and may result in some additional payments that, under the Plan, would go to the Asbestos PI Trust. An additional approximately $190 million in Products/Completed Operations Coverage issued by the Insolvent Insurers remains potentially available to pay asbestos-related bodily injury (and other) claims, subject to such claims being allowed and paid according to the applicable payment percentage. Regardless of the source of recovery (i.e., if non-asbestos claims are allowed by an insolvent insurer), under the Plan any recoveries from the Products/Completed Operations Coverage will be paid for the benefit of the Asbestos PI Trust and will form part of the Pfizer Contribution. Because the prospects for recovery under policies issued by Insolvent Insurers is subject to many uncertainties, the Liquidation Analysis did not include any stated value for such coverage, even though the coverage likely has some potentially significant value. In fact, the Insurance Settlement Proceeds Trust currently holds approximately $1.5 million that has been collected from Insolvent Insurers since the Petition Date.

Also relevant to the Liquidation Analysis is the fact that it is nearly impossible to extract fair value from insurance policies without the involvement of experienced, sophisticated insurance counsel and a willingness and wherewithal by the policyholder to expend considerable resources to pursue insurers. Between June 1990 through September 2004, Pfizer was involved in a costly and protracted series of lawsuits and arbitrations involving coverage for asbestos-related claims under Pfizer's occurrence-based insurance policies, collectively involving dozens of Pfizer's insurers (as well as multiple additional litigations and arbitrations against insurers involving other coverage and insurance issues). Pfizer was also involved in numerous settlement

negotiations and mediations to resolve coverage disputes under Pfizer's occurrence-based insurance policies. Such negotiations, mediations, arbitrations and litigation typically spanned the course of several years. If Quigley were liquidated, unless the trustee had access to sophisticated insurance coverage counsel and had the time and resources necessary to pursue the coverage, the estate recoveries from the insurance would be substantially reduced.

Pfizer, Quigley and other covered Pfizer subsidiaries historically have accessed the coverage provided under the occurrence-based policies to the extent of their covered liabilities and associated defense costs on a first-billed, first-paid basis, consistent with their respective rights to the shared insurance assets under the shared insurance policies and related settlement agreements. For example, from the time Pfizer and Quigley executed the Wellington Agreement (as discussed below), each would be allocated certain amounts for the defense and resolution of asbestos claims, and each would bill those amounts to their separate and shared settled insurance coverage as those amounts were incurred. Pfizer and Quigley continued this practice after leaving the CCR (as discussed below) and until the Petition Date. Prior to the Petition Date, Pfizer and Quigley entered into a number of settlement agreements concerning insurance coverage for asbestos-related bodily injury claims. As each of Pfizer and Quigley incurred asbestos-related liabilities and defense costs, each billed the settled insurance in accordance with the first-billed, first-paid methodology. As of Quigley's bankruptcy filing, however, Pfizer agreed that it would not access the shared insurance during the pendency of Quigley's bankruptcy case, subject to the entry of a preliminary injunction regulating the prosecution of asbestos claims against Pfizer. Conditioned on Plan confirmation and the Plan becoming effective, Pfizer has agreed to enter into the Insurance Relinquishment Agreement, to relinquish the Products/Completed Operations Coverage under the Shared Asbestos Insurance Policies, and

to contribute its rights to all non-AIG proceeds (discussed next) in the Insurance Settlement Proceeds Trust.[5]

In August 2004, Pfizer and Quigley entered into the AIG Insurance Settlement Agreement with the AIG Companies. Under the AIG Insurance Settlement Agreement, the AIG Companies agreed to pay to Quigley and Pfizer a total of $405,746,856 through a stream of payments over a ten (10) year period. The AIG Insurance Settlement Agreement resolved disputed issues relating to (a) remaining unbilled coverage under certain shared occurrence-based policies in the amount of $283,754,705; (b) an excess claims-reported policy issued to Pfizer providing $75 million in limits, which policy excluded coverage for asbestos claims and therefore had no value to Quigley or the Asbestos PI Trust; (c) an insurer receivable owed to Quigley in the amount of $40,620,245; and (d) an insurer receivable owed to Pfizer in the amount of $6,371,926. Prior to Quigley's bankruptcy filing, Pfizer and Quigley agreed to pay the proceeds of the AIG Insurance Settlement Agreement, as well as other insurance recoveries (net of certain receivables arising from prior billings), into a trust. To that end, Pfizer and Quigley, together with JP Morgan Chase Bank, as trustee, established the Insurance Settlement Proceeds Trust dated August 27, 2004 (the "Insurance Settlement Proceeds Trust Agreement"). As of April 30, 2009, the AIG Companies have paid $156.7 million under the AIG Insurance Settlement Agreement. That amount and the interest thereon (approximately $10.4 million as of April 30, 2009) is held in the Insurance Settlement Proceeds Trust.

Under the Insurance Settlement Proceeds Trust Agreement, the rights of each of Pfizer and Quigley to draw on the insurance proceeds in the Insurance Settlement Proceeds Trust are

---

[5] Pfizer will retain its right, title and interest to the Pfizer-Only Policies, insurer receivables owed to Pfizer and other insurance policies to the extent they do not cover Quigley for Asbestos PI Claims, including all Shared Asbestos-Excluded Insurance Policies, all Shared Asbestos Excluded Claims-Made Policies, and any separate general liability limits under the Shared Asbestos Insurance Policies.

identical to the rights each had pre-petition to bill the relevant shared insurance policies. That is, each of Pfizer and Quigley may draw on the funds in the Insurance Settlement Proceeds Trust to pay settlements, judgments, or defense costs on a first-billed, first-paid basis. With respect to the AIG Insurance Settlement Agreement, Pfizer and Quigley agreed that as the AIG Companies' payments were transferred into the Insurance Settlement Proceeds Trust, 20% of such amounts would be paid to Pfizer until a total amount of $81,871,482 is paid to Pfizer, and the remaining 80% would be drawn on by Pfizer and Quigley on a first-billed, first-paid basis.

During the pendency of the chapter 11 case, Pfizer and Quigley have entered into a number of additional court-approved insurance settlement agreements pursuant to which insurers other than the AIG Companies have paid substantial sums in cash and/or have agreed to pay substantial additional sums over time, including under certain policies that contain various restrictions on the availability of coverage for asbestos claims. As of April 30, 2009, the Bankruptcy Court has approved twelve settlements with insurers that will result in payments of approximately $70 million (net of amounts owed to Pfizer for insurer receivables or under Pfizer-Only Policies), and there are motions pending to approve two additional agreements that will result in additional payments of approximately $15 million. Some of these settlements are contingent on the Plan being confirmed and/or becoming effective; upon satisfaction of those (and other) conditions, payments are to be made to the Asbestos PI Trust. If, however, these conditions are not satisfied, then these settlements are void and the insurance is available both to Pfizer and Quigley on a first-billed, first-paid basis. Some of these settlements are not contingent on Plan confirmation. As to those non-contingent settlements, payments are made into the Insurance Settlements Proceeds Trust, and, once the Plan is confirmed and becomes effective, these non-AIG payments are to be paid to the Asbestos PI Trust. Again, however, if the Plan is

not confirmed and does not become effective, then the non-AIG funds paid into the Insurance Settlement Proceeds Trust are available both to Pfizer and Quigley on a first-billed, first-paid basis. As of April 30, 2009, the Insurance Settlement Proceeds Trust held over $28.5 million in proceeds and approximately $3.5 million in earned interest from such insurance settlements (exclusive of the $167.1 million in principal and interest received from the AIG Insurance Settlement Agreement).

Commencing in late 2003, counsel to Pfizer and certain of its affiliates began negotiations that led to the execution of the Pfizer Claimant Settlement Agreements (as defined below), pursuant to which Pfizer settled tens of thousands of claims against it and its subsidiaries (excluding Quigley) for an aggregate cash payment of approximately $450 million. To date, approximately $220 million of this sum have been paid. But for Pfizer's commitment in connection with Quigley's bankruptcy case not to bill these amounts to the shared insurance coverage – a commitment which is conditioned on Plan confirmation – Pfizer could bill these settlements to coverage now and effectively exhaust most of the AIG and non-AIG proceeds and earned interest held in the Insurance Settlement Proceeds Trust as well as most of the remaining coverage. For its part, Quigley has approximately $11 million in unpaid settlements, and it too could bill these amounts to the shared coverage, as well as draw down on the AIG proceeds to satisfy the $40.6 million insurer receivable owed by AIG. The longstanding first-billed, first-paid principle would apply, as it did pre-petition, in the event the Plan is not confirmed.

F.    Past Efforts to Resolve Personal Injury Claims

1.    Wellington Agreement

In an attempt to process efficiently the growing number of personal injury claims asserted against Quigley and Pfizer, and to preserve their resources, in June 1985, Quigley and

Pfizer executed the Agreement Concerning Asbestos-Related Claims, known as the "Wellington Agreement." The Wellington Agreement is a settlement agreement between thirty-three co-defendants in asbestos litigation and many, but not all, of their general liability insurers. Disclosure Statement at 25. The Wellington Agreement resolved various disputes among the defendant companies and signatory insurers regarding the manner in which the defendant companies would allocate and bill their asbestos defense and indemnity costs to their insurance policies, thereby providing a level of certainty to the signatory "producers" with respect to the availability of insurance coverage. The agreement allocated to each signatory a fixed share of the costs of defending and settling the claims, which were billed to the defendant companies' Wellington signatory and other settled insurers. The agreement also provided its signatories with a more cost-effective method of defending against thousands of cases in jurisdictions located throughout the country since each company only was responsible for its share of the cost of shared legal counsel, which represented the interests of all signatories. Pursuant to the Wellington Agreement, and until October 1988, the personal injury claims against Quigley and Pfizer were handled and administered by the Asbestos Claims Facility ("ACF"). Pfizer's and Quigley's respective shares of the costs of the defense of claims against the so-called "Wellington Group" of defendants were among the smallest. As to each of Pfizer and Quigley, once each was allocated a share of the ACF's costs of defending and resolving claims, its allocated amount was then billed to the Wellington insurers in accordance with the Wellington Agreement and/or to other settled insurers in accordance with their respective agreements.

2.    The Center for Claims Resolution

Following the dissolution of the ACF, from October 1988 to February 1, 2001, the Center for Claims Resolution (the "CCR"), a non-profit organization, handled and resolved the

personal injury claims asserted against Quigley, Pfizer and other members of the CCR. Under the CCR regime, members were allocated shares of defense and indemnity costs based on formulas that evolved somewhat over time, and each of Pfizer and Quigley billed its settled insurers for the CCR allocations. As of February 1, 2001, all remaining CCR members, including Quigley and Pfizer, began handling and resolving their own asbestos bodily injury claims. At present, the CCR – from which both Pfizer and Quigley withdrew in mid-2001 – continues to administer and process those claims that the CCR settled on behalf of all CCR members on or before February 1, 2001. Claims that the CCR did not settle on behalf of all CCR members on or before February 1, 2001, whether filed before or after February 1, 2001, are now resolved by each member, and former member, individually. Since June 30, 2001, when Quigley and Pfizer terminated their membership in the CCR, Quigley and Pfizer have been fully responsible for the handling of all asbestos related claims asserted against them.

G.    Claims Handling Unit

After terminating their membership in CCR, Pfizer and Quigley initially continued to use CCR's claims and settlement processing and insurer billing capabilities on a contract basis. When, effective the end of 2001, CCR decided to outsource those functions to a third party, Pfizer and Quigley undertook a comprehensive assessment of their options, solicited and evaluated bids from, and assessed the capabilities of, a variety of claims-processing vendors and concluded that their interests would be best served by leveraging the CCR's existing claims-handling and insurer-billing programs – available to them under the terms of the Producer Agreement – to create their own state-of-the art asbestos Claims Handling Unit (the "CHU"). With the assistance of an outside expert consulting team led by Kim Jenkins, Pfizer and Quigley acquired and customized the necessary hardware and software, imported the relevant data and

assembled a team of highly skilled and experienced personnel to staff the CHU, including a number of individuals who had previously performed similar functions for CCR.  Kim Jenkins agreed to head the unit and to become a Pfizer employee.

Since January 2002, the CHU has administered and processed asbestos personal injury claims and certain other personal injury claims on behalf of Quigley and Pfizer.  Prior to the Petition Date, Quigley entered into a shared service agreement with Pfizer (the "Shared Services Agreement") that became effective on August 31, 2004 (attached hereto as Exhibit A).[6]  Also, the employees of the CHU who were previously employed by Pfizer, including Kim Jenkins, became Quigley employees, and CHU contract employees previously hired by Pfizer also became Quigley contract employees.  *See* Shared Services Agreement at 1.  Consequently, since August 31, 2004, Quigley has continued to operate the CHU, which processes settlements for claims asserted against itself and Pfizer.  Disclosure Statement at 20.  Under the Shared Services Agreement, Pfizer currently pays Quigley $50,000 per month for its services.  *See* Shared Services Agreement at Article 5.

Upon emergence from chapter 11, Reorganized Quigley and Pfizer will execute a new five-year claims services agreement (the "Claims Services Agreement").  Disclosure Statement at 20, 111.  Pursuant to that new agreement, Reorganized Quigley will continue to service and process asbestos related claims that Pfizer resolved under settlement agreements with certain settling asbestos personal injury claimants, as well as Pfizer Non-Channeled Claims.  *Id.*

Quigley currently employs eight full-time employees who are primarily responsible for

---

[6] Pfizer designates the Shared Services Agreement Confidential Information pursuant to the Amended Stipulation and Order Governing the Production of Confidential Material by Quigley Company, Inc., Pfizer Inc., the Ad Hoc Committee of Tort Victims, the Future Claims Representative and/or the Official Committee of Unsecured Creditors, entered by the Court on October 28, 2008 (the "Confidentiality Agreement").  Accordingly, the Shared Services Agreement has been redacted for filing on the public docket.  Parties to the Confidentiality Agreement and the Court will be served separately with this exhibit.

the operation of the Quigley CHU. *Id.* at 21. These employees have years of experience processing complex mass-tort claims, and through them, Quigley utilizes a sophisticated computer architecture uniquely designed to facilitate these tasks. *Id.* Quigley also retains the services of approximately 23 individuals through four outsource staffing firms on an as-needed basis. *Id.* These individuals provide data processing, custom programming, information technology consulting and other project services to Quigley's clients. *Id.*

H.    State Court Asbestos Litigation

State court asbestos litigation is unique and oppressive to defendants. Complaints are generally "boilerplate" pleadings, often filed on behalf of multiple plaintiffs. The complaints almost always name multiple defendants (sometimes hundreds), and generally make no specific allegations concerning the basis on which liability is being asserted against any particular defendant (nor are they required to in many jurisdictions). As a result of that lack of specificity, it is often impossible to determine from the complaints the allegations asserted against any particular defendant.

Starting in the mid 1980s, plaintiffs' lawyers began conditioning the settlement of small numbers of claimants whose claims could be advanced to trial, upon the resolution of large inventories of unimpaired plaintiffs who typically had no symptoms of any asbestos disease and whose claims often suffered from many other deficiencies. As a result, in order to avoid trial and to resolve the claims of the colorably sick claimants, defendants were often compelled to settle the unimpaired claims. This necessarily increased the cost of defending against and settling asbestos personal injury claims. In certain situations and jurisdictions, this practice continues today.

The number of solvent defendants in asbestos litigation has dramatically decreased since

the mid 1980s. As the growing number of asbestos-related personal injury claims over the years essentially drove all the largest asbestos-product manufacturers and distributors into bankruptcy (including, among others, Johns Manville, Celotex, Raymark, Owens Corning, and Pittsburgh Corning), plaintiffs began to look for new targets to inundate with their tens of thousands of claims. Generally, each time an asbestos defendant has filed for bankruptcy, individual plaintiffs thereafter cease to name the debtor defendant in their complaints or to recall its products in their depositions and instead redirect their claims against solvent defendants. According to one asbestos plaintiff attorney deposed by the Ad Hoc Committee, "[w]hat happens is a very viable defendant that has very bad documents or whatever, that is getting hit all the time, now they file. So we start to investigate other defendants." *See* Tr. Deposition of James Ferraro, at 59:18-21 (Mar. 30, 2009) (the "Ferraro Dep.") (relevant portions attached hereto as Exhibit B).

Further, asbestos plaintiff firms have frequently added defendants to pending actions sometimes years after such actions are initially filed. This is particularly true after a key defendant's bankruptcy. For example, a review of the cases filed by Angelos, a member of the Ad Hoc Committee, revealed that claimants represented by the Angelos firm frequently served Pfizer with a lawsuit some period of time—often years—after the same claimant served Quigley. Shortly before Quigley's bankruptcy, Angelos sued Pfizer in a number of new actions.

As a result of the overwhelming effect that these tens of thousands of claims have had on the tort systems in many states, companies such as Pfizer—which have become targets of asbestos plaintiff law firms—cannot effectively control their potential liabilities by settling with only demonstrably injured plaintiffs. In addition, the exorbitant cost inherent in defending tens of thousands of claims and the uncertainty of state court litigation (particularly in jurisdictions favored by plaintiff law firms) presents substantial risks that most defendants are reluctant to

take.  Those substantial risks are then exacerbated to unacceptably high levels as defendants are effectively required to bat a thousand.  Added to that risk is the fact that any defendant that pursues a strategy of trying cases must be concerned that a single adverse verdict in a plaintiff-friendly jurisdiction would have precedential value, potentially impairing the ability to effectively defend against countless other lawsuits—including those for which a strong defense might be mounted.  Thus, the effect of losing a single case could be disastrous for the defendant. Unfortunately, a defense plan based on winning every asbestos case is not realistic, regardless of the lack of merit of the claims.  Nevertheless, defendants by and large (including Pfizer) do the best they can under nearly impossible circumstances to obtain product identification in every case, despite the unyielding practical realities of a many-decades-long litigation.  However objectively unwarranted, the specter of such exposure, even for defendants that never participated in the manufacture or distribution of asbestos containing products, often makes trial an unacceptable alternative.

Given the realities of the tort system, and based on the defendants' circumstances, it is not unusual for asbestos defendants to attempt to mitigate risk by settling both unfiled and filed claims.  In fact, the CCR, in which Pfizer and Quigley were longstanding members, utilized just such an approach to manage the defense and resolution of asbestos-related personal injury claims on behalf of its twenty or so members.  The CCR in many respects typified a common legal strategy employed by defendants trying to resolve mass tort liabilities through settlements of groups or inventories of claims.  The CCR settled claims and obtained releases for all of its members, even for those against which a given plaintiff had no evidence and made no allegation, and whether or not a formal claim had been filed.

In the existing asbestos litigation environment, every actual or potential claim against a

defendant—no matter how weak it may appear to be and no matter what affirmative defenses may exist—poses the risk of a potentially large, adverse verdict. The harsh reality of asbestos trial risks means that it often makes strategic and/or business sense to settle claims which on their face may appear to be subject to defenses.

The size of the dockets facing them and the concomitant trial risks associated with those tried result in the need to efficiently handle the litigation risks; for that reason, defendants will often negotiate a lump sum settlement amount with the plaintiffs' law firms by valuing that firm's entire inventory of claims based on an actual disease mix and a variety of other factors, including historical practice, jurisdiction and jobsite. After the defendant and the law firm enter into the settlement, the defendant is provided with the agreed upon plaintiff-specific evidence, the requirements for which are ordinarily detailed in the settlement agreement, and the defendant processes the claims. If the plaintiff law firm cannot produce enough claimants who meet these "documentation requirements," the settlement agreements typically mandate that the law firm must forfeit the unclaimed portion of the settlement amount or substitute the deficiency with new claims that do meet the requirements.

I.    Quigley Structure and Board of Directors

In order to resolve the difficulties Quigley was facing in handling its asbestos liabilities, and to permit arm's length negotiations between Quigley and Pfizer, in 2003, Pfizer decided to establish an independent Board of Directors and to appoint an independent Chief Executive Officer at Quigley. In that regard, on June 27, 2003, Paul Street was appointed as independent Chief Executive Officer and Chairman of the Board of Quigley. On June 22, 2004, Kevin Altit was appointed as the second independent member of the three-member Board of Quigley. Neither Mr. Altit nor Mr. Street had any prior material connection or financial relationship with

Pfizer or Quigley. Charles Raeburn, a Pfizer attorney, was appointed as the third member of the Quigley Board.

In March 2008, Mr. Street resigned from his positions as the CEO of Quigley and Chairman of the Board. Tr. Deposition of Paul Street, at 15:17-23 (Jan. 23, 2009) (the "Street Dep.") (relevant portions attached hereto as Exhibit C). Subsequently, Kim Jenkins, who is responsible for the operations of Quigley's claims handling business, succeeded Mr. Street as Quigley's Chief Executive Officer and has replaced him as a member of the Board. Disclosure Statement at 110.

J.      Quigley's Bankruptcy -- Commencement of Chapter 11 Case

As of the Petition Date, Quigley was defending approximately 160,000 pending asbestos personal injury claims, and when Quigley solicited acceptances and rejections of its prior plan, 209,171 claimants who claim to hold asbestos personal injury claims voted. *Id.* at 40-41. When coupled with the bankruptcies of nearly seventy asbestos defendants, the pressure on Quigley in the tort system had grown to intolerable levels. *Id.* at 41. Quigley currently estimates that the remaining coverage potentially available to it under the Shared Asbestos Insurance Policies, the Insurance Settlement Agreements and the AIG Settlement Agreement, together with the amounts held in the Insurance Settlement Proceeds Trust, will not be sufficient to satisfy in full the pending and future Asbestos PI Claims asserted against it. *Id.* Accordingly, Quigley commenced its chapter 11 case to conserve its remaining assets and to afford it time to formulate a chapter 11 reorganization plan that would satisfy the requirements of section 524(g) of title 11, United States Code (the "Bankruptcy Code") and treat all present and future claimants fairly and equitably. *Id.*

K.    Pfizer Claimant Settlement Agreements

Prior to the Petition Date, Pfizer and Quigley determined to resolve their potential asbestos-related liabilities on a global basis.  As one step toward implementation of that resolution, Pfizer entered into settlement negotiations with plaintiffs' counsel with the goal of settling all claims of such counsels' clients against Pfizer, both those alleging derivative liability arising from Quigley's asbestos-containing products and those involving direct asbestos-related claims against Pfizer.  Because of Quigley's insolvency, Quigley determined to file its chapter 11 case to provide equitable treatment for all claimants, current and future.  Tr. Deposition of Kevin Altit, at 35:5-12 (Jun. 7, 2007) (the "2007 Altit Dep.") (relevant portions attached hereto as Exhibit D); Tr. Deposition of Charles Raeburn, at 58:5-20 (Jun. 7, 2007) (the "2007 Raeburn Dep.") (relevant portions attached hereto as Exhibit E).

As part of the global approach to resolving asbestos-related claims, Pfizer agreed to make a substantial contribution to the asbestos trust to be established under the Plan in consideration for the benefit of a section 524(g) channeling injunction to protect Pfizer from derivative claims arising from alleged exposure to Quigley's asbestos-containing products.  As set forth in detail below, under the Plan, Pfizer's contribution to the trust is valued conservatively at a minimum of between $327 million and $405 million, on a net present value basis.  Amended Report of Karl N. Snow, Ph.D., dated May 14, 2009, at 6 (the "Snow Rebuttal Report") (relevant portions attached hereto as Exhibit F).[7]

Commencing in late 2003, counsel for Pfizer engaged in negotiations with plaintiffs' counsel who historically had represented claimants with cognizable claims against Pfizer and

---

[7] Due to confidentiality restrictions on expert reports and depositions pursuant to the Confidentiality Agreement, exhibits attached hereto containing portions of expert reports or expert depositions are redacted for filing on the public docket.  Parties to the Confidentiality Agreement and the Court will be served separately with unredacted copies of these exhibits.

Quigley.  Ultimately, Pfizer's counsel entered into numerous settlements (the "Pfizer Claimant Settlement Agreements") with plaintiffs' law firms (the "Settling Law Firms") representing claimants that Pfizer's counsel believed (i) could pursue claims alleging an actual asbestos-related disease arising from alleged exposure to Quigley asbestos-containing products or any non-Quigley asbestos-containing products for which Pfizer had alleged liability, or (ii) had asserted or would likely assert asbestos-related claims against Pfizer, and whose counsel's settlement demands were reasonable under the circumstances.

Each Pfizer Claimant Settlement Agreement was the result of extensive arm's length negotiations, in which Pfizer and the Settling Law Firm arrived at an appropriate settlement amount, based on numerous factors including, among many others, disease mix and numerosity. Pfizer settled high value mesothelioma claims, for example, with the plaintiff firms Waters & Kraus, Simmons Cooper, Kazan McClain, and Baron & Budd, among others.  Pfizer also settled lower value claims for commensurately modest amounts with certain firms such as the Jaques Admiralty Law Firm, P.C. (the "Jaques Firm").  Pfizer's goal was a *global* resolution of its asbestos litigation exposure.  Accordingly, Pfizer negotiated with every firm that had a substantial number of claims that had been asserted against it or which might be asserted during or following a Quigley bankruptcy filing, including the firms that comprise the Ad Hoc Committee.

The Pfizer Claimant Settlement Agreements contemplate an aggregate cash payment by Pfizer of approximately $450 million outside of Quigley's chapter 11 case.  From this cash payment, each plaintiff who became a settling plaintiff under a Pfizer Claimant Settlement Agreement (the "Settling Plaintiffs") will be paid an agreed settlement amount (each, a "Settlement Amount") in two installments  *See* Form of Pfizer Settlement Agreement at Section

4.2 (attached hereto as Exhibit G).[8]  The Settlement Amount for each Settling Plaintiff is principally dependent on which disease category the Settling Plaintiff qualifies for based on the Settling Plaintiff's satisfaction of the medical and exposure evidence requirements set forth in the Pfizer Claimant Settlement Agreements.  Form of Pfizer Settlement Agreement at Sections 2.1; 2.2; 2.3.

Consistent with its objective of a global resolution, Pfizer had intended to pay the Settlement Amounts and receive releases from the Settling Plaintiffs following the date of the global resolution of all of Pfizer's Quigley-related asbestos claims—when Quigley's Plan is confirmed by a final, non-appealable order.  However, during the course of negotiating the Pfizer Claimant Settlement Agreements, counsel for the Settling Plaintiffs insisted that their clients should not have to wait what could be an extended period of time to receive their Settlement Amounts in the event that Quigley's Plan would not be confirmed in the timeframe contemplated by the parties.  To address this concern, Pfizer agreed to pay (i) 50% of each Settlement Amount upon the satisfaction of certain conditions for payment on the earlier of the confirmation of Quigley's Plan or December 1, 2005, *see* Form of Pfizer Settlement Agreement at Section 4.2, and (ii) the remaining 50% balance within five business days after the entry of a final order of the District Court for the Southern District of New York confirming the Plan (or affirming an order of the Bankruptcy Court confirming the Plan), which is not subject to appeal, review, or certiorari proceeding (the date of such order, the "Settlement Agreement Effective Date").  Form of Pfizer Settlement Agreement at Sections 1.1(b);  4.1(g).[9]  As consideration for Pfizer's

---

[8]  Pfizer designates the Form of Pfizer Settlement Agreement Confidential Information pursuant to the Confidentiality Agreement.  Accordingly, the Form of Pfizer Settlement Agreement has been redacted for filing on the public docket.  Parties to the Confidentiality Agreement and the Court will be served separately with this exhibit.
[9] As Judge Ronald Rubin, settlement counsel for Pfizer in 2004, explained at his deposition:

> I wanted to delay payment a hundred percent until later. . . .  after the Supreme Court had denied the petition for writ of certiorari.  But that was not acceptable to the plaintiffs.  Their view generally --

payment of the 50% advance, Settling Plaintiffs agreed to deliver a release, which otherwise would have been delivered on the Settlement Agreement Effective Date, that released all asbestos personal injury claims against Pfizer and the other Pfizer Protected Parties upon that payment. Form of Pfizer Settlement Agreement at Section 4.1(f). The Pfizer Claimant Settlement Agreements do *not* require the Settling Plaintiffs to vote in favor of the Plan.

Each of the members of the Ad Hoc Committee was among the many plaintiffs' attorneys with which Pfizer's counsel engaged in extensive settlement discussions in connection with the global resolution of asbestos-related claims against Pfizer. Unfortunately, as set forth in detail below, despite successful negotiations with plaintiffs' attorneys representing the vast majority of claims and potential claims against Pfizer, Pfizer could not achieve settlements with the members of the Ad Hoc Committee. The Ad Hoc Committee members would not budge from their unreasonable settlement demands.

L.      The Future Claimants Representative

Prior to the Petition Date, Pfizer and Quigley engaged in discussions with Albert Togut, who was selected by Quigley to serve as the representative of holders of future asbestos personal injury demands against Quigley. Disclosure Statement at 40. After the commencement of Quigley's chapter 11 case, by order dated September 27, 2004, the Bankruptcy Court approved

---

and I think they were pretty uniform in this -- was. . . if there's a filing and the automatic stay goes into effect, for some period of time, possibly for some long period of time. . . we're going to have to forebear by operation of federal law from bringing our claims which would otherwise -- many of which come to trial in the tort system. So as consideration for that forbearance, we want something. . . . [I]t was my sense that if I'm going to exit the tort system, I want to exit the tort system as completely and finally as I can; otherwise, I'm not interested. . . in giving away that kind of money to anybody, ever.

Tr. Deposition of Ronald Rubin, at 170:10-171:10; 172:24-173:5 (Jan. 30, 2009) (the "Rubin Dep.") (relevant portions attached hereto as Exhibit H). *See also* Tr. Deposition of Sanford Berland, at 153:24-154:6 (Dec. 16, 2008) (the "Berland Dep.") (relevant portions attached hereto as Exhibit I) ("It had been Pfizer's preference to have the entire plan payment wait until there had been a global resolution; in other words, effectuation of the overall objective of addressing the liability. But plaintiffs' firms pushed back and wanted payment earlier. So the compromise was 50/50.").

the appointment of Mr. Togut as the representative for holders of future asbestos personal injury demands against Quigley (the "<u>Future Claimants Representative</u>").  Final Order Appointing Legal Representative for Future Asbestos Personal Injury Claimants, No. 04-15739 (SMB) (ECF Doc. # 71) (Sept. 27, 2004).  By bench ruling on December 18, 2008, this Court found that Mr. Togut adequately represented the interests of both Quigley future demand holders as well as demand holders against Pfizer based on exposure to Quigley's products.  Tr. Hr'g Dec. 18, 2008, at 28:11-15 (relevant portions attached hereto as Exhibit J).

          M.      <u>Initial Negotiations/Pfizer Contribution</u>

Over the course of approximately three months prior to the Petition Date, Mr. Togut and his professionals[10] conducted due diligence on Pfizer, Quigley and the Asbestos PI Claims, including the product history of Quigley and the strength of asbestos victims potential claims against Pfizer and Quigley.  Disclosure Statement at 40.  During that time, Mr. Togut and representatives of Quigley and Pfizer spent considerable time negotiating the general terms of the Quigley Contribution and the Pfizer Contribution.  *Id.*

Shortly before the commencement of the chapter 11 case, the parties reached an agreement in principle on the broad parameters of a resolution of these issues.  *Id.*  Although, as discussed below, Pfizer ultimately agreed to make substantially greater contributions to the Asbestos PI Trust, based on these prepetition negotiations with the Future Claimants Representative, Pfizer agreed to, among other things, relinquish its rights under the Shared Asbestos Insurance Policies to the Asbestos PI Trust and to contribute Pfizer's right, title and interest in and to the Insurance Settlement Proceeds Trust (except for its right, title and interest in and to any AIG Payments and interest earned thereon) and an annuity (originally a note) with a

---

[10] Mr. Togut selected the law firm of Togut Segal & Segal LLP as his bankruptcy counsel and K&L Gates LLP as his special insurance counsel.  Mr. Togut also retained Hamilton, Rabinovitz & Alschuler, Inc. to act as Mr. Togut's expert for the purpose of evaluating the Asbestos PI Claims against Quigley.  Disclosure Statement at 40.

total nominal face value of $405 million (the "Pfizer/AIG Annuity").

Based on, *inter alia,* the actual backlog of Quigley and Pfizer claims in queue which could be billed to the Shared Asbestos Insurance Policies and/or satisfied by assets in the Insurance Settlement Proceeds Trust, the cost to Pfizer and value to Quigley of Pfizer relinquishing its rights to the Shared Asbestos Insurance Policies and to the funds in the Insurance Settlement Proceeds Trust (excluding the AIG Payments) is approximately $105-$182 million and $25 million, respectively. Snow Rebuttal Report at 23-24.

The net present value of the Pfizer/AIG Annuity is approximately $153 million. *Id.* at 21. Additionally, Pfizer agreed to forgive $30 million of its secured claim against Quigley, for a value to Quigley's estate of $30 million, and to transfer Reorganized Quigley's common stock, which can be conservatively valued at approximately $7 million, to the Asbestos PI Trust. *Id.* at 26, 28; *see also* Expert Report of Professor Israel Shaked, dated April 15, 2009, at Exhibit 9 (the "Shaked Report") (relevant portions attached hereto as Exhibit K). As a result of the substantial Pfizer contribution to the asbestos trust, Quigley's Disclosure Statement estimates that asbestos claimants would receive a 7.5% recovery (the "Payment Percentage") on their claims under Quigley's plan of reorganization. *See* Quigley Company, Inc. Third Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, No. 04-15739 (SMB), at Article I, Section 1.1 (ECF Doc. # 505) (Oct. 6, 2005).

N.     The Pfizer Waiver and Pfizer's Additional Contribution

As discussed below, Pfizer agreed to make additional contributions to the Asbestos PI Trust. The Pfizer Claimant Settlement Agreements provide that if, as Quigley projects, the Asbestos PI Trust Assets are insufficient to satisfy 100% of the value attributed under the Asbestos PI Trust Distribution Procedures (the "TDP") to the Asbestos PI Claims of all non-

settling present claimants and the estimated number of future claimants as determined as of the Effective Date of the Plan, each Settling Plaintiff agrees to reduce the amount of the distribution from the Asbestos PI Trust to an amount not to exceed 10% of the payment percentage established in the TDP for similarly-situated non-settling and future claimants (the "90% Reduction Provision").  Form of Pfizer Settlement Agreement at Section 2.4(b).

In connection with the solicitation of Quigley's Third Amended Plan of Reorganization, in August 2006 this Court held that, based on the 90% Reduction Provision, the weight of the votes of Settling Plaintiffs would be reduced by 90%.  *In re Quigley Co., Inc.,* 346 B.R. 647 (Bankr. S.D.N.Y. 2006) (the "Asbestos Claims Estimation Order"); Disclosure Statement at 49. Subsequent to the issuance of the Court's opinion, Pfizer decided to waive the 90% Reduction Provision (the "Pfizer Waiver").  Accordingly, claimants that become Settling Plaintiffs under the Pfizer Claimant Settlement Agreements will receive the same distribution from the Asbestos PI Trust as similarly situated non-settling holders of Asbestos PI Claims.

In November 2006, Pfizer's counsel and the Future Claimants Representative commenced a preliminary review of the methodology for determining the projected cost of replenishing the Asbestos PI Trust on account of the possible Pfizer Waiver.  In January and February 2007, Pfizer provided the updated claims data to the experts for the Future Claimants Representative and the official committee of unsecured creditors (the "Official Committee") and thereafter commenced discussions regarding the evaluation of the data and its re-evaluation of the Asbestos PI Trust's projected financial position.  Over the next several weeks, the Future Claimants Representative evaluated the data and conducted its own analyses and Pfizer and the Future Claimants Representative negotiated over each data point and the assumptions and calculations underlying it.  In March, April and May 2007, Pfizer provided additional data and

analyses to both the Future Claimants Representative and to the expert for the Official Committee, responding to positions asserted and proposals provided by the Future Claimants Representative regarding the administrative operations of the Asbestos PI Trust and the valuation of assets allocated for operation of the Asbestos PI Trust and Reorganized Quigley.

In early May 2007, negotiations began in earnest over the additional contribution Pfizer would have to make to the Asbestos PI Trust. Those contributions were intended to account for the modification of treatment afforded to Settling Plaintiffs and for operational expenses and thereby to obtain support for the Plan. Quigley's counsel held meetings at its offices among representatives of Quigley, Pfizer, the Future Claimants Representative and the Official Committee on May 3, May 17, May 22 and again on May 29, 2007.

Following these extensive and difficult negotiations, Pfizer agreed to (i) make additional financial contributions to the Asbestos PI Trust on the Effective Date in the aggregate amount of $95.1 million (the "Additional Pfizer Contribution"), consisting of $50 million in cash and an additional annuity (the "Pfizer Annuity") with a nominal face value of $45.1 million and a net present value of approximately $12.2 million, Snow Rebuttal Report at 25, and (ii) to enter into the five-year Pfizer Claims Services Agreement (the "Claims Services Agreement"), pursuant to which Pfizer will pay Quigley $5 million per year in exchange for Quigley's continued claims handling services. *See* Plan Supplement, No. 04-15739 (SMB), at Exhibit N (ECF Doc. # 1531) (Aug. 27, 2008) (the "Plan Supplement"). The Additional Pfizer Contribution, having an aggregate value of approximately $120.1 million, is intended, among other things, to maintain the payment percentage of 7.5% based on current projections of claims and assets available for distribution to claimants. The Claims Services Agreement ensures that there will be sufficient funds to satisfy the administrative costs of the Asbestos PI Trust. The Pfizer Contribution,

including the Additional Pfizer Contribution but not including the Claims Services Agreement, in net present value terms, has a minimum cost to Pfizer/value to Quigley based on a conservative analysis of between $327 and $405 million. Snow Rebuttal Report at 6.

## III.  ARGUMENT

For the reasons set forth herein and in the Quigley Confirmation Brief, the Court should overrule all objections, including the Ad Hoc Committee's objection (the "AHC Objection"), in their entirety and enter the proposed order confirming Quigley's Plan.

The central theme underlying the AHC Objection is that Pfizer and Quigley acted in bad faith in connection with this chapter 11 case. The Ad Hoc Committee, however, has failed to present a scintilla of evidence to support its allegations of bad faith. Indeed, the evidence is directly contrary to the Ad Hoc Committee's assertions.

### A.  Quigley's Commencement of This Case Was Not in Bad Faith

Without citing any authority, the Ad Hoc Committee remarkably accuses Pfizer and Quigley of bad faith based on the fact that Quigley sought relief under chapter 11 of the Bankruptcy Code. As a company with significant liabilities and limited assets, Quigley had an absolute right to seek relief under the Bankruptcy Code.

The Ad Hoc Committee contends, in essence, that Quigley is not eligible for relief under the Bankruptcy Code because Quigley did not have a profitable business prior to filing its chapter 11 petition. The law does not support the Ad Hoc Committee's position. There is no prohibition that precludes a company that may have lacked a profit-producing business from seeking chapter 11 relief and then emerging from bankruptcy with a profitable operating business. For example, in *A-Best Products Company, Inc.*, the debtor had historically engaged in the manufacture of industrial safety clothing. First Amended Disclosure Statement with Respect

to Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code for A-Best Products Company, Inc, at §1.2(a), No. 02-12734 (JKF) (Bankr. D. Del. Feb. 23, 2004) (ECF Doc. # 383). For approximately four years prior to filing for chapter 11 protection, the debtor had not engaged in any manufacturing operations, and its only activities were related to settling asbestos claims arising from exposure to the products it formerly manufactured. *Id.* Upon emergence from bankruptcy, the reorganized debtor operated a "claims handling vehicle" that processed, liquidated, and recommended resolution and payment of asbestos claims in accordance with the applicable trust distribution procedures. *Id.* at §3.3(d). *See also In re Swan Transportation Corp.*, Disclosure Statement with Respect to Plan of Reorganization Under Chapter 11 of the United States Bankruptcy Code for the Swan Transportation Corporation, at §§ 1.1(d), 1.2(g), No. 01-11690 (JKF) (ECF Doc. # 46) (Bankr. D. Del. Feb. 22, 2002) (debtor conducted no ongoing business since 1995 besides litigation defense and the collection of insurance proceeds; plan confirmed even though debtor had no conventional business and existed for the sole purpose of maximizing insurance recoveries and funneling proceeds to trust for distribution to asbestos claimants); *In re Kaiser Aluminum Corp.,* Disclosure Statement with Respect to Debtors' Second Amended Plan of Reorganization, at 30, No. 02-10429 (JKF) (ECF Doc. # 7311) (Bankr. D. Del. Sept. 5, 2005) (plan confirmed where debtor's reorganized business was limited to ownership of a piece of property contributed by a corporate affiliate that drew $50,000 per month in rent).

Here, it is undisputed that Quigley was a defendant in the tort system, defending hundreds of thousands of asbestos claims. At the time Quigley filed its petition, its sole remaining asset was limited to its rights to insurance coverage that it shares with Pfizer. Quigley's only available option for treating all present and future claimants fairly and equitably

was to seek relief under the Bankruptcy Code. Indeed, the global resolution negotiated with Pfizer enabled Quigley to dramatically increase the assets that are available for distribution to present and future creditors of the estate. Had Quigley not sought relief under chapter 11, its creditors would have had a race to the courthouse, and only those claimants in front of the line would have been compensated at the expense of all other present and future claimants. Quigley's chapter 11 and its Plan, if confirmed, will prevent such injustice. This set of facts simply does not support a claim of bad faith.

The Ad Hoc Committee's contention that Pfizer is improperly seeking to benefit from Quigley's chapter 11 filing, without itself filing for chapter 11, is equally unavailing. Section 524(g)(4)(A)(ii) specifically contemplates that nondebtor affiliates of the debtor may benefit from a section 524(g) channeling injunction, without themselves having to file for bankruptcy protection. That Pfizer and Quigley are seeking to enforce such rights under the Bankruptcy Code can hardly be a basis to support a claim of bad faith.

Likewise, while the employees of Quigley's CHU previously were employed by Pfizer, those employees' primary job function was to process and administer asbestos claims that had been filed against Quigley, and to a lesser degree, Pfizer. Insofar as Quigley was going to seek relief under the Bankruptcy Code to address its asbestos liabilities, it was entirely logical to transfer the CHU to Quigley to continue with their job function of processing asbestos claims. These facts simply do not support a claim of bad faith, and the Ad Hoc Committee has cited no authority to the contrary.

B.    The Pfizer Claimant Settlement Agreements were Entered Into in Good Faith and Fully Disclosed

1.    *Incentives Are Not Improper*[11]

At the heart of the AHC Objection and assertion of bad faith is the Ad Hoc Committee's baseless allegation that Pfizer "bought the vote" of the Settling Plaintiffs.  This wholly unsubstantiated allegation is repeated over and over throughout the AHC Objection.  *See, e.g.,* AHC Objection at ¶¶ 78, 86-93, 111, 189-205, 225, 236-37, 257-58, 273-74, 278.  However, after over four years of litigation and discovery in this chapter 11 case, and after having reviewed hundreds of thousands of pages of documents produced by various parties and taken the depositions of more than 15 witnesses, which include 4 Settling Law Firms, the Ad Hoc Committee has failed to present to the Court a scintilla of evidence to support its allegations that Pfizer acted in bad faith or "bought" votes.  The solitary basis under which the Ad Hoc Committee purports to support its allegation is the undisputed fact that the Pfizer Claimant Settlement Agreements contemplate the payment of the second 50% installment of the settlement amounts upon the confirmation of Quigley's Plan -- a fact that was disclosed to the Court at the inception of this chapter 11 case, and which simply fails to support the allegations of bad faith proclaimed by the Ad Hoc Committee.

Whether or not the second settlement payment provides an added incentive for Settling

---

[11] On May 1, 2009, the Ad Hoc Committee filed a motion to designate the votes of the Settling Plaintiffs (the "Designation Motion").  Motion to Designate Votes Pursuant to 11 U.S.C. Section 1126(e), No. 04-15739 (SMB) (ECF Doc. # 1800) (May 1, 2009).  On May 29, 2009, Pfizer and Quigley each responded to the Designation Motion, and Pfizer cross-moved to designate the votes cast by the claimants represented by the Ad Hoc Committee (respectively, the "Pfizer Designation Response/Cross Motion" and the "Quigley Designation Response").  *See* Pfizer's Response to Motion of the Ad Hoc Committee of Tort Victims to Designate Votes Pursuant to 11 U.S.C. § 1126(e) and Pfizer's Cross-Motion to Designate Votes of Claimants Represented by the Ad Hoc Committee of Tort Victims, No. 04-15739 (SMB) (ECF Doc. # 1814) (May 29, 2009); Response of Quigley Company, Inc. to Motion of Ad Hoc Committee of Tort Lawyers for Designation of Votes Under 11 U.S.C. § 1126(e), with Joinder in Cross-Motion of Pfizer Inc. to Designate Votes Under 11 U.S.C. § 1126(e) of Claimants Represented by Ad Hoc Committee of Tort Lawyers, No. 04-15739 (SMB) (ECF Doc. # 1815) (May 29, 2009).  Pfizer fully incorporates herein the Pfizer Designation Response/Cross Motion and the Quigley Designation Response.

Plaintiffs to vote in favor of the Plan, as set forth below, the law is clear: the existence of an incentive to vote in favor of a plan of reorganization is not improper. Indeed, in almost every chapter 11 case, there are certain creditors and groups of creditors who have incentives that are not shared by other creditors. For example, suppliers will benefit from continued business with a debtor that reorganizes, rather than liquidates. Similarly, many employees will benefit from continued employment from a reorganized debtor. On the other hand, no such benefits (outside the plan) will inure to the same debtor's other creditors, such as noteholders. If the mere existence of outside incentives were a barrier to confirmation, virtually no plan of reorganization would be comfirmable. This is not the law.

Arrangements between creditors that provide incentives to support a plan of reorganization generally cannot be challenged absent use of estate property. *See, e.g., In re WorldCom, Inc.,* No. 02-13533 (AJG), 2003 Bankr. LEXIS 1401, at *178 (Bankr. S.D.N.Y. Oct. 31, 2003) (holding that "[a]ny enhanced value received by holders of Class 6B Claims on account of contributions from other Classes is not a treatment of these Claims under the plan" and so would not be examined by the court); *Mabey v. Sw. Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.),* 150 F.3d 503, 516, 519 (5th Cir. 1998) (reversing district court's finding of bad faith because a creditor-proponent offering to pay certain fees for another creditor which may have incentivized the creditor to vote in favor of the creditor-proponent's plan over competing plans did not render the plan unconfirmable as a matter of law). Objections to such arrangements "confuse[] estate property and nonstate property," and the Bankruptcy Code "does not govern the rights of creditors to transfer or receive nonstate property." *Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.),* 984 F.2d 1305, 1313 (1st Cir. 1993). Here, as in the cases described in this paragraph, the Pfizer settlement payments are not

treatments under the Plan and are made from Pfizer property, not estate property.

In addition, "[i]t is well established that settlement agreements are favored under the law especially in bankruptcy matters." *Lambert Brussels Assocs. Ltd. v. Drexel Burnham Lambert Group., Inc. (In re Drexel Burnham Lambert Group, Inc.),* 140 B.R. 347, 350 (S.D.N.Y. 1992) (*quoting In re Joint E. and S. Dist. Asbestos Litig.*, 129 B.R. 710, 861 (E.D.N.Y. and S.D.N.Y. 1991)). "[T]he law should favor settlements. This should be no less true in the context of a Chapter 11 case than in any other matter under the jurisdiction of a court. The Bankruptcy Courts should apply this maxim so as to encourage the formulation of reorganization plans that incorporate consensual arrangements between plan proponents and creditors and other parties in interest." *In re Kellogg Square P'ship,* 160 B.R. 336, 339 (Bankr. D. Minn. 1993). In fact, "[t]he intent of the Bankruptcy Code is to encourage consensual resolution of claims through the plan negotiation process." *In re Rhead,* 179 B.R. 169, 176 (Bankr. D. Ariz. 1995) (citing *Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.),* 7 F.3d 127 (8th Cir. 1993).

A plan proponent may settle with some creditors within a class but not others when there is a reasonable basis for doing so. *See In re Jartran, Inc.,* 44 B.R. 331, 381-83 (Bankr. N.D. Ill. 1984) (holding that a reasonable settlement offered to certain creditors within a class but not others was not discriminatory when the settling claims were distinguishable from the non-settling claims); *see also In re W. Real Estate Fund, Inc.,* 75 B.R. 580, 586 (Bankr. W.D. Okla. 1987) (settlement with some creditors in the class and not others was not impermissible discrimination).

Indeed, courts have made findings of good faith and confirmed plans in a number of section 524(g) cases involving settlements that provided incentives or inducements of one form

or another.  *See, e.g., In re Mid-Valley, Inc.,* No. 03-35592 (JKF), Affidavit of Albert O. Cornelison in Support of Debtors' Chapter 11 Petitions and First Day Motions and Applications, at ¶ 84 (ECF Doc. # 4) (Bankr. W.D. Pa. Dec. 16, 2003); *In re Mid-Valley, Inc.,* Case No. 03-35592 (JKF), 2004 Bankr. LEXIS 1553, at *22-31, *47 (Bankr. W.D. Pa. July 21, 2004) (confirming debtors' plan that contained a section 524(g) trust, where debtors had also entered into prepetition settlement agreements conditioning obligation to pay settling claimants on confirmation).  *See also, e.g., In re J T Thorpe Co.,* No. 02-41487-H5 11, Declaration of Gerald W. Scott in Support of J T Thorpe Company's Voluntary Petition Under Chapter 11 of Title 11 of the United States Code and First Day Motions, at ¶ 19 (ECF Doc. # 17) (Bankr. S.D. Tex. Oct. 1, 2002); *J T Thorpe*, Chapter 11 Plan of Reorganization Filed by J T Thorpe, at 7, 02-41487 (KKB) (ECF Doc. # 15) (Bankr. S.D. Tex. Oct. 1, 2002); *In re J T Thorpe Co.,* 308 B.R. 782, 787 (Bankr. S.D. Tex. 2003), *aff'd,* 2004 U.S. Dist. LEXIS 13589 (S.D. Tex. Mar. 3, 2004)(finding the plan was proposed in good faith under 1129(a)(3) where claimants who settled prepetition received a security interest for 75% of their claim value and retained the remaining 25% as unsecured "stub claims" to be received upon confirmation of the debtor's plan).

Here, it is uncontroverted that the Pfizer Claimant Settlement Agreements are legitimate settlement agreements, negotiated by Pfizer at arm's-length to resolve very real litigations, claims, and threatened claims, both present and future, against Pfizer.  As this Court stated, "[t]he Release under the Pfizer Settlement Agreement is broader than the release available under the Plan.  The former releases both Pfizer Derivative Claims and Pfizer Direct Claims.  The latter only releases Pfizer Derivative Claims, and the non-settling PI Claimants can pursue their direct claims after confirmation."  *In re Quigley Co., Inc.,* 377 B.R. 110, 118 (Bankr. S.D.N.Y. 2007). Accordingly, "the Settling PI Claimants are receiving a greater distribution, but may also be

paying a greater consideration." *Id.* All parties to these agreements took risks in exchange for potential rewards in their efforts to settle complex litigation. Moreover, the splitting of the Settlement Amount into two payments was part of a legitimate compromise made at the behest of counsel to the Settling Plaintiffs.[12] There is no statutory or other basis to support the contention that the timing of the second payment is improper or a basis for a finding of bad faith on the part of Pfizer, and the Ad Hoc Committee fails to cite a single authority that supports that proposition.

The Ad Hoc Committee also has presented no evidence that any Settling Plaintiff voted in favor of the Plan solely to receive the second half of the settlement payment. Indeed, the testimony the Ad Hoc Committee elicited from the four Settling Law Firms it chose to depose is clear that they evaluated the treatment of their clients' claims under the Plan in determining whether or not to vote in favor of the Plan. For example, James Ferraro, a lawyer from a Settling Law Firm testified as follows with respect to the Plan:

> We hope [the Plan is confirmed] because we think it's in the best interest of our client, because it is expedited money for them, as opposed to waiting 20 years at a number we think is reasonable and fair for them under the circumstances. So we want them to vote for it. We recommend they vote for it.[13]

Mr. Ferraro also explained why the Plan is in the best interests of any clients that retained his firm after the settlement with Pfizer, notwithstanding that such clients would not receive

---

[12] As this Court observed:

> Settling PI Claimants assumed a risk that the non-settling PI Claimants avoided. . . . The Release. . . . is immediately effective, even though Pfizer prepaid only 50% of the Settlement Amount. . . . the Releases are valid and effective, even though Quigley may never confirm a plan and Pfizer may never make another payment. The Settling PI Claimants have already surrendered their rights to pursue any claims against Pfizer or the other released parties, but absent confirmation of the Plan, the non-settling PI Claimants can pursue all of their claims against Pfizer.

*In re Quigley Co., Inc.,* 377 B.R. 110, 118 (Bankr. S.D.N.Y. 2007).

[13] Ferraro Dep. at 73:5-11

payments from Pfizer:

> [New clients] were not part of the deal.  But if that deal blows up, that deal has an effect on future clients, big time effect on future clients.  If the Pfizer deals blows out, they are going to be backlogged behind all these Pfizer claims for the next 10 years.
>
> Even though they came in after the fact, it is in their best interest that they missed that deal because they didn't exist as clients then.  It is still in their best interest to vote in favor of the deal.  Otherwise, if that deal falls apart, we have a backlog in all our -- all the filed cases would be backlogged behind the blown-up deal.  We would not want that to happen.[14]

Consistently, Tony Sakalarios, of the law firm Morris, Sakalarios, & Blackwell, PLLC testified that when Quigley's Plan was filed, experienced lawyers from his firm analyzed the benefits it would provide to his clients, and based on that analysis, Mr. Sakalarios made his recommendation to his clients:

> I. . . care when the plan comes out how it's going to affect my clients as to the remaining Quigley liability. . . .  I care about that.[15]
>
> And so with respect to voting whether a plan is good or not, [lawyers at the firm] look at that.  They have meetings.  They assess whether it's good for our clients or not.  They tell me what their opinion is.  And they're lawyers.  They're supposed to vote.  And they're seasoned lawyers.  And so I -- take their opinions and I take the appropriate conduct.[16]

John Deakle, of the Deakle-Couch Law Firm, testified that he calculated the value to his individual clients of payments they would receive under the Plan:

> Q.      "Okay.  But have you spent any time in calculating the value to your clients of the payments that will be available to them under the trust if it's -- if the plan is approved?"
>
> A.      "Individually, yes."[17]

Alan Kellman, of the Jaques Firm, also testified that the payment under the Quigley Plan

---

[14] *Id*. at 140:24 - 141:13.

[15] Tr. Deposition of Tony Sakalarios, at 78:14-17 (Jan. 27, 2009) (the "<u>Sakalarios Dep.</u>") (relevant portions attached hereto as Exhibit L).

[16] *Id*. at 81:15-22.

[17] Tr. Deposition of John Deakle, at 51:15-19 (Jan. 27, 2009) (the "<u>Deakle Dep.</u>") (relevant portions attached hereto as Exhibit M).

mattered to him.

> Q: "From your perspective in negotiating the overall settlement, did it matter whether the 10 percent against Quigley was worth a dime or a thousand dollars?"
>
> A: "Sure, it would matter."
>
> Q: "So the 10 percent remainder for the nonmalignancies was not that important in the grand scheme of things?"
>
> A: "I don't want to say it's not important."[18]

Indeed, a review of the votes cast by Asbestos PI Claimants who did not vote as a party to a Pfizer Claimant Settlement Agreement and who are not represented by the Ad Hoc Committee (and thus have not sought to obstruct confirmation to recover payment from Pfizer) tells a consistent story that claimants voted on Quigley's Plan based on its treatment, as opposed to the second settlement payment. These "neutral" claimants who will not receive any payment from Pfizer voted in favor of the Plan by approximately 75% in number and 83% in amount. Rebuttal Report of Stephen E. Sellick, dated May 7, 2009, at 10 (the "<u>Sellick Rebuttal Report</u>") (relevant portions attached hereto as Exhibit O).[19]

Thus, the Ad Hoc Committee has failed to present a scintilla of evidence that the second settlement payment was the sole reason Settling Plaintiffs voted in favor of Quigley's Plan. The mere fact that the Pfizer Claimant Settlement Agreements exist does not and cannot provide any support for the Ad Hoc Committee's claim of bad faith.

> 2. *There is no Basis for Ad Hoc Committee's Allegation that Pfizer Selected Settling Law Firms With Historically Lower Settlement Values*

The Ad Hoc Committee contends that Pfizer acted in bad faith by "selecting" law firms

---

[18] Tr. Deposition of Alan Kellman, at 45:23-46:19 (November 12, 2008) (the "<u>Kellman Dep.</u>") (relevant portions attached hereto as Exhibit N).

[19] While the Sellick Rebuttal Report opines that such "neutral" Asbestos PI Claimants voted in favor of the Plan by more than the requisite 75% in number, because many claimants voted with individual ballots without identifying his or her counsel, Pfizer cannot state with certainty that more than 75% of neutral claimants voted in favor of the Plan.

for the Pfizer Claimant Settlement Agreements that had historically settled at lower values with Pfizer and Quigley than the law firms that did not participate in the settlements (collectively, the "Non-Participating Law Firms").  AHC Objection at ¶¶ 34, 80, 91, 91 n.39.  Such objections are of no merit because: (a) Pfizer's goal was to enter into settlement agreements with *all* plaintiffs' counsel who had asserted or would likely assert asbestos-related claims against Pfizer, including all three members of the Ad Hoc Committee; (b) in light of timing issues and changes in the composition of law firms, determining a definitive "historic" settlement value for each law firm is problematic; (c) the data demonstrates that even to the extent alleged historic values can be discerned at the law firm level, the Settling Law Firms' historic settlement values spanned a considerable range of values, including some of the very highest values; thus, there is no basis to assert that Pfizer settled with only "low value" firms; and (d) there is no basis to conclude that the historic settlement by law firm is predictive of future settlements by law firm.

a.    Pfizer Sought to Settle at Reasonable Values With All Plaintiff Law Firms

Although the Ad Hoc Committee contends that Pfizer "cherry-picked" law firms to settle with based on such firms' purported lower historical settlement values, the Ad Hoc Committee fails to present a shred of evidence that demonstrates that Pfizer made any such "selection" from the universe of plaintiff law firms that had asserted or would likely assert asbestos-related claims against Pfizer.  That is because Pfizer's objective was to identify and achieve a settlement with as many plaintiffs' firms as possible who had sued or may sue Pfizer.  Accordingly, Pfizer negotiated with *every* firm that had a substantial number of claims that had been asserted against it or that might be asserted in the future.

To that end, Pfizer entered into settlement negotiations with all plaintiffs' law firms representing claimants that it believed would either be able to pursue claims alleging an actual

asbestos related disease arising from exposure to a Quigley asbestos containing product or a different product for which Pfizer had alleged liability, or who had asserted or would likely assert such claims against Pfizer, and whose counsel's settlement demands were reasonable under the circumstances. *See* Tr. Deposition of Peter G. Angelos, at 21:2 (Feb. 6, 2009) (the "Angelos Dep.") (relevant portions attached hereto as Exhibit P) (referring to Pfizer's "approach to working out a deal with anybody").

The Ad Hoc Committee's assertion that Pfizer selected for settlement plaintiff law firms that only had historically low value settlements is astounding, particularly where the Ad Hoc Committee members, which proclaim to have historically high value settlements, were negotiating with Pfizer. As is clear from the deposition testimony of members of the Ad Hoc Committee, Pfizer engaged in extensive, albeit unsuccessful, negotiations with the Ad Hoc Committee members, all of whom were offered the opportunity to settle their claims. That the Ad Hoc Committee members chose not to settle with Pfizer for reasonable amounts in an effort to use Quigley's bankruptcy case to extract hold-up value from Pfizer is hardly a basis to blame Pfizer for not settling the claims represented by the Ad Hoc Committee. *See, e.g.,* Tr. Deposition of John Cooney, at 89:20-23 (Sept. 28, 2007) (the "2007 Cooney Dep.") (relevant portions attached hereto as Exhibit Q) (Mr. Cooney denying that he was "shut out of any prepetition settlement negotiations with Pfizer"); Tr. Deposition of Perry Weitz, at 67:7-14 (Feb. 3, 2009) (the "Weitz Dep.") (relevant portions attached hereto as Exhibit R) (acknowledging settlement discussions with Pfizer); Angelos Dep. at 14:5-21 (Feb. 6, 2009) (recalling discussions with Pfizer counsel "in an effort to arrive at a settlement of your claims against Pfizer before the Quigley bankruptcy").

Unfortunately, Pfizer could not reach a settlement with Weitz, Cooney, or Angelos,

because their settlement demands were unreasonable. The record here is replete with evidence that demonstrates that Pfizer's inability to settle with the members of the Ad Hoc Committee was *not* because Pfizer chose to exclude Weitz, Cooney, and Angelos from settlement discussions, but rather because the members of the *Ad Hoc Committee refused* to settle for a reasonable sum. It is now clear that they chose not to settle because they believed they could leverage Quigley's bankruptcy case to extract outsize settlement amounts from Pfizer. As counsel for the Ad Hoc Committee stated in open Court:

> As a practical matter, you know it and I know it and everyone in this courthouse knows it. *This case,* from the perspective of the dissenting members, *is all about the view,* trying not to editorialize it, *that there wasn't enough money offered in settlement by Pfizer for my clients to be willing to accept it.* . . . In terms of a dynamic that's ever going to suggest to Pfizer that Pfizer out to re-think whether or not it wants to consider resolution with my constituency. . . Pfizer has to be told for once in the last three years it's not going to get its way.

Tr. Hr'g Jun. 12, 2007 at 76:4-25 (emphasis added) (relevant portions attached hereto as Exhibit S).

Equally telling are the statements made by Perry Weitz in response to Pfizer counsel's settlement efforts. Pfizer's settlement counsel, Michael Rozen, attempted to reason with Mr. Weitz via e-mail, in hopes of reaching a settlement. Mr. Rozen inquired, "what is to be gained by your seemingly hardline position? [S]et aside number for a minute and just look at 'terms.' [Y]ou know full well that it's impossible, for multiple reasons, to do anything different for you than for others . . . . [I]t seems to me that the 'best' result here, under the circumstances, is to make the Quig[ley] deal and stop being an objector." E-mail from Michael Rozen to Perry Weitz (Dec. 20, 2005, 08:40:06 EST) (email chain attached hereto as Exhibit T). In response, Mr. Weitz stated that "nobody would care if I was paid differently they just care that I stop objecting !" E-mail from Perry Weitz to Michael Rozen (Dec. 20, 2005, 08:50:00 EST).

If there were ever any doubt that the objections of the Ad Hoc Committee to the Plan are based solely on its goal of extracting more money for *its members* from Pfizer *outside of the Plan*, such doubts were laid to rest when Mr. Weitz flat-out *admitted* as much during his deposition. Mr. Weitz explained that "Mr. Rozen knows that . . . there's a number that he could get that I would resolve these cases for. I think that unfortunately he cannot do that *so we have proceeded with the objections."* Weitz Dep. at 99:20-25 (emphasis added). *See also id.*. at 118:12-19 ("I think that if [Mr. Rozen] got the. . . $250 million . . . I would recommend the deal to my clients. . . . [I]f my clients settle, I'm no longer an objector."). The evidence is clear and uncontroverted: (i) Pfizer selected for settlement discussions those plaintiffs' law firms, *including the members of the Ad Hoc Committee*, that represent clients who had asserted, or were reasonably likely in the future to assert, personal injury claims against Pfizer arising from asbestos-containing products manufactured by Quigley; and (ii) settlement negotiations with the members of the Ad Hoc Committee were unsuccessful because those law firms, hoping to extract hold-up value from Pfizer by obstructing Quigley's bankruptcy case, were unwilling to settle on reasonable terms acceptable to Pfizer.

> b.    The Data Does Not Show that Settling Law Firms Had Lower Historical Settlement Values than Non-Participating Law Firms

Lacking any evidence that Pfizer selected for settlement only those law firms with low value settlement history, the Ad Hoc Committee retained an expert, Daniel Rourke, to purportedly demonstrate, by using the CHU data, that the Non-Participating Law Firms had higher settlement histories for malignant claims than the Settling Law Firms. In his report, dated April 15, 2009, (the "Rourke Report") (attached hereto as Exhibit U). Dr. Rourke opined:

- The data in the CHU database can be used to determine historical settlement means by law firm.

- The historic mean for Non-Participating Law Firms is higher than the historic

mean for Settling Law Firms for mesothelioma, lung cancer, and other cancer (not statistically reliable for other cancer).[20]

- The historic settlement mean by law firm is predictive of other settlements by law firm.

In presenting his conclusions, Dr. Rourke includes a table (Table 1) listing Settling Law Firms and Non-Participating Law Firms that purportedly demonstrates the contention of the Ad Hoc Committee that Pfizer selected firms for settlement with lower historical settlement values for malignant claims. Rourke Report at 12. Although Pfizer disputes the validity, reliability, and utility of Dr. Rourke's Table 1, it is notable, that even according to that table, with respect to the most serious malignancy -- mesothelioma -- historically, Settling Law Firms had the second, the fifth, the sixth, and the seventh highest value claims. The Ad Hoc Committee does not explain, if Pfizer set out to negotiate settlements only with the lower value law firms as it alleges, why Pfizer settled with, among others, Baron & Budd, which had (according to the Ad Hoc Committee) 139 mesothelioma claims and a historical mean settlement $327,594 for such claims, but didn't settle with the Angelos firm which had (according to the Ad Hoc Committee) 42 mesothelioma claims and a historical mean settlement of $282,899 for such claims. Even assuming *arguendo* the validity of the Ad Hoc Committee's Table 1, a review of that table illustrates that historical settlement values did not drive the Pfizer settlements; rather they were driven by the ability of the parties, in each case, to agree on reasonable terms.

While it is obviously possible to use the CHU data to perform a calculation of historic settlement means by law firm, as demonstrated in the Sellick Report, the reliability and utility of that calculation varies depending upon how the data is categorized and how it is used.[21] Here,

---

[20] For purposes of this section, Pfizer adopts Dr. Rourke's categorization of Non-Participating Law Firms and Settling Law Firms, although there are certain firms Dr. Rourke may have incorrectly categorized.

[21] For example, as noted in the Sellick Rebuttal Report, Dr. Rourke's choice of definition of law firm as the "local" law firm resulted in Cooney & Conway having the highest average mesothelioma settlement at $526,120; if he had

there are at least two aspects of the approach taken by Dr. Rourke that seriously undermine the validity of his conclusions.

First, although Dr. Rourke's Table 1 is based on approximately 46,000 settlements from the CHU database, by the time Dr. Rourke has disaggregated by law firm and injury, in many instances there are only a handful of settlements for a particular combination of law firm and disease that Dr. Rourke then uses to characterize historical experience. For instance, Dr. Rourke's calculation of mean settlement values for Cooney & Conway, a member of the Ad Hoc Committee, relies on only six settlements for lung cancer, two settlements for other cancer, and three settlements for non-malignant claims. In fact, four of Dr. Rourke's calculations of historical settlement means are based on less than 10 settlements each for 40% of Settling Law Firms and 75% of Non-Participating Law Firms, undermining their reliability in characterizing historical experience. Sellick Rebuttal Report at 4.

Second, even in those instances where there are a larger number of settlements for a particular law firm, at the disaggregated level the settlement means calculated and relied upon by Dr. Rourke are heavily influenced by extreme values. For example, the Cooney & Conway mesothelioma mean settlement of $526,120 is based on 75 historic settlements which range from $15,000 to $4 million. Nine of these 75 settlements comprise *over half* the aggregate value. That is, a small percentage of settlements drive the simple average value and give a distorted picture of the "typical" mesothelioma settlement with Cooney & Conway. If one were to apply Dr. Rourke's mean to all claims filed by Cooney & Conway, the claimants would be vastly overcompensated in comparison to the actual experience. Without these nine settlements the mean would be $286,500 - just over half of the mean used by Dr. Rourke. In such instances, the

---

defined law firm instead as the "settling" law firm, Wise & Julian would have the highest mesothelioma average at $677,000. Sellick Rebuttal Report at 3 n.1.

mean is not considered the best way to summarize or describe a set of data and "presents a distorted representation of what the data are conveying." Sellick Rebuttal Report at 4 (quoting Mark L. Berenson and David M. Levine, *Basic Business Statistics: Concepts and Applications*, at 132 (7th ed. 1999)).

As an alternative to Dr. Rourke's examination of the mean values, and to examine the distortion of values created by the use of the simple mean, Dr. Sellick examined the median values for Settling Law Firms and Non-Participating Law Firms. The median value (where half of the observations are smaller and half are larger) is unaffected by extreme values and is often used rather than the mean to describe data, such as here, where extreme values are present. Berenson and Levin, *Basic Business Statistics,* at 135. For example, for Cooney & Conway, the median mesothelioma settlement is $265,000, less than half the mean settlement value presented by Dr. Rourke. Thus, unlike the mean values relied upon by Dr. Rourke, median values are not influenced by extreme values -- high or low -- and are appropriately used where, as here, such extreme values might distort what might be considered "typical" values.[22] Using his flawed approach, Dr. Rourke finds that the mean settlement for Non-Participating Law Firms is higher for mesothelioma (by 30%), lung cancer, and other cancer and that the mean for non-malignant claims is higher for Settling Law Firms.

Examining the median values reveals very different results:

- The median for mesothelioma settlements is only 7.7% higher for Non-Participating Law Firms -- about 75% lower than the 30% difference found when comparing means.

- The median for other cancer is higher for Settling Law Firms where the mean is higher for Non-Participating Law Firms.

Sellick Rebuttal Report at 8.

---

[22] Environmental Science Deskbook, 1:14 ("While the mean of a set of numbers is often very informative, in some cases it could be misleading. If one number in the set is far higher or lower than the rest, the average can similarly be biased and not truly reflect the central tendency.")

Thus, when looking at the median values, two categories - mesothelioma and lung cancer - are slightly higher for Non-Participating Law Firms while two categories - other cancer and non-malignant - are higher for Settling Law Firms. While there may be some difference in the historic settlement values for Settling Law Firms and Non-Settling Law Firms, Dr. Rourke has distorted the degree of difference and its significance through his chosen methodology and by his reliance on small numbers of observations and including in his calculations values that are heavily influenced by a small number of extreme values.

          c.       There is No Basis to Contend that Historic Settlement Mean By Law Firm and Disease is Predictive of Other Claims Values

Notwithstanding this flawed analysis of Dr. Rourke, the Ad Hoc Committee and Dr. Rourke are not satisfied with using his calculations to purportedly describe historic experience; rather they assert that these mean values determine -- or should determine -- the value of other claims. Rourke Report at 11-13. This assertion is totally unfounded.

Without any apparent basis, Dr. Rourke states in his report that "law firms that have historically received more than law firms that have historically received less for otherwise identical claims will continue to do so." *Id.* at 11. While the settlement history of a law firm may have some impact on settlement negotiations with that law firm, settlement history alone does not determine the value of a claim, even after controlling for disease. Sellick Rebuttal Report at 6; Tr. Deposition of Michael Rozen, at 13:11-23; 50:22-51:14 (Feb. 3, 2009) (the "Rozen Dep.") (relevant portions attached hereto as Exhibit V). This is amply illustrated by Cooney & Conway's mesothelioma settlement history described in the Sellick Rebuttal Report. Notably, Cooney & Conway's 75 mesothelioma settlement amounts over a three year period are all over the map, ranging from a low of $15,000 to a high of $4,000,000. If past history determined future settlement values, one would certainly expect a much narrower range of

settlement amounts.

One source of these differences is that -- as Dr. Rourke implicitly acknowledges in his statement -- one group of historic claims for a particular disease, such as mesothelioma, may not be "otherwise identical" to other groups of claims. Another source of differences is that the claims are resolved at different points in time, and factors other than law firm, disease, and other claim-specific factors -- such as tort reform, changes in court rules, etc. -- can impact settlement values. Sellick Rebuttal Report at 6. *See also* Ferraro Dep at 61:9-12 ("[y]ou can't sit there and give a point in time and say 2001 or 2002 you did a settlement with Pfizer for this amount of money, and say that has any relationship with what happened in 2004."); Rozen Dep 13:11-23 ("[T]here are any one of a number of factors that have to do with the cases and the jurisdictions and the company and its posture and what other things they have going on among a very, very wide range of considerations that all depend on the circumstances.").

Dr. Rourke has not controlled for any of these factors in his analysis where he assumes claims would, on average, be settled for their historic averages. Rourke Report at 11-13; Tr. Deposition of Daniel Rourke, Ph.D, at 51:12-52:1 (May 21, 2009) (the "Rourke Dep.") (relevant portions attached hereto as Exhibit W). Dr. Rourke's use of historic means by law firm and disease to determine the value of other claims is unreliable because (i) the historic means by law firm are unreliable measures of the historic data and (ii) Dr. Rourke has not shown that historic claims by law firm and disease are "otherwise equal" to other claims with respect to claim characteristics or external factors.

        d.      The Ad Hoc Committee's Attacks on Pfizer's Settlement with the Jaques Firm Violates Stipulation and Order of this Court

The Ad Hoc Committee's repeated attacks on Pfizer's settlement with the Jaques Firm

directly violates the Stipulation and Order approved by this Court on April 13, 2009 (the "Objection Withdrawal Stip").  While the Ad Hoc Committee contends that Pfizer settled claims lacking in merit for the purpose of manufacturing votes, by the Objection Withdrawal Stip, the Ad Hoc Committee agreed to "withdraw with prejudice any and all objections to the confirmation of Quigley's Fourth Amended and Restated Plan of Reorganization . . . that are in any way based on an assertion that . . . the claims of the Settling Plaintiffs are of little or no value; and/or . . . Pfizer improperly solicited or obtained votes by settling claims of little or no value . . . ."  Objection Withdrawal Stip at 4.  To the extent the Court is inclined to consider this portion of the AHC Objection notwithstanding the Objection Withdrawal Stip, Pfizer has fully addressed this issue in a previous filing with the Court, and would respectfully refer the Court to that filing.[23]

3. *Quigley Was Not a Third Party Beneficiary of the Pfizer Claimant Settlement Agreements*

The Ad Hoc Committee contends that Quigley was a third party beneficiary of the Pfizer Claimant Settlement Agreements and breached its fiduciary duty because it allegedly permitted the Pfizer Waiver which allegedly resulted in a diminution of the assets available to the Asbestos PI Trust.  These allegations are unfounded because (i) Quigley has no rights under the Pfizer Claimant Settlement Agreements and (ii) at the urging of Quigley and following difficult and protracted arms-length negotiations with the Future Claimants Representative, Pfizer agreed to replenish the Asbestos PI Trust with a substantial additional contribution.

According to the Ad Hoc Committee, Quigley is purportedly a third party beneficiary of the Pfizer Claimant Settlement Agreements based on Section 7.1 of the Form of Pfizer

---

[23] *See* Reply of Pfizer Inc. to Opposition of the Ad Hoc Committee of Tort Victims to Motion of Pfizer Inc. for a Protective Order and Response of Pfizer Inc. to Cross-Motion of the Ad Hoc Committee of Tort Victims to Compel Pfizer Inc. and Quigley Company, Inc. to Produce Documents, No. 04-15739 (SMB) (ECF Doc. # 1662) (Dec. 16, 2008), which Pfizer hereby incorporates fully herein.

Settlement Agreement which provides that the agreement "will not confer any rights or remedies upon any person other than Pfizer, other Pfizer Protected Parties, and each Plaintiff." Although in certain of the Pfizer Claimant Settlement Agreements,[24] Quigley is included in the scope of the defined term "Protected Party," it was not the intention of the parties to any of the Pfizer Claimant Settlement Agreements to confer any rights on Quigley. This is facially clear in Section 4.1(f) which states that each plaintiff "will have executed and delivered to Pfizer or its designee a valid Plaintiff Release which releases the Claims against the Pfizer Protected Parties (*other than Quigley*)" (emphasis added). Accordingly, the Pfizer Claimant Settlement Agreements do not confer any rights on Quigley.

Even assuming *arguendo* that Quigley had a right as a third party beneficiary to enforce the 90% Reduction Provision, there is no basis to conclude that Quigley breached its fiduciary duty. To the contrary, it was in the interests of Quigley and its creditors to confirm a Plan of reorganization with a substantial contribution from Pfizer. Accordingly, once Pfizer determined to waive the 90% Reduction Provision, Quigley, together with the Future Claimants Representative urged Pfizer to make an additional contribution to the Asbestos PI Trust to maintain the Payment Percentage. Following extensive and difficult negotiations, brokered by Quigley, between Pfizer and the Future Claimants Representative, Pfizer agreed to make contributions that exceeded the amount required to replenish the Asbestos PI Trust. As a result, if the Plan is confirmed, all of Quigley's creditors will benefit from the deal that Quigley brokered following the Pfizer Waiver.

> C.    The Plan Satisfies The Requirements For Entry Of The Asbestos PI Channeling Injunction Under Section 524(g)

The Plan comports with the Bankruptcy Code's requirements for issuance of an

---

[24] Under the Form of Pfizer Settlement Agreement, Quigley is included in the definition of "Protected Parties." This is not the case for many of the actual Pfizer Claimant Settlement Agreements.

injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect to asbestos-related claims or demands against Reorganized Quigley or its property. Accordingly, Pfizer respectfully requests that the Court enter the Asbestos PI Channeling Injunction under section 524(g) of the Bankruptcy Code in connection with the confirmation of the Plan.

1.  *The Asbestos PI Trust Satisfies the Structure and Funding Requirements of Section 524(g)(2)(B)(i)*

In connection with confirmation of a plan of reorganization, section 524(g)(1)(A) authorizes a court to enter an injunction to enjoin entities from taking legal action to recover, directly or indirectly, payment in respect of asbestos-related claims or demands if the plan of reorganization establishes a trust to resolve and pay such claims. 11 U.S.C. § 524(g)(1). To receive such an injunction, the trust to which such claims and demands are channeled must meet the structure and funding requirements of section 524(g)(2)(B)(i) of the Bankruptcy Code. For the reasons set forth below, the Asbestos PI Trust satisfies those requirements.

Section 524(g)(2)(B)(i)(I) requires that an asbestos-claims trust assume the liabilities of a debtor that, as of the petition date, has been named as a defendant in actions to recover damages for asbestos related claims. 11 U.S.C. § 524(g)(2)(B)(i)(I). The Asbestos PI Trust meets this requirement because as of the Petition Date, Quigley had been named as a defendant in approximately 411,100 asbestos personal injury claims in approximately 131,500 civil actions brought in federal and state courts throughout the United States, Disclosure Statement at 34, and on the Effective Date, the Asbestos PI Trust will assume all liability and responsibility for all pending and future Asbestos PI Claims. *See* Plan § 9.3(a).

Section 524(g)(2)(B)(i)(II) requires that an asbestos-claims trust "be funded in whole or in part by the securities of one or more of the debtors involved in such plan and by the obligation

of such debtor or debtors to make future payments, including dividends." 11 U.S.C. § 524(g)(2)(B)(i)(II). In accordance with this subsection, the Plan provides that the Asbestos PI Trust is to be funded in part by securities of Quigley. On the Stock Transfer Date, Pfizer will transfer 100% of the common stock of Reorganized Quigley to the Asbestos PI Trust. *See* Plan § 9.3(k). Thus, the Asbestos PI Trust will have the right to receive future dividends from Reorganized Quigley.

Section 524(g)(2)(B)(i)(III) of the Bankruptcy Code requires that an asbestos-claims trust have the ability to own, if specified contingencies occur, "a majority of the voting shares of— (aa) each such debtor; (bb) the parent corporation of each such debtor; or (cc) a subsidiary of each such debtor that is also a debtor." 11 U.S.C. § 524(g)(2)(B)(i)(III). As set forth in sections 1.1 and 9.3(k) of the Plan, the Asbestos PI Trust shall have a right to 100% of the common stock of Quigley upon the satisfaction of each of the following conditions: (a) the one year anniversary of the Effective Date has occurred; and (b) the Asbestos PI Trust has processed Asbestos PI Claims having an aggregate nominal amount of at least $25 million. These provisions satisfy subsection (aa) because the Asbestos PI Trust will have the ability to own a majority of the common stock of Reorganized Quigley.

Finally, section 524(g)(2)(B)(i)(IV) requires an asbestos-claims trust "to use its assets or income to pay claims and demands." 11 U.S.C. § 524(g)(2)(B)(i). Here the Asbestos PI Trust will assume all liability and responsibility for all Asbestos PI Claims and demands, *see* Plan § 9.3(a), and will use its assets to pay and satisfy Asbestos PI Claims in accordance with the Plan, the Asbestos PI Trust Agreement, the TDP Procedures and the Confirmation Order, thus satisfying the requirements of subsection (IV).

Accordingly, based on the foregoing provisions of the Plan and other applicable

documents, the Asbestos PI Trust satisfies the structure and funding requirements for an asbestos-claims trust set forth in section 524(g)(2)(B)(i) of the Bankruptcy Code.

2.   *Quigley's History, the Nature of Asbestos Related Litigation, and the Facts of the Chapter 11 Case Support the Findings Required Under 524(g)(2)(B)(ii) and 524(g)( 1)(A)*

Section 524(g)(2)(B)(ii) of the Bankruptcy Code requires the court to make certain factual findings to support the issuance of a channeling injunction under section 524(g)(1)(A). As set forth below, Quigley's history, the nature of asbestos-related litigation and the facts of this chapter 11 case all support the findings required for the issuance of the Asbestos PI Channeling Injunction under section 524(g)(1)(A) of the Bankruptcy Code.

To support entry of a channeling injunction under section 524(g)(1)(A), a court must find that "the debtor is likely to be subject to substantial future demands for payment arising out of the same or similar conduct or events that gave rise to the claims that are addressed by the injunction." 11 U.S.C. § 524(g)(2)(B)(ii)(I). Quigley's history and the nature of asbestos-related litigation support this finding in connection with confirmation of the Plan.

Although Quigley had ceased producing Damit, Insulag and Panelag in the 1970s, and exited the refractories business in 1992, commencing in 1979 or 1980, large numbers of asbestos-related personal injury or wrongful death claims based on Quigley's historical operations have been filed against Quigley. Disclosure Statement at 34. As set forth above, as of the Petition Date, Quigley had been named as a defendant in approximately 411,100 asbestos personal injury claims in approximately 131,500 civil actions brought in federal and state courts throughout the United States, Disclosure Statement at 34. Also as of the Petition Date, there were approximately 212,000 asbestos personal injury claims that either were pending against Quigley or that Quigley believed would be asserted against it, Disclosure Statement at 9, 21, and

Quigley was then actively defending itself against approximately 162,000 asbestos personal injury claims in approximately 59,000 actions.

As of the Petition Date, Quigley and Pfizer had incurred approximately $1.04 billion in settlement payments or judgments with respect to asbestos personal injury and wrongful death claims and incurred approximately $179 million to defend asbestos-related personal injury claims. Disclosure Statement at 40. Based on the long latency period of asbestos-related disease and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved, Quigley will undoubtedly be subject to substantial future demands for payment arising from the same conduct or events that gave rise to the Asbestos PI Claims, which supports the finding required by section 524(g)(2)(B)(ii)(I).[25]

Section 524(g)(2)(B)(ii)(II) of the Bankruptcy Code requires a court to find that "the actual amounts, numbers, and timing of such future demands cannot be determined." 11 U.S.C. § 524(g)(2)(B)(ii)(II). Due to the long latency period for asbestos-related diseases and the substantial number of asbestos-related personal injury lawsuits that had been asserted in the past and that remained unresolved as of the Petition Date, Quigley is unable to determine the actual amounts, numbers and timing of future demands against it with specificity at this time. Accordingly, the Court should make the finding required by section 524(g)(2)(B)(ii)(II).

Section 524(g)(2)(B)(ii)(IV) of the Bankruptcy Code requires a court to find that, as part of the confirmation process, that the terms of the channeling injunction proposed, including "any provisions barring actions against third parties," are set forth in the plan of reorganization and the disclosure statement in support of the plan. 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(aa). A court must also find that "a separate class or classes of the claimants whose claims are to be addressed by a

---

[25] Indeed, asbestos plaintiffs have begun to seek distributor defendants to step into Quigley's shoes, and have thus continued the relentless onslaught against Insulag even as Quigley's bankruptcy proceedings have been ongoing.

trust described in clause (i) is established and votes, by at least 75 percent of those voting, in favor of the plan." 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).  As part of the confirmation process in this case, Quigley clearly set forth the terms of the Asbestos PI Channeling Injunction, including provisions therein barring actions against third parties such as the Asbestos Protected Parties, in both the Plan and the Disclosure Statement.  *See* Plan § 11.6; Disclosure Statement at 76-78. Quigley also designated a separate class, Class 4 under the Plan, for all Asbestos PI Claims.  *See* Plan § 4.4.  Of the holders of Class 4 Asbestos PI Claims that voted, 86.62% in number voted in favor of the Plan - well above the required 75 percent.  *See* Declaration of Ronda K. Collum Certifying the Tabulation of Ballots Regarding Vote on Quigley Company, Inc.'s Fourth Amended and Restated Plan of Reorganization, at Exhibit A, No. 04-15739 (SMB) (ECF Doc. # 1519) (Jul. 24, 2008) (the "Trumbull Certification Affidavit"); Declaration of Brad Daniel on Behalf of BMC Group, Inc., as Tabulation Agent, Regarding the Tabulation of Votes With Respect to Quigley Company, Inc.'s Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as modified March 28th, 2008), No. 04-15739 (SMB) (ECF Doc. # 1525) (Aug. 15, 2008) (the "BMC Certification Affidavit").

> 3.    *The Court May Extend the Asbestos PI Channeling Injunction to the Pfizer Protected Parties*

Section 524(g)(4)(A)(ii) of the Bankruptcy Code designates certain entities that may be protected by a channeling injunction entered pursuant to section 524(g)(1)(A).    Section 524(g)(4)(A)(ii) provides that a channeling injunction entered pursuant to section 524(g)(1)(A):

> may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of—
>
> (I) the third party's ownership of a financial interest in the debtor,

a past or present affiliate of the debtor, or a predecessor in interest of the debtor;

(II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;

(III) the third party's provision of insurance to the debtor or a related party; or

(IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to—

> (aa) involvement in providing financing (debtor or equity), or advice to an entity involved in such a transaction; or

> (bb) acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii).  Pfizer easily satisfies these statutory requirements.

Section 11.6(a) of the Plan provides that the Asbestos PI Channeling Injunction will bar certain actions against any Asbestos Protected Party.[26]  As required by section 524(g)(4)(A)(ii), each Asbestos Protected Party under the Plan is either identifiable from the terms of the injunction or is a member of an identifiable group.  *See* Plan §§ 1.1 and 11.6(a).  The Plan

---

[26]  The Plan defines Asbestos Protected Party to include the following—
(a)        any Quigley Person;
(b)        Reorganized Quigley;
(c)        any Pfizer Protected Party and any other Entity that is alleged to be directly or indirectly liable for the conduct of, Claims against or Demands on Quigley to the extent such alleged liability arises by reason of—

> (i)        the Pfizer Protected Party's or other Entity's ownership of a financial interest in Quigley, a past or present Affiliate of Quigley, Reorganized Quigley or a predecessor in interest of Quigley or Reorganized Quigley;
> (ii)        the Pfizer Protected Party's or other Entity's involvement in the management of Quigley, Reorganized Quigley or a predecessor in interest of Quigley or Reorganized Quigley, or service as an officer, director or employee of Quigley, Reorganized Quigley or a Related Party; or
> (iii)        the Pfizer Protected Party's or other Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of Quigley, Reorganized Quigley or a Related Party, including but not limited to—
> > a.        involvement in providing financing (debt or equity), or advice to an Entity involved in such a transaction; or
> > b.        acquiring or selling a financial interest in an Entity as part of such a transaction.

defines Asbestos Protected Party to include certain third parties that fit within the categories listed in section 524(g)(4)(A) of the Bankruptcy Code. *See* Plan § 1.1. Each Asbestos Protected Party under the Plan therefore falls within the groups designated in section 524(g)(4)(A)(ii) as a party to whom a channeling injunction may be extended. All claims against Pfizer that the Plan will channel arise directly or indirectly from Pfizer's ownership of or involvement in the management of Quigley. Accordingly, the Court may extend the Asbestos PI Channeling Injunction to protect all Asbestos Protected Parties from liability for any Asbestos PI Claims, including any future asbestos-related demands.

<blockquote>a.    Pfizer's Contribution is Fair and Equitable to Future Claimants Under 524(g)(4)(B)(ii)</blockquote>

In order for a 524(g) channeling injunction to bar demands against a qualified third party, such as Pfizer, the court must determine that "such injunction with respect to such demands for purposes of this subparagraph is fair and equitable with respect to the persons that might subsequently assert such demands, in light of the benefits provided, or to be provided, to such trust on behalf of such . . . third party." 11 U.S.C. § 524(g)(4)(B)(ii).

Courts have yet to define what "fair and equitable" means in the context of section 524(g). *In re Congoleum Corp.*, 362 B.R. 167, 179 (Bankr. D.N.J. 2007). One court in California held as a matter of law that the phrase "fair and equitable" in section 524(g) does not have the same meaning as in section 1129, but the court did not define its meaning for 524(g) purposes. *In re W. Asbestos Co.*, 313 B.R. 832, 850 n.25 (Bankr. N.D. Cal. 2003). Most courts that have considered the 524(g) fair and equitable requirement have examined all the elements of a plan and then made a generalized determination of what is fair and equitable. *See, e.g., In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), 2006 Bankr. LEXIS 3945, at *57 (Bankr. D. Del. Feb. 6, 2006) (finding in light of the substantial contributions to be made to the Asbestos PI

Trust on behalf of the protected parties, entry of the channeling injunction and the naming of the protected parties therein is fair and equitable with respect to the persons that might subsequently assert future asbestos-related demands); *J T Thorpe*, 308 B.R. at 790 (holding in light of the benefits provided to the trust, the extension of the channeling injunction to the third parties is fair and equitable).

A review of the case law shows that finding that a section 524(g) injunction is fair and equitable is largely tied to the value being contributed. For example, in *Kaiser Aluminum*, the "fair and equitable" finding was based on the "substantial" contributions made by the debtors, which included $13 million and 94% of the shares of one of the debtors. In *Congoleum*, on the other hand, the Court held that a contribution by the parent of only $250,000 was not substantial and thus did not satisfy the fair and equitable requirement. *See Congoleum,* 362 B.R. at 175-182 (holding that the $250,000 contribution from parent is "not substantial enough to meet the fair and equitable standard of §524(g)(4)(B)(ii) needed to justify extending the benefits of the Asbestos Channeling Injunction").

Pfizer's contribution - conservatively calculated at between $327 million and $405 million on a net present value ("NPV") basis - is unquestionably a substantial contribution that easily satisfies the section 524(g) "fair and equitable" standard. This is particularly evident in light of the fact that Pfizer has never been found liable for a single asbestos personal injury claim arising from exposure to Quigley's products. Indeed, based on the facts of this case, Pfizer has no liability for Quigley's asbestos containing products based on theories of alter-ego liability or veil piercing. *See infra* Point III. F.

Pfizer will obviously derive a benefit from the channeling injunction, if approved, as it will reduce its defense costs and minimize the risks of adverse judgments in state courts. The

524(g) "fair and equitable" test, however, is not based on the benefit to Pfizer; rather it is based on the benefit to claimants who might otherwise subsequently assert derivative claims against Pfizer. *See, e.g. In re U.S. Mineral Prods. Co.,* No. 01-2471 (JKF), 2005 WL 5898300, at *24 (Bankr. D. Del. Nov. 29, 2005) (determining that "in light of the benefits provided, or to be provided, to the Asbestos Trusts by or on behalf of each Protected Party, the Permanent Channeling Injunction is fair and equitable *with respect to persons* that might subsequently assert Demands") (emphasis added). Because of Pfizer's substantial contribution, such claimants will have available immediately following Plan confirmation a minimum of $327 million of assets that, but for Pfizer's contribution, would not have been otherwise available to pay their claims. To benefit from these assets, claimants will simply be required to satisfy the TDP disease and exposure requirements -- they will *not* be required to prove that Pfizer is derivatively liable for injuries arising from alleged exposure to Quigley asbestos-containing products.

As a result of Pfizer's contribution, qualifying claimants will receive a 7.5% payment distribution from Quigley's trust. Absent Pfizer's contribution to Quigley's asbestos trust, Quigley would be forced to liquidate. *See* Liquidation Analysis, Disclosure Statement at Exhibit H. Claimants would receive little or nothing from Quigley and would face years of costly and highly uncertain litigation against Pfizer, which based on past experience, would likely be unfruitful. For these reasons, Asbestos PI Claimants voted overwhelmingly in favor of the Plan, and by their vote, have accepted that Pfizer's contribution was substantial. Moreover, the Future Claimants Representative who represents the future demands has determined that Pfizer's contribution is fair and equitable for the future demand holders and is supporting the Plan.

Asbestos PI Claimants who did not vote as a party to a Pfizer Claimant Settlement Agreement and who are not represented by the Ad Hoc Committee (and thus have not sought to

obstruct confirmation to recover payment from Pfizer) also voted in favor of the Plan and the proposed 524(g) injunction by approximately 75% in number and 83% in amount. Sellick Rebuttal Report at 10.[27] The vote of the Asbestos PI Claimants and the support of the Plan by the Future Claimants Representative demonstrate that Pfizer's contribution is both substantial, and fair and equitable to future demand holders.

        b.    The Interpretation of "Fair and Equitable" Proposed by the Ad Hoc Committee Has No Legal or Logical Basis

Contrary to the unambiguous language of section 524(g) and the holdings of every court that has considered this issue, without any basis, the Ad Hoc Committee contends that the Court should make its "fair and equitable" determination based on the benefits Pfizer will derive from the injunction as opposed to the benefits derived by the claimants who would subsequently assert derivative claims. AHC Objection at ¶ 162. The Ad Hoc Committee then goes on to contend that, to satisfy the "fair and equitable" 524(g) requirement, Pfizer would have to contribute an amount *equal* to the benefit Pfizer would derive from the channeling injunction, AHC Objection at ¶ 162,[28] which the Ad Hoc Committee's expert "calculates" to be about $4.2 billion. Shaked Report at 5. This amount purportedly represents the amount of claims that would remain "open" in the tort system against Pfizer and/or Quigley if the Plan were not confirmed as well as the estimated value of the future claims. *Id.* Dr. Shaked's calculation of the value of claims that will remain open in the tort system consists of a simple multiplication of the number of certain claims

---

[27] While the Sellick Rebuttal Report opines that such "neutral" Asbestos PI Claimants voted in favor of the Plan by more than the requisite 75% in number, because many claimants voted with individual ballots without identifying his or her counsel, Pfizer cannot state with certainty that more than 75% of neutral claimants voted in favor of the Plan.

[28] The Ad Hoc Committee cites three case that purportedly support its theory. All are inopposite. In *In re Mid-Valley, Inc.,* 2004 Bankr. LEXIS 1553, at *22, the Court found that the contribution was sufficient because claimants would receive 100%. This has nothing to do with calculating the benefit to the third party contributor, much less the proposition that the third party must contribute an amount equal to 100% of its benefit. AHC Objection at ¶ 163. The AHC also cites as support but without explanation *Congoleum,* 362 B.R. at 181-82, and *In re Combustion Eng'g, Inc.,* No. 03-10495 (JKF), 2005 Bankr. LEXIS 2623, at *7-8, 41, 73-74 (Bankr. D. Del. Dec. 19, 2005), both of which plainly hold that courts should evaluate a third-party contribution in terms of whether it is "substantial."

that voted on the Plan plus additional claim numbers set forth in an email from Weitz & Luxenberg (assuming *every* claim will qualify for payment) by the alleged historic settlement means from Dr. Rourke's Table 1.[29]  The calculation of the value of future claims is based on the estimate of future claims against Quigley as determined by the expert for the Future Claimants Representative.  Disclosure Statement at Exhibit I.

This calculation relied on by the Ad Hoc Committee is seriously flawed.  First and foremost, Dr. Rourke's calculations (used to value the "current" claims) are based on his computation of average historic settlement numbers by law firm (as defined by Dr. Rourke) for claims against Pfizer *and* Quigley using the inherently flawed methodology previously discussed.    Second, the computation adopts the estimate of future liability of Quigley as computed by the expert for the Future Claimants Representative.  That future liability estimate does not purport to estimate Pfizer's potential future liability; it is an estimate of  Quigley liability.  Assuming *arguendo*, that it is relevant  to calculate the benefit to Pfizer of the channeling injunction, any estimate of the value of claims against Pfizer must be based on the nature of the claim against Pfizer and the different legal defenses applicable to Pfizer.  Sellick Rebuttal Report at 21-22.  Any purported calculation of the value of the claims against Pfizer would have to address the fact that such a claim is factually and legally devoid of merit, and that no plaintiff has ever successfully prosecuted a claim against Pfizer arising from exposure to Quigley's asbestos-containing products.  Dr. Rourke's opinion totally ignores this critical issue

---

[29] Aside from the lack of reliability of emails from Weitz & Luxenberg as a basis for Dr. Rourke's analysis, there are at least two other facial flaws readily apparent in this calculation that exaggerate the outcome.  First, to the extent individuals in the voting ballot database had not filed a complaint against Pfizer and/or Quigley in the tort system prior to the bankruptcy they would not have "open" claims in the tort system should the Plan be confirmed.  Second, it appears that Dr. Rourke included in his count of claims invalid ballots regardless of why they were deemed invalid.  In addition, Pfizer's expert was unable to reconcile the voting ballot counts in Dr. Rourke's report.  Sellick Rebuttal Report at 18 n. 33.  Dr. Rourke also assumes, contrary to historical experience and his own analysis, that every single potential claim would qualify for payment in the tort system.

in considering historic settlement amounts of claims against Pfizer *and* Quigley.[30]

In addition to the foregoing fundamental flaw in Dr. Rourke's calculation, as demonstrated above, the historic means by law firm and disease which form the basis of Dr. Rourke's calculation are an unreliable basis for predicting or determining the value of these claims. Further, Dr. Rourke provides no analysis or any basis whatsoever to support his assumption that the non-settled "open" claims are "otherwise identical" to the settled claims for these law firms, a prerequisite for the predictive value of the historic means, assuming *arguendo*, one were to accept Dr. Rourke's predictive theory. Dr. Rourke also assumed that each and every "open" claim would have been resolved with payment and that none would be resolved without payment, even though he acknowledged that this is not "actually how it happens in the tort system." Rourke Dep. at 300:1-301:6.

In addition to the lack of legal basis in the context of a 524(g) "fair and equitable" determination, requiring a valuation of potential derivative claims against Pfizer would be incredibly time consuming and costly for all parties and could result in an indefinite delay of confirmation. Moreover, it is questionable whether this Court has authority to make such a determination. S*ee In re W. Asbestos Co.,* 313 B.R. at 845-46 (stating "it could not 'adjudicate' the aggregate amount of asbestos related claims and demands as part of the confirmation process").

The Ad Hoc Committee makes the preposterous argument that Pfizer is required to make a larger contribution to the Asbestos PI Trust because it "has the means to contribute more,"

---

[30] *See* Sellick Rebuttal Report at 21-22 ("An expert performing an analysis of the potential liability of Pfizer arising from piercing the corporate veil or by Pfizer being deemed an 'apparent manufacturer' would need to take into account specific issues relating to Pfizer's 'derivative' liability. These issues would include the probability of Pfizer 'derivative' liability being established at trial; the effect of any separate and independent defenses Pfizer might have; the filing, qualification rate, and value of claims specifically relating to Pfizer's derivative liability; and the timing of any such events occurring." )

AHC Objection ¶ 166.   Although this contention ironically exposes the tactics employed by members of the Ad Hoc Committee in targeting defendants in the tort system, there is no such requirement in section 524(g), which requires only that the contribution be "fair and equitable [to claimants] in light of the benefit provided," § 524(g)(4)(ii)(B), not in light of the non-debtor's "deep pockets."   There likewise is no case law to support this proposition.   *Congoleum,* the only case cited by the Ad Hoc Committee, is inapposite.   In that case, the debtors were proposing to contribute a minority of new shares to the asbestos trust, asserting that they could not contribute a majority as that would result in the parent company - ABI - abandoning its interest in the reorganized debtor which allegedly could not survive without its parent.   *Congoleum,* 362 B.R. at 180.

In that context, the *Congoleum* court noted that it would need evidence to support the argument regarding ABI's potential abandonment and whether the debtor had the means to contribute more than the note it was contributing, as well as an analysis of whether the note even constituted a contribution.   *Id.*   In *Congoleum*, the court was concerned that the debtors were freeing themselves of crushing asbestos liabilities while offering little other than insurance proceeds in return.   *Id.* at 181.   In that regard, it could be relevant for the court to consider the capacity of the debtor to make a larger contribution before approving a channeling injunction for the *debtor* notwithstanding its relatively meager contribution.   Here, the evidence is clear that Pfizer, a *non-debtor*, is making a substantial contribution to the Asbestos PI Trust in an aggregate amount of more than $327 million (NPV) in satisfaction of the "fair and equitable" standard as described above.   Pfizer is not requesting that the Court approve a meager contribution by pleading poverty, so there is no basis for an inquiry into Pfizer's balance sheet or capacity to pay.

        c.      The Ad Hoc Committee's Valuation of the Pfizer Contribution is Legally, Financially, and Arithmetically Flawed

As set forth above, Pfizer will make a contribution to Quigley's asbestos trust conservatively valued at between $327 million and $405 million (NPV).

(i) Calculation of the Pfizer Contribution

Below is a summary of the components of the proposed Pfizer Contribution as set forth in the Snow Rebuttal Report:[31]

| Pfizer Contribution | Cost to Pfizer/Value to Quigley (in millions) |
|---|---|
| Quigley's relinquishment of claims to $405 million 10-year AIG Annuity | ($54) |
| $405 million 40-year Pfizer annuity payable to Asbestos PI Trust | $153 |
| Pfizer's relinquishment of rights, title and interest in Insurance Settlement Proceeds Trust | $25 |
| Insurance Relinquishment Agreement | $ 105 - $182 |
| $50 million payment from Pfizer to Trust | $ 50 |
| $45.1 million 41-year Pfizer annuity payable to Asbestos PI Trust in equal installments starting on fifth anniversary of the Effective Date | $ 12 |
| Pfizer agreement to forgive $30 million secured claim | $ 30 |
| Transfer of Reorganized Quigley common stock from Pfizer to Asbestos PI Trust | $ 7 |
| **Total Cost to Pfizer / Value to Quigley of Pfizer Contribution** | **$ 327 - $ 405** |

As discussed above, in connection with the AIG Annuity (i.e., the AIG Insurance Settlement Agreement), the Shared Asbestos Insurance Policies, and the Insurance Settlement Proceeds Trust, Pfizer and Quigley have the right to draw from these sources on a first-billed,

---

[31] Snow Rebuttal at 6, Exhibit 1.

first-paid basis. Accordingly, in determining the value of the Pfizer Contribution, the first step must be to analyze and value each of Pfizer's and Quigley's ready-to-bill claims. In that regard, Dr. Snow determined that Pfizer has a backlog of approximately $418 million in unbilled claims arising from the Pfizer Claimant Settlement Agreements, of which approximately 50% or $209 million have already been paid by Pfizer, with the balance to be paid by Pfizer on the Plan Effective Date. Snow Rebuttal Report at 8, ¶ 12, Exhibit 2. But for its decision to contribute its share of the Shared Asbestos Insurance Policies and funds in the Insurance Settlement Proceeds Trust to the Asbestos PI Trust if the Plan is confirmed, Pfizer could have utilized these assets to satisfy these claims. In addition to these unbilled claims, there are 25,281 claims aggregating approximately $41 million that are part of the Pfizer Claimant Settlement Agreements that are eligible for payment upon the respective plaintiff's compliance with certain requirements under applicable settlement agreements. *Id.* at 8, ¶ 13. Quigley, for its part, has approximately $11 million in unbilled settlements. *Id.* at 8, ¶ 14. Having performed the analysis discussed in this paragraph, the components of the Pfizer Contribution can be properly analyzed and valued.

The AIG Annuity

As described above, the $405 million 10-year AIG Annuity arose from a 2004 settlement with the AIG Companies over the value of insurance policies issued to Pfizer for the benefit of Pfizer and/or Quigley. The AIG Annuity makes quarterly payments for a fixed 10-year period that began in 2004. As set forth above, under the terms of the Insurance Settlement Proceeds Trust, funds from the AIG Annuity are distributed to Pfizer and Quigley on a first-billed, first-paid basis (after 20% is first paid to Pfizer up to a total of $81.9 million). Under the terms of the Plan, Quigley would renounce its rights and interests in the AIG Annuity. On the other hand, under the Plan, Pfizer will contribute to the Asbestos PI Trust a $405 million 40-year annuity

66

(the "Pfizer/AIG Annuity").  This Pfizer/AIG Annuity would be funded by Pfizer's own assets and is strictly for the benefit of the Asbestos PI Trust.  Disclosure Statement at 67.

Of the $405 million in the AIG Annuity, under the terms of the Insurance Settlement Proceeds Trust Agreement, (i) an amount of $75 million is allocated to Pfizer for non-asbestos claims, (ii) an amount of $6 million is allocated to Pfizer for an insurance receivable, (iii) an amount of $41 million is allocated to Quigley for an insurance receivable, and (iv) the remaining balance of $284 million is jointly held by Pfizer and Quigley.  *Id.*

As of May 7, 2009, there were approximately $167 million in escrow - approximately $157 million of original annuity payments plus approximately $10 million of interest.  Snow Rebuttal Report at 11.  The remaining $249 million ($405 million less the $157 million already paid) of annuity payment will be paid in the future.  Under the Plan, Quigley will renounce its claims to these assets.

Quigley would give up its rights to the $41 million insurance receivable.  Assuming that Quigley would be entitled to receive the first payment out of the existing cash in escrow, Dr. Snow values the relinquishment at $43 million ($41 million plus approximately $2 million in interest).[32]  Snow Rebuttal Report at 15, ¶ 34.  Quigley would cede its rights to the remaining $284 million of shared assets.  Dr. Snow determined that the NPV of the joint portion of the AIG Annuity is $281 million.  Snow Rebuttal Report at 15, ¶ 35, Exhibit 10.  As the distribution of the AIG Annuity is on a first-billed, first-paid basis and Quigley and Pfizer have $11 million and $418 million in unbilled claims respectively, all but $11 million of the AIG Annuity joint  assets (i.e. $270 million) would go to Pfizer.  This means that the cost to Quigley of ceding all its rights to the AIG Annuity is $54 million -- $43 million from the Quigley insurance receivable plus $11 million from its claim on the joint portion of the annuity.

[32] This is higher than the $39 million estimate of Dr. Shaked.  Shaked Report at 11.

<u>Value of Pfizer's Interest in the Insurance Settlement Proceeds Trust</u>

Under the Plan, Pfizer will contribute its right, title and interest in and to the Insurance Settlement Proceeds Trust. Disclosure Statement at 66. As of March 2008, the Insurance Settlement Proceeds Trust contained $24.5 million in net insurance proceeds. Shaked Report at 15-16. Because the $24.5 million cash currently is in the Insurance Settlement Proceeds Trust and available on the Effective Date to pay claims under the TDP, there is no need to convert to a present value. The only issue is how to apportion the $24.5 million of joint Pfizer/Quigley interests between Pfizer and Quigley.

As set forth in the Disclosure Statement, the Insurance Settlement Proceeds Trust confers on Quigley and Pfizer rights that are "identical in every respect to the rights they held to draw on the relevant shared insurance policies" and that the companies "may draw upon the Net Insurance Proceeds on a first-billed, first-paid basis to pay documented settlements, judgments and defense costs." Disclosure Statement at 32. Accordingly, the relevant fact for determining the apportionment of this asset between Quigley and Pfizer is which company will be first in line with claims to present against the Insurance Settlement Proceeds Trust. Snow Rebuttal Report at 22, ¶ 54.

As demonstrated above, Pfizer has more than $418 million in unbilled claims, whereas Quigley has approximately $11 million. The entirety of Quigley's unbilled claims and $270 million of Pfizer's unbilled claims could be paid in full by the AIG Annuity. Since Pfizer would still have a remainder of $148 million in unbilled claims, Pfizer would be able to draw on the full amount of $24.5 million in the Insurance Settlement Proceeds Trust. Therefore, Pfizer's contribution to the Asbestos PI Trust of Pfizer's rights to the Insurance Settlement Proceeds Trust have a value of $24.5 million. Snow Rebuttal Report at 22-23, ¶ 55.

<u>The Insurance Relinquishment Agreement</u>

Under the Plan, Pfizer will execute and deliver to Reorganized Quigley the Insurance Relinquishment Agreement. Disclosure Statement at 66. Under this agreement, Pfizer will relinquish for the benefit of the Asbestos PI Trust all of Pfizer's rights, title, and interests under the Products/Completed Operations Coverage of the Shared Asbestos Insurance Policies and the Insurance Settlement Agreements. According to the Liquidation Analysis, the stated value of these policies and agreements is $182 million.[33] Liquidation Analysis, Disclosure Statement at Exhibit H. It is undisputed that the value of the relinquishment to the Asbestos PI Trust (or the cost of the relinquishment to Pfizer) is the amount Pfizer would have claimed absent the relinquishment. Snow Rebuttal Report at 23, ¶ 57; Shaked Report at 7. As demonstrated above, Pfizer has more than $418 million in unbilled claims in its backlog and an additional $41 million of potential claims. Absent Pfizer's agreement to relinquish its rights, approximately $270 million of those claims would be paid by the AIG Annuity and $24.5 million by the Insurance Settlement Proceeds Trust. That leaves approximately $123.5 million in remaining Pfizer claims in line for reimbursement from the Shared Asbestos Insurance Policies prior to any claim from Quigley, whose $11 million backlog would have been paid in full from the AIG Annuity. At least 85% of the value of the Pfizer claims could be applied against the Shared Asbestos Insurance Policies.[34] Therefore, absent the Insurance Relinquishment Agreement, Pfizer would

---

[33] Both Dr. Snow and Dr. Shaked use the $182 million figure from the Disclosure Statement. However, included in the Shared Asbestos Insurance Policies is approximately $600 million in coverage that was issued by insurers that are currently in rehabilitation or liquidation proceedings, subject to a scheme of arrangement and/or have been declared insolvent. *See* Plan at Exhibit C, Schedule 2. The Liquidation Analysis does not ascribe a stated value to this coverage, although this coverage is part of the Pfizer Contribution and *does* likely have some, potentially substantial, value. Among other things, approximately $120 million in claims under this coverage have been allowed and may result in additional payments to the Asbestos PI Trust. Because of the uncertainty, the Liquidation Analysis did not include any value for this coverage, even though the coverage potentially has significant value. In fact, the Insurance Settlement Proceeds Trust currently holds approximately $1.5 million that has been collected from Insolvent Insurers since the Petition Date.

[34] A portion of the claims would trigger Pfizer-only policies.

be able to draw at least $105 million (85% x $123.5 million) from the Shared Asbestos Insurance Policies. Snow Rebuttal Report at 23-24, ¶ 58.

As discussed above, there are potentially $41 million in additional losses that could quickly become part of the Pfizer claim backlog and Pfizer has also accrued additional defense costs. Snow Rebuttal Report at 24, ¶ 59; *id.* at Exhibit 3. As it is not possible to know exactly how the remaining $77 million ($182 million less $105 million) of coverage under the Shared Asbestos Insurance Policies will be split between Pfizer and Quigley, Dr. Snow created upper and lower bounds on the value of this asset to Pfizer. If Quigley were able to draw on all of the remainder, Pfizer would be transferring to Quigley for the benefit of the Asbestos PI Trust an asset worth $105 million. At the other bound, if Pfizer were able to draw on all of the remainder, Pfizer would be transferring an asset worth $182 million. Therefore, the value of Pfizer's contribution to the Asbestos PI Trust in connection with the Insurance Relinquishment Agreement is between $105 million and $182 million. Snow Rebuttal Report at 24, ¶ 59.

### The Pfizer Annuities, Cash Contribution, Waiver of Secured Claim, and Contribution of Reorganized Quigley Stock

Under the Plan, among other things, Pfizer will contribute to the Asbestos PI Trust a $405 million 40-year annuity (Pfizer/AIG Annuity), a $45.1 million 41-year annuity, $50 million cash, forgiveness of its $30 million secured claim, and the equity of Reorganized Quigley.

The Pfizer/AIG Annuity is a $405 million annuity that provides for a 40-year sequence of equal nominal payments. Disclosure Statement at 66; Plan Supplement at Exhibit L. As with any stream of cash flows, the proper valuation of this asset requires a conversion of the stream of payments to an NPV. Snow Rebuttal Report at 16-17, ¶ 39. Applying a 6.494% yield on a recently-issued non-callable 18-year Pfizer bond yields a conservative NPV of $153 million for

the 40-year $405 million Pfizer annuity.[35]  Snow Rebuttal Report at 21, ¶ 50.

The Pfizer 41-year $45.1 million annuity provides for payments by Pfizer of 41 equal annual installments with the first installment payable on the fifth anniversary of the Effective Date.  Again applying the 6.494% yield on a recently-issued non-callable 18-year Pfizer bond yields a conservative NPV of $12.2 million for the 41-year $45.1 million Pfizer annuity.[36]  Snow Rebuttal Report at 25, ¶ 64.

In addition, under the Plan, Pfizer is contributing to the Asbestos PI Trust $50 million cash on the Effective Date and waiving its $30 million secured claim.  It is undisputed that the value of these contributions are $50 million and $30 million respectively.  Shaked Report at 14-15; Snow Rebuttal Report at 6.

Finally, under the Plan, Pfizer is contributing to the Asbestos PI Trust the stock of Reorganized Quigley.  In his report, Dr. Shaked provides a discounted cash flow ("DCF") analysis of Reorganized Quigley that Dr. Shaked concludes demonstrates that the value of Reorganized Quigley as a going concern is $6.6 million. Shaked Report at 79-89, Exhibit 9.  Although Dr. Shaked's analysis underestimates the value of Reorganized Quigley for several reasons demonstrated by Dr. Snow in his Rebuttal Report, Pfizer and Dr. Snow have applied Dr. Shaked's very conservative estimate of $6.6 million for the value of Reorganized Quigley for purposes of valuing Pfizer's overall contribution to the Asbestos PI Trust.

(ii)     The Ad Hoc Committee's Calculation of the Pfizer Contribution is Flawed

According to the Ad Hoc Committee, the value of the Pfizer Contribution to the Trust is either negative $188.3 million or, alternatively, negative $76.7 million.  Shaked Report at 17.

---

[35] Dr. Shaked calculated an NPV of $154.9 million for the Pfizer/AIG Annuity.  Shaked Report at 7; *id.* at 70, Exhibit 6C.

[36] Dr. Shaked calculated an NPV of $12.4 million for the Pfizer 41-year annuity.  Shaked Report at 77-78, Exhibit 8C.

There are three major flaws in the Ad Hoc Committee's calculation that largely account for the totally distorted results presented by Dr. Shaked: (1) misreading, misconstruing, and misapplying *Congoleum*, the Ad Hoc Committee does not attribute any value to Pfizer's contribution to the Asbestos PI Trust of shared insurance assets; (2) Dr. Shaked's analysis fails to account for and totally ignores the "first-billed, first-paid" rule for the joint Pfizer/Quigley assets and the two companies' respective claims on those assets; and (3) Dr. Shaked deducts from his valuation of Pfizer's contribution a number that Dr. Shaked attributes to the "cost" of the 90% Reduction Provision claiming that the waiver of the 90% Reduction Provision results in a "loss" to the Trust. Dr. Shaked incorrectly ascribes a "savings" to Pfizer and thus a "loss" to Quigley based on a comparison of two different plans and an asserted computation of the cost of waiving the 90% Reduction Provision that ignores incorrectly the fact that the Plan provides exactly what Pfizer committed to provide: a contribution that will result in an Initial Payment Percentage of 7.5%. Declaration of Stephen E. Sellick, dated April 15, 2009, at ¶ 28 (the "<u>Sellick Declaration</u>") (relevant portions attached hereto as Exhibit X).

> The Shared Insurance Assets

The case law is clear and unequivocal -- the contribution of shared insurance provides value to the asbestos trust for the purpose of assessing whether a contribution is "fair and equitable" in the context of section 524(g)(4)(B)(ii). For example, in *In re Kaiser Aluminum Corp.*, No. 02-10429 (JKF), 2006 WL 616243 at *57, 61-64 (Bank. D. Del. Feb. 6, 2006), the court held that the channeling injunction was proper in light of the non-debtor parties' contributions, including rights to insurance policies. In *In re Abb Lummus Global Inc.*, 2006 Bankr. LEXIS 1462 *18-*19, *65-*68 (Bankr. D. Del. June 29, 2006), the court confirmed the plan of reorganization and extended the 524(g) channeling injunction to subsidiaries of the

debtor in light of their contributions to the asbestos trust which included assignment of rights to insurance proceeds to the debtor. Again, in *J T Thorpe*, 308 B.R. at 790, the court found that the corporate parent and other non-debtor parties should be protected by discharge and injunction where, among other contributions, the parties had assigned the trust rights to insurance. In *In re Federal-Mogul Global, Inc.*, No. 01-10578 (JKF), 2007 Bankr. LEXIS 3940, at *95 (Bankr. D. Del. Nov. 8, 2007), the court held that in light of the substantial contributions by non-debtors — including insurers' contributions of insurance proceeds — entry of the third party injunction and the naming of the non-debtor parties therein was fair and equitable. *See also In re Dow Corning Corp.,* 287 B.R. 396, 407 (E.D. Mich. 2002) (third party release and injunction without 524(g); shared insurance was "a substantial contribution to fund the Joint Plan of reorganization"); *In re ACandS, Inc.*, Findings of Fact and Conclusions of Law Regarding Confirmation of ACandS's Second Plan of Reorganization Dated November 19, 2007, as Modified, at 11-12, No. 02-12687 (JKF) (Bankr. D. Del. May 6, 2008) (ECF Doc. # 3310) (noting that non-debtor contributed, among other things, rights to asbestos insurance policies, in exchange for a 524(g) channeling injunction); *In re Babcock and Wilcox Co.*, Summary Disclosure Statement as of September 28, 2005 Under Section 1125 of the Bankruptcy Code With Respect to the Joint Plan of Reorganization as of September 28, 2005 Proposed by the Debtors, the Asbestos Claimants' Committee, the Future Asbestos-Related Claimants' Representative and McDermott Incorporated, No. 00-10992 (JAB) (Bankr. E.D. La. Sept. 29, 2005) (ECF Doc. # 6757) (plan confirmed Jan. 18, 2006, *see* ECF Doc. # 7053) (describing shared insurance policies of non-debtor corporate parent to be contributed to asbestos trust). Indeed, in virtually every 524(g) bankruptcy case, reported or not, where third parties are protected by a channeling injunction, the third party's contribution includes shared insurance assets.

Here, however, the Ad Hoc Committee is asking the Court to ignore the weight of the case law, disregard the language of section 524(g)(4)(B)(ii), defy common sense, and adopt a contorted reading of a single paragraph of *Congoleum* which is inapplicable to the facts of this case.[37]  In *Congoleum*, ABI, the parent of the debtors, sought the protection of the 524(g) channeling injunction.  Under the Congoleum plan of reorganization, ABI proposed to contribute $250,000 in cash, its rights to asbestos coverage as an additional insured under Congoleum's insurance policies, and a waiver of its claims for indemnification for future defense costs arising from derivative Congoleum asbestos claims.   362 B.R. at 181; *In re Congoleum Corp.,* Declaration of Howard N. Feist, III in Support of Debtors' Memorandum of Law in Opposition to Certain Insurers' Summary Judgment Motion Denying Confirmation of the Tenth Plan, at 101, No. 03-51524 (KCF) (Doc. # 4758-14) (Bankr. D.N.J. Oct. 18, 2006).

The *Congoleum* court appeared to equate the contribution of rights to coverage as an additional insured with the waiver of the indemnification for future costs and concluded that the waiver did not provide value to the asbestos trust, stating that it "fails to comprehend how that 'contribution' correlates to additional value to the Plan Trust.  The Plan provides that all future asbestos claims that are derivative of the Debtors will be funneled to the Plan Trust.  As a result, there will be no future defense costs for ABI arising from derivative Congoleum asbestos claims."  362 B.R. at 181.  This holding is understandable even if it might be technically incorrect (since the parent company could well face litigation that it would defend by asserting the injunction).  In this context, however, the court assumed that if the Congoleum plan were confirmed as proposed, ABI would not have any such claims and thus there would be no future

---

[37] Although the Ad Hoc Committee has attempted to dress up its legal misinterpretation of *Congoleum* as Dr. Shaked's "expert" opinion, the record is clear that Dr. Shaked's purported expert opinion is based on nothing other than instructions from the attorneys for the Ad Hoc Committee.  *See* Shaked Report at 6-7 (relying on counsel's interpretation of *Congoleum* for his conclusion that Pfizer's contribution of shared insurance assets should not be attributed any value).

defense costs and no future claim to waive. Pfizer's agreement to contribute to the Asbestos PI Trust its right to draw upon the shared insurance assets, in contrast, has distinct and measurable value. Pfizer is agreeing to give up its rights to recover from its insurance carriers both the hundreds of millions of dollars worth of claims that it could assert now, as well as its right to draw upon that coverage in the future and is providing to the Asbestos PI Trust the exclusive right to access this coverage. The contribution of shared insurance is obviously distinct from the waiver of non existent claims -- the Asbestos PI Trust will use the shared insurance to pay claims; thus the contributed insurance has a highly substantial value to the trust.

Moreover, even if *Congoleum* were to be interpreted as holding that ABI's contribution of rights to derivative coverage as an additional insured has no value, and even if this Court were to apply that interpretation notwithstanding the weight of the countervailing case law, such an interpretation would have no effect on the value of Pfizer's contribution in the instant case. First, unlike in *Congoleum*, where ABI proposed to contribute only *derivative* coverage, the insurance Pfizer is contributing under Quigley's Plan, is the same coverage Pfizer would otherwise be able to use to pay its own non-derivative liabilities. By contributing its share of the joint insurance assets, in addition to foregoing its rights to use the shared insurance assets to pay non-derivative liabilities, Pfizer also is foregoing its right to bill the $418 million in unbilled claims in its backlog and an additional $41 million of potential claims (as well as additional claims and costs that Pfizer has incurred and that are not attributable to the Pfizer Claimant Settlement Agreements). The incorrect application of *Congoleum* by Dr. Shaked results in an understatement of the value of Pfizer's contribution by an amount of at least between $418 million and $495 million.

<u>Dr. Shaked Ignores the First-Billed, First-Paid Provisions of the Joint Insurance Assets</u>

As an alternative to the unsupported and unsupportable view of the Ad Hoc Committee that no value should be attributed to Pfizer's contribution of its share of joint Pfizer/Quigley insurance assets, Dr. Shaked fundamentally mischaracterizes the proportion of the joint insurance assets available to Quigley and Pfizer in the absence of Pfizer's contribution to the trust. Dr. Shaked bases his apportionment on his assertion that, through 2004, Quigley had allegedly accounted for more than three-quarters of insurance billings -- a 77%/23% split. Shaked Report at 7. Based on this alleged historical allocation, Dr. Shaked assumes that, absent the Plan, Quigley would be entitled to receive 77% of the funds from the joint AIG insurance funds. Assuming *arguendo* that Dr. Shaked's historical allocation were correct, using the 77%/23% split is inappropriate because, as set forth above, it is uncontroverted that claims under all of the shared insurance assets are paid on a first-billed, first-paid basis.

In his report, Dr. Shaked does not account for the first-billed, first-paid basis for allocation. When asked at his deposition to explain why he failed to give effect to the first-billed, first-paid provisions, Dr. Shaked responded alternately that he did not understand the rationale behind first-billed, first-paid, and that he relied on "trends" rather than the operative documents. Tr. Deposition Dr. Israel Shaked, at 264:7-9 (May 18, 2009) (the "<u>Shaked Dep.</u>") (relevant portions attached hereto as Exhibit Y) ("I take the first $420 million, because I bill first, I didn't understand it -- the rationale behind it."); *id.* at 265:17-266:2 (Q: "Did you give any effect to that paragraph [in the Joint Insurance Settlement Proceeds Trust Agreement that says Pfizer and Quigley can bill on a first come, first serve basis] in connection with your conclusion that the Pfizer contribution of the insurance to the trust would have no value?" A: "Actually, my base assumption is that it has no value . . . given that I have seen this kind of language. . . it

contradict [sic] what I said earlier [regarding historical billing].”); *id.* at 266:5-6 (“I wanted to know long-term trends, not as of today.”); *id.* at 267:12-17 (“[E]ven if one would find that there is some contribution. . . should not be different in the long-term trend. The fact that it’s, you know, equal doesn’t contradict what I said. I don’t understand why -- why is it different.”); *id.* at 268:23-269:12 (“I actually have an opinion that Pfizer, in my calculation, the base case, don’t have any claim on the shared insurance. I say, even if one will think that there is a value to it, it should be based on long-term historical trends, not as of who sits now in the higher pile of invoices. . . . I think a better way in this kind of analysis is to take it long term to see who paid what.” Q: “Are you aware that there were coverage-in-place agreements during the CCR years that affected the manner in which amounts were billed to the shared insurance assets?” A: “Might well be the case. I just -- as you can see, rely on these numbers, total billing.”). *See also id.* at 266:4-7, 17-20; 268:25-269:3.

The relevant and operative agreements provide that Pfizer and Quigley are entitled to draw on all of the shared insurance assets on a first-billed, first-paid basis. In connection with the Plan, Pfizer would agree to relinquish its claims against those assets. Pfizer has never agreed and does not agree to relinquish its claims against those assets in the event that the Plan is not confirmed. The Court should reject the Ad Hoc Committee’s attempt to understate the value of Pfizer’s contribution by applying a self-serving, purportedly historical-based allocation of those assets that ignores the value of those assets and Pfizer’s claims against those assets.

There is no Basis to Deduct the Value of the 90% Reduction Provision From Pfizer’s Contribution

As discussed above, following the issuance of the Asbestos Claims Estimation Order, Pfizer decided to waive the 90% Reduction Provision. Accordingly, claimants that become

Settling Plaintiffs under the Pfizer Claimant Settlement Agreements will receive the same distribution from the Asbestos PI Trust as similarly situated non-settling holders of Asbestos PI Claims. Following extensive and difficult negotiations with Quigley, the Committee, and the Future Claimants Representative, Pfizer agreed, *inter alia*, to make additional contributions to the Asbestos PI Trust of $50 million cash and the $45.1 million annuity. These additional contributions are "intended, among other things, to maintain the payment percentage of 7.5% based on current projections of claims and assets available for distribution to claimants[.]" Disclosure Statement at 50.[38] The Disclosure Statement states that the Initial Payment Percentage will be set at 7.5%. *See also* Sellick Declaration at ¶ 28 (confirming that the 7.5% Initial Payment Percentage is reasonable given the data and the analysis of the expert for the Future Claimants Representative).

In his report, Dr. Shaked concludes that Pfizer received a "benefit" arising from the difference between the aggregate value of the $50 million contribution and the $45.1 million annuity (which he values together at $62.4 million) and the purported increase in the Asbestos PI Trust's obligations arising from "Pfizer waiving the obligation in the Pfizer Claims Settlement Agreements that required settling plaintiffs to reduce their distributions from the Asbestos PI Trust to 10% of the amounts assigned for each disease category." (which Dr. Shaked values at $127.8 million). Shaked Report at 13.

Dr. Shaked's analysis is logically flawed. In the context of calculating Pfizer's contribution to the proposed Plan before the Court, no purpose is served by comparing Pfizer's contributions between the current plan and prior versions. All that matters are the values of the assets that Pfizer is contributing under the current Plan. To the extent the Asbestos PI Trust is

---

[38] In addition, Pfizer agreed to enter into the Claims Services Agreement to ensure that there would be sufficient funds to satisfy the administrative costs of the Asbestos PI Trust. *Id.*

diminished by the Pfizer Waiver, that diminishment would obviously be equal to the value of the

90% Reduction that Pfizer had agreed to contribute to the prior version of the Plan. If Pfizer had

agreed to contribute, among other things, U.S. treasury bills -- say in the amount of $10 million -

- in the first plan, and in the next plan, determined to contribute, among other things, $12 million

of cash but not the treasury bills, it is self evident, that in valuing Pfizer's contribution to the

latter plan, it would make no sense to deduct the $10 million on account of the absent treasury

bills from the $12 million cash contribution. Similarly, it makes no sense to deduct the value of

the absent 90% Reduction[39] from the additional Pfizer contributions.

4.     *The Asbestos PI Injunction Tracks the Language of Section 524(g)*

In the AHC Objection, the Ad Hoc Committee complains that the Asbestos PI

Channeling Injunction in Plan Section 11.6 is overly broad, vague, and unworkable. This

objection is puzzling, to say the least, because the Asbestos PI Channeling Injunction set forth in

Plan Section 11.6 precisely tracks section 524(g) word-for-word. The Asbestos PI Channeling

Injunction will channel all Asbestos PI Claims, which are defined by Plan Section 1.1 as:

> any Claim or Demand seeking recovery for damages for bodily
> injury allegedly caused by the presence of, or exposure to,
> asbestos or asbestos-containing products (1) against or on
> Quigley or Reorganized Quigley; and (2) against or on any other
> Entity that is alleged to be directly or indirectly liable for the
> conduct of, Claims against or Demands on Quigley to the extent
> such alleged liability arises by reason of --
>> (a)      the other Entity's ownership of a financial interest
>> in Quigley, a past or present Affiliate of Quigley,
>> Reorganized Quigley or a predecessor in interest of
>> Quigley or Reorganized Quigley;
>> (b)      the other Entity's involvement in the management
>> of Quigley, Reorganized Quigley or a predecessor in

---

[39] Although not relevant to this analysis, Dr. Shaked's calculation that the increase in the Asbestos PI Trust's obligations is $127.8 million is flawed as he fails to apply any qualification rate to the claimants - among other things, he simply assumes without any basis that each and every one of the claimants under the Pfizer Claimant Settlement Agreements will apply, qualify, and be paid by the Asbestos PI Trust. *See* Sellick Rebuttal Report at 21-22 (discussing in full).

interest of Quigley or Reorganized Quigley, or service as an officer, director or employee of Quigley, Reorganized Quigley or a Related Party;

(c)    the other Entity's provision of insurance to Quigley, Reorganized Quigley or a Related Party; or

(d)    the other Entity's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of Quigley, Reorganized Quigley or a Related Party, including but not limited to --

> (i)    involvement in providing financing (debt or equity), or advice to an Entity involved in such a transaction; or

> (ii)    acquiring or selling a financial interest in an Entity as part of such a transaction.

*See* Plan Section 1.1. Likewise, section 524(g)(4)(A)(ii) provides that:

> (ii) Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor to the extent such alleged liability of such third party arises by reason of--
>
> (I) the third party's ownership of a financial interest in the debtor, a past or present affiliate of the debtor, or a predecessor in interest of the debtor;
>
> (II) the third party's involvement in the management of the debtor or a predecessor in interest of the debtor, or service as an officer, director or employee of the debtor or a related party;
>
> (III) the third party's provision of insurance to the debtor or a related party; or
>
> (IV) the third party's involvement in a transaction changing the corporate structure, or in a loan or other financial transaction affecting the financial condition, of the debtor or a related party, including but not limited to--
>
> (aa) involvement in providing financing (debt or equity), or advice to an entity involved in such a transaction; or
>
> (bb) acquiring or selling a financial interest in an entity as part of such a transaction.

11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV).

Courts have regularly confirmed section 524(g) plans with channeling injunctions that

track section 524(g). *Kaiser*, Second Amended Plan of (Joint) Reorganization Filed by Kaiser Aluminum Corporation, at 16, No. 02-10429 (JKF), (ECF Doc. # 7312) (Bankr. D. Del. Sept. 7, 2005) (plan confirmed Feb. 6, 2006, *see* ECF Doc. # 8225) (definition of "Protected Parties" includes an "entity" to the extent he, she or it is "alleged to be liable . . ." and tracks the statute); *Combustion Engineering,* No. 03-10495, Glossary of Terms for the Plan Documents Pursuant to Combustion Engineering, Inc.'s Plan of Reorganization as Modified Through October 7, 2005, at 5, No. 03-10495 (JKF) (ECF Doc. # 2589) (Bankr. D. Del. Oct. 7, 2005) (plan confirmed Dec. 19, 2005, *see* ECF Doc. # 2752) (definition of Asbestos Protected Party includes any Entity that satisfies the criteria set forth by Section 524(g)(4)(A)(ii), and Asbestos Protected Parties include indirect parent of debtor); *USG,* First Amended Chapter 11 Plan of Reorganization of USG Corporation and Its Debtor Subsidiaries, at 11, No. 01-2094 (JKF) (Bankr. D. Del. Apr. 5, 2006) (plan confirmed Jun. 16, 2006, *see* ECF Doc. # 11688) (Protected Parties include "any Entity to the extent such Entity . . .  " and tracks the statute language); *United States Mineral Products,* Modified Fifth Amended Plan of Reorganization Jointly Proposed by the Chapter 11 Trustee and the Official Committee of Asbestos Bodily Injury and Property Damage Claimants for United States Mineral Products Company, at 17, No. 01-02471 (JKF) (Bankr. D. Del. Nov. 22, 2005) (plan confirmed Nov. 30, 2005, *see* ECF Doc. # 3282) (definition of Protected Party includes any Person or Entity to the extent he, she, or it is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor, by reason of . . . " and tracks the statute).

In fact, the Ad Hoc Committee is not actually objecting to the injunctive language contained in Plan section 11.6; what the Ad Hoc Committee is objecting to is this Court's Clarifying Order, holding, among other things, that claims against Pfizer based on "apparent manufacturer" theories are within the scope of the Amended PI Order issued by this Court.

*Quigley,* 2008 Bankr. LEXIS 1565, at *8 n. 2 (Bankr. S.D.N.Y. May 15, 2008). *See* AHC

Objection at ¶ 123 ("*as interpreted by this Court in the Clarifying Order*, [Plan Section 11.6]

impermissibly stretches the limits of Section 524(g) well beyond that which Congress intended

or the statute, by its express terms, permits.")

The Clarifying Order is the subject of a pending appeal filed by the Ad Hoc Committee

on April 8, 2008. In the AHC Objection, the Ad Hoc Committee spends *eighteen* complete

pages arguing the appeal with what appears to be basically language cut and pasted from its

original brief filed in connection with the Clarifying Order. *See* AHC Objection at ¶¶ 123-53

(pages 48-65). Pfizer will not burden this Court with the arguments it will make at the District

Court if the appeal is eventually litigated. Pfizer believes that in the Clarifying Order, this Court

correctly applied the injunctive language at issue to the facts and circumstances of this case.

However, the interpretation of the scope of section 524(g) is not at issue here. Simply stated, the

language in Plan Section 11.6 tracks the statute and Pfizer respectfully submits that the Court

should overrule any objections regarding the appropriateness of the language provided in the

statute.[40]

D.     The Plan Does Not Improperly Benefit an Insider
       Section 524(g) is Specifically Designed to Offer Protection to Affiliates

In the AHC Objection, the Ad Hoc Committee argues that the Plan fails to comply with

the good faith requirement of Section 1129(a)(3) because it allegedly provides an insider, Pfizer,

---

[40] Out of an abundance of caution, to protect the record, Pfizer hereby incorporates herein the pleadings and related documents it filed in connection with the Clarifying Order, specifically: Memorandum of Law of Pfizer in Support of Motion (I) to Enforce the Preliminary Injunction Order and (II) for Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, Adv. No. 04-04262 (SMB), (ECF Doc. # 242) (Feb. 28, 2008); Supplemental Memorandum of Law of Pfizer in Support of Motion (I) to Enforce the Preliminary Injunction Order and (II) for Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, Adv. No. 04-04262 (SMB), (ECF Doc. # 252) (Mar. 17, 2008); Request of Pfizer Inc. for Factual Findings in Connection with Motion (I) To Enforce the Preliminary Injunction Order and (II) For Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, Adv. No. 04-04262 (SMB), (ECF Doc. # 257) (Apr. 2, 2008); Statement of Pfizer in Response to the Opposition of Angelos to Request of Pfizer for Factual Findings in Connection with Motion (I) To Enforce the Preliminary Injunction Order and (II) for Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, Adv. No. 04-04262 (SMB) (ECF Doc. # 262) (Apr. 11, 2008).

with a windfall.  AHC Objection at ¶ 104.  The Ad Hoc Committee is wrong on the facts and wrong on the law.

With respect to the facts, the alleged windfall to Pfizer is premised on the erroneous notion that Pfizer's contribution to the Asbestos PI Trust is negative based on Dr. Shaked's flawed analysis of the value of the Pfizer contribution.  As demonstrated above, Pfizer is actually contributing assets worth an aggregate of at least $327 million to the Asbestos PI Trust.

In addition, the Ad Hoc Committee complains that the channeling injunction provides a substantial benefit to an insider, Pfizer.  This assertion is almost incomprehensible, as section 524(g)(4)(A)(ii)(I) of the Bankruptcy Code expressly provides that the channeling injunction may protect a third party, such as Pfizer, with respect to claims arising by reason of the third party's ownership of the debtor, in this case Quigley.  Because the protection Pfizer will receive under the Plan is specifically provided for under the statute, it is patently ridiculous to suggest that the extension of the channeling injunction to Pfizer violates section 1129(a)(3).  None of the cases cited by the Ad Hoc Committee concerns benefits under section 524(g) and therefore they are all inapplicable here.  *Cf.* AHC Objection at ¶¶ 105-106  *See, e.g., In re Bush Indus., Inc.,* 315 B.R. 292, 304-06 (Bankr. W.D.N.Y. 2004) (rejecting debtor's plan as not proposed in "good faith" because the debtor negotiated a lock-up agreement that included an *illegal* "golden parachute" for its CEO that secured a promise for "what is essentially a bonus that would be distributed to himself and without concern for minority stock interests" in breach of his fiduciary obligations and in violation of the law); *In re Woolley's Parkway Ctr., Inc.,* 147 B.R. 996, 1002-03 (Bankr. M.D. Fla. 1992) (plan of reorganization served no other purpose than to relieve its principal shareholder of his guarantee of the debtor's primary obligation); *In re Future Energy Corp.,* 83 B.R. 470, 487 (Bankr. S.D. Ohio 1988) (citing in *dicta* the proposition that "[c]learly,

an attempt by a debtor-in-possession to give favorable treatment to an insider [creditor] is violative of § 1129(a)(3)," but finding that the good faith objection could not prevent confirmation as it was "not supported by evidence . . [and] is premised purely upon the objectors' speculation as to the debtor-in-possession's future conduct").  Having failed to explain how conveying a benefit to Pfizer in accordance with section 524(g) reflects bad faith, the Court should overrule the AHC Objection.

E.    The Ad Hoc Committee is Seeking to Relitigate Numerous Issues that Have Previously Been Resolved by the Court

In the AHC Objection, the AHC is seeking to relitigate numerous issues on which the Court has already ruled against the Ad Hoc Committee.  Indeed, it appears that the Ad Hoc Committee has cut and pasted substantial portions of pleadings that it previously filed with this Court and is now impliedly asking the Court to revisit its prior decisions.  Among the previously decided issues that the AHC Objection raises are the following:

- Historical settlement values should not be considered in tabulating votes on the Plan.  *In re Quigley Co., Inc.,* 346 B.R. 647 (Bankr. S.D.N.Y. 2006).
- The Plan's classification scheme is not improper.  *Quigley.,* 377 B.R. 110 (Bankr. S.D.N.Y. 2007).
- The Plan does not treat similarly situated creditors unequally.  *Id.*
- Asbestos PI Claimants that reside in states which have enacted tort reform statutes were entitled to vote on the Plan.  *In re Quigley Co., Inc.,* 383 B.R. 19 (Bankr. S.D.N.Y. 2008).
- Quigley did not need to appoint a separate individual in addition to the Future Claimants Representative to represent the interests of Pfizer future demand holders, or the interests of malignant as opposed to nonmalignant Asbestos PI Claimants.  Tr. Hr'g Dec. 18, 2008, at 27:15-28:16.
- Claims alleging that Pfizer is the apparent manufacturer of Quigley's asbestos containing products can be channeled to the Asbestos PI Trust.  *Quigley Co., Inc. v. Coleman (In re Quigley Co., Inc.)*, No. 04-15739 (SMB), Adv. Proc. 04-04262 (SMB), 2008 Bankr. LEXIS 1565, at *13 (Bankr. S.D.N.Y. May 15, 2008).

(collectively, the "Decided Issues").

1.    *The Decided Issues*

All of the Decided Issues constitute the law of this case.  The law of the case doctrine

"posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California,* 460 U.S. 605, 618 (1983). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816 (1988). "A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances." *Id.* at 817. Courts in the Second Circuit decline to invoke the law of the case doctrine only upon "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *DiLaura v. Power Auth.,* 982 F.2d 73, 76 (2d Cir. 1992) (internal citations and quotation omitted). The burden to justify reconsideration of the law of the case is on the party challenging a ruling of a prior court in the same case. *See In re N. Telecom Ltd. Secs. Litig.,* 42 F. Supp. 2d 234, 239 (S.D.N.Y. 1999). Here, there has been no change in the law or new evidence presented that would warrant disregarding the law of the case, nor was there clear error or manifest injustice in connection with any of the Decided Issues. The Ad Hoc Committee has wholly failed to allege -- let alone carry its burden for showing -- any of the extraordinary circumstances that would justify revisiting the Decided Issues.

Pfizer will not burden the Court with long submissions on each of the Decided Issues; rather it will simply provide a very brief summary of each. Out of an abundance of caution and to protect the record, Pfizer incorporates herein each of the pleadings and related documents filed with the Court by Pfizer and/or Quigley in connection with the Decided Issues.

> a.    It is Law of the Case that TDP Values are Utilized to Weigh Claim Values for Voting

This Court has previously rejected the Ad Hoc Committee's argument that historical

settlement values should be accounted for in weighing claim values and tabulating votes on the Plan, which the Ad Hoc Committee argued in its Memorandum of Law in Support of a Voting Methodology that Takes Into Account Both the Differing Interests Held by Settling and Non-Settling Claimants as Well as Disease Based Variations in Claim Value (ECF Doc. # 838) (Jun. 2, 2006). In its decision on this issue, the Court adopted the use of TDP claim values to estimate claims for voting purposes. *See Quigley*, 346 B.R. at 655-56 (concluding that the use of TDP values for claims estimation purposes is appropriate in this case). In connection therewith, this Court found and determined that:

> [The] Ad Hoc Committee's proposal [to assign claim values based upon historical settlement values of such claims] is no better and is more time consuming than the use of the TDP values. Claims are settled based on the individual merit of the underlying claim, and relevant factors include the plaintiff's age, disease, medical proof, pain and suffering, exposure history, and lifestyle. . . . The same bits of information would be necessary under the Ad Hoc Committee's proposal, and the Court would have to review every claim, including the identity of the lawyer representing the claimant, to determine its appropriate voting weight. Furthermore, the TDP values already reflect Quigley's settlement experience, have been approved by the Official Committee of Unsecured Creditors and the Future Claims Representative, and no one has suggested that the TDP values, or the differences in values assigned to the various disease categories, are arbitrary or unreasonable.

*Id.* "In addition, this approach fulfills the expectations of the claimants since their votes are presumably cast, in part, based upon the amount the creditors expect to receive from the Trust. Moreover, [the Ad Hoc Committee, Quigley and Pfizer] acknowledge that this result is reasonable." *Id.* at 655 (internal citations omitted). This is the law of the case.

          b.       It is Law of the Case that Classification and Treatment Under the Plan are Proper

It is the law of this case that the Plan's classification and treatment schemes are proper

under the Bankruptcy Code. In the AHC Objection, the Ad Hoc Committee argues that the Plan

treats similarly situated creditors unequally in violation of section 1123(a)(4) a result of: (i) the

Pfizer Claimant Settlement Agreements; and (b) the Pfizer Waiver. AHC Objection at ¶¶ 91-

101. The Ad Hoc Committee further contends that the Plan improperly classifies Asbestos PI

Claimants by placing Settling Plaintiffs and Non-Settling Plaintiffs into the same class, when the

two groups purportedly have different legal rights as a result of the Pfizer Claimant Settlement

Agreements. AHC Objection at ¶¶ 102-08. All of these arguments were previously decided by

the Court in connection with the Ad Hoc Committee's objection to the Disclosure Statement. At

the July 12, 2007 Disclosure Statement hearing, the Court granted the parties an opportunity to

be heard on these issues, and stated:

> I think the more serious issue that I have is this what I call the
> classification issue. Maybe it's an unequal treatment issue. But,
> certainly, I can look at that as a legal issue, whether the mere
> connection between the Pfizer settlement and the confirmation of
> the plan somehow makes it unconfirmable as a matter of law as
> presently proposed, whether the settling creditors have to be
> separately classified, which may cure at least any of that.

Tr. Hr'g Jul. 12, 2007, at 83:23-84:5 (relevant portions attached hereto as Exhibit Z).

Accordingly, the Court specifically invited briefing "particularly on the classification issue," *id.*

at 84:9-10, and the Ad Hoc Committee submitted a memorandum devoted to argument on

unequal treatment and classification.[41] Quigley and Pfizer submitted a joint memorandum on the

issue, as well as a joint reply memorandum.[42] On October 23, 2007, the Court entered its

opinion holding that "the classification scheme and treatment of the members of the [Asbestos

PI] class satisfy the relevant provisions of the Code." *Quigley,* 377 B.R. at 112. *See also id.* at

---

[41] Memorandum of the Ad Hoc Committee Addressing Unequal Treatment of Similarly Situated Creditors (ECF Doc. # 1192) (Jul. 27, 2007).

[42] Memorandum of Quigley and Pfizer Regarding Classification of Asbestos PI Claims under 11 U.S.C. § 1122(a) (ECF Doc. # 1190) (Jul. 20, 2007); Reply of Quigley and Pfizer in Support of Memorandum of Law Regarding Classification of Asbestos PI Claims (ECF Doc. # 1195) (Aug. 3, 2007).

116 (the Pfizer Claimant Settlement Agreements "do not require the separate classification of the two groups of PI Claimants."); *id.* at 116-17 ("The Pfizer payments do not, however, affect the equality of treatment because all similarly situated PI Claimants will receive the same distribution under the Plan. The Pfizer settlement is being funded by a non-debtor and is being paid outside of the Plan."); *id.* at 119 ("the Court cannot find as a matter of law that the non-settling PI Claimants are receiving unequal treatment in violation of 11 U.S.C. § 1123(a)(4)."). Accordingly, it is the law of this case that the Plan's classification scheme and treatment of creditors are proper.

### c. It is the Law of the Case that Asbestos PI Claimants Residing in Tort Reform States Were Entitled to Vote on the Plan

The Court has also previously issued a written opinion rejecting the Ad Hoc Committee's argument that Asbestos PI Claimants residing in certain states were not entitled to vote on the Plan because of "state tort reform statutes" that may have procedurally delayed their state law causes of action. AHC Objection at ¶¶ 206-207. This argument was previously raised and litigated by the Ad Hoc Committee at the Disclosure Statement hearing, and as part of its objection to the proposed ballot and solicitation materials.[43] *See Quigley,* 383 B.R. at 23-24 (describing the Ad Hoc Committee's multiple filings on this issue, as well as briefings by multiple other parties). *See id.* at 21 ("the [Ad Hoc Committee] contends that such creditors do not hold 'claims,' and are not entitled to vote. . . . the [Ad Hoc Committee's] objection is overruled"). In so ruling, the Court held that "an Asbestos PI Claimant's pre-petition exposure to asbestos gave rise to a 'claim,' regardless of whether the law of any particular state renders the

---

[43] *See* Memorandum in Response to Notice of Presentment on Balloting and Solicitation Materials, at 4 (ECF Doc. # 1278) (Nov. 19, 2007) (arguing that claimants from tort reform states "do not possess current claims against Quigley and, thus cannot be allowed to vote."); Tr. Hr'g Jul. 12, 2007, at 59:5-6 (claiming that the Plan and proposed voting procedures are "allowing creditors. . . to vote on a plan that have no claim"); *id.* at 61:7-8 ("It's a matter of statute that the claim doesn't exist under state law.").

cause of action unenforceable until some future contingency occurs." *Id.* at 27. Moreover, the Court found that "[a]lthough the foregoing is sufficient to dispose of the [Ad Hoc Committee's] objection, its arguments also mischaracterize the effect of the laws in the Tort Reform States" because "[t]he Tort Reform Statutes . . . do not affect whether the Asbestos PI Claimant holds a 'claim' in a bankruptcy case." *Id.* at 27-28. The tort reform argument set forth in the AHC Objection has been decided by this Court and that decision is the law of the case.

### d. It is Law of the Case that the Future Claimants Representative Can Adequately Represent the Interests of All Future Demand Holders

Subsequent to the Ad Hoc Committee filing the AHC Objection, this Court issued a bench ruling in connection with the Ad Hoc Committee's summary judgment motion asserting that multiple futures representatives should have been appointed in Quigley's case. The Court rejected the Ad Hoc Committee's argument. AHC Objection at ¶¶ 208-15.[44] At the December 18, 2008 hearing, the Court found it "clear that [section 524(g)] doesn't require the appointment of multiple futures representatives." Tr. Hr'g Dec. 18, 2008, at 27:17-19. As the Court further reasoned, "every derivative Pfizer claim by definition has a tagalong direct Quigley claim. . . all of the future constituents. . . have the same claim against Pfizer and the same claim against Quigley." *Id.* at 28:4-8. Although the Court acknowledged that "the claims have different strengths," it found that "true of. . . everybody in the creditor body and a single committee still represents the creditors." *Id.* at 28:9-11. The Court concluded that "the basis of liability is the

---

[44] *See* Motion of the Ad Hoc Committee for Partial Summary Judgment on Objection, Denial of Plan Confirmation and Dismissal of This Case (ECF Doc. # 1592) (Nov. 5, 2008); Reply Filed in Further Support of Motion for Partial Summary Judgment on Objection, Denial of Plan Confirmation and Dismissal of This Case (ECF Doc. # 1654) (Dec. 8, 2008). *See also* Opposition of Certain Settling Claimants Represented by Baron & Budd, P.C. to Motion of the Ad Hoc Committee for Partial Summary Judgment on Objection, Denial of Plan Confirmation and Dismissal of This Case (ECF Doc. # 1619) (Nov. 24, 2008); Opposition of Quigley to Motion of the Ad Hoc Committee of Tort Lawyers for Order Granting Partial Summary Judgment on Objection (ECf Doc. # 1620) (Nov. 24, 2007); Statement of the Legal Representative for Future Asbestos Personal Injury Claimants in Connection with Motion of the Ad Hoc Committee for Partial Summary Judgment (ECF Doc. # 1622) (Nov. 24, 2008); Response of Pfizer in Opposition to Motion of the Ad Hoc Committee for Partial Summary Judgment on its Objection for Failure to Appoint a Second Representative of Future Demand Holders (ECF Doc. # 1623) (Nov. 24, 2008).

same. And the current future representative can represent that constituency, which all have the same interest against Quigley and Pfizer, and that interest is to get enough money for the futures." *Id.* at 28:11-15. The Court's decision that multiple futures representatives are not required is the law of the case.

      e.      It is Law of the Case That Apparent Manufacturer Claims May Be Channeled, Despite the Ad Hoc Committee's Appeal of the Court's Ruling

As discussed above, the AHC Objection includes an attempt to relitigate this Court's May 2008 opinion finding that apparent manufacturer claims can be channeled to the Asbestos PI Trust. It is "well settled that the pendency of an appeal has no effect on the finality or binding effect of a trial court's holding." *Pharmacia & Upjohn Co. v. Mylan Pharm., Inc.,* 170 F.3d 1373, 1381 (Fed. Cir. 1999) (*quoting Deposit Bank v. Board of Councilmen of City of Frankfort,* 191 U.S. 499 (1903)) (citing cases). *See also Breeden v. Bennett (In re The Bennett Funding Group, Inc.),* 367 B.R. 269, 286 (Bankr. N.D.N.Y. 2007) ("[P]endency of an appeal does not deprive a judgment of its preclusive effect.") (internal quotation omitted); 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure, § 4433.

The parties thoroughly briefed the issue of whether section 524(g) permits channeling apparent manufacturer claims against Pfizer to the Asbestos PI Trust. When Angelos presented Pennsylvania state court complaints alleging that Pfizer apparently manufactured Insulag, which were filed subsequent to the Court's entry of the amended preliminary injunction in this case (the "Amended Preliminary Injunction"), the Court ruled that all such claims were subject to the Amended Preliminary Injunction.[45] In the AHC Objection, the Ad Hoc Committee argues yet

---

[45] *See* Memorandum of Law of Pfizer in Support of Motion (I) to Enforce the Preliminary Injunction Order and (II) for Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, Adv. No. 04-04262 (SMB), (ECF Doc. # 242) (Feb. 28, 2008); Memorandum in Opposition to Pfizer's Motion for Interim Relief to Enjoin the Pending Insulag Actions, Adv. No. 04-04262 (SMB), (ECF Doc. # 244) (Mar. 3, 2008); Memorandum of Law

again that "Section 400 . . . provides a basis for Pfizer's liability arising on Pfizer's *own conduct,"* and that "Restatement Section 400 claims do not depend upon 'claims' or 'demands' against Quigley . . . . they are 'stand-alone' claims that would exist against Pfizer even if no claim was ever asserted against Quigley and are wholly separate from any liability that may attach to Quigley." AHC Objection at ¶ 129. This Court issued a written opinion on May 15, 2008, flatly rejecting Angelos' contention that apparent manufacturer claims against Pfizer were not enjoined by the Amended Preliminary Injunction. The Court rejected the contention that such claims could not be channeled, because the Plan's definition of Asbestos PI Claims to be channeled tracks the language of the Amended Preliminary Injunction (and section 524(g)) exactly.

In so ruling, the Court posed three inquiries: "(1) does Pfizer's Section 400 liability arise directly or indirectly from the 'conduct of, claims against, or demands on' Quigley; (2) will the Section 400 claims asserted by the Pennsylvania plaintiffs against Pfizer be paid under Quigley's plan; and (3) does Pfizer's liability 'arise by reason of' its ownership or management of Quigley?" *Quigley,* 2008 Bankr. LEXIS 1565, at *11. In answering its questions, the Court stated:

> The first two answers are clearly in the affirmative. The Section 400 claims arise from Quigley's conduct. Quigley manufactured the Insulag that the Pennsylvania plaintiffs allege caused their injuries, and but for Quigley's allegedly tortious conduct, no

Supporting Position That The Amended Injunction Does Not Extend to the Direct Pfizer Insulag Actions, Adv. No. 04-04262 (SMB), (ECF Doc. # 250) (Mar. 17, 2008); Supplemental Memorandum of Law of Pfizer in Support of Motion (I) to Enforce the Preliminary Injunction Order and (II) for Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, Adv. No. 04-04262 (SMB), (ECF Doc. # 252) (Mar. 17, 2008); Request of Pfizer Inc. for Factual Findings in Connection with Motion (I) To Enforce the Preliminary Injunction Order and (II) For Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, Adv. No. 04-04262 (SMB), (ECF Doc. # 257) (Apr. 2, 2008); Opposition Brief to Pfizer's Reply Brief on the Issue of the Permissible Scope of the Amended Injunction, Adv. No. 04-04262 (SMB), (ECF Doc. # 259) (Apr. 9, 2008); Statement of Pfizer in Response to the Opposition of Angelos to Request of Pfizer for Factual Findings in Connection with Motion (I) To Enforce the Preliminary Injunction Order and (II) for Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion, Adv. No. 04-04262 (SMB) (ECF Doc. # 262) (Apr. 11, 2008).

> Section 400 liability could exist. Pfizer did not commit an actionable tort simply by placing its name and logo, or allowing Quigley to place the Pfizer name and logo, on Quigley corporate documents, forms and packaging. In addition, because Quigley, as the actual manufacturer, is liable for the same injuries, the Pennsylvania plaintiffs can assert their claims against the Quigley trust established under the proposed plan.

*Id.* at * 13. The Court then addressed the third question. After analyzing the issue in detail, it held:

> The evidence presented on this motion shows that Quigley simply added the Pfizer logo to its existing documents and written materials after the Pfizer acquisition, but nothing else changed. Furthermore, the Angelos Firm acknowledged that the Pfizer name and logo would not have been used by Quigley but for the Pfizer affiliation. Under the facts presented, the joinder of the Quigley and Pfizer names and logos is a statement of corporate affiliation. Even if it is sufficient to trigger Section 400 liability under non-bankruptcy law, that liability nevertheless "arises by reason of" Pfizer's ownership or management of Quigley. *Consequently, the Section 400 claim may be channeled into the Quigley trust.*

*Id.* at *19 (emphasis added). *See also id.* at *14 ("Pfizer's Section 400 liability 'arises by reason of' its corporate connection to Quigley."); *id.* at *15 ("If the corporate affiliation is the *sine qua non* of liability, the liability may be said to 'arise by reason of' the corporate relationship.").

Although the Court declined to rule on whether Pfizer actually manufactured Insulag, neither Angelos nor the Ad Hoc Committee has presented a shred of evidence in support of this later-created allegation that Angelos did not already offer in connection with its assertion that Pfizer was an apparent manufacturer of Insulag. The Court expressed skepticism that Angelos' evidence demonstrated *any* Insulag liability on the part of Pfizer, much less that Pfizer actually manufactured the product. *See id.* at *6-7 n.1 ("[T]he 1999 Notes to Pfizer's Consolidated Financial Statements stated that '[t]hrough the early 1970s, Pfizer Inc. (Minerals Division) and Quigley Company, Inc. ('Quigley'), a wholly owned subsidiary, sold a minimal amount of one construction product and several refractory products containing asbestos' . . . . The statement

does not, however, refer to Insulag by name."); *id.* at *15 ("Quigley began manufacturing Insulag in the 1930s, thirty years before Pfizer acquired it . . . . Before and after Pfizer's acquisition, Quigley used identical promotional materials, except that Quigley added the Pfizer logo after the acquisition . . . . But for Pfizer's ownership and/or management of Quigley, its name and logo would never have been used, and the Angelos Firm conceded as much at oral argument."); *id.* at *19 ("The evidence . . . shows that Quigley simply added the Pfizer logo to its existing documents and written materials after the Pfizer acquisition, but nothing else changed. Furthermore, the Angelos Firm acknowledged that the Pfizer name and logo would not have been used by Quigley but for the Pfizer affiliation. Under the facts presented, the joinder of the Quigley and Pfizer names and logos is a statement of corporate affiliation."). *See also* Tr. Hr'g Mar. 4, 2008, at 16:24-17:4 (THE COURT: If Pfizer didn't own Quigley, you think their logo would be on their purchase order? MR. ARNOLD: There are cases where that has happened because – THE COURT: You think it would happen in this case? MR. ARNOLD: Of course not.) (relevant portions attached hereto as Exhibit aa). Accordingly, the Ad Hoc Committee's contentions in the AHC Objection that apparent manufacturer claims cannot be channeled are barred by the law of the case doctrine.

F.     Pfizer Has No Liability for Quigley Derivative Claims

Pfizer and Quigley are two separate and distinct corporations, and there are no facts to support a claim against Pfizer for asbestos claims arising from exposure to Quigley's asbestos containing products. A parent company is generally not liable for the acts of a subsidiary, even where the parent is the sole shareholder of the subsidiary. *See In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F. Supp. 1447, 1452 (N.D. Ala. 1995) (court noted that limited liability is the rule, and not the exception); *Bennett v. GAF Corp.*, No. Civ. 93-432-M, 1994 WL 279752, at

*2 (D.N.H. Jun. 2, 1994) (noting that parent is not liable for the acts of its subsidiary "merely because it owns all of the subsidiary's stock"); *see also* Delaware General Corporate Law, Section 102(b)(6) ("the stockholders or members of a corporation shall not be personally liable for the payment of the corporation's debt except as they may be liable by reason of their own conduct or acts").

Courts are very reluctant to pierce the corporate veil and hold a parent liable for judgments against its subsidiary, absent "exceptional circumstances." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 270 (D. Del. 1989); *see also Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967) ("[T]he corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception[.]"); *Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 141 F. Supp. 2d 412, 418 (S.D.N.Y. 2001) (quoting *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) ("New York courts disregard corporate form reluctantly")); *Hillsborough Holdings Corp. v. Celotex Corp. (In re Hillsborough Holdings Corp.)*, 166 B.R. 461, 468 (Bankr. M.D. Fla. 1994), *aff'd,* 176 B.R. 223 (M.D. Fla. 1994) ("Florida and Delaware courts disregard the corporate entity in only the most extraordinary cases.").

A court will pierce the corporate veil only where two corporations operate as a single entity, such that it would be inequitable to uphold a legal distinction between them. *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1458 (2d Cir. 1995). The veil-piercing inquiry is fact-intensive, and the party who seeks to pierce the corporate veil bears the burden of proving that the corporate parent dominated and controlled the subsidiary to such an extent that it ceased to exist independently and was nothing more than the parent's alter ego. *Hillsborough Holdings*, 166 B.R. at 468 (*citing Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.)*, 622 F.2d 709 (5th Cir. 1980));

*see also Feitshans v. Kahn*, No. 06 Civ. 2125 (SAS), 2006 U.S. Dist. LEXIS 68633, at *14 (S.D.N.Y. Sept. 21, 2006) ("Because it is legitimate to incorporate to avoid personal liability, plaintiffs seeking to pierce the corporate veil bear a 'heavy burden' in showing that defendants have perverted the privilege of doing business in a corporate form.").

Courts conduct a two-prong analysis to determine whether to pierce a corporation's veil. First, a court will examine whether the parent has exercised such dominion and control over the subsidiary that the subsidiary may be deemed a mere instrumentality or alter ego of the parent. *Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett*, No. 05 Civ. 8988 (GEL), 2007 U.S. Dist. LEXIS 43508, at *8-9 (S.D.N.Y. Jun. 13, 2007*); Publicker Indus.,* 603 F.2d at 1069; *Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, No. 00 Civ. 2798 (DLC), M 19-375, 2002 U.S. Dist. LEXIS 24619, at *25 (S.D.N.Y. Dec. 27, 2002); *Hillsborough Holdings*, 166 B.R. at 468-69. Second, if a court finds that the subsidiary was a mere instrumentality or alter ego for the parent, the court will then pierce the corporate veil only if it also finds that it would be fundamentally unfair and unjust to allow the parent to avoid liability for actions of the subsidiary. *See Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997); *Bennett*, 1994 WL 279752 at *2; *Mobil Oil*, 718 F. Supp. at 267-69.[46]

### 1. *Pfizer Did Not Exercise Dominion and Control Over Quigley*

Courts review a wide variety of facts concerning the relationship between a parent and a

---

[46] Some states also require some element of fraud before piercing a corporate veil, but most courts require only dominion and control and fundamental unfairness. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995). *But see Lippe v. Bairnco Corp.*, No. 03-7360, 2004 WL 1109846, at *8 (2d Cir. May 17, 2004) ("...New York law is clear that domination *and* fraud are required" for veil-piercing) (emphasis in original); *Am. Fin. Int'l Group-Asia v. Bennett*, No. 05 Civ. 8988, 2007 U.S. Dist. LEXIS 43508, at *8-9 (S.D.N.Y. Jun. 13, 2007) (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991)) ("To pierce the corporate veil, plaintiffs must show that defendants '(1) have exercised such control that the subsidiary has become a mere instrumentality of the parent, which is the real actor; (2) such control has been used to commit fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff.'"); *Starfish Condo. Ass'n v. Yorkridge Servs. Corp., Inc.*, 458 A.2d 805, 816 (Md. 1983) (to pierce the corporate veil, fraud must be alleged with particularity); *Bart Arconti & Sons v. Ames-Ennis*, 340 A.2d 225, 235 (Md. 1975) (corporate veil will be pierced only where a corporation is used as a mere shield for the perpetuation of a fraud).

subsidiary to determine whether the subsidiary is so dominated by the parent as to be a mere instrumentality or alter-ego of the parent. Among the factors most commonly considered are whether:

- basic corporate formalities have been upheld (*e.g.,* separate board and shareholder meetings are held, with separate formal minutes being kept);

- the parent and subsidiary operate as separate businesses;

- the subsidiary is wholly owned by the parent;

- the parent and subsidiary share common directors, officers, and employees;

- the parent and subsidiary share the same attorneys and accountants;

- there is a sharing of common departments;

- the companies share common office space;

- the parent and subsidiary are perceived by the public as one or as separate business entities;

- the parent performs the subsidiary's administration of accounts payable and bookkeeping;

- the subsidiary is billed for such services if the parent performs administrative tasks for the subsidiary;

- the companies are separate in terms of types of asset ownership and operations;

- the subsidiary receives its assets directly from the parent or actually transacts business with third parties;

- the directors and officers of the subsidiary act independently and in the interest of the subsidiary, rather than of the parent.

*See, e.g., Fletcher,* 68 F.3d at 1458; *United Steelworkers v. Connors Steel Co.*, 855 F.2d 1499, 1505 (11th Cir. 1988); *Nelson v. Int'l Paint Co.*, 734 F.2d 1084, 1093 (5th Cir. 1984); *Gabriel Capital,* 122 F. Supp. at 432; *Silicone Gel Breast Implants Prods. Liab. Litig.*, 887 F. Supp. at 1452-53; *Mobil Oil*, 718 F. Supp. at 270-72; *Hillsborough Holdings*, 166 B.R. at 465-75.

No single factor is dispositive. Rather, courts look at the totality of circumstances to ascertain whether the subsidiary was operated as a separate and district entity. *Bair v. Purcell*, 500 F. Supp. 2d 468, 481 (M.D. Pa. 2007); s*ee also United Steelworkers v. Connors Steel*, 855 F.2d at 1506 ("[T]here is no litmus test for determining whether a subsidiary is the alter ego of

its parent. Instead, we must look at the totality of the circumstances."). However, given judicial reluctance to pierce the corporate veil, the presence of one or even a few of these facts is generally insufficient to pierce the corporate veil. *See Nelson,* 734 F.2d at 1090; *Land Ocean Logistics, Inc. v. Aqua Gulf Corp.*, 68 F. Supp. 2d 263, 276 (W.D.N.Y. 1999).

      a.      <u>Pfizer and Quigley Observed the Requisite Corporate Formalities</u>

Among the most important factors courts consider are whether the subsidiary regularly held board meetings, elected directors and officers through formal shareholder and board votes, prepared and maintained minutes and other corporate records, and observed the corporate formalities generally observed by an independent corporation. *See Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l., Inc.,* 2 F.3d 24, 28 (2d Cir. 1993); *A.I. Credit Consumer Disc. Co. v. Premiere Foods, Inc.*, No. 04-4049 (WHW), 2007 U.S. Dist. LEXIS 81737, at *12 (D.N.J. Nov. 5, 2007) (quoting *Craig v. Lake Asbestos of Que., Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988)); *Hillsborough Holdings*, 166 B.R. at 461. If a subsidiary is abiding by these basic corporate formalities, courts generally find that the subsidiary is not dominated by its parent, notwithstanding the existence of some other indicia of domination or control. *See id.* at 466-69. In *Hillsborough Holdings*, the court refused to pierce the corporate veil where the subsidiary held its own board meetings and maintained its own corporate minute books. By contrast, the court in *Carte Blanche* pierced the corporate veil, in part because of the total absence of any corporate formalities at the subsidiary. In that case, the subsidiary kept no corporate records or minutes, had no officers or directors elected in accordance with its by-laws, and had no functioning board of directors for at least two years at the time plaintiff was dealing with the subsidiary. *Carte Blanche,* 2 F.3d at 28.

Among the most *Hillsborough Holdings* is particularly instructive. There, the court refused to pierce the

corporate veil between a holding company, JWC, and its wholly-owned subsidiary, Celotex, to impose Celotex's asbestos-related liabilities on JWC. The court found that, even though there was some evidence that JWC dominated and controlled Celotex (*e.g.*, overlap of directors, bookkeeping services provided to subsidiary by parent, loans by parent to subsidiary that were not fully formalized, and close monitoring of the subsidiary's activities by the parent), that it was insufficient to support piercing of the corporate veil in light of other factors which demonstrated a clear separation between the parent and its subsidiary (*i.e.* Celotex held its own board meetings and maintained its own corporate minute books, JWC charged Celotex for the accounting, legal, tax and investment services it provided, Celotex made its own personnel decisions, and the loans JWC made to Celotex made good business sense, were recorded in both companies' books, and were repaid in a timely manner). 166 B.R. at 465-68, 471-75.

As in *Hillsborough Holdings*, Quigley observed the appropriate corporate formalities by: (i) holding regular board of directors and shareholder meetings; and (ii) maintaining minutes of those meetings and records of appropriate shareholder votes. The Quigley board minutes, moreover, demonstrate that Quigley's board regularly met to manage the affairs of Quigley, and that Pfizer did not improperly attempt to manage the affairs of Quigley. The Quigley board appointed Quigley's officers. Quigley also maintained its own books and records, its own banking and investment accounts and its own payroll. As in *Hillsborough Holdings*, Quigley's observance of the requisite corporate formalities establishes that Pfizer did not dominate or control Quigley.

    b.  Pfizer Did Not Improperly Influence Quigley's Policies and Decisions

Pfizer did not improperly influence (or even involve itself in) the operation of Quigley's day-to-day business. If the parent (particularly representatives of the parent who have no official

position with the subsidiary) makes day-to-day operational decisions or appears to control the operations of the subsidiary, a court is more likely to pierce the corporate veil.  *Mobil Oil*, 718 F. Supp. at 269-70; *see Pritchard Servs. (NY) Inc. v. First Winthrop Props., Inc.,* 568 N.Y.S.2d 775, 776 (N.Y. App. Div. 1991) (stating "subsidiary corporation, over which a parent corporation exercises control in every day operations may be deemed an instrumentality of the parent").  For instance, in *Pritchard Services*, the court permitted an action against the parent for breach of contract by its subsidiary, where the subsidiary's day-to-day operations were conducted by the parent's management, and the subsidiary "had no apparent function other than providing the corporate form through which [the parent's] management dealt with plaintiff."  568 N.Y.S.2d at 776.

However, the parent's involvement in a subsidiary's significant business decisions is not considered to be evidence of undue control by the parent.  For example, in *Fletcher v. Atex*, no domination was found even though: (i) the subsidiary was required to seek its parent's approval for "real estate leases, major capital expenditures, negotiations for a sale of minority stock ownership;" and (ii) the parent "played a significant role in the ultimate sale" of the subsidiary's assets to a third party.  68 F.3d at 1459-60.  Rather, the court held that such conduct was "typical of a majority shareholder or parent corporation."  *Id.* at 1460.  Similarly, in *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.*, a requirement that the subsidiary obtain the parent's approval for expenditures exceeding $250,000 was found not to be evidence of improper domination or control of the subsidiary.  456 F. Supp. 831, 843 (D. Del. 1978).

Here, Pfizer left the day-to-day management of Quigley's business to Quigley's officers and employees.  Moreover, the Quigley board minutes and corporate resolutions show that, to the extent Pfizer exerted any influence over Quigley, it did so through its representatives on

Quigley's board or through shareholder votes. Accordingly, Pfizer's role was consistent with that of a "typical" majority shareholder or parent corporation, and does not support piercing the corporate veil. *Fletcher*, 68 F.3d at 1460.

c.     Limited Director/Officer Overlap Is Not Improper

Although a court may conclude that a subsidiary is dominated by its parent where the two companies share a significant number of common officers, directors, or other employees, "a duplication of some or all of the directors or executive officers" is not evidence of domination and control. *United States v. Bestfoods*, 524 U.S. 51, 62 (1998); *see also Fletcher*, 68 F.3d at 1460 (stating "[p]arents and subsidiaries frequently have overlapping boards of directors while maintaining separate business operations."). Indeed, a certain level of overlap is to be expected, and is considered insignificant to the domination analysis. For instance, in *Fletcher*, the fact that a parent and subsidiary had only one director in common during the period in question was determined "negligible" by the court. *Id.* Rather, to support piercing the corporate veil, courts generally require an *absence* of separate officers, directors or employees. For example, in *Carte Blanche*, the court pierced the corporate veil because, *inter alia*, Carte Blanche International ("CBI"), a wholly-owned subsidiary of Diners Club, Inc. had no directors and its sole officer and only apparent employee was an employee and officer of Diners Club. 2 F.3d at 26-28. That officer, moreover, was merely appointed by Diners Club and not elected or appointed by CBI's non-existent board. *Id.*

Here, in contrast, Quigley had its own duly elected board of directors, which Pfizer did *not* dominate, and its own, predominantly independent, officers. Indeed, for most of its history, from 1916 until late August 1968, Quigley had no connection whatsoever to Pfizer, and even after its stock was acquired by Pfizer, and especially during the brief period during which Quigley continued to manufacture asbestos-containing products, only one or a few Quigley

officers were simultaneously Pfizer officers. Moreover, at all relevant times Quigley maintained a substantial independent work force at its Old Bridge, New Jersey factory and other facilities. Thus, the mere fact that during the relevant time some of Quigley's directors may also have been Pfizer officers or employees or that one or a few of its officers may also have been Pfizer employees is not by itself sufficient to support piercing the corporate veil between Pfizer and Quigley. *Fletcher*, 68 F.3d at 1460; *Gabriel Capital*, 122 F. Supp. 2d at 429-30.

d.     <u>Sharing of Office Space is Insufficient to Support Veil Piercing</u>

The mere fact that Quigley moved its headquarters to Pfizer's headquarters building following the acquisition will not support piercing the corporate veil. Some courts have observed that, where a parent and subsidiary share a common address or have the same telephone number, this may, when combined with other factors not present here, support piercing the corporate veil. *See, e.g., Pledger v. United States*, 236 F.3d 315, 323 (6th Cir. 2000) (affirming lower court finding that subsidiary was mere instrumentality and alter ego of parent where, *inter alia*, subsidiary lacked independent office space and used parent's office space as if it were its own); *Feitshans v. Kahn*, No. 06 Civ. 2125 (SAS), 2007 U.S. Dist. LEXIS 63028, at *29 (S.D.N.Y. Aug. 24, 2007) (*quoting Amalgamated Lithographers of Am. Local One v. Armen Graphics Ltd.*, No. 96 Civ. 5844 (LBS), 1997 WL 458738, at *8-9 (S.D.N.Y. Aug. 12, 1997)). However, this factor alone is never sufficient to pierce the corporate veil; indeed the existence of other factors, particularly observance of corporate formalities, will generally outweigh this factor.

For instance, *in In re Foxmeyer Corp.*, a parent and subsidiary shared an address, office space and a phone number. 290 B.R. 229, 245 (Bankr. D. Del. 2003). However, because other corporate formalities were maintained (*e.g.*, the subsidiary's directors were elected in accordance

with its articles, corporate meetings were held regularly, and minutes were kept), the court held that the plaintiff did not meet its "heavy burden" of proof as to dominance. *Id.* Here, Pfizer and Quigley each had separate space at Pfizer's headquarters and did not operate out of a single location or use the same phone numbers. Moreover, at all relevant times, Quigley maintained its own manufacturing facility in Old Bridge, New Jersey, did not use Pfizer's manufacturing facilities and did not share the Old Bridge plant with Pfizer. Further, Quigley's offices in Pfizer's building were on a separate floor and Quigley was allocated a rental charge for the use of the space. Thus, the mere fact that Quigley's headquarters were located in Pfizer's headquarters building will not support piercing the corporate veil. *See Land Ocean Logistics,* 68 F. Supp. 2d at 276 (holding that plaintiff could not pierce defendant corporation's veil where the parent and subsidiary had their headquarters at the same location but where the two corporations maintained separate facilities and corporate and financial records, as well as separate employees).

e.      A Parent May Provide Services to its Subsidiaries

Quigley's use of Pfizer's corporate legal, accounting and occupational safety departments does not support piercing Quigley's corporate veil. *See, e.g., Hukill v. Auto Care, Inc.*, 192 F.3d 437, 443 (4th Cir. 1999) (shared administrative departments and services not sufficient to permit piercing corporate veil); *Quarles v. Fuqua Indus.*; 504 F.2d 1358, 1363 (10th Cir. 1974) (no veil piercing where parent provided general financial, legal, tax and administrative services to wholly-owned subsidiary); *Horizon Plastics, Inc. v. Constance*, No. 00 Civ. 6458 (RCC), 2004 WL 1234049, at *4 (S.D.N.Y. Jun. 2, 2004) (court refused to pierce corporate veil where parent and subsidiary shared office space, intermingled funds and shared services); *Japan Petroleum v. Ashland Oil*, 456 F.Supp. at 846 (shared administrative services insufficient to permit piercing

corporate veil). Courts have long recognized that a subsidiary may use the administrative departments of its parent to achieve economies of scale or otherwise, without losing its separate corporate existence. This is particularly true where, as here, the parent and subsidiary generally observe corporate formalities, have their own officers and directors, maintain separate operations and the subsidiary pays the parent for its share of such costs. *See Nelson,* 734 F.2d at 1084 (holding that no basis exists to pierce veil where*, inter alia*, subsidiary uses parent's research and development facilities but pays parent for such use and also maintains a separate board of directors and headquarters). Quigley's overwhelmingly separate operations far outweigh any evidence that Quigley sometimes utilized Pfizer's accountants, lawyers or safety personnel for its operations. Moreover, Pfizer charged Quigley for the services of these departments.[47]

### 2. *Refusal to Pierce Will Not Result in Unfairness or Injustice*

Even if, assuming *arguendo*, that the court were to find that Pfizer exerted "excessive control" over Quigley, that would not be sufficient to permit a plaintiff to pierce the corporate veil and impose liability upon the parent. *See Outokumpu Eng'g Enters, Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996) ("Mere dominion and control of the parent over the subsidiary will not support alter ego liability."). Courts also require a plaintiff to demonstrate that not piercing the veil will result in unfairness and injustice, arising out of the defendant's misuse of the corporate form. *See, e.g., Fletcher*, 68 F.3d at 1461 (requiring an "'overall element of injustice or unfairness' that would result from respecting the two companies' corporate separateness."); *Underwood v. Armstrong World Indus., Inc. (In re Birmingham Asbestos Litig.*, 997 F.2d 827, 829-30 (11th Cir. 1993) (requiring, in addition to dominion and control by parent, that "there must be the added element of harm or loss resulting

---

[47] Pfizer charged Quigley for the use of these services by allocating their costs to Quigley through journal entries in the corporate accounts of both companies.

from the misuse [of the separate corporate entity"]). Like domination and control, the "unfairness" factor is a fact intensive inquiry. To determine whether the corporate veil may be pierced to avoid an inequity, courts consider whether:

- the subsidiary received adequate capitalization at the time of its incorporation;
- the parent stripped the subsidiary of its assets;
- the subsidiary, at the direction of its parent corporation, engaged in unlawful or fraudulent activities;
- the subsidiary acted in clear contravention of its creditors' interests; and
- the subsidiary was used by the parent to protect a parent's crime, to achieve/perpetuate a monopoly, or to evade existing legal obligations.

*Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1390 (7th Cir. 1994); *W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.,* 11 F.3d 65, 67 (5th Cir. 1994); *Silicone Gel Breast Implants Prods. Liab. Litig.*, 837 F. Supp. at 1137-39; *Mobil Oil*, 718 F. Supp. at 270-72; *Morris v. N.Y.S. Dep't of Taxation and Fin.*, 603 N.Y.S.2d 807, 811 (1993).

a.  Quigley Was Adequately Capitalized

The parent's failure to adequately capitalize its subsidiary is one significant factor in determining whether piercing the corporate veil is necessary to avoid an inequitable outcome. *See Nelson*, 734 F.2d at 1092; *Hillsborough Holdings*, 166 B.R. at 474. Courts require the undercapitalization to be severe. *See, e.g., Carte Blanche*, 2 F.3d at 24 (finding subsidiary inadequately capitalized because it had no assets, paid in capital of $10,000 and was more than $7 million in debt to the parent company). The mere fact that potential liabilities (including liabilities to plaintiff) exceed the subsidiary's assets is not sufficient to pierce the corporate veil. *Hillsborough Holdings*, 166 B.R. at 474. Moreover, to be relevant, the undercapitalization must have existed from the time the subsidiary was created or have resulted from the acts of the parent (*e.g.,* stripping assets from the subsidiary). *Foxmeyer*, 290 B.R. at 244.

Here, Quigley was acquired by Pfizer more than fifty years after it was formed, and had

substantial assets at the time.  Disclosure Statement at 20.  As Quigley was formed decades before the potential threat of asbestos-related tort liability was known or reasonably foreseeable, Quigley cannot be considered inadequately capitalized at formation for purposes of this analysis. *See Silicone Gel Breast Implant Litig.*, 837 F.Supp. at 1128 (holding that Dow Corning was not inadequately capitalized where it was formed decades before the threat of products liability exposure was even known).  Overall, Quigley's net capitalization was maintained.  Accordingly, there is no basis to support a finding that Quigley was so inadequately capitalized that it would be unfair not to pierce the corporate veil due to inadequate capitalization.

b.    Pfizer Did Not Strip Assets From Quigley

Pfizer never stripped Quigley of valuable assets.  Nor was the sale of Quigley's assets in 1992 undertaken in order to strip the company of valuable assets.  To the contrary, the transaction resulted in the conversion of Quigley's illiquid assets into the $78.8 million in cash which was paid to Quigley (not Pfizer) and subsequently used to satisfy asbestos claims. Moreover, the transaction was at arm's length and undertaken by Pfizer as part of a legitimate strategy to divest itself of non-core businesses and focus on its core health care businesses. Where, as here, the subsidiary's assets are sold for fair value, there is no basis to conclude that the sale was an unfair effort to strip the subsidiary of assets.  *See Lippe v. Bairnco Corp.*, No. 03-7360, 2004 WL 1109846, at *6 (2d Cir. May 17, 2004) (reasoning that it is "a crude simplification to suggest that the exchange of a business for cash is somehow inherently unfair," particularly where there is independent support for the fairness of the transaction); *Hillsborough Holdings*, 166 B.R. at 472 (sale of subsidiary's assets does *not* constitute unfair effort to strip subsidiary of assets).

c.    There are No Other Indicia of Fraud or Unfairness

There is no evidence - indeed, there has never been an allegation - that the Quigley subsidiary was created to perpetuate a fraud or permit Pfizer to shield itself from liability for its own conduct.  To the contrary, Quigley was formed decades before Pfizer acquired it for the purpose of manufacturing industrial products, and it continued to function as a legitimate and separate business after it was acquired by Pfizer.  Disclosure Statement at 20.

Accordingly, assuming *arguendo*, that a court were to find Quigley to be, contrary to fact, an alter ego of Pfizer, there is simply no evidence that Pfizer, or any of Pfizer's directors or officers, misused Quigley's subsidiary status to cause harm or avoid liability for their own actions.  Plaintiffs will be unable to show fraud, and plaintiffs cannot show that they were Quigley "creditors" who were prejudiced by the sale of Quigley's assets, which in any case yielded fair value.  Thus, an action under a veil-piercing theory to attempt to hold Pfizer liable for asbestos-related claims against Quigley would fail.

G.    Court Should Find That Pfizer Did Not Participate In the
Manufacture or Distribution of Insulag or Any Other Quigley Product

As the Court is aware, and as Pfizer has described in detail in pleadings filed previously in this chapter 11 case, the members of the Ad Hoc Committee have continually sought to circumvent the preliminary injunctions entered by this Court by retooling their theories of liability and their factual allegations against Pfizer.

For example, barely one month after the Court entered the Amended Preliminary Injunction Order, dated December 6, 2007 (the "Amended PI Order"), Angelos attempted to assert and prosecute 1,386 personal injury actions based on alleged exposure to Insulag manufactured by Quigley on the theory that Pfizer was an "apparent manufacturer."  *See Quigley,* 2008 Bankr. LEXIS 1565.  Because, as the Court subsequently found, these actions

were in violation of the Amended PI Order, Pfizer filed a motion to enforce the order. However, even before the Court had an opportunity to decide the issue, Angelos spun a new theory to circumvent the Amended PI Order -- that Pfizer actually manufactured or distributed Insulag. *See* Memorandum of Law Supporting Position That The Amended Injunction Does Not Extend to the Direct Pfizer Insulag Actions, Adv. No. 04-04262 (SMB), (ECF Doc. # 250) (Mar. 17, 2008). While Angelos' new theory has absolutely no basis in fact, its decision to advance this theory of liability against Pfizer raises significant questions as to what protection, if any, Pfizer will receive under the Asbestos PI Channeling Injunction.

When Pfizer agreed to make its very substantial contribution to Quigley's section 524(g) trust, the consideration that Pfizer bargained for was an end to lawsuits based on exposure to Quigley's products, including Insulag, Panelag, and Damit. Because Pfizer never manufactured or distributed Insulag, Panelag, or Damit, any claims against Pfizer for injuries caused by these products are properly enjoined under section 524(g). This is uncontroverted by all of the case law, as set forth in detail in the Supplemental Memorandum of Law of Pfizer in Support of Motion (I) to Enforce the Preliminary Injunction Order and (II) for Interim Relief to Enjoin the Insulag Actions Pending Ruling on the Motion (the "Pfizer Supplemental Brief").

If Angelos and any other plaintiffs' firm are allowed to pursue actions against Pfizer by simply making the false and baseless allegation that Pfizer manufactured Insulag, Panelag, or Damit, the Asbestos PI Channeling Injunction will be rendered meaningless. Pfizer would be forced to expend enormous resources defending baseless claims. As discussed in the Pfizer Supplemental Brief, a principal goal of section 524(g) – to induce third parties to contribute to section 524(g) trusts in exchange for protection from claims based on the debtor's conduct – would be read out of existence.

The Asbestos PI Channeling Injunction is the foundation of the Plan. Thus, it is essential that all parties in interest understand precisely what claims are enjoined and what claims are not enjoined by it. Absent such clarity, there cannot be a meeting of the minds as to the agreement at the core of the Plan: the protection Pfizer receives as consideration for its very substantial contribution to the Asbestos PI Trust.

In order to properly define the scope of the Asbestos PI Channeling Injunction, Pfizer respectfully requests that the Court determine, in connection with confirmation of the Plan, whether or not all claims based on alleged exposure to Insulag, Panelag, and Damit are enjoined by the Asbestos PI Channeling Injunction. Such a determination requires factual findings that Pfizer never manufactured or distributed these products. Absent such a determination, state courts will not have the necessary guidance to understand the scope of the Asbestos PI Channeling Injunction, and countless cases will likely end up before this Court for a determination as to their inclusion in the Asbestos PI Channeling Injunction.

In considering confirmation of a debtor's proposed plan of reorganization, bankruptcy courts routinely make many factual findings. In a section 524(g) case, when considering a channeling injunction, the court may make factual findings in connection with determining the scope of the injunction. For example, in order to clarify the scope of the channeling injunction in *Manville,* the bankruptcy court engaged in extensive fact-finding regarding Manville and its relationship with Travelers, determining, among other things, that "Travelers learned virtually everything it knew about asbestos from its relationship with Manville." *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.,* 517 F.3d 52, 59 (2d Cir. 2008), *cert. granted sub nom., Travelers Indem. Co. v. Bailey*, 129 S.Ct. 761 (2008), and *Common Law Settlement*

*Counsel v. Bailey*, 129 S.Ct. 762 (2008).[48]  In *Pittsburgh Corning,* the bankruptcy court conducted extensive evidentiary hearings in connection with confirmation and the scope of the proposed 524(g) channeling injunction.  Among other things, the bankruptcy court found that "[n]either PPG nor Corning [the two parents of the debtor] manufactured, distributed or sold Unibestos [asbestos product manufactured by the debtor], with the exception of two sales of Unibestos by PPG's fiberglass division in August and October 1969 for sale prices of $384.00 and $292.80, respectively."  *See* Stipulated Findings of Fact at ¶ 40, *In re Pittsburgh Corning Corp.,* No. 00-22876 (JKF) (ECF Doc. # 3603) (Bankr. W.D. Pa. Sept. 24, 2004) (citing, *inter alia,* hearing transcripts).

If Angelos or any other plaintiffs' firm is permitted to circumvent the Asbestos PI Channeling Injunction by merely alleging that Pfizer manufactured Insulag, Panelag, or Damit, then Pfizer will be right back in the tort system, defending tens if not hundreds of thousands of claims based on exposure to Quigley's products, irrespective of the lack of merit to such claims. The very protections provided by the Asbestos PI Channeling Injunction for which Pfizer has agreed to make significant contributions to the Asbestos PI Trust and to Quigley will become meaningless.  Because of the position taken by the members of the Ad Hoc Committee, it will be very difficult, if not impossible, for the Court to effectively delineate what claims are channeled in a manner that would provide clarity to state courts.  For these reasons, Pfizer respectfully submits that it is now necessary for this Court to make the factual finding that Pfizer did not manufacture or distribute Insulag, Panelag, or Damit.  Pfizer submits that this is the only way to ensure that the Asbestos PI Channeling Injunction will provide meaningful protection for Pfizer.

Accordingly, Pfizer respectfully requests that the Court make findings of fact that Pfizer

---

[48] Although the decision in the district court affirming the bankruptcy court was vacated and remanded by the Second Circuit, the Second Circuit did not reject the bankruptcy court's factual findings.

did not manufacture or distribute Insulag, Panelag, or Damit and that as such, all claims against Pfizer based on alleged exposure to Insulag, Panelag, or Damit are enjoined by the Asbestos PI Channeling Injunction.  If the Court is not inclined to make a factual determination, Pfizer respectfully requests that the Court explicitly retain jurisdiction so as to allow Pfizer to seek relief from the Court, including necessary factual determinations, that any alleged direct claims that may be filed against Pfizer have no basis in fact and are nothing more than derivative claims that are based on exposure to Quigley's products that have been recast as direct claims against Pfizer.

## IV.    CONCLUSION

For all of the foregoing reasons, Pfizer requests that the Court: (i) overrule all pending objections to the Plan; and (ii) confirm the Plan.

Dated:      New York, New York
            June 5, 2009

GREENBERG TRAURIG, LLP

/s/ John H. Bae_____

Bruce R. Zirinsky
John H. Bae
Gary D. Ticoll
Michele L. Angell
MetLife Building
200 Park Avenue
New York, New York  10281
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
zirinskyb@gtlaw.com
baej@gtlaw.com
ticollg@gtlaw.com
angellm@gtlaw.com

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
Dennis J. Block
dennis.block@cwt.com

Attorneys for Pfizer Inc.