# EXHIBIT A

# **REDACTED**

# EXHIBIT B

1

2    UNITED STATES BANKRUPTCY COURT

     SOUTHERN DISTRICT OF NEW YORK

3

4    _____ X

5    IN RE:   QUIGLEY COMPANY, INC.

6                                  Debtor.

7    _____ X

8

9                       4000 Ponce de Leon Boulevard

                         Coral Gables, Florida

10                       Monday, March 30, 2009

                         1:50 p.m. – 4:50 p.m

11

12              DEPOSITION OF JAMES L. FERRARO

13

14           Taken before RANDI GARCIA, Registered

15   Professional Reporter, Court Reporter and Notary

16   Public in and for the State of Florida at Large,

17   pursuant to Notice of Taking Deposition filed in the

18   above cause.

19

20

21

22

23

24

25

JAMES L. FERRARO

1 dissolved -- perhaps not the right word -- at least
2 terminated around 2001?
3
4    A   I don't know the exact date they
5 terminated CCR. I really don't recall the date. I
6 know it was a while ago.
7    Q   Do you recall after that point in time
8 that there came a point in time when you have, on
9 behalf of your clients, would negotiate directly
10 with Pfizer to resolve claims that you represented
11 against both Quigley and Pfizer?
12    A   Yes. CCR, when they broke up you had to
13 go out and deal with all the pieces. That is what
14 firms did. There were like, I think there were 20
15 firms or 20 defendants that were part of the Center
16 for Claims Resolution.
17    Q   And, in fact, on behalf of your clients,
18 after the CCR terminated dissolved, whatever, you
19 did in fact negotiate at least some settlements with
20 Pfizer directly, before this particular deal we have
21 been talking about?
22    A   We probably did some. I would have to go
23 back and see. You have to understand the dynamics
24 of asbestos litigation at that time. You also had
25 the beginning of the bankruptcy age. So you had a

JAMES L. FERRARO

1 lot of firms that were not just threatening to go
2 into Chapter 11, but actually were.
3
4    What would happen over time -- this is an
5 evolving type of litigation, where in the early
6 years everyone was jumping on John Manville. That
7 is what most firms did. They would beat up on John
8 Manville. They filed in '82. They then started
9 looking at other defendants.
10    Some of our tradesman are exposed -- could
11 be exposed to 100 different products. But we
12 clearly can't go out and investigate 100 products,
13 especially if you're going to try a case. Your
14 total damages are what they are. So it doesn't
15 behoove us to go out and try to find everything.
16 Most the time the workers can't remember. It all
17 depends on a case by case basis.
18    What happens is a very viable defendant
19 that has very bad documents or whatever, that is
20 getting hit all the time, now they file. So we
21 start to investigate other defendants. For
22 instance, Owens Corning became popular. They were
23 popular for a long time. Then the case got worked
24 out. A lot of other plaintiff firms got the
25 documents from the firm that first worked it up.

JAMES L. FERRARO

1 Everyone started trying cases against Owens Corning
2 because it was easier. The documents were out
3 there. Then they filed, and the focus starts to
4 turn to some companies like Union Carbide, and go,
5 wow, look at the documents that are out there on
6 Carbide. We should have been doing them for the
7 last 20 years. That is the nature of this business.
8    The ones I consider to be more of
9 pioneers, the ones that are going out there and
10 digging up documents, and I don't say finding new
11 defendant, because a lot of them are already in
12 litigation but they are not in place, so to speak.
13    So as you get more bankruptcies, new
14 entities come into play. Pfizer -- I am sure Pfizer
15 was very, very upset the day CCR broke up.
16    Because now firms are starting to look at
17 Pfizer and Quigley. They never did before. CCR to
18 me was the best kept secret for defendants in the
19 history of this litigation.
20    Every defendant that was part of the CCR,
21 they let that thing fall apart. I mean, they should
22 go to Gallo's, because it was the best deal you
23 could possibly get. All the plaintiff's bar would
24 consider CCR like one defendant. They were 20

JAMES L. FERRARO

1 different companies.
2    Once they broke up, now they have a
3 serious problem. Pfizer has a big serious problem.
4 Because now we are looking at them. We are looking
5 at Carbide. We are looking at all individual
6 pieces. Some of those pieces went into bankruptcy,
7 like GAF, Armstrong. That is how this evolved.
8    You can't sit there and give a point in
9 time and say 2001 or 2002 you did a settlement with
10 Pfizer for this amount of money, and say that that
11 has any relationship to what happened in 2004. By
12 2004 the numbers probably start getting ready to go
13 up, and they know it. We are looking at it. We got
14 the little red dot from our rifle right on your
15 forehead. You see that red dot and you say you
16 better doing something, because they are looking at
17 us. That is how this works.
18    Q   If I were to represent to you that based
19 on information provided to us during the course of
20 discovery by Pfizer, specifically their database of
21 claims settled, specifically in the period after the
22 CCR terminated them before this particular
23 settlement deal was done, that the average
24 settlement value of mesothelioma claims that your

JAMES L. FERRARO

1 
2 to be in the future. That is what 524B is in
3 essence about. It is a different type of situation.
4 And say that the insurers have 4 billion
5 to put into the trust. We have to decide how much
6 of that is for now for the current claimants and how
7 much is for the future. It is also a strange thing
8 because as plaintiff lawyers we know we are going to
9 represent people in the future, but we don't
10 represent them now. So at the time you do these
11 deals, you only represent who your clients are. You
12 can't represent in the future. The future rep has
13 to take care of the future. We can't take care of
14 the future. We don't know who they are. We don't
15 know if we are going to represent them. In reality
16 we know we are going to. We hope the future rep and
17 present rep can do something that makes sense going
18 forward. That is it. That is what it's all about.
19 **Q   Are you also aware under 524G that it is**
20 **possible for a non-debtor to receive protection**
21 **through injunction issued by the Bankruptcy Court**
22 **from future lawsuits based upon asbestos liability**
23 **of its subsidiaries?**
24 MR. WILSON: Object to form, as to
25 characterization.

JAMES L. FERRARO

1 
2 THE WITNESS: Yes. They can do it. You
3 can ask the Bankruptcy Court for a lot of
4 things. Doesn't mean you're going to get it,
5 but you can get it.
6 BY MR. STOLL:
7 **Q   Are you aware or familiar with the**
8 **requirements necessary in order for a plan to be**
9 **confirmed under 524G?**
10 MR. WILSON: Objection as to form.
11 THE WITNESS: In a broad sense, the
12 future -- you have to have an agreement between
13 the future and the present. And you also need,
14 in the present you need a 75 percent vote from
15 the present. That is not future. They have to
16 confirm. That is basic. That is just a very
17 basic part of 524G.
18 **Q   So you knew well at the time you were**
19 **negotiating this particular settlement agreement?**
20 A   Absolutely, as did every major plaintiff's
21 firm in the United States. This is not the
22 bankruptcy to come down the pike. The 524G wasn't
23 invented for this bankruptcy. It was not passed for
24 this bankruptcy. It was already there for the prior
25 bankruptcy.

JAMES L. FERRARO

1 
2 **Q   Right. So then turning back to section**
3 **4.1, page 16 of Exhibit 5, specifically 4.1D.**
4 A   Weren't we just there?
5 **Q   Yes. We are going back. So here it says**
6 **again that "each settlement plaintiff will have a**
7 **appeared in court and filed papers to support any**
8 **action by Pfizer or Quigley to enjoin further**
9 **prosecution of claims or personal injuries." See**
10 **that?**
11 A   I see it.
12 **Q   What was your understanding of what your**
13 **responsibility was on behalf of your clients with**
14 **respect to section 4.1D?**
15 A   We are the plaintiff's counsel. That is
16 what they are referring to through its plaintiff's
17 counsel. We acted on behalf of our clients. We are
18 going protect the interest of our clients. We want
19 to protect our deal for our clients, and part of it
20 is that our clients would vote in favor of them.
21 We recommended it that way to our clients
22 very specifically. And we in turn honored the deal.
23 The deal is that we are going to vote in favor of
24 the plan, or our clients are going to vote in favor
25 of the plan. You're going to get some that may not.

JAMES L. FERRARO

1 
2 That happens. And then they don't. But at the end
3 of day, there is no deal if you don't get 75
4 percent.
5 It is what it is. It happens or doesn't
6 happen. We hope it happens because we think it's in
7 the best interest of our client, because it is
8 expedited money for them, as opposed to waiting 20
9 years at a number we think is reasonable and fair
10 for them under the circumstances. So we want them
11 to vote for it. We recommend they vote for it.
12 That is all that is basically saying. We have to
13 protect them. We have to -- we can't keep suing
14 Pfizer, because we can't -- it doesn't help anyone
15 to do that.
16 **Q   The next condition is that under E, this**
17 **is, again, "condition to Pfizer's obligation to make**
18 **payment, is that Pfizer will have entered into**
19 **binding settlement agreements with claimants holding**
20 **in the aggregate in the sole judgment of Pfizer**
21 **claims equaling 75 percent of the outstanding**
22 **potential personal injury claims against the**
23 **Pfizer-protected parties." See that?**
24 A   Yes. That is what I just told you about.
25 That is 75 percent.

## Page 138

JAMES L. FERRARO

1  claims against Pfizer and Quigley that didn't exist
2  as clients or participate in the pre-petition
3  settlement agreement?
4      A   They didn't exist as clients, we didn't
5  represent them -- well, they definitely didn't. If
6  we didn't represent them, they definitely didn't
7  participate through us.
8      Q   Yes. That may have been. 2004, August of
9  2004 you entered into the settlement. The second
10 vote, the one on the Fourth Amended --
11     A   2008.
12     Q   -- takes place in March 2008, almost four
13 years later.
14         My question is: By the time of that vote,
15 had you acquired additional asbestos tort victims as
16 clients who were not represented by you at the time
17 of the pre-petition settlement?
18     A   I am sure --
19         MR. WILSON: Objection.
20         THE WITNESS: -- I am sure we picked up
21 new clients, but not that many. What happened
22 was you had the big tort reform push, federal
23 level, so the amount of claims dropped off
24 dramatically around that time. The amount of

## Page 139

JAMES L. FERRARO

1  new claims we picked up since then was de
2  minimis. But, you know, whether they voted or
3  not, I have no clue, right now sitting here.
4  If you want me to go try to find out, I could
5  try to find out not. Right now I can't, but it
6  would take me a little while.
7      Q   I will make a representation to you that
8  in the course of discovery in this case one of the
9  bodies of information that were provided to us was
10 the voting database by the ballot agent. And in
11 that database they, among other things, record for
12 any particular law firm claimants, those claimants
13 that say they participated in the Pfizer settlement
14 agreement and those claimants that did not.
15         With respect to claimants that voted under
16 your law firm, Kelley and Ferraro, according to the
17 ballot database that was provided to us, 11,762
18 claimants identified or were identified as
19 participating in the Pfizer settlement agreement,
20 and 15,262 claimants were identified as not
21 participating in the Pfizer settlement.
22         My question is: Do those numbers sound
23 accurate to you?
24     A   This is in 2008?

## Page 140

JAMES L. FERRARO

1          MR. WILSON: Objection. Assumes facts not
2  in evidence. No foundation.
3          THE WITNESS: I have no clue how that
4  happened. I don't believe we picked up 15,000
5  clients before '08, unless they were referred
6  in by other firms, which is possible. I would
7  have to check. I have no clue what you're
8  talking about, no clue whatsoever.
9          However, you know, if we had new clients
10 in, you know, we very may well have recommended
11 they vote that way, because we thought it was a
12 good deal.
13 BY MR. STOLL:
14     Q   Would a client that you acquired after the
15 pre-petition settlement agreement be permitted to
16 share in the settlement amount that was negotiated
17 on behalf of ---
18     A   No. But there is -- do you want to know
19 why?
20     Q   Sure.
21     A   Because they were part of the deal.
22     Q   Because they were or were not?
23     A   They were not part of the deal. But if
24 that deal blows up, that deal has an effect on

## Page 141

JAMES L. FERRARO

1  future clients, big time effect on future clients.
2  If the Pfizer deals blows out, they are going to be
3  backlogged behind all these Pfizer claims for the
4  next 10 years.
5          Even though they came in after the fact,
6  it is in their best interest that they missed that
7  deal because they didn't exist as clients then. It
8  is still in their best interest to vote in favor of
9  the deal. Otherwise, if that deal falls apart, we
10 have a backlog in all our -- all the filed cases
11 would be backlogged behind the blown-up deal. We
12 would not want that to happen.
13         We recommend for anyone coming in to vote
14 in favor of it, because it is a deal that is done,
15 get it off the books, and move on to the next one.
16         Like I said before, some plaintiffs have
17 100 different targets. And to have that deal blow
18 up for a future client that is in our office now,
19 four years down the road, is not a good thing for
20 that client.
21     Q   For a future client?
22     A   It is not.
23     Q   Even though they don't get any money on
24 any other deal?

# EXHIBIT C

1                           PAUL STREET
2    UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
3
4    -------------------------------x
5    In re:
6    QUIGLEY COMPANY, INC.,              Chapter 11
                                         Case No. 04-15739
7                    Debtors.
8    -------------------------------x
9
10
11                      January 23, 2009
                        9:06 a.m.
12
13
14
15        Deposition of PAUL STREET, pursuant to notice,
16        taken by the Ad-Hoc Committee of Tort Victims,
17        at the offices of Consor & Associates, 1655
18        Palm Beach Lakes Boulevard, West Palm Beach,
19        Florida, before Kelli Ann Willis, a Registered
20        Professional Reporter, Certified Realtime
21        Reporter and Notary Public within and for the
22        State of Florida.
23
24
25

PAUL STREET

1            PAUL STREET
2 '08.
3      We will not permit him to testify to
4 matters you should have covered in the first
5 seven hours of his deposition.
6      MR. COOK: I join in that objection, and
7 note that in the prior deposition transcript,
8 Pages 10 through 34, Page 39, Pages 88 and 89
9 of Mr. Street's deposition dealt with the same
10 subject matter. And I have a letter dated
11 November 3 from Mr. Arnold, stating that we
12 would not be covering topics previously covered
13 in the June 4, '07 deposition.
14      Mr. Arnold specifically said: "For
15 starters, it is certainly not our intention to
16 redepose witnesses on the same topics that have
17 already been covered in prior depositions and
18 ask the same questions that have already" --
19 there's a typo here, "been answered." End of
20 quote.
21 BY MR. JONAS:
22    Q. Mr. Street, unless you are instructed not
23 to answer a question, the general rules of the road
24 are for you to answer the question.
25      MR. RATHKOPF: He's been instructed not to

1            PAUL STREET
2 answer.
3      MR. JONAS: That's your instructions?
4      MR. RATHKOPF: That's correct.
5      MR. JONAS: Okay.
6      MR. RATHKOPF: And if you ask any question
7 that pertains to an event prior to June 4th,
8 2007, he will be instructed and is instructed
9 not to answer.
10      MR. JONAS: Well, I'm going to conduct my
11 deposition and I will ask the questions. And
12 if you feel compelled, you will put on the
13 record that -- you'll instruct him not to
14 answer.
15      MR. RATHKOPF: Proceed.
16 BY MR. JONAS:
17    Q. Mr. Street, when did your involvement with
18 Quigley Company conclude?
19    A. March of 2008.
20    Q. And what were the circumstances
21 surrounding the conclusion of your involvement with
22 Quigley?
23    A. I resigned.
24    Q. And why did you resign?
25    A. Personal reasons.

1            PAUL STREET
2    Q. What were those reasons?
3    A. I -- my father had recently passed away,
4 and my informed 86-year-old mother needed a
5 significant amount of help with winding up his
6 estate and a significant amount of my time on
7 personal matters, and I decided that the Quigley
8 matter was taking too much time and not giving me
9 enough time to spend taking care of my mother.
10      Amongst -- that was my principal reason.
11    Q. And in March of 2008, when you resigned,
12 did you submit a letter of resignation?
13    A. No.
14    Q. How did you effect your resignation?
15    A. I called the individual members of the
16 board and I called Mr. Cook, and told them -- and I
17 called Ms. Jenkins, and told them of my intention to
18 resign.
19    Q. And who were -- when you say "members of
20 the board," do you mean the Quigley board?
21    A. Members of the Quigley board.
22    Q. Who were the members of the board that you
23 contacted?
24    A. Kevin Altit and Charles Rabin.
25    Q. And including yourself at that time, the

1            PAUL STREET
2 three of you composed the entire Quigley board?
3    A. Yes.
4    Q. Do you remember the date that your
5 resignation became effective?
6    A. It was the end of March.
7    Q. That's March 31st?
8    A. Yes.
9    Q. Let's just talk about March of 2008 for a
10 minute. How much time, in March of 2008, did you
11 spend on Quigley-related matters?
12    A. I don't have a point estimate. I would
13 say between quarter and a half of my time, my
14 working time.
15    Q. Would you say that a quarter and a half
16 would be between 10 and 20 hours a week?
17    A. During the time I was involved with
18 Quigley, somewhere in that order.
19    Q. And was that, to use your words, the time
20 you were involved with Quigley, was your time
21 commitment generally or the time that you spent, 10
22 to 20 hours a week, was it generally constant
23 throughout your involvement with Quigley?
24    A. Well, it had its ups and downs, but it was
25 generally within that range.

# EXHIBIT D

1

2            UNITED STATES BANKRUPTCY COURT

3            SOUTHERN DISTRICT OF NEW YORK

4     - - - - - - - - - - - - - - - - - -x

5     In Re:

6     QUIGLEY COMPANY, INC.,

7                      Debtor                    .

      - - - - - - - - - - - - - - - - - -x

8

9

10         TELEPHONIC DEPOSITION OF KEVIN ALTIT

11

12               New York, New York

13             Thursday, June 7, 2007

14

15

16

17

18

19    Reported by:

20    JEFFREY BENZ, CRR, RMR

21    JOB NO. 11839b

22

23

24

25

1                    Altit

2    right word, individually, in lieu of the

3    community of claimants against -- against the

4    company.

5            And it would allow the company to

6    prepare and present the plan that would allow it

7    to reorganize itself and try to come out of the

8    Chapter 11 proceeding as an ongoing basis, and

9    therefore allow its -- its claimants, present

10   and future, to receive more assets and be

11   benefit -- be benefited from the whole

12   procedure.

13       Q.   Was there anybody from Pfizer at that

14   meeting?

15       A.   Not that I recall, sir.

16       Q.   Was there any discussion about

17   possible benefits that Pfizer would receive as a

18   result of Quigley's bankruptcy filing?

19       A.   No.

20       Q.   So ultimately, a resolution was

21   proposed to authorize the company to enter

22   bankruptcy.  Is that correct?

23       A.   Yes.

24       Q.   And that was a decision that was made

25   by the board; is that correct?

# EXHIBIT E

1

2          UNITED STATES BANKRUPTCY COURT

3           SOUTHERN DISTRICT OF NEW YORK

4     - - - - - - - - - - - - - - - - - -x

5     In Re:

6     QUIGLEY COMPANY, INC.,

7                     Debtor                    .

      - - - - - - - - - - - - - - - - - -x

8

9

10          DEPOSITION OF CHARLES RAEBURN

11

12              New York, New York

13             Thursday, June 7, 2007

14

15

16

17

18

19    Reported by:

20    JEFFREY BENZ, CRR, RMR

21    JOB NO. 11839a

22

23

24

25

1          Raeburn
2 motive, but I presume it was because he felt
3 that it was in the best interest of Quiqley to
4 do so.
5    **Q. I want to understand from the board**
6 **and perspective, and specifically from your**
7 **perspective as a director, why did you -- did**
8 **you vote in favor of a Chapter 11 filing?**
9    A. Yes, I did.
10   **Q. Why?**
11   A. Because I believed, based upon
12 recommendation from the CEO of the company and
13 the advice of counsel, that this was in the best
14 interest of the Quiqley company.
15   **Q. Okay. Why? What was going to be**
16 **achieved through a Chapter 11 filing?**
17   A. That this would be a way that the
18 assets of the company could be maximized for
19 ultimate recovery by the creditors of the
20 company.
21   **Q. Has the dollar value of Pfizer's**
22 **secured claim changed over time?**
23   A. I don't know.
24   **Q. Do you know whether or not that claim**
25 **accrues interest?**

1          **Raeburn**
2    A. I don't know.
3    **Q. Do you know what rate it accrues**
4 **interest?**
5    A. No, I don't.
6    **Q. Who negotiated the interest rate on**
7 **the secured claim between Pfizer and Quiqley?**
8    A. I don't know.
9    **Q. Did the board of directors of Quiqley**
10 **approve the interest rate?**
11   A. I don't know, sitting here today,
12 whether or not we approved anything with respect
13 to the secured loan, or even if it predated my
14 coming on the board.
15   **Q. Uh-huh. Is Quiqley the beneficiary of**
16 **a debtor-in-possession financing facility?**
17   A. I don't -- I'm not sure that I
18 understand what a debtor-in-possession financing
19 facility is.
20   **Q. Does Quiqley have any post-petition**
21 **loans?**
22   A. I believe Pfizer may loan it money,
23 but I -- I really don't know that.
24   **Q. Okay. To the extent that Pfizer has**
25 **made loans to Quiqley on a post-petition basis,**

1          **Raeburn**
2 **are you aware of the magnitude of those loans?**
3    A. No.
4    **Q. Do you know at what interest Pfizer**
5 **accrues claims against Quiqley on account of**
6 **that loan?**
7    A. No.
8    **Q. Do you know in terms of payment**
9 **priorities whether or not Pfizer is entitled to**
10 **get paid back on that loan before creditors**
11 **receive any value?**
12   A. I don't know.
13   **Q. Other than its claims-handling**
14 **business, are you aware of any other business**
15 **operations that reorganized Quiqley is designed**
16 **to have?**
17   A. No.
18   **Q. Have you ever seen any documentation**
19 **referring or relating to certain drug lines that**
20 **are going to be dedicated by Pfizer to Quiqley?**
21   A. I remember there was a proposal at one
22 point that Pfizer would do so, and I believe
23 that proposal has now been dropped.
24   **Q. Okay. But in any event, the board of**
25 **Quiqley has not, to your knowledge, resolved to**

1          **Raeburn**
2 **go into the -- the drug business.**
3    A. No, we have not.
4    **Q. And that is a determination that you**
5 **would suspect would be taken to the board before**
6 **implementing.**
7    A. Yes.
8    MR. WEISFELNER: I think we need a
9 five-minute break. I want to see if
10 there's anything I'm missing, Michael.
11   MR. COOK: Okay.
12   MR. WEISFELNER: Okay.
13   (Recess from 11:14 to 11:32.)
14 BY MR. WEISFELNER:
15   **Q. Aside from the law firm of Schulte**
16 **Roth & Zabel, what other professionals has**
17 **Quiqley retained in its Chapter 11 case?**
18   A. They are our sole attorneys. I don't
19 remember whether we've ever retained any other
20 professional firms.
21   **Q. I think you identified the futures**
22 **claim representative as Al Togut.**
23   A. If that's his correct name, yes,
24 that's who I'm referring to.
25   **Q. How was Mr. Togut selected as the**

# EXHIBIT F

**REDACTED**

# EXHIBIT G

# REDACTED

# EXHIBIT H

1 UNITED STATES BANKRUPTCY COURT

2 SOUTHERN DISTRICT OF NEW YORK

3

4 _____

5 In Re: Quigley Company, Inc., )

6 Debtor. )

7 _____ )

8

9

10

11 C O N F I D E N T I A L

12 DEPOSITION OF RONALD B. RUBIN

13 Rockville, Maryland

14 Friday, January 30, 2009

15

16

17

18

19

20

21

22

23 Reported by:

24 MARY ANN PAYONK, RMR-CRR, CCP, CBC, CLR

25 JOB NO. 20689

1       R. Rubin - CONFIDENTIAL
2   processing of their claims?
3       A.    Well, there's that, and they have to
4   confirm in writing they haven't breached their
5   covenants and its corporate law-type provisions,
6   so I didn't want to exclude, and they're probably
7   pretty important, so --
8       Q.    I'm just --
9       A.    Okay.
10      Q.    Okay. What was the purpose of
11  conditioning or delaying one half of the payment
12  until after bankruptcy court approval of the plan
13  of reorganization?
14          MS. FROST: Objection, form.
15      A.    Well, actually, this was a
16  compromise. Speaking for me, I wanted to delay
17  payment a hundred percent until later.
18      Q.    "Later," being after the confirmation
19  of the plan of reorganization?
20      A.    Actually, I wanted to have it until
21  after the Supreme Court had denied the petition
22  for writ of certiorari.
23          But that was not acceptable to the
24  plaintiffs. Their view generally -- and I think
25  they were pretty uniform in this -- was, look,

1       R. Rubin - CONFIDENTIAL
2   between -- if there's a filing and the automatic
3   stay goes into effect, for some period of time,
4   possibly for some long period of time --
5   apparently, it's been a long time -- we're going
6   to have to forebear by operation of federal law
7   from bringing our claims which would otherwise --
8   many of which come to trial in the tort system.
9   So as consideration for that forbearance, we want
10  something.
11          I mean, this went back and forth and
12  back and forth. This wasn't -- this didn't
13  spring from the brow of Zeus.
14      Q.    Whether it be the --
15          VIA TELEPHONE: Due to inactivity
16  in your conference, this call will be
17  terminated unless you press the digit
18  "1" on your touchtone phone.
19          THE WITNESS: They have the
20  opportunity, but they're not obligated
21  to attend, okay?
22          VIA TELEPHONE: Could somebody in
23  the deposition push 1, please?
24          THE WITNESS: I did, yes.
25          VIA TELEPHONE: Thank you.

1       R. Rubin - CONFIDENTIAL
2   BY MR. STOLL:
3       Q.    Whether it be the 50 percent
4   provision that's set forth in 4.2C of the Pfizer
5   settlement agreement, or your original desire,
6   which was the entire payment after all rights of
7   appeal had expired --
8       A.    Including a petition for writ of
9   certiorari denied by the Supreme Court.
10      Q.    Understood.
11      A.    For granted, we would have more time.
12      Q.    Is it fair to say that the actual
13  provision or your desired provision was for the
14  purposes of ensuring that the settling plaintiffs
15  would vote in favor of the consensual plan?
16          MS. FROST: Objection, form.
17      A.    No.
18      Q.    What was the purpose of the delay?
19      A.    My purpose was if I was going to do
20  this, I wanted world peace. If it was going to
21  work, great. Be happy to pay for peace. But if
22  it's not going to work, I'm not happy to give
23  away all that money.
24          So it was my sense that if I'm going
25  to exit the tort system, I want to exit the tort

1       R. Rubin - CONFIDENTIAL
2   system as completely and finally as I can;
3   otherwise, I'm not interested -- not that it's my
4   money -- in giving away that kind of money to
5   anybody, ever.
6       Q.    When you say "work," for the plan to
7   work --
8       A.    It would be acceptable to the courts.
9       Q.    Right. You understood that one of
10  the requirements of it being acceptable to the
11  courts is compliance with the requirements of
12  Section 524(g); correct?
13          MS. FROST: Objection to form.
14      A.    I don't think it's optional on the
15  Court's part.
16      Q.    Correct. One of those requirements
17  is that 75 percent of claimants vote in favor of
18  the plan; correct?
19      A.    I knew there had to be a vote. I
20  knew that there had to be a vote under the
21  auspices of a court in a way that was acceptable
22  to federal judges, and that if that could be
23  accomplished and it was acceptable to the
24  bankruptcy court, the district court, possibly
25  even the Second Circuit, and I was out of the

# EXHIBIT I

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   -----------------------------x

5   In Re:  Quigley Company, Inc.,

6               Debtor,

7   -----------------------------x

8

9       * * * CONTAINS CONFIDENTIAL PORTION * * *

10

11          DEPOSITION OF SANFORD N. BERLAND

12                 New York, New York

13                 December 16, 2008

14

15  Reported by:

16  MARY F. BOWMAN, RPR, CRR

17  JOB NO. 19881

18

19

20

21

22

23

24

25

**BERLAND**

1
2     A.  I'm not aware of any instances in
3  which the substantive requirements of the
4  settlements, that is the overall need for
5  medical documentation on the one hand and
6  exposure documentation on the other, were
7  dispensed with.
8        There may have been situations -- and
9  this goes back to the CCR period and perhaps
10 earlier to the ACF, where if information had
11 already been obtained through the litigation
12 process, through discovery, or was otherwise
13 available to the parties, particularly for
14 low level, comparatively inexpensive
15 settlements, duplicative documentation would
16 not necessarily be required.
17    **Q.  I am sorry, I must admit I got a**
18 **little bit lost in your answer.  Maybe we could**
19 **try a yes or no.  Are you aware of any instances**
20 **in which Pfizer granted a waiver under this**
21 **subsection?**
22    A.  Again, I've answered the question as
23 best I can.  And what I have said was I'm not
24 aware of any situations in which the substantive
25 requirements of documentation of medical

1                    BERLAND
2  condition on the one hand and appropriate
3  information concerning product exposure was
4  dispensed with.
5        There may have been situations where
6  certain particular documents weren't
7  submitted because the information had already
8  been obtained through the litigation process
9  or through formal discovery or otherwise, but
10 I'm not aware of any situation where the
11 fundamental requirements of proof of medical
12 condition on the one hand and product
13 exposure on the other were waived.
14    MS. FROST:  Mr. Jones, for the record,
15    you will recall we have designated another
16    witness on behalf of Pfizer in terms of the
17    30(b)(6) notice on this category of
18    question.
19    MR. JONAS:  Last question on this.
20    **Q.  Where would you go or where would one**
21 **go in order to be able to provide details as to**
22 **what waivers of deficiencies Pfizer granted?  Do**
23 **you know?**
24    A.  I'm not aware of any waivers of
25 deficiencies.

1                    BERLAND
2     **Q.  Assuming -- if, in fact, there were**
3  **some -- where would one go in order to cull that**
4  **information?**
5     A.  One would go to two places, at least,
6  and there may be others.  One would be the
7  entity that processed the claim and gathered
8  documentation.
9        The other would be the law firm that
10 maintained the documentation with respect to
11 that particular claimant's claim.  And there
12 may be other sources.  Could be situations
13 where national counsel had the information,
14 as opposed to local counsel, or where
15 settlement counsel, in the course of
16 negotiation, was provided with information
17 about groups of claimants; for example, job
18 site information, purchase records applicable
19 to the overall job site, and that sort of
20 thing.  So there are at least two places and
21 possibly other places to go to obtain that
22 information.
23    **Q.  Is it your general understanding under**
24 **the prepetition global settlement agreements the**
25 **settling plaintiffs were paid 50 percent -- I'll**

1                    BERLAND
2  **say shortly after execution.  I appreciate there**
3  **is date restrictions on that -- generally were**
4  **paid 50 percent at some point reasonably after**
5  **execution and promised a second 50 percent upon**
6  **the effective date of a Quigley plan?**
7     A.  I think you have to go through the
8  settlement agreements and look at the point in
9  time at which eligibility for payment would
10 mature, which typically would require -- you
11 would have to go through these, submission of
12 certain information, releases and so on before a
13 payment could be released to the claimant or the
14 claimant's attorney.
15    **Q.  What about the second 50 percent?**
16 **That's the -- only one condition on the payment**
17 **of that, which is the effective date of a**
18 **Quigley plan, correct?**
19    A.  Correct.
20    **Q.  Why was the second 50 percent payment**
21 **conditioned on the effective date of a Quigley**
22 **plan?**
23    A.  It was, as I understand it, the other
24 way around.  It had been Pfizer's preference to
25 have the entire payment wait until there had

1  BERLAND
2  been a global resolution; in other words,
3  effectuation of the overall objective of
4  addressing the liability. But plaintiffs' firms
5  pushed back and wanted payment earlier. So the
6  compromise was 50/50.
7    Q.  One more question and we can hopefully
8  move off this document.
9        At the bottom of page 11, rolling over
10 to 12, you will see recovery of settlement
11 amount, subparagraph B there, "Settling
12 plaintiffs will be entitled to assert a
13 prepetition claim against Quigley," et cetera,
14 and then it goes on to say, "provided, however,
15 to the extent the trust assets are insufficient
16 to satisfy 100 percent of the value, under the
17 trust distribution procedures, each settling
18 plaintiff agrees to reduce its distribution to
19 10 percent." Do you see that?
20   A.  I don't. But I am familiar with the
21 provision. Tell me where you are.
22   Q.  It's on a number of pages in, page 11
23 of the settlement agreement, rolls over to 12.
24   A.  OK.
25   Q.  I appreciate you have testified

1  BERLAND
2  before, I will ask two or three questions and we
3  will be done on this.
4        What was the genesis of that
5  provision?
6    A.  Discussions with the future claimants'
7  representative.
8    Q.  And that is something that he
9  requested?
10   A.  That's my understanding.
11   Q.  And this provision was later waived,
12 correct?
13   A.  It was, correct.
14   Q.  And that was -- it was a Pfizer
15 decision to waive that provision?
16   A.  The genesis of it was effectively
17 objections made by the ad hoc committee to the
18 formulation, and in deference to that, and the
19 judge's ruling on it, Pfizer decided to waive
20 that provision.
21   Q.  And were you involved in that decision
22 by Pfizer?
23      MS. FROST: Objection, form.
24   A.  In the broadest sense, yes. In terms
25 of -- I am getting into privileged areas here.

1  BERLAND
2  You need to instruct me. It was -- the
3  discussions, at least my involvement were
4  privileged.
5    Q.  Do you know, did Quigley approve that
6  waiver?
7      MS. FROST: Objection, form.
8    Q.  If you know?
9    A.  It certainly involved input from the
10 futures -- future claimants' representative, and
11 I assume, but I have was not privy to
12 discussions with Quigley with respect to that.
13   Q.  So you don't know whether Quigley
14 approved the waiver?
15   A.  If Quigley's approval was required,
16 since the waiver occurred, I assume they
17 approved.
18   Q.  OK, but you're -- I am not trying to
19 argue with you --
20   A.  I was not part of whatever discussions
21 occurred with Quigley with respect to that.
22   Q.  OK.
23      (Exhibit 10, Proof of Claim with
24 attachment marked for identification, as of
25 this date.)

1  BERLAND
2    Q.  Showing you what has been marked as
3  Exhibit 10, which is the proof of claim,
4  unsecured proof of claim filed by Quigley in
5  the -- filed by Pfizer in the Quigley bankruptcy
6  case, and I want to draw your attention to the
7  page numbered in Exhibit A, which is the fourth
8  page in, it is page number 2, and the
9  subheading, "Pfizer's Post-petition Payment to
10 Settling Plaintiffs on Behalf of Quigley."
11   A.  Yes.
12   Q.  Can you explain that to me, what the
13 basis of that part of the claim is?
14   A.  Again?
15   Q.  I'm not sure you have. If you have, I
16 will know quickly.
17   A.  I did. In my prior deposition, I did.
18   Q.  OK, can you just explain it to me
19 quickly.
20   A.  And I haven't gained any new knowledge
21 about it in the --
22   Q.  No new knowledge?
23   A.  -- in the interim.
24   Q.  Why don't you give it a try.
25   A.  My best recollection at this remove --

# EXHIBIT J

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

. Chapter 11
.
IN RE: .
. Case No. 04-15739 (SMB)
.
QUIGLEY COMPANY, INC. .
.
. New York, New York
              Debtors. . Thursday, December 18, 2008
. 11:13 a.m.
.

. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTIONS AND STATUS CONFERENCE
BEFORE THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:          Michael L. Cook, Esq.
                          Victoria A. Lepore, Esq.
                          SCHULTE, ROTH & ZABEL, LLP
                          919 Third Avenue
                          New York, New York  10022

For Pfizer:               John H. Bae, Esq.
                          CADWALADER, WICKERSHAM & TAFT, LLP
                          One World Financial Center
                          New York, New York 10281

(Appearances Continued)

Audio Operator:           Electronically Recorded
                          by Court Personnel

Transcription Company:    Rand Reporting & Transcription, LLC
                          80 Broad Street, Fifth Floor
                          New York, New York 10004
                          (212) 504-2919
                          www.randreporting.com

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1  will reiterate what was stated in the brief paper put in, and

2  that is that the Future Claims Rep believed that he has fully

3  carried out his duties pursuant to this Court's order of

4  appointment.

5          THE COURT:  A bold position?

6          MR. RATNER:  Yes.  Yes.  In effectively representing

7  the interest of all future claimants of Quigley who may assert

8  demands in the future against Quigley and its affiliated

9  entities based on exposure to Quigley products.  And I think

10 this Court has correctly identified the issues in its early

11 questions to the Ad Hoc Committee about -- you know, there is a

12 single constituency here that is being represented.

13         THE COURT:  Okay.

14         MR. RATNER:  Thank you, Your Honor.

15         THE COURT:  I'm going to deny the motion for summary

16 judgment.  Initially -- when the motion was -- it was an issue

17 of whether -- what the statute required.  It's clear that the

18 statute doesn't require the appointment of multiple futures

19 representatives.  We've had the arguments and the briefs that

20 it uses the singular and the statute contemplates that there

21 will be third-party non-debtor releases, which is not to say

22 that in appropriate circumstances the Court can't or shouldn't

23 appoint an additional -- one or more additional futures

24 representatives.  But, I cannot conclude as a matter of law

25 that Mr. Togut cannot adequately represent both the future

1  Quigley creditors and the future Pfizer creditors, because as I

2  see the case -- or at least I haven't been shown, that their

3  interests are any different.  Every -- let me put it this way,

4  every derivative Pfizer claim by definition has a tagalong

5  direct Quigley claim, that's what makes it a derivative claim.

6  So that all of the future constituents, none of whom have

7  obviously settled with Pfizer, have the same claim against

8  Pfizer and the same claim against Quigley.

9       Sure the claims have different strengths, but that's

10  true of every -- everybody in the creditor body and a single

11  committee still represents the creditors.  But the basis of the

12  liability is the same.  And the current future representative

13  can represent that constituency, which all have the same

14  interest against Quigley and Pfizer, and that interest is to

15  get enough money for the futures.  So the motion is denied for

16  the reasons stated on the record.

17       Next.

18       MR. BAE:  Your Honor, John Bae with Cadwalader on

19  behalf of Pfizer.

20       The next item, I think it's the last item, is Pfizer's

21  motion for a protective order.

22       THE COURT:  Right.

23       MR. BAE:  Just by way of background, Your Honor --

24  I'll try to be brief since we've said quite a bit in our

25  papers.  The genesis of this motion was never about Pfizer

# EXHIBIT K

# REDACTED

# EXHIBIT L

1

2        UNITED STATES BANKRUPTCY COURT
         SOUTHERN DISTRICT OF NEW YORK

3

4

5

IN RE: QUIGLEY COMPANY, INC.      DEBTOR

6

7

8

9   **************************************************

              30(B) (6) DEPOSITION OF

10     MORRIS, SAKALARIOS & BLACKWELL, PLLC
            (TONY SAKALARIOS)

11  **************************************************

12         APPEARANCES NOTED HEREIN

13

14     TAKEN AT INSTANCE OF: DEFENDANTS
           DATE: JANUARY 27, 2009

15   PLACE: MORRIS, SAKALARIOS & BLACKWELL
          1817 HARDY STREET

16      HATTIESBURG, MISSISSIPPI
         TIME: 10:06 A.M.

17

18

19

REPORTED BY: TODD J. DAVIS

20        CSR #1406, RPR

21

22

23

24

25

1        **TONY SAKALARIOS**
                    78
2    reorganization for Quigley?
3        A.   No.  I can tell you that.
4        Q.   Okay.
5        A.   Absolutely not.
6        Q.   And I take it you had no understanding
7    of what the ultimate plan of reorganization that
8    Quigley was -- that was going to propose would
9    be --
10       A.   I don't know and don't care.  Because my
11   understanding was, either way I'm going to get
12   paid.  So I don't care.
13       Q.   Okay.  And --
14       A.   Well, I say I don't care.  I do care
15   when the plan comes out how it's going to affect
16   my clients as to the remaining Quigley liability
17   to my clients.  I care about that.
18       Q.   Okay.
19       A.   Okay?  But as far as Pfizer is concerned
20   and this settlement agreement is concerned, I
21   didn't care what that plan said as to -- as to
22   Pfizer.  Because I understood if Pfizer gets
23   relief, they get relief.  But, hell, they're going
24   to get relief when I give them a release when they
25   pay me anyway, so what do I care?

1        TONY SAKALARIOS
                    79
2        Q.   Hypothetically, though, if you're wrong
3    about that, meaning --
4        A.   What do you mean?
5        Q.   Let me finish the question, please.
6        A.   Okay.
7        Q.   If the payments are two-tiered, meaning
8    you get one-half of the payment for your
9    particular client once it's -- their claim is
10   processed and the other half only if the plan of
11   reorganization is approved?
12       A.   That's not my understanding of how it
13   worked.  You know, I --
14       Q.   Well, I'll represent to you that that --
15   that's exactly how it works.
16       A.   Well, that's how you say it.  We'll see
17   if it -- if it don't get confirmed and I file a
18   motion to compel settlement agreement, we'll see
19   what the Court says.
20       Q.   Okay.  Okay.
21       A.   They'll either give it to me or they
22   won't.
23       Q.   Okay.  So -- so you're saying that's
24   never been your understanding?
25       A.   I'm saying that it -- I'm going to live

1        TONY SAKALARIOS
                    80
2    by whatever I signed.  And if the court says
3    that's the way it is -- or if when I have my
4    lawyers look at it, they say, "Well, we didn't
5    understand it that way either," but that's the way
6    it shakes out and I signed it, I'm going to live
7    by it.
8        Q.   Okay.
9        A.   You understand me?
10       Q.   Uh-huh (affirmative response).
11       A.   But I'm representing you as we sit here
12   today that was not my understanding.
13       Q.   Okay.  That's fair enough.
14       A.   Okay.
15       Q.   And -- and so when you -- strike that.
16   Let me ask it this way.
17            During the course of the
18   bankruptcy, do you recall receiving materials
19   which asked you either to get your clients or on
20   behalf of your clients to vote in favor of the
21   plan of reorganization that was approved?
22       A.   I'm sure we have.  I've had other
23   lawyers in the firm that handle that, and they do
24   that; and I'm sure that we have.
25       Q.   Okay.  But are you aware that there were

1        **TONY SAKALARIOS**
                    81
2    two separate votes?
3        A.   You know, I'm telling you and
4    representing to you that I have other lawyers in
5    the firm that handle that end of it.
6        Q.   Yep.
7        A.   And I can't speak whether there was one
8    vote, two votes.  They look at that.  They assess
9    it.  They bring it to me.  As one of the managing
10   partners, I sign off on it.
11            But I -- you know, just like
12   anything else, when you have lawyers representing
13   large firms, you've got to delegate duties and
14   trust their judgment in these things.
15            And so with respect to voting
16   whether a plan is good or not, they look at that.
17   They have meetings.  They assess whether it's good
18   for our clients or not.  They tell me what their
19   opinion is.  And they're lawyers.  They're
20   supposed to vote.  And they're seasoned lawyers.
21            And so I -- I take their opinions,
22   and I take the appropriate conduct.
23       Q.   Okay.  And you understand, sir, I'm not
24   trying to be difficult with you.  I'm just
25   trying --

# EXHIBIT M

1

1

2       UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF NEW YORK
3

4

5

      IN RE:  QUIGLEY COMPANY, INC.        DEBTOR
6

7

8

9   **************************************************
                 30 (B) (6) DEPOSITION OF
10              DEAKLE-COUCH LAW FIRM
                    (JOHN DEAKLE)
11  **************************************************
12           APPEARANCES NOTED HEREIN
13

14       TAKEN AT INSTANCE OF: DEFENDANTS
                DATE: JANUARY 27, 2009
15       PLACE: DEAKLE-COUCH LAW FIRM
                802 NORTH MAIN STREET
16          HATTIESBURG, MISSISSIPPI
                 TIME: 1:08 P.M.
17

18

19

      REPORTED BY: TODD J. DAVIS
20            CSR #1406, RPR
21

22

23

24

25

JOHN DEAKLE
50

2     A. Yes. Yes, I have.
3     BY MR. STOLL:
4     Q. So you have a sense of the magnitude of
5  that overall settlement if it is paid?
6     A. Yes.
7     Q. And with -- and those very same
8  claimants are entitled to file claims under the
9  bankruptcy plan as proposed by Quigley, correct?
10     A. I'm sorry? Say again.
11     Q. Those very same claimants -- claimants
12  of yours -- your clients, that are part of the
13  settlement with Pfizer -- are also able to file
14  claims against Quigley under the plan as they have
15  proposed it? Fair?
16     MS. FROST: Objection to form.
17     A. That would call for assumption on my
18  part. I don't know.
19  BY MR. STOLL:
20     Q. Okay. So as you sit here today, you
21  don't know, for example, if a client -- if one of
22  your claim -- one of your clients has the disease
23  of mesothelioma, for example, and is processing a
24  claim under the Pfizer settlement agreement, you
25  don't know whether that same individual can file a

JOHN DEAKLE
51

2  meso claim -- a mesothelioma claim under the --
3  against the trust under the bankruptcy plan?
4     A. Are you asking is it -- as it appears
5  today in Exhibit 8?
6     Q. Yes.
7     A. Or whether or not you're successful in
8  torpedoing the plan?
9     Q. Oh, no. No. If it's -- if it's
10  approved?
11     A. I'm aware that if it's approved, there
12  will be another payment to my clients. I'm not
13  aware of the mechanism -- of the mechanics of us
14  getting to that.
15     Q. Okay. But have you spent any time in
16  calculating the value to your clients of the
17  payments that will be available to them under the
18  trust if it's -- if the plan is approved?
19     A. Individually, yes.
20     Q. Okay. And have you compared that with
21  the value that will -- is achieved under the
22  settlement with Pfizer?
23     A. Say that again.
24     Q. Sure. Have you compared the value to be
25  received under the plan with the value to be

JOHN DEAKLE
52

2  received under the settlement with Pfizer?
3     A. No.
4     Q. Okay. Do you have individual asbestos
5  clients who were not clients of yours at the time
6  that you entered into the settlement agreement
7  with Pfizer?
8     A. Yes.
9     Q. Okay. Are those individual claimants --
10  clients entitled to file claims under the Pfizer
11  settlement agreement?
12     A. I'm afraid I may be divulging the terms
13  of that agreement that the Court has ordered to be
14  filed in camera and to be confidential if I answer
15  that.
16     MS. GUICE: And you may not do that.
17  BY MR. STOLL:
18     Q. Okay. Do you know an individual named
19  Ron Reuben?
20     A. No. I don't believe I do. I used to
21  know a guy named Reuben that ran a television
22  station here. I'm sure that's --
23     Q. Not the same one.
24     A. Not the...
25     Q. Okay. Do you know an individual named

JOHN DEAKLE
53

2  Michael Rosen?
3     A. No. I'm just a little fish in a little
4  pond down here in Hattiesburg. I don't -- I'm
5  afraid I don't travel those circles.
6     Q. Okay. I'm going to ask a question about
7  the settlement agreement with Pfizer. I'll ask
8  it -- I'll try to ask it generically --
9     A. Okay.
10     Q. -- and see if we get anywhere with it.
11     Under the settlement agreement with
12  Pfizer, was there a requirement for your
13  clients -- well, strike that.
14     Under the settlement agreement with
15  Pfizer, based on Exhibits 5 and 6, which are the
16  two packets, there was the requirement that you,
17  on behalf of your clients, identify their exposure
18  to asbestos, correct?
19     A. I believe that's correct.
20     Q. And if we were to look at, say -- let's
21  look at Exhibit 5.
22     A. Okay. Which one? Which --
23     Q. Let's just look at the first one.
24     A. Mr. Alford?
25     Q. Yeah. If I can find my pile -- which I

# EXHIBIT N

1              ALAN KELLMAN

2      UNITED STATES BANKRUPTCY COURT

3      SOUTHERN DISTRICT OF NEW YORK

4

5   In Re:

6   QUIGLEY COMPANY, INC.,

7              Debtor.     Case No. 1:2006cv03077

8   _____

9

10

11      The Deposition of ALAN KELLMAN,

12      Taken at 645 Griswold Street, Suite 1370,

13      Detroit, Michigan,

14      Commencing at 1:36 p.m.,

15      Wednesday, November 12, 2008,

16      Before Joanne M. Kippert, CSR-2592, RPR, RMR, CRR.

17

18

19          CONTAINS CONFIDENTIAL PORTIONS

20

21

22

23

24

25

1    **ALAN KELLMAN CONFIDENTIAL**
2    A.   No, no, very small.
3    Q.   Hand full?
4    A.   Hand full.
5            MR. ARNOLD: Let's take a break now.
6            (Break at 2:40 p.m.)
7            (Back on the record at 2:51 p.m.)
8            MR. ARNOLD: We're back on. Sara, you're
9    not there yet, right?
10           MR. SMITH: Trick question.
11           MR. ARNOLD: I e-mailed her on a break and
12   told her we had taken a break, and we were still going
13   to be going through the settlement agreements to some
14   extent when we got back.
15   BY MR. ARNOLD:
16   Q.   Under the settlement agreement that you reached with
17       Pfizer and Quigley, can you describe, as you recall it,
18       the nature of what claims were, in fact, settled and/or
19       released under the agreement, the structure of it? Is
20       it fair to say that as structured in the settlement
21       agreement you signed, your firm settled in full claims
22       against Pfizer?
23   A.   Yes.
24   Q.   Okay. Your firm did not settle in full claims against
25       Quigley?

1    **ALAN KELLMAN CONFIDENTIAL**
2    A.   Correct.
3    Q.   How did that situation come about?
4    A.   I can say with a great deal of certainty with respect
5        to the malignancy claims that that was a negotiated
6        point that we were leaving open, you know, the ability
7        to go back against Quigley for full value. And the
8        nonmalignancies was a subject of negotiation. And, I
9        mean, the whole thing was just -- it was negotiated.
10   Q.   And what's your recollection of the substance of the
11       negotiations regarding the partial resolution of
12       Quigley claims?
13   A.   I don't know that I have a particular recollection
14       other than whatever the discussion was, it ultimately
15       resulted in the signed agreement.
16   Q.   The signed agreement, you're aware, has a provision by
17       which your claimants agreed to forego 90 percent of any
18       recovery against the Quigley trust if certain
19       conditions were met. Do you recall that provision of
20       the agreement?
21   A.   Right. Except for the malignancy claims.
22   Q.   Can you --
23   A.   As I'm remembering it correctly, but let me look. I
24       guess we're talking second injuries, second injury,
25       okay.

1    ALAN KELLMAN CONFIDENTIAL
2    Q.   It does have a second injure provision?
3    A.   Yes, yeah.
4    Q.   Where if somebody gets --
5    A.   Yeah, yeah.
6    Q.   So aside from that second injury provision, which is in
7        the agreement, I'm focusing on the provision by which
8        your claimants would release or agree to forego 90
9        percent of any recovery from the Quigley trust post
10       petition?
11   A.   Right.
12   Q.   Do you recall any discussion about that particular
13       provision during those conversations with Mr. Rozen and
14       Mr. Rubin?
15   A.   Not particularly, no. I mean, it was obviously there.
16       I mean, I was aware of it, but I can't really tell you
17       the substance of any discussion.
18   Q.   Do you recall whether it was there in the first draft
19       of the proposed settlement agreement that you saw?
20   A.   No, I don't recall.
21   Q.   Do you recall if that was something that you proposed?
22   A.   I did not propose that.
23   Q.   Did you ever ask whether or not you could just settle
24       100 percent of your Quigley claims at the time?
25   A.   Not that I recall.

1    ALAN KELLMAN CONFIDENTIAL
2    Q.   So you don't recall any discussion with Pfizer with Mr.
3        Rozen, or Mr. Rubin, or Pfizer, Quigley representatives
4        during this time at which you proposed settling Quigley
5        claims in their entirety?
6    A.   Correct.
7    Q.   At the time you were having these discussions, did you
8        have any -- were you shown any documentation or told
9        any verbal communications concerning the proposed trust
10       distribution procedures?
11   A.   No.
12   Q.   Was there any discussion or communications concerning
13       the proposed payment percentage under the Quigley plan?
14   A.   No.
15   Q.   Did you have any ability during these communications
16       and discussions to assess what that 10 percent
17       remainder against the Quigley trust would be?
18   A.   No.
19   Q.   Pfizer made no representations to you as to what, you
20       know, what you could expect to recover on behalf of
21       your claimant for that 10 percent?
22   A.   No.
23   Q.   From your perspective in negotiating the overall
24       settlement, did it matter whether that 10 percent
25       against Quigley was worth a dime or a thousand dollars?

ALAN KELLMAN CONFIDENTIAL
2  A. Sure, it would matter.
3  Q. I guess what I'm trying to get at was the money being
4     offered by Pfizer sufficient enough such that anything
5     else the 10 percent you might get from the Quigley
6     trust was, you know, gravy, or was it -- I'm just
7     trying to understand what your, you know, you're making
8     the deal, and agreeing to give up 90 percent of a
9     number.
10 A. Most of the money that gets paid to my clients is for
11    malignancy claims, and that money I preserved. I mean,
12    that money I obviously was getting more than -- I was
13    getting more than nonmalignancy under the deal, and I
14    was preserving the second injury claims for the
15    nonmalignancy clients, which is important to me.
16 Q. Okay. So the 10 percent remainder for the
17    nonmalignancies was not that important in the grand
18    scheme of things?
19 A. I don't want to say it's not important.
20 Q. But in any event, you don't recall any discussions with
21    Pfizer about what that represented?
22 A. No, I do not.
23 Q. And you never approached Pfizer from the point of view
24    of, you know, if you're paying me X to settle Pfizer
25    claims, and 90 percent of Quigley claim, make it X plus

ALAN KELLMAN CONFIDENTIAL
2     Y and settle the whole thing?
3  A. I did not.
4  Q. Looking at the settlement agreement, page 11, the
5     section 2.3 settlement amounts?
6  A. Yes.
7  Q. And there's a chart beneath that. Total number of
8     settling plaintiffs 27,377. Total settlement amount of
9     approximately $13 million. I believe you testified
10    before this was one of the areas that you do recall
11    negotiating?
12 A. The bottom line, yes.
13 Q. Describe those negotiations for me?
14 A. There was some back and forth, and we made a demand,
15    and they said no. And they made a counter, and we said
16    no. And we made a demand, and they said no. And
17    eventually we got to this rather strange number.
18 Q. Do you recall who made the first -- whether you made a
19    demand, or they made an offer first?
20 A. Oh, boy. I don't actually.
21 Q. At some point you had to either make an initial demand
22    or a counteroffer?
23 A. Yes.
24 Q. When you were coming up with your figures?
25 A. Yes.

ALAN KELLMAN CONFIDENTIAL
2  Q. What were you using as a marker? Did you have
3     historical settlement information how much you would
4     settle previous claims for Quigley for?
5  A. No, we did not. I have obviously information from a
6     number of different bankruptcies that we have
7     participated in over the years from the very small such
8     as H.K. Porter, you know, to Manville. I didn't have
9     OCF at the time but, you know, I had a number of values
10    and we had, let's see, at that point I would have had
11    some approved procedures with values in a shipyard case
12    out of Florida called American Shipbuilding/Tampa
13    shipyards, Steinbrenner's yards down there in Tampa, or
14    actually up here also. And Lykes Brothers was another
15    where we had some procedures and values. And, you
16    know, there's all sorts of factors that go into this,
17    because you have the ship owners. You know, we name
18    ship owners and manufacturers. So there are still a
19    number of defendants left in our cases even after all
20    the bankruptcies are taken care of.
21 Q. The American Shipyards and Lykes cases that you were
22    talking about, were Pfizer or Quigley defendants in
23    those cases, to your recollection?
24 A. In some of the Lykes Brothers cases Quigley would have
25    been named.

ALAN KELLMAN CONFIDENTIAL
2  Q. But had you reached settlements with Quigley?
3  A. No, no, no. You had asked me sort of what am I using
4     to evaluate these numbers.
5  Q. Yes.
6  A. And I'm saying that there were a number of bankrupt
7     entities that had their own trust distribution
8     procedures with values, and I'm just throwing out a
9     couple more that are not national that we participated
10    in.
11 Q. And I guess, you know, trying to cut to the chase, is
12    it fair to say that when you were -- you had to come to
13    a number that you were comfortable with?
14 A. Yes.
15 Q. In arriving at that number for your clients, did you
16    have any historical settlement data points with either
17    Pfizer or Quigley to put into that matrix?
18 A. I did not.
19 Q. During your discussions with Mr. Rozen or Mr. Rubin,
20    did either of them make any reference to your firm's
21    prior settlement history with Pfizer or Quigley as
22    being a benchmark to be used for valuing these claims?
23 A. I can't recall. If anything, they would have pointed
24    out the fact that there probably was no settlement
25    history. They used that as a point as to why we should

# EXHIBIT O

# **REDACTED**

# EXHIBIT P

1             UNITED STATES BANKRUPTCY COURT

2             SOUTHERN DISTRICT OF NEW YORK

3

4

5     _____

6   In Re:   Quigley Company, Inc.,        )

7                Debtor.             )

8     _____)

9

10

11

12         DEPOSITION OF PETER G. ANGELOS

13             Baltimore, Maryland

14          Friday, February 6, 2009

15

16

17

18

19

20

21

22

23   Reported by:

24   MARY ANN PAYONK, RMR-CRR

25   JOB NO. 20692

P. Angelos

2  Mr. Angelos, are any discussions that you --
3     A.  Excuse me. Kilnoiz.
4     Q.  All right, thank you.
5     I want to focus on any discussions
6  that you would have had with anyone who was
7  representing Pfizer in an effort to arrive at a
8  settlement of your claims against Pfizer before
9  the Quigley bankruptcy.
10    A.  I believe it was -- the first person
11  was Ken Feinberg. Also, of course Mike Rozen at
12  one point or another.
13    Q.  And you remember when Mr. Rozen and
14  Mr. Feinberg approached you about settling their
15  claims in anticipation of a Quigley bankruptcy?
16    A.  Having read those depositions, I get
17  the date 2003, 2004. I guess thereabouts. But
18  we weren't involved in, you know, the bankruptcy
19  proceedings were occurring throughout the
20  country with various manufacturers, that is, our
21  office.
22    We had our cases, we were trying our
23  cases, and we were not participating in the same
24  way that I think Mr. Cooney and Mr. Weitz were.
25    Q.  All right. And you in your answer

P. Angelos

2  referred to reading the depositions. You're
3  talking about the deposition of Mr. Weitz and the
4  deposition of --
5    A.  I read those two last night to see
6  what this was all about.
7    Q.  All right. And after reading this --
8    A.  And I still don't know.
9    Q.  Maybe it will become clear as I ask
10  you some questions.
11    A.  All right. Good.
12    Q.  Let's go back to what we were talking
13  about, and that is conversation between you -- or
14  with Mr. Rozen and Mr. Feinberg. And you
15  understood that they were at that point speaking
16  to you on behalf of Pfizer; correct?
17    A.  The combination, Quigley/Pfizer.
18  There was some kind of a pact between the two.
19  Seems to me that Pfizer was trying to
20  piggyback on top of the Quigley bankruptcy to try
21  to absolve itself of its exposure. That was my
22  analysis. They didn't tell me that.
23    Q.  All right. When they had
24  conversations with you, they were -- these
25  conversations were about settling your claims

P. Angelos

2  against Pfizer; correct?
3    A.  No, I think they were talking about
4  both. While we made -- we contended that they
5  were inextricably involved, they didn't debate
6  that. They were just talking about let's try to
7  resolve the cases that you have where your
8  claimants or clients are claiming they were
9  exposed to products of Quigley, Pfizer, call it
10  what you like, but --
11    Q.  And you said from reading Mr. Weitz
12  and Mr. Cooney's depositions, you -- your
13  recollection is that was in around the 2002-2003
14  time frame?
15    A.  I think that was the time.
16    Q.  Okay.
17    A.  When they began to -- they came here
18  and talked about this.
19    Q.  All right. And by "came here,"
20  you're talking about your office here in
21  Baltimore?
22    A.  In the office here, right.
23    Q.  Tell me again who was present at the
24  meeting from the Law Offices of Peter Angelos.
25    A.  When they first came to Baltimore?

P. Angelos

2    Q.  Yes.
3    A.  I think it was just me with Ken
4  Feinberg initially. Later, Rozen was involved.
5  I don't know -- I think the two of them were here
6  together once, maybe twice.
7    Q.  All right.
8    A.  And Deano would -- and I think
9  George.
10    Q.  Were there more than two meetings
11  that you participated in? Or do you only recall
12  two?
13    A.  Well, I know Ken Feinberg. He was a
14  special master here for a while, and I came to
15  know him. So there may have been more meetings
16  than two or three with him about various things.
17  And maybe that came up.
18    Rozen, I believe it was once or
19  twice, although I think he had meetings with
20  Deano with George. But I really left most of
21  that to Deano and George.
22    Q.  All right. Well, let me just focus
23  on the meetings that you attended.
24    A.  Sure.
25    Q.  And you said you would have meetings

P. Angelos

1 with Mr. Feinberg on other matters, and perhaps
2 the subject of a Pfizer settlement might come up.
3 A. Well, he and I became friends from
4 the contact we had when he was serving as special
5 master in our Circuit Court. So yes, we talked
6 about a variety of things, politics, etc., etc.
7 He's a big booster of Senator Kennedy, and so am
8 I, so we'd talk about that and various other
9 subjects.
10 Q. At one of these meetings, did you and
11 Mr. Rozen, or you and perhaps some people from
12 your firm, attempt to reconcile case lists, that
13 is, to make sure that the cases that you believe
14 you had pending against Pfizer matched up with
15 the cases that Pfizer believed you had pending
16 against Pfizer?
17 A. Yes. But primarily, Deano and George
18 would put that all together.
19 Q. All right.
20 A. Deano being the chief individual in
21 charge of that kind of activity.
22 Q. During the meetings that you had with
23 Mr. Rozen, did you discuss values that you
24 thought were appropriate to settle your cases

P. Angelos

1 with Pfizer?
2 A. I think I discussed values, but I
3 didn't think they were appropriate.
4 You know, he would sort of negotiate,
5 in a sense, but he was really a big -- you know,
6 if you know Mike, he's a good negotiator, he's
7 kind of cute, and he's trying to find out where
8 you are.
9 But they were -- as I said before,
10 they were instigating the discussions. I wasn't
11 interested in talking to them about settling all
12 our cases. I was more interested in having all
13 our cases tried as expeditiously as possible in
14 our courts.
15 They came to me, and they talked
16 about it. And it was all cordial and friendly,
17 in a sense, professionally.
18 Q. Okay. During the meeting when you
19 were discussing values that you thought would be
20 appropriate to settle your pending cases against
21 Pfizer, did you suggest a figure of $150 million?
22 A. That number came up after much
23 discussion between me and George, Deano in
24 particular. But most of that work in determining

P. Angelos

1 what they -- we thought those cases should settle
2 for, what kind of a discount would be applied in
3 the event there was a bulk settlement and we
4 could get the monies to our clients more quickly,
5 obviously, than trying the cases in light of the
6 fact that these cases were not given enough
7 judicial resources to get them moving through the
8 court systems.
9 Now, whether that was accidental or
10 deliberate, obviously because of that slow
11 movement, we were interested if somebody talked
12 about moving all the cases of a particular
13 manufacturer at a given time in a group. And I
14 think that number evolved from those discussions.
15 Q. All right. Did Mr. Rozen ever
16 suggest a number that -- or Mr. Feinberg, for
17 that matter, ever suggest a number to you that
18 they thought would be appropriate for Pfizer to
19 pay to settle all of your cases?
20 A. They never made a concrete offer.
21 They talked about numbers. It was more of a --
22 how would you put it? They were really trying to
23 find out where we were, which is obviously part
24 of their approach to working out a deal with

P. Angelos

1 anybody. And -- but as far as saying here,
2 here's an offer in writing, or verbally, for your
3 cases, this is what we will pay, the answer's no.
4 Q. Okay. After these couple of meetings
5 in either 2002 or 2003, did you have any further
6 conversations with Mr. Rozen or Mr. Feinberg at
7 which you discussed numbers or case lists, you
8 know, attempting to reconcile the number of cases
9 that you had? Or did that --
10 A. I basically left that to Deano.
11 Q. Okay. So you --
12 A. Although I did meet with Ken
13 Feinberg, and I may have seen Mike a couple of
14 times, but strictly on a sort of semi-social
15 basis.
16 Q. All right. What I want to do is
17 really make sure that I have gotten from you
18 everything that you remember specifically about
19 meeting with Mr. Rozen or Mr. Feinberg to discuss
20 either case values or the number of cases that
21 your firm had against Pfizer in order to try to
22 reach a settlement. And have I basically
23 explored all of that? Gotten all of the
24 information?

# EXHIBIT Q

1       UNITED STATES BANKRUPTCY COURT

2        SOUTHERN DISTRICT OF NEW YORK

3    IN RE:                   ) Chapter 11

4    QUIGLEY COMPANY, INC.,   ) Case No.: 04-15739 (PCB)

5          Debtors.          )

6

7

8

9

10

11

12        The discovery deposition of JOHN D. COONEY,

13    taken in the above-entitled cause, before

14    Elizabeth L. Vela, a notary public of Cook County,

15    Illinois, on the 28th day of September, 2007 at the

16    time of 9:47 a.m. at 120 North LaSalle Street,

17    Chicago, Illinois, pursuant to Notice.

18

19

20

21

22

23

24    Reported by:  Elizabeth L. Vela, CSR

25    License No.:  084-003650

ELISA DREIER
REPORTING CORP.

950 Third Avenue          Telephone: 212-557-5558
New York, New York 10022   Fax: 212-557-0050
Email:production@courtreportingedrc.com

1    of conversations or negotiations with Pfizer

2    representatives concerning prepetition settlements

3    prior to the Quigley bankruptcy?

4        A.    I don't want to speak for them, but I

5    would be surprised.

6            I mean, I know they've had conversations

7    with representatives of Pfizer.  And I've been in

8    rooms when they have had them.

9            So you know, aside from the

10   characterization of what the conversations were,

11   have I talked to Mike Rosen and Ron Ruben, has

12   Perry Weitz?  I'm sure they have.  That's --

13       Q.    So it wouldn't be fair to characterize

14   those conversations as being Cooney & Conway was

15   shut out of the prepetition settlement negotiation

16   conversation process?

17       A.    Of course it would be, because I can have

18   a conversation with anybody about anything, but the

19   substance of the conversation is what matters.

20       Q.    So it's your position that you were shut

21   out of any prepetition settlement negotiations with

22   Pfizer?

23       A.    No.  I think Pfizer made a financial

24   decision that -- hell, it's not my assumption,

25   because I was told it.

# EXHIBIT R

1

2        UNITED STATES BANKRUPTCY COURT

3        SOUTHERN DISTRICT OF NEW YORK

4

    -------------------------------x

5  IN RE:  QUIGLEY COMPANY, INC.

6             Debtor.

    -------------------------------x

7

8

9              VIDEOTAPED

10       DEPOSITION OF PERRY WEITZ

11         New York, New York

12      Tuesday, February 3, 2009

13

14

15

16

17

18

19

20

21  Reported by:

    FRANCIS X. FREDERICK, CSR, RPR, RMR

22  JOB NO. 20690

23

24

25

P. WEITZ

1 pre-pack scenario conversations?
2    **Q. No. I intend to talk --**
3    A. No, no, no. I -- no, I'm just
4 trying to get a --
5    **Q. Yeah, right.**
6    A. You're going from the docket deal
7 to now when Michael and I spoke about the --
8 two years later when Quigley was going to file
9 and they had the present plan. I just want to
10 clarify.
11    **Q. All right. Let me start over.**
12    A. Okay.
13    **Q. You said in response to my**
14 **question about whether there was ever any**
15 **discussion between you and Mr. Rozen about**
16 **doing an aggregate settlement of your entire**
17 **docket --**
18    A. Right.
19    **Q. -- when I was actually talking**
20 **about the 2001 understanding that you and he**
21 **reached about the processing thing, you**
22 **volunteered that you had a meeting with Mr.**
23 **Rozen in about 2002 to discuss settling all of**
24 **your cases against Pfizer and Quigley in**

P. WEITZ

1 **anticipation of Quigley filing a bankruptcy.**
2    MR. JONAS: Objection. You can
3 answer if you can. I'm not sure there's
4 a question.
5    **Q. Okay. I'll ask a question.**
6 **With that background which I hope**
7 **will fix you on the time period I want to**
8 **focus on and the subject I want to focus on,**
9 **did you and Mr. Rozen, before Quigley filed**
10 **its bankruptcy, have discussions about how to**
11 **resolve Weitz & Luxemburg's cases as part of**
12 **the bankruptcy?**
13    A. Two separate conversations. One
14 was about two years before they actually filed
15 where they wanted me to negotiate a pre-pack
16 and take the lead on it with them because I
17 had -- I had one of the highest valued
18 inventories against Pfizer. When you
19 extrapolate out what they were paying me per
20 claim and you look at my inventory cases,
21 mesos and lung cancers, and the values that
22 they were paying and non-malignants, it was a
23 very high number. So it made sense for them
24 to come to me and negotiate that. That was

P. WEITZ

1 one negotiation.
2    Then there were completely
3 different negotiations about two years later
4 when this plan was being considered to be --
5 to be filed.
6    **Q. All right. So I want to make sure**
7 **I understand it.**
8    **Your testimony is that in 2002 Mr.**
9 **Rozen approached you, Perry Weitz, to help --**
10    A. Mr. Rozen and Mr. Feinberg.
11    **Q. Right. You said Mr. Feinberg.**
12    A. Right.
13    **Q. Was it your memory of the meeting**
14 **that they wanted you to, one, settle your**
15 **cases with them, but also take the lead in**
16 **helping to put together other settlements with**
17 **other plaintiffs' firms?**
18    A. Yeah. I had just finished
19 negotiating I think the Owens Corning national
20 settlement program, the Haliburton deal, and I
21 think the Honeywell deal, or that might have
22 come a little later. They knew about the
23 success that I had had in getting those deals
24 done. And it at that time made sense for

P. WEITZ

1 them.
2    **Q. All right. And what did Mr. Rozen**
3 **and Mr. Feinberg tell you about what they were**
4 **planning to do and what they wanted your role**
5 **to be?**
6    A. Well, the first thing they had to
7 do was deal with the higher value
8 jurisdictions. And I was, you know, certainly
9 the highest or one of the highest value
10 jurisdictions in the country to see if the
11 they could get a deal done at a number that
12 Pfizer would agree so.
13    So the first thing is seeing if
14 you can get your arms around a value that
15 makes sense based upon the historical
16 settlement history that Pfizer had with each
17 of the law firms.
18    And then seeing, you know, what
19 kind of discount there would possibly be for
20 them settling all the cases at once. And then
21 seeing if Pfizer would be willing to pay that
22 for their 524(g) relief.
23    **Q. And where did this meeting occur?**
24    A. It occurred -- there were several

P. WEITZ

2 A. Never.

3 Q. Okay. I should have just asked
4 that question first.

5 During the discussions that you
6 had with Mr. Rozen leading up -- I shouldn't
7 say leading up to it because it makes it sound
8 like these discussions ended up in a
9 bankruptcy. So let me rephrase it.

10 During the discussions that you
11 had with Mr. Rozen in '04, prior to Quigley
12 filing their petition, were there any other
13 individuals involved with Mr. Rozen?

14 A. No.

15 Oh, I think Ron Rubin was around a
16 couple of times for some lunches at the Four
17 Seasons. And then I believe Mike Kelly from
18 the law firm of Kelly & Ferraro tried to put
19 Mike and I back together when things were sort
20 of going in the wrong direction. And tried to
21 play liaison in trying to get a deal done.

22 Q. Okay. Anyone else that you
23 recall?

24 A. No.

25 Q. Okay. By this time did you have a

---

P. WEITZ

2 BlackBerry --

3 A. Oh, Scott Gilbert.

4 Q. Okay.

5 A. Sorry. Scott Gilbert at one
6 meeting we had. Or a breakfast meeting.

7 Q. Did Mr. -- did either Mr. Rubin or
8 Mr. Gilbert make any offer -- not offers --
9 make any indication as to what they thought
10 Pfizer might be willing to pay to settle with
11 the Weitz & Luxemburg clients?

12 A. I don't recall. No, I don't --
13 not that I remember.

14 Q. Okay. When is the last time that
15 you and Mr. Rozen had a communication, whether
16 it was by e-mail, fax, telephone,
17 face to face, about trying to reach a number
18 that would be acceptable to you to settle your
19 cases?

20 A. I think Mr. Rozen knows that if he
21 was able to get the authority for the company
22 that there's a number that he could get that I
23 would resolve these cases for. I think that
24 unfortunately he cannot do that so we have
25 proceeded with the objections.

---

1 P. WEITZ

2 Q. Okay. And you said that you think
3 that Mr. Rozen knows the number that if he
4 could get authority from the client you would
5 accept on behalf of your clients.

6 A. I think he knows that if he got
7 the 250 I would accept that.

8 Q. Okay. If Mr. Rozen told you in
9 writing that he had authority from his client
10 to pay you $250 million to settle the cases
11 with your clients would have you to
12 communicate that offer to your clients?

13 A. Absolutely.

14 Q. And if your clients said no there
15 would be no deal, right?

16 A. No deal.

17 Q. Okay.

18 A. I mean, I would counsel on why I
19 think they should or should not take it
20 individually. But -- but, you know, these
21 settlements are all subject to clients'
22 consent.

23 Q. Right. So there really has never
24 been a number that you communicated to Mr.
25 Rozen so that he could go to the client and

---

P. WEITZ

2 say Mr. Weitz has all of his clients'
3 permission to settle all of his cases for any
4 number. That hasn't happened, has it?

5 A. Mr. Rozen has been settling cases
6 with me for almost 20 years and I'd say I got
7 about a hundred percent batting average with
8 him.

9 Q. Okay. But the answer to my
10 question is no, that hasn't happened, has it?

11 A. I don't know if that's the answer
12 to your question because if I'm Mr. Rozen, he
13 knows, and he's said it on many occasion, that
14 if say I'm going to get a deal done I'm going
15 to be able to communicate it to my client and
16 I'm going to be able to explain to them why
17 it's in their best interest to accept it. And
18 in every deal he's done with me settling
19 literally tens of thousands of cases over a
20 very long period of time, we have -- there's
21 never been a client that has caused a deal to
22 fall apart.

23 Q. Okay. And in your dealings with
24 Mr. Rozen, while he has been representing
25 Pfizer, have you found that it's the same on

P. WEITZ

1 would -- I would -- I told him that if he got
2 it in writing from his client, $250 million,
3 and we were able to, you know, deal with some
4 of these other issues, I would consult my
5 clients and recommend the deal.
6   Q.  Yeah.  Actually what you told him
7 in a couple of e-mails is that if he would pay
8 you the money that you wanted he would get rid
9 of you as an objector or words to that effect,
10 correct?
11   A.  I think that if he got the $250 --
12 $250 million I just said I would recommend the
13 deal to my clients.
14   Q.  Right.  And he would get rid of
15 you as an objector.
16   MR. JONAS:  Objection.
17   A.  Well, if my clients settle I'm no
18 longer an objector.
19   Q.  Sure.  Okay.  I thought that was
20 obvious but, you know.
21       Now, you said that your case
22 values were -- I think you said it both ways,
23 the highest or among the highest in the
24 country with respect --

P. WEITZ

1   A.  Mine or Cooney's.
2   Q.  I'm sorry?
3   A.  Mine or Cooney's.
4   Q.  Okay.  And what is that belief
5 based upon?
6   A.  It's based upon the numbers that
7 Pfizer was paying me per disease over a --
8 over a period of time.  My settlement history
9 with them and extrapolating that out over my
10 inventory of cases and the disease mix.
11   Q.  Right.  But clearly, in order for
12 you to believe that your cases or Cooney's
13 cases have the highest per case values with
14 respect to Pfizer you have to have some
15 information about other payments that Pfizer's
16 made to other plaintiffs' firms.
17   A.  I think that if you looked at
18 Pfizer's internal documents and you looked at
19 who they were paying annually the most money
20 to, you'll see that it was me and Cooney or
21 Cooney, then me, and there might have been
22 some other isolated cases that would pop up
23 around the country where they might have paid
24 more per case.  But those people didn't have

P. WEITZ

1 the inventory to make them a significant
2 player for Pfizer.
3   Q.  When you referred to looking at
4 Pfizer's documents --
5   A.  Could we just take a break to go
6 to the men room's?
7   Q.  Yeah.  Sure.
8   THE VIDEOGRAPHER:  The time is now
9 12:01 p.m.  We are now going off the
10 record.
11   (Recess taken.)
12   THE VIDEOGRAPHER:  This is the
13 start of tape number three.  The time is
14 now 12:12 p.m.  We are now back on the
15 record.
16 BY MR. POWERS:
17   Q.  Mr. Weitz, are you ready to
18 proceed?
19   A.  Sure.
20   Q.  Okay.  Before we broke you had
21 answered one of my questions by -- about how
22 you knew what the case values for other
23 plaintiffs' firms were with respect to Pfizer
24 by saying you referred to Pfizer's documents.

P. WEITZ

1       And what I want to ask you is did
2 you get the information about what other
3 plaintiffs' firms were receiving in
4 settlements from Pfizer by looking at Pfizer
5 documents?
6   A.  I don't recall.
7   Q.  Okay.  What I want to know is how
8 you know what other plaintiffs' firms'
9 historical settlement numbers were with Pfizer
10 and Quigley.
11   A.  Talking to other plaintiffs and I
12 think that when I was doing the pre-pack there
13 was some -- I had seen some historical
14 settlement numbers.  And then I think we saw
15 them again in this litigation.
16   Q.  Okay.  In this litigation you're
17 talking about the litigation in the bankruptcy
18 matter.
19   A.  Yes.
20   Q.  Okay.  Are you aware of what other
21 plaintiffs' firms are receiving in settlement
22 as -- in the Quigley bankruptcy?
23   A.  I believe you produced that in
24 this litigation.

# EXHIBIT S

1              UNITED STATES BANKRUPTCY COURT
              SOUTHERN DISTRICT OF NEW YORK
2

3                     .
   IN RE:               .  Case No. 04-15739 (smb)
4                     .
   QUIGLEY COMPANY, INC., et al, .  New York, New York
5                     .  Tuesday, June 12, 2007
              Debtors.  .  10:05 a.m.
6  . . . . . . . . . . . . . . .

7                    TRANSCRIPT OF
        MOTION TO APPROVE INSURANCE SETTLEMENT
8     MOTION BY THE U.S. TRUSTEE TO DISMISS OR CONVERT
  MOTION BY THE AD HOC COMMITTEE OF TORT VICTIMS FOR TRUSTEE
9      BEFORE THE HONORABLE STUART M. BERNSTEIN
        CHIEF UNITED STATES BANKRUPTCY JUDGE
10

   APPEARANCES:
11

   For the Debtors:          Lawrence V. Gelber, Esq.
12                     Michael L. Cook, Esq.
                      Jessica L. Fainman, Esq.
13                     SCHULTE, ROTH & ZABEL, LLP
                      919 Third Avenue
14                     New York, New York 10022

15   For The U.S. Trustee:      Greg M. Zipes, Esq.
                      Serene Nakano, Esq.
16                     OFFICE OF THE U.S. TRUSTEE
                      33 Whitehall Street, 21st Floor
17                     New York, New York 10004

18  (Appearances Continued)

19  Audio Operator:           Electronically Recorded
                      by Michelle Brown, ECRO
20

   Transcription Company:     Rand Transcript Service, Inc.
21                     80 Broad Street, Fifth Floor
                      New York, New York 10004
22                     (212) 504-2919
                     www.randtranscript.com
23

24
   Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

1   certainly puts the cart before the horse.  And now let me
2   just talk practically, Judge.

3          As a practical matter, you know it and I know it and
4   everyone in this courthouse knows it.  This case, from the
5   perspective of the dissenting members, is all about the view,
6   trying not to editorialize it, that there wasn't enough money
7   offered in settlement by Pfizer for my clients to be willing
8   to accept it.

9          From our perspective, and we will demonstrate as
10  part of the bad-faith case, when and if we ever get to it,
11  that the amounts that they offered to us were historically
12  very, very light in terms of the amounts that they were
13  paying historically to settle those similar claims; that the
14  settlements they did get with 171,000 claims were very, very
15  cheap settlements from people that historically they weren't
16  very worried about.  They went out and, we think, sort of
17  manufactured these settlements in order to get to the eight-
18  percent level.

19         My point is this.  In terms of a dynamic that's ever
20  going to suggest to Pfizer that Pfizer ought to re-think
21  whether or not it wants to consider resolution with my
22  constituency, with the other objecting parties that are out
23  there that joined in our motion for a trustee, that support
24  the conversion dismissal motion, Pfizer has to be told for
25  once in the last three years it's not going to get it's way.

# EXHIBIT T

## Michael Rozen

| | |
|---|---|
| From: | pweitz |
| Sent: | Tuesday, December 20, 2005 8:50 AM |
| To: | Michael Rozen |
| Subject: | Re: P: despite your racing out at the end, it was good to see youyesterday. it's been far too long sinc |

Attachments: Mime.822

My clients have nothing to lose and everything to gain. your positions have not only created enormous credibility issues between you and me but I'm outraged by the numbers you paid everyone else (historicals) and are refusing to pay us ! Save your nonsense excuses for someone who doesn't know better ! By the way nobody would care if I was paid differently they just care that I stop objecting !

# REDACTED

Original Message
From: "Michael Rozen" <mkrozen@feinberggroup.com>
Date: Tue, 20 Dec 2005 08:40:06
To:<pweitz@mycingular.blackberry.net>, <pweitz@weitzlux.com>
Subject: P: despite your racing out at the end, it was good to see you
        yesterday. it's been far too long sinc

P: despite your racing out at the end, it was good to see you yesterday. it's been far too long since we've hung out, so let's make a definitive plan for early in '06.

let me ask you one question....what is to be gained by your seemingly hardline position? set aside the number for a minute and just look at "terms." you know full well that it's impossible, for multiple reasons, to do anything different for you than for others, on either front. so seeking such a substantial difference can only be designed to kill any possibility of getting something done. but, i ask myself, why come to the meeting and say at the outset that you want to make a deal, only to set up a condition that you know is impossible to meet, thereby undermining the thing you said you wanted to achieve? It doesn't make any sense. As to the dollars, while you may feel aggrieved about how Quig has played out so far, what is to be gained by continuing to fight? (a) you will lose the vote; (b) you will likely lose before the bankruptcy court and we will have a confirmed plan, which will cause us to pay the remaining 50% to the participants; (c) your best case is on appeal, and we all know how uncertain a road that is; (d) even if you prevail, years from now, on an appeal, Quig is still a limited fund and there is simply no way to get blood from a stone, unless (e) you somehow persuade a court to pierce the veil, which we both know (and all of your bretheren have conceded) is about as unlikely a possibility as any we've ever discussed. So, where does that leave us? I'm not in your shoes, so maybe there is something i don't fully comprehend, however it seems to me that the "best" result here, under the circumstances, is to make the

Quig deal and stop being an objector. /   ___   **REDACTED**

whatever the case, i hope you have a relaxing and enjoyable holiday and
i look forward to seeing you in early January.
M

Sent via BlackBerry  a service from AT&T Wireless.

# EXHIBIT U

# **REDACTED**

# EXHIBIT V

1      CONFIDENTIAL - M. ROZEN

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  --------------------------------x

5  In Re:  Quigley Company, Inc.,

6           Debtor.

7  --------------------------------x

8

9         CONFIDENTIAL VIDEOTAPED

10     DEPOSITION OF MICHAEL K. ROZEN

11         New York, New York

12      Tuesday, February 3, 2009

13

14

15

16

17

18

19  Reported by:

20  KATHY S. KLEPFER, RMR, RPR, CRR, CLR

21  JOB NO. 20830

22

23

24

25

1      CONFIDENTIAL - M. ROZEN
2          (Rozen Exhibit 1, Declaration of
3      Michael K. Rozen in Support of Motion of
4      Pfizer Inc For a Protective Order Pursuant
5      to Federal Rules of Civil Procedure 26(c)
6      and 30(d), marked for identification, as of
7      this date.)
8      **Q.   Exhibit 1 is entitled Declaration of**
9      **Michael K. Rozen in Support of Motion of Pfizer**
10     **Inc. For Protective Order pursuant to Federal**
11     **Rules of Civil Procedure 26(c) and 30(d).**
12         **Have you seen this document before,**
13     **sir?**
14     A.   I have.
15     **Q.   And on page 13, it indicates that you**
16     **are the signatory, although that's a conformed**
17     **signature, I guess, signature block.  Do you see**
18     **that?**
19     A.   Uh-huh.  Yes.
20     **Q.   But you reviewed this affidavit and**
21     **signed it and believed it to be true at the time**
22     **that you presented it to the court?**
23     A.   Yes.
24     **Q.   I want you to look at paragraph 2, if**
25     **you would, please, in which you say that for**

1      **CONFIDENTIAL - M. ROZEN**
2      **more than five years you served as a special**
3      **master for asbestos litigation through a joint**
4      **appointment by Justice Helen Friedman and -- of**
5      **the New York State Supreme Court and Federal**
6      **District Judge Jack Weinstein.  Do you see that?**
7      A.   I do.
8      **Q.   When was that, sir?**
9      A.   I would have to look back at my
10     records to be sure.  It probably started in or
11     about the time I left Kaye Scholer and continued
12     for five years or so thereafter.
13     **Q.   So sometime between 1993 and 1998?**
14     A.   Yeah, I mean, I'm not going to say
15     that those are the exact dates.  Probably in and
16     around that timeframe.
17     **Q.   And as a special master, what was your**
18     **function?**
19     A.   Anything that the court wanted me to
20     do, including management of the case inventory
21     and/or convening settlement negotiations and/or
22     making discovery rulings or what have you.
23     Whatever the courts needed.
24     **Q.   And then you say, same paragraph, you**
25     **say, subsequently, you served as settlement**

1      **CONFIDENTIAL - M. ROZEN**
2      **counsel for no less than a dozen defendants in**
3      **the nationwide asbestos litigation.**
4          **What defendants did you represent over**
5      **that time period?**
6      A.   I have represented, among others,
7      Rapid American, Owens-Corning, GAF, Pfizer,
8      obviously -- I'm not going to remember them
9      all -- IMO, Warren.  Probably a handful of
10     others.  I can't recall as I sit here.
11     **Q.   Okay.  You say you've been involved in**
12     **the resolution of hundreds of thousands of**
13     **claims.  Do you see that?**
14     A.   Yes.
15     **Q.   Over what time period are we talking**
16     **about?**
17     A.   From whenever I first got involved
18     with asbestos, which would have been Brooklyn
19     Naval Shipyard consolidation timeframe, which is
20     probably '89, '90, through to the present.
21     **Q.   And in resolving or settling asbestos**
22     **claims, what were the factors that you evaluated**
23     **in order to allow you to reach a recommendation**
24     **for a client as to the appropriate resolution of**
25     **any claim?**

1      **CONFIDENTIAL - M. ROZEN**
2          MS. FROST:  Objection.  Form.
3          THE WITNESS:  Are you asking me if
4      there is a specific list of factors that I
5      considered uniformly --
6      BY MR. STOLL:
7      **Q.   No.**
8      A.   -- in --
9          Because there isn't one.
10     **Q.   Okay.**
11     A.   There are a myriad of things that, you
12     know, doesn't lend itself to the abstract kind
13     of answer that you seem to be seeking from me.
14     It depends on the circumstances of the company,
15     it depends on the circumstances of the case.
16         If you want to give me specifics, I
17     might be able to better answer it for you, but
18     there are any one of a number of factors that
19     have to do with the cases and the jurisdictions
20     and the company and its posture and what other
21     things they have going on among a very, very
22     wide range of considerations that all depend on
23     the circumstances.
24     **Q.   So if I distill that down, each**
25     **settlement is unique?**

CONFIDENTIAL - M. ROZEN

1 portfolio is more valuable than if it were -- if
2 the proportion were differently?
3
4     A.   To the extent that your question is if
5 I have hypothetically the exact same lawyers in
6 the exact same jurisdictions with the exact same
7 number of cases at the exact same timeframe, and
8 given that hypothetical, one of them has all
9 mesos and the mirror image of it has all
10 non-malignants, would I, under those exact same
11 circumstances, value the one with mesos higher?
12 Probably.
13     Q.   And I take it by your -- by the
14 answer, as you were bracketing that up to make
15 it apples and apples, that one of the factors
16 that you look at in valuing a plaintiff law
17 firm's inventory is the plaintiff law firm
18 itself?
19     A.   Sometimes.
20     Q.   Is that fair?
21     A.   Sometimes.
22     Q.   And what about the plaintiff law firm
23 is important in valuing the inventory of claims
24 that they represent?
25     A.   Well, look, let's be clear. There

---

CONFIDENTIAL - M. ROZEN

1
2 are, as I've said now countless times, there are
3 a variety of factors that I might use at any
4 given point in time. To the extent you want to
5 try to keep isolating individual factors,
6 plaintiff law firm matters probably only to the
7 extent of their experience in this, but I don't
8 think that one -- or, I certainly would not draw
9 from that a bright rule that said that the more
10 experienced is the more valuable. Sometimes you
11 can be experienced and incapable of doing
12 anything well, in which case it may be that you
13 have a long track record of incompetence, so
14 that might matter too.
15     Q.   Okay. And I take it from your
16 practice you have a view as to which plaintiff
17 law firms are competence or incompetent in
18 handling asbestos cases?
19         (Telephone interruption.)
20     Q.   I'm sorry. Let me go back and read
21 that question.
22     A.   I remember the question.
23     Q.   You do?
24     A.   I don't think I would characterize any
25 plaintiff law firm that I'd be willing to

---

CONFIDENTIAL - M. ROZEN

1
2 mention as incompetent. I think there are
3 gradations of competence and, yes, I have views
4 about that depending on the time and place and
5 circumstances and what have you.
6     Q.   Do you consider Mr. Weitz to be
7 incompetent in handling --
8     A.   Incompetent?
9     Q.   Incompetent in handling asbestos
10 cases?
11         MS. FROST: Objection. Form.
12         THE WITNESS: No, I don't consider him
13 to be incompetent.
14 BY MR. STOLL:
15     Q.   Do you consider him to be competent?
16     A.   Him and his law firm? Yes.
17     Q.   Yes. How about Mr. Angelos, do you
18 consider him to be incompetent or competent in
19 handling asbestos cases?
20     A.   Competent.
21     Q.   How about Mr. Cooney, incompetent or
22 competent?
23     A.   Competent.
24     Q.   Okay. You also mention in sentence 7
25 after the --

---

CONFIDENTIAL - M. ROZEN

1
2     A.   I'm sorry, sentence 7?
3     Q.   I'm sorry. Excuse me. In paragraph
4 11, after the "disease mix and variety of other
5 factors," you also identify historical practice.
6         What did you mean by "historical
7 practice" in paragraph 5 -- I'm sorry, in
8 paragraph 11 on page 5.
9     A.   What I meant was a particular
10 defendant's history of relations and dealings
11 with any particular firm with which they had had
12 prior settlements or prior litigation experience
13 or what have you.
14     Q.   Do you know -- strike that. And how
15 would the historical practice figure into your
16 evaluation of a particular firm's inventory?
17     A.   I'm not sure what you're asking me.
18 If what you're asking is, is it a -- one of a
19 variety of factors? Yes, that's what I wrote
20 here, yes.
21     Q.   And if -- is it fair to say that if
22 the firm had a history of obtaining low values
23 for their claimants, that that would, in part,
24 cause you to value the claims on the low side?
25         MS. FROST: Objection. Form.

# EXHIBIT W

**<u>REDACTED</u>**

# EXHIBIT X

# REDACTED

# EXHIBIT Y

# **REDACTED**

# EXHIBIT Z

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:                            .   Case No. 04-15739 (smb)
                                  .
QUIGLEY COMPANY, INC., et al, .   New York, New York
                                  .   Thursday, July 12, 2007
                    Debtors.      .   10:05 a.m.
. . . . . . . . . . . . . . .

TRANSCRIPT OF
OBJECTIONS TO DISCLOSURE STATEMENT
STATUS CONFERENCE ON TRUSTEE MOTION
FOR PRELIMINARY INJUNCTION
BEFORE THE HONORABLE STUART M. BERNSTEIN
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:   (On the Record)

For the Debtors:              Lawrence V. Gelber, Esq.
                              Michael L. Cook, Esq.
                              SCHULTE, ROTH & ZABEL, LLP
                              919 Third Avenue
                              New York, New York 10022

For The U.S. Trustee:         Greg M. Zipes, Esq.
                              OFFICE OF THE U.S. TRUSTEE
                              33 Whitehall Street, 21st Floor
                              New York, New York 10004


(Appearances Continued)

Audio Operator:               Electronically Recorded
                              by Court Personnel

Transcription Company:        Rand Transcript Service, Inc.
                              80 Broad Street, Fifth Floor
                              New York, New York 10004
                              (212) 504-2919
                              www.randtranscript.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    plans, and no more."

2    For someone reading that, someone getting this, you

3    know, that's a helpful piece of information, and that's not

4    really anywhere -- you can't read the disclosure statement

5    and see that.

6    MR. COOK: If it's as non-controversial as he said,

7    I'm happy to consider it, and we'll kill a few more trees and

8    put it in.

9    THE COURT: It sounds to me like -- this sounds a

10   little argumentative, which -- it was said before that the

11   purpose of the increased contribution was to keep the non-

12   settling people at the same level, and raise the payments to

13   the people who went from ten percent to ninety percent.

14   That's what it was. Okay.

15   What I'm inclined to do with the disclosure

16   statement is I want to reserve decision on the two or two-

17   and-a-half legal issues that were raised, specifically, the -

18   - whether the language of the injunction, regardless of the

19   disputes that have been raised, exceeds the permissible scope

20   of 524(g). The bottom line is I think that can be resolved

21   by just putting 524(g), which you have in the plan, and not

22   describing by example the types of claims.

23   I think the more serious issue that I have is this

24   what I call the classification issue. Maybe it's an unequal

25   treatment issue. But, certainly, I can look at that as a

1  legal issue, whether the mere connection between the Pfizer

2  settlement and the confirmation of the plan somehow makes it

3  unconfirmable as a matter of law as presently proposed,

4  whether the settling creditors have to be separately

5  classified, which may cure at least any of that.

6           I don't know if you can confirm the plan, then, but

7  that's an issue I'm going to reserve decision on.

8           I know I have briefs.  Do parties want to submit any

9  more legal authority, particularly on the classification

10 issue?  Not this general stuff about similarly situated

11 claims should be separately --

12          MR. ZIRINSKY:  No, but we'd like to specifically

13 address that issue, Your Honor.  So we'd like some time to

14 put it --

15          THE COURT:  All right.  You want to submit

16 simultaneous briefs?

17          MR. ZIRINSKY:  That would be fine.

18          MR. WEISFELNER:  Well, it's their plan.  I mean, I'd

19 like an opportunity to respond to whatever their argument is.

20          THE COURT:  All right.  When can you submit a --

21          MR. ZIRINSKY:  I'd say within a week.

22          THE COURT:  So the Pfizer/Quigley brief, I'll give

23 you a week from tomorrow.  So that's the 20th.

24          Can you respond within a week?

25          MR. WEISFELNER:  Certainly.

# EXHIBIT aa

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

QUIGLEY COMPANY, INC.

                         Debtors.

. Chapter 11
.
. Case No. 04-15739 (SMB)
.
. New York, New York
. Tuesday, March 4, 2008
. 10:11 a.m.

QUIGLEY COMPANY, INC.,

                Plaintiff,

      vs.

A.C. COLEMAN, et al,

              Defendants.

. Adv. Proc. No. 1-04-04262
.
.
.
.
.
.
.
.
.

TRANSCRIPT OF MOTION
BEFORE THE HONORABLE STUART M. BERNSTEIN
CHIEF UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtors:        Michael L. Cook, Esq.
                        Jessica L. Fainman, Esq.
                        SCHULTE, ROTH & ZABEL, LLP
                        919 Third Avenue
                        New York, New York 10022

(Appearances Continued)

Audio Operator:        Electronically Recorded
                        by Karen, ECRO

Transcription Company:  Rand Reporting & Transcription, LLC
                        80 Broad Street, Fifth Floor
                        New York, New York 10004
                        (212) 504-2919
                        www.randreporting.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE COURT: Right.

2    MR. ARNOLD: But they have to be -- the ones that

3  are enjoined, based on the language of the statute, are those

4  that are based on mere ownership or involvement of the

5  management [sic].

6    THE COURT: The question I ask is when you put your

7  logo on it, you say Quigley, a subsidiary of Pfizer, and

8  assuming Pfizer participated in that decision or acquiesced

9  in it, why isn't that just a corporate ownership issue?

10    MR. ARNOLD: It's ancillary to corporate ownership.

11  If it was just ownership, if the decision -- and I do want to

12  point out that some of them -- not all of them say "a

13  subsidiary of."

14    THE COURT: I know.

15    MR. ARNOLD: So, you know, again, you've got at

16  least --

17    THE COURT: You think it makes a difference if it

18  says that or it just has the Pfizer logo on it?

19    MR. ARNOLD: I think it does. I think it does under

20  the restatement and the cases decided thereunder.

21    But the -- you know, again, it's not Pfizer's

22  ownership of Quigley that drives the claim. If Pfizer had

23  bought Quigley --

24    THE COURT: If Pfizer didn't own Quigley, you think

25  their logo would be on their purchase order?

1    MR. ARNOLD:  There are cases where that has happened
2  because --

3         THE COURT:  you think it would happen in this case?
4         MR. ARNOLD:  Of course not.  But I think you hit it
5  on the head, why did they put it there?

6         THE COURT:  Well, I suppose that there are
7  circumstances under which, you know, they could have gotten
8  together and said, hey, this is good business, let's do it.

9         MR. ARNOLD:  Exactly.  And that decision -- that
10  decision gives rise to the claim, not the ownership.  And --

11         THE COURT:  So why not clarify the injunction to say
12  the mere placement of the logo doesn't give rise to a claim,
13  you have to prove that you essentially participated in a plan
14  to sell the product and trade on Pfizer's name?

15         MR. ARNOLD:  Where does the discovery on that claim
16  -- are you then going to supervise --

17         THE COURT:  No, not at all.  Then you go back --
18  it's just define the parameter of the claim, then you go back
19  to state law and you take your discovery on why they put the
20  logo on.  What's wrong with that?

21         MR. ARNOLD:  With all due respect, I think if we go
22  back to the state court, then we're right here again.
23  They're going to say it's barred.  I mean, they're trying to
24  stop the state court in their tracks.

25         THE COURT:  Well, at some point somebody has got to