**BROWN RUDNICK LLP**
7 Times Square
New York, New York 10036
(212) 209-4800
Edward S. Weisfelner (EW-5581)

One Financial Center
Boston, MA 02111
(617) 856-8200
Jeffrey L. Jonas (JJ-5670)
James W. Stoll (JS-5931)
Gregory T. Arnold (GA-2147)

*Counsel to the Ad Hoc Committee Of Tort Victims*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| QUIGLEY COMPANY, INC., | : | Case No. 04-15739 (SMB) |
| | : | |
| Debtors. | : | |

---------------------------------------------------------------X

## CORRECTED
## REPLY OF THE AD HOC COMMITTEE OF TORT VICTIMS TO RESPONSES TO MOTION TO DESIGNATE VOTES PURSUANT TO 11 U.S.C. § 1126(e)
## - AND -
## OBJECTION OF THE AD HOC COMMITTEE OF TORT VICTIMS TO PFIZER'S CROSS-MOTION TO DESIGNATE VOTES OF CLAIMANTS REPRESENTED BY THE AD HOC COMMITTEE

The Ad Hoc Committee of Tort Victims (the "Ad Hoc Committee"),[1] by and through its undersigned counsel, hereby submits this (i) reply to the responses filed by Pfizer Inc. ("Pfizer"), Quigley Company, Inc. ("Quigley"), and Baron & Budd, P.C. ("Baron & Budd" and, together with Pfizer and Quigley, the "Objecting Parties") to the Ad Hoc Committee's motion (the "Designation Motion"), pursuant to 11 U.S.C. § 1126(e), to designate the votes of all Settling

---

[1] The current members of the Ad Hoc Committee are Weitz & Luxenberg, PC, Cooney & Conway and the Law Offices of Peter G. Angelos, PC, who collectively represent more than 34,100 individual asbestos claimants. These three firms have been representing asbestos victims against Pfizer and Quigley for decades.

Plaintiffs (as defined in the Designation Motion) in favor of Quigley Company, Inc's Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as of March 28, 2008) (the "Proposed Plan"), and (ii) objection to Pfizer's cross-motion ("Cross-Motion") to designate the votes of the claimants represented by the Ad Hoc Committee (the "AHC Claimants"). For all of the reasons described below, the Court should grant the Designation Motion, overrule any objections thereto, and deny the Cross-Motion.[2] In support hereof, the Ad Hoc Committee respectfully states as follows:

## PRELIMINARY STATEMENT

Pfizer's latest salvo, an utterly meritless attack on the good faith and motives of the Ad Hoc Committee, seeks to divert the Court's attention from the stark reality that it bought the vote while at the same time completely disenfranchising those sick and dying asbestos claimants whom it refused to compensate in connection with its pre-petition settlements. Fortunately, however, applicable law does not permit Pfizer's gambit to succeed. Unlike the Settling Plaintiffs – who are unquestionably motivated to vote for Quigley's plan by their interest in receiving the second settlement payment from *non-debtor* Pfizer, which payment, while central to Pfizer's overall scheme, is to be made *outside of the plan* and only if confirmation occurs – the AHC Claimants have voted to reject the Proposed Plan solely because of the Plan's (improper and inequitable) treatment of their claims. Thus, while grounds plainly exist to designate the votes of the Settling Plaintiffs (who are motivated by an interest that "does not relate to their claims"), grounds do not exist to designate the AHC Claimants' votes. See In re Dune Deck Owners Corp., 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995) (Bernstein, C.J.).

---

[2] All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Designation Motion (which is incorporated herein), the Proposed Plan or the objection to the Proposed Plan filed by the Ad Hoc Committee, as applicable.

Notwithstanding Pfizer's misdirection, nothing has changed the fact that Pfizer, through the Pre-Petition Settlement Agreements, bought the vote in favor of the Proposed Plan by, inter alia, (i) binding the Settling Law Firms, the overwhelming majority of which cast ballots on behalf of their clients using master ballots, to recommend that the Settling Plaintiffs take all steps necessary to support Quigley's plan and to vote in favor of such plan and to support Quigley and Pfizer in their efforts at the outset of the bankruptcy case to obtain an injunction against the prosecution of claims against the Pfizer Protected Parties (as defined in the settlement agreements), and (ii) conditioning the second settlement payment on confirmation of Quigley's plan. Nothing has changed the fact, which this Court itself has recognized, that Pfizer "influenced the vote" by tying the second payment to confirmation, and that the Settling Plaintiffs "had a substantial interest in voting for the plan in order to get their money from Pfizer." See December 18 Transcript, pp. 37, 46. Indeed, Pfizer's scheme left the Settling Plaintiffs no choice but to vote for the Proposed Plan because the value of the settlement payments so far outweighed any value that they might one day receive *as creditors* of Quigley under an approved plan (particularly given that claimants are unlikely to be paid under the Quigley trust for *up to 20 years after confirmation* and Pfizer's contention that roughly half of them will *never* recover from the proposed trust). Therefore, the Court should grant the Designation Motion and deny the Cross-Motion.

## ARGUMENT

### A. Grounds do not exist to designate the votes of the AHC Claimants

1. Pfizer, having already substantially disenfranchised the AHC Claimants by (i) creating, through the Pre-Petition Settlement Agreements, an ulterior motive for the Settling Plaintiffs to vote overwhelmingly in favor of the Proposed Plan, (ii) placing the Settling Plaintiffs in the same class as the Non-Settling Plaintiffs in Quigley's plan (notwithstanding such

3

claimants' differing legal rights), and (iii) in response to this Court's voting methodology order, unilaterally waiving the 90% reduction provision in the settlement agreements in order to artificially inflate the value of the Settling Plaintiffs' votes, now seeks to finish the job and completely disqualify the AHC Claimants from voting. In perhaps its most perverse maneuver yet, Pfizer has moved this Court to designate the votes of those asbestos claimants whom it chose not to pay in connection with its pre-petition settlements on the basis that the AHC Claimants are objecting to the Proposed Plan simply to extract "hold-up value" from Pfizer. Not only does Pfizer completely mischaracterize the Ad Hoc Committee's motives, its disingenuous attempt to turn the tables ignores both settled precedent and all of the relevant circumstances surrounding these proceedings.

2. As this Court noted in Dune Deck, designation is appropriate where a creditor is voting with an ulterior motive, "such as to procure some collateral . . . advantage that *does not relate to its claim*." See 175 B.R. at 844 (emphasis added); see also Landing Assocs., 157 B.R. at 807 ("[W]hen the voting process is being used as a device with which to accomplish some ulterior purpose, out of keeping with the purpose of the reorganization process itself, and only incidentally related to the *creditor's status qua creditor*, section 1126(e) is rightly invoked.") (emphasis added); Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter Ltd.), 118 F.3d 635, 639 (9th Cir. 1997) ("It is always necessary to keep in mind the difference between a *creditor's interest as a creditor* and a motive which is ulterior to the purpose of protecting a creditor's interest.") (emphasis added).

3. As detailed in the Designation Motion, the Settling Plaintiffs are clearly motivated not by their interest as creditors of Quigley, but rather by their interest in receiving the settlement payments from Pfizer, including the second payment, which can be received only if Quigley's

plan is confirmed. By contrast, the AHC Claimants' votes against the Proposed Plan are motivated solely by their view that the Proposed Plan does not fairly and adequately treat their claims. Pfizer preposterously suggests that the AHC Claimants voted to reject the Proposed Plan "simply to increase their leverage against Pfizer and to extract a larger settlement from *Pfizer*, and *not* **because they opposed their treatment under the Plan**." See Pfizer's Objection, ¶ 37 (emphasis added). To the contrary, the AHC Claimants vehemently oppose their treatment under the Proposed Plan, and the AHC Claimants voted against the Plan because of its woefully inadequate treatment of their "Asbestos PI Claims" (which term encompasses claims against both Quigley and Pfizer).³

4.      Unlike the Settling Plaintiffs – who have already contracted to release their claims against Pfizer in exchange for ~$450 million – the AHC Claimants stand to recover only 7.5% of the TDP value of their claims and will be forever enjoined from pursuing any derivative claims against Pfizer. Such a forced abdication of their valuable derivative claims, in the face of Pfizer's unquestionably robust financial health, is precisely why the AHC Claimants voted against the Proposed Plan. It may have been a vote based on self-interest, which is a motivation permitted by Section 1126(e), but it was unmistakably a vote exercised based on the Proposed Plan's inequitable treatment of the AHC Claimants' Asbestos PI Claims. Simply put, the AHC Claimants' desire to be fairly compensated for their claims cannot be bad faith.

5.      The argument that the Ad Hoc Committee is engaging in obstructive or bad faith conduct merely because it is seeking to extract money *from Pfizer* is a red herring. As the Ad Hoc Committee will prove at the confirmation hearing, there is not currently, and there has not

---

³ "Asbestos PI Claim" is defined in the Proposed Plan as "any Claim or Demand seeking recovery for damages for bodily injury allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products (1) against or on **Quigley** or **Reorganized Quigley**; **and** (2) against or on **any other Entity [*e.g.*, Pfizer]** that is alleged to be **directly** or **indirectly liable** for the conduct of, Claims against or Demands on Quigley to the extent such alleged liability arises by reason of [certain relationships with Quigley]."

5

been since 1992, a real, viable Quigley entity from which asbestos creditors could obtain just compensation for their injuries. Pfizer, the only entity capable of providing such compensation, has steadfastly refused to make anything approaching a "fair and equitable" contribution to the Asbestos PI Trust, as it is required to do by the Bankruptcy Code, and the creditors who have not already been paid by Pfizer, including the AHC Claimants, are suffering as a consequence. As the AHC Claimants have numerous good faith reasons to be dissatisfied with their treatment under the Proposed Plan, surely their votes against the Plan should not be designated.

6.  Moreover, even if Pfizer's baseless and self-serving characterization of the Ad Hoc Committee's conduct were accurate, courts have declined to designate votes simply because a party uses litigation in order to obtain leverage in a dispute. See In re Adelphia Commcn's Corp., 359 B.R. 54, 63 (Bankr. S.D.N.Y. 2006) ("I don't think I should disenfranchise creditors from their statutory voting rights based on my personal views as to the way they should behave . . . [W]here, as here, creditors are acting to maximize their recoveries, their overly aggressive conduct in the chapter 11 process is not a basis for disqualifying their votes."). Accordingly, the Court must deny the Cross-Motion and refuse to designate the votes of the AHC Claimants.

**B.  The Objecting Parties' arguments in opposition to the Designation Motion are wrong on the facts and the law and must uniformly be rejected by the Court**

7.  The Objecting Parties raise a veritable grab-bag of insupportable arguments in a desperate attempt to counter the Designation Motion.[4] None of these contentions, however,

---

[4] Pfizer's pleading (see pp. 17-19) is replete with a slew of generic, but wholly inapplicable, propositions of law, such as the notion that bankruptcy law favors settlements and that a plan proponent may settle with some creditors in a class but not others. The Ad Hoc Committee does not contest these fundamental principles. However, the settlement of a legitimate claim is transmuted into an entirely different animal where the settlement simultaneously effects a purchase of creditors' votes in favor of a debtor's plan of reorganization. Pfizer also superfluously points out that courts have confirmed plans and made findings of good faith *under Section 1129(a)(3)*, notwithstanding that they involved settlements providing inducements in one form or another. But the "good faith" findings in the Mid-Valley, Inc. and J T Thorpe Co. cases were in the context of consensual plans in which the courts were not faced with the question of whether the claimants' votes should be designated *under Section 1126(e)*. Furthermore, it is noteworthy, for example, that in Mid-Valley, creditors received 100% payment on account of their

6

undercuts either of the Ad Hoc Committee's central premises – namely, that the Settling Plaintiffs votes in favor of the Proposed Plan were not cast in good faith and were not solicited or procured in good faith.

> **1. The Settling Plaintiffs' votes in favor of the Proposed Plan were cast with the ulterior motive of triggering Pfizer's second payment under the pre-petition settlements**

8. The Objecting Parties go to great lengths to argue that the Settling Plaintiffs did not have an ulterior motive when it came to voting on the Proposed Plan. In so arguing, the Objecting Parties would have this Court ignore myriad compelling circumstances, including, inter alia, the express terms of the Pre-Petition Settlement Agreements, the obvious economic incentives created by Pfizer's settlement payments, the facts underlying the voting results, the testimony of the Settling Law Firms, and applicable case law (not to mention the Court's own statements regarding the motivations created by Pfizer's settlement payments). See December 18 Transcript, pp. 37, 46. A review of these topics makes clear that the Objecting Parties' objections cannot be sustained.

*a. The Pre-Petition Settlement Agreements:* Incredibly, the Objecting Parties tout the lack of an "express obligation" on the Settling Plaintiffs themselves to vote for any particular plan and suggest that the Settling Plaintiffs were "free" to vote as they pleased. However, in fact, *more than 97%* of all votes cast were cast, not by the claimants themselves, but by law firms using master ballots. See Voting Certification, at Ex. A. Not only do the Settling Law Firms (as distinct from the Settling Plaintiffs) have a strong financial interest in confirmation of a Quigley plan – because receipt of the second half of Pfizer's settlement payment (and their legal fees) was conditioned on confirmation of a Quigley plan – they were

---

asbestos claims, and in J T Thorpe, non-settling plaintiffs were placed in a separate class from settling plaintiffs such that they would not have been disenfranchised in any event.

7

also, in fact, *expressly required* by the terms of the Pre-Petition Settlement Agreements to recommend that the Settling Plaintiffs take all steps necessary to support and vote for Quigley's plan. See Pre-Petition Settlement Agreement, § 3.2(c) ("Plaintiff Counsel . . . will recommend that the Plaintiff take all steps necessary to support Quigley's Consensual Plan and to vote in favor of Quigley's Consensual Plan."). Moreover, in the event that Quigley solicited acceptances prior to December 1, 2005, and less than 75% of the claimants who voted, voted to accept the plan, Pfizer would have had no obligation to pay *either portion* of the settlement amount. See Pre-Petition Settlement Agreement, § 4.3.[5] The notion that the Settling Plaintiffs, or the Settling Law Firms who actually voted for them, were "free" to vote as they pleased is simply ludicrous.

      ***b. Economic Incentives:*** Sidestepping Dr. Rourke's thorough analysis of the economic incentives created by the Pfizer settlement payments (see Designation Motion, at pp. 16-17), Pfizer argues simply that the alleged incentives created by the much larger payments under the Pre-Petition Settlement Agreements "mask" the individual reality that over 44,000 claimants would receive more under the Proposed Plan than in connection with their *second* Pfizer payment. In fact, this argument "masks" several even more compelling facts:

- First, as mentioned above, *more than 97%* of all votes cast were cast by master ballot (and not by the individual claimants themselves); thus, the individual motivations of each of the Settling Plaintiffs are beside the point.

---

[5] See also Pre-Petition Settlement Agreement, § 3.3(d) ("Plaintiff Counsel will use its best efforts and take all necessary action and will fully cooperate with Pfizer and Quigley in the timely and successful prosecution of Quigley's chapter 11 case and all proceedings and matters relating thereto, including without limitation, the confirmation of Quigley's Consensual Plan, the solicitation of acceptances . . ."). Moreover, as a condition to the Settling Plaintiffs' receipt of *the entire settlement payment from Pfizer*, each Settling Plaintiff, through its counsel, agreed to assist in Pfizer and Quigley's efforts to obtain an injunction against claimants' continued prosecution of their asbestos claims. See Pre-Petition Settlement Agreement, § 4.1(d) ("Each Settling Plaintiff, through its Plaintiff Counsel, will have appeared in court or filed papers to support any action by Pfizer, Quigley, or both, to enjoin further prosecution of claims by any personal injury claimant against the Pfizer Protected Parties by extending the protections of section 362 of the Bankruptcy Code or an injunction under section 105 of the Bankruptcy Code.").

- Second, the Pre-Petition Settlement Agreements initially tied *the entire amount* of the Settling Plaintiffs' settlement payments to acceptance of Quigley's plan by 75% of the asbestos claimants if votes were solicited prior to December 1, 2005 (see Pre-Petition Settlement Agreement, § 4.3); thus, the Settling Plaintiffs' entire settlement amounts were once at risk if they failed to vote in favor of Quigley's plan of reorganization.

- Third, Pfizer's comparison of the amounts to be received in connection with the second Pfizer settlement payments and under the Proposed Plan ignores the inevitable delay in plan distributions; even under conservative estimates, claimants are unlikely to be paid under the Quigley trust for *up to 20 years after confirmation*. See Rourke Report, p. 36.

   c. *Voting Results:* Pfizer argues that, if both the AHC Claimants and the Settling Plaintiffs are excluded from the vote, approximately 75% in number and 83% in amount of these "neutral" claimants voted in favor of the Proposed Plan. These percentages are substantially and synthetically inflated for at least two reasons:

- First, the voting numbers are deceptively high due to the fact that 7,865 claimants who indicated on their ballots that they were not Settling Plaintiffs actually appear in Pfizer's database of Settling Plaintiffs. See Rourke Report, p. 38. Indeed, Pfizer has already paid more than 2,600 of these claimants. See id. at p. 40.

- Second, and even more significantly, of the 101,192 votes purportedly cast, according to the Voting Certification, by Non-Settling Plaintiffs, ***73,499 of them were cast by Non-Settling Plaintiffs who are represented by Settling Law Firms*** (which firms – almost all of which voted by master ballot – are both economically motivated to support Quigley's plan and contractually required to recommend that the Settling Plaintiffs support and vote in favor of Quigley's plan). See Rourke Report, p. 38. With only a single exception (the firm of Edward O. Moody), the clients of 62 of the Settling Law Firms voted unanimously to accept the Proposed Plan. See id. at p. 14. This was true regardless of whether or not the individual claimants indicated on their ballots that they were a party to one of the pre-petition settlements. See id.; see also Rourke Report, Appendix C-2 (listing individual law firm votes). Notably, if only the votes cast by claimants represented by non-settling law firms (*i.e.,* those claimants who were not influenced in any way by Pfizer's cash payments) are counted, ***an overwhelming 80.7% voted to reject the Proposed Plan***. See Rourke Report, pp. 13-15.[6]

---

[6] Relatedly, Baron & Budd argues that the fact that "well over 66% (65,198 of 101,074) of the non-settling asbestos claimants voted to accept the plan" demonstrates that most, if not all, "non-settling plaintiffs" unaffiliated

9

**d. Testimony By Settling Law Firms:** The Objecting Parties argue that the Settling Law Firm depositions do not provide "a shred of evidence" that any votes in favor of the Proposed Plan were cast "solely or primarily" based on the second Pfizer settlement payment. But the fact that the payments from Pfizer were *primarily* what motivated the Settling Law Firms is exactly the testimony elicited from the Mr. Ferraro at his deposition. See, e.g., Ferraro Depo., 90:7-9 ("Our *primary concern* was to get the big nut paid between Pfizer. That was it. That was it.") (emphasis added); 147:18-21 ("We're *more concerned* with a settlement agreement, the Pfizer component, and that's it. The Quigley deal is not a hill of beans. It just isn't.") (emphasis added). Moreover, Pfizer grossly misstates Mr. Ferraro's testimony by suggesting that because "Mr. Ferraro was **unaware** that the second Pfizer payment is contingent on Plan confirmation, it is not possible that his affirmative vote recommendation was determined by that contingent payment." In fact, Mr. Ferraro specifically testified in his deposition that he **was aware** that the second payment would not be paid until plan confirmation. See Ferraro Depo., 76:30 – 79:14 ("Q: The other half would not be paid until the consensual plan was confirmed by the court, correct? A: That is correct. The thing was we didn't think it was going to take this long, but that is what we agreed to. We thought it would happen probably in 2006."). Whether the Objecting Parties are honestly confusing the timing of the settlement payments with the effectiveness of the releases, or whether they are willfully trying to obscure the Court's understanding of the relevant testimony, the fact is that Mr. Ferraro testified both that he knew the second payment from Pfizer would not be made until plan confirmation and that receiving such payment was his primary concern.

---

with the Ad Hoc Committee supported the Proposed Plan. For the reasons described, the figures contained in the Voting Certification do not accurately reflect the views of "neutral" claimants with respect to the Proposed Plan.

*e. The Settling Plaintiffs' Purported "Independent" Motivation For Accepting The Proposed Plan:* The Objecting Parties also argue that the Settling Plaintiffs had an "independent" motivation to accept the Proposed Plan, given their expected recoveries in a chapter 7 liquidation. In fact, a review of the expected recoveries of Settling Plaintiffs and Non-Settling Plaintiffs in a liquidation actually underscores the fallacy of any purported "independent" motive. As the Ad Hoc Committee will prove at the confirmation hearing, the Non-Settling Plaintiffs are better off in a chapter 7 liquidation than they would be under the Proposed Plan because, in a liquidation, they would retain valuable derivative claims against Pfizer. The Settling Plaintiffs, by contrast, are better off under the Proposed Plan than they would be in a chapter 7 liquidation – *but only because* they have already contracted, through the Pre-Petition Settlement Agreements, to give up their derivative claims against Pfizer in exchange for Pfizer's payment of ~$450 million, the second half of which they stand to receive only upon confirmation of the Proposed Plan. The Settling Plaintiffs cannot possibly have an "independent" motive to vote in favor of the Proposed Plan because their votes in favor of it are hopelessly intertwined with the rights they contracted to give up (and which the Non-Settling Plaintiffs still retain) in exchange for the value already received and to be received pursuant to the Pre-Petition Settlement Agreements.

*f. Applicable Case Law:* Inexplicably, Pfizer selects Adelphia Commcn's Corp. as its poster-child for how rarely courts are willing invoke the remedy of vote designation. See 359 B.R. 54 (Bankr. S.D.N.Y. 2006). Yet, although Judge Gerber ultimately declined to designate creditors' votes, a close reading of the circumstances addressed in Adelphia makes plain that that case in no way supports Pfizer's position. First, the Adelphia court addressed a scenario in which the receipt of certain releases was expressly conditioned upon the creditors'

11

acceptance of a settlement in the plan; members of the class who rejected the plan, however, did not receive those benefits. See id. at 62. The creditors in Adelphia were voting in order to receive a "special consideration" *under the plan* and not some benefit outside of the plan; the Settling Plaintiffs, by clear contrast, voted in order to receive a special consideration *outside of the Proposed Plan*. Moreover, unlike the rejecting Adelphia creditors – who did not receive a "special consideration" under that plan, but could have if they had elected to vote in favor of the plan – the Ad Hoc Committee's claimants were never even given the opportunity to receive the considerable benefits offered to and received by the Settling Plaintiffs.

Second, the Adelphia court addressed the argument that certain creditors' votes in one class should be designated because such creditors owned claims in another class of another debtor, and their votes in favor of the plan were driven by the ulterior motive of maximizing recovery in the other class. See 359 B.R. at 63. The court, cognizant of the reality that creditors of different debtors in multi-debtor cases will often have interests contrary to each other, concluded that a creditor's ownership of claims against several debtor entities did not alone constitute grounds to designate such creditor's votes. See id. at 57, 64. In so holding, the court reasoned that "the law has long upheld creditors' efforts to maximize their individual recoveries in their self-interest *as creditors under a plan*." See id. at 64 (emphasis added). Unlike the Adelphia creditors, however, the Settling Plaintiffs are not voting to maximize their recoveries "*as creditors under a plan*"; they are voting in order to receive a settlement payment from a non-debtor outside of the proposed plan of reorganization.[7]

---

[7] The Objecting Parties also attempt to distinguish In re Combustion Eng'g, Inc. on the basis that the pre-petition settlement payments in that case were made with estate assets and not by a third party. Whatever import this distinction may have with respect to the unequal treatment issues, it has no relevance to Section 1126(e)'s inquiry – which is focused squarely on the voting claimant's motivations. The simple fact is that the payments from Pfizer dramatically influenced the vote and caused certain privileged creditors with a substantially diminished interest in the amounts to be received under Quigley's plan – but, concomitantly, a heightened interest in seeing *any* Quigley plan confirmed – to control approval of the Proposed Plan. See 391 F.3d at 244, 247. Regardless of who

12

### 2. The Settling Plaintiffs' votes in favor of the Proposed Plan were not solicited or procured in good faith

9. Beyond the ulterior motives underlying the Settling Plaintiffs' votes in favor of the Proposed Plan, the Objecting Parties still have the other prong of Section 1126(e) to contend with – that is, whether the Settling Plaintiffs' acceptances were either "solicited <u>or</u> procured" in good faith. See 11 U.S.C. § 1126(e). The Objecting Parties, however, choose not to address the relevant case law at all, arguing instead that (i) the negotiation and execution of the Pre-Petition Settlement Agreements did not constitute "solicitation" under the Bankruptcy Code because Pfizer did not make a "specific request for an official vote," and (ii) Pfizer did not actually "purchase" the Settling Plaintiffs' claims.

10. Regardless of the differing ways in which courts have construed the term "solicited" (see, e.g., In re Gilbert, 104 B.R. 206, 215 (Bankr. W.D. Mo. 1989)),[8] the Objecting Parties would ostensibly have this Court ignore the issue of whether Pfizer *procured* acceptance of the Proposed Plan in bad faith by (i) binding the Settling Law Firms (who, in the vast majority of cases, voted their clients' claims by master ballot) to recommend that the Settling Plaintiffs take all steps necessary to support Quigley's plan and vote in favor of such plan and to support Quigley and Pfizer's efforts to obtain an injunction, and (ii) conditioning the second settlement payment to the Settling Plaintiffs on confirmation of Quigley's plan. See Pre-Petition Settlement

---

actually made the payments, the inappropriate incentives created by the pre-petition settlements were precisely the issue about which the Third Circuit was concerned. See id.

[8] Although the Objecting Parties cite cases advocating a narrow interpretation of "solicitation," it is worth noting that each and every one of these cases focused on Section 1126(e)'s *other* inquiry – i.e., whether the solicitation was done in accordance with the Bankruptcy Code (and thus whether the solicitation was done with the provision of adequate information or after dissemination of a court-approved disclosure statement). In adopting a narrow definition of "solicitation," these courts expressed concern that an overly broad definition would unduly chill negotiations among parties in interest over the terms that may lead to the development of a disclosure statement and plan and thereby put an end to meaningful creditor participation in chapter 11 cases. See, e.g., Century Glove, Inc. v. First Am. Bank of New York, 860 F.2d 94, 101-102 (3d Cir. 1988). Whether or not these courts' concerns are well-founded in that context, it cannot be the case that a similarly narrow definition of "solicitation" is appropriate where the matter to be decided is whether creditors' acceptance has been sought *in bad faith*.

Agreement, §§ 3.2(c); 4.1(g). Represented by sophisticated counsel throughout this process, Pfizer may have been careful not to include an express clause saying "thou must vote in favor of the plan," but the Pre-Petition Settlement Agreements as a whole make it crystal clear that the Settling Plaintiffs would get none of the Pfizer money if they did not support the Quigley/Pfizer plan throughout these proceedings, including voting in favor of the Proposed Plan. After all, Section 524(g) mandates a creditor vote of 75% in favor and Pfizer retained the absolute right to terminate the agreements at any time it desired (see Pre-Petition Settlement Agreement, § 5.1), which ineluctably meant if it did not like the way things were going. One would have to be willfully blind to interpret the Pre-Petition Settlement Agreements as anything other than brazen vote-buying. Even if the execution of the settlements was not a "specific request for an official vote," certainly it constituted an effort by Pfizer to "procure" acceptance of Quigley's plan.

11. Tellingly, the Objecting Parties do not even attempt to address the plethora of case law cited by the Ad Hoc Committee[9] in which courts have disapproved of claim purchases as having been done in bad faith. While the Settling Claimants' claims themselves were not actually purchased by Pfizer, their votes were. And given that all of the indicia of bad faith identified in these claim-buying cases – purchases by *insiders*, purchases by *plan proponents*, and purchases resulting in *discrimination* in favor of the "selling" creditors – are present in spades in connection with the Pre-Petition Settlement Agreements, it cannot seriously be argued that these cases have no bearing on the propriety or impropriety of Pfizer's conduct in this case.

---

[9] See, e.g., In re P-R Holding Corp., 147 F.2d 895, 898 (2d Cir. 1945); In re Allegheny Int'l, Inc., 118 B.R. 282, 296 (Bankr. W.D. Pa. 1990); In re Applegate Property, Ltd., 133 B.R. 827 (W.D. Tex. 1991); In re Machne Menachem, Inc., 2007 WL 1157015, at *2 (3d Cir. Apr. 19, 2007); In re Holly Knoll P'ship, 167 B.R. 381, 389 (Bankr. E.D. Pa. 1994); Zentak GBV Fund IV, LLC v. Vesper, 2001 WL 1032217, at *246-47 (6th Cir. Aug. 29, 2001); Figter, 118 F.3d at 639.

## CONCLUSION

**WHEREFORE**, the Ad Hoc Committee respectfully requests that the Court grant the Designation Motion, designate the votes of all Settling Plaintiffs and disallow them in their entirety for purposes of determining whether the requirements of Section 524(g)(2)(B)(ii)(IV)(bb) (acceptance by 75% in number) and Section 1126(c) (acceptance by two-thirds in amount) have been satisfied, overrule any and all objections to the Designation Motion, deny the Cross-Motion, and grant the Ad Hoc Committee such other and further relief as is just and proper.

Dated: New York, NY
         June 15, 2009

**BROWN RUDNICK LLP**

By: /s/ Gregory T. Arnold
    Edward S. Weisfelner, Esq. (EW-5581)
    7 Times Square
    New York, NY 10036
    (212) 704-0100

    Jeffrey L. Jonas, Esq. (JJ-5670)
    James W. Stoll, Esq. (JS-5931)
    Gregory T. Arnold, Esq. (GA-2147)
    One Financial Center
    Boston, MA 02111
    (617) 856-8200

COUNSEL TO THE AD HOC COMMITTEE OF TORT VICTIMS

# 1658604