

Seven
Times
Square
New York
New York
10036
*tel* 212.209.4800
*fax* 212.209.4801

**GREGORY T. ARNOLD, ESQUIRE**
Direct Dial: 617-856-8539
Direct Fax: 617-289-0453
E-Mail: garnold@brownrudnick.com
http://www.brownrudnick.com

October 15, 2009

**VIA HAND DELIVERY**
Honorable Stuart M. Bernstein
Chief United States Bankruptcy Judge
United States Bankruptcy Court
Southern District of New York
Alexander Hamilton Customs House
One Bowling Green
New York, NY 10004-1408

    **RE:**    In re Quigley Company, Inc.
             Chapter 11 Case No. 04-15739 (SMB)

The Honorable Stuart M. Bernstein:

      By this letter, the Ad Hoc Committee of Tort Victims (the "Ad Hoc Committee") requests that the Court reconsider its sequestration order as it relates to the exclusion of expert witnesses. The attendance and allowance of Dr. Israel Shaked and Daniel Rourke, Ph.D. (the "AHC Experts"), to hear and consider trial testimony of fact and expert witnesses is essential to the presentation of the Ad Hoc Committee's case. Thus, we ask that the Court find that the AHC Experts are exempt from sequestration under subsection 3 of Federal Rule of Evidence 615 ("Rule 615").

      Rule 615(3) provides an exemption to the sequestration rule for "a person whose presence is shown by a party to be essential to the presentation of the party's cause." The Notes of the Advisory Committee on Rules explicitly provide that this category contemplates the exemption of "an expert needed to advise counsel in the management of litigation." See Malek v. Federal Insurance Co., 994 F.2d 49, 54 (2d Cir. 1993) (citing approvingly the advisory committee notes). Further, "where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, ... the trial court is bound to accept any reasonable substantiated representation to this effect by counsel." See Malek, 994 F.2d at 54 (citing Morvant v. Construction Aggregates Corp., 570 F.2d 626, 630 (6th Cir.), cert dismissed, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978)).

      Assistance of the AHC Experts is essential to the Ad Hoc Committee's ability to understand the direct trial testimony of Pfizer and Quigley's expert witnesses so that the Ad Hoc Committee can effectively cross-examine these witnesses. See Malek, 994 F.2d at 54 (allowing expert witness's presence to assist counsel in preparing cross examination of adversary's expert witness). Here, the Court and parties are faced with complex issues relating to analysis of financial documents, projections of purported future business opportunities and the complex claims databases. The Ad Hoc Committee relies fully on the AHC Experts for support in this analysis. In such instance, limiting the expert witnesses to reviewing the testifying witness's pre-trial expert reports rather than being present for trial testimony may be insufficient, especially if the witness testifies on issues beyond the witness's report. See id. Furthermore, an expert witness can be permitted to remain and hear trial testimony so that the expert witness can rebut an adversary expert's testimony. See Trans World Metals, Inc. v. South Wire Co., 769 F.2d 902, 911 (2d Cir. 1985). If the AHC



Experts are excluded, and further prevented from even reading the trial testimony of the opposing expert, it would hamper the cross-examination and eliminate any effective rebuttal case.

Furthermore, the AHC Experts necessarily rely on facts and trial testimony, including the upcoming testimony of Messrs. Snow and Britven, the Debtor's and plan proponent's experts, to opine as to the viability of Quigley as an ongoing business. If the AHC Experts are sequestered, they will be unable to provide opinions based on evidence in the record, including the testimony of Quigley's fact witnesses who presumably will provide the factual support for the opinions expressed by Messrs. Snow and Britven. For this reason, courts generally do not require the sequestration of expert witnesses. See In re Omeprazole Patent Litigation, 190 F.Supp. 2d 582, 584 (S.D.N.Y. 2002) ("Usually an expert is either responding to the theories of an adversary's expert or is basing his opinion entirely on facts adduced by fact witnesses at trial. Such experts are infrequently sequestered.") (citing Morvant, 570 F.2d at 629-30 ("Theoretically at least, the presence in the courtroom of an expert witness who does not testify to facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it involves.")); Weinstein on Evidence, § 615.04[3][c] (stating that generally the Rule 615(3) exception is invoked on the ground that the expert will base his or her testimony and conclusions on evidence that will be shown at trial).[1]

Moreover, no purpose is served by sequestering the AHC Experts. The rationale for sequestering witnesses under Rule 615 is to prevent witnesses from the same side from coloring their factual account based on the account provided by prior witnesses. See Geders v. United States, 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976) (sequestration serves two purposes: it "exercises restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid."); Fed. R. Evid. 615, Advisory Committee Notes (sequestering witnesses is "a means of discouraging and exposing fabrication, inaccuracy, and collusion."). Sequestering expert witnesses from hearing an adversary fact or expert witnesses' testimony does not forward such goal because the expert witness is not testifying as to the occurrence of facts, but instead providing expert testimony based on factual accounts of other witnesses. See Trans World, 769 F.2d at 911(allowing expert witness to hear trial testimony because "he was not a fact witness whose recollection might have been colored by accounts of prior witnesses"); Malek, 994 F.2d at 54 (same relying on Trans World); U.S. v. Jackson, 60 F.3d 128, 135 (2d Cir. 1995) (setting out six factors to consider when exercising discretion to exclude witnesses, including most relevant here: (1) how critical the testimony in question is, that is, whether it will involve controverted and material facts; (2) whether the information is ordinarily subject to tailoring such that cross-examination or other evidence could bring to light any deficiencies; and (3) any potential for bias that might motivate the witness to tailor his testimony).

In fact, the aim of Quigley and Pfizer relating to the Ad Hoc Committee's request is purely strategic and designed to disadvantage the Ad Hoc Committee. At least one Pfizer witness, Ms. Greenspan, has attended the trial following her testimony. The AHC Experts who testify near the end of the trial will not have this option. To the extent the Court allows Quigley and Pfizer's witnesses to attend the trial following their testimony but excludes the AHC Experts, Quigley's and Pfizer's witnesses will unfairly be able to

---

[1] While the court in Omeprazole expressed a concern about experts on the same side testifying as to the same issue possibly coloring each other's testimony, that concern is simply not present here, where Dr. Shaked and Dr. Rourke opine on different issues.



provide cross-examination support and consider trial testimony for the purposes of rebuttal while the Ad Hoc Committee must do without. For this reason, if the Court does not grant the Ad Hoc Committee's request, it does ask the Court to exclude all sequestered witnesses during the entire duration of the trial – not just until after their original testimony.

It is also the understanding of the Ad Hoc Committee that the U.S. Trustee, whose motion was the basis of the sequestration order, did not intend it to apply to expert witnesses and supports the Ad Hoc Committee's current request.

Based on the reasons set out above, the Ad Hoc Committee asks that the Court grant its request. For the convenience of the Court, the cases cited herein are attached. Thank you in advance for your consideration of this matter.

Very truly yours,

**BROWN RUDNICK LLP**

By: _____

Gregory T. Arnold

cc: Michael Cook, Esquire (via email)
Victoria Lepore, Esquire (via email)
Scott Ratner, Esquire (via email)
Richard Milin, Esquire (via email)
Ronald Reinsel, Esquire (via email)
Rita Tobin, Esquire (via email)
John Bae, Esquire (via email)
Michele L. Angell, Esquire (via email)
Greg Zipes, Esquire (via email)
Edward Weisfelner, Esquire (via email)
James Stoll, Esquire (via e-mail)
Jeff Jonas, Esquire (via email)

# 1691319 - durkentj - 024762/0001



Page 1

190 F.Supp.2d 582, 58 Fed. R. Evid. Serv. 1279
**(Cite as: 190 F.Supp.2d 582)**

**H**

United States District Court,
S.D. New York.
In re OMEPRAZOLE PATENT LITIGATION
No. MDL NO. 1291.
No. M-21-81.

Feb. 28, 2002.

In patent litigation, plaintiffs moved to sequester defense experts from one another's testimony during the presentation of invalidity proof. The District Court, Jones, J., held that: (1) second expert to testify would be sequestered from the preceeding testimony of the other expert until after they both had testified, but (2) first invalidity expert to testify would not be sequestered from the following testimony of the second invalidity expert.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A ⚖══2012**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(C) Reception of Evidence
         170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
Evidentiary rule addressing exclusion of witnesses exercises a restraint on witnesses tailoring their testimony to that of earlier witnesses, and aids in detecting testimony that is less than candid. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⚖══2012**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(C) Reception of Evidence
         170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
Because a court may only decline to grant a party's

request to sequester particular witnesses under one of the exemptions of the evidentiary rule addressing exclusion of witnesses, the rule carries a strong presumption in favor of sequestration. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ⚖══2012**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(C) Reception of Evidence
         170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
Determination of whether a witness is "essential," for purposes of the evidentiary rule addressing exclusion of witnesses, lies in the discretion of the district court. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ⚖══2012**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(C) Reception of Evidence
         170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
Party seeking exemption for a witness under the evidentiary rule addressing exclusion of witnesses, on the ground that the witness' presence is essential to the presentation of the party's cause, has the burden of showing that the witness' presence is "essential," though any reasonable, substantiated representation by counsel that the witness' presence is essential will usually be sufficient to meet that burden. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⚖══2012**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(C) Reception of Evidence
         170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
Second invalidity expert to testify in patent litigation would be sequestered from the preceding testi-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

190 F.Supp.2d 582, 58 Fed. R. Evid. Serv. 1279
**(Cite as: 190 F.Supp.2d 582)**

mony of another invalidity expert until after they both had testified; neither expert was providing any objective facts upon which the other needed to rely, their testimony would encompass many of the same issues, and there was a potential motivation to tailor testimony for the purposes of consistency; moreover, their opinions on invalidity were not adverse, any opinions of the second expert concerning the documents or opinions disclosed in the first expert's report should have been disclosed prior to trial, and concerns about redundant testimony did not make the expert's presence "essential." Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⊂⟳2012**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(C) Reception of Evidence
            170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
Factors to be considered in determining whether a witness' presence is essential to the presentation of a party's cause, for purposes of the evidentiary rule addressing exclusion of witnesses, are: (1) whether the testimony will involve controverted and material facts, (2) whether the information is subject to tailoring such that cross-examination or other evidence could bring to light any deficiencies, (3) to what extent the testimony of the witnesses encompasses the same issues, (4) the order in which the witnesses will testify, (5) any potential bias that might motivate the witness to tailor his testimony, and (6) whether the witness' presence is truly essential or merely desirable. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⊂⟳2012**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(C) Reception of Evidence
            170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
First invalidity expert to testify in patent litigation would not be sequestered from the following testi-

mony of another invalidity expert; defendant claimed that the first expert's presence during the second expert's testimony was essential to the presentation of the rest of the defendant's invalidity case, particularly rebuttal evidence. Fed.Rules Evid.Rule 615( 3), 28 U.S.C.A.

**\*583** Errol B. Taylor,Fredrick M. Zullow, Robert L. Baechtold, Charles P. Baker, Gregory B. Sephton and John D. Carlin of Fitzpatrick, Cella, Harper & Scinto, New York City, for plaintiffs AstraZeneca, et al.

Edgar H. Haug, Jeffrey A. Hovden, Charles J. Raubicheck and Christian M. Smolizza of Frommer Lawrence & Haug LLP, New York City, for defendant Genpharm, Inc.

Brian M. Poissant, F. Dominick Cerrito, Ronald M. Daugnault and Leo Merken of Pennie & Edmonds LLP, New York City, for defendants Kremers Urban Development Co. et al.

Louis M. Solomon, Margaret A. Dale and Colin A. Underwood of Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York, NY., and James V. Costigan and Martin P. Endres of Hedman & Costigan, P.C., New York City, for defendant Andrx Pharmaceuticals, Inc.

Andrew J. Miller, Brian Moriarty, David Novack, Bruce Radin and Frank D. Rodriguez of Budd Larner Gross Rosenbaum Greenberg & Sade, P.C., Short Hills, NJ, for defendants Cheminor Drugs, et al.

*Order*

JONES, District Judge.

Plaintiffs move pursuant to Federal Rule of Evidence 615 to sequester Defendants' experts Dr. Story and Dr. Porter from the other's testimony during the presentation of Defendants' invalidity proof. Dr. Story will be testifying first for Genpharm, and Dr. Porter will be testifying second for Cheminor. Both

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

190 F.Supp.2d 582, 58 Fed. R. Evid. Serv. 1279
**(Cite as: 190 F.Supp.2d 582)**

Genpharm and Cheminor oppose Astra's motion pursuant to Rule **615( 3)** on the grounds that their experts are "essential" to their management of this litigation. For the following*584 reasons, the court GRANTS in part and DENIES in part Astra's motion.

[1][2][3][4] Rule 615 "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid." *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976). "Because a court may only decline to grant a party's request to sequester particular witnesses under one of the Rule 615 exemptions, the rule carries a strong presumption in favor of sequestration." *United States v. Jackson*, 60 F.3d 128, 135 (2d Cir.1995); *see, e.g., Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 628 (4th Cir.1996). However, by its very terms, Rule 615( 3) "does not authorize exclusion ... of a person whose presence is shown by a party to be essential to the presentation of the party's cause." The determination of whether a witness is essential under Rule **615( 3)** lies in the discretion of the district court. *See, e.g., Polythane Sys. v. Marina Ventures Int'l*, 993 F.2d 1201, 1209 (5th Cir.1993); *Morvant v. Construction Aggregates, Corp.*, 570 F.2d 626, 630 (6th Cir.1978). The party seeking exemption for a witness under Rule **615( 3)** has the burden of showing that the witness' presence is "essential." *See, e. g., Jackson*, 60 F.3d at 135; *Government of the V.I. v. Edinborough*, 625 F.2d 472, 475 (3d Cir.1980). However, any reasonable, substantiated representation by counsel that the witness' presence is essential will usually be sufficient to meet that burden. *See, e.g., Malek v. Federal Ins. Co.*, 994 F.2d 49, 54 (2d Cir.1993).

[5] For the most part, Genpharm and Cheminor oppose Astra's motion simply because Dr. Story and Dr. Porter are their invalidity experts. Usually an expert is either responding to the theories of an adversary's expert or is basing his opinion entirely on facts adduced by fact witnesses at trial. Such experts are infrequently sequestered. *See Morvant,*

570 F.2d at 629-30 ("Theoretically at least, the presence in the courtroom of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate understanding of the testimony as it evolves ...."). However, courts have rejected the argument that, consistent with Rule 703, Rule **615( 3)** impliedly exempts expert witnesses who express opinions based on the facts of the case. *See, e.g., Opus 3*, 91 F.3d at 629; *Woodson v. McGeorge Camping Ctr., Inc.*, 42 F.3d 1387 (4th Cir.1994) (unpublished table decision); *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373-74 (5th Cir.1981); *Morvant*, 570 F.2d at 630.

This motion presents a unique situation-both Genpharm and Cheminor may rely on the evidence presented by both experts, and Dr. Story and Dr. Porter are both being offered by Defendants to opine that Plaintiffs' patents are invalid. To the extent that their opinions were disclosed in expert reports, they are not inconsistent; they are complementary. After reading the reports, the court cannot conceive of any way in which these two experts could be considered "adverse" on the issue of invalidity, and the court will not permit either expert to offer opinions at trial that were not disclosed in his original expert report. In addition, neither expert is providing any objective facts upon which the other expert needs to rely, and neither expert is relying on the opinions of the other as a basis for his own conclusions.

[6] Given the unique situation at issue, the factors to be considered in making a determination under Rule 615( 3) are: (1) whether the testimony will involve controverted*585 and material facts, (2) whether the information is subject to tailoring such that cross-examination or other evidence could bring to light any deficiencies, (3) to what extent the testimony of the witnesses encompasses the same issues, (4) the order in which the witnesses

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

190 F.Supp.2d 582, 58 Fed. R. Evid. Serv. 1279
(Cite as: 190 F.Supp.2d 582)

will testify, (5) any potential bias that might motivate the witness to tailor his testimony, and (6) whether the witness' presence is truly essential or merely desirable. *Jackson,* 60 F.3d at 135. Of course, not all of those factors are relevant in every case.

After weighing the *Jackson* factors listed and considering the unique circumstances of this case, the court concludes that Dr. Porter must be sequestered from the testimony of Dr. Story until after Dr. Porter has himself testified during Cheminor's case-in-chief on invalidity.[FN1] In particular, the second, third, fourth, and fifth factors weigh heavily in favor of sequestering Dr. Porter from the testimony of Dr. Story. There is potential for tailoring of the testimony of these witnesses. If permitted to hear the testimony of the first invalidity expert, Dr. Story, the second invalidity expert, Dr. Porter, could conform his phraseology and opinions to those of Dr. Story. *See Miller,* 650 F.2d at 1374 (noting that exempting the defendant's expert from sequestration under Rule 615 "would be questionable" in a copyright infringement case where the expert would be analyzing the similarity of two works after the plaintiff analyzed the same two works).

> FN1. For the same reasons that the court sequesters Dr. Porter from the testimony of Dr. Story until after the close of Dr. Porter's own testimony, the court also precludes Dr. Porter from reading the transcript of Dr. Story's trial testimony prior to taking the witness stand. *See Miller,* 650 F.2d at 1373 ("The opportunity to shape testimony is as great with a witness who reads trial testimony as with one who hears the testimony in open court.")

In this case, subtle distinctions between Defendants' and Plaintiffs' proposed claim constructions and the meanings of various terms in the patent and the prior art can dramatically affect the import of certain testimony. It would be difficult, if not impossible, for Plaintiffs to bring to light on cross-examination

such subtle changes in the testimony of one expert, which would, nevertheless, enhance the consistency of their opinions. *Cf. Jackson,* 60 F.3d at 135 ("Testimony regarding 'simple objective facts' is 'ordinarily not subject to tailoring, and, if it were, it could have been exposed easily.' ") (quoting *United States v. Prichard,* 781 F.2d 179, 183 (10th Cir.1986)). Moreover, any chance Plaintiffs would have to expose such inconsistencies on cross-examination would be impaired if Dr. Porter were present in the courtroom during Astra's cross-examination of Dr. Story.

With respect to the third factor, the court finds, after a thorough review of the expert reports of both Dr. Story and Dr. Porter, that their testimony will encompass many of the same issues. Although some of the documents each expert cites are different, the content of many of the documents overlaps, and the ultimate conclusions of the two experts-finding invalidity-are the same. As to the fourth factor, Dr. Porter will testify after Dr. Story. Lastly, under the fifth factor, the court finds a potential motivation for tailoring the expert testimony for the purposes of consistency, which could lend additional credibility to the opinion of each expert.

In opposing Astra's motion, Cheminor makes three arguments to support its claim that Dr. Porter's presence during Dr. Story's testimony is "essential." None of the arguments is persuasive. First, Cheminor argues that Dr. Porter will provide*586 counsel with assistance in determining whether Cheminor should cross-examine Dr. Story. If this concern were not completely evanescent, it might support denial of Astra's motion under Rule 615( 3). However, as discussed previously, the problem of cross-examining Dr. Story is unlikely to arise since his opinions on invalidity are clearly not adverse to Cheminor's position. Moreover, Cheminor has been in possession of Dr. Story's expert report, which contains the only opinions about which the court will permit Dr. Story to testify, since August 23, 2000. Any consultation counsel for Cheminor needs with respect to the decision to cross-examine

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

190 F.Supp.2d 582, 58 Fed. R. Evid. Serv. 1279
(Cite as: 190 F.Supp.2d 582)

Dr. Story can and should be done on the basis of that document and Dr. Story's deposition testimony.

Second, Cheminor claims Dr. Porter should be permitted to hear and comment upon the "facts or data" upon which Dr. Story bases his opinion. The court finds this argument disingenuous. Essentially, Cheminor attempts to circumvent the rulings made by the court in its Memorandum and Order dated February 26, 2002, which precluded Dr. Porter from opining or relying on documents if his opinions concerning them were either undisclosed or disclosed belatedly. Acceptance of Cheminor's argument would vitiate this court's previous rulings about the permissible scope of Dr. Porter's testimony. Discovery in these cases was consolidated; all of the documents, facts, and opinions available to and commented on by Dr. Story were available to Cheminor and Dr. Porter as well. If Dr. Porter had opinions concerning the documents or opinions disclosed in Dr. Story's expert report, they should have been disclosed prior to trial.

Third, Cheminor argues that Dr. Porter should have access to Dr. Story's testimony so that Dr. Porter can avoid repetitive testimony about the documents previously addressed by Dr. Story. In accordance with this court's February 26, 2002, Memorandum and Order, only four documents will be discussed by both experts. The court is willing to permit any slight duplication of testimony required to allow Dr. Porter to address all four of those documents to the full extent of the opinions contained in his original expert report. Cheminor's concerns about limited redundancy in Dr. Porter's testimony does not make Dr. Porter's presence "essential" under Rule 615( 3).

While Dr. Porter's presence during the testimony of Dr. Story may be desirable for Cheminor, it is not essential. Moreover, the court will permit Dr. Porter to review the transcript of Dr. Story's testimony in its entirety once Dr. Porter has completed his testimony in Cheminor's case-in-chief on invalidity. At that point, Dr. Porter will be available to Cheminor to identify any issues that may necessitate rebuttal

testimony, and Cheminor may seek permission from the court to permit Dr. Porter to address those issues.[FN2]

> FN2. Of course, the same would be true for any new theories of validity raised by Astra during its cross-examination of Dr. Story; if permitted by the court, those new theories could be addressed by Dr. Porter on rebuttal.

[7] Because Dr. Story will have finished his testimony in Genpharm's case-in-chief on invalidity before Dr. Porter takes the stand, none of the *Jackson* factors discussed above in relation to Dr. Porter counsel for sequestering Dr. Story. Genpharm argues that Dr. Story's presence during Dr. Porter's testimony, which will occur after Dr. Story has finished his own testimony, is essential to the presentation of the rest of Genpharm's invalidity case, particularly rebuttal evidence. Consistent with this court's ruling that Dr. Porter will *587 be permitted to review Dr. Story's testimony to advise Cheminor about rebuttal issues, the court will not sequester Dr. Story from Dr. Porter's testimony. Dr. Story may either be present at trial or review the transcript of Dr. Porter's testimony to advise Genpharm on those same issues.

For the foregoing reasons, the court sequesters Dr. Porter from the testimony of Dr. Story during Genpharm's case-in-chief on invalidity. The court also precludes Dr. Porter from reading the transcript of that testimony until after Dr. Porter has concluded his testimony during Cheminor's case-in-chief on invalidity. The remainder of Astra's motion is denied.

SO ORDERED:

S.D.N.Y.,2002.
In re Omeprazole Patent Litigation
190 F.Supp.2d 582, 58 Fed. R. Evid. Serv. 1279

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



570 F.2d 626, 2 Fed. R. Evid. Serv. 994
**(Cite as: 570 F.2d 626)**

H

United States Court of Appeals,
Sixth Circuit.
Lena V. MORVANT, etc., et al., Plaintiffs-Appellants,
v.
CONSTRUCTION AGGREGATES CORPORATION, Defendant-Appellee.
**No. 76-2052.**

Argued Dec. 6, 1977.
Decided Feb. 13, 1978.

Widow of tugboat skipper, who drowned when tugboat capsized and sank, brought action on behalf of herself and three minor children and as administratrix of skipper's estate under Jones Act and under general maritime law against owner of tugboat, alleging negligence of the owner and its employees and unseaworthiness of the tugboat. The United States District Court for the Western District of Tennessee, Bailey Brown, Chief Judge, entered judgment in favor of widow in the amount of $58,000, and widow appealed. The Court of Appeals, Engel, Circuit Judge, held that: (1) trial court erroneously rejected expert testimony concerning tugboat skipper's future wage increases resulting from skipper's developing skill and inflation; (2) trial court erroneously rejected expert testimony concerning economic value which skipper contributed to family apart from his wages by virtue of services performed around the home; (3) trial court did not err in permitting defense to use leading questions when cross-examining its own employee, who had been called by widow on direct examination as part of her case-in-chief, and (4) widow failed to establish that amount of award represented undue allocation of fault for accident to contributory negligence of tugboat skipper.

Reversed and remanded for new trial.

West Headnotes

**[1] Federal Civil Procedure 170A ⊂⇒2012**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(C) Reception of Evidence
            170Ak2012 k. Separation and Exclusion
of Witnesses. Most Cited Cases
There is little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to the facts of the case. Federal Rules of Evidence, rules 615(3), 703, 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⊂⇒2012**

170A Federal Civil Procedure
    170AXV Trial
        170AXV(C) Reception of Evidence
            170Ak2012 k. Separation and Exclusion
of Witnesses. Most Cited Cases

**Federal Courts 170B ⊂⇒823**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk823 k. Reception of Evidence.
Most Cited Cases
Where party seeks to except expert witness from exclusion under Federal Rule of Evidence relating to sequestration of witnesses, on basis that witness needs to hear firsthand testimony of witnesses, decision whether to permit him to remain is within discretion of trial judge and should not normally be disturbed on appeal; on the other hand, where fair showing has been made that expert witness is in fact required for management of case, and this is made clear to trial court, trial court is bound to accept any reasonable, substantiated representation to this effect by counsel. Federal Rules of Evidence, rules 615, 615(3), 28 U.S.C.A.

**[3] Evidence 157 ⊂⇒523**

157 Evidence

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

157XII Opinion Evidence
  157XII(B) Subjects of Expert Testimony
    157k521 Value
      157k523 k. Services. Most Cited Cases
In action brought under Jones Act and general maritime law against owner of tugboat by widow of tugboat skipper, who drowned when tugboat capsized, trial court erroneously rejected expert testimony concerning tugboat skipper's future wage increases resulting from his developing skill and experience and from inflation, particularly in view of stability of skipper's homelife and background, diligence with which he attended to his work, his expanding experience in the trade, and demonstrated improvement in his financial circumstances from year to year. Jones Act, 46 U.S.C.A. § 688.

**[4] Damages 115 ☞30**

115 Damages
  115III Grounds and Subjects of Compensatory Damages
    115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
      115III(A)1 In General
        115k30 k. Elements of Compensation in General. Most Cited Cases
Societal losses are not an element of damages under the Jones Act. Jones Act, 46 U.S.C.A. § 688.

**[5] Evidence 157 ☞523**

157 Evidence
  157XII Opinion Evidence
    157XII(B) Subjects of Expert Testimony
      157k521 Value
        157k523 k. Services. Most Cited Cases
In action brought under Jones Act and general maritime law against tugboat owner by widow of tugboat skipper, who drowned when tugboat capsized and sank, trial court erroneously rejected expert testimony concerning economic value which skipper contributed to family, apart from his wages, by virtue of services performed around the home. Jones Act, 46 U.S.C.A. § 688.

**[6] Death 117 ☞87**

117 Death
  117III Actions for Causing Death
    117III(H) Damages or Compensation
      117k80 Elements of Compensation
        117k87 k. Loss of Services. Most Cited Cases
In a wrongful death action under either Jones Act or general maritime law, loss of services is recognized element of damages. Jones Act, 46 U.S.C.A. § 688.

**[7] Evidence 157 ☞523**

157 Evidence
  157XII Opinion Evidence
    157XII(B) Subjects of Expert Testimony
      157k521 Value
        157k523 k. Services. Most Cited Cases

**Federal Courts 170B ☞901.1**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)6 Harmless Error
        170Bk901 Exclusion of Evidence
          170Bk901.1 k. In General. Most Cited Cases
          (Formerly 170Bk901)
In action brought against tugboat owner by widow of tugboat skipper, who drowned when tugboat capsized and sank, trial court committed reversible error in cutting off proffered testimony of economist, concerning economic value which skipper contributed to family, apart from his wages, by virtue of services performed around the home, in view of fact that effect of ruling was to cut off all further consideration of that element of damages representing loss of skipper's household services, which should have been presented to jury for its consideration in view of testimony concerning household services performed by skipper.

**[8] Evidence 157 ☞555.2**

157 Evidence

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

157XII Opinion Evidence
    157XII(D) Examination of Experts
        157k555 Basis of Opinion
            157k555.2 k. Necessity and Suffi-
ciency. Most Cited Cases
(Formerly 157k555)
In wrongful death action for damages, trial judge
has discretion to confine testimony of expert wit-
ness within limits of facts shown concerning de-
cedent.

**[9] Federal Courts 170B &#8918;823**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)4 Discretion of Lower Court
                170Bk823 k. Reception of Evidence.
Most Cited Cases
Whether expert testimony will assist trier of fact is
question for trial court. Federal Rules of Evidence,
rules 702, 702 note, 28 U.S.C.A.

**[10] Federal Courts 170B &#8918;870.1**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)5 Questions of Fact, Verdicts
and Findings
                170Bk870 Particular Issues and Ques-
tions
                    170Bk870.1 k. In General. Most
Cited Cases
(Formerly 170Bk870)
Where trial court has resolved preliminary question
of fact concerning admissibility of expert testimony
based upon misconception of the law, appellate
court may exercise review free of the constraints of
the clearly erroneous rule. Federal Rules of Evid-
ence, rule 104(a), 28 U.S.C.A.

**[11] Evidence 157 &#8918;379**

157 Evidence
    157X Documentary Evidence

        157X(D) Production, Authentication, and Ef-
fect
            157k369 Preliminary Evidence for Au-
thentication
            157k379 k. Maps, Plats, and Diagrams.
Most Cited Cases
In action brought against tugboat owner under
Jones Act and general maritime law arising out of
death of tugboat skipper, who drowned when tug-
boat capsized and sank, trial court did not err in re-
fusing admission of blueprints of tugboat, in view
of inadequate foundation. Jones Act, 46 U.S.C.A. §
688.

**[12] Witnesses 410 &#8918;282**

410 Witnesses
    410III Examination
        410III(B) Cross-Examination
            410k279 Questions on Cross-Examination
                410k282 k. Leading Questions. Most
Cited Cases
In action brought against tugboat owner arising out
of death of tugboat skipper, who drowned when
tugboat capsized and sank, trial court did not abuse
its discretion in permitting tugboat owner to use
leading questions when cross-examining its own
employees, who had been called by widow of tug-
boat skipper on direct examination as part of her
case-in-chief. Federal Rules of Evidence, rule
611(c), 28 U.S.C.A.

**[13] Witnesses 410 &#8918;282**

410 Witnesses
    410III Examination
        410III(B) Cross-Examination
            410k279 Questions on Cross-Examination
                410k282 k. Leading Questions. Most
Cited Cases
While Federal Rule of Evidence permits use of
leading questions when party calls witness identi-
fied with adverse party, there is no complementary
provision requiring such a witness to be cross-
examined without use of leading questions by party
to whom that witness is friendly; that matter is

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

within court's traditional discretion to control mode of interrogation. Federal Rules of Evidence, rules 611(c), 611 note, 28 U.S.C.A.

**[14] Witnesses 410 ⚖➙282**

410 Witnesses
    410III Examination
        410III(B) Cross-Examination
            410k279 Questions on Cross-Examination
                410k282 k. Leading Questions. Most Cited Cases
Right of cross-examiner to employ leading questions is not absolute; if witness is friendly to examiner, there is same danger of suggestiveness as on direct, and, consequently, court may, in its discretion, forbid use of leading questions. Federal Rules of Evidence, rules 611(c), 611 note, 28 U.S.C.A.

**[15] Seamen 348 ⚖➙29(5.14)**

348 Seamen
    348k29 Personal Injuries
        348k29(5.14) k. Weight and Sufficiency of Evidence. Most Cited Cases
In action brought against tugboat owner by widow of tugboat skipper, who drowned when tugboat capsized and sank, widow failed to establish that amount of award represented undue or unfair allocation of fault for accident to contributory negligence of tugboat skipper, in view of lack of separate determination of specific elements of contributory negligence, lack of relationship between amount actually awarded and gross amount of skipper's wages, and particularly strong evidence of skipper's contributory negligence.

**\*628** J. Issac Funderburk, Funderburk, Conque & Doucet, Durwood W. Conque, Abbeville, La., for plaintiffs-appellants.

Robert A. Lanier, Farris, Hancock, Gilman, Branan & Lanier, Henry H. Hancock, Memphis, Tenn., for defendant-appellee.

Before PHILLIPS, Chief Judge, and ENGEL and KEITH, Circuit Judges.

ENGEL, Circuit Judge.

Michael J. Morvant drowned in the Mississippi River near Memphis, Tennessee, on March 8, 1975, when the tugboat Marco, of **\*629** which he was skipper, capsized and sank, trapping him in the pilothouse.

Morvant's widow, on behalf of herself and their three minor children and as administratrix of his estate, brought an action under the Jones Act, 46 U.S.C. s 688 (1970), and under the general maritime law against Construction Aggregates Corporation as owner of the Marco. The complaint charged both negligence on the part of the company and its other employees and unseaworthiness of the vessel. In a jury trial a verdict was rendered in favor of the plaintiff in the amount of $58,000. She appeals, claiming that the amount awarded was inadequate and resulted from numerous errors of the district court, principally in the restrictions upon the admission of evidence concerning damages. We reverse and remand for a new trial.

I

Plaintiff claims the trial court erred in excluding from the courtroom her expert on marine surveying. Although she intended to call the expert as a witness, she nevertheless claims he was exempt from sequestration under subsection (3) of Rule 615, Federal Rules of Evidence. Rule 615 provides:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause. (emphasis added).[FN1]

FN1. As the Advisory Committee Notes to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

> Rule 615 indicate,
>
> (Exception 3) contemplates such persons as an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation. See 6 Wigmore s 1841, n. 4.

Judge Weinstein recognizes that exception 3 of Rule 615 will be most frequently invoked in the case of expert witnesses, but observes that "(t)he responsibility for demonstrating that a given witness is essential lies with the parties." 3 Weinstein's Evidence P 615(01) at 615-9 (1976). See also Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 175 (3d Cir. 1977).

In support of her position, plaintiff now urges on appeal:

The complicated and unusual circumstances surrounding the facts of this case and the highly technical nature of the unseaworthiness issue made the advice of an expert, on the spot, essential to the presentation of plaintiff's cause. The record clearly substantiates this contention.

The difficulty with this argument is that it was never presented to the district court. Instead, plaintiff's counsel based his request in the district court upon his desire that the expert witness hear the testimony of the other witnesses so that he could testify on the issue of causation.

[1] We perceive little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to the facts of the case. As Professor Wigmore's treatise summarizes:

The process of sequestration consists merely of preventing one prospective witness from being taught by hearing another's testimony . . . .

6 Wigmore on Evidence s 1838 at 461 (Chadbourn rev. 1976).[FN2] Theoretically at least, the presence in the courtroom of an expert witness who does not testify to the facts of the case but rather gives his opinion based upon the testimony of others hardly seems suspect and will in most cases be beneficial, for he will be more likely to base his expert opinion on a more accurate *630 understanding of the testimony as it evolves before the jury.

> FN2. As Professor Wigmore's treatise points out, the rule excluding witnesses from the courtroom while others are testifying is one of ancient lineage and even finds a biblical antecedent in the story of Susanna and the elders. 6 Wigmore on Evidence s 1837 (Chadbourn rev. 1976); Daniel 13 (Douay).

As made before the trial court, plaintiff's argument for invoking subsection (3) appears to be based upon the language of Rule 703 of the Federal Rules of Evidence, which at least implies that experts will be present in court to hear the evidence:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This view has support from Judge Weinstein, who observes:
Certainly an expert who intends to base his opinion on "facts or data in the particular case" (Rule 703) will be unable to testify if he has been excluded (from the courtroom by an order under Rule 615).

3 Weinstein's Evidence, supra, P 615(01) at 615-8.

That an expert witness may be assisted by being present in the courtroom to hear the testimony upon which he is expected to base his expert opinion, as set forth in Rule 703, does not in our judgment furnish an automatic basis for exempting him from sequestration under Rule 615. Cf. 6 Wigmore, supra, s 1841 at 475. The reason for our conclusion is simple: had the framers intended it, they would

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

have said so, or added a fourth exception. It is true that an expert witness does not normally testify to his firsthand knowledge of the facts of the particular case and therefore will not be in a position to conform his testimony to that of others even if so inclined. Nevertheless, the very breadth of the permissible scope of testimony by an expert witness suggests that in some circumstances at least, the trial judge could be justified in holding that his presence in the courtroom was not essential and that his exclusion from the courtroom might in a given case make a more objective and, perhaps, more honest witness out of him.

[2] We therefore hold that where a party seeks to except an expert witness from exclusion under Rule 615 on the basis that he needs to hear firsthand the testimony of the witnesses, the decision whether to permit him to remain is within the discretion of the trial judge and should not normally be disturbed on appeal. See generally 3 Weinstein's Evidence, supra, P 615(01) at 615-8. On the other hand, where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, we believe that the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel.

II

Plaintiff qualified an expert in "economic projections" for the purpose of establishing the present value of the decedent's projected earnings and from that, the pecuniary loss to the widow and children resulting from Michael Morvant's death. In addition to computing his lost wages between the date of death and the trial of the case at $18,198.86, the expert testified to a gross loss of future income of $565,465.90, measured from the trial date to a projected date of retirement at an age of 62.5 years. By totalling the projected earnings and discounting them at a rate of 5% per annum and adding to that the amount of lost wages between the date of death and trial, the expert arrived at a sum of $287,508.71. From this he deducted 20% Representing the amount he concluded the decedent would have spent on himself. He, therefore, assumed that the remainder would be available for the support of the decedent's wife and family over the period of his work life. All of this testimony was admitted into evidence without objection by the defense, which was left free to test the accuracy of the expert's assumptions and projections by cross-examination and by any counter evidence which it might desire to introduce. On cross-examination, the defense brought out the fact that the expert's income projections were based on the questionable assumption*631 that the deceased would have continued to work seven days a week for his entire work life as he had been doing at the time of his death. It also properly brought out the possibility of illness, anticipated absences for other reasons, the vagaries of the business in which Morvant was engaged, and the differences in life expectancy according to different available life expectancy tables. On cross-examination, the defense also brought out many other circumstances which might occur to a wage earner to decrease his earnings, such as mental illness, being the victim of crime, and general recessions. It also cross-examined the expert on the 5% Discount rate employed, pointing to higher yields which might be obtained from sound investments. With respect to the deduction of 20% For personal maintenance, the defense brought out the fact that Morvant's contribution would vary over the years and that he might be expected to devote more to his own needs and desires when the children were out of school and independent. In sum it can fairly be said that the plaintiff's careful direct examination of the expert witness and the equally careful cross-examination by the defense presented the jury with a fair and comprehensive appraisal of the projected income and expenses of the deceased. From this evidence the jury could have determined with reasonable certainty the economic contribution of Morvant to his family, to the extent that the evaluation was based upon Morvant's rate of income at death.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

[3] The foregoing testimony, however, did not include any factor either for inflation or for any increase in earning capacity which might have occurred due to Morvant's developing skill and experience.[FN3] The effort of the plaintiff's expert to testify to future wage increases was met by the sustained objection of the defense to such testimony on the basis of Petition of United States Steel Corp., 436 F.2d 1256 (6th Cir. 1970), cert. denied, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971). We conclude that the trial judge's rejection of this testimony arose from an erroneous interpretation of United States Steel, especially as the concepts therein announced were further refined in Bach v. Penn Central Transportation Co., 502 F.2d 1117 (6th Cir. 1974).

> FN3. The projection for future lost wages did, however, account for a pay raise which had been given by the company between the date of Morvant's death and the trial.

In United States Steel, our circuit held that it was error in determining the loss of a decedent's earning capacity to have added to the established earnings of the decedent prior to his death an annual increase of 4% To 5% Representing increased productivity and inflation, where it was shown that the decedent's employment was subject to a collective bargaining agreement which restricted annual wage increases to 11/2% Per annum. 436 F.2d at 1275. Specifically our court held that the more generalized projections of actuaries and economists must yield where the uncontradicted facts of the particular case establish that the decedent's earnings would increase at a lesser rate. This is, of course, quite different from ruling, as the trial court did here, that no increases were to be allowed in any event.[FN4]

> FN4. Presumably upon remand in United States Steel, the Commissioners were empowered to make proper adjustments to allow for the 11/2% Increase reflected in the record. The court took particular care to find no additional error in the Commis-

sioners' computation of the decedents' earning capacity loss, other than holding that the most recent year of earnings before a decedent's death was the appropriate base for computations. 436 F.2d at 1275.

In Bach, supra, our court made clear that it was altogether appropriate for the jury to consider future increases or decreases in the purchasing power of money in making an award based upon the projected future earnings of the decedent. At the same time it upheld the trial court's exclusion of testimony by an economist projecting lost future wages. Starting with a base figure of $13,496 representing the decedent's income for the last full calendar year prior to death and adding amounts representing inflation and future increases in income, the economist in Bach was prepared to testify that the decedent would have had an income of $49,413.12 in the year 2002. As the court observed:

*632 In recent history inflation has been so persistent that it is difficult to conceive that the purchasing power of the dollar might remain constant through the year 2000. On the other hand, the predictive abilities of economists have not advanced so far that they can forecast with any certainty the existence and rate of inflation for the next thirty years. Limited use of economists and other experts may be appropriate in some cases to show that raises in income or promotions would most probably occur. See Senn v. Lackner, 91 Ohio App. 83, 100 N.E.2d 432 (1951), aff'd 157 Ohio St. 206, 105 N.E.2d 49 (1952). Yet testimony on the exact income that the decedent would have received through the year 2002 is so speculative, in our view, that it is inadmissible.

We do not hold, however, that the jury may never consider inflation and future increases in income in determining damages. Ideally, the damage award should compensate appellant for the financial loss she will suffer as a result of the death of her husband. If a jury is not permitted to consider decreases in the purchasing power of money, appellant would be woefully damaged if inflation should

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

continue at its present or at any other substantial rate. Some consideration of probabilities is inevitable in any fair award of damages. The court's role is to keep such extrapolations within reasonable bounds and insure that they conform to the evidence. Har-Pen Truck Lines, Inc. v. Mills, 378 F.2d 705, 709-710 (5th Cir. 1967).

Even though no expert testimony on inflation and future increases was admitted, it was still error for the district court to charge the jury that it should not consider "future increases or decreases in the purchasing power of money." Cf. Willmore v. Hertz Corporation, 437 F.2d 357 (6th Cir. 1971). Inflation is a fact of life within the common experience of all jurors. Admittedly, if the jury considers this issue without expert testimony, their calculations will be even more imprecise. There is always a chance that the verdict may be too generous. But if jurors should be prohibited from applying their common knowledge of inflation in reaching a verdict, the party entitled to recovery could be grievously under-compensated. The court can always rectify an exorbitant verdict through its power of remittitur. See 6A Moore's Federal Practice P 59.05(3).

502 F.2d at 1122.

In fairness to the trial judge, we recognize that he may have concluded that the plaintiff's economist was endeavoring to present to the jury the type of future projection which was rejected in Bach as being too speculative. [FN5] At the same time it is clear that Bach does not bar all such expert testimony and holds that, in fact, it is error to preclude a jury from considering factors affecting future wages, such as inflation and, we conceive, evidence of an individual's propensity to increase in productivity and hence earning capacity. The inflation observed in 1974 in Bach is no less evident in 1977 and 1978. And in this case, because of the decedent's youth, other factors are particularly important. In sum, the stability of Morvant's home life and background, the diligence with which he attended to his work, his expanding experience in the trade,

and the demonstrated improvement in his financial circumstances from year to year, as well as inflation, point to the conclusion that Morvant's income would have grown over his working life. The trial judge's ruling deprived the jury of evidence necessary to reach such a conclusion. While no objection was made to the instructions as given, we note that they did not permit the jury to infer increased earning*633 capacity based upon the evidence before it. The fact that the ruling of the court excluding the evidence appears to have been made in the presence of the jury further compounds the potential injury and compels reversal here.

> FN5. Plaintiff sought to overcome any possible objection by representing to the court that the economist would not specifically project Morvant's income, but the income of "someone of the same class or status as the deceased." We do not conceive that this would automatically have satisfied the proscriptions of Bach if the result, hypothetical or otherwise, would still be too speculative. What Bach aimed at preventing was a projection of statistical data so attenuated as to be reductio ad absurdum, thus allowing damages to be ballooned beyond all rational experience.

## III

[4][5][6] Also on the strength of its interpretation of United States Steel, the trial court excluded plaintiff's effort to present expert testimony concerning the economic value which the decedent contributed to the family, apart from his wages, by virtue of services performed around the home. The district court's rejection of additional economic testimony concerning the value of decedent's household services again represents an erroneous interpretation of that case. Once more, at least a substantial part of the fault for the court's error in this regard must lie at the doorstep of the plaintiff's counsel, who appears to have misconceived United States Steel, thus allowing little opportunity for

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

correction.[FN6] Hauling out the garbage, mowing the lawn, making repairs, and other household tasks may be performed by a father as labors of love, but they are labors nonetheless, and historically where they have been performed for others, they have commanded an economic price which we think may fairly be included as a part of the pecuniary loss suffered by the decedent's family,[FN7] considered apart from the non-pecuniary element of loss of society.[FN8]

> FN6. The record indicates that plaintiff's counsel acceded to the court's interpretation of United States Steel but argued, incorrectly, that the case had been legislatively overruled by Federal Rules of Evidence 702 and 703.

> FN7. E. g., United States Steel, supra, 436 F.2d at 1277; 2 Benedict on Admiralty s 86 at 7-46 & n. 6 (7th ed. 1975). In a wrongful death action under either the Jones Act or the general maritime law, the loss of services is a recognized element of damages.

> FN8. The trial judge instructed the jury that if they found that Morvant's death was caused by the unseaworthiness of the Marco, they could add to the award for pecuniary loss an additional sum representing reasonable compensation for the loss of decedent's society to his wife and children, which would include love, companionship, care, attention, guidance, protection, and comfort, but not including the grief caused by Morvant's death. This was correct under the expanded liability arising after Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), and Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). Societal losses are not, however, an element of damages under the Jones Act. E. g., United States Steel, supra, 436 F.2d at 1277. See generally 2 Benedict

on Admiralty, supra, s 86 at 7-49 to 7-50.

[7][8] Expert testimony concerning the pecuniary value of such services has been common where the decedent was the wife and the plaintiff was her surviving husband. See Har-Pen Truck Lines, Inc. v. Mills, 378 F.2d 705 (5th Cir. 1967), cited with approval in Bach, supra, 502 F.2d at 1122. Har-Pen expressly upheld the testimony of an expert concerning the value of a hypothetical housewife. See 378 F.2d at 711-12. Accord, e. g., Haddigan v. Harkins, 441 F.2d 844, 851-52 (3d Cir. 1970). While we are impeded here, as we were in consideration of the projection of future earnings, by the fact that no separate record was made, we nonetheless conclude that it was error for the trial court so summarily to have cut off the proffered testimony of the economist, whose qualifications to testify as an expert had been established. We hold this ruling to be reversible error because its effect was to cut off all further consideration of that element of damages representing the loss of Morvant's household services, an element which we believe should be presented to the jury for its consideration where there is proof to support it. At the same time we recognize the trial judge's discretion to confine the testimony of the expert within the limits of the facts shown concerning the decedent. [FN9]

> FN9. At the time of the ruling in this case, however, there had been considerable testimony by the widow concerning the household services performed by the decedent.

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact *634 to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The Advisory Committee Notes to Rule 702 offer further guidance:

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier. "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Ladd, Expert Testimony, 5 Vand.L.Rev. 414, 418 (1952). When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time. 7 Wigmore s 1918.[FN10]

> FN10. Rule 702, in conditioning the expert testimony on the requirement that it assist the trier, continues the view of our circuit as it existed prior to the adoption of the Rules. E. g., Bridger v. Union Railway Co., 355 F.2d 382, 387 (6th Cir. 1966); see generally 11 Moore's Federal Practice s 702.02 at VII-21 to -22 (1976).

[9] Whether expert testimony will assist the trier is a question for the trial court:

Whether the two conditions to the admissibility of expert testimony set forth in Rule 702 (a qualified witness who can assist the trier of fact) have been satisfied, involves a preliminary question for the trial court; and is a determination largely committed to that court. Appellate courts permit trial courts "the widest possible discretion" in making these determinations, and will not reverse a trial court unless its decision was "clearly erroneous" or "manifestly erroneous."

Naturally this wide lattitude (sic) applies to the trial court's decisions about both the witnesses's (sic) qualifications and his ability to assist the trier of fact. In applying this deferential policy, appellate courts have even upheld the determination of a trial judge, while admitting that if sitting as a trial court they would have reached the opposite conclusion on admissibility. (footnotes omitted)

11 Moore's Federal Practice s 702.10(3) (1976).

[10] While we are loath to disturb the trial court's ruling in view of the foregoing standard of review, we nevertheless conclude that reversal is called for here not because the trial court abused its discretion, but rather because it incorrectly conceived that it had no discretion, thus depriving itself, the plaintiff, and the jury of a proper exercise of that discretion, as contemplated by Rule 702.[FN11]

> FN11. The Fifth Circuit notes that where a trial court's finding is "tainted by a misapprehension of the controlling legal principles," the appellate court may exercise review "free of the constraints of the clearly erroneous rule." Higginbotham v. Mobil Oil Corp., 545 F.2d 422, 433 (5th Cir. 1977), petition for cert. granted on another issue, -- U.S. --, 98 S.Ct. 54, 54 L.Ed.2d 72 (1977). See also Ritter v. Morton, 513 F.2d 942, 949 (9th Cir.), cert. denied, 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975); Case v. Morrisette, 155 U.S.App.D.C. 31, 475 F.2d 1300, 1307 (1973); S. S. Silberblatt, Inc. v. Seaboard Sur. Co., 417 F.2d 1043, 1055 (8th Cir. 1969); Darter v. Greenville Community Hotel Corp., 301 F.2d 70, 72 (4th Cir. 1962). While Higginbotham addresses the standard of review governing findings where the trial court is sitting as the trier of fact, Fed.R.Civ.Pro. 52(a), we conceive that the same principle applies where the trial court has resolved a preliminary question of fact concerning the admissibility of expert testimony based upon a misconception of the law. See generally Fed.R.Evid. 104(a).

Upon remand, it will be proper for the plaintiff to present proofs concerning the economic value of the physical labors which the decedent contributed to the household and which were lost to the survivors because of his death. The extent to which the widow's testimony alone will suffice, or the extent

Page 11

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
(Cite as: 570 F.2d 626)

to which further testimony by an expert will aid the trier to make a reasonable evaluation of those services, is an issue which we do not address. Upon retrial, it is left to the trial court's discretion, to be exercised free from any misconceived constraint imposed by United States Steel.

## *635 IV

The final three assignments of error on appeal are without merit.

[11] The trial court did not err in refusing admission of the blueprints of the Marco, based upon the inadequate foundation laid for their admissibility at trial.

[12][13][14] It was not error for the trial court to permit the defense to use leading questions when cross-examining its own employees, who had been called by plaintiff on direct examination as part of her case-in-chief. While Federal Rule of Evidence 611(c) permits the use of leading questions when a party calls a witness identified with an adverse party, there is no complementary provision requiring such a witness to be cross-examined without the use of leading questions by the party to whom that witness is friendly. This matter is within the court's traditional discretion to control the mode of interrogation.[FN12] We find no abuse in this case.

> FN12. Rule 611(c) provides in part: "Ordinarily leading questions should be permitted on cross-examination." As the Advisory Committee Notes explain:
>
> (Rule 611(c)) conforms to tradition in making the use of leading questions on cross-examination a matter of right. The purpose of the qualification "ordinarily" is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the "cross-examination" of a party by his own counsel after being called by the opponent

(savoring more of re-direct) or of an insured defendant who proves to be friendly to the plaintiff.

The right of a cross-examiner to employ leading questions is not absolute under Rule 611(c). If the witness is friendly to the examiner, there is the same danger of suggestiveness as on direct; and consequently the court may, in its discretion, forbid the use of leading questions. 3 Weinstein's Evidence, supra, P 611(05) at 611-59.

[15] Likewise, we find no error in the amount of the award as representing an undue or unfair allocation of fault for the accident to the contributory negligence of the deceased. We find no persuasive corroboration for the plaintiff's conclusion that the jury reduced its award by 90% To adjust for his contributory negligence.

We note in the first instance that the case was submitted to the jury for a determination on a general verdict and that, therefore, there was no separate determination of this specific element made by the jury. Nor do we see the relationship between the amount actually awarded and the gross amount of decedent's wages as indicating any particular percentage of fault. In any event, it is apparent that even such a high percentage of contributory negligence was well within the proofs before the jury. Unfortunately for the plaintiff, the evidence of her husband's contributory negligence was particularly strong in this case.

## CONCLUSION

We have reached the decision to reverse with some reluctance, for in most respects the case was fully and fairly tried in the district court and the errors were those which might have been cured by a more thorough understanding by plaintiff's counsel of the existing law, particularly United States Steel and Bach. Had the errors not posed such a potential in-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

570 F.2d 626, 2 Fed. R. Evid. Serv. 994
**(Cite as: 570 F.2d 626)**

jury to the substance of the claim of the widow and the children of the deceased, we might have been disposed to affirm. An overall consideration of the ends of justice, however, persuades us to remand for a new trial.

Reversed and remanded for a new trial.

C.A.Tenn. 1978.
Morvant v. Construction Aggregates Corp.
570 F.2d 626, 2 Fed. R. Evid. Serv. 994

END OF DOCUMENT



769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
**(Cite as: 769 F.2d 902)**

☞

United States Court of Appeals,
Second Circuit.
TRANS WORLD METALS, INC., Trans-World
Metals and Co. Limited, and Trans World Metals,
Limited, Plaintiffs-Appellees,
v.
SOUTHWIRE COMPANY, Defendant-Appellant.
**Docket No. 84-7856.**

Argued April 2, 1985.
Decided Aug. 5, 1985.

Seller brought action to recover damages for buyer's repudiation of long-term aluminum supply contract. The United States District Court for the Southern District of New York, Charles E. Stewart, Jr., J., entered judgment in favor of seller, and buyer appealed. The Court of Appeals, Jon O. Newman, Circuit Judge, held that: (1) parol evidence of trade usage was properly admitted regarding delivery terms of contract; (2) contract did not permit buyer to terminate on basis of late shipments of aluminum; (3) jury finding, not challenged by buyer, that there was no substantial impairment of value of late shipments or contract as a whole supported ultimate finding that buyer breached contract by repudiating contract; (4) seller was not to be denied the benefit of its bargain as reflected by contract/market price differential; (5) finding that New York law governed the contract was not in error; and (6) testimony of managing director of seller, rebutting testimony of buyer's damage expert, did not prejudice buyer.

Affirmed.

West Headnotes

**[1] Customs and Usages 113 ☞15(2)**

113 Customs and Usages
   113k9 Application and Operation
      113k15 Explanation of Contract

         113k15(2) k. Construction of Particular Words and Phrases. Most Cited Cases
Parol evidence, consisting of evidence of trade usage, was admissible regarding meaning of timing of delivery terms contained in long-term aluminum supply contract, where apparent certainty of provision requiring delivery at rate of 1,000 metric tons per month was undermined by provision regarding delivery instructions from buyer. N.Y.McKinney's Uniform Commercial Code §§ 1-205(3), 2-202(a).

**[2] Sales 343 ☞84**

343 Sales
   343II Construction of Contract
      343k84 k. Duration and Termination of Contract. Most Cited Cases
Long-term aluminum supply contract, confirmed by exchanged unsigned, standard form documents, did not permit buyer to terminate contract on basis of late shipments, where termination clause in buyer's purchase contract confirmation explicitly afforded seller right to cure within ten days from date of receiving written notice of default from buyer, buyer provided seller with written notice of default, and seller cured any potential default by completing all requested deliveries before period for cure expired.

**[3] Sales 343 ☞170**

343 Sales
   343IV Performance of Contract
      343IV(C) Delivery and Acceptance of Goods
         343k170 k. Effect of Default or Delay in Delivery. Most Cited Cases
Long-term aluminum supply contract, providing for delivery of 1,000 metric tons of aluminum per month, constituted an "installment contract" within meaning of New York Uniform Commercial Code § 2-612(1), so that jury finding, not challenged by buyer on appeal, that there was no substantial impairment of value of either January shipments of aluminum received in February or contract as a whole supported ultimate finding that buyer

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
(Cite as: 769 F.2d 902)

breached contract by repudiating the contract on the basis of the January shipments of aluminum received in February. N.Y.McKinney's Uniform Commercial Code § 2-612(1, 3).

**[4] Sales 343 ☞384(1)**

343 Sales
    343VII Remedies of Seller
        343VII(F) Actions for Damages
            343k384 Damages
                343k384(1) k. In General. Most Cited Cases
"Lost profits" measure of damages under New York Uniform Commercial Code § 2-708(2) does not apply where seller would be over compensated by contract/market price differential measure set forth in New York Uniform Commercial Code § 2-708(1), N.Y. McKinney's Uniform Commercial Code § 2-708(1).

**[5] Sales 343 ☞384(2)**

343 Sales
    343VII Remedies of Seller
        343VII(F) Actions for Damages
            343k384 Damages
                343k384(2) k. Time and Place by Which Determinable in General. Most Cited Cases
Seller under long-term aluminum supply contract, which accepted risk that prices would rise, was not to be denied the benefit of its bargain, as reflected by contract/market price differential measure of damages under New York Uniform Commercial Code § 2-708(1), after prices fell following buyer's repudiation of the contract, where contract was entered into by the parties eight months prior to initial deliveries called for by its terms, last of anticipated deliveries of aluminum would not have been completed until full 20 months after negotiations took place, and, parties were betting on which way aluminum prices would move. N.Y.McKinney's Uniform Commercial Code § 2-708(1).

**[6] Sales 343 ☞384(2)**

343 Sales
    343VII Remedies of Seller
        343VII(F) Actions for Damages
            343k384 Damages
                343k384 k. Time and Place by Which Determinable in General. Most Cited Cases
For purposes of calculating damages for buyer's repudiation of installment contract by contract/market price differential, "time for tender," under New York Uniform Commercial Code § 2-708(1), is the date for each successive tender of an installment, as specified in the contract, and not the date of buyer's repudiation. N.Y.McKinney's Uniform Commercial Code § 2-708(1).

**[7] Sales 343 ☞384(2)**

343 Sales
    343VII Remedies of Seller
        343VII(F) Actions for Damages
            343k384 Damages
                343k384(2) k. Time and Place by Which Determinable in General. Most Cited Cases
For purposes of calculating damages for buyer's repudiation of installment contract, contract/market price differential should have been calculated for each month during 1982, where successive dates for tender were last day of each month in 1982, at which time seller was authorized to invoice that month's shipments, even if such shipments had not been "released" by buyer's delivery instructions. N.Y.McKinney's Uniform Commercial Code § 2-708(1).

**[8] Sales 343 ☞384(1)**

343 Sales
    343VII Remedies of Seller
        343VII(F) Actions for Damages
            343k384 Damages
                343k384(1) k. In General. Most Cited Cases
Use of actual market price for one month to project forward from that month "anticipated" increases for each month thereafter was inappropriate to calculate damages arising from buyer's repudiation of in-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
(Cite as: 769 F.2d 902)

stallment contract for long-term supply of aluminum; however, buyer had no basis for complaint, since seller's projected monthly market prices were closer to contract price than were actual market prices and, thus, entitled seller to less damages than it would have received had it used the correct measure of contract/market price differential. N.Y.McKinney's Uniform Commercial Code § 2-708(1).

[9] Contracts 95 ⊂⟹206

95 Contracts
   95II Construction and Operation
     95II(C) Subject-Matter
       95k206 k. Legal Remedies and Proceedings. Most Cited Cases
In action for damages arising from buyer's repudiation of installment contract for long-term supply of aluminum, finding that choice-of-law provision on back of purchase contract confirmation was not part of the contract was not clearly erroneous.

[10] Sales 343 ⊂⟹55

343 Sales
   343II Construction of Contract
     343k55 k. What Law Governs. Most Cited Cases
In action for buyer's repudiation of installment contract for long-term supply of aluminum, finding that New York, rather than Georgia, law governed the contract was not error, in that there was serious doubt that seller had sufficient contacts in Georgia to subject it to personal jurisdiction.

[11] Federal Civil Procedure 170A ⊂⟹2012

170A Federal Civil Procedure
   170AXV Trial
     170AXV(C) Reception of Evidence
       170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
In action for buyer's repudiation of installment contract for long-term supply of aluminum, testimony of managing director of seller, rebutting testimony

of buyer's damage expert after managing director was not excluded from courtroom during such expert's testimony regarding damages, was not error, since managing director was not a fact witness whose recollection might have been colored by accounts of prior witnesses but was a person whose presence was essential to the presentation of seller's case, and buyer failed to point out any manner in which managing director's rebuttal testimony was different from his earlier testimony on direct examination. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**\*904** James H. Bratton, Jr., Atlanta, Ga. (John G. Despriet, Jane Childs Carr, Edward H. Wasmuth, Jr., Smith, Gambrell & Russell, Atlanta, Ga., Bud G. Holman, John J. Quinn, Kelley Drye & Warren, New York City, on brief), for defendant-appellant.

Howard A. Rosenstein, New York City (Jerry Oppenheim, Eric C. Rubenstein, Miriam B. Chaloff, Sol Herskowitz, Oppenheim & Rosenstein, P.C., New York City, on brief), for plaintiffs-appellees.

Before FEINBERG, Chief Judge, VAN GRAAFEILAND and NEWMAN, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal requires us to resolve an expensive dispute arising out of the repudiation of a long-term commodity supply contract. Southwire Company ("Southwire") appeals from a judgment of the District Court for the Southern District of New York (Charles E. Stewart, Jr., Judge) entered in this diversity action following a four-week jury trial. The jury awarded plaintiffs Trans World Metals, Inc., Trans-World Metals & Co., Ltd., and Trans World Metals, Ltd. (collectively "Trans World") approximately $7.1 million in damages. Southwire challenges the finding that it is liable to Trans World under the contract, the measure of damages awarded to Trans World, and various rulings by the District Court. We affirm.

BACKGROUND

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
(Cite as: 769 F.2d 902)

On April 7, 1981, Trans World and Southwire negotiated by telephone for the purchase and delivery in 1982 of approximately $20.4 million of aluminum. The parties confirmed the contract by exchanging unsigned, standard form documents: Trans World sent Southwire both a confirming telex and a similarly worded "sales contract"; Southwire sent Trans World a "purchase contract confirmation." The contract documents reflect an agreement for the sale and delivery of twelve thousand metric tons of primary aluminum at an average price of $.77 per pound. The "delivery time" clause of the Trans World sales contract and the "shipment schedule" clause of the Trans World telex both state that delivery shall occur "[a]t the rate of 1000 mt [metric tons] per month from January 1982 through December 1982." The **905** Southwire purchase contract confirmation indicates that the quantity and "expected date" under the agreement is 2,205,000 lbs. (one thousand metric tons) "Per Month." The standard printed form on the reverse side of the purchase contract confirmation indicates, in the "Delivery" clause, that "Time is hereby made of the essence, any late delivery shall be a default, and Seller shall be fully responsible for any cost occasioned Buyer thereby."

Also pertinent to the delivery obligation is the following clause in the Trans World sales contract:

Delivered Railhead, usual midwest U.S.A. destinations *as per buyer's instructions, which are to be submitted no later than the 15th of the month of shipment.* Any tonnage not released by that date is to be invoiced on the last day of month on net 30 days terms.

(Emphasis added). The purchase contract confirmation contained similar language.

The Southwire purchase contract confirmation contained a "termination" clause with the following provision regarding untimely delivery:

(a) Buyer may, by written notice of default, cancel this contract in whole or in part if:

(1) Seller fails to make timely delivery, time being of the essence; or

(2) Seller fails to comply with any provision thereof; and

Seller fails to cure such failure within ten (10) days, or such longer period as may be specified in the notice, from the date of receiving the notice.

Pursuant to the delivery terms of the contract, Southwire sent Trans World several delivery instruction "releases" during January 1982. Trans World shipped about three-fourths of the first month's one thousand metric tons of aluminum during January. The remaining one-fourth of the first one thousand tons of metal was shipped between February 1 and February 11, 1982. On February 17, 1982, representatives of Trans World attended a meeting at Southwire's request in Carrollton, Georgia, at which Southwire sought to extend the length of the contract to two years without altering the total quantity of aluminum to be delivered. The parties did not discuss the late delivery of the aluminum ordered in January. Southwire sent no delivery instruction releases to Trans World after January 1982.

Between April 1981, when the contract was negotiated, and March 1982, the price of aluminum fell dramatically. On March 4, 1982, Southwire sent Trans World a telex repudiating the entire contract, pursuant to the termination clause of the purchase contract confirmation. The telex stated:

Pursuant to [the termination clause] of our contract ... Southwire Company hereby notifies you of default in your performance of said contract and cancels the same because of your failure to make timely delivery of material called for by said contract.

Please advise us how to dispose of material you have late shipped, which we hold for your instruction.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
(Cite as: 769 F.2d 902)

The "failure to make timely delivery" refers to shipments to be made during the first month of the twelve-month contract. The "late shipped" material consists of the $419,232.84 worth of aluminum shipped by Trans World in early February 1982.

On May 3, 1982, Trans World brought suit in New York state court against Southwire for breach of the aluminum supply contract.[FN1] Southwire removed the action to federal court and unsuccessfully sought to transfer the case to Georgia. At the conclusion of the trial the jury answered special interrogatories in addition to rendering a general verdict in favor of Trans World. *906 The jury found that the parties had entered into a contract but that the "time is of essence" and "termination" clauses of Southwire's "purchase contract confirmation" were not a part of the contract. The jury could not agree whether the aluminum shipments made in early February were timely but found that, even if the shipments were late, they were accepted by Southwire and that there was no substantial impairment of the value either of any particular shipment or of the contract as a whole. The jury awarded Trans World total damages of $7,122,141.84, consisting of $6,702,529.00 for repudiation of the remaining purchase obligations of the contract and $419,232.84 for shipments accepted without payment by Southwire in February.[FN2] The District Court applied the New York prejudgment interest rate and awarded Trans World $1,304,804.88 in prejudgment interest, for a total of $8,426,946.72. The District Court denied Southwire's motions for judgment notwithstanding the verdict and for a new trial. This appeal followed.

> FN1. Southwire had earlier brought a similar action against Trans World in the Northern District of Georgia. The day after repudiating the supply contract, Southwire filed suit seeking a declaratory judgment that the contract was of no force and effect. The District Court for the Northern District of Georgia dismissed for lack of personal jurisdiction. The Eleventh Circuit reversed

> that judgment after the action in the Southern District of New York had gone to trial. *See Southwire Co. v. Trans World Metals & Co., Ltd.,* 735 F.2d 440 (11th Cir.1984).

> FN2. The component figures total $380 less than the aggregate figure awarded by the jury. The discrepancy has not been noticed by the parties, which we take to be a waiver of any complaint.

## DISCUSSION

### I.

Southwire challenges the jury's finding that it is liable for repudiation of the contract, arguing that the District Court should have ruled as a matter of law that Trans World breached the contract by failing to complete the first month's shipments in January. Southwire argues, in essence, that the deliveries made in February violated the "delivery" and "termination" clauses of its purchase contract confirmation and therefore that it was error for the District Court to permit Trans World to introduce evidence regarding trade practices in order to show that the February deliveries were timely. Even if we ignore the jury's findings that the "time is of the essence" and "termination" clauses were not part of the contract between the parties, Southwire's argument fails.

[1] First, because the provisions governing the timing of delivery are somewhat ambiguous, the District Court correctly admitted parol evidence regarding the contract meaning of the terms. *See Rose Stone & Concrete, Inc. v. County of Broome,* 76 A.D.2d 998, 999, 429 N.Y.S.2d 295, 296 (3d Dep't 1980) ("[T]rade terms may be shown by parol evidence to have acquired a meaning by usage."); *cf. Long Island Airports Limousine Service Corp. v. Playboy-Elsinore Associates,* 739 F.2d 101, 103-04 (2d Cir.1984) (non-U.C.C. case; parol evidence admissible when contract susceptible of at least two

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
(Cite as: 769 F.2d 902)

fairly reasonable meanings); *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983) (same). The contract provides for delivery at a rate of 1,000 metric tons per month, but the apparent certainty of this provision is undermined by the provision regarding delivery instructions from the buyer. It is not self-evident from reading both provisions whether 1,000 metric tons are to be delivered precisely within each calendar month or whether some part of each month's shipment may be delivered in the following month so long as it is shipped within a reasonable time after receipt of delivery instructions. At a minimum the delivery provisions were permissibly "explained or supplemented" by evidence of trade usage. N.Y.U.C.C. Law § 2-202(a) (McKinney 1964); *see Flower City Painting Contractors, Inc. v. Gumina Construction Co.*, 591 F.2d 162, 165 (2d Cir.1979); *Edison v. Viva International, Ltd.*, 70 A.D.2d 379, 383, 421 N.Y.S.2d 203, 205 (1st Dep't 1979); N.Y.U.C.C. Law § 1-205(3).

[2] Second, the termination clause in Southwire's purchase contract confirmation explicitly affords Trans World a right to cure "within ten (10) days ... from the date of receiving [written] notice" of default. Southwire provided no written notice of default before March 4, when it sent Trans World the telex repudiating·the contract. Because Trans World had cured any potential default by completing all requested**907 deliveries before the period for cure expired, the contract does not permit Southwire to terminate on the basis of the shipments made in February.

[3] Finally, the Uniform Commercial Code offers Southwire no ground to repudiate the contract. The agreement at issue is an "installment contract" within the meaning of N.Y.U.C.C. Law § 2-612(1) because it "requires or authorizes the delivery of goods in separate lots to be separately accepted." Therefore, Southwire may treat a late shipment of one installment as a breach of the entire contract only if the "default with respect to one or more installments substantially impairs the value of the

whole contract." *Id.* § 2-612(3). The jury's finding, not challenged by Southwire on appeal, that there was no substantial impairment of the value of either the shipments received in February or the contract as a whole supports the ultimate finding that Southwire breached the contract. The District Court properly refused to overturn the jury verdict against Southwire.

## II.

Southwire complains that the damage award, calculated by the difference between contract and market prices, gave Trans World an unwarranted windfall. Southwire favors an alternative measure of damages based on the rate of profit earned by Trans World on the first month's completed shipments projected over the twelve-month life of the contract. Such a measure, Southwire argues, would better estimate the amount Trans World would have made had the contract been completed. We reject this alternative as contrary to the Uniform Commercial Code.

Seller's damages for repudiation are governed by section 2-708 of the Uniform Commercial Code. Subsection 1 of this section sets forth the general rule that damages are to be calculated by the difference between the contract and market prices:

> (1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2-723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (Section 2-710), but less expenses saved in consequence of the buyer's breach.

N.Y.U.C.C. Law § 2-708(1). The drafters of the Uniform Commercial Code recognized that this measure would not adequately compensate certain types of sellers, generally referred to as "lost

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
(Cite as: 769 F.2d 902)

volume sellers." *See* J. White & R. Summers, Uniform Commercial Code § 7-9, at 274-76 (2d ed. 1980) ("White & Summers"). Therefore, an alternative measure of damages was provided for those sellers who would be *inadequately* compensated by the standard contract/market price differential:

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article (Section 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

N.Y.U.C.C. Law § 2-708(2). This measure of damages is often preferred by sellers who have not acquired the goods to be sold prior to the buyer's repudiation because such sellers often would be undercompensated by the contract/market price measure of damages.[FN3]

> FN3. Professors White and Summers refer to such sellers as "jobbers."
>
> By "jobber" we refer to a seller who satisfies two conditions. First, he is a seller who never acquires the contract goods. Second, his decision not to acquire those goods after learning of the breach is commercially reasonable under 2-704.... Since he has no goods on hand to resell, he cannot even resell on the market at the time of tender and so recoup the amount necessary to make him whole by adding such proceeds to his 2-708(1) recovery. Thus the only recovery which grossly approximates the "jobber's" economic loss is a recovery based on lost profits.
>
> White & Summers § 7-10, at 278. In a case involving a commodity like aluminum that fluctuates rapidly in price-as

compared to standard-priced goods like cars, *see* 67 Am.Jur.2d *Sales* § 1129-the lost profits of a selling jobber may well be adequately reflected by the contract/market price differential.

**\*908** [4] Southwire argues that the "lost profits" measure should also apply when the seller would be *overcompensated* by section 2-708(1). We disagree. We do not doubt that the contract/market price differential "will seldom be the same as the seller's actual economic loss from breach." White & Summers § 7-7, at 269; *see* Peters, *Remedies for Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article Two*, 73 Yale L.J. 199, 259 (1963). However, nothing in the language or history of section 2-708(2) suggests that it was intended to apply to cases in which section 2-708(1) might overcompensate the seller. *See* White & Summers § 7-12, at 283. Nor has Southwire cited any New York case that interprets section 2-708(2) as Southwire urges us to interpret it. As a federal court sitting in diversity, we will not extend the application of this state law.

[5] Nor are we convinced that Trans World has been overcompensated. No measure other than the contract/market price differential will award Trans World the "benefit of its bargain," that is, the "amount necessary to put [it] in as good a position as [it] would have been if the defendant had abided by the contract." *Western Geophysical Co. of America, Inc. v. Bolt Associates, Inc.*, 584 F.2d 1164, 1172 (2d Cir.1978) (quoting *Perma Research & Development Co. v. Singer Co.*, 402 F.Supp. 881, 898 (S.D.N.Y.1975), *aff'd*, 542 F.2d 111 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976)). The contract at issue in this case is an aluminum supply contract entered into eight months prior to the initial deliveries called for by its terms. The last of the anticipated deliveries of aluminum would not have been completed until a full twenty months after the negotiations took place. It simply could not have escaped these

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
(Cite as: 769 F.2d 902)

parties that they were betting on which way aluminum prices would move. Trans World took the risk that the price would rise; Southwire took the risk that the price would fall. Under these circumstances, Trans World should not be denied the benefit of its bargain, as reflected by the contract/market price differential.[FN4] *Cf. Apex Oil Co. v. Vanguard Oil & Service Co.,* 760 F.2d 417 (2d Cir.1985) (defaulting seller obliged to pay damages based on contract/market price differential).

> FN4. Southwire presented no evidence and made no claim concerning any expenses saved by Trans World as a result of Southwire's breach. Such expenses, if established, would have reduced the recoverable damages. N.Y.U.C.C. Law § 2-708(1); *see Katz Communications, Inc. v. The Evening News Association,* 705 F.2d 20, 26-27 (2d Cir.1983).

The decision primarily relied upon by Southwire is distinguishable from this case. *Nobs Chemical, U.S.A., Inc. v. Koppers Co., Inc.,* 616 F.2d 212 (5th Cir.1980), involved a seller acting as a middleman. The seller in *Nobs* had entered into a second fixed-price contract with its own supplier for purchase of the goods to be sold under the contract sued upon; its "market price" thus had been fixed in advance by contract. Because the seller had contractually protected itself against market price fluctuation, the Fifth Circuit concluded that it would have been unfair to permit the seller to reap a riskless benefit. As that Court noted, "the difference between the fallen market price and the contract price is [not] necessary to compensate the plaintiffs for the breach. Had the transaction been completed, their 'benefit of the bargain' would not have been affected by the fall in the market price...." *Id.* at 215. Whether or not we would have reached the same result in *Nobs,* here the benefit of the bargain under a completed contract would have been affected by the fall in aluminum *909 prices.[FN5] Because Trans World accepted the risk that prices would rise, it is entitled to benefit from their fall.

> FN5. Although Trans World had available to it about 78,000 tons of aluminum at the time of the breach, Trans World had corresponding obligations to deliver about 76,000 tons of aluminum to buyers other than Southwire. Absent any indication that Trans World had "identified" any of this metal to the Southwire contract, *see* N.Y.U.C.C. Law § 2-501(b), we cannot say, as could the court in *Nobs,* that a change in the market price would not affect the seller's "benefit of the bargain."

### III.

Southwire raises a number of further points on appeal. The first involves the proper determination of the market price for purposes of calculating the contract/market price differential. The jury relied upon Trans World's damage calculations, which were based on the market price as reflected by bids received on April 26 (and projections discussed below). Southwire argues that because the contract was repudiated on March 4, the market price figure used to calculate damages should be the March 4 price. We do not agree. The measure of damages set forth in section 2-708(1) is "the difference between the market price *at the time and place for tender* and the unpaid contract price." N.Y.U.C.C. Law § 2-708(1) (emphasis added); *cf. id.* § 2-713(1) (*buyer's* damages for repudiation by *seller* measured by contract/market price differential "at the time when the buyer learned of the breach"). Thus, the pertinent market price date is not the date of repudiation but the date for tender.

We would accept Southwire's argument that the date Trans World learned of the repudiation would be the correct date on which to calculate the market price had this action been tried *before* the time for full performance under the contract. *See* N.Y.U.C.C. § 2-723(1) (market price at time aggrieved party learned of repudiation used to calculate damages in action for anticipatory repudiation that "comes to trial before time for performance

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
**(Cite as: 769 F.2d 902)**

with respect to some or all of the goods"). However, where damages are awarded *after* the time for full performance, as in this case, the calculation of damages under section 2-708(1) should reflect the actual market price at each successive date when tender was to have been made under the repudiated installment contract. This was the rule prior to enactment of the Uniform Commercial Code. *United States v. Burton Coal Co.*, 273 U.S. 337, 340, 47 S.Ct. 351, 352, 71 L.Ed. 670 (1927) (following repudiation of supply contract, "seller may recover the difference between the contract price and the market value at the times when and the places where deliveries should have been made"); *L.W. Foster Sportswear Co. v. Goldblatt Brothers, Inc.*, 356 F.2d 906, 910 & n. 6 (7th Cir.1966) (recognizing same standard under pre-U.C.C. law and U.C.C. § 2-708); *see* 67A Am.Jur.2d *Sales* § 1115, at 505 n. 19 (2d ed. 1985); *id.* § 1118, at 510 n. 50. New York did not intend to deviate from this measure of damages upon adoption of the Uniform Commercial Code. The Official Comment to section 2-708 indicates that the "prior uniform statutory provision is followed generally in setting the current market price at the time and place for tender as the standard by which damages for non-acceptance are to be determined." N.Y.U.C.C. Law § 2-708 Official Comment 1. The "prior uniform statutory provision" indicated that where " 'there is an available market for the goods ... [damages should be measured by] the difference between the contract price and the market or current price ... when the goods ought to have been accepted, or, if no time was fixed for acceptance, then at the time of the refusal to accept.' " *Id.* § 2-708 Practice Commentary (quoting Sales Act § 64 (McKinney's Personal Property Law § 145)).

[6][7] We therefore conclude that when calculating damages for a buyer's repudiation of an installment contract by the contract/market price differential, "time ... for tender" under section 2-708(1) is the date for each successive tender of an installment, as specified in the contract. *See* 67A Am.Jur.2d *Sales* § 1118, at 510 ("[W]here the breach is of an install-

ment **\*910** contract, damages should be measured by the market price at the time of each delivery." (footnote omitted)). In this case the successive dates for tender were the last day of each month in 1982, at which time Trans World was authorized to invoice that month's shipments even if such shipments had not been "released" by Southwire's delivery instructions. A contract/market price differential should have been calculated for each month during 1982.

[8] We recognize that the jury relied upon a damage calculation prepared for Trans World that did not use actual market prices for each month of scheduled tenders. Instead, Trans World's expert took the actual price for April 1982 and projected forward from that date "anticipated" increases of $15 per metric ton for each month thereafter. Though the use of such an estimate was inappropriate because the actual market price for each successive month was known by the date of the trial, Southwire has no basis for complaint. Trans World's projected monthly market prices were closer to the contract price than were the actual market prices. Trans World therefore received less in damages using its expert's projection than it would have received using the correct measure. Furthermore, Southwire did not preserve at trial the factual issue as to the correct market price on each successive date of tender. Southwire did not object to Trans World's use or the accuracy of projected prices nor otherwise raise the issue with the jury, relying instead on its unsuccessful effort to convince the jurors that the contract/market price differential was not an appropriate method for calculating damages. Having failed to preserve the point for appeal, Southwire may not now raise the issue for the first time. *See, e.g., Schmidt v. Polish People's Republic*, 742 F.2d 67, 70 (2d Cir.1984).

[9][10] Southwire contends that it was improper for the District Court to award prejudgment interest because Georgia law governs this case and Georgia does not permit prejudgment interest except on liquidated damages. *See United States ex rel. Geor-*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88
(Cite as: 769 F.2d 902)

*gia Electric Supply Co., Inc. v. United States Fidelity and Guaranty Co.,* 656 F.2d 993, 997 (5th Cir.1981). Southwire argues that Georgia law applies to this case both because of the inclusion of a choice-of-law provision on the back of the purchase contract confirmation and because under New York choice-of-law rules Georgia is the place of "most significant contacts." *See, e.g., Transatlantic Cement, Inc. v. Lambert Freres et Cie,* 462 F.Supp. 363, 364-65 (S.D.N.Y.1978). In ruling on this issue the District Court stated that "[i]n view of the numerous contacts with the State of New York, we believe that New York law is applicable, that plaintiffs are entitled to [prejudgment] interest and the appropriate rate is nine percent per annum." Because the District Court would not have undertaken this conflict-of-laws analysis had it determined that the choice-of-law provision in the purchase contract confirmation was part of the contract between the parties, we take the District Court's statement as an implicit ruling that, like the delivery time and termination clauses of the purchase contract confirmation, the choice-of-law provision was not part of the contract. This implicit finding is not clearly erroneous. Nor can we say that the choice-of-law ruling was in error. Though both Georgia and New York had contacts with this transaction, it would be anomalous to reject the holding that New York was the state with the *most* significant contacts when there was serious doubt that Trans World had sufficient contacts in Georgia even to subject it to personal jurisdiction there. *See* note 1, *supra.*

[11] Southwire asserts that the District Court violated the "rule of sequestration" of Federal Rule of Evidence 615 [FN6] by permitting Reuben, the managing director of Trans World Metals, Ltd., to rebut the testimony of Southwire's damage expert, Lawlor. Reuben was not excluded from the courtroom during Lawlor's testimony regarding damages, which Reuben later rebutted.*911 Reuben may well have been entitled to remain pursuant to the exception in Rule 615(3) for a person whose presence is essential to the presentation of a case, *see Morvant v. Construction Aggregates Corp.,* 570

F.2d 626, 629-30 (6th Cir.) (generally unnecessary to exclude expert from courtroom), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978). He was not a fact witness whose recollection might have been colored by accounts of prior witnesses. In any event, the failure of Southwire to point out any manner in which Reuben's rebuttal testimony was different from his earlier testimony on direct examination demonstrates that Southwire suffered no prejudice from admission of the rebuttal testimony.

> FN6. Federal Rule of Evidence 615 provides:
>
> > At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

We have considered Southwire's remaining claims and find them to lack merit. The judgment of the District Court is affirmed.

C.A.2 (N.Y.),1985.
Trans World Metals, Inc. v. Southwire Co.
769 F.2d 902, 41 UCC Rep.Serv. 453, 19 Fed. R. Evid. Serv. 88

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
**(Cite as: 994 F.2d 49)**

c

United States Court of Appeals,
Second Circuit.
Eliezer Moshe MALEK and Malke Malek,
Plaintiffs-Appellants-Cross-Appellees,
v.
FEDERAL INSURANCE COMPANY; Sea Insur-
ance Company, Limited, Defendants-Ap-
pellees-Cross-Appellants.
**No. 742, Dockets 92-7782, 92-7858.**

Argued Dec. 30, 1992.
Decided April 30, 1993.

Insureds commenced action to recover proceeds of
fire policy after insurer rejected their claim. The
United States District Court for the Southern Dis-
trict of New York, Lee P. Gagliardi, J., dismissed
complaint after jury found that insureds concealed
or misrepresented material facts during insurers' in-
vestigation of fire and that they intentionally caused
that fire. Insureds appealed. The Court of Appeals,
Miner, Circuit Judge, held that: (1) case notes of
social worker responsible for case file concerning
children of insureds' former tenants should have
been admitted under business records exception to
hearsay rule, and social worker should have been
allowed to testify about use of fire in cult activities
that took place on premises during the tenancy and
about photographs which tenant took and sent to
Department of Social Services; (2) insureds' expert
should not have been sequestered during testimony
of insurers' expert; (3) insureds' accountant should
not have been impeached through cross-ex-
amination about his religious affiliation and that of
his clients; and (4) cumulative effect of the eviden-
tiary errors substantially prejudiced insureds' case.

Reversed and remanded.

McLaughlin, J., dissented and filed opinion.

West Headnotes

**[1] Federal Courts 170B €══823**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk823 k. Reception of Evidence.
Most Cited Cases
District court's exclusion of hearsay is reviewed for
abuse of discretion.

**[2] Evidence 157 €══333(1)**

157 Evidence
  157X Documentary Evidence
    157X(A) Public or Official Acts, Proceed-
ings, Records, and Certificates
      157k333 Official Records and Reports
        157k333(1) k. In General. Most Cited
Cases
In action to recover proceeds of fire policy follow-
ing insurer's rejection of claim, case notes of social
worker responsible for case file concerning children
of insureds' former tenants who allegedly started
fire were admissible under business records excep-
tion to hearsay rule; case notes were records kept
by Orange County Department of Social Services in
the regular course of business, were taken in the
normal course of business, and were made close to
time of events they recorded, and notes were in part
based on social worker's personal knowledge and
observations. Fed.Rules Evid.Rule 803(6), 28
U.S.C.A.

**[3] Insurance 217 €══2200**

217 Insurance
  217XVI Coverage--Property Insurance
    217XVI(A) In General
      217k2196 Evidence
        217k2200 k. Admissibility. Most Cited
Cases
  (Formerly 217k429.1(2))
Social worker's testimony about use of fire in cult

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

activities that took place on insured premises and knowledge she might have bearing on second-degree burns sustained by woman who claimed to have been burned there was relevant and admissible in action to recover proceeds of fire policy following insurers' rejection of claim; testimony had tendency to make more probable insureds' theory that their former tenants were responsible for the fire and was not prejudicial, cumulative, or misleading. Fed.Rules Evid.Rules 401-403, 28 U.S.C.A.

**[4] Evidence 157 ☞359(1)**

157 Evidence
   157X Documentary Evidence
      157X(C) Private Writings and Publications
         157k359 Photographs and Other Pictures; Sound Records and Pictures
            157k359(1) k. Photographs in General. Most Cited Cases
In action to recover proceeds of fire policy following rejection of claim, district court should not have prevented social worker from testifying about photographs depicting container of milk that had not yet reached its expiration date that insureds' former tenant took and sent to Department of Social Services; proffered testimony of photographs directly implicated issues of opportunity and causation as it related to insurers' arson defense.

**[5] Federal Civil Procedure 170A ☞2012**

170A Federal Civil Procedure
   170AXV Trial
      170AXV(C) Reception of Evidence
         170Ak2012 k. Separation and Exclusion of Witnesses. Most Cited Cases
In action to recover proceeds of fire policy following rejection of claim, insureds' expert witness should not have been sequestered during testimony of insurers' expert despite assertions by insureds' counsel that expert's presence was necessary to assist in preparing to cross-examine insurers' expert; testimony of insurers' expert that fire was "intense" was important finding bearing on question of arson and was not made in his reports, and ten-minute re-

cess following that testimony was not an adequate substitute for presence of insureds' expert during that testimony. Fed.Rules Evid.Rule 615(3), 28 U.S.C.A.

**[6] Witnesses 410 ☞340(2)**

410 Witnesses
   410IV Credibility and Impeachment
      410IV(B) Character and Conduct of Witness
         410k339 Particular Traits of Character or Habits
            410k340 In General
               410k340(2) k. Religious Faith or Moral Sense. Most Cited Cases
In action to recover proceeds of fire policy following rejection of claim, insurers should not have been permitted to impeach insureds' accountant-whom they had called to testify as to their financial stability in order to rebut insurers' contention that they had financial motive to set fire to the premises-about his religious affiliation and that of his clients. Fed.Rules Evid.Rule 610, 28 U.S.C.A.

**[7] Federal Courts 170B ☞896.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk896 Admission of Evidence
               170Bk896.1 k. In General. Most Cited Cases
(Formerly 170Bk896)

**Federal Courts 170B ☞901.1**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)6 Harmless Error
            170Bk901 Exclusion of Evidence
               170Bk901.1 k. In General. Most Cited Cases
(Formerly 170Bk901)
Making determination of whether the improper ad-

Page 3

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

mission or exclusion of evidence affects a substantial right of one of the parties involves an assessment of the likelihood that the error affected the case outcome. Fed.Rules Evid.Rule 103(a), 28 U.S.C.A.

**[8] Insurance 217 ⚖═➤2201**

217 Insurance
    217XVI Coverage--Property Insurance
        217XVI(A) In General
            217k2196 Evidence
                217k2201 k. Weight and Sufficiency.
Most Cited Cases
    (Formerly 217k429.1(8))

**Insurance 217 ⚖═➤3198(1)**

217 Insurance
    217XXVII Claims and Settlement Practices
        217XXVII(B) Claim Procedures
            217XXVII(B)2 Notice and Proof of Loss
                217k3193 Evidence
                    217k3198 Weight and Sufficiency
                        217k3198(1) k. In General. Most
Cited Cases
    (Formerly 217k562.3(3.1))
In New York, insurance company defending action brought by its insured to recover the proceeds of an insurance policy must prove the affirmative defenses of arson and fraudulent misrepresentation by clear and convincing evidence.

**[9] Federal Courts 170B ⚖═➤891**

170B Federal Courts
    170BVIII Courts of Appeals
        170BVIII(K) Scope, Standards, and Extent
            170BVIII(K)6 Harmless Error
                170Bk891 k. Necessity That Error Be
Prejudicial. Most Cited Cases
Cumulative effect of evidentiary errors in insureds' action to recover proceeds of fire policy following rejection of claim was to substantially prejudice insureds' case, even though any one of the evidentiary errors, standing alone, might have been harmless

and would not mandate reversal. Fed.Rules Evid.Rule 103(a), 28 U.S.C.A.

*50 Eugene I. Farber, White Plains, NY (Steven L. Segall, Hinda Keller Farber, Katz, Kleinbaum, Farber & Segall, White Plains, NY, of counsel), for plaintiffs-appellants-cross-appellees.

Paul Kovner, New York City (Franklin D. Tell, Kenneth R. Feit, Tell, Cheser & Breitbart, New York City, of counsel), for defendants-appellees-cross-appellants.

Before OAKES, MINER and McLAUGHLIN, Circuit Judges.

MINER, Circuit Judge:

Plaintiffs-appellants-cross-appellees Eliezer Moshe Malek and Malke Malek ("the Maleks") appeal from a judgment entered after a jury trial in the United States District Court for the Southern District of New York (Gagliardi, *J.*) dismissing their complaint. The Maleks, a married couple, commenced this action to recover the proceeds of their fire insurance policy after defendant-appellee-cross-appellant*51 Federal Insurance Company ("Federal") rejected their claim. The district court dismissed the Maleks' complaint after the jury returned a verdict, the jury having found that the Maleks concealed or misrepresented material facts during Federal's investigation of the fire that destroyed their property and that the Maleks intentionally caused the fire.

The Maleks contend that the district court erred in, *inter alia,* excluding the relevant testimony of a social worker who was prepared to testify on the basis of her personal knowledge and business records; sequestering the Maleks' expert during the testimony of the defendants' expert, where the presence of the Maleks' expert was essential to the Maleks' cross examination of the defendants' expert; and permitting defense counsel to cross examine a witness about his religious affiliation and the religious affiliation of his clients. For the reasons set forth below,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

we agree with the Maleks that the district court erred in making these rulings and that these errors substantially affected the outcome of the trial.

## BACKGROUND

### A. *The Fire*

The Maleks owned a house in Highland Mills, New York and rented it to Mr. and Mrs. Leo Agrillo. The house was insured by defendant-appellee-cross-appellant Sea Insurance Company, Limited ("Sea"), a subsidiary of Federal. In 1988, the Maleks commenced a landlord-tenant proceeding against the Agrillos and in June 1989 obtained a warrant of eviction against them. On July 5, 1989, the Agrillos' eviction date, Deputy Sheriff Anthony Patricola inspected the house and confirmed that it was vacant.

On July 10, 1989, the house was destroyed by fire. The Maleks submitted a claim for the fire loss to Sea for $264,766. In March 1991, after a lengthy investigation, Federal rejected the Maleks' fire loss claim.[FN1] The Maleks brought an action against both Sea and Federal for breach of the fire insurance policy issued by Sea.

> FN1. Sea inadvertently failed to reject the claim.

### B. *The Trial*

During trial, defendants contended they were not obligated to pay the Maleks' fire loss claim because the fire was incendiary in origin; the Maleks were responsible for the arson; and the Maleks had misrepresented and concealed material facts and circumstances during the investigation of the fire. The Maleks argued that they did not lie or misrepresent facts to the insurance companies during the course of the investigation and that the fire was not a result of arson. Rather, the Maleks alleged that the fire may have been caused by an electrical malfunction

or accidentally may have been set by the Agrillos. The Maleks sought to demonstrate that the Agrillos may have been responsible for the fire because the Agrillos engaged in cult activities involving the use of candles and fire; a young woman had suffered second degree burns on the premises some time before the July 10 fire; and the Agrillos had access to and were present in the house after July 5, 1989-the date Deputy Sheriff Patricola confirmed that the house was vacant-and before July 10, 1989-the date of the fire.

### 1. *The Testimony of the Social Worker*

To support their contention that the Agrillos may have set the fire, the Maleks attempted to introduce the testimony and case notes of Carol Barber, a social worker for the Orange County Department of Social Services who handled the case file concerning the Agrillo children. Barber was prepared to testify that the Agrillos had continued access to the premises; the Agrillos engaged in cult activities; and that a young woman had sustained second-degree burns at the premises. She also would have supported her testimony that the Agrillos had access to the house after the eviction date by submitting photographs, taken in the house by Mrs. Agrillo on July 6 or 7, 1989, which depicted a container of milk that had not yet reached its expiration date. The district court excluded Barber's testimony *in toto.*

### *52 2. *Sequestering the Maleks' Expert Witness*

To show the absence of arson, the Maleks presented the testimony of Thomas Curley, a taxi driver on duty in the vicinity at the time of the fire. Curley claimed that the color of smoke from the fire was white. The color of the smoke was relevant because black smoke indicates the presence of accelerants, which are often used by arsonists, while white smoke indicates the absence of accelerants.

To refute this testimony and to establish arson as the cause of the fire, the defendants called a fire ex-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

pert, David Redsicker. The Maleks sought permission from the court to have their fire expert, Fire Chief George Friedell, present in the courtroom during Redsicker's testimony in order to aid their counsel in cross examining Redsicker. The district court denied the Maleks' request and ordered all witnesses to leave the courtroom.

Redsicker testified that the fire was caused by arson. Although a laboratory analysis of debris found no accelerants present, Redsicker asserted that either water from fire fighting could have washed accelerants away or accelerants could have burned off due to the intensity of the fire. After returning to the courtroom, Friedell testified that accelerants could not be washed away and that, despite the intensity of the fire, small, solid particles would remain. The Maleks also disputed whether Redsicker conducted a proper inspection of the scene after the fire. The Maleks contended that Redsicker failed to "overhaul," or to sift through, all of the debris and failed to look for evidence such as candles or other evidence of cult activities.

Redsicker introduced several photographs taken at the scene of the fire. The photographs showed that copper wiring, but not hollow copper tubing, had melted. Redsicker testified that the fire was "very intense," a conclusion reached during his trial testimony but not explicitly stated in his reports provided to the Maleks prior to trial. This portion of his testimony was relevant because the melting of the copper wire indicated arson. However, Redsicker's theory did not explain why the hollow copper tubing failed to melt despite the intensity of the fire. Friedell's absence from the courtroom precluded him from informing the Maleks' counsel of this inconsistency. Counsel for the Maleks failed to cross examine Redsicker about why the copper tubing had not melted.

*3. Impeaching a Witness by Using His Religious Beliefs*

To rebut the defendants' contention that they had a financial motive to set fire to the premises, the Maleks called an accountant, William Schneck, to testify as to their financial stability. During the cross examination of Schneck, the following colloquy took place:

Q. Was your principal a member of the Hassidic [sic] community in the business transaction you had with Mr. Malek?

[The Maleks' Attorney]: Objection, your Honor.

THE COURT: Overruled.

A. Yes.

Q. Do you act as a CPA for other members of the Hassidic [sic] community?

[The Maleks' Attorney]: Objection.

THE COURT: Overruled.

A. Not just Hassidic [sic] people.

Q. I didn't ask you that.

A. In that respect, yes. There's a number of people that I do that for.

Q. You've been a professor at Tuoro [sic] University for eight years, is that correct?

A. Yes.

Q. And that's part of the Yeshiva University system, isn't [it]?

[The Maleks' Attorney]: Objection.

THE COURT: I'll permit it.

A. It's not a member, no.

Q. Isn't it affiliated with organized Jewish institutions?

[The Maleks' Attorney]: Objection.

THE COURT: Sustained.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

The district court gave no limiting instruction to the jury to indicate that it was improper for the defendants to impeach Schneck's credibility with evidence of his religious affiliations or beliefs.

After deliberating for approximately an hour-and-a-half, the jury delivered a verdict *53 in favor of the defendants, and the district court dismissed the Maleks' complaint.

## DISCUSSION

### A. *Testimony of the Social Worker*

[1] The district court excluded Barber's testimony, and it excluded her case notes on the ground they were not business records and thus were inadmissible hearsay. The business records exception to the hearsay rule allows for the admission of the following evidence for the purpose of proving the truth of its contents:

A memorandum, report, record, or data compilation ... of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity.

Fed.R.Evid. 803(6). We review a district court's exclusion of hearsay for abuse of discretion. *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990).

[2] Barber's case notes were records kept by the Orange County Department of Social Services in the regular course of business. These case notes were taken in the normal course of business, as Barber was the social worker responsible for the case file concerning the Agrillo children. The notes were made close to the time of the events they recorded and were, in part, based on Barber's personal knowledge and observations. Thus, we find that Barber's records should have been admitted under the business records exception to the hearsay rule. *See United States v. Ray,* 930 F.2d 1368, 1370 (9th Cir.1990) (testimony of a welfare fraud investigator about the contents of a welfare file was admissible under Rule 803(6)), *cert. denied,* 498 U.S. 1124, 111 S.Ct. 1084, 112 L.Ed.2d 1189 (1991); *see also United States v. King,* 613 F.2d 670 (7th Cir.1980) (social security investigative reports held admissible under Rule 803(6)).

[3] We also conclude that the district court should have admitted Barber's testimony about the use of fire in cult activities that took place on the premises during the Agrillos tenancy because her testimony would have been relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. As a general rule, "[a]ll relevant evidence is admissible." Fed.R.Evid. 402.

Here, Barber was not permitted to testify regarding any personal knowledge she may have had bearing on the second-degree burns allegedly sustained by a woman who claimed to have been burned at the Agrillos' house. Such testimony would have been relevant because it had a tendency to make the existence of the Maleks' theory that the Agrillos were responsible for the fire more probable than it would have been had Barber not testified. Thus, because Barber's testimony was not prejudicial, cumulative, or misleading, *see* Fed.R.Evid. 403, the district court erred in excluding this relevant testimony.

[4] We also find that the district court erred in preventing Barber from testifying about the photographs that Mrs. Agrillo took and sent to the Department of Social Services. Barber's testimony about Mrs. Agrillo's photographs and the photographs themselves would have contradicted the defendants' argument that the Agrillos could not have started the fire because the fire occurred five days after Sheriff Patricola confirmed the house was vacant. Barber's proffered testimony, combined with the photographs, also provided support for the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

Maleks' theory that the Agrillos may have started the fire accidentally during one of their cult activities. The proffered testimony and photographs directly implicated the issues of opportunity and causation as it related to the defendants' arson defense.

### B. *The Sequestering of the Maleks' Expert Witness*

[5] Fed.R.Evid. 615 provides that a district court may sequester witnesses to prevent them from hearing the testimony of other witnesses. Rule 615(3) provides an exception for "a person whose presence is shown by a party to be essential to the *54 presentation of the party's cause." The advisory committee notes specify that the exception contemplates "an expert needed to advise counsel in the management of the litigation." Fed.R.Evid. 615(3) advisory committee notes; *see Trans World Metals, Inc. v. South Wire Co.,* 769 F.2d 902, 911 (2d Cir.1985) (expert allowed to remain in the courtroom for the testimony of the adversary's expert); *see also Morvant v. Construction Aggregates Corp.,* 570 F.2d 626, 630 (6th Cir.) ("where a fair showing has been made that the expert witness is in fact required for the management of the case, and this is made clear to the trial court, we believe that the trial court is bound to accept any reasonable, substantiated representation to this effect by counsel"), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978). We review the district court's evidentiary ruling for abuse of discretion. *Healey v. Chelsea Resources, Ltd.,* 947 F.2d 611, 620 (2d Cir.1991) (district court evidentiary rulings reviewed for abuse of discretion); *see also Morvant,* 570 F.2d at 630 (district court's decision about whether to sequester witness reviewed for abuse of discretion).

The district court did not permit Friedell to remain in the courtroom during Redsicker's testimony even though the Maleks' counsel asserted that Friedell's presence was necessary to assist him in preparing to cross examine Redsicker. The district court concluded that counsel could have prepared his cross examination in advance by using Redsicker's re-

ports submitted before the trial but granted a tenminute recess between the testimony of the two experts to permit the Maleks' expert to confer with counsel.

In *Trans World Metals,* we approved a ruling permitting an expert to remain in the courtroom to hear the testimony of an adversary's expert. In that case, an expert witness was permitted to remain in the courtroom during the direct testimony of the adversary's expert and was later called to rebut the testimony of the adversary's expert. We said:

> [The expert] may well have been entitled to remain pursuant to the exception in Rule 615(3) for a person whose presence is essential to the presentation of a case.... He was not a fact witness whose recollection might have been colored by accounts of prior witnesses.

*Id.* at 911 (citation omitted). Here, Friedell also was not "a fact witness whose recollection might have been colored" by the testimony of other witnesses; rather, he was an expert whose assistance was important to the presentation of plaintiffs' case and who should have been permitted to remain in the courtroom.

Under the circumstances revealed in this case, we find that the district court erred in sequestering Friedell. Our review of the record reveals that Redsicker's testimony differed from his reports: Redsicker testified that the fire was an "intense fire" but did not make that specific finding anywhere in his report. Since this was an important finding bearing on the question of arson and was not made in Redsicker's reports, Friedell's presence in the courtroom was important to the presentation of the Maleks' case, and a ten-minute recess was not an adequate substitute for his presence.

### C. *Impeachment of a Witness Using His Religious Beliefs*

[6] Fed.R.Evid. 610 provides that "[e]vidence of the beliefs or opinions of a witness on matters of re-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

ligion is not admissible for the purpose of showing that by reason of their nature [his] credibility is impaired or enhanced." Over the Maleks' repeated objections, the district court permitted Schneck to respond to defense counsel's questions about whether his transactions with Malek involved other Hasidim, whether he had other Hasidic clients and whether his teaching position was part of the Yeshiva University system.

Because it is apparent from these questions that defense counsel attempted to show that Schneck's character for truthfulness was affected by his religious beliefs and that such questioning may have prejudiced the Maleks, the district court erred in permitting the defendants to pursue this line of questioning. *See Contemporary Mission, Inc. v. Bonded Mailings, Inc.,* 671 F.2d 81, 84 (2d Cir.1982) (affirming district court's refusal to permit questioning of witness' beliefs in the Roman *55 Catholic Church in a breach of contract action because religion was a "collateral, potentially confusing and prejudicial, issue which would perforce have raised a 'religious problem' "). We are particularly troubled about this line of questioning, especially where the impeached witness' religious affiliation is the same as that of the plaintiffs.

### D. *Harmless Error*

[7] Although each of the erroneous evidentiary rulings discussed above, standing alone, may be insufficient to justify reversal, we cannot say that the cumulative effect is harmless. We only will reverse where the improper admission or exclusion of evidence affects "a substantial right" of one of the parties. Fed.R.Evid. 103(a); *see* 28 U.S.C. § 2111 (1988); Fed.R.Civ.P. 61. Making this determination involves an "assessment of the likelihood that the error affected the outcome of the case." *Jordan v. Medley,* 711 F.2d 211, 218 (D.C.Cir.1983) (Scalia, J.) (citing *United States ex rel. D'Agostino Excavators, Inc. v. Heyward Robinson Co.,* 430 F.2d 1077, 1083 (2d Cir.1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971)). In the words of

the Supreme Court: "[I]f one cannot say, with fair assurance ... that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). "Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected ... and the centrality of that issue to the ultimate decision." *Jordan,* 711 F.2d at 219 (citations omitted); *see also Schrand v. Federal Pac. Elec. Co.,* 851 F.2d 152, 157 (6th Cir.1988); *Lataille v. Ponte,* 754 F.2d 33, 37 (1st Cir.1985).

[8][9] In New York, an insurance company defending an action brought by its insured to recover the proceeds of an insurance policy must prove the affirmative defenses of arson and fraudulent misrepresentation by clear and convincing evidence. *See Long Island Ski Ctr., Inc. v. Hartford Fire Ins. Co.,* 121 A.D.2d 368, 502 N.Y.S.2d 800, 801 (2d Dep't 1986) (clear and convincing burden of proof for misrepresentation affirmative defense); *Hutt v. Lumbermens Mut. Casualty Co.,* 95 A.D.2d 255, 466 N.Y.S.2d 28, 30 (2d Dep't 1983) (clear and convincing burden of proof for arson affirmative defense). Although any one of the above evidentiary errors standing alone may have been harmless and would not mandate reversal, the cumulative effect of these errors substantially prejudiced the Maleks' case.

Much of the evidence produced at trial by the defendants to show the presence of arson and misrepresentation was circumstantial. The evidence excluded by the district court was related to the central issues of this case (motive and opportunity), was not cumulative in nature and did not relate to collateral matters. Given the quality of evidence introduced by the defendants and the heightened burden of proof they faced in proving their affirmative defenses, we cannot say with fair assurance that the jury's verdict was not substantially swayed by the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
**(Cite as: 994 F.2d 49)**

exclusion of the Maleks' evidence. Accordingly, the judgment must be reversed.

## CONCLUSION

The judgment of the district court is reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.

McLAUGHLIN, Circuit Judge, dissenting:
My reading of the record differs utterly with the majority's. And on the law I have less than a quarrel, but more than a cavil. More particularly, I disagree with the majority's conclusions that the district judge abused his discretion (1) in excluding evidence from the social worker, (2) in permitting cross-examination of Schneck about his ties to the Hasidic community, and (3) in excluding the Maleks' expert from the courtroom during the testimony of Sea's expert. Reluctantly, I must dissent.

*1. Barber and the Notes.*

Carol Barber, the social worker, was called by plaintiffs to give testimony and to usher *56 into evidence certain notes regarding the Agrillos. The majority refers to the notes as "Barber's case notes," implying that Barber herself made the case notes. The majority states that Barber would also have testified about her personal observations. As I read the record, however, Barber was not the author of the notes and had made no personal observations.

Nowhere in the record did the Maleks' lawyer allege that Barber had recorded the case notes in question or that she would have testified regarding events that she had personally observed. Rather, the record indicates that the Maleks' counsel issued a subpoena for whatever social worker was responsible for the Agrillos' case at the time of trial, and required that individual to produce all of the Department's records "in connection with residents at" the house the Agrillos leased from the Maleks. Transcript of Trial ("Tr.") at 365.

Barber showed up with the records. When the Maleks' counsel, Eugene Farber, sought to question her about the records, Sea's lawyer, Paul Kovner, objected, stating that "[s]he doesn't have any firsthand knowledge of any of this and counsel knows it." Tr. at 366. Judge Gagliardi then examined the records with Barber's help:

THE COURT: Sustained. This is all hearsay in any event. Anything in here of any substance that she can testify to?

MR. FARBER: I believe your Honor, that the social worker did herself observe some of this and I suggest that it's admissible under 803(6).

THE COURT: I don't believe so.

MR. FARBER: May I ask one more question, your Honor, and then if your ruling stands I'll move on.

THE COURT: Very well.

MR. FARBER: Ms. Barber, is there any information that you have personally about cult activity that took place at the premises, specifically involving fire prior to 7/10/9 [sic]?

MR. KOVNER: Objection, your Honor.

THE COURT: Sustained.

MR.FARBER: I'm not asking on the records, your Honor.

THE COURT: Sustained.

MR. FARBER: Do you have any personal knowledge that the children who lived at the residence were taken from their parents, Ms. Barber?

MR. KOVNER: Objection, your Honor.

THE COURT: Sustained. I'm going to ask you to remain. You may step down and we'll get to your situation as soon as we can.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
**(Cite as: 994 F.2d 49)**

Tr. at 366-67.

This colloquy hardly advanced the inquiry as to who made the notes and as to whether Barber had any first-hand knowledge of the case. I have not overlooked Farber's statement that "the social worker did herself observe some of this." *Id.* It is clear from the rest of the record, however, that Farber never meant to claim that Barber had made any personal observations, much less recorded any of the case notes.

When Sea's counsel objected that Barber "doesn't have any firsthand knowledge of any of this and counsel knows it," Farber did not challenge the characterization in any way. Any residual confusion was later dispelled when Farber raised the issue again:

THE COURT: What else do we have with objections and so forth?

MR. FARBER: You sustained exclusion of the entire testimony of the social worker.

THE COURT: Yes.

MR. FARBER: It seems to me, your Honor-

THE COURT: She has no personal knowledge of anything as far as I understood.

MR. FARBER: I don't think she has to, Judge.

THE COURT: She has no personal knowledge.

MR. FARBER: *I'm aware of that. The person who did is in Pennsylvania retired.*

Tr. at 422-23 (emphasis added).

Thus, Mr. Farber finally and candidly conceded that Ms. Barber did not have personal knowledge as to any part of her "entire *57 testimony," and that the social worker who made the records was in Pennsylvania. *Id.* The colloquy then continued as follows:

MR. FARBER: But under Rule 408 [sic. Presumably he meant 803.], your Honor, I think she can testify based upon records kept in the ordinary course of her business.

THE COURT: As to what?

MR. FARBER: Any observations made or things told to a social worker who was actually handling the matter at the time or, your Honor, as to observations which she made and some she did.

Tr. at 423.

In this last colloquy, counsel's artless language fuels the confusion, and demonstrates the perfidy of an unanchored pronoun. The majority may have concluded that the "she" in Farber's final quoted sentence is the same "she" he referred to in his prior or statement to the court, *viz.*, Ms. Barber. However, in the context of the other statements made by Farber, it seems to me that the final "she" was not Barber, but rather "a social worker who was actually handling the matter at the time." This seems the only logical reading, given counsel's concession, made just eight lines earlier in the transcript, that Barber had no personal knowledge as to the matters on which she was about to testify. It is impossible to have made observations, and, yet, to have no personal knowledge of them.

Accordingly, I reject the majority's conclusion that the Maleks proffered Barber to testify on records that she actually made and to testify to events that she actually observed. In reaching this conclusion, I recognize that Farber was twice precluded from asking questions regarding Barber's personal knowledge. However, as noted above, Farber explicitly conceded to Judge Gagliardi later in the trial that Barber had no personal knowledge of the matters to which she was called to testify. Clearly, the Maleks can show no prejudice from this ruling.

Moreover, even if Barber could honestly say that she had personal knowledge of matters occurring at the house before July 10, including cult activity in-

Page 11

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

volving fires, or personal knowledge that the children who lived at the house were taken from their parents, such personal knowledge should not be indiscriminately identified with first-hand knowledge. A person may have personal knowledge of a hearsay declaration; but that does not make it admissible. Barber could have gained personal knowledge (and likely did) from a conversation with the former social worker or from conversations with others.

I believe that the trial judge was well within his rights to conclude that Barber had no first-hand knowledge of this case. Certainly the lawyer who tendered her as a witness failed to demonstrate that she could give admissible evidence, other than testimony to lay the foundation for the admissibility of the case notes as business records.

For sure, Barber, as a social worker, would be competent to shepherd the case notes into evidence under Fed.R.Evid. 803(6). And this remains true, even though she lacked first-hand knowledge of the facts recorded therein. If, as I believe is the case here, her sole contribution to the trial would be to answer the formulaic question of Rule 803(6) (regular course of business to keep records and to make regular entries), the inquiry proceeds to the next step: who made the entries in the record, and did that person have first-hand knowledge?

These entries appear to have been made by the retired social worker who had moved to Pennsylvania before trial. To the extent that the retired social worker had first-hand knowledge of the facts, the records would have been admissible. Unfortunately, plaintiffs' counsel chose to leave the trial record clouded in obscurity on this pivotal issue. And, of course, it was his burden to make an offer of proof that would dissipate the fog. See W.W.W. Pharmaceutical Co. v. Gillette Co., 984 F.2d 567, 574, n. 4 (2d Cir.1993) ("an offer of proof [is] required to preserve evidentiary rulings of exclusion for appeal").

If the retired social worker lacked first-hand know-

ledge, then some other exception to the hearsay rule would have to be invoked to forge an admissible chain of hearsay links. See Gray v. Busch Entertainment Corp., 886 F.2d 14, 15 (2d Cir.1989) (statements of daughter of accident victim to amusement *58 park nurse recorded in first-aid report were not admissible because daughter "in talking with the nurse, was not acting in the regular course of business," and the record of her statement did not fall "within some [other] exception to the hearsay rule"); Cook v. Hoppin, 783 F.2d 684, 690 (7th Cir.1986) (in hospital setting, business records exception encompasses declarants who report to a record-keeper as part of their regular business routine, and does not encompass statements by unidentified declarant who brought patient to the hospital); Yates v. Bair Transport, Inc., 249 F.Supp. 681, 684 (S.D.N.Y.1965) ("it must be borne in mind that there are numerous exceptions to the hearsay rule and that an utterance, while not properly admitted under one exception, may very well be admitted under another"); cf. In re Leon RR, 48 N.Y.2d 117, 122, 421 N.Y.S.2d 863, 867, 397 N.E.2d 374, 377 (1979) (To defeat an objection to multiple-level hearsay in a business record, "not only must the entrant be under a business duty to record the event, but the informant must be under a contemporaneous business duty to report the occurrence to the entrant as well."). Thus, to the extent that the reports included statements made to the retired social worker by individuals not under a business duty to make such statements, plaintiffs did not even suggest an adequate basis to defeat the hearsay objection.

The photographs appended to the reports (and offered to prove that the Agrillos still occupied the house on July 10th, the date of the fire) are particularly troublesome. Of course, it cannot be contended that extraneous documents that are attached to a business record thereby become a part of the record and automatically admissible as such. See United States v. Rosenstein, 474 F.2d 705, 710 (2d Cir.1973). While the majority has adopted the Maleks' appellate representations that the photo-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

graphs were "taken ... by Mrs. Agrillo" and "depicted a container of milk that had not yet reached its expiration date," the sum total of Farber's discussion in the trial record on this point was as follows:

MR. FARBER: The evidence will show that somebody went either the 5th, 6th, or 7th and took pictures in the place and in the place they found a container of Half 'n Half which was still good.

Tr. at 218.

Thus, by the terms of the proffer at trial, the evidence that the milk was still fresh came from the representation of an unnamed person and not from the photograph itself. This underscores the wisdom of Judge Gagliardi's decision to exclude it. *See Saks Int'l, Inc. v. M/V "Export Champion,"* 817 F.2d 1011, 1013 (2d Cir.1987) ("The principal precondition to admission of documents as business records pursuant to Fed.R.Evid. 803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable."); *see also Cook,* 783 F.2d at 689-90 (declarations of unnamed person who brought plaintiff to hospital properly excluded as not within the business records exception). If, as Farber now claims on appeal (but did not mention to the trial court), the photographs were taken by Mrs. Agrillo, it is clear that neither the photographs themselves nor any representations she may have made regarding them were admissible as business records because she was under no business duty to impart such information. I also note the total lack of authentication of the photographs as required by Rule 901.

Focussing solely on the evidence that might properly have been admitted under Rule 803(6)-those parts of the retired social worker's reports based on her first-hand knowledge-I cannot conclude that Judge Gagliardi abused his discretion in excluding even that evidence on relevance grounds. As he succinctly put it, "[t]hese people [referring to the Agrillo family] were out of there, by the testimony in this case, on July 5th,...." Tr. at 423-24. Because

the fire occurred on July 10, the trial judge concluded that testimony about the Agrillos' ceremonial use of fire prior to July 5th was irrelevant.

The majority argues that the photographs and testimony about them "would have been relevant" because such evidence "would have contradicted the defendants' argument that the Agrillos could not have started the fire because the fire occurred five days after" the eviction. Again adopting a representation made in the Maleks' brief (which the Maleks did not make to the trial judge), the majority *59 finds that the pictures were taken "on July 6 or 7, 1989." The trial record, however, reveals that Farber stated that the photographs were taken on "either the 5th, 6th or 7th" of July. Tr. at 218.

Thus, by Farber's own words, the photographs might have been taken on July 5th; and there was no direct evidence proffered that the Agrillos were in the house thereafter. A photograph taken on July 5th depicting continuing residence would prove little because the Agrillos were not evicted until that day. Upon that, everyone agrees. The majority cannot simply accept counsel's representation, made for the first time on appeal, that the photographs were not taken on July 5th. Accordingly, Judge Gagliardi's conclusion that all of Barber's evidence was irrelevant was, in my estimation, eminently reasonable, and certainly no abuse of discretion.

*2. Cross-Examination About Witness's Religious Belief.*

I also disagree with the majority's conclusion that the cross-examination of William Schneck violated Fed.R.Evid. 610. The majority states that "it is apparent from these questions that defense counsel attempted to show that Schneck's character for truthfulness was affected by his religious beliefs...." It is not apparent to me, and, in fact, I disagree. Rather, I believe that the questioning represented a completely legitimate attempt to impeach Schneck by showing that his livelihood depended in large part

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

on his relationship with the Hasidic community, a community of which Mr. Malek was a member. As such, it was an attempt to show bias, which does not violate Rule 610, even where, unlike here, the witness is asked about his religious beliefs and opinions. *See United States v. Teicher*, 987 F.2d 112, 118 (2d Cir.1993) ("The rule proscribes the impeachment of witnesses based upon their religious beliefs. However, inquiry into religious beliefs 'for the purpose of showing interest or bias because of them is not within the prohibition.' ") (citation omitted) (quoting Fed.R.Evid. 610 advisory committee's note).

Sea's counsel opened his cross-examination of Schneck by establishing that he first met Mr. Malek during a business transaction. Sea's counsel also brought out that Schneck had been a radio personality on a local Rockland County, New York station. The following exchange occurred:

Q. What was the target audience of that station?

A. To be honest with you, I don't know. I believe it was a Rockland show.

Q. Was it in the Hasidic community?

A. Not that I know of. It's a radio station that is supposed to go across the complete county. It possibly carries over Dutchess and Orange, I can't speak for it, though. I'm not a technical person in that respect.

Tr. at 389. This exchange was immediately followed by the questioning that appears in the majority's discussion of the religious issue.

It is significant that all the areas discussed, a radio show, commercial transactions, work as a CPA, and teaching, involved Schneck's livelihood. At no point was he asked about his opinions or beliefs. Nor, indeed, was he questioned about what religion he followed. He was queried solely about his livelihood, presumably to demonstrate that he earned his living by service to the Hasidic community. Moreover, when defense counsel seemed to stray

beyond this perimeter by questioning Schneck regarding whether Touro Law School was "affiliated with organized Jewish institutions," Judge Gagliardi sustained an objection, apparently because the question did not pertain specifically to Schneck's relationship to the Hasidic community. Nobody, in short, suggested that Schneck was less credible because of his belief on matters of religion.

Unlike the only case cited in the majority's opinion, *Contemporary Mission, Inc. v. Bonded Mailings, Inc.*, 671 F.2d 81, 84 (2d Cir.1982), the witness here was not subject to "extensive cross-examination ... on the genuineness of his ... [religious] affiliation...." I am aware of no case-and none has been cited-where a Rule 610 violation was found absent direct questions about either the witness's*60 religious beliefs or the witness's opinions on religious beliefs or practices. *Cf. United States v. Kalaydjian*, 784 F.2d 53, 57 (2d Cir.1986) (affirming district court's decision precluding cross-examination about witness's reasons for not swearing on the Koran before testifying); *United States v. Sampol*, 636 F.2d 621, 666 (D.C.Cir.1980) (rejecting appellant's arguments that trial court erred in "refus[ing] to permit counsel ... to cross-examine [witness] about his religious beliefs" where, on voir dire, witness had "testified that he faithfully adhered to the teachings of [a] sect and consulted with spirits of his religion before taking certain actions," but "had no religious beliefs which would cause him to violate his oath to testify truthfully"); *Government of Virgin Islands v. Petersen*, 553 F.2d 324, 326 (3d Cir.1977) (upholding exclusion of testimony from defendant's alibi witness where defense counsel stated that "I would like to get some proof in the record about this [witness]'s beliefs.... about being Rastafarian[ ]").

Because I believe that the evidence here was introduced to show bias, and because such a purpose is clearly permissible under Rule 610, I dissent from the majority's conclusion to the contrary. *See* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence*, ¶ 610[01] at 610-2 (1991). ("Evidence

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

994 F.2d 49, 37 Fed. R. Evid. Serv. 103
(Cite as: 994 F.2d 49)

probative of something other than veracity is not within the prohibition of [Rule 610]. For example, disclosure of affiliation with a church which is a party to the litigation may be admitted as relevant to bias....") (footnote omitted).

Finally, I am puzzled that the majority is "particularly troubled about this line of questioning, especially where the impeached witness' religious affiliation is the same as that of plaintiffs." First of all, there is no evidence that Schneck and Maleks are co-religionists. Secondly, Schneck's religion, as noted above, was never even discussed. Thirdly, the only times that Mr. Malek's religion was brought up, it was by his own counsel. In his opening statement, Farber informed the jury that "Mr. Malek, of course, is a Hasidic [sic] Jew. You can see that readily. And wasn't born in this country. Came here, studied-...." Tr. at 44. At this point, Judge Gagliardi interrupted Farber's opening, because the statement was digressing from the relevant facts of the case. *Id.* Malek was called as the first witness in his own case, and Mr. Farber's first six questions to his client related to Mr. Malek's employment as the executive director of a synagogue. Tr. at 59-60.

### 3. *Sequestering the Expert.*

The majority also faults the trial judge for excluding the plaintiffs' expert (Friedell) from the courtroom during the testimony of Sea's expert (Redsicker). It has been said that the sequestration provision of Rule 615 does not apply to experts. *Trans World Metals, Inc. v. Southwire Co.,* 769 F.2d 902, 911 (2d Cir.1985) (expert permitted to remain because he "was not a fact witness whose recollection might have been colored by accounts of prior witnesses"); *Morvant v. Construction Aggregates Corp.,* 570 F.2d 626, 630 (6th Cir.) ("It is true that an expert witness does not normally testify to his firsthand knowledge of the facts of the particular case and therefore will not be in a position to conform his testimony to that of others even if so inclined."), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978).

The difficulty I have with the majority opinion is that I cannot accept its assertion that Friedell "was not 'a fact witness whose recollection might have been colored' by the testimony of other witnesses." The record clearly indicated that Friedell testified extensively to facts arising from his personal examination of the fire scene. Among other things, he testified that:

"I found immediately upon entering, and I had seen it before that, that in the south portion of the building where the chimney is, that the roof had completely burned off, that the floor on the first floor had burned and collapse had occurred," Tr. at 404;

"inside the building, all sides of all appliances, all parts of the walls were totally blackened and charred," Tr. at 405;

"[t]here was no melting of copper in any hollow tubing anywhere," Tr. at 407; and

"I saw copper tubing which went from a quarter to three eighths diameter which led originally from the propane tanks *61 which were outside the building into the appliances which were inside. Some of it was cut, some of it was severed. All of the copper tubing which I saw both inside and outside the house was in severely damaged condition. But none of it was melted," Tr. at 407-08.

He also testified that he saw no fuses in the house's fuse box, Tr. at 411, and that "[t]here was massive fire damage in that building." Tr. at 414. It strikes me that this factual testimony could easily have been "colored" by Friedell if he had been permitted to hear Redsicker's testimony. *Cf. Morvant,* 570 F.2d at 630 ("the very breadth of the permissible scope of testimony by an expert witness suggests that in some circumstances at least, the trial judge could be justified in holding that his presence in the courtroom was not essential and that his exclusion from the courtroom might in a given case make a more objective and, perhaps, more honest witness out of him").

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Because Redsicker also testified extensively to facts regarding the condition of the house, Tr. at 248-72, the trial court's decision to exclude Friedell during Redsicker's testimony was consonant with the basic thrust of Rule 615, which, in a departure from the common law, makes the exclusion of witnesses mandatory in most circumstances. *See Government of Virgin Islands v. Edinborough,* 625 F.2d 472, 474 (3d Cir.1980) ("The mandatory language of the rule shows that it was intended to change the prior practice under which the trial court had discretion to determine whether a witness should be excluded."). Though a witness should not be excluded under Rule 615 if his presence "is essential to the presentation" of the case, and, had I been the trial judge, I probably would not have excluded Friedell, that hardly ends the inquiry. We may not find error unless the decision to exclude rises to the level of abuse of discretion. I do not believe it does.

I respectfully dissent.

C.A.2 (N.Y.),1993.
Malek v. Federal Ins. Co.
994 F.2d 49, 37 Fed. R. Evid. Serv. 103

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

**H**

United States Court of Appeals,
Second Circuit.
UNITED STATES of America, Appellee,
v.
Joseph JACKSON; Kevin Anthony Richardson;
Ryan O. Ragland; Robert G. Ragland; Abdullah
Muhammad; Michael Elliot; Darnell Gordino; Fre-
deric Mitchell; Dana Gordino; Terry Kierce and
James Moore, Defendants,
Lopez D. Jones, also known as "Donald Lopez
Jones", also known as "Rock", also known as "L",
also known as "Lopez", also known as "Loggie";
Che Collins, Reorn Mark Jones, also known as
"Mark", also known as "Jonesy", also known as
"J", and Michael Barretto, also known as "Chico",
also known as "Suave", and Kevin Blackmon, also
known as "WB", also known as "Waterbed", also
known as "Kev", Defendants-Appellants.
Nos. 158, 159, 143, 160, 163, Dockets 93-1619,
93-1620, 93-1621, 93-1622, 93-1628.

Argued Oct. 14, 1994.
Decided July 14, 1995.

Defendants were convicted in the United States
District Court for the District of Connecticut, Ellen
B. Burns, J., of conspiring to distribute narcotics,
and they appealed. The Court of Appeals, Walker,
Circuit Judge, held that: (1) Sentencing Commis-
sion did not exceed its statutory authority by treat-
ing drug conspiracy conviction as controlled sub-
stance offense for sentencing defendant as career
offender, and (2) any error in exempting three gov-
ernment case agents from sequestration was harm-
less in view of overwhelming evidence in favor of
convictions.

Affirmed.

West Headnotes

**[1] Sentencing and Punishment 350H ⛛1235**

350H Sentencing and Punishment
    350HVI Habitual and Career Offenders
        350HVI(B) Offenses Subject to Enhance-
ment
            350Hk1235 k. Controlled Substance Of-
fenses. Most Cited Cases
        (Formerly 110k1202.2)
Sentencing Commission did not exceed its statutory
authority by including drug conspiracy conviction
as controlled substance offense for sentencing de-
fendant as career offender; Congress manifested its
intent that drug conspiracies and underlying of-
fenses should not be treated differently by imposing
same penalty for narcotics conspiracy conviction as
for substantive offense. Comprehensive Drug Ab-
use Prevention and Control Act of 1970, § 406, 21
U.S.C.A. § 846; 28 U.S.C.A. § 994(a, h); U.S.S.G.
§§ 4B1.1, 4B1.2(2), 4B1.2, comment. (n.1), 18
U.S.C.A.

**[2] Criminal Law 110 ⛛1168(2)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1168 Rulings as to Evidence in Gen-
eral
                110k1168(2) k. Reception of Evidence.
Most Cited Cases
Any error in district court's failure to sequester
from trial three case agents who were present at
government's table during drug conspiracy prosecu-
tion was harmless, since minimal overlap in testi-
mony of agents was not sufficient to prejudice de-
fendants in view of overwhelming evidence presen-
ted in favor of convictions; evidence included testi-
mony of 24 witnesses, tape-recorded intercepted
telephone conversations, narcotics purchased by
undercover agents, narcotics, paraphernalia, and
firearms seized by government, and testimony of
three cooperating defendants, which was corrobor-
ated by other evidence. Fed.Rules Evid.Rule 615,
28 U.S.C.A.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[3] Criminal Law 110 €═665(1)**

110 Criminal Law
    110XX Trial
        110XX(C) Reception of Evidence
            110k665 Separation and Exclusion of Witnesses
                110k665(1) k. Power and Duty of Court. Most Cited Cases
Defendants clearly expressed their wishes to have government witnesses sequestered at trial, though exchange concerning sequestration did not explicitly refer to sequestration rule, where defense counsel moved to have all nonessential witnesses sequestered from courtroom and later stated during trial that case agents should not be sitting at government's table while other witnesses were testifying. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[4] Criminal Law 110 €═665(1)**

110 Criminal Law
    110XX Trial
        110XX(C) Reception of Evidence
            110k665 Separation and Exclusion of Witnesses
                110k665(1) k. Power and Duty of Court. Most Cited Cases
In making ruling on motion to sequester witnesses, district court must exercise discretion, considering as factors whether testimony is critical, whether information is ordinarily subject to tailoring, to what extent testimony of witnesses is likely to encompass same issues as that of other witnesses, order in which witnesses will testify, any potential for bias that might motivate witness to tailor his testimony, and whether witness' presence is essential rather than simply desirable. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[5] Criminal Law 110 €═665(1)**

110 Criminal Law
    110XX Trial
        110XX(C) Reception of Evidence
            110k665 Separation and Exclusion of Witnesses
                110k665(1) k. Power and Duty of Court. Most Cited Cases
There is strong presumption in favor of sequestration of witnesses. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[6] Criminal Law 110 €═665(2)**

110 Criminal Law
    110XX Trial
        110XX(C) Reception of Evidence
            110k665 Separation and Exclusion of Witnesses
                110k665(2) k. Exceptions from Rule. Most Cited Cases
Party opposing sequestration of witness has burden of demonstrating why exception applies and why policy in favor of automatic sequestration is inapplicable in situation; party requesting sequestration should thereafter have chance to demonstrate its necessity. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[7] Criminal Law 110 €═1163(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1163 Presumption as to Effect of Error
                110k1163(1) k. In General. Most Cited Cases
Burden to demonstrate lack of prejudice, or harmless error, properly falls on party that had opposed sequestration of witness. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

**[8] Criminal Law 110 €═1168(2)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1168 Rulings as to Evidence in General
                110k1168(2) k. Reception of Evidence. Most Cited Cases

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

Where case agents have been exempted from sequestration, new trial is in order unless it is manifestly clear from record that error was harmless or unless prosecution proves harmless error by preponderance of evidence. Fed.Rules Evid.Rule 615, 28 U.S.C.A.

*129 Gerald Bodell, Stratford, CT and Timothy P. Pothin, New Haven, CT, for defendant-appellant Lopez D. Jones.

*130 William F. Tiernan, New Haven, CT, for defendant-appellant Che Collins.

William B. Barnes, Fairfield, CT (Rosenstein & Barnes, Fairfield, CT), for defendant-appellant Reorn Mark Jones.

Frank J. Riccio, Bridgeport, CT, for defendant-appellant Michael Barretto.

Vito A. Castignoli, Milford, CT, for defendant-appellant Kevin Blackmon.

Christopher F. Droney, U.S. Atty., New Haven, CT, Anthony E. Kaplan, Peter D. Markle, H. Gordon Hall, Asst. U.S. Attys., David P. Gold, Sr. Asst. U.S. Atty., for appellee.

Before NEWMAN, Chief Judge, WALKER, and CALABRESI, Circuit Judges.

WALKER, Circuit Judge:

Five defendants-appellants appeal their judgments of conviction and sentences following a jury trial in the United States District Court for the District of Connecticut (Ellen Bree Burns, *District Judge* ). Their appeal involves a series of challenges commonly brought in drug conspiracy appeals, "the disposition of which will have little precedential import." *United States v. Rodriguez,* 943 F.2d 215, 216 (2d Cir.1991) (limiting opinion to single issue of precedential import). We write this opinion to address two issues of first impression: 1) whether the United States Sentencing Commission exceeded its statutory authority in treating a drug conspiracy conviction as a predicate for sentencing a defendant as a career offender pursuant to U.S.S.G. § 4B1.1; and 2) whether Federal Rule of Evidence 615, which requires sequestration of witnesses except in three limited circumstances, exempts from sequestration no more than one government case agent under each exception.

## BACKGROUND

Appellants Lopez Jones, Reorn Mark Jones, Michael Barretto, Che Collins, and Kevin Blackmon were among sixteen people indicted following a lengthy investigation of the "Jungle Boys" drug gang in New Haven, Connecticut. All five were tried by a jury and convicted of conspiring to distribute narcotics in violation of 21 U.S.C. § 846. Lopez and Reorn Jones were also convicted as supervisors of a continuing criminal enterprise under 21 U.S.C. § 848. In addition, Reorn Jones was found guilty of acting as an accessory in the sale of cocaine, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and as an accessory in the sale of cocaine within 1000 feet of a school, 21 U.S.C. §§ 841(a)(1), 860 and 18 U.S.C. § 2. Collins was convicted of the sale of cocaine, 21 U.S.C. § 841(a)(1), and the distribution of cocaine within 1000 feet of a school, 21 U.S.C. §§ 841(a)(1), 860, as well as conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846.

As a career offender, Blackmon was sentenced to 292 months imprisonment. Reorn Jones and Collins each received a 292-month term of incarceration, while Lopez Jones and Barretto were sentenced to 328 and 168 months, respectively. The five defendants each received five years of supervised release as well as the obligatory assessments.

While the appellants present a number of challenges to their convictions and/or sentences, we limit our discussion to the career offender and Rule 615 issues, which were raised by four of the five appellants. We have considered the remaining

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

Page 4

claims of the defendants-appellants, and we find them to be without merit.

## DISCUSSION

### I. Career Offender Sentence

[1] Blackmon challenges his sentence as a career offender on the ground that a prior drug conspiracy conviction cannot be a predicate for career offender status. We find this argument to be without merit.

The Sentencing Guidelines describe three criteria for sentencing a defendant as a career offender:

(1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony *131 convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1. A "controlled substance offense" includes any "offense under a federal or state law prohibiting the manufacture, import, export, distribution, or dispensing of a controlled substance ... or the possession of a controlled substance ... with intent to manufacture, import, export, distribute, or dispense." U.S.S.G. § 4B1.2(2). Application Note 1 broadens the definition to include "the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."

In this case, Blackmon was over eighteen years of age and had two prior convictions, one for manslaughter and one for assault in the second degree with a firearm. As a result, he satisfied the first and third elements of § 4B1.1, a fact that Blackmon does not contest. Because he was convicted of conspiracy to distribute a controlled substance, Judge Burns found that he fulfilled the second element as well and sentenced him as a career offender. The sole issue for decision therefore is whether the term "controlled substance offense" includes a drug con-

spiracy conviction.

In claiming that it does not, Blackmon does not challenge the application of the Sentencing Guidelines; Judge Burns clearly followed the explicit language of the guidelines and commentary. Instead, Blackmon argues that the Sentencing Commission exceeded its statutory mandate under 28 U.S.C. § 994(h) by including drug conspiracies as controlled substance offenses.

We begin by noting that even though the broadened definition of "controlled substance offenses" articulated in the commentary does not appear in an actual guideline, it is binding authority. Commentary "that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States,* 508 U.S. 36, ----, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993); *see also* U.S.S.G. § 1B1.7 (Failure to follow commentary that interprets or explains the application of a guideline "could constitute an incorrect application of the guidelines, subjecting the sentence to possible reversal on appeal."). Application Note 1 is authoritative because it interprets and explains § 4B1.2 by listing offenses that constitute "controlled substance offenses" and "crimes of violence." *See Stinson,* 508 U.S. at ----, 113 S.Ct. at 1920 (finding commentary to § 4B1.2, which stated that "the offense of unlawful possession of a firearm by a felon" was not a "crime of violence," to be interpretive and therefore authoritative). As we explain below, this interpretation is not inconsistent with, let alone a violation of, 28 U.S.C. § 994(h) or any other statute. Consequently, the commentary is binding authority.

In challenging the Sentencing Commission's authority to promulgate Application Note 1, Blackmon relies principally on *United States v. Price,* 990 F.2d 1367 (D.C.Cir.1993), the first case to address this issue. In *Price,* the D.C. Circuit focused on the Commission's explicit statement in the Background Commentary to Ch. 4, Pt. B that 28 U.S.C. § 994(h) mandated the adoption of the career of-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

fender guideline. Although the court recognized that the Commission's enabling legislation, 28 U.S.C. § 994(a), gave it discretionary authority to establish guidelines for the determination of sentences, it noted the Commission's failure to state expressly that its promulgation of Ch. 4, Pt. B was based on § 994(a). As a result, the D.C. Circuit concluded that the sole authority for the guideline provisions of that part came from § 994(h). *Id.* at 1369.

The *Price* court then found that 28 U.S.C. § 994(h) provided no authority to include drug conspiracies as predicates for a controlled substance offense. Section 994(h), in spelling out the authority for career criminal sentences for offenders convicted of a felony that is a crime of violence or a controlled substance offense, defines a controlled substance offense as those "described in" 21 U.S.C. §§ 841, 952(a), 955, 955a, and 959, none of which is a conspiracy offense. 28 U.S.C. §§ 994(h)(1)(B), (2)(B); *Price,* 990 F.2d at 1368-69. The court distinguished between conspiracies and their underlying substantive crimes on the basis that a conspiracy "requires only the meeting of the conspirators' minds, plus an overt act that *132 need not itself be in any way criminal." *Id.* at 1369. Based in part on this distinction, the court concluded that the list of offenses "described in" § 994(h) was exclusive and that Application Note 1 was beyond the Commission's statutory authority. *Id.*

Since the *Price* decision, a majority of the circuits to consider the question have rejected *Price. See United States v. Williams,* 53 F.3d 769, 772-73 (6th Cir.1995); *United States v. Weir,* 51 F.3d 1031, 1031 (11th Cir.1995); *United States v. Piper,* 35 F.3d 611, 618 (1st Cir.1994), *cert. denied,* 513 U.S. 1158, 115 S.Ct. 1118, 130 L.Ed.2d 1082 (1995); *United States v. Kennedy,* 32 F.3d 876, 888 (4th Cir.1994), *cert. denied,* 513 U.S. 1128, 115 S.Ct. 939, 130 L.Ed.2d 883 (1995); *United States v. Damerville,* 27 F.3d 254, 257 (7th Cir.), *cert. denied,* 513 U.S. 972, 115 S.Ct. 445, 130 L.Ed.2d 355 (1994); *United States v. Hightower,* 25 F.3d 182, 187 (3d Cir.), *cert. denied,* 513 U.S. 952, 115

S.Ct. 370, 130 L.Ed.2d 322 (1994); *United States v. Allen,* 24 F.3d 1180, 1186 (10th Cir.), *cert. denied,* 513 U.S. 992, 115 S.Ct. 493, 130 L.Ed.2d 404 (1994); *United States v. Heim,* 15 F.3d 830, 831 (9th Cir.), *cert. denied,* 513 U.S. 808, 115 S.Ct. 55, 130 L.Ed.2d 14 (1994). Only the Fifth and Eighth Circuits have followed the D.C. Circuit's decision. *United States v. Mendoza-Figueroa,* 28 F.3d 766, 767-68 (8th Cir.1994) (opinion vacated, rehearing en banc granted); *United States v. Bellazerius,* 24 F.3d 698, 701 (5th Cir.), *cert. denied,* 513 U.S. 954, 115 S.Ct. 375, 130 L.Ed.2d 326 (1994). We join those circuits that have parted company with *Price* and hold that Application Note 1 was fully authorized.

First, we do not believe that the sole basis for the Commission's authority to devise the career offender guidelines stems from 28 U.S.C. § 994(h). It seems to us quite plain that § 994(a) also provides such authority. As the introductory commentary in the Sentencing Guidelines makes clear, the "guidelines and policy statements promulgated by the Commission are issued pursuant to Section 994(a) of Title 28, United States Code." U.S.S.G. Ch. 1, Pt. A, intro. comment. n. 1; *see also Damerville,* 27 F.3d at 257. We do not interpret the Commission's specific reference to § 994(h) in the Background Commentary to Ch. 4, Pt. B to preclude reliance on § 994(a) as authority to promulgate that part. *See Weir,* 51 F.3d at 1032; *Kennedy,* 32 F.3d at 888; *Damerville,* 27 F.3d at 257; *Allen,* 24 F.3d at 1186-87. Certainly nothing in the commentary or guidelines suggests that the Commission treated § 994(h) as "the sole legal authority for promulgating the career offender guidelines." *Heim,* 15 F.3d at 832; *see also Hightower,* 25 F.3d at 186. Instead, we view the reference to § 994(h) as suggesting an additional, rather than an exclusive, basis of authority.

Even if § 994(h) were the sole authority relied upon for Ch. 4, Pt. B, however, we do not interpret the statute and its legislative history as imposing an exclusive list of offenses that would subject a defend-

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

ant to a career offender sentence. Section 994(h) simply provides a list of offenses that subject an offender to a sentence at or near the maximum if other criteria are met. Nothing in the statute indicates that such an enhancement applies only to those listed offenses. *See Hightower,* 25 F.3d at 187 (Section 994(h) "does not define the *only* crimes for which the commission may specify a sentence at or near the maximum; it merely declares that the enumerated crimes must be so treated." (quotation omitted)). In fact, the legislative history is quite to the contrary. Congress intended that subsection 994(h)(2) be treated as a floor, not a ceiling, for the types of offenses for which the Commission should specify sentences near the maximum. *See Heim,* 15 F.3d at 832. For example, the Senate Report states that "subsections (h) and (i) are not necessarily intended to be an exhaustive list of types of cases in which ... terms at or close to authorized maxima should be specified." S.Rep. No. 225, 98th Cong., 2d Sess. 176 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3359; *see also Piper,* 35 F.3d at 618; *Kennedy,* 32 F.3d at 889; *Hightower,* 25 F.3d at 185; *Allen,* 24 F.3d at 1187.

Finally, in concluding that the promulgation of Application Note 1 was within the Commission's authority, we accept the *Price* court's observation that conspiracies involve "quite different elements from [the] substantive crime." *See Price,* 990 F.2d at 1369. *133 Nevertheless, we find it more relevant that Congress has manifested its intent that drug conspiracies and underlying offenses should not be treated differently: it imposed the same penalty for a narcotics conspiracy conviction as for the substantive offense. *See* 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."); *see also Damerville,* 27 F.3d at 257. Our view is fully consistent with the purpose behind § 994(h) to impose "substantial prison terms ... on repeat violent offenders and repeat drug traffickers," S.Rep. No. 225, 98th Cong.,

2d Sess. 175 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3358. *See Kennedy,* 32 F.3d at 889 (noting that by "including conspiracy as a career offender offense, the Commission ensured that persons engaged in a collective drug distribution scheme would receive the same treatment as individual violators of similarly serious drug trafficking laws"). For these reasons, we conclude that both 28 U.S.C. §§ 994(a) and 994(h) vested the Commission with authority to expand the definition of "controlled substance offense" to include aiding and abetting, conspiring, and attempting to commit such offenses. *See* U.S.S.G. § 4B1.2, comment. n. 1.

While, until now, we have not set forth our reasoning on this issue, we note that two of our prior decisions in the area are in accord with our holding today. First, in *United States v. Whitaker,* 938 F.2d 1551 (2d Cir.1991), *cert. denied,* 502 U.S. 1076, 112 S.Ct. 977, 117 L.Ed.2d 141 (1992), we found, without comment, that drug conspiracy convictions pursuant to 21 U.S.C. §§ 846 and 963 qualify as controlled substance offenses. *Id.* at 1552-53. Second, in *United States v. Liranzo,* 944 F.2d 73 (2d Cir.1991), we held that criminal facilitation of the sale of cocaine did not constitute a controlled substance offense because facilitation was not listed in Application Note 1 as a basis for a career offender enhancement and unlike conspiracy or attempt, facilitation does not require a finding of intent to commit the underlying substantive offense. *Id.* at 78-79.

Accordingly, we confirm the statutory authority underlying Application Note 1 to § 4B1.2 and affirm Blackmon's enhanced sentence as a career offender.

## II. Sequestration of Witnesses

[2] Appellant Lopez Jones joins appellants Collins and Barretto, both arguing *pro se,* in claiming that Judge Burns violated Federal Rule of Evidence 615 in failing to sequester from the trial the three case agents who were present at the government's table.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

Rule 615 requires the trial court, at "the request of a party [to] order witnesses excluded so that they cannot hear the testimony of other witnesses." The rule, however,

does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

Rule 615 codified a well-established common law tradition of sequestering witnesses "as a means of discouraging and exposing fabrication, inaccuracy, and collusion." Fed.R.Evid. 615, Advisory Committee Notes; *see also Government of the Virgin Islands v. Edinborough,* 625 F.2d 472, 475, 476 (3d Cir.1980); *Frideres v. Schiltz,* 150 F.R.D. 153, 158 (S.D. Iowa 1993) (noting that "[s]equestering witnesses to assist in ascertaining truth is at least as old as the Bible"). The Supreme Court observed that this practice, which goes back to "our inheritance of the common Germanic law," serves two purposes: it "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid." *Geders v. United States,* 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976).

In this case, Barretto's counsel moved to have "all nonessential witnesses ... sequestered from the courtroom." Lopez Jones's and Collins's counsel joined in the motion. The former added his concerns that in addition to Agent Kline, who was the designated case agent, Agent Williams and Officer Detective*134 Kendall would be sitting at the government's table. Any ambiguity as to whether Lopez Jones's counsel was concerned with the agents' presence at the table or in the courtroom was resolved by his statement that Agent Williams and Officer Kendall "shouldn't be sitting there while all the other witnesses are testifying." The government responded by noting that Detective Kendall, Special Agent Williams, and Special Agent Kline were all case agents. Stressing the complexity of the case, the government made clear that the agents were needed because there "is a voluminous amount of evidence and electronic equipment to control." To downplay the risks that the witnesses would influence each other's testimony, the government pointed out that the three witnesses would be "in and out of the courtroom." It did, however, concede that "[w]e have no problem as to a sequestration order as to those three individuals." Reorn Jones's counsel accepted the need for one government case agent, but objected to the argument that more than one was necessary, "even in a case of this size." Thereafter, the district court overruled the objections without comment.

[3] The government now argues that Lopez Jones raised the Rule 615 claim for the first time on appeal. Collins and Barretto raised this claim *pro se* after the government filed its brief, and the government did not address this issue in its supplemental brief. Therefore, it is not apparent whether the government believes that Collins and Barretto failed to raise the Rule 615 argument below. In any event, even though the exchange concerning sequestration did not explicitly refer to Rule 615, the defendants clearly expressed their wishes to have the government witnesses sequestered. Thus, we reject the government's position and find that a proper motion was made below.

In asserting that the district court erred, the appellants rely on the reasoning of other circuits that the government may only exempt one agent for each subprovision of Rule 615. *See United States v. Pulley,* 922 F.2d 1283, 1286 (6th Cir.) (allowing exemption of only one agent under 615(2) and one agent under 615(3)), *cert. denied,* 502 U.S. 815, 112 S.Ct. 67, 116 L.Ed.2d 42 (1991), *United States v. Farnham,* 791 F.2d 331, 335 (4th Cir.1986). This Circuit has not yet addressed whether more than one agent may be exempted pursuant to each subprovision of Rule 615. We have only noted in dicta that two agents could appropriately be exempted from the Rule, one under the second subprovision and the other under the third. *United States v.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

*Rivera,* 971 F.2d 876, 889-90 (2d Cir.1992).

One might interpret the language of Rule 615, as well as the advisory notes, as suggesting that the drafters contemplated the exemption of only one person for each subprovision. For example, the exemptions in the Rule are described in the singular and the advisory notes discuss the government's frequent use of "*a police officer*" or "*an investigative agent*" to assist with its case. Fed.R.Evid. 615, Advisory Committee Notes (emphasis added); *cf. Pulley,* 922 F.2d at 1286 (finding no reason to "convert the singular into the plural" in interpreting Rule 615). Nevertheless, we would be reading the language too narrowly to assume that the use of the singular implies that the drafters intended to allow only one exemption per provision. The Rule and the Notes say nothing further to indicate that, in a case in which two agents are "essential to the presentation of the party's cause," for example, only one could be exempt from the opposing party's request to sequester the agents.

While we would expect it to be the rare case when a district judge exempts more than one witness under a particular subprovision of Rule 615, we hold that a district court judge has discretion to do so. The advisory notes to Rule 615 do state that the Rule treats the matter of sequestration as "one of right," as opposed to being "committed to the [trial judge's] discretion." Although we interpret this, consistent with the Rule's use of the word "shall," to require the sequestration of witnesses upon a party's request, we read the caselaw to provide the judge with discretion in determining whether the witness in question falls within one of the Rule 615 exemptions. *See United States v. Payan,* 992 F.2d 1387, 1394 (5th Cir.1993) (The trial judge has discretion to determine how many witnesses may be excused from sequestration.);*135 *Rivera,* 971 F.2d at 889 ("It is within a trial court's discretion to exempt the government's chief investigative agent from sequestration...."). Because the Rule does not expressly limit to one the number of exemptions per provision, we conclude that this discretion extends to deciding whether, in a particular case, more than one witness should be exempt under a particular subprovision.

[4] In making a Rule 615 ruling, a district court must exercise discretion, and among the factors that might usefully inform the exercise of such discretion are: 1) how critical the testimony in question is, that is, whether it will involve controverted and material facts; 2) whether the information is ordinarily subject to tailoring, *see United States v. Prichard,* 781 F.2d 179, 183 (10th Cir.1986) (Testimony regarding "simple objective facts" is "ordinarily not subject to tailoring, and, if it were, it could have been exposed easily."), such that cross-examination or other evidence, *cf. United States v. Womack,* 654 F.2d 1034, 1040-41 (5th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982), could bring to light any deficiencies; 3) to what extent the testimony of the witness in question is likely to encompass the same issues as that of other witnesses, *see Pulley,* 922 F.2d at 1286-87; 4) the order in which the witnesses will testify, *see id.* at 1286; 5) any potential for bias that might motivate the witness to tailor his testimony, *see United States v. Agnes,* 753 F.2d 293, 307 (3d Cir.1985) (Sequestration found proper when government feared defendant's girlfriend would have both the ability and motive to modify her testimony in favor of defendant.); and 6) if the court is considering exempting the witness from sequestration under Rule 615(3), whether the witness's presence is "essential" rather than simply desirable.

[5][6] Because a court may only decline to grant a party's request to sequester particular witnesses under one of the Rule 615 exemptions, the rule carries a strong presumption in favor of sequestration. The party opposing sequestration therefore has the burden of demonstrating why the pertinent Rule 615 exception applies, *Edinborough,* 625 F.2d at 474, and "why the policy of the Rule in favor of automatic sequestration is inapplicable in that situation," *id.* at 476. The party requesting sequestration should thereafter have a chance to demonstrate

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

its necessity. *Id.* Such an exchange affords the court full opportunity to consider the competing interests and, if it denies the motion, to explain the factors it considered in reaching its decision. *Id.*

In this case, the record is scant as to why the presence of more than one agent was essential. The government expanded the usual request by asking that three rather than one case agent remain in the courtroom. It sought to meet the requirement of Rule 615(3) by pointing out that the case was complex and that there was a "voluminous amount of evidence and electronic equipment to control." The prosecutor also sought to minimize the significance of the agents' remaining in the courtroom by assuring the trial judge that the agents would be "in and out of the courtroom."

The district court made no explicit finding as to whether these reasons alone justified the conclusion that more than one case agent was "essential to the presentation of the party's cause" pursuant to Rule 615(3). Instead, the court merely overruled the objections. It would have been helpful to our review of the Rule 615 issue if the trial judge had articulated the basis for the exercise of her discretion. We are skeptical as to whether the reasons advanced by the government are sufficient to support the lower court's ruling. For example, we doubt that simply the voluminousness of the evidence and the amount of electronic equipment to be used would normally justify such a ruling. Except in unusual circumstances, it would seem that when the government requires more assistance than a single case agent could provide, non-witness personnel could generally be employed to help operate equipment and handle the evidence. In those cases, it would be up to the government to make some showing of a need to use the additional agents it planned to call as witnesses for those administrative tasks in the courtroom. In this case, however, we need not decide whether the judge acted within her discretion since we believe that, for the reasons discussed below, reversal*136 would not be required, even if she abused her discretion.

This Circuit has not yet articulated the appropriate test for determining whether a Rule 615 violation amounts to reversible error. Recently, we have suggested in dicta that the harmless error standard applies. *See Rivera,* 971 F.2d at 890 ("[E]ven when a proper request has been made and a trial court has erred [under Rule 615], courts have ruled that not even Rule 52(a) harmless error, much less Rule 52(b) plain error, occurred."). Sister circuits exploring this issue agree that the appellate court must consider whether the party moving for sequestration was prejudiced by the error. *See, e.g., United States v. Ramirez,* 963 F.2d 693, 704 (5th Cir.), *cert. denied,* 506 U.S. 944, 113 S.Ct. 388, 121 L.Ed.2d 296 (1992); *Pulley,* 922 F.2d at 1286; *United States v. Conners,* 894 F.2d 987, 991 (8th Cir.1990); *United States v. Brewer,* 947 F.2d 404, 411 (9th Cir.1991); *Farnham,* 791 F.2d at 335; *Prichard,* 781 F.2d at 183; *Edinborough,* 625 F.2d at 474. The circuits differ, however, as to who has the burden on the issue of prejudice. The majority of courts to consider this question requires the movant to show that the failure to sequester resulted in prejudice. *See, e.g., United States v. Sykes,* 977 F.2d 1242, 1245 (8th Cir.1992); *Prichard,* 781 F.2d at 179; *Edinborough,* 625 F.2d at 474.

A few courts reject this approach, however, and apply the harmless error test, placing the burden on the government to prove that failure to sequester was harmless, i.e., that it did not prejudice the movant. *See, e.g., Pulley,* 922 F.2d at 1286; *Farnham,* 791 F.2d at 335. *But see United States v. Greschner,* 802 F.2d 373, 376 (10th Cir.1986) (applying harmless error analysis, yet putting burden on defendant to establish burden was prejudicial), *cert. denied,* 480 U.S. 908, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987). These courts reason that a violation of Rule 615 should be presumed to result in prejudice, thereby requiring reversal unless the presumption is rebutted. *See Brewer,* 947 F.2d at 411 (" '[W]hen a court fails to comply with Rule 615, prejudice is presumed and reversal is required unless it is manifestly clear from the record that the error was harmless or unless the prosecution proves

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

harmless error by a preponderance of the evidence.' ") (quoting *United States v. Ell*, 718 F.2d 291, 293-94 (9th Cir.1983)). According to this rationale, any other approach places an unreasonable, even impossible, burden on the defendant. For example, the Fourth Circuit interprets

the mandatory, unambiguous language of the rule to reflect the drafters' recognition that any defendant [claiming there was a Rule 615 violation] would find it almost impossible to sustain the burden of proving the negative inference that the second agent's testimony would have been different had he been sequestered. A strict prejudice requirement of this sort would be not only unduly harsh but also self-defeating, in that it would swallow a rule carefully designed to aid the truth-seeking process and preserve the durability and acceptability of verdicts. Rule 615 thus reflects an *a priori* judgment in favor of sequestration, and the exceptions should be construed narrowly in favor of the party requesting sequestration.

*Farnham*, 791 F.2d at 335.

[7][8] We believe the correct view is that the burden to demonstrate lack of prejudice, or harmless error, properly falls on the party that had opposed sequestration.[FN*] First, we agree that placing the burden of persuasion on the movant virtually demands the impossible; only with 20/20 hindsight could a party demonstrate what would have been said had a witness been sequestered. Moreover, placing the harmless error burden on the party that had opposed sequestration is consistent with Rule 615's express presumption in favor of sequestration. Thus, we hold that where *137 case agents have been exempted in violation of Rule 615, a new trial is in order "unless it is manifestly clear from the record that the error was harmless or unless the prosecution proves harmless error by a preponderance of the evidence." *Brewer*, 947 F.2d at 411 (quoting *Ell*, 718 F.2d at 293-94).

FN* We note that at first glance *United States v. Pellegrino*, 470 F.2d 1205 (2d Cir.1972), *cert. denied*, 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973), might be read to suggest the contrary. There we held that in allowing an FBI agent, who was the last witness to be called, to sit at the prosecution table during the trial, the trial court did not abuse its discretion. Part of our holding was based on the fact that "[n]o showing of prejudice flowing from the order of Government's proof [was] made by appellants." *Id.* Even so, we do not find *Pellegrino* instructive here since our decision was not based on Rule 615 and the exclusion of a single agent from sequestration does not generally constitute error under Rule 615.

Applying this analysis, we conclude that the case before us "is the exceptional case because the facts are such that any presumption of prejudice is rebutted." *Farnham*, 791 F.2d at 336. Even without the testimony of the three agents, the evidence presented in favor of the convictions was overwhelming. The evidence adduced included testimony of twenty-four witnesses and a large number of exhibits such as seventy-five tape-recorded intercepted telephone conversations; narcotics purchased by undercover agents; narcotics, narcotics paraphernalia, and firearms, all seized by the government; video and photographic surveillance; and documentary evidence. Particularly compelling was the testimony of three cooperating defendants-Joseph Jackson, Michael Elliot, and Kevin Richardson-which was fully corroborated by the intercepted telephone conversations and other evidence. All three cooperating defendants testified as to Lopez Jones's leadership role. In addition, Michael Elliot testified as to Barretto's participation in the drug conspiracy, which was corroborated by another witness and by intercepted calls from Barretto. Finally, an undercover purchase of cocaine from Collins, surveillance photographs, Kevin Richardson's testimony, and intercepted conversations, in which Collins participated concerning his provision of cocaine to the Jungle Boys' operation, all supported

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

60 F.3d 128, 42 Fed. R. Evid. Serv. 904
(Cite as: 60 F.3d 128)

Collins's guilty verdict.

Furthermore and significantly, there was virtually no overlap in the testimony of the agents and other witnesses, except in one noted instance. *See Pulley,* 922 F.2d at 1286-87. Over the course of the trial, Agent Williams testified about the background of the investigation, the means of intercepting the conversations, a search related to Collins's arrest, and fifteen intercepted telephone conversations. Detective Kendall testified as to the preparation of the transcript of the intercepted telephone conversations, an overview of the complex in which the Jungle Boys were located, the arrest of Joseph Jackson, a number of search warrants, and twelve intercepted phone calls. Agent Kline's testimony was limited to one intercepted conversation and a portion of the surveillances. One of the surveillances was related to a phone conversation about which Agent Williams also testified. However, at the government's request, Agent Kline was excused when Agent Williams testified on the subject. Finally, the testimony of the three cooperating defendants concerned various intercepted conversations.

The parties have only identified one notable overlap in all of this testimony. Both Agent Williams and Detective Kendall identified the voice of one of the participants in a particular intercepted telephone conversation as Lopez Jones, whereas cooperating defendant Richardson could not identify the voice as that of Jones. In our view, this minimal overlap is insufficient in the context of the remaining evidence supporting the convictions to constitute prejudice to the defendants. Consequently, we find that the Rule 615 error was harmless.

## CONCLUSION

The judgment of the district court is affirmed.

C.A.2 (Conn.),1995.
U.S. v. Jackson
60 F.3d 128, 42 Fed. R. Evid. Serv. 904

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.