**BROWN RUDNICK LLP**
7 Times Square
New York, New York 10036
(212) 209-4800
Edward S. Weisfelner (EW-5581)

One Financial Center
Boston, MA 02111
(617) 856-8200
Jeffrey L. Jonas (JJ-5670)
James W. Stoll (JS-5931)
Gregory T. Arnold (GA-2147)

*Counsel to the Ad Hoc Committee Of Tort Victims*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| QUIGLEY COMPANY, INC., | : | Case No. 04-15739 (SMB) |
| | : | |
| Debtors. | : | |

----------------------------------------------------------X

**PROPOSED FINDINGS OF FACT OF THE AD HOC COMMITTEE OF TORT
VICTIMS IN OPPOSITION TO THE QUIGLEY COMPANY, INC. FOURTH
AMENDED AND RESTATED PLAN OF REORGANIZATION UNDER CHAPTER 11
OF THE BANKRUPTCY CODE (AS MODIFIED AS OF MARCH 28, 2008)**

**Table of Contents**

Page

I. QUIGLEY WAS NOT AN OPERATIONAL ENTITY WHEN PFIZER DECIDED TO SEEK A QUIGLEY BANKRUPTCY FILING TO OBTAIN THE CHANNELING INJUNCTION AND QUIGLEY WILL NOT BE A GOING CONCERN EMERGING FROM BANKRUPTCY CAPABLE OF PROVIDING EVERGREEN FUNDING TO THE ASBESTOS PI TRUST. ........................................ 1

A. QUIGLEY WAS NOT AN OPERATIONAL ENTITY WHEN PFIZER DECIDED TO SEEK A QUIGLEY BANKRUPTCY FILING TO OBTAIN THE CHANNELING INJUNCTION. ............................ 1

i. Quigley's Operating History (1916-1992) ............................................................. 1

ii. Quigley Continues As A Shell, Dominated And Controlled By Pfizer (1992-2003) .......... 2

iii. Pfizer Changes The Composition Of The Quigley Board To Implement Its Global Strategy (2003-2004). ......................................................................... 4

iv. Pfizer Transfers the CHU To Quigley in an attempt to satisfy the Bankruptcy Code. ........ 5

v. Quigley Seeks To Establish Its "Independence." ................................................. 8

B. QUIGLEY WILL NOT BE A GOING CONCERN EMERGING FROM BANKRUPTCY CAPABLE OF PROVIDING EVERGREEN FUNDING TO THE ASBESTOS PI TRUST. ............................................ 9

i. Quigley's Purported Post-Confirmation Business Consists Solely Of Processing Its Own Asbestos Liability And That Of Its Parent Company. ....................................... 11

ii. Quigley Has No Operating History From Which Any Reasonable Inference Can Be Drawn That It Will Be Profitable As It Has Lost Millions Of Dollars Operating Under The Shared Services Agreement It Entered With Pfizer. ...................................... 12

iii. The Asbestos PI Claims Services Agreement Is Not The Result Of An Arms-Length Negotiation, But Is Being Forced Upon The Asbestos PI Trust At Above-Market Rates In Order To Give Reorganized Quigley A Reason To Exist. ................................ 14

iv. The Pfizer Claims Services Agreement Is Not The Result Of An Arms-Length Negotiation, But Is Merely A Means By Which Pfizer Is Attempting To Back-Fill A "Revenue" Source To Reorganized Quigley In An Effort To Make It Appear Viable For A Few Years Following Confirmation. ............................................................. 16

v. By Quigley's Own Projections And Admissions, Absent Attracting Third-Party Business, It Will Not Survive Beyond At Most 5 Years. ........................................... 17

vi. It Is Pure Speculation To Assume That Quigley Will Obtain The Third-Party Business That It Admits It Needs To Survive Once Pfizer's Financial Support Runs Out. .......................................................................................... 20

a. No Evidence That Quigley Similar To Successful Competitors .............................. 21

b. No Evidence That Quigley Could Enter An Accessible Third-Party Claims Handling Market. .......... 22

c. No Evidence Of Strategic Alliances. ............................................................. 25

d. Pure Speculation To Conclude That Quigley Will Obtain Third-Party Claims Handling Business And Be An Ongoing Business. ............................................................................... 25

II. PFIZER'S VOTE BUYING SCHEME RENDERS THE VOTE ILLEGITIMATE AND UNRELIABLE. ...... 26

A. PFIZER ENTERED INTO THE PFIZER SETTLEMENT AGREEMENTS TO LOCK-UP THE QUIGLEY VOTE. ........................................................................................ 32

B.  THE PFIZER SETTLEMENT AGREEMENTS INTENDED TO LOCK UP A 75% AFFIRMATIVE
    VOTE IN QUIGLEY'S BANKRUPTCY. ................................................................... 35
    i.   Vote Recommendation Requirement. ................................................................ 35
    ii.  Payment Conditioned On Binding Settlements With 75%. ................................. 37
    iii. No Obligation To Pay If Less Than 75% Vote In Favor. ................................... 37
    iv.  Right To Terminate. .......................................................................................... 39
C.  OTHER SETTLEMENT PROVISIONS REQUIRE PLAINTIFF COUNSEL TO OTHERWISE SUPPORT
    PFIZER'S EFFORTS TO OBTAIN THE 524(G) CHANNELING INJUNCTION. ....................... 39
    i.   Best Efforts/Cooperation Requirement. ............................................................ 40
    ii.  The Automatic Stay Support Provision. ............................................................ 41
    iii. The Injunction Support Provision. .................................................................... 41
D.  THE LATE INSERTION OF THE 90% SUBORDINATION PROVISION EVIDENCES THE SETTLING
    PLAINTIFFS' LACK OF INTEREST IN THE QUIGLEY PLAN. ............................................ 42
E.  THE ECONOMIC STRUCTURE OF THE PFIZER SETTLEMENT AGREEMENTS ENSURED THAT
    THE SETTLING PLAINTIFFS WOULD VOTE IN FAVOR OF ANY QUIGLEY PLAN. ............... 45
    i.   Qualification Rates Impact The Expected TDP Recovery Of Settling Plaintiffs. ....... 47
    ii.  The Settling Plaintiffs Receive Substantially More Under The Pfizer Settlement
         Agreements Than They Would Under A Confirmed Quigley Plan. ......................... 48
    iii. The Disparity Between Pfizer Payments And Plan Payments Is Made Even More
         Clear By Looking At Individual Law Firms. ..................................................... 50
         a.  Kelley & Ferraro. .............................................................................................. 53
         b.  Jacques Admiralty Firm. .................................................................................... 54
         c.  Baron & Budd. .................................................................................................. 55
         d.  Deakle-Couch. .................................................................................................. 56
         e.  Summary. .......................................................................................................... 58
    iv.  The Fact That The Trust Payments Will Be Paid Over Ten Years Further Minimizes
         Their Significance To Settling Plaintiffs Compared To The Pfizer Payments. ............ 58
F.  PFIZER APPLIED LESS RIGOROUS CRITERIA WHEN DECIDING WHETHER TO ACCEPT
    CLAIMS FOR PAYMENT UNDER THE PFIZER SETTLEMENT AGREEMENTS THAN IT HAD
    APPLIED HISTORICALLY. ................................................................................. 59
G.  THE VOTING RESULTS REFLECT THE IMPACT OF THE ECONOMIC INCENTIVES CREATED BY
    THE PFIZER SETTLEMENT AGREEMENTS AND ARE UNRELIABLE. ................................. 61
    i.   The Original TDP Expressly Contemplated That Most Settling Plaintiffs Would
         Receive Nothing Under The Plan. ..................................................................... 62
    ii.  Testimony From Settling Law Firms Shows They Voted To Receive The Settlement
         Amounts, Not Quigley Distributions. ................................................................ 64
    iii. The Designation Of A Claimant As A "Non-Settlor" On Their Ballot Is Not A
         Reliable Indicator Of Economic Interests. .......................................................... 66
H.  THE AD HOC COMMITTEE'S OPPOSITION TO THE PLAN AND RECOMMENDATIONS TO ITS
    CLIENTS TO REJECT THE PLAN WERE MOTIVATED BY ITS VIEW OF THE PLAN AND THE
    PLAN'S TREATMENT OF THEIR CLAIMS. ............................................................... 67

III. PFIZER'S "CONTRIBUTION" IS NOT "FAIR AND EQUITABLE" IN LIGHT OF THE BENEFIT PFIZER RECEIVES FROM THE CHANNELING INJUNCTION (I.E., PROTECTION FROM BILLIONS OF DOLLARS OF QUIGLEY-RELATED ASBESTOS EXPOSURE. ...................................... 70

   A. VALUE OF PRESENT AND FUTURE DERIVATIVE LIABILITY PFIZER RELIEVED OF BY ISSUANCE OF CHANNELING INJUNCTION RANGES BETWEEN $3.1B AND $4.2B. ........................ 73

      i. Dr. Rabinovitz Projected Future Quigley-Related Asbestos Claims Of $4.43 Billion, With A NPV of $2.66 Billion. ............................................................. 73

      ii. Value Of Non-Settled Quigley-Related Asbestos Liability Is Between $420 Million And $1.525 Billion. ................................................................................... 73

   B. THE VALUE OF PFIZER'S PROPOSED CONTRIBUTION BETWEEN NEGATIVE $78.6M AND $370M, WITH THE PRIMARY DIFFERENCE BEING ASSUMPTIONS RELATING TO "CREDIT" FOR THE SHARED INSURANCE. ...................................................................................... 78

      i. Dr. Shaked Determined That Pfizer's Contribution Either Negative $78.6M Or Positive $30.6M Based On Alternative Assumptions. ...................................... 80

         a. Pfizer's AIG Scheme Allows Pfizer To Take Cash Out Of Quigley's Estate By Swapping The 10-Year AIG Annuity With A 40-Year Pfizer Annuity. ......................................................... 81

         b. Value Of Shared Insurance Assets. ............................................................................. 83

         c. $50 Million Cash And $45.1 Million 41-Year Annuity Benefits Settling Plaintiffs, Not Non-Settling Plaintiffs And Futures. ..................................................................................... 84

         d. Value of Quigley Stock. ............................................................................................. 84

      ii. Dr. Snow's $330M Contribution Determination Entirely Dependent On Pfizer's Flawed Assertion That It Can Bill $399M of Pfizer Settlement Agreements Against Shared Insurance. ...................................................................................... 84

         a. The Preliminary Injunction Prohibits Pfizer From Billing The Shared Insurance. ............... 87

         b. Pfizer Is Judicially Estopped From Seeking A Credit For The Shared Insurance. ................ 89

         c. Pfizer Will Not Pay $209M Second-Half Settlement Payments Unless Plan Is Confirmed And After Insurance Assets Transferred To Asbestos PI Trust. ........................................................ 90

         d. Disclosure Statement Uses 50/50 Assumption. ........................................................... 91

         e. Pfizer's New Assertions Of Other Claims It Could Bill Against Shared Insurance Unsupported. .... 91

      iii. Togut's Opinion That Pfizer's Contribution Is "Fair And Equitable" Is Irrelevant And Unreliable. ............................................................................................... 93

IV. BEST INTERESTS TEST/LIQUIDATION ANALYSIS. ..................................................... 98

V. PFIZER'S GLOBAL SCHEME RESULTS IN VASTLY UNEQUAL TREATMENT OF SETTLING PLAINTIFFS AND NON-SETTLING PLAINTIFFS. ........................................................ 100

   A. THE PFIZER SETTLEMENT AGREEMENTS AND THE QUIGLEY BANKRUPTCY CONSTITUTE A TWO-PART INTEGRATED GLOBAL SCHEME. ......................................................... 100

   B. PFIZER SEEKS CREDIT FOR PAYMENTS MADE UNDER THE PFIZER SETTLEMENT AGREEMENTS AND, THUS, THE COURT MUST CONSIDER THOSE PAYMENTS IN EVALUATING THE TREATMENT OF CLAIMANTS. ................................................... 101

   C. THE SETTLING PLAINTIFFS WILL RECEIVE SUBSTANTIALLY MORE THAN NON-SETTLING PLAINTIFFS IF THE PLAN IS APPROVED. ............................................................ 102

   D. THE NON-SETTLING PLAINTIFFS ARE REQUIRED TO "PAY" SUBSTANTIALLY GREATER CONSIDERATION THAN THE SETTLING PLAINTIFFS MUST PAY. ................................. 104

VI. **Pfizer's Global Strategy, And Quigley's Related Plan, Were Riddled With Bad Faith Aided By Fiduciary Failures Of Quigley's Board, The FCR And Committee.** ............................................................................................................... 106

A. Pfizer Exercised Undue Influence Over Quigley, And Dictated The Key Decisions Made By, Other Constituencies In The Case. ................................... 107

    i. Just Prior To Setting Quigley On The Path Towards Bankruptcy, Pfizer Stripped Quigley Of The Remaining Proceeds From The MinTech Transaction............................ 107

    ii. Pfizer Converted Pfizer-Directed Settlements Into Quigley-Owed Secured Debt By Entering The Credit And Security Agreement With Pfizer-Only Quigley Board Members. ................................................................................................................. 108

    iii. Pfizer Changes The Composition Of The Quigley Board To Implement Its Global Strategy (2003-2004). ................................................................................................. 109

    iv. Pfizer Secured The Ability To Settle Quigley's Claims Under The Joint Defense Agreement, Only To Then Exclude Quigley From The Settlement Process....................... 110

    v. Pfizer selects a putative Future Claimants' Representative and negotiates a limited fund. ........................................................................................................................... 112

    vi. Pfizer Structures The AIG Swap, Allowing It To Fund The Deal Agreed To With the FCR Using Almost Exclusively Estate Assets. ....................................................... 114

    vii. Pfizer's decision to 'resurrect' Quigley lacked any legitimate business purpose and was done solely as a means of securing substantial asbestos protection for Pfizer............ 116

        a. Pfizer Gave Quigley Its Claims Handling Unit. ..................................................................116

        b. Pfizer Initially Proposed Providing Quigley Cash-Flow From Drug Lines To Make It Look Like An Ongoing Business. ................................................................................................................................118

        c. The FCR Failed to Evaluate Pfizer's Attempt to Create a Business. ......................................119

    viii. Pfizer Structured The Pfizer Settlement Agreements To Buy The Quigley Vote, Resulting In Unequal Treatment Under The Quigley Plan. ....................................... 120

    ix. Pfizer Never Informed Quigley About The Pfizer-Only Pfizer Settlement Agreements And Two-Part Global Strategy. ............................................................................... 122

    x. Pfizer's Bad Faith Continued After The Filing Of The Plan. .................................. 124

B. The Quigley Board Showed A Lack Of Good Faith By Leaving Major Decisions To Pfizer. ................................................................................................................. 127

    i. Quigley's Board Failed To Monitor Joint Counsel's Settlement Activities. ....................... 127

    ii. Quigley's Board Failed To Understand Quigley's Rights To The Shared Insurance. ........ 128

    iii. Quigley's Board Failed To Understand The Value Of The Channeling Injunction To Pfizer And Negotiate A "Fair And Equitable" Contribution. ................................... 129

    iv. Quigley's Board Never Tried To Renegotiate The Shared Services Agreement Despite Losing Tens Of Millions Operationally. ................................................... 131

    v. Quigley's Board Unaware That Quigley's Losses Principally Funded With Insurance Proceeds. ............................................................................................................... 132

    vi. Quigley's Board Failed To Consider The Allowability Of Pfizer's Secured Claim. .......... 132

    vii. Quigley's Board Never Tried To Offset The Tax Receivable Pfizer Owed Quigley Against The Interest-Accruing Secured Debt. ........................................................ 132

viii.   Quigley's Board Paid Hundreds Of Thousands To Witnesses To Be Available To Testify For Pfizer's Benefit. ............................................................................................ 133

ix.   The Quigley Board's Eve-Of-Trial Retention Of Experts Is Insufficient To Overcome Its Breaches ............................................................................................................... 134

C.   THE BENEFITS RECEIVED BY PFIZER FAR OUTWEIGH ANY PURPORTED CONTRIBUTIONS IT IS MAKING, ESPECIALLY IN LIGHT OF PFIZER'S ABILITY TO SATISFY 100% OF ITS LIABILITIES. ..................................................................................................................... 134

VII.  PFIZER AND QUIGLEY WITNESSES LACKED CREDIBILITY AT TRIAL. ........................................ 135

A.   PFIZER TAKES THE POSITION THAT IT NEVER PAID TO SETTLE QUIGLEY-DERIVATIVE LIABILITY, DESPITE PRIOR ADMISSIONS AND EVIDENCE TO THE CONTRARY. .......................... 136

B.   PFIZER ENTERED THE PFIZER SETTLEMENT AGREEMENTS AGREEING TO PAY $457M TO RESOLVE QUIGLEY-DERIVATIVE LIABILITY .............................................................................. 137

C.   BERLAND AND ROZEN'S TESTIMONY THAT PFIZER HAS NEVER PAID TO SETTLE QUIGLEY-DERIVATIVE LIABILITY NOT CREDIBLE ....................................................................... 140

D.   COONEY BROUGHT FORWARD DOCUMENTS CONTRADICTING BERLAND'S ASSERTION THAT PFIZER NEVER PAID TO SETTLE A DERIVATIVE CLAIM BASED ON A QUIGLEY PRODUCT ........ 142

**I.** **QUIGLEY WAS NOT AN OPERATIONAL ENTITY WHEN PFIZER DECIDED TO SEEK A QUIGLEY BANKRUPTCY FILING TO OBTAIN THE CHANNELING INJUNCTION AND QUIGLEY WILL NOT BE A GOING CONCERN EMERGING FROM BANKRUPTCY CAPABLE OF PROVIDING EVERGREEN FUNDING TO THE ASBESTOS PI TRUST.**

   **A.** **Quigley Was Not An Operational Entity When Pfizer Decided To Seek A Quigley Bankruptcy Filing To Obtain The Channeling Injunction.**

      **i.** **Quigley's Operating History (1916-1992).**

1. Founded in 1916 and acquired by Pfizer as a wholly-owned subsidiary in 1968, Quigley developed, produced and marketed a broad range of refractory products related primarily to the iron, steel, power generation, petroleum, chemical and glass industries. JPTO, Undisputed Facts, ¶¶ 1-2. Among the asbestos-containing products produced and sold were Insulag and Panelag, both of which had primary uses in steel mills, powerhouses and refineries, and which was sold primarily in the mid-Atlantic and Northeast regions. Tr. 2428:1-12 (Cooney); Ex. A4073 (Insulag was primarily sold to the steel industry, Panelag primarily used in powerhouses, sales of both products concentrated in Mid-Atlantic and Northeast).[1]

2. Beginning in the late 1970s, Quigley and Pfizer began to be named as defendants in various asbestos personal injury lawsuits, almost all of which were based upon alleged harm from exposure to Insulag or Panelag. Tr. 148:16-150:14 (Kany). Beginning in the mid-1980s and continuing through 2001, these claims were generally resolved through a consortium with other asbestos defendants, first through the Asbestos Claims Facility ("ACF") and later through the Center for Claims Resolution ("CCR"). Tr. 158:16-160:14 (Kany); Tr. 220:9-221:17 (Berland).

---

[1] All trial testimony is denoted by "Tr." followed by the relevant page/witness. All trial exhibits are denoted by "Ex." followed by the exhibit number and relevant page of the PDF exhibit file. References to this Proposed Findings of Fact are denoted by "AHCF". Docket indexes are denoted by "[D.I. __ ]". Attached hereto is Exhibit A, "Comparison of Aggregate Recovery under Pfizer Settlement Agreement compared to Expected Recovery Under TDP."

1

3.     In 1992, Pfizer caused Quigley's assets to be sold for $78.8M to another Pfizer subsidiary, Specialty Refractories, Inc., and then, along with two other Pfizer subsidiaries, transferred into Mineral Technologies, Inc. Within weeks Pfizer had caused Mineral Technologies to engage in an Initial Public Offering, at which time Pfizer sold 40% of its stake. Pfizer's remaining 60% was sold in a secondary public offering six months later. Pfizer realized $480M from the sale of its Minerals Technologies stock to the public (the "Asset Sale"). Tr. 165:4-8, 167:12-168:24, 177:6-178 :25, 180:3-18 (Kany); Tr. 308:1-310:20, 522:5-523:8 (Berland); Ex. A4502 (Mineral Technologies article, Oct. 30, 1992); Ex. A4005 (Mineral Technologies article, Apr. 6, 1993); Ex. A4503 (corporate documentation).

4.     Pfizer represented to this court at the outset of the Chapter 11 proceedings that the entire $78M sale proceeds remained in Quigley; however, at trial Sandy Berland admitted that over $53M of the $78M purchase price was retained by Pfizer to "satisfy" unidentified intercompany accounts and that only $25M actually remained with Quigley. Tr. 253:22-254:22 (Berland).

5.     This amount, along with other cash in Quigley, remained on Quigley's balance until 2002. Tr. 168:3-19, 186:8-188:22 (Kany); Tr. 253:22-254:22, 302:5-303:21, 305:19-306:17 (Berland); Ex. J538, at 204, 301 (Quigley Financial Reports).

### ii.     Quigley Continues As A Shell, Dominated And Controlled By Pfizer (1992-2003).

6.     Following the 1992 Asset Sale, Quigley had no employees, no factory, no plant, and no equipment. JPTO, Undisputed Facts, ¶ 4; Tr. 313:4-314:19, 317:23-318:4 (Berland); Tr. 726:21-23 (Street). In her deposition on December 10, 2008, Kim Jenkins, Quigley's current President, testified that during the 2002-2004 time frame (when she was an employee of Pfizer), she dealt with "no one" at Quigley. Tr. 1487:6-18 (Jenkins). Following her deposition, Jenkins

submitted an errata sheet changing "no one" to "From March 2003 to July 2004 I interacted with Quigley's board of directors and Paul Street." Tr. 1487:19-1488:12 (Jenkins). At trial, Jenkins admitted that her errata sheet was a "mistake" and that her "reports went to Pfizer and what Pfizer did with them, [she's] not sure." Tr. 1488:23-1489:16 (Jenkins).

7.     Quigley was neither producing nor selling any goods or services. Tr. 314:25-315:12 (Berland).

8.     As admitted by Pfizer in its 2002 and 2003 10-K filings with the SEC, "Quigley has conducted no active trade or business since 1992". Tr. 311:13-313:19, 314:25-315:12 (Berland); Tr. 198:23-199:4 (Kany); Tr. 728:3-25 (Street); Tr. 898:23-899:13, 902:5-14 (Altit); Ex. A4561, at 128 (Pfizer's 2002 10-K); Ex. A4562, at 129 (Pfizer's 2003 10-K).

9.     During an early background discussion with Pfizer's counsel, the FCR's representatives were told that Quigley's assets were sold in 1992 and "[t]he company ceased to exist in March of 1994." Ex. A4073 (July 8, 2004, e-mail from Rabinovitz to Sims).

10.    In or about 2001, Pfizer created an internal Claims Handling Unit ("CHU") within its 150 East 42nd Street, New York office, through which Pfizer employees handled the processing of all asbestos claims filed against Pfizer and Quigley. JPTO, Undisputed Facts, ¶¶ 15, 29; Tr. 319:11-320:25 (Berland).

11.    The CHU was not a revenue-producing activity; it was a cost center that was only processing asbestos liability claims against Pfizer and Quigley. Tr. 904:16-905:5 (Altit).

12.    Between October 1992 and June 2003, the board of directors (the "Quigley Board") of Quigley consisted solely of Pfizer employees. Tr. 313:20-314:3, 317:3-318:4 (Berland); Tr. 726:2-9 (Street); JPTO, Undisputed Facts, ¶ 4.

13.     As of May 2003, the three (3) Quigley Board members were Susan Grant, Kathy Ulrich and Charles Raeburn, all of whom were Pfizer employees. Ex. J219, at 1 (Quigley Board Minutes, Feb. 27, 2003, listing Grant, Ulrich and Raeburn as directors).

### iii.     Pfizer Changes The Composition Of The Quigley Board To Implement Its Global Strategy (2003-2004).

14.     As part of its global strategy, Pfizer sought to give Quigley the appearance of being 'independent' from Pfizer prior to filing for bankruptcy. Tr. 259:3-260:7 (Berland).

15.     By early 2003, Bruce Zirinsky, a bankruptcy attorney representing Pfizer, consulted with Sandy Berland, in-house counsel at Pfizer, and contacted Paul Street about becoming a member of the Quigley Board. Tr. 682:16-25, 717:8-22 (Street); Tr. 260:8-20. (Berland); JPTO, Undisputed Facts, ¶ 16; Tr. 2278 (Raeburn).

16.     Paul Street, who knew Mr. Zirinsky to be a bankruptcy lawyer, was told that Quigley was a Pfizer subsidiary that had produced asbestos products, and that Pfizer wanted to negotiate a global resolution of its asbestos liability. Tr. 684:4-24, 718:1-721:6 (Street).

17.     Pfizer's counsel hired Mr. Street and negotiated his compensation, which was paid by Pfizer because Quigley did not have its own bank account and had no operating revenue or other cash resources. Tr. 724:4-24 (Street) (Balance Sheet).

18.     Although it was not involved in the negotiations leading to his hiring, the Quigley Board, comprised at the time entirely of Pfizer employees, appointed Paul Street as Quigley's President and Chairman on May 27, 2003, at which time he also joined the Quigley Board. Ex. J220 (Notice of Special Meeting of Board of Directors); Tr. 1508:2-14 (Jenkins).

19.     Street was initially hired at an annual compensation of $180,000. In July 2004, his compensation increased from $180,000 per year to $900,000 per year at a time he claims to have spent no more than 25% to 50% of his time on Quigley matters. Quigley had no operating

4

revenue at the time of this increase. Tr. 724:9-15, 784:9-785:3, 849:14-851:3 (Street); Ex. J225 (July 6, 2004 board minutes approving increasing Mr. Street's compensation); Ex. J220 (Notice of Special Meeting of Board of Directors); JPTO, Undisputed Facts, ¶ 26 (Mr. Street received a salary of $900,000 a year from the Petition Date through May 2007).

20.     Since the beginning of its bankruptcy, Quigley's annual revenues were limited to $600,000 paid to it solely by Pfizer under the Shared Services Agreement. Street was unconcerned that his annual salary exceeded Quigley's annual revenue by 50%. Tr. 849:18-850:17 (Street).

21.     In the fourth quarter of 2003, with the advance approval of Pfizer, and while its board remained dominated by Pfizer employees, Quigley retained the law firm of Schulte Roth & Zabel LLP and one of its partners, Michael Cook, whom Street knew to be a bankruptcy specialist. Tr. 1520:1-5 (Jenkins); Tr. 731:8-732:24 (Street).

22.     One year later, Mr. Street recommended Kevin Altit, an attorney residing in Brazil with whom he had previously worked in connection with the Enron bankruptcy proceedings, as another candidate for appointment to the Quigley Board. Tr. 873:1-874:24 (Altit). At a board meeting on June 22, 2004, less than three months prior to Quigley's bankruptcy filing, Ms. Ulrich and Ms. Grant resigned from the Quigley Board and Mr. Altit was appointed; this was the sole Quigley Board meeting that Mr. Altit attended in person. Tr. 1508:8-25 (Jenkins); Tr. 953:9-954:3 (Street); Tr. 870:6-18, 873:15-19 (Altit).

### iv.     Pfizer Transfers the CHU To Quigley in an attempt to satisfy the Bankruptcy Code.

23.     Pfizer believed that before Quigley could file for bankruptcy, there had to be a business to reorganize. Tr. 349:21-350:4, 357:9-18 (Berland) (acknowledging that the CHU was

transferred because of the requirement that there be a business to 'reorganize'). Thus, Pfizer decided to transfer its internal CHU to Quigley. JPTO, Undisputed Facts, ¶ 15.

24.  The CHU was not a revenue generating activity at Pfizer. Tr. 904:22-905:5 (Altit).

25.  On July 15, 2004, seven weeks before Quigley filed its petition for bankruptcy, Pfizer transferred its CHU to Quigley, a transaction that involved no consideration and was not memorialized in any written documentation. JPTO, Undisputed Facts, ¶¶ 30; Tr. 319:2-320:25, 351:11-352:5 (Berland); Tr. 1504:8-1505:19 (Jenkins); Tr. 695:22-696:21 (Street); Tr. 443:3-19 (Berland).

26.  Quigley had never before been in the business of claims processing; had never sold claims processing services to any third party, and had never earned a single penny of revenue from the sale of claims processing services. JTPO, Undisputed Facts, ¶¶ 2, 30.

27.  In connection with Pfizer's transferring its CHU to Quigley, eight (8) Pfizer employees, including Kim Jenkins, became employees of Quigley. JTPO, Undisputed Facts, ¶ 30.

28.  Quigley performed no due diligence prior to accepting the transfer of the CHU – nobody at Quigley prepared any cash flow or profit/loss projections; nobody at Quigley knew the number of claims the CHU would process; nobody at Quigley knew whether the unit would be adequately capitalized; nobody at Quigley discussed a price that Quigley would pay to Pfizer in order to acquire this 'business.' Tr. 781:11-783:21 (Street); Tr. 904:4-906:8 (Altit); Tr. 2282:5-6 (Raeburn).

29.  Mr. Altit testified that the transfer CHU was accepted because Quigley had no other operational activity around which to reorganize. Tr. 899:11-13, 903:21-905:5 (Altit).

30.     Mr. Raeburn had no idea why Quigley accepted the transfer of the CHU. Tr. 902:17-25, 905:14-25 (Altit); Tr. 2280:6-2281:20 (Raeburn).

31.     Notwithstanding the lack of due diligence, Street recommended that Quigley accept the transfer of the CHU, testifying that there was no point being on a board that simply processed claims for its parent. Tr. 690:5-15, 771:1-23, 785:4-23 (Street).

32.     At the same June 22, 2004, board meeting in which it agreed to accept the CHU from Pfizer, the Quigley Board simultaneously discussed a Chapter 11 filing, even though it was non-operational and had no employees or revenue at that time. Tr. 898:2-902:14 (Altit); Ex. J224, at 5-6 (Quigley Board Meeting, June 22, 2004).

33.     At no time did the Quigley Board discuss a Chapter 7 liquidation. Tr. 782:8-783:5, 802:10-12; 806:1-14 (Street) (no recollection of Chapter 7 bring considered); Tr. 1570:15-25 (Jenkins) (same). While one board member, Kevin Altit, testified on direct examination that he thought the Quigley Board did discuss a Chapter 7 filing, Tr. 876:10-23 (Altit), on cross-examination, when he was shown his deposition testimony to the contrary, Altit admitted that he may be contradicting himself, but the discussions had happened a long time ago. Tr. 911:9-913:8 (Altit).

34.     Kim Jenkins, the head of the CHU at Pfizer, testified that she was not informed why the CHU was being transferred to Quigley or what her role as a Quigley employee would be when she was asked to move to Quigley. Tr. 1503:23-1504:11 (Jenkins).

35.     After the transfer of the CHU to Quigley, the same employees worked in the same physical space (within Pfizer's office) and performed the same responsibilities; while their paychecks now came from a newly-created Quigley bank account, their benefits (health, medical and life insurance) continued to be paid by Pfizer; and "Quigley's" records continued to be

maintained by Pfizer personnel on Pfizer's accounting system. Tr. 443:23-444:3 (Berland); Tr. 1504:14-1506:25 (Jenkins); JPTO, Undisputed Facts, ¶ 32; Tr. 1214:23-1218:20 (Charboneau).

36.     Quigley had no operating revenue from the transferred CHU business until after it executed the Shared Services Agreement on August 31, 2004, only three (3) days prior to Quigley's bankruptcy filing. JPTO, Undisputed Facts, ¶¶ 31, 33; Ex. J447 (Shared Services Agreement).

37.     Since the July 2004 transfer of the CHU, Quigley has processed claims for only three entities – itself, Pfizer, and a *de minimis* amount of claims from Warner-Lambert, a Pfizer subsidiary responsible for historical American Optical asbestos liabilities. Tr. 1535:8-17, 1538:3-1539:24, 1543:2-24 (Jenkins); Tr. 1282:2-15 (Charboneau); Ex. J466, at 85 (2008 Pfizer 10-K).

### v.     Quigley Seeks To Establish Its "Independence."

38.     On or about July 15, 2004, Quigley signed a sublease with Pfizer for the space the CHU occupied within Pfizer's office. Tr. 1563:25-1564:2 (Jenkins); Tr. 322:24-323:10 (Berland).

39.     In August of 2004, in an effort to establish that it was 'independent' from Pfizer, Quigley entered into a sublease at 52 Vanderbilt Avenue in New York, which the landlord required Pfizer to guarantee due to concerns about Quigley's creditworthiness. Ex. 4217 (Sublease Agreement); Tr. 776:12-23, 778:4-20, 780:9-781:10 (Street, Quigley was "trying to establish our independence and we needed to sever ties as it were, or to make certain that everyone understood that Quigley was now an operating entity."); Tr. 1559:3-5, 1563:3-1564:20 (Jenkins); 930:3-25 (Altit); JPTO, Undisputed Facts, ¶¶ 36-37.

40.     After Quigley relocated to 52 Vanderbilt, it continued to use Pfizer's computer systems and infrastructure, including database administrator, network support, Outlook

enterprise servers, Blackberry service, cell phones, copy and fax machine maintenance, laptops, telephones and maintenance of equipment. JPTO, Undisputed Facts, ¶ 38; Tr. 1505:14-16 (Jenkins).

41. Three (3) days before it filed for bankruptcy, Quigley entered into the Shared Services Agreement to process claims for Pfizer in exchange for $50,000 per month and certain services. Tr. 834:4-835:25 (Street); JPTO, Undisputed, Facts ¶¶ 31, 33; Ex. J447 (Shared Services Agreement).

42. No one employed by Quigley prepared any financial projections or analysis prior to the execution of the Shared Services Agreement, no one knew the number of claims that were anticipated to be processed and no one knew that the agreement obligated Quigley to process the 170,000 Pfizer Settlement Agreements. Tr. 1548:2-1549:25 (Jenkins); Tr. 836:2-18, 839:1-24 (Street).

**B.      Quigley Will Not Be A Going Concern Emerging From Bankruptcy Capable Of Providing Evergreen Funding To The Asbestos PI Trust.**

43. Quigley's expert, Thomas Britven, acknowledged that under 524(g) "the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants." Ex. Q2008, at 8, 18 (Britven Report, citing Combustion). Britven's conclusion that Quigley was a going concern was based on his conclusion that Quigley would be profitable for three years. Tr. 1638:20-1639:10, 1658:1-1659:7 (Britven).

44. The term "going concern" is understood in the financial field to mean that the entity is expected to survive for a long time, that it will "operate indefinitely," and that it will "operate in the foreseeable future and not cease operations and liquidate." Tr. 2541:8-24 (Shaked); Ex. A4559, at 4 (Shaked Slides).

45. Reorganized Quigley's only projected post-confirmation "business" is based on two, five-year, non-arm's length, non-market contracts: (1) the Pfizer Claims Services Agreement (added to the Plan in 2007, when the drug license was withdrawn), for which it will receive $25M over 5 years to process an undefined number of Pfizer-related claims, and (2) Quigley's claims servicing agreement with the Asbestos PI Trust, for which it will receive $47.50 per claim for processing its own liability. Tr. 2543:9-20 (Shaked); Ex. J47, §§ 1.1, 12.2(d)(v) (August 6, 2009, Plan, "Asbestos PI Claims"); Ex. J43, at 336, 340 (March 28, 2008, Plan, Ex. J, §§ 2.1, 8.1, proposed Asbestos PI Claims Services Contract); Tr. 2203:6-15 (Togut) ("Q....[Y]ou did come to understand that Quigley's post-emergence business would be limited to processing Pfizer and Quigley claims, right? A. I understand.").

46. Pfizer initially proposed a second 'business' for Reorganized Quigley – the 'licensing' of income to Quigley from four drug lines that would continue to be produced, marketed and sold by Pfizer. Ex. A4023, at 1, 3-4 (April 2005 e-mail between Quigley and The Foresight Group concerning pharmaceutical product due diligence: identifying the four drugs as those that "Pfizer is willing transfer"; proposal is a means to fund Quigley's operating expenses; Pfizer "will continue to be responsible for all aspects of manufacturing, sales, distribution, regulatory filing and adverse reaction reporting relating to the products."); Ex. J22, at 40-65 (Third Amended Plan Supplement, Ex. L, Product License and Service Agreement); Ex A4533 (July 2004, email string, "For tax and other purposes, we are seeking to transfer one or more Diversified Products totaling about $5 million in US sales to a newly created entity.").

47. Pfizer conceded at trial that this proposed transfer was also intended to give Quigley a 'business' to help satisfy Section 524(g)'s requirement, although it was eventually dropped by Pfizer during the pendency of the bankruptcy case. Tr. 357:9-18, 444:4-12

(Berland); Tr. 2169:2-23 (Togut); Tr. 551:2-25 (Greenspan); Ex. A4043, ¶ 4 (September 13, 2005 e-mail from FCR's counsel to Quigley, Pfizer and Committee) ("[T]he contribution of net income stream from the four prescription drugs cannot be relied upon [as a funding mechanism to pay operating expenses of the trust] and its primary purpose is to make Quigley look like some sort of operating entity with a viable business upon emergence from Chapter 11."); Ex. A4315 (May 20, 2007, Milin email); Ex. A4072 (May 21, 2007, Milin email).

        **i.**     **Quigley's Purported Post-Confirmation Business Consists Solely Of Processing Its Own Asbestos Liability And That Of Its Parent Company.**

48.    Virtually all of the revenue that Reorganized Quigley projects earnings in the first three years after confirmation arising from processing claims is based on Quigley's own sale of asbestos products.

49.    The vast majority of assets proposed to be contributed to the Asbestos PI Trust are derived from the Shared Insurance contributed by Quigley. These same assets will be used to pay Reorganized Quigley. Quigley's revenues under the Asbestos PI Claims Services Agreement emanate almost exclusively from Quigley's former assets. Ex. J47, at 14, 24, 42 (August 6, 2009, Quigley Plan, §§ 1.1 (definitions of "Asbestos PI Trust Assets", "Quigley Contribution"), 9.3(d)); Ex. J43, at 87-88 (March 28, 2008, Plan, Amended Ex. A, proposed Asbestos PI Trust Agreement, § 2.01).

50.    The income to be generated by the contract with the Asbestos PI Trust, is insufficient to allow Reorganized Quigley to be profitable from day one. Tr. 2552:7-15, 2554:14-2556:1 (Shaked); Ex. 4559, at 9, 12-13 (Shaked Slides, absent the additional $25M from Pfizer, Reorganized Quigley has negative performance from 2009 through 2052). Accounting for the Pfizer Claims Services Agreement, Reorganized Quigley will be profitable

for no more than five years. Tr. 2552:13-15, 2556:1-2557:13 (Shaked); Ex. A4559, at 9, 14, 14a (Shaked Slides); Tr. 1304:15-1305:6 (Charboneau); Ex. A4051.

      **ii.**      **Quigley Has No Operating History From Which Any Reasonable Inference Can Be Drawn That It Will Be Profitable As It Has Lost Millions Of Dollars Operating Under The Shared Services Agreement It Entered With Pfizer.**

51.    During this bankruptcy, from September 3, 2004 to trial, Quigley has lost millions of dollars operating its claims services business. Tr. 1549:19-25 (Jenkins); Tr. 1273:3-7 (Charboneau).

52.    Quigley has lost $46M operationally through August 2009 ($23M, excluding interest accrual). Between August 31, 2004 and August 31, 2009, Quigley received a total of $3.2M under the Claims Services Agreement with Pfizer, while incurring $21M in operating expenses. Ex. J164, at 1 (Statement of Operations).

53.    On an overall basis, Quigley's net losses before taxes during the bankruptcy exceed $76M, including $30M in professional fees and debt services. Ex. J164, at 1 (Statement of Operations, August 2009, Monthly Operating Report).

54.    Quigley's losses have been funded from only two sources: (a) the $600,000 per year that Quigley receives from Pfizer under the Shared Services Agreement and (b) proceeds from the liquidation of some of the shared insurance. Ex. J164, at 2 (August 2009, Balance Sheet, Insurance Settlements Negotiated and Insurance Receivables Collected); Tr. 1332:5-1333:3 (Charboneau). Pfizer's Secured Claim was rolled into Quigley's DIP financing facility and accrued interest of approximately $30M during the case; Quigley never drew down additional funds under the DIP after the petition date to fund Quigley's case, which was principally funded by shared insurance proceeds. Tr. 1499:9-1499:15, 1500:18-1501:25

(Jenkins); Tr. 1036:4-1036:5 (Street); Tr. 1132:1-1132:2, 1132:22-1133:1, 1332:2-1332:4 (Charboneau).

55.    On a cash basis, Quigley has expended almost all of the approximately $45M in insurance receivables it collected during the case for operations and professional fees. Ex. J164, at 2 (August 2009, Balance Sheet, Insurance Settlements Negotiated and Insurance Receivables Collected, collecting $45.2M of insurance receivables and retaining $4.4M in cash through August 2009).

56.    Dr. Shaked considered in his analysis Quigley's lack of successful operating history, including: that Quigley sold its operating assets in 1992; that Quigley had no operating revenue and no employees from 1993 to 2004; and that Quigley lost $47M operationally (inclusive of interest on the Pfizer secured claim) from 2004 to 2009. Tr. 2558:3-2559:9 (Shaked); Ex. A4559, at 15 (Shaked Slides).

57.    The only evidence in the record that Quigley has a good reputation in the industry and that Quigley is known as accurate, efficient, or less expensive, is the uncorroborated testimony of Kim Jenkins. Tr. 2633:11-2635:8 (Shaked).

58.    Britven, Quigley's expert, admitted that in examining the future financial viability of a company, past financial performance is relevant and that it is important to understand the company's business. Britven testified that he did not know the year Quigley began operating as a claims handling unit of Pfizer, did not know if the Shared Services Agreement was or is profitable for Quigley or the result of an arm's length negotiation, and did not know whether the Pfizer Claims Services Agreement and Asbestos PI Claims Services Agreement were based on market rates. Tr. 1687:18-1688:23, 1695:10-15, 1697:23-1698:25, 1703:2-4, 1738:11-12 (Britven).

59.     Britven also admitted that management's performance in relationship to past projections is relevant to the likelihood of management meeting future projections. Britven testified that he did not look at how Quigley's current management historically performed against in relationship to past projections. Tr. 1710:14-1711:4 (Britven).

###### iii.     The Asbestos PI Claims Services Agreement Is Not The Result Of An Arms-Length Negotiation, But Is Being Forced Upon The Asbestos PI Trust At Above-Market Rates In Order To Give Reorganized Quigley A Reason To Exist.

60.     Up through and including the trial, there were no trustees nominated or appointed for the Trust. Ex. J42, at 86 (March 28, 2008, Disclosure Statement, providing that the trustees will be appointed by the Bankruptcy Court on the confirmation date of the Plan, p. 84).

61.     The Asbestos PI Claims Services Agreement between Quigley and the Trust is a condition of the proposed plan, under which Quigley charges the Asbestos PI Trust a $250,000 one-time, start-up fee and $47.50 per claim reviewed. Ex. J43, at 338-39 (March 28, 2008, Quigley Plan, Proposed Asbestos PI Claims Services Contract, Ex. J, § 5.1).

62.     The $47.50 per claim fee was determined based upon the amount necessary to cover the cost of processing claims; Quigley never investigated or determined a "fair market" charge for claims processing services required under the Asbestos PI Claims Services Agreement. Tr. 1270:2-4, 1288:11-1289:5 (Charboneau) ("I was asked to determine what the projected costs of reorganized Quigley will be in the future, such that the amount to be charged to the trust would be enough to cover the cost in the future."); Ex. A4047a (March 2007 e-mail from FCR's counsel to Pfizer's counsel, "[W]hy doesn't the Trust simply outsource the claims processing function to a third party provider – rather than have that function performed by reorganized Quigley? In addition to being objectively cheaper from the Trust's perspective, it would [remove other uncertainties]. I think we need a reason other than reorganized Quigley

must have some business when it emerges from Chapter 11 so as to enable Pfizer to benefit from channeling injunction issues pursuant to section 524(g).").

63.     Under the terms of the Asbestos PI Claims Services Agreement, the Asbestos PI Trust is not entitled to cancel the agreement with Quigley even if it is able to identify cheaper or better pricing. Tr. 1611:1-17 (Jenkins).

64.     John Cooney, a plaintiffs' attorney and member of the Ad Hoc Committee, who has extensive experience representing clients or serving himself on official creditors' committees in 524(g) cases and on trust advisory committees for 524(g) asbestos trusts, testified that he has never seen a proposed trust agreement that requires the trust to give its business to a certain claims servicing entity. Tr. 2420:1-2422:24, 2467:4-17 (Cooney).

65.     Cooney also testified that the $47.50 per claim rate required in this case was more than double other claims handling businesses charge. Tr. 2469:5-19 (Cooney); Tr. 1695:16-18 (Britven) (testifying that the fee range for processing claims by other companies is as low as $12 per claim).

66.     The FCR, Al Togut, understood that Quigley would charge the Asbestos PI Trust above market rates under the Asbestos PI Claims Services Agreement required by the Plan. Ex. A4047a (March 29, 2007, Ratner email).

67.     The FCR's legal representative, Scott Ratner, asked Pfizer to justify this arrangement, with "a reason other than Reorganized Quigley must have some business when it emerges from Chapter 11 so as to enable Pfizer to benefit from channeling injunction issued pursuant to section 524(g)." Ex. A4047a, at 1 (March 29, 2007, Ratner email).

68.     There is no evidence in the record concerning Pfizer's response.

iv. **The Pfizer Claims Services Agreement Is Not The Result Of An Arms-Length Negotiation, But Is Merely A Means By Which Pfizer Is Attempting To Back-Fill A "Revenue" Source To Reorganized Quigley In An Effort To Make It Appear Viable For A Few Years Following Confirmation.**

69.     Reorganized Quigley's only other source of revenue will be the $25M it expects to receive under the still-to-be-finalized Pfizer Claims Services Agreement.

70.     This agreement is a substitute for the income that was to be generated by the drug license, which Pfizer withdrew from its proposal between the first and second votes. (and the approximately $20M that Pfizer had initially guaranteed under that license). Ex. J47, at 63-64 (August 6, 2009, Quigley Plan, § 12.2(d)(viii)); Tr. 2254:6-24 (Togut); Tr. 552:6-554:18 (Greenspan); Tr. 984:4-985:9 (Street, "My recollection is that [the Pfizer Claims Services Agreement] was introduced as a substitute for the drug lines to provide Quigley with breathing room to attempt to build its third-party claims handling business."); Tr. 1584:24-1585:24 (Jenkins).

71.     Quigley understood that it was not a "real third party contract," but instead a mechanism for filling the gap caused by Pfizer's removal of the drug income. Tr. 590:5-591:9 (Greenspan); Tr. 985:3-15 (Street); Tr. 1246:2-1247:21 (Charboneau).

72.     Quigley's President, Kim Jenkins, testified that she does not know why Pfizer is paying $5M per year under the Pfizer Claims Services Agreement, as contrasted with the $600,000 per year Pfizer presently pays under the Shared Services Agreement. Tr. 1586:8-1587:6 (Jenkins).

73.     Aside from the aggregate contract price of $25M over 5 years, the details of the Pfizer Claims Services Agreement were not resolved as of trial. Tr. 2254:17-21 (Togut, "Q. Do you know if the Pfizer Claims Services Agreement has been finalized? A. I know it has not.").

74.     Quigley has no idea how many claims it will be asked to process under the Pfizer Claims Services Agreement, what type of claims it will be asked to process, or the timing at which such claims will be received and/or processed. Tr. 1248:17-1249:4 (Charboneau, low initial expectation of claims numbers); Tr. 1286:8-1288:9 (Charboneau) (assuming 10,000 total claims to be processed); Tr. 1592:5-24 (Jenkins, agreement amended days before confirmation to require processing of up to 35,000 claims); Ex. J42, at 134 (March 28, 2008, Disclosure Statement, Ex. C, Income Statement); Ex. J47a, at 6 (September 2009 Projected Financial Information, Income Statement); Tr. 1291:4-25 (Charboneau, assuming 35,000 claims per year). Even using Quigley's maximum of 35,000 claims per year, Quigley would earn revenue of approximately $143 per claim. Tr. 1291:5-18 (Charboneau). This amount far exceeds the market rate for claims processing Britven testified to at trial. Tr. 1695:7-24 (Britven, testifying that fees for processing claims range between $12 to $60 plus an upfront fee).

75.     Quigley's President, Kim Jenkins, testified that even the 35,000 claim number contained in the current draft was a cap, and that she still expects that Quigley will process "minimal" claims under the Pfizer Claims Services Agreement for Pfizer. Tr. 1615:3-1616:12 (Jenkins).

> **v.      By Quigley's Own Projections And Admissions, Absent Attracting Third-Party Business, It Will Not Survive Beyond At Most 5 Years.**

76.     Both the Pfizer Claims Services Agreement and the Asbestos PI Claims Services Agreement terminate after five (5) years. Ex. A4553, at 10-11 (September 29, 2009, Draft Pfizer Claims Services Agreement, §§ 6.1-2); Ex. J43, at 340 (Proposed Asbestos PI Claims Services Contract, Ex. J, § 8.1).

77.     Quigley's own expert and Board members admitted that after that date, Reorganized Quigley will not survive without some third-party business. Tr. 1734:5-6 (Britven); Tr. 1578:19-25 (Jenkins); Tr. 2288:10-19 (Raeburn).

78.     This conclusion is supported by the fact that Reorganized Quigley projects to generate gross revenue of $1.2M, $4.75M and $4.75M processing claims for the Asbestos PI Trust in 2010, 2011, and 2012, respectively. Tr. 2554:14-21 (Shaked); Ex. 4559, at 11 (Shaked Slides); Ex. J47a. To meet these projections, Reorganized Quigley will need to process 225,263 claims for the Asbestos PI Trust during those years ($1,200,000 + $4,750,000 + $4,750,000 divided by $47.50 per claim charge). Tr. 1318:1-1319:24 (Charboneau); Ex. J47a (September 2009, Projected Financial Information).

79.     Once these 'present' claims are processed, the volume of claims available to be processed will decrease and the only known claims that will be available for processing are those estimated by the Future Claims Representative's expert, Dr. Francene Rabinovitz. Ex. J42, at 158-62 (March 28, 2008, Disclosure Statement, Ex. I); Tr. 2553:2-2554:2 (Shaked); Ex. A4559, at 10-11 (Shaked Slides). The FCR's legal representative, Scott Ratner, recognized that retaining Reorganized Quigley as the Trusts processing service could cause the Trust to have to subsidize Quigley's operational losses. Ex. A4047a (March 29, 2007, Ratner email).

80.     Accepting the claims projections set forth by Dr. Rabinovitz, and even assuming that the above-market rate of $47.50 per-claim continues indefinitely, Reorganized Quigley's anticipated projected revenue falls dramatically, from $4.75M in 2012 to $610,000 in 2013, $577,000 in 2014 and $545,000 in 2015 (at which time the Pfizer Claims Services Agreement expires). Tr. 2553:2-21 (Shaked); Ex. A4559, at 10-11 (Shaked Slides).

81.     Assuming the Trust elected to renew the Asbestos PI Claims Services Agreement with Quigley at the end of five years, revenue would continue to decline annually as follows: $394,000 in revenue in 2020; $264,000 in revenue in 2025; $159,000 in revenue in 2030; $83,000 in revenue in 2035; $35,000 in revenue in 2040; $11,000 in revenue in 2045; and $2,000 in revenue in 2050. Tr. 2552:10-2553:21, 2556:21-2557:13 (Shaked); Ex. A4559, at 9-11, 14, 14a (Shaked Slides).

82.     Even if the Asbestos PI Trust renews the Asbestos PI Claims Services Agreement from 2015 until 2052, Reorganized Quigley's revenue is not adequate to cover its expenses; in fact, in such period, Reorganized Quigley's revenue cannot even cover its payroll and salary related expenses. Tr. 2552:7-15, 2556:21-2557:13 (Shaked); Ex. A4559, at 9, 14, 14a (Shaked Slides).

83.     Early Quigley financial projections spanned five years and showed that the company would lose money in years 4 and 5. Tr. 1304:15-1305:6 (Charboneau); Ex. A4051 (forecasted Income Statement for CHU).

84.     At trial, Quigley presented financial projections spanning a shorter, three-year window (2009 through 2012) which coincides with a surge of backlogged claims being processed and includes $15M injected by Pfizer through the Pfizer Claims Services Agreement, and which have no contingencies or reserves to deal with unforeseen circumstances. These projections show a $3M profit for the entire period. Tr. 1300:3-24, 1325:1-23 (Charboneau); Ex. J47a, at 6 (September 2009 Projected Financial Information, Income Statement).

85.     Quigley provided no legitimate rationale for limiting the financial projections to three years. Tr. 1198:2-11 (Charboneau) ("SEC reporting provides for a look-back of three years for companies that report public information. So I turned it the other way around and said we

would look forward three years."); Ex. 4559, at 10 (Shaked Slides) (graphically demonstrating drop in anticipated Quigley revenue in 2015).

### vi. It Is Pure Speculation To Assume That Quigley Will Obtain The Third-Party Business That It Admits It Needs To Survive Once Pfizer's Financial Support Runs Out.

86. Quigley has not obtained any third-party claims handling customers. Ex. J42, at 8 (March 28, 2008, Disclosure Statement). Quigley is not presently in discussions with any potential third party customers and is not even reaching out to any potential third party customers at this time because it believes any attempt would be "futile." Tr. 1612:1-17 (Jenkins); Tr. 1024:13-23 (Street); Tr. 1729:1-3 (Britven). Moreover, Quigley's marketing efforts, to date, are limited to the creation of brochures, a letterhead, a tag line, a logo, a non-public website, a one-page executive elevator summary, and envelopes. Tr. 2265:19-2266:9, 2270:2-9 (Jenkins).

87. Mr. Britven admitted at trial that the statement in his April 15, 2009, report that Quigley was currently in discussions with a potential customer was incorrect and that those discussions never, in fact, took place. Tr. 1724:3-1727:3 (Britven).

88. Dr. Shaked opined that based on the testimony and documents in the record, Quigley "currently has no indication of getting new business." Tr. 2559:10-2560:2, 2631:3-11 (Shaked).

89. Dr. Shaked further opined that the explanation, that Quigley has been unable to obtain third party business because it is in Chapter 11 or because of confidentiality considerations, does not justify a conclusion that Quigley is more likely to obtain third party business when it exits Chapter 11. Tr. 2561:17-2564:5, 2643:1-7 (Shaked).

90. Neither Quigley nor its financial expert, Thomas Britven, include any projected revenue from any third-party source. Tr. 1727:13-1728:25 (Britven); Tr. 1311:22-24

(Charboneau); Ex. J47a, at 6 (September 2009 Projected Financial Information, Income Statement).

91.    No evidence was adduced at trial of any contract to provide services with any third party source.

92.    No evidence was adduced at trial of any offer by Quigley to any third party source to provide services.

93.    Dr. Shaked testified that when management expects future revenue, it will include projections for such revenue and not exclude it solely to be conservative.  Tr. 2630:5-22 (Shaked).  Dr. Shaked opined that including any projected revenues would be "pure speculation, based on the absence of any evidence." Tr. 2560:1-7, 2628:16-25 (Shaked).

### a.    No Evidence That Quigley Similar To Successful Competitors.

94.    Quigley's expert, Thomas Britven, opines that because Quigley says it intends to attract third-party business, it *will* attract third-party business and, thus, will be an ongoing business.  Tr. 1668:21-1670:17 (Britven); compare Tr. 2561:4-2561:13 (Dr. Shaked countered that a stated purpose is insufficient to find that Quigley will obtain new clients).

95.    Britven opined that he expected that Quigley could be successful because it has a similar business model and ownership as some six claims handling companies owned by asbestos trusts.  Tr. 1666:17-1668:20 (Britven); Ex. Q2008, at 19 (Britven Report).

96.    Britven failed to provide any documentation or substantiation, qualitative or quantifiable, to support this opinion.  Tr. 2565:1-11, 2565:5-2567:10, 2576:2-2576:13 (Shaked).

97.    Britven did not independently assess Quigley's assertions that it has competitive advantages in the marketplace.  Tr. 1736:1-1737:8, 1674:20-1675:5 (Britven).  Moreover, Jenkins knows little about the competitive landscape in which Reorganized Quigley will operate. Tr. 1581 (Jenkins).

21

98.     Britven did not analyze any financial or operational characteristics of these 6 companies such as (1) revenue, (2) cost structure, (3), efficiency or (4) number of claims processed.  Tr. 2564:16-2565:11 (Shaked); Ex. A4559, at 20 (Shaked Slides).

99.     Britven did not evaluate the following characteristics of companies he identified as potential competitors: the number of employees, whether the work force is made up of full-time or temporary workers, the number of claims processed per year, annual revenue, annual net profitability, types of claims processed, efficiency, market share, cost structure, or profit margins.  Tr. 1716:9-1721:15 (Britven); Tr. 2565:12-2567:2 (Shaked).

100.    Britven's analysis was limited to gleaning information available about existing companies from the internet and he acknowledged that little information was available because the companies are privately held.  Tr. 1666:17-1667:13 (Britven).

101.    Dr. Shaked opined that the lack of information cannot be used to support the conclusion that Quigley will be able to compete and obtain new business.  Tr. 1667:7-13 (Britven); Tr. 2646:3-24 (Shaked).

   **b.** **No Evidence That Quigley Could Enter An Accessible Third-Party Claims Handling Market.**

102.    Britven opined that "noting the number of trusts for whom claims are being processed, as well as the length of existence of these claims-processing companies, suggests that claims-processing can be a viable business."  Ex. Q2008, at 21 (Britven Report).

103.    Dr. Shaked opined that the fact that other claims-processing companies are in the market does nothing to predict whether Reorganized Quigley will be successful.  Tr. 2568:3-19 (Shaked);  Ex. A4559, at 22 (Shaked Slides).

104. Britven performed no analysis to assess the intermediate and long-term viability of the six claims processing companies he identifies as competitors. Ex. A4559, at 22 (Shaked Slides); Tr. 1716:9-1721:15 (Britven).

105. Dr. Shaked opined that Mr. Britven's opinion reflects a survival bias because (1) he only discusses claims processing companies that have survived and are currently operating and (2) he does not account for claims processing companies that may have failed. Tr. 2568:23-2569:3 (Shaked); Ex. A4559, at 22 (Shaked Slides).

106. Dr. Shaked opined that the existence of established businesses is a barrier to entry for new entrants to the market. Tr. 2569:4-11 (Shaked); Ex. A4559, at 22 (Shaked Slides).

107. Dr. Shaked opined that reorganized Quigley would be a new entrant and is effectively a start-up business because it has no third party customers and only processes claims for itself and its parent Pfizer. Tr. 2649:15-25 (Shaked).

108. Britven testified that he did not know whether the market for asbestos claims processing work is growing or declining. Tr. 1695:19-21, 1722:11-14 (Britven).

109. Britven opined that his viability opinion depends on the assumption that Quigley would seek and obtain additional non-asbestos work in the future. Tr. 1684:8-23 (Britven).

110. Britven testified that if Quigley's intention was only to seek to process asbestos claims in the future, it may affect his opinion regarding Quigley's viability. Tr. 1685:10-1686:4 (Britven).

111. Jenkins originally testified on October 27, 2009 that post-confirmation, Quigley intends to process only asbestos claims. Tr. 1574:22-24 (Jenkins).

112. Following Britven's testimony, Jenkins re-took the stand a second time and testified that her prior testimony was incorrect and that Quigley would seek to obtain non-

asbestos work from third parties, because she reviewed marketing materials that stated Quigley would pursue such other work. Tr. 2270:10-24 (Jenkins, "I don't believe I answered it correctly on October 27th. Right now, I'm focused on the two clients that I currently have, so when you asked that question, that's what I was focused on. But if you look in the brochure, it obviously doesn't -- the two don't match.").

113.    On April 22, 2005, at a meeting attended by Jenkins, Street advised the Quigley Board that Quigley would be unable to develop a profitable business processing claims for third parties because the claims handling industry was too competitive. Tr. 979:1-982:1 (Street); Tr. 1582:19-1583:8 (Jenkins); Ex. J229 (April 18, 2005, Quigley Board Minutes); Ex. A4069 (e-mail string from June 2006, in response to request from third party for an asbestos claims processor, Ms. Jenkins provides three companies given to her by Mr. Charbonneau – none of which is Quigley).

114.    While Street testified at trial that he thought there was less competition in the market now because some of the people trying to build claims handling businesses had abandoned their efforts, Street never considered that others may have abandoned efforts to build third-party business because the market would not support such effort. Tr. 981:4-25 (Street). Additionally, Street recognized that while a number of insurance trusts were being formed and were trying to enter the third-party claims handling business in 2005, a number of these trusts eventually considered they were better off outsourcing their claims handling work rather than trying to find new customers. Tr. 979:15-982:1 (Street).

115.    Quigley engaged in no third-party marketing efforts until May 2008, when Charboneau prepared a one-page elevator pitch containing nine (9) "talking points" – most of which had "placeholders" where any details would be. Ex. A4055; Tr. 1312:8-1315:11

(Charboneau); Tr. 1583:25-1584:20 (Jenkins, the one page, incomplete bullet-point summary represents Quigley's most current marketing efforts as of May 1, 2008).

c.     <u>No Evidence Of Strategic Alliances.</u>

116.    Britven opines that "[p]ost-confirmation, Quigley will have the opportunity to enter into advantageous strategic relations with others to collaborate on how Quigley can obtain additional asbestos claims processing." Tr. 1675:11-1676:13 (Britven); Ex. Q2008, at 21 (Britven Report).

117.    Britven further opined that Quigley may be able to take advantage of its relationship with the plaintiffs' bar to engage additional third party work. Tr. 1676:20-1677:6 (Britven).

118.    Britven also testified that Quigley currently has no strategic relationships and Britven himself did not talk to any members of the tort plaintiffs' bar regarding Quigley's prospects to obtain future claims processing work. Tr. 1730:2-1731:19 (Britven).

119.    Jenkins testified that she declined to pursue one potential alliance because its cost of $20,000 up-front and $10,000 a month from Quigley would not be a benefit to Quigley. Tr. 2569:12-2570:9 (Shaked); Tr. 1604:8-24 (Jenkins, discussing "tremendous" fee and monthly fees).

d.     <b>Pure Speculation To Conclude That Quigley Will Obtain Third-Party Claims Handling Business And Be An Ongoing Business.</b>

120.    Dr. Shaked opined that it would be "pure speculation" to assume that Quigley will obtain third-party claims handling business based on the evidence in the record. Tr. 2628:18-25 (Shaked).

121.    Dr. Shaked further opined that Mr. Britven's opinion, that "it is anticipated that Quigley will be successful in obtaining new clients," is entirely speculative as it is not based on

any methodology, either quantitative or qualitative, and relies on unsubstantiated statements with no support in the record. Tr. 2576:2-13 (Shaked); Ex. Q2008, at 21 (Britven Report).

122. Dr Shaked opined that since Quigley has no history of profitably operating a claims-handling business, the two non-arms length contracts it anticipates are insufficient to maintain profitability beyond 3-5 years and the fact that there is no evidence in the record from which to conclude it will attract the third-party business that it admits will be necessary to survive, there is no basis to conclude that Reorganized Quigley will be a going concern capable of funding the payment of Quigley-related asbestos claims from the Trust into the future. Tr. 2541:5-7, 2552:20-25 (Shaked); Ex. A4559, at 3 (Shaked Slides).

## II. PFIZER'S VOTE BUYING SCHEME RENDERS THE VOTE ILLEGITIMATE AND UNRELIABLE.

123. By late-2003 or early-2004, Pfizer had devised a two-part global strategy to address its Quigley-related asbestos liability. Tr. 330:3-332:21 (Berland).

124. In September 2003, or about the time that Pfizer conceived its two-prong strategy, the Pfizer-controlled Quigley Board entered into the Joint Defense Agreement pursuant to which Quigley delegated to Pfizer the exclusive right to settle all Quigley asbestos claims and to bill all settlement claims to insurance shared by Pfizer and Quigley. Ex. J445 (Joint Defense Agreement); Ex. J220 (Board Minutes, board consisted of Street and three Pfizer employees); Ex. 4558 (January 2004, Allocation Agreement).

125. Following the execution of the Joint Defense Agreement, and the delegation of settlement authority thereunder, Mike Rozen and Ron Rubin, on behalf of Pfizer, negotiated for approximately 10 months with plaintiffs' law firms purporting to represent over 190,000 claimants. Tr. 2027:14-2031:7, 2085:5-2086:3 (Rozen).

126. Rozen played an integral role in helping to conceive and draft a Form of Pfizer Settlement Agreement, which was circulated to all of the firms with whom Pfizer was negotiating to explain to them in detail the requirements of the proposed settlement. Tr. 2044 (Rozen); Ex. P3003 (Form Settlement Agreement).

127. As part of the two-part strategy, Pfizer sought to enter into settlement agreements with what it believed to be plaintiffs law firms representing 75% of the existing Quigley-related, tort-system claimants, conditional upon a Quigley bankruptcy plan to be filed under §524(g). Tr. 331:18-333:7, 335:6-24 (Berland); Tr. 2029:20-2049:3 (Rozen) ("It's a private settlement for Pfizer on the one hand, and it's a 524(g) bankruptcy for Quigley on the other. Those are the two pieces of the problem that Pfizer had . . .").

128. Pfizer's bankruptcy counsel informed Al Togut, in the Summer of 2004, that Pfizer's goal was to secure the votes of at least 75% of existing tort claimants. Tr. 2204:21-2205:5 (Togut).

129. In contrast to a consistent, twenty-year history of jointly settling claims and securing general releases for each Pfizer and Quigley, in the pre-petition negotiations, Pfizer sought releases for Pfizer only. Tr. 160:6-14, 283:1-284:8 (Berland); Tr. 2026:7-2027:6, 2032:7-13, 2033:7-2034:4, 2088:11-18, 2094:9-21, 2113:2-2114:21, 2127:2-10, 2128:4-13, 2132:17-2133:9 (Rozen); Ex. P3003 (Form Settlement Agreement, §2.4(b), explicitly retaining Quigley claims, Ex. B, Form Plaintiff Release, explicitly excluding Quigley from the release of All Pfizer Protected Parties)); Ex. J467-J536.

130. In fact, Rozen and Rubin affirmatively dissuaded plaintiffs' counsel from settling with Quigley. Tr. 2706:2-16 (Kellman).

131. Under the Pfizer Settlement Agreements, Pfizer was primarily settling Quigley-related liability, mainly claims of derivative liability against Pfizer. Tr. 2093-94 (Rozen, testified that plaintiffs focused on Quigley products and values when negotiating Pfizer Settlement Agreements); Tr. 2407:22-2408:11 (Deposition Reading Kellman); JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 27:20-28:10 (Nov. 12, 2008); Ex. J466, at 134 (2008 Pfizer 10-K, 19.B Product Litigation, Pfizer's public financial filings state that it entered into the Pfizer Settlements to settle "claims related to Quigley products against Quigley and Pfizer."); Ex. J465, at 191 (2007 Pfizer 10-K, 20.B Product Litigation, same); Ex. J464, at 157 (2006 Pfizer 10-K, 19.B Product Liability); Ex. J463, at 150 (2005 Pfizer 10-K, 18.B Product Liability, same); Ex. J462, at 162 (2004 Pfizer 10-K, 17.B Product Liability, same); Ex. J42, at 37 (March 28, 2008, Disclosure Statement, Pfizer believes that each of the 172,095 claimants it entered into Pfizer Settlement Agreements hold asbestos personal injury claims against Quigley); Ex. A4078 (Email from Rabinovitz to Ratner, "Quigley lawyers allege … that the settlements it reached just prior to the filing of the bankruptcy petition are closer to the actual value of the Quigley claims."); Ex. A4079 (Email from Rabinovitz to Togut, FCR claims estimation expert chose to rely on the pre-petition settlement values as best indicator of Quigley-related claims).

132. Rozen tracked Pfizer's progress to determine when it had Pfizer Settlement Agreements in place with 75% or more of present Quigley claimants needed to satisfy the voting requirement of Section 524(g). JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 165:25-166:10 (Jan. 30, 2009).

133. In conjunction with the approval of Quigley's bankruptcy filing and only after Rozen and Rubin, working with a public accounting firm, determined that Pfizer had signed Pfizer Settlement Agreements with 75% or more of present Quigley claimants, attorneys within

Pfizer were notified and Atiba Adams countersigned the documents for Pfizer. JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 196:7-196:25, 197:12-199:2 (Jan. 30, 2009).

134. Between August 31, 2004 and September 3, 2004, Pfizer entered into sixty-six (66) of the seventy (70) Pfizer Settlement Agreements with 80 law firms, each of which was expressly conditioned upon the filing and successful prosecution of a Quigley bankruptcy including a Section 524(g) channeling injunction enjoining future asbestos lawsuits against Pfizer. Tr. 331:18-333:7 (Berland); Tr. 2029:20-2030:3, 2097:4-15 (Rozen); J536 (§§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan"), 4.1, 4.1(g), 4.2(c)); J536; Ex. J15, at 29 (October 6, 2005, Disclosure Statement).

135. Quigley filed for bankruptcy on September 3, 2004. JPTO, Undisputed Facts, ¶ 64; Ex. J42, at 43 (March 28, 2008, Disclosure Statement, § V(A)).

136. Four additional settlement agreements were entered into with plaintiff law firms post-petition. The agreements were likewise conditioned upon a successful Quigley bankruptcy. Ex. J480, J534, J535 at 4, 6, 16, 17 (§§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan"), 4.1, 4.1(g), 4.2(c)); Ex. J533 at 4, 6, 16, 17 (§§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan"), 4.1, 4.1(g)).

137. The AHC Designation Motion was served by first class mail on the Settling Law Firms at the places where they regularly carry on their business. See Amended Affidavit of Service (May 5, 2009) [D.I. 1804]. Quigley's Ballot and Tabulation Solicitation Procedures permit votes to be cast by master ballot, provided that their counsel "*must certify that such counsel has the authority to cast a Ballot on the Plan* on behalf of the [claimants]." Ex. J68, at 19-20 (Order Approving Ballot Solicitation Procedures, Ex. A, Certification by Counsel of Authority to Vote) (emphasis added). The Court's approval was based on Quigley's

acknowledgement of the logistical difficulties of directly contacting the Settling Plaintiffs because Quigley "historically only maintained addresses for counsel of record" because all communications were through counsel, and would not be able to obtain the addresses of all individual holders "within any reasonable time frame or in any cost effective manner." Ex. J62, at 16 (Motion for Approval of Ballot Solicitation Procedures). As more than 97% of all votes were cast by master ballot, the overwhelming number of votes were cast by law firms who were required to expressly certify that they had the authority to vote on Quigley's plan. Ex. J77, at 5-6 (Voting Certification, Ex. A). Further, during the course of this bankruptcy case, at least 24 Settling Law Firms (collectively representing more than 136,932 claimants who voted on the Plan) entered an appearance and/or filed a pleading in the case. See In re Quigley Company, Inc., 04-15739 (SMB) (Bankr. S.D.N.Y) [D.I. 46, 47, 98, 101, 155, 237, 249, 252, 260, 265, 266, 433, 434, 435, 458, 497, 519, 555, 560, 703, 855, 910, 911, 912, 913, 914, 915, 916, 917, 918, 919, 1109, 1110, 1118, 1119, 1228, 1288, 1438, 1573, 1619, 1630, 1658, 1696, 1738, 1775, 1812, 1816, 1820, 1826, 1992, 1994, 1996, 2002, 2009, 2011, 2013, 2016, 2019].

138.    Twenty-five (25) of the Settling Law Firms had not settled a single case with either Pfizer or Quigley during the post-CCR period. Tr. 2331:22-24 (Rourke); Ex. A4547a, at 12-13 (Rourke Slides). These firms settled more than 29,000 claims for an aggregate sum of more than $49M and voted more than 25,000 claims, all in favor of the Plan. Ex. A4547, at 72 (Rourke Report, Appendix C-2 tallying votes by firm, and Appendix C-3 tallying payments to each firm); Ex. A4547a, at 12-13 (Rourke Slides); Tr. 2119 (Rozen, had not personally negotiated with many of the Settling Law Firms prior to the time that the Pfizer Settlement Agreements were negotiated).

139. One of these firms, Deakle-Couch, which settled almost 17,000 claims (16,330 of which were non-malignant) with Pfizer in 2008, had never even filed a case against either Pfizer of Quigley. JPTO, AHC Deposition Designations, Ex. D, Deakle Dep. 28:15-22 (Jan. 27, 2009); Ex. A4547 (Rourke Report).

140. Another sixteen (16) Settling Law Firms had settled less than five (5) cases with Pfizer and/or Quigley during the post-CCR period. Ex. A4547 (Rourke Report, Appendix C-1, listing historical settlements by firm and disease). These firms settled more than 46,000 claims for an aggregate sum of more than $65M and voted over 49,000 claims, all in favor of the Plan. Ex. A4547 (Rourke Report, Appendix C-2 tallying votes by firm, and Appendix C-3 tallying payments to each firm).

141. One of these firms, The Jacques Admiralty Firm, which had settled a single lung cancer case with Quigley during the post-CCR period, had more than 27,000 asbestos claims pending against Quigley, none of which named Pfizer as a defendant. JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 19:4-19:24 (Nov. 12, 2008). 22,348 of the Jacques claimants were non-malignant claimants, paid $███ each by Pfizer. Ex. A4547, at 71 (Rourke Report, Appendix C-3).

142. Claimants of the Settling Plaintiffs and those Non-Settling Plaintiffs represented by Settling Law Firms overwhelmingly voted in favor of the Plan. Ex. A4547, at 6 (Rourke Report, Opinion 2).

143. Non-Settling Plaintiffs represented by Non-Settling Law Firms voted overwhelmingly to reject the Plan. Ex. J78, at 362, 365 (BMC Group Voting Declaration, Ex. A-2 and Ex. C-2); Ex. A4547, at 14-16, 39, 41, 43 (Rourke Report); Tr. 2305-07, 2319, 2333, 2348 (Rourke).

**A.** **Pfizer Entered Into The Pfizer Settlement Agreements To Lock-Up The Quigley Vote.**

144.    Pfizer concedes that it entered into the Pfizer Settlement Agreements as part of its overall strategy to place Quigley into bankruptcy and secure for itself a channeling injunction under Section 524(g) of the Bankruptcy Code. Tr. 331:18-333:7 (Berland); Tr. 2029:20-2030:3, 2097:4-15 (Rozen).

145.    At the time that Pfizer negotiated settlements with the individual plaintiff law firms, the Form of Pfizer Settlement Agreement contained the following salient provisions:

> RECITAL: ". . . Pfizer <u>is willing, upon the effectiveness of Quigley's Consensual Plan</u> (defined below) to be filed by Quigley in its Chapter 11 case, once commenced, to pay a portion of the Claims in cash and to contribute assets to the Trust (defined below) to settle the remaining portion of the Claims all on the terms and subject to the conditions set forth in this Agreement." (Ex. 3003 p. 1) (emphasis added).

> ""Quigley Consensual Plan" means a Chapter 11 plan, which <u>Quigley files and successfully confirms</u> in a case under the Bankruptcy Code, and which establishes<u>, under Section 524(g)</u> of the Bankruptcy Code . . . <u>an injunction for the benefit of the Pfizer Protected Parties.</u>" (Ex. 3003, Art. I, p. 5) (emphasis added).

> <u>Section 2.3 Settlement Amounts</u>. "Upon <u>satisfaction of the conditions set forth in Section 4.1</u>, Pfizer agrees to pay the values set forth in the table below, as applicable, multiplied by number of Settling Plaintiffs (the "Settlement Amount") . . ." (Ex. 3003, § 2.3, p. 11) (emphasis added).

> <u>Section 2.4 Recovery of Settlement Amount.</u>

> (a)  Subject to <u>satisfaction of conditions set forth in Section 4.1</u>, Pfizer will pay the Settlement Amount.

> (b) "[E]ach Settling Plaintiff agrees to reduce its distribution on its claim against Quigley to ten percent (10%) of the Payment Percentage of the allowed amount of such claim under the Trust Distribution Procedures (the "<u>Quigley Claim Amounts</u>")." (Ex. 3003, § 2.4, pp. 11-12) (emphasis added).

3.2(c) Independent Judgment. Plaintiff Counsel will recommend to each Plaintiff acceptance of the Settlement Amount offered to that Plaintiff, consistent with Plaintiff Counsel's independent professional judgment based on the facts of each Plaintiff's claim, and will recommend that the Plaintiff take all steps necessary to support Quigley's Consensual Plan and to vote in favor of Quigley's Consensual Plan. (Ex. 3003, § 3.2(c), p. 14) (emphasis added).

3.3(d) Plaintiff Counsel will use its best efforts and take all necessary action and will fully cooperate with Pfizer and Quigley in the timely and successful prosecution of Quigley's chapter 11 case and all proceedings and matters relating thereto, including without limitation, the confirmation of Quigley's Consensual Plan, the solicitation of acceptances, the opposition to any motion for the appointment of any trustee or examiner and the support of positions which may be taken by Pfizer or Quigley in connection with any matter or proceeding, or in connection with any appeal, review or certiorari proceeding relating to any order. (Ex. 3003, § 3.3(d), p. 16) (emphasis added).

Section 4.1 Conditions of Pfizer Obligations. The obligation of Pfizer to make the Pfizer Contribution and to pay the Settlement Amount under this Agreement is subject to the satisfaction of each of the following conditions:

(a) All representations and warranties of Plaintiff Counsel and each Settling Plaintiff are true and correct on the date of this Agreement and will be true and correct on the Consensual Plan Effective Date;

(b) Plaintiff Counsel shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be performed or complied with;

(c) Each Settling Plaintiff will have performed and complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with on or before the times set forth herein;

(d) Each Settling Plaintiff, through its Plaintiff Counsel, will have appeared in court or filed papers to support any action by Pfizer, Quigley, or both, to enjoin further prosecution of claims by any personal injury claimant against the Pfizer Protected Parties by extending the protections of section 362 of the Bankruptcy Code or an injunction under section 105 of the Bankruptcy Code; and

(g) Quigley will have filed Quigley's Consensual Plan and the Consensual Plan Effective Date shall have occurred. (Ex. 3003, § 4.1, pp. 16-17) (emphasis added).

Section 4.2 Timing of Payment of Settlement Amount.

(a) Pfizer agrees to pay the Settlement Amount within five (5) Business Days after the satisfaction of all of the conditions set forth in Section 4.1.

(b) In the event that all of the conditions set forth in Section 4.1 have been satisfied, other than the occurrence of the Consensual Plan Effective Date, and subject to the provisions of Section 4.3, and provided that Plaintiff Counsel shall confirm in writing to Pfizer that Plaintiff Counsel will continue to perform all of its covenants, obligations and agreements to be performed under this Agreement, including, without limitation, the covenants and agreements contained in Section 3.3 of this Agreement, Pfizer agrees to pay as an advance against the Settlement Agreement (which advance shall be a credit against the Settlement Amount) provided for in subparagraph (a) above, an amount equal to 50% of the Settlement Amount, within five (5) Business Days after the earlier to occur of (i) District Court Confirmation date and (ii) December 1, 2005.

(c) If Pfizer shall have made the payment under subparagraph (b) above, within five (5) Business Days after the occurrence of the Consensual Plan Effective Date, Pfizer will pay the 50% remaining balance of the Settlement Amount. (Ex. 3003, § 4.2, p. 17) (emphasis added).

Section 4.3 Exception to Payment of Settlement Amount. Notwithstanding any provision to the contrary contained in this Agreement, in the event Quigley solicits acceptances of Quigley's Consensual Plan prior to December 1, 2005, and less than 75% of the claimants who vote, vote for acceptance of Quigley's Consensual Plan, Pfizer shall have no obligation to pay the Settlement Amount to any Plaintiff or Plaintiff Counsel. (Ex. 3003, § 4.3, p. 17) (emphasis added).

Section 5.1 Termination of Agreement. Pfizer, in its sole discretion, may terminate this Agreement at any time prior to the Consensual Plan Effective Date. If Pfizer terminates this Agreement, Pfizer's sole obligation will be to make the 50% payment provided for in Section 4.2(b) above, provided that all of the conditions and agreements set forth in Section 4.2(b) of this Agreement shall have been satisfied. Pfizer's obligation to make

such payment shall be subject to the exception set forth in Section 4.3 of this Agreement.

> Section 6.1  Bankruptcy Stay.  Each Plaintiff and Plaintiff Counsel agree that, commencing on the Settlement Effective Date and continuing during the pendency of Quigley's chapter 11 bankruptcy case, they will support the imposition and continuation of the automatic stay under section 362 of the Bankruptcy Code for the benefit of Quigley and the Pfizer Protected Parties.

146.    The seventy (70) seventy individual settlement agreements entered into between Pfizer and the plaintiff law firms on behalf of the Settling Plaintiffs contain slight variations in language as to certain terms. Ex. J467-J536 (Pfizer Settlement Agreements).

147.    However, each and every agreement contained the provision conditioning receipt by the Settling Plaintiffs of the second half of the contracted settlement amount on final confirmation of a Quigley plan that provided Pfizer with the protection of a Section 524(g) channeling injunction. Ex. J467-J536 (Pfizer Settlement Agreements, §§ 4.1(g), 4.2(a)-(c)), J533 (Pfizer Settlement Agreement, §§ 4.1(g), 4.2(a)-(b)).

**B.      The Pfizer Settlement Agreements Intended To Lock Up A 75% Affirmative Vote In Quigley's Bankruptcy.**

**i.      Vote Recommendation Requirement.**

148.    Pursuant to Section 3.2(c) of the Form of Pfizer Settlement Agreement, each Settling Law Firm represented and warranted that it would recommend each Plaintiff take all steps necessary to support Quigley's Consensual Plan and vote in favor of a Quigley plan. Ex. P3003, at 14 (Form Settlement Agreement, § 3.2(c)).

149.    When shown the Form of Pfizer Settlement Agreement, Mr. Berland testified that it was his belief that most of the final agreements did not have that language. Tr. 401:1-25 (Berland).

150. Mr. Berland was then shown six (6) specific agreements which contained the language of Section 3.2(c) and which, collectively, covered more than 101,000 of the 170,000 Settling Plaintiffs. Tr. 432:7-441:18 (Berland).

151. That specific clause, or one with very minor alterations appears in thirty-one (31) of the executed Pfizer Settlement Agreements (representing 145,268 claims and **$407,826,741** in settlement payment obligations). Ex. J470, J472, J473, J475, J477, J481, J485, J536, J489, J490, J495, J497-J500, J503, J509, J510, J513, J514, J520, J526, J528, J532-J535 (form version of § 3.2(c) provision, 27 agreements representing 131,430 claims and $327,239,157 in settlement payment obligations); Ex. J469, J480, J502, J519 (version of § 3.2(c) with slight alterations, 4 agreements representing 13,838 claims and $80,587,584 in settlement payment obligations).

152. The remaining thirty-nine (39) other executed Pfizer Settlement Agreements (representing 43,394 claims and **$79,007,000** in settlement payments) contain a Section 3.2(c), which required Plaintiff Counsel to recommend that the Settling Plaintiff support Quigley's Consensual Plan. Ex. J467, J468, J471, J474, J476, J478, J479, J482-J484, J486-J488, J491-J494, J496, J501, J504-J508, J511, J512, J515-J518, J521-J525, J527, J529-J531 (Settlement Agreements, § 3.2(c)).

153. At the time that the initial sixty-six (66) Pfizer Settlement Agreements were entered into, and each Settling Law Firm represented and warranted that it would recommend to its respective clients that they vote for and/or support Quigley's plan, no plan had been filed and no draft of a plan had been created or circulated by Pfizer or Quigley to the Settling Law Firms. Tr. 2405:4-20 (Deposition Reading Sakalarios); JPTO, AHC Deposition Designations, Ex. D, Sakalarios Dep. 78 (Jan. 27, 2009); JPTO, AHC Deposition Designations, Ex. D, Kellmen Dep. 45:7-45:22 (Nov. 12, 2008); JPTO, AHC Deposition Designations, Ex. D, Deakle Dep. 33:5-

34:17 (Jan. 27, 2009) (Deakle had no recollection of bankruptcy materials being discussed)
JPTO, AHC Deposition Designations, Ex. D, Ferraro Dep. 89:18-90:7, 91:5-92:24 (Mar. 30,
2009).

### ii. Payment Conditioned On Binding Settlements With 75%.

154.    The Pfizer Settlement Agreements conditioned Pfizer's obligation to pay the
Settlement Amount on Pfizer having entered into binding settlement agreements with claimants
holding in the aggregate claims equaling 75% of the outstanding and potential personal injury
claims against the Pfizer Protected Parties (the "75% Settlement Condition"). This provision
appears in each of the executed Pfizer Settlement Agreements. Ex. P3003, at 17 (Form
Settlement Agreement, § 4.1(e)); Ex. J467-J536 (Settlement Agreements, §4.1(e)).

155.    Pfizer acknowledged that the 75% Settlement Condition appears in the agreement
to achieve the 75%-in-amount voting requirement of Section 524(g), and Pfizer wanted the
opportunity to walk away from the Pfizer Settlement Agreements if the global strategy was not
achievable. Tr. 397:18 – 398:24 (Berland); Tr. 2053:12-2054:10 (Rozen).

156.    Pfizer's counsel discussed with the plaintiffs law firms the fact that Pfizer needed
75% of claimants to comply with the 75% voting requirement under Section 524(g) and kept a
running tally to determine if and when Pfizer would reach or surpass the 75% requirement. Only
when Pfizer met the 75%-in-amount requirement did it execute the Pfizer Settlement Agreements
and have Quigley file for bankruptcy. JPTO, AHC Deposition Designations, Ex. D, Rubin Dep.
163-6, 196, 197- 9 (Jan. 30, 2009).

### iii. No Obligation To Pay If Less Than 75% Vote In Favor.

157.    Section 4.3 of the Form of Pfizer Settlement Agreement provides that,
notwithstanding any provision to the contrary contained in this Agreement, in the event Quigley
solicits acceptances of Quigley's Consensual Plan prior to December 1, 2005, and less than 75%

of the claimants who vote, vote for acceptance of Quigley's Consensual Plan, Pfizer shall have no obligation to pay the Settlement Amount to any Plaintiff or Plaintiff Counsel (the "75% Voting Requirement"). Ex. P3003 (Form Settlement Agreement, § 4.3). This provision appears in sixty-seven (67) of the executed Pfizer Settlement Agreements (representing 176,551 claims and $414,476,234 in settlement payments), Ex. J467–J479, J481–J532, J534, J536 (§ 4.3); only the three (3) Pfizer Settlement Agreements entered after December 1, 2005 did not contain the provision. Ex. J480, J533, J535.

158.     As a consequence of the 75% Voting Requirement, if the vote were solicited prior to December 1, 2005, the Settling Plaintiffs risked the full value of their Settlement Amounts if they did not vote in favor of the Plan and less than 75% of voting claimants accepted the Plan. Ex. J467–J479, J481–J532, J534, J536 (Settlement Agreements, § 4.3).

159.     At the time this case was filed, Quigley and Pfizer anticipated a quick confirmation process. Ex. J395, at 7:14-16 (Hearing Transcript, Sept. 24, 2004, "We are aiming to get it out, get the case confirmed in something like six months of less.").

160.     Attorney Ferraro, a principal of the Settling Law Firm, Kelly and Farraro, testified that he understood Section 524(g) very well when negotiating the firm's Pfizer Settlement Agreement, including the statute's 75% voting requirement, and understood that the Pfizer Settlement Agreement required his firm and his clients to vote in favor of the Quigley plan. JPTO, AHC Deposition Designations, Ex. D, Ferraro Dep. 68, 71-73 (Mar. 30, 2009) (*"The deal is that we are going to vote in favor of the plan*, or our clients are going to vote in favor of the plan. ... [A]t the end of the day, *there is no deal if you don't get 75 percent vote.*") (emphasis added).

## iv.    Right To Terminate.

161.    Under Section 5.1 of each of the executed Pfizer Settlement Agreements (the "Termination Provision"), Pfizer retained the right to terminate the Pfizer Settlement Agreements at any time prior to the Consensual Plan Effective Date, as defined in the Pfizer Settlement Agreements, and only be obligated to pay fifty percent (50%) payment of the Settlement Amount Ex. J467–J536  (§5.1); Ex. P3003, at 17 (Form Settlement Agreement, §5.1); JPTO, Undisputed Facts, ¶ 54.

162.    Pfizer included the Termination Provision as another way to limit its downside, to the First-Half Settlement Payment, in the event that the Quigley 524(g) plan is not approved.  Tr. 2054:11-25 (Rozen).

163.    Because the Settling Plaintiffs released all asbestos personal injury claims against Pfizer in connection with the payment of the (first half) 50% Settlement Amount payment, and because the Termination Provision enabled Pfizer to terminate the Pfizer Settlement Agreements at any time prior to the Consensual Plan Effective Date and have no further obligation to the Settling Plaintiffs, if the Settling Plaintiffs did not vote in favor of the Plan, they could not recover either the full Settlement Amount under the Pfizer Settlement Agreements or any other amounts from Pfizer.  Tr. 398:7-398:10 (Berland); Tr. 2127:2-10, 2184:4-13 (Rozen); Ex. P3003, at 17 (Form Settlement Agreement, §§ 4.2(b)-(c), 5.1); Ex. J467–J536 (Settlement Agreements, §5.1).

### C.    Other Settlement Provisions Require Plaintiff Counsel To Otherwise Support Pfizer's Efforts To Obtain The 524(g) Channeling Injunction.

164.    A variety of other provisions in the Pfizer Settlement Agreements require the Settling Law Firms to use their best efforts to support Pfizer's prosecution of Quigley's chapter

11 case, support the imposition and continuation of the automatic stay, and support the enjoinment of personal injury claims against the Pfizer Protected Parties.

### i. Best Efforts/Cooperation Requirement.

165. Section 3.3(d) of the Form of Pfizer Settlement Agreement required Plaintiff Counsel to use its best efforts and take all necessary action and fully cooperate with Pfizer and Quigley in the timely and successful prosecution of Quigley's chapter 11 case and all proceedings and matters relating thereto, including without limitation, the confirmation of Quigley's Consensual Plan, the solicitation of acceptances, the opposition to any motion for the appointment of any trustee or examiner and the support of positions which may be taken by Pfizer or Quigley in connection with any matter or proceeding, or in connection with any appeal, review or certiorari proceeding relating to any order. Ex. P3003, at 15 (Form Settlement Agreement, § 3.3(d)).

166. This particular provision appears in one (1) of the executed Pfizer Settlement Agreements (representing 190 claims and $3,852,000 in settlement payments), Ex. J534 (Settlement Agreement, §3.3(d)); a similar provision appears in four (4) of the executed Pfizer Settlement Agreements (representing 13,838 claims and $80,587,584), Ex. J469, J502, J519, J480 (Settlement Agreements, §3.3(c));  and thirty-nine (39) of the executed Pfizer Settlement Agreements (representing 43,394 claims and $79,007,000 in settlement payments) have an analogous provision, requiring Plaintiff Counsel not to take any action to undermine Pfizer's and Quigley's efforts to timely and successfully prosecute Quigley's Chapter 11 case. Ex. J469, J468, J471, J474, J476, J478, J479, J482-J484, J486-J488, J491-J494, J496, J501, J504-J508, J511, J512, J515-J518, J521-J525, J527, J529-J531 (Settlement Agreements, §3.3(d)).

### ii.  The Automatic Stay Support Provision.

167.  Pursuant to Section 6.1 of the Form of Pfizer Settlement Agreement (the "Automatic Stay Support Provision"), each Settling Plaintiff and each Settling Law Firm agreed that, commencing on the Settlement Effective Date and continuing during the pendency of Quigley's chapter 11 bankruptcy case, they will support the imposition and continuation of the automatic stay under section 362 of the Bankruptcy Code for the benefit of Quigley and the Pfizer Protected Parties. Ex. P3003, at 18 (Form Settlement Agreement, § 6.1). This provision appears in twenty-seven (27) executed Pfizer Settlement Agreements (representing 131,430 claims and $327,239,157 in settlement payments). Ex. J470, J472, J473, J475, J477, J481, J485, J536, J489, J490, J495, J497-J500, J503, J509, J510, J513, J514, J520, J526, J528, J532, J533-J535 (Settlement Agreements, §6.1).

168.  Thirty-nine (39) of the executed Pfizer Settlement Agreements (representing 43,394 claims and $54,555,500 in settlement payments) had a slightly varied provision, which required each Settling Plaintiff to support the imposition and continuation of the automatic stay for the benefit of Quigley and the Pfizer Protected Parties through December 1, 2005 (or the pendency of the bankruptcy if the fifty percent (50%) payment of the Settlement Amount is made pursuant to Section 4.2(b)). Ex. J467, J468, J471, J474, J476, J478, J479, J482-J484, J486-J488, J491-J-494, J496, J501, J504-J508, J511, J512, J515-J518, J521-J525, J527, J529-J531 (Settlement Agreements, §6.1).

### iii.  The Injunction Support Provision.

169.  Section 4.1(d) of the Form of Pfizer Settlement Agreement conditioned payment of the Settlement Amount on each Settling Plaintiff, through its Plaintiff Counsel, having appeared in court or filed papers to support any action by Pfizer, Quigley, or both, to enjoin further prosecution of claims by any personal injury claimant against the Pfizer Protected Parties

by extending the protections of section 362 of the Bankruptcy Code or an injunction under section 105 of the Bankruptcy Code. Ex. P3003 (Form Settlement Agreement, § 4.1(d)). This provision appears in twenty-four (24) of the executed Pfizer Settlement Agreements (representing 121,316 claims and $308,981,150 in settlement payments). Ex. J470, J472, J473, J475, J477, J481, J495, J536, J489, J491-J494, J496, J501, J503, J509, J510, J513, J514, J520, J526, J528, J532, J535 (Settlement Agreements, §4.1(d)).

170. Forty-two (42) of the executed Pfizer Settlement Agreements (representing 56,352 claims and $115,343,084 in settlement payments) provided, as a condition to payment of the Settlement Amount, that upon written request by Pfizer or Quigley, each Settling Plaintiff through counsel, will have appeared in court or filed papers to support any reasonable action by Pfizer, Quigley, or both, to enjoin further prosecution of claims by any personal injury claimant against the Pfizer Protected Parties by extending the protections of section 362 of the Bankruptcy Code or an injunction under section 105 of the Bankruptcy Code, (i) through December 1, 2005, or (ii) if Pfizer makes the 50% payment pursuant to Section 4.2(b) then through the pendency of the bankruptcy. Ex. J467-J469, J471, J474, J476, J478, J479, J482-J484, J486-J488, J491-J494, J496, J501, J502, J504-J508, J511, J512, J515-J519, J521-J525, J527, J529-J531 (Settlement Agreements, §4.1(d)).

**D. The Late Insertion Of The 90% Subordination Provision Evidences The Settling Plaintiffs' Lack of Interest <u>In The Quigley Plan.</u>**

171. In or about July 2004, after Rozen/Rubin had reached agreements in principle with most Settling Law Firms, Al Togut, the then-putative future claims representative, requested that Pfizer add a new provision to the agreement requiring Settling Plaintiffs to subordinate 90% of their Quigley claims in the event that Trust assets were insufficient to provide 100% distributions. Tr. 2042:24-2043:11, 2110:24-2111:23 (Rozen). The Pfizer

Settlement Agreements acknowledged that it was unlikely that they would receive 100% of their Quigley claim amount. Tr. 2244-2247 (Togut); Ex. P3003, at 11-12 (Form Settlement Agreement, § 2.4(b)).

172.     Togut testified that during the pre-petition settlement process, "everyone" – in particular, Pfizer – understood that it was necessary to acquire seventy-five percent of the votes in order to confirm a Quigley Plan and that the "goal" of the Pfizer Settlement Agreements was to ensure that Pfizer acquired seventy-five percent of the vote. Tr. 2179:11–2181:8 (Togut).

173.     Togut testified that, in order to preserve more money for his future claimants, he asked Pfizer to insert a provision into the Pfizer Settlement Agreements that would require all Settling Plaintiffs to waive some portion of their expected recovery from the Trust. Tr. 2241:12-2242:24 (Togut). When it apprised the Court, in January of 2005, of the basic terms of the Plan, Quigley indicated that Pfizer would be receiving a contribution "credit" equivalent to the value of the 90% Subordination Provision. Ex. 4247, at 2 (January 19, 2005, letter to the Court).

174.     Togut acknowledged that the best-case for his constituents would have been if the Settling Plaintiffs had waived 100% of their distribution, although he never even asked for that because "the way these cases work there need to be settlements and there need to be claims in the trust." Tr. 2245:17-2246:7 (Togut). When asked by the Court why he thought asking for 90% was appropriate, but asking for 100% was not, Togut admitted that eliminating the Settling Plaintiffs from the process entirely "was an ask that wasn't going to go anywhere." Tr. 2246:21-2247:23 (Togut).

175.     Togut acquiesced to the Pfizer Settlement Agreements and Pfizer's creation of "stub claims" to control the vote, never asking for a full subordination of such claims even though Pfizer agreed to the 90% Subordination Provision because he knew Pfizer needed the

stub claims to control the vote. Tr. 2245:17-2247:23, 2253:13-24 (Togut, did not think it was his job to make sure the voting process was done in good faith).

176. According to Mr. Rozen, Pfizer's lead negotiator, each of the Settling Law Firms consisted of sophisticated lawyers who were experienced with asbestos bankruptcies, and the negotiations with them were vigorous. Tr. 2101:23-2102:6 (Rozen).

177. According to Rozen, the Settling Law Firms were "not accustomed to leaving any pennies lying around;" rather, they wanted every single dollar they could get. Tr. 2101-2, 2104, 2039:23-2040:10 (Rozen).

178. Rozen testified that, much to his surprise, he was able to convince each and every law firm to give up 90% of any recovery under a Quigley plan without offering any additional compensation. Tr. 2110:24-2111:14 (Rozen).

179. None of the plaintiffs law firms with which Pfizer was in discussions ceased negotiating with Pfizer or asked for an increased payment under the Pfizer Settlement Agreement or an increased Pfizer contribution to the Asbestos PI Trust as a result of the inclusion of the 90% Subordination Provision. Tr. 2112:2-5 (Rozen); JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 44:6-44:20 (Nov. 12, 2008) (could not recall any discussion relating to the inclusion of the 90% subordination provision).

180. The 90% Subordination Provision appears in sixty-eight (68) of the executed Pfizer Settlement Agreements (representing 177,431 claims and $434,276,234 in settlement payments). Ex. J467-J532, J534, J536 (Settlement Agreements, §2.4(b)). Only those Pfizer Settlement Agreements relating to the Deakle-Couch Law Firm, P.L.L.C. and Early, Ludwick, Sweeney & Strauss, L.L.C., both of which were executed in 2008 after Pfizer waived the 90%

Subordination Provision in the other Pfizer Settlement Agreements, do not contain the 90% Subordination Provision. Ex. J533, J535 (Settlement Agreements).

**E.    The Economic Structure Of the Pfizer Settlement Agreements Ensured That The Settling Plaintiffs Would Vote In Favor Of Any Quigley Plan.**

181.    Collectively, the seventy Pfizer Settlement Agreements committed Pfizer to pay the Settling Plaintiffs approximately $457M, subject to satisfaction of certain express conditions. JPTO, Undisputed Facts, ¶ 50.

182.    Pfizer originally wanted the entire Settlement Amount to be payable only after Quigley's plan became final and non-appealable. Tr. 405:7-24 (Berland); Tr. 2099:15-2100:12 (Rozen); JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 167:2-171:13 (Jan. 30, 2009).

183.    The purpose of making the payment conditional on an approved plan was that Pfizer did not want to "give away all that money" unless the Quigley 524(g) plan was approved and it received protection from Quigley-related derivative liability through the issuance of the channeling injunction. JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 172:18-173:8 (Jan. 30, 2009); Tr. 2099:15-2100:12 (Rozen).

184.    Pfizer and the Settling Law Firms ultimately agreed that Pfizer would pay an advance of 50% of the Settlement Payment prior to the Consensual Plan Effective Date (subject to certain conditions) within five (5) Business Days after the earlier to occur of (i) the District Court Confirmation date and (ii) December 1, 2005 (the "First-Half Settlement Payment"). Tr. 405:7-24 (Berland); Tr. 2099:15-2100:12 (Rozen); JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 167:2-171:13 (Jan. 30, 2009); Ex. P3003, at 17 (Form Settlement Agreement, §§ 4.2(b)-(c)); Ex. J467-J536, J470, J472, J473, J475, J477, J481, J485, J536, J489, J490, J495, J497-J500, J503, J509, J510, J513, J514, J520, J526, J528, J532 (Settlement Agreements, §§ 4.2(b)-(c)); Ex. J467-J469, J471, J474, J476, J478, J479, J480, J482-J484, J486-J488, J491-J494,

J496, J501, J502, J504-J508, J511, J512, J515-J519, J521-J525, J527, J529-J531 (Settlement Agreements, §§ 4.2(b)-(c)) (subject to Sections 4.1(d), 4.1(f), and 5.1 and "if such payment was not made in accordance with this Section 4.2(b), Settling Plaintiffs' counsel, may, at its sole discretion, terminate the Settlement Agreement); Ex. J480 (Settlement Agreement, §§ 4.2(b)-(c)) (50% payable within twenty (20) business days after the date Settling Plaintiffs' counsel provides Pfizer with written notice that a minimum of four hundred (400) plaintiffs who have been diagnosed with mesothelioma have agreed to be Settling Plaintiffs and subject to Section 5.1(a)); Ex. J533 (Settlement Agreement, §§ 4.2(a)-(b)) (earlier of the District Court confirmation date and December 1, 2008); Ex. J535 (Settlement Agreement, §§ 4.2(b)-(c)) (earlier of the District Court confirmation date and December 1, 2008 and "if such payment was not made in accordance with this Section 4.2(b), Settling Plaintiffs' counsel, may, at its sole discretion, terminate the Settlement Agreement); Ex. J534 (Settlement Agreement, §§ 4.2(b)-(c)) (earlier of the date Settling Plaintiffs' counsel provides Pfizer with written notice that a minimum of eighty-two (82) plaintiffs who have been diagnosed with mesothelioma have agreed to be Settling Plaintiffs and the District Court confirmation date).

185.    The remaining 50% balance (the "Second-Half Payment") was conditioned upon a confirmed, final and non-appealable Quigley plan that establishes a 524(g) trust and channeling injunction for the benefit of Pfizer and the other Pfizer Protected Parties (the "Consensual Plan Effective Date"). Ex. P3003 (Form Settlement Agreement, §§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan"), 4.1, 4.1(g), 4.2(c)); Ex. J467-J532, J534-J536 (Settlement Agreements, §§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan"), 4.1, 4.1(g), 4.2(c)); Ex. J533 (Settlement Agreement, §§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan"), 4.1, 4.1(g)).

186.     As of trial, 150,932 Settling Plaintiffs had received their First-Half Settlement Payment (an aggregate payment of $228M); all Settling Plaintiffs will receive their Second-Half Settlement Payment only if, and only if, Quigley's Plan is confirmed.  Ex. J4547, at 24-25 (Rourke Report, Table 11);  Ex. P3003 (Form Settlement Agreement, §§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan"), 4.1, 4.1(g), 4.2(c)); Ex. J467-J532, J534-J536 (Settlement Agreements, §§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan"), 4.1, 4.1(g), 4.2(c)); Ex. J533 (Settlement Agreement, §§ 1.1 (definitions of "Consensual Plan Effective Date" and "Quigley Consensual Plan", 4.1, 4.1(g)).

### i.     Qualification Rates Impact The Expected TDP Recovery Of Settling Plaintiffs.

187.     "Qualification rates" are an estimate of the percentage of claims submitted that will satisfy the requirements of the TDP and thus "qualify" for payment under the plan.  Tr. 1938:14-24 (Rabinovitz).

188.     A "Settling Plaintiff" is defined as a claimant who has met the requirements under the Pfizer Settlement Agreement thereby entitling them to be paid by Pfizer in the amount specified in the particular agreement to which they were a party.  Ex. P3003, at 6 (Form Settlement Agreement, §1.1 (definition of "Settling Claimant")); Ex. J467-J536 (Settlement Agreements).

189.     In discussions with Pfizer concerning the additional contribution to be made to account for Pfizer's waiver the 90% Subordination Provision, Al Togut and Dr. Rabinovitz applied per-disease qualification rates for these Settling Plaintiffs.  Ex. Q2007; Tr. 1989:2-7 (Rabinovitz).

190. Both Pfizer and the FCR, through its claims expert HR&A, assumed that approximately 117,414 of the 170,306 Settling Plaintiffs would not be able to meet the requirements of the TDP, and thus would not qualify for a payment under the Quigley Plan. Ex. Q2007; Tr. 1898:2-1993:11 (Rabinovitz).

191. Specifically, Dr. Rabinovitz calculated, disease-by-disease, that the percentage of Settling Plaintiffs who would be expected to qualify for payment under the TDP requirements (*i.e.,* the "Qualification Rate") was: 56% of mesotheliomas; 60% of lung cancer and other cancers and 28% of non-malignants. Ex. Q2007 (Pfizer/FCR Make-Whole Calculation); Tr. 1898:2-1993:11 (Rabinovitz); Tr. 2253:4-10 (Togut, Togut believes that somewhere around half of the Settling Plaintiffs will not qualify under the TDP).

### ii. The Settling Plaintiffs Receive Substantially More Under The Pfizer Settlement Agreements Than They Would Under A Confirmed Quigley Plan.

192. At the time of the March 31, 2006 vote on the third amended plan of reorganization (the "Third Amended Plan"), prior to Pfizer's waiver of the 90% Subordination Provision, the Settling Plaintiffs collectively stood to receive a maximum of $14,203,420 under the Quigley plan (if 100% of them qualified under the TDP) and a minimum of $5,972,774 (if the FCR's qualification rates are considered). JPTO, Undisputed Facts, ¶ 50; Ex. A4547, at 26 (Rourke Report); Tr. 1992-93 (Rabinovitz); Ex. Q2007 (Pfizer/FCR Make-Whole Calculation, projecting that of the Settling Plaintiffs only between 56% and 60% of the malignancies and 28% of the non-malignances would qualify for payment under Quigley's TDP).

193. The aggregate Second-Half Settlement Payment ($228M) was, as of the first vote in 2006, at least sixteen (16) times the total amount that the Settling Plaintiffs could have expected to receive under the Plan ($228M / $14.2M). Ex. A4547, at 26 (Rourke Report).

194.    At the time of the 2008 vote, following Pfizer's unilateral waiver of the 90%

Subordination Provision, the maximum amount that the Settling Plaintiffs could expect to

receive under the Plan is $14,034,200M (if 100% of then qualified under the TDP) and a

minimum of $59,727,738M (if the FCR's qualification rates are considered). Ex. A4547, at 26

(Rourke Report, Table 12 (displaying total number of Settling Plaintiffs, Total dollars owed to

them by Pfizer and Expected recovery under the TDP accounting for the 90% waiver), Table 13,

(displaying Expected recovery under the TDP for the same Settling Plaintiffs once the 90%

Subordination Provision was removed)); Ex. Q2007 (Pfizer/FCR Make-Whole Calculation).

195.    The aggregate Second-Half Settlement Payments was at least 161% of the

corresponding Quigley TDP value assuming 100% of the Settling Plaintiffs qualify ($228M vs.

$142M), and is higher than that when qualification rates are applied ($228M vs. $67M). Ex.

A4547, at 25 (Rourke Report, Table 13).

196.    The most significant economic incentive the Settling Plaintiffs and the Settling

Law Firms had in voting to approve the plan was to ensure the receipt of the Second-Half

Settlement Payment from Pfizer. Ex. A4547, at 25 (Rourke Report); Tr. 2333:8-11 (Rourke).

197.    Although Pfizer's expert, Stephen Sellick, criticizes Dr. Rourke's analysis of

Settling Plaintiffs' voting motivations, he never examined the actual Pfizer Settlement

Agreements to ascertain the requirements of receiving payment under those agreements.  Tr.

2779:3-21 (Sellick).

198.    Sellick also ignored the first vote in 2006 (at which time the 90% reduction was

still in place) in his rebuttal of Rourke's opinion that the Settling Plaintiffs had an economic

incentive to vote for the Pan. Tr. 2805:14-15 (Sellick).

### iii. The Disparity Between Pfizer Payments And Plan Payments Is Made Even More Clear By Looking At Individual Law Firms.

199. Before the first vote in 2006, Quigley and Pfizer's proposed contributions had been identified, a future claims estimate had been made, TDP values had been scheduled and the Initial Payment Percentage of 7.5% had been established. Ex. J15 (Oct. 6, 2005, Third Amended Disclosure Statement, § A.8 Class 4 Asbestos Claims). Applying the Scheduled Values, the Initial Payment Percentage and the 90% Subordination Provision results in an anticipated recovery for a Settling Plaintiff, if they otherwise met the TDP requirements, of $1,500 for a mesothelioma claimant, $262.50 for a lung cancer claim or severe asbestosis claimant, $113 for an other cancer claimant, $38 for an asbestos/pleural disease level II claimant and $15 for an asbestosis/pleural disease Level I claimant.

200. Thus, at the time of the 2006 vote, any individual Settling Plaintiff had information available to him/her sufficient to allow them to compare the money he/she would be entitled to receive under the Pfizer Settlement Agreement (indeed, many of the Settling Plaintiffs had already received the first-half of their Pfizer payment) with the money he/she would be entitled to if they met the requirements of the TDP.

201. For example, any Settling Plaintiff suffering from mesothelioma and represented by Baron & Budd knew that they would receive $████ from Pfizer if they resided in Texas ($████ if they resided elsewhere) as opposed to $1,500 if they qualified under the TDP, Ex. J469, at 8; any individual mesothelioma claimant represented by Ferraro & Associates knew that they would receive $████ from Pfizer as opposed to $1,500 if they qualified under the TDP, Ex. J500, at 11; any of the almost 10,000 non-malignant claimants represented by Morris, Sakalarios knew that they would receive more than $████ from Pfizer as opposed to $15

(Asbestos/Pleural Disease Level I) or $37.50 (Asbestos/Pleural Disease Level II) if they qualified under the TDP. Ex. J469.

202. In total, at the time of the 2006 vote, only nine (9) individual claimants (8 mesothelioma claimants represented by Dies, Dies & Henderson who were each receiving $██ from Pfizer; and 1 mesothelioma claimant represented by The Carlile Law Firm who was receiving $██ from Pfizer), out of more than 170,000 Settling Plaintiffs, stood to gain more from the Asbestos PI Trust than Pfizer had promised to pay them. Ex. A4547, at 82 (Rourke Report, Appendix C-5b, setting forth per-disease settlement values for each Settling Law Firm, only two of which (covering 9 claimants) were less than the anticipated per-disease recovery in 2006 when the 90% Subordination Provision was in place).

203. The Settling Law Firms were capable of performing the same analysis with respect to their clients as a whole, and also were aware of the qualification rates at which their claimants had historically received payments from Pfizer and Quigley. Ex. A4547, at 74-75 (Rourke Report, Appendix C-4, listing post-CCR qualification rates by firm for the Settling Law Firms).

204. In August 2006, the Court ruled that as a result of the 90% Subordination Provision, the votes of the Settling Plaintiffs had to be weighted accordingly and, as a result, the vote did not satisfy the 2/3 value requirement of 11 USC §1123. See In re Quigley Co., 346 B.R. 647, 659 (Bankr. S.D.N.Y. 2006) ("Accordingly, dilution of the Settling PI Claimants' vote by 90% results in rejection of the Plan by Class 4").

205. As a result, Pfizer unilaterally waived §2.4(b), thus increasing each Settling Plaintiffs' Quigley claim by a factor of ten, for which the putative Asbestos PI Trust would be responsible. Tr. 964:1-965:18, 967:21-968:11 (Street, not aware of waiver or impact); Ex.

A4547, at 27-29 (Rourke Report, accounting for possible independent review and calculating anticipated rates after the 90% Subordination Provision had been waived of $15,900 for a mesothelioma, $2,500 for a lung cancer, $1,200 for other cancer, and $300 for a non-malignant claimant).

206.     Following Pfizer's waiver, there were still only a small number of malignant claimants who (assuming they could qualify under the TDP) could have expected to receive more under the TDP than they were receiving from Pfizer. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b, setting forth per-disease settlement values for each Settling Law Firm).

207.     There were approximately 22,000 non-malignant claimants who, if they qualified, may have received more under the TDP than they were receiving from Pfizer. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b). All of these claimants were represented by the Jacques Admiralty Firm, and each was scheduled to receive approximately $▮▮▮ from Pfizer. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b).

208.     These claims had all been pending against Quigley for many years. JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 12:7-19, 19:22-25 (November 12, 2008) (Jacques firm began naming Quigley as a defendant in 1993, most cases had named them by 1999).

209.     Prior to entering the Pfizer Settlement Agreement, in its entire history of representing asbestos claimants, the Jaques Firm had settled only one (1) case with Quigley – a single lung cancer settled during the post-CCR period. JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 23:12-24 (Nov. 12, 2008) (Attorney Kellman unaware of any settlements, or settlement discussions, with Pfizer or Quigley prior to his Summer 2004 discussions); Ex. A4547, at 62-68 (Rourke Report, Appendix C-1, listing a single lung cancer case settled by Jacques during the post-CCR period).

210. In addition, the expected $█████ from Pfizer was *less* than the recovery that a claimant suffering from Asbestosis/Plueral Disease Level I could have expected under the TDP in 2008. Ex. J43, at 126-160 (March 28, 2008, Plan, Ex. B, Trust Distribution Procedures, $2,000 scheduled value for Asbestosis/Plueral Disease Level I; 7.5% Initial Payment Percentage; $15 total expected recovery). The electronic voting database indicates that the Jacques Firm cast 20,293 accepting ballots in the "Pleural Disease (Level 1)" category, each assigned a voting value of $2,000 which, when the Initial Payment Percentage is applied, equates to a $150 potential TDP recovery. Ex. J79 (Electronic Voting Database, "tblMasterBallotDetailsExport" Table, queried for "Jacques" in Name field and "Plueral Disease (Level 1)" in the Disease field).

### a. Kelley & Ferraro.

211. On August 31, 2004, Michael V. Kelley, Esquire, on behalf of the law firm of Kelley & Ferraro LLP, Bevan & Associates LPA and Climaco, Lefkowitz, Peca, Wilcox & Garafoli Cp., LPA and James L. Ferraro, Esquire, on behalf of the law firm of Ferraro and Associates, P.A. (collectively, the "Ferraro Firms") entered into a Pfizer Settlement Agreement with Pfizer (the "Ferraro Agreement"). Ex. J500 (Ferraro Settlement Agreement).

212. The Ferraro Agreement lists a total of 20,929 claimants (87 mesothelioma, 507 lung cancer, 282 other cancer and 20,053 other asbestos disease) who settled for an aggregate sum of $70,000,000. Ex. J500, at 11 (Ferraro Settlement Agreement, Settlement Amount); Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b, identifying 12,792 total claims for Kelley & Ferraro, 4,899 total claims for Ferraro & Associates, 2,301 total claims for Bevan and 396 total claims for Climaco).

213. The Ferraro Agreement breaks down this $70M by disease – each of the 87 mesothelioma claimants was to receive $█████ each of the 507 lung cancer II claimants was to receive $████ each of the 282 other cancer claimants was to receive $████ and each of

53

the 20,053 non-malignant claimants was to receive $█████ Ex. J500, at 11 (Ferraro Settlement Agreement, Settlement Amount); cf. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b, identifying 20,398 total claimants submitted and accepted in the Schedule 1 Database owed a total of $66,375,614).

214. Based on the Scheduled TDP Values, the proposed 7.5% Initial Payment Percentage, the 90% waiver and the HR&A qualification rate assumption, the Ferraro claimants who were entitled to receive $70,000,000 under the Pfizer Settlement Agreement expected to receive only $342,264 from the Quigley Trust at the time of the 2006 vote and only $3,422,640 from the Quigley Trust at the time of the 2008 vote. Ex. Q2007 (Pfizer/FCR Make-Whole Calculation); Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b).

215. Pfizer has paid the first half of the Settlement Amount to the Settling Plaintiffs under the Ferraro Agreement, approximately $35M. Ex. 4547 (Rourke Report).

216. Pfizer will pay the second-half payment of an additional $35M to Ferraro's claimants five (5) days after the plan is confirmed, but only if it is confirmed, and all rights to appeal are exhausted. Ex. J500 (Ferraro Settlement Agreement).

**b.** **Jacques Admiralty Firm.**

217. On August 31, 2004, The Jacques Admiralty Firm entered into a Pfizer Settlement Agreement (the "Jacques Agreement"), pursuant to which it settled approximately 27,377 claims for an aggregate sum of $13,004,075. Ex. J497, at 12 (Jacques Admiralty Settlement Agreement, Settlement Amount). The Jacques Agreement provides no per-disease breakdown of the claims, although such information has been determined by Dr. Rourke from the CHU Database. Ex. J497, at 12 (Jacques Admiralty Settlement Agreement, listing simply 27,377 Settling Plaintiffs for $13,004,075); Ex. A4547 (Rourke Report, Appendix C-5b, identifying 24,637 claims for the Jaques Firm in the Schedule 1 Database).

218.  Dr. Rourke's analysis reveals that of the Jaques claims accepted by Pfizer, 65 were held by claimants alleged to be suffering from mesothelioma (paid an average of $██████, 1,367 were held by claimants alleged to be suffering from lung cancer (paid an average of $████, 857 were held by claimants alleged to be suffering from other cancer (paid an average of $████) and 22,348 were held by claimants alleged to be suffering from a non-malignant disease (paid an average of $███. Ex. A4547 (Rourke Report, Appendix C-5b, listing Schedule 1 Claims by disease category).  In the aggregate, Dr. Rourke determined that Pfizer paid, or committed to pay, 24,637 Jaques claimants a total of $12,448,787 under the Jaques Agreements. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b); Ex. J497, at 11 (Jacques Admiralty Settlement Agreement, agreement lists 27,377 claims for $13,004,075).

219.  Based on the Scheduled TDP Values, the proposed 7.5% Initial Payment Percentage, the 90% waiver and the HR&A qualification rate assumption, the Jaques claimants who were entitled to receive almost $13M under the Jaques Agreement stood to receive only $512,353 from the Quigley Trust at the time of the 2006 vote and only $5,123,532 from the Quigley Trust at the time of the 2008 vote. Ex. Q2007; Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b).

220.  As noted above, the Jacques Firm had almost no prior settlement history with Pfizer/Quigley and had only named Pfizer in one (1) out of more than 27,000 lawsuits.  JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 19:4-19:24 (Nov. 12, 2008).

c.  **Baron & Budd.**

221.  On September 1, 2004, the law firm of Baron & Budd entered into a Pfizer Settlement Agreement (the "Baron & Budd Agreement"), pursuant to which it settled approximately 4,377 claims for an aggregate sum of $47,767,100. Ex. J469, at 1, 8, 112 (Baron & Budd Settlement Agreement, stating 4,377 individual claimants, breaking these claimants

down by disease type, Texas and non-Texas residents and settlement amounts and aggregate sum); Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b, identifying 4,098 Baron & Budd claims in the Schedule 1 Database).

222.    The Baron & Budd Agreement breaks these 4,377 claimants down by two (2) variables, disease type and whether the claimant resides in Texas or not, and assigns a dollar value to each category of claimant. Ex. J469, at 8 (Baron & Budd Settlement Agreement). In particular, each of the 114 Texas mesothelioma claimants receives $██████, each of the 262 non-Texas mesothelioma claimants receives $██████, each of the 106 Texas lung cancer claimants receives $██████, each of the 413 non-Texas lung cancer claimants receives $██████ each of the 58 Texas other cancer claimant receives $██████ each of the 125 non-Texas other cancer claimants receives $██████ each of the 941 Texas non-malignant claimants receives $██████ and each of the 2,358 non-Texas non-malignant claimants receives $██████ Ex. J469, at 8 (Baron & Budd Settlement Agreement); cf. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b, identifying 4,098 total claimants in the Schedule 1 Database owed a total of $45,888,689).

223.    Based on the Scheduled TDP Values, the proposed 7.5% Initial Payment Percentage, the 90% waiver and the HR&A qualification rate assumption, the 4,377 claimants who were entitled to receive $47,767,100 under the Baron & Budd Agreement stood to receive only $453,528 from the Quigley Trust at the time of the 2006 vote and only $4,535,280 from the Quigley Trust at the time of the 2008 vote. Ex. Q2007 (Pfizer/FCR Make-Whole Calculation); Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b).

**d.    Deakle-Couch.**

224.    On February 25, 2008 the Deakle-Couch Law Firm, PLLC, entered into a Pfizer Settlement Agreement (the "Deakle Agreement"), pursuant to which it settled up to 16,908 claims for an aggregate sum not to exceed of $16,907,007.47. Ex. J533, at 11 (Deakle-Couch

Settlement Agreement, Settlement Amount, "The parties contemplate the submission of not to exceed 16,908 Claims of Settling Plaintiffs, for a total Settlement Amount of no more than $16,907,007.47.").

225. The Deakle Firm had no previous settlement history with Pfizer/Quigley and, at the time of the Pfizer Settlement Agreement, did not even have a pending action filed against either company. JPTO, AHC Deposition Designations, Ex. D, Deakle Dep. 28:15-22 (Jan. 27, 2009); Ex. A4547 (Rourke Report).

226. The Deakle Agreement provides no per-disease breakdown of the claims, although such information has been determined by Dr. Rourke from the CHU Database. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b, identifying 16,894 claims for the Deakle firm in the Schedule 1 Database).

227. Dr Rourke's analysis reveals that of the 16,894 Deakle claims accepted by Pfizer, 17 were held by claimants alleged to be suffering from mesothelioma (paid an average of $██████), 262 were held by claimants alleged to be suffering from lung cancer (paid an average of $██████), 285 were held by claimants alleged to be suffering from other cancer (paid an average of $██████) and 16,330 were held by claimants alleged to be suffering from a non-malignant disease (paid an average of $████. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b, listing Schedule 1 Claims by disease category). In the aggregate, Dr. Rourke determined that Pfizer paid, or committed to pay, 16,894 Deakle claimants a total of $16,883,118 under the Deakle Agreement. Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b); Ex. J497, at 11 (agreement lists up to 16,908 claims for not more than $16,906,007.47).

228. Based on the Scheduled TDP Values, the proposed 7.5% Initial Payment Percentage, and the HR&A qualification rate assumption, the 16,894 claimants who were

entitled to receive $16,883,118 under the Deakle Agreement stood to receive only $2,212,288 from the Quigley Trust at the time of the 2008 vote. Ex. Q2007; Ex. A4547, at 82-91 (Rourke Report, Appendix C-5b).

### e. **Summary.**

229. This same analysis, done for each of the Settling Law Firms, indicates that accounting for the FCR's qualification rates, collectively, the more than 170,000 Settling Plaintiffs who were entitled to receive more than $450M from Pfizer stood to receive only $6,489,579 from the Quigley Trust at the time of the 2006 vote and only $67,017,096 from the Quigley Trust at the time of the 2008 vote. See Chart attached hereto as **Exhibit A**.

230. Mr. Sellick testified that 44,000 of the Settling Plaintiffs will receive a greater distribution under the Quigley plan than they would under the Second-Half Settlement Payment. Tr. 2748:15-25 (Sellick).

231. Mr. Sellick did not identify those claimants in any way. Tr. 2748:15-25 (Sellick).

232. His testimony is misleading because he: (i) fails to compare the payments from Pfizer to the expected Plan distributions prior to the time of Pfizer's unilateral waiver of the 90% Subordination Provision; (ii) fails to compare the distribution the Settling Plaintiffs will receive under the Plan with the entire settlement payment from Pfizer; and (iii) fails to consider that, using Pfizer's and the FCR's expected qualification rates, more than 68% of these 44,000 Settling Plaintiffs will not receive any payment under Quigley's plan. Tr. 2748:2-25 (Sellick).

### iv. **The Fact That The Trust Payments Will Be Paid Over Ten Years Further Minimizes Their Significance To Settling Plaintiffs Compared To The Pfizer Payments.**

233. Payments from the Asbestos PI Trust under the TDP will take an average of ten years from the time of submission of a claim to the Trust. Ex. A4547, at 31-37 (Rourke Report, Opinion 6).

234.   The delay in payment under the TDP occurs because of (i) a surge of initial claims and thus a limit on claims processing capacity; (ii) once a claim is processed, it is placed in a payment queue and cannot be paid until there are sufficient funds in the Trust; (iii) the bulk of the liability occurs in the very early years of the Asbestos PI Trust's operations, but the funds to pay it (primarily from the annuities from Pfizer) are distributed ratably over the expected life of the Trust (50 years); and (iv) the terms of the TDP prohibit borrowing or capitalizing assets to pay claims (thus forcing claims to be carried over to the following year when assets are insufficient in order to conserve the Asbestos PI Trust's assets).  Tr. 2335, 2338-43, 2370, 2386 (Rourke); Ex. A4547, at 31-37 (Rourke Report); Ex. J1, at 173, 218 (March 4, 2005, Disclosure Statement, Ex. A (Plan), Ex. B (Asbestos-Related Personal Injury Trust Distribution Procedures)).

235.   This delay in receiving payments from the Trust further discounts the value Settling Plaintiffs receive under the TDP, and increases the significance of the Pfizer payments to Settling Plaintiffs when considering their voting motivations.  Tr. 2335, 2338-43, 2370, 2386 (Rourke); Ex. A4547, at 31-37 (Rourke Report).

**F.     Pfizer Applied Less Rigorous Criteria When Deciding Whether To Accept Claims For Payment Under The Pfizer Settlement Agreements Than It Had Applied Historically.**

236.   Under the Pfizer Settlement Agreements, the Settling Plaintiffs would not receive any payment from Pfizer until he or she submitted the requisite information and it was accepted by Pfizer, Ex. P3003 (Form Settlement Agreement, §§ 2.1, 2.2), a process took many months. The First-Half Settlement Payments under the Pfizer Settlement Agreements did not begin being made until November 29, 2005.  Tr. 1806:1-10; 1819:19-1820:4 (Snow).

237.   First-Half Settlement Payments continued to be made into 2007.  Tr. 1806:1-10 (Snow).

238. Under the Pfizer Settlement Agreements, Pfizer retained the ability to waive any deficiency in a claimant's claim submission. JPTO, Undisputed Facts, ¶ 53.

239. The rate at which claims qualified and were thus accepted for payment by Pfizer under the Pfizer Settlement Agreements was 81.3% (compared to only 48.6% for post-CCR claims for the same Settling Law Firms); that is, the acceptance rate in connection with the Pfizer Settlement Agreements was almost double what it had been historically. Ex. A4547, at 24-25 (Rourke Report); Ex. A4076 (August 4, 2004, email among FCR representatives – Rabinovitz, summarizing a conversation with Greenspan and Rubin, reports that they stated "the exposure requirements in the [Proof of Claim] are not being required of the settlers.").

240. In Dr. Rourke's experience, he has never seen as large and rapid change in acceptance rates filed with the same entity due to changes in the characteristics of the claims being filed. Ex. A4547, at 24-25 (Rourke Report).

241. In Dr. Rourke's opinion, it is reasonable to conclude that the change in acceptance rate is because Pfizer applied a significantly less strict criteria to the evaluation of the Pfizer Settlement Agreements than it had historically applied in the tort system. Ex. A4547, at 24-25 (Rourke Report).

242. Had Pfizer paid the Pfizer Settlement Agreements at the historic acceptance rate, 90,200 claimants would have been accepted and paid, but over 95,300 claimants would have been rejected. Ex. A4547, at 25 (Rourke Report).

243. Since claims began being submitted in late 2004 and the final vote seeking approval of the proposed Plan did not occur until March 2008, rejection at historic rates might have caused the rejected claimants to either not vote or vote against the Plan, thus leaving Pfizer without the necessary vote for approval. Ex. A4547, at 25 (Rourke Report).

**G. The Voting Results Reflect The Impact Of The Economic Incentives Created By The Pfizer Settlement Agreements And Are Unreliable.**

244. On cross-examination, Dr. Rourke testified that, in his opinion, the voting results demonstrate that the Pfizer Settlement Agreements influenced the voting behavior of the Settling Plaintiffs and motivated them to vote in favor of the plan. Tr. 2364:23-2268:9 (Rourke); see also Tr. 2305-07, 2319:17-23, 2333:4-11, 2348 (Rourke); Ex. A4547, at 13-15 (Rourke Report).

245. The Settling Plaintiffs voted in favor of the Plan by 99.48% in number and 98.53% in amount. Ex. J78, at 365 (BMC Group Voting Declaration, Ex. C-2).

246. Among Non-Settling Plaintiffs, only 66.27% in number and 66.20% in amount voted in favor of the Plan. Ex. J78, at 365 (BMC Group Voting Declaration, Ex. C-2).

247. The vast majority of claimants voted by master ballot (97.1% or 254,215 out of 261,790). Ex. J78, at 362 (BMC Group Voting Declaration, Ex. A-2).

248. With only a single exception (the firm of Edward O. Moody), the clients of the Settling Law Firms who voted on the Plan voted unanimously to accept it. These unanimous votes cast by the Settling Law Firms included the votes of a substantial number of Non-Settling Plaintiffs who were represented by Settling Law Firms. Ex. A4547, at 14-15 (Rourke Report). The only reason unanimous support by Settling Law Firms does not exist is because a single lawyer, Edward Moody, is recorded in Schedule 1 of the CHU database as a Settler, and his clients voted both for and against the Plan. Mr. Moody's law firm is not identified as a Settling Law Firm in any of the Settlement Agreements. Ex. J467-J536 (Settlement Agreements). Nonetheless, because he appeared in the Schedule 1 database, Dr. Rourke treated him as a Settling Law Firm. Ex. A4547, at 14-15 (Rourke Report).

249. Almost three-fourths of all votes cast by Non-Settling Plaintiffs (73,499 out of 101,192) were cast by Non-Settling Plaintiffs who are represented by Settling Law Firms. Ex. A4547, at 38 (Rourke Report).

250. If only those votes cast by claimants represented by Non-Settling Law Firms are considered, only 19.7% in number voted to accept the Plan and 80.3% voted to reject it. Ex. A4547, at 13-15 (Rourke Report).

### i. The Original TDP Expressly Contemplated That Most Settling Plaintiffs Would Receive Nothing Under The Plan.

251. The initial draft TDP was an exhibit to the Form of Pfizer Settlement Agreement and was prepared by Pfizer's counsel. Tr. 2112 (Rozen).

252. Each of the executed Settlement Agreements expressly incorporated that same draft TDP into its terms pursuant to § 2.4(b).

253. Section 4.4 of the initial draft TDP included a provision, entitled "De Minimis Distributions," which provides as follows:

> Section 4.4    De Minimis Distributions.    Notwithstanding any other provision of these Trust Distribution Procedures, the Trust Agreement or the Plan, the Trustees shall not be required to make any distribution to any holder of an Allowed Quigley Asbestos Trust Claim in an amount less than $100.00. Cash allocated to an Allowed Quigley Asbestos Trust Claim but withheld from distribution pursuant to this Section 4.4 shall be held for a period of three years by the Trustees for the account of and future distribution to the holder of such Allowed Quigley Asbestos Trust Claim in the event the holder of such Allowed Quigley Asbestos Trust Claim becomes entitled to a distribution which, together with all distributions withheld pursuant to this Section 4.4, exceeds $100.00. If at the expiration of the three-year period referred to above, the distributions for each Allowed Quigley Asbestos Trust Claim being withheld at such time does not exceed $100.00, then the money withheld on account of such Allowed Quigley Asbestos Trust Claim will revert to the Asbestos Personal Injury Trust.

Ex. J492, at 54 (Ex. C, draft TDP, § 4.4) (emphasis added); Tr. 2115:10-2116 (Rozen).

254. At the time that the Pfizer Settlement Agreements were entered into, the proposed scheduled values in the draft TDP for the two types of asbestos/pleural disease were $200 or $2,500. Ex. J492, at 59-62 (Ex. C, draft TDP, § 5.3(a)(3)).

255. Applying sections 2.3, 4.4, and 5.3(a)(3) of the TDP, and the 90% Subordination Provision included in the Pfizer Settlement Agreements, any Settling Plaintiffs with the less severe Asbestos/Pleural Disease could not have expected to receive a distribution under Quigley's plan (regardless of what the Initial Payment Percentage ended up being), even if they would have qualified for payment under the TDP. Ex. J492, at 50, 54, 59-64 (Ex. C., draft TDP, §§ 2.3 (application of payment percentage), 4.4, 5.3(a)(3), (b)(3)); Ex. P3003, at 11-12 (Form Settlement Agreement, § 2.4(b)).

256. Likewise, as a result of sections 2.3, 4.4, and 5.3(a)(3) of the TDP and the 90% Subordination Provision included in the Pfizer Settlement Agreements, all Settling Plaintiffs with the more severe Asbestos/Pleural Disease could not have expected to receive any distributions under Quigley's plan, unless the Initial Payment Percentage was greater than 40%. Ex. J492, at 50, 54, 59-64 (Ex. C., draft TDP, §§ 2.3 (application of payment percentage), 4.4, 5.3(a)(3), (b)(3)); Ex. P3003, at 11-12 (Form Settlement Agreement, § 2.4(b)); Ex. A4544, at 2 (Rabinovitz comments to initial TDP - Trust not required to make payments less than $100, level 4 claims get $250, "the payment percentage would have to be 40% for them to be paid").

257. More than 153,000 of the Settling Plaintiffs were claimants with non-malignant asbestos-related claims. Ex. Q2007.

258. Of the Settling Plaintiffs who actually voted for the Plan, 136,000 were claimants with non-malignant claims. Ultimately, of the 68,385 Settling Plaintiffs with the less severe

Asbestos/Pleural Disease who voted on the Plan, 67,815 (or 99.61%) voted to accept the Plan. Ex. J78, at 365 (BMC Declaration, Ex. C-2).

259. Of the 70,385 Settling Plaintiffs with the more severe Asbestos/Pleural Disease who voted on the Plan, 68,975 (or 99.50%) voted to accept the Plan. Ex. J78, at 365 (BMC Declaration, Ex. C-2).

### ii. Testimony From Settling Law Firms Shows They Voted To Receive The Settlement Amounts, Not Quigley Distributions.

260. James Ferraro, who cast affirmative votes by Master Ballot on behalf of more than 48,000 claimants testified that the "primary concern" was to get the payment from Pfizer under the Ferraro Firms' Pfizer Settlement Agreement. Ex. A4547, at 69 (Rourke Report, Appendix C-2, 26,946 votes cast by Kelley & Ferraro; 16,999 votes cast by Ferraro & Associates); JPTO, AHC Deposition Designations, Ex. D, Ferraro Dep. 89:18-90:9, 102:2-14 (Mar. 30, 2009) ("Our primary concern was to get the big nut paid between Pfizer. That was it. That was it.") ("As far as this deal here, as long as we got out 70 million, whatever our component of that was, that was our biggest concern. To sit there and try to be a soothsayer about the trust going forward, we had better things to do with out time."); Tr. 2399:5-2400:19 (Ferraro Deposition Reading).

261. Ferraro stated that the contribution Pfizer was proposing, as described in the Pfizer Settlement Agreements, to make to the Trust was "nothing" and would be eaten up by administrative costs, and that the amount to be distributed to creditors under Quigley's plan was *de minimis*. JTPO, AHC Deposition Designation, Ex. D, Ferraro Dep. 146-7 (Mar. 30, 2009). Ferraro testified further:

> [I]t was not a big plan. We can't, you know, all we knew is it was
> not a big number. Knowing it is not a big number, knowing that
> nothing is there, you can't get blood out of a stone. We're more

concerned with a settlement agreement, the Pfizer component, and
that's it. The Quigley deal is not a hill of beans. It just isn't.

JTPO, AHC Deposition Designation, Ex. D, Ferraro Dep. 147 (Mar. 30, 2009).

262.    Anthony Sakalarios, attorney with the Settling Law Firm of Morris, Sakalarios &

Blackwell, PLLC (which represents 10,105 claims, including 9,762 non-malignancies, with a

value of $18,973,009), testified that he did not receive a copy of Quigley's proposed plan before

he entered into a Pfizer Settlement Agreement with Pfizer, and that he did not know and did not

care what Quigley's plan provided for because he was going to receive payment under the Pfizer

Settlement Agreement in any event. JPTO, AHC Deposition Designations, Ex. D., 30(b)(6)

Deposition of Morris, Sakalarios & Blackwell, PLLC (Tony Sakalarios), 77:22-78:17 (Jan. 27,

2009); Ex. A4547, at 71 (Rourke Report).

263.    John Deakle, attorney with the Settling Law Firm of The Deakle-Couch Law

Firm, P.L.L.C. (which represents 16,894 claims, including 16,300 non-malignancies, with a

value of $16,890,822), testified that he could not recall whether he received Quigley bankruptcy

materials in connection with his entering the Pfizer Settlement Agreement or whether he knew

any of the provisions of the proposed plan at that time, but he did understand that the Second-

Half Settlement Payment would only be made if the Quigley plan was confirmed. JPTO, AHC

Deposition Designations, Ex. D., Deakle Dep. 33:5-34:17, 43:24-44:19 (Jan. 27, 2009); Ex.

A4547, at 72 (Rourke Report, Appendix C-3).

264.    Alan Kellman, attorney with the Settling Law Firm the Jaques Admiralty Law

Firm, P.C. (which represents 24,637 claims, including 22,348 non-malignancies, who are

receiving approximately $13M from Pfizer), testified that he had no ability to assess the value of

the 10% Quigley trust distribution, Pfizer made no representation as to what his clients could

expect to recover from the Quigley trust, and there were no discussions regarding the proposed

TDP or payment percentage when he negotiated the Pfizer Settlement Agreement. JPTO, AHC Deposition Designations, Ex. D, Kellman Dep., 45:7-45:22 (Nov. 12, 2008); Ex. A4547, at 71 (Rourke Report, Appendix C-3).

### iii. The Designation Of A Claimant As A "Non-Settlor" On Their Ballot Is Not A Reliable Indicator Of Economic Interests.

265. Virtually all claimants' votes were cast by master ballot (97.1% or 254,215 out of 261,790). Ex. J78, at 362 (BMC Group Voting Declaration, Ex. A-2) .

266. Many of the Settling Law Firms cast votes on behalf of more claimants than they had Settling Plaintiffs; in other words, these firms represented both claimants who were receiving Pfizer payments and those who were not. Ex. A4547, at 39 (Rourke Report, Table 18).

267. In virtually every instance, the Master Ballots submitted by these firms voted 100% in favor of the Plan. Ex. A4547, at 14-15 (Rourke Report).

268. For example, the Ferraro Agreement covered 20,929 Settling Plaintiffs (represented by the firms of Kelley & Ferraro, Ferraro & Associates, Bevan & Associates and Climaco Leftkowitz), who collectively stand to receive $70M from Pfizer, but these same firms cast "yes" votes on behalf of 48,320 claimants. Ex. J500 (Kelley & Ferraro Settlement); Ex. A4547, at 39 (Rourke Report, Table 18, 17,013 claims by Ferraro & Associates; 27,024 claims by Kelley & Ferraro; 4,283 claims by Bevan & Associates).

269. Of these 48,320 votes, 29,311 were cast by "non-settling claimants." Ex. A4547, at 39 (Rourke Report, Table 18, 12,118 "non-settling" Ferraro & Associates claimants; 15,262 "non-settling" Kelley & Ferraro claimants; 1,931 "non-settling" Bevan & Associates claimants).

270. Similarly, the firm of Brent Coon & Associates settled 14,398 claims under their Pfizer Settlement Agreement for an aggregate sum of $24,451,500, but voted 17,314 total claims.

Ex. J472, at 13 (Brent & Coon Settlement Agreement, Settlement Amounts); Ex. 4547, at 39 (Rourke Report, Table 18, 17,314 votes cast by Brent Coon).

271. Of these 17,314 votes, 8,060 were cast by "non settling claimants." Ex. A4547, at 39 (Rourke Report, Table 18).

272. The firm of Baron & Budd settled 4,377 claims under their Pfizer Settlement Agreement for an aggregate sum of $47,767,100, but voted 12,578 total claims. Ex. J469, at 1, 8, 112 (Baron & Budd Settlement Agreement); Ex. 4547, at 39 (Rourke Report, Table 18, 12,578 votes cast by Baron & Budd).

273. Of these 12,578 votes, 2,750 were cast by "non settling claimants." Ex. A4547, at 39 (Rourke Report, Table 18).

274. In total, of the 101,074 votes cast by "non-settling claimants," 73,499 were cast by Settling Law Firms pursuant to master ballots. Ex. J78, at 165 (Voting Declaration, Ex. C-2); Ex. A4547, at 39 (Rourke Report, Table 18).

**H. The Ad Hoc Committee's Opposition To The Plan And Recommendations To Its Clients To Reject The Plan Were Motivated By Its View Of The Plan And The Plan's Treatment Of Their Claims.**

275. Cooney & Conway, Weitz & Luxenberg, PC, and the Law Offices of Peter G. Angelos, PC joined together to form the Ad Hoc Committee of Tort Victims because all three firms had significant reservations about the fairness, equality, and appropriateness of Quigley's proposed plan. Tr. 2417:20-2418:10 (Cooney).

276. The Ad Hoc Committee, on behalf of the 40,000 claimants it represents, opposes confirmation of Quigley's plan because Pfizer's proposed contribution was an invented number, unrelated to Pfizer's historical liability. Tr. 2456:12-2457:3 (Cooney).

277. The Ad Hoc Committee also opposes the Plan because of the inclusion of Mineral Technologies, Inc. in the Section 524(g) injunction (notwithstanding the fact that Mineral Technologies provided no contribution to the Asbestos PI Trust). Tr. 2485:18-24 (Cooney).

278. The Ad Hoc Committee's opposition to confirmation and recommendations that their clients reject the Plan is informed by the discrepancy between historical mean settlement values and the proposed plan recoveries. For example, Cooney's historical mean settlements for mesothelioma cases with Pfizer and Quigley were in excess of half-a-million dollars, while the estimated plan recoveries for each mesothelioma victim was only approximately $15,000 payable at some point over a period of ten years. Tr. 2488:1-2489:17 (Cooney); Ex. A4547, at 12, 16 (Rourke Report).

279. As calculated by Dr. Rourke, the value of the claims represented by the members of the Ad Hoc Committee (based on the respective firms' historical, per-disease average settlements) was an aggregate of $966,783,887. Ex. A4547, at 38 (Rourke Report, Table 17, $425,777,279 for Cooney & Conway claimants; $415,067,749 for Weitz & Luxenberg claimants, $125,938,859 for Angelos claimants).

280. Rozen testified at trial that he made settlement offers to Perry Weitz ($100M) and Peter Angelos (approximately $30M-$40M). Tr. 2071:8-2072:22, 2062:9-19, 2057:6-21 (Rozen). This testimony was rebutted by the AHC witnesses. JPTO, Pfizer Deposition Designations, Ex. C, Weitz Dep. 92:4-92:16 (Feb. 3, 2009); JPTO, Pfizer Deposition Designations, Ex. C, Angelos Dep. 20:16-21:4; 24:16-25:16 (Feb. 6, 2009); JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 108:13-109:4 (Jan. 30, 2009); JPTO, AHC Deposition Designations, Ex. D, Feinberg Dep. 46:10-46:14 (Jan. 7, 2009); Tr. 793-96 (Street); Tr. 2462:24-2463:11 (Cooney, testified that Rozen never provided his firm a settlement offer).

Even if the Court were to accept Mr. Rozen's testimony, the numbers he testified to represented lower percentages of historical averages than what had been paid to many Settling Law Firms.

281.    For example, pursuant to the Ferraro Agreement, Pfizer committed to pay 20,398 claimants an aggregate total of approximately $70M. Ex. 4547 (Rourke Report, Appendix C-3, (setting out per-disease, per firm settlement dollars for Kelley & Ferraro, Ferraro & Associates, Bevan & Associates and Climaco Leftkowitz). Based on their firms' respective historical averages, as computed by Dr. Rourke, these same claimants could have expected to received approximatelt $136M if they remained in the tort system. Ex. 4547 (Rourke Report, Appendix C-1 (setting out each firms' historical, per-disease average), Appendix C-3 (listing the number of Settling Plaintiffs for each firm)). In other words, Pfizer agreed to pay these claimants approximately 50% ($70M/$136M) of their expected tort system recovery. Mr. Rozen's claimed offer of $100M to Mr. Weitz, even if accepted, represented less than 25% of his claimants' expected tort system recovery ($100M/$415M).

282.    Cooney & Conway, Weitz & Luxenberg, PC, and the Law Offices of Peter G. Angelos, PC did not enter into Pfizer Settlement Agreements because Pfizer never negotiated in good faith to resolve their claims for fair value and Pfizer never provided firm settlements to any of them. Tr. 2462:20-2463:11(Cooney); Tr. 2057:2-23, 2060:1-4, 2071:13-2072:4 (Rozen); JPTO, Pfizer Deposition Designations, Ex. C, Weitz Dep. 92:4-92:16 (Feb. 3, 2009); JPTO, Pfizer Deposition Designations, Ex. C, Angelos Dep. 20:16-21:4; 24:16-25:16 (Feb. 6, 2009); Tr. 793-96 (Street); JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 108:13-109:4 (Jan. 30, 2009); JPTO, AHC Deposition Designations, Ex. D, Feinberg Dep. 46:10-46:14 (Jan. 7, 2009).

### III. PFIZER'S "CONTRIBUTION" IS NOT "FAIR AND EQUITABLE" IN LIGHT OF THE BENEFIT PFIZER RECEIVES FROM THE CHANNELING INJUNCTION (I.E., PROTECTION FROM BILLIONS OF DOLLARS OF QUIGLEY-RELATED ASBESTOS EXPOSURE.

283.    Pfizer is a non-debtor and 100% shareholder of Quigley. JPTO, Undisputed Facts, ¶ 4.

284.    Pfizer has been named in thousands of asbestos complaints over the past twenty years based on various theories of liability arising from Quigley's Insulag and Panelag products. Tr. 286:9-289:20 (Kany).

285.    In connection with Quigley's bankruptcy, Pfizer has voluntarily elected to request the issuance and protection of a channeling injunction under §524(g). Tr. 2099:3-8 (Rozen, admission that Pfizer was not a candidate for its own bankruptcy filing).

286.    The value of the channeling injunction consists of two components; (a) the value of the future claims estimated by HR&A; and (b) the tort system value of the unsettled claims that existed as of the petition date. Tr. 2584:15-24 (Shaked); Ex. A4546, at 18 (Shaked Report).

287.    The uncontested present value of the projected future tort claims is $2.66B. Tr. 1874:24-1875:23 (Rabinovitz); Ex. J42, at 162 (March 28, 2008, Disclosure Statement, Ex. I., HR&A Future Claims Analysis). The total value of those claims (not present valued) is $4.6B. Ex. J42, at 162 (March 28, 2008, Disclosure Statement).

288.    The value of the unsettled tort system claims ranges between $1.5B (the Ad Hoc Committee's estimate) and $420M (Pfizer's estimate). Tr. 2330:14-2332:24 (Rourke); Ex. A4547, at 40 (Rourke Report); Tr. 2759:7-2762:25 (Sellick).

289.    The total value of the requested channeling injunction is between $3.1B and $4.2B. Tr. 1874:24-1875:9 (Rabinovitz); Ex. J42, at 162 (March 28, 2008, Disclosure

Statement, Ex. I., HR&A Future Claims Analysis); Tr. 2330:14-20, 2332:1-24 (Rourke); Ex. A4547, at 40 (Rourke Report); Tr. 2759:7-2562:25 (Sellick).

290. Pfizer is ranked 46th in the Fortune 500 and has a market capitalization of $148.1B, total assets of $141.3B, cash and investments of $52.5B, annual revenue of $48.3B, annual earnings of $16.4B, annual cash flow from operations $17.7B, and annual net income of $8.1B. Tr. 2584:15-2585:19 (Shaked); Ex. A4559, at 37, 40 (Shaked Slides).

291. Compared to other solvent entities receiving 524(g) relief, Pfizer has greater means to provide a contribution equal to the value of its derivative exposure. Tr. 2584:15-2585:19, 2587:1-15 (Shaked); Ex. A4559 , at 37, 40 (Shaked Slides).

292. Pfizer's proposed contribution ranges between a negative $79M (the Ad Hoc Committee expert's number) and $370M (Pfizer expert's maximum number). See AHCF ¶¶ 325, 327 (below).

293. Regardless of which estimated value of Pfizer's putative contribution is accepted, it is uncontested that at most, Pfizer's contribution is equal to no more than 1/10 of the value of the claims that would be subject to the channeling injunction. See AHCF ¶¶ 289, 292 (above).

294. Pfizer's proposed contribution is limited only by what it is "willing" to contribute. Tr. 2108:5-21, 2110:3-23 (Rozen, Pfizer's contribution was limited by the available insurance coverage and "the amount that Pfizer determined was reasonable" and Pfizer agreed to pay a finite sum "contribution" regardless of the projected payment percentage and appropriate TDP values (based on historical settlement values)).

295. Pfizer's proposed contribution, in combination with that of Quigley, results in a projected recovery for asbestos claimants of only 7.5% of schedule TDP values. Ex. J47, at 21 (August 6, 2009, Plan, §1.1 definition of "Payment Percentage").

71

296.    Other very solvent, Fortune 500 companies, such as Halliburton and Honeywell, were afforded 524(g) channeling injunction protection for making contributions that resulted in 100% payments of asbestos claims.  Halliburton, the non-debtor parent, agreed to a contribution of approximately $4 billion in order to ensure a 100% payout to asbestos claimants.  In re Mid-Valley, Inc., 2004 Bankr. LEXIS 1553, at *20-21 (W.D. Pa. July 21, 2004) (59.5 million shares of Halliburton stock, raise or obtain commitments for the approximately $2.4 billion that will be needed to fund cash contributions, provide up to $350 million in DIP financing, and enter into a master letter of credit facility covering draws on $1.1 billion).  Honeywell, the non-debtor parent, agreed to a contribution of approximately $5.88 billion in order to ensure a 100% payout to asbestos claimants.  In re N. Am. Refractories Co., 2007 Bankr. LEXIS 4721, at *18 (W.D. Pa. Nov. 13, 2007); see also NARCO/Honeywell, Disclosure Statement, at 69-70 (Dec. 28, 2005); NARCO/Honeywell, Order Confirming Third Amended Plan (September 24, 2007) (Honeywell would pay $100-$150 million per year for fifteen years and $145 million per year for approximately twenty five years thereafter).  Likewise, in In re USG Corp., (No. 01-2094), the reorganized debtors agreed to pay asbestos claims through a total possible contribution of approximately $3.95 billion.  See USG, Findings of Fact and Conclusions of Law Regarding Confirmation of First Amended Joint Plan, at 13-14 (June 16, 2006 Bankr. D. Del.); see also USG, Disclosure Statement, at 1-2, 61 (Apr. 5, 2006) (agreed to pay $890 million and issue a promissory note in the amount of $10 million to the Asbestos Personal Trust and contingent notes in the aggregate amount of $3.05 billion to the Asbestos Personal Trust if the FAIR Act did not pass in a certain period of time, which it did not).

**A.**  **Value Of Present And Future Derivative Liability Pfizer Relieved Of By Issuance Of Channeling Injunction Ranges Between $3.1B And $4.2B.**

      **i.**  **Dr. Rabinovitz Projected Future Quigley-Related Asbestos Claims Of $4.43 Billion, With A NPV of $2.66 Billion.**

297.  Dr. Rabinovitz projected over 261,000 future Quigley-related asbestos claims reflecting liability of $4.43B, with a net present value of $2.66B.  Tr. 1874:24-75:23 (Rabinovitz); Ex. J42, at 162 (March 28, 2008, Disclosure Statement, Ex. I., HR&A Future Claims Analysis).

298.  The number and value of claims that can be brought against Quigley in the future are the same as the claims that can be brought against Pfizer asserting Quigley-derivative liability related to Insulag or Panelag.

      **ii.**  **Value Of Non-Settled Quigley-Related Asbestos Liability Is Between $420 Million And $1.525 Billion.**

299.  Using the settlement data in the CHU's databases for the period from 2001 through July 2004 (i.e., post-CCR period and pre-Pfizer Settlement Agreement period), along with the 2008 voting data Dr. Rourke calculated the amount of present, unsettled Quigley-related asbestos exposure to be $1.525B.  Tr. 2309:2-2320:12, 2330:14-20 (Rourke); Ex. A4547, at 12, 37, 62-68 (Rourke Report, Appendix C-1).

      **a.**  **Establishing Historical Settlement Averages By Firm.**

300.  Historical settlement averages are an appropriate and statistically valid means to determine the aggregate tort system value of the unsettled outstanding claims against Pfizer and Quigley based on Quigley-asbestos products.  Tr. 2319:1-16, 2327:6-19, 2357:3-23 (Rourke); Ex. A4547, at 12 (Rourke Report); Ex. A4547a (Rourke Slides).

301.  Dr. Rourke and Sellick, Pfizer's expert, both testified that Dr. Peterson computed the TDP values, which were ultimately used by Dr. Rabinovitz to calculate the future asbestos

liability and which form the basis of Mr. Sellick's implicit opinion of the aggregate tort system value of unsettled present claims, using arithmetic means of Pfizer and Quigley settlement data. Tr. 2327:22-2329:8 (Rourke); Tr. 2735:2-24, 2761:25-2762:19, 2767:10-20, 2770:14-23 (Sellick); Ex. P3025, at 4 (Sellick Declaration, ¶¶ 17-19); Ex. J42, at 162 (March 28, 2008, Disclosure Statement, Ex. I., HR&A Future Claims Analysis) ("The values are based on average amounts historically paid to resolve claims by disease type. ... [T]o determine the scheduled values for purposes of creating the payment "grid" in the TDP, the expert selected historical resolution values from a specific period in Quigley's claims resolution history. More specifically, the values paid by Quigley to resolve claims during the period following Quigley's exit from the Center for Claims Resolution provided the basis for the scheduled values set forth in the TDP.").

302. Dr. Rourke used historical settlement disease mean values by law firm, rather than historical settlement disease mean values for all claimants, to capture the characteristics of the individual law firms' claims. Ex. A4547, at 13 (Rourke Report).

303. Dr. Rourke opined that in his experience the negotiation and resolution of a law firm's current claims is impacted by that firm's settlement history, and law firms that have historically received more than law firms that have received less, for otherwise identical claims, will continue to do so. Ex. A4547, at 12 (Rourke Report).

304. In fact, this impact is explicitly considered in the claim valuation criteria for individually reviewed claims in the TDPs for many of the new asbestos settlement trusts. Ex. A4547, at 12 (Rourke Report).

305. Use of law firms' historical settlement disease averages (or means) to determine the value of the unsettled asbestos liability is also supported by testimony that plaintiffs' firms

and other parties use such information in their settlement negotiations. Tr. 2039:10-17 (Rozen); JPTO, AHC Deposition Designations, Ex. D, Feinberg Dep. Kellman Dep. 49:19-50:2 (Nov. 12, 2008); JPTO, AHC Deposition Designations, Ex. D, Ferraro Dep. 55:19-57:8 (Mar. 30, 2009); JPTO, Pfizer Deposition Designations, Ex. C, Weitz Dep. 70:23-72:6 (Feb. 3, 2009); JPTO, Pfizer Deposition Designations, Ex. C, Angelos Dep. 39:23-40:20 (Feb. 6, 2009); JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 55:3-55:7 (Jan. 30, 2009); JPTO, AHC Deposition Designations, Ex. D, Feinberg Dep. 15:10-16:18 (Jan. 7, 2009).

306. Dr. Rourke calculated historical tort system settlement values by disease for those law firms which have a history of settling asbestos claims with Pfizer and Quigley. Tr. 2320:13-2321:1, 2325:9-12 (Rourke); Ex. A4547, at 12, 62-68 (Rourke Report, Appendix C-1).

307. The total number of claims settled in the post-CCR period (prior to the Pfizer Settlement Agreements) is approximately 46,000, of which, only approximately 59 were paid by Pfizer only and not Quigley or Pfizer and Quigley. Tr. 2329:21-2330:17 (Rourke).

308. Relying on Pfizer's assertions, particularly Kany's affidavit, that almost all of Pfizer's asbestos exposure was derivative of Quigley liability and relatively few cases were based on non-Quigley products, Dr. Rourke assumed, for his analysis, that where both Pfizer and Quigley coded in the database for the same injured party i.d. November (i.e., a single settled claim), the Pfizer and Quigley amounts should be thought of not as two claims, but a single, composite claim and settlement addressing Quigley-related liability. Tr. 2322:7-2323:3, 2359:11-24 (Rourke). This assumption is supported by the fact that the exposure information in the database is based on job site, not product, and does not draw a distinction between exposure to a Quigley-product or exposure to a Pfizer-product. Ex. A4547a, at 5 (Rourke Slides).

309. Dr. Rourke demonstrated through computer screen shots taken from the CHU database that Pfizer and Quigley jointly settled asbestos claims involving a single claimant, with a single disease, who worked at a single job site. Ex. 4547a, at 2-5 (Rourke Slides).

310. From the CHU database, Dr. Rourke established that individual settlements based on exposure to a single jobsite were allocated 1/3 to Pfizer and 2/3 to Quigley. Ex. 4547a, at 5 (demonstrating that claimant with Injured Party ID number of 2003571310 claimed exposure only at Bethlehem Steel – Sparrow's Point settled his claim and received payment from both Pfizer (1/3 share) and Quigley (2/3 share).[2] Ex. A4547a, at 5 (Rourke Slides).

311. Dr Rourke further demonstrated that the CHU contained no field where exposure to a participation product was recorded. Ex. 4547a, at 2-5 (Rourke Slides).

312. Dr. Rourke established that the CHU only recorded "job site" information to prove exposure. Ex. 4547a, at 2-5 (Rourke Slides).

313. Dr. Rourke's assumption is also supported by Rozen's testimony that plaintiffs' law firms focused on Quigley-exposure and viewed their historical settlement values as the aggregate value of the Pfizer and Quigley settlement payments. Tr. 2033:3-21, 2039:2-22 (Rozen).

314. Moreover, Dr. Rourke's review of the database corroborated this assumption because where both Pfizer and Quigley paid claims, it was the same person, same disease and same exposure. Tr. 2323:4-10 (Rourke).

### b.     <u>Applying Historic Averages To Current, Unsettled Claimants.</u>

---

[2] Since the specific dollar amount of this individual claimant's settlement was designated as confidential at the time it was entered, the actual dollar figures are not being listed in this document. At trial, Dr. Rourke displayed a redacted version of this screenshot, Ex. 4547a, although the Court, along with counsel for Pfizer and Quigley, was provided with an unredacted version.

315.     To calculate the tort system value of the unsettled Quigley-related asbestos claims, Dr. Rourke used the historic settlement means by disease for each of the Peter G. Angelos firm, the Cooney & Conway firm, the Weitz & Luxenberg firm, and an aggregate mean for all other Non-Settling Law Firms (i.e., means by disease for all Non-Settling Law Firms excluding those of the Ad Hoc Committee firms). Tr. 2332:9-24 (Rourke); Ex. A4547, at 38 (Rourke Report).

316.     Dr. Rourke determined the number of Quigley-related claims not settled by Pfizer under the Pfizer Settlement Agreements using claims information in the 2008 ballot database for Non-Settling Law Firms; except for the Weitz & Luxenberg claim numbers because Weitz & Luxenberg did not vote by master ballot and the information was not available, to calculate these numbers Dr. Rourke used facsimile and email records to Kenneth Feinberg and Mike Rozen adjusted by information in the CHU database. Tr. 2381:1-2383:6; Ex. A4547, at 38, 40 (Rourke Report).

317.     Dr. Rourke's approach was conservative in that using the 2008 ballots underestimates the total number of non-settled claims because (1) not every Non-Settling Law Firm elected to participate in the 2008 vote, (2) there are law firms with open claims that never voted on the plan, and (3) 73,000 claimants represented by Settling Law Firms who certified that they did not participate in the Pfizer Settlement Agreements with Pfizer were not included. Ex. A4547, at 38 (Rourke Report).

318.     Dr. Rourke did not apply a qualification rate because his analysis was meant to set the upper bound of liability; nevertheless, his numbers are conservative. Tr. 2375:16-2376:21 (Rourke).

319. Using this conservative approach, Dr. Rourke estimated that Quigley and Pfizer face $1.525B of present, non-settled tort liability for Quigley-related asbestos exposure. Tr. 2330:14-20, 2332:9-24 (Rourke); Ex. A4547, at 40 (Rourke Report).

320. Sellick did not render an opinion as to the tort system value of the unsettled present claims, however, he testified that he calculated an implicit value of those claims in his cash flow analysis of approximately $420M, using average TDP values, derived from the aggregate historical means of all law firms, rather than the law firm specific historical settlement values, and applying Dr. Rabinovitz's qualification rates. Tr. 2759:7-2762:25 (Sellick).

321. Recognizing Dr. Rourke's conservative approach and his use of historical settlement averages by law firm, Dr. Rourke's calculation that the present, non-settled claims against Pfizer and Quigley based on Quigley-related exposure are worth $1.525B is more reasonable than Sellick's implicit calculation; nevertheless, the value of the present, non-settled Quigley-related asbestos liability is no less than $420M. Tr. 2759:7-2762:25 (Sellick).

**B.      The Value of Pfizer's Proposed Contribution Between Negative $78.6M And $370M, With The Primary Difference Being Assumptions Relating To "Credit" For The Shared Insurance.**

322. Pfizer's proposed contribution consists of 5 items: (a) the present value of the AIG/Pfizer annuity swap (i.e., Quigley assigns Pfizer its rights in the AIG settlement payable over 10 years in exchange for Pfizer's agreement to contribute the 40 year Pfizer annuity); (b) the estimated recoverable value of other shared insurance policies; (c) $50M in cash; (d) the present value of the $45M, 41 year annuity that begins 5 years after the anniversary date of confirmation; and (e) Quigley's stock. Ex. J47, §1.1 (August 6, 2009, Plan, definition of "Pfizer Contribution", "Pfizer/AIG Annuity", "Cash Contribution", and "Pfizer Annuity"); Ex. J42, at 66-67 (March 28, 2008, Disclosure Statement).

323. Dr. Snow credits Pfizer with a "contribution" for its agreement to forgive its secured debt. Ex. P3000a (Snow Report), at 1. Dr. Shaked excluded the forgiveness from his analysis because it benefits Quigley, not the Asbestos Trust, was intended to address Quigley's cash deficiency caused by its operational losses so that it can exit bankruptcy, and triggers a taxable event for Quigley resulting from debt-forgiveness. Tr. 2578:15-23 (Shaked); Ex. A4559, at 26 (Shaked Report).

324. Neither Pfizer nor the Ad Hoc Committee attributes any value for the Pfizer Claims Services Agreement as a contribution to the Trust because it is a contract between Pfizer and Quigley, however, the value of the Pfizer Claims Services Agreement is indirectly included in the value of Pfizer's contribution of Quigley's common stock. Tr. 2552:1-2554:2 (Shaked, Pfizer Claims Services Agreement is necessary to keep Quigley profitable).

325. Dr. Shaked opined that the total value of Pfizer's proposed contribution ranged between a net negative $78.6M and positive $30.6M. Tr. 2576:18-23, 2580:20-2581:3 (Shaked); Ex. A4559, at 25-26 (Shaked Slides).

326. The range in value opined to by Dr. Shaked is the result of alternative analyses: the first being the assumption that Pfizer cannot receive credit for the contribution of shared insurance already contributed by Quigley because it has no quantified claims available to be billed against these insurance assets; the second being a 77% Quigley/23% Pfizer allocation of the insurance assets being contributed derived from Pfizer's and Quigley's 20-year historical allocation used to bill insurers for asbestos-related settlements. Tr. 2576:18-24, 2580-81 (Shaked); Ex. A4559, at 25-28 (Shaked Slides); Ex. A4015 (indemnity sharing for asbestos related claims between Quigley and Pfizer from 1985 to 2004 was 77% Quigley and 23% Pfizer).

327.     Pfizer's expert, Dr. Snow, opined that Pfizer's proposed contribution ranges between $330M and $370M. Tr. 1428:12-19, 1766:8-10 (Snow); Ex. P3000a, at 1 (Snow Slides); Ex. P3024, at 6 (Snow Report).[3]

328.     Dr. Snow opined that Pfizer's contribution is worth $330M based on his assumption that Pfizer has $399M in claims that it could bill (but has not) to the Shared Insurance, manifesting from the settling payments made under the Pfizer Settlement Agreements. Next, he opines that Pfizer's contribution may be up to $370M if Pfizer is credited with the remaining unallocated shared insurance assets under his analysis, if additional payments are made under the Pfizer Settlement Agreements. Tr. 1436:20-23, 1783:1-1784:7 (Snow); Ex. P3000a, at 1-9 (Snow Slides); Ex. P3024, at 5 (Snow Report).

### i.     Dr. Shaked Determined That Pfizer's Contribution Either Negative $78.6M Or Positive $30.6M Based On Alternative Assumptions.

329.     Dr. Shaked testified that Pfizer's "contribution" to the Asbestos PI Trust is negative $78.6M – instead of providing net assets to the Asbestos PI Trust, Pfizer actually benefits by $78.6M because Pfizer is not entitled to a credit for a contribution of the shared insurance assets. Tr. 2576:18-23, 2581:9-21 (Shaked); Ex. A4559, at 25-27 (Shaked Slides).

330.     Dr. Shaked assumed that the payments under the Pfizer Settlement Agreements thus far made ($209M according to Dr. Snow) are not amounts available to be billed against the insurance assets. Tr. 2579:9-21 (Shaked); Ex. A4559, at 27 (Shaked Slides).

---

[3] Moreover, Pfizer now asserts that the value of its contribution is between $381M and $419M, relying on Snow's trial demonstrative as its sole support. PB, at 11; PQFF ¶ 295. However, Snow's trial demonstrative shows a contribution range of between $330M and $370M. Ex. P3000a, at 1 (Snow Slides). The difference is caused by Pfizer's new assertion that it is entitled to a contribution credit for its agreement to waive the full $76M secured claim, as opposed to only $30M of the secured claim. PB, at 11; PQFF ¶ 295; Ex. P3000a, at 1 (Snow Slides). However, Snow never testified that it was appropriate to consider the $76M waiver as part of Pfizer's contribution. In addition, the full value of the $76M waiver will not be available to Quigley which will be taxed on the forgiveness of debt by approximately 40% or $29M, reducing the benefit to Quigley to $47M. Tr. 1150:16-1151:3 (Charboneau). Nevertheless, as discussed herein, the waiver of Pfizer's secured claim benefits Quigley by allowing it to exit bankruptcy and is not a contribution to the Trust for the benefit of asbestos claimants.

331. Dr. Shaked based his assumption on the following factors:

A) Under the decision In re Congoleum, 362 B.R. 167, 181-2 (Bankr. D.N.J. 2007), the court held that where a primarily liable debtor is contributing all available insurance assets the non-debtor parent's "contribution" of the same insurance assets is of no value because all derivative claims will be channeled if the Plan is approved and the injunction issued;

B) At no time prior to the issuance of Dr. Shaked's report on April 15, 2009, had Pfizer asserted that it was entitled to a contribution for the value of the Pfizer Settlement Agreements (made or conditionally owing);

C) At all times prior to the issuance of Dr. Shaked's report Pfizer had represented to the court that it would not use Quigley's assets, which consist solely of the insurance assets, to pay for the Pfizer Settlement Agreement obligations;

Tr. 2579:2-21 (Shaked).

332. Under Dr. Shaked's alternative assumption using Quigley's and Pfizer's historical allocation of shared insurance 77% and 23%, respectively, Pfizer's contribution is net $30.6M. Tr. 2580:20-2581:3 (Shaked); A4559, at 26-28 (Shaked Slides); Ex. A4015.

       **a.     Pfizer's AIG Scheme Allows Pfizer To Take Cash Out Of Quigley's Estate By Swapping The 10-Year AIG Annuity With A 40-Year Pfizer Annuity.**

333. Shortly before Quigley filed bankruptcy, Pfizer and Quigley entered into the AIG Settlement, pursuant to which AIG agreed to pay them $405,746,856 in quarterly installments beginning in September 2004 through September 2014 to resolve any of AIG's indemnity obligations for asbestos claims. Ex. J43, at 233, 305 (March 28, 2008, Plan, Ex. G, AIG Assignment Agreement, recitals and payment schedule).

334. The face amount of the annuity is $405M, and consists of (a) $282M of unallocated insurance proceeds, (b) $43M available solely to Quigley based on past billings, and (c) $81M available solely to Pfizer based on a single $75M non-asbestos policy and $6M of past asbestos related billings. Tr. 246:7-247:23 (Berland); Tr. 1764:16-1765:25 (Snow); Ex. P3000a,

at 1, 7 (Snow Slides); Ex. J42, at 69 n.7 (March 28, 2008, Disclosure Statement); Ex. J43, at 232 (March 28, 2008, Plan, Ex. G, AIG Assignment Agreement, recitals).

335. AIG has paid $181M to date under the AIG settlement. That money, with $11M in interest, is currently in the Insurance Settlement Proceeds Trust. Ex. J47b (Liquidation Analysis, Schedule 6).

336. The net present value of the AIG Settlement as of September 30, 2009 was $402M, made up of the $191M in the Insurance Settlement Proceeds Trust and the NPV of future payments through September 30, 2014, of $211.8M (nominal value of $225.7M). Ex. J47b (Liquidation Analysis, Schedule 6); Ex. A4559, at 30 (Shaked Slides).

337. Under the Plan, Quigley will assign its interests in the AIG Settlement to Pfizer in exchange for the 40-year $405M Pfizer/AIG Annuity. Ex. J43, at 230-39 (March 28, 2008, Plan, Ex. G, AIG Assignment Agreement); Ex. J46, at 1-13 (Plan Supplement, Ex. L, Pfizer/AIG Annuity); Ex. J47, at 22, 45 (August 6, 2009, Plan, §§ 1.1 "Pfizer/AIG Annuity," 9.11).

338. The net present value of the Pfizer/AIG Annuity is $174.5M. Ex. A4559, at 26 (Shaked Slides); Ex. P3000a (Snow Slides, calculating NPV of $161M).

339. Pfizer's obligations under the Pfizer/AIG Annuity will not begin unless and until the Plan is confirmed. Ex. J46, ¶ 14 (Plan Supplement, Ex. L, "Pfizer/AIG Annuity") ("The Pfizer/AIG Annuity shall become effective only upon the Effective Date of the Plan, and no obligations of Pfizer hereunder shall become legally binding unless and until the occurrence of the Effective Date.").

340. Using the assumption that Pfizer is not entitled to a credit for contributing the shared insurance assets, the net loss (or cost) to Quigley of the AIG/Pfizer Annuity Swap is $147M (Quigley's interest in the AIG Settlement is $321.5M, including $40.2M solely available

to Quigley and $281.2M of shared insurance assets, while the NPV of the Pfizer/AIG Annuity it receives is $174.5M). Tr. 2581:9-2582:21 (Shaked); Ex. A4559, at 26, 29-32 (Shaked Slides).

341.    Alternatively, using historical insurance billing allocations, the net loss (or cost) to Quigley of the AIG/Pfizer Annuity Swap is $81.9M (Quigley's interest in the AIG Settlement is $256.4M, including $40.2M solely available to Quigley and $216.2M of shared insurance assets (77% of $281.2M of shared insurance assets)); while the NPV of the Pfizer/AIG Annuity it receives is $174.5M. Tr. 2583:1-21 (Shaked); Ex. A4559, at 26, 33-34 (Shaked Slides).

342.    Under either assumption, the AIG Swap allows Pfizer to actually profit from the Quigley's estate, either by $81.9M or $147.0M, rather than contribute it. See AHCF ¶¶ 340-41 (above).

343.    Moreover, there is an additional loss to the Asbestos PI Trust and concurrent "profit" to Pfizer because Pfizer will receive $190.6M of AIG proceeds and interest on the Plan effective date (actually more as AIG continues to pay over $10M quarterly) and it will take 18 years for Pfizer to pay an equivalent amount to the Asbestos PI Trust under the proposed 40 year Pfizer/AIG annuity. Ex. J46 (Plan Supplement, Ex. L, "Pfizer/AIG Annuity"); Ex. J47b (Liquidation Analysis, Schedule 6).

### b.    Value Of Shared Insurance Assets.

344.    Pfizer values the non-AIG shared insurance policies at $149M and the non-AIG insurance proceeds in the Insurance Settlement Proceeds Trust at $42M – a total of $191M. Ex. P3000a, at 8-9 (Snow Slides); Ex. J42, at 24-26 (March 28, 2008, Disclosure Statement, §IV(A)(6), the other shared insurance refers to the non-AIG occurrence based policies, covering policy years 1968 to 1985 and having a nominal face value of $291M).

345.    Dr. Shaked opines that Pfizer does not receive any credit for those amounts for the same reasons set forth in Findings 330-331 alternatively, using historical insurance billing

allocations, Pfizer's credit is $34.5M and $9.6M, respectively – a total of $44.1M. Tr. 2583:22-2584:10 (Shaked); Ex. A4559, at 26 (Shaked Slides).

> **c.** **$50 Million Cash And $45.1 Million 41-Year Annuity Benefits Settling Plaintiffs, Not Non-Settling Plaintiffs And Futures.**

346.    The value of Pfizer's cash contribution is $50M and the net present value of Pfizer's contribution of the Pfizer 41-year annuity is between $13 (Pfizer's value) and $14.7M (AHC's value). Ex. A4559, at 26 (Shaked Slides); Ex. P3000a, at 1 (Snow Slides).

347.    Pfizer agreed to provide the $50M cash contribution and the $45.1M annuity only as part of its make-whole payment to maintain the 7.5% payment percentage after Pfizer's unilateral waiver of the 90% Subordination Provision in the Pfizer Settlement Agreements; thus, the contribution was provided to pay additional distribution value to Settling Plaintiffs, not for the benefit of Non-Settling Plaintiffs and future claimants. Ex. J38, at 50, 66 (November 5, 2007, Disclosure Statement).

> **d.** **Value of Quigley Stock.**

348.    The value of Pfizer's contribution of Reorganized Quigley's stock is between $3.8 (AHC's value) and $7M (Pfizer's value). Ex. A4559, at 26 (Shaked Slides); Ex. P3000a, at 1 (Snow Slides).

349.    The only reason Quigley stock has any positive value is because the revenue from the Pfizer Claims Services Agreement allows Reorganized Quigley to be marginally profitable for the first five years post-confirmation.

> **ii.** **Dr. Snow's $330M Contribution Determination Entirely Dependent On Pfizer's Flawed Assertion That It Can Bill $399M of Pfizer Settlement Agreements Against Shared Insurance.**

350.    Dr. Snow's "contribution" opinion relies on the assumption that Pfizer may receive a credit for its unexercised "right" to bill to the insurance assets virtually all of the

Settlement Amounts that have been paid or are conditionally payable only if confirmation of the Quigley plan occurs. Under that assumption, Dr. Snow credited Pfizer with $399M in claims arising out of the Pfizer Settlement Agreements that it could permissibly apply against the shared insurance assets (Snow opined that $19M of the $418M Pfizer Settlement Agreements payments would be applied against pre-1968 Pfizer-only policies) resulting in a total net valuation of Pfizer's contribution of $330M. In addition, Snow opines that Pfizer's contribution may be up to $370M if Pfizer is credited with the entire remaining unallocated portion of the shared insurance under his analysis; thus, Pfizer would receive a credit for $439M out of $473M of shared insurance assets. Tr. 1436:3-23, 1783:4-16, 1806:1-10, 1832:2-9 (Snow); Ex. P3000a, at 6-9 (Snow Slides).

351. Snow opined that Quigley had only $36M in potential claims to bill against the same insurance assets. Snow's opinion ignores the $4B in value of existing and future claims recognized by all parties. Tr. 1874:24-1875:1 (Rabinovitz); Ex. J42, at 162 (March 28, 2008, Disclosure Statement, Ex. I, HR&A Future Claims Analysis); Tr. 2330:18-20, 2332:1-24 (Rourke); Ex. A4547, at 40 (Rourke Report); Tr. 2759:7-2762:13 (Sellick).

352. Based on these assumptions, Dr. Snow opines that, of approximately $473M in unallocated shared insurance ($282M of the AIG Settlement Annuity, $42M of non-AIG proceeds in the Insurance Settlement Proceeds Trust, and $149M of shared insurance contributed under the Insurance Relinquishment Agreement), (1) Pfizer should be apportioned $399M because of the of Pfizer Settlement Agreements, (2) Quigley should be apportioned only $36M, and (3) a range of $38M remains unapportioned because neither Pfizer nor Quigley currently have claims that can be asserted against these remaining amounts. Tr. 1773:14-1775:17, 1777:19-1778:7 (Snow); Ex. P3000a, at 6-9 (Snow Slides).

353.    Dr. Snow's $330M contribution opinion is entirely dependent on his assumption that Pfizer has the legal right to bill $399M of Pfizer Settlement Agreements payments and obligations against shared insurance assets; without such a credit Dr. Snow recognized that his contribution opinion would have to be adjusted downward and would result in a negative contribution, due to Pfizer's profiting under the AIG Swap. Ex. P3000a, at 1, 6-9 (Snow Slides).

354.    Dr. Snow applied the Pfizer Settlement Agreement amounts as credits against the shared insurance in his analysis despite understanding (1) that the preliminary injunction prohibits Pfizer from billing the shared insurance; (2) that only the $209M First-Half Settlement Payments have been made to date and that the Second-Half Settlement Payments are conditioned upon an approved, final and non-appealable Quigley Plan, and then only payable the insurance assets have been transferred to the Asbestos PI Trust; (3) that an insured needs claims covered by the policy to access the shared insurance; and (4) that Quigley, as a co-insured, has the equal right to bill and access the shared insurance assets for its claims. Tr. 1802:16-20, 1805:3-25, 1808:25-1809:23, 1817:22-1818:15, 1823:16-23 (Snow).

355.    Dr. Snow's assumption that the Pfizer Settlement Agreement payments and conditional obligations should count as a contribution was reached without ever reading any of the Pfizer Settlement Agreements; without ever reading the AIG Settlement Agreement or the AIG Assignment; without ever reading any pleadings in this case; and without ever reading or analyzing the Congoleum Decision. Tr. 1801:14-24, 1806:1-1807:23, 1833:24-1834:1 (Shaked).

356.    Counsel for Pfizer expressly told Dr. Snow not to review or consider these materials. Tr. 1831:18-1832:9 (Snow).

357.    Dr. Snow acknowledged that if Dr. Shaked's interpretation of the Congoleum decision is correct it would have a material effect on his analysis. Tr. 1797:3-1798:1 (Snow).

358.    If the Court accepts Dr. Snow's position with respect to the first-half payments but not the unpaid and unprocessed claims, then Pfizer's best case is a contribution of $121M ($370M - $209M - $40M). Tr. 1826:2-1829:5 (Snow); Ex. P3000a, at 1 (Snow Slides).

359.    Dr. Snow also credited Pfizer with a $30M "contribution" for Pfizer's initial waiver of its secured claim against Quigley, notwithstanding the fact that such waiver benefits Quigley, not the Trust. No evidence was submitted at trial showing any value to the Trust for the waiver by Pfizer of its secured debt with Quigley - backing-out the $30M secured claim forgiveness "contribution" results in a $91M contribution. Tr. 1435:3-13 (Snow); Ex. P3000a, at 1 (Snow Slides).

360.    In addition, Dr. Snow acknowledged that certain of Pfizer's claims under the Pfizer Settlement Agreements would need to be applied against pre-1968 policies and not the shared insurance assets, however, Dr. Snow provides no documentary support for his assertion that only $19M of the $418M of claims under the Pfizer Settlement Agreements would be applied against the pre-1968 policies rather than the shared insurance assets; if a larger amount of the claims under the Pfizer Settlement Agreements should be applied against pre-1968 policies, those claims would have to be backed out of Dr. Snow's analysis as well. Tr. 1786:9-1787:4, 1811:8-1812:25 (Snow); Ex. P3000a, at 9 (Snow Slides, applying 85% of Pfizer's $130M of remaining claims or $111M against remaining unapportioned shared insurance of $149M).

### a.    The Preliminary Injunction Prohibits Pfizer From Billing The Shared Insurance.

361.    The Pfizer Settlement Agreements are expressly conditioned upon the filing by Quigley of a Chapter 11 petition. Ex. P3003, at 16-17 (Form of Settlement Agreement, §§ 4.1-3); see AHCF, ¶¶ 123-136, 141-170, 181-186 (above).

362. At the time the Pfizer Settlement Agreements were entered into, both Pfizer and the Settling Plaintiffs understood that no payments would be made before Quigley filed its petition and the automatic stay became effective. Ex. P3003, at 16-17 (Form of Settlement Agreement, §§ 4.1-3); see AHCF, ¶¶ 123-136, 141-170, 181-186 (above).

363. On September 7, 2004, the Court issued a Temporary Restraining Order (the "TRO") which, among other things, restricted the ability of Pfizer and Quigley to access the Shared Insurance. See TRO, Adv. Proc. 04-04262, at 5 (Bankr. S.D.N.Y. Sept. 7, 2004) [D.I. 24]; Ex. J303 (Order for TRO); Ex. J42, at 45-46 (March 28, 2008, Disclosure Statement, §V(C), Significant Events During the Chapter 11 Cases). This TRO was converted to a Preliminary Injunction on December 17, 2004. See Preliminary Injunction, Adv. Proc. 04-04262, at 6 (Bankr. S.D.N.Y. Dec. 17, 2004) [D.I. 122]; Ex. J42, at 44 (March 28, 2008, Disclosure Statement, §V(C), Significant Events During the Chapter 11 Cases). This Preliminary Injunction was amended on December 6, 2007. See Amended Injunction, Adv. Proc. 04-04262, at 5 (Bankr. S.D.N.Y. Dec. 6, 2007) [D.I. 238]; Ex. J42, at 51 (March 28, 2008, Disclosure Statement, §V(C), Significant Events During the Chapter 11 Cases). None of the amendments altered the restriction on Pfizer or Quigley's ability to access the Shared Insurance.

364. No settlement payments under the Pfizer Settlement Agreements were made until November 29, 2005, approximately one year after the preliminary injunction was entered.

365. Since the outset of Quigley's bankruptcy and for the duration of the case, at no point in time has Pfizer had the opportunity or legal right to bill any of the Pfizer Settlement Agreement payments against any of the insurance because the Amended Injunction prohibits Pfizer from drawing from the shared insurance policies and the insurance trust during the prosecution of Quigley's chapter 11 plan. Tr. 500:23-501:1 (Berland) (acknowledging that

Pfizer can not access any of the shared insurance assets during the pendency of the case because of the preliminary injunction); Tr. 1817:7-1818:7 (Snow); see Amended Injunction, Adv. Proc. 04-04262, at 5 (Bankr. S.D.N.Y. Dec. 6, 2007) [D.I.. 238]; Preliminary Injunction, Adv. Proc. 04-04262, at 6 (Bankr. S.D.N.Y. Dec. 17, 2004) [D.I. 122]; TRO, Adv. Proc. 04-04262, at 5 (Bankr. S.D.N.Y. Sept. 7, 2004) [D.I. 24].

366.    Because Pfizer does not have the legal right to bill shared insurance which Quigley is contributing to the Trust, Pfizer is not entitled to a "credit" for Pfizer Settlement Agreement amounts it cannot bill against the shared insurance.

   **b.    Pfizer Is Judicially Estopped From Seeking A Credit For The Shared Insurance.**

367.    Pfizer repeatedly stated that it would not bill the shared insurance for the Pfizer Settlement Agreements:

- "[S]ettlements will be funded by Pfizer, which will not seek reimbursement via insurance proceeds under policies that provide coverage to Quigley." See Omnibus Response of Quigley Company, Inc. and Pfizer Inc., at 5, ¶ 8 (Sept. 23, 2005) [D. I. 470].

- "[T]he settlement agreements entered into by Pfizer will be funded solely by Pfizer's own assets." See id., at 6, ¶ 8.

- "As explicitly stated in the Disclosure Statement, the settlement agreements will be funded by 'an aggregate cash payment by Pfizer of approximately $430 million outside of Quigley's Chapter 11 Case.' … [N]one of Quigley's assets have funded, or ever will fund, the payment to the settling plaintiffs." See id., at 6, ¶ 9.

- "While the settling plaintiffs will receive an additional payment from Pfizer to resolve Pfizer's and other Pfizer Protected Parties' alleged liability, such payments are not being made from Quigley's estate …" See id., at 32, ¶ 64.

- "[T]he settlement agreements were entered into by Pfizer, a non-debtor, and will be funded exclusively by Pfizer's assets." See id., at 34, ¶ 70.

- "No assets of Quigley have been or will be used to pay the settling plaintiffs." See id., at 35, ¶ 71.

- "Pfizer… sought to minimize its potential asbestos liability by (i) settling claims (using its own assets and not shared insurance)…." See Reply of Pfizer Inc. to Opposition of the Ad Hoc Committee of Tort Victims to Motion of Pfizer Inc. for Protective Order and Response of Pfizer Inc. to Cross-Motion of the Ad Hoc Committee of Tort Victims to Compel Pfizer Inc. and Quigley Company, Inc. to Produce Documents, Ex. A, Declaration of M. Rozen, at 6, ¶ 12 (Dec. 16, 2008) [D. I. 1662].

368. The above statements were made in opposition to the Ad Hoc Committee's assertion that the Disclosure Statement could not be approved because, as a matter of law, the Pre-Petition Settlement Agreements resulted in unequal treatment.

      c.      **Pfizer Will Not Pay $209M Second-Half Settlement Payments Unless Plan Is Confirmed And After Insurance Assets Transferred To Asbestos PI Trust.**

369. As of the trial, Pfizer has paid $209M (not $418M) under the Pfizer Settlement Agreements. Tr. 1820:5-7 (Snow). The remaining $209M Second-Half Settlement Payments are conditioned upon confirmation of Quigley's Fourth Amended Plan, and will only be paid after the Consensual Plan Effective Date and after the insurance assets become the property of the Trust. Ex. P3003 (Form Settlement Agreement, §§ 1.1 (definitions of "Quigley Consensual Plan" and "Consensual Plan Effective Date"), 4.1(g), 4.2(a)-(c)); Ex. J467-J532, J534-J536 (§§ 1.1 (definitions of "Quigley Consensual Plan" and "Consensual Plan Effective Date"), 4.1(g), 4.2(a)-(c)); Ex. J533 (§§ 1.1 (definitions of "Quigley Consensual Plan" and "Consensual Plan Effective Date"), 4.1(g), 4.2(a)-(b)).

370. Assuming a plan was confirmed, Pfizer would still have no right to bill shared insurance because it would have already relinquished its rights to the remaining shared insurance policies and assigned its rights to the non-AIG insurance proceeds in the Insurance Settlement Proceeds Trust to the Asbestos PI Trust. Ex. J47, §12.2(d)(iv) (August 8, 2009, Plan); Ex. J43, at 348 (March 28, 2008, Plan, Amended Ex. K, Insurance Relinquishment Agreement).

#### d. Disclosure Statement Uses 50/50 Assumption.

371. The Disclosure Statement dated March 28, 2008, voted upon by creditors, asserted that the value of the AIG/Pfizer Annuity Swap should be analyzed under the assumption that Quigley/Pfizer would share 50/50 in the unallocated portion. Ex. J42, at 69 n.7 (March 28, 2008, Disclosure Statement); Tr. 987:10-20 (Street); Tr. 1222:17-1224:7 (Charboneau).

372. Pfizer did not assert in this Disclosure Statement that it was entitled to a contribution credit for the Pre-Petition Settlement Payments.

373. In each and every disclosure statement filed with the Court up to and including the disclosure statement voted upon in 2006, Pfizer asserted that it was to be provided a "deemed contribution" equal to the value of the 90% Subordination Provision in the Pfizer Settlement Agreements. Ex. J1, at 39 (March 4, 2005, Disclosure Statement); Tr. 507:13-508:10 (Berland); Ex. A4028 (Quigley Reorganization Term Sheet).

374. Pfizer's present argument that it is entitled to a contribution for almost all of the shared insurance based on the Pfizer Settlement Agreement payments is inconsistent with all of the prior disclosure statements, filed with the Court and voted on by creditors.

#### e. Pfizer's New Assertions Of Other Claims It Could Bill Against Shared Insurance Unsupported.

375. Dr. Snow's analysis of claims that potentially could be billed against the shared insurance was limited to the Pfizer Settlement Agreements (claims that Pfizer could potentially assert against the Shared Insurance are "predominantly asbestos-related claims"). Tr. 1433:11-16, 1788:9-13 (Snow).

376. Snow did not consider non-asbestos claims in his analysis. Tr. 1433:11-16, 1788:9-13 (Snow).

377. On rebuttal, Berland testified as to the alleged existence of non-asbestos (i.e., Shiley heart valve) and non-Quigley related Pfizer-asbestos (i.e., based on Kilnoise and Firex) claims that could be billed against the shared insurance. Tr. 2696:4-2698:8 (Berland).

378. Berland did not quantify the alleged claims by number or value in any way and merely asserted that potential future claims might be available to bill against the shared insurance. Tr. 2698:3-8 (Berland).

379. Berland failed to provide any contemporaneous documentary evidence whatsoever of the number and value of non-asbestos or Pfizer-asbestos claims that purportedly could be asserted against the shared insurance, the timing of such claims, or whether they arose between 1968-1985 (the relevant policy years).

380. Berland never told Dr. Snow about the existence of any claims (other than those settled pursuant to the Pfizer Settlement Agreements). Tr. 2702:2-22, 2704:3-2709:9, 2719:16-2720:4 (Berland).

381. Berland's rebuttal testimony is also inconsistent with the testimony of Kany and Cooney that Kilnoise is geographically limited to Ohio and there are very few historic Kilnoise claims. Tr. 146:9-148:4 (Kany) ("almost all of the cases were in Ohio and they were by local Ohio plaintiffs").

382. Berland's testimony about a significant number of recent heart valve claims is also inconsistent with the prior testimony offered by David Killalea, Pfizer's outside insurance counsel, who testified in open court on November 17, 2004 that, while heart valve claims would be covered by the Shared Insurance, the only "recent" claims that had been billed to the Shared Insurance were asbestos claims. Ex. J397, at 57-58 (November 17, 2004, Hearing Transcript). Mr. Killalea went on to testify that Pfizer did not refrain from billing its insurance carriers when

it paid claims. Ex. J397, at 57-58 (it has not been Pfizer's practice to forego billing its insurers) Similarly, Kany admitted that any historic asbestos-related property damage claims were *de minimis* in amount and may not have even exceeded applicable deductibles. Tr. 196:23-198:14 (Kany).

### iii. Togut's Opinion That Pfizer's Contribution Is "Fair And Equitable" Is Irrelevant And Unreliable.

383. Togut agreed to Pfizer's "contribution" in August 2004, before Quigley had filed for bankruptcy, before he had been appointed as the FCR, while his services were being paid by Pfizer, and without knowing the payment percentage or projected number or value of current and future asbestos claims based on exposure to Quigley-products. Tr. 2220:3-23 (Togut).

384. Togut testified that he did not view it as his duty to maximize the recovery for his constituency. Tr. 2222:22 – 2223:15 (Togut).

385. Togut believed his role was to ensure that Pfizer and Quigley contributed only available insurance. Tr. 2150:7-21, 2231:3-15 (Togut); Ex. A4072 (FCR's counsel acknowledging that they had settled with Pfizer for a "pool of assets"); Ex. A4289 (FCR's May 14, 2007 response to Pfizer proposal, "we believe that the parties agreed to accept contribution of a particular pool of assets").

386. Togut believed his role was limited to that of a negotiator. Tr. 2150:4-21 (Togut).

387. Togut acknowledged that Pfizer has the ability to pay more than it is contributing under the Plan. Tr. 2227:15-21 (Togut) ("Pfizer certainly has financial wherewithal to pay more than it [is] paying").

388. Despite understanding that Pfizer had the means to pay significantly more than its proposed contribution, Togut failed to even attempt to negotiate for an increased contribution. Tr. 2227:15-2228:22, 2230:11-15 (Togut).

389.    Togut's agreement to Pfizer's proposed contribution was predicated on Pfizer's assertion, and Togut's acquiescence with that assertion, that Pfizer had no derivative liability, which limited the amount of contribution Togut sought from Pfizer.    Tr. 2207:20-2214:23 (Togut).

390.    Togut testified that he made a determination that Pfizer's risk of being found liable on a derivative theory of liability was "highly remote," and that this determination played a significant role in his discussions with Pfizer concerning the amount of any contribution they would make under the Plan.  Tr. 2210:16-19, 2212:15-2213:3, 2213:7-14, 2229:21-25 (Togut).

391.    Togut admitted that his conclusion "hugely diminished" any leverage he felt he had over Pfizer to seek a higher contribution.  Tr. 2212:25-2213:3.

392.    His view was that Pfizer was getting very little benefit under the Plan.    Tr. 2225:16-19 (Togut, "My view was that Pfizer was getting very little here.").

393.    Togut reached his "conclusion" about Pfizer's tort-system risk for derivative liability based on his legal staff interviewing Louis Kilian, a former Quigley employee that had acted as a paid witness for the previous twenty years.  Kilian was hired by Quigley in 1969 (after it had been acquired by Pfizer) as a summer laborer, a position he also held in the Summer of 1970 and 1971; following his graduation from college in 1972 he was hired on a full-time basis.  Tr. 1398:10-1400:2 (Kilian).

394.    At trial, Togut could not recall if his analysis included an assessment of Pfizer's liability on a successor-in-interest theory, piercing the corporate veil, alter-ego, respondeat superior, principal and agent, apparent manufacturer, distributor liability, concert of action or civil conspiracy.  Tr. 2210:20-2211:19 (Togut).  He also could not recall if his analysis had spanned the law of all 50 states.  Tr. 2211:20-23 (Togut).

395.     Togut was aware that Pfizer had a twenty-plus year history of resolving asbestos claims, during which it had paid hundreds of millions of dollars. Tr. 2213:15-24 (Togut). Togut was also aware that no case against Pfizer had ever gone to judgment. Tr. 2214:12-14 (Togut, "THE COURT: Were you aware that no Pfizer case had gone to judgment? A. Yes, I was.").

396.     Togut ignored the fact that Pfizer had been directing the settlement of over a billion dollars of asbestos claims against Pfizer and Quigley over the past 20 years. Tr. 2213:15-2214:2, 2225:20-2226:2 (Togut).

397.     In reaching "agreement with Pfizer" Togut concluded that Pfizer's settlement history and the Pfizer Settlement Agreements were not relevant to the issue of Pfizer's contribution to fund future claims, despite recognizing that Pfizer made an economic judgment to extricate themselves from litigation by entering the settlements.   Tr. 2213:7-24, 2216:11-19, 2219:6-2220:15 (Togut, "Pfizer just made an economic judgment that it was worth X to extricate themselves from the litigation and they were spending that in that effort").

398.     Togut testified that, while he knew Pfizer was negotiating pre-petition settlement deals in the Summer of 2004, he had "no idea" of the amount of money they were spending to do so and that he did not think the amount of money Pfizer was paying to resolve those claims had any bearing on his analysis of how much money he could extract from Pfizer in exchange for a channeling injunction. Tr. 2153:22-2154:17, 2203:17-2204:20, 2216:11-19 (Togut, "my view at that time was that what Pfizer was doing with Pfizer's money was Pfizer's business").

399.     Togut admitted that when he was making his determination as to the value of pending and future derivative claims against Pfizer, he never spoke to a single plaintiff's attorney. Tr. 2146:15-25 (Togut). In fact, he testified that Pfizer specifically prevented him from having any such conversations. Tr. 2215:7-22 (Togut, "Q. You didn't think that [access to

plaintiffs' attorneys] was relevant to your discussions and negotiations with Pfizer? A. Which point in time? Q. In the Summer of 2004. A. I wasn't given access to them. I didn't know who they were. Q. Okay. Did you ask Pfizer to tell you who they were? A. I did. Q. And they said no? A. They said no.").

400. Togut testified that at the time he negotiated the contribution with Pfizer he assumed that the issue would be revisited by an official creditors committee after the bankruptcy was filed. Tr. 2152:17-2153:17, 2223:2-15 (Togut, "I anticipated in the pre-filing period that there would be a second shot at this if I wasn't doing the right job when the UCC was formed because that's what UCC's do.").

401. Mr. Togut acknowledged that the official creditors committee owed a duty to present claimants, while he owed a duty to future claimants. Tr. 2223:18-22 (Togut).

402. On September 21, 2004, the United States Trustee appointed the Official Committee in this case. JPTO, Undisputed Facts, ¶ 65. The Official Committee consists of seven (7) individual asbestos claimants, four (4) of whom are Settling Plaintiffs and are represented by a Settling Law Firm. JPTO, Undisputed Facts, ¶ 66.

403. There is no evidence in the record that the Official Committee ever negotiated at all concerning Pfizer's proposed contribution (except in the context of the additional contribution being made to off-set Pfizer's waiving of the 90% Subordination Provision).

404. In contrast, Cooney testified that in his experience on official committees representing asbestos victims in other cases that he was personally involved, as a fiduciary to asbestos claimants, in the negotiations that led to the level of the non-debtor's contribution to the debtor's plan, the scheduled disease values, and the payment percentage, including the Halliburton case (where the non-debtor contributed more than $5B) and the NARCO/Honeywell

case (where the non-debtor contributed almost $3B and set up an evergreen trust for 100% payment of future claimants). Tr. 2527:11-2528:21, 2458:5-2460:6, 2489:18-2493:23 (Cooney).

405. Togut was later told by his future claims expert, Dr. Rabinovitz, that Quigley was contending that the payments made under the Pfizer Settlement Agreements were a good approximation of the value of Quigley claims (*i.e.,* that Pfizer was paying to resolve derivative liability) and that they would factor into her assessment of the value of future claims being channeled to the Trust. Tr. 2217:2-2218:23 (Togut); Ex. A4078.

406. At some point in time after the petition was filed, Togut became aware of the fact that Pfizer had committed to pay approximately $450 million under the agreements, although he never compared that to the consideration he was getting in exchange for agreeing to channel all future derivative claims into the Trust. Tr. 2219:6-2220:7 (Togut).

407. On re-direct, Togut admitted that he did not know whether Pfizer had settled any non-Quigley-related claims as part of the Pfizer Settlement Agreements. Tr. 2257:17-20 (Togut).

408. According to Togut, he was forced into the agreement by Pfizer, which specifically told him that if no settlement was reached, it would exhaust the remaining shared insurance to cover Pfizer claims, at a time Togut knew Pfizer was out negotiating the Pfizer Settlement Agreements. Tr. 2150:8-16 (Togut wanted Pfizer to use Pfizer funds, rather than the shared insurance, to pay the prepetition Pfizer Settlement Agreements), 2179:2-5, 2228:23-2229:17 ("I was told, specifically told that if there was not a settlement pursuant to Chapter 11 in this case and if there was no filing … [Pfizer] would have sought to use … the insurance assets because it was joint insurance to the extent they could exhaust the insurance dealing with their own liability") (Togut).

## IV. BEST INTERESTS TEST/LIQUIDATION ANALYSIS.

409. The liquidation analysis, as prepared by Quigley, calculates the aggregate value of the Quigley estate upon liquidation as $249,830,356. Ex. J47b (Liquidation Analysis). Altit testified that he only reviewed the liquidation analysis on the Tuesday before his testimony, when he had a discussion with Mr. Charbonneau about it as he was preparing for his trial testimony. Tr. 1064:4-1065:14 (Altit). Altit had no input into the preparation of the liquidation analysis. Id.

410. In preparing the liquidation analysis, Quigley did not consider or ascribe any value to the Quigley-related, derivative claims that non-Settling, present claimants have against Pfizer and would retain under a liquidation. Ex. J47b, at 2 (Liquidation Analysis); Tr. 1266:21-1268:12 (Charboneau).

411. The liquidation analysis prepared by Quigley calculates the aggregate plan value available to present and future claimants at $700,578,659. Ex. J47b.

412. In calculating the "value" available under the Plan, Quigley did not present value the $405M Pfizer 40-year annuity or the $45M, 41-year annuity; Charboneau never thought to do it. Tr. 1231:22-1233:25 (Charboneau).

413. The net present value of the $405M 40-year Pfizer/AIG Annuity is $174.5M. Tr. 2582:13-18 (Shaked); Ex. A4559, at 26, 32, 34 (Shaked Slides); Tr. 1765:16-19 (Snow calculating NPV at $161M); Ex. P3000a, at 1 (Snow Slides, same).

414. The net present value of $45.1M 41-year Pfizer Annuity is $14.7M. Ex. A4559, at 26 (Shaked Slides); Tr. 1765:24 (Snow calculating NPV at $13M); Ex. P3000a, at 1 (Snow Slides, same).

415. The Plan value is $437M once the annuities are properly present valued. Tr. 1345:9-1348:17 (Charboneau).

416. The present value of current and future Quigley-product derivative claims against Pfizer is between $3.1B and $4.2B, including present unsettled claims having an aggregate tort system value of between $420M (Pfizer estimate) and $1.525B (AHC estimate) and projected future claims with a value of $2.66B. Tr. 2330:14-2332:24 (Rourke); Tr. 2759:7-2762:7 (Sellick); Tr. 1874:24-1875:14 (Rabinovitz); Ex. A4547, at 40 (Rourke Report); Ex. J42, at 162 (March 28, 2008, Disclosure Statement, Ex. I, HR&A Future Claims Analysis).

417. The aggregate value of the Quigley-derivative claims Non-Settling Plaintiffs retain against Pfizer under a non-524(g) liquidation easily exceeds the $200M difference between the Quigley liquidation value and the plan value. Thus, Non-Settling Plaintiffs receive or retain more under a liquidation than under the proposed Plan. Ex. J47b, at 2 (Liquidation Analysis); Tr. 1345:9-1348:17 (Charboneau).

418. For example, under the Plan, a mesothelioma victim represented by Cooney's law firm will only be entitled to $15,000 (the initial payment percentage of 7.5% multiplied by the TDP scheduled mesothelioma value of $200,000). Ex. J42, at 89, 92 (March 28, 2008, Disclosure Statement).

419. Cooney testified that mesothelioma claims represented by his firm against Pfizer and Quigley had a mean settlement value of $691,000 in the tort system. Tr. 2435:10-2436:15 (Cooney); Ex. A4547, at 38 (Rourke Report, Table 17, Dr. Rourke calculated the mean settlement value of mesothelioma settlements during the post-CCR period at $526,120).

420. Under a liquidation, Cooney's mesothelioma victim will receive a Quigley liquidation distribution and retain a Quigley-derivative claim against Pfizer valued at over $500,000, which alone is 35 to 46 times greater than their $15,000 plan distribution. See AHCF, ¶¶ 418-19 (above).

## V.  PFIZER'S GLOBAL SCHEME RESULTS IN VASTLY UNEQUAL TREATMENT OF SETTLING PLAINTIFFS AND NON-SETTLING PLAINTIFFS.

### A.  The Pfizer Settlement Agreements And The Quigley Bankruptcy Constitute A Two-Part Integrated Global Scheme.

421.  At trial, Pfizer conceded that it employed a two-part global strategy consisting of the Pfizer Settlement Agreements conditioned upon a Quigley for bankruptcy that successfully obtained a Section 524(g) channeling injunction which would allow Pfizer relief from Quigley-derivative liability.  Tr. 331:3-333:13, 335:6-24 (Berland); Tr. 2029:21-2030:3, 2097:4-25 (Rozen).

422.  The explicit terms of the Pfizer Settlement Agreements demonstrate the integration between the settlements and Quigley's 524(g) bankruptcy:  The Pfizer Settlement Agreements (a) set out in the preamble that Pfizer is willing, upon the effectiveness of Quigley's Consensual Plan, to be filed in Quigley's chapter 11 bankruptcy case, to pay a portion of the claims in cash and to contribute assets to the Trust to settle the remaining portion of the claims; (b) are explicitly conditioned on (i) a final, non-appealable confirmed Quigley 524(g) plan establishing a channeling injunction for the benefit of Pfizer and the other Pfizer Protected Parties; (ii) voting acceptance of Quigley's plan by 75% of claimants; and (iii) Quigley vote recommendation and support of Quigley's automatic stay representations and covenants; (c) require Settling Plaintiffs to subordinate 90% of their Quigley claim distribution and (d) establish the contribution to Quigley's 524(g) trust of insurance in an amount of not less than $100M and a 40-year $405M annuity.  Ex. P3003 (Form Settlement Agreement, Recitals ¶ 2, §§ 1.1 ("Consensual Plan Effective Date", "Quigley's Consensual Plan" and "Trust Contribution"), 2.4(b), 3.2(c), 3.3(d), 4.1 – 4.3, 6.1).

423.    Pfizer wanted the ability to walk away from the Pfizer Settlement Agreements if global resolution, meaning final confirmation of Quigley's plan and the establishment of a channeling injunction, was not achievable.    Tr. 2053:12-2054:25 (Rozen); Ex. P3003, at 17 (Pfizer Form Settlement Agreement, §§ 4.1(e), 5.1); JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 165:25, 196:7-196:25, 197:12-199:2 (Jan. 30, 2009) (the Pfizer Settlement Agreements were executed by Pfizer in conjunction with Quigley's bankruptcy filing after it determined it entered Pfizer Settlement Agreements with 75% or more of Quigley claimants to lock-up the vote).

**B.    Pfizer Seeks Credit For Payments Made Under The Pfizer Settlement Agreements And, Thus, The Court Must Consider Those Payments In Evaluating The Treatment of Claimants.**

424.    As part of the Court's initial decision on equal treatment, the Court relied on Pfizer's repeated assertions that it would use its own assets to pay the Pfizer Settlement Agreements and would not use Quigley shared insurance assets.    Ex. J343 (Memorandum Decision dated Oct 24, 2007, Concerning Classification and Treatment of Asbestos Personal Injury Claims).

425.    Now, however, Pfizer seeks a credit for the Pfizer Settlement Agreements in connection with the Court's evaluation of its proposed contribution of shared insurance assets, arguing that it was entitled to access the Shared Insurance (*i.e.*, Quigley asserts) to pay for them. Tr. 1428:15-19, 1436:3-23, 1766:9-10, 1783:6-13, 1806:1-5, 1832:6-9 (Snow); Ex. P3000a, at 7-9 (Snow Slides); Ex. P3024, at 6 (Snow Report).

426.    If Pfizer is not given credit for the Pfizer Settlement Agreements, Pfizer's contribution is negative under both Pfizer's expert's analysis (negative $69M, calculated by subtracting credit of $399M for Pfizer Settlement Agreements from $330M contribution) and the Ad Hoc Committee expert's analysis (negative $78.6M).    Tr. 1777:6-1778:7 (Snow); Ex.

P3000a, at 6-9 (Snow Slides); Tr. 2576:15-23, 2581:4-21 (Shaked); Ex. A4559, at 25-26 (Shaked Slides).

### C. The Settling Plaintiffs Will Receive Substantially More Than Non-Settling Plaintiffs If The Plan Is Approved.

427. If the Plan is approved, Settling Plaintiffs will receive both (i) Quigley TDP payments and (ii) the Settlement Amount payments under the Pfizer Settlement Agreements, while qualifying Non-Settling Plaintiffs are limited to a single Quigley TDP recovery. Ex. J47, at 25-26 (August 6, 2009, Plan, § 4.4); Ex. P3003, at 16-17 (Form Settlement Agreement, §§ 4.1 – 4.2(c)).

428. Accounting for both payments, Settling Plaintiffs will receive an amount more than 4.2 to 6.0 times larger than Non-Settling Plaintiffs for releasing Quigley-related claims against Pfizer and Quigley. Ex. A4547, at 26 (Rourke Report).

429. Further, when all Settling Law Firms are averaged together, the impact of the combined Settlement Amount payments and TDP payments establishes that these firms' recoveries, compared to their historical averages, are ten times greater than the recoveries of the Non-Settling Law Firms. Ex. A4547, at 29 (Rourke Report).

430. On account of releasing their Quigley-related asbestos claims against Pfizer and Quigley, Settling Plaintiffs with mesothelioma claims will receive a mean Settlement Amount under the Pfizer Settlement Agreements of $51,169 plus the Quigley TDP Amount of $15,900 for a total recovery $67,069; which is 4.2 times greater than the recovery of Non-Settling Plaintiffs whose recovery is limited to the Quigley TDP Amount of $15,900; moreover, Settling Plaintiffs will receive 45.0% of their post-CCR historical mean settlement of $149,017 while Non-Settling Plaintiffs will only recover 4.0% of their post-CCR historical mean settlement of $398,050. Ex. A4547, at 29 (Rourke Report, Table 15).

431.     Similarly, Settling Plaintiffs with lung cancer claims will receive a mean Settlement Amount under the Pfizer Settlement Agreements of $9,992 plus the Quigley TDP Amount of $2,500 for a total recovery $12,492; which is 5.0 times greater than the recovery of Non-Settling Plaintiffs whose recovery is limited to the Quigley TDP Amount of $2,500; moreover, Settling Plaintiffs will receive 50.5% of their post-CCR historical mean settlement of $24,756 while Non-Settling Plaintiffs will only recover 4.5% of their post-CCR historical mean settlement of $55,585. Ex. A4547, at 29 (Rourke Report, Table 15).

432.     Settling Plaintiffs with other cancer claims will receive a mean Settlement Amount under the Pfizer Settlement Agreements of $5,974 plus the Quigley TDP Amount of $1,200 for a total recovery $7,174; which is 6.0 times greater than the recovery of Non-Settling Plaintiffs whose recovery is limited to the Quigley TDP Amount of $1,200; moreover, Settling Plaintiffs will receive 49.6% of their post-CCR historical mean settlement of $14,468 while Non-Settling Plaintiffs will only recover 5.2% of their post-CCR historical mean settlement of $23,127. Ex. A4547, at 29 (Rourke Report, Table 15).

433.     Settling Plaintiffs with non-malignancy claims will receive a mean Settlement Amount under the Pfizer Settlement Agreements of $1,273 plus the Quigley TDP Amount of $300 for a total recovery $1,573; which is 5.2 times greater than the recovery of Non-Settling Plaintiffs whose recovery is limited to the Quigley TDP Amount of $300; moreover, Settling Plaintiffs will receive 35.1% of their post-CCR historical mean settlement of $4,480 while Non-Settling Plaintiffs will only recover 4.3% of their post-CCR historical mean settlement of $6,946. Ex. A4547, at 29 (Rourke Report, Table 15).

**D.     The Non-Settling Plaintiffs Are Required To "Pay" Substantially Greater Consideration Than The Settling Plaintiffs Must Pay.**

434.     Pfizer provided no evidence at trial as to the value of any direct claims released under the Pfizer Settlement Agreements, and has consistently maintained that only a "miniscule portion of the claims [against it] may be based on exposure to a Pfizer product..." See Reply in Support of Quigley's Motion for Order Confirming Application of Automatic Stay and Granting Preliminary Injunction, Adv. Pro. 04-04262, at 12 (Oct. 27, 2004) [D.I. 48];  Ex. J465, at 191 (2007 Pfizer 10-K);  Ex. J464, at 157 (2006 Pfizer 10-K); Ex. J463, at 150 (2005 Pfizer 10-K); Ex. J462, at 163 (2004 Pfizer 10-K) ("a small number of lawsuits pending against Pfizer in various federal and state courts seeking damages for alleged personal injury from exposure to products containing asbestos and other allegedly hazardous materials sold by Gibsonburg Lime Products Company, which was acquired by Pfizer in the 1960's ...").

435.     Public financial filings state that Pfizer entered into the Pfizer Settlement Agreements to settle "claims related to Quigley products against Quigley and Pfizer." Ex. J466, at 134 (2008 Pfizer 10-K); Ex. J465, at 191 (2007 Pfizer 10-K); Ex. J464, at 157 (2006 Pfizer 10-K); Ex. J463, at 150 (2005 Pfizer 10-K); Ex. J462, at 162 (2004 Pfizer 10-K).

436.     Alan Kellman, an attorney for the Settling Law Firm Jacques Admiralty Law Firm, testified that he believed he was settling Quigley-derivative liability for his 27,000 claims settled pursuant to the firm's Pfizer Settlement Agreement.  Tr. 2407:11-2408:11 (Deposition Reading Kellman).

437.     According to Kany, almost all of the cases arising from Kilnoise were in Ohio, and were by local Ohio plaintiffs who had been exposed to the products in the course of their work as plasterers in Ohio; Pfizer's Minerals Division manufactured the asbestos-containing product Kilnoise out of a plant in Gibsonburg, OH and the Kilnoise product was inexpensive,

selling for approximately $100 per ton, so it was not cost-effective to ship the product far from where it was produced. Tr. 146:2-148:7 (Kany).

438. Pfizer otherwise submitted no evidence quantifying any exposure it faced from Kilnoise-related claims.

439. Cooney testified that historically, plaintiffs' firms were unaware of Pfizer's connection to the Firex asbestos product; that just about the time of Quigley's bankruptcy his firm discovered Pfizer's liability for Firex by doing reverse patent searches for products for which Pfizer sought intellectual property protection back during the asbestos era and for the first time in the summer of 2004 added Firex allegations against Pfizer. Tr. 2433:1-8 (Cooney). Because other law firms were unaware of Pfizer's Firex asbestos exposure at the time of the Pfizer Settlement Agreements, it is reasonable to conclude that little to none of the value of the Pfizer Settlement Agreements derive from resolving allegations of asbestos exposure to the Firex product.

440. Having already released their Quigley-derivative claims in exchange for the payment under the Pfizer Settlement Agreements, Settling Plaintiffs only retain Quigley claims, which are being paid through the TDP. Tr. 398:7-398:10 (Berland); Tr. 2127:2-10, 2184:4-13 (Rozen); Ex. P3003, at 26 (Ex. B Form of Plaintiff Release explicitly provides that claims against Quigley are not released: "However I do not release any of my claims against Quigley,") at 11 ("Settling Plaintiffs will be entitled to assert a prepetition claim against Quigley which will be subject to the terms of the Trust Distribution Procedures" §2.4(b)); Ex. J467-J536.

441. By contrast, if the Plan is confirmed, the Non-Settling Plaintiffs will receive a single TDP payment for their Quigley and their derivative claims which are being channeled. Ex. J47, at 54 (August 6, 2009, Plan, § 11.6).

442. As discussed above, absent the injunction, Pfizer will face Quigley-derivative claims from Non-Settling Plaintiffs of between $420M (Pfizer estimate) and $1.525B (AHC estimate) and from future claimants of $2.66B (net present value) for a total value of between $3.1B and $4.2B. Tr. 1874:24-1875:14 (Rabinovitz); J42, at 162 (March 28, 2008 Disclosure Statement, Ex. I, HR&A Future Claims Analysis); Tr. 2330:14-20, 2332:1-24 (Rourke); Ex. A4547, at 40 (Rourke Report); Tr. 2759:18-2762:25 (Sellick).

443. Thus, Non-Settling Plaintiffs and future claimants are giving up additional value of between $3.1B and $4.2B in Quigley-derivative claims under the Plan than given up by the Settling Plaintiffs.

## VI. PFIZER'S GLOBAL STRATEGY, AND QUIGLEY'S RELATED PLAN, WERE RIDDLED WITH BAD FAITH AIDED BY FIDUCIARY FAILURES OF QUIGLEY'S BOARD, THE FCR AND COMMITTEE.

444. Following the 1992 Asset Sale, Quigley was an operationally defunct shell-company with no business and no employees, dominated by Pfizer through a board consisting entirely of Pfizer employees. Tr. 313:10-314:3, 317:23-318:4 (Berland); Tr. 726:2-23 (Street); JPTO Undisputed Facts ¶ 4. The Quigley shell retained its existing asbestos liabilities and its sole assets were its rights to shared insurance policies. Tr. 169:2-5 (Kany).

445. Over the next 10+ years, Pfizer attorneys, either in monitoring the activities of the Center for Claims Resolution ("CCR") or directly, handled the defense and resolution of all liability relating to Insulag and Panelag, always securing a release for both Pfizer and Quigley and allocating for internal insurance billing purposes, 77% of the total settlement dollars to Quigley and 23% to Pfizer. Ex. A4015; Tr. 160:6-14, 283:1-284:8 (Berland); Tr. 2018:4-17, 2026:3-6, 2032:7-13, 2033:7-2034:4, 2088:11-18 (Rozen) (Rozen acted in this capacity following withdrawal from CCR); Tr. 2431:2-5 (Cooney) (naming both Pfizer and Quigley for harm caused by Insulag and Panelag because "they manufactured, distributed, and sold the

product[s]"); Ex. A4559, at 28 (Shaked Slides). Pfizer billed $1.2B in asbestos-related liability to shared insurance during the 20-year period from 1985 through 2004 proceeding Quigley's bankrupting, allocating 77% to Quigley and 23% to Pfizer. Ex. A4015; Tr. 295:19-298:22 (Berland).

### A. Pfizer Exercised Undue Influence Over Quigley, And Dictated The Key Decisions Made By, Other Constituencies In The Case.

446. In or about 2003, Pfizer decided to use the Quigley corporate shell as a vehicle for achieving its own asbestos protection. Tr. 168:25-169:5 (Kany).

447. Multiple Pfizer witnesses conceded that the Quigley bankruptcy was part of Pfizer's two-part global strategy to afford Pfizer the protection of the 524(g) channeling injunction from Quigley-derivative liability. Tr. 259-60, 331:18-332:8 (Berland); Tr. 2026:12-2030:3-29, 2097:4-15, 2099:15-2100:12 (Rozen).

### i. Just Prior To Setting Quigley On The Path Towards Bankruptcy, Pfizer Stripped Quigley Of The Remaining Proceeds From The MinTech Transaction.

448. Throughout this case, Pfizer maintained the $78M purchase price proceeds between Quigley and Pfizer's other Subsidiary, Specialty Refractories, Inc., remained in the Quigley shell. Ex. A4521, at 6 (Amended Affidavit of Steven Kany, Adv. Proc. 04-04262, ¶ 15 (Bankr. S.D.N.Y. Sept. 7, 2004) [D.I. 19]); Pfizer witness, Sandy Berland, admitted at trial that Quigley had, in fact, only retained $25.6M. Tr. 165:4-18, 167:16-168:24, 177:6-178:25, 180:3-18 (Kany); Ex. A4503 (MinTech Transaction Documents); Ex. A4502 (Mineral Technologies article, Oct. 30, 1992); Ex. A4005 (Mineral Technologies article, April 6, 1993) ; Ex. J538 at 204 (Quigley's 1992 Balance Sheet showing cash of $25.6M); Tr. 186:8-14 (Kany). Tr. 253:11-254:22, 302:5-303:1, 305:19-306:1 (Berland) (Pfizer resurrected its financials and determined

that due to intercompany setoffs – which were never quantified or explained – Quigley only retained $26M).

449. As of 1992, Quigley had retained earnings from operations of $23M. Ex. J538, at 204 (Quigley Financial Statements, 1992 Balance Sheet).

450. With net proceeds from the assets sale of $25M and additional paid-in-capital of $22.6M, between 1993 and 2001, Quigley maintained cash and cash equivalents in excess of $43M. Ex. J538, at 209, 230, 248, 261, 272, 278, 283, 289, 295 (Quigley Financial Statements, Balance Sheets 1993-2001).

451. By 2001, the total of Quigley's cash and cash equivalents carried on its balance sheet was $43M. Ex. J538, at 295 (Quigley Financial Statements, 2001 Balance Sheet)

452. In 2002, the $43M in cash and cash equivalents disappears from Quigley's balance sheet. Ex. J538, at 301 (Quigley Financial Statements, Quigley's 2002 Balance Sheet showing negative $4M cash and cash equivalents).

ii. **Pfizer Converted Pfizer-Directed Settlements Into Quigley-Owed Secured Debt By Entering The Credit And Security Agreement With Pfizer-Only Quigley Board Members.**

453. In or around 2002, new liabilities of $88.3M were added to Quigley's financial statements for an intercompany loan and intercompany accounts payable charged by Pfizer to Quigley to pre-fund Pfizer-directed settlements. Ex. J538, at 301 (Quigley Financial Statements, Quigley's 2002 Balance Sheet); Tr. 738:7-739:14 (Street).

454. Between 1992 and 2002 no such inter-company loan appears on Quigley's balance sheet and inter-company payables were not more than approximately $1M. Ex. J538, at 209, 230, 248, 261, 272, 278, 283, 289, 295 (Quigley Financial Statements, Balance Sheets 1992-2001).

455.    On March 6, 2003, without the independent review of counsel and at a time when the Quigley board consisted entirely of Pfizer employees, Quigley and Pfizer entered into a credit and security agreement (the "Credit Agreement"), converting $91,542,000 of unsecured debt to secured debt, and providing Quigley a $50M secured revolver.    Tr. 358:2-359:22, 360:10-16 (Berland); Ex. J446 (Credit and Security Agreement and Unanimous Written Consent of Board of Directors in Lieu of Meeting); Tr. 738:7-740:2 (Street); Ex. J446 at 3 (Credit and Security Agreement and Unanimous Written Consent of the Board of Directors In Lieu of a Meeting, dated March 6, 2003, §§ 1(a)–(b)).    The Credit Agreement was secured by the pledge of Quigley's interests in the insurance assets.

### iii.    Pfizer Changes The Composition Of The Quigley Board To Implement Its Global Strategy (2003-2004).

456.    As part of its global strategy Pfizer implemented changes to the Quigley Board – changes which Pfizer witnesses admitted were designed to make Quigley appear "independent" from Pfizer.  Tr. 259:3-260:7 (Berland).

457.    These changes started when Bruce Zirinsky, a bankruptcy attorney at Cadwalader representing Pfizer, consulted with Sandy Berland, in-house counsel at Pfizer, and contacted Paul Street about becoming a member of the Quigley Board.  Tr. 682:16-25, 717:8-22 (Street); Tr. 260:8-20. (Berland); JPTO, Undisputed Facts, ¶ 16.

458.    Mr. Street, who knew Mr. Zirinsky to be a bankruptcy lawyer, was told simply that Quigley was a Pfizer subsidiary that had produced asbestos products and that Pfizer wanted to negotiate a final resolution. Tr. 682:16-25, 718:1-721:6, 718-21 (Street); JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 64:3-64:16 (Jan. 30, 2009) (testifying that he believed that Quigley began to consider filing for bankruptcy sometime in 2003).  Mr. Zirinksy

and/or Mr. Berland hired Mr. Street and negotiated his compensation, which was paid by Pfizer because Quigley had neither a bank account nor any liquid assets. Tr. 724:4-24 (Street).

459.    Although it was not involved in the negotiations leading to his hiring, the Pfizer-controlled Quigley Board at the time consisting of Susan Grant, Kathy Ulrich and Charles Raeburn (all Pfizer employees) appointed Paul Street as Quigley's President and Chairman on May 27, 2003. Ex. J220; Tr. 1507:18-1508:7 (Jenkins).

460.    One year later, Street recommended Kevin Altit, an attorney residing in Brazil with whom he had previously worked in connection with the Enron bankruptcy proceedings, as another candidate for appointment to the Quigley Board. Tr. 870:6-18, 873:12-874:24 (Altit).

461.    At a board meeting on June 22, 2004, less than three months prior to Quigley's bankruptcy filing, Ms. Ulrich and Ms. Grant resigned from the Quigley Board and Mr. Altit was appointed.  This was the first time that the Quigley board consisted of a majority of non-Pfizer employee board members  (two 'independent' board members, Street and Altit, and one Pfizer employee, Raeburn).  This was the sole Quigley Board meeting that Mr. Altit attended in person. Tr. 1508:2-10 (Jenkins); Tr. 953:10-954:3 (Street); Tr., 873:15-19 (Altit).

462.    In the fourth quarter of 2003, with the advance approval of Pfizer, and at a time when the Quigley Board was dominated by Pfizer employees, Quigley retained the law firm of Schulte Roth and one of its partners, Michael Cook, whom Street knew to be a bankruptcy specialist. Tr. 1520:1-7 (Jenkins); Tr. 731:8-732:5 (Street).

> **iv.    Pfizer Secured The Ability To Settle Quigley's Claims Under The Joint Defense Agreement, Only To Then Exclude Quigley From The Settlement Process.**

463.    In the 10+ years during which Pfizer counsel had been resolving asbestos claims for the benefit of both Quigley and Pfizer, there was never a document memorializing any joint defense agreement between the companies. Tr. 375:5-25 (Berland).

464. In September 2003, prior to the appointment of Mr. Altit and at a time when it was still controlled by Pfizer, the Quigley Board, authorized a joint defense agreement (the "Joint Defense Agreement"), pursuant to which Quigley delegated full authority to Pfizer to investigate, defend, settle or otherwise resolve or dispose of asbestos claims, including making payment with respect to the claims from the insurance. Tr. 366:14-25, 370;10-371:4 (Berland); Tr. 744:7-25 (Street) (acknowledging that he understood himself to be delegating to Pfizer the authority to settle and dispose of asbestos claims); Ex. J445 (Joint Defense Agreement).

465. Charles Raeburn, who was on the Quigley Board in September of 2003, testified at trial that he was wholly unaware of the existence of the Joint Defense Agreement. Kevin Altit, who was not appointed a director until July of 2004, just prior to Quigley's bankruptcy testified that he was not made aware of the existence of the Joint Defense Agreement at the time he joined the Board. Tr. 917:16-918:8(Altit); Tr. 2278:21-23 (Raeburn).

466. Pfizer did not inform Street when the Joint Defense Agreement was being negotiated, either that it intended to settle hundreds of thousands of Insulag and Panelag-related asbestos claims only against itself, or that it intentionally would not settle related claims against Quigley held by the same claimants. Tr. 757:7-15 (Street).

467. Pfizer subsequently entered the Pfizer Settlement Agreements, which expressly preserved the Settling Plaintiffs claims against Quigley. Tr. 378:8-379:22, 381:13-25 (Berland). These contracts were negotiated by Mike Rozen and Ron Rubin, both of whom had previously represented the interests of both Quigley and Pfizer in joint settlements. JPTO, AHC Deposition Designations, Ex. D, Rubin Dep. 12:12-12:16; 31:23-33:24 (Jan. 30, 2009) (admitting that he represented both Pfizer and Quigley, even though his point of contact on Quigley matters was limited to internal Pfizer attorneys).

468. Rozen testified that he was never Quigley's attorney during this period, that he was unaware of the 2003 Joint Defense Agreement, that he was not communicating with anyone at Quigley, and that he negotiated and settled claims on Quigley's behalf during the post-CCR period based on Pfizer's instructions. Tr. 2081:4-2088:10 (Rozen).

469. Both Street and Jenkins believed that Rozen and Rubin represented both Quigley and Pfizer; Jenkins does not know at what point Mike Rozen ceased representation of Quigley, and does not know of any request by Mike Rozen for a conflicts release or waiver from Quigley. Tr. 763:2-8, 748:25 (Street); Tr. 1567:12-1568:9 (Jenkins).

### v. Pfizer selects a putative Future Claimants' Representative and negotiates a limited fund.

470. In the Spring of 2004, Pfizer's bankruptcy counsel contacted Al Togut regarding the putative future claims representative position for Quigley's bankruptcy case; no representatives from Quigley attended the initial meeting and Street, Quigley's President, never even interviewed Togut. Tr. 2141:13-2142:14, 2172:6-2176:20 (Togut); Tr. 767:10-12 (Street).

471. Togut was retained as the putative future claims representative (his law firm, Togut, Segal & Segal, and expert, Francine Rabinovitz, were also retained) by June 2004, after which time he participated in numerous meetings with Pfizer attorneys concerning Quigley's bankruptcy. Ex. A4403 (June 2004 Invoice); Ex. A4343 (Email from Cook re: TS&S July Invoices); Tr. 1849:5-10 (Rabinovitz). Debbie Greenspan, counsel for Pfizer, also met extensively with Togut's expert, Dr. Rabinovitz during the prepetition period. Tr. 563:1-565:22, 568:21-569:8 (Greenspan).

472. Quigley was billed for Togut's services beginning in August 2004 and paid his prepetition bills. Tr. 2147:4-6 (Togut); Ex. A4403 (June 2004 Invoice).

473.     John Cooney, who has served on a substantial number of official creditors' committees, asbestos claimants' committees, and trust advisory committees in connection with asbestos bankruptcies, testified that the appointment of the person who is going to serve as the representative of future claimants is usually done in consultation with the plaintiffs law firms who work directly with claimants and understand their needs and rights, and will be the parties that ultimately represent the future claimants.  Tr. 2420:1-2422:2, 2457:25-2459:17 (Cooney).

474.     At a time when Quigley had absolutely no operating revenues and no cash or cash equivalent assets, payments to Togut were financed by Pfizer.  Tr. 898:23-899:13 (Altit).

475.     During this time frame, Pfizer and Togut's representatives were discussing the timing of Quigley's bankruptcy filing.  Tr. 1892:25-1893:19 (Rabinovitz); Ex. A4073 (July 8, 2004 Rabinovitz email, "[Greenspan] is not clear when they are aiming at filing the prepack. Originally the idea was the end of July but that seems unrealistic now.").  Members of the Quigley Board had no knowledge of any such discussions.  Tr. 1052:22-1054:25, 1060:13-1061:23, 897:6-10 (Altit); Tr. 2274:16-20, 2275:14-18 (Raeburn).

476.     Togut reached an "agreement in principle" on Pfizer's contribution prior to Quigley's bankruptcy filing, which was limited to a pool of assets consisting primarily of shared insurance.  Tr. 2183:15-24 (Togut); Tr. 646:5-647:9 (Greenspan); Ex. J300, 3, ¶ 7 (FCR Application, Togut's "extensive and substantive negotiations" prepetition resulted in "agreement on the principle elements of a chapter 11 plan to establish a trust under section 524(g) of the Bankruptcy Code"); Ex. A4289 (email from Milin to Greenspan responding to an FCR proposal and noting "pool of assets" concept); Ex. A4315.

### vi. Pfizer Structures The AIG Swap, Allowing It To Fund The Deal Agreed To With the FCR Using Almost Exclusively Estate Assets.

477.    On or about August 14, 2004, Pfizer and Quigley entered into the AIG Settlement Agreement, pursuant to which AIG agreed to pay Pfizer and Quigley $405,746,856 over a ten (10) year period.  JPTO, Stipulated Facts, ¶¶ 43-45; Ex. J43, at 240, 247 (March 28, 2008, Plan, Ex. G, AIG Assignment Agreement, Ex. A, AIG Insurance Settlement Agreement).

478.    The $405M consists of three basic components: (a) $282M of unallocated insurance proceeds, (b) $43M available solely to Quigley based on past billings, and (c) $81M purportedly available solely to Pfizer (a $75M non-asbestos policy and $6M of past asbestos related billings).  Tr. 246:4-247:23 (Berland); Tr. 1764 (Snow); Ex. P3000a, at 1, 7 (Snow Slides); Ex. J42, at 69 n.7 (March 28, 2008, Disclosure Statement); Ex. J43, at 232 (March 28, 2008, Plan, Ex. G, AIG Assignment Agreement).

479.    The AIG Settlement was entered into in conjunction with a Quigley bankruptcy filing.  Under the AIG Settlement, (1) Pfizer and Quigley are required to use commercially reasonable efforts to cause any bankruptcy plan adopted under Chapter 11 for the benefit of Pfizer and Quigley to provide an injunction pursuant to 524(g) enjoining asbestos-related claims against the AIG companies and (2) AIG cannot assert as a defense to payment the fact that Quigley commences a bankruptcy proceeding or that AIG is ordered to pay the settlement proceeds to a 524(g) Trust.  Tr. 459, 462:1-10 (Berland); Ex. J43, at 247-48, 257 (March 28, 2008, Plan, Ex. G, AIG Assignment Agreement, Ex. A, AIG Insurance Settlement Agreement, pp. 7-8, 17).

480.    Pfizer and Quigley also agreed to the AIG Assignment under which Quigley will, upon confirmation of its bankruptcy plan, assign all of its rights in the AIG settlement payments to Pfizer in exchange for a 40-year note from Pfizer (the "AIG Swap").  Ex. J43, at 245, 254-55

(March 28, 2008, Plan, Ex. G, AIG Assignment Agreement, Ex. A, AIG Insurance Settlement Agreement, pp. 5, 14-15).

481. By exchanging the 10-year AIG payments for a 40-year obligation ("the AIG Swap"), Pfizer profited by between $81.9M and $147M. Tr. 2581:9-2583:21 (Shaked); Ex. A4559, at 26, 29-34 (Shaked Slides).

482. The AIG Swap will also result in Pfizer receiving in excess of $191M on the Effective Date, as that is the amount paid by AIG as of the confirmation trial and on deposit in the Interim Insurance Fund Trust. It will take Pfizer more than 18 years to pay an equivalent nominal value to Quigley under the 40-year annuity. Ex. J47(b) (Liquidation Analysis, Schedule 6); Ex. A4559, at 26, 30 (Shaked Slides); Ex. P3000a (Snow Report, calculating NPV of $161M); Ex. J46 (Plan Supplement, Ex. L., Pfizer/AIG Annuity).

483. When Pfizer entered into the Pfizer Settlement Agreements with Settling Law Firms beginning August 31, 2004, it promised to contribute the 40 year annuity to the Trust. Ex. P3003 (Form Settlement Agreement, §1.1 definition of "Trust Contribution"); Ex. J467-J536 (same); Ex. J42, at 69 n.7 (March 28, 2008, Disclosure Statement); Ex. 46 (Plan Supplement, Ex. L, Pfizer/AIG Annuity); Ex. J47 (August 6, 2009, Plan, § 1.1 "Pfizer/AIG Annuity"); Tr. 2044:1-16 (Rozen).

484. Togut, only a putative FCR at the time, agreed to the AIG Swap as part of Pfizer's proposed 'contribution' prior to Quigley's bankruptcy filing because it was the "best" Pfizer would agree to, not because Togut wanted to swap a 10-year annuity for a 40-year annuity. Tr. 2152:2-2153:17, 2236:16-2238:18 ("I asked for the money up front. I asked for the money over ten years. I asked for a lot of things I didn't get. I asked for interest. The best I ended up with is what you see, which is this payout over forty years.") (Togut).

### vii. Pfizer's decision to 'resurrect' Quigley lacked any legitimate business purpose and was done solely as a means of securing substantial asbestos protection for Pfizer.

#### a. Pfizer Gave Quigley Its Claims Handling Unit

485. While simultaneously discussing a chapter 11 filing at the June 22, 2004 board meeting, the Board agreed to accept the CHU from Pfizer to give it an operation that it could reorganize under Chapter 11. Tr. 900:15-902:25 (Altit); Ex. J224, at 5-6 (Quigley Board Meeting, June 22, 2004).

486. The CHU was a non-revenue producing activity at Pfizer. Tr. 905:18-906:8 (Altit).

487. At trial, the Quigley Board could not answer whether it was Pfizer's idea or Quigley's idea to transfer the CHU from Pfizer to Quigley. Tr. 785:4-23 (Street); 903:1-904:8 (Altit).

488. Street testified that Quigley negotiated the transfer of the CHU because there was no point to be on a board that simply processed claims for its parent; in fact, the CHU was a unit of Pfizer, not Quigley, until the transfer; and Quigley was not processing claims for its parent, its parent Pfizer was processing claims for Quigley. Tr. 689:10-690:15 (Street, Street was concerned about employee morale in connection with the transfer of the CHU to Quigley, especially in light of Quigley's bankruptcy, because the employees were moving from one of the biggest companies in the world to "a small standalone [sic] enterprise which did nothing but process asbestos claims, which will eventually run out.").

489. Altit testified that the CHU was transferred to Quigley because Quigley had no other business other than managing its claims and because the CHU was a cost center to Pfizer. Tr. 905:1-13 (Altit). When confronted with his admission that Quigley was contemplating a Chapter 11 filing prior to the Quigley board's approval of the transfer of the CHU from Pfizer to

Quigley and asked what Quigley was hoping to reorganize if it had no operations, no revenues and no employees, Altit conceded that Quigley sought to bring the CHU operations to Quigley for the purpose of allowing Quigley to reorganize. Tr. 900:18-902:20 (Altit).

490. Raeburn did not know why Pfizer transferred the CHU to Quigley; neither Berland or Street explained to Jenkins why the CHU was being transferred. Tr. 2280:1-16 (Raeburn); Tr. 1504:8-11 (Jenkins).

491. Quigley had no operating revenue from the transferred CHU business until after it executed the Shared Services Agreement with Pfizer on August 31, 2004 (the "Shared Services Agreement") only three (3) days prior to Quigley's bankruptcy. JPTO, Undisputed Facts, ¶¶ 31, 33; Ex. J447 (Shared Services Agreement).

492. Quigley lost tens of millions of dollars operationally during this case processing claims settled by Pfizer under the Pfizer Settlement Agreements. Ex. J164 (August 2009 MOR, Statement of Operations, earning $3.2M for services and incurring $21M in operating expenses from August 31, 2004 and August 31, 2009).

493. Quigley's prospects of surviving post-confirmation depend on two non-arms length contracts (the Asbestos Claims Services Contract and the Pfizer Claims Services Contract) which do not reflect market rates and which terminate in 5 years. See Proposed Findings, ¶¶93-122, supra.

494. Scott Ratner, one of Togut's legal professionals, questioned why the Asbestos PI Trust did not simply outsource the claims processing function to a third-party processor rather than retaining Quigley because (1) it would be objectively cheaper from the Trust's perspective and (2) it would remove substantial uncertainties regarding possible operating deficits/losses at the Quigley level which the Trust will have to subsidize as the owner of Reorganized Quigley.

Ex. A4047a (March 29, 2007, Ratner email). Ratner asked Debbie Greenspan for "a reason other than that Reorganized Quigley must have some business when it emerges from Chapter 11 so as to enable Pfizer to benefit from [a] channeling injunction issued pursuant to section 524(g)." Ex. A4047a (March 29, 2007, Ratner email). No such "reason" was given. Nevertheless, Togut accepted the requirement that the Asbestos PI Trust retain Quigley to process its claims. Ex. J43, at 334-45 (Proposed Asbestos PI Claims Services Contract, Ex. J).

### b. Pfizer Initially Proposed Providing Quigley Cash-Flow From Drug Lines To Make It Look Like An Ongoing Business.

495. Initially, Pfizer proposed granting Reorganized Quigley a license for four old, off-patent niche drugs. Under Pfizer's proposal, Reorganized Quigley would receive a cash revenue stream from the drugs upon confirmation, but not take on any responsibility for their manufacture, advertising or sale. Tr. 445:3-446:25 (Berland); Tr. 1571:19-1572:6 (Jenkins); Ex. J21A (Fourth Amended Disclosure Statement, Oct. 17, 2005); Ex. A4023, at 4 April 2005 e-mail between Quigley and The Foresight Group).

496. Berland conceded at trial that the proposal was intended to give Quigley an additional business and that such transfer would have been a component of Section 524(g)'s requirement that Quigley have a "going business." Tr. 357:9-18, 444:4-12 (Berland).

497. The FCR's legal representatives recognized income to be produced pursuant to the drug license was structured as a contract with, instead of a direct contribution to Quigley, the Trust, "to make Quigley look like some sort of operating entity with viable business upon emergence from chapter 11." Ex. A4043.

498. Quigley's board also understood that Pfizer's decision to transfer the drug lines license to Quigley was to "give Quigley some greater business substance." Tr. 2287:4-17 (Raeburn).

499.    Street had no discussions with Pfizer regarding the license of the Pfizer drug lines; Pfizer simply told Quigley of their intention to grant the drug lines license, and Quigley had no participation in the selection of the drug line products. Tr. 982:6-984:3 (Street).

500.    Pfizer eventually decided to take the drug line contribution out of the Plan, replacing it with the Pfizer Claims Services Agreement. Tr. 2169; Tr. 550:23-551:25 (Greenspan); Ex. J23, at 51 (May 18, 2007, Disclosure Statement, no mention of drug line transfer).

### c.    The FCR Failed to Evaluate Pfizer's Attempt to Create a Business.

501.    Togut had no idea that Quigley sold its operating assets in 1992 and did not know whether Quigley had any operations in June 2004 when he began his engagement. Tr. 2189:23 – 2191:11 (Togut) ("I was not concerned about any of that in connection with my work on behalf of the futures, in getting a contribution for the futures."). He was unaware of whether Quigley had any revenue-generating activities. Tr. 2192:9-11 (Togut).

502.    Togut did nothing to evaluate Quigley's prepetition "business" in the summer of 2004, and has done nothing to evaluate the desirability of continuing Quigley's business post-confirmation. Tr. 2191:122192:8 (Togut, "Q. At no time before or after your formal appointment as FCR did you undertake an assessment of Quigley's business as it entered bankruptcy, correct? A. That's correct.").

503.    Togut did not consider it important to his duty as future claims representative to understand Quigley's business, despite knowing that it lost tens of millions operationally during the case, and was not concerned that Pfizer would cause a non-operating subsidiary to file a chapter 11 petition to seek 524(g) protection when the subsidiary had no operating business. Tr. 2192:16-2193:7 (Togut, "Q. Did you consider whether it was proper under 524(g) for a non-

debtor parent to cause its non-operating subsidiary to file a Chapter 11 petition when the subsidiary had no operating business? A. I did not look at that issue.").

504. Togut never considered the propriety of Quigley's proposed post-confirmation business, which was limited to processing its own claims, as claims processor for the Asbestos PI Trust and Pfizer's claims, under the Pfizer Claims Services Agreement. Tr. 2203:6-14 (Togut).

505. Togut considered the $25M in "revenue" projected for Quigley under its claims servicing agreement as nothing more than a contribution by Pfizer and was unaware that Pfizer was paying Quigley under the agreement to process Pfizer claims, rather than to administer claims from the Trust. Tr. 2235:3 (Togut).

506. Togut knew that the purpose of the Pfizer Claims Services Agreement was to function like that providing an annuity and was designed to help to establish that Quigley had an ongoing business. Ex. A4315 (May 20, 2007, Milin email); Ex. A4072 (May 21, 2007, Milin email).

### viii. Pfizer Structured The Pfizer Settlement Agreements To Buy The Quigley Vote, Resulting In Unequal Treatment Under The Quigley Plan.

507. Pfizer conditioned the Pfizer Settlement Agreements on provisions requiring approval of the Quigley bankruptcy plan because it wanted "the ability to walk away from" the Pfizer Settlement Agreements "if [its] intention in going into it in the first place; i.e., global resolution, was not achievable." Tr. 2053:10-2054:10, 2099:15-2100:12 (Rozen, "Pfizer's goal was a comprehensive one. That comprehensive goal was achievable in two parts, not in one. And so when the goal had been achieved, that's when they would have expected to or desired to make payment [of the Pfizer Settlement Agreements]."). See Proposed Findings of Facts ¶123-232, supra.

508. As discussed in detail above in Article II, Pfizer committed to pay the Settling Plaintiffs vastly more money under the Pfizer Settlement Agreements than they could have expected to receive under a Quigley Plan, and conditioned that payment on the final, non-appealable, approval of the Quigley plan and issuance of the channeling injunction. See Proposed Findings of Fact, ¶181-232, supra.

509. In exchange for these payments, Pfizer obtained a release for itself and a large group of Pfizer Protected Parties but consciously decided to exclude Quigley from the scope of the release. Tr. 2032:7-13, 2088:11-25, 2089:1-4, 2133:4-9 (Rozen) (obtaining broad releases for Pfizer and Quigley in 2003 and 2004 and describing the global resolution in two distinct parts, one of which was settling Pfizer liability only – there was never a discussion of putting Quigley in the release under the Pfizer Settlement Agreement). Tr. 2133:4-9 (Rozen).

510. When questioned by the Court, Rozen could not explain why Pfizer did not simply add Quigley to the release for no additional cost; in light of Rozen's earlier testimony that Pfizer historically settled Quigley claims and obtained Pfizer releases for no additional cost. Tr. 2132:17-2133:9 (Rozen).

511. As Togut testified at trial, Pfizer was willing to agree to the 90% subordination provision, however, Togut knew that Pfizer would not agree to a full release recognizing the need for settled claims to be asserted against the trust. Tr. 2245:17-2247:23 (Togut, "Because the way these cases work there need to be settlements and there need to be claims in the trust.").

512. In response to the Court's directed question as to why he didn't ask for 100% if he was asking for 90%, Togut stated "I don't ask for things I don't think I can't get." Tr. 2245:25-2246:1 (Togut).

### ix. Pfizer Never Informed Quigley About The Pfizer-Only Pfizer Settlement Agreements And Two-Part Global Strategy.

513.   During his direct examination, Berland testified that both Quigley and Pfizer agreed to the global strategy of resolving only Pfizer's asbestos liability through the Pfizer Settlement Agreements, while resolving Quigley's through a bankruptcy centered upon a Section 524(g) injunction.   Tr. 382:25-383:6 (Berland).   Numerous Quigley witnesses subsequently testified differently.

514.   Street testified that he never became aware of, and was never told about, Pfizer's two-prong "global strategy," nor did he have any understanding that Quigley's bankruptcy was part of it.  Tr. 759:21-760:8 (Street).  Street also testified that he never had a conversation with Rozen about Pfizer's "global strategy" and could not recall having a conversation with Berland in which Berland advised him of Pfizer's "global strategy".  Tr. 775:20-776:11 (Street).  In fact, Street testified that no member of Quigley's board was ever advised as to Pfizer's "global strategy"; no one representing Quigley ever advised Street of their understanding of Pfizer's "global strategy" and Street never read anything that suggested the existence of Pfizer's "global strategy".  Tr. 759:21-760:8, 775:20-776:11 (Street).

515.   Street also testified that he was unaware of the Pfizer Settlement Agreements until after they were entered into (although he could not recall whether he was first aware of them prior to or after Quigley's bankruptcy filing); that he had no recollection of a discussion with Rubin related to the fact that Pfizer was in the process of entering the Pfizer Settlement Agreements; and that no one at Quigley had any participation in the settlements and that he would have known if anyone (including counsel) was involved in them.  Tr. 701:6-703:9; 721:7-722:7, 787:2-16, 793:12-795:20, 799:11-21, 829:9-25 (Street).

516. Further, Street testified that he has no knowledge why Pfizer decided to settle only claims against Pfizer and not claims against Quigley; that he was unaware that the Pfizer Settlement Agreements contemplated a Quigley bankruptcy; and that he did not recall whether the Pfizer Settlement Agreements required a confirmed Quigley plan as a condition to Pfizer making the second-half of its settlement payments. Tr. 757:20-759:10, 787:2-16 (Street).

517. Altit testified that he was unaware of the Pfizer Settlement Agreements until "sometime in 2005"; that he did not remember Street reporting to the Quigley board in August 2004 about conversations between Street and Rubin regarding the Pfizer Settlement Agreements or any other recent developments about the likelihood of a Quigley Chapter 11 filing; and that he was unaware of Pfizer's activities in the summer of 2004 relating to Pfizer's planning with respect to a Quigley bankruptcy, but, that he believed that Street and Cook would have informed the board if they were involved in meaningful discussions regarding Quigley. Tr. 933:3-934;15, 1047:11-1048:9(Altit). Moreover, Altit was unaware that the Pfizer Settlement Agreements had provisions contemplating a Quigley bankruptcy. Tr. 923:5-924:3 (Altit).

518. Jenkins testified that she was not aware that Pfizer intended to settle hundreds of thousands of Quigley-related asbestos claims for itself, but not for Quigley and that she did not know about the Pfizer Settlement Agreements until after the bankruptcy filing, in the first or second week of September 2004. Tr. 1464:8-19, 1522:14-1523:9, 1529:20-1530:2 (Jenkins).

519. Raeburn testified that he was unaware of the Pfizer Settlement Agreements, even at the time of his June 2007 deposition, and that he did not know anything about the settlements. Tr. 2283:1-2284:15 (Raeburn).

520. Berland, in rebuttal of his co-plan proponent witnesses, testified that he participated in ongoing meetings in June, July, and August of 2004 with the Quigley legal team

regarding the status of the Pfizer Settlement Agreement efforts and the structure of the two-pronged global strategy. Tr. 2698:9-24 (Berland). Berland asserted that he was certain that in the June, July, or August of 2004 time-frame, he told Paul Street that Pfizer intended to enter into the Pfizer Settlement Agreements; that he was in regular contact with Quigley through discussions with Kim Jenkins and frequent conversations with Paul Street about the status of the settlement effort; from these discussions, he understood that information concerning the Pfizer Settlement Agreement negotiations was shared with Quigley; and that he understood that in August of 2004, Rubin sat down with Paul Street and briefed him "extensively" on the state of the settlement negotiations. Tr. 2699:2-11, 2720:12-19, 2721:24-2722:6 (Berland). Berland also testified that he believes that the joint global strategy was approved by Quigley's board. Tr. 2723:10-17 (Berland).

### x. Pfizer's Bad Faith Continued After The Filing Of The Plan.

521. On August 9, 2006, the Court held that the 90% Subordination Provision had to be considered when weighing the value of Settling Plaintiffs' claims for the purpose of determining whether the Plan was accepted by two-thirds in amount as required under Section 1126(c) (the "Voting Decision"). See In re Quigley Co., Inc., 346 B.R. 647 (Bankr. S.D.N.Y. 2006). When the voting was computed under this methodology, Quigley's plan failed to garner sufficient votes. See id.

522. In response Pfizer unilaterally waived the 90% Subordination Provision, so as to increase the economic value of the Settling Plaintiffs' claims and ensure that the Settling Plaintiffs controlled the vote on the Plan. Tr. 572:21-576:10, 636:5-638:22 (Greenspan); Tr. 1076:5-1077-12 (Altit).

523. Waiving the 90% subordination provision resulted in the value of Settling Plaintiffs' votes to increase ten-fold for purposes of evaluating the 2/3 in value requirement of

Section 1126(c). It also resulted in the Settling Plaintiffs' potential recovery from the Quigley Trust to increase from $14.2M to $142M. Ex. A4547, at 26 (Rourke Report); Q2007 (increase from $5.9M to $59.7M when qualification rates considered).

524. The FCR recognized that Pfizer's decision resulted in the Settling Plaintiffs' potential recovery from the Trust to have increased by a factor of ten. Ex. A4289 (FCR's May 14, 2007 Response to Pfizer Proposal, "In the FCR's view, the additional resources that should be contributed to the Trust are easily calculated. Each Settling Claimant will now be receiving ten times as much. Accordingly, the additional resources the Trust will require equal nine times the distribution to Settling Claimants anticipated in the Plan, subject to any necessary corrections based on new information.").

525. Togut agreed to Pfizer's waiver of the subordination provision as long as it agreed to make up the difference. Ex. A4082 (November 9, 2006 Togut email); Ex. A4289 (FCR's May 14, 2007 Response to Pfizer Proposal). Pfizer and the FCR ultimately agreed on a make-whole amount designed to maintain the initial 7.5% payment percentage. Ex. A4348 (May 14, 2007, FCR Response to May 9, 2007, proposal); Tr. 549-50 (Greenspan); Ex. Q2007 (Pfizer/FCR Make-Whole Calculation); Ex. J38, at 50 (Fifth Amended and Restated Disclosure Statement, as modified Nov. 5, 2007).

526. The make-whole amount was intended to compensate the Asbestos PI Trust for the additional distribution to Settling Plaintiffs after Pfizer's waiver of the 90% subordination provision; thus, all additional amounts solely benefit Settling Plaintiffs, not Non-Settling Plaintiffs and future claimants. Tr. 548:17-550:11 (Greenspan); Tr. 1879:6-1880:5 (Rabinovitz); Ex. Q2007 (Pfizer/FCR Make-Whole Calculation).

527. During the negotiations, Pfizer indicated a desire to spread the payments out over time, so as to "help them show that Quigley will have an ongoing business." Ex. A4315 (May 20, 2007, email from FCR's counsel, "Pfizer is very interested in the notion of paying the admin costs AND additional payment contribution over time through an annuity. They seem to think based on recent research that the annuity ides will help establish that Q has an on-going business."); Ex. A4072 (May 21, 2007, e-mail from FCR's counsel, "You should know, also, that Pfizer is very interested in paying over time, potentially through an annuity, which they say will help them show that Quigley will have an ongoing business. Debbie [Greenspan] did not explain this last point, which seems counter-intuitive.").

528. In May 2007, Pfizer initially took the position that $18M in cash plus a $2.34M enhancement to the guaranteed income from the drug lines would satisfy the replenishment requirement; without questioning Pfizer's number Quigley filed a plan based on the $20.34M make-whole amount. Tr. 602:9-603:3, 639:13-640:13, 642:4-11, 639-40, 642 (Greenspan); Ex. A4366 (May 9, 2007, Greenspan proposal); Ex. A4348 (May 14, 2007, FCR Response to May 9, 2007 proposal); Ex. J23, at 51 (May 18, 2007, Disclosure Statement, no mention of drug line transfer).

529. To reach the estimated value of increased liability to the Trust from the settled claims, Pfizer and the FCR assumed that less than one-third -- only 52,946 of 170,306 -- of the claims that Pfizer settled under the Pfizer Settlement Agreements would qualify for payment under the TDP. Tr. 1989:2 – 1995:21 (Rabinovitz); Ex. Q2007 (using qualification rates of 56–60% for malignancies and 28% for non-malignancies) (Pfizer/FCR Make-Whole Calculation).

530. Pfizer and the FCR applied the qualification rates to the Pfizer Settlement Agreement claims even though these same claims had already been approved by Pfizer and

received their first-half payment under the settlements and would vote to approve the Plan. Tr. 1993:8-1994:13 (Rabinovitz).

531.    Dr. Rabinovitz never requested any of the detailed claim documents provided in connection with the Pfizer Settlement Agreements to determine whether these claims would qualify under the TDP. Tr. 1994:17-1995:10 (Rabinovitz).

532.    In February 2007, Pfizer provided updated claims data to the FCR and Creditors' Committee as part of the negotiation of the make-whole contribution. Ex. A4307 (February 2007 FCR email chain). Rob Sims, one of the FCR's experts working with Dr. Rabinovitz, questioned why Pfizer was "cleaning" the databases and requested that such changes be explained. Ex. A4264 (March 20, 2007, Sims Email).

533.    Mark Peterson, the Creditors' Committee's claims expert, expressed his view that providing a new, "cleaned" database was unprecedented. Ex. A4307 (February 2007, FCR email chain); Tr. 1981:4-14 (Rabinovitz).

534.    Dr. Rabinovitz did not independently audit the databases and HR&A accepted the new databases as sent by Pfizer. Tr. 1983:14-24 (Rabinovitz).

535.    Eventually, the agreed upon aggregate financial impact of the waiver to the Trust was set at $59,727,738. Tr. 1984:1-1986:24 (Rabinovitz); Ex. Q2007 (Pfizer/FCR Make-Whole Calculation); Ex. A4329, at 3 (May 14, 2007 email from R. Sims re: Updated Future Forecast and Pro Rata Share Estimates).

> **B.      The Quigley Board Showed A Lack Of Good Faith By Leaving Major Decisions To Pfizer.**
>
> > **i.      Quigley's Board Failed To Monitor Joint Counsel's Settlement Activities.**

536.    After delegating all defense and settlement authority to Pfizer, Quigley's board failed to monitor the work of joint settlement counsel. Tr. 744:7-25, 763:2-8 (Street).

537.     Street could not recall if he expected Rozen and Rubin to continue settling claims on behalf of Quigley after entering the Joint Defense Agreement, Tr. 756:22-757:5 (Street), nor could he recall when he learned about the Pfizer Settlement Agreements; if he knew how Pfizer planned to fund the Pfizer Settlement Agreements or whether it would access the Shared Insurance. Tr. 757:16-758:24, 760:1-781:14 (Street).

538.     The Quigley board never discussed the propriety of the settlements and did not know how much money Pfizer committed to the Pfizer Settlement Agreements. Tr. 757:20-758:24, 760:24-761:6 (Street).

539.     One Quigley board member, Kevin Altit, testified that he did not become aware of the Pfizer Settlement Agreements until sometime October of 2005. Tr. 918:9-922:15 (Altit). Altit testified that since Pfizer said it would use its own money to fund the settlements, he does not believe the agreements are relevant to his role as a Quigley board member. Tr. 925:25-930:2, 1048:2-1049:1 (Altit, "I have nothing to do with Pfizer. If Pfizer did anything that was wrong, it was Pfizer. I – you know, I wasn't part of that. I don't care what Pfizer did. I'm sorry. It's none of my business.").

**ii.     Quigley's Board Failed To Understand Quigley's Rights To The Shared Insurance.**

540.     Quigley's board was unaware that it has the same rights to access the shared insurance as Pfizer. Tr. 808:9-809:8, 813:2-13, 989:7-991:11, 1011:6-1012:23 (Street).

541.     Street testified that he thought Pfizer had better rights to the proceeds of the shared insurance because the policies listed Pfizer on their face and were not directly between Quigley and the insurers. Tr. 808:9-809:3 (Street).

542. Based on this misunderstanding, Street was unaware whether Quigley had a choice to receive proceeds under the AIG 10-year annuity or whether it had to accept the Pfizer 40-year annuity. Tr. 813:23-25 (Street).

543. Quigley was unaware of, and did not request information about, Quigley's historic use of the shared insurance (77% Quigley and 23% Pfizer) when it assumed a 50/50 split to calculate the value of Pfizer's contribution as part of the process of preparing the Disclosure Statement. Tr. 987:1-989:24, 991:7-992:22 (Street); 1222:17-1224:7 (Charboneau).

### iii. Quigley's Board Failed To Understand The Value Of The Channeling Injunction To Pfizer And Negotiate A "Fair And Equitable" Contribution.

544. The Quigley board never considered the amount of distributions in other asbestos bankruptcy cases in connection with negotiating Pfizer's contribution. Tr. 1097:21-1098:3 (Altit); Tr. 2289:16-19 (Raeburn did not even know the proposed distribution to asbestos claimants under the Quigley plan).

545. The Quigley Board never attempted to determine the financial value of the Section 524(g) injunction to Pfizer. Tr. 955:1-15 (Street).

546. The Board did not know whether the benefit to Pfizer was greater or less than the value of Pfizer's contribution and never negotiated with Pfizer to ensure that its contribution was "fair and equitable." Tr. 824:1-5, 826:14-827:24, 954:18-957:2, 961:2-963:4 (Street); Tr. 1094:16-20, 1097:21-24 (Altit); Tr. 1335:3-6 (Charboneau).

547. Quigley's board was unaware that prior to the date on which it filed its bankruptcy petition, Pfizer and Al Togut had agreed to the pool of assets (*i.e.,* the Shared Insurance) that Pfizer would propose to provide to the Asbestos PI Trust. Tr. 759:20-760:8, 771:18-773:18, 820:7-11, 954:4-13 (Street); Tr. 1048:16-1049:1, 1053:17-1055:11, 1059:12-

1063:2 (Altit, unaware that Togut was meeting with Cook and Zirinsky in Summer of 2004 and never even heard Togut's name until sometime in 2005, after the petition was filed).

548. The Quigley Board did not know about the Pfizer Settlement Agreements before they were executed. Tr. 703:1-9 (Street); Tr. 925:25-926:9, 1067:9-23 (Altit); Tr. 1522:14-22 (Jenkins); Tr. 2283-84 (Raeburn, still unaware at his June 2007 deposition that Pfizer entered the Pfizer-only Pfizer Settlement Agreements prior to Quigley's bankruptcy filing and did not know why Pfizer would only settle Pfizer claims without getting a concomitant release for Quigley).

549. The Quigley Board did not know that Pfizer conditioned its obligations under the Pfizer Settlement Agreements on a Quigley bankruptcy filing that would seek relief under Section 524(g). Tr. 774:11-21 (Street); 1057:3-14 (Altit); Tr. 2284:16-18 (Raeburn).

550. After Quigley's Board discovered the existence of the Pfizer Settlement Agreements, it nonetheless never tried to determine the cost to obtain a full release for Quigley under those agreements. Tr. 964:21-965:7, 967:21-968:11 (Street).

551. The Quigley Board did not know that the Pfizer Settlement Agreements, as originally executed, contained a provision, § 2.4(b), in which each Settling Plaintiff agreed to reduce their recovery from a Quigley trust by a factor of 90%. Tr. 1524:5-12 (Jenkins); Tr. 2284:19-23 (Raeburn).

552. The Quigley Board did not discuss with Pfizer its decision to subsequently waive the 90% subordination provision in the Pfizer Settlement Agreements. Tr. 993:11-20 (Street); Tr. 1077:14-1078:8 (Altit); Tr. 1334:6-1335:6 (Charboneau); Tr. 2285:16-2286:15 (Raeburn was unaware that Pfizer waived the 90% subordination provision).

553. The Quigley Board never determined the economic impact of Pfizer's waiver upon Quigley creditors. Tr. 994:25-999:6, 1001:2-1002:18 (Street); Tr. 1078:25-1079:24 (Altit);

Tr. 1334:6-1335:6 (Charboneau); Tr. 2286:19-2287:3 (Raeburn did not even know whether the effect of the waiver would increase or decrease the dollar value of claims that could be asserted against the trust).

### iv. Quigley's Board Never Tried To Renegotiate The Shared Services Agreement Despite Losing Tens Of Millions Operationally.

554. The Quigley Board demonstrated a lack of understanding of the financial provisions of the Shared Services Agreement. Tr. 1549:5-10 (Jenkins does not know if Quigley received a competitive prevailing rate); Tr. 914:21-915:9 (Altit thought the agreement was reasonable, but that Quigley should try to get more).

555. Quigley had no knowledge of the value of the services provided by Pfizer to Quigley under the Shared Services Agreement at the time that it entered into the agreement or at the time of Jenkins' September 15, 2009 deposition. Tr. 1550:17-1551:6 (Jenkins).

556. Only in connection with the confirmation hearing did Jenkins ask Pfizer to provide some information in this regard, but no analysis was introduced into evidence and Jenkins could not provide any individual breakdown of the value of the services. Tr. 1472:2-9, 1551:11-1557:17 (Jenkins).

557. Quigley's board never tried to re-negotiate the Shared Services Agreement, despite losing tens of millions of dollars operationally under the agreement during its 5+ year bankruptcy case. Tr. 914:4-915:9 (Altit); 1273:3-1274:5 (Charboneau); (Jenkins); Ex. J164, at 3 (August 2009 Monthly Operating Report, Statement of Operations, earning $3.2M for services and incurring $21M in operating expenses from August 31, 2004 and August 31, 2009); Tr. 2282:14-16 (Raeburn was entirely unaware how much money Quigley has lost during this case).

###### v. Quigley's Board Unaware That Quigley's Losses Principally Funded With Insurance Proceeds.

558. Quigley's board was unaware that Quigley's losses during the case were principally funded with insurance assets that would otherwise have been available to asbestos victims. Tr. 908:3-909:12, 1071:14-1075:17 (Altit); Tr. 1332:5-1333:3 (Charboneau); Tr. 2278:2-4 (Raeburn was unaware whether Quigley borrowed funds from Pfizer during the case).

###### vi. Quigley's Board Failed To Consider The Allowability Of Pfizer's Secured Claim.

559. Pfizer's Secured Claim was created in March 2003, at a time when the Quigley Board was comprised entirely of/dominated by Pfizer employees. Tr. 1076:25-1077:6 (Altit).

560. Raeburn who was on the Quigley board at that time could not recall Quigley entering into the Credit Agreement or who represented Quigley in connection with its execution. Tr. 2275:19-2276:4 (Raeburn).

561. At no point following Kevin Altit's appointment, did the 'independent' Quigley Board ever review the Pfizer Secured Claim. Tr. 1068:10-1069:11 (Altit); Tr. 2276:22-2277:4 (Raeburn).

562. The Quigley Board never discussed the appropriateness of Quigley entering the Credit Agreement or the enforceability of Pfizer's secured claim; in fact, Altit was unaware of where Pfizer's secured claim originated. Tr. 857:17-21 (Street); Tr. 1068:7-1069:11 (Altit); Tr. 2276:5-2277:23 (Raeburn).

###### vii. Quigley's Board Never Tried To Offset The Tax Receivable Pfizer Owed Quigley Against The Interest-Accruing Secured Debt.

563. Quigley never tried to offset the $41.1M tax receivable Pfizer owed Quigley against the interest-accruing $75.2M secured debt (both as of August 2009). Ex. J164 (August 2009, Monthly Operating Report); Tr. 855:11-856:23 (Street) (no evidence that Pfizer would

have sought to foreclose on its insurance collateral because Quigley would have been forced to liquidate and Pfizer would have been unable to obtain the channeling injunction).

564. As a result of the proposed waiver of the Secured Debt by Pfizer, Quigley will lose its entitlement to the tax receivable. Tr. 1150:16-1151:3 (waiver of $76M secured claim results in a tax charge of $29M based on Pfizer's 40% tax rate); Tr. 1199:24-1200:9 (Charboneau); Tr. 855:19-856:11 (Street). Pfizer had to waive the full $76M secured claim to allow Quigley to exit bankruptcy after it discovered a $9M deficiency on the eve of trial. Tr. 1601:1-1602:17 (Jenkins); Tr. 1306:17-1307:7, 1310:9-14 (Charboneau). No evidence was presented at trial demonstrating any value of the waiver (which benefits Quigley, not the Trust) will inure to benefit the Trust.

### viii. Quigley's Board Paid Hundreds Of Thousands To Witnesses To Be Available To Testify For Pfizer's Benefit.

565. Quigley has paid Louis Kilian $6,250 a month (a total of approximately $360,000) during the bankruptcy case when his sole activity was being available to testify as to Quigley's pre-1992 operational history in support of Pfizer's assertion that it has no derivative liability. Tr. 1275:8-1277:6 (Charboneau).

566. Quigley, through its controller, Mr. Charboneau, was unable to explain why Quigley, as a Chapter 11 debtor, needed Kilian available to testify on such matters. Tr. 1275:15-1277:6 (Charboneau).

567. Kilian testified at trial only as to issues relating to Pfizer not Quigley (*i.e.,* information about a meeting Kilian had with the FCR regarding Pfizer's beliefs as to its derivative liability and Pfizer's divesture of Quigley's operational assets). Tr. 1381:3-1413:1 (Kilian).

568. Street was not even aware that Kilian was on Quigley's payroll as a witness and referred to Kilian as an expert in archival and data retrieval. Tr. 846:17-848:17 (Street).

569. Quigley paid Robert Galloway $800 a month for a total of approximately $48,000 during the bankruptcy case when he performed no services for Quigley other than remaining available to testify if called upon; Charboneau had no idea what subject matters Galloway is qualified to testify on for Quigley. Tr. 1277:7-24 (Charboneau).

### ix. The Quigley Board's Eve-Of-Trial Retention Of Experts Is Insufficient To Overcome Its Breaches.

570. Altit testified that at some point in 2009, the Quigley Board received some sort of report valuing Pfizer's contributions and assessing the AIG Swap. Tr. 940:12-941:5, 1110:15-1111:25 (Altit).

571. Even putting aside the fact that the Quigley Board did not have these reports available to it at the time it filed this case or prepared the Plan and Disclosure Statement, no such report was ever produced in discovery or at trial. Tr. 1109:6-1111:24 (Altit).

### C. The Benefits Received by Pfizer Far Outweigh Any Purported Contributions It Is Making, Especially In Light Of Pfizer's Ability to Satisfy 100% Of Its Liabilities.

572. Pfizer seeks relief from $3.1B to $4.2B of Quigley-derivative asbestos liability exposure in exchange for a "contribution" ranging from negative $79M (the Ad Hoc Committee expert's number) to at most $370M (Pfizer expert's maximum number), when Pfizer has the means to fully pay its liability. Tr. 1874:24-1875:1 (Rabinovitz); Ex. J42, at 162 (March 28, 2008, Disclosure Statement, Ex. I, HR&A Future Claims Analysis); Tr. 2330:14-20, 2332:1-24 (Rourke); Ex. A4547, at 40 (Rourke Report); Tr. 2759:7-25 (Sellick); Tr. 2576:15-23, 2581 (Shaked); Ex. A4559, at 25-26 (Shaked Slides); Tr. 1428:12-19, 1766:8-10 (Snow); Ex. P3000a,

at 1 (Snow Slides); Ex. P3024, at 6 (Snow Report); Tr. 2584:15-24 (Shaked); Ex. A4559, at 37, 40 (Shaked Slides).

573. Pfizer has the ability to satisfy the full value of its Quigley-derivative asbestos exposure; Pfizer is ranked 46th in the Fortune 500 and has a market capitalization of $148.1B, total assets of $141.3B, cash and investments of $52.5B, annual revenue of $48.3B, annual earnings of $16.4B, annual cash flow from operations $17.7B, and annual net income of $8.1B. Tr. 2584:25-2587:6 (Shaked); Ex. A4559, at 37, 40 (Shaked Slides).

574. Pfizer's proposed contribution is comprised almost exclusively of insurance assets. See AHCF, ¶¶ 322-345, 350-358.

575. In economic terms, the cost to Pfizer to satisfy the full value of its derivative liability exposure is insignificant. Tr. 2487:1-6 (Shaked); Ex. A4559, at 36-39 (Shaked Slides). The interest cost of borrowing funds to pay the $4.2B of derivative exposure at 5.37 percent is $224.7M or $162.9M after-tax (assuming Pfizer's effective tax rate of 27.5%). Tr. 2485:16-2486:14 (Shaked); Ex. A4559, at 38 (Shaked Slides). Pfizer's annual cash flow of $18B is approximately $50M per day meaning that Pfizer generates cash to cover the interest cost in 3.4 or 3.5 days. Tr. 2486:8-14 (Shaked); Ex. A4559, at 38 (Shaked Slides). Pfizer's $162.9M interest cost amounts to approximately $.02 per share over $8B in shares. Tr. 2486:15-20 (Shaked); Ex. A4559, at 39 (Shaked Slides). Two-cents a share amounts to less than one-percent of Pfizer's projected earnings. Tr. 2486:21-25 (Shaked); Ex. A4559, at 39 (Shaked Slides).

## VII. PFIZER AND QUIGLEY WITNESSES LACKED CREDIBILITY AT TRIAL.

576. At trial and in its latest pleadings, Pfizer asserts that it never paid to settle Quigley-derivative liability. Pfizer's Brief, pp. 14-15; Pfizer Proposed Findings, ¶¶ 101-111. This assertion is directly at odds with years of statements to the contrary.

**A. Pfizer Takes The Position That It Never Paid To Settle Quigley-Derivative Liability, Despite Prior Admissions And Evidence To The Contrary.**

577.     Pfizer has consistently stated in pleadings and in testimony to this Court that virtually all of its asbestos exposure is based on Quigley-derivative liability and Quigley-asbestos products and that only a miniscule portion its historical liability has been based on exposure to a Pfizer-asbestos product.

- "Here, virtually all of the claims against Pfizer are based on exposure to asbestos allegedly contained in Quigley's products." See Reply in Support of Quigley's Motion for Order Confirming Application of Automatic Stay and Granting Preliminary Injunction (Adv. Pro. 04-04262, Docket No. 48, 10/27/04), p. 11.

- "Some miniscule portion of the claims may be based on exposure to a Pfizer product..." See id., p. 12.

- "As of December 31, 2003, approximately 165,700 claims naming Pfizer and/or Quigley . . . were pending in various federal and state courts seeking damages for alleged asbestos exposure and exposure to other allegedly hazardous materials. The majority of these claims involved alleged activities of Quigley, for which we believe any liability should be solely the responsibility of Quigley." See Confirmation Hearing Transcript, 147-48 (testimony of Steven Kany).

- "Almost all of the claims against Pfizer are based on exposure to asbestos allegedly contained in Quigley's products . . ." See A4521, Amended Affidavit of Steven C. Kany in Support of Quigley's Motion for Order Confirming Application of the Automatic Stay Order (Adv. Pro. 04-04262, Docket No. 19, 9/7/04), ¶ 22.

- "To the best of Quigley's knowledge, information and belief, in most of these cases, any allegations of liability of Pfizer are derivative of claims against Quigley." See J383, Memorandum of Law in Support of Quigley's Motion for an Order Confirming Application of the Automatic Stay and Granting Preliminary Injunction and a Temporary Restraining Order (Adv. Pro. 04-04262), p. 4.

578.     Pfizer has also stated in its public financial filings that the majority of the claims filed against Quigley and Pfizer relate to alleged activities of Quigley.  Ex. A4562, at 49 (2003 Pfizer 10-K, "As of December 31, 2003, approximately 165,700 claims naming Pfizer and/or Quigley and numerous other defendants were pending in various federal and state court seeking damages for alleged asbestos exposure and exposure to other allegedly hazardous materials.  The

majority of these claims involved alleged activities of Quigley, for which we believe any liability should be solely the responsibility of Quigley."); Ex. A4561, at 63 (2002 Pfizer 10-K).

579. In addition, Pfizer has stated in its public financial filings that it entered into the Pfizer Settlement Agreements to settle "claims related to Quigley products against Quigley and Pfizer Ex. J466, at 134 (2008 Pfizer 10-K); Ex. J465, at 191 (2007 Pfizer 10-K); Ex. J464, at 157 (2006 Pfizer 10-K); Ex. J463, at 150 (2005 Pfizer 10-K); Ex. J462, at 162 (2004 Pfizer 10-K). In the Disclosure Statement, Pfizer and Quigley stated that the Pfizer Settlement Agreements were entered into with law firms that represented claimants that Pfizer believed would be able to establish exposure to a Quigley product. Ex. J42, at 37 (March 28, 2008, Disclosure Statement).

580. Pfizer's own counsel, in opening argument, even admitted this fact: "Pfizer has settled claims against it directly, as well as derivative claims." Tr. 14:20-21 (Bae).

**B.**     **Pfizer Entered The Pfizer Settlement Agreements Agreeing To Pay $457M To Resolve Quigley-Derivative Liability.**

581. As plaintiffs had done during the post-CCR period, plaintiffs negotiating the Pfizer Settlement Agreements focused on Quigley-related exposure. Tr. 2132 (Rozen).

582. Out of more than 27,000 asbestos suits filed by the Jacques Admiralty Law Firm, P.C., a Settling Law Firm, naming Quigley, only one (1) named Pfizer as a defendant. JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 19:4 – 19:24 (Nov. 12, 2008).

583. Alan Kellman, an attorney for the Jacques Admiralty Law Firm, was familiar with Quigley products, including Insulag, but had no knowledge of asbestos-containing Pfizer-products, including Kilnoise and Firex. JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 20:2-21:3 (Nov. 12, 2008).

584. Prior to January 2004, Kellman never had any discussions with anyone from Pfizer or Quigley concerning the resolution of asbestos claims. JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 23:25 – 24:6 (Nov. 12, 2008).

585. After hearing from Joe Rice that there was potential for a settlement, Kellman contacted Rubin in the summer of 2004 specifically to resolve his clients' Quigley claims. JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 24:12–25:22 (Nov. 12, 2008).

586. Kellman testified that, during his discussions with Pfizer's attorneys, either Rozen or Rubin, the conversation shifted from the settlement of claims against Quigley to the settlement of claims against Pfizer, when he learned that Pfizer had responsibility for Quigley claims. Tr. 2407 (reading of deposition transcript of Kellman). JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 24:7-28:24 (Nov. 12, 2008).

587. Kellman had no discussion of Pfizer asbestos products or any other non-Quigley-related asbestos liability during these negotiations; Kellman's understanding from these discussions was that Pfizer's responsibility for Quigley claims was based on derivative liability. Tr. 2407:2-2408:11 (reading of deposition transcript of Kellman); JPTO, AHC Deposition Designations, Ex. D, Kellman Dep. 26:23-28:5, p. 6 (Nov. 12, 2008).

588. James Ferraro, an attorney for Kelley and Ferraro, a Settling Law Firm, also viewed the Pfizer Settlement Agreement that he entered with Pfizer as "a case of successor liability" relating to the Quigley product because in his view the Pfizer product liability was minimal. JPTO, AHC Deposition Designations, Ex. D, Ferraro Dep. 86:22–87:19 (Mar. 30, 2009).

589.     Rozen conceded that Pfizer sought to resolve its Quigley-derivative exposure through the Pfizer Settlement Agreements.   Tr. 2034:24-2035:16, 2127:2-2128:21 (Rozen) ("Pfizer faced the risk of an allegation that it is somehow derivatively responsible for Quigley.").

590.     According to Rozen, Pfizer believed it has no derivative responsibility for Quigley; however, that does not mean that there is not risk in the tort system that a court or jury might find that there is derivative liability and Pfizer was seeking to minimize the risk to Pfizer of cases in the asbestos tort system. Tr. 2034:24-2035:13-16 ("I think it's fair to say we didn't believe there was any and don't believe there's any derivative liability, but it didn't really matter. We were trying to cabin risk at that point."), 2099:3-9 (Pfizer resolved claims "it had legitimately perceived risk for in the tort system" through the Pfizer Settlement Agreements) (Rozen). As Rozen conceded, although Pfizer does not believe it has any derivative liability for Quigley products, "[t]hat *doesn't mean, however, that there isn't risk presented in the tort system*, and it doesn't mean however that there might not be courts or juries that might find that there is derivative liability." Tr. 2035 (Rozen) ("I think it's fair to say we didn't believe there was any and don't believe there's any derivative liability, but *it didn't really matter.* We were trying to cabin risk at that point.") (emphasis added); Tr. 2125 (Rozen).

591.     Moreover, Pfizer accepted job sites where it knew Quigley products were used, without more, to fulfill the exposure requirements under the Pfizer Settlement Agreements. Tr. 2036:6-22 (Rozen).

592.     Pfizer ultimately settled approximately 175,000 cases under the Pfizer Settlement Agreements with an aggregate value of $457M to resolve Quigley-derivative liability exposure. Tr. 2033:25-2034:5 (Rozen); JPTO, Undisputed Facts, ¶ 50.

**C.** **Berland and Rozen's Testimony That Pfizer Has Never Paid To Settle Quigley-Derivative Liability Not Credible.**

593. Berland's assertion that Pfizer had never settled any derivative claims based on Quigley product sales, Tr. 284:9-19 (Berland), is contradicted by a number of other Pfizer witnesses including, Stephen Kany, Berland's former boss at Pfizer, who in his affidavit, averred that "[a]lmost all of the claims against Pfizer are based on exposure to asbestos allegedly contained in Quigley's products," and that in most of these cases, any allegations of liability of Pfizer are derivative of claims against Quigley"; Berland's response to Kany's sworn testimony was limited to saying: "I don't know if I can go that far." Tr. 288:9-291:6 (Berland).

594. Berland's trial testimony is also contradicted by Berland's previous deposition testimony, in which he attested that (i) Pfizer took the position that the majority of its exposure to asbestos litigation is derivative of or is a consequence of products manufactured by Quigley, and (ii) with regard to the claims that were settled, Pfizer did not have any reason to believe that the majority of the claims were predicated on something other than derivative liability. Tr. 293:15-294:2 (Berland).

595. Berland even contradicted his own trial testimony as he admitted that relatively few of the claims against Pfizer and/or Quigley are based on alleged exposure to a non-Quigley product. Tr. 287:3-17 (Berland).

596. Berland and Rozen also testified that Pfizer never paid to settle a Quigley-derivative claim because it always allocated the settlement of claims based on a Quigley-product to Quigley which would pay the settlement, while Pfizer would not pay, but still receive the benefit of a full release. Tr. 232:2-233:5, 239:16-20, (Berland); Tr. 2033:7-21 (Rozen).

597. In response to the Court's direct question whether Pfizer considered simply adding Quigley as a released party under the Pfizer Settlement Agreements, as Pfizer asserts was

the practice when Quigley settled its liability and Pfizer was added as a released party for no cost, Rozen answered that this approach was not considered by Pfizer. Tr. 2133:4-9 (Rozen).

598.    Pfizer also has taken the position, based on Berland's and Rozen's testimony, that Pfizer determined the basis of liability, whether based on a Pfizer-product or a Quigley-product, and Pfizer only paid settlements based on Pfizer products and Quigley only paid settlements based on Quigley products as evidenced by the CHU claims database. Pfizer Proposed Facts, ¶¶ 106-7, 109-10; Tr. 232:19-233:5, 300:8-20 (Berland); Tr. 2035:22-2056:5 (Rozen).

599.    Pfizer did not demonstrate this assertion with the CHU claims database at trial or provide any other contemporaneously created written document to support his assertion at trial that Pfizer never settled a Quigley-related derivative claim. Tr. 2700:17-2701:19 (Berland).

600.    As Dr. Rourke demonstrated, however, Pfizer's contention is not supported because the CHU claims database does not provide exposure information by product identification (whether based on a Quigley-product or a Pfizer-product); instead, exposure information in the CHU claims database is limited to job site, the person's occupation and the duration of the exposure. Tr. 2232:15-2322:6 (Rourke) (testifying that exposure data in the database is not linked to the company, whether Pfizer or Quigley); Ex. A4547a, at 5 (Rourke Slides).

601.    Moreover, as noted above, the CHU claims database shows that the same claimant received payment from both Pfizer and Quigley for exposure at the same job sites. Tr. 2312:19-2315:24, 2323 (Rourke); Tr. 4547a (Rourke Slides), p. 5. For example, the database shows that settling asbestos victim identified as 2003571310 settled with and was paid by both Pfizer (1/3 share (CCN 15)) and Quigley (2/3 share (CCN 16)) on November 17, 2003 for exposure at a single job site - Bethlehem Steel Sparrows Point Steel Plant - and there is no indication of any

specific product that was used at that location. Tr. 2312:-2317:14 (Rourke); Ex. 4547a, at 5 (Rourke Slides).

602.    Similarly, the claim form attached to the Pfizer Settlement Agreements, required only job site disclosures to establish exposure, not product identification. Tr. 2036 (Rozen); Ex. P3003, ¶ 4 (Form Settlement Agreement, Ex. A, Plaintiff Claim Form); Ex. J467-J536 (Settlement Agreements).

**D.    Cooney Brought Forward Documents Contradicting Berland's Assertion That Pfizer Never Paid To Settle A Derivative Claim Based On A Quigley Product.**

603.    Cooney's asbestos clients have historically worked in and been exposed to asbestos products in the steel mills, refineries, and powerhouses in and around Chicago, Illinois, industries which all used Quigley's refractory products. Tr. 2426:7-2428:10 (Cooney).

604.    In the post-CCR period, Cooney & Conway settled 86 asbestos cases with Pfizer and Quigley, each settled directly between Cooney and Michael Rozen and, in every instance, were based on the client's exposure to Insulag and Panelag. Tr. 2436:5-2437:15 (Cooney).[4]

605.    In connection with these settlements, Cooney's clients typically executed separate releases of Pfizer and Quigley and received separate payments from Pfizer and Quigley; Cooney and his law firm had no role in the allocation of settlement dollars between Pfizer and Quigley which were generally allocated 30/70, with Pfizer paying 30% of the settlement amount and Quigley paying 70% of the settlement amount. Tr. 2437:10-2438:22, 2450:3-19 (Cooney).

606.    In the complaint Cooney's firm filed on November 5, 2001 in the Circuit Court of Cook County on behalf of Veronica Anderson, as special administrator of the estate of Dwayne Anderson, Pfizer and Quigley were named as defendants in connection with the plaintiff's

---

[4] In the post-CCR period, Cooney & Conway filed only three lawsuits based on the acoustical plaster Kilnoise; in those complaints, the Kilnoise product was identified by name. Tr. 2431:22-2432:18 (Cooney).

alleged exposure to Insulag and Panelag at Reynolds Aluminum, Texaco Romeoville, and Mobile Oil Joliette. Tr. 2440:3-2443:13 (Cooney); Ex. A4577, at 141 (Pfizer), 144 (Quigley) (Anderson Asbestos Litigation Complaint, deposit slips for settlement payments from Pfizer and Quigley).

607. Pfizer and Quigley paid separate checks in connection with the Anderson settlement. Tr. 2449 (Cooney); Ex. 4577, at 141 (Pfizer), 144 (Quigley), (Anderson Litigation Complaint).

608. In connection with the settlement of the Anderson case in 2004, Pfizer sent Cooney & Conway a Settlement Claims/Release Request Form, requesting the information relating to the plaintiff's asbestos exposure history (dates, location, job site, city, state, and occupation); the Form, which Cooney & Conway filled out and returned, did not require that the plaintiff indicate exposure to a particular product. Tr. 2444:1-2446:22 (Cooney); Ex. A4557, at 134 (Anderson Asbestos Litigation Complaint, Settlement Claims/Release Request Form).

609. Similarly, in the complaint Cooney's firm filed on behalf of Joseph Bickwermert, Pfizer and Quigley were named as defendants in connection with the plaintiff's alleged exposure to Insulag and Panelag. Tr. 2450:24-2451:25 (Cooney); Ex. A4558, at 1 (Bickwermert Asbestos Litigation Complaint, naming Pfizer and Quigley as defendants).

610. In connection with the settlement of the Bickwermert case, Pfizer paid one-third of the settlement amount, and Quigley paid two-thirds of the settlement amount. Tr. 2453 (Cooney); Ex. A4558, at 84-85 (Bickwermert Asbestos Litigation Complaint, deposit slips for settlement payments from Pfizer and Quigley).

611.  Cooney testified that while he played no role in allocating the aggregate settlement amount, it was customary for Pfizer to pay 30% and Quigley to pay 70% of the total agreed-upon settlement amount.  Tr. 2450:3-19 (Cooney).

Dated:  New York, NY
        January 27, 2010

**BROWN RUDNICK LLP**

By: /s/Edward S. Weisfelner
    Edward S. Weisfelner, Esq. (EW-5581)
    7 Times Square
    New York, NY  10036
    (212) 704-0100

    Jeffrey L. Jonas, Esq. (JJ-5670)
    James W. Stoll, Esq. (JS-5931)
    Gregory T. Arnold, Esq. (GA-2147)
    One Financial Center
    Boston, MA  02111
    (617) 856-8200

    COUNSEL TO THE AD HOC COMMITTEE OF
    TORT VICTIMS

# 1721113

# EXHIBIT A

## Exhibit A
### Comparison of Aggregate Recovery under Pfizer Settlement Agreement compared to Expected Recovery Under TDP

| | | Pfizer Agreements | | Expected Under TDP | |
|---|---|---|---|---|---|
| | Law Firm | Total Paid Claimants | Total Pfizer Payments | Qualifying Claimants | Recovery (w/90%) | Recovery (w/o 90%) |
| * | Ferraro | 20,929 | $70,534,500 | 6,137 | $342,264 | $3,422,640 |
| * | Baron & Budd | 4,377 | $47,767,100 | 1,556 | $453,528 | $4,535,280 |
| | Simmons Cooper | 687 | $37,903,097 | 331 | $399,376 | $3,993,756 |
| | Brent Coon | 13,673 | $23,975,115 | 4,221 | $372,138 | $3,721,380 |
| | Goldberg Persky | 6,374 | $20,825,143 | 2,069 | $292,608 | $2,926,080 |
| | Waters & Krause | 119 | $20,673,983 | 65 | $58,548 | $585,480 |
| | David Law Firm | 876 | $19,710,000 | 494 | $710,251 | $7,102,512 |
| | Morris Sakalarios | 10,105 | $18,975,208 | 2,939 | $123,698 | $1,236,984 |
| | Early Ludwick | 1,267 | $17,730,949 | 609 | n/a | $6,706,680 |
| | Deakle-Couch | 16,894 | $16,883,118 | 4,910 | n/a | $2,121,288 |
| | Jacques Admiralty Law Firm | 24,637 | $12,448,787 | 7,628 | $512,353 | $5,123,532 |
| | David Lipman | 4,342 | $11,323,350 | 1,313 | $136,591 | $1,365,912 |
| | Motley Rice | 5,431 | $11,114,126 | 1,686 | $248,390 | $2,483,904 |
| | Provost & Umphrey | 4,380 | $8,679,555 | 1,416 | $158,108 | $1,581,084 |
| | Bevan & Associates | 2,301 | $8,066,007 | 673 | $38,774 | $387,744 |
| | Peter T. Nicholl | 5,244 | $7,372,758 | 1,589 | $87,354 | $873,540 |
| | LeBlanc & Wadell | 6,495 | $6,495,704 | 1,963 | $150,187 | $1,501,872 |
| | Robert G. Taylor | 3,276 | $6,413,030 | 959 | $45,870 | $458,700 |
| | Thornton & Naumes | 1,179 | $5,952,614 | 456 | $192,804 | $1,928,040 |
| | Porter & Malouf | 2,443 | $5,894,960 | 738 | $62,629 | $626,292 |
| | Alwyn Luckey | 4,976 | $5,854,361 | 1,433 | $61,991 | $619,908 |
| | Norris & Phelps | 2,711 | $5,118,284 | 789 | $33,366 | $333,660 |
| | Silber Pearlman | 1,413 | $4,982,323 | 424 | $25,273 | $252,732 |
| | Kazan McClain | 10 | $4,500,000 | 5 | $7,282 | $72,816 |
| * | Bergman Senn | 124 | $4,195,900 | 68 | $77,897 | $778,968 |
| | Goldenberg Miller | 5,728 | $3,812,103 | 1,687 | $97,235 | $972,348 |
| | Clapper Patti | 184 | $3,735,976 | 89 | $93,994 | $939,936 |
| | Nix Patterson | 2,557 | $3,442,011 | 760 | $44,952 | $449,520 |
| | Reyes & O'Shea | 2,080 | $3,240,024 | 634 | $56,552 | $565,524 |
| | Ryan Foster | 3,142 | $3,126,689 | 918 | $38,329 | $383,292 |
| | Pierce, Raimond & Coulter | 1,776 | $3,039,160 | 503 | $19,079 | $190,788 |
| | Foster & Sear | 2,451 | $2,643,562 | 751 | $48,875 | $488,748 |
| | Cascino Vaughan | 1,859 | $2,333,198 | 568 | $40,775 | $407,748 |
| | Heard Robins | 744 | $2,271,830 | 244 | $34,588 | $345,876 |
| | Richardson Patrick | 234 | $2,266,760 | 113 | $141,320 | $1,413,204 |
| | Keahey, G. Patterson | 1,257 | $2,258,574 | 557 | $126,173 | $1,261,728 |
| | Maples & Lomax | 850 | $2,025,664 | 261 | $19,102 | $191,016 |
| | Wallace & Graham | 1,050 | $1,714,500 | 325 | $26,358 | $263,580 |
| | Williams Bailey | 703 | $1,506,320 | 241 | $30,238 | $302,376 |
| | Paul A. Weykamp | 933 | $1,431,000 | 284 | $20,720 | $207,204 |
| | Jon L. Gelman | 214 | $1,339,956 | 86 | $47,176 | $471,756 |
| | Odem & Elliot | 976 | $1,174,282 | 283 | $12,392 | $123,924 |
| | Frazer & Davidson | 1,063 | $1,123,112 | 300 | $10,661 | $106,608 |
| * | Bogdan Law Firm | 740 | $1,009,500 | 221 | $13,044 | $130,440 |
| | Caroselli Beachler | 180 | $901,477 | 72 | $27,386 | $273,864 |
| * | Bagget & McCall | 387 | $858,500 | 129 | $15,674 | $156,744 |
| | Lipsitz & Pontiero | 186 | $832,986 | 66 | $28,272 | $282,720 |
| | Byrd, Gibbs & Martin | 248 | $760,556 | 80 | $9,264 | $92,640 |
| | Nichol & Associates | 311 | $754,080 | 101 | $16,880 | $168,804 |

| Law Firm | Pfizer Agreements | | Expected Under TDP | | |
|---|---|---|---|---|---|
| | Total Paid Claimants | Total Pfizer Payments | Qualifying Claimants | Recovery (w/90%) | Recovery (w/o 90%) |
| Young Reverman | 630 | $693,999 | 179 | $8,554 | $85,536 |
| Shepard, Michael C | 57 | $634,500 | 28 | $25,159 | $251,592 |
| * Ashcraft & Gerel | 294 | $626,000 | 99 | $10,986 | $109,860 |
| Zamler Mellen | 462 | $603,880 | 146 | $19,568 | $195,684 |
| George & Sipes | 202 | $520,016 | 63 | $15,036 | $150,360 |
| Pritchard, Robert A | 178 | $512,666 | 55 | $6,630 | $66,300 |
| Burns, James D | 138 | $506,500 | 51 | $13,774 | $137,736 |
| Sutter Law Firm | 352 | $488,000 | 105 | $6,738 | $67,380 |
| Shannon Law Firm | 471 | $484,002 | 135 | $5,060 | $50,604 |
| Humphreys, James F. | 284 | $443,000 | 84 | $8,119 | $81,192 |
| Carlile Law Firm | 770 | $431,100 | 228 | $12,121 | $121,212 |
| John F. Dillon | 146 | $429,000 | 47 | $12,773 | $127,728 |
| Harvit & Schwartz | 280 | $405,500 | 84 | $5,928 | $59,280 |
| Parks, Chris | 362 | $264,496 | 113 | $6,671 | $66,708 |
| Donaldson & Black | 125 | $259,554 | 39 | $5,711 | $57,108 |
| Hartley & O'Brien | 12 | $221,000 | 6 | $9,803 | $98,028 |
| Dies Dies & Henderson | 357 | $178,500 | 112 | $13,913 | $139,128 |
| Scott & Scott | 55 | $157,000 | 4 | $4,556 | $45,564 |
| Cumbest | 19 | $146,000 | 8 | $5,735 | $57,348 |
| Michie Hamlett | 19 | $114,500 | 7 | $4,112 | $41,124 |
| Bruegger & McCullogh | 139 | $105,520 | 41 | $1,798 | $17,976 |
| Fitzgerald & Associaes | 64 | $70,500 | 18 | $679 | $6,792 |
| Varas & Morgan | 55 | $68,000 | 16 | $745 | $7,452 |
| Goodman Meagher | 15 | $66,000 | 5 | $2,173 | $21,732 |
| Sieben Polk | 50 | $50,000 | 14 | $420 | $4,200 |
| Riggs Abney | 1 | $20,000 | 1 | $1,590 | $15,900 |
| Summers & Wyatt | 1 | $7,500 | 1 | $150 | $1,500 |
| Cuniff, Clifford W | 6 | $6,000 | 2 | $60 | $600 |
| Harrison Kemp & Jones | 1 | $1,000 | 1 | $30 | $300 |
| *Totals:* | 179,661 | $459,505,525 | 55,436 | $5,818,911 | $67,017,096 |

## SOURCES:

"Total Paid Claimants" information taken from Tr. Ex. 4547 (Rourke Report), Appendix C-5b or from Pfizer Settlement Agreement (if per-disease break down was available).

"Total Pfizer Payment" information taken from Tr. Ex. 4547 (Rourke Report), Appendix C-5b or from Pfizer Settlement Agreement (if per-disease break down was available).

"Qualifying Claimants" information derived from application of the FCR/Pfizer's Qualification Rates (as listed in Tr. Ex. Q2007) to the number of claims in each disease category (Mesothelioma; Lung Cancer; Other Cancer, Non-Malignancies).

"Recovery (w/90%)" information is derived by taking the number of "Qualifying Claimants" and multiplying it by the expected TDP recovery as of 2006 Vote (TDP Schedule Value, multiplied by 7.5% Initital Payment Percentage, accounting for 90% subordination provision, as described in Tr. Ex. 4547 (Rourke Report), page 29 and depicted inAppendix C-5b).

"Recovery (w/o 90%)" information is derived by taking the number of "Qualifying Claimants" and multiplying it by the expected TDP recovery as of 2008 Vote (TDP Schedule Value, multiplied by 7.5% Initital Payment Percentage, as described in Tr. Ex. 4547 (Rourke Report), page 29 and depicted in Appendix C-5b).

\* - Indicates figures are derived from numbers contained in Pfizer Settlement Agreements