UNITED STATES BANKRUPTCY COURT      **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

In re:                                   :

                                          :      Chapter 11

QUIGLEY COMPANY, INC.,           :      Case No. 04-15739 (SMB)

                                            :

                                            :

                       Debtors.         :

-------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A P P E A R A N C E S:**

SCHULTE ROTH & ZABEL LLP
Attorneys for the Debtor
919 Third Avenue
New York, NY 10022

        Michael L. Cook, Esq.
        Lawrence V. Gelber, Esq.
               Of Counsel

GREENBERG TRAURIG, LLP
Attorneys for Pfizer, Inc.
MetLife Building
200 Park Avenue
New York, NY 10166

        Bruce R. Zirinsky, Esq.
        John H. Bae, Esq.
        Gary D. Ticoll, Esq.
               Of Counsel

CADWALADER, WICKERSHAM & TAFT, LLP
Attorneys for Pfizer, Inc.
One World Financial Center
New York, New York 10281

        Dennis J. Block, Esq.
        Ingrid Bagby, Esq.
               Of Counsel

POWERS FROST
Attorneys for Pfizer, Inc.
1221 McKinney Street, Suite 2400
Houston, Texas 77010

> Sharla J. Frost, Esq.
> Patrick C. Smith, Esq.
> R. Clive Markland, Esq.
>> Of Counsel

BROWN RUDNICK LLP
Attorneys for the Ad Hoc Committee of Tort Victims
120 West 45th Street
New York, New York 10036

> Edward S. Weisfelner, Esq.
> Jeffrey L. Jonas, Esq.
> James W. Stoll, Esq.
> Gregory T. Arnold, Esq.
>> Of Counsel

CAPLIN & DRYSDALE, CHARTED
Attorneys for the Official Committee of Unsecured Creditors
One Thomas Circle, NW
Suite 1100
Washington, D.C. 20005

> Ronald E. Reinsel, Esq.
>> Of Counsel

TOGUT, SEGAL & SEGAL, LLP
Attorney for the Future Claims Representative
One Penn Plaza
New York, New York 10110

> Richard K. Milin, Esq.
> Scott E. Ratner, Esq.
>> Of Counsel

OFFICE OF THE UNITED STATES TRUSTEE
33 Whitehall Street
21st Floor
New York, New York 10004

> Greg M. Zipes, Esq.
> Serne K. Nakano, Esq.
>> Of Counsel

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA, PC
Attorneys for Baron & Budd, P.C.
2323 Bryan Street, Suite 2200
Dallas, Texas 75201

Andrea L. Ducayet, Esq.
Of Counsel

WHITE & WILLIAMS, LLP
Attorneys for Allianz, Inc.
One Penn Plaza
250 W. 34th Street, Suite 4110
New York, New York 10119

Karel S. Karpe, Esq.
Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Quigley Company Inc. ("Quigley") commenced this case under chapter 11 of the

Bankruptcy Code (the "Code") on September 3, 2004 (the "Petition Date"), and now seeks to

confirm its Fourth Amended and Restated Plan of Reorganization, modified as of August 6, 2009

(J47 ("Fourth Plan")).[1]   The Official Committee of Unsecured Creditors ("Committee"), Albert

Togut, Esq., the Future Claims Representative ("FCR"), and Pfizer, Inc. ("Pfizer"), Quigley's

parent, support confirmation.  The Ad Hoc Committee of Tort Victims ("AHC") and the United

States Trustee oppose confirmation, and seek dismissal of the case.  The parties also seek other

relief discussed below, but confirmation is the main event.

---

[1]     The following conventions are used in citing to the trial record.  The compiled transcript is cited by page and line number.  An explanatory parenthetical specifies the witness when necessary.  For example, "Tr. 167:10 (Smith)" refers to testimony by Smith on Page 167, Line 10 of the transcript.  "P" refers to Pfizer's trial exhibits, "Q" refers to Quigley's trial exhibits, "A" refers to the AHC's trial exhibits and "J" refers to joint trial exhibits. Page references are to the numbered page of the document within the exhibit.  If the underlying document does not have clear numbering, the page reference is to the page of the exhibit.

The Court conducted a 15-day bench trial during which it heard numerous fact and expert witnesses, and received scores of documentary exhibits. The case was exceptionally well-tried on all sides. For the reasons that follow, the application to confirm the Fourth Plan is denied. In addition, Quigley's motion to exclude portions of the testimony, illustrative slides, and expert report of Dr. Israel Shaked is granted in part and denied in part, the motion made or joined in by various Settling Law Firms to seal certain information is denied, and the United States Trustee's objection to the Street Employment Motion is overruled.

**BACKGROUND**

**A.    Quigley's Asbestos Liability**

Quigley, founded in 1916, was a manufacturer of refractory products used primarily in the iron, steel, power generation, petroleum, chemical, and glass industries. (Pre-Trial Order, Undisputed Facts at ¶¶ 1–2, dated Aug. 12, 2009 ("PTO Undisputed Facts") (ECF Doc. # 1885).) Between the 1940s and 1970s,[2] Quigley manufactured and sold three asbestos-containing products: Insulag, Panelag, and Damit. (PTO Undisputed Facts ¶ 5.)

Pfizer acquired Quigley in 1968 and remains Quigley's sole shareholder. (Tr. 1398:10–13 (Kilian); Tr. 223:25–224:2; 376:5–7 (Berland).) Pfizer is a research-based, global pharmaceutical company that develops and manufactures prescription medicines. (J466 at 1 (Pfizer 2008 10-K).) Before it streamlined its business to focus on pharmaceuticals, Pfizer also manufactured asbestos-containing products including Kilnoise, an acoustical plaster, (Tr. 146:6–8 (Kany)), and Firex, used to treat and insulate armaments in the military. (Tr. 2432:15–18, 2433:5–6 (Cooney).) Pfizer also manufactured, and in some cases faced, product liability claims

---

[2]     Quigley stopped manufacturing asbestos-containing products in 1973 or early 1974. (Tr. 1407:2–9 (Kilian).)

relating to the Shiley Heart Valve, Howmedica hip and knee products, and various other household and pharmaceutical products.  (Tr. 2697:3-13 (Berland).)  After Quigley became a Pfizer subsidiary, many of Pfizer's liability policies provided joint coverage to both companies.

In September 1992, Quigley sold substantially all of its operating assets to Specialty Refractories, Inc. ("SPI").  (Tr. 178:17–179:2 (Kany); Tr. 252:16–17 (Berland).)  SPI subsequently transferred the assets to Minerals Technologies, Inc. ("MTI").  (Tr. 522:24–523:8 (Berland).)  Quigley did not operate any business between the time that its assets were sold and just prior to the Petition Date.  (Tr. 311:13–313:19 (Berland).)

The sale of assets did not affect Quigley's asbestos liability.  Quigley was first named as a defendant in asbestos-related personal injury claims in 1979 or 1980, (PTO Undisputed Facts ¶ 6), and by the Petition Date, had been named as a defendant with respect to approximately 411,100 asbestos personal injury claims asserted in approximately 131,500 civil actions in federal and state courts throughout the United States.  (J42 at 34 (Fifth Amended and Restated Disclosure Statement with Respect to Quigley Company, Inc. Fourth Amended and Restated Plan of Reorganization under Chapter 11 of the Bankruptcy Code (as Modified as March 28, 2008), dated Mar. 28, 2008 ("Fifth Disclosure Statement")).)  As of the Petition Date, 212,000 asbestos personal injury claims were either actually pending or expected to be asserted against Quigley—not including future demands.  (Fifth Disclosure Statement at 9.)  Francine Rabinovitz, the FCR's expert, estimated the tort-system value of the outstanding claims to be $1.258 billion, applying historic qualification rates.  (P3075 at 3.)  She also estimated that there would be 261,567 future demands extending until 2052, with a present value of $2.667 billion, applying the same historic qualification rates.  (P3075 at 3; Fifth Disclosure Statement, Ex. I at 3-4.)

Pfizer was also a defendant with respect to 280,343 of the 411,100 claims asserted against Quigley. (Fifth Disclosure Statement at 35.) Most if not all of these claims were based on exposure to Quigley's products rather than Pfizer's products such as Kilnoise or Firex. In other words, the plaintiffs in these lawsuits sued Pfizer, Quigley's wealthy parent, for injuries resulting from Quigley's alleged misconduct relating to the manufacture and sale of Insulag or one of Quigley's other asbestos-containing products. The claims against Pfizer based on Quigley products are referred to as derivative claims.

Over the years, Quigley and Pfizer tried various methods to deal with the growing number of asbestos claims. In June 1985, they executed the "Wellington Agreement," (PTO Undisputed Facts ¶ 9),[3] under which personal injury claims against Quigley, Pfizer, and other participating companies were administered by the Asbestos Claims Facility ("ACF"). (PTO Undisputed Facts ¶ 10.) The Wellington Agreement allocated a fixed share of the costs of the ACF to each signatory, which was then billed to insurers. (Tr. 156:13–158:15 (Kany); Fifth Disclosure Statement at 25.) The ACF dissolved in 1986 due to disputes among the members regarding the allocation of liability. (Tr. 220:18–22 (Berland); Tr. 159:13–22 (Kany).)

After the dissolution of the ACF, the Center for Claims Resolution (the "CCR"), a non-profit organization, administered asbestos personal injury claims asserted against, among others, Quigley and Pfizer. (PTO Undisputed Facts ¶ 11.) The CCR members were each charged a share of defense and indemnity costs, based on formulas that evolved over time, and each member billed its own insurer for its allocated share. (Tr. 159:23–160:22 (Kany); Tr. 220:13–221:7 (Berland); Tr. 1450:9–15 (Jenkins).) Each CCR settlement or release provided for a

---

[3]    The Wellington Agreement is described in Continental Cas. Co. v. Pfizer, Inc. (In re Quigley Co.), 361 B.R. 723, 731 (Bankr. S.D.N.Y. 2007).

release of every member, including those against whom no claim had been filed. (<u>PTO</u> Undisputed Facts ¶ 12.) Quigley and Pfizer terminated their membership in the CCR in July 2001. (Tr. 231:16–19 (Berland); Tr. 1450:16–18 (Jenkins).)

In addition to their participation in the ACR and CCR, Pfizer and Quigley tried other approaches. For example, they took part in the Georgine class-action settlement that was overturned by the United States Supreme Court in <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591 (1997). In addition, Pfizer, Quigley and a number of asbestos defendants supported efforts to pass legislation aimed at creating a mechanism to divert cases from the tort system into an industry and insurance-funded trust that would process claims. (Tr. 219:6–24 (Berland).) This effort also proved unsuccessful. (Tr. 219:25–220:2 (Berland).)

By 2001, a substantial number of "front-line defendants" or major producers of asbestos had sought bankruptcy relief. (Tr. 219:17–19 (Berland).) Plaintiffs began to assert claims against the remaining solvent ex-CCR members. (Tr. 2024:10–25 (Rozen).) In January 2002, Pfizer formed a claims-handling unit ("CHU") to process asbestos personal-injury claims and certain other personal-injury claims asserted against Quigley and Pfizer. (Tr. 172:25–173:22 (Kany).) Kim Jenkins, a Pfizer employee, ran the CHU. (<u>PTO</u> Undisputed Facts ¶ 28.)

## B. Pfizer's Global Strategy

As of 2003, Quigley was a non-operating wholly-owned subsidiary of Pfizer. Both companies faced diminishing shared insurance and increasing litigation. They had failed to resolve their asbestos liabilities through the ACR, CCR, legislation and the Georgine class action. It was around this time that Pfizer devised its global strategy to deal with their asbestos liability, a strategy that involved two discrete but related components. First, Pfizer would

resurrect Quigley as an independent, operating entity with the goal of filing a chapter 11 case. Second, Pfizer would enter into agreements with asbestos personal injury claimants—whether or not they had asserted claims against Pfizer—to settle its own liabilities (but not Quigley's), and make the settlement payments contingent on the confirmation of a Quigley plan that included an injunction in Pfizer's favor under 11 U.S.C. § 524(g).  To accomplish the global strategy, the following occurred:

### 1. Establishing Quigley's Independence

As of early 2003, the three Quigley Board members included Susan Grant, Kathleen Ulrich and Charles Raeburn, all Pfizer employees.  (J219 (Quigley Board Minutes, dated Feb. 27, 2003).)  Around this time, Bruce Zirinsky, Esq., a bankruptcy attorney representing Pfizer, spoke to Sanford Berland, a Pfizer in-house counsel, about hiring independent management for Quigley.  Apparently obtaining Berland's agreement, Zirinsky contacted Paul Street, the president of Impala Partners, LLC, an advisory and investment firm specializing in distressed companies, (PTO Undisputed Facts ¶ 23–24), and sounded him out about becoming a member of the Quigley Board.  (PTO Undisputed Facts ¶ 16; Tr. 682:16–25, 717:8–22 (Street); Tr. 260:8–20 (Berland); Tr. 2278:5–20 (Raeburn).)  Street agreed, and in May 2003, became president of Quigley and a member of its board of directors.  (Tr. 684:25–685:4 (Street); J220 (Quigley Board Minutes, dated May 27, 2003).)  On the recommendation of Street, Kevin Altit became the second independent member of the Quigley board on June 22, 2004, (Tr. 2279:13–16 (Raeburn); Tr. 261:14–262:1 (Berland); Tr. 873:1–874:24 (Altit)), and Ulrich and Grant resigned their positions.  (Tr. 1508:8–25 (Jenkins).)  Charles Raeburn, a Pfizer attorney, remained a board member, (Tr. 262:2–9 (Berland)), but was now outnumbered by non-Pfizer board members.

Street's arrival ushered in an era of independent management, but Quigley still had no business to operate. In July 2004, several weeks before Quigley filed its bankruptcy petition, Pfizer transferred the CHU to Quigley. (Tr. 690:8–18 (Street); Tr. 1502:3–6 (Jenkins); Tr. 316:3–5 (Berland).) Jenkins and seven other Pfizer employees became Quigley employees. (<u>PTO</u> Undisputed Facts ¶ 30–31.) In August 2004, Quigley physically separated itself from Pfizer by leasing space at 52 Vanderbilt Avenue in New York, New York. (<u>PTO</u> Undisputed Facts ¶ 36.) Pfizer guaranteed the Quigley lease. (<u>PTO</u> Undisputed Facts ¶ 37.)

The transfer of the CHU gave Quigley a business but no operating income; the CHU had operated as a division of Pfizer handling the claims asserted against Pfizer and Quigley. However, on August 31, 2004, three days prior to the Petition Date, Quigley and Pfizer executed the Shared Services Agreement. (<u>PTO</u> Undisputed Facts ¶ 31.) Under the Shared Services Agreement, (J447), Pfizer agreed to pay Quigley $50,000 per month and provide Quigley with numerous services, including, <u>inter alia</u>, accounts-payable services for settlements with plaintiffs, access to Pfizer and the CHU's computer servers, a disaster-recovery plan, email accounts, internet access, offsite storage for Quigley-related documents, payroll-processing services, purchasing discounts for office supplies, security badges for access to Pfizer facilities, and office hardware, such as copiers, faxes, computers, and printers. (J447 at 4, B-1 (Shared Services Agreement); Tr. 696:8–10 (Street).) Quigley values these various services at approximately $100,000 per month (in addition to the $50,000 monthly cash payment.) (Tr. 1471:14–20, 1472:7–9; 1553:7–9 (Jenkins).)

Following the transfer, the CHU processed claims for Pfizer, Quigley, and American Optical, a Pfizer subsidiary, (Tr. 1535:8–10 (Jenkins); J466 at 85 (2008 Pfizer 10-K)), and since the Petition Date, Quigley has processed approximately 155,000 claims in connection with the

Pfizer settlements, discussed below, pursuant to the Shared Services Agreement. (Tr. 1468:22–1469:3 (Jenkins).) The CHU has not operated profitably, and Quigley has been sustained largely through loans from Pfizer. Between August 31, 2004 and August 31, 2009, Quigley received a total of $3.2 million under the Shared Services Agreement, but suffered operating losses of roughly $46 million. (See J164 at 3 (Statement of Operations).)

Pfizer and Quigley also took the preliminary legal steps necessary to prepare for Quigley bankruptcy. In the fourth quarter of 2003, and with the advance approval of Pfizer, Quigley retained Schulte Roth and one of its partners, Michael Cook, as its bankruptcy counsel. (Tr. 1520:1–7 (Jenkins); Tr. 731:8–732:5 (Street).) Also prior to the bankruptcy filing, Togut was contacted by Zirinsky to serve as the representative of holders of future asbestos personal-injury demands (the "Futures") against Quigley and certain affiliated parties. (PTO Undisputed Facts ¶ 58; Tr. 2141:19–2142:14 (Togut).) Prior to the Petition Date, Togut participated in negotiations and reached an "agreement in principle" with Pfizer regarding Pfizer's contribution to a Quigley Plan, which consisted primarily of shared insurance. (Tr. 2183:15–24 (Togut); J300 at 3, ¶ 7 (FCR Application); A4289 (email from Milin, attorney for FCR, to Greenspan).)

### 2. The Pfizer Settlement Agreements

The centerpiece of the global strategy was the execution of the Pfizer Settlement Agreements primarily in August 2004. Historically, Pfizer and Quigley settled their alleged liabilities to a claimant at the same time, and each received a release. Their joint counsel generally settled a claim based on Quigley's historical settlement values, and obtained a release for Pfizer at no additional cost. (Tr. 2033:18–24 (Rozen).) Pfizer could not determine the type of liability—direct based on its own products or derivative based on Quigley's—from the pleadings, and made the determination later in the settlement process, after it had reviewed the

pertinent documentation. (Tr. 292:3–5, 2694:1–7 (Berland); Tr. 2025:1–13, 2030:12–20 (Rozen).) Pfizer and Quigley allocated the settlement dollars on the basis of company-specific claim information, such as "terms of injuries involved, exposure to various products of either company, relative time periods of exposure, work sites, and the like," provided by the plaintiff's counsel. (Tr. 2695:14–24 (Berland).) According to Berland, Pfizer paid to obtain the release of derivative liability arising from a Quigley asbestos-containing product. (Tr. 232:22–233:9, 300:11–20.)

On September 13, 2003, shortly after Street became Quigley's president, Pfizer and Quigley executed the "Joint Defense Agreement." (See J445 ("Joint Defense Agreement").) The Joint Defense Agreement memorialized the settlement practices followed by Pfizer and Quigley since the Wellington Agreement, (Tr. 371:8–14, 520:14–24 (Berland)), and enabled Pfizer and Quigley to maintain a single network of counsel across the country. (Tr. 378:11–20 (Berland).) To facilitate this approach, Quigley delegated "full authority to Pfizer to investigate, defend, settle or otherwise resolve or dispose of the Claims." (Joint Defense Agreement at 3.) Following the execution of the Joint Defense Agreement, Pfizer continued, for a time, to settle asbestos claims against Quigley in the same manner that it had settled cases prior to the execution of the Joint Defense Agreement. (Tr. 1522:9–13 (Jenkins); Tr. 2087:10–20 (Rozen); Tr. 519:16–521:19 (Berland).)

Eventually, however, Pfizer changed its approach to settling claims to accommodate its global strategy. It continued to negotiate settlements, but now settled only its own liability, and did not obtain a release for Quigley. This was a departure from Pfizer's historical practice of settling on behalf of both itself and Quigley. (Tr. 160:6–14, 283:1–284:8 (Berland).) Despite the departure, the settlement approach remained consistent. The claimants' lawyers were guided

by their history of settlements with Pfizer and Quigley, and no one tried to "parse out the Pfizer piece" and negotiate on that basis. (Tr. 2039:10–22 (Rozen).)

Prior to the Petition Date, Pfizer entered into approximately sixty-six agreements (the "Pfizer Settlement Agreements") with law firms (the "Settling Law Firms") on behalf of roughly 175,000 clients (the "Settling Claimants") for the aggregate amount of $450 million. (Tr. 829:9–11 (Street); see J467–79, J481–532, J536.) After the Petition Date, Pfizer entered into four more Pfizer Settlement Agreements with other Settling Law Firms representing at least 18,000 claimants for roughly $49 million total. (See J480; J533–J535) Typically, Pfizer settled with a law firm for a lump sum amount based on the levels of impairment of the claimants covered by the settlement. (See P3003 §§ 2.1; 2.2; 2.3 (Form Pfizer Settlement Agreement ("Form PSA")).) A Settling Claimant was not guaranteed payment; he or she still had to prove an impairment. This entailed the submission of evidence to and review by Pfizer. (Form PSA §§ 2.1, 2.2.) Applying Rabinovitz' qualification rates, the tort system value of the Settling Claimants' claims is roughly $835.6 million, and the value of the Non-Settling Claimants' claims is roughly $422.3 million.[4] (P3075 at 5.)

Pfizer had originally hoped to condition all settlement payments on the entry of a final confirmation order. (Tr. 2042:10–23, 2099:15–2100:12 (Rozen).) The Settling Law Firms and their clients refused, (Tr. 2042:10–23 (Rozen)), leading to a compromise. Pfizer agreed to pay 50% of the settlement amount on the earlier of the Quigley's Plan confirmation or December 1,

---

[4]    Daniel Rourke, the AHC's valuation expert, estimated that the Non-Settling Claimants' claims are worth $1.525 billion. (Tr. 2330:14–20, 2332:9–24 (Rourke); A4547 at 39 ("Rourke Report").) Rourke used the firm-by-firm historic settlement mean, by disease, for some firms—Peter G. Angelos, Cooney & Conway, and Weitz & Luxenberg—and the mean, by disease, across all non-settling firms for the rest. (Tr. 2332:9–24 (Rourke); Rourke Report at 37.) Rourke did not, however, apply a qualification rate to the outstanding claims, an unreasonable assumption that renders his figure inaccurate.

2005 ("First Payment") and the remaining 50% within five business days after the entry of a final

order of the District Court for the Southern District of New York confirming the Plan ("Second

Payment"). [5] (Tr. 2042:10–23 (Rozen); <u>see also</u> <u>Form PSA</u> §§ 4.1(g), 4.2.) If, however, Quigley

solicited plan acceptance before December 1, 2005, and less than 75% of the voting claimants

accepted Quigley's plan, Pfizer was relieved of the obligation to pay any amount to the Settling

Law Firms or the Settling Claimants. (<u>Id.</u> § 4.3.)[6] Furthermore, Pfizer could terminate the

Settlement Agreements at any time before the plan effective date and limit payment to the First

Payment. (<u>Id.</u> § 5.1.) Finally, if the Plan was not confirmed, Pfizer could bill the First Payments

to the remaining insurance coverage. (Tr. 250:7–21 (Berland); Tr. 1773:3–1775:17 (Snow).) As

of September 24, 2009, Pfizer had paid between $200 million and $220 million to the Settling

Claimants. (Tr. 250:7–21 (Berland).) [7]

The payment terms gave the Settling Claimants the economic incentive to vote to accept

any Quigley plan. Other provisions in the Pfizer Settlement Agreement required or encouraged

the Settling Law Firms and the Settling Claimants to support the plan as well as other actions

taken by Pfizer and Quigley during the Quigley bankruptcy. Among other things:

      i. To the extent consistent with their independent professional
        judgment, counsel was required to "recommend that the Plaintiff

---

[5]     As a precondition to the First Payments, the Pfizer Settlement Agreements required Settling Claimants to relinquish <u>all</u> asbestos personal injury claims against Pfizer. (<u>See</u> P3003 § 4.1(f).)

[6]     This exception was based on the requirement that at least 75% of asbestos personal injury creditors who vote must accept the plan. <u>See</u> 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb). It appeared in sixty-seven of the executed Pfizer Settlement Agreements (representing 176,551 claims and $414,476,234 in settlement payments). (J467–J479, J481–J532, J534, J536 (§ 4.3)). Thirty-nine of these included a qualification: "In that event, all parties shall be returned to their respective positions as existed prior to the execution of this Settlement Agreement." (J467, J468, J471, J474, J476, J478, J479, J482–84, J486–88, J491–94, J496, J501, J504–08, J511, J512, J515–18, J521–25, J527, J529–31 (§ 4.3).)

[7]     Any delay in the First Payment beyond December 31, 2005 under the prepetition settlements was presumably due to the qualification process, <u>i.e.</u>, the submission of evidence to and review of that evidence by Pfizer.

take all steps necessary to support Quigley's Consensual Plan and to vote in favor of Quigley's Consensual Plan." (<u>Form PSA</u> § 3.2(c).)[8]

    ii.   The Settling Law Firms agreed to cooperate with Pfizer and Quigley in the prosecution of Quigley's chapter 11 case, including all proceedings and appeals, and to oppose any motion to appoint a trustee or examiner. (<u>Id.</u> § 3.3(d).)[9]

    iii.   The Settling Law Firms agreed to appear in court or file papers, or both, to support any action by Pfizer or Quigley to enjoin further prosecution of claims by any personal injury claimant against the Pfizer Protected Parties. (<u>Id.</u> § 4.1(d).)[10]

    iv.   Each Settling Plaintiff and Settling Law Firm agreed to support the imposition and continuation of the automatic stay under § 362 of the Bankruptcy Code for the benefit of Quigley and the Pfizer Protected Parties. (<u>Id.</u> § 6.1).[11]

---

[8]    This clause appeared in twenty-seven of the Pfizer Settlement Agreements, representing 145,268 claims and $407,826,741 in settlement payments. (<u>See</u> J470, J472, J473, J475, J477, J481, J485, J489, J490, J495, J497–500, J503, J509, J510, J513, J514, J520, J526, J528, J532–36.) A similar clause, qualified by "subject to the exercise of its independent professional judgment as to the circumstances of individual clients," appeared in four of the Pfizer Settlement Agreements representing 13,838 claims and $80,587,584 in payments. (<u>See</u> J469, J480, J502, J519.)

[9]    Many Settling Law Firms did not agree to this provision as initially drafted, (Rozen, Tr. 2050:2–20), and the language was modified in forty of the Pfizer Settlement Agreements: "*Consistent with its determination that this agreement is in its best interest of the covered plaintiffs*, plaintiffs' counsel will not take action to undermine Pfizer and Quigley's efforts to timely and successfully prosecute Quigley's chapter 11 case." (<u>See</u> J467, J468, J471, J474, J476, J478–80, J482–84 , J486–88, J491–94, J496, J501, J504–08, J511, J512, J515–18, J521–25, J527, J529–31 § 3.3(c) (replacing Section 3.3(d) of the <u>Form PSA</u>).) Three other Pfizer Settlement Agreements contained variations on the original language of the provision. (<u>See</u> J469, J502, J519 § 3.3(c).) The parties deleted the provision entirely from twenty-six of the Pfizer Settlement Agreements.

[10]    This provision appeared in twenty-four of the executed Pfizer Settlement Agreements, representing 121,316 claims and $308,981,150 in settlement payments. Forty-two of the executed Pfizer Settlement Agreements, representing 56,352 claims and $115,343,084 in settlement payments, limit this provision (i) through December 1, 2005, or (ii) if Pfizer makes the 50% payment pursuant to Section 4.2(b) then through the pendency of the bankruptcy. (J467–69, J471, J474, J476, J478, J479, J482–84, J486–88, J491–94, J496, J501, J502, J504–08, J511, J512, J515–19, J521–25, J527, J529–31.)

[11]    This provision appeared in twenty-seven executed Pfizer Settlement Agreements (representing 131,430 claims and $327,239,157 in settlement payments.) (J470, J472, J473, J475, J477, J481, J485, J536, J489, J490, J495, J497–500, J503, J509, J510, J513, J514, J520, J526, J528, J532, J533–35 § 6.1 (Settlement Agreements).) Thirty-nine of the executed Pfizer Settlement Agreements (representing 43,394 claims and $54,555,500 in settlement payments) had a slightly varied provision, which required each Settling Plaintiff to support the imposition and continuation of the automatic stay for the benefit of Quigley and the Pfizer Protected Parties through December 1, 2005 (or the pendency of the bankruptcy if the fifty percent (50%) payment of the Settlement Amount is made pursuant to Section 4.2(b)). (J467, J468, J471, J474, J476, J478, J479, J482–84, J486–88, J491–94, J496, J501, J504–08, J511, J512, J515–18, J521–25, J527, J529–31 § 6.1.)

### 3.     The 90% Subordination Provision

As noted, the Pfizer Settlement Agreements settled Pfizer's liability, but not Quigley's. Nevertheless, the Settling Claimants agreed, in substance, that if the assets in the Asbestos PI Trust (the "Trust") created under the plan were insufficient to pay 100% of the value under the Trust Distribution Procedures ("TDP") schedule—a foregone conclusion—the Settling Claimants would only receive 10% of the payment otherwise due from the Trust. (See Form PSA § 2.4(b).) In other words, the Settling Claimants agreed to take a 90% haircut, and retain a "stub" claim against Quigley. [12] This subordination agreement did not affect their rights under the Pfizer Settlement Agreements.

### C.     The Chapter 11 Case

Throughout the summer of 2004, Quigley's financial situation "worsen[ed] dramatically every day." (Tr. 875:24–25; 1047:15–19 (Altit).) The Quigley board held four formal meetings with independent counsel, (see J225 at 4; J226 at 2; J227 at 1; J228 at 3), and several informal meetings, (Tr. 693:8–697:4 (Street); Tr. 876:8–878:1 (Altit)), to discuss Quigley's options: continue to operate and use shared insurance until depleted, (Tr. 876:21–24 (Altit)); sell the CHU; remain a Pfizer affiliate, (Tr. 687, 693:13–14 (Street)); wait for federal legislation to create a fund for asbestos-related liabilities, (J227 at 1; Tr. 693:16–22 (Street); Tr. 876:11–14 (Altit)); liquidate under chapter 7, (Tr. 876:15–17 (Altit); but see Tr. 802:10–12 (Street unable to recall the discussion to liquidate under chapter 7)); or reorganize under chapter 11 (Tr. 693:14–15 (Street); Tr. 876:18–20 (Altit)). The board concluded that filing a chapter 11 petition with

---

[12]     The 90% Subordination provision appeared in sixty-eight of the executed Pfizer Settlement Agreements (representing 177,431 claims and $434,276,234 in settlement payments.) (See J467–532, J534, J536.) Only those Pfizer Settlement Agreements executed in 2008 after Pfizer waived the 90% Subordination Provision did not contain the 90% Subordination Provision. (J533, J535.)

financial support from Pfizer was the best alternative. (Tr. 878:2–13 (Altit); J226 at 2; J227 at 1.) Absent reorganization, Quigley's claimants would receive payment on a first-come-first-serve basis, and nothing would remain for the Futures. (Tr. 697:10–16 (Street).)

Quigley filed its chapter 11 petition on September 3, 2004.[13] In due course, the United States Trustee appointed the Committee, which consisted of seven individual asbestos claimants, four of whom were Settling Claimants represented by Settling Law Firms. (PTO Undisputed Facts ¶¶ 65–66.) The Court also approved the selection of Togut as FCR; until then, he had acted without authority. Finally, three non-settling law firms, Cooney & Conway, Weitz & Luxenberg, PC, and the Law Offices of Peter G. Angelos, PC, joined together to form the AHC.

On October 6, 2005, Quigley filed its Third Amended Plan of Reorganization ("Third Plan"). (See J16.) The 90% Subordination in the Pfizer Settlement Agreements had a dramatic impact on the prospects for its success: over 175,000 Quigley claimants with "stub" claims were entitled to vote. Moreover, Quigley asked the Court to estimate the Class 4 Asbestos PI Claims at $1.00 for voting purposes only.[14] Given the number of Settling Claimants, the estimation methodology, if approved, would virtually assure acceptance by Class 4–at least 75% in number, 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), and two-thirds in amount, 11 U.S.C. § 1126(c), were likely to vote in favor of the plan. In fact, eighty-five percent in number—177,530—accepted the plan

---

[13] Quigley simultaneously sought a preliminary injunction with respect to all claims against Pfizer in order to protect Quigley's and Pfizer's shared insurance. The Bankruptcy Court granted the preliminary injunction, and the District Court affirmed. Quigley Company, Inc. v. A.C. Coleman, et al. (In re Quigley Company, Inc.), 323 B.R. 70, 77 (S.D.N.Y. 2005).) The preliminary injunction was subsequently narrowed to track the relief that Pfizer would receive under 11 U.S.C. § 524(g) if Quigley confirmed a plan. (Memorandum Opinion and Order Clarifying Amended Injunction, dated May 15, 2008 (Adv. Proc. No. 04-04262, ECF Doc. # 265).)

[14] Motion of Quigley Company, Inc. For an Order: (I) Approving Quigley's Disclosure Statement; (II) Approving Solicitation Procedures, Forms of Ballots, and Manner of Notice; (III) Estimating Each Asbestos PI Claim at $1.00 Solely for Voting Purposes and (IV) Fixing Date, Time and Place for Confirming Hearing and Deadline for Filing Objections Thereto, dated Aug. 17, 2005. (ECF Doc. # 421.)

and fifteen percent, or 31,641, voted to reject it. (Second Supplemental Declaration of Daniel P. McSwigan Certifying Tabulation of Ballots Regarding Vote on Debtor's Third Amended Plan of Reorganization, dated July 17, 2006, Ex. A (ECF Doc. # 880).)

The AHC challenged Quigley's proposed estimation on two grounds. First, each Asbestos PI Claimant's vote should be valued for purposes of 11 U.S.C. § 1126(c) based on the severity of the claimant's impairment rather than at $1.00 regardless of the impairment. For example, the TPD scheduled the "value" of a mesothelioma claim at $200,000 and an Asbestosis/Pleural Disease (Level I) claim at $2,000. See In re Quigley Co., 346 B.R. 647, 651 (Bankr. S.D.N.Y. 2006) ("Quigley I"). Under the AHC's theory, the mesothelioma claim was "worth" 200 times more than the asbestosis claim in computing whether Quigley had met the "two-thirds in amount" requirement.[15] Second, and more importantly, the votes of the Settling Claimants should be diluted to reflect the voluntary 90% Subordination.

The Court concluded that the votes of Settling Claimants should be valued at 10% of the TPD scheduled value, giving effect to the 90% Subordination (the "Tabulation Ruling"). Quigley I, 346 B.R. at 657–58. Diluting the Settling Claimants' votes mooted the AHC's first challenge. The vote failed to satisfy the "two-thirds in amount" requirement whether each claim was valued at $1.00 or in an amount reflecting the claimant's impairment. Id. at 658–59. In response, Pfizer opted to waive the 90% Subordination. (Tr. 635:19–636:3 (Greenspan).) Quigley, not party to the Pfizer Settlement Agreements, had no contractual right to prevent the waiver and apparently had no say.

---

[15]    This example is illustrative only. The AHC actually advocated the use of historical settlement values rather than the TPD values, but the Court rejected the argument.

**D.     The Fourth Plan**

Quigley subsequently filed the Fourth Plan, which is the subject of the confirmation application.  It is a lengthy and complex document that may only be modified with the consent of Pfizer.  (<u>Fourth Plan</u> at 59.)  The following summary is intended to highlight the provisions that are germane to the disputed issues.

**1.     The Parties' Contributions**

**a.     Pfizer**

**i.     Cash**

Pfizer was not contributing any cash under the Third Plan, which envisioned paying the Asbestos PI Claimants 7.5% of the TPD value corresponding to the claimant's impairment.  The waiver of the 90% Subordination in the Fourth Plan diluted the recoveries, and called for an additional contribution from Pfizer to bring claimants and Futures back up to the 7.5% dividend. The FCR negotiated with Pfizer to increase its contribution to ensure at least the same recovery for Futures that they would have expected to receive under the original plan.  Eventually, the parties agreed that the financial impact to the Trust from the waiver of the 90% Subordination was $59,727,738.  (Q2007 (Pfizer-FCR Make-Whole Calculation); A4329 at 3 (May 14, 2007 email).)

To close the gap, Pfizer agreed to contribute $50 million in cash to the Trust and to pay an annuity with a nominal face value of $45.1 million.  The annuity is payable in equal installments starting five years after the Effective Date.  (<u>Fourth Plan</u> § 1.1.)  The parties estimate the net present value at between $13 and $14.7 million.  (A4559 at 26; P3024 at 25 (<u>Updated Report of Karl N. Snow, Ph.D.</u>, dated September 16, 2009) ("<u>Updated Snow Report</u>").)

### ii. Insurance

### A. The Pfizer/AIG Annuity

The AIG Companies ("AIG") had issued insurance policies to Pfizer in prior years, and some of these policies covered Quigley.  In August 2004, Pfizer, Quigley and AIG entered into a settlement to resolve disputes regarding certain insurance receivables.  AIG agreed to pay Quigley and Pfizer $405,746,856 over ten years, (see P3000 at 3 (Insurance Settlement Proceeds Trust Agreement); Tr. 245:13–19, 460:22–461:4, 463:17–464:16 (Berland))), and Pfizer and Quigley agreed to deposit the joint AIG proceeds and any other insurance recoveries (excluding certain preexisting receivables) into a trust (the "Insurance Settlement Proceeds Trust").  At the time of the trial, the AIG proceeds amounted to $179.5 million, including interest.  (Updated Snow Report at 13).  AIG had yet to pay $225,711,538 of face value of the annuity, with a present value of $85,770,384.  (J47b at 2 (dated November 1, 2009 ("Updated Liquidation Analysis")).)  Pfizer and Quigley on the one hand, and the AHC on the other, dispute the value of Pfizer's and Quigley's respective rights in the AIG settlement proceeds.  The dispute is discussed below.

Under the Fourth Plan, Quigley will surrender its rights in the AIG settlement to Pfizer.  (Fourth Plan §§ 1.1, 12.1.)  In exchange, Pfizer will pay the Trust a $405-million 40-year annuity, with a net present value between $161 million and $174.5 million (the "Pfizer Annuity").  (Tr. 2581:9–2582:21 (Shaked); Updated Snow Report at 21.)

### B. Other Insurance

Pfizer and Quigley have rights in other non-AIG insurance policies.  These rights fall into one of four buckets depicted in the following chart:

| Nature of Other Insurance | Face Value ($) |
|---|---|
| Non-AIG Proceeds in Insurance Settlement Proceeds Trust[16] | 41,650,114 |
| Shared Insurance Coverage without Asbestos Restrictions[17] | 101,866,116 |
| Shared Insurance Coverage with Asbestos Restrictions[18] | 190,965,000 |
| Insolvent Insurers without Asbestos Restrictions[19] | 190,000,000 |
| **Total** | 524,481,230.00 |

The first category reflects the proceeds of settlements or recoveries that are already in hand. The second category reflects unrestricted, available coverage owed by solvent insurers. The last two categories are problematical as they encompass policies that either contain restrictions on asbestos coverage or were issued by insurers who are presently insolvent. Pfizer will relinquish its rights under these policies in connection with the Fourth Plan. (Fourth Plan §§ 1.1, 12.1.) Pfizer and the AHC disagree over the value of these insurance rights (other than the cash in hand).

### iii. Quigley Stock

Pfizer will contribute the stock of Reorganized Quigley to the Trust. (Fourth Plan §§ 1.1, 12.1.) The Parties estimate the value of Reorganized Quigley to be between $3.8 and $6.6 million.

---

[16] (Liquidation Analysis at 2.)

[17] Id.

[18] Id.

[19] Tr. 226:5–227:4 (Berland). This estimate is highly speculative. The Fifth Disclosure Statement states that "[r]ecovery under policies issued by insolvent insurers is subject to the uncertainties that result from each of insolvent insurers' respective liquidation proceedings or foreign scheme of arrangement, and therefore it is not possible to predict any additional amounts that may ultimately be recovered." (Fifth Disclosure Statement at 23.)

### iv. The Pfizer Lien

On or about March 6, 2003, Quigley and Pfizer entered into a Credit and Security Agreement, which was amended from time to time. (<u>See</u> J446.) The agreement grants Pfizer a security interest in substantially all of Quigley's assets other than certain insurance policies. (<u>Fifth Disclosure Statement</u> at 34.) By the time of the confirmation hearing, Pfizer held a secured claim in the approximate amount of $76 million. (<u>Liquidation Analysis</u> at 2.) The Fourth Plan states that Pfizer will waive $30 million of this secured claim. At trial, however, its counsel stated that Pfizer would waive the entire claim. (Tr. 63:13–19.)

### b. Quigley Contribution

Quigley's contribution to the Trust consists primarily of Quigley's insurance rights.[20]

(<u>Fifth Disclosure Statement</u> at 65–66.)

### 2. § 524(g) Channeling Injunction

In return for these contributions, the Fourth Plan grants Quigley and, more importantly, Pfizer, among others, the protection of an 11 U.S.C. § 524(g) channeling injunction. The plan limits the recourse of asbestos claimants to the Trust and enjoins each claimant from taking action against Quigley, Reorganized Quigley or any other Asbestos Protected Party, including Pfizer.[21] (<u>Fourth Plan</u> § 11.6.)

---

[20] Quigley is also making a contribution entitled "Excess Cash." The parties did not analyze the value of the contribution.

[21] The Fourth Plan defines "Asbestos Protected Party" as any Quigley Person, Reorganized Quigley, and any Pfizer Protected Party and any other Entity that is directly or indirectly liable for Quigley's conduct under 11 U.S.C. § 524(g)(4)(A). <u>See</u> (<u>Fourth Plan</u> at 6); 11 U.S.C. § 524(g)(4)(A). "Pfizer Protected Party" means "(a) Pfizer; (b) Pfizer's Affiliates (other than Quigley) . . . ; and (c) Mineral Technologies Inc." (<u>Fourth Plan</u> at 15.)

### 3. Claim Processing Business

As discussed above, Quigley has operated the CHU since the summer of 2004, but at a significant loss.  Under the Third Plan, Pfizer proposed to license the income from four drug lines to Quigley that would continue to be produced, marketed, and sold by Pfizer.  (J22, Ex. L (Product Licenses and Services Agreement ("L&S Agreement")).)  The proposal was intended to give Quigley an "ongoing business" to meet the requirements of § 524(g).  (Tr. 357:9–18 (Berland).)  The L&S Agreement provided for quarterly payments, and included a make-whole provision that required Pfizer to pay Quigley the difference if the profit from the licensing agreement fell below $21.7 million after the first five years, effectively insuring that amount for Quigley.  (L&S Agreement § 5.5.)  After five years, Quigley would continue to receive the operating profits from the drug lines but also became obligated to pay Pfizer any operating losses every quarter.  (Id.)  Street did not discuss the licensing of drug lines with Pfizer and did not participate in their selection; Pfizer simply told Quigley what it intended to do.  (Tr. 982:6–984:3 (Street).)

The L&S Agreement was replaced in the Fourth Plan by a proposed claims processing agreement—the Pfizer Claims Services Agreement—which is still in the draft stage.  (Fourth Plan § 12.2(d)(viii); A4553 ("Pfizer Draft CSA").)  Under the September 24, 2009 draft, Pfizer agrees to pay Quigley $5 million per year for five years in exchange for claim processing services to Pfizer.  (Pfizer Draft CSA at 9.)  The draft agreement caps the number of claims Pfizer can ask Quigley to process at 35,000 claims per year.  (Id. at 3, 9.)  Pfizer agrees to pay Quigley a minimum of $20 per claim for each claim it processes in excess of the 35,000 annual cap.  (Id. at 4, 9.)  Moreover, the agreement contains an "anti-swamping" provision that permits

Quigley either to renegotiate the excess claims fee or to delay processing claims if it cannot process excess claims profitably.  (Id. at 23–24.)  In any case, Quigley expects that Pfizer's post-confirmation work will be minimal.[22]  (Tr. 1615:12–24 (Jenkins).)

The Fourth Plan provides that Quigley will also perform the claims-handling work for the Trust until either the termination of the Trust, or by notice of one of the parties after five years, or by mutual agreement of the parties.  (Fourth Plan, Ex. J at 6.)

### 4.    The Vote

Before the vote on the Fourth Plan, Quigley sought approval of the disclosure statement and proposed ballots.[23]  The Ad Hoc Committee, among others, objected.  The Court overruled these objections, In re Quigley Co., Inc., 383 B.R. 19 (Bankr. S.D.N.Y. 2008) ("Quigley III"), and approved the ballot. (See J68 (the "Ballot").)

The ballot streamlined the voting process for Asbestos PI Claimants.  Counsel representing more than one claimant could submit a single "Master Ballot" on behalf of all consenting claimants, including a summary of the number of accepting and rejecting votes for each disease category.  (Id. § 4(c)).)[24]  Counsel could only vote for its claimants individually or

---

[22]    This expectation seems realistic.  Quigley has already processed and paid over 155,000 of the approximate 175,000 claims settled through the Pfizer Settlement Agreements.  (Tr. 1468:24–1469:3 (Jenkins).)  If the Plan is confirmed, Pfizer will receive a release of any derivative liability for the claims against Quigley, and those claims will be channeled to the Trust.  Hence, there will be few if any Pfizer claims left to process.

[23]    Notice of Presentment By Quigley Company, Inc. Of Order: (I) Approving Quigley's Disclosure Statement; (II) Approving First Amended Ballot Solicitation and Tabulation Procedures, Forms of Ballots and Manner of Notice; (III) Estimating Each Asbestos PI Claim Solely for Voting Purposes Using Amounts Set Forth in the Asbestos PI Trust Distribution Procedures; and (IV) Fixing Date, Time and Place for Confirmation Hearing and Deadline for Filing Objections Thereto, dated Nov. 7, 2007 (ECF Doc. #1261).  The proposed individual and master ballots were attached to the Proposed Order as Exhibits D and E, respectively.

[24]    The Court approved the Master Ballots because Quigley only maintained address information for and communicated through counsel, nor could it obtain the information "within any reasonable time frame or in any cost effective manner." (J62 at 16.)

in a Master Ballot if it could "certify [it] ha[d] the authority to cast a Ballot on the Plan on behalf of the (claimants)." (Id.)

Ultimately, each impaired class accepted the Fourth Plan. (J78 at 4–5 ("BMC Declaration"); PTO Undisputed Facts ¶ 72.) The members of Class 4, the Asbestos PI Claimants, cast 261,790 ballots.[25] Of these, 254,215 were cast by Master Ballot. (BMC Declaration, Ex. A-2.) Weitz & Luxenberg, PC, a member of the AHC, did not vote by Master Ballot. (Tr. 2382:9–11 (Rourke).) Each vote was weighed according to its maximum TDP value. Class 4 accepted the Plan by a margin of 86.62% in number and 81.77% in amount. (BMC Declaration at 4–5.)

## E.     The Parties' Contentions

The AHC and the United States Trustee object to confirmation,[26] and all of the parties submitted post-trial proposed findings of fact and conclusions of law, or memoranda in lieu of proposed conclusions of law. The disputes center on four main areas, and raise a host of issues under several Code provisions:

First, the AHC contends that Pfizer manufactured this entire bankruptcy for its own benefit, and "bought the votes" through the Pfizer Settlements to ensure its success. The AHC's charges implicate questions of good faith, 11 U.S.C. 1129(a)(3), artificial impairment, 11 U.S.C.

---

[25]     The Tabulation Agent invalidated 7,665 of these ballots. (BMC Declaration, Ex. C-2.)

[26]     The AHC and the United States Trustee raised many of the same objections. For sake of brevity, this opinion refers to the objections by the AHC but is intended to include the objections by both parties.

§ 1129(a)(10), and by separate motion, designation of the votes of the Settling Claimants.[27]  11 U.S.C. § 1126(e).

Second, the AHC asserts that the plan is not "fair and equitable," a condition to the issuance of the channeling injunction that effectively discharges Pfizer's liability for derivative claims.  11 U.S.C. § 524(g)(4)(B)(ii).  According to the AHC, the value of the injunction to Pfizer greatly exceeds the value of Pfizer's contribution to the Trust.  Pfizer rejects the comparative approach, and argues that I must determine whether the contribution is "substantial" without regard to the released liability.  The AHC also argues that MTI, who has not made a contribution to the Trust, is not entitled to the benefit of the channeling injunction.

Third, the AHC maintains that Reorganized Quigley's claims handling business will not be viable.  Consequently, Quigley cannot satisfy what the AHC describes as the "ongoing business" requirement imposed under 11 U.S.C. § 524(g)(2)(B)(i)(II) or the feasibility requirement under 11 U.S.C. § 1129(a)(11).

Fourth the AHC argues that the Fourth Plan fails to satisfy the "best interest of creditors" test, 11 U.S.C. § 1129(a)(7), because the claimants that voted to reject the Fourth Plan do not receive a greater distribution under the plan than they would in a hypothetical chapter 7 liquidation.  Specifically, if the Fourth Plan is not confirmed, the Non-Settling Claimants will be

---

[27]  In its response, Pfizer cross-moved to designate the votes of the AHC law firms' claimants because their votes were not based on plan treatment but on the desire to extract hold-up value from Pfizer.  (Pfizer's Response to Motion of the Ad Hoc Committee of Tort Victims to Designate Votes Pursuant to 11 U.S.C. § 1126(e) and Pfizer's Cross-Motion to Designate Votes of Claimants Represented by the Ad Hoc Committee of Tort Victims, dated May 29, 2009 (ECF Doc. # 1814) ("Pfizer Designation Response").  Quigley joined in Pfizer's response.  (Response of Quigley Company, Inc. to Motion of Ad Hoc Committee of Tort Lawyers [*sic*] for Designation of Votes Under 11 U.S.C. § 1126(e), with Joinder in Cross-Motion of Pfizer Inc. to Designate Votes Under 11 U.S.C. § 1126(e) of Claimants Represented by Ad Hoc Committee of Tort Lawyers [*sic*], dated May 29, 2009 (ECF Doc. # 1815) ("Quigley Designation Response").)

free to prosecute their derivative claims against Pfizer, and the value of this right exceeds anything that might be distributed to them under the Fourth Plan. In contrast, the Settling Claimants, who received the First Payment, have already released Pfizer from all liability, regardless of whether the Fourth Plan is confirmed.

This difference in rights against Pfizer also results in unequal treatment under 11 U.S.C. § 1124(a)(4). The Non-Settling Claimants must release their derivative claims against Pfizer in exchange for their 7.5% distribution. The Settling Claimants have already released Pfizer and do not have to give up anything more to get their 7.5% distributions. Hence, the Non-Settling Claimants must pay greater consideration to get the same distribution.

In addition to the specific confirmation issues discussed, several unresolved motions are pending. In May 2007, Quigley filed a motion seeking approval of the extension of the Paul Street employment agreement from May 2007 to May 2008 (the "Street Employment Motion"). (J324.) In September 2007, the United States Trustee filed an objection to the Street Employment Motion (the "United States Trustee Street Objection"). (J341.) The parties agreed at December 2007 hearing to postpone the resolution of the motion. In its opposition, the United States Trustee argues that Street's continued employment, or the justifications of the Street Employment Motion, did not meet the "business judgment" standard for non–ordinary course use of property of the estate under 11 U.S.C. § 363(b), and implies that Street should disgorge some or all of the compensation he received.

Baron & Budd, a Settling Law Firm, filed a motion aimed at protecting confidential information.  See 11 U.S.C. § 107(b)(1).[28]  It asked the Court to redact or seal  information—principally found in the Pfizer Settlement Agreements but also discussed in expert reports and testimony—that refers to the settlement amounts, whether by claimant, jurisdiction, or disease level, because the amounts are commercial information under 11 U.S.C. § 107(b)(1).  Some but not all of the other Settling Law Firms joined in this motion.[29]

Finally, Quigley filed a post-trial motion to exclude portions of the testimony, illustrative slides, and report of Israel Shaked, the AHC's valuation expert.[30]  Quigley argues that trial testimony and slides of Shaked were improperly based on new information that was not included in his report.

## DISCUSSION

A debtor seeking to confirm a plan under 11 U.S.C. § 524(g) must satisfy the requirements of both § 524(g) and § 1129 of the Bankruptcy Code.  In re Western Asbestos Co., 313 B.R. 832, 838 (Bankr. N.D. Cal. 2003); see In re Combustion Eng'g, Inc., 391 F.3d 190, 209 (3d Cir. 2004); In re Armstrong World Indus., Inc., 348 B.R. 136, 158 (D. Del. 2006); In re J T Thorpe Co., 308 B.R. 782, 785 (Bankr. S.D. Tex. 2003).  The proponent of confirmation bears

---

[28]  Motion of Baron & Budd, P.C. Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9018 to Seal Certain Settlement Agreements, dated December 21, 2010 ("Sealing Motion"). (ECF Doc. # 1992).

[29]  The Settling Law Firms that joined the Sealing Motion include, Stutzman Bromberg, the David Law Firm, Motley Rice, Thornton Naumes, Provost Umphrey, Foster & Sear, Lipsitz & Ponterio, and Goldberg, Persky & White.  Early, Ludwick, Sweeney & Strauss also joined but after the filing deadline.

[30]  Motion of Quigley Company, Inc. for Order under Fed. R. Bankr. P. 7026(e)(1) and (2), 7037(c)(1), 9014(c), and FRE 802 Partially Excluding Testimony, Illustrative Exhibits, and Expert Report of Doctor Israel Shaked, dated Jan. 5, 2010 (ECF Doc. # 2004).  The AHC responded.  (Objection of the Ad Hoc Committee of Tort Victims to Motion of Quigley Company, Inc., for Order under Fed. R. Bankr. P. 7026(e)(1) and (2), 7037(c)(1), 9014(c), and FRE 802 Partially Excluding Testimony, Illustrative Exhibits, and Expert Report of Doctor Israel Shaked, dated  Jan. 21, 2010 (ECF Doc. # 2025).

the burden of proof by a preponderance of the evidence.  J T Thorpe, 308 B.R. at 785 ("The

Debtor, as proponent of the Plan, has met its burden of proving, by a preponderance of the

evidence, that the elements of Sections 524(g) and 1129(a) of the Bankruptcy Code are

satisfied.")

**A.      The Pfizer Settlement Agreements**

**1.      Good Faith**

Pursuant to 11 U.S.C. § 1129(a)(3), the party seeking confirmation must show that "[t]he

plan has been proposed in good faith and not by any means forbidden by law."  "Good faith" is

not defined in the Bankruptcy Code, but as explained in In re Madison Hotel Assocs., 749 F.2d

410 (7th Cir. 1984):

> Though the term "good faith," as used in section 1129(a)(3), is not defined in the
> Bankruptcy Code, the term is generally interpreted to mean that there exists "a
> reasonable likelihood that the plan will achieve a result consistent with the
> objectives and purposes of the Bankruptcy Code. . . . Thus, for purposes of
> determining good faith under section 1129(a)(3) . . .  the important point of
> inquiry is the plan itself and whether such plan will fairly achieve a result
> consistent with the objectives and purposes of the Bankruptcy Code.

Id. at 424–25 (citations omitted); accord Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d

Cir. 1988) ("The good-faith test means that the plan was proposed with honesty and good

intentions and with a basis for expecting that a reorganization can be effected.") (internal

quotation marks and citations omitted); In re Koebl, 751 F.2d 137, 139 (2d Cir. 1984) ("This

court has defined the good faith standard in the bankruptcy context as requiring a showing that

the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a

reorganization can be effected.'" (quoting Manati Sugar Co. v. Mock, 75 F.2d 284, 285 (2d

Cir.1935)).

Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan." In re Bush Industries, Inc., 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004). It must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan, Madison Hotel Assocs., 749 F.2d at 425; In re Jasik, 727 F.2d 1379, 1383 (5th Cir. 1984); In re WorldCom, Inc., No. 02-13533, 2003 WL 23861928, at *51 (S.D.N.Y. Oct. 31, 2003); In re Leslie Fay Cos., 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997), including the debtor's pre-filing conduct. Leslie Fay, 207 B.R. at 781 (Bankr. S.D.N.Y. 1997); In re Resorts Int'l, Inc. 145 B.R. 412, 469 (Bankr. D.N.J. 1990); In re Toy & Sports Warehouse, Inc., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). Among other things, good faith provides "a check on the debtor's intentional impairment of claims." Combustion Eng'g, 391 F.3d at 246; accord In re Greate Bay Hotel & Casino, Inc., 251 B.R. 213, 240 (Bankr. D.N.J. 2000) ("Of course, the classification and treatment of classes of claims is always subject to the good faith requirements under § 1129(a)(3)."); In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1353 (5th Cir. 1989) (remanding to determine whether the separate classification and impairment of two creditors for the apparent purpose of procuring acceptance of the plan violated the requirement of good faith); In re Dunes Hotel Assocs., 188 B.R. 174, 189 (Bankr. D.S.C. 1995) (artificial impairment of de minimis claim held by sole, friendly creditor to procure accepting impaired class constitutes artificial impairment in violation of § 1129(a)(10) and lack of good faith under § 1129(a)(3)); In re Daly, 167 B.R. 734, 737 (Bankr. D. Mass. 1994) ("[A] contrived and artificial impairment can be viewed either as a violation of the requirement of an accepting impaired class, § 1129(a)(10), or as a violation of the requirement that the plan be proposed in good faith, § 1129(a)(3), or as both.").[31]

---

[31]     As some of cited cases suggest, vote manipulation and gerrymandering are often viewed as improper forms

Here, Pfizer wrongfully manipulated the voting process to assure confirmation of the Quigley plan, and thereby gain the benefit of the channeling injunction for itself and the other Pfizer Protected Parties. Initially, this is a Quigley bankruptcy in name only. Pfizer conceived and executed the global strategy, including the resuscitation of the moribund Quigley and the filing of the chapter 11 case contemplated in the Pfizer Settlement Agreements. Pfizer funded the chapter 11; Quigley suffered postpetition losses of $75.8 million before taxes as of August 31, 2009, including nearly $50 million just from operations. (J164 at 3.) Pfizer is also providing the bulk of the plan funding. The Fourth Plan, like the plans that preceded it, is designed to free the Pfizer Protected Parties from derivative liability, and only incidentally, to reorganize Quigley to the extent necessary to confirm the plan. Pfizer, the parent of Quigley, the architect of the

---

of artificial impairment as well as bad faith. Section 1129(a)(10) requires the Debtor to show that "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." A claim is not impaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest" or if the plan cures or compensates for past default. 11 U.S.C. § 1124. The purpose of § 1129(a)(10) is to "provide some indicia of support by affected creditors and prevent confirmation where such support is lacking." Combustion Eng'g, 391 F.3d at 243-44 (quoting Windsor on the River Assocs. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs.), 7 F.3d 127, 131 (8th Cir. 1993).) "'Artificial' impairment occurs when a plan imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired under § 1124." Id. at 243. Artificial impairment "potentially allows a debtor to manipulate the Chapter 11 confirmation process by engineering literal compliance with the Code while avoiding opposition to reorganization by truly impaired creditors." Id.

There is a split among the authorities as to whether the creation of an artificially impaired accepting class violates § 1129(a)(10) or, instead, is a species of lack of good faith under § 1129(a)(3). Compare In re L & J Anaheim Assocs., 995 F.2d 940, 943 (9th Cir. 1993) (holding that the court should examine artificial impairment under § 1129(a)(3), and affirming that plan was proposed in good faith), In re Hotel Assocs. of Tucson, 165 B.R. 470, 475 (B.A.P. 9th Cir. 1994) (concluding that § 1129(a)(10) does not require a court to "ask whether alternative payment structures could produce a different scenario in regard to impairment of classes"), and In re 203 North LaSalle Street Ltd. P'ship, 190 B.R. 567, 593 (Bankr. N.D. Ill. 1995) ("[T]here appears to be a developing consensus among the decisions that the 'artificial impairment' objection is best seen, not as a ground for finding noncompliance with Section 1129(a)(10), but as an argument that a plan has not been proposed in good faith"), rev'd on other grounds, 526 U.S. 434 (1999), with Combustion Eng'g, 391 F.3d at 244-45 (creation of "stub" claims under pre-petition settlements in asbestos class may constitute artificial impairment under § 1129(a)(10)), and Windsor, 7 F.3d at 131-32 (holding that § 1129(a)(10) does not permit artificial impairment).

The Second Circuit has not ruled on the issue. Because the Court concludes that the voting manipulation in this case constituted bad faith under § 1129(a)(3), it does not address whether the same conduct is also prohibited under § 1129(a)(10).

global strategy, the only source of chapter 11 and plan financing and the principal beneficiary of the channeling injunction, is the <u>real</u> proponent of this plan.[32]

In a nutshell, Pfizer bought enough votes to assure that any plan would be accepted. To do so, it had to first alter its historical approach to settling asbestos claims. Prior to the Pfizer Settlement Agreements, the same lawyer represented Pfizer and Quigley. Counsel settled the claims against Quigley based upon Quigley's historic settlement values, and obtained a release for Pfizer at no additional cost. During the period when Pfizer was attempting to establish Quigley as an independent entity, Pfizer and Quigley entered into the Joint Defense Agreement, under which Quigley delegated the authority to settle its cases to Pfizer. In theory, the delegation of settlement authority continued this historical approach to the settlement of Quigley and Pfizer asbestos liability.

To effect its global strategy, Pfizer deviated from this practice and began entering into settlements that expressly excluded Quigley. Remarkably, Pfizer failed to inform Quigley's directors about the new approach to settling claims. Each of Quigley's directors testified that they were not aware of the Pfizer Settlement Agreements at the time they were executed. Street testified that he did not learn of the settlements until after they were made. (Tr. 721:12–19.) Altit testified that he did not learn of the settlements until some time in 2005. (Tr. 1048:2–9.) Raeburn said he did not know "anything about those settlements" until after the filing. (Tr. 2283:17–2284:2.)[33]

---

[32]        In any event, Quigley acquiesced in if not actively embraced Pfizer's actions in connection with the prosecution of its chapter 11 case, and Pfizer's bad faith may be attributed to Quigley as well.

[33]        The directors' testimony implies that Pfizer, not Quigley, determined the timing of the commencement of the chapter 11 case. By August 31, 2004, Pfizer had settled approximately 175,000 claims, or roughly 83% of the 212,000 claims pending against Quigley as of the Petition Date. The case was commenced three days later. Given

The record supports the finding that Pfizer could have also settled Quigley's liability at the same time for little, if anything, more. According to Rozen, the Settling Law Firms did not attempt to parse out Pfizer's share of the liability in connection with the negotiations leading up to the Pfizer Settlement Agreements. I infer from this that they continued to settle at Quigley's historical settlement values. In the past, Pfizer would have settled Quigley's liability under the same criteria and obtained a Pfizer release without any additional payment. Had Pfizer structured the settlements in this manner, it could have obtained the release of both Pfizer and Quigley liabilities for the amount that Pfizer agreed to pay for the release limited to the Pfizer Parties.

The decision not to settle Quigley's liability, and instead, grant the Settling Claimants 10% stub claims was purposeful. The stub claims gave the Settling Claimants the status of creditors in the anticipated bankruptcy with the financial incentive to vote for any Quigley plan in order to receive the Second Payment.[34] The FCR testified that he requested the 90% Subordination during prepetition negotiations to preserve more Trust assets for his constituents, (Tr. 2242:17–24 (Togut)), and did not ask for a 100% waiver because he did not believe that a 100% waiver would be obtainable. (Tr. 2246:22–2247:19 (Togut).) His testimony was disingenuous, confirmed by the fact that none of the Settling Law Firms asked for more money when they consented to the 90% Subordination. (Tr. 2112:2–5 (Rozen).)

---

the Settling Claimants' financial stake in confirmation of any plan, Pfizer had good reason to believe that it had enough votes by late August or early September to be confident that a Quigley plan would be accepted by 75% of the Asbestos PI Claimants in Class 4 as required under § 524(g).

[34]    Pfizer and Quigley contend that the 90% Subordination is irrelevant, and I should not consider it, because it is not part of the Fourth Plan. See In re Nielsen, 211 B.R. 19, 23 (8th Cir. B.A.P. 1997) (good faith must be considered under the plan that the debtor is attempting to concern and not some earlier plan). I disagree. The totality of the circumstances, including Pfizer's and Quigley's pre-petition conduct, is relevant to the good faith issue. The 90% Subordination was one piece in the global strategy to manipulate the vote.

In truth, at the time that the Pfizer Settlement Agreements were executed, a majority of the Settling Claimants had little or no expectation of any distribution under the draft TDP attached to the Settlement Agreements. (E.g., J519, Ex. C.) Most Settling Claimants—indeed most of Class 4—suffered from asbestosis/pleural disease, the least serious disease level.[35] The TDP divided asbestosis/pleural disease into two categories. The scheduled value under "Asbestosis/Pleural Disease I" ("Level I") was $2,000.00. (Id., Ex. C § 5.3(a)(3)).) The scheduled value under "Asbestosis/Pleural Disease II" ("Level II") was $250.00. (Id., Ex. C § 5.3(a)(3).)[36] In light of the 90% Subordination, a maximum distribution would pay only $200.00 and $25.00, respectively, and the agreements even acknowledged "that the Settling Plaintiffs are not likely to receive 100% of their Quigley Claim Amount." (E.g., J502 § 2.4(b).) The Trust was not, however, required to make distributions in an amount less than $100.00. (Id., Ex. C § 4.4.) In short, the Settling Claimants with Level II would never receive any distribution under the TDP, and those with qualified Level I claims would not receive a distribution unless and until the Trust held sufficient assets to make a 50% distribution against the scheduled values. In fact, Quigley subsequently projected a 7.5% distribution against the TDP values.

The elimination of the 90% Subordination in the Fourth Plan did not alter the Settling Claimants' financial incentive to accept the plan in order to receive the Second Payment. The ballot results depict a high correlation between the Pfizer Settlement Agreements and the rate of acceptance. Settling Claimants accepted the Fourth Plan by a margin of 99.48% in number and 98.53% in amount. This is only slightly higher than the approximate 97% of Settling Claimants

---

[35] According to the voting results of the Fourth Plan, Claimants with asbestosis/pleural disease cast 222,503 votes out of a total vote of 261,790. (BMC Declaration, Ex. B.) This represents 85% of all of the votes cast.

[36] The TPD under the Fourth Plan reordered the levels, scheduling Level I at $2,000.00 and Level II at $5,000. (Fourth Plan, Ex. B at 18-19.) The de minimis distribution threshold was dropped from the TDP attached to the Fourth Plan.

that voted to accept the Third Plan, which included the 90% Subordination.  <u>Quigley I</u>, 346 B.R. at 658.  By contrast, Non-Settling Claimants accepted the Fourth Plan by a margin of 66.27% in number and 66.20% in amount.  (<u>BMC Declaration</u>, Ex. C-2.)  Even that acceptance rate by the Non-Settling Claimants owed much to the Pfizer Settlement Agreements.  Virtually all Class 4 votes—97.1 % or 254,215—were cast by Master Ballot.   (<u>Id.</u>, Ex. A-2.)  Some of the Settling Law Firms cast votes in their Master Ballots on behalf of clients that had not settled with Pfizer.  (<u>Rourke Report</u> at 38 (Table 18).)  Almost all of the claimants—Settling and Non-Settling— covered by Master Ballots submitted by Settling Law Firms accepted the Plan.  (<u>Id.</u> at 69–70 (App'x C-2).)  By contrast, only 13.4% of Master Ballots submitted by Non-Settling Law Firms accepted the Plan. (<u>Id.</u> at 14–15.)

I infer from this disparity that the Settling Claimants, through the Settling Law Firms, were motivated to accept the Fourth Plan by virtue of the financial incentive under the Pfizer Settlement Agreements.  Ironically, Pfizer had the legal means to obtain the benefit of the § 524(g) channeling injunction without manipulating the vote.  It could have simply bypassed the Pfizer Settlement Agreements entirely, and increased its contribution to the Trust in a like amount, to be shared equally by all asbestos claimants present <u>and future</u>.  Alternatively, if the release of direct claims—not possible under § 524(g)—was that important, it could have entered into the same Pfizer Settlement Agreements but secured a release for Quigley as well as Pfizer.  Finally, it could have explored with Quigley the possibility of separately classifying the Settling Claimants and Non-Settling Claimants and requiring that each class accept the plan.  <u>See, e.g.</u>, <u>In re Combustion Eng'g</u>, No. 03-10495, 2005 Bankr. LEXIS 2623, at *68-69 (Bankr. D.N.J. Dec. 19, 2005).  This would have removed any suggestion that the settlements tainted the vote.

These alternatives, however, presented risks to the global strategy. If Pfizer contributed the settlement funds to the Trust under a confirmed plan, the asbestos claimants might have rejected it, or sought substantially more. It is always more difficult, in this regard, to negotiate with an organized class of creditors than with creditors individually. "Divide and conquer" is cheaper. If Pfizer procured a release for Quigley, it would eliminate a motivated subclass with the incentive to vote in favor of a plan. Lastly, if Quigley separately classified the two groups, Pfizer faced the risk that the Non-Settling Claimants' class would reject the plan, as essentially occurred. Instead, Pfizer created and incentivized an impaired subclass consisting of the majority of the members of Class 4 to vote in favor of Quigley's plan. I conclude that the Fourth Plan was proposed in bad faith since it was designed to achieve acceptance through a tainted vote.

**2.      Designation**

The AHC moved to designate (i.e., disqualify) the votes cast by the Settling Claimants,[37] and Pfizer cross-moved to designate the votes of the claimants represented by the AHC.[38] Quigley joined in Pfizer's motion.[39] The parties served their motions on counsel but did not personally serve the individual claimants they sought to disenfranchise. The Court sua sponte questioned whether the parties had properly served their designation motions, and afforded the parties the opportunity to brief the issue. Pfizer and Quigley contend that the AHC failed to effect proper service because the Settling Law Firms were not authorized to receive service on

---

[37]      See Motion of the Ad Hoc Committee of Tort Victims to Designate Votes Pursuant to 11 U.S.C. § 1126(e), dated May 1, 2009 (ECF Doc. # 1800).

[38]      See Pfizer Designation Response.

[39]      See Quigley Designation Response.

behalf of the Settling Claimants.  The AHC does not contest service of Pfizer's designation motion.

The designation motions commenced contested matters.  The movants were required to serve their motions in the same manner as a summons and complaint provided by Rule 7004 of the Federal Rules of Bankruptcy Procedure.  FED. R. BANKR. P. 9014(b).  As all of the members of Class 4 are individuals, the motion could be served by mail on the individual defendant, FED. R. BANKR. P. 7004(b)(1), upon an agent authorized to receive service, see FED. R. BANKR. P. 7004(b)(8), or in accordance with Rule 4 of the Federal Rules of Civil Procedure.  FED. R. BANKR. P. 7004(a).

The Settling Law Firms were not expressly authorized by statute, rule or agreement to accept service of the designation motion on behalf of their clients.  Nevertheless, an attorney that takes an active role on behalf of a client in a bankruptcy case has implied authority to receive service of process initiating a proceeding in that case.  Solow v. Kalikow (In re Kalikow), 602 F.3d 82, 92–93 (2d Cir. 2010); Reisman v. First New York Bank for Business (In re Reisman), 139 B.R. 797, 801 (Bankr. S.D.N.Y. 1992); cf. Luedke v. Delta Air Lines, Inc., 159 B.R. 385, 395 (S.D.N.Y. 1993) ("An attorney's activities on behalf of a client in proceedings in one court may indicate implied authority to receive service of process in an integrally related litigation in another court.").

While some of the approximately seventy Settling Law Firms participated more than others in the case, all represented their respective clients in the case.  In particular, every attorney was authorized to cast a Master Ballot on behalf of its clients provided that the attorney certified the authority to do so.  More than 97% of the votes were cast by counsel through a Master Ballot.

In addition, each of the Settling Law Firms represented their clients in the very asbestos litigation that served as the raison d'etre for the bankruptcy case. In connection with that role, each Settling Law Firm entered into a Pfizer Settlement Agreement with Pfizer on behalf of the Settling Claimant. Accordingly, I conclude that the Settling Law Firms were implicitly authorized to receive service of the AHC's designation motion, rendering service sufficient under Rule 7004(b)(8).

Turning to the substance of the motions, I conclude that the findings of bad faith under § 1129(a)(3) also support the conclusion that the votes of the Settling Claimants should be designated. Section 1126(e) of the Bankruptcy Code provides:

> On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

The provision "grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in 'bad faith.'" Century Glove, Inc. v. First Am. Bank of New York, 860 F.2d 94, 97 (3d Cir. 1988). The Bankruptcy Code does not define "good faith" or "bad faith"—instead, their meanings have been left for development under the case law. In re Figter, Ltd., 118 F.3d 635, 638 (9th Cir. 1997); In re DBSD N. Am., Inc., 421 B.R. 133, 137 (Bankr. S.D.N.Y. 2009); In re Dune Deck Owners Corp., 175 B.R. 839, 844 (Bankr. S.D.N.Y. 1995); In re Landing Assocs., Ltd., 157 B.R. 791, 802 (Bankr. W.D. Tex. 1993).

The cases have generally recognized two types of bad faith: (1) where a claimholder attempts to extort a personal advantage not available to other creditors, or (2) where the claimholder has an "ulterior motive." DBSD, 421 B.R. at 138; Dune Deck Owners Corp., 175

B.R. at 844.  While the decisions have typically focused on the voting creditor's motive, the statute is broader: it provides a basis to designate, without regard to the creditor's motive, where the vote is "solicited or procured" in bad faith.[40]  In this sense, the test substantially overlaps with the type of bad faith vote manipulation presented in this case.

Pfizer sidesteps the question by arguing that the Pfizer Settlement Agreements, which it likens to plan-support agreements, were not improper solicitations under 11 U.S.C. § 1125(b), primarily because they did not require the Settling Claimants to vote in favor of a Quigley plan. (Post-Trial Brief and Conclusions of Law of Pfizer Inc. in Support of Confirmation of Quigley Company, Inc.'s Fourth Amended and Restated Plan Of Reorganization, dated Jan. 5, 2010, at 37–40 ("Pfizer Brief").)  The point is debatable, but in any event lacks merit.  To begin with, the Pfizer Settlement Agreements do not involve the typical lockup or postpetition plan agreement that provides for payments under a plan by the debtor (or gifted by a secured creditor) to an entire class.  E.g., In re Journal Register Co., 407 B.R. 520, 527 (Bankr. S.D.N.Y. 2009) (confirming plan under which secured creditors contributed funds they would otherwise retain on account of their claims for distribution to class of trade creditors); In re WorldCom, Inc., No. 02-

---

[40]     AHC argues and Pfizer appears to acknowledge that it is improper for the debtor's insider to purchase claims in order to vote for acceptance of the plan.  (See Post-Trial Brief of the Ad Hoc Committee of Tort Victims in Opposition to the Quigley Company, Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as of March 28. 2008), dated Jan. 27, 2010, at 24 ("AHC Brief") ("Courts have also found bad faith where insiders pay claimants in order to secure the votes necessary for approval of a debtor's plan."); Pfizer Reply, at 12 (distinguishing the AHC's authorities on the basis that "Pfizer did not purchase or vote any other creditors' claims, and consequently, these cases have no relevance here").

Pfizer could not have purchased the Settling Claimants' claims as many if not all jurisdictions prohibit the assignment of personal injury claims.  See 6A C.J.S. Assignments § 54 (2010)  ("Although in at least one state all causes of action, including personal injury actions, are assignable in the absence of a statutory bar, in most jurisdictions, an unliquidated cause of action to recover for personal injuries may not be assigned, unless the assignment of such a cause of action is authorized by statute.") (citations omitted); 6 AM. JUR. 2D Assignments § 55 ("A right of action for a tort that causes a strictly personal injury, and that does not survive the death of the person injured, is not assignable.") (citations omitted).  Moreover, its insider votes would not have counted under 11 U.S.C. § 1129(a)(10).  See In re Applegate Prop., Ltd., 133 B.R. 827, 833 (Bankr. W.D. Tex. 1991) (holding claims acquired by insider from non-insider cannot be counted under § 1129(a)(10)).  The creation of the subclass of Settling Claimants effectively bypassed both limitations.

13533, 2003 WL 23861928, at *60 (Bankr. S.D.N.Y. Oct. 31, 2003) ("Any enhanced value received by holders of Class 6B Claims on account of contributions from other Classes is not a treatment of these Claims under the plan and does not constitute unfair discrimination.")  Here, Pfizer simply paid cash to the Settling Claimants, a subclass, outside of a Quigley plan, and promised a second payment if any Quigley plan was confirmed.  The payments came from Pfizer, not Quigley, and were not "gifts" of its collateral to a class of creditors.

Furthermore, a plan based on a lockup agreement that secures an advantage for insiders at the expense of the creditors is not one proposed in good faith.  See In re Bush Indus., Inc., 315 B.R. 292, 307–08 (Bankr. W.D.N.Y. 2004).  The global strategy was designed to free Pfizer from derivative liability through a Quigley plan.  The Fourth Plan, if confirmed, will squeeze out the Non-Settling Claimants and Futures, stripping them of derivative claims against Pfizer[41] and limiting them to the projected 7.5% distribution from the Trust.

More significantly, Pfizer's argument ignores the "procuring" language in § 1126(e). "Procurement" refers to "[t]he act of getting or obtaining something or of bringing something about."  BLACK'S LAW DICTIONARY 1327 (9th ed. 2009); accord In re V & M Mgmt., Inc., 215 B.R. 895, 903 (Bankr. D. Mass. 1997) (relying on similar definition in earlier edition of Black's Law Dictionary to interpret "procured" as used in 11 U.S.C. § 1144); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1809 (1981) (defining "procure," inter alia, to mean "to get possession of," "to cause to happen or be done: bring about," and "to prevail upon to do something indicated.").  While an improper motive often results from an improper procurement, it is not necessary to classify the Settling Claimants' voting motive as wrongful; it is sufficient to

---

[41]     The Settling Claimants, or at least those that received the First Payment, have already waived all direct and derivative claims against the Pfizer Protected Parties without regard to confirmation.

conclude that rather than leave it to chance, Pfizer bought their votes for the purpose of obtaining the benefit of the channeling injunction. See In re Wiston XXIV, Ltd. P'ship, 153 B.R. 322, 326 (Bankr. D. Kan. 1993) (finding bad faith procurement and solicitation by mortgagee who, opposing the plan and seeking to foreclose, offered consideration to another creditor that was dependent on rejection of the plan); In re Featherworks Corp., 25 B.R. 634, 641 (Bankr. E.D.N.Y. 1982) (accepting vote by creditor who was paid $25,000 by plan funder to induce creditor to change its original rejecting vote was not "solicited, procured, or given in good faith" and "will not be allowed"), aff'd, 36 B.R. 460 (E.D.N.Y. 1984).

Accordingly, I conclude that the accepting votes cast on behalf of the Settling Claimants were procured in bad faith and will be designated. Without these votes, the Fourth Plan cannot be confirmed under any circumstances.

Conversely, Pfizer's cross-motion to designate the votes of the Non-Settling Claimants represented by the three members of the AHC lacks merit. Pfizer points to two pieces of evidence which, it contends, prove their improper voting motives. First, the AHC's counsel stated, among other things, "there wasn't enough money offered in settlement by Pfizer for my clients to be willing to accept it." (Pfizer Designation Response at 44.) Counsel's statement does not imply an ulterior motive; it explains why the AHC's clients refused to settle voluntarily with Pfizer outside of bankruptcy. It also explains why they voted against an involuntary settlement that Pfizer tried to foist on them through the Fourth Plan. The Non-Settling Claimants are being asked to surrender their derivative claims against Pfizer, claims they can pursue if the Fourth Plan is not confirmed. They are not inclined to give up what they view as a valuable right for what they view as a paltry contribution. It was Pfizer that interjected its derivative liability into the case when it embarked on its global strategy, and cannot complain if the Non-Settling

Claimants vote to reject it because the price they are being asked to pay for their distribution is too high.

Second, Pfizer argues that Perry Weitz, Esq. of Weitz & Luxenberg, a member of the AHC, rejected the plan in order to extract a larger settlement from Pfizer. (See Pfizer Designation Response at 44–45.) Although his statements come closer to proving an ulterior motive, there is no basis to impute his statements or intent to the other members of the AHC. To the contrary, John Cooney, a principal of Cooney & Conway, an AHC firm, testified credibly that the limited plan payout informed his vote. (Tr. 2489:16–17 ("My recommendation that they not vote in favor of a plan which would pay them 14,000 bucks.").) The votes of the Weitz clients in this regard were immaterial to the outcome. Weitz did not cast a Master Ballot. His clients voted by individual ballot. A total of 1,445 claimants voted individual ballots rejecting the Fourth Plan, and Weitz's voting clients comprise a subset of that number. (O'Rourke Report 70.) The record does not reflect the identity of the Weitz clients or how many voted against the Fourth Plan. Furthermore, the 1,445 rejecting votes made up approximately one-half of one percent of the total number of votes cast.

Accordingly, Pfizer's cross motion to designate the votes of the Settling Claimants that are represented by the AHC member firms is denied.

## B. Fair and Equitable

### 1. Introduction

Section 524(g) requires that a channeling injunction under the plan be "fair and equitable with respect to the persons that might subsequently assert . . . demands, in light of the benefits provided, or to be provided, to such trust on behalf of such debtor or debtors or such third party."

11 U.S.C. § 524(g)(4)(B)(ii).  Both the statute and legislative history are silent regarding what is

"fair and equitable."  Nevertheless, the phrase implies, at least where the trust does not propose

to pay 100%, that there must be a relationship between the benefits received and the

contributions made by the third-party that receives the benefit of the injunction.[42]  As the leading

bankruptcy treatise explained, "the court should afford [third parties] the protection of the

injunction only if they contribute to the trust <u>in amounts that are consistent</u> with their likely

liability . . . outside of bankruptcy."  4 COLLIER ON BANKRUPTCY ¶ 524.07[2], at 524–59 (16th

ed. 2010) (emphasis added).

### 2.    Pfizer's Likely Liability Outside of Bankruptcy

The determination of Pfizer's likely liability begins with consideration of Quigley's

likely liability.  Rabinovitz projected that, over the next forty-two years, more than 261,000

asbestos-related claims will be asserted against the Trust.  This reflects the universe of future

demands.  Rabinovitz estimated that these claims will total $4.449 billion, or $2.667 billion in

present value, under the FCR's assumed qualification rates.  (P3075 at 2.)

---

[42]    The AHC contends that the Court should also consider Pfizer's ability to pay more, citing <u>In re Congoleum Corp.</u>, 362 B.R. 167, 180 (Bankr. D.N.J. 2007).  There, the court expressed the need for evidence regarding the <u>debtor's</u> ability to contribute more to the Plan Trust.  This makes sense when a debtor offers to pay less than 100% of the future demands.  If the debtor is able to pay more but does not, the owners of its equity receive a corresponding benefit.  Consequently, there is "the inherent danger in any reorganization plan proposed by the debtor . . . that the plan will simply turn out to be too good a deal for the debtor's owners."  <u>Id.</u> at 181 (quoting <u>Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship</u>, 526 U.S. 434, 444 (1999) (explaining the reason for the "fair and equitable" requirement under 11 U.S.C. § 1129(b)).  It does not follow that a solvent third party such as Pfizer must pay more than 100% of its projected liability to receive the benefit of a channeling injunction just because Quigley is insolvent and cannot pay more.

Pfizer, for its part, analogizes the fair and equitable requirement to a consensual settlement in this case because it "is the result of intensive negotiations between Pfizer, Quigley and [Togut]," <u>Pfizer Brief</u> at 14, and contends that the Court should apply the same standard that governs the approval of settlements.  In the Second Circuit, the court must determine that a settlement does not fall "below the lowest point in the range of reasonableness."  <u>Cosoff v. Rodman (In re W.T. Grant Co.)</u>, 699 F.2d 599, 608 (2d Cir. 1983) (internal quotation marks and citation omitted), <u>cert. denied</u>, 464 U.S. 822 (1983).  While I decline to adopt the suggestion, I nevertheless agree that comparing the benefits and costs to Pfizer under the "fair and equitable" test does not mandate mathematical precision.  As shown in the succeeding text, the components of the "fair and equitable" test, particularly on the liability side, are often based on projections.

Between 1985 and the 2004 Petition Date, Pfizer paid over $1.2 billion in insurance proceeds to settle asbestos claims against itself and Quigley. Overall, 23% of these settlement costs were allocated to Pfizer and 77% were allocated to Quigley. (A4015 at 2; Tr. 295:19–298:22 (Berland).) Assuming the same overall allocation going forward, it would cost Pfizer approximately $613 million to settle the $2.667 billion in future claims—channeled to the Trust under the Fourth Plan—outside of bankruptcy. In other words, $613 million represents the measure of Pfizer's derivative liability to the Futures based on Quigley-related asbestos products.

At trial, Berland, former in-house counsel at Pfizer, insisted that Pfizer never paid anything to settle a Quigley derivative claim, implying that Pfizer's derivative liability to the Futures should be estimated at zero. (Tr. 231:3–8.) His trial testimony, however, directly contradicted his deposition testimony that the majority of the asbestos cases that Pfizer settled were based on exposure to Quigley products. (Tr. 293:15–294:2.) Nor could he satisfactorily explain why, during the twenty year span of 1985 through the 2004 Petition date, Pfizer would have paid over $311 million, (see A4015 at 2), to settle the admittedly miniscule number of Kilnoise cases.[43]

Other testimony and documentary evidence also contradicted Berland's trial testimony. John Cooney, whose firm is a member of the AHC, testified that his firm settled eighty-six cases with Pfizer and Quigley between 2001 and the 2004 Petition Date. (Tr. 2436:5–7.) Except for three cases involving Kilnoise, the liabilities his firm settled were based on the Quigley products

---

[43] At the onset of the case, Quigley sought a preliminary injunction to prevent plaintiffs from suing Pfizer and dissipating the remaining shared insurance. It represented that virtually all of the claims against Pfizer were based on Quigley products, (Reply In Support Of Quigley Company, Inc. Motion For Order Under 11 U.S.C. §§ 105(A) And 362(A) And Fed. R. Bankr. P. 7065 Confirming Application Of Automatic Stay And Granting Preliminary Injunction, dated Nov. 27, 2004, at 11 (Adv. Proc. No. 04-4262, ECF Doc. # 48)), and only "some miniscule portion . . . may be based on exposure to Pfizer products." (Id. at 12.)

Insulag or Panelag. (Tr. 2437:10–15; see, e.g., Tr. 2440:2–2442:17.) Cooney's firm settled with and released Quigley and Pfizer at the same time, (Tr. 2438:3–5), and, on each occasion, Pfizer and Quigley sent separate settlement checks, allocating 30% of the settlement to Pfizer and 70% to Quigley. (Tr. 2450:3–19.)

Accordingly, the Court concludes that the 23% historical allocation, or $613 million in present value, reflects a reasonable estimate of the probable costs that Pfizer would incur to settle its derivative liability to the Futures outside of bankruptcy and will avoid if a channeling injunction issues.[44]

### 3. Pfizer's Contribution

The value of Pfizer's contribution was the subject of substantial evidence at the confirmation trial. Each side offered expert testimony regarding the present value of the various components, which include cash, the Pfizer Annuity, other insurance, Quigley stock and Pfizer's forgiveness of its secured debt. Although the numbers changed between the time each expert issued his report and the time he testified, the following represents a summary of their positions:

| Item | Pfizer Contribution | Present Value (in millions of $) according to Karl Snow, Pfizer's Expert | Present Value (in millions of $) according to Israel Shaked, AHC's Expert |
|------|---------------------|------------------------------------------------------------------------|---------------------------------------------------------------------------|
| 1 | $50 million payment from Pfizer to Trust | 50 | 50 |
| 2 | $45.1 million 41-year Pfizer annuity | 13 | 14.7 |
| 3 | Quigley's relinquishment of its rights to the AIG Annuity | (79) | (256.4–321.5) |
| 4 | $405 million 40-year Pfizer annuity | 161 | 174.5 |

---

[44]     Berland testified that some portion of the 23% consisted of non-asbestos liability. (Tr. 298:23–299:4.) Berland did not, however, elaborate.

44

| | | | |
|---|---|---|---|
| 5 | Insurance Settlement Proceeds Trust | 42 | 0–9.6 |
| 6 | Insurance Relinquishment Agreement | 111–149 | 0–34.5 |
| 7 | Reorganized Quigley common stock | 6.5 | 3.8 |
| 8 | Forgiveness of secured claim | 30 | 0 |
| | **Total Present Value of Pfizer Contribution** | **334.5–372.5** | **(78.5) – 30.7** |

### a. Cash (Items 1 and 2)

The experts agreed that the value of the cash payment on the Effective Date would be $50 million. (Item 1.) They disagreed slightly regarding the present value of the forty-one year annuity, (Item 2), but the difference is immaterial, and I will use an approximate intermediate value of $14 million.

### b. The AIG Annuity (Item 3)

There were material disagreements regarding the present value of the AIG Annuity, which is to be swapped for the Pfizer Annuity (Item 4). Because of the swap, it is necessary to compute Quigley's interest in the AIG Annuity to arrive at a net value that Pfizer will be contributing through the Pfizer Annuity.

The AIG Annuity is a ten year, $405 million annuity that AIG began paying in September 2004. It consists of three bundles (see A4546 at 68 (Expert Report of Professor Israel Shaked, dated April 15, 2009 ("Shaked Report"))):

| Item | Component | Nominal Value ($) |
|---|---|---|
| 1 | Amount available solely to Pfizer | 81,149,371 |
| 2 | Amount available solely to Quigley | 40,620,245 |
| 3 | Amount available to both Pfizer and Quigley | 283,977,240 |
| | **Total** | **405,746,856** |

The approximate $81 million available solely to Pfizer consists of products liability and asbestos insurance coverage insurance and a Pfizer receivable.  The experts agree that Quigley has no rights in these amounts.

The approximate $40.6 million available solely to Quigley reflects an outstanding receivable.  The experts disagreed over its present value.  Karl Snow, Pfizer's expert, thought it was worth $43 million, reflecting that AIG had already funded almost one-half of the AIG Annuity, and the funds had earned interest.  (Updated Snow Report at 32.)  Israel Shaked, the AHC expert, valued the Quigley-only portion at slightly more than $39 million.  (Shaked Report at 65.)

The difference relates to the discount rates used by the experts.  Shaked used the yield-to-maturity on a Pfizer debt of similar time of maturity, and derived a discount rate of 3.61%.  (Shaked Report at 10.)  Snow criticized Shaked, stating that it was inappropriate to use the Pfizer debt as a baseline because the rate should reflect the risk associated with the ability to pay the obligation.  The obligor is AIG; the appropriate rate is the one associated with AIG debt.  Furthermore, it was inappropriate to use corporate bond rates to determine the present value of an annuity.  Snow could not locate the information regarding the rate on the appropriate AIG debt, and substituted the spot rates associated with U.S. Treasury STRIPS.  (Updated Snow Report at 12–14.)  Acknowledging that such rates are lower than the corporate bond and annuity rates, (see id. at 13), Snow's analysis generated a "conservatively high estimate" of the present value of Quigley's claim.  (Id. at 14.)

If Shaked's estimate was too low, Snow's was admittedly too high. The present value falls somewhere between. Accordingly, I will select the midpoint, and find that the present value of the Quigley-only portion of the AIG Annuity is $41 million.

The balance of roughly $284 million reflects amounts available to Pfizer and Quigley on a "first-billed-first-paid" basis. (Updated Snow Report at 11.) The parties have identified two issues: the present value and the allocation as between Pfizer and Quigley.

### i.    Present Value

Shaked ascribed a present value of $274,987,649, (Shaked Report at 65), that I will round up to $275 million. Snow appraised the present value at $282,454,051 (Updated Snow Report at 33), which he rounded to $282 million. (See id. at 15.) Snow again criticized Shaked's use of Pfizer's corporate bond rate with a different time profile, opting to use U.S. Treasury STRIPS to calculate the discount rate. (Updated Snow Report at 15.) For the reasons discussed with the Quigley-only portion, I will select the intermediate amount, and find that the present value of the shared portion of the AIG Annuity is $278.5 million.

### ii.    Allocation

The bigger dispute concerned the appropriate allocation of the shared portion of the AIG Annuity. Shaked concluded, in the main, that Pfizer was not entitled to an allocation of any portion of the shared annuity, and Quigley was entitled to 100% of the allocation, based upon AHC's counsel's interpretation of In re Congoleum Corp., 362 B.R. 167 (Bankr. D.N.J. 2007). (Shaked Report at 11.) Alternatively, if one assumed that Pfizer is entitled to an allocation, it

should be limited to 23%, the amount that Pfizer would be expected to draw based on its historical share of the Pfizer/Quigley settlements. [45] (Id. at 7.)

Snow opted for a modified version of Shaked's alternative position. As noted, the AIG Annuity is payable to Pfizer and Quigley on a "first-billed-first-paid" basis. According to Snow, Pfizer has $418 million of unbilled claims in its backlog, and Quigley has $36 million. (Updated Snow Report at 16.) The $418 million appears to represent Pfizer's liability for the First and Second Payments under the Pfizer Settlement Agreements. According to Snow, in the absence of bankruptcy, Quigley could immediately bill $36 million and Pfizer could immediately bill $418 million to available shared insurance. (Id.) After allocating the first $36 million to Quigley, Snow concluded that the balance of the AIG Annuity would be used to satisfy the Pfizer claims, (id.), leaving an unbilled balance that Pfizer could bill to the other shared insurance discussed below.

I reject both experts' allocation testimony. First, the allocation dispute does not require or benefit from expertise in valuation. Rather, Shaked made an assumption of law and Snow made one of fact, and both assumptions were wrong.

Shaked's allocation testimony relied on the decision in In re Congoleum Corp., 362 B.R. 167 (Bankr. D.N.J. 2007). There, certain insurers filed summary judgment motions urging the court to deny confirmation under § 524(g). The plan provided that ABI, the debtor's non-debtor

---

[45]     Berland testified that Pfizer has between $125 million and $130 million in non-asbestos liability claims that are ready to be billed against available joint insurance. (Tr. 2708:7–14.) He implied that this amount should be deducted from available joint insurance before allocating the balance. I reject the implication. Berland did not provide any detail, and the experts may have already taken these claims into account in computing Pfizer's contribution to the Trust. Of the $81 million in Pfizer-only coverage under the AIG Annuity that all sides agree is not being contributed to the Trust, $75 million relates to Pfizer-only products liability coverage. (P3000 at 3.) In addition, Pfizer's expert, Dr. Snow, never suggested that Pfizer could immediately bill an additional $125 million to $130 million in claims against the shared insurance.

parent, would contribute equity, $250,000 in cash and its rights under its insurance policies, and in exchange, would receive the protection of the channeling injunction. The court concluded that the contribution of insurance did not add value to the trust because all of the derivative claims would be channeled to the trust and there would be no future defense costs to ABI. Id. at 181.

I take a different approach to the "fair and equitable" determination, and reach a different conclusion. As discussed, the third-party must contribute amounts consistent with its likely liability, at least where the plan will pay less than 100% of the scheduled amount of the asbestos claims. If I count the claims against Pfizer on the liability side of the equation, I must count the amount of the insurance Pfizer is contributing on the contribution side. In this manner, Pfizer will be using the same insurance to discharge the same liabilities under the Fourth Plan that it would outside of bankruptcy. Furthermore, unlike ABI, Pfizer has substantial claims to bill against all of the shared insurance, to wit $209 million in First Payments. If the Fourth Plan is confirmed, Pfizer will have no insurance to look to for indemnification.[46]

Snow's allocation testimony, on the other hand, erroneously assumed that Pfizer could immediately bill the First and Second Payments aggregating $418 million to the shared insurance. However, if the Fourth Plan is not confirmed, Pfizer will never have to make the Second Payment. Furthermore, since the Settling Claimants released Pfizer as a condition to receiving the First Payment, Pfizer will not face any further liability to them even if the Fourth Plan is not confirmed. Consequently, Pfizer's immediately billable claims will not exhaust the shared portion of the AIG Annuity (or reach the other shared insurance discussed below). After

---

[46] Shaked also applied his Congoleum theory inconsistently. Like Pfizer, Quigley should not receive any allocation of the shared insurance because the Fourth Plan will also free Quigley from all present and future asbestos liabilities.

deducting the $36 million and $209 million, respectively, that Quigley and Pfizer can now bill, $33.5 million of shared insurance will remain that should be allocated to Pfizer and Quigley consistent with their historic apportionment of settlements—$7.7 million to Pfizer and $25.8 million to Quigley.

The present value of Quigley's interest in the AIG Annuity can now be computed. It consists of three parts: the Quigley-only portion ($41 million), the portion of the shared insurance that Quigley could immediately bill ($36 million), and its allocable share of the future billings ($25.8 million). These components total $102.8 million.

### c. The Pfizer Annuity (Item 4)

The Pfizer Annuity in the nominal amount of $405 million is payable in forty annual installments. Snow opined that the present value of the Pfizer Annuity on the Effective Date will be $161,484,381, (Updated Snow Report at 34), which he rounded to $161 million. (Id. at 21.) Shaked initially valued the Pfizer Annuity at $154.9 million, (Shaked Report at 12), but when he testified at trial in December 2009, nearly eight months after the date of his report, he valued the Pfizer Annuity at $174.5. (Tr. 2582:15–17.) He did not explain the reason for the increased value, but since the higher number is adverse to AHC's position in the case, I will use Shaked's more recent estimate. Accordingly, I conclude that the net value of the contribution of the Pfizer Annuity is $71.7 million ($174.5 million minus $102.8 million). This sum represents the ultimate benefit to the Trust and the detriment to Pfizer of swapping the AIG Annuity for the Pfizer Annuity.

### d. The Other Insurance

#### i. The Insurance Settlement Proceeds Trust (Item 5)

The Insurance Settlement Proceeds Trust was projected to include $41,650,114 as of November 1, 2009, exclusive of the AIG Annuity payments. (See Updated Liquidation Analysis at 2.) Using the same historic allocation formula, I attribute 23% of that amount, or roughly $9.6 million, to Pfizer as its contribution.

#### ii. The Insurance Relinquishment Agreement (Item 6)

The Insurance Relinquishment Agreement disposes of Pfizer's and Quigley's respective rights in certain shared asbestos insurance policies and insurance settlement agreements. (Fifth Disclosure Statement at 66; Updated Snow Report at 23.) The Fourth Plan valued these rights in the amount of $182,866,205, as of March 2008. (Fifth Disclosure Statement at 155 (Ex. H).) Both experts relied on this valuation in rendering their opinions. (Shaked Report at 6–7; see Updated Snow Report at 23.) According to the revised Liquidation Analysis prepared by Quigley on or about September 11, 2009, the value was reduced to $149,199,507, (Updated Liquidation Analysis at 2; see Updated Snow Report at 23), which is rounded to $149.2 million. The updated figure presumably reflects an additional eighteen months of collections deposited in the Insurance Settlement Proceeds Trust and a corresponding decrease in insurance availability.

Snow relied on the revised number in his updated report. (Updated Snow Report at 23.) Shaked did not revise his report, but apparently used the revised figure during his testimony. (See Tr. 2583:22–2584:4.) Pfizer's allocated share of that value is $34.3 million, reflecting the value of its contribution under the Insurance Relinquishment Agreement.

### e.　Quigley Stock (Item 7)

Shaked ascribed a value of $6.6 million to Reorganized Quigley as of the Effective Date.[47]  (Shaked Report at 17.)  This included a 30% marketability discount.  (Id. at 80.)  Although he strongly disagreed with Shaked's analysis, Snow ultimately valued the Quigley stock at $6.5 million, essentially the same amount as Shaked.  (Updated Snow Report at 27–29.)  The difference between Shaked's $6.6 million value and Snow's $6.5 million value is immaterial, and I will adopt $6.6 million.

### f.　The Pfizer Lien (Item 8)

Shaked initially credited Pfizer's forgiveness of a $30 million secured claim as a contribution to the Trust.  (Shaked Report at 15.)  At trial, he appeared to change his testimony, because he deemed the forgiveness to be a contribution to Quigley rather than the Trust.  (Tr. 2578:15–20.)  Snow agreed with Shaked's original conclusion, and also valued this aspect of the Pfizer contribution at $30 million.  (Updated Snow Report at 26.)  Prior to trial, Pfizer's counsel stated that Pfizer agreed to relinquish its entire secured claim of roughly $76 million, but Quigley did not modify the Fourth Plan, and Snow continued to use the $30 million figure as the measure of this component of its contribution.  (Tr. 1766:1–4.)

Pfizer's waiver of its secured claim confers a corresponding benefit on the Trust.  Under the prepetition Credit and Security Agreement, Quigley granted Pfizer a security interest, inter alia, in its right to payment under the asbestos liability insurance policies.  (J446 at 4–5, § 6(a).)  As of the Petition Date, Pfizer held a secured claim of roughly $46 million.  (J233 at 2, ¶ 2.)  In

---

[47]　At trial, Shaked lowered his estimate to $3.8 million for the Reorganized Quigley stock.  (See Tr. 2620:8–14.)  In the absence of a supplemental report and an adequate explanation for the change, I do not credit the testimony.

contemplation of the bankruptcy filing, Quigley and Pfizer executed an Amendment No. 3 to the

Credit and Security Agreement that provided financing and allowed Quigley to use Pfizer's cash

collateral.  (See id. at 28–36 (Ex. A).)  The Amendment granted Pfizer a priming lien in the same

assets.  (See id. at 31–33, § 4(a).)  The Court approved the proposed financing and use of cash

collateral.48

Accordingly, Pfizer holds a security interest in the insurance rights and receivables that

Quigley will be contributing to the Trust.  Since Quigley's share of the insurance exceeds

Pfizer's secured claim, Pfizer is fully secured.  But for its waiver, Pfizer could pursue its lien

against the assets that Quigley is contributing to the Trust, and reduce the amounts available to

the Trust to pay claims.  Despite counsel's representations, Snow continued to value it at $30

million—the amount of the waiver continued in the Fourth Plan.  Accordingly, the Court finds

that the value of the lien waiver is $30 million.

### 4.      Recapitulation and Conclusion

Based on the forgoing, the present value of Pfizer's contribution to the Trust under the

Fourth Plan is $216.2 million, broken down as follows:

| Item | Pfizer Contribution | Present Value (in millions of $) |
|---|---|---|
| 1 | $50 million payment from Pfizer to Trust | 50.0 |
| 2 | $45.1 million 41-year Pfizer annuity | 14.0 |
| 3 | Quigley's relinquishment of its rights to the AIG Annuity | (102.8) |

---

[48]      Final Order: (I) Authorizing Postpetition Financing; (II) Granting Security Interests and Superpriority Administrative Expense Status; (III) Authorizing Quigley Company, Inc. to Enter into Financing Agreements; (IV) Further Authorizing the Use Of Cash Collateral; (V) Granting Replacement Liens and Rights to Adequate Protection; and (VI) Modifying the Automatic Stay, dated Sept. 27, 2004.  (ECF Doc. # 69).

| 4 | $405 million 40-year Pfizer annuity | 174.5 |
| 5 | Insurance Settlement Proceeds Trust | 9.6 |
| 6 | Insurance Relinquishment Agreement | 34.3 |
| 7 | Reorganized Quigley common stock | 6.6 |
| 8 | Forgiveness of secured claim | 30.0 |
| | **Total Present Value to Trust of Pfizer Contribution** | **216.2** |

This contribution is substantially less than the benefit that Pfizer will realize from the channeling injunction. Furthermore, Pfizer's contribution is overstated. The "fair and equitable" test focuses on the Futures, and the $613 million benefit that Pfizer will receive through the channeling injunction is based on Pfizer's estimated liability to the Futures. But Pfizer's contribution is being offered to pay both existing claimants as well as Futures.

The projected future demands represent approximately 68% of the projected claims against the Trust, or roughly twice the amount of the current claims. Accordingly, only about $147 million of Pfizer's total contribution will reach the Futures. This represents less than 25% of the benefit that Pfizer will receive, and is not "fair and equitable."

## C.      Reorganized Quigley's Viability

Quigley's post-confirmation business implicates at least three separate provisions of the Bankruptcy Code—the "funding" requirement under § 524(g)(2)(b)(i)(II), the feasibility requirement under § 1129(a)(11) and the discharge provisions under § 1141(d)(3). The parties have focused on the first two and ignored the third. In any event, the Fourth Plan is not a liquidating plan, and Quigley would be entitled to a discharge under § 1141(d) if it is confirmed. Accordingly, I turn to the two provisions in dispute.

### 1.	The Funding Requirement

Section 524(g)(2)(b)(i)(II) requires the trust to "be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends."  11 U.S.C. § 524(g)(2)(b)(i)(II) (the "Funding Requirement").  In dicta, the Combustion Engineering Court stated the provision implied "that the reorganized debtor must be a going concern, such that it is able to make future payments into the trust to provide an 'evergreen' funding source for future asbestos claimants."[49] In re Combustion Eng'g, 391 F.3d at 248.  The Court observed that that debtor's post-confirmation business operations would be minimal; it would own an environmentally contaminated piece of real estate and engage in related lease activities.  It would have no employees, products or services, and would maintain a cash neutral position.  Id.  It suggested, again in dicta, that it was "debatable" whether the reorganized debtor could satisfy § 524(g)(2)(b)(i)(II).  Id.  The AHC argues that Quigley has similarly failed to demonstrate that it the post-confirmation CHU will satisfy the "ongoing business" requirement.

The starting point for the construction of any statute is the plain language of the statute itself.  United States v. Ron Pair Enters., 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (internal citation omitted).  The provision imposes two funding requirements or sources: the securities of the debtor and the obligation of the debtor to make future payments, including dividends.

---

[49]	See 140 Cong. Rec. S4521-01, S4523 (Apr. 20, 1994) (statement of Senator Heflin) ("[W]hen an asbestos-producing company goes into bankruptcy and is faced with present and future asbestos-related claims, the bankruptcy court can set up a trust to pay the victims. The underlying company funds the trust with securities and the company remains viable. Thus, the company continues to generate assets to pay claims today and into the future. In essence, the reorganized company becomes the goose that lays the golden egg by remaining a viable operation and maximizing the trust's assets to pay claims.")  (footnote 69 in original).

The two requirements can be conflated. The term "security" includes both debt and equity, 11 U.S.C. § 101(49), and a debtor could satisfy the funding requirement by delivering a debt instrument obligating it to make future payments to the trust. Similarly, even profitable corporations are not ordinarily "obligated" to pay dividends, but the transfer of the debtor's equity to the trust would allow the trust to declare dividends and use the dividends to fund the trust. The statute nevertheless implies an ability to make payments into the future—an "evergreen" source of funding—and this is what the Third Circuit in Combustion Engineering undoubtedly meant when it referred to an "ongoing business" requirement. Cf. In re Johns-Manville Corp., 68 B.R. 618, 621–22 (Bankr. S.D.N.Y. 1986) (emphasizing that the call on dividends, a future obligation, gave the trust an "'evergreen' source of funding.").

The more difficult questions surround the provision's silence regarding the amount and duration of the funding obligation. The trust need only be "funded in part" by the obligation of the debtor. Does this imply that the debtor can simply agree to make relatively small payments? Furthermore, asbestos trusts can last for forty years.[50] Must the debtor incur an obligation co-extensive with the duration of the trust and then demonstrate its (or another's) ability to meet that obligation? A debtor would be hard-pressed to produce credible forty-year income projections. Moreover, a broad interpretation that imposes an ongoing business requirement could transform the funding requirement into a feasibility test, duplicating the requirement imposed under 11 U.S.C. § 1129(a)(11).

---

[50]    Here, the Fourth Plan states that the Trust will terminate ninety days after either (1) the Trustees decide to terminate the Trust because they deem it unlikely that any new asbestos claims will be filed and the Trust has paid all outstanding claims; (2) the Trustees create an agreement with third parties adequate to discharge all expected remaining obligations and expenses and the Court approves; (3) or, if any rule against perpetuities applies to the Trust, twenty-one years less ninety-one days after the death of the last survivor of all currently living descendants of the late Joseph P. Kennedy, Sr. of Massachusetts, father of the late President John F. Kennedy. (Fourth Plan at 21.) Rabinovitz predicted that new claims would continue to be filed until 2052. (Fifth Disclosure Statement, Ex. I at 3–4.)

Here, the Court reads § 524(g)(2)(b)(i)(II) narrowly, and concludes that the Fourth Plan satisfies the funding requirements. Pfizer will transfer its equity in Quigley to the Trust. The evidence showed that Reorganized Quigley will operate profitably during the five year life of the Pfizer Claims Services Agreement, and generate excess income which, at the Trustees' option, can be used to fund the Trust "in part." Instead, the problem that Quigley faces involves feasibility -- what is likely to happen after the expiration of the Pfizer Claims Services Agreement with Pfizer. It is to this topic I now turn.

### 2.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires the plan proponent to prove that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." The plan must be workable and stand a reasonable likelihood of success. Kane v. Johns-Manville Corp., 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); Leslie Fay, 207 B.R. at 788 ("The court must find that the plan is workable and has a reasonable likelihood of success."). "To establish feasibility, the debtor must present proof through reasonable projections, which are not speculative, conjectural or unrealistic, that there will be sufficient cash flow to fund the plan and maintain operations." Leslie Fay, 207 B.R. at 789; accord In re Repurchase Corp., 332 B.R. 336, 343 (Bankr. N.D. Ill. 2005) ("Confirmation should neither be based on speculation nor the visionary projections of a debtor's champion."); In re Prudential Energy Co., 58 B.R. 857, 862–63 (Bankr. S.D.N.Y. 1986) ("[A] plan based on impractical or visionary expectations cannot be confirmed. . . . [The president] testified that he had continuing

contact with prospective investors. But that unsubstantiated and optimistic testimony hardly rises to the level of orders in hand.").

Although Quigley will remain viable and profitable for the five years that it operates under the Pfizer Claims Services Agreement, Quigley's prospects after five years are less certain.[51] According to Thomas W. Britven, a Quigley expert called to opine on its post-confirmation viability, Quigley must attract new customers to remain viable after the five-year Pfizer Claims Services Agreement terminates. (Tr. 1733:21–1734:6.) Quigley's president Kim Jenkins agreed, (Tr. 1578:19–25), as did Quigley director Charles Raeburn. (Tr. 2288:10–19.)

Although Quigley witnesses testified at trial about Quigley's business plan and its ability to attract new business, its business plan was speculative at best and visionary at worst. With one exception, and despite marketing efforts, Quigley has failed to attract any new business since the Petition Date.[52] (See Fifth Disclosure Statement at 6.) Jenkins attributed this lack of success to the uncertainty surrounding the bankruptcy and the concerns of prospective clients that their information will remain confidential, especially from the plaintiffs' bar. (Tr. 1470:6–23, 1574:25–1576:19 (Jenkins).)

The removal of the perceived obstacle of bankruptcy does not automatically translate into better business prospects because the problem may not be Quigley's bankruptcy. There was no credible evidence of a viable market that will absorb Quigley's proposed claims handling

---

[51]     During the same period, Quigley will be processing claims for the Trust. No evidence suggested that this presented the opportunity for a viable standalone business.

[52]     The one exception was American Optical. Quigley processed 4600 claims for American Optical between December 2004 and the middle of 2005, and was paid by Pfizer. (Tr. 1469:8–21.)

services; in fact, there is evidence to the contrary.[53]  Aside from Quigley, no other company has

entered the market for several years.  (Tr. 1581:25–1582:15 (Jenkins).)  Moreover, Quigley's

former chairman, Paul Street, had advised the Quigley board at an April 18, 2005 meeting that

Quigley "will be unable to develop a profitable business processing claims for third parties

because of the highly competitive nature of the industry."[54]  (J229 at 3; see Tr. 979:15–21.)  His

view derived from discussions with third-party vendors who were trying to find customers for

their claims handling services.  (Tr. 980:3–21.)[55]

Furthermore, the trial evidence indicated that the asbestos claims handling business may

have peaked, and be winding down.  By 2001, many of the "front-line" asbestos defendants, the

major producers of asbestos products, had filed for bankruptcy.  (Tr. 219:17–20 (Berland).)

Their claims work is presumably dealt with in accordance with previously confirmed plans.  In

addition, Rabinovitz projected that the future claims against the Trust would decline

precipitously after the first few years following confirmation.  (Fifth Disclosure Statement, Ex. I

at 3–4.)  While numerous unresolved claims may still exist against other debtors, potential

---

[53]     Jenkins originally testified that post-confirmation, Quigley intends to process only asbestos claims.  (Tr. 1574:22–24.)  She subsequently testified that Quigley would seek non-asbestos work as well.  (Tr. 2271:1–4.)  My analysis and conclusions do not change because there is no evidence of a viable market in handling non-asbestos claims.

[54]     Scott Ratner, Esq., one of Togut's lawyers, expressed similar concerns.  In a March 29, 2007 email to Pfizer attorney Deborah Greenspan, Esq., he questioned why the Trust did not outsource the claims processing function to a third-party processor rather than retain Quigley.  He believed that it would be objectively cheaper from the Trust's perspective and would remove substantial uncertainties regarding possible operating losses at the Quigley level that the Trust will have to subsidize as the owner of Reorganized Quigley.  (A4047a.)  He suggested the only reason for the proposed claims handling business was that "Reorganized Quigley must have some business when it emerges from Chapter 11 so as to enable Pfizer to benefit from [a] channeling injunction issued pursuant to section 524(g)."  (Id.)

[55]     He retreated from this position at trial, testifying that the market had changed during the ensuing three years.  He nevertheless conceded that the prospects for new business were still "uncertain," and he "couldn't be sure."  (Tr. 980:22–981:5.)  His opinion changed because single-company asbestos trusts that had initially sought to branch out and do third-party claims work were considering outsourcing their own work rather than trying to find new work.  (Tr. 981:6–982:1.)  The withdrawal from the claims handling business and the decision to outsource also implies that the market has dried up and the cost of doing one's own claims handling is uneconomical.

debtors and non-debtors, the evidence does not support an inference that the flow of unresolved claims will continue unabated into the future and provide substantially more work for the existing vendors or new entrants into the field.

Finally, I give no weight to Britven's conclusions regarding the availability of third-party claims handling work after confirmation. First, his conclusions were based primarily on what Jenkins told him. Second, his conclusions were also based on his examination of the business model and structure of six privately-held companies of which little or no public information was available.

In conclusion, Quigley failed to prove that its plan is feasible, or more generally, that it satisfied 11 U.S.C. § 1129(a)(11). Once the Pfizer Claims Services Agreement expires, Quigley will not have sufficient business to continue operating, and in all likelihood, will need to seek further bankruptcy relief.

## D.    Best Interest of Creditors

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part, that the Court "shall confirm a plan only if" each creditor in an impaired class "(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." (Emphasis added.) While the "fair and equitable" test under § 524(g) protects the Futures, § 1129(a)(7) is designed to protect individual dissenting members of an impaired, accepting class, establishing the minimum that they must receive or retain under the plan. Kane v. Johns-Manville Corp., 843 F.2d at 649 ("Subsection 1129(a)(7) incorporates the former 'best interest of

creditors' test and requires a finding that each holder of a claim or interest either has accepted the plan or has received no less under the plan than what he would have received in a Chapter 7 liquidation.").

In the usual case, this requires a comparison between the distributions under the plan and in a hypothetical chapter case. The comparison is not always straightforward. At times, a Code provision that affects the amount available for distribution applies under one chapter but not the other. For example, the trustee of an insolvent chapter 7 partnership may sue the general partners to recover any deficiencies. See 11 U.S.C. § 723(a). The trustee in a chapter 11 partnership case does not have this right. The "best interest of creditors" test in a partnership chapter 11 case must estimate the probable collection from the general partners because these additional assets would be available to pay creditors in a hypothetical chapter 7 case. See 7 COLLIER ON BANKRUPTCY ¶ 1129.02[7][c][iv], at 1129–38.

At other times, a Code provision may affect the amount of a creditor's claim under one chapter but not the other, altering the distribution to the remaining creditors. With certain exceptions, 11 U.S.C. § 1111(b)(1) gives a secured creditor in chapter 11 an unsecured deficiency claim whether or not the creditor has recourse under non-bankruptcy law. Chapter 7 does not provide a non-recourse creditor with recourse, i.e., the creditor does not get the unsecured deficiency claim. The absence of a deficiency claim in chapter 7 can dramatically affect the distribution to the other unsecured creditors in chapter 7 and must be factored into the "best interest" test.

Different priority rules can have a similar effect. Penalty claims are statutorily subordinated to unsecured claims in chapter 7, see 11 U.S.C. § 726(a)(4), but there is no

comparable subordination of penalty claims under chapter 11.  Cf. United States v. Reorganized C F & I Fabricators of Utah, Inc., 518 U.S. 213, 228–29 (1996) (holding that bankruptcy court cannot equitably subordinate tax penalty claim based solely on its characteristic as a penalty). The distribution to the other unsecured creditors may be greater in chapter 7 where they do not have to share pari passu with the penalty claim.

In each of these examples, the comparison is between the distributions under the plan and the distributions to the dissenting creditor from the estate in a hypothetical chapter 7 case.  So limited, the same comparison in this case does not present any difficulty.  As a result of the Pfizer contribution to the Trust, the amount available for distribution to the Class 4 claimants under the Fourth Plan is certainly greater than the amount available to the same creditors from a hypothetical Quigley chapter 7 estate.  However, the "best interest" test is not limited to comparing distributions, i.e., the amounts that creditors will receive.  The express language of § 1129(a)(7) also requires me to consider the value of the property that each dissenting creditor will retain under the plan and in the hypothetical chapter 7.

Here, the Fourth Plan releases Pfizer from derivative liability; Pfizer would not receive a release in a hypothetical chapter 7 case.  This does not matter to any Settling Claimants that did not accept the Fourth Plan.  They already released their rights against Pfizer other than those granted under the Pfizer Settlement Agreements.  However, the confirmation of the Fourth Plan and discharge of Pfizer will affect the dissenting Non-Settling Claimants because they would "retain" their right to sue Pfizer if Quigley were liquidated under chapter 7.  As the parties recognize, the critical question is whether I should consider the value of these derivative claims in deciding whether the Fourth Plan is in the "best interest" of the dissenting Non-Settling Claimants.

I conclude that I must.  See Mercury Capital Corp. v. Milford Conn. Assocs., L.P., 354

B.R. 1, 9 (D. Conn. 2006) (remanding to bankruptcy court to consider whether extinguishment of

third-party guarantees under plan violates the "best interest" test):[56]

> In a Chapter 7 liquidation proceeding, creditors retain their rights to pursue non-debtors for full payment, because there is no reorganization to protect by providing non-debtor releases. Thus, giving at least liquidation value to each creditor requires protection of the Chapter 7 right to pursue non-debtor actions. The lopsided view of creditor equality, which sanctions confiscation of these non-debtor rights in Chapter 11 through non-debtor releases, ignores the creditors' Chapter 7 right to seek full satisfaction from non-debtors in gauging satisfaction of the best interests test—comparing a creditor's Chapter 11 distribution with a hypothetical Chapter 7 distribution, from the debtor only. Yet, the best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the plan is treating those non-debtor claims by release.

Ralph Brubaker, Bankruptcy Injunctions and Complex Litigation: A Critical Reappraisal of Non-

Debtor Releases in Chapter 11 Reorganizations, 1997 U. ILL. L. REV. 959, 992 (1997) (footnotes

omitted); accord Joshua M. Silverstein, Hiding in Plain View: A Neglected Supreme Court

Decision Resolves the Debate Over Non-Debtor Releases in Chapter 11 Reorganizations, 23

EMORY BANKR. DEV. J. 13, 76–77 (2006) ("In a chapter 7 proceeding, a creditor may recover any

deficiency from a solvent co-obligor if the liquidation distribution does not completely satisfy

the creditor's claim.  Therefore, since the dissenting creditor would receive payment in full on its

claim in a chapter 7 bankruptcy from either the debtor, the co-obligor, or a combination of the

two, the dissenting creditor must receive full payment under the debtor's chapter 11 plan of

reorganization if the codebtor receives a release.  Otherwise, the plan violates the best-interests

test.") (footnotes omitted).

---

[56]       On remand, the bankruptcy court ruled that the plan was not feasible and did not address the "best interest" question.  See In re Milford Conn. Assocs., L.P., No. 04-30511 (ASD), 2008 WL 687266 (Bankr. D. Conn. Mar. 10, 2008).

Here, the derivative claims against Pfizer that the Non-Settling Claimants would retain in a hypothetical Quigley chapter 7 case satisfy the definition of "property," they have "value," and although they are unliquidated and disputed, they are neither speculative nor incapable of estimation. Furthermore, they presently exist and would exist at the time of any date selected for valuation in a hypothetical Quigley chapter 7. Cf. WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship), 227 B.R. 445, 451 (S.D.N.Y. 1998) ("The possibility of WHBA being able to commence foreclosure proceedings in the future and extinguish the API lease is immaterial to an inquiry under § 1129(a)(7), since the best interest of the creditors test only assesses the effective date of the plan."), aff'd, 198 F.3d 234 (2d Cir. 1999).

Once the derivative claims against Pfizer are factored into the equation, the Fourth Plan fails the "best interest" test. Under the Fourth Plan, the dissenting Non-Settling Claimants will receive an estimated 7.5% distribution on their allowed claims. Even if they would receive nothing in a hypothetical Quigley chapter 7 bankruptcy, they would retain their rights to pursue their derivative claims against Pfizer, which I estimate to be worth 23% of that same claim based upon what Pfizer historically paid to settle derivative claims.

The case law that has considered this issue is sparse, and the few contrary authorities are distinguishable. Some cite or analogize to the "best interest" test under chapter 13, see 11 U.S.C. § 1325(a)(4),[57] to suggest that the bankruptcy court should not consider rights against third parties that may be affected by the plan. See, e.g., In re Dow Corning Corp., 237 B.R. 380, 411

---

[57] Section 1325(a)(4) states in relevant part that "the court shall confirm a plan if . . . the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date."

(Bankr. E.D. Mich. 1999) ("A best-interests-of-creditors test that is almost identical to the one found in § 1129(a)(7) is contained in § 1325(a)(4). Courts construing this chapter 13 provision uniformly hold that amounts obtainable from other sources, such as guarantors, are irrelevant when performing that section's best-interest-of-creditors test."); see Post-Trial Brief and Conclusions of Law of Quigley Company, Inc. in Support of Confirmation of Chapter 11 Reorganization Plan Under 11 U.S.C. § 1129(a), dated Jan. 5, 2010, at 5 n.5 (discussing cases).

The chapter 13 provision, which is quoted in the margin, is different from the § 1129(a)(7) in one important respect. It is limited to a comparison of distributions, and as the Dow Corning court also observed, does not include the "retention" language in § 1129(a)(7). Dow Corning Corp., 237 B.R. at 412. The "best interest" test under chapter 11 requires the court to factor in the retained rights, and for the reasons stated, the Fourth Plan fails the "best interest" test.

### E.      Unequal Treatment

Section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Equality of treatment involves two facets: (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution. In re Quigley Co. Inc., 377 B.R. 110, 117 (Bankr. S.D.N.Y. 2007) ("Quigley II"); see In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986).

The Court previously dealt with both issues. When Quigley sought approval of its Fifth Amended Disclosure Statement, the AHC countered that the proposed plan violated the principle

of equality of treatment and was unconfirmable as a matter of law. It argued that (1) the Settling Claimants were receiving payments from Pfizer and the Trust, but the Non-Settling Claimants were receiving payments only from the Trust, and (2) Pfizer was paying the Settling Claimants to release their claims against Pfizer but the Non-Settling Claimants were not receiving a payment for their release of the Pfizer derivative claims. Quigley II, 377 B.R. at 115.

The Court rejected both arguments. The Court ruled that all claimants were receiving the same treatment under the plan through the Trust; the Pfizer payments were being made outside of the plan. Id. at 116–17. Furthermore, the Settling Claimants might be providing greater consideration than the Non-Settling Claimants through the release of their direct claims against Pfizer, claims that the Non-Settling Claimants would retain under any confirmed plan. Id. at 118. Finally, the Settling Claimants were assuming a risk that the Non-Settling Claimants had avoided. The releases granted under the Pfizer Settlement Agreements became effective no later than the delivery of the First Payment and did not depend on the confirmation of a plan or receipt of the Second Payment. Id. The Court concluded that "cannot determine as a matter of law that the non-settling PI Claimants are receiving unequal treatment in violation of 11 U.S.C. § 1123(a)(4)." Id. at 119 (emphasis added).

The AHC has renewed its unequal treatment argument post-trial. First, it contends that I mistakenly ignored Pfizer's third-party payments. (Pfizer Brief at 57–61.) In Quigley II, I interpreted the phrase "the plan shall . . . provide the same treatment" literally. I looked only to the treatment under the Fourth Plan, and consequently, did not consider payments outside under this provision of the Code. That determination is law of the case that I decline to reconsider.[58]

---

[58] According to the AHC, "[a]fter years of telling this Court that the settlement payments would be paid only from Pfizer assets, Pfizer now asserts that virtually all of the shared insurance should be considered Pfizer's

Whatever other provisions of the Code they implicate, the Pfizer payments do not constitute

"treatment" under the Fourth Plan within the meaning of § 1123(a)(4).[59]

Second, the AHC contends that the Non-Settling Claimants are being forced to pay

greater consideration for their 7.5% distribution. Here, the AHC stands on firmer ground. In

Quigley II, I noted that the Pfizer direct claims might have value, Quigley II, 377 B.R. at 118,

and expressed a reluctance to review the merits or value of the Pfizer direct claims that the

Settling Claimants had released but the Non-Settling Claimants were keeping. Id. at 118–19.

---

contribution because Pfizer could, but did not, reimburse itself from the insurance assets for the settlement payments." (Pfizer Brief at 60.) Both statements are correct, but not inconsistent. Pfizer did not and will not seek reimbursement from the shared insurance for the settlement payments, notwithstanding Pfizer's ownership of the policies and right to payment under them. Nevertheless, it is entitled to credit for its insurance contribution under the "fair and equitable" test for the reasons stated in the preceding text.

[59]     The AHC's contrary authorities are distinguishable. In Allegheny Int'l, 118 B.R. 282 (Bankr. W.D. Pa. 1990), the bankruptcy court observed that a tender offer made by a plan proponent caused discriminatory treatment in violation of § 1123(a)(4) because those who tendered received immediate cash while the plan paid similarly situated creditors over time. Id. at 295–96. Similarly, in Machne Menachem, Inc., 233 Fed. App'x 119, 2007 WL 1157015 (3d Cir. Apr. 19, 2007), the Court ruled that the purchase of certain claims by an insider for less than 100% resulted in unequal treatment under § 1123(a)(4) because the plan paid 100% to similarly situated creditors. With respect, "equal treatment" test does not mandate that creditors that assign their claims receive the same payment as non-assigning creditors who receive their distributions under a plan. In addition, ACC Bondholders Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337 (S.D.N.Y. 2007) is plainly inapposite; the plan itself involved different treatment depending on whether the creditor voted to accept or reject the plan. Id. at 362–64.

In re CGE Shattuck, LLC, 254 B.R. 5 (Bankr. D.N.H. 2000) presented an unusual twist on "gift" plans. The secured creditor (NCC) proposed a competing plan that included a separate commitment to make extra payments to certain designated unsecured creditors from its collateral. Id. at 8. It subsequently withdrew the plan, but not the separate commitment, which it made dependent on the granting of relief from the automatic stay or the conversion of the case to chapter 7. Id. NCC sought to include a disclosure about its commitment with the solicitation materials sent by the debtor and the co-proponent of the debtor's plan. The bankruptcy court refused to sanction the proposed disclosure, ruling that the commitment was a proxy for the withdrawn NCC plan and was designed to circumvent the protections of the chapter 11 plan process, including the equal treatment of creditors under § 1123(a)(4). Id. at 12–13.

The Pfizer Settlement Agreements are not de facto plans but private settlements between Pfizer and groups of asbestos claimants. If Pfizer had not made the Second Payment dependent on the confirmation of a Quigley plan, and even if the Settling Claimants had released Quigley, the Pfizer Settlement Agreements would nevertheless have caused the same "unequal treatment" of which the AHC complains; the Settling Claimants are receiving more from Pfizer than the Non-Settling Claimants are receiving under the Fourth Plan. But creditors frequently enter into settlements with co-obligors, and, in the end, may receive more than similarly situated creditors under a plan. Absent bad faith, vote manipulation, or similar wrongful conduct, these settlements do not violate the confirmation requirements.

The evidence at trial indicated that the Pfizer direct claims had little if any value—the vast majority of the asbestos claims are based on the exposure to Quigley products. Furthermore, the derivative claims have substantial value. Hence, the Non-Settling Claimants as a group are being compelled to give up their valuable derivative claims—which the Settling Claimants have already surrendered—to get the same 7.5% distribution.

This conclusion is simply the flipside of the earlier conclusion that the Fourth Plan violates the "best interest" test. The latter measured the "retention" value of the derivative claims in a hypothetical Quigley chapter 7. The "equal treatment" standard measures the value of the same derivative claim as the price of participation in the distribution from the Trust. Just as the retention of the derivative claim in a Quigley chapter 7 results in the violation of the "best interest" test, the compelled surrender of the derivative claim in a Quigley chapter 11 results in "unequal treatment" under 11 U.S.C. § 1123(a)(4).

**F.    Remaining Motions**

**1.    Shaked's Testimony and Report**

The Shaked Report, dated Apr. 15, 2009, addressed three principal areas: the value of Pfizer's contribution under the Fourth Plan, the amount of Pfizer's potential claim relief, and Quigley's liquidation value. Quigley's expert, Thomas Britven, also submitted an expert report on April 15, 2009, and in response, Shaked submitted a rebuttal report on May 7, 2009 (the "Rebuttal Report").

Quigley subsequently filed updated financial statements on September 3, 2009, (J47a), and an updated liquidation analysis on September 11, 2009 (J47b). By this time, discovery had closed. According to Quigley, the parties reopened discovery, and the AHC deposed three

witnesses (Berland, Jenkins and Douglas Charboneau, Quigley's controller and the draftsman of the updated financial statements) on September 15, 2010.  (See <u>Reply of Quigley Company, Inc. to Objection of Ad Hoc Committee of Tort Lawyers to Motion for Order Under Fed R. Bankr. P. 7026(e)(1) and (2), 7037(c)(1), 9014(c), and FRE 802 Partially Excluding Testimony, Illustrative Exhibits, and Expert Report of Doctor Israel Shaked</u>, dated Jan. 26, 2010, at ¶ 18 & n. 3)(ECF Doc. # 2029).)  Britven thereafter filed a supplemental report on September 21, 2009 to reflect the updated information published on September 3, 2009.

Shaked did not file an updated report.  During the trial, he nevertheless gave expert testimony, over Quigley's objection, which incorporated and relied on the updated financial information.  During his testimony, he used illustrative slides that also incorporated the new financial information.  One day after Shaked completed his testimony, the AHC moved into evidence Shaked's slides, the Shaked Report and the Rebuttal Report.  (Tr. 2831:12-16.) Quigley again objected.  The Court admitted the evidence subject to Quigley's post-trial briefing of the objection, (Tr. at 2549:22-2550:2, 2554:8-10; 2833:13-20), and Quigley followed up with a post-trial motion to exclude specific portions of Shaked's testimony, slides and reports.  <u>See Motion of Quigley Company, Inc. for Order Under Fed. R. Bankr. P. 7026(e)(1) and (2), 7037(c)(1), 9014(c), and FRE 802 Partially Excluding Testimony, Illustrative Exhibits, and Expert Report of Doctor Israel Shaked</u>, dated Jan. 5, 2010 ("<u>Exclusion Motion</u>").  (ECF Doc # 2024.)

Quigley's objection centered on two arguments. First, the portions of Shaked's testimony and slides that focused on the updated financial information[60] were inadmissible under Rules 7026(e)(1) and (2), 7037(c)(1) and 9014(c) of the Federal Rules of Bankruptcy Procedure because the AHC had failed to supplement Shaked's reports to reflect his new testimony. Quigley identified several objectionable portions of his testimony, (see Exclusion Motion at ¶¶ 8-9), which fell into three general categories: (1) Reorganized Quigley would not be viable, notwithstanding the Pfizer Claims Services Agreement; (2) Reorganized Quigley would not be able to attract new business; and (3) as of the Effective Date, the value of Reorganized Quigley's stock would be $3.8 million rather than his previous estimate of approximately $6.6 million.

Second, the portions of the Shaked Report that contained his liquidation analysis, (Shaked Report at 19-20, 100), were inadmissible hearsay under Rule 802 Federal Rule of Evidence; Shaked had failed to testify regarding his liquidation analysis at the trial. Furthermore, because the AHC sought to introduce it a day after Shaked left the stand, Quigley argued that it was unfairly denied the chance to cross-examine him as to its contents.

### a. New Information

Bankruptcy Rule 7026 makes Rule 26 of the Federal Rules of Civil Procedure applicable in adversary proceedings, and Bankruptcy Rule 9014(c) makes Bankruptcy Rule 7026 applicable in contested matters. Rule 26(e)(1)(A) of the Federal Rules of Civil Procedure requires a party to supplement a disclosure "in a timely manner if the party learns that in some material respect the [report] is incomplete or incorrect, and if the additional or corrective information has not

---

[60] Tr. 2543:18-20, 2544:10-2545:14, 2553:14-18, 21-2554:2, 2554:14-2555:4, 2555:13-2556:23, 2557:10-13, 2562:25-2564:5, 2565:12-2567:10, 2569:4-11, 2569:20-2570:7, 2620:8-2621:4, 2642:16-2643:13; Shaked Slides at 6-8, 10-14A, 16, 26.

otherwise been made known to the other parties during the discovery process or in writing."

Rule 26(e)(2), which applies to expert witnesses, provides that "the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition" and "[a]ny additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  Under Rule 37, which is made applicable to this contested matter through Rules 7037 and 9014(c) of the Federal Rules of Bankruptcy Procedure, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a hearing, or at trial, unless the failure was substantially justified or is harmless."

Rule 26(e)(1)(A), the general provision governing supplementation, does not apply.  The updated financial information was prepared by Charboneau and known to Quigley.  See 6 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 26.131[1], at 26-580 (3rd ed. 2010).  Nevertheless, the AHC should have supplemented Shaked's reports under Rule 26(e)(2) to include the updated financial information he relied on in forming the opinions to which he testified at trial.[61]  The updated financial information changed the information in Shaked's reports, and altered his expert opinion.  Furthermore, although discovery had closed before the updated financial information was issued, the parties reopened discovery by mutual consent to permit inquiry into the new information.

It does not follow, however, that the testimony and related evidence should be excluded under Rule 37.  When considering whether to exclude the evidence under Rule 37, the Court

---

[61] The AHC's reliance on Highland Capital Management, L.P. v. Schneider, 551 F. Supp. 2d 173 (S.D.N.Y. 2008) is misplaced.  It cited to the portion of the opinion that discussed the duty to supplement witness lists and not expert reports, as its parenthetical suggests.

must weigh four factors: "(1) the party's explanation for the failure to comply ..., (2) the importance of the testimony of the precluded witness, (3) the prejudice suffered by the opposing party ...; and (4) the possibility of a continuance." Softel, Inc. v. Dragon Medical and Scientific Communications, Inc., 118 F.3d 955, 961 (2d Cir.1997); accord Outley v. City of New York, 837 F.2d 587, 590 (2d Cir.1988).

Here, the AHC did not provide a satisfactory explanation for Shaked's failure to update his reports. The updated financial information was issued in September 2009, and Shaked testified in December. Moreover, Britven was able to supplement his report. This factor favors exclusion. On the other hand, neither side suggested the need for a continuance. In any event, the admission of Shaked's testimony did not prejudice Quigley, and was harmless, for the simple reason that Shaked's objectionable testimony was not accorded any weight by the Court. Although the Court concluded that Reorganized Quigley would not be viable after the termination of the Pfizer Claims Services Agreement, the conclusion was not based on Shaked's testimony. Rather, the Court relied on Britven's acknowledgment that Quigley could not survive without additional business and rejected Quigley's evidence, primarily Jenkins prediction, that Quigley would attract new business once the specter of bankruptcy was removed. Shaked was not an expert in the claims handling business, and the Court stated at trial that his testimony regarding Quigley's inability to attract new business was not entitled to any weight. (Tr. 2562:8-21.) Finally, the Court rejected Shaked's $3.8 million valuation of Quigley's common stock. Accordingly, the motion to strike Shaked's testimony and corresponding slides is denied.

      **b.**      **Shaked's Liquidation Analysis**

I reach a different conclusion with regard to Shaked's liquidation analysis. Although included in his initial report, he did not testify about it, and the AHC deprived Quigley of the

opportunity to cross-examine Shaked on this point. As a rule, expert reports are hearsay. Ake v. General Motors Corp., 942 F. Supp. 869, 878 (W.D.N.Y. 1996); Granite Partners, L.P. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 96 Civ. 7874(RWS), 2002 WL 826956, at *7 (S.D.N.Y. May 1, 2002). Nevertheless, Quigley only seeks to exclude the liquidation analysis in the Shaked Report, and the AHC's belated request for admission was prejudicial. Quigley raised the substance of this objection when the report was offered although it did not utter the word "hearsay," (see Tr. 2831:12-2833:17), and properly preserved it.

Furthermore, NAACP v. A.A. Arms, Inc., No. 99-CV-3999(JBW), 2003 WL 2003750 (E.D.N.Y. April 4, 2003) is not to the contrary. There, the parties moved in limine to exclude certain expert reports. The movants contended that the experts were scheduled to testify at trial, and the reports would be redundant. Id. 2003 WL 2003750 at *1. Judge Weinstein questioned the position apparently taken by the movants the reports were inadmissible hearsay in light of Rules 702 and 703 of the Federal Rules of Evidence. In addition, Judge Weinstein distinguished the cases cited by the movants on the grounds that they were decided before the 2000 amendments to these rules and the courts excluded the reports because the experts were scheduled to testify. Id. Judge Weinstein ultimately concluded that it could not rule out an expert report it had not yet seen, observing that the "[r]ulings will have to be made on a report by report basis as requested by the parties." Id.

Here, the motion is not one in limine that asks the Court to speculate on the contents of the Shaked Report or its redundancy. The portion of the report that Quigley seeks to exclude is not redundant because Shaked never testified about his liquidation analysis. Although the report might have proved helpful to the Court had he done so, it is unfair to credit Shaked's liquidation

analysis under the circumstances.[62]  Accordingly, this part of Quigley's Exclusion Motion is granted.

## 2.    The Sealing Motion

During the confirmation hearing, the Pfizer Settlement Agreements were received in evidence.  Many contained the type of personal identifying information about the claimants that would be subject to redaction under Federal Bankruptcy Rule 9037 if filed with the Court.  The Court directed the redaction of that information.  Other information allowed the reader to ascertain how much a Settling Law Firm received in settlement for each claimant with a specific impairment.  For example, one could tell by examining the Pfizer Settlement Agreements that Settling Law Firm A settled its mesothelioma cases for $100,000 each while Settling Law Firm B settled its mesothelioma cases for $200,000 each.  A particular agreement might also show that a Settling Law Firm settled the same impairment for different amounts, depending on the jurisdiction where the claimant resided.

Baron & Budd, P.C., a Settling Law Firm, filed the Sealing Motion at the conclusion of the trial, and other Settling Law Firms joined in or filed their own motions.  They contend that the Pfizer Settlement Agreements, as well as certain testimony derived from the information in those agreements, contain "confidential settlement information reflecting the settlement practices of Counsel for Tort Claimants and Pfizer, such as the settlement amounts for individual claimants."  (Sealing Motion ¶ 4.)  They maintain that the information is proprietary, (id.), and "[t]he release of the terms of the Settlement Agreements to the public potentially could prejudice

---

[62]     Even if the liquidation analysis were not excluded, it would not be entitled to weight.  Shaked ascribe a liquidation value of roughly $4.2 million to the claims that the Non-Settling Claimants and Futures would retain against Pfizer.  In other words, he assumed that Pfizer is 100% liable for Quigley's products.  As discussed in the preceding text, the Court valued Pfizer's liability at 23% of the historic settlement value of the asbestos claims.

Counsel for Tort Claimants' ongoing litigation and settlement discussions with other defendants." (<u>Id.</u> ¶ 7.) In addition, two firms argue that the settlement information is inadmissible under Rule 408 of the Federal Rules of Evidence.[63] (<u>Motion to Exclude Settlement Information of Maritime Claimants Settlement Agreements</u>, dated Dec. 21, 2009 (ECF Doc. # 1991); <u>Objection to Presentation of Settlement Information by Clients of the Law Offices of Peter T Nicholl</u>, filed Dec. 23, 2009)(ECF Doc. # 1996).) The United States Trustee and the AHC oppose the motions.[64]

Section 107(a) of the Bankruptcy Code provides that all papers "filed in a case under this title ... are public records and open to examination" by the public. 11 U.S.C. § 107(a). "This policy of open inspection, codified generally in § 107(a) of the Bankruptcy Code, evidences congress's strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings." <u>Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures</u>

---

[63]     Rule 408 (Compromise and Offers of Compromise) provides:

(a) Prohibited uses.--Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:

(1) furnishing or offering or promising to furnish--or accepting or offering or promising to accept-- a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses.--This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

[64]     <u>See</u> <u>Objection of the United States Trustee to Motions to Seal Certain Settlement Agreements</u>, dated Jan. 13, 2010 (ECF Doc. # 2014); <u>Omnibus Objection of the Ad Hoc Committee of Tort Victims to (I) Motion to Exclude Settlement Information of Maritime Claimants Settlement Agreements, (II) Motion of Baron & Budd, P.C. Pursuant to Section 107 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9018 to Seal Certain Settlement Agreements, and (III) Objection to Presentation of Settlement Information By the Clients of the Law Offices of Peter T. Nicholl</u>, dated Jan. 13, 2010 (ECF Doc. # 2015).)

Corp.), 21 F.3d 24, 26 (2d Cir. 2004); accord  In re Silicon Graphics, Inc., Case no. 06-10977, 2009 Bankr. LEXIS 1350, at *6 (Bankr. S.D.N.Y. Apr. 24, 2009) In re Food Mgmt. Group, LLC, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007).  Nevertheless, a limited exception to public disclosure may be invoked to protect "an entity with respect to a trade secret or confidential research, development or commercial information."  11 U.S.C. § 107(b)(1); accord FED. R. BANKR. P. 9018.  The "commercial information" exception protects parties from the release of information that could cause them harm or give competitors an unfair advantage.  Orion Pictures, 21 F.3d at 27; In re Global Crossing Ltd., 295 B.R. 720, 725 (Bankr. S.D.N.Y. 2003).  The moving party bears the burden of showing that the information is confidential.  Food Mgmt. Group, 359 B.R. at 561; In re Fibermark, Inc., 330 B.R. 480 (Bankr. D. Vt. 2005)

The sealing movants contend, in substance, that they will be placed at a competitive disadvantage if future tort defendants discover how much they accepted from Pfizer to settle a particular impairment.  They apparently fear that a future tort defendant will not offer $200,000 to settle a mesothelioma case if it knows that the Settling Law firm settled the same claim for $100,000 under the Pfizer Settlement Agreement.  In other words, the Settling Law Firm will lose leverage in future cases.

A similar argument was raised in Geltzer v. Andersen Worldwide, S.C., No. 05 Civ. 3339(GEL), 2007 WL 273526 (S.D.N.Y. Jan. 30, 2007).  There, the chapter 7 trustee sued the defendants for professional malpractice and other torts.  The trustee and the defendants eventually entered into a settlement agreement, and the trustee sought judicial approval of the settlement pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure.  The trustee's motion failed to disclose the amount of the settlement, contending that the information should remain confidential.  According to the trustee, the defendants no longer engaged in the

accounting profession – or any other profession.  Their business consisted primarily of settling lawsuits brought against them, and the settlement amount related directly to the conduct of their business.  Id. at 3.

The decision focused mainly on the Court's independent duty to judge the reasonableness of the settlement, but Judge Lynch also rejected the argument that the amount of the settlement was commercial information "in any normal sense of the words," id., or  that the defendants' "bargaining position" was commercial information that had to be protected:

> The only reason given by the Trustee for confidentiality is that "public disclosure of the Settlement Amount would enable other claimants against Andersen to determine how much Andersen is currently willing, and able, to pay in respect of the Trustee's claim, thereby potentially undercutting Andersen's negotiating leverage with such claimants."  (Eiseman Decl. ¶ 19.)  This is a wan excuse for impinging on the public's right of access to judicial documents.  There is no discernable public interest, or interest of the bankruptcy estates, in preserving Andersen's "leverage" as against other parties who have sued it.  Nor has the movant indicated any authority to support its implicit proposition that protecting the bargaining position of the defendant in other, unrelated cases, is even a proper consideration of a court being asked to approve a settlement in a given case.

Id. at 4; accord In re Northwest Airlines Corp., 363 B.R. 704, 708 & n.8 (Bankr. S.D.N.Y. 2007)(rejecting argument by ad hoc committee of equity security holders that its members should be relieved of disclosure obligations required under Federal Bankruptcy Rule 2019 because disclosure would reveal their investment strategies and damage their bargaining positions).

The sealing movants' concern about leverage in future settlement negotiations is similarly unworthy of protection under § 107(b)(1).  Their bargaining leverage in future unrelated cases is not "commercial information."  Furthermore, their expressed concern over their bargaining power is speculative, but even if it were not, countervailing considerations dictate the need for disclosure.  The Pfizer settlements were part of a strategy, conceived and

executed in bad faith, to manipulate the vote in this case. The Settling Claimants, represented by the Settling Law Firms, were participants; they tendered their votes in exchange for the Second Payment. Thus, they knew or should have suspected that their settlements might become an issue in the anticipated bankruptcy case. The public has the right to know how much they were paid to vote in favor of the Quigley's plans.

Finally, I agree with the United States Trustee that any objection based on Federal Rule 408 has been waived. The joint pre-trial order was filed before the trial, and alerted all parties in interest that the Pfizer Settlement Agreements would be part of the trial record. All parties in interest were afforded ample opportunity to move in limine to exclude the settlements under Rule 408, or attend the trial and object when the agreements were offered into evidence. The two Settling Law Firms that are relying on Rule 408 failed to do either.

Accordingly, the Sealing Motion is denied.

### 3.     The Street Employment Motion

#### a.     Background

The final issue to be addressed is the so-called Street Employment Motion. (See Motion Of Quigley Company, Inc. for Order under 11 U.S.C. §§ 105(a) and 363(b) Approving Supplement to Paul A. Street Employment Agreement, dated May 7, 2007 (J324.) The motion was subsequently withdrawn, and the procedural posture of the issues raise by the Street Employment Motion is unusual. Some background is helpful.

Quigley originally hired Street as its president and chairman of the board in May 2003, and entered into a written agreement with Street in May 2004.[65] (Street Employment Agreement, Ex. B.) The agreement ran for one year, (id. § 3), and Street received an annual salary of $900,000. (Id. § 4.1.) Street agreed to "perform such duties as may be assigned to him from time to time by the Board of Directors of the Corporation [and to] devote such amount of his business time and efforts sufficient to perform his duties hereunder." (Id. at § 2.) He was not required to devote 100% of his time to Quigley. Street was a principal of Impala Partners LLC, and Quigley consented "to his performing services for Impala on matters unrelated to the affairs of [Quigley]." (Id. § 2.)

The Quigley Board considered the employment agreement at its July 6, 2004 meeting. The meeting minutes reflect that the agreement was reviewed by Quigley's counsel and also addressed by Michael Cook, Esq., Quigley's retained bankruptcy counsel. (J225 at 2.) In addition, the minutes also reflect a discussion that Street had the right to participate in unrelated Impala Partners matters provided that they did not interfere or conflict with his duties as Quigley's president and chairman. (Id. at 1.) The Board approved the May 2004 agreement, with Street abstaining. (Id. at 2.)

The Board subsequently approved two post-petition supplements to Street's employment agreement at its April, 2005 and May, 2006 Board meetings. Each supplement extended the term of Street's employment for one year. Street abstained from both votes. (See J229 (April 18, 2005 Board meeting minutes), at 3; J231 (May 10, 2006 Board meeting minutes), at 3).) Quigley

---

[65] The original agreement was between Quigley and Impala Partners LLC, Street's company. (J220, Ex. A.) Subsequent agreements were directly between Quigley and Street.

sought Court approval of the supplements, which the Court granted. No party, including the United States Trustee, objected to either the 2005 or 2006 supplements.

At its April 17, 2007 Board meeting, the Board considered an additional one year extension of Street's employment. Street had agreed to accept a 50% reduction in his salary, and "Raeburn suggested a renewal of Mr. Street's Employment Agreement on the same terms of the agreement currently in place between the Company and Mr. Street, subject to Mr. Street's voluntary reduction in compensation." (See J232 (April 17, 2007 Board meeting minutes) at 1.) "Following a full and thorough discussion, upon motion made and seconded, with Mr. Street abstaining," the Board passed a resolution approving the extension (the "2007 Supplement"). (Id. 2.) Except for the amount of compensation, the material provisions of the earlier agreements remained unchanged. (See Street Employment Motion, Ex. A.)

Quigley filed the Street Employment Motion, seeking approval of the 2007 Supplement, in May 2007. By then, the AHC and United States Trustee had sought a variety of relief, including the appointment of a chapter 11 petition and the conversion or dismissal of the case, and each objected for the first time to Street's continued employment. (See Objection of the United States Trustee to the Motion of the Debtor Under 11 U.S.C. §§ 105(a) and 363(b) Approving Supplement to Paul A. Street Employment Agreement, dated Sept. 24, 2007 (ECF Doc. # 1221); The Ad-Hoc Committee of Tort Victims Objection to Quigley Company, Inc.'s Motion for Order Extending Employment Agreement of Paul A. Street, dated Sept. 20, 2007 (ECF Doc. # 1223).) The various pending motions also triggered a new wave of discovery and discovery disputes.

In response, Quigley moved to dismiss the Street Employment Motion. (See Motion Of Quigley Company, Inc. for Order Under Federal Bankruptcy Rule 7041 to Dismiss Motion to Approve Supplement to Paul A. Street Employment Agreement, dated Nov. 1, 2007 (ECF Doc. # 1254).) Quigley argued that the issues raised by the pending United States Trustee and AHC motions, as well as the Street Employment Motion, overlapped with the confirmation issues and should be addressed as part of the contested confirmation hearing. Furthermore, the Street Employment Motion would be mooted by the appointment of a chapter 11 trustee. (Id. ¶¶ 16-19.)

The United States Trustee opposed Quigley's dismissal motion. (See Response of the United States Trustee to the Motion of the Debtor Under Bankruptcy Rule 7041 to Dismiss Motion to Approve Supplement to Paul A. Street Employment Agreement, dated Dec. 3, 2007 (ECF Doc. # 1283.) She expressed a concern that permitting Quigley to withdraw the motion would have the same effect as granting it; Street would continue to be employed by Quigley and receive compensation at the annual rate of $450,000. (Id. 1.) Instead, the Court should expedite the hearing on the Street Employment Motion, or alternatively, prohibit Street from receiving any compensation until the motion was considered. (Id. 1-2.) In other words, she had no objection to Street's continued service as an estate fiduciary as long as he did not get paid.

The Court conducted a hearing on December 6, 2007. The United States Trustee repeated her concern that Street continued to receive compensation in the face of unresolved objections, and wanted assurance that any excessive compensation would be subject to disgorgement. (Transcript of Hearing, Held Dec. 6, 2007, at 5 (ECF Doc. # 1301).) The Court observed that an excessive compensation claim belonged to the estate and could still be pursued. (Id. 6.) The Court questioned whether Street understood the risk of disgorgement, and Quigley's

counsel responded that he did.  (Id.)  Satisfied with the preservation of the disgorgement claim, the United States Trustee withdrew her objection.  (Id.)  The Court subsequently signed an order dismissing the Street Employment Motion "without prejudice to any claims relating to Street's employment."  (Order Granting Motion of Quigley Company, Inc. Under Fed. R. Bankr. P. 7041 to Dismiss Prior Motion for Order Approving Supplement to Paul A. Street Employment Agreement, dated Dec. 12, 2007(ECF Doc. # 1301.)

The United States Trustee's post-confirmation hearing submission continues to press certain arguments relating to Street's employment and compensation.[66]  (See Proposed United States Trustee Findings of Fact and Conclusions of Law Supporting: (A) Denial of Confirmation on the Grounds that the Debtor's Fourth Amended and Restated Reorganization Plan Does Not Meet the Requirements of 11 U.S.C. § 1129(a)(3) and (11); and (B) Denial of the Debtor's Motion Dated May 7, 2007 to Approve the Supplement to the Paul A. Street Employment Agreement Under 11 U.S.C. § 363(b), dated Jan. 27, 2010 ("UST Brief").)  The United States Trustee still maintains that the Street Employment Motion did not satisfy the "business judgment" test, but her principal concern focuses on the effectiveness of Street's performance during the period covered by the 2007 Supplement, implying that he did not earn his pay.  Thus, while the United States Trustee states that Quigley "offered no evidence of industry standards, and whether, for example, executives at other claims-handling units are able to work part-time," (UST Brief ¶ 124), she maintains that "Street had no clear idea of the terms of Pfizer's offer following the Tabulation Ruling,"[67] but if he did, "it is patently clear that the terms agreed to by

---

[66]     The AHC's post-trial submissions do not address the Street Employment Motion, and I deem its objection abandoned.

[67]     The "Tabulation Ruling" refers to the Court's decision reducing the effect of the vote of the Settling Claimants by virtue of the 90% Subordination.

the Debtor were grossly inadequate." (Id. ¶ 125.)  Finally, she also states that Quigley never

sought an "adjournment of confirmation or otherwise" after Street resigned for the reason that it

had lost "Street's 'unique familiarity' with Quigley's business or the 'issues facing Quigley in its

efforts to reorganize.'" (Id. ¶ 126.)

### b.     The "Business Judgment" Rule

The United States Trustee and Quigley agree that the issues relating to Street's

employment are governed, in the first instance, by the "business judgment" rule.  "The business

judgment rule 'is a presumption that in making a business decision the directors of a corporation

acted on an informed basis, in good faith and in the honest belief that the action taken was in the

best interest of the company.'"  Integrated Resources, 147 B.R.650, 656 (S.D.N.Y. 1992)(citing

Smith v. Van Gorkom, 488 A.2d 858, 872 (Del.1985)); accord In re Global Crossing Ltd., 295

B.R. 726, 743 (S.D.N.Y. 2003).  This presumption "shields corporate decision-makers and their

decisions from judicial second-guessing when the following elements are present: '(1) a business

decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some courts and

commentators, no abuse of discretion or waste of corporate assets.'"  Integrated Resources, 147

B.R. at 656 (quoting DENNIS J. BLOCK, NANCY E. BARTON & STEPHEN A. RADIN, THE BUSINESS

JUDGMENT RULE 12 (3d ed. 1991)); accord Global Crossing, 295 B.R. at 743.  "Courts are loath

to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross

negligence."  Integrated Resources, 147 B.R. at 656 (citing Van Gorkom, 488 A.2d at 872-73);

accord In re Metaldyne Corp., 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) ("In [determining

whether the requirements under Code § 363(b) are met] the Court is guided by decisions in this

jurisdiction emphasizing that the Court should not substitute its business judgment for that of the

Debtors'.") (citations omitted), aff'd 421 B.R. 620 (S.D.N.Y. 2009).  "Parties opposing the

proposed exercise of a debtor's business judgment have the burden of rebutting the presumption

of validity." <u>Integrated Resources</u>, 147 B.R. at 656.

### c.     Mootness

Although the parties agree on the legal standard, it is not clear how it should be applied.

The Street Employment Motion, as such, is moot.  Quigley moved to dismiss the motion, and the

United States Trustee eventually withdrew her objection.  As noted, she did not object to Street's

continued service as Quigley's president and chairman provided that he would be subject to

disgorgement.  As a result, Street continued to serve as Quigley's president and chairman for ten

additional months pursuant to a contract under which Quigley agreed to pay him $450,000 on an

annual basis.  Under the circumstances, the United States Trustee cannot challenge Quigley's

decision to extend Street's employment.

Furthermore, the United States Trustee does not argue that Street should be denied all

compensation in the absence of an order approving his extended employment.[68]   Hence, the

denial of the Street Employment Motion at this point does not resolve the fundamental question

of whether Street was overpaid.  On the other hand, the denial of the Street Employment Motion

---

[68]     I do not mean to suggest that an order was necessary.  The Street Employment Motion sought Court
authorization to continue to employ Street at half of his salary for another year.  His employment had been extended
for one year on the same terms in 2005 and 2006.  His continued employment under the same terms for less money
for another year was an ordinary course transaction and did not require a motion under § 363.  <u>E.g.</u>, <u>In re Crystal
Apparel, Inc.</u>, 220 B.R. 816, 834 (Bankr. S.D.N.Y. 1998)("[T]he one year contract term [extending the executive's
employment] was in the ordinary course of business in light of the size and complexity of the Debtors' businesses
and the expected length of time the Chapter 11 cases would take until confirmation."); <u>In re All Seasons Indus., Inc.</u>,
121 B.R. 822,  (Bankr. N.D. Ind. 1990)("The continued employment of existing management of a debtor-in-
possession constitutes part of the operation of debtor's business and is within the ordinary course of business
authorized by the Bankruptcy Code. Where post-petition operations are concerned, as long as it confines itself to
operating within the ordinary course of business, a debtor-in-possession's actions are cloaked with an aura of
propriety and, thus, the debtor is entitled to a presumption concerning the reasonableness of its decisions.")

may raise a host of issues regarding Street's authority during the period covered by the 2007 Supplement when he unquestionably served as Quigley's principal officer and chairman.

### d. Standing

More importantly, while the order granting Quigley's dismissal motion reserved everyone's rights, it does not follow that the United States Trustee has any rights to assert. If the decision to continue Street's employment at an annual salary of $450,000 (as opposed to firing him or paying him less) was an inappropriate exercise of business judgment, it might give rise to a breach of fiduciary duty claim against Quigley's directors. Alternatively, if the decision to extend Street's employment at $450,000 was an appropriate exercise of business judgment, but Street failed to perform adequately, it might give rise to breach of contract or excessive compensation claims that would subject Street to damages or disgorgement. In either case, the claims belong to Quigley although shareholders and creditors may have standing to assert them derivatively. While section 307 of the Bankruptcy Code grants the United States Trustee the right to appear and be heard on any issue (other than filing a plan under § 1121(c), it does not authorize the United States Trustee to assert control over causes of action belonging to the Quigley estate. Cf. In re Smart World Techs., LLC, 423 F.3d 166, 182-83 (2d Cir. 2005)(Bankruptcy Code § 1109(b) allows a party in interest to intervene in a pending proceeding but does not allow it to take control of the estate's legal causes of action).

### e. The Merits

Assuming that the Street Employment Motion is still ripe and the United States Trustee has standing to seek disgorgement on some theory, she has failed to sustain her burden of proof.

### i.       The Decision to Extend Street's Employment

The decision to extend Street's employment at half his current salary is entitled to the presumption that it was an appropriate exercise of business judgment. The decision served a legitimate business purpose; Quigley needed a president and chairman. The directors that approved the continuation of his employment were disinterested, and there was no evidence of their bad faith, self-interest, or gross negligence.

Moreover, the record amply supports Quigley's decision to continue Street's employment for another year. Street had already served as Quigley's president and chairman for the preceding four years. The proposed extension, like the prior ones, was limited to one year, and paid Street 50% of his salary he received during the preceding four years. Hence, the 2007 Supplement did not commit Quigley to a long-term, expensive obligation, and actually represented a savings over past years. The directors had fully vetted the agreement at their July 2004 meeting, had received the advice of counsel, and were satisfied that Street's continued pursuit of unrelated Impala business would not interfere with the performance of his duties with Quigley.

Street had shepherded Quigley through nearly three years under chapter 11. The Court had denied confirmation, and the Tabulation Ruling forced Quigley to develop a new plan. The record reflects that Quigley generated new versions of the disclosure statement on May 18, 2007 (J23), June 7, 2007 (J25), November 5, 2007 (J38), and Street signed each new draft. The case was obviously at an active and critical stage, there was no evidence of dissatisfaction with Street's services, and there was no reason to change horses mid-stream.

The United States Trustee contends that Quigley nevertheless failed to sustain its burden of proof because Quigley did not offer any evidence of industry standards or whether executives at other claims-handling units are able to work part-time. This argument is based on the decision in In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006). There, the Court addressed a motion to assume complex pre-petition employment agreements between the debtor on the one hand and its chief executive officer and senior executives. In addition to base salary, the employment agreements included incentive compensation, pension benefits and severance.

The issue was whether the proposed obligations were permissible under 11 U.S.C. § 503(c)(3) which precludes, inter alia, a debtor from paying money or incurring administrative obligations to insiders outside of the ordinary course of business that are "not justified by the facts or circumstances of the case." The Court stated that in determining whether a proposed incentive plan is supported by "sound business judgment," it must consider the structure of the proposal and the process through which it was developed. Id. at 576. The relevant factors, repeated by the United States Trustee in her post-trial brief, (see UST Brief ¶ 122), include whether the plan bears a reasonable relationship to the results to be obtained, whether the cost of the plan is reasonable in light of the debtor's assets, liabilities and earning potential, whether the plan applies to all employees, or alternatively, discriminates unfairly, whether the plan is consistent with industry standards, and whether the corporation exercised due diligence in determining the need for the plan, analyzing which key employees should be incentivized, what is available and what is generally applicable in the particular industry, and finally, whether the debtor received advice from independent counsel in performing due diligence and in creating and authorizing the incentive compensation. Dana, 358 B.R. at 576-77.

Dana is distinguishable, and does not govern the Street Employment Motion. The Dana court was interpreting a provision -- § 503(c)(3) -- enacted in 2005. Quigley's case was filed prior to the enactment of BAPCPA, and § 503(c)(3) does not apply. Even if it did, the factors listed by the Dana court do not. The 2007 Supplement was not an incentive plan. It applied to one person; it ran for one year; it was limited to base salary. Dana does not require a corporation to proffer evidence of "industry standards, and whether, for example, executives at other claims-handling units are able to work part time" before extending the employment of the corporation's current president for one year at 50% of his salary.[69] Finally, Street had been providing his services "part time" without complaint, so there was no need to canvass the industry to determine if comparable officers of comparable companies could or could not do their jobs on a part-time basis.

### ii. Street's Compensation During the Extended Period

As noted, the United States Trustee's principal contention is that Street failed to perform competently after his contract was extended, and his compensation should be denied or limited. Following the Tabulation Ruling, Pfizer waived the 90% Subordination. The effect of the waiver was to dilute the recovery to the asbestos claimants and the Futures. The question was how much more Pfizer would have to contribute to maintain the 7.5% distribution contemplated prior to the waiver.

Quigley initially agreed with Pfizer that Pfizer should contribute $18 million in cash on the effective date. Street's deposition testimony and trial testimony showed that he did not

---

[69]     The argument implies that Quigley was simply a claims handling unit. It ignores the fact that it was also a chapter 11 debtor that had to deal with a variety of constituencies while attempting to confirm a plan over the increasing opposition of the United States Trustee, the AHC and the insurers.

participate in the determination that $18 million was sufficient and did not make any inquiry before signing a draft disclosure statement that said it was. (Tr. 1001:16-20; 1002:4-15.) As a result of subsequent negotiations spearheaded by the FCR, Pfizer eventually agreed to increase its contribution by an additional $95 million. (Tr. 2164:13-2169:8 (Togut).)

Accepting the United States Trustee's contention that Street failed to familiarize himself with the negotiations with Pfizer and agreed to a grossly inadequate contribution, she has not explained how this should affect Street's compensation. Except for the Pfizer negotiations, the United States Trustee does not contend that Street failed to comply with the terms of his agreement. More importantly, the United States Trustee does not contend and has certainly not proved that Street's actions or inactions injured Quigley or any other party in the case. Finally, the United States Trustee failed to supply any evidence of compensation paid to similarly-situated executives to support her excessive compensation claim.

The United States Trustee's last point – that Quigley never sought an adjournment of the confirmation hearing after Street departed and Quigley lost his experience – is frivolous. Kim Jenkins succeeded Street. She had run the CHU for years, and participated extensively in the bankruptcy. In fact, she signed the Fourth Plan and Disclosure Statement, both dated March 28, 2008, in her capacity of Senior Vice President.[70] (See J42 at 120; J43 at 61.) Quigley obviously planned for Street's succession, and that hardly provides a reason to conclude that he did not earn his pay, or that the decision to hire him in the first place was wrong.

Accordingly, the Court overrules the United States Trustee's objections to the Street Employment Motion.

---

[70] Street's resignation became effective two days later.

**CONCLUSION**

To recapitulate, Quigley's motion to confirm the Fourth Plan is denied, Quigley's motion to strike portions of Shaked's testimony, related exhibits and report is granted in part and denied in part, the Sealing Motion is denied and the United States Trustee's objection to the Street Employment Motion is overruled. The foregoing constitutes the Court's findings of fact and conclusions of law. Counsel are directed to schedule a conference to address the dismissal or other disposition of this case. Settle order on notice.

Dated: New York, New York
September 8, 2010

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge