**BROWN RUDNICK LLP**
7 Times Square
New York, New York 10036
(212) 209-4800
Edward S. Weisfelner (EW-5581)

One Financial Center
Boston, MA 02111
(617) 856-8200
Jeffrey L. Jonas (JJ-5670)
James W. Stoll (JS-5931)

*Counsel to the Ad Hoc Committee Of Tort Victims*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
In re:                                              :       Chapter 11
                                                    :
QUIGLEY COMPANY, INC.,                              :       Case No. 04-15739 (SMB)
                                                    :
                              Debtor.               :
------------------------------------------------------------X

## MOTION OF THE AD HOC COMMITTEE OF TORT VICTIMS FOR AN ORDER DISMISSING QUIGLEY COMPANY, INC.'S BANKRUPTCY CASE

The Ad Hoc Committee of Tort Victims (the "Ad Hoc Committee"),[1] by and through its undersigned counsel, hereby moves (the "Motion") for an order dismissing the bankruptcy case of Quigley Company, Inc. ("Quigley"), subject to Quigley's prior payment in full of all administrative expenses (including any administrative expenses granted in connection with the Ad Hoc Committee's application for allowance of administrative expenses incurred in making a substantial contribution in Quigley's bankruptcy case (the "Substantial Contribution Application"), filed contemporaneous herewith, if and to the extent allowed). In support of the Motion, the Ad Hoc Committee respectfully states as follows:

---

[1] The current members of the Ad Hoc Committee are Weitz & Luxenberg, PC, Cooney & Conway and the Law Offices of Peter G. Angelos, PC, who collectively represent more than 34,100 individual asbestos claimants. These three firms have been representing asbestos victims against Pfizer and Quigley for decades.

1

**PRELIMINARY STATEMENT**

1.      On September 8, 2010, five days after the sixth anniversary of the commencement of Quigley's bankruptcy case, this Court issued its Post-Trial Findings of Fact and Conclusions of Law (the "Opinion")[2], which denied confirmation of the Plan on a substantial number of independent grounds, including that the Plan was not feasible, failed the best interest of creditors test, resulted in unequal treatment, and was proposed in bad faith, that the votes in favor of the Plan were procured in bad faith, and that Pfizer's contribution under the Plan was not fair and equitable given the benefits Pfizer stood to receive. At the recent September 27th status conference, this Court gave Pfizer an additional thirty days to come up with a brand new plan that cures the bad faith and other deficiencies that permeated each of the many prior iterations. The Ad Hoc Committee submits that no further extension of time is warranted and that this Court should dismiss Quigley's case.[3]

2.      First and foremost, a grant of additional time would be of limited utility because, in light of the Court's determinations, it likely is difficult for Quigley to submit a confirmable plan of reorganization. Even if Pfizer was willing to put up sufficient funds to satisfy the unequal treatment, best interest of creditors, and fair and equitable defects in the Plan (a prospect that the Ad Hoc Committee has good reason to doubt), the Settling Claimants' votes may remain

---

[2]     All capitalized terms used but not defined herein shall have the meaning ascribed to them in Quigley Company, Inc.'s Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as of March 28, 2008) (the "Plan") or the Opinion, as applicable.

[3]     To address a question raised by the Court at the September 27th status conference in this case, the Ad Hoc Committee has not previously filed a motion to dismiss in this case. The United States Trustee, in a motion dated May 11, 2007 (the "UST Motion to Dismiss"), previously sought an order converting or dismissing Quigley's bankruptcy case. See Docket No. 1089. This Court reserved decision on the UST Motion to Dismiss, along with the Ad Hoc Committee's contemporaneously filed motion to appoint a trustee, pending an evidentiary hearing to occur as part of the confirmation hearing. See Fifth Disclosure Statement, p. 51.

2

tainted by Pfizer's "bad faith vote manipulation," making it difficult for Quigley and Pfizer to be able to obtain confirmation.  See Opinion, p. 38.

3. Moreover, the charade that is Quigley's bankruptcy represents the quintessential case for dismissal.  Quigley is nothing but an asset-less dummy entity that was resurrected, handed Pfizer's money-losing claims handling unit, and then propped up by Pfizer pursuant to a non-arm's-length contract of limited duration – all in order to provide Quigley's extremely well-heeled non-debtor parent Pfizer with a channeling injunction against present and future asbestos claims.  As this Court observed in denying confirmation: "The Fourth Plan, like the plans that preceded it, is designed to free the Pfizer Protected Parties from derivative liability, and only incidentally, to reorganize Quigley to the extent necessary to confirm the plan."  Opinion, p. 30.  At all times during this case, Pfizer, the "architect of the global strategy" and the "real proponent of the plan," has dominated and controlled Quigley and prosecuted the bankruptcy for its benefit alone.  Id. at 30-31.  This is consistent with the fact that Quigley effectively was merged into Pfizer long ago.  Notably, this domination is no mere relic of the past that has been altered by the Opinion's harsh words about Quigley's acquiescence in Pfizer's scheme.  Just days ago, at the September 27th status conference, Quigley's counsel (Michael Cook) again deferred to puppet-master Pfizer, saying that "[b]ecause Quigley has no viable option," he wanted to wait and see the new plan that Pfizer was proposing to support.  See Transcript of Court-Ordered Conference Before the Honorable Stuart M. Bernstein, dated September 27, 2010, p. 3.

4. Simply put, this is not the sort of "rehabilitation" or "reorganization" that can pass muster under the Bankruptcy Code, and certainly not one that justifies the continuing depletion of Quigley's insurance assets to sustain the more-than-$54-million in operating losses that have accrued and more-than-$34-million in professional fees that have been paid during the pendency of this case – to say nothing of the more-than-half-a-million dollars that has been paid to date,

3

and continues to be paid, by Quigley's estate for two Pfizer witnesses (Louis Kilian and Robert Galloway, the former of whom testified at the confirmation hearing solely for Pfizer's benefit and the latter of whom did not testify at all).

5. Turning to the applicable law, this case bears **all** of the hallmarks that courts traditionally consider in assessing whether a debtor's case should be dismissed as having been filed in bad faith: (i) Quigley lacks a bona fide, ongoing business with a realistic chance of reorganizing; (ii) Quigley's bankruptcy was filed to shield the real party in interest (Pfizer) and its assets from the Court's jurisdiction; (iii) Quigley's filing constitutes an abuse of the Court's jurisdiction and the bankruptcy process; and (iv) Quigley's case was filed not to reorganize a business, but rather as a litigation tactic for Pfizer to more conveniently handle its escalating asbestos liability. In addition, separate and apart from Pfizer's and Quigley's bad faith and abuse of the bankruptcy process in devising, filing, and prosecuting Quigley's case, several other factors (each of which on its own constitutes "cause" to dismiss the case) are present here: (i) there has been continuing loss to or diminution of Quigley's estate and there is an absence of a reasonable likelihood of rehabilitation; (ii) Quigley and Pfizer have demonstrated an inability to effectuate a plan; and (iii) Quigley and Pfizer have engaged in unreasonable delay that has resulted in prejudice to creditors. This is precisely the sort of case that mandates dismissal pursuant to section 1112(b).

6. There is no longer any room for a wait-and-see attitude in this case; dismissal is an appropriate option. Even if this Court dissolves the preliminary injunction in Pfizer's favor (the "Injunction"),[4] the Ad Hoc Committee's members would be greatly prejudiced if they were constrained to pursue only Pfizer in the tort system while Quigley's bankruptcy case continued.

---

[4] The Ad Hoc Committee has, contemporaneous with this Motion, filed its Motion for an Order (A) Dissolving the Existing Injunction and (B) If and to the Extent Necessary, Granting Relief from the Automatic Stay (the "Injunction Motion"). The relief sought in the Injunction Motion, while necessary to protect the rights of Non-Settling Claimants, is not a sufficient alternative to dismissing Quigley's case.

4

As a practical matter, the claims against Pfizer would be hampered by the continuation of the automatic stay as to Quigley, because their discovery rights and ability to obtain Quigley witnesses and documents would be severely circumscribed. More importantly, continuation of the chapter 11 case while allowing claims against Pfizer to go forward shifts all of the risk to those who pursue their valid state law rights against Pfizer. The Ad Hoc Committee's members would be forced into a position where they could spend many months and vast sums of money out of their own pockets pursuing Pfizer in state court only to have the rug pulled out from under them by Quigley and Pfizer obtaining confirmation of a section 524(g) plan that permanently enjoins further asbestos litigation against Pfizer.

7. Moreover, notwithstanding Pfizer's professed desire to maintain the "status quo," any continuing Quigley bankruptcy case may need significant Court imposed changes. New fiduciaries may need to be appointed to represent present and future asbestos claimants, in place of or in addition to the members of the Committee who are Settling Claimants and the FCR. The FCR, by acquiescing in Pfizer's bankruptcy strategy and vote-buying and the amount of Pfizer's contribution (before the case was even filed), failed to fulfill its fiduciary duties to the Futures. Opinion, p. 32 (finding Mr. Togut's testimony with respect to the Pfizer Settlement Agreements "disingenuous"); Opinion, p. 54 (finding that Pfizer's proposed contribution to the Futures was less than 25% of the benefit that Pfizer stood to receive under the Plan and rejecting the contribution as not "fair and equitable"). However, if a new future claimants representative is appointed and the Creditors' Committee members who are Settling Claimants are replaced, there will necessarily be a steep learning curve – with the concomitant added time and expense – for the new fiduciaries to acquaint themselves with the six-year-old case.

8. Further, if Quigley's case is allowed to continue, the Court may need to consider whether the Debtor can be permitted to remain in possession. Quigley has been complicit in

Pfizer's bad faith throughout this case. See, e.g., Opinion, p. 31 n. 32 ("Quigley acquiesced in if not actively embraced Pfizer's actions in connection with the prosecution of its chapter 11 cases, and Pfizer's bad faith may be attributed to Quigley as well."). As but one example, Quigley's blind acceptance of Pfizer's dominion has resulted in valuable estate causes of action (particularly those that could be brought against Pfizer) laying dormant throughout this case. If Quigley had been an independent fiduciary, it could have, among other things, brought a claim to substantively consolidate Quigley's and Pfizer's assets, a claim against Pfizer for piercing the corporate veil as a result of Pfizer's utter domination and control of Quigley, claims to equitably subordinate and/or recharacterize Pfizer's secured and unsecured claims, claims to avoid and recover various liens granted and payments made to Pfizer, claims for breach of contract and breach of the implied warranty of good faith and fair dealing with respect to the Joint Defense Agreement, and claims for aiding and abetting Quigley's breaches of fiduciary duty to its creditors. In this regard, if a chapter 11 trustee was to be appointed, it would change the playing field and enable these claims to be prosecuted for the benefit of Quigley's unsecured creditors, but it would also result in an even longer delay in the resolution of this case.

9. In sum, allowing this case to continue indefinately would be highly prejudicial to the Ad Hoc Committee's clients (even if the Injunction is dissolved), and incredibly costly and time-consuming (as the necessary changing of the fiduciary guard would bring more expense and delay to a case that has already dragged on for more than six years). As described in more detail below, this is a textbook case for dismissal under applicable law. Quigley's bankruptcy should be dismissed in order to avoid further harm to asbestos claimants and further abuse of this Court's jurisdiction and the bankruptcy process.

# ARGUMENT

## A. Law Governing Dismissal Of A Bankruptcy Case

10. Section 1112(b) enumerates several examples of what constitutes "cause" to dismiss a case, including where there is (i) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation, (ii) inability to effectuate a plan, or (iii) unreasonable delay by the debtor that is prejudicial to creditors. See 11 U.S.C. §§ 1112(b)(1), 1112(b)(2), 1112(b)(3).[5] A finding of "cause" is not limited to the grounds stated in section 1112(b). See 11 U.S.C. § 102(3) (in construing the Bankruptcy Code, the terms "includes" and "including" are not limiting); In re Tornheim, 181 B.R. 161, 164-65 (Bankr. S.D.N.Y. 1996) (Bernstein, C.J.) (citations omitted) ("[t]he factors listed in section 1112(b) are not exhaustive, and the . . . [t]he bankruptcy court can consider other factors that may arise, and use its equitable powers to reach a proper result.").

11. Although not expressly enumerated in section 1112(b), courts commonly consider whether the debtor's bankruptcy petition was filed in good faith in assessing whether "cause" exists to dismiss the case. See In re AdBrite Corp., 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003); see also In re UNED Assocs., LLC, 2007 Bankr. LEXIS 1467 at *6 (Bankr. S.D.N.Y. Apr. 20, 2007) ("It is well recognized that the courts have implicit authority to dismiss a Chapter 11 petition as having been filed in bad faith.").

---

[5] Section 1112(b) of the Bankruptcy Code, as in effect prior to the 2005 amendments, applies to cases (such as Quigley's) that were commenced before October 17, 2005. This section provides that a court may dismiss a case under Chapter 11 for "cause," including: (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation; (2) inability to effectuate a plan; (3) unreasonable delay by the debtor that is prejudicial to creditors; (4) failure to propose a plan under section 1121 of this title within any time period fixed by the court; (5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or modification of a plan; (6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title; (7) inability to effectuate substantial consummation of a confirmed plan; (8) material default by the debtor with respect to a confirmed plan; (9) termination of a plan by reason of the occurrence of a condition specified in the plan; or (10) nonpayment of any fees or charges required under chapter 123.

## B. Application Of Dismissal Standard To Quigley's Case

12. Abundant "cause" exists to dismiss Quigley's bankruptcy case. Quigley's petition was filed in bad faith as part of Pfizer's scheme to shield its own assets from asbestos claimants and the Court's jurisdiction and obtain the relief offered by section 524(g) for as little money as possible. Furthermore, at least three of the enumerated factors constituting "cause" to dismiss a case are present here; specifically, (i) there has been continuing loss to or diminution of the estate and there is an absence of a reasonable likelihood of rehabilitation; (ii) Quigley and Pfizer have demonstrated an inability to effectuate a plan; and (iii) Quigley and Pfizer have engaged in unreasonable delay and that delay has resulted in prejudice to creditors. For all of these reasons, this case should be dismissed.

### 1. Quigley's Bankruptcy Case Should Be Dismissed For Lack Of Good Faith In Filing Of The Petition

13. The standard in determining whether a petition should be dismissed as having been filed in bad faith is "objective futility of the reorganization process and subjective bad faith in filing the petition." See In re Kingston Square Assocs., 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997); see also In re Adler, 329 B.R. 406, 410 (Bankr. S.D.N.Y. 2005) ("To protect against dismissal pursuant to section 1112(b), a debtor must exhibit good faith at each stage of a bankruptcy case: in its commencement, during its prosecution, and at confirmation. The good faith requirement attempts to prevent abuse of the provisions, purpose or spirit of the Bankruptcy Code.") (internal citations omitted). Among the factors courts consider in evaluating whether a petition was filed in bad faith are: (i) whether the debtor lacks an ongoing business or has no realistic chance of reorganizing, (ii) whether the bankruptcy filing shields the real party in interest and its assets from the court's jurisdiction, (iii) whether the filing constitutes an abuse of

the bankruptcy court's jurisdiction or the bankruptcy process, and (iv) whether the bankruptcy filing was made as a litigation tactic. All of these indicia are present in Quigley's case.[6]

### a. **Quigley Lacks A Bona Fide, Ongoing Business To Reorganize**

14. Courts have held that a case should be dismissed "to prevent misuse of the Chapter 11 remedy by debtors which are not bona fide business organizations filing to reorganize an ongoing enterprise." See, e.g., In re Eden Assocs., 13 B.R. 578, 584 (Bankr. S.D.N.Y. 1981); In re SGL Carbon, 200 F.3d 154, 165 (3d Cir. 1999) ("[A] Chapter 11 petition is not filed in good faith unless it serves a valid reorganizational purpose."); In re Ocean Beach Props., 148 B.R. 494, 495 (Bankr. E.D. Mich. 1992) ("If there is not a potentially viable business in place worthy of protection and rehabilitation, a Chapter 11 effort has lost its raison d'etre.") (internal quotations omitted); AdBrite, 290 B.R. at 218 ("Factors relevant to a determination of whether a Chapter 11 petition was filed in good faith include . . . whether the debtor had an ongoing business to reorganize."). As the Second Circuit has noted:

> When it is clear that, from the date of the filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the Chapter 11 petition may be frivolous. … [T]he purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. If there is not a potentially viable business in place worthy of protection and rehabilitation, the Chapter 11 effect has lost its *raison d'etre* . . .

C-TC 9th Ave. P'ship v. Maplewood Colonie Common School District (In re C-TC 9th Ave. P'ship), 113 F.3d 1304, 1309-12 (2d Cir. 1997) (citations omitted).

15. It is beyond cavil that Quigley lacks a "bona fide" business to reorganize. Quigley was a "moribund" shell company until a few months before the petition date when

---

[6] To the extent Quigley's petition was filed in bad faith, any plan proposed by Quigley likely will fail to comply with section 1129's requirements. See In re Natural Land Corp., 825 F.2d 296, 298 (11th Cir. 1987) ("It seems unquestionable to us that the taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus any proposal submitted by a debtor who filed his petition in bad faith would fail to meet section 1129's good faith requirement."). Accordingly, Quigley's case should be dismissed promptly in order to prevent any further drain on this Court's time and resources.

Pfizer "resuscitat[ed]" Quigley and transferred to its subsidiary its own money-losing claims handling unit so it could look like a real business (notwithstanding that Quigley is merely processing its own liability claims). Opinion, p. 30. Quigley may be "viable" for the next five years – but that is solely because of the non-market Pfizer Claims Services Agreement, pursuant to which Pfizer has agreed to prop up Quigley for five years. Id. at p. 58. Finding that Quigley's "business plan was speculative at best and visionary at worst," this Court concluded that "Quigley will not have sufficient business to continue operating" after expiration of the Pfizer Claims Services Agreement. Id. at pp. 58, 60. Simply put, this is far from a viable "bona fide" business worthy of protection and rehabilitation. In fact, Quigley has "no realistic chance of reorganizing," and its bankruptcy case should be dismissed.

### b. Quigley's Bankruptcy Case Was Improperly Filed To Shield The Real Party In Interest From Court's Jurisdiction

16. Courts have especially condemned the filing of entities with "no ongoing business to reorganize" where such a filing enables the actual parties in interest to shield themselves and their assets from the bankruptcy court's jurisdiction. See Eden, 13 B.R. at 584-85 ("This is particularly applicable . . . where '*debtors have elected not to submit the actual entities in interest* to the jurisdiction of the court, thereby isolating the entities in interest from the scrutiny and control of the court during proceedings.'") (citing In re Dutch Flat Inv. Co., 6 B.R. 470, 471 (Bankr. N.D. Cal. 1980) (emphasis added). Here, the actual entity in interest (Pfizer) has orchestrated the filing of a fabricated entity with no bona fide ongoing business in order to isolate Pfizer's assets from this Court's jurisdiction. As the Court noted: "[T]his is a Quigley bankruptcy in name only. . . . Pfizer, the parent of Quigley, the architect of the global strategy, the only source of chapter 11 and plan financing and the principal beneficiary of the channeling injunction, is the real proponent of this plan." Opinion, pp. 31-32 (emphasis in original). Such

10

subterfuge and wholesale abuse of the Bankruptcy Code's reorganization provisions cannot be condoned by this Court.

### c. Quigley's Filing Constitutes An Abuse Of This Court's Jurisdiction And The Reorganization Process

17. Courts have also noted that the focus of the "good faith" analysis should be on whether the jurisdiction of the bankruptcy court or the reorganization process has been abused. See In re Johns-Manville Corp., 36 B.R. 727, 737 (Bankr. S.D.N.Y. 1984); In re Gucci, 174 B.R. 401, 409 (Bankr. S.D.N.Y. 1994). In Johns-Manville, Judge Lifland denied motions to dismiss the debtor's bankruptcy petition, reasoning that the debtor had not attempted to abuse the court's jurisdiction because it was "undeniable that there has been no sham or hoax perpetrated on the Court in that Manville is a *real business* with real creditors in pressing need of economic reorganization." See id. at 738 (emphasis added). In reaching this conclusion, the court distinguished cases that had been dismissed as bad faith shams: "[I]n those cases in which the company that filed never operated in business, never made a profit, was formed just to file, is losing money postpetition, has no hope of rehabilitation and has no unsecured creditors, it has been held that such a petition was filed merely to take advantage of the automatic stay, that that is an abuse of the bankruptcy court's jurisdiction and that the case should be dismissed." See id.

18. Writing twenty years before Quigley's filing, Judge Lifland could not have described the Quigley sham any better. Prior to Pfizer's transfer of its non-profitable claims handling unit to Quigley, Quigley had not operated a business or made any profit in more than a decade. In addition, Quigley, which effectively had been merged into Pfizer long ago, was resurrected by Pfizer solely to file for bankruptcy and for Pfizer to take advantage of a stay of asbestos claims, has consistently lost money postpetition, and has no hope of rehabilitation. Under these circumstances, it is clear that Quigley is exactly the type of sham entity for which

11

dismissal is warranted in order to avoid an abuse of this Court's jurisdiction and the bankruptcy process.

### d. Quigley's Case Was Improperly Filed As A Litigation Tactic

19. Numerous courts have observed that the bankruptcy laws are intended to benefit those in genuine financial distress; they are "not intended to be used as a mechanism to orchestrate pending litigation." See In re SGL Carbon, 200 F.3d 154, 165 (3d Cir. 1999); In re UNED Assocs., LLC, 2007 WL 1200822, at *2 (Bankr. S.D.N.Y. Apr. 20, 2007). Pfizer resurrected its long-dormant subsidiary and coordinated its bankruptcy filing in an effort to most conveniently orchestrate the hundreds of thousands of asbestos claims pending against it and, in particular, to take advantage of section 524(g) of the Bankruptcy Code and obtain for itself an injunction for substantial present and future asbestos liability. Although this may have been the most convenient solution for Pfizer's asbestos problem (after having failed in its attempts to globally resolve its liability outside of bankruptcy), arranging a bankruptcy filing as a litigation tactic is not a permissible use of the bankruptcy laws. This Court should not sanction this bad faith by permitting Quigley's bankruptcy case to continue.

### 2. Quigley's Bankruptcy Case Should Be Dismissed Due To Continuing Loss To The Estate And The Absence Of A Reasonable Likelihood Of Rehabilitation

20. Section 1112(b)(1) codifies a two-pronged test: (i) continuing loss to or diminution of the estate and (ii) absence of a reasonable likelihood of rehabilitation. See AdBrite, 290 B.R. at 215. To determine whether the first prong is met, a court must make a full evaluation of the present condition of the estate, not merely look at the debtor's financial statements; the touchstone is that the debtor should not continue in control of the business beyond a point at which reorganization no longer remains realistic. See id. One indication of continuing loss to the bankruptcy estate is negative cash flow after the bankruptcy is commenced. See In re Taub, Case No. 08-44210 (Bankr. E.D.N.Y. Apr. 9, 2010), Memorandum

Decision on Motion to Restrain, Motion to Compel, and Order to Show Cause ("Taub"), p. 34. Since the commencement of Quigley's bankruptcy case, Quigley has accrued more than $54 million in operating losses and incurred more than $34 million in professional fees. See Quigley Corporate Monthly Operating Report for the Month of August 2010, pp. 4, 5. Moreover, these losses have been funded by the depletion of the only meaningful asset in Quigley's estate – namely, Quigley's rights to insurance policies and related proceeds that are shared with Pfizer. See Transcript of Confirmation Hearing Before the Honorable Stuart M. Bernstein ("Tr."), pp. 1332-33 (testimony of Douglas Charboneau).

21. In assessing whether the second prong has been met, courts examine whether the debtor "will be **re**established on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met." See AdBrite, 290 B.R. at 216 (emphasis added); see also Taub, p. 35 ("The debtor's 'boundless confidence' that reorganization will be successful is not a sufficient basis on which to conclude that rehabilitation is possible."). In this case, there is no viable debtor business to be "**re**established"; Quigley's purported claims-handling business was a "cost center" at Pfizer and has never been a profitable endeavor. See Tr., pp. 904-6 (testimony of Kevin Altit). To the contrary, Quigley exists today as a "business" solely to enable Pfizer to attempt to obtain relief from derivative liability – not because it is a real company worthy of chapter 11 reorganization. See In re WorldCom, Inc., 2003 WL 23861928, at *46 (Bankr. S.D.N.Y. Oct. 31, 2003) ("[T]he primary goal of chapter 11 is to promote the rehabilitation of the debtor" because "continuation of the operation of a debtor's business as a viable entity benefits the national economy through the preservation of jobs and continued production of goods and services").

22. Even if one ignores the fact that there was and is no business to reestablish, it is manifest that Quigley does not have a secured financial foundation. Although it is being propped

up by Pfizer pursuant to a non-arm's-length contract for a period of five years, it "will need new customers in order to be viable after five years." See Tr., pp. 1733-34 (testimony of Thomas Britven). Yet, there is nothing indicating that it will be able to attract the necessary new customers – and therefore nothing indicating that it will be able to meet its current obligations after the contract with Pfizer lapses. See Opinion, pp. 58-59 ("There was no credible evidence of a viable market that will absorb Quigley's proposed claims handling services; in fact, there is evidence to the contrary."). In "all likelihood," Quigley will need to seek bankruptcy relief after expiration of the Pfizer Claims Services Agreement. Id. at p. 60. Thus, Quigley lacks a secured financial basis, and its case should be dismissed.

### 3. Quigley Lacks An Ability To Effectuate A Plan

23. Section 1112(b)(2) provides that "cause" exists to dismiss a case where the debtor lacks the ability to formulate a plan or to carry one out. See 11 U.S.C. § 1112(b)(2); AdBrite, 290 B.R. at 216. In the more than six years since this case was commenced, Pfizer and Quigley have failed to demonstrate an ability to formulate and carry out a confirmable plan. Not only does Quigley's most recently rejected plan suffer from myriad defects that render it unconfirmable (as this Court found in the Opinion), in fact, certain of these defects may be difficult to cure. For example, Quigley will have difficulty formulating a plan that satisfies section 1129(a)(11) (requiring that the Plan be feasible). Quigley also may be unable to submit a plan that is not tainted by the bad faith vote manipulation that this Court has already found objectionable. Accordingly, "cause" exists to dismiss Quigley's bankruptcy case for inability to effectuate a plan.

### 4. Quigley's Bankruptcy Case Has Been Riddled With Unreasonable Delay That Is Prejudicial To Creditors

24. Section 1112(b)(3) provides that "cause" exists to dismiss the debtor's case where there is unreasonable delay that is prejudicial to creditors. See 11 U.S.C. § 1112(b)(3). The court must take into consideration the context of the delay; the focus of the analysis is the time taken by the debtor to submit a confirmable plan. See AdBrite, 290 B.R. at 216. Notwithstanding Quigley's assertions that this case would be over within six months, this case has dragged on for more than six years. As a result of the Injunction, Quigley and Pfizer have enjoyed an exceedingly valuable reprieve from defending asbestos claims in the tort system for that entire time, and accordingly have, at numerous junctures throughout this case, been content to let the bankruptcy proceedings languish. All the while, creditors such as the Ad Hoc Committee's clients have been substantially prejudiced by having to sit idly by, unable to pursue their state law claims against Pfizer. Significantly, many of these asbestos claimants have died during the prolonged delay. In addition, the delay has resulted in the squandering of estate assets through the consumption of shared insurance proceeds to fund Quigley's operating losses and professional fees. Pfizer has mocked bankruptcy law and process, subjecting it to ridicule. Pfizer's and Quigley's unreasonable and prejudicial delay throughout the bankruptcy clearly constitutes "cause" to dismiss this case.

**WHEREFORE**, the Ad Hoc Committee respectfully requests that the Court (i) enter an order, in the form attached hereto as Exhibit A, dismissing this case pursuant to 11 U.S.C. § 1112(b), subject to Quigley's prior payment in full of all administrative expenses (including any administrative expenses granted in connection with the Substantial Contribution Application, if and to the extent allowed), and (ii) grant the Ad Hoc Committee such other and further relief as is just and proper.

Dated: New York, NY
October 5, 2010

**BROWN RUDNICK LLP**

By: /s/ Edward S. Wiesfelner
Edward S. Weisfelner, Esq. (EW-5581)
7 Times Square
New York, NY 10036
(212) 704-0100

Jeffrey L. Jonas, Esq. (JJ-5670)
James W. Stoll, Esq. (JS-5931)
One Financial Center
Boston, MA 02111
(617) 856-8200

COUNSEL TO THE AD HOC COMMITTEE OF TORT VICTIMS

# 1772521 V12