UNITED STATES BANKRUPTCY COURT       **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                  :
                                       :       Chapter 11
QUIGLEY COMPANY, INC.,             :       Case No. 04-15739 (SMB)
                                       :
                                       :
                Debtors.             :
-------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER REGARDING UNITED STATES TRUSTEE'S OBJECTIONS TO FEE APPLICATIONS

**A P P E A R A N C E S :**

SCHULTE ROTH & ZABEL LLP
*Attorneys for Debtor*
919 Third Avenue
New York, NY 10022

      Michael L. Cook, Esq.
      Lawrence V. Gelber, Esq.
        Of Counsel

CAPLIN & DRYSDALE, CHARTERED
*Attorneys for the Official Committee of Unsecured Creditors*
One Thomas Circle, NW
Suite 1100
Washington, D.C. 20005

      Elihu Inselbuch, Esq.
      Ronald E. Reinsel, Esq.
      Rita C. Tobin, Esq.
        Of Counsel

TOGUT, SEGAL & SEGAL, LLP
*Attorneys for the Legal Representative for Future Asbestos Personal Injury Claimants of Quigley Company, Inc.*
One Penn Plaza
New York, New York 10110

      Scott E. Ratner, Esq.
        Of Counsel

OFFICE OF THE UNITED STATES TRUSTEE
201 Varick Street, Room 1006
New York, New York 10004

  Greg M. Zipes, Esq.
  Andrew Velez-Rivera, Esq.
   Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

  The principal question presented by the final fee applications in this case is whether counsel are entitled to compensation for the work they did in proposing or supporting a plan that failed, *inter alia*, for lack of good faith.  The United States Trustee ("UST") filed objections on this and several other grounds to the final fee applications submitted by Schulte Roth & Zabel LLP ("Schulte"), attorneys for the debtor Quigley Company, Inc. ("Quigley"), Caplin & Drysdale, Charted ("Caplin"), attorneys for the Official Committee of Unsecured Creditors (the "Committee") and Togut, Segal & Segal LLP (the "Togut Firm"), attorneys for Albert Togut in his capacity as Legal Representative for Future Asbestos Personal Injury Claimants (the "Legal Representative").  For the reasons that follow, the UST's principal objection is overruled, and the final fee applications submitted by Schulte and the Togut Firm are allowed.  The UST's objection to the final fee application of Caplin is sustained in part, its fee request will be reduced by $20,600.00, and allowed in the reduced amount provided that Caplin supplies the Certification required by the Court's *Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York*, ("*Amended Guidelines*"), at ¶ B(1)[1] that covers all fees and disbursements sought in the final fee application.

---

[1]  The *Amended Guidelines* were first adopted as General Order M-447 (Bankr. S.D.N.Y. Jan. 20, 2013), and now may be accessed through a hyperlink (http://www.nysb.uscourts.gov/sites/default/files/2016-1-a-Guidelines.pdf) in Bankr. S.D.N.Y.R. 2016-1(a).  They are not materially different from the fee guidelines that were

# BACKGROUND

## A.    Introduction

The background facts are set forth at length in the Court's Post–Trial Findings of Fact

and Conclusions of Law, dated Sept. 8, 2010, denying confirmation of Quigley's Fourth

Amended and Restated Plan of Reorganization (the "Fourth Plan").  *See In re Quigley Co.*, 437

B.R. 102 (Bankr. S.D.N.Y. 2010) (the "*Confirmation Decision*").  The Court assumes familiarity

with the *Confirmation Decision*, and limits the background discussion to the facts relevant to the

current disputes.

Quigley had been engaged in the business of manufacturing refractory products that used

asbestos.  Pfizer, Inc. ("Pfizer") acquired Quigley in 1968, and remains Quigley's sole

shareholder.  As a result of the acquisition, Quigley fell under the protection of most of Pfizer's

liability insurance and both shared a substantial amount of insurance payable on a first come,

first pay basis.  In September 1992, Quigley sold substantially all of its operating assets, and did

not operate any business between the date of the sale and just before it filed its chapter 11

petition on September 3, 2004 (the "Petition Date").

Over the years, hundreds of thousands of asbestos-related personal injury claims were

asserted against Quigley and Pfizer.  Most if not all of the claims asserted against Pfizer were

based on exposure to Quigley's products, and covered by the shared insurance.  Quigley and

Pfizer were represented by the same counsel who resolved many of the claims through a

---

in effect throughout the case.  Accordingly, references to the *Amended Guidelines* include the pertinent
corresponding provisions in the previous guidelines that governed fee applications at the time those applications
were made.

settlement that covered the claims against both. Historically, Quigley paid 77% of the settlement, and Pfizer paid 23%.

As the tide of continuing litigation depleted the insurance used to pay claims, Pfizer developed its global strategy described in the *Confirmation Decision*. The object of the global strategy was for Quigley to file chapter 11 and confirm a plan under 11 U.S.C. § 524(g) that would release Pfizer and its affiliates from present and future liability for products manufactured by Quigley. To accomplish this, Pfizer first resurrected the non-operating Quigley, hired independent management and transferred Pfizer's claims handling business to Quigley. Next, Pfizer entered into settlements (the "Pfizer Settlement Agreements") with approximately 175,000 asbestos claimants (the "Settling PI Claimants") for an aggregate amount of roughly $450 million. Half of the settlement was payable no later than December 1, 2005, and the remaining 50% was payable only after Quigley's confirmation order became final.

Although Pfizer had historically settled its liability and Quigley's liability at the same time, the Pfizer Settlement Agreements only covered Pfizer. Nevertheless, the Settling PI Claimants agreed, in substance, that if the assets in the Asbestos PI Trust (the "Trust") created under the plan were insufficient to pay 100% of the value under the Trust Distribution Procedures ("TDP") schedule, the Settling PI Claimants would only receive 10% of the payment otherwise due from the Trust. Since the Trust assets would unquestionably be insufficient, the Settling PI Claimants effectively agreed to take a 90% haircut and retain a "stub" claim against Quigley.

Meanwhile, Quigley's financial situation worsened as a result of mounting litigation and diminishing insurance to meet it. The Quigley board (two of the three members were

4

independent of Pfizer) met several times during the summer of 2004 to review Quigley's options.

They considered several alternatives including continuing to operate until the insurance ran out,

immediately liquidating under chapter 7, and filing a chapter 11 case with the financial support

of Pfizer.  The Quigley board opted for the last alternative.  Quigley filed the chapter 11 petition

on the Petition Date and immediately and successfully moved for an injunction that stayed all

litigation against Quigley and Pfizer that would have eroded the remaining pool of shared

insurance.  The injunction was subsequently modified in scope but in its various forms managed

to preserve the remaining insurance for use in connection with a plan.

**B.**      **The Plans**

Quigley filed its initial plan and disclosure statement on March 4, 2005 (ECF Doc. ##

288, 289), the day exclusivity expired.  The draft plan was incomplete.  It omitted the total

amount of Pfizer's contribution as well as many schedules, documents and agreements that had

yet to be prepared but eventually would be included as part of the plan.  As evidenced by the

placeholder exhibit dividers in the first plan, these included the Schedule of Shared Asbestos-

Related Insurance Policies, the Schedule of Asbestos-Related Insurance Settlement Agreements,

the AIG Assignment Agreement, the Amended Bylaws of Reorganized Quigley, the Amended

Certificate of Incorporation of Reorganized Quigley, the Asbestos-Related PI Claims Services

Agreement, the Pfizer Insurance Relinquishment Agreement and the Product Transfer and

Services Agreement.  Quigley subsequently filed its first amended plan and disclosure statement

on August 15, 2005 (ECF Doc. ## 419, 420), a second amended plan and disclosure statement on

September 23, 2005 (ECF Doc. ## 471, 472) and a third amended plan and disclosure statement

on October 6, 2005.  (ECF Doc. ## 504, 505.)  Each of the amended plans and disclosure

statements were accompanied by exhibits reflecting the continued negotiation and preparation of

5

critical plan documents, including the Asbestos PI Trust Distribution Procedures (ECF Doc. ##

423, 507), the Asbestos PI Trust Agreement (ECF Doc. ## 473, 506) and updated financial

information and projections.  (ECF Doc. ## 475, 508, 509, 510.)

By order dated January 23, 2006, the Court approved Quigley's disclosure statement.

(ECF Doc. # 593.)  The order provided that each asbestos personal injury claim would be

estimated at $1.00 for voting purposes, but all objections to the manner of tabulating the votes

were preserved.  The votes were solicited on the third amended plan, and based on the $1.00

estimation, the plan was accepted by 85% in number and amount of the class of asbestos

personal injury plaintiffs.  The vote met the confirmation requirement that at least 75% of those

voting cast a vote in favor of the plan.  *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb).

The Ad Hoc Committee of Tort Victims ("AHC") challenged the proposed methodology

for estimating and tabulating the votes.  The Court sustained the objection, concluding that the

votes of Settling PI Claimants should be valued at 10% of the TDP scheduled value to reflect the

90% subordination incorporated into the Pfizer Settlement Agreements.  *In re Quigley Co.*, 346

B.R. 647, 657-58 (Bankr. S.D.N.Y. 2006).  Once the votes were re-valued, they were insufficient

to accept the plan.  *Id.* at 658-59.  The Settling Claimants subsequently agreed to waive the 90%

subordination, Pfizer agreed to increase its contribution following negotiations to reflect the

increased amount the Trust now had to pay and Quigley filed the Fourth Plan and accompanying

Fifth Amended Disclosure Statement on May 18, 2007.  (ECF Doc. ## 1097, 1098.)  Quigley

thereafter filed modified versions of the Fourth Plan and Fifth Amended Disclosure Statement

together with additional exhibits.  (ECF Doc. ## 1124, 1125, 1174, 1175, 1178, 1179, 1180,

1181, 1182, 1257, 1258, 1379, 1380.)

The AHC and the UST objected to Quigley's motion to approve the Fifth Amended Disclosure Statement.  Many of the objections dealt with the adequacy of disclosure and were either resolved or overruled at the disclosure statement hearing.  *In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) (the "*Disclosure Statement Ruling*").  The AHC also argued that the Fifth Amended Disclosure Statement described a plan that was unconfirmable as a matter of law and should not be approved based on the classification and treatment of the non-Settling PI Claimants.

The Court overruled the legal objections, concluded that the Fourth Plan was not unconfirmable on its face, and identified various factual disputes regarding the Pfizer Settlement Agreements, including good faith and improper voter manipulation, which could only be resolved through a trial.  *Id.* at 119.  During the next two years, the parties engaged in discovery, prepared for trial and presented a host of disputes to the Court relating to discovery, confirmation and the confirmation trial.

C.    **The Confirmation Trial**

The confirmation hearing began in September 2009, covered fifteen trial days and ended in December 2009.  Following extensive post-trial briefing, the Court denied confirmation.  The problem with the Fourth Plan was two-fold.  First, it was proposed in bad faith.  The entire bankruptcy was instigated by Pfizer primarily for the purpose of obtaining a discharge of its derivative liability for Quigley's products.  The Pfizer Settlement Agreements incentivized the Settling PI Claimants to vote for any plan regardless of how it dealt with their claims because the second payment under the Pfizer Settlement Agreements depended on confirmation; "[i]n a nutshell, Pfizer bought enough votes to assure that any plan would be accepted."  *Confirmation*

*Decision*, 437 B.R. at 127.  The same bad faith resulted in the designation of the votes cast by the Settling PI Claimants.  *Id.* at 130-32.

Second, the Fourth Plan failed to satisfy the financial requirements for confirmation including the "fair and equitable" test, *id.* at 133-40, the "funding" requirement under 11 U.S.C. § 524(g)(2)(B)(i)(II) and the related issue of feasibility, *Confirmation Decision*, 437 B.R. at 140-43, the best interest of creditors test, *id.* at 146, and the equal treatment of creditors.  *Id.* at 146-48.  The financial issues were intertwined with and depended on difficult and disputed calculations concerning, *inter alia*, the present value of (1) the projected future asbestos-related claims that would be asserted against Quigley, (2) Pfizer's contribution to the Fourth Plan and (3) Pfizer's projected future liability for asbestos products manufactured by Quigley.

**D.    The Confirmation of the Fifth Plan**

Pfizer, Quigley and the AHC appealed, and the AHC moved to dismiss the case and dissolve the preliminary injunction, as modified, that had protected Pfizer since the inception of the case.  The UST separately moved to dismiss the case.  While these motions were pending, Pfizer settled with the AHC as well as other claimants, and Quigley filed a Fifth Amended and Restated Plan of Reorganization ("Fifth Plan") on April 6, 2011.  (ECF Doc. # 2264.)  Pfizer increased its contribution to rectify the various financial deficiencies outlined in the *Confirmation Decision*.  Claimants who had not settled with Pfizer received an enhanced distribution that reflected the amount of Pfizer's projected liability to these claimants.  Lastly, the Fifth Plan separately classified the claimants who had entered into the Pfizer Settlement Agreements, thereby removing the taint that the Pfizer Settlement Agreements had on the vote. After some further modifications, (*see* ECF Doc. ## 2391, 2405), the Court approved Quigley's Sixth Amended and Restated Disclosure Statement.  (ECF Doc. # 2458.)  The Court thereafter

confirmed the Fifth Plan on July 3, 2013 (ECF Doc. # 2671) over one objection, and the District

Court affirmed the confirmation order pursuant to 11 U.S.C. § 524(g)(3)(A) on July 30, 2013.

(*See* ECF Doc. # 2681.)

### E.     The Fee Requests

Eight professionals filed their last interim and final fee applications in early August 2013.

The professionals who had been in since the beginning had filed a total of twenty-six interim fee

applications during the case.  The UST objected to the final applications submitted by Schulte,

Caplin and the Togut Firm.  (*See Objection of the United States Trustee to Final Fee*

*Applications and Requests for Reimbursement of Out-of-Pocket Expenses*, dated Sept. 10, 2013

("*UST Objection*") (ECF Doc. # 2700).)  Following a hearing, the Court reserved decision on

those applications and granted the remaining five final applications.[2]  (*See Omnibus Order*

*Granting Applications for Allowance of Interim and Final Compensation and Reimbursement of*

*Expenses*, dated Sept. 30, 2013 (ECF Doc. # 2721).)

The following table summarizes the final applications that were the subject of the UST's

objection:

| Applicant | Retained As | Fees ($) | Expenses ($) |
|---|---|---|---|
| Schulte | Counsel to Quigley | 21,080,652.90 | 519,770.21 |
| Caplin | Counsel to the Committee | 5,406,992.75 | 215,502.69 |
| The Togut Firm | Counsel to the Legal Representative | 3,651,454.50 | 48,133.13 |

---

[2]     All of the fees and disbursements in this case have been paid (or will be paid) by Pfizer.  The fee awards
will not affect the amount available for distribution to present or future creditors.

The UST made two objections common to all three applications and requested substantial reductions. First, the applicants supported a plan that could not and did not meet the good faith test, (*UST Objection* at 3), and consequently, the plan-related services (other than those pertaining to the confirmed Fifth Plan) did not provide a benefit to the estate and were unreasonable. (*Id.* at 12.) Furthermore, the inability to confirm the plan should have been apparent to counsel early on. (*Id.* at 13.) The UST raised a related objection to the $2,806,644.50 billed by Schulte in the "Litigation" category between May 1, 2009 and December 31, 2009, a period that roughly corresponded to the run up to and conduct of the confirmation trial. (*Id.* at 16.)

Second, the UST computed the fees billed to plan-related work through the approximate date of the first plan and disclosure statement and compared those sums to the fees billed to all plan-related work during the entire case. The UST argued based on this comparison that "[t]he fees charged for plan and disclosure statement issues increased markedly during the pendency of this case with no justification. While the plan was amended a number of times, it does not appear that any amendment to the plan required the significant time billed by each of these professionals." (*Id.* at 3, 14-15.) For example, Schulte billed $679,465.00 under the "Plan and Disclosure Statement" category through the approximate date of the filing of the original plan, and billed $8,691,055.50 to the category for the entire case. (*Id.* at 15.) According to the UST, Schulte spent too much time revising plans where the only change was the amount of Pfizer's contribution, (*id.*), and Schulte did not secure the increases that Pfizer agreed to make. (*Id.*) The UST maintained that the fees billed by Schulte in the "Plan and Disclosure Statement" category should be reduced by 50%, or by $4,345,527.75, (*id.* at 15-16), and the fees billed in the "Litigation" category should be reduced by 10%, or $280,664.00. (*Id.* at 17.)

10

The UST directed the same two common objections, with variations, at Caplin and the Togut Firm.[3]  As to the first, their plan-related services up through the Fourth Plan were not reasonable and did not benefit the estate.  (*Id.* at 18, 24.)  Moreover, Caplin's fees in the "Plan and Disclosure Statement" category could not be explained by negotiations or motion practice with Pfizer because the Committee was a "neutral party" whose main task was to ensure that the calculations and distributions were correct, and this role fell primarily on the Committee's experts and not counsel.  (*Id.* at 18.)  As to the second common objection, Caplin billed $93,170.00 for "Plan and Disclosure Statement" work through the approximate filing date of the first plan and $2,323,332.00 to the category for the entire case, (*id.* at 19), and the Togut Firm billed $57,591.50, and $1,999,047.00,  respectively, for the same periods.  (*Id.* at 25.)  The UST recommended that the Court reduce the "Plan and Disclosure Statement" work billed by Caplin by 75%, or $1,742,499.00, (*id.* at 20), and the Togut Firm's comparable fees by 50%, or $999,523.50.  (*Id.* at 25.)

The UST also raised several specific objections that are discussed below.

## DISCUSSION

Bankruptcy Code § 330 authorizes a bankruptcy court to award reasonable compensation to a fee applicant based on actual, necessary services, and to reimburse it for his actual, necessary expenses.  11 U.S.C. § 330(a)(1) (2012).  The relevant criteria include (1) the time spent on the services; (2) the rates charged for the services; (3) whether the services were necessary to the administration of the estate, or beneficial at the time they were rendered toward the completion of the case; (4) whether the services were performed within a reasonable amount

---

[3]    The UST did not object to the fees incurred by Caplin and the Togut Firm participating in the confirmation trial.

of time in light of the complexity, importance, and nature of the problem, issue, or task; and (5)

whether the compensation is reasonable based on the customary compensation charged by

comparably skilled practitioners in non-bankruptcy matters.  11 U.S.C. § 330(a)(3).  Conversely,

the Court should not allow compensation for fees that are not reasonably likely to benefit the

estate or necessary for the administration of the estate.  11 U.S.C. § 330(a)(4).

The fee applicant bears the burden of proof on its claim for compensation.  *Zeisler &*

*Zeisler, P.C. v. Prudential Ins. Co. of Am.* (*In re JLM, Inc.*), 210 B.R. 19, 24 (B.A.P. 2d Cir.

1997); *In re Keene Corp.*, 205 B.R. 690, 695 (Bankr. S.D.N.Y. 1997).  Under the fee-shifting

statutes, there is "[a] strong presumption that the lodestar figure—the product of reasonable

hours times a reasonable rate—represents a 'reasonable' fee."  *Pennsylvania v. Del. Valley*

*Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); *accord Blum v. Stenson*, 465 U.S.

886, 897 (1984) ("When . . . the applicant for a fee has carried his burden of showing that the

claimed rate and number of hours are reasonable, the resulting product is presumed to be the

reasonable fee" to which counsel is entitled.).  The same presumption applies under Bankruptcy

Code § 330(a).  *See In re Apex Oil Co.*, 960 F.2d 728, 731 (8th Cir. 1992) ("In determining what

constitutes 'reasonable compensation' under this section [11 U.S.C. § 330(a)], most courts have

adopted the formula used to calculate fees under various federal fee-shifting statutes."); *In re*

*ASARCO, LLC*, 477 B.R. 661, 672 (S.D. Tex. 2012) ("There is a strong presumption that the

lodestar amount is reasonable.").

While the lodestar presumption is generally invoked when the applicant seeks a fee

enhancement, *see, e.g.*, *In re Brous*, 370 B.R. 563, 570-71 (Bankr. S.D.N.Y. 2007), it has also

been applied in the applicant's favor to support the fee request.  *See D.A. Elia Constr. Corp. v.*

*Damon & Morey, LLP* (*In re D.A. Elia Constr. Corp.*), No. 04-CV-975A, 2006 WL 1720361,

12

200at *7 (W.D.N.Y. June 19, 2006) ("The Supreme Court has instructed that there is a 'strong presumption' that 'the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee to which the applicant is entitled.") (quoting *Del. Valley Citizens' Council for Clean Air*, 478 U.S. at 565), *aff'd sub nom.*, *Bernheim v. Damon & Morey, LLP*, No. 06-3389-BK(CON), 2007 WL 1858292 (2d Cir. 2007); *In re Hunt's Health Care, Inc.*, 161 B.R. 971, 980 (Bankr. N.D. Ind. 1993) ("[T]he fee produced by the resulting lodestar calculation will, presumptively, be a reasonable one [and a]bsent evidence to the contrary, the presumption of reasonableness should be respected and the fee generated by the lodestar calculation should be the fee awarded."); *In re Blackwood Assoc., L.P.*, 165 B.R. 108, 111 (Bankr. E.D.N.Y. 1994) (If the fee application "contains all information and detail necessary for a presumption of reasonableness . . . a *prima facie* case for the requested fees has been made."); *cf. Fed. Trade Comm'n v. Capital Acquisitions & Mgmt. Corp.*, No. 04 C 7781, 2005 WL 3676529, at *3 (N.D. Ill. Aug. 26, 2005) (applying presumption in favor of receiver's fee request).

The fee applicant carries its burden of going forward by submitting contemporaneous time records that, *inter alia*, provide sufficient detail to enable the Court to determine that the services were reasonable and necessary. *Amended Guidelines*, at ¶ A ("All applications should include sufficient detail to demonstrate compliance with the standards set forth in 11 U.S.C. § 330."); *In re 415 West 150 LLC*, No. 12–13141 (SMB), 2013 WL 4603162, at *3 (Bankr. S.D.N.Y. Aug. 28, 2013) ("Proper time record keeping is necessary to enable the court to determine the reasonableness of the work that has been performed.  Generally, fee applications, standing alone, must contain sufficient detail to demonstrate compliance with § 330."); *cf. Hensley v. Eckerhart*, 461 U.S. 424, 441 (1983) (Burger, C.J., concurring) (To recover attorneys' fees under 42 U.S.C. § 1988, "the party who seeks payment must keep records in sufficient detail

13

that a neutral judge can make a fair evaluation of the time expended, the nature and need for the service, and the reasonable fees to be allowed.")

Once the applicant carries its burden of showing the reasonableness and necessity of its services, and hence, its fees, the burden shifts to the objector to produce evidence showing that the applicant has requested an unreasonable amount. *D.A. Elia Constr. Corp.*, 2006 WL 1720361, at *7 ("Having satisfied its entitlement to a presumption of reasonableness, the burden fell upon the debtor to rebut that presumption."); *In re Abel*, No. 95–11044, 2001 WL 36160133, at *3 (Bankr. D. Vt. May 29, 2001) ("A party objecting to a fee application has a responsibility to challenge with specificity the information presented and to produce evidence controverting that produced by the applicant."); *Blackwood Assocs., L.P.*, 165 B.R. at 112 ("A party opposing a fee application must carry the burden of explaining what therein is unreasonable or, at least, what would be reasonable under the circumstances. Absent such evidence by the objectant, the opposition fails. It is not for the Court to supply such evidence or the detail required to support the objectant's overly general pleading." (citations omitted)).

Important to the present dispute, a court does not determine "reasonableness" through hindsight, *Brous*, 370 B.R. at 570, or penalize counsel simply because it rendered services prosecuting an application that failed or opposing one that succeeded. *See JLM*, 210 B.R. at 25; *In re West End Fin. Advisors, LLC*, No. 11–11152 (SMB), 2012 WL 2590613, at *6 (Bankr. S.D.N.Y July 3, 2012). The test is an objective one, and considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances." *In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 72 (2d Cir. 1996) (*citing In re Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995) (Posner, C.J.)); *accord In re Angelika Films 57th, Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998), *aff'd*, 246 B.R. 176 (S.D.N.Y. 2000); *In re Keene Corp.*, 205 B.R. at 696; *In re*

*Drexel Burnham Lambert Grp., Inc.*, 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991).

Schulte and the Togut Firm established the presumptive reasonableness of their fee requests through the twenty-six interim applications, and with a few exceptions discussed below, so did Caplin. These applications detailed the services that each rendered in connection with the case. The time entries adequately detail what each firm did, when it did it and how long it took to do. All of the services were rendered in the case, and on their face, were reasonable and necessary to the administration of the case. Furthermore, Schulte and the Togut Firm certified in accordance with the Court's *Amended Guidelines*, at ¶ B(1), that the fees and disbursements they sought were billed at rates and in accordance with practices customarily employed and generally accepted by their applicant's clients. (*See Final Application Under 11 U.S.C. § 330(a) of Schulte Roth & Zabel LLP, Counsel to Quigley Company, Inc., for Allowance of Compensation and Reimbursement of Expenses from September 3, 2004 Through July 2, 2013*, dated Aug. 2, 2013, at Ex. A, ¶ 5 at pg. 44 of 137 (ECF Doc. # 2682)); *Final Application of Togut, Segal & Segal LLP, as Bankruptcy Counsel for Albert Togut in His Capacity as Legal Representative for Future Asbestos Personal Injury Claimants, for Allowance of Compensation for Services Rendered Through July 2, 2013; and for Reimbursement of Expenses, Etc.*, dated Aug. 5, 2013, at Ex. 3, ¶ 7 (ECF Doc. # 2691-3).) Caplin did not include a Certification, and as noted in the introduction, its award will depend on compliance with that Certification requirement.[4] Moreover, and with the exception of some of Caplin's time entries that are dealt with later in this decision, the UST did not challenge the rates, contend that the time entries did not sufficiently

---

[4]     Caplin did certify that it billed its time during the Twenty-Sixth Interim Application period at its standard hourly rates. (*Twenty-Sixth Interim and Final Application of Caplin & Drysdale, Chartered as Counsel to the Unsecured Creditors Committee for Compensation and Reimbursement of Expenses*, dated Aug. 2, 2013, at ¶ 11 (ECF Doc. # 2683).)

describe what the applicants did, or argue that the applicants failed to provide the services depicted in the time records.

Consequently, and with the aforementioned proviso regarding Caplin, each of the firms carried their initial burden of going forward and established the *prima facie* reasonableness of their fee requests. The burden then shifted to the UST to come forward with evidence (or legal argument) demonstrating that the requests were unreasonable.

## A.    The UST's Common Objections

### 1.    The Failed Plan

A Court may disallow fees incurred by a law firm for work relating to a plan if it is patent that the plan was unconfirmable *at the time that the services were rendered*. *In re Ahead Commc'ns Sys., Inc.*, 395 B.R. 512 (D. Conn. 2008), decided by then-District Judge Droney, aptly illustrates this principle. There, the debtor filed a plan that provided for the distribution of non-voting stock to GDC, the debtor's largest creditor. *Id.* at 515. GDC objected to the debtor's plan and the corresponding services in the fee application submitted by the debtor's attorneys because the issuance of non-voting stock violated Bankruptcy Code § 1123(a)(6) and (a)(7).[5] *Id.* In other words, the debtor's plan was unconfirmable on its face.

The Bankruptcy Court overruled the objection to the fee application, but the District Court reversed. Judge Droney stated that no reasonable attorney "could have believed that a plan that creates nonvoting stock, in violation of 1123(a)(6)'s plain meaning, *might* be confirmable."

---

[5]      Section 1123(a)(6) requires that "a plan shall provide for the inclusion in the charter of the debtor . . . of a provision prohibiting the issuance of nonvoting equity securities." Section 1123(a)(7) requires a plan to "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."

*Id.* at 517 (emphasis in original).  The Bankruptcy Court had erroneously concluded that the

confirmability of the plan presented a litigable issue despite these Code violations.  *Id.* at 517-18.

The District Court concluded:

> The Court finds that Zeisler reasonably should have known that the Debtor's Plan
> could not be confirmed, and therefore its activities in preparing and filing the plan
> were not "beneficial at the time rendered," nor were they "reasonably likely to
> benefit the debtor's estate" as required for an award of fees under 11 U.S.C.
> § 330(a)(3)(c).

*Id.* at 520.

The authorities cited by the UST confirm this rule; compensation should be denied when

it is clear that the plan was unconfirmable *at the time the plan-related services were rendered*.

*See Rubner & Kutner, P.C. v. U.S. Tr.* (*In re Lederman Enters., Inc.*), 997 F.2d 1321, 1323-24

(10th Cir. 1993) ("[T]he debtor's inability to successfully develop and complete a plan should

have been apparent to counsel from commencement of the case.  Therefore, any work performed

by R & K was not necessary, and the bankruptcy court did not abuse its discretion in refusing to

compensate the law firm for such services."); *In re Universal Factoring Co.*, 329 B.R. 62, 79

(Bankr. W.D. Okla. 2005) ("Counsel for a debtor or debtor in possession will not be

compensated for time spent in preparation of a plan which has no realistic hope of confirmation."

(quoting *In re Polishuk*, 258 B.R. 238, 249 (Bankr. N.D. Okla. 2001)) (internal quotation marks

omitted)); *In re Crown Oil, Inc.*, 257 B.R. 531, 539 (Bankr. D. Mont. 2000) ("While it is not

necessary to have a successful reorganization in order for debtor's counsel to be awarded fees,

fees may be denied when counsel should have realized that reorganization was not feasible and

therefore services in that effort did not benefit the estate." (internal quotation marks and citations

omitted)); *In re Office Prods. of Am.*, 136 B.R. 983, 990-91 (Bankr. W.D. Tex. 1992) ("The fee

detail does indeed suggest that there was a point in time when the debtor knew or should have

known that pursuit of this plan flew in the face of § 1129(a), yet the debtor pushed on anyway. At that point, the services of counsel were no longer 'necessary,' as the debtor was no longer at that point discharging its duties as fiduciary of the estate, was no longer pursuing legitimate reorganization."); *In re Hunt*, 124 B.R. 263, 267 (Bankr. S.D. Ohio 1990) ("An attorney should not expect to be fully compensated for such unrealistic effort," where feasibility of plan "was nonexistent at the time the plan was offered."); *cf. 415 West 150 LLC*, 2013 WL 4603162, at *5 (denying fees to a receiver's attorney for pursuing a contempt motion in bankruptcy court against the debtor's principal because the receiver had already obtained an order of contempt against the debtor's principal in state court, the bankruptcy court contempt motion did not seek monetary, injunctive or other relief beyond a declaration of contempt,  and hence, "the lack of any conceivable benefit to the estate should have been obvious from the outset."); *In re 530 West 28th Street, L.P.*, No. 08-13266 (SMB), 2009 WL 4893287, at *9-10 (Bankr. S.D.N.Y. Dec. 11, 2009) (denying fees to Committee's counsel, as unreasonable and unnecessary, for opposing a debtor's plan that essentially provided all of the relief the Committee had sought in the case).

In contrast to the UST's authorities, the Fourth Plan raised a litigable issue of good faith.[6] The Court had overruled the AHC's objection to the disclosure statement, concluded that the plan was not unconfirmable as a matter of law, and ruled that the issues surrounding the Pfizer Settlement Agreements, including good faith, involved the resolution of factual issues and required a trial. *Disclosure Statement Ruling*, 377 B.R. at 119.  Furthermore, Pfizer argued that

---

[6]    There was never a serious question that the Quigley petition, as opposed to the Fourth Plan, was filed in good faith.  Quigley faced endless litigation with rapidly diminishing insurance.  Furthermore, while the Court concluded that Pfizer instigated the Quigley chapter 11 to obtain a release of its derivative liability, that motive, standing alone, does not constitute bad faith.  Bankruptcy Code § 524(g) allows the plan to grant releases to qualifying affiliates like Pfizer, and as the confirmation of the Fifth Plan showed, the result is consistent with the Bankruptcy Code.  The problem with the Fourth Plan was the way that Pfizer went about doing it.

18

the Pfizer Settlement Agreements were essentially plan support agreements permitted under

applicable law that did not expressly require any Settling PI Claimant to vote for the Fourth Plan.

(*See Post-Trial Brief and Conclusions of Law of Pfizer Inc. in Support of Confirmation of*

*Quigley Company, Inc.'s Fourth Amended and Restated Plan of Reorganization*, dated Jan. 5,

2010, at 34, 37-38 (ECF Doc. # 2007).)  The Court rejected the argument, *Confirmation*

*Decision*, 437 B.R. at 131, but the argument was not frivolous.

Even the UST recognized that the outcome was in doubt.  In July 2009, only two months

before the confirmation trial began, the UST filed an objection to the latest round of interim fee

applications.  The UST argued for a "holdback" because "the overall outcome of this case is in

doubt," (*Objection of the United States Trustee to Applications for the Allowance of Interim*

*Compensation and Reimbursement of Expenses*, dated July 9, 2009 ("*UST Interim Fee*

*Objection*"), at 1 (ECF Doc. # 1861), and "the ultimate success of the case is not yet certain."

(*Id.* at 4-5.)  The UST's expression of doubt implicitly recognized that no one can safely predict

the outcome of litigation, or that Schulte should have known from day one that the plan could not

be confirmed.  *Cf. O'Connell v. Arthur Anderson LLP* (*In re Alphastar Ins. Group Ltd.*), 383

B.R. 231, 262 (Bankr. S.D.N.Y. 2008) ("Every trial lawyer has won cases he should have lost,

and lost cases he should have won.  A party cannot, therefore, plead scienter by alleging that

management knew or should have known that the company would lose a litigation.")

Accordingly, although Quigley faced a difficult fight, the outcome was in doubt, and I reject the

argument that Schulte's services rendered in connection with the promulgation and prosecution

of the Fourth Plan would not have been undertaken by a reasonable attorney on behalf of its

client.  This conclusion follows even more strongly in the case of Caplin and the Togut Firm who did not propose the Fourth Plan but ultimately supported it.[7]

Furthermore, the UST's argument that Caplin should be docked 75% of its plan-related fees (as opposed to the 50% reduction for Schulte in the Togut Firm) is misguided.  According to the UST, Caplin cannot explain time by referring to services rendered in connection with negotiations or motion practice with Pfizer because the Committee was a "neutral party" whose main task was to ensure that the calculations and distributions were correct, and this role fell primarily on the Committee's experts and not counsel.  (*UST Objection* at 18.)  The UST's "neutrality" argument may have come from Caplin's response to the UST's objection to its Thirteenth Interim Fee Application.  There, Caplin stated that the Committee had "remained neutral with respect to the Plan while the Ad Hoc Committee and the Debtor have litigated questions related to the status and voting rights of certain members of the asbestos creditor constituencies."  (*Response of Caplin & Drysdale, Chartered, to the Objection of the United States Trustee to Applications for the Allowance of Interim Compensation and Reimbursement of Expenses*, dated July 10, 2009[8] ("*Caplin Interim Application Response*"), at ¶ 2 (ECF Doc. # 1862).)  Caplin continued, however, that the Committee nonetheless played an active role preparing and reviewing plan documents relating to the personal injury trust, defending the Committee's privileges at each deposition, analyzing fact witness expert reports and testimony for the Committee members, and actively participating in litigation involving the Owens-Illinois objection and insurer issues.  (*Id.* at 3-4.)

---

[7]     While the UST argues that the Togut Firm's plan-related fees should be reduced by 50%, she did not seek a reduction in Togut's fees as the Legal Representative.  But the Legal Representative presumably directed the activities that his lawyer's undertook in connection with the plans and disclosure statements.

[8]     The document is misdated "2008."

20

Contrary to the UST's supposition, the Committee was not a "neutral" party that just called balls and strikes; it represented the interests of all of the existing creditors. It was appointed by the UST, 11 U.S.C. § 1102(a)(1), to, *inter alia*, "participate in the formulation of a plan [and] advise those represented by such committee of such committee's determinations as to any plan formulated," 11 U.S.C. § 1103(c)(2), and was primarily responsible for negotiating the plan on behalf of its constituency. *In re Refco Inc.*, 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 85 B.R. 13, 16-17 (Bankr. S.D.N.Y. 1988); 7 COLLIER ON BANKRUPTCY ¶ 1103.05[1][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2013); *see* H.R. REP. NO. 95-595, at 401 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6357 ("[The Committees] will be the primary negotiating bodies for the formulation of the plan of reorganization. They will represent the various classes of creditors and equity security holders from which they are selected.") The UST's suggestion that Committee played a minimal role in the case is not well taken and lacks merit, a fact confirmed by an examination of the numerous amendments, updates and revisions to the plans and disclosure statements filed in the case, as well as Caplin's own time records.

### 2.    The Statistical Comparison

The second prong of the UST's common objection is that each of the applicants spent an unreasonable amount of time on plan-related services after the first plan and disclosure statement were filed. As noted, the UST compared the amount of time billed to the "Plan and Disclosure Statement" category prior to May 1, 2005,[9] and the total fees billed to the category during the entire case. The comparison showed that Schulte's total fees were nearly twelve times greater

---

[9]    The initial plan and disclosure statement were filed on March 4, 2005.

than the fees billed during the earlier period, and Caplin's and the Togut Firm's fees were, respectively, twenty-three times and thirty-four times greater.

The UST's objection illustrates the axiom that statistics are a group of numbers looking for an argument. The UST's objection was fueled by the misperception that after the original plan and disclosure statement were filed, the later changes "related to increases in Pfizer's contributions and did not involve wholesale redrafting of the First Plan and Disclosure Statement." (*UST Objection* at 15.) The UST did not, however, participate in any substantive plan negotiations. (*See Declaration of Michael L. Cook in Support of Schulte Roth & Zabel LLP Final Fee Application Under 11 U.S.C. §330(a) (Docket No. 2682) and in Response to U.S. Trustee's Objection (Docket No. 2700*, dated Sept. 17, 2013 ("*Cook Declaration*"), at ¶ 8 (ECF Doc. # 2706).) Furthermore, the applicants responded to the objection with details of the plan-related work that they performed after April 30, 2005. In Schulte's case, this included but was not limited to continuous negotiations with the AHC, the liability insurers, Pfizer and the Committee, preparation of revisions and updates of the financial information, participation in disclosure statement litigation, conducting research regarding numerous legal issues relating to confirmation, participation in plan-related discovery, preparation for the confirmation hearing, addressing the silica claims, and preparation for what appeared might be a contested confirmation hearing relating to the Fifth Plan. (*Id.* at ¶ 11; *see also Declaration of David B. Killalea in Support of Schulte Roth & Zabel LLP Final Fee Application Under 11 U.S.C. § 330(a) (Docket No. 2682)*, dated Sept. 16, 2013, at ¶¶ 3-4 (ECF Doc. # 2704).) Caplin offered similar evidence of its plan-related services after April 30, 2005, (*Reply of Caplin & Drysdale, Chartered to the Objection of the United States Trustee to Final Fee Applications and Requests for Reimbursement of Out-of-Pocket Expenses*, dated Sept. 17, 2013, at 13-14 ("*Caplin Reply*")

(ECF Doc. # 2710), and so did the Togut Firm.  (*Reply of Togut, Segal & Segal LLP to the Objection of the United States Trustee to Its Final Fee Application*, dated Sept. 17, 2013, at ¶¶ 13-18 (ECF Doc. # 2707).)

The firms' time records and responses to the *UST Objections* demonstrate the substantial amount of plan-related work that occurred after April 30, 2005.  Much of this work was evidenced by the filing of various plans and disclosure statements, cited above, that included new, revised and updated exhibits.  The increase in activity after April 30, 2005 implies the opposite of what the UST argues; the first plan and disclosure statement were incomplete placeholders filed on the date that exclusivity expired, and required substantial additional work.

Based on the foregoing, the UST's two common objections to the reasonableness of the Schulte, Caplin and Togut Firm plan-related fees and the Schulte "Litigation" fees are overruled.

**B.      The UST's Specific Objections**

**1.      Schulte**

Over the approximately nine years that this case has been pending, fourteen Schulte attorneys each billed less than six hours to the case.  (*UST Objection* at 17-18.)  The aggregate amount of legal fees attributable to the services of these so-called "transitory" timekeepers was $15,349.50.  The UST contended that absent a satisfactory explanation for using "transitory" timekeepers, all of this time should be disallowed.  (*See id.* at 18.)

The primary concern with too many attorneys billing too little time is the learning curve. Every attorney must be brought up to speed to the extent necessary to perform his or her task, and the theory goes that the cost of this education can be saved or minimized if attorneys already familiar with the case perform the service instead.  This concern diminishes where the

"transitory" timekeeper provides services on an *ad hoc* basis within an area of expertise that is not possessed by the attorneys regularly assigned to the case or the task is so focused that it is unnecessary to spend time learning the details of the case.

Schulte's response to the UST objection sets forth the services rendered by these "transitory" timekeepers.  (*See Cook Declaration* at ¶ 15.)  Most were experts in particular fields (real estate, intellectual property, tax, employment law, environmental law) and dealt with specific, non-recurring issues that arose in the course of the case.  A few of the "transitory" timekeepers belonged to the litigation or business reorganization departments, and the time-value of their services totaled $3,353.50.  Again, they dealt with discrete issues relating to ethical disqualification, a specific withdrawal motion, the carve out provisions in the early financing orders, research relating to the Pfizer Settlement Agreements and the analysis of a specific document request.

There is a rebuttable presumption in bankruptcy that the staffing decisions made by attorneys retained by court order "have been made in good faith in view of the attorneys' legal and ethical responsibilities as officers of the Court."  *In re Cenargo*, 294 B.R. 571, 596 (Bankr. S.D.N.Y. 2003); *accord In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991).  The UST has not identified any evidence to rebut this presumption.  And given the nature of their services and the minimal amount of time attributable to them, the "transitory" timekeepers did not spend much time coming up to speed.  Nor is it evident that the same services could have been rendered by other, "better-educated" attorneys in less time.  Accordingly, the UST's objection to the "transitory" timekeepers is overruled.

2.    **Caplin**

a.    **Vagueness**

The *Amended Guidelines* spell out the level of detail for certain services.  Time entries

for telephone calls, letters or other communications should identify the parties to and the nature

of the communications.  (*Amended Guidelines* at ¶ A (4)(vii).)  "Time entries for court hearings

and conferences should identify the subject of the hearing or conference."  (*Id.*)  These specific

requirements are consistent with the general rule that "[a]ll applications should include sufficient

detail to demonstrate compliance with the standards set forth in 11 U.S.C. § 330."  The UST

argues that vagueness and inaccuracy permeate Caplin's time records, and its allowed fees

should be reduced by $200,000.00.  (*UST Objection* at 21.)

The first category of vague time records targeted by the UST are the numerous entries

referring to "review of court dockets and calendars" and similar descriptions.  For example, one

paralegal (ADK) billed thirty minutes to "review of Court dockets and calendars" on each of

sixty-one separate occasions in the Ninth Interim Fee Application, including on many days

without any docket activity.  (*Id.* at 20-21.)  He recorded the same entries on his time records

sixty-six times in the Fifth Interim Fee Application.  (*Id.* at 20 n.7.)  Another paralegal (SMS)

made similar time entries on nine occasions (1/10/12, 1/18/12, 1/20/12, 1/23/12, 1/24/12,

1/25/12, 1/26/12, 1/27/12, 1/30/12), but there was no docket activity on those days.  The UST's

supplemental objection annotated the time records she argued were vague.  (*Supplement to

Objection of the United States Trustee to Final Fee Applications and Requests for

Reimbursement of Out-of-Pocket Expenses*, dated Sept. 16, 2013 ("*UST Supplemental

Objection*"), Ex. A, pp. 4-16 of 24 (ECF Doc. # 2701).)

According to Caplin, ADK (and presumably SMS as well) performed a daily docket review in each of Caplin's many bankruptcy cases, downloaded and reviewed filings, prepared an oral or written summary for the senior attorneys assigned to each case, and on occasion, printed and transmitted a copy of the document to an attorney at the firm. (*Declaration of Rita C. Tobin*, dated Sept. 17, 2013 ("*Tobin Declaration*"), at ¶¶ 14-16 (ECF Doc. # 2710-1).) Obviously, the time records do not describe these services. More important, Caplin doesn't explain why the paralegals billed time to these services on days when there were no docket entries; possibly the time should have been charged to a different Caplin case that involved docket activity. ADK's billing rate ranged from $175 per hour to $205 per hour, and the time value of his 127 entries of one-half hour each is approximately $12,000.00. The nine entries by SMS aggregate $832.50. Because they also reviewed the dockets on days when there were docket entries, the Court will disallow $6,500.00, or approximately 50% of their time.

The records also reflect similar although sporadic entries of twelve to eighteen minutes by Rita Tobin, an attorney. (*See UST Supplemental Objection*, Ex. A.) According to Ms. Tobin, she reviewed emails, reports from paralegals and reports from local counsel with a view toward apprising Caplin's partner-in-charge, Elihu Inselbuch, Esq., about important issues. (*Tobin Declaration* at ¶ 21.) In addition, she was responsible for reviewing all of the paralegal and local counsel docket reports. (*Id.* at ¶ 22.)

Nevertheless, several of the time entries relating to docket review included days on which there was no docket activity (5/29/07, 1/14/08, 1/18/08, 5/13/09, 5/22/09, 6/26/09, 1/13/12). On another occasion (9/7/2006), she billed one hour to "review documents and documents filed"

when the only documents filed that day were three affidavits of service.[10]  Ms. Tobin's hourly

billing rate ranged from $435 to $505, and the value of the time reviewing the docket on the days

of no or minimal docket activity was roughly $1,200.00.  This time is disallowed.[11]

Aside from the "docket review" activities, the UST highlighted several other vague

entries.  The Court concludes that the following entries, sometimes involving large blocks of

time, do not sufficiently detail the activity involved, or in the case of communications, do not

identify the other party to the communication and/or the subject matter of the communications:

| Timekeeper | Date | Hours | Value | Entry |
|---|---|---|---|---|
| RCT | 1/4/06 | .7 | 304.50 | Address Plan issue |
| PVL | 1/11/06 | .2 | 152.00 | Teleconference Levin |
| RCT | 2/7/06 | 1.0 | 435.00 | Research Plan issue |
| RER | 2/27/06 | 2.6 | 1,508.00 | Review pleadings and plan documents re: meeting |
| RER | 5/8/07 | 1.1 | 671.00 | Telephone conference regarding claims estimates, projections and follow up |
| PVL | 5/9/07 | .1 | 80.00 | Review EI memo |
| RCT | 5/9/07 | .5 | 240.00 | Review emails and respond |
| PVL | 5/11/07 | .2 | 160.00 | Review email (.1); review EI memo (.1) |
| RCT | 5/16/07 | 2.8 | 1,344.00 | Review TDP issues (.8); review Plan documents (2.0). |
| RCT | 5/16/07 | 1.0 | 480.00 | Research re Plan issues (1.0). |
| RCT | 5/17/07 | 1.0 | 480.00 | Review Plan documents |

---

[10]      During the preceding week, the only other documents filed were five three-page stipulations extending time.

[11]      A few of these entries indicate that Ms. Tobin also reviewed local counsel's recommendations as they pertained to updating Mr. Inselbuch.  The entries do not separate out this service from the review of the docket.

| RER | 5/18/07 | .4 | 244.00 | Coordinate regarding plan meeting |
| PVL | 5/21/07 | .1 | 80.00 | Review EI memo |
| PVL | 5/22/07 | .1 | 80.00 | Review DS motion |
| PVL | 5/24/07 | .3 | 240.00 | Confer RER |
| RER | 6/4/07 | .8 | 488.00 | Review descriptions of transactions |
| RCT | 6/5/07 | .3 | 144.00 | Review correspondence |
| EI | 8/17/07 | .1 | 87.50 | Status |
| PVL | 8/21/07 | .1 | 80.00 | Conference with EI and RER. |
| RCT | 2/1/08 | .6 | 318.00 | Memo to RER (.3); review emails |
| EI | 2/7/08 | .5 | 460.00 | Conf RCT re: status[12] |
| RER | 3/7/08 | .5 | 320.00 | Review discovery requests and follow up.[13] |
| RER | 3/7/08 | 2.4 | 1,536.00 | Follow up w/RCT re: hearing, review transcripts and follow up re: committee position. |
| EI | 3/12/08 | .2 | 184.00 | RER call |
| RER | 3/28/08 | .6 | 384.00 | Correspondence and follow up re: confirmation |
| RER | 7/27/09 | 1.9 | 1,216.00 | Review and follow up re: plan supplement documentation. |
| RER | 7/27/09 | 1.2 | 768.00 | Review drafts and correspondence and follow up w/RCT re: PTO |
| RER | 7/28/09 | .7 | 448.00 | Review and follow up re: PTO |
| RCT | 5/5/10 | .3 | 163.50 | Emails re status |
| RCT | 5/7/10 | 1.6 | 872.00 | Review and organize files re future events |
| EI | 6/14/10 | .1 | 95.00 | Status inquiry |

---

[12]     A conference regarding the status of the case that lasts for one half hour should describe the subjects discussed in more detail.

[13]     Some of the services involve "follow up" or "addressing" issues. The use of such verbs does not explain the service the timekeeper rendered.

| RER | 7/26/12 | .3 | 214.50 | Correspondence re: conf. call w/Debtor and Pfizer |
|-----|---------|-----|-----------|----------------------------------------------------|
|     |         |     | **14,277.00** |                                                |

The services in this chart aggregated $14,277.00 in billed time.  Based on the vague

descriptions, 50%, rounded to $7,200.00, is disallowed.

### b.    Review of Billing

Although professionals are entitled to reasonable compensation for the time spent

preparing their fee applications, time spent preparing or editing bills is not allowed under the

assumption that lawyers do not charge their clients for preparing time records.  *In re CCT*

*Commc'ns, Inc.*, No. 07–10210 (SMB), 2010 WL 3386947 (Bankr. S.D.N.Y. Aug. 24, 2010); *see*

*415 West 150, LLC*, 2010 WL 338647, at *6 n.3.  According to the UST, Caplin spent a

significant amount of time reviewing and presumably editing billing statements, and "[b]ecause

of the pervasive nature of these entries, the United States Trustee requests that the Court reduce

C&D's fee award in this category by $100,000.00."  (*UST Objection* at 22-23.)  Caplin

responded that the time entries referred to the review and editing of time records that contained

privileged material.  (*Tobin Declaration* at ¶¶ 8-11.)  The amount of time Ms. Tobin spent

reviewing and editing time records to remove privileged material aggregated nearly $9,000.00,

(*see UST Supplemental Objection*, Ex. B, pp. 17-24 of 24), and according to Caplin, the total

amount of time to which the UST objected was only $10,710.00.  (*Caplin Reply* at 21 n.10.)

While the time spent preparing, reviewing and editing the bills is not generally

compensable, it is reasonable for the attorney responsible for preparing the fee application to

spend some amount of time reviewing the time records to ensure that the description of a service

does not reveal a secret or confidential communication or waive a privilege.  The time records

are attached to the fee application and made publically available.  Although the fee applicant

could seek permission to file a redacted fee application and submit an unredacted copy *in

camera*, *Amended Guidelines*, at ¶ C, the time spent reviewing and redacting the time records

would not be any different than the time spent reviewing and editing the time records.

Timekeepers can and should be instructed whenever possible not to describe their services in a

manner that might waive a privilege, but not all timekeepers are attorneys, some timekeepers

may nonetheless include privileged material in their time entries, it may be impossible to record

certain time without revealing confidential material and someone will have to conduct a privilege

review anyway.

Since the time expended by Caplin reviewing and editing the bills was minimal compared

to the amount of time Caplin billed to preparing its own fee applications during the nine year life

of the case ($232,900.00 according to *UST Objection* at 22), the UST's objection is overruled.

### c.    Defending Fees

### i.    The Thirteenth Interim Application

The *Thirteenth Interim Application of Caplin & Drysdale Chartered, Counsel to

Unsecured Creditors Committee, for Interim Compensation and Reimbursement of Expenses*,

dated June 5, 2009 ("*Caplin's Thirteenth Interim Application*") (ECF Doc. # 1837) sought

$423,845.50 in interim fees and $20,929.39 in interim reimbursement of expenses.  The majority

of the fees were billed in the "Litigation" category.  The UST objected to several applications at

the time, including Caplin's, and requested a 10% reduction in its fees.  (*See UST Interim Fee

Objection*, at 2, 10.)  The UST argued that Caplin was not "particularly active" in litigation

during the fee period, (*id.* at 9), much of the Committee's time records reflect "review" of

documents and "attendance" by the Committee at various hearings and depositions, (*id.* at 9-10),

some of the time entries were vague or lumped (the UST identified four), (*id.* at 10), and the

$44,022.00 billed to "Case Administration" largely concerned the review and organization of

documents, making it difficult to determine the reasonableness of fees.  (*Id.* at 10 & Ex. D.)

Finally, the UST argued that Caplin had billed 76 hours in time (representing $15,580.00 in fees)

to "Docket Review & Control," this activity was part of overhead, and the time charges should

be "categorically denied."  (*Id.*) (citing *In re Fibermark, Inc.*, 349 B.R. 385, 397 (Bankr. D. Vt.

2003).)

 The UST objection provoked a spirited reply.  Caplin argued that the objection itself was

too vague to permit a meaningful response, (*Caplin Interim Application Response*, at 2, 5), and

although the Committee was "neutral" with respect to the plan while Quigley and the AHC

litigated plan issues, the Committee was actively involved in the case and other litigation,

including discovery, review of expert reports and litigation pertaining to the Owens-Illinois

objection and insurer issues.  (*Id.* at 3-4.)  Caplin also argued that the vagueness and lumping

objections lacked merit based on the four examples offered by the UST, (*id.* at 5), the time

records comprising the "Case Administration" category "relate to the identification, tagging and

identification of documents and attorney review of such documents in connection with pre-

confirmation discovery, including document productions, fact depositions, and expert

depositions," (*id.* at 5 & Ex. A), the 10% reduction request was arbitrary, (*id.* at 6), and lastly the

"docket control and review" was not part of overhead, and had to be performed by a paralegal

rather than a clerical employee.  (*Id.* at 7-8.)

 The order granting the interim fee awards indicated that the Court disallowed $2,025.00

of the fees sought by Caplin on an interim basis without prejudice and denied $2,116.00 in fees

sought by Schulte on an interim basis with prejudice and an additional $9,375.00 without

prejudice.  (*Omnibus Order Approving Interim Fee Applications of Professionals*, dated July 20,

2009, Schedule A(1), at nn.1-2 (ECF Doc. # 1869).)  The record does not reflect whether these

dispositions resolved the *UST Interim Fee Objection*, or whether Caplin or Schulte are seeking

the fees disallowed without prejudice in their final application.[14]  Neither the *UST Objection* nor

Schulte's reply papers mentioned the *UST Interim Fee Objection*, but Caplin stated that the

objections to its interim request have not been decided.  (*Caplin Reply* at 22.)  I infer from this

statement that Caplin now seeks the fees denied without prejudice, those fees are the only

unresolved objections raised in the *UST Interim Fee Application*, and turn to this objection

before considering the fees incurred by Caplin in defending the *Thirteenth Interim Fee

Application.*

### A.    Vagueness/Excessive Time

The UST's "excessive time" objection was based on the erroneous premise that the

Committee "has not been particularly active in the litigation during the Fee Period."  (*UST

Interim Fee Objection* at 9.)  Caplin explained that it was actively involved in certain litigations,

and the time records reflect that the Committee was heavily involved in discovery and discovery-

related matters during the fee period.  (*See Caplin Thirteenth Interim Fee Application*, Ex. A at

pp. 9-29 of 50 (ECF Doc. # 1837-1).)  Thus, this aspect of the objection is overruled.

As to the general vagueness/lumping objection, the UST argued that "a number of the

time entries of C&D professionals were vague and/or 'lumped' together, such that the

reasonableness of the time spent and fees charged for the tasks is difficult to determine."  (*UST

---

[14]    The transcript of the fee application hearing appears to be one of the few that was never docketed on ECF.

*Interim Fee Objection* at 9.)  However, she offered only four examples to support this sweeping statement:

| Date | Timekeeper | Category | Hours | Entry |
|------|-----------|----------|-------|-------|
| 2/17/09 | TEP | Litigation | 7.5 | legal research re: substantive legal issue |
| 2/19/09 | JPW | Litigation | 1.7 | research insurance issues |
| 4/1/09 | KCM | Litigation | 0.4 | review/analyze correspondence |
| 4/13/09 | RCT | Litigation | 2.2 | TC KCM re discovery and privilege documents (0.2); review privilege documents (2.0) |

(*UST Interim Fee Objection* at ¶ 20.)

The first two entries described a total of 9.2 hours of legal research.  When compensation for legal research is sought, the time records should identify the issues researched with enough specificity to assess their relevancy and necessity to the case.[15]  *In re D'Amico*, No. 05–19217, 2009 WL 2982987, at *3 (Bankr. N.D.N.Y. Sept. 14, 2009); *Fibermark*, 349 B.R. at 397.  The concern increases with the amount of time billed, and an applicant does not sustain its burden with vague descriptions of legal research involving large blocks of time.  These entries describe the legal research in terms so vague that it is impossible to figure out what the lawyers did, whether it took them a reasonable amount of time to do it, or whether the research was even relevant to the case.

Both timekeepers submitted declarations in an effort to cure the deficiency.  The first timekeeper stated that his "research related to the OI objection and potential response."  (*Caplin Interim Application Response*, Ex. D (*Declaration of Todd E. Phillips*), dated July 10, 2009, at ¶

---

[15]     As noted, if the disclosure of work product or other privileged matter is cause for concern, the applicant can seek permission to file a redacted application.

2 (ECF Doc. # 1862-4).)  The second timekeeper explained that his "research involved legal and factual matters arising in connection with insurer objections to the Plan."  (*Id.*, Ex. C (*Declaration of James P. Wehner*), dated July 10, 2009, at ¶ 2 (ECF Doc. # 1862-3).)  These supplemental responses explained what prompted the research but did not adequately identify the issues researched or why it took the amount of time billed to do it.

Moreover, the two examples were not isolated instances of inadequately described legal research projects in the "Litigation" category.  The following table charts several other problem entries:

| Date | Timekeeper | Hours | Entry |
|------|-----------|-------|-------|
| 2/13/09 | TEP | 2.6 | legal research re substantive legal issue |
| 2/18/09 | TEP | 0.5 | Legal research re substantive legal issue |
| 2/23/09 | TEP | 3.0 | Legal research re substantive legal issue |
| 2/25/09 | TEP | 1.5 | Legal research re substantive legal issue |
| 3/9/09 | JPW | 2.2 | Insurance issue research |
| 3/11/09 | JPW | 2.7 | Research insurance issues |

The time-value of the legal research identified in the two tables totals $7,344.00.  The Court disallows 50%, rounded to $3,700.00.

The third entry of the four cited by the UST did not identify the correspondence that was reviewed.  It too was vague.  However, the timekeeper submitted a declaration that clarified the entry, stating that he reviewed correspondence, including internal emails relating to TDP issues as well as the proposed Rabinovitz deposition.  (*Id.*, Ex. B (*Declaration of Kevin C. Maclay*), dated July 10, 2009, at ¶ 2 (ECF Doc. # 1862-2).)  Given the amplification and the amount of time devoted to the task, no reduction is warranted.

The fourth entry was *not* vague, but the timekeeper nevertheless supplied a declaration amplifying it.  (*Id.*, Ex. A (*Declaration of Rita C. Tobin*), dated July 10, 2009, at ¶¶ 5-6 (ECF Doc. # 1862-1).)  No reduction is warranted.

Although the UST identified a handful of vague entries, she did not support her request that the Court should reduce the entire interim fee application by 10%, or $42,384.00.  The UST presumably reviewed most or all of the time records in order to make the statement that "a number of the time entries of C&D professionals were vague and/or 'lumped' together, such that the reasonableness of the time spent and fees charged for the tasks is difficult to determine." (*UST Interim Fee Objection* at 9.)  She generally supports such objections by attaching and annotating the time records with handwritten notations to indicate the problem time entries. (*See, e.g.*, *UST Supplemental Objection*, Ex. A & B.)  She did not follow this practice in the *UST Interim Fee Objection.*  The Court has an independent duty to review the fee application, but it does not have the duty to search for evidence to support the UST's general objection. *Blackwood Assocs., L.P.*, 165 B.R. at 112.  Caplin's time records allow the Court to determine the reasonableness and necessity of the services rendered, and no further reduction is warranted.

### B.    "Case Administration"

The second prong of the UST's objection to Caplin's *Thirteenth Interim Fee Application* centered on the $44,022.00 billed to "Case Administration."  Caplin explained that the document review work related to the review of documents in connection with pre-confirmation discovery. (*Caplin Interim Application Response* at 5.)  This explanation supplied the detail needed to ascertain the reasonableness of the services and to allow the Court to conclude that they were reasonable and necessary.  Consequently, the UST's objection is overruled.

### C.    Billing for Overhead

The final prong of the objection related to the $15,580.00 billed in the "Docket Review and Control" category. The UST apparently argued for a *per se* rule that the review of the docket for updates should not be billed to the estate. I disagree. According to Caplin, no member of its clerical or administrative staff had the expertise and training to perform the necessary work using electronic dockets. (*See id.* at 8.) Moreover, as stated earlier, there is a presumption that retained professionals staff their matters in an appropriate manner, and the UST has not offered any concrete argument that justifies rebutting the presumption. Accordingly, this part of the UST's objection is also overruled.

### ii.    The Final Fee Application

The UST objects to the fees incurred by Caplin defending the *Thirteenth Interim Fee Application*. Caplin billed $18,626.00 to the effort, (*see Fourteenth Interim Application of Caplin & Drysdale Chartered, Counsel to Unsecured Creditors Committee, for Interim Compensation and Reimbursement of Expenses*, dated Oct. 6, 2009, Ex. A, pp. 4-5 of 33 (ECF Doc. # 1946-1), but the UST only seeks a reduction in the amount of $4,000.00. (*UST Objection* at 24.)

There is no *per se* rule allowing or denying fees incurred defending a fee application in the face of an objection. The Bankruptcy Code does not speak to the issue. On the one hand, it is argued that fee applicants, like other litigants, should bear their own legal expenses under the "American Rule," *CCT Commc'ns, Inc.*, 2010 WL 3386947, at * 9; *In re St. Rita's Assocs. Private Placement, L.P.*, 260 B.R. 650, 652 (Bankr. W.D.N.Y. 2001), the defense of a fee application is neither reasonable nor necessary to the administration of the estate, *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 883 (11th Cir. 1990), and allowing the

36

losing applicant to recover its legal fees would encourage meritless fee requests because the applicant could earn more fees opposing objections to its frivolous request. *See In re Riverside-Linden Inv. Co.*, 945 F.2d 320, 323 (9th Cir. 1991).  On the other hand, the failure to award fees would dilute the fee award and encourage frivolous objections. *E.g.*, *Smith v. Edwards & Hale, Ltd.* (*In re Smith*), 317 F.3d 918, 929 (9th Cir.2002), *cert. denied* 538 U.S. 1032 (2003); *Hennigan Bennett & Dorman LLP v. Goldin Assocs. L.L.C.* (*In re Worldwide Direct Inc.*), 334 B.R. 108, 111 (D. Del. 2005); *In re Ahead Commc'ns Sys., Inc.*, No. 02–30574, 2006 WL 2711752, at *5 (Bankr. D. Conn. Sept. 21, 2006).  Some have staked out a middle ground, declining to award fees when the objection was filed in good faith and the objecting party prevailed. *Brous*, 370 B.R. at 572; *In re Teraforce Tech. Corp.*, 347 B.R. 838, 867 (Bankr. N.D. Tex. 2006).

Here, the UST filed her objections to the *Thirteenth Interim Fee Application* in good faith but did not prevail for the most part.  The UST sought to reduce the overall fee award by 10%, and the entire $15,580.00 incurred under the category "Docket Review and Control."  This would have penalized Caplin twice for the latter category of time, and the UST's objection should be read to have sought a total reduction of $56,406.55 ($15,580.00 plus 10% of the balance of the fees).  The Court disallowed only $3,700.00, or 6.56% of the total disallowance sought by the UST.

Nevertheless, a portion of Caplin's defense was devoted to clarifying vague entries in the "Litigation" category, and providing context to the entries relating to the review and organization of documents in the "Case Administration" category.  Some of Caplin's efforts were unsuccessful and resulted in a disallowance of $3,700.00 in fees.  Some of the efforts were successful but necessary to sustain the request for allowance.  Just as a fee applicant is not

37

entitled to compensation *ex ante* for editing vague entries when preparing a fee application, it should not be entitled to compensation *ex post* for supplying the necessary clarification after a party in interest objects.

The Court has reviewed the time records attributable to the defense of the *Thirteenth Interim Fee Application* and cannot discern the value of the services devoted to *ex post* corrections or clarifications of vague or deficient time records.  The Court sustained the *UST's Interim Fee Objection* to only 6.56% of its total fee objection, and the corresponding percentage of defense fees equals $1,221.78 (6.56% of $18,626.00).  The Court will round this up to $2,000.00 to account for Caplin's clarification of ambiguous entries that the Court relied on in overruling the UST's objection (*e.g.*, to "Case Administration" services), and reduce the request by that amount.

The foregoing constitutes the Court's findings of fact and conclusions of law.  The attorney for Quigley is directed to submit a final fee order consistent with this opinion that conforms to the Court's form *Order Granting Application(s) for Allowance of Interim/Final Compensation and Reimbursement of Expenses*, attached through a hyperlink to Bankr. S.D.N.Y.R. 2016-1(b).

Dated: New York, New York
         October 24, 2013


                               */s/ Stuart M. Bernstein*
                               STUART M. BERNSTEIN
                               United States Bankruptcy Judge

38